UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Civil Action No.

| | |
|---|---|
| RONALD JOHNSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| TOWN OF SMITHFIELD, MICHAEL SCOTT, in his individual and official capacity as TOWN MANAGER, TIMOTHY KERIGAN, in his individual and official capacity as TOWN HUMAN RESOURCES DIRECTOR, TERRY WEST, in his individual and official capacity as TOWN POLICE DEPT. LT., KEITH POWELL, in his individual and official capacity as TOWN POLICE CHIEF, MARLON LEE, in his individual and official capacity as TOWN COUNCIL MEMBER, THE JOHNSTON COUNTY SCHOOL BOARD OF EDUCATION, TODD SUTTON, in his individual and official capacity as MEMBER and FORMER CHAIR, TERRI SESSOMS, in her individual and official capacity as MEMBER, TERRY TIPPETT, in his individual and official capacity as MEMBER, MICHAEL WOOTEN, in his individual and official capacity as MEMBER, LYN ANDREWS, in her individual and official capacity as MEMBER and CURRNT CHAIR, KAY CARROLL, in his individual and official capacity as MEMBER, KEVIN DONOVAN, in his individual and official capacity as MEMBER, SUSAN DOYLE, DISTRICT ATTORNEY of JOHNSTON COUNTY, in her individual and official capacity, RICHARD HOFFMAN, in his individual and official capacity, BENJAMIN O. ZELLINGER, in his individual and official capacity as Special Prosecutor, ANGIE MCLEOD, JIMMY LAWRENCE, DAVID MARSHBURN, and the ESTATE OF JOSEPH PRESTON, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Defendants.                    )
                               )
                               )
                               )
                               )
                               )

**COMPLAINT**

***JURY TRIAL DEMANDED***

Ronald Johnson, ("Plaintiff"), by and through his undersigned attorneys, hereby alleges and states as follows:

**PRELIMINARY STATEMENT**

1.    Plaintiff brings this action against the Town of Smithfield ("Town" or "Defendant Town") for violations of Title VII of the Civil Rights Act of 1964 (Title VII) (42 U.S.C. § 2000e).

2.    Plaintiff also brings this action against Defendant Town for violations of the Americans with Disabilities Act (ADA) of 1990, as amended, (42 U.S.C. 12101 et seq.) and the North Carolina Persons with Disabilities Protection Act (N.C. Gen. Stat. § 168A-1 et seq.).

3.    Plaintiff also brings this action against Defendant Town, MICHAEL SCOTT, in his individual capacity, TIMOTHY KERIGAN, in his individual capacity, TERRY WEST, in his individual capacity, KEITH POWELL, in his individual capacity, MARLON LEE, in his individual capacity, for violations of the Family and Medical Leave Act (FMLA) (29 U.S.C. § 2601, et seq.).

4. Plaintiff also brings this action under 42 U.S.C. § 1983 against the following persons who acted under color of State law and engaged in State action and violated Plaintiff's rights, privileges, and immunities guaranteed by the First, Fourth, Fifth, and Fourteenth Amendments of the Constitution of the United States, as well as by 42 U.S.C.A. §§ 1983, 1985, and 1988 and in violation of 18 U.S.C. § 2261(A)(2) and 18 U.S.C. § 875:

   A. The Town of Smithfield and MICHAEL SCOTT, in his individual capacity and in his official capacity as Town Manager, TIMOTHY KERIGAN, in his individual capacity, TERRY WEST, in his individual capacity and in his official capacity as Investigations Lieutenant, KEITH POWELL, in his individual capacity and in his official capacity as Chief of Police, MARLON LEE, in his individual capacity and in his official capacity as Town Council Member;

   B. The Johnston County School Board of Education ("School Board" or "BOE" or "Board") and School Board members, TODD SUTTON, in his individual and official capacity as a member and former chair, TERRI SESSOMS, in her individual and official capacity as a member, TERRY TIPPETT, in his individual and official capacity as a member, MICHAEL WOOTEN, in his individual and official capacity as a member, LYN ANDREWS, in her individual and official capacity as a member, KAY CARROLL as a member and, in his individual and official capacity, KEVIN DONOVAN, in his individual and official capacity;

C.  District Attorney SUSAN DOYLE, in her individual and official capacity, and her employee RICHARD HOFFMAN in his individual and official capacity; and

D.  BENJAMIN O. ZELLINGER, in his individual and official capacity; and

E.  DAVID MARSHBURN, JOSEPH PRESTON, JAMES LAWRENCE, and ANGIE MCLEOD, who conspired with the above State actors;

5.  Plaintiff also brings supplemental claims under the common law of North Carolina against Defendant Town for wrongful termination in violation of the public policy of the State of North Carolina.

6.  Defendant Town hired Plaintiff on June 13, 2005, as a Police Officer and he became a detective in 2012. During Plaintiff's tenure with the Town of Smithfield, he had excellent performance ratings.

7.  During his employment, and with the knowledge and permission of his supervisors and the Town, in 2016, Plaintiff ran for and was elected to a seat on the School Board.

8.  While serving as a School Board member, he learned that the School Board's attorney, Defendant James Lawrence, was engaged in sexual harassment of a School Board employee. Plaintiff actively opposed Lawrence's conduct but was unsuccessful in his efforts to convince School Board members to take action to stop the harassment.

9.  Eventually, after the intervention of others, Lawrence resigned his lucrative position but blamed Plaintiff for the loss of his position and determined to

retaliate against Plaintiff for the same.

10. In June of 2022, David Marshburn, a political candidate for Sheriff in Johnston County, and Joseph Preston began publishing information on social media, specifically on Facebook via a "live" posting, making accusations about and threats towards Plaintiff that he should resign his position with the Town and his position as School Board member. The posts also included allegations that Plaintiff had engaged in misconduct as a police detective, violated the law, and that he had engaged in misconduct as a member of the School Board.

11. Some of the information which was posted by Preston and Marshburn could only have come from members of the School Board or its employees or from the City and its employees.

12. After the social media posts in June 2022, the City began an investigation into allegations of misconduct which included initially the improper use of City resources for political purposes.

13. Johnson was told that the investigation was politically motivated and in retaliation for his having reported the sexual harassment of the School Board employee by the then School Board attorney. He was told that the investigation would result in his termination and that the School Board was also focused on his resigning from his seat on the School Board.

14. As a result of the social media attacks and the resulting investigation by his employer, Plaintiff developed anxiety and depression, and he eventually sought FMLA. The City then interfered with and retaliated against him for

taking FMLA, and when he complained about his denial of FMLA, and alleged that the investigation and his treatment, both before and during the investigation, was illegal discrimination against him motivated by his sex and his disability, and his opposition to the harassment of the School Board employee, he was also subjected to illegal retaliation.

15. During this same period of time and prior to his termination, the Defendant School Board issued three public censures against Plaintiff, who was told repeatedly that they were the consequence of his failure to resign his School Board member seat. The censures were adopted based on incomplete and biased investigations by the School Board attorneys and were adopted in violation of the School Board's own processes and procedures and thus were null and void.

16. Nonetheless, the School Board referred the improperly adopted censures to the Johnston County district attorney for prosecution under a 1901 statute, N.C. Gen. Stat. § 14-230, which criminalized as a Class 1 misdemeanor certain actions called "misbehavior in office" in the statute. These actions were described as a public official's willful and corrupt omission, neglect, refusal to discharge his duties or the willful and corrupt violation of the oath of his office. If found guilty, a Court is entitled to remove the official from office as part of the punishment.

17. Ultimately, after changing the focus of the investigation several times and after conspiring with the School Board and its attorneys, Marshburn,

Lawrence, McLeod, and Preston, all of whom sought his termination from the City and his resignation from the School Board, and after sharing confidential personnel information and personal health information about Plaintiff with the School Board and the individual defendants, the City terminated him.

18. Since his termination, Plaintiff has been subjected to unconstitutional searches and seizures of his person and property by the District Attorney, who is pursuing the charges of "misbehavior in office" as requested by the School Board. Both the District Attorney and the School Board and its individual members have continued to pursue criminal charges against Plaintiff despite being informed that the censures were improperly adopted and thus null and void.

19. As a result of the actions of the Defendants, which violated multiple rights protected by the United States and North Carolina Constitutions, Plaintiff has suffered significant pecuniary and non-pecuniary damages and irreparable harm to his reputation and livelihood.

## JURISDICTION

20. This Court has jurisdiction over Plaintiff's Title VII action pursuant to 28 U.S.C. § 1331, because this is a civil action arising under Title VII.

21. This Court has jurisdiction over Plaintiff's FMLA claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2617, because this is a civil action arising under the FMLA.

22. This Court has jurisdiction over Plaintiff's constitutional claims pursuant to

28 U.S.C.A. §§ 1331 and 1343.

23.     This Court also has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

## VENUE

24.     Venue is proper in this district for Plaintiff's Title VII claims under 42 U.S.C. § 2000e-5(f)(3), because the unlawful employment practices were committed in Johnston County, North Carolina, 42 U.S.C. § 2000e-5(f)(3), because the relevant employment records are maintained in this district, 42 U.S.C. § 2000e-5(f)(3), because the Plaintiff would have worked in this district but for the alleged unlawful employment practice, 42 U.S.C. § 2000e-5(f)(3), because Defendant Town of Smithfield and its employees have their principal office in this district, and there is no other district that has substantial connection to the claim.

25.     Venue is proper in this district for Plaintiff's FMLA claims under 28 U.S.C. § 1391(b)(1), because Defendant Town of Smithfield and its employees, reside in this district and the individual defendant employees of the Town of Smithfield reside in the counties located in the Eastern District of North Carolina, 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district, 28 U.S.C. § 1391(b)(2), because Defendant Town of Smithfield and its employees are subject to personal jurisdiction in this district with respect to this action, and there is no other district in which the action may otherwise be brought.

26.    Venue is proper in this district for Plaintiff's claims under 42 U.S.C. §§ 1983, 1985, and 1988 because Defendant Town of Smithfield and its employees, and the School Board and its members reside in this district and all individual defendants reside in the counties located in the Eastern District of North Carolina, 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district, 28 U.S.C. § 1391(b)(2), because Defendant Town and its employees, and the School Board and its members, are subject to personal jurisdiction in this district with respect to this action, and there is no other district in which the action may otherwise be brought.

## CONDITIONS PRECEDENT

27.    On February 8, 2023, Plaintiff timely filed a charge of sex and disability discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC).

28.    On or about March 28, 2023, the EEOC issued Plaintiff a Notice of Right to Sue. This Complaint has been filed within 90 days of receipt of that notice. Plaintiff has fully complied with all prerequisites to jurisdiction in this Court under Title VII and the ADA.

## PARTIES

29.    Plaintiff resides in and is a citizen of Johnston County, North Carolina.

30.    Plaintiff is an employee, as defined by Title VII, and worked for Defendant Town in Smithfield, North Carolina, from approximately June 2005 to October

2022, when he was terminated from his position with the City.

31. Plaintiff is an employee, as defined by the ADA, and worked for Defendant Town in Smithfield, North Carolina, from approximately June 2005 to October 2022, when he was terminated from his position with the City.

32. Plaintiff is a duly elected School Board member of the Johnston County School Board of Education and has been since November 2016.

### Town of Smithfield and Policymakers

33. Defendant Town is an employer within the meaning of the ADA and Title VII, and for purposes of the ADA, is engaged in an industry affecting commerce, and has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

34. Defendant Terry West was at all times relevant to this complaint a duly appointed police officer of the Town of Smithfield and a State actor. He is sued in his individual and official capacity and the actions of Defendant West alleged in this Complaint were taken under color of the laws of the State of North Carolina.

35. Defendant Keith Powell was at all times relevant to this complaint a duly appointed police officer of the Town of Smithfield and a State actor. He is sued in his individual and official capacity and the actions of Defendant Powell alleged in this Complaint were taken under color of the laws of the State of North Carolina.

36. Defendant Michael Scott was at all times relevant to this complaint the duly

appointed manager of the Town of Smithfield and a State actor. He is sued in his individual and official capacity and the actions of Defendant Scott alleged in this Complaint were taken under color of the laws of the State of North Carolina.

37. Defendant Timothy Kerigan was at all times relevant to this complaint the duly appointed human resources director of the Town of Smithfield. He is sued in his individual and official capacity and the actions of Defendant Kerigan alleged in this Complaint were taken under color of the laws of the State of North Carolina.

38. Defendant Marlon Lee was at all times relevant to this complaint a duly elected member of the Town of Smithfield Town Council. He is sued in his individual and official capacity and the actions of Defendant Lee alleged in this Complaint were taken under color of the laws of the State of North Carolina.

39. Defendant Lee was a policy maker for the Town of Smithfield and exercised the power to generally manage the Town under N.C. Gen. Stat. § 160A-67. He supervised Defendant Scott, the Town Manager, pursuant to N.C. Gen. Stat. § 160A-148(a).

40. Defendant Scott as the Town Manager exercised the powers and duties contained in N.C. Gen. Stat. § 160A-148(a), including the power to (1) "appoint and suspend or remove all city officers and employees . . . in accordance with such general personnel rules, regulations, policies, or ordinances as the council may adopt" and (2) "direct and supervise the administration of all

departments, offices, and agencies of the city, subject to the general direction and control of the council, except as otherwise provided by law," which included the police department.

41. The duly adopted ordinances of the Town provide in Section 16-1 that the "chief of police shall be the head of the police department and he and such employees as the town council may deem necessary shall constitute the police department." Under Section 16-38, "[t]he chief of police, subject to the town manager, shall have charge of the police department and shall be responsible to the town manager in seeing that the police officers faithfully perform their duties."

42. The Town Manager and Chief of Police, along with Defendant West who acted at Defendant Powell's direction and with his knowledge and consent, were policy makers for the Town of Smithfield because they acted jointly and with final policy making authority to engage in the personnel practices applied to Plaintiff with respect to his investigation and termination and the Town ratified their actions and is thus responsible for them.

**BOE and Policymakers**

43. Defendant School Board is body corporate created by State statute, is capable of prosecuting and defending suits for or against the corporation, has "general control and supervision of all matters pertaining to the public schools in [its] respective local school administrative unit" and is charged with the responsibility of "execut[ing] the school laws in" its unit, pursuant to N.C. Gen.

Stat. § 115C-40 and is subject to suit in any court of competent jurisdiction in North Carolina.

44. Upon information and belief, the BOE waived "its governmental immunity from liability for damage by reason of death or injury to person or property caused by the negligence or tort of any agent or employee of such board of education when acting within the scope of his authority or within the course of his employment" pursuant to N.C. Gen. Stat. § 115C-42.

45. Defendant Sutton was elected to the BOE pursuant to N.C. Gen. Stat. § 115C-37 and was elected as chair of the BOE pursuant to N.C. Gen. Stat. § 115C-41, and served in that position during the events alleged in this Complaint until November 2022, at which time he was replaced as Chair by Lyn Andrews. He is subject to suit pursuant to N.C. Gen. Stat. § 115C-43 and is being sued in his individual and official capacity. In his position, he was a State actor, acting under the color of State law, and his actions in his individual and official capacity were State actions.

46. Defendant Andrews was elected to the BOE pursuant to N.C. Gen. Stat. § 115C-37 and was elected as chair of the BOE pursuant to N.C. Gen. Stat. § 115C-41 after the November 2022 election and currently serves in that position. She is subject to suit pursuant to N.C. Gen. Stat. § 115C-43 and is being sued in her individual and official capacity. In her position, she was a State actor, acting under the color of State law, and her actions in her individual and official capacity were State actions.

47. Defendant Sessoms was elected to the BOE pursuant to N.C. Gen. Stat. § 115C-37 and was elected as vice-chair of the BOE pursuant to N.C. Gen. Stat. § 115C-41 and served in that position during the events alleged in this Complaint until November 2022, at which time she was replaced as vice-chair by Terry Tippett. She is subject to suit pursuant to N.C. Gen. Stat. § 115C-43 and is being sued in her individual and official capacity. In her position, she was a State actor, acting under the color of State law, and her actions in her individual and official capacity were State actions.

48. Defendant Tippett was elected to the BOE pursuant to N.C. Gen. Stat. § 115C-37 and was elected as vice-chair of the BOE pursuant to N.C. Gen. Stat. § 115C-41 after the election in November 2022 and currently serves in that position. He is subject to suit pursuant to N.C. Gen. Stat. § 115C-43 and is being sued in his individual and official capacity. In his position, he was a State actor, acting under the color of State law, and his actions in his individual and official capacity were State actions.

49. Defendant Wooten was elected to the BOE pursuant to N.C. Gen. Stat. § 115C-37 and currently serves in that position. He is subject to suit pursuant to N.C. Gen. Stat. § 115C-43 and is being sued in his individual and official capacity. In his position, he was a State actor, acting under the color of State law, and his actions in his individual and official capacity were State actions.

50. Defendant Carroll was elected to the BOE pursuant to N.C. Gen. Stat. § 115C-37 and currently serves in that position. He is subject to suit pursuant to N.C.

Gen. Stat. § 115C-43 and is being sued in his individual and official capacity. In his position, he was a State actor, acting under the color of State law, and his actions in his individual and official capacity were State actions.

51.   Defendant Donovan was elected to the BOE pursuant to N.C. Gen. Stat. § 115C-37 and currently serves in that position. He is subject to suit pursuant to N.C. Gen. Stat. § 115C-43 and is being sued in his individual and official capacity. In his position, he was a State actor, acting under the color of State law, and his actions in his individual and official capacity were State actions.

52.   Defendants Sutton, Andrews, Sessoms, Tippett, Wooten, Carroll, and Donovan were all individuals who acted with final policy making authority for the Defendant BOE and acted with the powers and duties conferred by the General Assembly in N.C. Gen. Stat. § 115C-36 and 115C-47, including the power to elect a superintendent and prescribe the superintendent's duties, § 115C-47(13) and (15), and to make rules concerning the conduct and duties of personnel, § 115C-47(18).

53.   The BOE's policies provides that "[m]embers of the Board have authority only when acting as a board "legally in session." Policy 2100.

54.   BOE policy provides that "[a]ll applicants selected for employment must be recommended by the superintendent and approved by the Board." Policy 7100 All employees are protected from "any form of reprisal, retaliation, or discrimination" for making a report of wrongdoing. Policy 1760/7280.

55.   The BOE's policies prohibit "all forms of unlawful discrimination,"

Policy1710/4030/7230, and the Board is required to act "consistent[ly] with Federal and State Law," Policy 1010, and perform "judicial functions by conducting hearings as appropriate or as required by law regarding decisions of school system personnel or the Board," Policy Code 1010. All meetings of the BOE "will be conducted in accordance with the current edition of Robert's Rules of Order, Newly Revised, including the manual's procedure for small boards."

56. All BOE members are required to "obey all applicable state and federal laws regarding official actions taken as a board member and "conduct the affairs of the Board in an open and public manner, complying with all applicable laws governing open meetings and public records." Policy 2120. Moreover, Policy 1760/7280 provides that "[b]oard members and employees are expected to be honest and ethical in the performance of their duties and to comply with applicable federal, state, and local laws, policies, and regulations."

57. By ratifying the actions of the individual members of the BOE who had policy making authority with regard to Plaintiff and his service on the board, the BOE ratified the actions of the individual members and is responsible for the consequences of the same.

### District Attorney

58. At all times relevant to this Complaint, Defendant Doyle has been the duly elected Johnston County District Attorney which is an office created by the N.C. Constitution, Art. IV, Sec. 18. She is being sued in her individual and

official capacity and is a State actor, acting under the color of State law, and her actions in her individual and official capacity were State actions.

59. At all times relevant to this Complaint, Defendant Hoffman was a Johnston County District Attorney Special Investigator working under the direction of and with the consent and knowledge of Defendant Doyle. He is being sued in his individual and official capacity and is a State actor, acting under the color of State law, and his actions in her individual and official capacity were State actions.

**Special Prosecutor for N.C. Department of Justice**

60. Benjamin O. Zellinger is a Special Prosecutor working for the State of North Carolina and the Attorney General of the State of North Carolina, and in his official capacity acts on behalf of the State of North Carolina. He is being sued in his individual capacity, acting under the color of State law, for damages for his actions toward Plaintiff, and he is being sued in his official capacity as a representative of the State of North Carolina for prospective injunctive relief.

61. Angie McLeod is a private citizen and upon information and belief resides in a county in the Eastern District of North Carolina.

62. James "Jimmy" Lawrence is a private citizen, a member of the N.C. State Bar, former school board attorney, and upon information and belief resides in a county in the Eastern District of North Carolina.

63. David Marshburn is a private citizen and upon information and belief resides in a county in the Eastern District of North Carolina.

64. Joseph Preston was a private citizen and upon information and belief resided in a county in the Eastern District of North Carolina and upon information and belief his estate is capable of being sued in this district.

## FACTS

65. Plaintiff began working for Defendant Town on June13, 2005, as a police officer in its police department. In 2012, he became a detective in the police department. During his employment he maintained a virtually unblemished history of exceptional performance.

66. In November 2016 with the approval of his employer Plaintiff exercised his first amendment rights to run for a seat on the BOE and was elected and took office in December 2016.

67. As required by statute, N.C. Gen. Stat. § 115C-47(58) and N.C. Gen. Stat. § 160A-86(b), the BOE adopted by resolution an ethics code for its members "to guide actions by the governing board members in the performance of the member's official duties as a member of that governing board" and pursuant to N.C. Gen. Stat. § 160A-86(b), the ethics code included provisions addressing *inter alia* the need for all Board members "to obey all applicable laws regarding official actions taken as a board member," "to uphold the integrity and independence of the board member's office," and "to conduct the affairs of the governing board in an open and public manner, including complying with all applicable laws governing open meetings and public records."

68. At the time Plaintiff joined the BOE, James "Jimmy" Lawrence was the School

Board's attorney.

69. In July 2019, Plaintiff learned that Lawrence was sexually harassing a School Board employee. Upon information and belief, Lawrence had previously harassed another employee. Plaintiff reported this to then Superintendent Ross Renfrow on July 31, 2019, who told Plaintiff that he would take care of it.

70. Plaintiff did not want to publicize the matter or risk retaliation against the victim employee, so at several Board meetings beginning in August 2019, he proposed that the School Board adopt protocols or policies governing the conduct of the Board's attorney. These were designed to stop the sexual harassment of the employee.

71. Plaintiff sent a document called "Board Attorney Protocols" via email to each member of the BOE and a text message. With the employee's agreement, Plaintiff told the Board members he would drop the issue if the Board Attorney adhered to the protocols. The employee knew that certain Board members had a close relationship with Jimmy Lawrence and did not want them to know who she was.

72. On August 23, 2019, Lawrence retaliated against Plaintiff by attempting to have him charged for bringing his service weapon onto School Board property when he attended a meeting. Lawrence was unsuccessful but the enmity between Plaintiff and Lawrence grew.

73. In August 2019, Superintendent Renfrow resigned his position and James "Jim" Causby became the interim superintendent.

74. In August 2019, the Board was also involved in controversy involving the then Clayton High School principal Bennett Jones. Jones had been reassigned after allegations were made, and then reinstated to his position by Causby.

75. Plaintiff also alleged that the school system bought $60,000 worth of products from a School Board member's employer's business after she promoted her business to the school system, which was a conflict of interest. Board Chair Sutton denied that a conflict of interest existed because after the School Board member was elected she no longer represented the company in its dealings with the school system.

76. At Plaintiff's first meeting with Causby on September 17, 2019, Plaintiff reported the ongoing sexual harassment of the employee by Lawrence. Plaintiff also reported the harassment to Assistant Superintendent Ben Williams on September 18, 2019.

77. In October, Causby informed the board members in closed session that the school system's finance officer had been directed by an unnamed person to lie to School Board members and county commissioners about the amount of money the school system needed to cover a budget shortfall.

78. Plaintiff believed that the public should know about these allegations, but after Plaintiff disclosed them, Causby denied having made the statement about the finance officer. Defendant Board Chair Sutton also held a press conference denying that the Board acted improperly.

79. On October 30, 2019, and November 15, 2019, additional incidents of

harassment occurred involving physical contact.

80. On November 18, 2019, Plaintiff met again with Superintendent Causby and expressed his concerns about what was going on and the Board's lack of action.

81. On January 2, 2020, the News & Observer[1] ran a story about the allegations of financial impropriety and the lack of action by the Board with regard to the allegations of sexual harassment as well as other issues. **Exhibit 1**. Sutton blamed the School Board's lack of action with regard to the allegations of sexual harassment on Plaintiff, stating that he had not provided any proof of the allegations. He did not explain why the School Board failed to undertake an independent investigation.

82. On January 7, 2020, Plaintiff was informed by the employee that Lawrence had asked her if Plaintiff had gone to the newspaper for political gain.

83. On January 8, Plaintiff, the employee, School Board member Terri Sessoms, and Superintendent Causby met and the employee made her complaint to the Superintendent in person. Causby refused to take the complaint and said he would call in a female investigator.

84. On January 9, 2020, an article ran in The Johnston County Report[2] about the allegations of sexual harassment and the School Board's failure to take any action.

85. On January 10, 2020, after months of inaction, Plaintiff accompanied the

---

[1] Johnston County school leaders deny corruption allegations | Raleigh News & Observer (newsobserver.com)
https://www.newsobserver.com/article238899683.html
[2] Johnston County Schools Sexual Harassment Victim Speaks Out | JoCo Report
https://jocoreport.com/johnston-county-schools-sexual-harassment-victim-speaks-out/

employee to the office of Susan Doyle, the Johnston County District Attorney, where the employee sought help in getting the harassment to end.

86. On January 10, Superintendent Causby resigned his position. Brian Ventrano, the Chief of Human Resources and Financial Services began acting as the Superintendent.

87. On January 27, 2020, Maura O'Keefe and Ken Soo interviewed Plaintiff in connection with an investigation into whether Lawrence harassed the employee. As part of that investigation, they questioned Plaintiff about text messages sent between Lawrence and Plaintiff on April 9, 2019, and on May 14, 2019. **Exhibit X.**

88. Apparently, neither O'Keefe or Soo considered the messages to be sexual harassment at the time, nor to Plaintiff's knowledge did they raise any issue about the messages to Board Chair Todd Sutton or any other members of the Board in 2020. The messages however were found by O'Keefe and Soo to be objectionable and suitable to justify censure by the BOE two years later in October 2022.

89. While unremarkable in 2020, in 2022, Soo described the texts as "disrespectful," "inconsistent with Board policy," "salacious," disrespectful, an "improper example for conduct in the workplace," lacking integrity, demonstrating "impropriety in the exercise of his office," and "an example of incivility."

90. Jimmy Lawrence resigned his position as School Board attorney on March 6,

2020.[3]

91. Plaintiff ran for re-election to the School Board in the fall of 2020 and won a second four-year term.

## "Affair" with Angie Mcleod Barbour

92. Unfortunately, Plaintiff made the poor choice in the fall of 2020 to become involved in a relationship with a woman who he met at various political events and School Board meetings, Angie Barbour McLeod. She befriended Plaintiff and requested to help Plaintiff with his campaign for re-election to the School Board.

93. In October 2020, she asked for political signs to put up for Plaintiff, asked to be in a re-election campaign video, met Plaintiff's wife, added Plaintiff as a "friend" on Snapchat, and began promoting Plaintiff's candidacy.

94. Plaintiff encountered McLeod at an election night event in November 2020. McLeod came up to Plaintiff and his wife and hugged them each and congratulated them. She stated she wanted Plaintiff to meet a group of people she recruited to campaign for him. Plaintiff told her he would be more than happy to meet them, and Plaintiff and his wife left the event soon after speaking with McLeod.

95. On November 14, 2020, McLeod asked Plaintiff if he would stop by a restaurant in Clayton, NC to thank the group of "teachers" who campaigned for Plaintiff.

---

[3] [Johnston County School Board Attorney Resigns | JoCo Report](https://jocoreport.com/johnston-county-school-board-attorney-resigns/)
https://jocoreport.com/johnston-county-school-board-attorney-
resigns/#:~:text=Johnston%20County%20school%20board%20attorney%20Jimmy%20Lawrence%20resigned,as%2
0the%20attorney%20for%20the%20Board%20of%20Education.

When Plaintiff arrived, he saw McLeod, sitting at a circular table with four other women. Plaintiff walked up to the table and sat with the group. McLeod introduced them as "Allyson", "Carly, and "Tiffany".

96.     During the conversation, Plaintiff learned that Allyson was Allyson Bond. He did not learn the last names of Carly and Tiffany. It turned out that none of the women had actually campaigned for him as McLeod had said.

97.     Plaintiff sat with the group for approximately 20 minutes, and McLeod bought Plaintiff an alcoholic drink, and was insistent that he drink it. Plaintiff did not consume the drink because he does not like to drink alcohol.

98.     Plaintiff told the group he was leaving, and they asked if Plaintiff would walk with them to a bar (Revival) which was approximately 0.2 miles from the restaurant. Plaintiff walked with them and continued talking to McLeod and Bond in the outside patio area.

99.     McLeod stated she wanted to be on the Board of Education and asked for Plaintiff's help. Bond interjected and stated "Angie, you don't even live in Johnston County." Angie responded that she was moving to Johnston County soon and apologized to Plaintiff for lying about her residency.

100.    Plaintiff told McLeod she could not work for the school system and be on the Board of Education at the same time, but Plaintiff told her he would help her run for County Commissioner.

101.    Plaintiff then left the bar and went to work out. Approximately an hour later, while Plaintiff was working out, Plaintiff received Snapchat messages from

McLeod, followed by a text message from McLeod saying she had broken her foot and was afraid because some guys at Revival had a gun. She asked Plaintiff to come pick up herself and Bond and give them a ride to Bond's house, which he agreed to do.

102.     When Plaintiff arrived at the bar, he did not see McLeod or Bond and so he left and started to drive home. He then received a message from McLeod asking where Plaintiff was. Plaintiff explained that he did not see them at the bar. McLeod then stated that she and Bond were at a different location, which Plaintiff's GPS showed was very close, approximately three minutes away. She again asked Plaintiff to give Bond and herself a ride.

103.     Plaintiff picked them up and Bond gave Plaintiff her address, where he dropped her off. Bond asked McLeod if she was coming with Bond to her house, but McLeod then asked Plaintiff to take her home, which Plaintiff agreed to do.

104.     While driving, Plaintiff asked McLeod about the guys with the gun at the bar, which she then stated "was nothing." While driving, McLeod suddenly began talking about how she "liked" Plaintiff and how she was "in trouble" because she has wanted Plaintiff "for a long time." Plaintiff attempted to stop the line of conversation by telling McLeod to "chill." McLeod kept trying to hold Plaintiff's hand while Plaintiff was driving. Plaintiff patted her on the hand and said, "calm down, we will talk about it later."

105.     As Plaintiff got on the interstate, McLeod took off her seatbelt and started

ripping off her shirt. She held up her cell phone and stated "Do you want to go Facebook Live Mister Board Member" while she was laughing. Plaintiff told her to stop. She began kissing Plaintiff's neck and grabbing his penis. Plaintiff pushed her off and told her to "chill." She fell back into her seat, brought her legs up from the floorboard, rotated in the passenger seat and kicked the steering wheel.

106.    McLeod kept advancing, trying to pull at the elastic of Plaintiff's gym shorts. She put her face in Plaintiff's crotch area, and started licking on top of Plaintiff's shorts as she was putting her hand in his pants, attempting to pull his penis out. She said, "You're going to let me suck your peter or I am going to bite it off." Plaintiff was afraid of crashing his car.

107.    Plaintiff allowed her to perform oral sex on him while Plaintiff drove on Interstate 40 for approximately 3 or 4 minutes. Plaintiff did not ejaculate. After passing the Benson exits on Interstate 40, and Plaintiff told her McLeod that he did not know where he was, and she said, "It's okay I know where we are." Plaintiff told her he needed her to stop and help him get to where he was taking her. She then stopped performing oral sex, and sat up in her seat.

108.    Plaintiff did not welcome the actions of McLeod.  He felt assaulted, when she performed oral sex on him, and believed he had been the victim of a First Degree Forcible Sexual Offense (NCGS 14-27.4).

109.    McLeod told Plaintiff she was going through a divorce, and she was going to move to Johnston County. Eventually, Plaintiff and McLeod arrived at a single

wide trailer where she told Plaintiff she lived.

110.  McLeod then asked Plaintiff to help her get into the house because her foot was hurting. Plaintiff helped her to the door, which was unlocked, because McLeod said no one ever came out to the rural area. McLeod told Plaintiff her daughters were at their dad's house.

111.  When Plaintiff got McLeod to the door, she tried to push him inside a bedroom, but because she was so intoxicated Plaintiff was able to pull away from her. At this time, "Carly" arrived at the residence. "Carly" ran to her car, and said she had to get home and drove away. Plaintiff got into his car and went home.

112.  McLeod contacted Plaintiff a couple of days later, telling him that she did not remember what happened that evening and asking him to tell her what happened.

113.  Plaintiff told her about the car ride and she apologized. At her request, Plaintiff met her for dinner, at which time, she cried and told Plaintiff she wanted to be with him, attempting to hold his hand and telling him that she loved him. Plaintiff told her that they could be friends and she left the restaurant crying and asking if they could be friends and hang out. Plaintiff told her he would be friends with her to work together in politics and to improve the school system, in which she was a teacher.

114.  In December, McLeod asked to meet with Plaintiff regarding a school related issue. She told Plaintiff she was on her way to Raleigh, NC for a therapy appointment and stated that she was "trying to work on herself." Plaintiff met

McLeod in the area of Wise Recycling (Clayton, NC).

115.   When Plaintiff met with McLeod, she again told Plaintiff she was going through a divorce, and she needed sex. She said, "I just need some d*&^" and "I am going through a divorce." McLeod said, "I want you and I get what I want." Plaintiff told her he could not.

116.   McLeod then threatened to tell Plaintiff's wife that she had performed oral sex on him if Plaintiff would not have sex with her. She also threatened to tell her husband. McLeod and Plaintiff argued about the matter for at least 10 minutes and McLeod told him that she only wanted him to have sex with her for a couple of months.

117.   Plaintiff did not want McLeod to tell his wife because he had not told his wife about the incident at the time and he was ashamed and embarrassed.

118.   On December 18, 2020, McLeod drove to Virginia Beach, Virginia where Plaintiff had told McLeod he would be was visiting friends and comic bookstores. Thereupon began a series of meetings between Plaintiff and McLeod, who initiated each encounter by threatening to tell Plaintiff's wife and McLeod's husband if Plaintiff did not have the sexual encounters with her, which occurred on approximately less than a dozen times between December 2020 and August 2021.

119.   Plaintiff believed he was the victim of Blackmail/Extortion (NCGS 14-118.4). In December 2020, Plaintiff contacted Defendant Tim Kerigan, Town of Smithfield Human Resources director, asking for information regarding the

Employee Assistance Program (EAP), because Plaintiff was dealing with stress and trauma from the November 14 assault, and the subsequent blackmail/extortion to have a sexual relationship.

120.    From December 2020 to August of 2021, McLeod initially wanted more sexual encounters, and then her demands progressed to wanting control of Plaintiff's political activity. McLeod also wanted to be the first to know School Board information before any other person.

121.    McLeod acted extremely different in person than on the phone. In person, she was very demanding and autocratic. On the phone, she acted as if we were friends and wanted a personal relationship. When Plaintiff spoke on the phone with McLeod, she was always in a crisis, seeking sympathy, or trying to find a reason to meet with Plaintiff in person. McLeod's motives were confusing as she appeared to be two different individuals depending on the setting or means of communication.

122.    In March 2021, Allyson Bond "friend requested" and contacted Plaintiff via Snapchat. She asked if Plaintiff was okay. Plaintiff responded Plaintiff was doing the best he could, because Plaintiff thought she was asking about his wellbeing because she might have known that Plaintiff's father was suffering from cancer.

123.    Bond then told Plaintiff she knew what McLeod was doing to him because McLeod had told her. Bond wanted Plaintiff to know that she knew what McLeod was doing to Plaintiff and she said she wanted to help Plaintiff get

McLeod to stop.

124. Bond stated she knew McLeod was threatening to tell Plaintiff's wife if Plaintiff did not have sex with McLeod, because McLeod had told her. Bond explained that McLeod was obsessed with Plaintiff.

125. Bond told Plaintiff that in January of 2021, McLeod had asked Bond to help her look for apartments and told her that she wanted to move to an apartment complex which was close to places Plaintiff was known to frequent.

126. Bond told Plaintiff that she had tried to persuade McLeod to stop, but McLeod had told Bond that she was determined to be with Plaintiff and have his children. Bond also told Plaintiff that McLeod had told Bond that if Plaintiff would not be with her that she would make sure Plaintiff lost everything.

127. In April 2021, Plaintiff told McLeod that he could not continue having sex with her due to his father's cancer diagnosis. McLeod initially accepted this and seemed to agree that she and Plaintiff could be friends without engaging in sexual encounters.

128. In May 2021, McLeod contacted Plaintiff and asked him to come to her home and help her move a television. Plaintiff did not respond to her request.

129. In June 2021, Bond contacted Plaintiff regarding a conversation she had with McLeod. Bond told Plaintiff that McLeod was angry that Plaintiff had stopped talking with McLeod. Bond also told Plaintiff that McLeod had told Bond that she, McLeod, was going to follow through with her threat of telling Plaintiff's wife and McLeod's husband about the sexual encounters.

130. Bond also told Plaintiff that McLeod said she was going to contact Defendant Lawrence and Defendant Sutton because they would know how to cause Plaintiff harm in his job and as a School Board member.

131. Bond told Plaintiff she would try to mediate the situation between Plaintiff and McLeod and attempt to persuade her to stop.

132. In mid-July 2021, Bond, McLeod, and Plaintiff met in a parking lot in Clayton, NC. Plaintiff had not seen McLeod in months, and he noticed her behavior was extremely erratic and aggressive. McLeod told Plaintiff and Bond she wanted a "contract" giving her the right to have sex with Plaintiff two times a week.

133. Plaintiff told McLeod that he would not do that and that they could just be friends. Plaintiff told McLeod that she was single and she needed to date people who were single. McLeod stated again that she did not want to date other people, that she just wanted a sexual relationship with Plaintiff and that she would tell her husband and Plaintiff's wife about their encounters.

134. McLeod questioned why Plaintiff did not want to have a sexual relationship with her. Bond attempted to persuade McLeod to stop her threats, but McLeod would not even look at Bond when she was talking. McLeod told Plaintiff she knew he had a lot of enemies and that he had more enemies than just Defendant Lawrence and that she could tell a "few people" about their sexual encounters and that Plaintiff would be "done." The meeting ended.

135. Later in July 2021, McLeod began messaging Plaintiff about school related issues and asking him about his father's condition, knowing that his father was

terminally ill.

136.   On August 27, 2021, Plaintiff's father died. Bond contacted Plaintiff and told him that McLeod had told her he was going to go to Plaintiff's father's funeral. Plaintiff asked Bond to please attempt to dissuade McLeod from doing so.

137. Between September 2021 and December 2021, McLeod did not attempt any sexual advances towards Plaintiff, and their encounters were limited to phone calls and occasionally she would come to the location where Plaintiff worked out and knock on the door until he came out and talked to her outside the gym.

138. In January 2022, McLeod began showing up at various political events where she knew Plaintiff was present. Plaintiff knew this because various people would tell him that McLeod would contact them and ask them if Plaintiff was present at the event, before she would come to the event.

139. McLeod apparently wanted to use her influence to affect who Plaintiff supported in various political races and so began trying to reengage in a sexual relationship with Plaintiff, who repeatedly told McLeod that he would not. McLeod began threatening, again, to tell Plaintiff's wife and McLeod's husband about their previous encounters.

140. After an incident when McLeod, who had obviously been drinking, called Plaintiff and another person and invited them both to her apartment, Plaintiff encouraged McLeod to stop drinking and making phone calls. McLeod then complained if Plaintiff would not have a relationship with her, he needed to find her someone to have a relationship with.

141.    Plaintiff attempted to connect her with Owen Phillips, who was then a friend and former coworker of Plaintiff's.  In March 2022, Plaintiff saw McLeod at a political gathering and she texted him about the availability of the person with whom Plaintiff was sitting.  Plaintiff told McLeod that person was not interested in meeting her, but that she should give Phillips a chance.

142.    After this March meeting, McLeod's behavior became more erratic and controlling. Plaintiff stopped communicating with McLeod or responding to her text messages.  Plaintiff did hear that McLeod was dating Phillips.

143.    On May 8, 2022, Plaintiff began receiving harassing text messages from an unknown number. Later, Plaintiff connected the text messages with McLeod's activities on social media. The message on May 8 stated: "Your life is going to get quite interesting next week. Now may be a good time to take advantage of some of those Marriott points you have managed to accumulate."

144.    On May 17, 2022, Plaintiff attended a Primary Election results party. McLeod arrived approximately an hour after Plaintiff arrived. During the party, McLeod made comments directed at Plaintiff while Plaintiff was talking to other people and intended to be heard by everyone in earshot.

145.    For example, when someone thanked Plaintiff for his work on the School Board, McLeod laughed loudly and made comments like "You got another thing coming," and "I got something for you," and "You won't be there long enough to be Chairman." Plaintiff ignored her comments and outbursts of laughter.

146.    When Plaintiff attempted to leave the party through a side door, McLeod

approached him and said, "Don't you think we need to have a conversation?" Plaintiff replied, "No ma'am, we do not." McLeod then alternately threatened him and asked him if he loved her for the duration of the conversation which occurred in front of numerous attendees at the party. Eventually Plaintiff left and McLeod followed him to his car.

147.    McLeod told Plaintiff she was going to have him "handled" because Plaintiff was "just a board member." She followed up that comment by saying "Paul Holcombe is a Judge." She stated, "I am going to get your little police department to handle you because you think you're somebody with your little superhero car and your little superhero muscles." She said, "Ryan [McLeod's estranged husband] is going to sue you, so you will never own anything. I told him everything." She said, "You better start being my friend again before your life gets rough."

148.    In mid-May 2022, Plaintiff notified his supervisor, Defendant Smithfield Police Lt. Terry West about the threatening text messages and his previous encounters with McLeod. Defendant West told Plaintiff that he would not tell Defendant Police Chief Powell, because of Powell's previous comments and actions towards Plaintiff which were well known throughout the police department.

149.    In addition, he and Plaintiff both knew that Powell had a reputation for disclosing confidential information and exaggerating events in a way that damaged a person's reputation. Defendant West had spoken to Plaintiff on

numerous occasions regarding the unethical acts of Powell regarding promotions.

150.    As a result of Plaintiff's disclosures about McLeod, Defendant West told Plaintiff that they should keep the matter between themselves, and not tell anyone else at the Smithfield Police Department.

151.    On May 23, 2022, Plaintiff was at Carolina Beach with his wife. McLeod sent Plaintiff a text message at 11:07 am, and asked "Do you want to talk?" Plaintiff did not respond.

152.    On this same day, Plaintiff alerted then Johnston Count Public Schools Superintendent Eric Bracy about McLeod's texts and her behavior toward him and told him that McCleod, a school employee, continued to text him and was calling his wife.

153.    At 8:26 pm the same day, McCleod sent a text to Plaintiff stating, "Your threesome's here with me tonight." Plaintiff did not respond.

154.    McLeod continued calling Plaintiff and his wife. Plaintiff's wife finally answered a call from McLeod, who told her that McLeod and Plaintiff had been sleeping together for two years. McLeod also told Plaintiff's wife that her husband (Ryan Barbour) was going to sue Plaintiff. At 9:50 pm, she sent Plaintiff a text message and stated, "I'm pretty sure [your wife] knows" with a several laughing emojis.

155.    On the same evening, a mutual friend of McLeod's and Plaintiff's contacted Plaintiff and relayed messages to Plaintiff, at McLeod's request.

156. On June 1, 2022, Plaintiff received a text message stating: "I must assume you think this is going away but it is not. The package is almost complete with documentation that shows who you really are and will be turned over to various media outlets. It is all up to you."

157. On June 2, 2022, Plaintiff received a text message stating: "So how do you think Lindsey and Ally are going to feel when they get pulled into this? Looks like you had fun at Roxbury's in Charlotte and to also have the place card from your reserved table is priceless."

158. On June 14, 2022, WRAL sent an information request about allegations that paperwork was being filed against Plaintiff by McLeod for stalking and sexual harassment. Plaintiff later learned that Defendant Marshburn and McLeod had fed this story to WRAL in order to prompt them to make an inquiry. The inquiry came in the form of an email from WRAL Newsperson Kara Lysie at 6:15 pm to the school system Public Information Officer (PIO). Lysie stated she received a tip that "Angie McLeod filed paperwork in Johnston County against Johnston County School Board member Ronald Johnson, accusing him of stalking and sexual harassment." Lysie requested more information on "JoCo teacher takes out protection order against School Board member." Plaintiff was in a School Board meeting when the text came in and the PIO sent an email about it.

159. Once Plaintiff received the email falsely alleging legal process had been filed against him, Plaintiff left the School Board meeting. He called Defendant West

to tell him, and West told him he should get a protective order before she got a protective order, because if she got an order against Plaintiff, they would have to take his weapon and put him on leave.

160. Plaintiff contacted the Johnston County chief magistrate and asked if any order had been issued against him that day. On Tuesday, June 14, 2022, at 6:49 pm, the magistrate texted Plaintiff and confirmed that no orders had been filed that day against Plaintiff or by McLeod.

161. Plaintiff also contacted Capt. Kelly Garner with the Johnston County Sheriff's department and told her that McLeod was calling Plaintiff, calling Plaintiff's wife, texting Plaintiff, and sitting outside of the building while Plaintiff was working out. Capt. Garner stated she would get the paperwork ready for Plaintiff the next day for a protective order.

162. As a police detective, Plaintiff had no responsibilities with regard to obtaining orders under Chapters 50B (Domestic Violence), Chapter 50C (Civil No-Contact Orders) or Chapter 50D (Permanent Civil No-Contact Order Against Sex Offender on Behalf of Crime Victim) of the North Carolina General Statutes.

163. At approximately 7:00 pm, Plaintiff contacted Dale Lands, a mutual friend of Mcleod and Plaintiff, and asked if he heard anything about the protective order. Lands stated he and McLeod were talking on the phone, and she was watching the Johnston County Board of Education Meeting. She noticed Plaintiff got up and left the meeting and stated to Lands that Plaintiff must

have received an email about McLeod.

164. At 8:14 pm, Plaintiff received a text message stating, "Well as you can see, the walls are closing in, it is up to you how far this goes. Also, you need to pick someone who is smarter and someone who can keep their mouth shut to find out information for you. Things will continue to deteriorate for you until you make some right decisions. The train is rolling, and you can't stop it."

165. After Plaintiff forwarded the text message to Defendants West and Powell, West replied: "Looks like you better get that order." Powell then replied: "As soon as possible."

166. On June 15, 20202, at 8:07 am, Plaintiff texted Capt. Garner and she responded at 9:00am that she had the paperwork ready for Plaintiff to pick up.

167. Plaintiff met Capt. Garner at the courthouse steps and he took the paperwork home to fill out. At 11:18am, Plaintiff received a text message from Capt. Garner telling him that "Judge Wells will be in Courtroom #5 this afternoon. That would be the best way to be discreet. Judge Lock is in a trial so that isn't an option. You have to get on the witness stand and testify to the affidavit."

168. At 11:51 am, Plaintiff received another text message from Capt. Garner: "They can get you in at 2:00 before they let the next case in if you want or we can still play it by ear…(I wouldn't keep the judge waiting too long though.)" Garner also told him to take the paperwork "to the Clerks Office around 1:30 or so."

169. At 1:00pm, Plaintiff went to the Sheriff's Office and spoke with Capt. Garner. Captain Garner told Plaintiff she would bring someone from the Clerk of

Court's Office to the Sheriff's Office to complete the paperwork.

170. Capt. Garner took Plaintiff to a court room where they waited for Judge Wells. Once Judge Wells arrived, Plaintiff went into the Judge's Chambers with her. Judge Wells came in, with a deputy clerk of court, and the form was completed. Plaintiff then waited for the order to be served on McLeod.

171. Plaintiff rushed to get the order at the direction of Chief Powell and Lt. West because he was afraid that McLeod would take out false charges against him or obtain a protective order against him.

172. At 6:32 pm, Plaintiff received a text message stating, "So you really think that creating false information to obtain an order will cause this to stop? Desperate people do desperate things. You are just causing the train to go full throttle. Game on. You just have no idea the harm you are creating for yourself." The phrase "Game on" sent in a harassing text message was used four hours later in McLeod's post of the identical phrase "Game on" in a social media platform.

173. Plaintiff forwarded the messages to Defendants West and Powell and West replied: "It doesn't look she's going to stop." Powell replied: "Makes no sense."

174. Plaintiff later learned that the protective order was served on McLeod at 7:00pm.

175. At 10:24 pm, McLeod posted on social media, "Well. Game    on    everybody!" with a basketball emoji. Plaintiff realized later that at the time of her post, Plaintiff was alone in the gym at Clayton Fitness playing basketball.

176. On June 17, Plaintiff met with his attorney who sent a copy of a proposed

Consent Order to McLeod via email and a proposal that Plaintiff would not pursue the Order if McLeod agreed to stop having contact with Plaintiff. McLeod refused to sign the Consent Order.

177. On June 23, a district court judge, not Judge Wells, called Plaintiff and told him to dismiss the protective order against McLeod. On July 24, Plaintiff's attorney took a dismissal of the Order against McLeod.

### David Marshburn and Joe Preston and FB Live

178. Apparently, Defendants McLeod and Lawrence had enlisted the assistance of Defendants Marshburn and Preston in their attempts to cause trouble for Plaintiff.

179. On Friday, June 24, 2022, at around 8pm, Defendants Marshburn and Preston began taping a Facebook Live event the purpose of which appeared to be to raise allegations that Plaintiff had engaged in misconduct while working as a police detective. **Exhibit 4** In the recording, Defendants Marshburn and Preston identified Plaintiff by name, called him the "golden boy" of the BOE, and stated that "back in 2019 when he had just gotten elected and, you know, he exposed a lot of people in Johnston County." Marshburn said "You know, some of them were my friends."

180. Marshburn and Preston then alleged that Johnson had used "government property" to "go out as a person and expose people." They accused Plaintiff of "using microphones, hidden cameras," and of "grandstanding and using government property . . . to do that." Marshburn also stated that "to get all

that information" that Plaintiff allegedly obtained, he "used Smithfield Police Department's equipment to get this done. Him and another officer within the Police Department." He alleged that Plaintiff did not use the equipment for a "legal investigation."

181. Marshburn then stated that he was "going to have that experience here in the next few weeks of trying to do that against Steve Bizzell" who was Johnston County Sheriff. In fact, in November 2022, Marshburn did run as a write-in candidate against Sherriff Bizzell who won his seventh term as Sheriff that election.

182. Marshburn is a private investigator and as discussed in the video he received publicity in 2018 for his efforts to locate a missing child. **Exhibit 5.**

183. In the video, Marshburn and Preston alluded to allegations that Plaintiff was "running around on his wife" and that it "was going to come out."

184. Marshburn stated that he had "got to plant the seed, the problem is she fixing to file papers on him. The very next day Ronald Johnson files paper against her because he was afraid she was going to file one against him."

185. Marshburn stated that he "made up" the allegation and "told Rick she is going to be taking papers out on him. It is an integrity thing. What good are you in law enforcement?"

186. Marshburn stated finally: "Don't go after my friends, damn it don't step on my toes. It will catch you in the ass every time. When you use government issued equipment to record people, you use people. You could get charged for pimping

and human trafficking. We are paying for the gas to go in there. The A/C to be used while it is getting hot in there, I am just saying."

187. After this video, the Town through Defendants Powell and West initiated an internal investigation against Plaintiff based on the video. Over the course of the next several weeks and months, including the June 24 video, Marshburn and Preston posted twenty-three videos often including confidential personnel information and confidential personal health information about Plaintiff that was clearly being leaked by the Town of Smithfield.

## Background between Plaintiff and Chief Powell
## prior to Investigation

188. Beginning in 2005, Plaintiff worked for Defendant Johnston County Chief of Police R.K. Powell, who Plaintiff saw periodically crossed the lines of ethical conduct. Upon information and belief, Plaintiff knew he had engaged in multiples examples of poor leadership and judgment.

189. On December 21, 2015, Powell sent text messages to Plaintiff while on duty regarding Mickey Lamm, a local reporter for jocoreport.com, whom he called a "snake" and making allegations that he was working for other candidates against Plaintiff when he was running for a position on the Johnston County BOE.

190. On February 22, 2016, Powell sent text messages to Plaintiff while on duty requesting political signs.

191. On April 17, 2019, Powell refused to follow up on allegations and evidence provided to him by Plaintiff regarding allegations of blackmail and prostitution

involving a County Commissioner accused of solicitation of prostitution.

192.    Powell has a longstanding relationship with Defendant Lawrence. Powell has referred clients to Lawrence.

193.    When the allegation arose in August 2019 and continued through early January 2020 regarding the sexual harassment by Lawrence of a School Board employee, Powell told Johnson to "let it go" referring to the matter. When Powell told Plaintiff to "let it go," Plaintiff became afraid for the employee who then became concerned for her own safety, which is what precipitated Plaintiff taking the employee to the District Attorney on January 8, 2020.

194.    In March of 2020, Powell encouraged Plaintiff to be responsive to requests by Defendant West, a subordinate of Powell, but a superior to Plaintiff, that Plaintiff use his position as a member of the Board of Education to influence the hiring of Defendant West's wife by the Johnston County BOE.

195.    In June of 2021, Powell encouraged Plaintiff to be responsive to requests by Defendant Kerigan, Smithfield Police Department Human Resources, a subordinate of Powell, that Plaintiff use his position as a member of the BOE to influence the hiring of Kerigan's wife by the Johnston Count BOE.

196.    In January of 2022, Powell lied to Plaintiff by telling him that Defendant Smithfield Councilman Marlon Lee had made allegations against Plaintiff accusing him of racist behavior and that Powell was going to investigate the matter, which Plaintiff was later told by both Lee and Defendant Town Manager Michael Scott was not true.

197. In June of 2022, Powell sanctioned the use of racial epithets by senior officers in the Police Department when referring to alleged criminals.

198. Powell made statements in front of other employees that Plaintiff was engaging in a sexual relationship with Craig Olive, the Register of Deeds.

199. Powell made statements in front of other employees that Plaintiff was in a three-way sexual relationship with "Jeff and Dean," two individuals who were known to be acquaintances of Craig Olive.

200. Powell made statements in front of other employees that Plaintiff was having or had had a sexual relationship with Jessica Zavala, a former employee, and that one of Zavala's children was fathered by Plaintiff.

201. Ms. Zavala overhead these comments and later asked Plaintiff about them.

202. Powell made statements in front of other employees that Plaintiff was having sexual relationship with Brandy Galindo/Phelps, by saying on a number of occasions "you are fucking Galindo's wife."

203. Powell made statements that Laura Stewart, the former wife of an employee Jeremy Stewart, was part of Plaintiff's "harem" after Laura Stewart, contacted Plaintiff about an alleged domestic assault and Plaintiff followed protocol by contacting Powell about the same.

204. Powell abdicated his own responsibility and sanctioned Defendant Kerigan's direct supervision of Police Department employees, including Plaintiff, on multiple occasions.

205. For example, when Plaintiff requested a pay raise, he was told that the chain

of command for his request was Powell, then Kerigan, and last Town Manager Scott.

206. Powell both knew of and sanctioned actions by other Town employees which attempted to capitalize for personal and professional gain Plaintiff's position as an elected School Board member.

207. For example, in April of 2021, Powell sanctioned Kerigan's reaching out to Plaintiff's to use his position as a member of the School Board to schedule meetings with the Johnston County Superintendent of Schools to conduct town business with the school system.

208. In addition, Kerigan contacted Plaintiff and asked that Lee be removed from his position as a volleyball coach at Clayton High School, which Plaintiff refused to act on, and Plaintiff later learned that a position had been created in order to remove Lee from his position as coach.

209. In October of 2021, Kerigan requested that Plaintiff use his position on the School Board to call the School Superintendent and ask the school system to expend funds to send school system employees to a leadership class for county government.

210. Plaintiff was also aware of multiple incidents of police misconduct involving officers working for the Town of Smithfield's Police Department with regard to which Powell took little or no action.

211. Powell took no action to investigate a supervisor with the Smithfield Police Department who was known to have been photographed naked with his

uniform in the background.

212.     Powell failed to take action to address allegations that a Town Detective, while on duty, drove his patrol car to a neighboring county to have sexual intercourse with a female, who reported it to the Smithfield Police Department. This happened on multiple occasions. The Detective denied the incident and was subjected to a polygraph examination. After failing the polygraph examination, he eventually admitted to the incident and was allowed to keep his job with the Police Department.

213.     Powell failed to take action with regard to an officer who was the subject of numerous disciplinary actions upon information and belief reflecting numerous instances of aggressive behavior towards the public. The officer was allowed to continue working after each of these incidents, including one assaultive incident where he took a woman out of handcuffs and allowed her to fight him. The officer was also caught with his patrol vehicle, out of jurisdiction, behind Selma Middle School with an unknown woman at approximately 4am, by a neighboring town Police Officer with the girl sitting on his lap in the car. The officer was not terminated for this incident, but was ultimately terminated after he was found to have staged a vehicle crash where he damaged his own patrol vehicle.

214.     Powell failed to take action with regard to an officer in July of 2015 who allegedly allowed his duty firearm to be passed around by various individuals at a nightclub within the Smithfield Town Limits.

215.     Powell failed to take action with regard to an officer in September 2007, who allegedly, while on duty, showed her colleagues pictures and video of herself performing oral sex. This same officer also took photos of suicide victims and disseminated them to others and indicated that she thought doing so was humorous. Luckily, the family of the deceased were never notified of the Officer's unauthorized taking and dissemination of pictures, making fun of their deceased loved one's suicide act.

216.     Powell failed to take action with regard to an officer who had been accused of sexual assault while off duty; instead of suspending the officer pending investigation, the officer was allowed to return to work and this resulted in the Town being sued later as a result.

217.     On one occasion, where a suspect was acting suspicious and potentially under the influence of narcotics, the Town police officer who arrived on the scene did not evaluate or make contact with the suspect. The suspect later had an altercation with officers, where he was tased, and eventually died. Then Police Chief (later Town Manager) Defendant Michael Scott tasked Plaintiff with the investigation of the incident, telling him that then Lt. Keith Powell "could not even do the simple things right."

218.     In February of 2010, Powell failed to take action with regard to an officer who admitted to sending text messages of a sexual nature to an 18-year-old female while on duty, and while he was working an off-duty assignment and in full police uniform.

219. Powell was known to discipline employees who caused him difficulty with his relationships with other politicians or officials. In 2019, a lieutenant received written permission in the form of a text message from Powell to speak with people regarding a potential raise and have the ability for officers to take home cars. The lieutenant arranged for several officers to attend a town council meeting to show support for more officer benefits. After he did so, and town council members complained, Powell issued the lieutenant disciplinary action for discussing the pay raise and going to Town Hall, even though Powell had given him permission to do so.

220. In addition, after Powell expressed support for his advocacy for raises for police officers to this officer, this same officer sent a department-wide email which encouraged officers to get involved and compiled an argument for a raise. Prior to sending the email, the officer requested that Plaintiff proofread the email, which he did. Powell later called in Plaintiff and questioned him about proofreading the email. Powell then required Plaintiff to write on a copy of the email, admitting that he had proofread the email for Lt. Obranovich, and deflecting any responsibility for encouraging the officer to advocate for raises.

221. Powell also condoned harassing conduct by his officers and engaged in it himself. In 2022, on two occasions, Plaintiff heard Powell discussing an officer's sexuality in front of other employees, making statements that the officer was bi-sexual and watched pornography involving two men engaged in sexual activity. Apparently, the officer had disclosed this information during

his background investigation and Powell inappropriately shared this information with other employees.

222. The remarks made by Powell to Plaintiff regarding Plaintiff's alleged sexual activity with a variety of individuals, which remarks have been witnessed by many, violated Town policy and were made to Plaintiff based on his sex.

223. In May 2022, Plaintiff reported McLeod's assault and subsequent harassment to Defendant West at the Police Department, and he and Powell refused to believe that Plaintiff was sexually assaulted because of his sex and their skepticism that a man could be sexually assaulted and threatened to have sex.

224. Defendant Town, Defendant Powell, Defendant West also failed to take any action to protect Plaintiff and violated his rights under Article 46 of the North Carolina General Statutes, Crime Victims' Rights Act, § 15A-830 et seq.

**Administrative Investigation (June 29, 2022)**

225. After the Facebook Live posted video on Friday, June 24, 2022, on June 27th, 2022, the Smithfield Police Department initiated an investigation based on the false allegations made in the webcast and published by Marshburn and Preston.

226. On June 29, 2022, Plaintiff was notified by Lt. West that "an administrative investigation" would be conducted to determine if Plaintiff violated department policy by using "department equipment to investigate people in furtherance of" Plaintiff's "political career."

227. Secondly, the notice stated that the investigation would also be conducted

to determine if Plaintiff "violated department policy" by using "department equipment . . . in the commission of an extra-marital affair."

228. The policy sections listed as the subject of the investigation included Smithfield General Orders Sections 201 (Standards of Conduct), 202 (Neglect of Duty), 204 (Political Activities), and Town of Smithfield Personnel Regulations Section 42 (Use of Town Supplies and Equipment).

229. Lt. West told Plaintiff that he believed the internal affairs investigation was due to Plaintiff's involvement in the allegations against Defendant former School Board attorney Lawrence, by pointing in the direction of Lawrence's law office when he made these remarks to Plaintiff. Lawrence's office is located directly across the street from the Smithfield Police Department.

230. On June 30, 2022, Defendants Marshburn and Preston posted another webcast in which they made statements such as:

> During this whole ordeal, what transpired, I told y'all this last time that I wound up putting a bug in the ear and it got to him. Ronald Johnson went and filed papers on this woman. Said she is harassing me and stalking me, took out papers, a 50C and it should have been 50B. He is not going to admit he has had sexual relationship with her and used government property for illegal use so forth so on to get these bad guys right. Does a 50C and the whole time in the back of his mind, I need to find out how to shut her up so I don't lose everything I got that I have worked hard for to manipulate and blackmail a lot of people so I can be in this county and become the sheriff, basically be doing what Mr. Bizzell is doing over there, a lot of shady shit. I do not see that happening ever, I think the career is over with, I think things are going to be different.
>
> What Ronald Johnson did, when he got into the school board,

did all these recordings, paid people, paid people to do that, used government property to get that done, was not a formal investigation through the Smithfield Police Department. So that's got to be thrown out the window, that's not a formal investigation, the chain of command was not filled out, the forms. It's got to have a chain of command. Joe-People watching might not know that are watching that Ronald Johnson is a detective with Smithfield Police, he does have access to government property, he is also a board of education member, he is also part time teacher at Johnston County Community College. So just for some context.

David- Well I know, I hate it, someone loses their career, someone loses their position they got voted in for.

Allowing other people to use recording devices and things that he got from his authority position as a detective, on people during the campaign that is part of what he was saying earlier that he was going to be very involved. These are these types of things that go on that people don't really believe happen when they see two crazy guys like me and you and talking. That can't be true, I am telling you it is true.

I am going to call him a predator. I am going to call Ronald Johnson a predator, they come in and do what they do and say what they say.

There's a lot more, and it is deep. It goes to teachers, principals, superintendents, school board members, commissioners, town council men. It goes on and on. Some of this stuff was created by Ronald Johnson. It was to gain in the political realm, I call it blackmail, I call it just pure evil to do some of that stuff. We will be exposing more.

231.    Plaintiff has never used any government property to record anything, and

that allegation has never been substantiated.  Moreover, since McLeod

went public with details of the sexual encounters with Plaintiff, Plaintiff

never denied those encounters occurred. Defendants Marshburn and

Preston intended to damage Plaintiff by defaming him as a police detective

and as a school board member. Describing him as a predator was intended to specifically defame him as a school board member.

232. Upon information and belief, McLeod was interviewed at the police department on July 5, 2022, about her encounters with Plaintiff and was accompanied to the police department by a someone who worked with Defendant Lawrence or his firm.

233. On July 5, 2022, at 4:40pm, Defendant West and Capt. James Grady went to Plaintiff's home and informed him he was on leave with pay. Plaintiff was provided a copy of a "Memo to File" authored by Defendant Powell which further memorialized that Plaintiff "was placed on administrative leave **with pay** on July 5, 2022, due to allegations being made against him." Plaintiff's car, badge, gun, key card, and physical key were confiscated.

234. The allegations in the July 5th memo appear to have been lifted directly from the June 29, 2022 memorandum from Lt. West because they include a reference to "you" and quote that memo exactly: "for providing recording equipment to investigate people for the furtherance of your political career and in the commission of an extra-marital affair."

235. The same town policies as identified in the June 29, 2022 memorandum, were listed in this "memo to file."

236. On July 6, 2022, Defendant Powell met with Defendant Lawrence at his office. Defendant Powell told his administrative assistant that Lawrence

had told him that he had a lot more "s*&^" on Plaintiff and that "it was not going to end well."

237.    On July 7, 2022, Defendants Marshburn and Preston released another webcast in which they made the following statements, among others;

> It is a fact that he used government property paid for by the taxpayers for personal gain. He could actually from what I know, things I have talked to people about, he could be arrested for conspiracy of extortion. Do you remember when and I am not trying to beat a dead horse, Joe mentioned the CAAG.

> Ronald Johnson was involved deeply with this voter guide and that he pushed the agenda and extorted certain people he could because, to better understand it. Ronald Johnson causes problems.

> He goes in and creates a problem. He comes in and goes back and forth and acts like he is a savior.

> Ronald Johnson was the top dog when it came to the CAAG, Conservative card and the people on it. He was the one to put the ADT on the card. He bribed, kind of extorted, I need these people on this board. I will get you where you need to be, higher up in the system, I will get you a raise, I will get you this, but I need support. He actually got these people and had them so afraid because if they didn't do what he said, they felt like their job was in jeopardy, they were out there at polls working because they were afraid Ronald Johnson was going to retaliate against them. That's how sorry that individual is.

> They were being intimidated at the polls, some were under the direction of Ronald Johnson.

> He has gone to the point where he has taken the mistress, and pretty much sell her out, rent her out so he can have dirt on other people, like DeVan Barbour. Go flirt, see if you can have sex with him, and get pictures and video. No what kind of sick, sadistic son of a bitch is that? That's him. That come out of his mouth.

None of the allegations made by Defendants Marshburn and Preston have

ever been substantiated and were made solely to damage Plaintiff in his position as a police detective and school board member and in his personal life.

238. Initially, during the early days of the investigation, Lt. West told Plaintiff that the Smithfield Police Department and Town of Smithfield were only concerned with any sexual activity while on duty, any sexual intercourse where Plaintiff's assigned patrol vehicle was involved, and the use of any departmental recording devices for the "furtherance of a political career."

239. Prior to initiating the investigation, both Powell and Lt. West were aware of and encouraged Plaintiff, as evidenced by text messages between them and Plaintiff, on June 14, 2022, to take out a Protection Order against Defendant McLeod after Plaintiff explained to them that she was threatening Plaintiff and blackmailing Plaintiff to continue to have sexual encounters with her or she would make public that Plaintiff had done so by publicizing it on social media and disclosing it to individuals who would use it against him.

240. Plaintiff was told by Lt. West and Capt. Grady on June 29, 2022, and again on July 5, 2022, that whether Plaintiff had engaged in an extramarital affair did not matter to the agency as long as "the affair" did not happen while Plaintiff was working and on duty. Plaintiff assured Lt. West and Capt. Grady that at no time did he engage in any sexual activity while on duty.

241. Plaintiff provided the Town a note from his physician dated July 6, 2022, indicating that due to Plaintiff's condition of "acute anxiety," he was being advised to remain out of work until at least July 29, 2022.

242. This note put the Town on specific notice that Plaintiff had a serious medical condition as defined by the Family Medical Leave Act, 29 U.S.C. § 2601 et seq. (FMLA).

243. Despite knowing that Plaintiff had a serious medical condition, Defendants West and Powell attempted to pressure Plaintiff into returning to work on July 13, 2022, when they came to his house and provided him with a new "Memo to File" authored by Powell which informed him that as of the previous date, July 12, 2022, Plaintiff's administrative leave *with pay* which began on July 5, 2022, was terminated and he was on administrative leave *without pay* effective July 12, 2022.

244. This cessation of pay status and failure to offer Plaintiff paid leave was in direct violation of the FMLA.

245. In addition, the Town of Smithfield has promulgated an employment handbook which contains among other policies a Whistleblower policy (Section 40A), a Family Medical Leave policy (Section 82), and a Suspension policy (Section 89).

246. No one on behalf of the Town responded to Plaintiff's note that he was suffering from a serious medical condition in any way shape or form by offering him paid leave under the FMLA to which he is entitled both under

the employee handbook and under federal law.

247.    Instead, Plaintiff was subjected to repeated requests for doctor's notes which he was told needed to clear him to return to work against medical advice so he could be questioned regarding the allegations against him, which he had been told by Defendant West were politically motivated and orchestrated by Defendant Lawrence, among others.

248.    Not only was Plaintiff informed that he was not being paid as of July 12, 2022, he was also told that he was expected to "cooperate" with the investigation previously begun on June 29, 2022, and to remain in daily contact with Lt. West, in violation of state and federal wage and hour laws.

249.    On July 14, 2022, Defendants Washburn and Preston published a fifth webcast during which they discussed Plaintiff's law enforcement job, his marriage, and his being an elected member of the School Board. During the webcast they stated that Plaintiff should be fired from the Smithfield Police Department and removed from the Board.

250.    At 10:05pm, Plaintiff observed Defendant Council Member Marlon Lee "liked" the video. Plaintiff took a screen shot of the "like." Subsequently, at 10:51 pm Plaintiff observed Lee remove his "like" from the video. Nonetheless, Plaintiff was disturbed and uncomfortable that a council member overseeing the management of the Town and its manager and Police Department weighed in approving Plaintiff's removal both his School Board position and employment.

251.    On July 27, 2022, through counsel, Plaintiff put the Town on notice of his allegations that the investigation was motivated by Defendant Powell's animus toward Plaintiff because of his sex and was another example of Powell's discriminatory treatment of Plaintiff.

252.    The Town took no action to investigate these allegations nor did it take any action to stop the investigation of Plaintiff or to limit it to its original parameters, which were stated in writing to be 1) whether Plaintiff violated department policy by using "department equipment to investigate people in furtherance of" Plaintiff's "political career," and 2) whether Plaintiff "violated department policy" by using "department equipment . . . in the commission of an extra-marital affair."

253.    Plaintiff's counsel's letter making the allegations of discrimination, harassment, and violations of the FMLA and other laws was delivered on July 27, 2022. That afternoon, Defendant Powell's administrative assistant observed Defendant Powell slam his door, walk out, saying "I am tired of this s*&^."

254.    On August 1, 2022 Defendant Powell told his administrative assistant that "someone" had called Defendant Lawrence and told him that Plaintiff was being paid using sick time.  He also informed her that Plaintiff had made a sexual harassment complaint against him "like when I said Jesse's baby is Ronald's."

255.    Defendant Kerigan had to "redo" Plaintiff's timesheet three times because

he kept changing the entries from regular pay to sick leave. The time sheets were delivered to City Hall on August 1 around 11:30am and around 12:30pm Defendant Powell and Lawrence again discussed Plaintiff's time sheet. Defendant Powell told his administrative assistant that if he found somebody in the police department was calling Lawrence, he would fire them. Nonetheless, neither Powell nor Defendants Kerigan or Scott conducted any investigation into how information about Plaintiff was being leaked outside the department.

256. During this same time, Allyson Bond, Kevin Donovan, and Plaintiff all noticed that Owen Phillips appeared to be following them.

257. On August 10, and again on August 18, 2022, Lt. West was put on notice of Plaintiff's diagnosis. Upon information and belief, either Defendant West or Defendant Powell or someone at their direction disclosed Plaintiff's confidential personal health information and confidential personnel information to the public.

258. On August 12, 2022, when an employee asked Defendant Powell how the investigation with Plaintiff was going to end and if it was going to end the same way as an investigation with two other officers who were ultimately terminated, Defendant Powell responded "yeah, probably so."

259. In the interviews which Defendant West conducted, Plaintiff attempted to explain the background behind the social media posts exposing his sexual relations with Defendant McLeod and the consequences of those

encounters on his mental health.

260.    On August 16, 2022, during a webcast by Defendants Marshburn and
Preston, they posted a "Happy Birthday Ronald Johnson" and a picture of a
fake classified advertisement seeking an "ADULT ENTERTAINER" with
an "interest in porn" and "bisexual tendencies." Plaintiff noted that the
language in post was very similar to the comments made by Defendant
Powell regarding Plaintiff's sexuality. Defendant Powell was the only
person to continuously make the assertion that Plaintiff was bisexual or
gay through his frequent statements that Plaintiff was in a sexual
relationship with Craig Olive, and "Jeff & Dean." **Exhibit X.**

261.    Specifically, during Plaintiff's interview with Defendant West on
September 1, 2022, into the allegations that Plaintiff had had relations
with Defendant McLeod in his patrol car, Defendant West stated to
Plaintiff: "her story makes more sense than you being raped every time"
and "you mean to tell me you are a grown man and you could not stop her."
West flagrantly and maliciously disregarded Plaintiff's diagnosis of PTSD.
He discredited Plaintiff's allegations that his interactions with Defendant
McLeod had not been voluntary and for the purpose of personal pleasure
and he took no actions with regard to Plaintiff's allegation that they
constituted sexual assault resulting from her threats of extortion,
harassment, and public humiliation or that McLeod's actions were threats
to extort something of value to her from him.

262. Defendant West would have never made these comments to a female employee, and his comments were based solely on Plaintiff's sex and he would never have discredited Plaintiff as being the victim of the above mentioned criminal offenses had he been female.

263. Defendant West did not ask for text messages between Defendant McLeod and Plaintiff because he knew they would provide context and factual support for Plaintiff's version of events as opposed to McLeod's and that they would substantiate Plaintiff's claims that McLeod was aggressive and coercive and that she threatened Plaintiff into engaging in sexual encounters with her.

264. Defendant West also used Plaintiff's father's death as a tactic to obtain a stress induced response during the investigation. Defendant West was well aware of the trauma and impact Plaintiff's father's death had on Plaintiff because of text messages exchanged between the two of them. As a result of this interview tactic, Plaintiff suffered even more emotional distress which triggered additional therapist visits.

265. On September 7, 2022, Defendant Scott, Town Manager, interviewed Plaintiff.

266. After the investigation into its initial allegations of misconduct into whether Plaintiff used Town resources to engage in sexual activity or for political purposes could not be substantiated, the scope of the investigation changed over time and on September 30, 2022, shifted to whether his work

performance was deficient when he signed paperwork presented to him related to a protective order against Defendant McLeod and where he had travelled in his assigned patrol vehicle on certain dates.

267. On September 30, 2022, Lt. West interviewed Plaintiff and told Plaintiff that he had perjured himself when taking out the protective order against Defendant McLeod on June 14, 2022, because Plaintiff stated that the sexual contact with McLeod was under duress, and that West did not believe that it was. He stated that Plaintiff should have asked for a 50C order instead of a 50B order. The source of this allegation was the webcast made by Defendants Marshburn and Preston published on June 30, 2022, which had never been communicated to Plaintiff as a matter of concern prior to that date.

268. Plaintiff's criminal attorney advised him that the order he obtained was appropriate given the circumstances. Plaintiff took a voluntary dismissal on the order, to avoid mental trauma for what would later be diagnosed as PTSD, and because a district court judge called him up and told him to do so. When Plaintiff showed Defendant West the order in June before the investigation started, Lt West expressed no criticisms about the order.

269. On September 5, 2022, this investigation seemed to take a shift to less serious accusations to include Plaintiff's case work, performance, his cooperation with the District Attorney's Office, and the mileage on Plaintiff's assigned police car.

270. On September 21, 2022, Defendants Marshburn and Preston posted a webcast stating that Plaintiff had been given the option by the Town to resign or be terminated. Marshburn also disclosed that Plaintiff was in therapy, which was confidential personnel information.

271. Plaintiff notified Defendants Powell and Scott of these statements. To Plaintiff's knowledge, no investigation was made into who was disclosing his confidential personnel information to Defendants Marshburn and Preston. Plaintiff also asked for an update on what the exact allegations were against him and what was being investigated since it appeared that the original allegations had not been substantiated and the Defendants were searching for some basis on which to take disciplinary action against Plaintiff. He received no response to this email.

272. On September 28, 2022, Defendants Marshburn and Preston posted a webcast stating that Plaintiff was on FMLA leave, which Plaintiff again notified Defendants about. In addition, Plaintiff also requested an update about allegations against him regarding the subject on the ongoing investigation and again he received no response to his email.

273. At the same time the Police Department was conducting its investigation, the School Board initiated investigations into allegations against Plaintiff, using the law firm of Tharrington Smith who had replaced Defendant Lawrence as the school board attorney after he resigned in March 2020.

**School Board Investigations and Censures**

274. During the first week of May 2022, Tharrington Smith attorney Rod Malone informed Plaintiff that Defendant McLeod had filed a complaint against Plaintiff with the school system. Malone told Plaintiff that McLeod was told that the matters she alleged were "personal" and did not relate to the school system. Plaintiff understood this to mean that the BOE did not plan to investigate the matter and did not consider it to be a matter of import. Plaintiff knew and Malone knew that McLeod was a teacher with the school system.

275. On May 9, 2022, Plaintiff spoke with a woman who previously lived with Owen Phillips who described disturbing and abusive behaviors by Phillips while she lived with him. On May 11, 2022, Plaintiff spoke with another woman who described similar behaviors.

276. Plaintiff was troubled by what he had been told by the two women and he became concerned about the possible mistreatment of Phillip's children.

277. On May 16, 2022, Plaintiff spoke with Principal Bennett Jones about how school assignments were handled and mishandled. Plaintiff specifically asked whether a wellness check would be conducted on children if the school district evaluated whether the students' assignments were appropriate.

278. Town of Smithfield Mayor Andy Moore had previously contacted Plaintiff and made his own complaints about the assignment of his neighbor's children, who were attending out of district schools. Moore told Plaintiff at

that time that something needed to be done about the reassignment processes and students going to schools out of district. Moore stated more children on his street went to other schools besides Smithfield Selma High School. Moore was concerned about the number of students transferring out of Smithfield area schools.

279. Plaintiff explained to Moore that he was not one of the board members pushing through the reassignments and that Plaintiff suspected it was other board members. Plaintiff told Moore that he believed that a notation was being made by Dr. David Pearce every time a board member pushed through a reassignment without it going through the proper appeals process.

280. On July 14, 2022, Defendants Marshburn and Preston urged Plaintiff's removal as a school board member.

281. Subsequently, Defendant Todd Sutton requested that Tharrington Smith conduct investigations into allegations made against Plaintiff in retaliation for Plaintiff's actions in 2019 and 2020 with regard to DefendantLawrence and the sexual harassment of the school board employee, his exposure of possible financial shenanigans related to the budget shortfall, and his raising a conflict of interest issue about purchases from a board member's employer. Defendant Sessoms also sought to retaliate against Plaintiff for these same reasons.

282. Defendants Terry Tippett, Michael Wooten, Lynn Andrews, Kay Carroll,

and Kevin Donovan have all continued the retaliatory actions in their individual capacities to maintain the censures and damage to Plaintiff and hamper his ability to serve as a School Board member and punish him for exercising his first amendment rights.

283. On August 1, 2022, at the request of the BOE's attorneys at Tharrington Smith Jonathan Blumberg and Maura O'Keefe, Plaintiff spoke with them to discuss allegations that he had recorded a closed session meeting of the BOE. (Investigation I) The meeting was accusatory, and Plaintiff declined to provide information to the attorneys because he believed that were attempting to obtain information to use against him. He also knew that Tharrington Smith attorneys were present at the meeting and complicit.

284. Plaintiff had recorded a closed session board meeting on May 31, 2022, during which the School Board discussed reducing the salary of a school system employee because of her age and her disability. A Tharrington Smith school board attorney was present and did not counsel the Board that such considerations were improper.

285. Plaintiff believed that the discussions were improper, and he was afraid that the School Board would take an adverse action against the employee based on her age and disability. He wanted to let the employee know about the possibility that it might happen so she could be prepared to deal with it.

286. On August 8, 2022, Plaintiff informed Attorney O'Keefe that he was in the

process of obtaining legal advice about the investigation. Patricia Robinson, an attorney with Tharrington Smith, contacted Plaintiff but did not ask him to provide her with the name of his attorney, and contacted him again on August 10, August 16, and August 19. In her August 19 communication, Robinson informed Plaintiff that she would write her report based on the information she had by 5pm on August 22.

287. Even though the firm was on notice that Plaintiff was seeking legal advice, on August 18, 2022, Plaintiff received a text message from Robinson asking to interview him about allegation that he had attempted to "tamper" with the Clayton HS assignments of Owen Phillips' children based on an allegation by Owen Phillips made on August 11, 2022. Plaintiff called up Principal Jones who informed him that he had not taken any action about the school assignments of the Phillips' children. (Investigation II) Robinson contacted Plaintiff again the next day.

288. Based on his previous interactions with the Tharrington Smith attorneys regarding the closed session meeting, during which they knew improper conduct had taken place under their watch, Plaintiff chose not to be interviewed by them without legal counsel.

289. Plaintiff believed that both investigations were retaliation for his actions in 2019 and 2020 with regard to Defendant Lawrence and the sexual harassment of the school board employee, his exposure of possible financial shenanigans related to the budget shortfall, and his raising a conflict of

interest issue about purchases from a board member's employer.

290. Plaintiff did not explain to the Tharrington Smith attorneys that his discussions with Principal Jones were motivated by his concern about the welfare of the children and the possibility that a welfare check could be conducted. He did not provide any information because he did not believe that the Tharrington Smith attorneys were trustworthy and unbiased in their investigation. He believed that they had an agenda which was to obtain any information possible to justify taking action against Plaintiff as part of the desire of Defendants to retaliate against him.

291. On August 24, 2022, the Board of Education held a specially called meeting at which they voted to censure Plaintiff based on two separate investigations conducted by the Board's attorneys at Tharrington Smith. Both of these reports are dated August 24, 2022.

292. The first allegation involved Plaintiff's recording of a closed session meeting at which the Board discussed taking an adverse action against a school employee based on her age and her disability. The investigation report was authored by Maura O'Keefe of Tharrington Smith and presented by Rod Malone to the Board. The meeting was transcribed and minutes were taken. **Exhibit 8.** The report was provided in public session to the school board who released it to the public and the Board voted to censure Plaintiff in violation of its policies requiring it to adhere to Robert's Rules of Order, pursuant to the Board's own policies and procedures.

293. The second allegation involved allegations that Plaintiff attempted to tampered with the assignment of children in the district. The investigation report was also presented by Rod Malone to the Board at the same meeting. In her report on Investigation II, Attorney Robinson concluded that Plaintiff had sought to improperly influence the assignment of the children but acknowledged that no change to the students' assignment occurred as a result of any action of Plaintiff or any of his conversations with the principal. Again, this report was also provided in public session to the school board who released it to the public, and the Board voted to censure Plaintiff in violation of its policies requiring it to adhere to Robert's Rules of Order. **Exhibit X**.

294. Robert's Rules of Order 61:22 provides:

> If improper conduct by a member of a society occurs elsewhere than at a meeting, the members generally have no first-hand knowledge of the case. Therefore, if disciplinary action is to be taken, charges must be preferred and a formal trial held before the assembly of the society, or before a committee— standing or special—which is then required to report its findings and recommendations to the assembly for action. In addition, even when improper conduct occurs at a meeting, in order for disciplinary action to be taken *other than promptly after the breach occurs*, charges must be preferred and a formal trial held. (Emphasis in original.)

The rules further provide that "[t]he procedures governing all such cases are described in detail in 63" and an entire chapter governing how to conduct a formal investigation and trial is provided, if necessary.

295. Importantly, Robert's Rules 63:2 states explicitly:

> A society has the right to investigate the character of its members and officers as may be necessary to the enforcement of its own

standards. But neither the society nor any member has the right to make public any information obtained through such investigation. If it becomes common knowledge within the society, it may not be revealed to any person outside the society. Consequently, a trial must always be held in executive session, as must the introduction and consideration of all resolutions leading up to the trial.

296.    The publication of the allegations against Plaintiff and the remarks of the board members were all conducted in public and without giving Plaintiff due process to protect his liberty interests or allowing him to exercise his procedural rights under Robert's Rules of Order or his constitutional rights under the first amendment to refute the allegations. The allegations made by the Board in its reports were defamatory and damaged Plaintiff by their publication.

297.    At the August 24, 2022, meeting after the board voted on the first censure, Defendant Wooten made a motion that Plaintiff

submit his resignation to the board by noon on Friday, August 26, 2022. If a resignation is not submitted by the deadline, then the board would begin the process of removal by submitting a letter with attachments and exhibits to the District Attorney.

298.    This threat by the Board to obtain Plaintiff's resignation, which was of value to certain board members, was itself arguably a violation of N.C. Gen. Stat. § 14-118.4.

299.    Tharrington Smith obtained Plaintiff's attorney's contact information and was able to reach out the day after the August 24 board meeting, on August 25. The subject of the call was a desire to interview Plaintiff regarding a

third allegation against him involving text messages between Plaintiff and Defendant Lawrence sent in 2019 which Defendant Lawrence, upon information and belief, had released to Defendants Marshburn and Preston. Defendants Marshburn and Preston then published the texts on a webcast on August 8, 2022.

300. Plaintiff was aware that the Tharrington Smith attorneys had advised the Board that they could seek Plaintiff's removal from the school board by asking the District Attorney to prosecute Plaintiff for a Class 1 misdemeanor under a State statute adopted in 1901, which reads as follows:

§ 14-230. Willfully failing to discharge duties.

(a)      If any clerk of any court of record, sheriff, magistrate, school board member, county commissioner, county surveyor, coroner, treasurer, or official of any of the State institutions, or of any county, city or town, shall willfully omit, neglect or refuse to discharge any of the duties of his office, for default whereof it is not elsewhere provided that he shall be indicted, he shall be guilty of a Class 1 misdemeanor. If it shall be proved that such officer, after his qualification, willfully and corruptly omitted, neglected or refused to discharge any of the duties of his office, or willfully and corruptly violated his oath of office according to the true intent and meaning thereof, such officer shall be guilty of misbehavior in office, and shall be punished by removal therefrom under the sentence of the court as a part of the punishment for the offense.

301. On August 26, 2022, Defendant Sutton transmitted a letter to Defendant Doyle which included the investigations and asking her to "make a determination regarding whether the findings in these reports support [Plaintiff's] removal as Board member pursuant to GS 14-230."

302. Notably, Defendant Sutton asked Defendant Doyle to "review whether the circumstances that led to [Plaintiff's] suspensions with and without pay by

the Smithfield Police Department, separately or combined with the results of the investigations, support his removal as a Board member pursuant to GS 14-230."

303. Defendant Sutton specifically noted that the basis for the request for the District Attorney's involvement and review was Plaintiff's refusal to resign his school board position by noon on August 26, 2020, which was a specific and unambiguous expression of an intention to retaliate against Plaintiff for exercising his constitutional rights to free speech and his opposition to the discriminatory treatment of multiple employees of the school system going back to 2019 and as recently as May of 2022.

304. After being contacted first on August 25, and subsequently being provided information about the first set of allegations, on September 7, 2022, Plaintiff's attorney provided Tharrington Smith attorneys Ken Soo and Rod Malone with information regarding Plaintiff's reasons for recording the May 31, 2022 closed session meeting. Specifically, Soo and Malone were informed that Plaintiff taped a closed session of the School Board on May 31, 2022, because Defendant School Board Todd Sutton, along with School Board members Kay Carroll and Terri Sessions had discussed taking actions against Tracey Peedin-Jones based on her possible retirement/age and based on her absence from work due to a disability, which he believed to be illegal violations of the Age Discrimination in Employment Act (ADEA) and the Americans with Disability Act (ADA), federal anti-discrimination laws.

305. They took no action to amend their report to the BOE to include this additional information. Nor did they recommend revisiting the censure on this matter.

306. Defendants McLeod and Marshburn attended the September 15, 2022, school board meeting and were allowed by Defendant Chair Sutton during the public comment session to make inappropriate remarks such as:

- McLeod made remarks directed at Plaintiff regarding "trust" and "relationships" and "playing mind games."

- McLeod also urged the audience not to vote for Michelle Antoine or Kevin Donovan who were running for school board seats.

- David Marshburn made a public comment where he looked at Plaintiff and said to him: "don't wink at me, I am not that way." Plaintiff had not winked at Marshburn.

- Marshburn also stated during his public comments that the sexual harassment allegations against Defendant Lawrence in 2019 and 2020 were a "hoax."

- After Marshburn made his remarks and got up to leave, Councilman Marlon Lee left with him, indicating to Plaintiff that Lee was biased against Plaintiff.

307. On September 19, 2022, Plaintiff provided an affidavit with written responses to questions posed by Tharrington Smith. Specifically, Plaintiff noted that he had no control over the release of the messages by Defendants Marshburn and Preston in 2022. Plaintiff also noted that the messages were between him and the then school board attorney, so that if Plaintiff was culpable then the school board itself was equally culpable as it was responsible for its agent's actions.

308. Finally, Plaintiff provided the social context for the comments, including the fact that he had disclosed them to his then-friend and apologized to her, and that their relationship was such that such banter would not be considered offensive. What was clearly offensive was the publishing of the allegations on social media.

309. On October 6, 2022, a report authored by Ken Soo with Tharrington Smith was provided in public session to the school board who released it to the public and voted for a third time to censure Plaintiff in violation of its policies requiring it to adhere to Robert's Rules of Order.

310. School board elections occurred in November 2022 and Defendant Todd Sutton was replaced by Defendant Lynn Andrews as Chair. In addition, three new members, Michelle Antoine, Terri Tippet, and Kevin Donovan, were elected and replaced Terri Sessoms, Todd Sutton, and Allyson Byrd. Plaintiff was re-elected for an additional term.

**Referral of Censures to District Attorney for Prosecution**

311. After learning that the School Board had sent a request to the District Attorney to ratify the unconstitutional conduct of the Board and its individual members towards Plaintiff, Plaintiff's counsel wrote to the District Attorney to make clear Plaintiff's position. **Exhibit x.**

312. The District Attorney provided no response. Upon information and belief, however, she proceeded to assign an investigator, Defendant Rick Hoffman, to the matter and conduct interviews for the purpose of gathering

information to determine whether Plaintiff should be prosecuted under N.C. Gen. Stat. § 14-230 for "willfully and corruptly omit[ing], neglect[ing], or refus[ing] to discharge any of the duties of his office, or willfully and corruptly violat[ing] his oath of office." Hoffman admitted this in his affidavit of probable cause discussed below.

313. On January 24, 2023, Plaintiff's counsel wrote to Defendant Doyle and provided her with the following information:

> I write in reference to an August 26, 2022 letter sent to you by then Johnston County Public School Board Chair Todd Sutton regarding our client, Ronald Johnson, and a further letter we believe was sent to you after the Board's October 6, 2022 meeting, a copy of which the current attorneys for the Board have delayed in providing our firm. The letters attach censures the Board alleges to have issued against Mr. Johnson for three incidents which either happened outside of Board meetings, or happened at previous Board meetings (neither the August 24 nor October 6, 2022 board meetings, during which the censures were alleged to have been issued). Having reviewed the meeting minutes and the YouTube videos of those two meetings attempting to issue the censures, it is clear that the Board failed to follow Board Policy 2340, which dictates, among other things, that "meetings of the Board will be conducted in accordance with the current edition of Robert's Rules of Order, Newly Revised, including the manual's procedure for small boards."

> Robert's Rules 61:22 dictates that when alleged improper conduct of a member occurs outside a meeting, or is not addressed promptly after the conduct occurs within a meeting, "charges must pe preferred and a formal trial held." Such a trial must then proceed according to Article 63 of Robert's Rules.

> At neither the August 24 nor the October 6 meetings was a trial held, and certainly nothing resembling the procedures required by Robert's Rules. In fact, at one point in the August 24 meeting, Mr. Johnson was prevented by Chairman Sutton from speaking in his own defense. Further, the "investigations" conducted by Tharrington Smith, the then-attorneys for the Board, were presented in an open session, and shared with the public, in further

violation of Robert's Rule 63, which dictates "neither the society nor any member has the right to make public any information obtained through such investigation; if it becomes common knowledge within the society, it may not be revealed to any persons outside the society. Consequently, a trial must always be held in executive session, as must the introduction and consideration of all resolutions leading up to the trial."

Thus, Tharrington Smith, and subsequently, the Board of Education, and in particular then-Board chair Sutton violated Mr. Johnson's confidentiality and have caused him irreparable harm, which we will be addressing in a separate manner.

**Exhibit X.**

314. The letter was copied to both Katie Cornetto at Poyner Spruill who had upon information and belief replaced Tharrington Smith as School Board attorneys or alternatively who continued to work with them after they resigned in a letter from Rod Malone on October 25, 2022.

315. On February 7, 2023, in a closed session meeting with Cornetto, Cornetto informed the BOE that Plaintiff's attorneys had informed her that they believed the censures were improperly adopted by the BOE and were invalid. Defendant Donovan then asked Cornetto whether the process by which the censures were adopted was in accordance with Board policy and Robert's Rules of Order. Cornetto stated that she had not researched the process or evaluated the matter in which the censures were done.

316. On January 25, 2023, the very next day after the letter from Plaintiff's counsel regarding the invalidly adopted censures, a search warrant was obtained by Defendant Hoffman to seize property related to obtain evidence of crimes under N.C. Gen. Stat. § 14-72 "Larceny of property," and N.C. Gen.

Stat. § 14-230 "Willfully failing to discharge duties and Obstruction of Justice." **Exhibit X.**

317. The list of property to be seized included iphones, computers, identification, mobile devices, removable storage media, including but not limited to hard drives, navigation devices, digital cameras, power cords, modems, routers, email accounts, passwords, PIN codes, account names, screen names, remote data storage, etc. In addition, it sought "[a]ny article of personal property" related to "vehicles and offices."

318. The office to be searched was Plaintiff's office. The car to be searched was Plaintiff's car. Defendant Hoffman provided a sworn statement which contained no information about the alleged offenses and how the property to be seized was connected to the offenses. In the affidavit he identified himself as "Detective Michael Ambrosio on page 6" but signed each page at the bottom.

319. The affidavit of probable cause states no grounds for probable cause for larceny or for "willfully and corruptly omit[ing], neglect[ing], or refus[ing] to discharge any of the duties of his office, or willfully and corruptly violat[ing] his oath of office."

320. The affidavit states among other things only that

- Plaintiff was employed with the Police Department

- While serving on the BOE, Plaintiff made several allegations of misconduct involving others where he claimed to possess and, in some instances, produced evidence in the form of recordings of what he described as wrongdoings or corruption.

- Hoffman was assigned to conduct an independent investigation into the matters contained in the August 26, 2022 letter from the BOE.

- Upon being terminated, Plaintiff was asked by the Town to return phones assigned to Plaintiff.

- Plaintiff has "a history of making and sharing recordings of others with their knowledge publicly and privately."

- On social media, BOE members Defendant Kevin Donovan and another school board member playing a recording made by Plaintiff which showed that Defendant Carroll made the statement "hide your money" and "which members of the BOE disagreed as to whether the statement was inappropriate or constituted misconduct" but that the statement "involved a large sum of funds that could have been reverted to the county."

- Others knew and helped Plaintiff purchase phones and record conversations.

321.    No allegations of criminal activity were included in the affidavit of probable cause and no facts were stated showing any possible or alleged violation of law except the allegation that Plaintiff had failed to return two specific iphones with specific serial numbers to the Town.

322.    Hoffman knew or should have known that Plaintiff had told the Town that he lost the phones and did not have them in his possession.  In fact, the affidavit explicitly states that

> [t]he first was issued to him on approximately 6/22/2020 ( iPhone XS Serial# 356172098919050). The second phone was issued to Ronald Johnson on approximately 6/4/2021 (iPhone SE Serial# 356842116190385) as a replacement phone. Ronald Johnson didn't use his work issued cell phones while working for Smithfield PD to make calls.

323.    The search warrant was extensive and pursuant to it seized much more

property that the iphones which purportedly were in Plaintiff's possession and belonged to the Town.

324. No indictment was ever presented alleging larceny of the iphones.

325. Instead, on April 3, 2023, a true bill of indictment was presented and returned against Plaintiff using Defendant Hoffman's investigation by Special Prosecutor Zollinger for a misdemeanor violation under N.C. Gen. Stat. § 14-230 for recording the May 31, 2022 BOE closed session meeting at which school board members suggested reducing a school employee's salary based on her age and disability.

326. Hoffman and Zollinger knew or should have known that indicting and prosecuting Plaintiff for recording a closed session meeting at which illegal activity was believed to have been discussed was a violation of Plaintiff's constitutional rights and retaliation for his exercising his rights.

327. On April 3, 2023, a true bill of indictment was presented and returned against Plaintiff using Defendant Hoffman's investigation by Zollinger for a misdemeanor violation under N.C. Gen. Stat. § 14-230 for "failing to comply with a public records request" on November 10, 2022.

328. The inclusion of this alleged failure to turn over public records allegedly in Plaintiff's possession showed the independent animus of Defendants Hoffman and Doyle given that this act was not included in the school board's August 26, 2022 referral letter to the District Attorney.

329. Hoffman and Zollinger knew or should have known that indicting and

prosecuting Plaintiff for "failing to comply with public records requests" was a violation of Plaintiff's constitutional rights and retaliation for his exercising his rights.

330. On April 3, 2023, a true bill of indictment was presented and returned against Plaintiff using Defendant Hoffman's investigation by Defendant Zollinger for the felony under N.C. Gen. Stat. § 14-118.4 "Extortion" which provides that "[a]ny person who threatens or communicates a threat or threats to another with the intention thereby wrongfully to obtain anything of value or any acquittance, advantage, or immunity is guilty of extortion and such person shall be punished as a Class F felon."

331. The indictment alleged that

on or about April 25, 2022, the Defendant named above unlawfully, willfully, and feloniously did threaten and communicate a threat to DeVan Barbour IV, a candidate for political office, with the intent wrongfully to obtain an advantage. Defendant threatened to release a recording in the defendant's possession of defamatory allegations concerning DeVan Barbour IV weeks before a primary election in which DeVan Barbour IV was on the ballot. Defendant threatened to release the recording if DeVan Barbour IV did not pressure Angela McLeod Barbour into recanting her statements that she had an affair with the Defendant. Such a recantation would constitute an advantage to the Defendant.

332. The inclusion of this offense in the indictment was not only independently retaliatory, but it also showed continued law enforcement indifference to Plaintiff's own allegations that McLeod herself had threatened Plaintiff "with the intention . . . wrongfully to obtain anything of value or [an] advantage" when she threatened to disclose details of the sexual encounters

between herself and Plaintiff if he did not continue to have those encounters or have a relationship with her.

## Plaintiff's Termination

333. After the conclusion of the Town's investigation, on October 5, 2022, Defendant Powell wrote an "Employee Dismissal Recommendation" and delivered it to Plaintiff in a meeting with Defendant Kerigan and Defendant Powell.

334. In this document, Powell noted that Plaintiff had been involved in "an internal affairs investigation due to allegations by a member of the public," a reference to the June 24, 2022 Facebook Live broadcast by Defendants Marshburn and Preston.

335. Powell stated that the investigation "revealed that Detective Johnson had been involved in a two-year affair (which Detective Johnson alleged he was the victim of an ongoing sexual assault)." This statement was a clear acknowledgment that the Town knew that Plaintiff had provided factual evidence for not only a sexual assault investigation but an investigation into whether Defendant McLeod had committed extortion against Plaintiff when she threatened to disclose their sexual encounters unless he continued to have them and a relationship with her.

336. Moreover, Powell and West knew about the sexual encounters as early as md-May in West's case, and certainly by June 14, when Defendants West and Powell texted Plaintiff and recommended that he obtain the protective

order against her as soon as possible.

337. Powell stated further that "[d]uring this time, it was alleged that Detective Johnson used Police Department equipment and that he misrepresented facts when obtaining a no contact order (50C) on the female involved in the affair."

338. In fact, prior to this document, no allegation that Plaintiff had misrepresented any facts when obtaining the order had ever been made by anyone except Defendants Marshburn and Preston in their webcast on June 30, 2022.

339. Powell then made two contradictory statements back-to-back in the document.

340. First, he stated that "[t]he Department is solely looking to determine if Detective Johnson violated any Town or Department policies."

341. Then, he stated: "[d]uring the investigation, it was determined that Detective Johnson misrepresented facts to several people to obtain a no contact order (50-C)." This sentence is wholly unrelated to whether Plaintiff violated any Town or Department policies.

342. Next, Powell abandoned any claim that Plaintiff has misrepresented facts and stated that in fact he misapplied or misunderstood the law pertaining to protective orders, by stating that "[d]ue to the sexual relationship that had taken place with the female, the correct order would have been a (50-B)." At no time during the investigation did Powell or West inquire how the

order was generated or ask Plaintiff if he chose the type of protective order.

343. Moreover, as stated above, Plaintiff gave the facts to the Sheriff's office and the captain working with him determined what paperwork to provide Plaintiff which he took and filled out.

344. Finally, Powell then made a statement which he knew to be false. Powell stated that "[a]s an experienced officer, Detective Johnson knew, or should have known about the correct order." Not only did Powell know that Plaintiff had no responsibility for either obtaining or executing protective orders, but Powell's statement ignored the fact that at no time after Plaintiff provided the Town with a copy of the order obtained in June, did Powell or West identify any errors in the order. In addition, the order was dismissed only days after it was obtained after a district court judge called Plaintiff and told him to do so.

345. Powell stated that Plaintiff's "actions bring discredit on him and his abilities to perform the duties of a law enforcement officer."

346. Powell then purported to base his termination recommendation on Plaintiff's being involved with the School Board. Powell stated, "Detective Johnson's outside involvement with the School Board has brought a negative light on the Department and the Town. Refer to Town handbook section (37-b): Employment with organizations or in capacities that negatively impact the employee's perceived integrity, neutrality, or reputation related to the performance of the employee's town duties."

347. At no time did Powell or West or Kerigan or Scott ever give Plaintiff any indication that his membership on the School Board "negatively impacted" either Plaintiff's "perceived integrity, neutrality, or reputation related to the performance of the employee's town duties." Nor did Powell's letter explain how Plaintiff's involvement with the school had a negative impact.

348. In addition, given Plaintiff's knowledge of the kind of misconduct condoned by Defendants in the past, Powell's recommendation for termination based on an alleged violation of the "standards of conduct" policy was obviously pretextual. Powell stated that "Detective Johnson [sic] personal life has brought about Issues with his integrity as a police officer by the agency, citizens of Smithfield, and court officials."

349. Without specifying what particular aspects of Plaintiff's "personal life" raised issues about his "integrity," Powell then stated that he was recommending Plaintiff's termination "due to his violation of the Town and Department policies listed above," and that "Detective Johnson's Integrity and truthfulness have been called into question. This ultimately affects his ability to perform the duties of a police officer."

350. The fact, of course, that his integrity had been "called into question" by Defendants Marshburn and Preston did not mean that he lacked integrity. Defendants' investigation had failed to substantiate any integrity violations or any facts that could remotely be said to involve Plaintiff's integrity as a police detective.

351.    Plaintiff sought a final decision on the recommendation and on October 14, 2022, Defendant Scott as Town Manager doubled down on the statements made by Powell.

352.    In the first paragraph of his letter, Scott summarized the October 5 meeting between Plaintiff and Defendants Powell and Kerigan.  He summarized the reasons given in Powell's letter for recommending Plaintiff's dismissal, described by Scott as "based on violations of Town Handbook Section 37(b) and Police Departmental General Orders Section 201 regarding standards of conduct," and based on the "personal matter in which you obtained a 50C no contact order when you knew, or should have known based on your years of experience, that the correct order was a 50B no contact order."

353.    In addition to this summary, Scott also noted that the day after Powell and Kerigan provided Plaintiff with the October 5th recommendation for dismissal, Defendants Marshburn and Preston published another Facebook Live broadcast in which they published text messages between Plaintiff and Defendant Lawrence prior to schism in their relationship.

354.    Scott referenced a school board investigation of the text messages and an affidavit by Plaintiff in which he explained the messages and the subject of the messages.

355.    Scott also referred to a meeting between Plaintiff and Scott on October 12, during which Scott asked Plaintiff questions about the school board investigation and the texts which Scott told Plaintiff represented

"Detrimental Personal Conduct."

356. Scott noted that discussions at the October 12 meeting also included conversations with another Detective regarding communications with the individual involved in obtaining the 50C versus the 50B order, and the original allegation that Plaintiff had sued Police Department equipment for non-police matters.

357. Scott then informed Plaintiff that "[t]he decision to terminate your employment has been made due to the reasons set forth in the first paragraph of this letter as well as for Detrimental Personal Conduct due to the recent allegations reported on October 6 and further discussed with you during our October 12 meeting."

## Conspiracy

358. Plaintiff continues to serve as a School Board member although he has been stripped of any assigned schools as normally assigned to other members.

359. The school board continues to pursue retaliatory investigations against individuals known to have a connection to Plaintiff, such as Allyson Bond.

360. Defendant Marshburn continues his webcasts defaming Plaintiff. (Mr. Preston passed away in March of 2023.)

361. The Town has refused to produce a copy of all documents in Plaintiff's personnel file to him in violation of N.C. Gen. Stat. § 160A-0.

362. The School Board continues to pressure Plaintiff to resign, based on allegations he wrongfully recorded closed sessions, when he rightfully believed the Board was acting illegally in violation of a school employee's protected status; based on text messages with the then School Board attorney who has subsequently resigned; and based on his attempt to clarify when and how school reassignments are granted, as is appropriate to his position as a School Board member. He has been terminated from his employment with the Smithfield Police Department base on the allegations of the School Board and its attorneys. And the District Attorney, based on fallacious allegations by the School Board, has pursued criminal charges against Plaintiff. All defendants have conspired, in one way or another, to defame, injure, discriminate against Plaintiff, and deny him his rights under the First Amendment, Title VII, the ADA, and the FMLA.

## COUNT ONE
### Sex Discrimination in Violation of Title VII
### of the Civil Rights Act of 1964
### (42 U.S.C. §§ 2000e et al.)

1. Plaintiff repeats and realleges the preceding paragraphs hereof, as if fully set forth herein.

2. Plaintiff is a male and was qualified for his position when he was fired by Defendant Town.

3.Defendant Powell was the Smithfield Chief of Police and regularly made comments to and about Plaintiff which were abusive, and he made them because Plaintiff was male.

4.In addition, Defendants Powell and West diminished Plaintiff's complaints that he had been the victim of sexual assault and that he had agreed to engage in sexual encounters with Defendant McCleod out of fear because she threatened him.

5.Had he been female, Defendants Powell and West would never have diminished and ignored Plaintiff's complaints.

6.Because Chief Powell was Plaintiff's supervisor, the Town is strictly and vicariously liable for the discriminatory treatment to which Plaintiff was subjected.

7.Plaintiff suffered damages as a result of Defendants' unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits, and the costs of bringing this action.

8. Defendants intentionally violated Plaintiff's rights under Title VII, with malice or reckless indifference, and, as a result, the Defendant Town is liable for punitive damages.

## COUNT TWO
### Retaliation in Violation of Title VII of the Civil Rights Act of 1964
### (42 U.S.C. §§ 2000e et al.)

9.Plaintiff repeats and realleges the preceding paragraphs hereof, as if fully set forth herein.

10.On July 27, 2022, through counsel, Plaintiff engaged in protected activity by complaining to the Town that Defendant Powell had discriminated against him

during his employment based on his sex.

11. Plaintiff also complained that the investigation of Plaintiff was an additional adverse action by Defendant Powell and the Town which was also discrimination based on his sex.

12. The Town failed to take any action in response to Plaintiff's complaints, including but not limited to conducting an investigation into the validity of Plaintiff's complaints about his past discriminatory treatment by Powell.

13. The Town allowed Chief Powell to remain in Plaintiff's chain of command and to oversee the investigation into allegations that Plaintiff had misused Town property for improper purposes.

14. When the investigation was unable to substantiate those allegations, the Town allowed Powell to make and consider additional allegations against Plaintiff which were also not substantiated.

15. Finally, the Town and the Town Manager terminated Plaintiff in retaliation for engaging in protected activity and complaining about his discriminatory treatment both prior to and during the investigation.

16. Defendants' stated reason for terminating Plaintiff's employment was pretextual and baseless. Defendants fired Plaintiff because he complained about discrimination on July 27, 2022.

17. Plaintiff suffered damages as a result of Defendants' unlawful retaliatory actions, including emotional distress, past and future lost wages and benefits, and the costs of bringing this action.

18. Defendant Town intentionally violated Plaintiff's rights under Title VII, with malice or reckless indifference, and, as a result, is liable for punitive damages.

## COUNT THREE
## Discrimination in violation of the Americans with Disabilities Act
## 42 U.S.C. §§ 12101 et seq

19. Plaintiff repeats and realleges the preceding paragraphs hereof, as if fully set forth herein.

20. At the time of his termination, Plaintiff was disabled, as defined by the ADA, in that he was suffering from anxiety and depression.

21. At the time of his termination, Plaintiff was otherwise qualified to perform the essential functions of his position as a detective for the Town of Smithfield.

22. Plaintiff was an employee within the meaning of the ADA.

23. Defendant Town was an employer within the meaning of the ADA.

24. Defendant Town violated the ADA by disclosing Plaintiff's personal health information, knowing it would be published by Defendants Marshburn and Preston, and by intentionally discriminating against Plaintiff on the basis of his disability and by terminating him because of his disability.

25. Plaintiff suffered damages as a result of Defendants' unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits, and the costs of bringing this action.

26. Defendants intentionally violated Plaintiff's rights under Title VII, with malice or reckless indifference, and, as a result, the Defendant Town is liable for punitive damages.

## COUNT FOUR
## Retaliation in Violation of the Americans with Disabilities Act
### 42 U.S.C. §§ 12101 et seq

27. Plaintiff repeats and realleges the preceding paragraphs hereof, as if fully set forth herein.

28. On July 27, 2022, through counsel, Plaintiff engaged in protected activity by complaining to the Town that Powell had discriminated against him during his employment based on his disability.

29. Plaintiff also complained that the investigation of Plaintiff had was an additional adverse action by Chief Powell and the Town which was also discrimination based on his disability.

30. Plaintiff also complained that Defendant Town released information about his disability to the public.

31. The Town failed to take any action in response to Plaintiff's complaints, including but not limited to conducting an investigation into the validity of Plaintiff's complaints and whether anyone from the Town released the information that was publicly disclosed by Defendants Marshburn and Preston.

32. The Town allowed Defendant Powell to remain in Plaintiff's chain of command and to oversee the investigation into allegations that Plaintiff had misused Town property for improper purposes.

33. When the investigation was unable to substantiate those allegations, the Town allowed Powell to make additional allegations against Plaintiff which were also not substantiated.

34.Finally, the Town and the Town Manager terminated Plaintiff in retaliation for engaging in protected activity and complaining about his discriminatory treatment during the investigation.

35.Defendants stated reason for terminating Plaintiff's employment was pretextual and baseless. Defendants fired Plaintiff because he complained about discrimination on July 27, 2022.

36.Plaintiff suffered damages as a result of Defendant's unlawful retaliatory actions, including emotional distress, past and future lost wages and benefits, and the costs of bringing this action.

37.Defendant Town intentionally violated Plaintiff's rights under Title VII, with malice or reckless indifference, and, as a result, is liable for punitive damages.

## COUNT FIVE
## Interference in Violation of the Family and Medical Leave Act
## 29 U.S.C. 2615(a)(1)

38. Plaintiff repeats and realleges the preceding paragraphs hereof, as if fully set forth herein.

39.Defendant Town is an employer covered by the FMLA pursuant to 29 U.S.C. § 2611(4)(A)(iii).

40.Defendants Scott, Kerigan, Powell, and West are all employers as defined by 29 U.S.C. § 2611(4)(A)(ii)(I) as persons who acted "directly or indirectly in the interest of the Town with regard to Plaintiff's leave under the FMLA.

41.Plaintiff was an FMLA-eligible employee because he was employed by the Town for the requisite period of time prior to requesting FMLA leave and had been

employed by the Town for over 1,250 hours in the twelve-month period prior to his request.

42. Plaintiff was entitled to FMLA leave because he was suffering from anxiety, depression, and PTSD, serious medical conditions, and he provided the Town with sufficient and timely information to put them on notice of their obligations under the FMLA.

43. Defendants engaged in prohibited conduct under the FMLA by interfering with, restraining, and denying Plaintiff with his rights provided under the FMLA, namely the use of paid leave, by placing him on unpaid leave.

44. Defendants discouraged Plaintiff from fully using his FMLA leave by repeatedly contacting him with regard to their investigation which was not dependent on Plaintiff's participation after he was interviewed and denied the allegations.

45. Defendants action foreclosed Plaintiff's rights under the FMLA, including but not limited to the right to be returned to his position and to be free from threats and harassment for exercising his rights under the law.

46. As a result of Defendants wrongful acts and omissions, Plaintiff suffered damages, including expenses related to additional medical treatment and past and future lost wages and benefits. Plaintiff is also entitled to liquidated damages, attorneys' fees and costs, and other damages as recoverable by law.

**COUNT SIX**
**Retaliation in Violation of the Family and Medical Leave Act**
**29 U.S.C. §2615(a)(2)**

47. Plaintiff repeats and realleges the preceding paragraphs hereof, as if fully set forth herein.

48. Plaintiff exercised his FMLA rights by taking FMLA leave from his position as police detective.

49. Plaintiff was qualified for his position and had performed his job duties effectively prior to the acts complained of herein.

50. Plaintiff suffered an adverse employment action in that he was subjected to additional investigation after the original allegations against him could not be substantiated and subsequently terminated for pretextual reasons. He was also subjected to an adverse action when he was terminated for pretextual reasons.

51. Plaintiff was also retaliated against by releasing the fact that he was on FMLA to Defendants Marshburn and Preston, knowing that they would broadcast this information.

52. Defendants' decision to fire Plaintiff occurred only weeks after Plaintiff complained to the Town on July 27, 2022, that they had violated his rights under the FMLA.

53. Defendants fired Plaintiff because he complained of FMLA discrimination on July 27, 2022.

54. Defendants conduct constitutes unlawful retaliation against Plaintiff in violation of his rights under the FMLA. 29 U.S.C. §2615(a).

55. As a result of Defendants' wrongful acts and omissions, Plaintiff suffered damages, including expenses related to additional medical treatment and past and

future lost wages and benefits. Plaintiff is also entitled to liquidated damages, attorneys' fees and costs, and other damages as recoverable by law.

### COUNT SEVEN
### Against Individual Town Defendants
### 42 U.S.C. § 1983 (First Amendment)

56.  Plaintiff repeats and realleges the preceding paragraphs hereof, as if fully set forth herein.

57. At the time of the acts alleged in this Complaint, Plaintiff was a public employee employed as a police detective by the Town of Smithfield and a duly elected member of the Johnston County Board of Education.

58. Plaintiff engaged in protected speech on a matter of public concern when he opposed the sexual harassment of a School Board employee by the School Board attorney, when he opposed the hiding of funds by the School Board from the county, when he opposed the sexual harassment of himself by his supervisors at the Police Department, and age and disability discrimination by the School Board against a School Board employee, and his own sexual assault which Defendants dismissed because he was not female.

59. Defendants Town, Scott, Kerrigan, Powell, and West retaliated against Plaintiff for his protected speech and his actions by terminating him for his protected speech and conduct as a School Board member and his protected speech and conduct in obtaining a protective order against Defendant McLeod.

60. Defendants were acting in the course and scope of their employment for the Town when they deprived Plaintiff of his right to free speech.

61. At the time of the Plaintiff's employment, his investigation, and his termination, Defendants were acting under color of the laws and regulations of the State of North Carolina and the Town of Smithfield.

62. The adverse employment actions taken against Plaintiff would deter a person of ordinary firmness from continuing to engage in the protected speech.

63. Plaintiff's protected speech was a substantial and motivating factor in the decision of the Defendants Town, Scott, Kerrigan, Powell, and West to investigate and terminate him.

64. The decision of Defendants Town, Scott, Kerrigan, Powell, and West decision to investigate and terminate Plaintiff violated Plaintiff's clearly established constitutional rights and was not objectively reasonable in light of the circumstances.

65. Defendants Town, Scott, Kerrigan, Powell, and West acted willfully, deliberately, maliciously, or with reckless disregard for Plaintiff's right to free speech protected under the First Amendment, and Plaintiff was damaged by their actions.

66. The Town of Smithfield had a policy or custom in place that enabled the Town's agents and employees to act with deliberate indifference to Plaintiff's right to free speech. The Town's policy or custom in place also permitted the individual defendants acting as policymakers for the Town to violate Plaintiff's right to free speech by discouraging employees from publicly discussing any matter that would cast the Town or particular individuals in the Town in a negative light and this was accomplished by investigating and terminating Plaintiff for refusing to resign his position as a School Board member and refusing to resign his position as a police

detective and otherwise opposing improper conduct by the Town or by Defendants.

67.The Town knew of the unlawful acts of Defendants Scott, Kerrigan, Powell, and West, and had the power to remedy them, yet failed to do so; further, the Town ratified the acts of Defendants.

**COUNT EIGHT**
**Against Individual BOE Defendants**
**42 U.S.C. § 1983 (First Amendment)**

68.Plaintiff repeats and realleges the preceding paragraphs hereof, as if fully set forth herein.

69. At the time of the acts alleged in this Complaint, Plaintiff was a public employee employed as a police detective by the Town of Smithfield and a duly elected member of the Johnston County Board of Education.

70.Plaintiff engaged in protected speech on matters of public concern when he opposed the sexual harassment of a School Board employee by the School Board attorney, when he opposed the hiding of funds by the School Board from the county, when he opposed the pay cut of an employee for reasons related to her age and disability, when he identified conflicts of interest in the expenditure of school system funds, and when he made inquiries of a principal about whether students were assigned to appropriate schools.

71. Defendants BOE, Sutton, Andrews, Sessoms, Carroll, Tippett, and Wooten retaliated against Plaintiff for his protected speech and his actions by censuring him for his protected speech and conduct as a School Board member, by threatening him with referring him for criminal prosecution if he did not resign, and by then referring

the censures to the District Attorney for criminal prosecution when he refused to resign.

72. Defendants were acting in the course and scope of their positions as School Board members and acting for the BOE when they deprived Plaintiff of his right to free speech.

73. At the time of the investigation, censures, threats to Plaintiff to resign, and the referral of the censures for criminal prosecution, Defendants were acting under color of the laws and regulations of the State of North Carolina and the Johnston County Board of Education.

74. Defendants and their attorneys made no attempt to follow their own rules in censuring Plaintiff and as a result their actions were void ab initio and their threats to Plaintiff to refer the censures to the District Attorney for criminal prosecution was illegal and the actual referral for criminal prosecution violated Plaintiff's constitutional rights.

75. The actions taken against Plaintiff by Defendants would deter a person of ordinary firmness from continuing to engage in the protected speech.

76. When Defendants and their attorneys were notified of the lack of factual basis for the statements in the investigations upon which the censures were based and notified of their failure to use proper procedure in issuing the censures, Defendants took no action to undo their illegal and unconstitutional actions and the resulting damage done to Plaintiff.

77. Plaintiff's protected speech, including but not limited to his refusal to resign

his position as a School Board member, was a substantial and motivating factor in the decision of the Defendants BOE, Sutton, Andrews, Sessoms, Carroll, Tippett, and Wooten to conduct the investigations and censure Plaintiff and refer the censures for criminal prosecution.

78. The decisions of Defendants BOE, Sutton, Andrews, Sessoms, Carroll, Tippett, and Wooten to investigate and censure Plaintiff and then refer the censures for criminal prosecution violated Plaintiff's clearly established constitutional rights and those decisions were not objectively reasonable in light of the circumstances.

79. Defendants BOE, Sutton, Andrews, Sessoms, Carroll, Tippett, and Wooten acted willfully, deliberately, maliciously, or with reckless disregard for Plaintiff's right to free speech protected under the First Amendment and Plaintiff was damaged by their actions.

80. The BOE had a policy or custom in place that enabled the BOE's agents and employees to act with deliberate indifference to Plaintiff's right to free speech. The BOE's custom or policy permitted the individual Defendants acting as policymakers for the BOE to violate Plaintiff's right to free speech and which policy or custom and by discouraging employees from publicly discussing any matter that would cast the BOE or particular individuals associated with the BOE in a negative light and this was accomplished by investigating and censuring Plaintiff for exercising his first amendment rights, and for refusing to resign his position as a School Board member, opposing improper conduct by the BOE or by Defendants, and by referring the censures for criminal prosecution.

81. The BOE knew of the unlawful acts of Defendants Sutton, Andrews, Sessoms, Carroll, Tippett, and Wooten and had the power to remedy them, yet failed to do so; further, the Town ratified the acts of Defendants.

## COUNT NINE
### Against Defendants Doyle, Hoffman, and Zellinger
### 42 U.S.C. § 1983 (Due Process and Fourth Amendment)

82. Plaintiff repeats and realleges the preceding paragraphs hereof, as if fully set forth herein.

83. At all times relevant to this complaint, Defendants Doyle and Hoffman were acting under color of the laws of the State of North Carolina.

84. The investigation conducted by Defendant Hoffman under the direction of Defendant Doyle and Zollinger was precipitated by the Defendant BOE's referral of censures on August 24, 2022.

85. On January 24, 2023, Defendants were aware the actions of the BOE in censuring Plaintiff were void *ab initio* because they were done in violation of the Board's powers under its own policies and under its powers granted by State law.

86. Despite this knowledge, on January 25, 2023, Defendants swore to facts which were known to be insufficient to establish probable cause to arrest Plaintiff for larceny or a willful and corrupt omission, neglect, or refusal to discharge his duties as a school member or the willful and corrupt violation of the oath of his office.

87. Based on this knowingly insufficient affidavit, Defendants seized property wholly unrelated to either of the charges listed in the probable cause affidavit.

88. By the actions described in the preceding paragraphs, the defendant deprived

the Plaintiff of clearly established rights guaranteed by the Constitution of the United States and by the North Carolina Declaration of Rights, including:

a. freedom from unreasonable seizure of his property and person;

b. freedom from arrest without probable cause; and

c. freedom of speech.

89. Defendants also engaged in abuse of process in violation of Plaintiff's rights to procedural due process which forbids the use of legal process for a wrongful purpose.

90. In depriving Plaintiff of these rights, the defendants acted willfully, deliberately, maliciously, recklessly and with deliberate indifference to the Plaintiff's constitutional rights.

91. As a direct and proximate result of the acts of the Defendants, the Plaintiff suffered damages for which Defendants are responsible.

**COUNT TEN**
**WRONGFUL TERMINATION**
**IN VIOLATION OF PUBLIC POLICY**
**(North Carolina Common Law)**

92. Plaintiff repeats and realleges the preceding paragraphs hereof, as if fully set forth herein.

93. Plaintiff complained about Defendants Scott, Kerrigan, Powell, and West improper attempts to have Plaintiff exert his influence as a School Board member to advance the interests of Defendants or the Town.

94. Plaintiff also opposed illegal discrimination by Defendant Lawrence and by Defendant Powell.

95. Defendants initiated an investigation into allegations of misuse of Town property in retaliation for Plaintiff's complaints about discrimination by Defendant Lawrence. Defendants were unable to substantiate any of the allegations they made against Plaintiff.

96. After Plaintiff complained about discrimination by Defendant Powell, Defendants then came up with additional reasons to investigate Plaintiff and ultimately terminate him, based on his service as a School Board member, the censures issued by the School Board, and Plaintiff's seeking a protective order which Defendants alleged was the wrong kind of protective order.

97. All of these reasons for Plaintiff's termination were retaliatory and all of these reasons violated the public policy of the State of North Carolina.

98. As a direct and proximate result of the acts of the Defendants, the Plaintiff suffered damages for which Defendants are responsible.

99. Plaintiff's discharge by Defendants was in reprisal for his reporting misconduct and was in violation of public policy, and Defendants' disregard of Plaintiff's rights was done with actual malice entitling Plaintiff to punitive damages against Defendants.

## COUNT ELEVEN
## ABUSE OF PROCESS
### (North Carolina Common Law)

100. Plaintiff repeats and realleges preceding paragraphs hereof, as if fully set forth herein.

101. **Defendants** Doyle and Hoffman, and Zollinger were aware on January 25,

2023, that the censures issued by the Defendants BOE were void ab initio because the BOE failed to follow its own procedures in issuing them.

102. Despite this knowledge, Defendants proceeded recklessly to obtain a search warrant far in excess of and unrelated to the allegations contained in the censures, even if they had been valid.

103. Defendants had an ulterior motive when they misapplied criminal process to seize Plaintiff's property based on misdemeanor neglect of duty and go on a fishing expedition to find evidence of some matter for which they could charge Plaintiff criminally.

104. Defendants seizing of any property other than the specified phones alleged in the larceny charge was not warranted by the facts contained in probable cause affidavit known to Defendants at the time.

105. After misapplying criminal process to accomplish a purpose not warranted or commanded by the process, i.e., the facts and law contained in the search warrant, Defendants then proceeded to use the illegally seized evidence to accomplish a purpose not warranted or commanded by the warrant, that is, the indictment of Plaintiff on a felony charge of extortion and the resulting harassment and expenses of defending himself.

106. Despite the refusal of the alleged victim to participate in Defendants' efforts to use criminal process against Plaintiff, Defendants proceeded to obtain an indictment after both illegally seizing Plaintiff's property through the abuse of the criminal process and then committing the additional act of indicting Plaintiff on offenses for

which they knew no evidence supported.

107.In addition, Defendants by illegally seizing the excessive property seized including computers and files violated Plaintiff's rights by reading his privileged attorney client communications.

108.As a direct and proximate result of the acts of the Defendants, the Plaintiff suffered damages for which Defendants are responsible.

109.Defendants' disregard of Plaintiff's rights was done with actual malice entitling Plaintiff to punitive damages against Defendants.

**COUNT TWELVE**
**Against All Defendants**
**Intentional Infliction Of Emotional Distress**
**(North Carolina Common Law)**

110.Plaintiff repeats and realleges the preceding paragraphs hereof, as if fully set forth herein.

111.Defendants McLeod, Lawrence, Marshburn, and Preston engaged in extreme and outrageous conduct by obtaining and posting on social media false information, defamatory information, accusations without basis in fact or law.

112.Defendants Town, Scott, Kerigan, West, Powell, Lee, BOE, Sutton, Sessoms, Tippett, Wooten, Andrews, Carroll, Donovan, Doyle, and Hoffman, all ratified and adopted the actions of Defendants McLeod, Lawrence, Marshburn, and Preston by relying on them without any bona fide investigation or evaluation.

113.Defendants' actions were so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and should be regarded as atrocious and utterly intolerable in a civilized community.

114. Defendants intended for the outrageous and extreme conduct engaged in and ratified to cause Plaintiff severe emotional distress.

115. Defendants' actions did in fact cause Plaintiff severe emotional distress.

116. Defendants acted with malice and reckless disregard and should be responsible for punitive damages.

## COUNT THIRTEEN
### Against BOE and individual BOE Defendants
### and McLeod, Marshburn, Lawrence, and Preston
### Tortious Interference With Contract
### (North Carolina Common Law)

117. Plaintiff repeats and realleges preceding paragraphs hereof, as if fully set forth herein.

118. Plaintiff, by virtue of his employment relationship, had a contract with the Town.

119. Defendants McLeod, Lawrence, Marshburn, Preston, BOE, Sutton, Sessoms, Tippett, Wooten, Andrews, Donovan and Carroll knew that Plaintiff was employed by the Town.

120. Defendants took concerted efforts to make false allegations of misconduct and improper conduct and to issue censures based on incomplete and inadequate investigations which contained unsupported conclusions against Plaintiff in order to influence the Town to terminate his employment.

121. The Town in fact relied upon Defendants Marshburn, Lawrence, Preston, and McLeod's allegations that Plaintiff obtained the wrong protective order against Defendant McLeod when terminating Plaintiff.

122.In addition, the Town relied upon the censures instigated and ratified by **Defendants BOE, Sutton, Sessoms, Tippett, Wooten,** Andrews, Carroll, and Donovan when terminating Plaintiff.

123.Defendants acted without justification in taking the actions which were intended to and did induce the Town to terminate Plaintiff's employment.

124.As a direct and proximate result of the acts of the Defendants, the Plaintiff suffered damages for which Defendants are responsible.

125.Defendants' disregard of Plaintiff's rights was done with actual malice entitling Plaintiff to punitive damages against Defendants.

**COUNT FOURTEEN**
**Against All Defendants**
**Defamation**
**(North Carolina Common Law)**

126.Plaintiff repeats and realleges the preceding paragraphs hereof, as if fully set forth herein.

127.Defendants Town, Scott, Kerrigan, Powell, West, McLeod, Lawrence, Marshburn, Preston, **BOE, Sutton, Sessoms, Tippett, Wooten,** Andrews, Donovan, and Carroll made oral and written statements tending to impeach Plaintiff in his profession as a police detective and in his capacity as a School Board member and tending to subject Plaintiff to ridicule, contempt or disgrace.

128.Some of the statements made were defamatory *per se*.

129.As a direct and proximate result of the acts of the Defendants, the Plaintiff suffered damages for which Defendants are responsible.

130.Defendants' disregard of Plaintiff's rights was done with actual malice

entitling Plaintiff to punitive damages against Defendants.

## COUNT FIFTEEN
### Against All Defendants
### 42 U.S.C. § 1983 (Conspiracy)

131. Plaintiff repeats and realleges preceding paragraphs hereof, as if fully set forth herein.

132. Defendants, both public and private, all worked together and shared information intended to retaliate against Plaintiff for speaking out about matters of public concern and to violate Plaintiff's rights to procedural due process resulting from the improper use of process and his rights to be free from illegal searches and seizures.

133. There was a symbiosis and interdependence between the private actor Defendants McLeod, Lawrence, Marshburn, and Preston and the public actors Defendants Scott, Powell, Kerigan, and West and Sutton, Sessoms, Tippett, Wooten, Andrews, Donovan, and Carroll in their actions as seen in the facts showing communication and meetings between Defendants and the similarity of allegations and publication of information, the source of which could only be the public actors, with the then resulting reliance on the publication of information as the basis for taking State action.

134. Defendants McLeod, Lawrence, Marshburn, and Preston as private actors are liable under section 1983 because they participated with the public actor defendants in a conspiracy to violate Plaintiff's constitutional rights.

135. The actions of the public actor Defendants were not done in the normal course

of their corporate duties but were outside the scope of their authority as public actors.

136.There is between the parties an actual controversy as set forth in this complaint. The Plaintiff has suffered and is suffering irreparable injury and is threatened with irreparable harm in the future by reason of the acts herein complained of. A substantial loss or impairment of his constitutional rights has occurred and will continue to occur so long as defendants' conduct continues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

1.Reinstatement to the position Plaintiff held with Defendant Department prior to his termination;

2.All pay, benefits, seniority, promotions, leave and emoluments Plaintiff would have otherwise been entitled to as a police officer had it not been for the unlawful termination of Plaintiff in violation of Plaintiff's rights under the United States Constitution;

3.Interest on the back pay at the full legal rate, such interest accruing from the date each paycheck or other pay item disbursement would have been received had Plaintiff not been terminated;

4.General damages according to proof, including but not limited to:

    a.  Loss of earning capacity.

    b.  Damage to reputation in the past and future.

    c.  Mental anguish in the past and future.

5.Special damages according to proof;

6.Punitive damages according to proof;

7.Attorney fees pursuant to state and federal law, including 42 U.S.C. § 1988 and N.C. Gen. Stat. § 6-21.7;

8.Costs and expenses of suit; and

9.Such other and further relief as the court deems just and proper.

## PRAYER FOR RELIEF

There is between the parties an actual controversy as set forth in this complaint. The plaintiff has suffered and is suffering irreparable injury and is threatened with irreparable harm in the future by reason of the acts herein complained of. A substantial loss or impairment of his constitutional rights has occurred and will continue to occur so long as defendants' conduct continues.

WHEREFORE, Plaintiff respectfully requests judgment as follows:

1. Reinstatement to the position Plaintiff held with Defendant Department prior to his termination;

2. All pay, benefits, seniority, promotions, leave and emoluments Plaintiff would have otherwise been entitled to as employee of the Town had it not been for the unlawful termination of Plaintiff in violation of Plaintiff's constitutional and statutory rights described above, including his common law and statutory rights and his constitutional rights;

3. Interest on the back pay at the full legal rate, such interest accruing from the date each paycheck or other pay item disbursement would have been received had Plaintiff not been terminated;

4. General and special compensatory damages according to proof, including but not limited to

   a. Lost earnings.

   b. Loss of earning capacity.

   c. Damage to reputation in the past and future.

   d. Emotional distress, mental anguish, pain and suffering in the past and future.

   e. Loss of pension or retirement benefits.

5. Punitive damages against Defendants according to proof;

6. A preliminary and/or permanent injunction prohibiting Defendants, or any of them, from taking any punitive action against Plaintiff in response to Plaintiff's exercise of rights rights;

7. A preliminary and/or permanent injunction prohibiting Defendants from taking any of Plaintiff's personal property and subjecting him to additional unlawful searches and seizures;

8. Attorney fees pursuant to N.C. Gen. Stat. § 6-21.7 and 42 U.S.C.A. § 1988;

9. Costs and expenses of suit; and

10. Such other and further relief as the court deems just and proper.

**Plaintiff demands a trial by jury on all claims properly triable by a jury.**

Respectfully submitted, this 26th day of June 2023.

/S/ VALERIE L. BATEMAN     /S/ JUNE K. ALLISON
Valerie L. Bateman         June K. Allison
NC State Bar: 13417        NC State Bar: 9673
valerie@newsouthlawfirm.com  june@newsouthlawfirm.com
NEW SOUTH LAW FIRM       NEW SOUTH LAW FIRM
209 Lloyd St., Ste 350       233 S. Laurel Avenue
Carrboro, NC 27510        Charlotte, NC 28207
T: 919-969-9734           T: 704-277-0113
F: 919-823-6383           F: 919-823-6383

***Attorneys for Plaintiff***     ***Attorneys for Plaintiff***