IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:23-CV-349-D

RONALD L. JOHNSON, JR.,            )
                                   )
            Plaintiff,             )
                                   )
      v.                           )          **ORDER**
                                   )
TOWN OF SMITHFIELD, et al.,        )
                                   )
            Defendants.            )

On June 26, 2023, Ronald L. Johnson, Jr. ("Johnson" or "plaintiff") filed this action against

(1) the Town of Smithfield ("Smithfield"), (2) Michael Scott ("Scott") in his individual and official

capacity as Town Manager, (3) Timothy Kerigan ("Kerigan") in his individual and official capacity

as Town Human Resources Director, (4) Terry West ("West") in his individual and official capacity

as Town Police Department Lieutenant, (5) Keith Powell ("Powell") in his individual and official

capacity as Town Police Chief, (6) Marlon Lee ("Lee") in his individual and official capacity as

Town Council Member, (7) the Johnston County School Board of Education ("Board"), (8) Todd

Sutton ("Sutton") in his individual and official capacity as a member and former chair of the Board,

(9) Terri Sessoms ("Sessoms") in her individual and official capacity as a member of the Board,

(10) Terry Tippett ("Tippett") in his individual and official capacity as a member of the Board, (11)

Michael Wooten ("Wooten") in his individual and official capacity as a member of the Board, (12)

Lyn Andrews ("Andrews") in her individual and official capacity as a member and chair of the

Board, (13) Kay Carroll ("Carroll") in his individual and official capacity as a member of the

Board, (14) Kevin Donovan ("Donovan") in his individual and official capacity as a member of

the Board, (15) Susan Doyle ("Doyle") in her individual and official capacity as District Attorney

of Johnston County, (16) Richard Hoffman ("Hoffman") in his individual and official capacity as an assistant district attorney special investigator of Johnston County, (17) Benjamin O. Zellinger ("Zellinger") in his individual and official capacity as a special prosecutor for Johnston County, (18) Angie McLeod ("McLeod"), (19) Jimmy Lawrence ("Lawrence"), (20) David Marshburn ("Marshburn"), and (21) the Estate of Joseph Preston ("Preston") (collectively, "defendants") [D.E. 1].

Johnson alleges (1) sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq., against Smithfield, (2) retaliation in violation of Title VII against Smithfield, (3) discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., against Smithfield, (4) retaliation in violation of the ADA against Smithfield, (5) interference in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615, against Smithfield and Scott, Kerigan, West, Powell, and Lee in their individual capacities, (6) retaliation in violation of the FMLA against Smithfield and Scott, Kerigan, West, Powell, and Lee in their individual capacities, (7) violations of the First Amendment of the United States Constitution under 42 U.S.C. § 1983 against Smithfield, Scott, Kerigan, Powell, and West in their individual capacities, and Lee in both his individual and official capacities, (8) violations of the First Amendment of the United States Constitution under 42 U.S.C. § 1983 against the Board, Sutton, Sessoms, Tippett, Wooten, Andrews, Carroll, and Donovan in their individual and official capacities, (9) violations of the Fourth Amendment of the United States Constitution under 42 U.S.C. § 1983 against Doyle, Hoffman, and Zellinger in their individual and official capacities, (10) wrongful termination under North Carolina law against Smithfield, Scott, Kerigan, Powell, and West, (11) abuse of process under North Carolina law against Doyle, Hoffman, and Zellinger, (12) intentional infliction of emotional distress under North Carolina law against all defendants,

2

(13) tortious interference with contract under North Carolina law against the Board, Lee, Sutton, Sessoms, Tippett, Wooten, Andrews, Carroll, Donovan, McLeod, Marshburn, Lawrence, and Preston, (14) defamation under North Carolina law against all defendants, and (15) conspiracy under 42 U.S.C. § 1983 against all defendants. See [D.E. 1] 2–4, 86–108.[1]

On August 25, 2023, Lawrence moved to dismiss for failure to state a claim [D.E. 41] and filed a memorandum in support [D.E. 42]. On August 28, 2023, Zellinger moved to dismiss for failure to state a claim [D.E. 45] and filed a memorandum in support [D.E. 46]. The same day, Doyle and Hoffman moved to dismiss for lack of jurisdiction and failure to state a claim [D.E. 47] and filed a memorandum in support [D.E. 48]. On August 29, 2023, Marshburn filed an answer [D.E. 50]. On September 8, 2023, Andrews, Carroll, Donovan, the Board, Sessoms, Sutton, Tippett, and Wooten moved to dismiss for failure to state a claim [D.E. 67] and filed a memorandum in support [D.E. 71]. The same day, Kerigan, Lee, Powell, Scott, Smithfield, and West moved to dismiss for failure to state a claim [D.E. 72] and filed a memorandum in support [D.E. 73]. On September 20, 2023, Johnson filed a motion to deem his pleadings timely filed to allow his response in opposition to Lawrence's motion to dismiss [D.E. 81]. On October 2, 2023, Lawrence replied [D.E. 83]. On the same day, Johnson responded in opposition to Zellinger's motion to dismiss [D.E. 84] and Doyle and Hoffman's motion to dismiss [D.E. 85]. On October 13, 2023, Johnson responded in opposition to Kerigan, Lee, Powell, Scott, Smithfield, and West's motion to dismiss [D.E. 90]. On October 16, 2023, Zellinger replied [D.E. 92], and Doyle and

---

[1] Johnson alleges violations of the North Carolina Persons with Disabilities Act, N.C. Gen. Stat. §§ 168A-1, et seq. See [D.E. 1] 2. Johnson fails to allege any specific incidents or allege this violation as a count in his complaint. Thus, the court declines to consider any alleged violation of the North Carolina Persons with Disabilities Act. Additionally, Johnson alleges a Fifth Amendment violation. See id. at 3. Johnson, however, fails to allege any specific incidents or allege this violation as a count in his complaint. Thus, the court declines to consider any alleged Fifth Amendment violation.

3

Hoffman replied [D.E. 93]. On the same day, Johnson responded in opposition to Andrews, Carroll, Donovan, the Board, Sessoms, Sutton, Tippett, and Wooten's motion to dismiss [D.E. 95]. On October 20, 2023, McLeod moved to dismiss [D.E. 98], filed a memorandum in support [D.E. 99], and filed a motion to deem timely filed her motion to dismiss [D.E. 100]. On November 6, 2023, Andrews, Carroll, Donovan, the Board, Sessoms, Sutton, Tippett, and Wooten replied [D.E. 106]. On November 10, 2023, Kerigan, Lee, Powell, Scott, Smithfield, and West replied [D.E. 108]. On November 27, 2023, Johnson responded in opposition to McLeod [D.E. 111].

As explained below, the court grants Lawrence's motion to dismiss, denies Johnson's motion to deem timely filed his opposition to Zellinger's motion to dismiss, grants Zellinger's motion to dismiss, grants Doyle and Hoffman's motion to dismiss, dismisses in part Johnson's claims against Marshburn, grants the motion to dismiss of the Board, Sutton, Sessoms, Tippett, Wooten, Andrews, Carroll, and Donovan, grants in part and denies in part Smithfield's motion to dismiss, grants Scott, Kerigan, West, Powell, and Lee's motion to dismiss, denies McLeod's motion to deem timely filed her motion to dismiss, and dismisses Preston from the action.

I.

On June 13, 2005, Johnson joined the Smithfield Police Department as a police officer. See Compl. [D.E. 1] 4, 18. In 2012, the Smithfield Police Department promoted Johnson to detective. See id. During this time, Johnson received excellent performance ratings. See id. Johnson alleges that while he served in the police department, Powell made improper comments and engaged in other misconduct. See id. at 42–49.

In 2016, with the knowledge and permission of his supervisors and Smithfield, Johnson ran for the Board. In 2016, the voters in Johnston County elected Johnson to the Board. See id. at 4, 18. While serving on the Board, Johnson allegedly encountered misconduct, including sexual

harassment of a female employee by Lawrence in July 2019, a controversy with the Clayton High School principal, Bennett Jones ("Jones"), concerning how the school issued diplomas in August 2019, and self-dealing by Board member Tracie Zukowski ("Zukowski"). See id. at 4, 18–22. In August 2019, in his capacity as a Board member, Johnson proposed that the Board adopt a policy against sexual harassment. See id. at 19–22. On August 23, 2019, Lawrence filed a complaint against Johnson for bringing his service weapon onto school property. See id. at 19.

On January 2, 2020, the Raleigh News and Observer published an article concerning a video interview that Johnson posted on December 30, 2019. See [D.E. 2-2]. In the interview, Johnson said that he would give the State Bureau of Investigation recordings, emails, and text messages proving that high-ranking school officials engaged in "corrupt behavior." Id. at 2. According to the article, Johnson alleged bribery, corruption, lying to the public, and covering up complaints of sexual harassment of school employees. See id. According to the article, Johnson alleged that Art Stanley, the school district's chief finance officer, had been directed to lie about the amount of money the school district required. See id. at 3. Johnson called for a forensic audit of the school district's finances. See id. at 4. The article also stated that since June 2019, Johnson had been trying to help two female school employees who reported being sexually harassed and inappropriately touched by a male school employee. See id. Johnson claimed that he repeatedly conveyed information about the sexual harassment to school staff and Board members. See id. Johnson also claimed that he had proof of the sexual harassment, "including a recording of the male employee loosening his clothes, pulling at the clothes of one of the female employees, and the employee pushing him away and telling him to stop." Id. at 5. In the same article, the newspaper reported that Sutton denied that he or the Board had lied to the public about school finances or anything else, that he had not received any proof of the alleged sexual harassment from

5

Johnson until January 1, 2020, and that Johnson was supposed to provide evidence to the school superintendent to address the sexual harassment allegations. See id. at 2–5.

The newspaper also reported that Johnson claimed that Zukowski engaged in self-dealing because she promoted products that her employer sold. See id. at 5–6. Sutton responded that there was no conflict of interest because Zukowski's employer had replaced her as its representative after voters elected Zukowski to the Board. See id. at 6.

In the same article, Johnson charged that a "high-ranking" school official tried to bribe Jones with promises that he could keep his job as principal and get a promotion. Id. According to Johnson, the bribery scheme involved Jones publicly blaming a Board member as being the "driving force" behind the Clayton High School diploma controversy. Id. When Jones refused to join the bribery scheme, Jones was reassigned to another school in August 2019. See id.

On January 9, 2020, the JoCo Report published an article concerning the sexual harassment allegations. See [D.E. 2-3]. The article recounted an interview with a "longtime Johnston County Public Schools employee." Id. at 1. The article identified the "victim" employee as "one of two women" referenced in Johnson's allegations. Id. The alleged victim remained anonymous but detailed two years of verbal comments and unwanted touching by a powerful and influential man. See id. at 2. She repeatedly told the man to stop. See id. He did not. See id. In 2018, the victim complained to her supervisor. See id. Her supervisor did nothing. See id. In June 2019, she approached Johnson for assistance. See id. at 3.

In August 2019, according to the article, Johnson confronted the man and also told the Board about the sexual harassment. See id. at 3–4. In response, the Board told the man not to be alone with the female school employee. See id. Nevertheless, the man kept going to her office

6

and allegedly told her, "I will have his (Johnson's) badge and I will have it framed and on the wall in my house." Id. at 4.

According to the article, the victim came forward in response to WRAL-TV's coverage of Board Chair Sutton's January 2, 2020 press conference. See id. The victim said that when Sutton questioned Johnson's credibility, she knew she had to "speak out." Id. In the article, the victim urged Sutton and other members of the Board to take action. See id. at 6.

The Board retained Tharrington Smith LLP to investigate the allegations. As part of its investigation, Tharrington Smith LLP learned about inappropriate text messages that Johnson exchanged with then-Board counsel Lawrence during April 2019 and May 2019 Board meetings concerning a female school employee. See [D.E. 2-4] 1–2, 6. On January 27, 2020, Tharrington Smith LLP shared the April 9, and May 14, 2019 text messages with Johnson. Johnson, in turn, met with the female school employee and told her that he and Lawrence inappropriately texted with each other in 2019 about a blue dress that the female school employee had worn to some Board meetings in 2019. See id. at 2–3. Johnson did not share the text messages with the female school employee. See id.

On March 6, 2020, Lawrence resigned as Board counsel "effective immediately." [D.E. 2-5]; see Compl. 22–23.

In October 2020, McLeod initially assisted Johnson with his reelection campaign. The relationship between Johnson and McLeod, however, turned sexual. See Compl. 23–40. Johnson alleges that the relationship was not consensual and that McLeod forced herself upon him and then threatened to tell Johnson's wife about their affair. See id. at 23–28.

In November 2020, the voters reelected Johnson to the Board. See id. at 23. In December 2020, believing he was a victim of blackmail and extortion, Johnson requested help through the

7

Smithfield Employee Assistance Program from Kerigan, Smithfield's Human Resources Director. See id. at 28–29.

In May 2022, after McLeod's actions escalated, Johnson notified West, his supervisor at the Smithfield Police Department, about his encounters with McLeod. See id. at 34. Also in May 2022, Board attorneys informed Johnson that McLeod had filed a complaint against Johnson with the school system. See id. at 63. On June 14, 2022, WRAL's Kara Lysie sent an information request to Johnson stating that "paperwork was being filed against [Johnson] by McLeod for stalking and sexual harassment." Id. at 36. Marshburn and McLeod provided the story to WRAL. See id. Johnson called West for advice on how to respond. See id. at 36–37. West told Johnson to get a protective order against McLeod. See id. Johnson proceeded to do so. See id. at 37–40.

On June 24, 2022, at 8:00 p.m., Marshburn, a candidate for Johnston County Sheriff, and Preston streamed their first of 23 Facebook Live webcasts and public posts. See id. at 5, 40–42, 50–51, 56, 59, 62. In these webcasts, Marshburn and Preston alleged that Johnson had "engaged in misconduct as a police detective, violated the law, and that [Johnson] had engaged in misconduct as a member of the [Board]." Id. at 5. Marshburn and Preston also shared Johnson's "confidential personnel information and confidential personal health information." Id. at 42, 51. Johnson alleges Marshburn and Preston received this information at the direction of West or Powell. See id. at 58. The webcasts resulted in Johnson developing anxiety and depression. See id. at 5.

On June 29, 2022, West notified Johnson that he was the subject of an administrative investigation as a result of the June 24, 2022 webcast. See id. at 5, 49–62; [D.E. 2-6]. Smithfield intended to determine if Johnson "used department equipment to investigate people in furtherance of [his] political career and in the commission of an extra-marital affair in violation of departmental policy." [D.E. 2-6] at 1. The notice advised Johnson that Smithfield General Order Section 201

8

required officers to "avoid actions that tend to bring the Department into disrepute or tend to impair the operations of the Department or the efficiency of any officer or employee." Id. It also advised Johnson that Smithfield General Order Section 202 prohibited officers from engaging in "any activity or personal business which would cause them to neglect or be inattentive to their responsibilities." Id. Moreover, it advised Johnson that Smithfield General Order Section 204 stated that no "department member or employee shall use any supplies or equipment of [Smithfield] for political or partisan purposes." Id. Furthermore, it advised Johnson that Smithfield Personnel Regulation 42 provided that "[Smithfield] employees are not to use [Smithfield] equipment or vehicles for private purposes." Id.

On July 5, 2022, at 4:40 p.m., Smithfield placed Johnson on administrative leave with pay. See Compl. 52. On July 6, 2022, Johnson requested leave under the FMLA and provided Smithfield with a physician's note that he should not work until at least July 29, 2022. See id. at 55. Smithfield granted the FMLA leave but required Johnson to cooperate with the investigation and remain in daily contact with West. See id. at 56.

On July 12, 2022, Smithfield placed Johnson on administrative leave without pay. See id. at 55. The same day, West and Powell went to Johnson's residence and pressured Johnson to return to work early. See id. Smithfield also asked Johnson for return-to-work notices regularly. See id. at 56.

On July 27, 2022, Johnson informed Smithfield that he believed the administrative investigation was based on his sex. See id. at 57. Smithfield did not investigate Johnson's sex-discrimination allegation and continued to investigate Johnson. See id.

Concurrently with Smithfield's investigation of Johnson, the Board hired Tharrington Smith LLP to investigate Johnson's conduct on the Board. See id. at 6, 62–73. On August 1, 2022,

9

Johnson met with the Board's attorneys conducting the investigation, but Johnson refused to provide information during August 2022 without first obtaining counsel. See id. at 65–66.

On August 9, 2022, the day after the April 9, and May 14, 2019 text exchanges aired on a Facebook Live webcast, the female school employee texted Johnson. See [D.E. 2-4] 3. She asked, "so the texts in the infamous Facebook live last night are what you told me about / apologized for awhile ago?" Id. Johnson responded, "Yes." Id.

On August 24, 2022, Tharrington Smith LLP reported its findings to the Board. See [D.E. 2-8] 1. The investigation focused on two allegations: Johnson's recording of a closed session Board meeting and Johnson's attempt to interfere in the school assignment of two special education students. See id. at 2.

As for the first allegation, the investigation revealed that Johnson secretly recorded a portion of the Board's May 31, 2022 closed session meeting and later played that recording for a Board employee. See id. at 5. The Tharrington Smith LLP report stated that Johnson "acknowledged that he has recorded Board members on approximately 10 occasions since January 2022, without telling them he was recording, and that one discussion he recorded pertains to JCPS business." Id. at 5. Tharrington Smith LLP observed that under the Board's Code of Ethics Policy, Board members promise to "not make secret recordings, in any format, on school system property, at school- or Board-related events or meetings, or otherwise connected to the business of the Board or the Johnston County Public Schools." Id. at 7. Tharrington Smith LLP concluded that Johnson's actions violated Section (B)(7) of the Code of Ethics. See id. at 8.

As for the second allegation, Tharrington Smith LLP investigated complaints from a parent that Johnson attempted to remove the parent's two autistic children from their school assignment because of "personal issues" between Johnson and the parent. See id. at 11. Tharrington Smith

10

LLP's interviews with the school's principal and other Board employees revealed that Johnson "sought to interfere with the school assignment of two special education students for personal reasons," specifically because, "Johnson said Parent A had turned on him and that pulling the reassignments for Students 1 and 2 would do him a solid." Id. at 13. Tharrington Smith LLP found that Johnson violated Board Code of Ethics Policy 2120(B)(14), which includes "refrain[ing] from using the [B]oard member's position on the Board for personal or partisan gain." Id.

On August 24, 2022, the Board issued two public censures against Johnson based on Tharrington Smith LLP's findings. See Compl. 67. After the Board meeting, Tharrington Smith LLP contacted Johnson concerning a third allegation. See id. at 69–70. According to Sutton, an employee raised a claim of sexual harassment based on text messages that Johnson exchanged with Lawrence during Board meetings in April and May 2019. See [D.E. 2-9] 1.

On September 7, 2022, Johnson's attorney provided Tharrington Smith LLP with information concerning the allegations. See Compl. 71. On September 19, 2022, Johnson also provided sworn answers to interrogatories. See id. On September 26, 2022, Tharrington Smith LLP also asked Johnson whether Johnson used a Smithfield Police Department vehicle to visit a female school employee's residence and whether he showed that female school employee videos or promotional material for his Board campaign. See [D.E. 2-9] 2.

On September 30, 2022, West told Johnson that Johnson perjured himself when seeking a protective order against McLeod because Johnson requested a "50C protective order" instead of a "50B protective order." See Compl. 61. A 50B protective order is a domestic violence protective order concerning a person with whom the alleged victim had a personal relationship, including a current or former spouse or current or former paramour. See id. A 50C protective order is a civil no contact order that is designed for a victim of sexual assault or stalking who has not had a

11

personal relationship with the offender. See id. Powell also told Johnson that Johnson used police department equipment for personal use. See id. at 81.

On October 5, 2022, following Smithfield's investigation of Johnson, Powell delivered to Johnson an "Employee Dismissal Recommendation." See id. at 6–7, 80–85. In his recommendation, Powell stated that Johnson's conduct on the Board negatively affected Johnson's "perceived integrity, neutrality, or reputation related to the performance of the employee's town duties" in violation of the Smithfield handbook. [D.E. 2-13] 1. Powell also found that Johnson violated General Order Section 201, which states that "[o]fficers and employees are to conduct their private and professional lives in a manner becoming the office they hold." Id. "Officers and employees shall avoid actions that tend to bring the department into disrepute or tends to impair the operation of the department . . . ." Id.

On October 6, 2022, Tharrington Smith LLP completed its investigation and issued a memorandum concerning the alleged inappropriate text messages that Johnson exchanged with Lawrence during Board meetings in April and May 2019. See [D.E. 2-4]. During the investigation, Tharrington Smith LLP interviewed Lawrence, and he admitted exchanging the inappropriate text messages. Additionally, Johnson responded, through counsel, via affidavits in September and October 2022. See id. In the affidavits, Johnson admitted that during a Board meeting on April 9, 2019, he and Lawrence exchanged inappropriate text messages about the desirability of a female school employee who was attending the meeting. See id. at 1–2, 6. Likewise, on May 14, 2019, at a Board meeting, Johnson and Lawrence exchanged another inappropriate text message about the same female school employee attending the meeting. See id. at 2, 7.

As mentioned, on January 27, 2020, Tharrington Smith LLP shared the text messages of April 9, and May 14, 2019, with Johnson as part of a separate investigation. See id. at 2. The

12

same day, Johnson texted the female school employee who was the subject of the text exchanges. See id. at 2–3. Johnson asked to meet her because he "might've let [her] down." Id. at 2. In response to Tharrington Smith LLP's questions in 2022, Johnson said that the purpose of the January 27, 2020 meeting with the female school employee was not to discuss the text exchanges of April 9, and May 14, 2019. See id. at 3. Instead, Johnson claimed that he met the female school employee to discuss a personal matter. See id. The female school employee, however, told Tharrington Smith LLP in 2022 that at the January 27, 2020 meeting, Johnson told her that he and Lawrence had texted about a blue dress that she was wearing at a 2019 Board meeting. See id. In 2020, Johnson did not share the text messages with the female school employee. See id. At a Board meeting following their meeting on January 27, 2020, Johnson texted the female school employee and asked "where's the blue dress?" Id.

On October 6, 2022, Tharrington Smith LLP found that Johnson's 2019 text messages concerning the appearance and desirability of a female school employee violated Board policies requiring a respectful work environment. See id. at 4. Tharrington Smith LLP also found that Johnson's subsequent 2019 text to the female school employee asking "where's the blue dress" also violated the same Board policies. See id.

Tharrington Smith LLP observed that Board Policy 1010 required Board members to take "steps necessary to ensure legal compliance of Board and school system functions." Id. Moreover, the Board's Code of Ethics required Board members to: (1) "uphold the integrity and independence of the [B]oard member's office"; (2) "avoid impropriety in the exercise of the Board's and [B]oard member's official duties"; (3) model "civility to students, employees, and all elements of the community by encouraging the free expression of opinion by all [B]oard members and engaging in respectful dialogue with fellow [B]oard members on matters being considered by

13

the Board"; and (4) "take no private action that will compromise the Board or administration." Id. at 4–5.

Tharrington Smith LLP found that (1) "Johnson's text strings about the appearance and desirability of an employee on duty at a Board meeting damaged the integrity of his office in violation of Policy 2120(A.2)"; (2) "Johnson's text messages constituted impropriety in the exercise of his office and thus violated Policy 2120(A.3)"; (3) "Johnson's text messages set an example of incivility to a school employee in violation of Policy 2120(B.4)"; and (4) "Johnson's salacious text messages during a Board meeting about an employee present in her official role compromised the Board's mission of provid[ing] a respectful workplace that complies with law and Board policy in violation of Policy 2120(B.16)." Id. at 5.

On October 6, 2022, the Board issued its third public censure against Johnson. See Compl. 73. Johnson alleges that the Board's investigation was incomplete and biased in an attempt to force Johnson to resign from the Board. See id. at 6. The same day, the Board's attorneys released their investigative reports in a public session. See id. at 73.

After censuring Johnson on October 6, 2022, the Board referred Johnson's conduct to the Johnston County District Attorney's Office to determine whether Johnson committed the misdemeanors of a public official's willful and corrupt omission, neglect, or refusal to discharge his duties and the willful and corrupt violation of his oath of office. See id. at 6.

On October 14, 2022, Scott terminated Johnson's employment with Smithfield. See [D.E. 2-14]. Scott's stated reasons for terminating Johnson's employment included those reasons outlined in Powell's October 5, 2022 recommendation and the new allegations that were publicly revealed on October 6, 2022, in a JoCo Report news article concerning the inappropriate text messages in April and May 2019. See id. at 1. Scott determined that this admitted conduct of

14

"sending the text messages at issue in the article" also violated the Smithfield Employee Handbook. See id. Scott noted that he and Johnson met on October 12, 2022, to allow Johnson to respond to the most recent allegations and Powell's recommendation. See id. at 1–2. Scott made his final decision to terminate Johnson's employment after reviewing Johnson's responses, Powell's recommendation, the recent allegations, and Johnson's admissions. See id. at 2. After terminating Johnson's employment, Scott informed Johnson of his right to appeal the decision. See id.

In November 2022, the voters reelected Johnson to the Board. See Compl. 73.

On January 25, 2023, Hoffman, an investigator with the Johnston County District Attorney's office, obtained a search warrant from a North Carolina Superior Court Judge to search Johnson's office and car and to seize evidence of "[l]arceny of property" and "[w]illfully failing to discharge duties and [o]bstruction of [j]ustice." Id. at 75–76 (quotations omitted); see N.C. Gen. Stat. §§ 14-72, 14-230. Hoffman's probable cause affidavit in support of the search warrant cited Tharrington Smith LLP's findings that Johnson "secretly recorded a closed session" meeting of the Board. [D.E. 2-11] 6. The affidavit also stated that upon Johnson's termination from the Smithfield Police Department, the department asked Johnson to return two iPhones that the department issued to him. See id. Johnson had not returned the two iPhones despite department requests, and the affidavit noted that a person could use the iPhones as recording devices even without active cellular service. See id. The affidavit noted Johnson's history of making and sharing recordings of other individuals without their knowledge. See id. The affidavit also noted reports from witnesses that Johnson had used an iPhone to discuss school board information and information related to Board election campaigns. See id. at 7. The affidavit stated that Hoffman personally and recently viewed an iPhone and other electronic items used for video and

15

photography at Johnson's office. See id. The iPhone matched the model and description that the Smithfield Police Department provided to Johnson. See id. at 8.

On January 25, 2023, the Clayton Police Department assisted Hoffman when he went to apply to a North Carolina Superior Court Judge for a search warrant to obtain the iPhones. See id. While Hoffman was applying for the search warrant, Johnson visited his office and left minutes later with a large box. See id.

On March 29, 2023, Hoffman obtained another search warrant from a North Carolina Superior Court Judge to search Johnson's residence and car and to seize evidence of "[l]arceny of property," "[w]illfully failing to discharge duties, [f]elony obstruction of justice[,] and [c]onspiracy to [c]ommit extortion." Id. at 12. Hoffman's probable cause affidavit in support of the search warrant recounted Johnson's secret recordings concerning Board matters. See id. at 16–17. The affidavit also recounted statements from Angie McLeod (then named Angie Barbour) concerning Johnson's request for McLeod to "help record other persons," so that Johnson could "obtain recordings he could use at a later time for leveraging or to give him an advantage." Id. at 18. According to McLeod, Johnson "asked her to help him get De[V]an Barbour by recording him or by having sex with him." Id. A search warrant for the records connected with a phone Johnson gave to McLeod revealed that the email address used to activate the phone was "rljohnson@smithfieldpd.org." Id. at 19–20. The affidavit also stated that a search of Johnson's police department computer revealed "recordings of several past school superintendents and [B]oard members." Id. at 20.

The affidavit in support of the search warrant also included details of Hoffman's interview of DeVan Barbour on November 1, 2022. See id. at 21. During that interview, Barbour recounted to Hoffman a meeting between Barbour and Johnson in April 2022, where Johnson told Barbour

16

that he had a damaging recording of an incident between Barbour and McLeod. See id. at 22. At the time of the April 2022 meeting, Barbour was a candidate for Congress in a contested primary and the election was on May 17, 2022. See id. At the time of the April 2022 meeting, Johnson told Barbour that in exchange for not releasing the damaging recording and thereby damaging Barbour's campaign, Johnson wanted Barbour to secure a "written statement from [McLeod] stating that she lied about the affair" with Johnson. Id. As further support of Barbour's allegations about Johnson, Hoffman obtained text messages from Barbour. The text messages were between Barbour and Johnson and corroborated the occurrence and timing of Barbour's April 2022 meeting with Johnson. See id. at 22–24. The affidavit also stated that on May 12, 2022, Barbour received a text message from a phone number with an out of state area code again threatening to release the damaging recording of an incident between Barbour and McLeod. See id. Hoffman also obtained and executed a search warrant to determine the registered phone number behind the disguised "Pinger" phone number, and the search revealed Johnson's T-Mobile phone number as the registered user of the disguised "Pinger" number. See id. at 25.

Hoffman's affidavit in support of the search warrant also stated that Johnson removed items from his office before a Superior Court Judge issued the January 25, 2023 search warrant and immediately after someone told Johnson that the district attorney's office asked about security footage at the location of Johnson's office. See id. at 28. Hoffman noted that this "appeared to be in an effort to remove and/or destroy evidence this investigator was attempting to seize with a search warrant." Id.

On April 3, 2023, a Johnston County grand jury indicted Johnson and charged him with (1) felony extortion on April 25, 2022, in violation of North Carolina General Statute § 14-118.4 by threatening a candidate for political office, DeVan Barbour IV, with the intent to wrongly obtain

an advantage, (2) willfully failing to discharge duties in violation of North Carolina General Statute § 14-230 by recording a closed session of the Board's meeting on May 31, 2022, (3) willfully failing to discharge duties in violation of the same statute by failing to comply with public records requests on November 10, 2022, (4) willfully failing to discharge duties in violation of the same statute by attempting to transfer students to another school as an act of personal retaliation on July 1, 2022, and (5) felony common law obstruction of justice on January 25, 2023, by removing evidence related to Johnson's criminal activity when he was aware that law enforcement intended to search his belongings. See [D.E. 2-12]; Compl. 78–79. The charges remain pending in Johnston County Superior Court. See Compl. 7, 73–86.

On June 26, 2023, Johnson filed this action. Johnson seeks reinstatement with the Smithfield Police Department, backpay, compensatory damages, punitive damages, and injunctive relief against all defendants. See id. at 108–09.

## II.

### A.

Johnson seeks to have his response in opposition to Zellinger's motion to dismiss deemed timely filed. See [D.E. 80, 81]. On September 18, 2023, Johnson's response was due. See [D.E. 81] 1. That day, Johnson's counsel was unable to file in CM/ECF. See id. To remedy this issue, at 11:56 p.m., Johnson's counsel emailed the filings to "technical_failure_NCED@nced.uscourts.gov" and opposing counsel. See id. at 2. On September 20, 2023, Johnson filed a motion to have his response in opposition deemed timely filed. See id.

The Eastern District of North Carolina's CM/ECF Policy Manual ("Policy Manual") outlines the policy for technical failures. "The Eastern District of North Carolina's CM/ECF website will be considered a 'technical failure' if the site is unable to accept filings continuously

18

or intermittently over the course of any period of time greater than one hour after 10:00 A.M. Eastern Standard Time on a given day." Policy Manual 22. "A filer who is experiencing difficulty filing in CM/ECF should call the CM/ECF Helpdesk at 1-866-855-8894 to determine whether there is a technical failure as defined in this section." Id. at 23. "The Helpdesk is staffed only during regular business hours." Id. "Problems of the filing user, such as failure with the filer's phone line, internet service provider, or hardware and software, will not constitute a technical failure." Id.

On September 18, 2023, CM/ECF did not fail. Rather, Johnson's counsel waited until the final hour to file Johnson's response and then experienced technical difficulties. See [D.E. 81] 1–2. Counsel's difficulties do not constitute excusable neglect. See, e.g., Smith v. Look Cycle USA, 933 F. Supp. 2d 787, 790–92 (E.D. Va. 2013); cf. Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ships, 507 U.S. 380, 395 (1993) (describing factors to consider concerning excusable neglect). Thus, the court strikes as untimely Johnson's response in opposition to Zellinger's motion to dismiss. See [D.E. 80, 81].[2]

## B.

McLeod seeks to have her motion to dismiss deemed timely filed. See [D.E. 98–100]. Pro se litigants are not held to the same standards as attorneys, and courts liberally construe their pleadings. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam); Hughes v. Rowe, 449 U.S. 5, 9 (1980); Haines v. Kerner, 404 U.S. 519, 520–21 (1972) (per curiam). Pro se litigants, however, must comply with the Federal Rules of Civil Procedure. See McNeil v. United States, 508 U.S. 106, 113 (1993); Hansan v. Fairfax Cnty. Sch. Bd., 405 F. App'x 793, 794 (4th Cir. 2010)

---

[2] Alternatively, the court has considered the arguments in Johnson's response. These arguments are not persuasive and do not alter the court's analysis of Zellinger's motion to dismiss.

19

(per curiam) (unpublished); <u>Mason v. Walmart Stores, Inc.</u>, No. 5:23-CV-226, 2024 WL 497137, at *2 (E.D.N.C. Feb. 8, 2024) (unpublished); <u>Jones v. Se. Reg'l Med. Ctr.</u>, No. 7:18-CV-28, 2019 WL 97036, at *3 (E.D.N.C. Jan. 2, 2019) (unpublished); <u>Howard v. Lea</u>, No. 5:05-CV-637, 2006 WL 8438735, at *2 (E.D.N.C. May 1, 2006) (unpublished).

On June 29, 2023, Johnson sent McLeod a waiver of service. <u>See</u> [D.E. 30]. McLeod waived service, and her answer was due on August 28, 2023. <u>See id.</u> On October 20, 2023, McLeod filed her motion to dismiss. <u>See</u> [D.E. 98–100]. McLeod's failure to file a timely responsive pleading does not constitute excusable neglect. <u>See, e.g.</u>, <u>McNeil</u>, 508 U.S. at 113. Accordingly, the court strikes as untimely McLeod's motion to dismiss. <u>See</u> [D.E. 98–100].

### C.

In March 2023, Preston died. <u>See</u> Compl. 85. On June 26, 2023, Johnson filed this action against Preston. <u>See id.</u> at 111. On June 27, 2023, the Clerk of Court notified Johnson through CM/ECF of his failure to provide a summons or waiver of service on Preston or his estate. Johnson, who is represented by counsel, failed to serve a summons and complaint or waiver of service on Preston within 90 days. <u>See</u> Fed. R. Civ. P. 4(m). Accordingly, the court dismisses without prejudice Johnson's action against Preston and his estate. <u>See id.</u>; <u>Henderson v. United States</u>, 517 U.S. 654, 662–63, 663 n.10 (1996).

### D.

Johnson brings some claims against Smithfield and the Board and some claims against the employees of Smithfield and members of the Board in both their individual and official capacities. <u>See</u> Compl. 1. A claim against a public official sued in his official capacity is "essentially a claim against" the government entity the official represents. <u>Love-Lane v. Martin</u>, 355 F.3d 766, 783 (4th Cir. 2004); <u>see</u> <u>Kentucky v. Graham</u>, 473 U.S. 159, 165–66 (1985); <u>Ridpath v. Bd. of</u>

Governors Marshall Univ., 447 F.3d 292, 307 n.13 (4th Cir. 2006). Thus, Johnson's claims against Scott, Kerigan, Powell, West, and Lee in their official capacities are functionally brought against Smithfield. See Compl. 1; [D.E. 73] 10–11; Santos v. Frederick Cnty. Bd. of Comm'rs, 725 F.3d 451, 469 (4th Cir. 2013) ("For purposes of section 1983, these official-capacity suits [against government officials] are treated as suits against the municipality." (cleaned up)); see also Hafer v. Melo, 502 U.S. 21, 25 (1991). Similarly, Johnson's claims against Sutton, Sessoms, Tippett, Wooten, Andrews, Carroll, and Donovan in their official capacities are functionally brought against the Board, which Johnson admits. See [D.E. 90] 5–6. Accordingly, the court dismisses Johnson's official capacity claims against Scott, Kerigan, Powell, West, Lee, Sutton, Sessoms, Tippett, Wooten, Andrews, Carroll, and Donovan.

E.

In Johnson's response in opposition to the motion to dismiss of Smithfield, Scott, Kerigan, Powell, West, and Lee, Johnson attempts to add another claim under 42 U.S.C § 1983 and a claim under the ADA. See [D.E. 90] 4–8, 18–20; [D.E. 95] 24–33. Johnson cannot use a response in opposition to a motion to dismiss to amend his complaint. See United States ex rel. Carter v. Halliburton Co., 866 F.3d 199, 210 n.6 (4th Cir. 2017); Murray Energy Corp. v. Admin. of EPA, 861 F.3d 529, 537 n.5 (4th Cir. 2017); vonRosenberg v. Lawrence, 849 F.3d 163, 167 n.1 (4th Cir. 2017); S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC, 713 F.3d 175, 184 (4th Cir. 2013); Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 617 (4th Cir. 2009); Optima Tobacco Corp. v. U.S. Flue-Cured Tobacco Growers, Inc., No. 5:16-CV-889, 2019 WL 4858848, at *7 (E.D.N.C. Sept. 30, 2019) (unpublished); Hexion Specialty Chems., Inc. v. Oak-Bark Corp., No. 7:09-CV-105, 2011 WL 4527382, at *7–8 (E.D.N.C. Sept. 28, 2011) (unpublished). Accordingly, these claims are not in this case.

III.

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency. See Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to [the nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 352 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by Reed v. Town of Gilbert, 576 U.S. 155 (2015). A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678–79. Rather, a plaintiff's factual allegations must "nudge[] [his] claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." Iqbal, 556 U.S. at 678–79.

"Determining whether a complaint states a plausible claim for relief . . . [is] a context specific task that requires the reviewing court to draw on judicial experience and common sense." Iqbal, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint does not suffice. Id.

When evaluating a motion to dismiss, a court considers the pleadings and any materials "attached or incorporated into the complaint." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011); see Fed. R. Civ. P. 10(c); Goines v. Valley Cmty. Servs.

22

Bd., 822 F.3d 159, 165–66 (4th Cir. 2016); Thompson v. Greene, 427 F.3d 263, 268 (4th Cir. 2005). A court also may consider a document submitted by a moving party if it is "integral to the complaint and there is no dispute about the document's authenticity" without converting the motion into one for summary judgment. Goines, 822 F.3d at 166. "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . . , the exhibit prevails." Id. (quotation omitted); see Fayetteville Invs. v. Com. Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991). Additionally, a court may take judicial notice of public records. See, e.g., Fed. R. Evid. 201; Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007); Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

North Carolina law applies to some claims in this case. For those claims, this court must predict how the Supreme Court of North Carolina would rule on any disputed state-law issue. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co., 433 F.3d 365, 369 (4th Cir. 2005). First, the court looks to opinions of the Supreme Court of North Carolina. See Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from that court, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation and citation omitted). In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013) (quotation omitted); see Hicks ex. rel. Feiock v. Feiock, 485 U.S. 624, 630 & n.8 (1988). Moreover, in predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and

23

quotation omitted); see Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

## A.

In count one, Johnson alleges a Title VII sex discrimination claim against Smithfield. See Compl. 86–87. Even though a plaintiff need not plead a prima facie case to survive a motion to dismiss,[3] Swierkiewicz "left untouched the burden of a plaintiff to allege facts sufficient to state all the elements of [his] claim." Jordan v. Alt. Res. Corp., 458 F.3d 332, 346 (4th Cir. 2006) (cleaned up), overruled on other grounds by Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264 (4th Cir. 2015) (en banc); see McCleary-Evans v. Md. Dep't of Transp., 780 F.3d 582, 585 (4th Cir. 2015). In order to state a sex discrimination claim under Title VII, Johnson must plausibly allege that Smithfield discriminated against him because of his sex.

Johnson lacks direct evidence of sex discrimination and proceeds under the burden-shifting framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973). See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc), abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009). "The McDonnell Douglas framework is comprised of three steps: (1) the plaintiff must first establish a prima facie case of employment discrimination or retaliation; (2) the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action; (3) the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory." Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016). The McDonnell Douglas framework applies to hiring, promotion, termination, and

---

[3] See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510–15 (2002).

retaliation claims under Title VII. See, e.g., Williams v. Giant Food Inc., 370 F.3d 423, 428, 430 & n.5 (4th Cir. 2004); Beall v. Abbott Laby's, 130 F.3d 614, 619 (4th Cir. 1997), abrogated in part on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).

To plausibly allege a prima facie case of sex discrimination, a plaintiff must plausibly allege that (1) he was a member of a protected class, (2) he suffered an adverse employment action, (3) he was fulfilling his employer's legitimate expectations at the time of the adverse action, and (4) he was treated differently than a similarly situated employee outside the protected class. See, e.g., Goode v. Cent. Va. Legal Aid Soc'y, Inc., 807 F.3d 619, 626 (4th Cir. 2015), abrogated in part on other grounds by Bing v. Brivo Sys., LLC, 959 F.3d 605, 611–12 (4th Cir. 2020); Coleman, 626 F.3d at 190; White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004); Tahir v. Sessions, No. 5:16-CV-781, 2017 WL 1735158, at *4 (E.D.N.C. May 2, 2017) (unpublished), aff'd, 703 F. App'x 211 (4th Cir. 2017) (per curiam) (unpublished).

An adverse employment action includes "one that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Hoyle v. Freightliner, LLC, 650 F.3d 321, 337 (4th Cir. 2011) (quotation omitted); see Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998); Boone v. Goldin, 178 F.3d 253, 255–56 (4th Cir. 1999), abrogated on other grounds by Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53 (2006); Wilson v. City of Chesapeake, 290 F. Supp. 3d 444, 457 (E.D. Va. 2018).

A plaintiff can prove pretext by showing that the alleged nondiscriminatory "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [sex] discrimination." Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) (quotation omitted), abrogated in part on other grounds by Gross, 557 U.S. 167 (2009). In analyzing the

25

record concerning pretext, the court does not sit to decide whether the employer in fact discriminated against the plaintiff on the basis of sex. See, e.g., Holland v. Washington Homes, Inc., 487 F.3d 208, 217 (4th Cir. 2007); Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279–80 (4th Cir. 2000).

Johnson alleges that he is a male and that Powell, the Smithfield Chief of Police, diminished Johnson's sexual assault complaints concerning McLeod "because [Johnson] was male." Compl. 87; see Bostock v. Clayton Cnty., 590 U.S. 644, 663–65 (2020); Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 82 (1998). Thus, Johnson plausibly alleges the first element. As for adverse employment action, Smithfield terminated Johnson. See Compl. 86. Thus, Johnson plausibly alleges the second element.

As for the third element, Johnson alleges that Powell recommended Johnson's termination for "us[ing] Police Department equipment and . . . misrepresent[ing] facts when obtaining a no contact order (50C) on the female involved in the affair." Id. at 81. Moreover, Smithfield's personnel handbook states that working with an organization which could negatively affect an employee's perceived integrity could be a basis for termination. See id. at 82. Powell states that he based his termination recommendation, in part, on "Detective Johnson's outside involvement with the . . . Board [which] has brought a negative light on the [Police] Department and [Smithfield]" and that Johnson's "personal life has brought about [i]ssues with his integrity as a police officer by the agency, citizens of Smithfield, and court officials." Id. at 82–83.

In his complaint, Johnson does not allege that he was fulfilling his employer's legitimate expectations when Smithfield (through Scott) terminated his employment on October 14, 2022. Furthermore, Johnson admits that his affair with McLeod could negatively affect his perceived

26

integrity. See id. at 23. Accordingly, Johnson fails to plausibly allege that he was fulfilling his employer's legitimate expectations when Smithfield terminated his employment.

As for the fourth element, in his complaint, Johnson paints the police department as lacking discipline and order. See id. at 42–49. But Johnson's allegations about various inappropriate actions of other officers that went unpunished include inappropriate actions by both male and female officers. See id. Furthermore, Johnson fails to plausibly allege a similarly situated employee outside the protected class who was not disciplined for similar behavior. See, e.g., Cosby v. S.C. Prob., Parole & Pardon Servs., 93 F.4th 707, 714–17 (4th Cir. 2024); Haynes v. Waste Connections, Inc., 922 F.3d 219, 223–24 (4th Cir. 2019); Spencer v. Va. State Univ., 919 F.3d 199, 207–08 (4th Cir. 2019); Lightner v. City of Wilmington, 545 F.3d 260, 265 (4th Cir. 2008). Accordingly, Johnson's sex discrimination claim fails, and the court dismisses count one against Smithfield.

## B.

In count two, Johnson alleges a Title VII retaliation claim against Smithfield. See Compl. 87–89. Johnson does not have direct evidence of retaliation and proceeds under the McDonnell Douglas burden-shifting framework. To establish a prima facie case of retaliation, Johnson must prove that (1) he engaged in protected activity under Title VII, (2) his employer took some action against him that a reasonable employee would find materially adverse, and (3) his employer took the adverse action because of the protected activity. See Massaro v. Fairfax Cnty., ___ F.4th ___, 2024 WL 1162061, at *5 (4th Cir. Mar. 19, 2024); Cosby, 2024 WL 792270, at *8; McIver v. Bridgestone Ams., Inc., 42 F.4th 398, 411 (4th Cir. 2022); Walton v. Harker, 33 F.4th 165, 177 (4th Cir. 2022); Roberts v. Glenn Indus. Grp., Inc., 998 F.3d 111, 122 (4th Cir. 2021); Sempowich v. Tactile Sys. Tech., Inc., 19 F.4th 643, 653 (4th Cir. 2021); Kitlinski v. U.S. Dep't of Justice, 994

F.3d 224, 232 (4th Cir. 2021); <u>Wilcox v. Lyons</u>, 970 F.3d 452, 460 (4th Cir. 2020); <u>Evans v. Int'l</u> <u>Paper Co.</u>, 936 F.3d 183, 195 (4th Cir. 2019); <u>Perkins v. Int'l Paper Co.</u>, 936 F.3d 196, 213 (4th Cir. 2019); <u>Savage v. Maryland</u>, 896 F.3d 260, 276 (4th Cir. 2018); <u>Strothers v. City of Laurel</u>, 895 F.3d 317, 327 (4th Cir. 2018); <u>Abilt v. CIA</u>, 848 F.3d 305, 315 n.9 (4th Cir. 2017); <u>Guessous</u>, 828 F.3d at 217; <u>Foster v. Univ. of Md.-E. Shore</u>, 787 F.3d 243, 253 (4th Cir. 2015); <u>Adams v. Anne</u> <u>Arundel Cnty. Pub. Schs.</u>, 789 F.3d 422, 429 (4th Cir. 2015); <u>DeMasters v. Carilion Clinic</u>, 796 F.3d 409, 416 (4th Cir. 2015); <u>Boyer-Liberto</u>, 786 F.3d at 281; <u>Balas v. Huntington Ingalls Indus.</u>, <u>Inc.</u>, 711 F.3d 401, 410 (4th Cir. 2013); <u>see also White</u>, 548 U.S. at 67–70; <u>Bonds v. Leavitt</u>, 629 F.3d 369, 384 (4th Cir. 2011).

Title VII protects two kinds of activities: opposition and participation. <u>See Netter v.</u> <u>Barnes</u>, 908 F.3d 932, 937–38 (4th Cir. 2018); <u>Laughlin v. Metro. Wash. Airports Auth.</u>, 149 F.3d 253, 259 (4th Cir. 1998). "[O]ppositional activity must be directed to 'an unlawful employment practice' under Title VII . . . ." <u>DeMasters</u>, 796 F.3d at 417; <u>see Netter</u>, 908 F.3d at 937–38; <u>Boyer-</u> <u>Liberto</u>, 786 F.3d at 282; <u>Laughlin</u>, 149 F.3d at 259. The opposition clause applies when an employee "opposes not only employment actions actually unlawful under Title VII but also employment actions [he] reasonably believes to be unlawful [under Title VII]." <u>DeMasters</u>, 796 F.3d at 417 (cleaned up); <u>see Netter</u>, 908 F.3d at 937–38; <u>Boyer-Liberto</u>, 786 F.3d at 282. The participation clause protects employees making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under Title VII. <u>See</u> 42 U.S.C. § 2000e-3(a); <u>Laughlin</u>, 149 F.3d at 259.

Under Title VII, material adversity "means [that an employer's actions] well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>White</u>, 548 U.S. at 68 (quotation omitted). Title VII does not redress "trivial harms" or provide a "general

civility code for the American workplace." Id. (quotation omitted); see Oncale, 523 U.S. at 80. Rather, Title VII's anti-retaliation provision prohibits an employer's actions that "are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." White, 548 U.S. at 68 (quotation omitted); see Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997). The court analyzes material adversity from the perspective of an objective, reasonable employee and ignores "a plaintiff's unusual subjective feelings." White, 548 U.S. at 68–69; see also Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 134–35 (4th Cir. 2002). Additionally, the court must account for the "particular circumstances" surrounding the alleged retaliation. White, 548 U.S. at 69.

A plaintiff must prove that "the desire to retaliate was the but-for cause of the challenged employment action." Univ. of Tex. Sw. Med. Center v. Nassar, 570 U.S. 338, 352 (2013); see Villa v. CavaMezze Grill, LLC, 858 F.3d 896, 900 (4th Cir. 2017); Guessous, 828 F.3d at 216–17; Huckelba v. Deering, No. 5:16-CV-247, 2016 WL 6082032, at *3 (E.D.N.C. Oct. 17, 2016) (unpublished). "This but-for causation requirement is stricter than the lessened causation standard for discrimination claims, under which a plaintiff need only show that race, color, religion, sex, or national origin was a motivating factor for an adverse action by an employer." Netter, 908 F.3d at 938 (quotations omitted); see Foster, 787 F.3d at 249. This causation standard "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Nassar, 570 U.S. at 360; see Guessous, 828 F.3d at 217. As such, "[n]aked allegations of a causal connection between plaintiff's protected activity and the alleged retaliation do not state a plausible Title VII claim." Huckelba, 2016 WL 6082032, at *3. "To establish a causal relationship between the protected activity and the termination, a plaintiff must show that the decision maker was aware of the protected activity at the time the alleged retaliation occurred." Roberts, 998 F.3d at 124.

29

An employee cannot plausibly allege a but-for causal connection between protected activity and the employer's adverse action without alleging that the decisionmaker who took the adverse action knew that the employee had engaged in protected activity. See Holland, 487 F.3d at 218; Hooven-Lewis v. Caldera, 249 F.3d 259, 278 (4th Cir. 2001); Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998), abrogated on other grounds by White, 548 U.S. 53; see also Conrad v. CSX Transp., Inc., 824 F.3d 103, 108 (4th Cir. 2016); Gestamp S.C., L.L.C. v. NLRB, 769 F.3d 254, 261–62 (4th Cir. 2014). Courts consider temporal proximity between an employer's knowledge of protected activity and an adverse employment action. See, e.g., Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273–74 (2001) (per curiam); Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004), abrogated on other grounds by Nassar, 570 U.S. 338. An adverse action taken shortly after an employer learned of protected activity typically permits a reasonable inference of causation. See Dowe, 145 F.3d at 657. "A lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action, [however,] . . . negates any inference that a causal connection exists between the two." Id. (finding three years too long to infer causation); see Breeden, 532 U.S. at 274 (same for 20 months); Massaro, 2024 WL 1162061, at *5 (same for 18 months); Roberts, 998 F.3d at 126 (same for three months); Penley v. McDowell Cnty. Bd. of Ed., 876 F.3d 646, 656 (4th Cir. 2017) (same for eight and nine months); Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998) (same for 13 months). A plaintiff can rebut this conclusion by plausibly alleging that her employer's actions taken during the intervening period demonstrate retaliatory animus. See Lettieri v. Equant Inc., 478 F.3d 640, 650 (4th Cir. 2007); King v. Rumsfeld, 328 F.3d 145, 151 n.5 (4th Cir. 2003).

Viewing Johnson's complaint in the light most favorable to him, Johnson plausibly alleges that he engaged in protected "opposition" activity on July 27, 2022, when he told Smithfield that

30

he believed that the administrative investigation was based on his sex. Moreover, Johnson plausibly alleges that Smithfield thereafter took action against him that a reasonable employee would consider materially adverse, including terminating his employment on October 14, 2022. See Compl. 88. Furthermore, Johnson plausibly alleges the required but-for causation. See, e.g., Wilcox, 970 F.3d at 457. Thus, the court denies Smithfield's motion to dismiss count two against Smithfield.

## C.

In count three, Johnson alleges an ADA Title I discrimination claim against Smithfield. See Compl. 89. The ADA prevents discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish an ADA discrimination claim, a plaintiff must prove "(1) that [he] has a disability, (2) that [he] is a 'qualified individual' for the employment in question, and (3) that [his] employer discharged [him] (or took other adverse employment action) because of [his] disability." Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 572 (4th Cir. 2015) (cleaned up); see EEOC v. McLeod Health, Inc., 914 F.3d 876, 883 (4th Cir. 2019). A party may prove disability discrimination through direct evidence or through the McDonnell Douglas burden-shifting framework. See Raytheon Co. v. Hernandez, 540 U.S. 44, 49–50 & n.3 (2003); Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985); McDonnell Douglas, 411 U.S. at 802–04; Guessous, 828 F.3d at 216. Direct evidence requires "conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Rhoads v. F.D.I.C., 257 F.3d 373, 391–92 (4th Cir. 2001) (quotation omitted); see Brinkley v. Harbour Recreation Club, 180 F.3d 598, 607 (4th Cir. 1999), abrogated

31

on other grounds by Desert Palace v. Costa, 539 U.S. 90 (2003); EEOC v. Mfrs. & Traders Tr. Co., 429 F. Supp. 3d 89, 118–19 (D. Md. 2019).

Johnson lacks direct evidence that Smithfield terminated his employment because of his alleged disability. Under the McDonnell Douglas framework, a plaintiff must plausibly allege: "(1) he was a qualified individual with a disability; (2) he was discharged; (3) he was fulfilling his employer's legitimate expectations at the time of discharge; and (4) the circumstances of his discharge raise a reasonable inference of unlawful discrimination." Reynolds v. Am. Nat'l Red Cross, 701 F.3d 143, 150 (4th Cir. 2012) (quotations and alterations omitted); see Rhoads, 257 F.3d at 387 n.11; Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 702 (4th Cir. 2001); Ali v. WorldWide Language Res., LLC, ___ F. Supp. 3d ___, 2023 WL 5120224, at *18 (E.D.N.C. Aug. 9, 2023); Hunter-Rainey v. N.C. State Univ., No. 5:17-CV-46, 2018 WL 1092963, at *3 (E.D.N.C. Feb. 28, 2018) (unpublished), aff'd, 744 F. App'x 801 (4th Cir. 2018) (per curiam) (unpublished).

Johnson does not plausibly allege that his anxiety and depression are disabilities under the ADA because he does not allege that they "substantially limit[ed] one or more [of his] major life activities" or that Smithfield perceived them as doing so. 42 U.S.C. § 12102(1)(A); see Compl. 5; J.D. ex rel. Doherty v. Colonial Williamsburg Found., 925 F.3d 663, 670 (4th Cir. 2019); Jacobs, 780 F.3d at 572–74; Reynolds, 701 F.3d at 152–54. Johnson also does not plausibly allege that Smithfield terminated his employment because of his alleged disability. See Compl. 5, 89; Haulbrook, 252 F.3d at 705–07. Johnson also does not plausibly allege that he was fulfilling Smithfield's legitimate expectations at the time of his discharge on October 14, 2022, or that the circumstances of his discharge raise a reasonable inference of discrimination under the ADA. Accordingly, Johnson does not plausibly allege an ADA claim in count three, and the court dismisses count three against Smithfield.

32

D.

In count four, Johnson alleges an ADA retaliation claim against Smithfield. See Compl. 90–91. The ADA makes it "unlawful to . . . interfere with any individual . . . on account of his or her having exercised or enjoyed . . . any right granted or protected by this chapter." 42 U.S.C. § 12203(b); see Reynolds, 701 F.3d at 154. Seeking a reasonable accommodation, including medical leave, under the ADA constitutes protected activity. See Works v. Colvin, 519 F. App'x 176, 186 (4th Cir. 2013) (per curiam) (unpublished); Rhoads, 257 F.3d at 381; Haulbrook, 252 F.3d at 706. To state a retaliation claim under the ADA, a plaintiff must plausibly allege that "(1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." Reynolds, 701 F.3d at 154; see White, 548 U.S. at 67–70; A Soc'y Without a Name v. Virginia, 655 F.3d 342, 350 (4th Cir. 2011); Ollis v. Hawkins, No. 5:18-CT-3276, 2020 WL 618835, at *2 (E.D.N.C. Feb. 10, 2020) (unpublished).

Viewing Johnson's complaint in the light most favorable to him, Johnson plausibly alleges that he engaged in protected activity under the ADA on July 6, 2022, when he submitted a physician's note that he should not work until July 29, 2022. Moreover, Johnson plausibly alleges that Smithfield thereafter took adverse actions against him, including converting his administrative leave from paid leave to unpaid leave on July 12, 2022, and then terminating his employment on October 14, 2022. See Compl. 90–91. Furthermore, Johnson plausibly alleges the required but-for causation. See, e.g., Wilcox, 970 F.3d at 457. Thus, the court denies Smithfield's motion to dismiss count four against Smithfield.

E.

In count five, Johnson alleges an FMLA interference claim against Smithfield, Scott, Kerigan, Powell, West, and Lee. See Compl. 2, 91–92. The FMLA entitles employees to take

33

"reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(2). The FMLA allows eligible employees to take a total of twelve workweeks of unpaid leave during any twelve-month period due to "a serious health condition that makes the employee unable to perform the functions of the position of such employee." Id. § 2612(a)(1)(D). Generally, after taking FMLA leave, employees may return to their pre-leave job or an equivalent position. See id. § 2614(a)(1)(A)–(B); see Fry v. Rand Constr. Corp., 964 F.3d 239, 244 (4th Cir. 2020).

Interference claims stem from section 2615(a)(1), which states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1); see Fry, 964 F.3d at 244; Waag v. Sotera Def. Sols., Inc., 857 F.3d 179, 186 (4th Cir. 2017). "[W]hether the FMLA imposes liability on employee supervisors in their individual capacities is an open question in this circuit . . . ." Jones v. Sternheimer, 387 F. App'x 366, 368 (4th Cir. 2010) (per curiam) (unpublished); see Meyer v. Town of Wake Forest, No. 5:16-CV-348, 2018 WL 4689447, at *14 (E.D.N.C. Sept. 28, 2018) (unpublished); Reed v. Md., Dep't of Hum. Res., Civ. No. 12-0472, 2013 WL 489985, at *7 (D. Md. Feb. 7, 2013) (unpublished); see, e.g., Ainsworth v. Loudon Cnty. Sch. Bd., 851 F. Supp. 2d 963, 972–74 (E.D. Va. 2012); Weth v. O'Leary, 796 F. Supp. 2d 766, 775–77 (E.D. Va. 2011); Sadowski v. U.S. Postal Serv., 643 F. Supp. 2d 749, 752–56 (D. Md. 2009).

On July 6, 2022, Johnson gave Smithfield a physician's note stating that Johnson needed medical leave until at least July 29, 2022. See Compl. 55. Johnson had worked over 1,250 hours for Smithfield in the last 12 months and qualified for FMLA leave. See id. at 91–92. After receiving the note, Smithfield granted Johnson leave. See id. at 55.

On July 13, 2022, West and Powell appeared at Johnson's residence to deliver a letter. See id. at 55. The letter told Johnson that his leave became unpaid on July 12, 2022. See id.

34

Furthermore, the letter required Johnson to remain in daily contact with West to "cooperate with the investigation." Id. at 56. Thereafter, Smithfield "repeated[ly]" asked Johnson for a return-to-work doctor's note. Id.

As for Scott, Kerigan, and Lee, Johnson fails to plausibly connect them to this claim. See id. at 55–56, 91–92. Thus, the court dismisses Johnson's FMLA claim against them.

As for Powell and West, the FMLA defines "employer," in relevant part, as "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(ii)(I). The FMLA also includes public agencies as employers. See id. § 2611(4)(A)(iii). Thus, some courts have concluded that a public employee who "acts, directly or indirectly, in the interest of [his] employer" falls within the FMLA's definition of "employer" and may be held liable in his individual capacity. See, e.g., Ainsworth, 851 F. Supp. 2d at 973 (collecting cases); Weth, 796 F. Supp. 2d at 776. Moreover, the FMLA's definition of "employer" "closely parallels that in the Fair Labor Standards Act ('FLSA'), 29 U.S.C. §[§] 201 et seq., and the FMLA's implementing regulations provide that 'as under the FLSA, individuals such as corporate officers acting in the interest of an employer are individually liable for any violations of the requirements of the FMLA.'" Weth, 796 F. Supp. 2d at 776 (quoting 29 C.F.R. § 825.104(d) (2009)) (cleaned up).[4] Under the FLSA, employers "include those with managerial responsibilities and substantial control of the terms and conditions of the work of employees." Kerr v. Marshall Univ. Bd. of Governors, 824 F.3d 62, 83 (4th Cir. 2016) (cleaned up). In order to determine whether an individual is an "employer" under the FLSA, a court considers "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled

---

[4] Since 2009, the relevant portions of the FMLA's implementing regulations have not changed. See 29 C.F.R. § 825.104(d) (2017).

employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." Id. (quotation omitted).

The court assumes without deciding that under certain circumstances individuals may be held liable as an "employer" under the FMLA. See, e.g., Ainsworth, 851 F. Supp. 2d at 972 (collecting cases); Weth, 796 F. Supp. 2d at 776. The court also assumes without deciding that the court should examine the same factors that the Fourth Circuit identified in Kerr to determine whether an individual is an "employer" under the FMLA. See Kerr, 824 F.3d at 83.

Johnson conclusorily alleges Powell and West are his "employer" under the FMLA. See Compl. 91.[5] Johnson, however, alleges no facts concerning Powell or West's power to hire and fire employees or that they controlled work schedules or conditions of employment, controlled the rate and method of payment of employees, or maintained employment records. Rather, Johnson alleges Powell only recommended Johnson's firing. See id. at 80–83; see also [D.E. 2-13] (Powell's dismissal recommendation). Furthermore, Scott made the termination decision. See [D.E. 2-14] (Scott's termination decision). Accordingly, Johnson fails to plausibly allege that Powell or West are his "employer" who can be held individually liable under the FMLA. See, e.g., Kerr, 824 F.3d at 83. Thus, the court dismisses Johnson's FMLA claim against Powell and West.

Johnson also contends that Smithfield's refusal to give him paid leave violates the FMLA. See id. at 55–56, 91–92. The FLMA, however, does not require an employer to grant paid leave. See 29 U.S.C. § 2612(c). Thus, any such claim fails and is dismissed.

Johnson also objects to Smithfield's request for a return-to-work note. See Compl. 56. To the extent Johnson objects to Smithfield's request for a return-to-work note, the FMLA allows

---

[5] Notably, when Johnson mentions his "employer" elsewhere in his complaint, he means Smithfield alone. See id. at 5, 10, 18.

employers to have "a uniformly-applied policy or practice" to obtain a fitness-for-duty certification from the employee's doctor. 29 C.F.R. § 825.312(a). Nonetheless, Johnson's claim that Smithfield required him to maintain daily contact with West to cooperate with the investigation plausibly violates the FMLA's interference provision. Although the FMLA does not define interference, requiring Johnson to maintain daily contact with West to participate in the investigation plausibly exceeds the scope of "de minimis work-related contact." Antekeier v. Lab'y Corp. of Am., 295 F. Supp. 3d 679, 685 (E.D. Va. 2018); see 29 U.S.C. § 2615(a)(1).

In opposition to this conclusion, Smithfield cites Antekeier and argues that its contact with Johnson was de minimis. See [D.E. 73] 23–25. In Antekeier, the plaintiff's employer contacted the employee multiple times concerning client contact information, a new client account, her return-to-work date, and whether to hold a holiday party. See Antekeier, 295 F. Supp. 3d at 685. In resolving cross motions for summary judgment, the district court held that because the employer requested only basic information and did not require the employee to respond to emails or telephone calls that this requirement was de minimis contact. See id. at 685–87.

Unlike Antekeier, Johnson plausibly alleges Smithfield required daily contact and an unanticipated in-person meeting. Compare Compl. 55–56, with Antekeier, 295 F. Supp. 3d at 685–86. Johnson also plausibly alleges that Smithfield repeatedly asked Johnson to return to work to answer questions "regarding the allegations against [Johnson]." Compl. 55–56. In contrast, Antekeier's supervisor simply asked when she would return to work, not if Antekeier would return to work before her medically suggested end date. See Antekeier, 295 F. Supp. 3d at 685–86; see also Adams, 789 F.3d at 426–28. Here, Johnson plausibly alleges an FMLA interference claim against Smithfield. Accordingly, the court declines to dismiss Johnson's FMLA interference claim against Smithfield.

F.

In count six, Johnson alleges an FMLA retaliation claim against Smithfield, Scott, Kerigan, Powell, West, and Lee. See Compl. 2, 92–94. The FMLA also protects employees who exercise their rights under the FMLA from retaliation. See 29 U.S.C. § 2615(a)(2) ("It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."). Section 2615(a)(2) encompasses retaliation claims. See Fry, 964 F.3d at 244; Waag, 857 F.3d at 186, 191. "In both contexts, a plaintiff can either (1) produce direct and indirect evidence of retaliatory animus or (2) demonstrate intent by circumstantial evidence, which we evaluate under the framework established for Title VII cases in McDonnell Douglas." Fry, 964 F.3d at 244 (quotations omitted); see Vannoy v. Fed. Rsrv. Bank of Richmond, 827 F.3d 296, 304 (4th Cir. 2016); Laing v. Fed. Express Corp., 703 F.3d 713, 717 (4th Cir. 2013); Yashenko v. Harrah's N.C. Casino Co., 446 F.3d 541, 550–51 (4th Cir. 2006).

The court dismisses Johnson's FMLA retaliation claim against Scott, Kerigan, Powell, West, and Lee for the same reasons it dismisses Johnson's FMLA interference claim against them. See Compl. 92–94; Iqbal, 556 U.S. at 677–80; Twombly, 550 U.S. at 554–63; Kerr, 824 F.3d at 83; Ainsworth, 851 F. Supp. 2d at 972–75. Nonetheless, viewing the complaint in the light most favorable to Johnson, Johnson has plausibly alleged that he engaged in protected activity under the FMLA when he requested FMLA leave on July 6, 2022, and provided Smithfield with a physician's note stating that he should not work until at least July 29, 2022. Moreover, Johnson has plausibly alleged that Smithfield thereafter took adverse action. See Compl. 93. Furthermore, Johnson has plausibly alleged the required but-for causation. See, e.g., Wilcox, 970 F.3d at 457.

38

Accordingly, the court declines to dismiss Johnson's FMLA retaliation claim against Smithfield in count six.

G.

In count seven, Johnson alleges a First Amendment retaliation claim under 42 U.S.C. § 1983 against Smithfield, Scott, Kerigan, Powell, West, and Lee. See Compl. 94–96. In count eight, he alleges the same claim against the Board, Sutton, Sessoms, Tippett, Wooten, Andrews, Carroll, and Donovan. See id. at 96–99.

"To state a claim under [section] 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). Additionally, a section 1983 plaintiff must plausibly allege the personal involvement of a defendant. See, e.g., Iqbal, 556 U.S. at 676–77; Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691–94 (1978); Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985). Qualified immunity may bar such a claim. See Pearson v. Callahan, 555 U.S. 223, 232 (2009).

In order to state a First Amendment retaliation claim under section 1983, a plaintiff must plausibly allege that: "(1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct." Martin v. Duffy, 858 F.3d 239, 249 (4th Cir. 2017) (cleaned up); see Tobey v. Jones, 706 F.3d 379, 387 (4th Cir. 2013); Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005). A plaintiff "suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." Constantine, 411 F.3d at 500 (quotation omitted); see Balt. Sun Co. v. Ehrlich, 437 F.3d 410, 416 (4th Cir. 2006). A

39

plaintiff also must plausibly allege that a "defendant's conduct resulted in something more than a 'de minimis inconvenience' to [his] exercise of First Amendment rights." Balt. Sun Co., 437 F.3d at 416 (quotation omitted); see Constantine, 411 F.3d at 500.

i.

"The First Amendment protects not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." Adams v. Trs. of the Univ. of N.C.-Wilmington, 640 F.3d 550, 560 (4th Cir. 2011) (quotation omitted). Johnson's First Amendment retaliation claim against Smithfield, Scott, Kerigan, Powell, West, and Lee requires the court to examine the constitutional protection afforded to the speech of public employees.

The Pickering-Connick framework governs the analysis. See, e.g., Connick v. Myers, 461 U.S. 138, 143–46 (1983); Pickering v. Bd. of Educ., 391 U.S. 563, 571–73 (1968); Adams, 640 F.3d at 562–65; Lee v. York Cnty. Sch. Div., 484 F.3d 687, 692–94 & n.9 (4th Cir. 2007); Boring v. Buncombe Cnty. Bd. of Educ., 136 F.3d 364, 368–69 (4th Cir. 1998) (en banc). To state a claim under the Pickering-Connick framework, Johnson must plausibly allege that (1) he spoke as a citizen on a matter of public concern, rather than as an employee on a matter of private interest, (2) his interest in speaking on the matter of public concern outweighed the defendants' interest in providing effective and efficient public service, (3) defendants took some action against him that deprived him of a valuable government benefit or that would tend to chill his protected speech, and (4) a causal relationship existed between his protected speech and the retaliation. See, e.g., Massaro, 2024 WL 1162061, at *8; Smith v. Gilchrist, 749 F.3d 302, 308 (4th Cir. 2014); Bland v. Roberts, 730 F.3d 368, 373–75 (4th Cir. 2013); Peters v. Jenney, 327 F.3d 307, 322–23 (4th Cir. 2003); Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 351–52, 356 (4th Cir. 2000); McVey v. Stacy, 157 F.3d 271, 277–78 (4th Cir. 1998).

40

Two inquiries guide the scope of constitutional protection accorded to a public employee's speech. "The first requires determining whether the employee spoke as a citizen on a matter of public concern." Garcetti v. Ceballos, 547 U.S. 410, 418 (2006); see Lindke v. Freed, ___ S. Ct. ___, 2024 WL 1120880, at *6 (U.S. Mar. 15, 2024); Lee, 484 F.3d at 694. If not, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." Garcetti, 547 U.S. at 418. If so, the court proceeds to the second inquiry: "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." Id. This determination requires weighing "the employee's interest in First Amendment expression" against "the public employer's interest in what the employer has determined to be the appropriate operation of the workplace." Lee, 484 F.3d at 694 (quotation omitted). Employees speaking as citizens on matters of public concern "must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." Garcetti, 547 U.S. at 419.

Whether the employee spoke as a citizen on a matter of public concern requires an effort to participate in a larger public dialogue. See Crouse v. Town of Moncks Corner, 848 F.3d 576, 585–87 (4th Cir. 2017); see, e.g., Pickering, 391 U.S. at 566 (including writing a letter to a newspaper about a public issue); Liverman v. City of Petersburg, 844 F.3d 400, 409–10 (4th Cir. 2016) (including making an online Facebook post concerning a public discussion of an important issue); Robinson v. Balog, 160 F.3d 183, 188 (4th Cir. 1998) (including testifying at a public meeting).

Johnson alleges that he spoke as a citizen on a matter of public concern when he opposed (1) Lawrence's "sexual harassment of a [Board] employee," (2) "the hiding of funds by the [Board]," (3) his own sexual harassment by his supervisors at the police department, (4) the

41

Board's illegal discrimination against a Board employee, and (5) his own sexual assault by McLeod. See Compl. 94. Additionally, Johnson alleges that obtaining a protective order against McLeod was a matter of public concern. See id.

The court assumes without deciding that Johnson spoke about matters of public concern when discussing: (1) Lawrence's sexual harassment of a Board employee; (2) the hiding of funds by the Board; (3) his own sexual harassment by his police department supervisors; (4) the Board's illegal discrimination against a Board employee; and (5) his own sexual assault by McLeod. See, e.g., Campbell v. Galloway, 483 F.3d 258, 266–70 (4th Cir. 2007) (protecting a police officer's complaint to a superior about sexual harassment in the department); Robinson, 160 F.3d at 187–89 (protecting Bureau of Solid Waste employee's testimony to the Board of Estimates and cooperation with federal agents); Knapp v. Whitaker, 757 F.2d 827, 845–46 (7th Cir. 1985) (protecting public employee's speech to school board on an "inequitable mileage allowance, liability insurance, and the grievance procedure"); McHugh v. Bd. of Educ. of Milford Sch. Dist., 100 F. Supp. 2d 231, 240–41 (D. Del. 2000) (protecting a School Board employee who complained about "issues of student safety, public officials' alleged malfeasance, and School Board policies, all of which are clearly matters of public concern").[6] Nonetheless, Johnson fails to plausibly allege a causal relationship between this protected speech and the alleged retaliation. See Compl. 94–96. Johnson has not plausibly alleged that Smithfield asked Johnson to stop speaking about these issues or to resign from the Board. Moreover, Johnson's complaint only conclusorily links Johnson's speech about his own alleged sexual discrimination and sexual assault while working as

---

[6] Seeking a protective order against McLeod is not protected speech. Thus, the court does not rely on Johnson's allegations about that conduct in analyzing his First Amendment claim.

a Smithfield employee to his October 14, 2022 termination and his First Amendment claim against Smithfield, Scott, Kerigan, Powell, and West. See id.

Smithfield has a strong interest in ensuring that its police officers provide proper service, including telling the truth in seeking a protective order, acting with integrity, and using police equipment for its intended purpose. Moreover, Scott's termination letter, which Johnson attached to his complaint, illustrates that Johnson's admission to sending inappropriate text messages during Board meetings in 2019 constituted an additional violation of Smithfield's policies. See [D.E. 2-14] 1. These breaks in the causal chain, including Johnson's October 2022 admission of misconduct in 2019, render Johnson's First Amendment claim implausible. See, e.g., Bhattacharya v. Murray, 93 F.4th 675, 687–98 (4th Cir. 2024); Porter v. Bd. of Trs. of N.C. State Univ., 72 F.4th 573, 582–84 (4th Cir. 2023); Hill v. Town of Mocksville, No. 22-1037, 2023 WL 2929681, at * 1–2 (4th Cir. Apr. 13, 2023) (per curiam) (unpublished). Accordingly, the court dismisses count seven against Smithfield, Scott, Kerigan, Powell, West, and Lee.

ii.

In count eight, Johnson seeks relief against the Board, Sutton, Andrews, Sessoms, Carroll, Tippett, and Wooten. In support, Johnson alleges that he spoke as a citizen on a matter of public concern when he opposed (1) Lawrence's "sexual harassment of a [Board] employee," (2) "the hiding of funds by the [Board]," (3) paycuts for a Board employee concerning "her age and disability," (4) "conflicts of interest in the expenditure of school system funds," and (5) "whether students were assigned to appropriate schools." Compl. 96. Additionally, Johnson alleges that the Board censured him, declined to assign any schools to him, and threatened to criminally prosecute him in retaliation for his speech. See id. at 98.

43

The court assumes without deciding that the First Amendment protects Johnson's speech as an elected official. See, e.g., Bond v. Floyd, 385 U.S. 116, 135–37 (1966); Werkheiser v. Pocono Twp., 210 F. Supp. 3d 633, 637–40 (M.D. Pa. 2016). Censure, however, does not suffice for a First Amendment retaliation claim. See, e.g., Houston Cmty. Coll. Sys. v. Wilson, 595 U.S. 468, 474–75 (2022). Thus, the court does not rely on the Board's censures in analyzing Johnson's First Amendment claim in count eight. Rather, the court focuses on the Board's decision not to assign any schools to Johnson and the Board's referral of its internal investigations to the district attorney's office for possible criminal prosecution.

"[A]n adverse action against an elected official is material when it prevents the elected official from doing his job, deprives him of authority he enjoyed by virtue of his popular election, or otherwise prevents him from enjoying the full range of rights and prerogatives that came with having been publicly elected." Boquist v. Courtney, 32 F.4th 764, 777 (9th Cir. 2022). Yet, Johnson only alleges that "he has been stripped of any assigned schools as normally assigned to other members." Compl. 85 (emphasis added). The Board's actions have not prevented Johnson from taking office, attending Board meetings, or exercising his voting power. See, e.g., Bond, 385 U.S. at 118, 136–37; Velez v. Levy, 401 F.3d 75, 98 (2d Cir. 2005). Furthermore, referring an internal investigation to the district attorney's office for possible criminal prosecution does not constitute an adverse action, particularly when the Board acknowledges that it lacks legal authority over whether Johnson is criminally prosecuted or legal authority to remove Johnson from office due to any potential criminal conviction. See, e.g., Velez, 401 F.3d at 99; Paladino v. Seals-Nevergold, No. 17-CV-538, 2020 WL 5544342, at *3 (W.D.N.Y. Sep. 15, 2020) (unpublished). Rather, the Board's actions to limit Johnson's school assignments and to refer the investigative findings of the Board's attorneys about Johnson to the Johnston County District Attorney for

44

possible criminal prosecution are more akin to censure. Essentially, they are "a form of speech from [Johnson's colleagues on the Board] that concerns the conduct of public office," rather than a deprivation of Johnson's authority of public office. Wilson, 595 U.S. at 478; cf. Penley, 876 F.3d at 662–63 (Wilkinson, J., concurring). Accordingly, Johnson fails to plausibly allege that the Board took a materially adverse action to sustain his First Amendment retaliation claim in count eight. See, e.g., Bhattacharya, 93 F.4th at 689–90 (describing the standard applicable to determine whether something constitutes adverse action and concluding that a medical student receiving a concern card and a letter about his tone and demeanor at a meeting were not adverse actions); Constantine, 411 F.3d at 500.[7]

Alternatively, even if the Board's actions do qualify as a materially adverse action, Johnson fails to plausibly allege a causal connection between his protected speech and the alleged retaliation.[8] First, Johnson alleges that his protected speech occurred between July 2019 and January 2020. See Compl. 19–22, 96. The beginning of the Board's investigation into Johnson's conduct did not occur until spring 2022. See id. at 63–65. Moreover, the Board only initiated its

---

[7] The Supreme Court is considering a case concerning a Texas city council member's First Amendment retaliation claim against city officials who allegedly referred her legal misconduct to investigative authorities and had her arrested. See Gonzalez v. Trevino, 144 S. Ct. 325 (2023). In Gonzalez, however, the defendants did more than publicly refer investigative information to the district attorney. Rather, in Gonzalez, the defendants allegedly appointed a special detective, directed the investigation, secured an arrest warrant for the city council member, and circumvented the district attorney by walking the warrant directly to the magistrate. See Gonzalez v. Trevino, 42 F.4th 487, 489–90 (5th Cir. 2022), rehearing en banc denied, 60 F.4th 906 (5th Cir. 2023) (per curiam). Thus, the Board's actions in this case are materially distinguishable from the actions in Gonzalez.

[8] Johnson did not characterize this claim as a retaliatory prosecution claim concerning the criminal charges in the grand jury indictment. If, however, Johnson is asserting a retaliatory prosecution claim, Johnson's claim fails. Johnson has not plausibly alleged an absence of probable cause for his prosecution. Moreover, he does not plausibly allege that he was arrested when other similarly situated individuals who had not engaged in the same protected speech were not. See, e.g., Nieves v. Bartlett, 139 S. Ct. 1715, 1723–27 (2019); Hartman v. Moore, 547 U.S. 250, 259–66 (2006).

45

investigation after receiving new allegations about Johnson's alleged wrongdoing. See, e.g., [D.E. 2-4] 1; [D.E. 2-8] 5, 11; Compl. 63. Thus, Johnson cannot rely on temporal proximity to infer causation.

Second, the Board hired an outside law firm, Tharrington Smith LLP, to investigate allegations against Johnson after the Facebook Live webcasts and posts in June 2022. See Compl. 63–73. Johnson attached Tharrington Smith LLP's reports to his complaint. See [D.E. 2-4]; [D.E. 2-8] 5–15; Kolon Indus., Inc., 637 F.3d at 448. As part of the investigation, Tharrington Smith LLP interviewed Johnson, several Board members, Lawrence, the Johnston County Public Schools Superintendent, other Board employees, and a parent. See [D.E. 2-4] 1; [D.E. 2-8] 5, 11. Tharrington Smith LLP found that Johnson violated the Board's policy and ethics code by (1) sending salacious text messages in April and May 2019 concerning school employees during a Board meeting, (2) secretly recording Board meetings and playing the recordings for other employees, and (3) attempting to unlawfully reassign the children of a personal adversary to a different school for personal retaliatory reasons. See [D.E. 2-4] 1; [D.E. 2-8] 5, 11. The Board relieved Johnson of certain responsibilities and referred Johnson for criminal prosecution because of these independent findings. See Compl. 63–79; see also [D.E. 2-8] 1. In light of Tharrington Smith LLP's findings, and the repeated breaks in the causal chain from independent allegations that prompted the investigation, the court rejects as implausible Johnson's allegations that the Board's investigation was a pretext for retaliating against Johnson's speech. See Porter, 72 F.4th at 584; Hill, 2023 WL 2929681, at *2; Giarratano, 521 F.3d at 302. Accordingly, the court dismisses Johnson's First Amendment retaliation claim in count eight against the Board, Sutton, Andrews, Sessoms, Carroll, Tippett, and Wooten.

## H.

In count nine, Johnson alleges a Fourth Amendment claim under 42 U.S.C. § 1983 against Hoffman, Doyle, and Zellinger. See Compl. 99–100. A "[section] 1983 malicious prosecution action is nothing more than a [section] 1983 claim arising from a Fourth Amendment violation." Lambert v. Williams, 223 F.3d 257, 260 (4th Cir. 2000). For malicious prosecution, the plaintiff must allege "that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012) (quotation omitted). Moreover, prosecutors are absolutely immune from suit for acts carried out in the judicial phase of their prosecutorial functions, including initiating a judicial proceeding or appearing in court. See, e.g., Van de Kamp v. Goldstein, 555 U.S. 335, 342–43 (2009); Buckley v. Fitzsimmons, 509 U.S. 259, 269–70 (1993); Imbler v. Pachtman, 424 U.S. 409, 430 (1976).

"When a prosecutor performs the investigative functions normally performed by a detective or police officer," the prosecutor is entitled only to qualified immunity. Buckley, 509 U.S. at 273. Johnson argues that the prosecutors in this case were engaging in police-style investigation. See [D.E. 84] 12–14; [D.E. 85] 21–23. Johnson also cites State v. Felts, 79 N.C. App. 205, 339 S.E.2d 99 (1986), and contends that North Carolina General Statute § 14-230 did not give the prosecutors the power to remove him as a detective. See [D.E. 84] 16–17; [D.E. 85] 25–27; Felts, 79 N.C. App. at 209–10, 339 S.E.2d at 101.

In his complaint, Johnson alleges that Hoffman, under the supervision of Doyle and Zellinger, investigated Johnson. See Compl. 99. Johnson also alleges that Hoffman, Doyle, and Zellinger knew the Board violated its powers in censuring Johnson. See id. Nonetheless, Hoffman, Doyle, and Zellinger presented an affidavit to a North Carolina Superior Court Judge

47

and obtained a search warrant. See id. Johnson alleges that Hoffman, Doyle, and Zellinger then improperly seized Johnson's property based on the warrant. See id.

Johnson does not specifically allege how any affidavit was improper or failed to establish probable cause. See id. at 73–79. Moreover, and in any event, Johnson cannot use this action to have this court review the propriety of a state court search warrant. Johnson must attack the validity of such state court search warrants in his pending criminal case in state court. See, e.g., Younger v. Harris, 401 U.S. 37, 41–46 (1971); Nivens v. Gilchrest, 444 F.3d 237, 241 (4th Cir. 2006).

Even viewing Johnson's complaint in the light most favorable to Johnson, Johnson's Fourth Amendment claim against Doyle, Hoffman, and Zellinger fails because probable cause existed to arrest him and because the criminal proceedings have not terminated in his favor. Alternatively, absolute prosecutorial immunity applies to Doyle, Hoffman, and Zellinger on count nine. See, e.g., Van de Kamp, 555 U.S. at 342–43. Accordingly, the court dismisses count nine.

I.

In count ten, Johnson alleges a wrongful termination claim under North Carolina law against Smithfield, Scott, Kerigan, Powell, and West. See Compl. 100–01. Under North Carolina law, an employer generally may terminate an at-will employee for any reason. See Garner v. Rentenbach Constructors Inc., 350 N.C. 567, 568–72, 515 S.E.2d 438, 439–41 (1999). North Carolina recognizes a narrow exception to that general rule if an employee's termination violates North Carolina public policy. See, e.g., Whitt v. Harris Teeter, Inc., 359 N.C. 625, 625, 614 S.E.2d 531, 532 (2005) (per curiam) (adopting dissenting opinion at 165 N.C. App. 32, 43–50, 598 S.E.2d 151, 159–63 (2004) (McCullough, J., dissenting)); Garner, 350 N.C. at 568–72, 515 S.E.2d at 439–41; Amos v. Oakdale Knitting Co., 331 N.C. 348, 350–54, 416 S.E.2d 166, 167–70 (1992); Coman

48

v. Thomas Mfg. Co., 325 N.C. 172, 176–78, 381 S.E.2d 445, 447–49 (1989). To prove a claim of wrongful discharge in violation of North Carolina public policy, a plaintiff must identify and rely upon a specific North Carolina statute or North Carolina constitutional provision stating North Carolina's public policy. See Garner, 350 N.C. at 568–72, 515 S.E.2d at 439–41; Amos, 331 N.C. at 350–54, 416 S.E.2d at 167–70; Coman, 325 N.C. at 176, 381 S.E.2d at 447; Horne v. Cumberland Cnty. Hosp. Sys., Inc., 228 N.C. App. 142, 146–48, 746 S.E.2d 13, 17–19 (2013); Gillis v. Montgomery Cnty. Sheriff's Dep't, 191 N.C. App. 377, 379–81, 663 S.E.2d 447, 449–50 (2008); Whitings v. Wolfson Casing Corp., 173 N.C. App. 218, 222, 618 S.E.2d 750, 753 (2005); Considine v. Compass Grp. USA, Inc., 145 N.C. App. 314, 321, 551 S.E.2d 179, 184 (2001), aff'd, 354 N.C. 568, 557 S.E.2d 528 (2001) (per curiam).

Johnson conclusorily alleges that his termination "violated the public policy of the State of North Carolina." Compl. 101. Even viewing the complaint in the light most favorable to Johnson, Johnson fails to state a wrongful termination claim. Accordingly, the court dismisses count ten.

J.

In count eleven, Johnson alleges abuse of process under North Carolina law against Doyle, Hoffman, and Zellinger. See id. at 101–03. Under North Carolina law, "[i]n order to succeed on a claim for abuse of process, the plaintiff must establish that (1) a prior proceeding was initiated against the plaintiff by the defendant or used by him to achieve an ulterior motive or purpose; and (2) once the proceeding was initiated, the defendant committed some willful act not proper in the regular prosecution of the proceeding." Semones v. S. Bell Tel. & Tel. Co., 106 N.C. App. 334, 341, 416 S.E.2d 909, 913 (1992); see Stanback v. Stanback, 297 N.C. 181, 200, 254 S.E.2d 611, 624 (1979), disapproved of on other grounds by Dickens v. Puryear, 302 N.C. 437, 276 S.E.2d 325 (1981); Pinewood Homes, Inc. v. Harris, 184 N.C. App. 597, 602, 646 S.E.2d 826, 831 (2007). A

49

plaintiff satisfies the ulterior motive requirement when the plaintiff plausibly alleges that the defendant initiated the prior action "to achieve a purpose not within the intended scope of the process used. The act requirement is satisfied when the plaintiff alleges that during the course of the prior proceeding, the defendant committed some [willful] act whereby he sought to use the proceeding as a vehicle to gain advantage of the plaintiff in respect to some collateral matter." Hewes v. Wolfe, 74 N.C. App. 610, 614, 330 S.E.2d 16, 19 (1985) (citations omitted); see Stanback, 297 N.C. at 200, 254 S.E.2d at 624. "The gravamen of a cause of action for abuse of process is the improper use of the process after it has been issued." Chidnese v. Chidnese, 210 N.C. App. 299, 311, 708 S.E.2d 725, 735 (2011) (cleaned up).

Johnson conclusorily alleges that "[d]efendants had an ulterior motive" to "go on a fishing expedition to find evidence of some matter for which they could charge [Johnson] criminally." Compl. 102. Defendants then obtained a search warrant and "proceeded to use the illegally seized evidence" to convince a grand jury to return an indictment against Johnson "on a felony charge of extortion and the resulting harassment and expenses of defending himself." Id.

Even viewing the complaint in the light most favorable to Johnson, Johnson fails to plausibly allege an abuse of process claim against Doyle, Hoffman, and Zellinger. See, e.g., Turner v. Thomas, 235 N.C. App. 520, 531–32, 762 S.E.2d 252, 262 (2014), aff'd in part, rev'd in part, 369 N.C. 419, 794 S.E.2d 439 (2016); Petrou v. Hale, 43 N.C. App. 655, 659, 260 S.E.2d 130, 133–34 (1979); London Leasing, LLC v. Ray, No. 14 CVS 7419, 2015 WL 8020472, at *2–3 (N.C. Super. Ct. Dec. 4, 2015) (unpublished) ("Without both an ulterior motive and a malicious misuse of process to gain an advantage to accomplish some purpose collateral to the lawsuit, an allegation of an ulterior motive in filing a lawsuit is not enough to support an abuse of process claim."). Accordingly, the court dismisses count eleven.

50

## K.

In count twelve, Johnson alleges intentional infliction of emotional distress ("IIED") under North Carolina law against all defendants. See Compl. 103–04. An IIED claim requires "1) extreme and outrageous conduct by the defendant 2) which is intended to and does in fact cause 3) severe emotional distress." Waddle v. Sparks, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992); see Dickens, 302 N.C. at 452, 276 S.E.2d at 335. Under North Carolina law, conduct is extreme and outrageous only when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 493, 340 S.E.2d 116, 123 (1986) (quotation omitted); compare Chidnese, 210 N.C. App. at 316, 708 S.E.2d at 738 ("[L]iability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." (quotation omitted)), with Clark v. Clark, 280 N.C. App. 384, 397, 867 S.E.2d 743, 754 (2021) (holding that harassing and stalking after a separation, scaring someone by stating "We are going to continue doing everything in our power to make your life miserable," and posting advertisements and photographs online containing personal information presented "more than a scintilla of evidence of 'extreme and outrageous behavior'"), and Chapman ex rel. Chapman v. Byrd, 124 N.C. App. 13, 20, 475 S.E.2d 734, 739 (1996) (holding that repeating rumors that someone at the workplace had AIDS or was HIV positive and failing to investigate the truth and falsity of the alleged rumors before repeating them constituted extreme and outrageous behavior). Whether conduct meets this standard is a question of law for the court. See Lenins v. K-Mart Corp., 98 N.C. App. 590, 599, 391 S.E.2d 843, 848 (1990).

Severe emotional distress means "any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling

emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A., 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990).

"Under North Carolina law, it is extremely rare to find conduct in the employment context that rises to the level of outrageousness necessary to support an IIED claim." Miller v. Gerber Collision (Ne.), Inc., No. 4:19-CV-18, 2019 WL 2527105, at *3 (E.D.N.C. June 19, 2019) (unpublished); see Ortiz v. Vance Cnty. Sch., Admin. Unit, No. 5:18-CV-91, 2019 WL 1940596, at *9 (E.D.N.C. Apr. 30, 2019) (unpublished); Everett v. Redmon, No. 7:16-CV-323, 2017 WL 2313468, at *9 (E.D.N.C. May 26, 2017) (unpublished); Howard v. Coll. of the Albermarle, 262 F. Supp. 3d 322, 340–41 (E.D.N.C. 2017), aff'd, 697 F. App'x 257 (4th Cir. 2017) (per curiam) (unpublished); Efird v. Riley, 342 F. Supp. 2d 413, 427 (M.D.N.C. 2004); see, e.g., Hogan, 79 N.C. App. at 493–94, 340 S.E.2d at 122–23 (finding no extreme or outrageous conduct where a supervisor screamed at employees, called them names, cursed at them, disrupted their work, threw menus at them, refused to grant pregnancy leave, and terminated an employee who left work due to labor pains). In cases where North Carolina courts have found IIED claims actionable, the conduct has been extremely egregious, involving sexual advances, obscene language, and inappropriate touching. See Miller, 2019 WL 2527105, at *3; Moody-Williams v. LipoScience, 953 F. Supp. 2d 677, 683 (E.D.N.C. 2013); Payne v. Whole Foods Mkt. Grp., 812 F. Supp. 2d 705, 710 (E.D.N.C. 2011), aff'd, 471 F. App'x 186 (4th Cir. 2012) (per curiam) (unpublished); see, e.g., Guthrie v. Conroy, 152 N.C. App. 15, 22–23, 567 S.E.2d 403, 409–10 (2002) (collecting cases); Groves v. Travelers Ins. Co., 139 N.C. App. 795, 800–01, 535 S.E.2d 105, 107–09 (2000) (McGee, J., dissenting) (collecting cases), rev'd per curiam on reasoning of dissent, 354 N.C. 206, 552 S.E.2d 141 (2001); Hogan, 79 N.C. App. at 493, 340 S.E.2d at 123. Moreover, "termination,

52

allegedly in violation of federal law alone, does not necessarily constitute extreme and outrageous conduct under North Carolina law." Efird, 342 F. Supp. 2d at 427; see Bratcher v. Pharm. Prod. Dev., Inc., 545 F. Supp. 2d 533, 545 (E.D.N.C. 2008); Pardasani v. Rack Room Shoes Inc., 912 F. Supp. 187, 192 (M.D.N.C. 1996) ("Plaintiff has alleged that he was given poor performance evaluations, not given promotions which were given to others, excluded from training and finally terminated from his employment. Assuming these allegation[s] to be true, these actions do not rise to the level sufficient to exceed all bounds usually tolerated by decent society.").

Johnson alleges that McLeod, Lawrence, Marshburn, and Preston engaged in extreme and outrageous conduct by obtaining and posting on social media false information and defamatory information. See Compl. 5, 40, 84, 103. Additionally, Johnson alleges Smithfield, Scott, Kerigan, West, Powell, Lee, the Board, Sutton, Sessoms, Tippett, Wooten, Andrews, Carroll, Donovan, Doyle, and Hoffman "all ratified and adopted" the actions of McLeod, Lawrence, Marshburn, and Preston by relying on them without a proper investigation or evaluation. Id. at 103. Johnson also alleges that "[a]s a result of the social media attacks and the resulting investigation by his employer, [he] developed anxiety and depression." Id. at 5.

As for Lawrence, Lawrence argues that Johnson had no expectation of privacy in the text messages they exchanged in 2019 which painted both Johnson and Lawrence in a negative light. See [D.E. 42] 20–21. Lawrence also argues that it would be "only rampant speculation" that Lawrence shared these text messages with anyone. Id. at 20. Moreover, Lawrence argues that the text messages did not cause Johnson's anxiety and depression. See id. at 21–22.

Even if Lawrence shared the text messages, that conduct does not constitute extreme or outrageous conduct. Accordingly, the court dismisses Johnson's IIED claim against Lawrence.

53

As for Smithfield, Scott, Kerigan, West, Powell, Lee, the Board, Sutton, Sessoms, Tippett, Wooten, Andrews, Carroll, Donovan, Doyle, and Hoffman, these defendants investigated Johnson based on Johnson's alleged misconduct. See Compl. 103. Unlike in Byrd, Johnson does not plausibly allege that these defendants also publicized rumors without investigation. See Byrd, 124 N.C. App. at 20, 475 S.E.2d at 739. Rather, these defendants investigated Johnson as a Smithfield employee and Board member to determine if there was any truth to the alleged misconduct allegations. See Compl. 5. Even viewing the complaint in the light most favorable to Johnson, Johnson fails to plausibly allege an IIED claim against these defendants. See id. at 103–04. Accordingly, the court dismisses Johnson's IIED claim against Smithfield, Scott, Kerigan, West, Powell, Lee, the Board, Sutton, Sessoms, Tippett, Wooten, Andrews, Carroll, Donovan, Doyle, and Hoffman.

As for Marshburn, Marshburn made numerous statements about Johnson on various livestreaming platforms and in writing. See Compl. 36, 40–42, 50–51, 53, 59, 62, 72. Some of the statements disclosed factual parts of investigations against Johnson. A few statements are uncivil and others appear to be defamatory. See id. at 53, 59. Allegedly uncivil or defamatory statements alone, however, do not suffice to satisfy the "extreme and outrageous conduct" element of an IIED claim. See, e.g., Collins v. AB Biodisk N. Am., Inc., No. 5:08-CV-355, 2009 WL 10705350, at *5–6 (E.D.N.C. Mar. 16, 2009) (unpublished); Sabrowski v. Albani-Bayeux, Inc., No. 1:02CV728, 2003 WL 23018827, at *3–4 (M.D.N.C. Dec. 19, 2003) (unpublished). Accordingly, Johnson fails to plausibly allege an IIED claim against Marshburn.

Johnson fails to plausibly allege an IIED claim against any defendant. Thus, the court dismisses Johnson's IIED claim in count twelve.

54

L.

In count thirteen, Johnson alleges tortious interference with contract under North Carolina law against the Board, Lee, Sutton, Sessoms, Tippett, Wooten, Andrews, Carroll, Donovan, McLeod, Marshburn, Lawrence, and Preston. See id. at 104–05. Under North Carolina law, tortious interference with contract requires: (1) a valid contract between the plaintiff and a third party; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) the defendant acts without justification; (5) actual damage to the plaintiff. See Benjamin v. Sparks, 173 F. Supp. 3d 272, 289–90 (E.D.N.C. 2016), aff'd, 986 F.3d 332 (4th Cir. 2021); United Lab'ys, Inc. v. Kuykendall, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988) (quotation omitted). Tortious interference with contract applies to at-will employment. See, e.g., Smith v. Ford Motor Co., 289 N.C. 71, 85, 221 S.E.2d 282, 291 (1976); Combs v. City Elec. Supply Co., 203 N.C. App. 75, 84, 690 S.E.2d 719, 725 (2010).

Acts of non-outsiders "are presumed to have been done in the interest of the corporation" and are therefore "justified." Embree Constr. Grp., Inc. v. Rafcor, Inc., 330 N.C. 487, 498, 411 S.E.2d 916, 924 (1992). Any party that has a "legitimate business interest . . . in the subject matter" is a "non-outsider." Smith, 289 N.C. at 87, 221 S.E.2d at 292. On the other hand, an "outsider" is "one who was not a party to the terminated contract and who had no legitimate business interest of his own" in the contract. Combs, 203 N.C. App. at 84, 690 S.E.2d at 725 (quotation omitted).

Johnson alleges that he had a valid contract with Smithfield as an at-will employee with the Smithfield Police Department and that multiple outsiders, namely the Board, Lee, Sutton, Sessoms, Tippett, Wooten, Andrews, Carroll, Donovan, McLeod, Marshburn, Lawrence, and Preston, knew that Smithfield employed him. See Compl. 104. Johnson alleges that these defendants "took concerted efforts to make false allegations of misconduct and improper conduct

55

and to issue censures based on incomplete and inadequate investigations which contained unsupported conclusions against [Johnson] in order to influence [Smithfield] to terminate his employment." Id.

Johnson fails to allege any individual or group-based facts that the Board, Lee, Sutton, Sessoms, Tippett, Wooten, Andrews, Carroll, Donovan, or Lawrence took action to influence Smithfield to investigate Johnson's employment. See id. at 104–05. Rather, Johnson alleges that "[a]fter the Facebook Live posted video on Friday, June 24, 2022, on June 27th, 2022, the Smithfield Police Department initiated an investigation based on the false allegations made in the webcast and published by Marshburn and Preston." Id. at 49. Moreover, and in any event, Johnson alleges that Smithfield engaged in its own independent investigation to come to its own conclusion about whether Johnson violated police department policies. See [D.E. 2-8] 1–13.

Even viewing Johnson's complaint in the light most favorable to him, Johnson has not plausibly alleged that defendants intentionally induced Smithfield not to perform its contract with Johnson or that defendants acted without justification. Accordingly, the court dismisses count thirteen against the Board, Lee, Sutton, Sessoms, Tippett, Wooten, Andrews, Carroll, Donovan, Lawrence, and Marshburn.

## M.

In count fourteen, Johnson alleges defamation under North Carolina law against all defendants. See Compl. 105–06. To establish a defamation claim under North Carolina law, a "plaintiff must allege and prove that the defendant made false, defamatory statements of or concerning the plaintiff, which were published to a third person, causing injury to the plaintiff's reputation." Griffin v. Holden, 180 N.C. App. 129, 133, 636 S.E.2d 298, 302 (2006) (quotation omitted); see Desmond v. News & Observer Publ'g Co., 375 N.C. 21, 41–44, 846 S.E.2d 647,

56

661–62 (2020); Hendrix v. Town of W. Jefferson, 273 N.C. App. 27, 32, 847 S.E.2d 903, 907 (2020); Boyce & Isley, PLLC v. Cooper, 211 N.C. App. 469, 478, 710 S.E.2d 309, 317 (2011); Craven v. Cope, 188 N.C. App. 814, 816, 656 S.E.2d 729, 732 (2008); Smith-Price v. Charter Behav. Health Sys., 164 N.C. App. 349, 356, 595 S.E.2d 778, 783 (2004); see also Syngenta Crop Prot., LLC v. Atticus, LLC, No. 5:19-CV-509, 2022 WL 842938, at *6 (E.D.N.C. Mar. 21, 2022) (unpublished). A statement is defamatory if it, either directly or by implication, ascribes dishonesty, fraud, lack of integrity, or reprehensible conduct to the subject of the statement. See Flake v. Greensboro News Co., 212 N.C. 780, 785–86, 195 S.E. 55, 60 (1938); Donovan v. Fiumara, 114 N.C. App. 524, 526, 442 S.E.2d 572, 574 (1994); Beane v. Weiman Co., 5 N.C. App. 276, 277, 168 S.E.2d 236, 237 (1969). A defamatory statement "tend[s] to prejudice another in his reputation, office, trade, business, or means of livelihood." Donovan, 114 N.C. App. at 526, 442 S.E.2d at 574 (quotation omitted); see West v. King's Dep't Store, Inc., 321 N.C. 698, 703, 365 S.E.2d 621, 624 (1998); Flake, 212 N.C. at 786, 195 S.E. at 60.

Defamation can be either libel or slander. See, e.g., Craven, 188 N.C. App. at 816, 656 S.E.2d at 732; Tallent v. Blake, 57 N.C. App. 249, 251, 291 S.E.2d 336, 339 (1982); cf. Renwick v. News & Observer Publ'g Co., 310 N.C. 312, 323–24, 312 S.E.2d 405, 412–13 (1984). Generally, libel is written and slander is oral. See Aycock v. Padgett, 134 N.C. App. 164, 165, 516 S.E.2d 907, 909 (1999); Tallent, 57 N.C. at 251, 291 S.E.2d at 338; cf. Bell v. Simmons, 247 N.C. 488, 494, 101 S.E.2d 383, 388 (1958).

Whether a statement is defamatory per se is a question of law. See, e.g., Ellis v. N. Star Co., 326 N.C. 219, 224, 388 S.E.2d 127, 130 (1990). When a plaintiff alleges that statements are defamatory per se, the statements "must be susceptible of but one meaning and of such nature that the court can presume as a matter of law that they tend to disgrace and degrade the party or hold

57

him up to public hatred, contempt or ridicule, or cause him to be shunned and avoided." Boyce & Isley, 153 N.C. App. at 30–31, 568 S.E.2d at 898–99. In making this determination, the court considers the statement alone without any explanatory circumstances, insinuations, innuendo, or colloquium. See, e.g., Nucor Corp. v. Prudential Equity Grp., LLC, 189 N.C. App. 731, 736, 659 S.E.2d 483, 487 (2008). A "pure expression of opinion" is not actionable under North Carolina law. Id., 659 S.E.2d at 486; see Desmond, 375 N.C. at 38, 846 S.E.2d at 659; Daniels v. Metro Mag. Holding Co., LLC, 179 N.C. App. 533, 539–40, 634 S.E.2d 586, 590 (2006). Nevertheless, "someone cannot preface an otherwise defamatory statement with 'in my opinion' and claim immunity from liability." Nucor Corp., 189 N.C. App. at 736, 659 S.E.2d at 486 (quotation omitted); see Milkovich v. Lorain Journal Co., 497 U.S. 1, 19–20 (1990); Design Res., Inc. v. Leather Indus. of Am., 789 F.3d 495, 504–05 (4th Cir. 2015); Desmond, 375 N.C. at 38, 846 S.E.2d at 659. In cases of defamation per se, damages and malice are presumed. See, e.g., Eshelman v. Puma Biotechnology, Inc., 2 F.4th 276, 283 (4th Cir. 2021); Donovan, 114 N.C. App. at 527, 442 S.E.2d at 574.

In considering a motion to dismiss, a court must "credit the plaintiff's allegation of the factual falsity of a statement." Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1092 (4th Cir. 1993); see Gilmore v. Jones, 370 F. Supp. 3d 630, 671 (W.D. Va. 2019). A plaintiff, however, cannot merely allege falsity in "vague, conclusory terms." Chapin, 993 F.2d at 1092; cf. Mayfield v. NASCAR, Inc., 674 F.3d 369, 377 (4th Cir. 2012) (stating that "the usual standards of notice pleading apply in defamation cases" (quotation omitted)); Hatfill v. N.Y. Times Co., 416 F.3d 320, 329 (4th Cir. 2005); Jolly v. Acad. Collection Serv., Inc., 400 F. Supp. 2d 851, 861 (M.D.N.C. 2005).

58

Johnson fails to allege any statements, let alone false statements, made by Scott, Kerigan, West, Lee, Sutton, Sessoms, Tippett, Wooten, Andrews, Carroll, Donovan, or Lawrence. Furthermore, because Johnson does not allege any public statements that Board members made, the Board members could not plausibly have made a false statement on behalf of the Board. Accordingly, the court dismisses Johnson's defamation claim against the Board, Scott, Kerigan, West, Lee, Sutton, Sessoms, Tippett, Wooten, Andrews, Carroll, Donovan, and Lawrence.

As for Powell, Powell was Smithfield's Police Chief. Johnson alleges that Powell:

- Made statements in front of other employees that Johnson "was engaging in a sexual relationship with Craig Olive, the Register of Deeds."
- Made statements in front of other employees that Johnson "was in a three-way sexual relationship with 'Jeff and Dean,' two individuals who were known to be acquaintances of Craig Olive."
- Made statements in front of other employees, including Jessica Zavala, that Johnson "was having or had had a sexual relationship with Jessica Zavala, a former employee, and that one of Zavala's children was fathered by [Johnson]."
- Made statements in front of other employees that Johnson "was having sexual relationship with Brandy Galindo/Phelps, by saying on a number of occasions 'you are fucking Galindo's wife.'"

Compl. 44. Johnson never pleads, however, that Powell's statements are false. See id.; Chapin, 993 F.2d at 1092; Hedgepeth v. Smoky Mountain Country Club Prop. Owners Ass'n, Inc., 288 N.C. App. 637, 886 S.E.2d 192, 2023 WL 3190690, at *4 (2023) (unpublished table decision); cf. Boyce & Isley, PLLC, 153 N.C. App. at 29, 568 S.E.2d at 897–98 (concluding plaintiffs' complaint "set forth sufficient specific facts to support their claim that the statements made by defendants were false"). Accordingly, the court dismisses Johnson's defamation claim against Powell.

As for Smithfield, Powell was Smithfield's Police Chief. Johnson attempts to hold Smithfield liable for Powell's statements. Sometimes, "an employer may be held vicariously liable for defamatory statements made by an employee." Hendrix, 273 N.C. App. at 32, 847 S.E.2d at 907; see Gillis v. Great Atl. & Pac. Tea Co., 223 N.C. 470, 474–75, 27 S.E.2d 283, 286 (1943).

59

Because Johnson fails to plausibly allege that Powell made any defamatory statements, Johnson cannot hold Smithfield vicariously liable for Powell's statements. Accordingly, the court dismisses Johnsons's defamation claim against Smithfield.

As for Marshburn, Johnson alleges that Marshburn made the following statements:

- Marshburn, after identifying Johnson, "called him the 'golden boy' of the BOE, and stated that 'back in 2019 when he had just gotten elected and, you know, he exposed a lot of people in Johnston County.'" Compl. 40.
- Marshburn and Preston said Johnson "had used 'government property'" to "go out as a person and expose people." They accused Johnson of "using microphones, hidden cameras," and of "grandstanding and using government property . . . to do that." Id.
- Marshburn stated that "'to get all that information' that [Johnson] allegedly obtained, he 'used Smithfield Police Department's equipment to get this done. [Johnson] and another officer within the Police Department.' [Marshburn] alleged that [Johnson] did not use the equipment for a 'legal investigation.'" Id. at 40–41.
- Marshburn and Preston stated that Johnson was "running around on his wife" and that it "was going to come out." Id. at 41.
- Marshburn stated that "[Johnson] had 'got to plant the seed, the problem is [McLeod] fixing to file papers on him. The very next day Ronald Johnson files paper against her because he was afraid she was going to file one against him.'" Id. Marshburn also stated that Johnson "'made up' the allegation and 'told Rick she is going to be taking papers out on him. It is an integrity thing. What good are you in law enforcement?'" Id.
- Marshburn declared: "Don't go after my friends, damn it don't step on my toes. It will catch you in the ass every time. When you use government issued equipment to record people, you use people. You could get charged for pimping and human trafficking. We are paying for the gas to go in there. The A/C to be used while it is getting hot in there, I am just saying." Id. at 41–42.
- During the June 30, 2022 live stream,
  - Marshburn and Preston made statements including: "During this whole ordeal, what transpired, I told y'all this last time that I wound up putting a bug in the ear and it got to him. Ronald Johnson went and filed papers on this woman. Said she is harassing me and stalking me, took out papers, a 50C and it should have been 50B. He is not going to admit he has had sexual relationship with her and used government property for illegal use so forth so on to get these bad guys right. Does a 50C and the whole time in the back of his mind, I need to find out how to shut her up so I don't lose everything I got that I have worked hard for to manipulate and blackmail a lot of people so I can be in this county and become the sheriff, basically

60

be doing what Mr. Bizzell is doing over there, a lot of shady shit. I do not see that happening ever, I think the career is over with, I think things are going to be different. What Ronald Johnson did, when he got into the school board, did all these recordings, paid people, paid people to do that, used government property to get that done, was not a formal investigation through the Smithfield Police Department. So that's got to be thrown out the window, that's not a formal investigation, the chain of command was not filled out, the forms. It's got to have a chain of command." Id. at 50–51.

- o Marshburn stated: "Well I know, I hate it, someone loses their career, someone loses their position they got voted in for. Allowing other people to use recording devices and things that he got from his authority position as a detective, on people during the campaign that is part of what he was saying earlier that he was going to be very involved. These are these types of things that go on that people don't really believe happen when they see two crazy guys like me and you and talking. That can't be true, I am telling you it is true. I am going to call him a predator. I am going to call Ronald Johnson a predator, they come in and do what they do and say what they say. There's a lot more, and it is deep. It goes to teachers, principals, superintendents, school board members, commissioners, town council men. It goes on and on. Some of this stuff was created by Ronald Johnson. It was to gain in the political realm, I call it blackmail, I call it just pure evil to do some of that stuff. We will be exposing more." Id. at 51.

- During the July 7, 2022 webcast, Marshburn and Preston stated:
  - o "It is a fact that he used government property paid for by the taxpayers for personal gain. He could actually from what I know, things I have talked to people about, he could be arrested for conspiracy of extortion. Do you remember when and I am not trying to beat a dead horse, Joe mentioned the CAAG." Id. at 53.
  - o "Ronald Johnson was involved deeply with this voter guide and that he pushed the agenda and extorted certain people he could because, to better understand it. Ronald Johnson causes problems." Id.
  - o "[Johnson] goes in and creates a problem. He comes in and goes back and forth and acts like he is a savior." Id.
  - o "Ronald Johnson was the top dog when it came to the CAAG, Conservative card and the people on it. He was the one to put the ADT on the card. He bribed, kind of extorted, I need these people on this board. I will get you where you need to be, higher up in the system, I will get you a raise, I will get you this, but I need support. He actually got these people and had them so afraid because if they didn't do what he said, they felt like their job was in jeopardy, they were out there at polls working because they were afraid Ronald Johnson was going to retaliate against them. That's how sorry that individual is." Id.

61

- o "They were being intimidated at the polls, some were under the direction of Ronald Johnson." Id.
- o "He has gone to the point where he has taken the mistress, and pretty much sell her out, rent her out so he can have dirt on other people, like DeVan Barbour. Go flirt, see if you can have sex with him, and get pictures and video. No what kind of sick, sadistic son of a bitch is that? That's him. That come out of his mouth." Id.
- During an August 16, 2022 webcast, Marshburn and Preston posted "Happy Birthday Ronald Johnson" and a picture of a fake classified advertisement seeking an "ADULT ENTERTAINER" with an "interest in porn" and "bisexual tendencies." Id. at 59.
- During a September 21, 2022 webcast, Marshburn and Preston stated that Smithfield gave Johnson the option to resign or be terminated. Marshburn also disclosed that Johnson was in therapy. See id. at 62.
- During a September 15, 2022 Board meeting, Marshburn made a public comment where he looked at Johnson and said to him "don't wink at me, I am not that way." Johnson had not winked at Marshburn. Id. at 72.

Johnson alleges that the following statements are false:

- Johnson states that he has "never used any government property to record anything, and that [Marshburn's] allegation has never been substantiated." Id. at 51.
- Johnson denies as untrue as all of the statements in the July 7, 2022 webcast. See id. at 53–54.

Johnson also contends that Marshburn's description of Johnson as a "predator" who engaged in "blackmail" constitutes defamation per se. Id. at 51–52, 105.

At this stage of the case, the court accepts Johnson's allegation that Marshburn's statements about Johnson's misusing government property, Marshburn's statements on July 7, 2022, and Marshburn's description of Johnson as a "predator" who engaged in "blackmail" are false. See id. at 51, 53–54, 105; Chapin, 993 F.2d at 1092. Moreover, on June 30, 2022, Marshburn's statement about misusing government property and calling Johnson a "predator" who engaged in "blackmail" occurred on Marshburn's publicly broadcast webcast. See Compl. 50. On July 7, 2022, Marshburn's second set of statements occurred on his public webcast. See id. at 53. Thus, the statements concerning Johnson were published to a third person. Finally, Johnson plausibly

alleges that Marshburn's statements caused injury to his reputation. See id. at 7, 51–52, 82, 104. Accordingly, Johnson has plausibly alleged a defamation claim in count fourteen against Marshburn.

N.

In count fifteen, Johnson alleges a conspiracy claim under 42 U.S.C. § 1983 against all defendants. See id. at 106–07. To state a conspiracy claim, Johnson must plausibly allege "that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [Johnson's] deprivation of a constitutional right." Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996). To show joint, concerted action, plaintiffs must, at minimum, provide "specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective." Id. Conclusory allegations of a conspiracy do not satisfy this "meeting of the minds" element and fail to state a claim. See, e.g., Simmons v. Poe, 47 F.3d 1370, 1376–77 (4th Cir. 1995); Gooden v. Howard Cnty., 954 F.2d 960, 970 (4th Cir. 1992) (en banc).

Johnson argues that his case is analogous to Haddle v. Garrison, 525 U.S. 121 (1998). See [D.E. 80] 12–13. In Haddle, the plaintiff was an at-will employee who received a federal grand jury subpoena to testify before a federal grand jury investigating his employer. See Haddle, 525 U.S. at 123. The plaintiff also was expected to testify for the prosecution in his employer's upcoming federal criminal trial. See id. In response, plaintiff alleged that two former executives of his employer conspired with a current executive to have him fired. See id. The district court and the United States Court of Appeals for the Eleventh Circuit held that the plaintiff's status as an at-will employee precluded such a claim under 42 U.S.C. § 1985(2). See id. at 123–24. The

63

Supreme Court reversed and held that the plaintiff need not suffer an injury to a constitutionally protected property interest to state a claim under 42 U.S.C. § 1985(2). See id. at 125–26.

This court acknowledges that Johnson's at-will employment status does not bar relief under 42 U.S.C. § 1983. Johnson, however, fails plausibly to allege a "meeting of the minds" among the named defendants. See, e.g., Bartko v. Wheeler, No. 5:14-CT-3043, 2014 WL 3563359, at *8 (E.D.N.C. July 18, 2014) (unpublished); Holbach v. Jenkins, No. 4:09-CV-26, 2009 WL 2382756, at *7 (D.N.D. July 30, 2009) (unpublished). Accordingly, the court dismisses count fifteen.

IV.

In sum, the court (1) GRANTS defendant Lawrence's motion to dismiss [D.E. 41]; (2) DENIES plaintiff's motion to deem timely filed plaintiff's opposition to defendant Zellinger's motion to dismiss [D.E. 81] and STRIKES [D.E. 80] from the record; (3) GRANTS defendant Zellinger's motion to dismiss and DISMISSES defendant Zellinger from this action [D.E. 45]; (4) GRANTS defendants Doyle and Hoffman's motion to dismiss and DISMISSES defendant Doyle and defendant Hoffman from this action [D.E. 47]; (5) DISMISSES IN PART Johnson's claims against Marshburn [D.E. 50]; (6) GRANTS the motion to dismiss of the Board, Sutton, Sessoms, Tippett, Wooten, Andrews, Carroll, and Donovan and DISMISSES defendants the Board, Sutton, Sessoms, Tippett, Wooten, Andrews, Carroll, and Donovan from this action [D.E. 67]; (7) GRANTS IN PART and DENIES IN PART defendant Smithfield's motion to dismiss [D.E. 72]; (8) GRANTS defendants Scott, Kerigan, West, Powell, and Lee's motion to dismiss and DISMISSES defendants Scott, Kerigan, West, Powell, and Lee from this action [D.E. 72]; (9) DENIES defendant McLeod's motion to deem timely filed defendant McLeod's motion to dismiss [D.E. 100] and STRIKES [D.E. 98] and [D.E. 99] from the record; and (10) DISMISSES defendant Preston from the action. Thus, the only claims and only defendants that remain are plaintiff's Title

64

VII retaliation claim in count two against Smithfield, plaintiff's ADA retaliation claim in count four against Smithfield, plaintiff's FMLA interference claim in count five against Smithfield, plaintiff's FMLA retaliation claim in count six against Smithfield, and plaintiff's defamation claim in count fourteen against Marshburn. The court DISMISSES all other claims and all other defendants.

SO ORDERED. This 28 day of March, 2024.

JAMES C. DEVER III
United States District Judge

65