| 14:07:17 | 1 | resigned you were going to turn over the recordings? |

2    A.    I did say -- I think the night that those

3    recordings were turned over by Mr. Jones, I did have a

4    conversation with Mr. Johnson and said we can -- you know, if

14:07:30    5    you want to listen to this, here it is, but we're asking for

6    your resignation.

7    Q.    So you confronted him about recordings?

8    A.    Yes, sir.

9    Q.    You asked him to resign?

14:07:47    10    A.    I did.

11    Q.    And did you say, if you don't resign, we're going

12    to release these recordings?

13    A.    Yes, sir.

14    Q.    Did you tell anybody else about that conversation?

14:08:02    15    A.    I believe that I had a conversation with our vice

16    chair because we discussed all matters.

17    Q.    And was -- did you tell, let's say, Susan Doyle

18    that you had had that conversation with Mr. Johnson?

19    A.    I don't recall that conversation with Ms. Doyle,

14:08:21    20    no.

21    Q.    Mr. Sutton, are you aware that in past meetings

22    board members have had discussion about financial -- well, let

23    me ask you this.

24    Had there been disagreements about how to allocate

14:09:33    25    public funds during board meetings?

Case 5:23-cv-00349-D-RN    Document 158-2    Filed 10/27/25    Page 1 of 150

| | | |
|---|---|---|
| 14:09:36 | 1 | A.   I think that's a fair statement. |
| | 2 | Q.   Is it fair to say that in the past members of the |
| | 3 | board have advocated moving line items so the county |
| | 4 | commissioners didn't know? |
| 14:09:50 | 5 | A.   I don't recall any of that, no, sir. |
| | 6 | Q.   Have you ever heard someone say "hide the money?" |
| | 7 | A.   I was not in a meeting, but I heard there was a |
| | 8 | recording of that, yes, sir. |
| | 9 | Q.   Somebody saying "hide the money?" |
| 14:10:02 | 10 | A.   Yes, sir.  I heard that that was said.  It was on a |
| | 11 | recording.  I didn't physically hear it in that meeting.  I |
| | 12 | wasn't present. |
| | 13 | Q.   And did you initiate an investigation after hearing |
| | 14 | a board member say, "we need to hide the money?" |
| 14:10:20 | 15 | MS. JAMES:  Your Honor, objection.  He doesn't say |
| | 16 | what board member, when this happened.  It wasn't him.  He |
| | 17 | already said he wasn't there. |
| | 18 | THE COURT:  Yes, sir.  If you want ask some |
| | 19 | additional questions. |
| 14:10:30 | 20 | MR. TYNDALL:  Okay. |
| | 21 | Q.   The context of this, Mr. Sutton, it was reported to |
| | 22 | you -- was it reported to you that a board member had made a |
| | 23 | comment at a committee meeting about the allocation of funds? |
| | 24 | A.   It was not reported to me.  I heard it from the |
| 14:10:47 | 25 | public when it was released. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 14:10:50 | 1 | Q.   And did you understand that that was in reference |
| | 2 | to a board member moving funds from the county to look like it |
| | 3 | was from a federal grant? |
| | 4 | MS. JAMES:   Objection.   It calls for him to |
| 14:11:08 | 5 | speculate.   He stated that -- |
| | 6 | MR. TYNDALL:   I'm not asking him to speculate.   I'm |
| | 7 | asking what his understanding was. |
| | 8 | THE COURT:   If he knows, he can answer. |
| | 9 | THE WITNESS:   Can you repeat the question, please? |
| 14:11:18 | 10 | Q.   Yes.   And all I'm asking is what you understood was |
| | 11 | going on because -- were you chair at the time? |
| | 12 | A.   Yes, sir. |
| | 13 | Q.   And so anything like that that might seem out of |
| | 14 | the ordinary, it would be your job as chair to sort of look |
| 14:11:29 | 15 | into it; wouldn't it, Mr. Sutton? |
| | 16 | A.   It would be my job, yes, sir.   We have a chief |
| | 17 | financial officer as well that would be involved in that as |
| | 18 | well. |
| | 19 | Q.   And in fairness, the board of education deals with |
| 14:11:42 | 20 | the public's money; right? |
| | 21 | A.   Yes, sir. |
| | 22 | Q.   I mean, our taxes for -- it's usually property |
| | 23 | taxes that go to support the schools? |
| | 24 | A.   As well as federal and state, yes, sir. |
| 14:11:57 | 25 | Q.   Right.   And each of those taxes, where they come |

Todd Parrish Sutton - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 14:12:01 | 1 | from, they follow a trail and they are allocated in a certain |
| | 2 | way; isn't that fair to say, Mr. Sutton? |
| | 3 | A. That's fair to say. |
| | 4 | Q. The discussion in this particular meeting was about |
| 14:12:13 | 5 | misallocating that; is that fair to say? |
| | 6 | A. The clip that I heard was very short so I cannot |
| | 7 | answer exactly what your -- what your question is about. |
| | 8 | Q. Right. You didn't exactly know what the clip |
| | 9 | meant; right? |
| 14:12:28 | 10 | A. No, sir. It was very short. |
| | 11 | Q. Did you follow up to investigate that clip? |
| | 12 | A. We discussed that, and we went to our chief |
| | 13 | financial officer as well. These line items are very, very |
| | 14 | strict on what you can do. So these line items could not be |
| 14:12:43 | 15 | transferred just to call what you're saying hide the money. |
| | 16 | Q. And I'm not saying hide the money. I'm just saying |
| | 17 | somebody said that. |
| | 18 | A. Right. |
| | 19 | Q. And so you followed up with that; is that fair |
| 14:12:57 | 20 | enough, Mr. Sutton? |
| | 21 | A. Yes, sir. |
| | 22 | Q. But you said somebody recorded that? |
| | 23 | A. Yes, sir. |
| | 24 | Q. Who recorded it? |
| 14:13:04 | 25 | A. My understanding it was Mr. Johnson that recorded |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 14:13:06 | 1 | that. |
| | 2 | Q.   And would you have known about that if he hadn't |
| | 3 | recorded it? |
| | 4 | A.   No, sir. |
| 14:13:14 | 5 | MR. TYNDALL:  I have no further questions for |
| | 6 | Mr. Sutton. |
| | 7 | THE COURT:  Any redirect? |
| | 8 | MR. ZELLINGER:  Yes, Your Honor. |
| | 9 | REDIRECT EXAMINATION BY MS. JAMES: |
| 14:13:21 | 10 | Q.   Now, you were asked about Angie Barbour calling |
| | 11 | you? |
| | 12 | A.   Yes, ma'am. |
| | 13 | Q.   And you stated that you only remember one specific |
| | 14 | conversation.  Why did she contact you? |
| 14:13:31 | 15 | A.   That afternoon she had contacted me.  She was very |
| | 16 | scared.  And I answered the call, and she asked me was she |
| | 17 | safe.  And I said that I'll need more information.  I don't |
| | 18 | understand what you're asking.  And she proceeded to tell me |
| | 19 | that Mr. DeVan Barbour had been trying to contact her numerous |
| 14:13:57 | 20 | times at school via text, as well as calling the school, and |
| | 21 | he finally got up with her and basically told her that if she |
| | 22 | did not submit a text to Mr. Johnson stating that the whole |
| | 23 | affair was a lie and apologize for any -- any emotional intent |
| | 24 | he had on his family that he was going to public with some |
| 14:14:26 | 25 | information about Mr. Barbour. |

| | | |
|---|---|---|
| 14:14:30 | 1 | Q. And had you talked to Ms. Barbour previously? |
| | 2 | A. About this situation? |
| | 3 | Q. Yes. Any. |
| | 4 | A. She came to me early on prior to that and said she |
| 14:14:46 | 5 | had some information that she wanted to move forward with and |
| | 6 | wanted to discuss it with us. I informed her she needed to go |
| | 7 | to the superintendent, and I notified our board attorneys of |
| | 8 | some information that may be coming to them from Ms. Barbour. |
| | 9 | Q. And so you didn't take that information; did you? |
| 14:15:08 | 10 | A. No, ma'am. |
| | 11 | Q. But on this day, that one conversation you answered |
| | 12 | the phone and she told you this? |
| | 13 | A. Yes, ma'am. |
| | 14 | Q. You were asked about the -- Jimmy Lawrence and |
| 14:15:19 | 15 | sexual harassment that was brought to your attention. |
| | 16 | A. Yes, ma'am. |
| | 17 | Q. And what did the board do with that particular |
| | 18 | allegation? |
| | 19 | A. I was not chair at the time when this was |
| 14:15:35 | 20 | happening. I came on right after that as far as the |
| | 21 | transition. I believe there was conversations with |
| | 22 | Mr. Lawrence about his behavior and so forth, and but once I |
| | 23 | became chair, that's when the first time I heard one of the |
| | 24 | recording clips that Mr. Johnson played for me. |
| 14:15:54 | 25 | Q. And so Mr. Johnson had a recording? |

Todd Parrish Sutton - Redirect by Ms. James

14:15:57    1       A.    Yes, ma'am.

2       Q.    He played that for you?

3       A.    Yes, ma'am.

4       Q.    Once you heard that recording, what did you or the

14:16:05    5 board do?

6       A.    At that point in time, I told Mr. Johnson if this

7 is accurate then we need to proceed, because this is -- this

8 is not behavior we wanted from a board attorney.

9       Q.    Did he turn the recording over for you guys to take

14:16:20    10 action?

11       A.    No, ma'am.

12       Q.    So he played it for you, but he didn't turn it over

13 so you can do something?

14       A.    That's correct.

14:16:27    15       Q.    So he just kept it?

16       A.    Yes, ma'am.

17       Q.    And so how could you proceed or how did you proceed

18 when he wouldn't turn over the recording?

19       A.    Prior to the first time we were notified about the

14:16:43    20 recording, we went to talk to Mrs. Doyle about what we could

21 do based on these recordings, and basically she said that in

22 her investigating the team --

23       Q.    Don't tell me what Ms. Doyle said.

24       A.    I'm sorry.

14:16:58    25       Q.    But based on what she told you, how did the board

| | | |
|---|---|---|
| 14:17:01 | 1 | proceed? |
| | 2 | A.   We couldn't do anything until we had the |
| | 3 | documentation to move forward at that time. |
| | 4 | Q.   And at that time Mr. Johnson still hadn't turned |
| 14:17:12 | 5 | over the recording to the board? |
| | 6 | A.   That's correct. |
| | 7 | Q.   You were asked about the salary for Ms. Tracey |
| | 8 | Peedin Jones, and that was her salary on the agenda for the |
| | 9 | discussion on that May session; correct? |
| 14:17:30 | 10 | A.   Yes, ma'am. |
| | 11 | Q.   So were there other salary discussions on that May |
| | 12 | agenda? |
| | 13 | A.   Yes, ma'am. |
| | 14 | Q.   And so when you're discussing those salaries, did |
| 14:17:46 | 15 | you ask about her salary? |
| | 16 | A.   Yes, ma'am. |
| | 17 | Q.   And so for these other people who were in these |
| | 18 | other positions, had they moved from one position to another? |
| | 19 | A.   Some of them it's possible, yes, ma'am. |
| 14:18:02 | 20 | Q.   And so I don't want to put words in your mouth. |
| | 21 | Why did you bring up her salary in discussion of these other |
| | 22 | people that had moved positions and their salaries stayed the |
| | 23 | same, why did you bring hers up? |
| | 24 | A.   Because there were previous cabinet members as |
| 14:18:19 | 25 | well. |

14:18:19  1      Q.    Were you trying to make a comparison between the

2    two?

3            A.    If we're going to be on a level playing field, if

4    they were no longer in cabinet and their salary -- they were

14:18:29  5    in a different position and their salary changes, I was just

6    bringing her up as well because she's no longer on cabinet.

7            Q.    Did you want everybody to be treated the same?

8            A.    Absolutely.

9            Q.    Now, you were asked about Bennett Jones coming to

14:18:54  10   the closed session with recordings, and the attorney would not

11   let him play those recordings; correct?

12           A.    Correct.

13           Q.    And the recordings that Mr. Bennett Jones had was

14   turned over to the board?

14:19:12  15           A.    Yes, ma'am.

16           Q.    Once they were turned over to the board, did you

17   personally take them?

18           A.    They were put in front of me on the -- on my chair.

19           Q.    And did you take custody of those recordings?

14:19:26  20           A.    Yes.

21           Q.    What did you do with the recordings?

22           A.    I gave one of them to Mr. Johnson for him to listen

23   to.

24           Q.    You did?

14:19:33  25           A.    Yes, ma'am.

| | | |
|---|---|---|
| 14:19:34 | 1 | Q. Did he give it back to you? |
| | 2 | A. No, ma'am. |
| | 3 | Q. So you gave him the recordings and he didn't give |
| | 4 | them back? |
| 14:19:42 | 5 | A. It was two different thumb drives. One of them I |
| | 6 | gave to Mr. Johnson and we never received it back. |
| | 7 | Q. What did you do with the second one? |
| | 8 | A. I turned it over to Mr. Hoffman. |
| | 9 | Q. So one ended up with Mr. Hoffman and one ended up |
| 14:20:00 | 10 | with the defendant? |
| | 11 | A. Yes, ma'am. |
| | 12 | Q. Did you intend for him to give that back? |
| | 13 | A. I wasn't -- the intention was -- we never discussed |
| | 14 | it, you know, to give it back at a certain time, but I felt |
| 14:20:10 | 15 | like he would return it. |
| | 16 | Q. But he didn't? |
| | 17 | A. That's right. |
| | 18 | Q. Has he returned it at this point? |
| | 19 | A. Not to my knowledge. |
| 14:20:18 | 20 | Q. When you stated that you had a conversation with |
| | 21 | him about asking him to resign or you are going to release it, |
| | 22 | release it to whom? Can you explain that? |
| | 23 | A. Release it to our board attorney for further |
| | 24 | investigation that -- to see what other avenues we had. |
| 14:20:39 | 25 | Q. Did he resign? |

| | | | |
|---|---|---|---|
| 14:20:41 | 1 | A. | No, ma'am. |
| | 2 | Q. | Who did you release it to? |
| | 3 | A. | Nobody. |
| | 4 | Q. | Nobody. Did you -- you never turned it over to the |
| 14:20:48 | 5 | board attorney either? | |
| | 6 | A. | Other thumb drive? |
| | 7 | Q. | Yes. |
| | 8 | A. | I gave it to Mr. Hoffman. |
| | 9 | Q. | And that was a part of this investigation? |
| 14:20:57 | 10 | A. | Yes, ma'am. |
| | 11 | Q. | Now, you were asked about hide the money, and you |
| | 12 | weren't a part of that? | |
| | 13 | A. | No, ma'am. |
| | 14 | Q. | And you stated Mr. Johnson had a recording he |
| 14:21:18 | 15 | played for you? | |
| | 16 | A. | Of that meeting? |
| | 17 | Q. | Uh-huh. |
| | 18 | A. | No, ma'am. I heard about it when it was released |
| | 19 | on the JoCo Report. | |
| 14:21:26 | 20 | Q. | Well, I'll strike that. |
| | 21 | | Now, you hear this recording and it was on the JoCo |
| | 22 | Report? | |
| | 23 | A. | Yes, ma'am. |
| | 24 | Q. | What is the JoCo Report? |
| 14:21:37 | 25 | A. | It's one of the media outlets that was online. It |

14:21:41  1   used to be radio, but this individual had an online news

        2   outlet.

        3       Q.   Okay.  And was this just a recording being played

        4   on the JoCo Report or was it an article?

14:21:58  5       A.   It was an article with two other individuals that

        6   were currently running for the school board.

        7       Q.   Once you found out about this information, what did

        8   you do with it?

        9       A.   I called our board attorney and they had a

14:22:17 10   discussion with our chief financial officer with regard to

       11   that because he was in that meeting as well.

       12       Q.   You stated that what they were saying can't be done

       13   of hiding money.  Why did you say that?

       14       A.   It's very restrictive on the line items from the

14:22:33 15   federal and the state, and so hiding the money was not

       16   something that -- I think it was taken out of context from the

       17   individual.  And the line items are very strict on what you

       18   can and can't do with that money depending on where it came

       19   from.

14:22:51 20           MS. JAMES:  If I can have just a moment, Your

       21   Honor?

       22           THE COURT:  Yes, ma'am.

       23       Q.   Mr. Sutton, have you ever recorded personally a

       24   closed session of the school board?

14:23:07 25       A.   No, ma'am.

| | | |
|---|---|---|
| 14:23:08 | 1 | Q. Why not? |
| | 2 | A. Because it wasn't the ethical thing to do. |
| | 3 | MS. JAMES: No further questions, Your Honor. |
| | 4 | THE COURT: Anything further, Mr. Tyndall? |
| 14:23:18 | 5 | RECROSS-EXAMINATION BY MR. TYNDALL: |
| | 6 | Q. Mr. Sutton, you mentioned Ms. Barbour called you in |
| | 7 | May of 2022 specifically to discuss some statement about DeVan |
| | 8 | Barbour; is that right? |
| | 9 | A. Yes, sir. |
| 14:23:34 | 10 | Q. Now, did you have a close relationship with |
| | 11 | Ms. Barbour? |
| | 12 | A. No, sir. |
| | 13 | Q. Was she a friend of yours? |
| | 14 | A. Acquaintance. I just knew her from the school |
| 14:23:42 | 15 | system. |
| | 16 | Q. So she's a teacher. |
| | 17 | A. Yes, sir. |
| | 18 | Q. Did you do political activities with her? |
| | 19 | A. Not that I can -- I mean, she was in part of the |
| 14:23:54 | 20 | GOP, but I wasn't too involved with her in that regard, no, |
| | 21 | sir. |
| | 22 | Q. So you were chair of the board of education, but |
| | 23 | you weren't a personal mentor to her; were you? |
| | 24 | A. No, sir. |
| 14:24:03 | 25 | Q. Did she tell you that she had made this disclosure |

| 14:24:07 | 1 | to several other people? |

14:24:07  1   to several other people?

          2        A.   Made what disclosure?

          3        Q.   About DeVan Barbour texting her at school and

          4   asking her to write a letter or something?

14:24:18  5        A.   To my knowledge, she didn't bring that up, no, sir.

          6   She just told me about it.  I don't know what else may have

          7   occurred.

          8        Q.   She didn't tell you she sought the counsel of

          9   people in the community?

14:24:30 10        A.   No, sir.

         11        Q.   Did she tell you she had told numerous people about

         12   this?

         13        A.   No, sir.  It occurred that day at school is what

         14   she told me.

14:24:40 15             MR. TYNDALL:  I have nothing further, Your Honor.

         16             THE COURT:  Ms. James?

         17             MS. JAMES:  Not from the State, Your Honor.

         18             THE COURT:  Sir, you are free to come down.  Thank

         19   you very much.

14:24:49 20             MS. JAMES:  Your Honor, may this witness be

         21   released for the day?

         22             MR. TYNDALL:  Can we keep him under subpoena in

         23   case we have to call him for something?  We can keep him on

         24   standby.

14:25:01 25             THE COURT:  Yes, sir.  You are free to go, subject

| | | |
|---|---|---|
| 14:25:04 | 1 | to being recalled.  You're still under subpoena. |
| | 2 | (Witness excused.) |
| | 3 | THE COURT:  We've had you sitting about an hour and |
| | 4 | a half.  Let's take a short 15-minute break.  Leave your notes |
| 14:25:12 | 5 | in your seats.  We'll make sure they are secured over the |
| | 6 | break. |
| | 7 | I know you just heard those same rules, but please |
| | 8 | remember, don't talk about the case among yourselves.  Don't |
| | 9 | let anybody else speak with you.  Don't do anything on your |
| 14:25:22 | 10 | own.  Thank you very much. |
| | 11 | See you back in 15 minutes. |
| | 12 | (Jury exits.) |
| | 13 | THE COURT:  Anything for the record before we |
| | 14 | recess? |
| 14:26:29 | 15 | MR. TYNDALL:  How long did you say? |
| | 16 | THE COURT:  Fifteen minutes. |
| | 17 | MR. ZELLINGER:  We had this conversation in |
| | 18 | chambers, but it seems to be more relevant now.  One of the |
| | 19 | potential witnesses for the State is Paul Holcombe who's a |
| 14:26:41 | 20 | Superior Court judge.  We -- AOC reached out because they are |
| | 21 | concerned that he shouldn't necessarily call himself judge on |
| | 22 | the witness stand out of a fear of bolstering his own |
| | 23 | testimony or something along those lines and we should refer |
| | 24 | to him as a state employee.  Defendant objected to that and |
| 14:27:00 | 25 | wanted to call him a Superior Court judge. |

14:27:02  1    So I just wanted to put on the record and have the
2    defendant say on the record that that is what the defendant,
3    in fact, wanted to do and the defendant actually did in
4    opening.  I just want to make sure that that was --
14:27:11  5    MR. TYNDALL:  We never had an objection to him
6    being called -- I mean, it's just the honesty of he's a judge.
7    THE COURT:  I still would at some point, even
8    though it's already been mentioned twice to the jury, I still
9    would like to maybe look at that advisory opinion.  Somebody
14:27:27 10    has an advisory opinion.  Maybe it's --
11    MR. ZELLINGER:  I can look into that.  I don't know
12    if there is an advisory opinion, but I can reach out to AOC
13    and see if they have something about that.  But at this point
14    I think the bell has kind of been rung.  And so, you know, I
14:27:41 15    know that the defendant just said that he didn't object to it,
16    but the defendant wants to call the judge as a judge in front
17    of the jury, I believe is what we discussed.  I just wanted to
18    make sure that's accurate.
19    MR. TYNDALL:  But I can't call him Paul.  Usually
14:27:57 20    they don't like you to call them mister, so...
21    THE COURT:  Well, I will note there was some
22    informal discussion about that and about how to proceed.  I
23    don't think there's anything formally addressed or put on the
24    record about that.  But we probably need to make sure we are
14:28:17 25    on the same page going forward from here.  So just think

Todd Sutton - Cross

| | | |
|---|---|---|
| 14:28:20 | 1 | through your options. |
| | 2 | MR. TYNDALL: And I don't know about any advisory |
| | 3 | opinion. If there is something, I'd be happy to look at it. |
| | 4 | I'll adjust my behavior. |
| 14:28:29 | 5 | THE COURT: We'll see what we've got. |
| | 6 | We'll just be in recess for 15 minutes. |
| | 7 | (Recess.) |
| | 8 | THE COURT: Can you guys approach. |
| | 9 | (Sidebar.) |
| 14:45:41 | 10 | THE COURT: Whenever you are ready with your next |
| | 11 | witness. |
| | 12 | MR. ZELLINGER: Can we have just one moment? |
| | 13 | THE COURT: Yes, sir. |
| | 14 | MR. ZELLINGER: Your Honor, can we approach? |
| 14:46:04 | 15 | (Sidebar.) |
| | 16 | MR. ZELLINGER: If there's anyone that's in the |
| | 17 | courtroom that's been subpoenaed, can you please step out of |
| | 18 | the courtroom. |
| | 19 | THE COURT: You can bring them in. |
| 14:49:28 | 20 | (Jury enters.) |
| | 21 | THE COURT: Everybody, welcome back. |
| | 22 | Mr. Zellinger, whenever you are ready. |
| | 23 | MR. ZELLINGER: Your Honor, the State calls DeVan |
| | 24 | Barbour. |
| | 25 | |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 14:49:51 | 1 | DEVAN BARBOUR, |
| | 2 | having been called as a witness for the State and being duly |
| | 3 | sworn at 2:49 p.m., testified as follows: |
| | 4 | DIRECT EXAMINATION BY MR. ZELLINGER: |
| 14:50:18 | 5 | Q. Mr. Barbour, could you state your name for the |
| | 6 | jury. |
| | 7 | A. DeVan Barbour, IV. |
| | 8 | Q. Where do you live? |
| | 9 | A. Benson. |
| 14:50:24 | 10 | Q. Did you grow up here in Johnston County? |
| | 11 | A. Yes, sir. |
| | 12 | Q. Whereabouts did you grow up? |
| | 13 | A. Benson. |
| | 14 | Q. Where did you go to high school? |
| 14:50:32 | 15 | A. South Johnston. |
| | 16 | Q. What do you do for a living? |
| | 17 | A. Employee benefits brokerage firm. |
| | 18 | Q. What's the name of that firm? |
| | 19 | A. Cornerstone Employee Benefits. |
| 14:50:46 | 20 | Q. Are you married? |
| | 21 | A. I am. |
| | 22 | Q. What's your wife's name? |
| | 23 | A. Britany. |
| | 24 | Q. Do you have any children? |
| 14:50:54 | 25 | A. Two. |

| | | |
|---|---|---|
| 14:50:55 | 1 | Q.   How old are your kids? |
| | 2 | A.   Nine and four. |
| | 3 | Q.   And when you were growing up, was your family |
| | 4 | involved in politics in Johnston County? |
| 14:51:06 | 5 | A.   They were.  My father was. |
| | 6 | Q.   What did you -- what did your father do? |
| | 7 | A.   He started out as a town councilman when I was |
| | 8 | small, then he transitioned to the school board and spent |
| | 9 | multiple terms on the school board, and then transitioned to |
| 14:51:19 | 10 | county commissioner until he retired in 2016. |
| | 11 | Q.   And around that time in 2016 did you begin to get |
| | 12 | involved in politics? |
| | 13 | A.   So growing up around, you know, politics -- I'd say |
| | 14 | public service more than politics.  Growing up around, you |
| 14:51:37 | 15 | know, somebody who was always going to meetings and committees |
| | 16 | and all that kind of stuff, I always had an interest in it. |
| | 17 | You know, being a kid that looks up to his dad, you know, it's |
| | 18 | kind of natural.  So when I went to NC State and it was time |
| | 19 | to declare a major, I declared political science and kind of |
| 14:51:56 | 20 | started to pursue that when I was in college. |
| | 21 | Q.   And when did you graduate college? |
| | 22 | A.   2006.  That's a long time ago. |
| | 23 | Q.   And I guess as your dad finished his term on the |
| | 24 | county commission, did you -- like would you help with his |
| 14:52:16 | 25 | campaigns and things of that nature? |

| 14:52:18 | 1 | A. Absolutely. Absolutely. |
| | 2 | Q. And did you become involved in your own right in |
| | 3 | helping with other campaigns? |
| | 4 | A. I did. I did. In college I began working with a |
| 14:52:28 | 5 | state Republican Party and met a lot of folks all over across |
| | 6 | the state that way and got involved in all sorts of political |
| | 7 | stuff. |
| | 8 | Q. And at some point in 2016, your dad came off the |
| | 9 | school board, and at some point did you meet the defendant in |
| 14:52:50 | 10 | this case, Ronald Johnson? |
| | 11 | A. I did. |
| | 12 | Q. When was that? |
| | 13 | A. It would have been some time during that election |
| | 14 | cycle. |
| 14:52:58 | 15 | Q. How is it that you came to meet the defendant? |
| | 16 | A. I would have just been at political events, |
| | 17 | meetings. |
| | 18 | Q. At political events, is there a lot of like |
| | 19 | handshaking and talking amongst people at the events? |
| 14:53:16 | 20 | A. Yes. |
| | 21 | Q. Can you describe what most of the events are like. |
| | 22 | A. Usually just a room full of folks, a bunch of |
| | 23 | people involved, a bunch of candidates. Usually you go in and |
| | 24 | whoever is leading the meeting will make remarks, the |
| 14:53:31 | 25 | candidates will make remarks, and then at the end of the |

| | | |
|---|---|---|
| 14:53:34 | 1 | meeting it's kind of open to where everybody, you know, you |
| | 2 | try and -- as a candidate, you want to try to shake as many |
| | 3 | hands as humanly possible and speak to as many people in the |
| | 4 | room as possible. |
| 14:53:44 | 5 | Q.   Got you.  So you met the defendant sort of under |
| | 6 | those circumstances back -- do you remember what year it was |
| | 7 | that you met him? |
| | 8 | A.   I would assume it would be 2016, but I don't know. |
| | 9 | Q.   At some point did you become aware that he was |
| 14:53:59 | 10 | running for school board? |
| | 11 | A.   Yes. |
| | 12 | Q.   Do you know when he got elected to the school |
| | 13 | board? |
| | 14 | A.   I believe it was 2016. |
| 14:54:07 | 15 | Q.   And how was your relationship with the defendant |
| | 16 | after he sort of got on the school board, would you continue |
| | 17 | to see him at events? |
| | 18 | A.   As I attended events, obviously after 2016, you |
| | 19 | know, I got less involved in politics, and, you know, I didn't |
| 14:54:25 | 20 | attend as many local meetings up until, you know, we started |
| | 21 | talking about running again I think in 2022, 2023. |
| | 22 | Q.   And you mentioned you have a child who's nine years |
| | 23 | old.  Is that why you became less involved in politics around |
| | 24 | then? |
| 14:54:44 | 25 | A.   Well, that and I lost.  So yea, the kids, and, you |

| | | |
|---|---|---|
| 14:54:48 | 1 | know, when you go through -- you know, political campaigns are |
| | 2 | rough. Just when you think you know how rough they are, you |
| | 3 | learn that, you know, they are tough and it takes a toll on |
| | 4 | you and your family. It puts things into perspective. So |
| 14:55:02 | 5 | yea. |
| | 6 | Q. When was your first political campaign? |
| | 7 | A. It was 2016. |
| | 8 | Q. What did you run for? |
| | 9 | A. County Commissioner. |
| 14:55:09 | 10 | Q. And that was the office that your dad had just |
| | 11 | left? |
| | 12 | A. Yea. But again, hindsight that wasn't -- dad |
| | 13 | wanted to retire, but I didn't know of anybody down in the |
| | 14 | southern part of the county that would be willing to step up |
| 14:55:22 | 15 | and run. So he sat me down at dinner one night and asked me |
| | 16 | if I would consider if -- if he wanted to retire, would I |
| | 17 | consider running. I saw that to be a great, you know, |
| | 18 | compliment from my dad, you know, whatever you want to call |
| | 19 | it. Then so you get wrapped up in the emotion of father and |
| 14:55:40 | 20 | son and, you know, that, and then it looks different in the |
| | 21 | public. So that didn't work out well. |
| | 22 | Q. So that same year the defendant was on the ballot, |
| | 23 | you were on the ballot as well? |
| | 24 | A. Correct. Yes, sir. |
| 14:55:50 | 25 | Q. And then your race was not ultimately successful. |

| | | |
|---|---|---|
| 14:55:53 | 1 | A. It was not. It was a -- I was unsuccessful in the |
| | 2 | primary. |
| | 3 | Q. Okay. And so then you sort of take a hiatus from |
| | 4 | politics for the next couple years? |
| 14:56:03 | 5 | A. (Witness gesturing affirmatively.) |
| | 6 | Q. And then did you actually run again a couple years |
| | 7 | later? |
| | 8 | A. Until I ran for Congress in '20. |
| | 9 | Q. 2020? |
| 14:56:13 | 10 | A. 2020 -- 2022. '22. |
| | 11 | Q. Did you originally -- you first ran for Congress in |
| | 12 | about '22; is that correct? |
| | 13 | A. Yes. Correct. Sorry. |
| | 14 | Q. And what was the decision like to get into that |
| 14:56:23 | 15 | race? |
| | 16 | A. So when I was involved in politics in college, I |
| | 17 | actually got real involved with the political organization |
| | 18 | around Johnston County, Harnett County, Sampson County, and |
| | 19 | Cumberland County, and that was back when I was just at NC |
| 14:56:41 | 20 | State, you know, still young, and I always stayed in touch |
| | 21 | with those folks. They actually elected me to be the Chairman |
| | 22 | of the Second Congressional District Party which covered |
| | 23 | Johnston, Sampson, Cumberland, and Harnett. And during the |
| | 24 | census in the district redraws for 2022 when they released the |
| 14:57:04 | 25 | initial maps, the initial version of the map was Johnston, |

| | | |
|---|---|---|
| 14:57:09 | 1 | Harnett, Sampson, and Cumberland. |
| | 2 | As soon as that map was released, you know, my |
| | 3 | phone started ringing and a lot of the folks I had known since |
| | 4 | I was 20-something started asking me to consider it.  So we |
| 14:57:22 | 5 | started kind of making phone calls to see if we had any |
| | 6 | support.  And we found that we did.  So it was -- it seemed |
| | 7 | like it would be a pretty good opportunity in that district as |
| | 8 | it was originally drawn.  That wasn't ultimately the district |
| | 9 | that, you know, was, you know, the final, but there was that |
| 14:57:40 | 10 | district that got us in the race. |
| | 11 | Q.   So every ten years, every state (sic) in North |
| | 12 | Carolina has to do redistricting where they sort of redraw the |
| | 13 | maps with the districts that people who are running for |
| | 14 | Congress run in; is that correct? |
| 14:57:52 | 15 | A.   Correct. |
| | 16 | Q.   So in 2022 after that redistricting there was a new |
| | 17 | district that didn't have an incumbent in it, somebody who was |
| | 18 | already sitting in Congress? |
| | 19 | A.   Correct. |
| 14:58:01 | 20 | Q.   And so that district involved those counties you |
| | 21 | are sort of close to; is that accurate? |
| | 22 | A.   Correct. |
| | 23 | Q.   And so you mentioned you made some calls and found |
| | 24 | some support.  Did you then begin your campaign for Congress |
| 14:58:14 | 25 | in 2022? |

| | | |
|---|---|---|
| 14:58:15 | 1 | A.    I did. |
| | 2 | Q.    And when did that -- did that actually -- the |
| | 3 | election was in 2022; is that right? |
| | 4 | A.    I believe so. |
| 14:58:23 | 5 | Q.    So it would have been like -- May 17th of 2022 is |
| | 6 | the primary; is that correct? |
| | 7 | A.    Correct. |
| | 8 | Q.    And a primary -- what is a primary?  A primary is |
| | 9 | an election between members of the same party? |
| 14:58:34 | 10 | A.    That's correct. |
| | 11 | Q.    So there's sort of the primary of Republicans |
| | 12 | running against each other and a primary of potentially |
| | 13 | Democrats running against each other and then the winners meet |
| | 14 | in the general election? |
| 14:58:45 | 15 | A.    Correct. |
| | 16 | Q.    The general election is typically in November? |
| | 17 | A.    Correct. |
| | 18 | Q.    Okay.  Now that we've covered civics for the day. |
| | 19 | And so you -- your primary for Congress the first time was in, |
| 14:58:56 | 20 | like, May 17th of 2022? |
| | 21 | A.    It was.  It was. |
| | 22 | Q.    And that's when the election is.  When does your |
| | 23 | campaign before that start?  Like how many months before that |
| | 24 | does it -- |
| 14:59:07 | 25 | A.    So we started having conversations, I'd say, in |

| | | |
|---|---|---|
| 14:59:10 | 1 | late August, early September the previous year. |
| | 2 | Q.   Okay.  So that would be have been August or |
| | 3 | September of 2021? |
| | 4 | A.   Because the maps weren't released until, you know, |
| 14:59:18 | 5 | around that time.  So, you know, that was really what it was. |
| | 6 | Q.   Okay.  And at that time period in 2021, the |
| | 7 | defendant, Ronald Johnson, was on the school board; is that |
| | 8 | correct? |
| | 9 | A.   Correct. |
| 14:59:31 | 10 | Q.   As you're running for Congress, do you try to get |
| | 11 | what's called endorsements? |
| | 12 | A.   (Witness nods in the affirmative.) |
| | 13 | Q.   What is an endorsement? |
| | 14 | A.   An endorsement is a person in the community that |
| 14:59:43 | 15 | you feel would have influence over voters there.  If they |
| | 16 | supported you publically, it would be a positive reflection on |
| | 17 | you and would encourage other people to support you as well. |
| | 18 | Q.   Did you attempt to get the defendant's endorsement |
| | 19 | for your congressional race? |
| 14:59:57 | 20 | A.   I did. |
| | 21 | Q.   And what happened with that? |
| | 22 | A.   So we had lunch one day and we were planning on |
| | 23 | doing a series of issue mail pieces, and one of the mail |
| | 24 | pieces was going to be on education, and I sought that |
| 15:00:14 | 25 | endorsement for the education mail piece. |

15:00:18  1          Q.    And so issue mail pieces are like the stuff you get
         2   in the mail that has a candidate and it's like healthcare,
         3   education, whatever it may be.  You had one on education in
         4   that mail piece that you had?
15:00:29  5          A.    Correct.
         6          Q.    And so you got lunch with the defendant about that?
         7          A.    Correct.
         8          Q.    And how did that go?
         9          A.    I thought it went well.  It was a nice lunch and
15:00:37 10   agreed to do that and that was that.
        11          Q.    And do you remember where you went to lunch?
        12          A.    Buffalo Wild Wings.
        13          Q.    And then as time went on, I guess, at some point
        14   did you attend the Dixie Deer Classic?
15:01:03 15          A.    I'm sure I did.  I try to go every year if I can.
        16          Q.    Do you know what time of year that is?
        17          A.    January, February.
        18          Q.    I guess at some point did you become concerned that
        19   there was -- that there's some negative feelings coming from
15:01:21 20   the defendant, Ronald Johnson?
        21          A.    I mean, at some point.  I wouldn't be able to say
        22   exactly when.
        23          Q.    And I guess during this time period, sort of 2021
        24   going into 2022, you're actively running for Congress at that
15:01:42 25   time; is that correct?

```
15:01:43   1        A.    Correct.

           2        Q.    And do you know how long school board terms are?

           3        A.    Four years.

           4        Q.    So Mr. Johnson was elected in 2016.  He would have

15:01:52   5    been -- was he re-elected in 2020?

           6        A.    Yes, sir.

           7        Q.    He wouldn't have been on the ballot until 2024; is

           8    that correct?

           9        A.    Correct.

15:02:01  10        Q.    So in 2022 when you're running, he's not currently

          11    on the ballot; is that correct?

          12        A.    Correct.

          13        Q.    And at some point did you become aware if this

          14    defendant, Ronald Johnson, was having an affair with a woman

15:02:15  15    named Angie Barbour?

          16        A.    It was a rumor.  Rumors that swirl as they do.

          17    That's what that had been, you know.

          18        Q.    You didn't see it with your own eyes?

          19        A.    No.

15:02:27  20        Q.    You didn't talk to the defendant about it?

          21        A.    No.

          22        Q.    You didn't talk to Angela Barbour about it?

          23        A.    No.

          24        Q.    Did you know Angela Barbour at this point?

15:02:34  25        A.    I did.
```

| | | |
|---|---|---|
| 15:02:35 | 1 | Q. How is it that you knew Angela Barbour? |
| | 2 | A. Through the -- mostly through political meetings |
| | 3 | and events. I'm sure we met in town in passing, but I think |
| | 4 | most of the times I saw her were at the political meetings. |
| 15:02:50 | 5 | Q. And do you know what her -- what she did for a |
| | 6 | living? |
| | 7 | A. She's a teacher. |
| | 8 | Q. And did you know her growing up at all? |
| | 9 | A. No. |
| 15:03:01 | 10 | Q. Just to be clear, her last name is Barbour, your |
| | 11 | last name is Barbour, but you are not related in any way. |
| | 12 | A. Correct. |
| | 13 | Q. You mentioned this meeting about having -- eating |
| | 14 | lunch with the defendant and asking for his endorsement and |
| 15:03:17 | 15 | having this issue mailer. Did he end up -- did you end up |
| | 16 | using him for the issue mailer? |
| | 17 | A. We didn't. |
| | 18 | Q. Why was that? |
| | 19 | A. We ended up not running those mail pieces. We went |
| 15:03:29 | 20 | a different direction with the mail pieces. Then, you know, |
| | 21 | there was a lot of -- a lot of turmoil and, you know, a lot |
| | 22 | of -- you know, a lot of kind of -- it became kind of |
| | 23 | controversial so we just kind of wanted to stay away. |
| | 24 | Q. So the defendant was sort of perceived as |
| 15:03:53 | 25 | controversial and you wanted to stay away; is that correct? |

| | | |
|---|---|---|
| 15:03:57 | 1 | A.    When you are in a primary, you have to have -- |
| | 2 | especially when you're an underdog candidate, it's important |
| | 3 | that you have everybody's votes, so you want to try and stay |
| | 4 | away from -- if you know there's any type of controversy and |
| 15:04:09 | 5 | controversial figures or anything like that, you want to stay |
| | 6 | away from it. |

7    Q.    And you mentioned underdog.  I mean, who else was

8    in your primary with you in 2022?

9    A.    Bo Hines, Kelly Daughtry, and a few others.

15:04:29   10    Q.    Do you remember -- I mean, you describe yourself as

11    an underdog.  How did you feel about your campaign when you

12    started and the likelihood of succeeding?

13    A.    We were realistically optimistic, if that makes

14    sense.  Our campaign was based on a bunch of things happening

15:04:49   15    that were beyond our control.  Strategic, you know, as far as

16    strategy goes.

17    Q.    And can you describe for the jury what sort of

18    things that would be?  I mean, you don't have to lay out your

19    entire strategy.

15:05:03   20    A.    So, so the -- I don't know how -- so Kelly and Bo

21    were very well funded, and they could self fund their campaign

22    to the tune of millions, and I couldn't do that.  We could do

23    enough to put together a pretty decent campaign, but there was

24    no way we could compete with that kind of money just kind of

15:05:25   25    being -- you know, I'm just a guy from Benson.  Part of our

DeVan Barbour - Direct by Mr. Zellinger

| | |
|---|---|
| 15:05:30 | 1 strategy was to kind of sit back, be there, just be as visible |
| | 2 as we could but kind of -- kind of lay back and hope that they |
| | 3 would start attacking each other. And when they started |
| | 4 attacking each other, then, you know, Kelly makes people not |
| 15:05:47 | 5 like Bo and then Bo makes people not like Kelly. And then |
| | 6 you're sitting in front of the TV and you say, golly, I don't |
| | 7 like Bo for this reason and I don't like Kelly for this |
| | 8 reason, maybe I'll take a look at DeVan, you know, and see |
| | 9 what he's like. |
| 15:06:00 | 10      Q. Okay. And you had some ads on TV; is that correct? |
| | 11      A. Uh-huh. |
| | 12      Q. And so during this time period, would it have been |
| | 13 advantageous for your campaign to talk about -- strike that. |
| | 14      At some point did you become concerned with the |
| 15:06:19 | 15 defendant having information on you or trying to supply other |
| | 16 people with information about you? |
| | 17      A. Yes. |
| | 18      Q. What happened? When did you first hear of this? |
| | 19      A. At a -- when we met behind the gym. |
| 15:06:41 | 20      Q. Prior to that -- that meeting at the gym was in |
| | 21 April 2022; is that correct? |
| | 22      A. Correct. |
| | 23      Q. And that was like April 25th of 2022; does that |
| | 24 sound right? |
| 15:06:49 | 25      A. It does. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

DeVan Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 15:06:50 | 1 | Q. Your primary was May 17th of 2022? |
| | 2 | A. Correct. |
| | 3 | Q. So this is like a couple weeks before the primary. |
| | 4 | How would you describe your stress level at that point? |
| 15:07:00 | 5 | A. Pretty high. Pretty high. |
| | 6 | Q. And so at some point prior to that, did you receive |
| | 7 | any sort of text messages about information or anything that |
| | 8 | you recall? |
| | 9 | A. So yes. So I knew that there had been, you know, |
| 15:07:13 | 10 | accusations about inappropriate conversation that I had, you |
| | 11 | know, with Ms. Barbour. |
| | 12 | Q. With Angie Barbour? |
| | 13 | A. Correct. |
| | 14 | Q. And where did you learn of that information? |
| 15:07:27 | 15 | A. Just in the political -- friends in the political |
| | 16 | circle that heard it would repeat it back to me that they |
| | 17 | heard it. |
| | 18 | Q. Okay. And then what happened next? |
| | 19 | A. So I received a -- I received kind of a cryptic |
| 15:07:38 | 20 | text message from an unidentified out-of-state number I never |
| | 21 | seen before that alluded to, you know, something like that |
| | 22 | going public. |
| | 23 | Q. Do you still have that text message? |
| | 24 | A. I do not. |
| 15:07:50 | 25 | Q. The nature of that text message was that |

| 15:07:53 | 1 | information about something bad about you and Angela Barbour |

15:07:53  1  information about something bad about you and Angela Barbour
          2  going public; is that correct?
          3      A.  I don't know it was specific.  I don't know that it
          4  was specific in its content, but I pretty much figured out
15:08:06  5  what it was talking about pretty quick.
          6      Q.  And do you remember when you received that?
          7      A.  I do.  I was sitting in the parking lot in Fuquay
          8  Varina about to go eat lunch with the mayor.
          9      Q.  Is that -- does April 13th sound right --
15:08:23 10      A.  That sounds about right.
         11      Q.  -- around the time that you received that?
         12      A.  Sounds about right.
         13      Q.  And what was the restaurant that you were going to
         14  eat at?
15:08:30 15      A.  It was a -- I think it was a Portuguese restaurant.
         16      Q.  Is it called Little Portugal or something?
         17      A.  That sounds about right, yes, sir.
         18      Q.  In your meeting with the mayor of Fuquay, is that
         19  again like trying to get endorsements?
15:08:41 20      A.  Correct.
         21      Q.  Okay.  And when you get that text message, what do
         22  you do?
         23      A.  Kind of stress level goes through the roof.
         24      Q.  When you received that text message, what did you
15:08:57 25  think?

| | |
|---|---|
| 15:09:02 | 1 |

      A.    What -- you know, what -- what in the world is

2   this.  I kind of -- I kind of -- I assumed I knew where the

3   origin -- you know, where it was coming from.

4       Q.    Okay.  And where did you assume it was coming from?

15:09:17  5       A.    I assumed it was coming from Mr. Johnson.

6       Q.    Why?

7       A.    In the conversation earlier, and I don't

8   remember -- I don't remember where or the conversation or the

9   context, but I immediately thought about a conversation where

15:09:33  10  we had -- where he had mentioned being able to -- a program

11  where you can send messages or whatnot from different numbers.

12      Q.    Okay.  So sort of send messages not from your own

13  number but from some other number?

14      A.    Correct.

15:09:48  15     Q.    When you got that message, you thought of Ronald

16  Johnson?

17      A.    Immediately.  I did.

18      Q.    Okay.  That was sort of in April of 2022.  What

19  led -- you mentioned this meeting at the gym.  What led to

15:10:02  20  that?  What happened next?  When did you schedule that?

21      A.    At some point after that I was contacted and told

22  that he -- that there was something that was very important

23  that could, you know, make or break my campaign.  It was very

24  important that we met, and we got together and I --

15:10:22  25     Q.    Just to break that down.  Who told that you that,

| 15:10:24 | 1 | that there was something important that could make or break |
|---|---|---|
| | 2 | your -- |
| | 3 |     A.   Mr. Johnson. |
| | 4 |     Q.   So when you talked to the defendant and he says, I |
| 15:10:43 | 5 | have something that can make or break your campaign, is that |
| | 6 | in person or is that over the phone, or how did you |
| | 7 | communicate with the defendant? |
| | 8 |     A.   It was either -- I think it was a phone call. |
| | 9 |     Q.   And do you remember when that phone call was in |
| 15:10:56 | 10 | relation to the day that you met with the defendant at the |
| | 11 | gym? |
| | 12 |     A.   It would have been a few days before. |
| | 13 |     Q.   Okay.  And if you can flip to tab 13 in the |
| | 14 | notebook. |
| 15:11:23 | 15 |     Looking at tab 13, it's two pages.  Do you see some |
| | 16 | messages back and forth? |
| | 17 |     A.   I do. |
| | 18 |     Q.   And do you still have the same phone number that |
| | 19 | you did back in 2022? |
| 15:11:38 | 20 |     A.   I do. |
| | 21 |     Q.   And what is that phone number? |
| | 22 |     A.   919-909-1507. |
| | 23 |     Q.   And are these some of the messages that you |
| | 24 | exchanged with the defendant prior to meeting with him behind |
| 15:11:53 | 25 | the gym on April 25th of 2022? |

| | | |
|---|---|---|
| 15:11:56 | 1 | A. It seems to be, yes. |
| | 2 | MR. ZELLINGER: Your Honor, I move to enter State's |
| | 3 | Exhibit 13 at this time. |
| | 4 | THE COURT: Any objection? |
| 15:12:03 | 5 | MR. TYNDALL: No objection, Your Honor. |
| | 6 | THE COURT: So allowed. |
| | 7 | (State's Exhibit Number 13 marked for |
| | 8 | identification and entered into evidence.) |
| | 9 | MR. ZELLINGER: Your Honor, may I publish that to |
| 15:12:08 | 10 | the jury? |
| | 11 | THE COURT: Yes, sir. |
| | 12 | (State's Exhibit Number 13 published to the |
| | 13 | jury.) |
| | 14 | MR. ZELLINGER: If we can highlight the first two |
| 15:12:32 | 15 | messages. Your Honor, could the Court inquire of the jury if |
| | 16 | they can see it. |
| | 17 | THE COURT: I thought the same thing. It's sort of |
| | 18 | far away. Can you guys see that okay? Is anybody having |
| | 19 | trouble seeing that? |
| 15:12:58 | 20 | Q. So this appears to be the top of the messages. And |
| | 21 | where its says DeVan Barbour, the number ends in 1507; is that |
| | 22 | your phone number? |
| | 23 | A. Correct. |
| | 24 | Q. And so the defendant appears to message you: Busy |
| 15:13:11 | 25 | tonight. Is that correct? |

| | | |
|---|---|---|
| 15:13:12 | 1 | A. Correct. |
| | 2 | Q. You responded? |
| | 3 | A. Not sure. |
| | 4 | Q. At this stage, I mean, you're three weeks or a |
| 15:13:18 | 5 | month away from the primary. Are you like going to stuff |
| | 6 | every night as part of your campaign? |
| | 7 | A. Every single night. |
| | 8 | Q. What sort of stuff are you going to? |
| | 9 | A. It could be anything. It could be a political |
| 15:13:30 | 10 | party meeting, could be a meet and greet, a fund-raiser, it |
| | 11 | could be, I mean, anything. |
| | 12 | Q. And these messages, are these after he's called you |
| | 13 | and said I have something that can make or break your campaign |
| | 14 | or is this prior to that or do you recall? |
| 15:13:46 | 15 | A. I -- I don't recall. They all might have been |
| | 16 | mixed in together. I don't recall. |
| | 17 | Q. If we can go to the next two messages. |
| | 18 | So you respond: Not sure. And then what does the |
| | 19 | defendant write to you? |
| 15:14:05 | 20 | A. K. Let me know. I'm available. And then two and |
| | 21 | a half hours later: Going to the gym around 8. And I said, |
| | 22 | you know: Can you go to Clayton or Smithfield? Available |
| | 23 | tomorrow. Probably won't be available after that. |
| | 24 | I remember not responding to those text messages |
| 15:14:25 | 25 | because I was, you know, being hesitant to meet. |

| | | |
|---|---|---|
| 15:14:29 | 1 | Q. And at this point you mentioned that you sort of |
| | 2 | knew the defendant to be controversial. Is that sort of |
| | 3 | in -- I don't want to put words in your mouth, but at this |
| | 4 | point did you know that the defendant was sort of |
| 15:14:42 | 5 | controversial? |
| | 6 | A. I did. I was -- yes. |
| | 7 | Q. And by the time of these messages, are you aware if |
| | 8 | you had that conversation about, you know, I've got something, |
| | 9 | that we need to meet or is this -- that's probably after this? |
| 15:14:58 | 10 | A. That was prob -- I don't know. I don't remember. |
| | 11 | Q. And if you don't know, that's totally fine. |
| | 12 | MR. ZELLINGER: If we can highlight the next three |
| | 13 | messages. |
| | 14 | Q. And then it appears and I -- the next thing you |
| 15:15:15 | 15 | respond, can you read that for the jury? |
| | 16 | A. It says: In church. I would assume that would be |
| | 17 | a message from a missed call. |
| | 18 | Q. Okay. So -- |
| | 19 | A. Because with the difference in the timestamp there, |
| 15:15:27 | 20 | I don't know that I out of the blue just message and say, in |
| | 21 | church. So I probably missed a call and then responded to the |
| | 22 | missed call. |
| | 23 | Q. It says: In church. It's like 3:50 in the |
| | 24 | afternoon of April 24th. Would you -- what time do you |
| 15:15:42 | 25 | normally go to church? |

15:15:45  1      A.   Well, that's around Easter.  So it could have, you

      2  know --

      3      Q.   So you could have been in church at 3:50 in the

      4  afternoon?

15:15:55  5      A.   It's possible.

      6      Q.   Okay.  And I believe April 24 -- you don't have any

      7  independent knowledge of April 24th, 2022, is a Sunday; is

      8  that correct?

      9      A.   I have no idea.

15:16:09  10      Q.   And then he responds to you:  That's cool, bro.

      11  I'll be at Clayton Fitness from 6 to 10 tonight.  I'm on a

      12  timeline and won't be available after tonight.

      13           And then what do you respond?

      14      A.   Timeline?

15:16:21  15      Q.   Okay.  Did you know what he was talking about at

      16  this point?

      17      A.   I have no clue.

      18      MR. ZELLINGER:  If we can go to the next two

      19  messages that I believe are on the top right.

15:16:34  20      Q.   And does the defendant write to you:  I got a lot

      21  of stuff next week.  I'm good either way.  Just trying to

      22  help.  No worries.

      23      A.   Yes.

      24      Q.   Do you recall what that was about?

15:16:55  25      A.   I don't.  I don't.

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 15:16:58 | 1 | Q.   Do you remember that conversation where he said:  I |
| | 2 | got something that can make or break your campaign.  That was |
| | 3 | prior to meeting with him at the gym; is that correct? |
| | 4 | A.   Correct. |
| 15:17:06 | 5 | Q.   And was that conversation the catalyst for you to |
| | 6 | actually meet with him? |
| | 7 | A.   Correct. |
| | 8 | Q.   But for that conversation of I've got something |
| | 9 | that can make or break your campaign, at this juncture would |
| 15:17:17 | 10 | you have met with a school board member? |
| | 11 | A.   Not under these parameters because it was kind |
| | 12 | of -- it was kind of awkward the way it was being set up and |
| | 13 | being behind the gym.  Usually if an elected official wants to |
| | 14 | meet with you or chat with you, it will be lunch or coffee or |
| 15:17:38 | 15 | something like that. |
| | 16 | Q.   Not behind a gym. |
| | 17 | A.   Correct. |
| | 18 | Q.   So he messages you:  I'm good either way.  Just |
| | 19 | trying to help.  No worries. |
| 15:17:49 | 20 | MR. ZELLINGER:  And then if we can go to the next |
| | 21 | two messages. |
| | 22 | A.   Yes.  And this makes me think the timestamps may be |
| | 23 | incorrect. |
| | 24 | Q.   That was my question, why do you believe that? |
| 15:17:58 | 25 | A.   Because my next is:  On the way to lunch now.  And |

| | | |
|---|---|---|
| 15:18:00 | 1 | it would make sense that I would leave church and go to lunch. |
| | 2 | MR. ZELLINGER: So if we can highlight the next |
| | 3 | two. |
| | 4 | Q. And Mr. Barbour, we'll likely have other witnesses |
| 15:18:15 | 5 | to talk about the timestamps, but if this was UTC and four |
| | 6 | hours ahead, would it make sense -- |
| | 7 | A. Oh, yea. That's -- yea. |
| | 8 | Q. -- it's 12:45. |
| | 9 | A. Yea. That's correct. UTC time. |
| 15:18:27 | 10 | Q. And so you respond -- what do you respond to the |
| | 11 | defendant? |
| | 12 | A. Are we talking -- I got you. We're on our way to |
| | 13 | lunch now. I'll call you after. We're door knocking in |
| | 14 | Angier this afternoon. |
| 15:18:40 | 15 | Q. And then the next message is like that message; is |
| | 16 | that correct? |
| | 17 | A. Correct. |
| | 18 | Q. And you know how to operate a phone, I assume. |
| | 19 | Like you can highlight the text and like a text message to |
| 15:18:55 | 20 | you; is that correct? |
| | 21 | A. Correct. |
| | 22 | MR. ZELLINGER: And then if we can go to the next |
| | 23 | message. |
| | 24 | Q. The defendant responds to you: I hope to see you |
| 15:19:11 | 25 | tonight. |

DeVan Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 15:19:11 | 1 | I mean, we're not real clear on the time. That |
| | 2 | could be at like 12:50. And then some hour later the |
| | 3 | defendant messages you: Did you call me? Is that correct? |
| | 4 | A. That's correct. |
| 15:19:27 | 5 | MR. ZELLINGER: And then if we can highlight the |
| | 6 | next two messages. |
| | 7 | Q. What do you respond? |
| | 8 | A. Yup. You and four others pocket dial. |
| | 9 | Q. Okay. And then there's like a little emoji of like |
| 15:19:44 | 10 | a face palm? |
| | 11 | A. Face palm, yes. |
| | 12 | Q. And the defendant -- the next message is laughing |
| | 13 | at that? |
| | 14 | A. Correct. |
| 15:19:52 | 15 | Q. And then that's it. April 24th. And if it is UTC, |
| | 16 | it's like 2:00 in the afternoon or something along those |
| | 17 | lines. |
| | 18 | MR. ZELLINGER: If we go to the next page of this |
| | 19 | exhibit. |
| 15:21:05 | 20 | Q. Looking at the next messages you -- these are from |
| | 21 | the next day on April 25th; is that correct? |
| | 22 | A. Correct. |
| | 23 | Q. And you write -- what do you write to the |
| | 24 | defendant? |
| 15:21:23 | 25 | A. About to leave Raleigh. |

15:21:25 1    Q.   And so the -- assuming we're not missing any

2    messages in between, it appears that you may have had a phone

3    call?

4        A.   There would have been a phone call between the two.

15:21:32 5    Q.   And you eventually meet with the defendant behind

6    Clayton Fitness on April 25th; is that right?

7        A.   Correct.

8        Q.   Do you recall what time of day that was?

9        A.   It was lunchtime.

15:21:42 10   Q.   Lunchtime?

11       A.   So it would have been 12:30, I guess.  12:30.

12       Q.   Okay.  So the next message is from the defendant.

13   It says:  Clayton Fitness 12:30.  Is that right?

14       A.   Correct.

15:21:53 15   Q.   And then you respond what to the defendant?

16       A.   12:15 ETA.

17       Q.   Then what does the defendant write back to you?

18       A.   12:35 ETA.  Park in the back.

19       Q.   What's the next message?

15:22:14 20   A.   Almost there.

21       Q.   Do you have a lot of meetings with elected

22   officials behind gyms?

23       A.   No.

24       Q.   Okay.  There's also like a photograph of Clayton

15:22:32 25   Fitness; is that correct?

15:22:34  1      A.    Correct.

          2      Q.    And your meeting with the defendant was not in the

          3  front of Clayton Fitness; is that accurate?

          4      A.    Correct.

15:22:41  5      Q.    Looking at this photograph that's on this exhibit,

          6  can you describe for the jury where you met with the

          7  defendant?

          8      A.    So I have been to Clayton Fitness exactly once in

          9  my life, and I would assume that that would be the front of

15:22:56  10 the building.  I know when I drove in, I believe there was

          11 kind of parking in the front and to the side.  Then if you

          12 drove down, there was also parking in the rear of the

          13 building, so then you drove down the side and to the back.

          14      MR. ZELLINGER:  If we can turn the lights back on,

15:23:13  15 Deputy.  Thank you very much.

          16      Q.    And so when you get to Clayton Fitness, you go

          17 behind the building.  This isn't like the middle of the night?

          18      A.    Lunchtime.  Middle of the day.

          19      Q.    What are you driving at that point?

15:23:26  20      A.    Pickup truck.

          21      Q.    Okay.  And what happens next?

          22      A.    So I park and I wait until he arrives.  Then he

          23 pulls in, parks, then eventually walks over and gets in the

          24 passenger side of my truck.

15:23:44  25      Q.    What happens next?

15:23:46  1          A.    So he gets in the -- in my passenger seat and he

        2     pulls out a couple of phones and some earbuds.

        3          Q.    Do you remember how many phones he had with him?

        4          A.    I mean, I know at least -- I saw two.

15:24:03  5          Q.    Okay.  What happens after he pulls out the two

        6     phones?

        7          A.    So he hands me an earbud and he tells me to put the

        8     earbud in my ear and he plays a recording of himself speaking.

        9          Q.    What do you hear the defendant say in that

15:24:18 10     recording?

       11          A.    He talks about having possession of a recording

       12     where I'm being accused of the inappropriate conversation with

       13     Ms. Barbour.

       14          Q.    Okay.  And do you actually -- is it his voice the

15:24:38 15     entire time or do you actually hear the recording of

       16     Ms. Barbour?

       17          A.    I heard -- it was his voice, and then he played a

       18     portion of the recording.

       19          Q.    And then you heard her voice talking?

15:24:50 20          A.    Yes.

       21          Q.    And do you remember what her voice said during that

       22     recording?

       23          A.    I don't remember specifically.

       24          Q.    I mean, the nature of it, though, was you having

15:25:01 25     some inappropriate interaction with her?

| | | |
|---|---|---|
| 15:25:03 | 1 | MR. TYNDALL:  Objection. |
| | 2 | THE COURT:  I'll sustain as to that.  I'll let you |
| | 3 | rephrase that question. |
| | 4 | MR. ZELLINGER:  Thank you, Your Honor.  I |
| 15:25:08 | 5 | apologize. |
| | 6 | Q.   What, if anything, do you remember about sort of |
| | 7 | the -- if you don't remember exactly the words that were said, |
| | 8 | what generally was the topic of the recording of her voice. |
| | 9 | A.   The topic of the recording of her voice was |
| 15:25:23 | 10 | referring to having an inappropriate phone conversation. |
| | 11 | Q.   With you having an inappropriate -- |
| | 12 | A.   With me and her having an inappropriate phone |
| | 13 | conversation. |
| | 14 | Q.   And that was after the defendant talked on this |
| 15:25:36 | 15 | recording; is that correct? |
| | 16 | A.   Correct. |
| | 17 | Q.   What was the defendant talking about when you |
| | 18 | listened to it? |
| | 19 | A.   To be honest, I don't -- I don't really remember. |
| 15:25:51 | 20 | The whole thing was kind of -- kind of a blur.  It was kind of |
| | 21 | a blur. |
| | 22 | Q.   And why was it a blur to you? |
| | 23 | A.   Because I was kind of sitting there feeling like I |
| | 24 | was living something out of a movie.  I kind of -- it kind of |
| 15:26:07 | 25 | caught me off guard.  I didn't know what was going on, kind of |

15:26:11  1   unexpected, kind of took the wind out of me.  And I just -- I

        2   just kind of -- I don't remember.

        3       Q.   Why did it take the wind out of you?

        4       A.   Just completely -- I mean, just completely

15:26:29  5   unexpected.

        6       Q.   At this point you're like three, four weeks out

        7   from your primary; is that correct?

        8       A.   Yes, sir.

        9       Q.   The recording that you heard of Angie Barbour

15:26:42 10   talking about this interaction, is that something that you

       11   wanted publicized?

       12       A.   No.

       13       Q.   Okay.  And how did you feel when you heard that?

       14       A.   Scared to death.

15:26:56 15       Q.   What were you scared about?

       16       A.   You name it.  Implications with -- I mean, forget

       17   the campaign, implications with my family, implications with

       18   my business, reputation.  You know, any time there's an

       19   accusation made it's...

15:27:16 20       Q.   And the defendant talking to you -- he doesn't

       21   physically talk to you.  He plays a recording to you of his

       22   own voice; is that accurate?

       23       A.   Correct.

       24       Q.   You said you put in one earbud, and that's like an

15:27:33 25   Apple headphone piece?

| | | |
|---|---|---|
| 15:27:36 | 1 | A.   Correct. |
| | 2 | Q.   And the other one he's listening to; is that |
| | 3 | accurate? |
| | 4 | A.   Correct. |
| 15:27:41 | 5 | Q.   After the recording is played, do you remember what |
| | 6 | happens next or what you do? |
| | 7 | A.   I don't remember.  And I don't remember how it |
| | 8 | ended.  I don't.  To be honest, I don't remember how the |
| | 9 | meeting came to an end.  I just remember -- I don't know. |
| 15:28:01 | 10 | Q.   Do you know if you talked to him in your car after |
| | 11 | that when he was sitting there? |
| | 12 | A.   I don't recall. |
| | 13 | Q.   Now, when was the next time that you talked to the |
| | 14 | defendant, Ronald Johnson? |
| 15:28:18 | 15 | A.   It would have been -- I mean, it was some days |
| | 16 | later. |
| | 17 | Q.   What did -- how did you talk to him? |
| | 18 | A.   So I believe that I'd gotten another text or |
| | 19 | another communication somehow alluding to the fact that the |
| 15:28:32 | 20 | recording was going to be made public, or something like that. |
| | 21 | So I had called and just kind of, you know, where is this |
| | 22 | coming from?  And that was -- we had a conversation that |
| | 23 | alluded back to the recording, and that was when he |
| | 24 | asked -- that was when he told that if I can have Ms. Barbour |
| 15:28:56 | 25 | write a letter denying their affair, he could make the |

|          |     |                                                          |
|----------|-----|----------------------------------------------------------|
| 15:29:01 | 1   | recording disappear.                                     |
|          | 2   | Q.    How did that make you feel when he said that?      |
|          | 3   | A.    Like a gut punch.                                   |
|          | 4   | Q.    Why was that a gut punch?                          |
| 15:29:31 | 5   | A.    I just didn't expect anything -- I didn't expect   |

6  anything like -- I mean, I believe I mentioned to him it felt

7  like blackmail and I wasn't expecting something like that.

8          Q.   And so would -- what he told you is if you would

9  write a letter -- if you would have Angie Barbour write a

15:29:56  10  letter denying the affair -- I want to break that down.  That

11  affair was between the defendant and Angie Barbour?

12          A.   Correct.

13          Q.   So if you got Angie Barbour to write a letter

14  denying she had an affair with the defendant, he told you the

15:30:11  15  recording would disappear?

16          A.   Correct.

17          Q.   And you responded that it felt like blackmail?

18          A.   I did.  My first reaction was that -- I mentioned

19  that that felt like blackmail.

15:30:31  20          Q.   Okay.  I mean, was he -- did he say he was just

21  trying to help you out and do you a favor?

22          A.   No.  As soon as I made the comment that it felt

23  like blackmail, the tone of the conversation changed, and at

24  that point I -- I'd known kind of the rumors and history.  I

15:30:53  25  tried to de-escalate and get off the phone as fast as I could.

15:30:58    1    Q.    Okay.  Going back to when you were in your truck

            2    and the defendant came in your truck.  If you were to be

            3    recording that situation, nothing would have been heard

            4    because it was all on that earbud; right?

15:31:17    5    A.    Correct.

            6    Q.    Okay.  And then some days later -- do you remember

            7    exactly how many days later it was when he said -- when he

            8    called you and told you that if you had Angie Barbour write a

            9    letter denying the affair, he would make the recording

15:31:31   10    disappear?

           11    A.    I don't know exactly how many days had passed.

           12    Q.    Following the meeting in the truck where he plays

           13    this recording for you, do you call anybody?

           14    A.    I don't believe so.

15:31:49   15    Q.    Let me ask you, at some point did you talk to Angie

           16    Barbour?

           17    A.    Oh, I mean, absolutely, to ask if there was any --

           18    you know, what in the world, and if she, you know, did.  And

           19    she had mentioned she had no knowledge of being recorded and

15:32:06   20    all that.

           21    Q.    So do you remember how long that was after the

           22    meeting in the truck that you called Angie Barbour?

           23    A.    I don't remember.  I imagine it didn't take very

           24    long.

15:32:17   25    Q.    I mean, I guess when you had that situation occur

| | | |
|---|---|---|
| 15:32:20 | 1 | behind the gym, as you left that conversation, how did you |
| | 2 | feel? |
| | 3 | A. Just gut punched, betrayed. Just, I mean, like |
| | 4 | this is kind of -- well, this is how it ends type feeling. |
| 15:32:44 | 5 | Q. When you say "this is how it ends," what do you |
| | 6 | mean? |
| | 7 | A. Well, I mean, in politics and being a public |
| | 8 | figure, you know, you live -- everything's -- you know, |
| | 9 | everything can come crashing down pretty quick. It doesn't |
| 15:33:02 | 10 | take much for everything to come crashing down pretty quick. |
| | 11 | Q. Okay. And so you call Angie Barbour. You do call |
| | 12 | her; is that correct? |
| | 13 | A. I was -- yes. |
| | 14 | Q. And what do you say to her after having that |
| 15:33:16 | 15 | meeting? |
| | 16 | A. What's going on? I mean, like what in the world is |
| | 17 | going on? Do you know anything about this? Did you know |
| | 18 | there was a recording? |
| | 19 | Q. What does she say to you? |
| 15:33:27 | 20 | A. She told me that she had never made a recording. |
| | 21 | She had no idea she had been recorded, and she didn't know |
| | 22 | what I was talking about. |
| | 23 | Q. At some point did you reach out -- I mean, you |
| | 24 | mentioned you talked to the defendant again. At some point |
| 15:33:58 | 25 | did you get another text message? |

| | |
|---|---|
| 15:34:01 | 1      A.    At some point between that phone conversation |
| | 2    alluding to the letter and the election day there was another |
| | 3    message that came from an out of state number that alluded to, |
| | 4    you know, it's about to -- it's about to drop, or -- I don't |
| 15:34:19 | 5    remember exactly what it said, but it alluded to releasing it. |
| | 6      Q.    Okay.  And when you got that message, what did you |
| | 7    think it was about? |
| | 8      A.    The recording. |
| | 9      Q.    Okay.  And the recording being publicized? |
| 15:34:33 | 10      A.    Correct. |
| | 11      Q.    Okay.  And was that pretty close to the primary |
| | 12    election date? |
| | 13      A.    I believe it was. |
| | 14      Q.    Okay.  And after that happened, did you call Angie |
| 15:34:41 | 15    or the defendant again? |
| | 16      A.    And so -- I'm sure I would have to, you know, ask, |
| | 17    you know, where it came -- what's going on. |
| | 18      Q.    Okay.  And when you called the defendant -- and |
| | 19    this is after the conversation that you say "this feels like |
| 15:34:58 | 20    blackmail."  This is a separate conversation; is that correct? |
| | 21      A.    It would have been.  I mean, I wouldn't have gotten |
| | 22    a second message. |
| | 23      Q.    And what, if anything, do you talk about with the |
| | 24    defendant or what does he tell you then? |
| 15:35:16 | 25      A.    I mean, I couldn't recall. |

| | |
|---|---|
| 15:35:17 | 1 |

Q.   Okay.   I mean, at any point did you feel like the
2   defendant was trying to do you a favor?

3       A.   It sure didn't seem like it.

4       Q.   Why?

15:35:30   5       A.   Because it felt like -- so when I first heard the
6   recording, I assumed that it was going to be used as, you
7   know, leverage.  You know, if we were fortunate enough to be
8   elected, all I can think about was now, you know, somebody's
9   got leverage over me as a congressman.  This isn't going to be
15:35:53  10   good.

11           So after that meeting, I just kind of thought it
12   would be held over my head as, you know, leverage.  And then
13   the phone call where the ask was made for the letter, I
14   never -- it was always -- I never got the -- you know, I never
15:36:10  15   got the feeling it was anything other than, you know, kind of
16   malicious.

17       Q.   At some point did you talk to -- after the
18   conversation with the defendant where you tell him it feels
19   like blackmail, then you get this text message, you mention
15:36:43  20   you called the defendant.  Did you also call Angie Barbour
21   again?

22       A.   I did.  I called -- I called Angie after.  So after
23   he, you know, mentioned the letter, that de-escalated and we
24   got off the phone.  And when I got off the phone with him, I
15:36:57  25   reached out to Angie and I told Angie, you know, what he had

15:37:01  1    requested.

       2        Q.    And what was it that he requested?

       3        A.    The letter.

       4        Q.    What was the letter to say?

15:37:08  5        A.    I told Angie that he had -- you know, there was

       6    this recording of her, and he had told me that if she would

       7    write a letter denying that he and her had an affair, he would

       8    get rid of the recording.

       9        Q.    Okay.  And did you tell her why you wanted that to

15:37:23  10    happen?

       11        A.    I didn't tell her I wanted that to happen.  When I

       12    made her aware of that, her response was -- she was very

       13    remorseful, and she made -- she actually made a comment,

       14    DeVan, I'll do whatever you want me to do.  She said she would

15:37:39  15    write the letter if I wanted her to.  I told her that, you

       16    know, I didn't want her to do anything on my sted.  And then

       17    that conversation ended and that was -- that was the only

       18    conversation we had in regards to that letter.

       19        Q.    Okay.  And during that conversation, did you talk

15:37:56  20    about, like, your campaign at all?

       21        A.    I doubt it.  That was the furthest thing from

       22    my mind at this point in time.

       23        Q.    Okay.  At some point did you tell her that like

       24    your campaign couldn't fight this or you didn't have the money

15:38:10  25    to fight it or anything like that; do you recall that?

15:38:14  1       A.   I don't -- I don't recall.

       2       Q.   Okay.  Okay.  Now, the text message saying, it's

       3  about to go out and the sort of flurry of phone calls after

       4  that, that's pretty close to the primary date; is that right?

15:38:29  5       A.   Correct.

       6       Q.   And do you remember what you did?  Like, did you go

       7  to a polling place on the primary day?

       8       A.   Yes, sir.

       9       Q.   As your election is going on, were you thinking

15:38:38  10  about this at all?

       11       A.   Every second of every day ever since.

       12       Q.   Did you tell your -- like any sort of, like,

       13  advisors about this?

       14       A.   (Witness shakes head in the negative.)

15:38:51  15       Q.   You have to answer out loud.

       16       A.   Oh, sorry.  No, I didn't.  I didn't tell anybody.

       17       Q.   Why not?

       18       A.   I -- to be honest with you, I have no idea.  I've

       19  kind of -- I mean, I -- I had no idea what to do.  So I

15:39:08  20  didn't.  I didn't tell.

       21       Q.   And did you want this information to come out into

       22  the public eye?

       23       A.   No.

       24       Q.   And so election day is like May 7th of 2022; does

15:39:23  25  that sound right?

15:39:25  1        A.   Yes, sir.

       2        Q.   How does that turn out?

       3        A.   We made a good showing, came up a little bit short,

       4   but we were -- we lost the primary.

15:39:36  5        Q.   Where did you finish?

       6        A.   Second.

       7        Q.   And was -- there were two really well-funded

       8   candidates.  You mentioned Daughtry and Bo Hines.  Bo Hines

       9   won; is that correct?

15:39:48 10        A.   Correct.

      11        Q.   And you finished second ahead of Daughtry; is that

      12   correct?

      13        A.   Correct.

      14        Q.   Was that kind of a surprise?

15:39:53 15        A.   It was to me.

      16        Q.   Okay.  And after this election in November, Bo

      17   Hines goes on to the general election; is that correct?

      18        A.   Correct.

      19        Q.   And then who does he run against?

15:40:14 20        A.   Wiley Nickel.

      21        Q.   Wiley Nickel wins that election; is that correct?

      22        A.   Correct.

      23        Q.   And so Wiley Nickel goes to Congress.  After Wiley

      24   Nickel is elected and Bo Hines loses -- and was this district

15:40:28 25   sort of -- you know, there's districts that are close

DeVan Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 15:40:31 | 1 | to -- which way did this district lean? |
| | 2 |      A.   So this was the only toss-up district in the state. |
| | 3 | It was a true 50 -- it was a true 50/50 district. |
| | 4 |      Q.   Okay.  And Bo Hines loses.  So when Bo Hines loses, |
| 15:40:43 | 5 | what happens next? |
| | 6 |      A.   I started getting calls 48 hours after the |
| | 7 | election. |
| | 8 |      Q.   What were those calls about? |
| | 9 |      A.   Alluding to running again. |
| 15:40:54 | 10 |      Q.   Okay.  And that's -- why was that?  Is that because |
| | 11 | you had a good showing in the primary? |
| | 12 |      A.   Yes, sir. |
| | 13 |      Q.   And again, like, at this point after you get these |
| | 14 | calls after November of 2022, would it have been helpful for |
| 15:41:18 | 15 | your campaign to have this information out there that this had |
| | 16 | happened? |
| | 17 |      A.   No. |
| | 18 |      Q.   And why not? |
| | 19 |      A.   No scandal is a good scandal in politics. |
| 15:41:32 | 20 |      Q.   So I mean, at any point after you met with the |
| | 21 | defendant in your truck, did you call the police right |
| | 22 | afterwards? |
| | 23 |      A.   No. |
| | 24 |      Q.   Why not? |
| 15:41:42 | 25 |      A.   I didn't want anybody to know.  This isn't |

| | | |
|---|---|---|
| 15:41:45 | 1 | something that I wanted to broadcast.  I was hoping it would |
| | 2 | just go -- you know, naive, I was kind of hoping it would go |
| | 3 | away. |
| | 4 | Q.   And after sort of you reached out to Angie Barbour |
| 15:42:06 | 5 | and after you told the defendant this felt like blackmail, was |
| | 6 | there a recording ever released, to the best of your |
| | 7 | knowledge? |
| | 8 | A.   Not to my -- I don't know. |
| | 9 | Q.   Okay.  At some point -- the next time this comes |
| 15:42:22 | 10 | up, is that when this is being investigated? |
| | 11 | A.   Correct. |
| | 12 | Q.   And Investigator Rick Hoffman meets with you; is |
| | 13 | that correct? |
| | 14 | A.   Correct. |
| 15:42:34 | 15 | Q.   And what happens in that meeting with the |
| | 16 | investigator?  Do you tell him the truth about what happened? |
| | 17 | A.   Yes, sir. |
| | 18 | Q.   Okay.  And after that comes out, there's further |
| | 19 | investigation into this; is that correct? |
| 15:42:53 | 20 | A.   Correct. |
| | 21 | Q.   And there's things like search warrants and other |
| | 22 | people interviewed and things along those lines; is that |
| | 23 | accurate? |
| | 24 | A.   I believe so, yes. |
| 15:43:04 | 25 | Q.   And eventually the defendant is charged, and that's |

15:43:09   1    why we're here today; is that correct?

2        A.    Correct.

3        Q.    And so has that been helpful to your career?

4        A.    I don't think so.

15:43:20   5        Q.    I mean, has it been helpful to your marriage?

6        A.    No.

7        Q.    I mean, after -- if you hadn't told the truth in

8    that interview with the detective or this hadn't come out,

9    would you be -- I mean, this would not have been publicized;

15:43:42  10    is that correct?

11        A.    Correct.

12        Q.    Okay. Do you recall at some point -- at some point

13    did Angie Barbour reach out to you about -- back when this --

14    in 2022 when this was kind of going on, did Angie Barbour

15:44:03  15    reach out to you with a concern that the defendant was coming

16    after you and sent, like, some sort of picture to you or

17    anything like that; do you recall that?

18        A.    Not to my knowledge.

19        Q.    Do you recall receiving, like, a Facebook

15:44:18  20    screenshot or something like that from her? Do you remember

21    that?

22        A.    I don't recall.

23        Q.    Do you know a person named Kevin Donovan?

24        A.    I do.

15:44:31  25        Q.    Who's Kevin Donovan?

| | | |
|---|---|---|
| 15:44:33 | 1 | A.    He was a candidate for school board that same |
| | 2 | election cycle and is now a school board member. |
| | 3 | Q.    Are there certain -- in the party here in Johnston |
| | 4 | County, the Republican Party, are there certain people that -- |
| 15:44:50 | 5 | like, is there subsets of the Republican Party that are like |
| | 6 | certain groups? |
| | 7 | A.    There -- I mean, it's like that in every Republican |
| | 8 | Party, not just Johnston County.  There's always, like, kind |
| | 9 | of cliques and factions. |
| 15:45:05 | 10 | Q.    Was Kevin Donovan associated with the defendant, |
| | 11 | Ronald Johnson? |
| | 12 | A.    During the campaign, yes. |
| | 13 | Q.    And at some point did Kevin Donovan call you? |
| | 14 | A.    Yes. |
| 15:45:13 | 15 | Q.    Do you remember where you were when you got that |
| | 16 | call? |
| | 17 | A.    I do.  I was with the family and we were pulling |
| | 18 | into, I believe, an Easter festival at the old Benson |
| | 19 | Elementary School in town and he called. |
| 15:45:29 | 20 | I didn't have his phone number so it was an |
| | 21 | unidentified number that I answered.  I took the call.  And |
| | 22 | something was mentioned that made me realize it wasn't a phone |
| | 23 | call I needed to have in front of the kids.  So once we |
| | 24 | parked, Britany took the kids into the Easter festival and I |
| 15:45:49 | 25 | stayed behind and called him back. |

| | | |
|---|---|---|
| 15:45:51 | 1 | Q. Okay. And what was that conversation about? |
| | 2 | A. He had mentioned -- he had mentioned -- or just |
| | 3 | reiterated what I already knew. He had mentioned that there |
| | 4 | was a recording and that, you know, my -- you know, people |
| 15:46:03 | 5 | were threatening and just -- just talked about the situation |
| | 6 | and there being a recording. |
| | 7 | Q. Was that after you had met with the defendant in |
| | 8 | your truck behind the gym? |
| | 9 | A. Yes. |
| 15:46:17 | 10 | Q. So he knew that at that point? |
| | 11 | A. I don't know what -- did Kevin know that we met in |
| | 12 | my truck? |
| | 13 | Q. Yes. |
| | 14 | A. I have no idea. |
| 15:46:26 | 15 | Q. I mean, did he bring up anything about the truck |
| | 16 | situation and the defendant getting in your truck? |
| | 17 | A. I don't recall. |
| | 18 | Q. But that conversation was about the recording? |
| | 19 | A. Correct. |
| 15:46:37 | 20 | Q. And did he threaten you in any way? |
| | 21 | A. No. |
| | 22 | Q. Did he tell you that if you wrote a letter that -- |
| | 23 | if you got Angie to write a letter saying she didn't have an |
| | 24 | affair that he would make the recording disappear? |
| 15:46:52 | 25 | A. No. |

| | | |
|---|---|---|
| 15:46:52 | 1 | Q. Okay. The defendant was the person who did that? |
| | 2 | A. Correct. |
| | 3 | Q. Do you recognize the defendant here in the |
| | 4 | courtroom? |
| 15:46:57 | 5 | A. I do. |
| | 6 | Q. And could you just point out an item of clothing |
| | 7 | that he's wearing and sort of point to him. |
| | 8 | A. A blue necktie. |
| | 9 | MR. ZELLINGER: Your Honor, I just ask the record |
| 15:47:04 | 10 | reflect that the witness identified the defendant. |
| | 11 | THE COURT: So allowed. |
| | 12 | Q. In 2024 -- so after 2022, you kind of surprisingly |
| | 13 | finished second behind Bo Hines who then goes on to lose; is |
| | 14 | that correct? |
| 15:47:31 | 15 | A. Correct. |
| | 16 | Q. And then in 2024, that's -- what happens to that |
| | 17 | district, if anything? |
| | 18 | A. It gets drastically changed and becomes a much more |
| | 19 | favorable district for a Republican Party candidate. |
| 15:47:46 | 20 | Q. Okay. And so when that district becomes more |
| | 21 | favorable for a Republican candidate, what effect does that |
| | 22 | have on you? |
| | 23 | A. Well, we were excited about that. |
| | 24 | Q. Okay. And so do you start another campaign for |
| 15:47:58 | 25 | Congress? |

| 15:47:59 | 1 | A. Correct. |
|---|---|---|
| | 2 | Q. And when that happens, there's another primary, and |
| | 3 | is it like in May of last year, May of 2024? |
| | 4 | A. Correct. |
| 15:48:13 | 5 | Q. And the defendant is still on the school board at |
| | 6 | this point? |
| | 7 | A. Correct. |
| | 8 | Q. Okay. Would you see the defendant at events and |
| | 9 | things? |
| 15:48:24 | 10 | A. Yes. |
| | 11 | Q. Okay. Did you grab him and say, why did you do |
| | 12 | this to me? |
| | 13 | A. I did not. |
| | 14 | Q. Okay. Why not? |
| 15:48:33 | 15 | A. Because that's not something you do. I always try |
| | 16 | to be as cordial as I can. Again, he was on the ballot, and |
| | 17 | if I wanted any shot at having a chance, you know, I needed |
| | 18 | his voters to vote for me too. |
| | 19 | Q. Okay. |
| 15:48:51 | 20 | A. So I wouldn't want to do anything. I tried to stay |
| | 21 | cordial and neutral as best I could. |
| | 22 | Q. Okay. And so would you ever talk to him last year |
| | 23 | as you were running for the primary? |
| | 24 | A. I'm sure in passing, yes, at the events. It's hard |
| 15:49:06 | 25 | not to when you're -- you know, these rooms are small. |

15:49:08  1      Q.    Okay.  And so why -- I mean, why were you cordial

 2    to him at that point?

 3           A.    Actually, that's how I was raised.  I don't know.

 4    Just, I mean...

15:49:21  5      Q.    I mean, if you were raised that way and you said,

 6    you know, why did you do this to me and started yelling at him

 7    in a party event, would that have helped your campaign?

 8           A.    No.

 9           Q.    Why not?

15:49:34 10      A.    Well, that would have made me look like, you know,

11    a not very level-headed individual, and it wouldn't have been

12    appropriate.

13           Q.    So do you -- as part of running for office, do you

14    have, like, many different social media feeds that you

15:50:06 15    yourself would use?

16           A.    I do.

17           Q.    Can you name what some of those are.

18           A.    Facebook, Instagram, Twitter.

19           Q.    Did you have Snapchat?

15:50:18 20      A.    I do.  I didn't use it for the campaign, but you

21    can always add Snapchat personally.

22           Q.    Okay.  So you had your own personal Snapchat?

23           A.    Yes.

24           Q.    Do you know what your name was on Snapchat?

15:50:25 25      A.    DVB4.

| | | |
|---|---|---|
| 15:50:28 | 1 | Q.    DBV4? |
| | 2 | A.    Correct. |
| | 3 | Q.    Outside of the campaign, do you, like, play a sport |
| | 4 | recreationally? |
| 15:50:45 | 5 | A.    I do. |
| | 6 | Q.    What is that? |
| | 7 | A.    Hockey.   Ice hockey. |
| | 8 | Q.    And is there an ice hockey team in Benson? |
| | 9 | A.    There is. |
| 15:50:54 | 10 | Q.    And you are on that ice hockey team? |
| | 11 | A.    I am. |
| | 12 | Q.    What is the name of the Benson ice hockey team? |
| | 13 | A.    So for clarification, adult men -- adult league |
| | 14 | hockey leagues are referred to informally as beer leagues. |
| 15:51:09 | 15 | It's just kind of what they call them.  And us being from |
| | 16 | Benson, as a nod to Mule Days, we named our team the Drunk |
| | 17 | Donkey. |
| | 18 | Q.    Okay. |
| | 19 | A.    I will state for the record, I did not have |
| 15:51:27 | 20 | anything to do with the naming of said hockey team. |
| | 21 | Q.    Okay.   That hockey team, were your games in -- is |
| | 22 | there, like, an ice hockey rink in Johnston County or did you |
| | 23 | come to Raleigh to play? |
| | 24 | A.    Garner and Cary. |
| 15:51:41 | 25 | Q.    Garner and Cary, okay.  And are those kind of -- |

15:51:43  1   you mentioned it's called beer league. I mean, after the

2   game, do folks drink beer afterwards?

3        A.   Some folks do. Sometimes. Depending on what time

4   the game is.

15:52:00  5        Q.   Okay.

6        MR. ZELLINGER:  Can I have a moment, Your Honor?

7        THE COURT:  Yes, sir.

8        Q.   Prior to the meeting in your truck on April 25th of

9   2022, was the defendant helpful to your campaign?

15:52:50  10       A.   We didn't really communicate much. I wouldn't

11   know, you know, if he was saying nice things about me in

12   public. I wouldn't have knowledge of that. We weren't

13   actively correlating -- or coordinating, you know.

14        Q.   Okay. So it's not like he was a surrogate that was

15:53:07  15   going out and talking on your behalf or anything along those

16   lines?

17        A.   No, he wasn't.

18        Q.   Okay. And then this incident with the truck, that

19   occurred on April 25th of 2022; is that correct?

15:53:21  20       A.   That's correct.

21        Q.   And in those conversations -- in the three weeks or

22   four weeks until the primary, did you actually reach out to

23   the defendant on the phone more than once?

24        A.   I'm sure I would have with all this going on.

15:53:42  25       Q.   And would you have done that but for this

| | | |
|---|---|---|
| 15:53:46 | 1 | conversation where the defendant requested that you get Angie |
| | 2 | to write a letter in order to make the recording disappear? |
| | 3 | A.   I don't believe so. |
| | 4 | MR. ZELLINGER:  Nothing further, Your Honor. |
| 15:53:57 | 5 | THE COURT:  Mr. Tyndall. |
| | 6 | MR. TYNDALL:  Thank you, Your Honor. |
| | 7 | CROSS-EXAMINATION BY MR. TYNDALL: |
| | 8 | Q.   Mr. Barbour, let's clarify something, if you don't |
| | 9 | mind for me.  You described an inappropriate phone call. |
| 15:54:10 | 10 | That's not what Angie Barbour has described; is it? |
| | 11 | A.   To my knowledge, it was an inappropriate phone |
| | 12 | call. |
| | 13 | Q.   Hasn't she accused you of standing in front of a |
| | 14 | mirror with your clothes off and calling her on Facetime? |
| 15:54:27 | 15 | A.   That's an inappropriate phone call, yes, sir.  Yes, |
| | 16 | sir. |
| | 17 | Q.   That's what you mean by inappropriate phone call? |
| | 18 | A.   Yes, sir. |
| | 19 | Q.   So she's saying a married man who's a candidate for |
| 15:54:34 | 20 | Congress stood in front of a mirror naked and called me? |
| | 21 | A.   Correct. |
| | 22 | Q.   Is that true? |
| | 23 | A.   I have zero recollection of any phone call like |
| | 24 | that ever happening. |
| 15:54:46 | 25 | Q.   Let me ask you again.  Is that true? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 15:54:50 | 1 | MR. ZELLINGER: Objection. Asked and answered. |
| | 2 | THE COURT: I'll sustain it. |
| | 3 | Q. Let me ask you a different way. Are you saying it |
| | 4 | could be true? |
| 15:55:04 | 5 | A. I'm not saying it could be true. I can't -- I |
| | 6 | can't say that I -- there's -- there's no way. I can't -- no. |
| | 7 | She, you know -- |
| | 8 | Q. Go ahead. Finish. I'm sorry, I didn't mean to -- |
| | 9 | A. I can't imagine that I would. I have zero |
| 15:55:34 | 10 | recollection of any exchange like that, and I can't for a |
| | 11 | million years understand why I would ever do anything like |
| | 12 | that. |
| | 13 | Q. Well, let me just -- do you have any memory |
| | 14 | problems? |
| 15:55:53 | 15 | A. I mean, sometimes. When I was -- when I proposed |
| | 16 | to my wife, I fell off of a boat and broke my neck and I've |
| | 17 | had some memory issues. I wouldn't say it was a result of |
| | 18 | that, but to answer honestly. |
| | 19 | Q. So with memories -- I mean, my memory, I'm getting |
| 15:56:17 | 20 | older, but it's -- there are details; is that right? |
| | 21 | A. Yes. |
| | 22 | Q. Memory for details is one thing; is that fair? |
| | 23 | A. Okay. |
| | 24 | Q. And is it fair to say there's a memory for bigger |
| 15:56:31 | 25 | events? |

| | | |
|---|---|---|
| 15:56:33 | 1 | A. Yes. |
| | 2 | Q. So like today would be a big event? |
| | 3 | A. I'd say, yea. |
| | 4 | Q. So you might remember that you've testified in |
| 15:56:40 | 5 | court; is that correct? |
| | 6 | A. I would. |
| | 7 | Q. But you might not remember the date; is that fair? |
| | 8 | A. Correct. |
| | 9 | Q. And so speaking of the details, you don't remember |
| 15:56:50 | 10 | the details really of your conversation with Mr. Johnson; do |
| | 11 | you? |
| | 12 | A. I mean, I remember the gist of the conversation, |
| | 13 | not as to verbatim word for word. |
| | 14 | Q. You don't remember the specific words he used? |
| 15:57:08 | 15 | A. Not for the entire conversation, but I remember, |
| | 16 | you know, specific words and portions of the conversation that |
| | 17 | stuck out. |
| | 18 | Q. Now, you've described a political campaign as being |
| | 19 | a very intense environment; is that fair to say? |
| 15:57:25 | 20 | A. Yes, sir. |
| | 21 | Q. You are on edge at every moment? |
| | 22 | A. Yes, sir. |
| | 23 | Q. I think I remember in one of your prior statements |
| | 24 | you said you sort of expect someone to come attack you at any |
| 15:57:35 | 25 | time? |

| | | |
|---|---|---|
| 15:57:36 | 1 | A. Correct. |
| | 2 | Q. You are almost paranoid; isn't that right, |
| | 3 | Mr. Barbour? |
| | 4 | A. I wouldn't say paranoid. You just kind of take it |
| 15:57:43 | 5 | as a, you know -- as a, you know, it will happen. |
| | 6 | Q. You're worried about what might happen next? |
| | 7 | A. Correct. |
| | 8 | Q. And you mentioned that -- it's fair to say that any |
| | 9 | scandal is a bad scandal; is that right? |
| 15:57:58 | 10 | A. Yes, sir. |
| | 11 | Q. Is it fair to say that if someone hears something |
| | 12 | bad out there, you would want to know it? |
| | 13 | A. Correct. |
| | 14 | Q. Now, I want to go back to some dates and some phone |
| 15:58:12 | 15 | calls you talked about. Do you remember a person named Kevin |
| | 16 | Donovan calling you on the 16th of April prior to your meeting |
| | 17 | with Mr. Johnson? |
| | 18 | A. I do not. |
| | 19 | Q. You don't remember those phone calls? |
| 15:58:26 | 20 | A. I don't. |
| | 21 | Q. The phone call you just described where you were |
| | 22 | with your family, do you remember getting a call from |
| | 23 | Mr. Donovan? |
| | 24 | A. I do. |
| 15:58:36 | 25 | Q. Whenever it was. |

DeVan Barbour - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 15:58:37 | 1 | A. That was -- it was the Easter -- the day of the |
| | 2 | Easter festival in Benson. |
| | 3 | Q. And do you remember after talking to Mr. Donovan |
| | 4 | talking to Mr. Johnson? |
| 15:58:51 | 5 | A. I don't. |
| | 6 | Q. Do you remember thanking him for letting you know |
| | 7 | about this information? |
| | 8 | MR. ZELLINGER: Objection to the form. |
| | 9 | THE COURT: Overruled. If he remembers, he can |
| 15:59:00 | 10 | answer. |
| | 11 | MR. ZELLINGER: Your Honor, can I just clarify? |
| | 12 | The thanking, was that the defendant or was that Donovan? |
| | 13 | THE COURT: If you can clarify. |
| | 14 | MR. TYNDALL: Yes. |
| 15:59:08 | 15 | Q. Do you remember thanking Mr. Johnson for letting |
| | 16 | you know or encouraging Mr. Donovan to call you? |
| | 17 | A. I don't. |
| | 18 | Q. Now, suffice it to say, after -- between the |
| | 19 | April 25th and May 17th -- May 17th was the primary; is that |
| 15:59:33 | 20 | right? |
| | 21 | A. I believe so, yes, sir. |
| | 22 | Q. No one released a recording about you; isn't that |
| | 23 | fair to say? |
| | 24 | A. To my knowledge, correct. |
| 15:59:42 | 25 | Q. Well, you're the congressional candidate, |

| | | |
|---|---|---|
| 15:59:46 | 1 | Mr. Barbour, don't you think -- |
| | 2 | A.    That's true. |
| | 3 | Q.    -- somebody would have picked up on that? |
| | 4 | A.    Yes, sir.  Yes, sir. |
| 15:59:50 | 5 | Q.    That's a fair -- |
| | 6 | THE COURT:  Just be mindful of our court reporter. |
| | 7 | I know you haven't testified much, but she's taking down |
| | 8 | everything that we say.  She can't record two conversations at |
| | 9 | the same time.  Just slow down a little bit. |
| 16:00:04 | 10 | Q.    That would have gotten out there; isn't that right? |
| | 11 | A.    Yes, sir. |
| | 12 | Q.    And after May 17th, you're unaware of anybody |
| | 13 | releasing that recording; isn't that fair to say? |
| | 14 | A.    That's correct. |
| 16:00:18 | 15 | Q.    And as far as you know, Mr. Johnson never mentioned |
| | 16 | anything about this recording to anybody else; isn't that fair |
| | 17 | to say? |
| | 18 | A.    I have no knowledge of that either way. |
| | 19 | Q.    You have no knowledge of him doing anything to you; |
| 16:00:32 | 20 | isn't that right? |
| | 21 | A.    That's correct. |
| | 22 | Q.    Now, but someone did release this information; |
| | 23 | isn't that fair to say?  Someone did accuse you of these |
| | 24 | things? |
| 16:00:45 | 25 | A.    Correct. |

| | | | |
|---|---|---|---|
| 16:00:46 | 1 | Q. | And who was that? |
| | 2 | A. | Angie Barbour. |

16:00:46    1         Q.    And who was that?

           2         A.    Angie Barbour.

           3         Q.    And she made statements about you online; is that

           4    right?

16:00:58    5         A.    I'm not sure.  To be honest with you, I try not to

           6    look at social media very much.

           7         Q.    Well, weren't you interviewed or didn't someone ask

           8    you about a -- to comment for an article?

           9         A.    Oh, yes.  Yes, sir.  Yes, sir.

16:01:17   10         Q.    And that was -- was that February 16th of 2024?

          11         A.    That was a --

          12         Q.    Did someone ask you to comment for an article that

          13    was going to be published?

          14         A.    Yes, sir.

16:01:33   15         Q.    And was that article published on February 16th,

          16    2024?

          17         A.    I believe -- I can't confirm the date, but that

          18    sounds like that would be correct.

          19         Q.    I mean, you were in the heat of the campaign at

16:01:45   20    that time; isn't that right, Mr. Barbour?

          21         A.    Correct.

          22         Q.    And isn't it fair to say that Ms. Barbour accused

          23    you repeatedly --

          24              MR. ZELLINGER:  Objection.

16:02:17   25              THE COURT:  We'll let him finish the question.

| | | |
|---|---|---|
| 16:02:20 | 1 | MR. TYNDALL: I'll rephrase it which might help. |
| | 2 | Q. Did you learn that this report stated that |
| | 3 | Ms. Barbour repeatedly accused you of making repeated |
| | 4 | prop -- excuse me, accused you of repeatedly propositioning |
| 16:02:39 | 5 | her for sex? |
| | 6 | A. That was news to me. I have never been made aware |
| | 7 | of that accusation until then. |
| | 8 | Q. Until this report? |
| | 9 | A. Correct. |
| 16:02:52 | 10 | Q. And that was two months before the primary in 2024; |
| | 11 | wasn't it? |
| | 12 | A. Correct. |
| | 13 | Q. And did you know that this -- I don't know if it's |
| | 14 | an online -- |
| 16:03:07 | 15 | A. It's like a blog. |
| | 16 | Q. It's like a blog or something said that she |
| | 17 | reported to them that you wanted her to drive to your house |
| | 18 | and have sex with you. |
| | 19 | A. I learned about that in that article as well. |
| 16:03:25 | 20 | Q. And that was two months before the primary? |
| | 21 | A. Correct. |
| | 22 | Q. Now, is that true? |
| | 23 | A. No. |
| | 24 | Q. Now, you weren't -- are you sure you didn't |
| 16:03:40 | 25 | repeatedly proposition Angie McLeod Barbour for sex? |

| | | |
|---|---|---|
| 16:03:49 | 1 | A. Yes. |
| | 2 | Q. Now, you mentioned in May that you got a text |
| | 3 | message from an out of state number; is that right? |
| | 4 | A. Correct. |
| 16:04:19 | 5 | Q. And would that have been May 9th, 2022? |
| | 6 | A. Could have been. |
| | 7 | Q. Let me be a little fair. I know you don't have |
| | 8 | this in front of you. But it would have been -- it was before |
| | 9 | the primary; is that right? |
| 16:04:34 | 10 | A. Yes, sir. |
| | 11 | Q. And is it -- was it some time in, you know, early |
| | 12 | to middle May; is that a fair enough range? |
| | 13 | A. Fair. |
| | 14 | Q. Do you remember if the number was 404-328-7853? |
| 16:04:53 | 15 | A. I do not remember. |
| | 16 | Q. Has anyone shown you your phone records in this |
| | 17 | case or your text records in this case? |
| | 18 | A. No. |
| | 19 | MR. TYNDALL: Excuse me, Your Honor. A little bit |
| 16:05:42 | 20 | unorganized. I apologize. |
| | 21 | Q. Now, do you remember -- I know you said you don't |
| | 22 | remember the specifics, but I'm going to ask you, do you |
| | 23 | remember when you met with Mr. Johnson behind Clayton Fitness |
| | 24 | that afternoon? |
| 16:06:08 | 25 | MR. ZELLINGER: Objection to the form of the |

| 16:06:09 | 1 | question. |
| | 2 | THE COURT: We'll let you reask that, if would you. |
| | 3 | Q. Do you remember meeting with Mr. Johnson on |
| | 4 | April 25th at around noon? |
| 16:06:17 | 5 | A. Yes, sir. |
| | 6 | Q. And do you -- the back of Clayton Fitness, is that |
| | 7 | a parking lot? |
| | 8 | A. It is. |
| | 9 | Q. And it's a paved parking lot just like in front? |
| 16:06:29 | 10 | A. Yes, sir. |
| | 11 | Q. Okay. And do you remember him suggesting to you |
| | 12 | that he knew this was a scary situation? |
| | 13 | A. I don't recall. |
| | 14 | Q. Do you remember if he said to you, don't panic? |
| 16:06:47 | 15 | A. I don't recall. |
| | 16 | Q. Do you remember if he said to you that he thought |
| | 17 | you had some influence with Ms. Barbour? |
| | 18 | A. I don't recall. |
| | 19 | Q. Do you remember if he said to you, I think she |
| 16:07:01 | 20 | respects you? |
| | 21 | A. I don't recall. I don't recall. As I mentioned |
| | 22 | earlier, I don't -- the whole meeting is kind of a blur, and I |
| | 23 | don't recall, you know, specifics of what was said and, you |
| | 24 | know, what -- I don't remember the specifics of things that |
| 16:07:18 | 25 | was said and mentioned. |

| | | | |
|---|---|---|---|
| 16:07:20 | 1 | Q. | You don't remember the specifics of what he said. |
| | 2 | A. | Correct. |
| | 3 | Q. | Do you remember that he told you that there was a |
| | 4 | recording? | |
| 16:07:26 | 5 | A. | Yes. |
| | 6 | Q. | And do you remember that he offered to let you hear |
| | 7 | the recording? | |
| | 8 | A. | Yes. |
| | 9 | Q. | And do you remember that he told you that he did |
| 16:07:41 | 10 | not want other people to get the recording? | |
| | 11 | A. | I don't recall. |
| | 12 | Q. | Now, when you called Ms. Barbour shortly after |
| | 13 | Mr. Johnson spoke to you, is that -- is that right?  Or did | |
| | 14 | you call her shortly after he spoke to you? | |
| 16:08:30 | 15 | A. | Which time?  Which conversation? |
| | 16 | Q. | The conversation on April 25th. |
| | 17 | A. | I'm sure I did. |
| | 18 | Q. | And did she deny ever saying anything like that? |
| | 19 | A. | Yes. |
| 16:08:47 | 20 | Q. | And did she deny that there was a recording of any |
| | 21 | kind of her saying anything like that? | |
| | 22 | A. | Yes. |
| | 23 | Q. | And did she deny knowing anything about what you |
| | 24 | were talking about? | |
| 16:08:58 | 25 | A. | Yes. |

| | | |
|---|---|---|
| 16:08:58 | 1 | Q. Did you later learn that that wasn't true? |
| | 2 | A. I did. |
| | 3 | Q. In those conversations with Mr. Johnson, did he |
| | 4 | tell you that Ms. Barbour had spoken to other people about |
| 16:09:29 | 5 | you? |
| | 6 | A. Probably. I'm sure that would have come up in |
| | 7 | conversation. |
| | 8 | Q. Did he use the name Darryl Mitchell or Cheryl |
| | 9 | Houseman as some people that she may have told? |
| 16:09:49 | 10 | A. I don't recall. |
| | 11 | Q. Now, Mr. Barbour, after you had a conversation with |
| | 12 | my client, or when you had a conversation with my client after |
| | 13 | the 25th; is that right? |
| | 14 | A. Correct. |
| 16:10:12 | 15 | Q. You had a phone conversation or something. |
| | 16 | A. Correct. |
| | 17 | Q. And when you said it seems like blackmail, did he |
| | 18 | seem to get offended? |
| | 19 | A. That, you know, I think -- I think offended, |
| 16:10:28 | 20 | aggravated, upset. |
| | 21 | Q. Right. Did he say to you, I'm just trying to help |
| | 22 | you? |
| | 23 | A. I don't recall. |
| | 24 | Q. And now, up until that meeting, he hadn't released |
| 16:10:41 | 25 | anything; had he? |

| 16:10:42 | 1 | A.   Correct. |
| | 2 | Q.   So you were glad about that; right? |
| | 3 | A.   Correct. |
| | 4 | Q.   First of all, were you glad you knew that there was |
| 16:10:48 | 5 | this threat out there? |
| | 6 | A.   I was. |
| | 7 | Q.   Were you glad that no one had released it so far? |
| | 8 | A.   Yes, sir. |
| | 9 | Q.   Were you glad that Ms. Barbour hadn't said this |
| 16:10:58 | 10 | publically so far? |
| | 11 | A.   Yes. |
| | 12 | Q.   Now, when you had that conversation with |
| | 13 | Mr. Johnson and he seemed offended, did he respond to you in |
| | 14 | some way? |
| 16:11:16 | 15 | A.   What do you mean? |
| | 16 | Q.   Well, you said he took -- he got aggravated or |
| | 17 | upset or something, and did he make a statement to you after |
| | 18 | he got aggravated and upset? |
| | 19 | A.   Well, the conversation continued.  I don't remember |
| 16:11:31 | 20 | exactly what was said. |
| | 21 | Q.   But did he say something like, well, just forget it |
| | 22 | then? |
| | 23 | A.   I don't -- again, I don't recall exactly what was |
| | 24 | said. |
| 16:11:41 | 25 | Q.   But I think -- did you tell Investigator Hoffman |

| | | |
|---|---|---|
| 16:11:45 | 1 | that once he said that, you never heard another word about it? |
| | 2 | A. I don't -- I don't -- I mean, there was a -- after |
| | 3 | that conversation, everything went pretty silent. |
| | 4 | Q. Pretty silent? |
| 16:12:04 | 5 | A. Yes, sir. |
| | 6 | Q. You never heard anything from Mr. Johnson again? |
| | 7 | A. I don't believe so. |
| | 8 | Q. He didn't offer to help you again; did he? |
| | 9 | A. No, sir. |
| 16:12:15 | 10 | Q. Mr. Johnson didn't call you in February 2024 and |
| | 11 | warn you that there was a blog coming out; did he? |
| | 12 | A. No. |
| | 13 | Q. Nobody else warned you about that either; did they, |
| | 14 | Mr. Barbour? |
| 16:12:27 | 15 | A. No. |
| | 16 | Q. Is it fair to say that when Ms. Barbour told you in |
| | 17 | your early conversations with her after you spoke -- after you |
| | 18 | spoke to Mr. Johnson on the 25th, is it fair to say that when |
| | 19 | Ms. Barbour told you it wasn't true, you were relieved? |
| 16:13:19 | 20 | A. Yes. |
| | 21 | Q. Is it fair to say that when she told you there was |
| | 22 | no recorded statement, you were relieved? |
| | 23 | A. Yes. |
| | 24 | Q. And that was all untrue; wasn't it, Mr. Barbour? |
| 16:13:31 | 25 | A. Correct. |

| | | |
|---|---|---|
| 16:13:32 | 1 | Q.   She was lying to you; wasn't she?  Wasn't she? |
| | 2 | MR. ZELLINGER:  Objection, Your Honor, calls for -- |
| | 3 | THE COURT:  Well, I'll sustain as to what she knew. |
| | 4 | MR. TYNDALL:  Okay. |
| 16:13:44 | 5 | Q.   From your standpoint, you were relieved; is that |
| | 6 | fair to say, Mr. Barbour? |
| | 7 | A.   Correct. |
| | 8 | Q.   You believed her when she said she never made that |
| | 9 | statement; didn't you? |
| 16:13:52 | 10 | A.   I did. |
| | 11 | Q.   You trusted her; didn't you? |
| | 12 | A.   I did. |
| | 13 | Q.   Is it fair to say that you don't trust her today; |
| | 14 | do you? |
| 16:14:00 | 15 | A.   I have a tough time trusting very many people at |
| | 16 | all nowadays. |
| | 17 | Q.   Do you trust Ms. Barbour? |
| | 18 | A.   I don't believe so. |
| | 19 | Q.   Mr. Zellinger asked you if the threat of this |
| 16:14:27 | 20 | recording was helpful to your campaign; do you remember that? |
| | 21 | A.   Yes. |
| | 22 | Q.   But the threat of the recording was never hurtful |
| | 23 | to your campaign; was it? |
| | 24 | A.   In which cycle? |
| 16:14:45 | 25 | Q.   Well, the recording was never released; was it? |

| | | |
|---|---|---|
| 16:14:48 | 1 | A. The recording was never released, no. |
| | 2 | Q. The information was released by Ms. Barbour; wasn't |
| | 3 | it? |
| | 4 | A. That's correct. |
| 16:15:03 | 5 | Q. In fact, it would have never been public had |
| | 6 | Ms. Barbour not told people; isn't that right? |
| | 7 | MR. ZELLINGER: Objection. |
| | 8 | THE COURT: To the extent he knows, I'll let him |
| | 9 | answer. |
| 16:15:13 | 10 | THE WITNESS: I mean -- I can't -- I don't know. I |
| | 11 | can't speculate, but ... |
| | 12 | Q. Well, are you aware of anyone else making public |
| | 13 | statements that you propositioned -- |
| | 14 | A. Oh, no. |
| 16:15:25 | 15 | Q. -- Ms. Barbour for sex repeatedly? |
| | 16 | A. No. |
| | 17 | Q. And do you know -- let me ask you this. Do you |
| | 18 | know a person named Paul Holcombe? |
| | 19 | A. I do. |
| 16:15:33 | 20 | Q. Do you go to church with him? |
| | 21 | A. I do. |
| | 22 | Q. You know he's a Superior Court judge here in town? |
| | 23 | A. Yes, sir. |
| | 24 | Q. Is he someone you consider a friend? |
| 16:15:41 | 25 | A. He is. |

DeVan Barbour - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 16:17:09 | 1 | Q.   Mr. Barbour, I know it's been a while since you did |
| | 2 | this.  I'm going to ask you some questions about your |
| | 3 | interview with Mr. Hoffman. |
| | 4 | A.   Okay. |
| 16:17:17 | 5 | Q.   I know it's been a while so I don't want to be |
| | 6 | unfair.  Do you remember the interview? |
| | 7 | A.   Yes, I remember being interviewed, yes. |
| | 8 | Q.   Did you know you were being recorded at the time? |
| | 9 | A.   I'm not sure. |
| 16:17:33 | 10 | Q.   Did he ever mention to you that there was going to |
| | 11 | be an audio recording of it? |
| | 12 | A.   I don't recall.  I'm not sure.  He may have. |
| | 13 | Q.   Has anyone played an audio recording for you since |
| | 14 | that interview? |
| 16:17:47 | 15 | A.   Yes. |
| | 16 | Q.   So you've heard that? |
| | 17 | THE COURT:  I'm sorry.  Before you get too far -- |
| | 18 | no, you're fine -- can you approach for just a minute? |
| | 19 | (Sidebar.) |
| 16:18:17 | 20 | THE COURT:  Ladies and gentlemen, I'm mindful |
| | 21 | you've been sitting for about an hour and 45 minutes.  We'll |
| | 22 | take a short recess, probably about 15 minutes, and we'll have |
| | 23 | you back about 4:30, 4:45.  Thank you very much. |
| | 24 | (Jury exits.) |
| 16:19:42 | 25 | THE COURT:  I didn't mean to interrupt you, |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 16:19:44 | 1 | Mr. Tyndall.  We'll take about 15 minutes. |
| | 2 | MR. ZELLINGER:  Mr. Barbour, you can come down. |
| | 3 | (Recess.) |
| | 4 | THE COURT:  Before we bring the jury back in, I |
| 16:37:20 | 5 | just want to make a comment.  This is an open courtroom, and |
| | 6 | everybody is welcome to be in here; however, if there's any |
| | 7 | more outbursts from anybody in here, these bailiffs have my |
| | 8 | full authority to act on my behalf.  The next time that |
| | 9 | happens, you are going to be standing here in front of me.  So |
| 16:37:41 | 10 | if you think you can't control yourself, now is the time for |
| | 11 | you to police your own action and leave.  If you can control |
| | 12 | yourself, you are welcome to stay.  We're not going to put up |
| | 13 | with any more of those outbursts from either side.  Okay? |
| | 14 | Just so everybody is aware of that. |
| 16:37:56 | 15 | Are you ready for the jury? |
| | 16 | MS. JAMES:  Yes, Your Honor. |
| | 17 | THE COURT:  Okay.  You can bring them on in. |
| | 18 | (Jury enters.) |
| | 19 | THE COURT:  All right.  Everybody, welcome back. |
| 16:40:39 | 20 | Mr. Tyndall, whenever you are ready. |
| | 21 | MR. TYNDALL:  Thank you, Your Honor. |
| | 22 | Q.    Let me just ask you something, Mr. Barbour.  Prior |
| | 23 | to any of this starting, had you ever reached out to |
| | 24 | Mr. Johnson and asked him for help? |
| 16:40:50 | 25 | A.    The lunch at Buffalo Wild Wings. |

| | | |
|---|---|---|
| 16:40:53 | 1 | Q.   Had you ever asked him with help, like school |
| | 2 | related, getting in the gym, or something like that for a |
| | 3 | function? |
| | 4 | A.   I don't believe so. |
| 16:41:01 | 5 | Q.   I want to go back to something we talked about. |
| | 6 | I'm not sure this will help you, but I'm going to see if this |
| | 7 | refreshes your recollection about when you got phone calls and |
| | 8 | when you didn't get phone calls. |
| | 9 | A.   Okay. |
| 16:41:18 | 10 | Q.   Will you go to tab 38.  Now, Mr. Barbour, this is |
| | 11 | an exhibit the State has prepared.  And I don't want you to |
| | 12 | read it out loud, but do you see the names on there and the |
| | 13 | numbers? |
| | 14 | A.   Yes, sir. |
| 16:41:48 | 15 | Q.   We're just talking about the first page. |
| | 16 | A.   Okay. |
| | 17 | Q.   I'm just going to ask you about the date of 4/16. |
| | 18 | I'm going to only ask you about the calls that are related to |
| | 19 | you. |
| 16:42:13 | 20 | A.   Yes, sir. |
| | 21 | Q.   Okay.  Now, will you take a look at the lines that |
| | 22 | relate to 4/16. |
| | 23 | A.   That relate to me? |
| | 24 | Q.   Yea.  That just relate to you.  And don't read it. |
| 16:42:26 | 25 | Just read it to yourself. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 16:42:28 | 1 | A.   (Witness complies.) |
| | 2 | Q.   Do there appear to be calls on that date between |
| | 3 | you and Kevin Donovan? |
| | 4 | A.   There do.  Yes, sir. |
| 16:42:52 | 5 | Q.   And between you and Angela Barbour? |
| | 6 | A.   Yes, sir. |
| | 7 | Q.   And does there appear to be a call from you to |
| | 8 | Ronald Johnson? |
| | 9 | A.   Yes, sir. |
| 16:43:04 | 10 | Q.   At least one call to Mr. Johnson; is that right? |
| | 11 | A.   Yes, sir. |
| | 12 | Q.   Does that refresh your recollection of when you |
| | 13 | actually got a call from Kevin Donovan about this -- hearing |
| | 14 | about this problem that you had? |
| 16:43:24 | 15 | A.   That would have been -- I mean, if that's the date, |
| | 16 | that's the day.  I remember where I was physically when the |
| | 17 | call came. |
| | 18 | Q.   Does that make sense that this is the order of |
| | 19 | things when you first were warned about Ms. Barbour's |
| 16:43:37 | 20 | accusations? |
| | 21 | A.   It would. |
| | 22 | Q.   Okay. |
| | 23 | A.   Well, I don't know that this was when I first |
| | 24 | learned, because I knew about this before any conversations |
| 16:43:46 | 25 | with Mr. Donovan. |

| | | |
|---|---|---|
| 16:43:48 | 1 | Q.   Well, is it fair to say that this is date you were |
| | 2 | talking about when you were -- the State was asking you |
| | 3 | questions where you referred to Mr. Donovan calling you and |
| | 4 | warning you about some accusations? |
| 16:44:06 | 5 | A.   Yes. |
| | 6 | Q.   And did you call -- you spoke to Ms. Barbour, |
| | 7 | whether you called her or she called you that day; is that |
| | 8 | right? |
| | 9 | A.   Yes, sir.  It looks like she called me. |
| 16:44:23 | 10 | Q.   And that was April 16th; is that right? |
| | 11 | A.   Yes, sir. |
| | 12 | Q.   Nine days before you met with Mr. Johnson. |
| | 13 | A.   Yes, sir. |
| | 14 | Q.   Now -- thank you, Mr. Barbour. |
| 16:44:54 | 15 | And do you remember having a text exchange with my |
| | 16 | client that day as well? |
| | 17 | A.   I don't recall. |
| | 18 | MR. TYNDALL:  I'm marking that tab Defendant's |
| | 19 | Exhibit 1 just for purposes of refreshing his recollection, |
| 16:45:46 | 20 | thanks to Mr. Zellinger.  And I'm going to mark this, Your |
| | 21 | Honor, Defendant's Exhibits 2 and 3. |
| | 22 | (Defendant's Exhibit Numbers 1, 2, and 3 marked |
| | 23 | for identification.) |
| | 24 | Q.   Mr. Barbour, what I'm doing is I'm just going to |
| 16:47:09 | 25 | refresh your recollection.  So when you look at this, don't |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 16:47:11 | 1 | read it out, just see if it refreshes your recollection. |
| | 2 | I'm going to hand you what's been marked as |
| | 3 | Defendant's Exhibit Number 2.  Does that appear to be a text |
| | 4 | exchange? |
| 16:47:22 | 5 | A.   Yes. |
| | 6 | Q.   And you can read through that. |
| | 7 | A.   (Witness complies.) |
| | 8 | Q.   Does that appear to be a text exchange between you |
| | 9 | and Mr. Johnson? |
| 16:47:42 | 10 | A.   It appears to be. |
| | 11 | Q.   And that's on -- does it appear to be April 16th of |
| | 12 | 2022? |
| | 13 | A.   It does. |
| | 14 | Q.   Does it appear to be a friendly exchange? |
| 16:47:51 | 15 | A.   It does. |
| | 16 | Q.   I'm going to show you what's been marked |
| | 17 | Defendant's Exhibit 3.  Do you remember when I asked you about |
| | 18 | the May 9th date and did you get a text messages from a |
| | 19 | certain number? |
| 16:48:03 | 20 | A.   Yes, sir. |
| | 21 | Q.   I'm going to hand you this.  Would you recognize |
| | 22 | your number if you saw it? |
| | 23 | A.   I would. |
| | 24 | Q.   Okay.  And does this document -- I've got it |
| 16:48:12 | 25 | highlighted, but does that refresh your recollection of the |

| | | |
|---|---|---|
| 16:48:16 | 1 | number that you got the text from? |
| | 2 | A.   I don't remember.  I don't remember the phone |
| | 3 | number. |
| | 4 | Q.   Okay.  But does this -- is this -- does it appear |
| 16:48:24 | 5 | that this is the number on here? |
| | 6 | A.   Yes, it does.  It appears there's a phone number on |
| | 7 | here that goes to my phone. |
| | 8 | Q.   Okay.  And what's that number? |
| | 9 | A.   My phone number? |
| 16:48:32 | 10 | Q.   No.  The number that's the text. |
| | 11 | A.   I'm sorry.  404-328-7853. |
| | 12 | Q.   Mr. Barbour, I want to talk to you a little bit |
| | 13 | about your interview with Investigator Hoffman. |
| | 14 | A.   Okay. |
| 16:49:00 | 15 | Q.   So your interview with him was some time in |
| | 16 | November of 2022.  Do you remember that? |
| | 17 | A.   I do. |
| | 18 | Q.   And is it fair to say that Investigator Hoffman did |
| | 19 | most of the talking? |
| 16:49:15 | 20 | A.   I think we both talked.  I don't know one way or |
| | 21 | the other. |
| | 22 | Q.   Well, if there's a recording and a transcript, it |
| | 23 | would -- |
| | 24 | A.   Yea, I mean, it would -- yea.  I mean, he talked a |
| 16:49:26 | 25 | lot.  I talked some.  I don't know that -- I don't know who |

DeVan Barbour - Cross by Mr. Tyndall

| 16:49:30 | 1 | talked more. |
|---|---|---|

2    Q.   Okay.  That's fair enough.  That was the question.

3  If you don't remember.

4         So he starts off telling you a little bit about

16:50:03  5  talking about a recording and referring to Mr. Johnson; is

6  that right?

7    A.   Right.

8    Q.   Right out of the gate he mentions Mr. Johnson and

9  asks you about a recording?

16:50:17  10   A.   Correct.

11   Q.   And he -- does he make references and says, I think

12  you are unaware she was close to Ronald?

13   A.   I don't know if that comment was made or not.

14   Q.   Did he tell you he didn't think Angie has any

16:50:44  15  malice?

16   A.   I don't recall if that comment was made.

17   Q.   But do you remember telling him, I can't imagine a

18  time when I would Facetime Angie?

19   A.   In that interview?

16:50:59  20   Q.   Yes.

21   A.   It's possible.  I don't recall.

22   Q.   I guess I was under the impression that you had

23  listened to your interview before you came here so you might

24  remember it.  Do you not?

16:51:11  25   A.   It was sent, and I listened to it one time last

| | |
|---|---|
| 16:51:14 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 16:51:28 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 16:52:07 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 16:52:14 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 16:52:24 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 16:52:45 | 25 |

1  week, and I had to listen to it again, but it was 40 minutes.

2  But I don't -- I would have listened to it multiple times if I

3  thought I needed to.  I'm sorry.

4      Q.   I'm not suggesting that you do.  I'm just asking

5  you if you remember the interview.  And you mentioned politics

6  is a rough game; right?

7      A.   Yes, sir.

8      Q.   It's tough, isn't it?  People do -- have you heard

9  the term opposition research?

10     A.   Yes, sir.

11     Q.   People do that on their friends and their enemies;

12  right?

13     A.   Correct.

14     Q.   Because you don't know who's going to run for

15  reelection against you next week; do you?

16     A.   Correct.

17     Q.   They might be on your side this week and on

18  somebody else's side next week; is that fair to say?

19     A.   It is.

20     Q.   And so I think at one point you mentioned:  I said

21  this looks a lot like blackmail in my world.  Because that's

22  the world you live in.  You're worried all the time about

23  somebody; isn't that right?

24     A.   Yes, sir.

25     Q.   And you told him at that time that there was no --

DeVan Barbour - Cross by Mr. Tyndall

| 16:52:48 | 1 | that Angie told you there was no way there was a recording; |
| | 2 | isn't that fair? |
| | 3 | A.    That's correct. |
| | 4 | Q.    And then when he asked you about the second call, |
| 16:53:18 | 5 | did you tell him:  It sounds a whole lot like blackmail.  He |
| | 6 | started getting defensive and backing up, and don't worry |
| | 7 | about it, don't even worry about it.  And then however it |
| | 8 | diffused, it diffused.  Is that right? |
| | 9 | A.    Correct. |
| 16:53:34 | 10 | Q.    And we got on the phone there, and I haven't heard |
| | 11 | anything about it since.  Is that right? |
| | 12 | A.    That sounds correct. |
| | 13 | Q.    And that's what you told Agent Hoffman or |
| | 14 | Investigator Hoffman in November of 2022? |
| 16:53:46 | 15 | A.    Correct.  And when I said I hadn't heard anything |
| | 16 | about it since, that was also referencing from the end of the |
| | 17 | election up until the time that I was sitting down there with |
| | 18 | him. |
| | 19 | Q.    Yea.  And that was -- |
| 16:53:57 | 20 | A.    Right. |
| | 21 | Q.    -- about six months or so. |
| | 22 | A.    So the whole time, correct.  Correct. |
| | 23 | Q.    We hadn't got to the 2024 mess yet; right? |
| | 24 | A.    Correct. |
| 16:54:04 | 25 | Q.    I mean, that article hadn't come out yet. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 16:54:07 | 1 | A.    Correct. |
| | 2 | MR. TYNDALL:  I'm sorry, Your Honor.  I'm trying to |
| | 3 | find something in here.  I apologize. |
| | 4 | .    Q.    And let me just ask you, Mr. Barbour.  You're |
| 16:55:32 | 5 | sitting there with Investigator Hoffman.  You knew he was a |
| | 6 | law enforcement officer; is that right? |
| | 7 | A.    Correct. |
| | 8 | Q.    You knew he was investigating this case? |
| | 9 | A.    Correct. |
| 16:55:41 | 10 | Q.    And when you spoke to him, did he ever say to you, |
| | 11 | you know, give me the details line by line? |
| | 12 | A.    I wouldn't say that.  It was just more of a casual |
| | 13 | conversation around some of the things we discussed today. |
| | 14 | Q.    And he never stopped you and said, wait a second, |
| 16:56:08 | 15 | where was everybody sitting, or how was it -- things like |
| | 16 | that; did he? |
| | 17 | A.    No. |
| | 18 | Q.    Did he ever say, wait a second, can you remember |
| | 19 | exactly what he said? |
| 16:56:18 | 20 | A.    I don't -- I don't recall.  You know, he may have |
| | 21 | and I wouldn't have been able to answer.  I'm not sure. |
| | 22 | Q.    Well, it was six months after the event instead of, |
| | 23 | what, now two months after your meeting with Mr. Johnson -- |
| | 24 | two years after your meeting with Mr. Johnson?  Isn't it fair |
| 16:56:36 | 25 | to say you might remember it a little better back then? |

| | | |
|---|---|---|
| 16:56:39 | 1 | A.    I'd assume so. |
| | 2 | Q.    In fact, when he asked you what Mr. Johnson wanted, |
| | 3 | your initial response was:  I knew there had to be something |
| | 4 | in there to it, but other than, other than.  And then he |
| 16:57:17 | 5 | stopped and said:  Did you feel like he was threatening your |
| | 6 | reputation.  Is that the way it went? |
| | 7 | A.    I believe so. |
| | 8 | Q.    Did he ever give you the chance to explain what |
| | 9 | Mr. Johnson may have wanted? |
| 16:57:30 | 10 | A.    Well, I believe we discussed when he had asked |
| | 11 | about getting a letter. |
| | 12 | Q.    Getting a letter, right.  When he asked that |
| | 13 | question, he didn't let you finish.  You said:  Other than, |
| | 14 | other than.  Is that right? |
| 16:57:45 | 15 | A.    I -- I believe so. |
| | 16 | Q.    Is it fair to say that what Mr. Johnson said to you |
| | 17 | is that he wanted to make sure that the recording never went |
| | 18 | out? |
| | 19 | A.    I mean, if -- if I can get a letter written, then |
| 16:58:22 | 20 | he would make sure that the recording would disappear. |
| | 21 | Q.    He never said to you he was going to release a |
| | 22 | recording; did he? |
| | 23 | A.    He never specifically said that he would release |
| | 24 | it.  All he alluded to was making sure that it went away. |
| 16:58:38 | 25 | Q.    No one ever got ahold of it; is that right? |

| | | |
|---|---|---|
| 16:58:41 | 1 | A.    Correct. |
| | 2 | Q.    And he also told you that there were other people |
| | 3 | that wanted to hear it; isn't that right? |
| | 4 | A.    I don't recall. |
| 16:59:21 | 5 | Q.    Mr. Barbour, do you remember going to an event with |
| | 6 | Ronald Johnson in the early part of 2024, being at a political |
| | 7 | event with him? |
| | 8 | A.    I don't know.  I wouldn't have gone to an event |
| | 9 | with him, but we would have -- we could have been at the same |
| 16:59:42 | 10 | event. |
| | 11 | Q.    Right.  Misuse of my words. |
| | 12 | A.    Okay. |
| | 13 | Q.    You were at the same event with him? |
| | 14 | A.    Okay.  Yes, sir.  It happened many times. |
| 16:59:50 | 15 | Q.    And do you remember him making a statement about |
| | 16 | this prosecution and -- I don't know -- generally that it was |
| | 17 | unfair? |
| | 18 | MR. ZELLINGER:  Objection. |
| | 19 | MS. JAMES:  Objection. |
| 16:59:58 | 20 | THE COURT:  I'll sustain at this point. |
| | 21 | Q.    Without the context, do you remember him making a |
| | 22 | speech that included some comments about the prosecution? |
| | 23 | A.    I believe so. |
| | 24 | Q.    Do you remember standing up afterward and speaking |
| 17:00:15 | 25 | and say:  I can't say it any better than Ron? |

| | |
|---|---|
| 17:00:22 | 1      A.   I don't remember that. |
| | 2      Q.   Do you remember saying that: They're going to be |
| | 3  sorry they came and messed with a couple of Johnston County |
| | 4  Republicans? |
| 17:00:33 | 5      A.   I don't recall -- I don't recall saying that. |
| | 6           MR. TYNDALL: Your Honor, that's probably a good |
| | 7  place to end it today. |
| | 8           THE COURT: Okay. Do you anticipate more tomorrow? |
| | 9           MR. TYNDALL: I do, Your Honor. |
| 17:00:44 | 10          THE COURT: Ladies and gentlemen, we'll go ahead |
| | 11  and recess for the day. If you would just leave your notes. |
| | 12  Make sure they are in your binders and we'll make sure they |
| | 13  are secure over night. |
| | 14          Remember the rules. Please don't discuss anything |
| 17:00:58 | 15  among each other or let anybody else speak with you about |
| | 16  this. Don't do anything on your own to try to learn anything. |
| | 17          One final thing before you go. We had always |
| | 18  planned on ending tomorrow at 12:30 because of the weather. |
| | 19  We just got a note that says: Johnston County Public Schools |
| 17:01:17 | 20  are going to dismiss three hours early tomorrow. If we plan |
| | 21  to get out of here by 12:30, is that going to accommodate what |
| | 22  you need for any children you might have in the school system? |
| | 23  Does anybody need to plan to leave earlier than that? |
| | 24          Okay. And we'll look at 12:30. It won't be much |
| 17:01:38 | 25  after that. It might be a little bit before depending on |

| | |
|---|---|
| 17:01:39 | 1 |

```
17:01:39   1   where we are in the testimony.

           2           Thank you.  We'll see you back in the morning at

           3   9:30.

           4           SHERIFF:  Leave your binders in your seats.

17:01:49   5           (Jury exits.)

           6           THE COURT:  You can come on down.

           7           (Witness steps down.)

           8           THE COURT:  Anything either side needs to get on

           9   the record before we adjourn today?

17:02:43  10           MR. ZELLINGER:  Not for the State, Your Honor.

          11   I'll bring it up in the morning.  Your Honor, I think there's

          12   something, but I can't recall.

          13           MR. TYNDALL:  Not for us.

          14           THE COURT:  Do either of you have the pattern jury

17:02:54  15   numbers for these?  I want to make sure we're all on the same

          16   page.  I want to make sure we're all kind of in agreement on

          17   what numbers apply.

          18           MR. ZELLINGER:  Your Honor, the extortion is

          19   220.80.  And I've got a -- if you give me a minute, I can try

17:03:13  20   to find the willful failure to discharge duties.

          21           MR. TYNDALL:  I don't think there's a pattern for

          22   that.

          23           MS. JAMES:  For willful failure to discharge

          24   there's not a pattern jury instruction, so we have to use

17:03:30  25   either case law or the statute.
```

```
17:03:33   1              MR. TYNDALL:  230.62, I think.

           2              THE COURT:  230.62.  Have either of you taken a

           3    crack at trying to draft an instruction for the discharge of

           4    duties?

17:03:51   5              MR. ZELLINGER:  No, but we will, Your Honor.  We'll

           6    be happy to supply that to you.  Can we give that to you on

           7    Monday?

           8              THE COURT:  I'm not asking for it now.  I'm

           9    wondering if somebody has done it.

17:04:00  10              MR. ZELLINGER:  We can look into it, sort of search

          11    the appellate records and case law and confer with defendant's

          12    counsel too.

          13              MR. TYNDALL:  I can give you a case number if you

          14    want it now.

17:04:10  15              THE COURT:  If you got one, that would be good.

          16              MR. TYNDALL:  120 N.C. App. 278.  It's just one

          17    case.  I don't remember what the holding is, but it should

          18    have the -- it's got the elements in there.

          19              THE COURT:  And what was the number again, 120 N.C.

17:04:30  20    App. what?

          21              MR. TYNDALL:  12 N.C. App. 278.

          22              THE COURT:  Just if you would -- and I don't need

          23    it now.  I mean, Monday, Tuesday, just some time so we can

          24    kind of look at it to make sure we are all on the same page as

17:04:44  25    well.
```

17:04:45    1          Anything else, guys?

         2          MR. ZELLINGER:  Not for the State, Your Honor.

         3          MR. TYNDALL:  No, sir.

         4          THE COURT:  9:30 in the morning.

17:04:51    5              (Court adjourned at 5:04 p.m.)

         6              (END OF VOLUME 4 OF 10.)

         7

         8

         9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

                    Denise St. Clair, RPR, CRR, CRC
                       Official Court Reporter

IN THE NORTH CAROLINA GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
JOHNSTON COUNTY
* * * * * * * * * * * * * * * * * * * *

STATE OF NORTH CAROLINA,       :   File No. 23 CR 003494-500

        versus                 :

RONALD LEE JOHNSON, JR.,       :
              Defendant.            Pages:  241-324

            * * * * * * * * * * * * * * * * * * *
                 TRANSCRIPT VOLUME 5 OF 10

                  Friday, January 10, 2025
            * * * * * * * * * * * * * * * * * * *

        Transcript of proceedings in the General Court of

Justice, Superior Court Division, Johnston County, 207 East

Johnston Street, Smithfield, North Carolina, at the January 6,

2025, Criminal Session, before the Honorable Joseph

Crosswhite, Judge Presiding.

APPEARANCES:

        Benjamin O. (Boz) Zellinger
        Arneatha James
        North Carolina Department of Justice
        Raleigh, NC 27603
        On Behalf of the State

        Amos G. Tyndall
        Valentin J. Bruder
        Parry Law
        Chapel Hill, NC 27517
        On Behalf of the Defendant

---

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter
N.C. Administrative Office of the Courts
denise.stclair@nccourts.org

```
 1                              INDEX

 2

 3     Discussion between the Court and Alternate          247
       Juror, Ms. Waters, regarding her tardiness
 4

 5                            WITNESSES

 6     ON BEHALF OF THE STATE

 7     DEVAN BARBOUR - continued from 1/9/25

 8     Voir Dire by Mr. Tyndall                            243
       Cross by Mr. Tyndall                                249
 9     Redirect by Mr. Zellinger                           264
       Recross by Mr. Tyndall                              274
10

11     ANGELA MCLEOD BARBOUR

12     Direct by Mr. Zellinger                             276

13

14                            EXHIBITS

15     ON BEHALF OF THE STATE

16     No.    Description                             ID       EVD

17     12     TracFone                                321      846

18     ON BEHALF OF THE DEFENDANT

19     No.    Description                             ID       EVD

20     4      Transcript of recorded interview of DeVan   253
              Barbour
21
       5      Recorded statement by Angela Barbour        204     1033
22

23                            * * *

24

25
```

10:11:02

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

09:37:06  1                (Commencing at 9:37 a.m.)

2                (Court and counsel confer in chambers).

3          THE COURT:  Mr. Barbour, you can come up to the

4  stand.

09:38:32  5         Before I turn it back over to you, Mr. Zellinger,

6  anything to get on the record?  Anything to discuss that we

7  discussed in chambers?

8         MR. ZELLINGER:  Yes, Your Honor.  I believe that

9  the defendant is still on cross.  What we discussed in

09:38:45  10  chambers was that the defendant wanted to refresh the witness'

11  memory potentially with an exhibit.  To do that we would

12  require the jury to go back out and play it for him.  I think

13  out of just economy it would be smart to do it now.

14         THE COURT:  Yes, sir.  I think that's what we

09:39:06  15  discussed.  I don't think there's any objection to that being

16  done outside the presence of the jury.  Mr. Tyndall.

17            DEVAN BARBOUR,

18  having been called as a witness for the State and having been

19  previously sworn, testified as follows:

09:39:15  20  VOIR DIRE EXAMINATION BY MR. TYNDALL:

21     Q.   When we left off yesterday, I was asking you about

22  being at events with Mr. Johnson, and I specifically asked you

23  about an event which you made some statements -- well, I asked

24  if you made statements about people coming down and messing

09:39:33  25  with two Johnston County republicans.  Do you remember those

DeVan Barbour - Voir Dire by Mr. Tyndall

| | | |
|---|---|---|
| )9:39:37 | 1 | questions? |
| | 2 | A. I do remember those questions. |
| | 3 | Q. If you heard a recording, do you think you could |
| | 4 | recognize your voice? |
| )9:39:43 | 5 | A. Absolutely. |
| | 6 | Q. Do you think that might refresh your recollection |
| | 7 | about statements you made? |
| | 8 | A. It would. |
| | 9 | MR. TYNDALL: Your Honor, I'm going to |
| )9:39:55 | 10 | approach -- is this Defense 5. |
| | 11 | I'm going to approach. We're going to mark this |
| | 12 | separately later. Right now I'm going to play it off the |
| | 13 | computer. |
| | 14 | THE COURT: This is being played outside the |
| )9:40:12 | 15 | presence of the jury. |
| | 16 | MR. ZELLINGER: And this is Defendant's 5 for |
| | 17 | purposes of the record. |
| | 18 | MR. TYNDALL: This will be Defendant's 5 for |
| | 19 | purposes of refreshing Mr. Barbour's recollection. |
| )9:40:22 | 20 | (Defendant's Exhibit Number 5 marked for |
| | 21 | identification.) |
| | 22 | MR. ZELLINGER: Your Honor, can I approach so I can |
| | 23 | hear? |
| | 24 | MR. TYNDALL: I'm not sure how loud it will be. |
| 9:41:20 | 25 | MS. JAMES: Your Honor, just for the record, can we |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| )9:41:21 | 1 | just note where that stopped on the recording? |
| | 2 | MR. BRUDER:  Timestamp 041. |
| | 3 | THE COURT:  Anything else before the jury comes in? |
| | 4 | MR. TYNDALL:  Well, should I ask -- |
| )9:41:33 | 5 | Q.   Does that refresh your recollection about making |
| | 6 | those statements, Mr. Barbour? |
| | 7 | A.   Yes.  Yes. |
| | 8 | Q.   Thank you. |
| | 9 | MR. TYNDALL:  That's all.  That's all I have. |
| )9:41:40 | 10 | THE COURT:  Are you ready for the jury? |
| | 11 | MR. TYNDALL:  I'm ready for the jury. |
| | 12 | THE COURT:  If we can get them in. |
| | 13 | SHERIFF:  We're still one short. |
| | 14 | THE COURT:  Which one? |
| )9:41:52 | 15 | SHERIFF:  Same one as yesterday. |
| | 16 | THE COURT:  Do you have her number? |
| | 17 | CLERK:  Yes. |
| | 18 | THE COURT:  Can you call her? |
| | 19 | CLERK:  Yes. |
| )9:42:09 | 20 | MR. ZELLINGER:  I have something to put on the |
| | 21 | record when Mr. Tyndall comes back. |
| | 22 | THE COURT:  It's still that same alternate that was |
| | 23 | late yesterday.  She's late again this morning. |
| | 24 | MR. ZELLINGER:  Your Honor, Investigator Hoffman |
| 9:42:42 | 25 | just let me know they have disposition court downstairs, so |

Case 5:23-cv-00349-D-RN    Document 158-2    Filed 10/27/25    Page 104 of 150

| | | |
|---|---|---|
| )9:42:47 | 1 | parking is hard today. |
| | 2 | THE COURT:  I just walked through and it's a mess. |
| | 3 | Yes, sir.  Anything on the record? |
| | 4 | MR. ZELLINGER:  Your Honor, the State and the |
| )9:43:50 | 5 | defendant agreed to a stipulation regarding the authenticity |
| | 6 | of certain recordings and phone records without -- and it's |
| | 7 | just to the authenticity of those records, and the defendant |
| | 8 | still can make objections to the relevancy or anything else. |
| | 9 | Can I approach? |
| )9:44:08 | 10 | THE COURT:  Yes.  Mr. Tyndall, any objection? |
| | 11 | MR. TYNDALL:  We reached that agreement and the |
| | 12 | State provided us with some recordings earlier than they had |
| | 13 | to.  So yea, we don't need to call people just to authenticate |
| | 14 | it. |
| )9:44:23 | 15 | THE COURT:  Thank you for that stipulation. |
| | 16 | MR. BRUDER:  Your Honor, may we approach for a |
| | 17 | minute? |
| | 18 | THE COURT:  Yes, sir. |
| | 19 | (Sidebar.) |
| 9:47:30 | 20 | THE COURT:  My understanding is -- it is 9:47, |
| | 21 | alternate number 2, Ms. Waters, is not here.  Can you have |
| | 22 | your department send a car by her house, pick her up and bring |
| | 23 | her here, please. |
| | 24 | Why don't we do this.  We're just going to be at |
| 9:47:58 | 25 | ease.  There's no sense sitting there. |

09:48:00    1                Mr. Barbour, you are certainly free to come down.

            2                Everybody stay close.

            3                SHERIFF:   Court will be at ease.

            4                    (Court at ease.)

10:42:39    5                THE COURT:   Can you bring her in?

            6                SHERIFF:   Yes, sir.

            7                    (Alternate juror, Ms. Waters, brought into the

            8                    courtroom.)

            9                THE COURT:   Ms. Waters, good morning.  You are at

10:42:45   10    this point an hour and 15 minutes late.  You were late

           11    yesterday morning.  This has been two times in a row.

           12                Before I say anything to you, I want to give you a

           13    chance to say anything you want to to me as far as any

           14    explanation for why you're late and why we had to send a

10:43:00   15    deputy out to bring you here.

           16                ALTERNATE JUROR-MS. WATERS:  I -- I've been sick,

           17    and I just haven't been sleeping good. 'I had -- I didn't

           18    sleep again last night.  I had to lay down for just -- I

           19    thought someone was going to wake me up.  I was depending on

10:43:18   20    them to wake me up and they didn't.  So that's why I

           21    overslept.

           22                THE COURT:   Yes, ma'am.  And we're doing this

           23    outside the presence of the other jurors, but I want you to

           24    please hear me and understand me.  Okay?  This is the second

10:43:33   25    day in a row that you've been late.  Today it was to the

                            Denise St. Clair, RPR, CRR, CRC
                                Official Court Reporter

| | | |
|---|---|---|
| 10:43:38 | 1 | extent that we had to send a deputy out to bring you in. All |
| | 2 | right? |
| | 3 | I told you when we had you impaneled that we needed |
| | 4 | everybody here on time because unless everybody is here we |
| 0:43:51 | 5 | can't get started. So this morning we had everybody sitting |
| | 6 | here for an hour and 15 minutes waiting on you to get here |
| | 7 | with nothing going on that. And not only does it delay the |
| | 8 | court proceedings, but it's very disrespectful for everybody |
| | 9 | else that's here. That's what I want you to understand. |
| 0:44:13 | 10 | This has been two times in a row. There's not |
| | 11 | going to be a third. If there is a third, I want you to |
| | 12 | understand that I am considering holding you in contempt. |
| | 13 | I'll have you housed in the jail until this trial is complete. |
| | 14 | Do you understand that? |
| 0:44:29 | 15 | ALTERNATE JUROR-MS. WATERS: Yes. |
| | 16 | THE COURT: I promise there will be somebody there |
| | 17 | that can wake you up and get you to court on time. I don't |
| | 18 | want to do that. I want you to be able to self correct and |
| | 19 | get yourself here on time. Do you understand that? |
| 0:44:41 | 20 | ALTERNATE JUROR-MS. WATERS: Yes, I do. |
| | 21 | THE COURT: All right, ma'am. Thank you very much. |
| | 22 | You can just stay right there. |
| | 23 | Are you ready to bring the jury in? |
| | 24 | MR. TYNDALL: Yes, sir. |
| 0:44:52 | 25 | THE COURT: Mr. Barbour, why don't we get you back |

| | | |
|---|---|---|
| 10:44:53 | 1 | up here, if we could. |
| | 2 | (DeVan Barbour takes the stand.) |
| | 3 | (Jury enters.) |
| | 4 | THE COURT:  Good morning, everybody.  I apologize. |
| 10:47:45 | 5 | You all were here at 9:30 like we ask.  I apologize you've |
| | 6 | been sitting back there for the last hour and almost 20 |
| | 7 | minutes now. |
| | 8 | Just a quick reminder.  I know I said it a couple |
| | 9 | days ago, but unless all 146 you are here we can't get started |
| 10:48:02 | 10 | on time.  So I just appreciate your patience. |
| | 11 | I do believe that we are ready to continue with |
| | 12 | Mr. Barbour.  Just to remind you, you are still under oath |
| | 13 | from yesterday. |
| | 14 | THE WITNESS:  Yes, sir. |
| 10:48:11 | 15 | THE COURT:  Mr. Tyndall, whenever you are ready. |
| | 16 | MR. TYNDALL:  Thank you, Your Honor. |
| | 17 | CROSS-EXAMINATION BY MR. TYNDALL: |
| | 18 | Q.    Mr. Barbour, when you were here earlier, outside |
| | 19 | the presence of the jury, did you listen -- let me ask you, do |
| 10:48:23 | 20 | you remember yesterday when we were talking about a political |
| | 21 | event that you attended? |
| | 22 | A.    Yes. |
| | 23 | Q.    And do you remember me asking you if you had |
| | 24 | attended a political event in January 2024? |
| 0:48:36 | 25 | A.    Yes. |

DeVan Barbour - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 0:48:37 | 1 | Q.    Do you remember me asking you if you had made |
| | 2 | statements about after Mr. Johnson spoke at that event? |
| | 3 | A.    Yes. |
| | 4 | Q.    Do you remember me asking you if you made |
| 0:48:55 | 5 | statements to the effect that they were going to regret coming |
| | 6 | to mess with a couple Johnston County Republicans? |
| | 7 | A.    Yes. |
| | 8 | Q.    Now, did you get the opportunity to listen to a |
| | 9 | recording this morning? |
| 0:49:09 | 10 | A.    Yes. |
| | 11 | Q.    And did that recording refresh your recollection -- |
| | 12 | A.    Yes. |
| | 13 | Q.    -- about those events. |
| | 14 | Now, do you remember now being at a political event |
| 0:49:21 | 15 | in January of 2024? |
| | 16 | A.    Yes. |
| | 17 | Q.    And do you remember speaking after Mr. Johnson |
| | 18 | spoke? |
| | 19 | A.    Yes. |
| 0:49:41 | 20 | Q.    And did you, in fact, say after Mr. Johnson spoke |
| | 21 | say, I could not agree more with -- I could not agree more |
| | 22 | with -- I could not agree with Ron more? |
| | 23 | A.    Yes. |
| | 24 | Q.    And did you ask the audience if they ever believed |
| 0:49:55 | 25 | anything that they heard on MSNBC about Donald Trump? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

DeVan Barbour - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 10:49:59 | 1 | A.    Yes. |
| | 2 | Q.    Did you ask them if they ever believed anything |
| | 3 | about -- they read about a Republican in the News and |
| | 4 | Observer? |
| 10:50:08 | 5 | A.    Yes. |
| | 6 | Q.    And then did you say, They're going to regret |
| | 7 | messing with two Johnston County Republicans? |
| | 8 | A.    Yes. |
| | 9 | Q.    And that was in January 2024? |
| 10:50:16 | 10 | A.    Yes. |
| | 11 | Q.    And that was a couple of months before the -- well, |
| | 12 | it's -- when is the Republican primary? |
| | 13 | A.    In May. |
| | 14 | Q.    So four months before the Republican primary; is |
| 10:50:34 | 15 | that right? |
| | 16 | A.    Yes. |
| | 17 | Q.    Now, I want to shift a little bit to some things we |
| | 18 | talked about yesterday because I may have confused you with |
| | 19 | some of my questions. I don't want to do that. |
| 10:50:56 | 20 | Do you remember testifying about a cryptic message |
| | 21 | you got when you were with the Fuquay Varina mayor? |
| | 22 | A.    It was before I had met with the mayor. Yes, I |
| | 23 | remember that question. |
| | 24 | Q.    But you say before you met with the mayor, was it |
| 0:51:11 | 25 | the same day? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 10:51:12 | 1 | A. It was the same day, but I was not with him. When |
| | 2 | -- I was not with others when I received the message. I was |
| | 3 | by myself when I received the message. |
| | 4 | Q. And when you were talking with Investigator Hoffman |
| 10:51:22 | 5 | about that, did you give him some date as a reference? |
| | 6 | Let me ask that a different way. |
| | 7 | A. Thank you. |
| | 8 | Q. Were you able to provide a date based on your |
| | 9 | calendar or something that you look back at to determine what |
| 10:51:41 | 10 | date it was? |
| | 11 | A. So I was able to look back at my calendar, the date |
| | 12 | that I had that lunch meeting. |
| | 13 | Q. Right. |
| | 14 | A. And that was how I correlated the events. |
| 10:51:51 | 15 | Q. Did you keep that text message? |
| | 16 | A. No, sir. |
| | 17 | Q. Okay. And was the date -- did it turn out that the |
| | 18 | date that you had that meeting with the mayor in Fuquay Varina |
| | 19 | turned out to be April 13th? |
| 10:52:04 | 20 | A. Yes, sir. |
| | 21 | Q. Of 2022? |
| | 22 | A. Yes, sir. |
| | 23 | Q. Now, I think you testified that you assumed that |
| | 24 | was a message from Mr. Johnson; is that right? |
| 10:52:20 | 25 | A. Yes. |

| 10:52:21 | 1 | Q. Isn't it fair to say though that that was an |

10:52:21    1    Q.    Isn't it fair to say though that that was an
            2    assumption you made later after you sort of put things
            3    together?
            4    A.    I don't know -- that was -- that came to mind
10:52:38    5    pretty quick.
            6         MR. TYNDALL:    May I approach, Your Honor?
            7         THE COURT:    Yes, sir.
            8              (Defendant's Exhibit Number 4 marked for
            9              identification.)
10:53:23   10         MR. TYNDALL:    Your Honor, I'm going to approach
           11    with what's been marked Defendant's Exhibit Number 4 for
           12    purposes of refreshing Mr. Barbour's recollection.
           13         THE COURT:    Yes, sir.
           14    Q.    Now, Mr. Barbour, I know your interview with
10:53:44   15    Investigator Hoffman was a couple of years ago, more than two
           16    years ago.  So I don't expect you to remember every detail of
           17    it, but I'm going to ask you a couple of questions about what
           18    you told him.
           19         I'm going to show you what -- this is a transcript
10:54:20   20    of a recording, and I'm going to show you -- I want you to
           21    read this to yourself, Mr. Barbour, and see if it refreshes
           22    your recollection about what you told Investigator Hoffman at
           23    the time.  This is sort of highlighted.  It's not colored, but
           24    it's highlighted.  Page 9, the highlighted portion at the
10:54:38   25    bottom.

DeVan Barbour - Cross by Mr. Tyndall

```
0:54:49   1        A.   (Witness complies.)

          2        Q.   Now, does that refresh your recollection at least

          3   as to what you told Mr. Hoffman?

          4        A.   It interest.

0:55:01   5        Q.   And did you -- did you tell Investigator Hoffman

          6   that later on you processed it and I had just assumed that it

          7   came from him?

          8        A.   Yes.  And to clarify, later on isn't necessarily a

          9   substantial amount of time.  Later on could have been later

0:55:27  10   that afternoon.

         11        Q.   Right.  But at the time that you got that text

         12   message, you had not talked to my client about any recording

         13   with Angie Barbour; had you?

         14        A.   I don't believe so.

0:55:40  15        Q.   And had you talked with Kevin Donovan about a

         16   recording with Angie Barbour?

         17        A.   I don't believe so.

         18        Q.   So your conclusion was based on?

         19        A.   Assumption.

0:55:57  20        Q.   Okay.  It was just a couple days later when you got

         21   a called from a person named Kevin Donovan; is that right?

         22        A.   Yes, sir.

         23        Q.   Based on the things I showed you yesterday --

         24        A.   Correct.  Yes, sir.

0:56:31  25        Q.   -- that refreshed your recollection.  And you
```

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

DeVan Barbour - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 0:56:35 | 1 | remember sort of where you were, but not necessarily all the |
| | 2 | details of that. |
| | 3 | A.    Correct. |
| | 4 | Q.    And did it appear when you talked to Mr. Donovan |
| 0:56:44 | 5 | that he was warning you about the possibility that Ms. Barbour |
| | 6 | had a recording that compromised your campaign? |
| | 7 | A.    Correct. |
| | 8 | Q.    Did you have conversations with Ms. Barbour and |
| | 9 | Mr. Johnson that day? |
| 0:56:57 | 10 | A.    Yes. |
| | 11 | Q.    And that was April 16th; is that right? |
| | 12 | A.    Yes, sir. |
| | 13 | Q.    Now, the State showed you some text messages |
| | 14 | yesterday -- excuse me, some text messages between you and |
| 0:57:20 | 15 | Mr. Johnson.  Do you remember that? |
| | 16 | A.    Yes, sir. |
| | 17 | Q.    And those text messages were on the 24th and the |
| | 18 | 25th of April? |
| | 19 | A.    Yes, sir. |
| 0:57:29 | 20 | Q.    Now, you mentioned going to Clayton Fitness.  The |
| | 21 | Clayton Fitness, it's -- it has a parking lot in the front and |
| | 22 | a parking lot in the back; is that right? |
| | 23 | A.    I believe so. |
| | 24 | Q.    So where you went in the back was a public place? |
| 0:57:49 | 25 | A.    Yes. |

Case 5:23-cv-00349-D-RN    Document 158-2    Filed 10/27/25    Page 114 of 150

| | | |
|---|---|---|
| 10:57:50 | 1 | Q.   In fact, isn't there an entryway to Clayton Fitness |
| | 2 | in the back? |
| | 3 | A.   I have no idea. |
| | 4 | Q.   That's the only time you've ever been there? |
| 10:57:57 | 5 | A.   Yes, sir. |
| | 6 | Q.   Now, the date you met was April 25th? |
| | 7 | A.   Yes, sir. |
| | 8 | Q.   And that's the first time -- I mean, you said that |
| | 9 | prior to that date you just sort of had this rumor that there |
| 10:58:24 | 10 | was a recording or there was some compromising information |
| | 11 | about you; is that right? |
| | 12 | A.   Yes, sir. |
| | 13 | Q.   Because Ms. Barbour had told you there was none? |
| | 14 | A.   Correct. |
| 10:58:32 | 15 | Q.   She had assured you that she hadn't told anybody |
| | 16 | anything like that? |
| | 17 | A.   Correct. |
| | 18 | Q.   And had she assured you that there was no |
| | 19 | recording? |
| 10:58:41 | 20 | A.   Correct. |
| | 21 | Q.   And did Mr. Johnson offer to play you an excerpt of |
| | 22 | or a recording of Ms. Barbour talking? |
| | 23 | A.   Yes. |
| | 24 | Q.   Did you decline to hear that or did you hear it? |
| 10:58:54 | 25 | A.   I believe I heard a bit of it. |

DeVan Barbour - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 10:58:57 | 1 | Q. Okay. And after that, you called Ms. Barbour; is |
| | 2 | that right? |
| | 3 | A. I believe so. |
| | 4 | Q. Is that still the same day, the 25th? |
| 10:59:08 | 5 | A. I don't recall. |
| | 6 | Q. But in that call, whenever it was, she denied |
| | 7 | saying that again? |
| | 8 | A. Correct. |
| | 9 | Q. So this is two times she's denied to you that |
| 10:59:19 | 10 | either she's made an allegation about you or that there's a |
| | 11 | recording? |
| | 12 | A. Correct. |
| | 13 | Q. And you believed her? |
| | 14 | A. Yes, sir. |
| 10:59:32 | 15 | Q. And now, at some point you said you called |
| | 16 | Mr. Johnson back? |
| | 17 | A. Correct. |
| | 18 | Q. And had a conversation with him; is that right? |
| | 19 | A. Correct. |
| 10:59:44 | 20 | Q. And you're saying it was in that call where he |
| | 21 | asked you to see if Ms. Barbour would write something down, |
| | 22 | write a letter or text or something saying these rumors are |
| | 23 | not true? |
| | 24 | A. It was to write a letter stating that the rumor of |
| 11:00:02 | 25 | their affair was not true, or the allegation of their affair |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

DeVan Barbour - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 1:00:05 | 1 | was not true. |
| | 2 | Q. Well, and in any of these conversations, did |
| | 3 | Mr. Johnson ever ask you to do anything other than talk to |
| | 4 | Ms. Barbour? |
| 1:00:15 | 5 | A. No, sir. |
| | 6 | Q. I mean, he never said he was going to harm her in |
| | 7 | any way; did he? |
| | 8 | A. No, sir. |
| | 9 | Q. He never said he was going to spread things about |
| 11:00:23 | 10 | her; did he? |
| | 11 | A. No, sir. |
| | 12 | Q. Did he ever say anything like, you know, I'll make |
| | 13 | sure she's never a candidate or anything like that? |
| | 14 | A. No, sir. |
| 11:00:32 | 15 | Q. All he asked you to do was talk to her; isn't that |
| | 16 | right? |
| | 17 | A. Correct. |
| | 18 | Q. And now, you mentioned yesterday at the point where |
| | 19 | you're hearing this, at least your impression is there's some |
| 11:00:50 | 20 | kind of threat behind it? |
| | 21 | A. Correct. |
| | 22 | Q. But when you confronted Mr. Barbour and told him |
| | 23 | how it made you feel, he said, well, don't worry about it |
| | 24 | then; isn't that right? |
| 11:01:04 | 25 | A. I believe so. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 11:01:04 | 1 | Q. I mean, that's -- |
| | 2 | A. Yea, when I -- |
| | 3 | Q. -- the first time you tell him how you felt about |
| | 4 | your conversation with him is when he said, don't worry about |
| 11:01:14 | 5 | it? |
| | 6 | A. When I made -- when I made the comment that it felt |
| | 7 | like blackmail, that was when the tone of it changed, and it |
| | 8 | started to de-escalate and I believe that comment was made. |
| | 9 | Q. So you never said anything like that during the |
| 11:01:29 | 10 | first meeting? |
| | 11 | A. No, sir. |
| | 12 | Q. Did you ever say to him, this makes me really |
| | 13 | uncomfortable, Mr. Johnson, I don't like this? |
| | 14 | A. No, sir. |
| 11:01:36 | 15 | Q. Did you ever say to him, you know, Mr. Johnson, I |
| | 16 | don't want to get in the middle of this? |
| | 17 | A. Prob -- I could see that would be something I would |
| | 18 | say, but I don't know that I said that or not. |
| | 19 | Q. And did you say, let me talk to my people or |
| 11:01:53 | 20 | anything like that? |
| | 21 | A. No. |
| | 22 | Q. Did you say, I need to -- did you ever consider |
| | 23 | talking to an adviser? |
| | 24 | A. No. |
| 11:02:02 | 25 | Q. So the first time you actually mentioned to |

DeVan Barbour - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 1:02:06 | 1 | Mr. Johnson that you were uncomfortable with the conversation |
| | 2 | was in your phone call the second time? |
| | 3 | A.    Yes. |
| | 4 | Q.    And he immediately backed off; is that right? |
| 1:02:15 | 5 | A.    Yes. |
| | 6 | Q.    And I think you told Agent Hoffman at the time in |
| | 7 | the fall of 2022 that that was the last you heard of it? |
| | 8 | A.    Yes. |
| | 9 | Q.    At that time you had not heard anything else about |
| 11:02:29 | 10 | the situation? |
| | 11 | A.    I believe so. |
| | 12 | Q.    And had Mr. Johnson contacted you to mention the |
| | 13 | situation in any way? |
| | 14 | A.    I don't -- I don't believe so. |
| 11:02:38 | 15 | Q.    Had he contacted you or said anything to you about |
| | 16 | a recording? |
| | 17 | A.    No. |
| | 18 | Q.    As far as you know, had Mr. Johnson talked to |
| | 19 | anyone else about a recording? |
| 11:02:52 | 20 | A.    Not that I know of. |
| | 21 | Q.    Nobody, none of your advisers or campaign |
| | 22 | people -- and you had a bunch of people out there helping you; |
| | 23 | right? |
| | 24 | A.    Yes. |
| 11:03:02 | 25 | Q.    Well, I mean, is it fair to say you had people on |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 11:03:05 | 1 | your payroll helping you? |
| | 2 | A.    Yes. |
| | 3 | Q.    Then you had people in the community who were |
| | 4 | volunteers helping you? |
| 11:03:11 | 5 | A.    Correct.  Correct. |
| | 6 | Q.    Did you mention knocking on doors -- |
| | 7 | A.    Yes. |
| | 8 | Q.    -- in one of the text messages? |
| | 9 | A.    Yes, sir. |
| 11:03:16 | 10 | Q.    Is that something volunteers do for you? |
| | 11 | A.    Yes. |
| | 12 | Q.    Did you have a lot of people out there knocking on |
| | 13 | doors for you -- |
| | 14 | A.    Yes. |
| 11:03:24 | 15 | Q.    -- during that campaign? |
| | 16 | And in fact, did your campaign depend on |
| | 17 | volunteers? |
| | 18 | A.    Yes. |
| | 19 | Q.    Had Mr. Johnson told you he would help you with |
| 11:03:34 | 20 | your campaign? |
| | 21 | A.    I don't recall. |
| | 22 | Q.    Well, do you recall anybody reporting to you that |
| | 23 | he had done anything to interfere with your campaign? |
| | 24 | A.    No. |
| 11:03:57 | 25 | Q.    And so after -- between that phone call and the |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

DeVan Barbour - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 11:04:02 | 1 | election, you actually called Ms. Barbour back; is that right? |
| | 2 | Or you spoke to Ms. Barbour.  I can't remember who called who. |
| | 3 | A.    At -- at some point, yes. |
| | 4 | Q.    And did you tell her the situation was handled? |
| 11:04:20 | 5 | A.    I would not -- no.  I wouldn't have made that |
| | 6 | comment to anybody, because I don't know the situation ever |
| | 7 | was handled. |
| | 8 | Q.    Well, you do know that a recording was never |
| | 9 | released; isn't that right, Mr. Barbour? |
| 11:04:32 | 10 | A.    Correct. |
| | 11 | Q.    As far as you know. |
| | 12 | A.    As far as I know. |
| | 13 | Q.    And you know that, at least from Mr. Johnson's |
| | 14 | standpoint, he never told anybody about a recording; did he? |
| 11:04:41 | 15 | A.    To my knowledge, no. |
| | 16 | Q.    To your knowledge? |
| | 17 | A.    To my knowledge, no. |
| | 18 | Q.    And certainly you've never heard him say anything |
| | 19 | publically about you in a recording? |
| 11:04:55 | 20 | A.    No. |
| | 21 | Q.    The next time you heard anything about this is when |
| | 22 | you talked to Investigator Hoffman; is that fair? |
| | 23 | A.    I -- |
| | 24 | Q.    Well, let me rephrase that.  I don't know who you |
| 11:05:32 | 25 | talked to in your inner circle, but did anyone contact you |

DeVan Barbour - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 11:05:36 | 1 | about this recording about Ms. Barbour's allegations after |
| | 2 | your conversation with Mr. Johnson on -- some time in May? |
| | 3 | A.　No. |
| | 4 | Q.　And the next person you talked to then was |
| 11:05:54 | 5 | Investigator Hoffman? |
| | 6 | A.　Correct. |
| | 7 | Q.　And that was some time in October of 2022? |
| | 8 | A.　I believe so. |
| | 9 | Q.　So that was six months or so after the election? |
| 11:06:06 | 10 | A.　Yes, sir. |
| | 11 | Q.　Now, after you spoke to Investigator Hoffman, did |
| | 12 | anyone contact you about these allegations prior to |
| | 13 | Ms. Barbour mentioning them publically? |
| | 14 | A.　No. |
| 11:06:40 | 15 | Q.　Did you have more than one interview with |
| | 16 | Investigator Hoffman? |
| | 17 | A.　No. |
| | 18 | Q.　And Mr. Barbour, just to be clear, is it fair to |
| | 19 | say you can't remember exactly what anyone said during those |
| 11:07:55 | 20 | two conversations with Mr. Johnson? |
| | 21 | MR. ZELLINGER:　Objection. |
| | 22 | THE COURT:　I'll sustain that.　I'll let you |
| | 23 | rephrase, if you would. |
| | 24 | Q.　You have described a conversation with Mr. Johnson; |
| 11:08:05 | 25 | is that right? |

| | | |
|---|---|---|
| 11:08:06 | 1 | A.    Correct. |
| | 2 | Q.    Do you remember the specific words in each of those |
| | 3 | conversations? |
| | 4 | A.    Not the specific in its entirety. |
| 11:08:18 | 5 | Q.    And do you remember how you interpreted this? |
| | 6 | A.    Yes. |
| | 7 | Q.    Is that fair to say? |
| | 8 | A.    Yes, sir. |
| | 9 | Q.    And do you remember the timing of when things |
| 11:08:24 | 10 | happened? |
| | 11 | A.    Yes, sir. |
| | 12 | Q.    And was that in the heat of your campaign? |
| | 13 | A.    Yes, sir. |
| | 14 | Q.    Is that the lens you were seeing everything |
| 11:08:35 | 15 | through? |
| | 16 | A.    Yes, sir. |
| | 17 | MR. TYNDALL:   Nothing further, Your Honor. |
| | 18 | THE COURT:   Mr. Zellinger. |
| | 19 | MR. ZELLINGER:   Thank you. |
| 11:08:42 | 20 | REDIRECT EXAMINATION BY MR. ZELLINGER: |
| | 21 | Q.    Are you still overwhelmed with your campaign that |
| | 22 | you confused the defendant asking you to help you out for |
| | 23 | extortion? |
| | 24 | A.    I'm sorry? |
| 11:08:53 | 25 | MR. TYNDALL:   Objection to the term extortion. |

DeVan Barbour - Redirect by Mr. Zellinger

| | | |
|---|---|---|
| 11:08:55 | 1 | THE COURT: I think that question did create |
| | 2 | confusion. We'll sustain it and let you reask, if you would. |
| | 3 | Q. Were you so confused about your campaign that you |
| | 4 | mistook the defendant trying to help you out for what you told |
| 11:09:08 | 5 | this jury about the defendant saying that he wanted you to get |
| | 6 | Angie Barbour to write a letter in exchange for him not |
| | 7 | releasing a recording? |
| | 8 | A. I don't believe so. I don't believe I could |
| | 9 | confuse that with help. |
| 11:09:22 | 10 | Q. I mean, yesterday during cross-examination you -- I |
| | 11 | think you said that you couldn't take it for anything but |
| | 12 | malicious. What did you mean by that? |
| | 13 | A. I -- when somebody -- when there's, you know, this |
| | 14 | allegation hanging over your head and someone asks you to do |
| 11:09:45 | 15 | something and then they can make that allegation go away, you |
| | 16 | just kind of assume that that's a, you know, means to an end. |
| | 17 | Q. Sure. And when you talked to the defendant after |
| | 18 | this meeting behind Clayton Fitness, you brought up the word, |
| | 19 | this feels like blackmail; is that correct? |
| 11:10:07 | 20 | A. Correct. |
| | 21 | Q. You were asked some questions about this recording |
| | 22 | ever being released. Have you ever gone through the |
| | 23 | defendant's e-mails? |
| | 24 | A. I have not. |
| 11:10:19 | 25 | Q. You were asked about how your campaign depends on |

DeVan Barbour - Redirect by Mr. Zellinger

| | | |
|---|---|---|
| 11:10:21 | 1 | volunteers.  If you came back to your campaign and said, hey, |
| | 2 | this is what happened, how would that have affected those |
| | 3 | volunteers in your campaign? |
| | 4 | A.    They probably would have been less likely to help. |
| 11:10:34 | 5 | Q.    And did you need all the help you could get at that |
| | 6 | point in your campaign? |
| | 7 | A.    Yes. |
| | 8 | Q.    You were asked some questions about the last time |
| | 9 | you heard of this, in reference to this conversation with the |
| 11:10:47 | 10 | defendant where you said this feels like blackmail, then he |
| | 11 | sort of backed off.  Do you recall those questions? |
| | 12 | A.    Yes. |
| | 13 | Q.    You then heard about it again.  You received -- at |
| | 14 | some point you received a text about the recording being |
| 11:11:03 | 15 | released; correct? |
| | 16 | A.    Correct. |
| | 17 | Q.    And that was after you had that conversation with |
| | 18 | the defendant about this feels like blackmail and he backed |
| | 19 | off; is that right? |
| 11:11:11 | 20 | A.    Correct. |
| | 21 | Q.    And you mentioned this morning on cross that you |
| | 22 | said this feels like blackmail, then it sort of deescalated |
| | 23 | and he backed off; is that correct? |
| | 24 | A.    Correct. |
| 11:11:28 | 25 | Q.    What was his tone like before he backed off? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

11:11:36  1        A.    It was -- just pointed.  Pointed and normal.

       2        Q.    Okay.  And what did he want from you during that

       3  conversation?

       4        A.    That was when he asked to contact Ms. Barbour to

11:11:53  5  have her write a letter denying the allegations of their

       6  affair.

       7        Q.    And that letter, would that have benefited you in

       8  any way?

       9        A.    No.

11:12:06 10        Q.    Would that have benefited the defendant's political

      11  situation?

      12        A.    Probably.

      13        Q.    One thing I want to ask you about, you were asked

      14  questions on cross-examination about -- you were just asked a

11:12:25 15  question about these two conversations that you had with the

      16  defendant.  This one we just discussed about the blackmail,

      17  then he backs off.  The prior one, I believe, was that when

      18  the defendant got in your truck and handed you the ear pod and

      19  played something for you?

11:12:41 20        A.    Yes.

      21        Q.    Do you -- was there a conversation or was it solely

      22  you listening to this recording?

      23        A.    It was just me listening to the recording.

      24        Q.    So when the recording ended, I mean, do you recall,

11:12:53 25  did you discuss it with the defendant, or what happened at

11:12:55   1   that point?

           2        A.   Honestly, I -- honestly, I do not recall how that

           3   meeting ended.  I don't.

           4        Q.   I mean, is it possible that he played you the

11:13:08   5   recording and then that sort of ended it?  He got out and you

           6   tried to figure out what to do at that point?  I mean, do you

           7   know what happened?

           8        A.   If I -- I have no clue.

           9        Q.   Okay.  You were asked some questions about Kevin

11:13:28  10   Donovan, and you spoke to Kevin Donovan about this potentially

          11   compromising recording on April 16th or something; is that

          12   correct?

          13        A.   Correct.

          14        Q.   That was when he called you and you were with your

11:13:44  15   kids, and you were like, I don't want to talk about this right

          16   now.

          17        A.   Correct.

          18        Q.   Do you remember where you were going?

          19        A.   To an Easter festival at Benson Elementary School.

11:13:54  20        Q.   And so after that is when you met with the

          21   defendant in your truck, is that correct, behind Clayton

          22   Fitness?

          23        A.   I believe that's correct.

          24        Q.   That was on the 25th?

11:14:03  25        A.   Correct.

| | | |
|---|---|---|
| 1:14:04 | 1 | Q. Then after that is when you got this text message |
| | 2 | in May from a number you didn't know about referencing the |
| | 3 | recording. |
| | 4 | A. Correct. |
| 1:14:16 | 5 | Q. You were asked about -- this morning you listened |
| | 6 | to a recording, and did you hear yourself talk in like a |
| | 7 | January 2024 campaign event or something? |
| | 8 | A. Yes. |
| | 9 | Q. You were asked some questions about that. In that |
| l1:14:34 | 10 | recording you were asked if you said you couldn't agree with |
| | 11 | Ron more? |
| | 12 | A. Yes. |
| | 13 | Q. Like, the defendant more? |
| | 14 | A. Yes. |
| l1:14:41 | 15 | Q. Is that correct? |
| | 16 | A. Yes. |
| | 17 | Q. And was that -- and then is the next part of that |
| | 18 | recording like, don't trust what MSNBC says about Donald Trump |
| | 19 | or don't trust what the N&O says about Republicans, or |
| l1:14:56 | 20 | something along those lines? |
| | 21 | A. Yes. |
| | 22 | Q. Were you agreeing with the defendant -- in that |
| | 23 | meeting in January 2024, what were you agreeing with the |
| | 24 | defendant about? |
| l1:15:06 | 25 | A. I have no idea. I don't recall. And I was trying |

11:15:10  1   to think about that during the -- during the Easter event.  I

2   don't recall the comments at all.

3        Q.   Did you ever stand up and say like, I agree with

4   the defendant that this never happened?

11:15:21  5        A.   No.

6        Q.   And you were asked a bunch -- some questions about

7   Angie Barbour.  And when you called Angie Barbour right after

8   the meeting in the truck on April 25th, she told you that she

9   didn't know anything about a recording; is that correct?

11:15:40 10        A.   Correct.

11        Q.   And you -- you don't have personal knowledge

12   whether Angie Barbour knew that she was recorded; is that

13   accurate?

14        A.   That is correct.

11:15:51 15        Q.   Did you know that you were recorded in January 2024

16   at this political event?

17        A.   I did not.

18        Q.   Do you have any idea who might have recorded you in

19   January of 2024?

11:16:03 20        A.   I could assume.

21        Q.   And just to be clear, January 2024 is -- at some

22   point the defendant was charged and these charges became

23   public; is that correct?

24        A.   Correct.

11:16:17 25        Q.   And that was before January 2024?

DeVan Barbour - Redirect by Mr. Zellinger

| | | |
|---|---|---|
| 11:16:22 | 1 | A.    I don't recall when. |
| | 2 | Q.    You don't know? |
| | 3 | A.    No.  Sorry. |
| | 4 | Q.    But you did not record that political event; is |
| 11:16:29 | 5 | that correct? |
| | 6 | A.    Correct. |
| | 7 | Q.    And do you recall -- I mean, sometimes were there |
| | 8 | like -- are there like microphones at these political events |
| | 9 | and the media is there, or this just like a gathering of |
| 11:16:41 | 10 | people?  I mean, can you quantify what it's like? |
| | 11 | A.    Most of the time it's just a gathering of people in |
| | 12 | the room.  Sometimes there's microphones.  Sometimes there are |
| | 13 | not. |
| | 14 | Q.    You were asked questions about your interview with |
| 11:17:04 | 15 | Investigator Hoffman.  Is it fair to say that when you talked |
| | 16 | to Investigator Hoffman, this was more recent, it was the same |
| | 17 | year that this event happened with the defendant? |
| | 18 | A.    Yes. |
| | 19 | Q.    You were asked yesterday about between January and |
| 11:17:34 | 20 | May of 2017, before the primary date basically, no one |
| | 21 | released this recording; is that correct? |
| | 22 | A.    Correct. |
| | 23 | Q.    At that time on the date of the primary, who did |
| | 24 | you know had this recording? |
| 11:17:50 | 25 | A.    Ronald and Kevin. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 11:17:52 | 1 | Q.   How did you know Kevin had the recording? |
| | 2 | A.   Ronald confirmed it. |
| | 3 | Q.   So the defendant told you that Kevin Donovan had |
| | 4 | it? |
| 11:17:59 | 5 | A.   Correct. |
| | 6 | Q.   Okay.  And you actually talked to Kevin Donovan as |
| | 7 | well? |
| | 8 | A.   Yes. |
| | 9 | Q.   And who was Kevin Donovan affiliated with |
| 11:18:09 | 10 | politically at that time? |
| | 11 | A.   At that time it was Mr. Johnson. |
| | 12 | Q.   You were asked some question yesterday about some |
| | 13 | blog or article that had Angie Barbour in it.  Do you recall |
| | 14 | that? |
| 11:18:33 | 15 | A.   Yes. |
| | 16 | Q.   Do you know anything about the veracity of that |
| | 17 | blog? |
| | 18 | A.   I do not. |
| | 19 | Q.   And to be clear, that came out -- was that -- that |
| 11:18:43 | 20 | was -- do you know when that blog came out? |
| | 21 | A.   I don't recall specifically. |
| | 22 | Q.   It was not around the time when the meeting with |
| | 23 | the defendant occurred; is that correct? |
| | 24 | A.   Correct. |
| 11:18:56 | 25 | Q.   Was it after material related to this case had |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 11:19:02 | 1 | become public? |
| | 2 |      A.   Yes. |
| | 3 |      Q.   I mean, and so -- at some point the defendant was |
| | 4 | charged and there were media stories about this; is that |
| 11:19:12 | 5 | correct? |
| | 6 |      A.   Correct. |
| | 7 |      Q.   You were asked a question about if the defendant |
| | 8 | was trying to help you and he didn't want other people to get |
| | 9 | the recording.  What was the defendant's tone like in that |
| 11:19:33 | 10 | recording that you heard in your truck when he played it for |
| | 11 | you? |
| | 12 |      A.   Just pointed.  As a matter of fact. |
| | 13 |      Q.   Did you feel like he was your friend at that point? |
| | 14 |      A.   Not at that point, no. |
| 11:19:49 | 15 |      Q.   Why? |
| | 16 |      A.   It was just not a very friendly interaction.  It |
| | 17 | felt like something very different. |
| | 18 |      Q.   What did it feel like? |
| | 19 |      A.   Something sketchy.  Something I wasn't prepared |
| 11:20:10 | 20 | for.  Something I didn't expect. |
| | 21 |      Q.   I mean, did you -- at any point during this, did |
| | 22 | you feel threatened? |
| | 23 |      A.   Not physically. |
| | 24 |      Q.   Sure.  Sure.  But, I mean, did you feel like your |
| 11:20:29 | 25 | career was threatened? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | | |
|---|---|---|---|
| l1:20:31 | 1 | A. | Yes. |
| | 2 | Q. | Did you feel like your family was threatened? |
| | 3 | A. | Oh, yes. |
| | 4 | Q. | And who did you feel that threat was coming from? |
| l1:20:40 | 5 | A. | Mr. Johnson. |

6          MR. ZELLINGER:  Can I have one moment, Your Honor?

7          THE COURT:  Yes, sir.

8          MR. ZELLINGER:  Nothing further, Your Honor.

9          THE COURT:  Mr. Tyndall.

l1:21:32   10          MR. TYNDALL:  Just briefly, Your Honor.

11  RECROSS-EXAMINATION BY MR. TYNDALL:

12         Q.   Mr. Zellinger asked you about some of your

13  volunteers.  I just wanted to be clear the context of my

14  question is accurate.  What I asked you about, you had a lot

l1:21:56   15  of volunteers out talking to people, knocking on doors, and

16  talking to people; is that fair to say?

17         A.   Yes.

18         Q.   And those folks would come back and they would all

19  talk and provide you information?

l1:22:10   20         A.   Yes.

21         Q.   Did any of those people ever tell you that there

22  was a rumor out there that you were making sexual advances

23  towards Ms. Barbour?

24         MR. ZELLINGER:  Objection.

l1:22:21   25         THE COURT:  I'll sustain it.

| | | |
|---|---|---|
| 11:22:27 | 1 | Q.   After the volunteers went out and knocked on doors |
| | 2 | and returned, did anything lead you to believe that |
| | 3 | Mr. Johnson had released a recording of you? |
| | 4 | A.   No. |
| 11:23:33 | 5 | Q.   And Mr. Barbour, Mr. Zellinger just asked you about |
| | 6 | a cryptic text message you received in May about a recording; |
| | 7 | is that right? |
| | 8 | A.   Yes. |
| | 9 | Q.   And was that the 404 number that we showed you |
| 11:23:46 | 10 | yesterday? |
| | 11 | A.   I would assume based on the records it would be, |
| | 12 | but I don't have -- I don't recall the specific number that it |
| | 13 | was, but I would assume based on the records that were |
| | 14 | presented, yes, that probably was it. |
| 11:23:59 | 15 | Q.   You don't recognize that 404 number at all; is that |
| | 16 | right? |
| | 17 | A.   I don't.  I don't. |
| | 18 | MR. TYNDALL:  I don't have anything further, Your |
| | 19 | Honor. |
| 11:24:07 | 20 | THE COURT:  Mr. Zellinger. |
| | 21 | MR. ZELLINGER:  Can I have one moment, Your Honor? |
| | 22 | THE COURT:  Yes, sir. |
| | 23 | MR. ZELLINGER:  I don't have anything further. |
| | 24 | THE COURT:  You are free to step down. |
| 11:25:14 | 25 | MR. ZELLINGER:  We would ask Mr. Barbour be |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 11:25:16 | 1 | released from his subpoena at this point. |
| | 2 | (Witness excused.) |
| | 3 | MR. TYNDALL:  Can we approach? |
| | 4 | (Sidebar discussion.) |
| 11:27:28 | 5 | THE COURT:  Mr. Zellinger, whenever you are ready |
| | 6 | for your next witness. |
| | 7 | MR. ZELLINGER:  The State calls Angie Barbour. |
| | 8 | ANGELA MCLEOD BARBOUR, |
| | 9 | having been called as a witness for the State and being duly |
| 11:27:34 | 10 | sworn at 11:27 a.m., testified as follows: |
| | 11 | THE COURT:  Mr. Zellinger, whenever you are ready. |
| | 12 | MR. ZELLINGER:  Thank you. |
| | 13 | DIRECT EXAMINATION BY MR. ZELLINGER: |
| | 14 | Q.    Ms. Barbour, can you state your name for the jury. |
| 11:28:54 | 15 | A.    Angela McLeod Barbour. |
| | 16 | Q.    Is there a name you go by? |
| | 17 | A.    Angie. |
| | 18 | Q.    Where do you live?  Not a specific address, but ... |
| | 19 | A.    Benson, North Carolina. |
| 11:29:04 | 20 | Q.    And did you grow up in Johnston County? |
| | 21 | A.    I grew up in Harnett, but just a couple miles from |
| | 22 | Johnson. |
| | 23 | Q.    What do you do for a living? |
| | 24 | A.    Johnston County school teacher. |
| 11:29:14 | 25 | Q.    And what do you teach? |

| | | |
|---|---|---|
| 11:29:15 | 1 | A. AVID. |
| | 2 | Q. And what is that? |
| | 3 | A. Advancement Via Individual Determination. And I |
| | 4 | teach children how to be college and career ready. I'm an |
| 11:29:24 | 5 | elective teacher. |
| | 6 | Q. Where? |
| | 7 | A. McGee's Crossroads Middle School. |
| | 8 | Q. How long have you been teaching at McGee's |
| | 9 | Crossroads? |
| 11:29:32 | 10 | A. Almost 23 years this year. |
| | 11 | Q. Okay. And prior to working at McGee's Crossroads, |
| | 12 | did you teach anywhere else? |
| | 13 | A. McGee's Crossroads Elementary across the road. |
| | 14 | Q. So how long have you been a teacher? |
| 11:29:45 | 15 | A. Almost 23 years this year. |
| | 16 | Q. Okay. Got you. And at some point did you meet the |
| | 17 | defendant in this case, Ronald Johnson? |
| | 18 | A. I did. |
| | 19 | Q. And can you tell the jury the first time that you |
| 11:30:05 | 20 | met the defendant? |
| | 21 | A. I met Ronald personally at a Republican Women's |
| | 22 | event at the Cleveland Draft House which is in Clayton. It |
| | 23 | was representing -- it was an event where we were celebrating |
| | 24 | women stuff. It was like the 100th anniversary celebrating |
| 11:30:24 | 25 | the 19th Amendment. |

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 1:30:26 | 1 | Q.   Do you remember roughly what year that was? |
| | 2 | A.   2020. |
| | 3 | Q.   2020.  Do you remember what time of year that was? |
| | 4 | A.   October. |
| 1:30:35 | 5 | Q.   Okay.  And was that the -- had you been involved in |
| | 6 | politics leading up to 2020? |
| | 7 | A.   Not too much.  My dad was very -- you know, always |
| | 8 | raised me to be aware of what was going on in the world. |
| | 9 | Q.   And so was that -- that Republican Women's event, |
| 1:30:55 | 10 | that was one of the first events you went to? |
| | 11 | A.   It was the first. |
| | 12 | Q.   The first? |
| | 13 | A.   For Johnston County, yes, sir. |
| | 14 | Q.   At that meeting, did you meet the defendant for the |
| 1:31:05 | 15 | first time? |
| | 16 | A.   I did. |
| | 17 | Q.   And what happened? |
| | 18 | A.   He got up and spoke, as all the people that were |
| | 19 | running for office did, and we just met and introduced |
| 1:31:20 | 20 | ourselves.  That was it. |
| | 21 | Q.   Sure.  At that point the defendant was already on |
| | 22 | the school board; is that correct? |
| | 23 | A.   He was. |
| | 24 | Q.   In 2020 he would have been running for reelection? |
| 1:31:29 | 25 | A.   Correct. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 11:31:30 | 1 | Q. And after that, did you continue to communicate |
| | 2 | with the defendant? |
| | 3 | A. Yes. He invited me that evening to be a part of a |
| | 4 | video that he made for running for office, and we went and |
| 11:31:40 | 5 | worked on a video together with some of his former students |
| | 6 | and current students. |
| | 7 | Q. What kind of video was that? |
| | 8 | A. It was just like a pun as to why the county |
| | 9 | individuals, constituents should vote for him and not the |
| 11:31:53 | 10 | individual he was running against. |
| | 11 | Q. And were there other teachers involved in that |
| | 12 | video? |
| | 13 | A. Other teachers, yes, sir, for Johnston County |
| | 14 | schools. |
| 11:32:01 | 15 | Q. Do you remember who they were? |
| | 16 | A. Amy Fisher from West Johnston High School was |
| | 17 | involved in that. I believe that may be her last name. |
| | 18 | Q. At this point are you still living -- you're living |
| | 19 | in Benson? |
| 11:32:17 | 20 | A. I'm back at home, yes, sir. |
| | 21 | Q. Okay. I'm saying back in 2020. |
| | 22 | A. Oh, yes, I was at home. I'm sorry. Yes. |
| | 23 | Q. Sure. And I mean, to cut to it chase, you ended up |
| | 24 | having an affair with the defendant; is that correct? |
| 11:32:28 | 25 | A. I did. |

| | | |
|---|---|---|
| 11:32:29 | 1 | Q.   After that you ended up back with your husband? |
| | 2 | A.   I did. |
| | 3 | Q.   You are currently back with your husband? |
| | 4 | A.   I am. |
| 11:32:34 | 5 | Q.   At this point in 2020, you're married to your |
| | 6 | husband.   What's your husband's name? |
| | 7 | A.   Benjamin Ryan Barbour. |
| | 8 | Q.   Does he go by Ryan? |
| | 9 | A.   Yes. |
| 11:32:44 | 10 | Q.   And how was your marriage going at that point? |
| | 11 | A.   At that point it was horrible, for personal |
| | 12 | reasons. |
| | 13 | Q.   And so after the video, did you continue to |
| | 14 | communicate with the defendant? |
| 11:32:55 | 15 | A.   I did. |
| | 16 | Q.   And how would you communicate? |
| | 17 | A.   Facebook Messenger mostly. |
| | 18 | Q.   And just because some people might use different |
| | 19 | messaging apps.   Facebook is a social media platform; is that |
| 11:33:08 | 20 | correct? |
| | 21 | A.   Correct. |
| | 22 | Q.   And there's also a separate component you can |
| | 23 | message people on Facebook? |
| | 24 | A.   Yes, sir. |
| 11:33:14 | 25 | Q.   And that might be like a separate app on your |

| 11:33:17 | 1 | phone; is that correct? |
| | 2 | A.    Yes, sir. |
| | 3 | Q.    And what was the tenor of your Facebook messages |
| | 4 | with the defendant? |
| 11:33:21 | 5 | A.    For the most part, professional at that time. |
| | 6 | Q.    And your personal life at that time, how would you |
| | 7 | describe it? |
| | 8 | A.    My personal life was not going really well at that |
| | 9 | time as far as home life. |
| 11:33:37 | 10 | Q.    And then as you got towards election day in 2020, |
| | 11 | how frequently are you communicating with the defendant on |
| | 12 | Facebook Messenger? |
| | 13 | A.    Frequent enough to form like a friendship.  A |
| | 14 | couple times a week maybe. |
| 11:33:53 | 15 | Q.    At some point did you end up helping the defendant |
| | 16 | with his campaign? |
| | 17 | A.    I did.  I offered. |
| | 18 | Q.    And what did you do for the defendant? |
| | 19 | A.    Work outside polls and put signs outside the road. |
| 11:34:03 | 20 | Q.    When you say work outside of the poll, what does |
| | 21 | that mean? |
| | 22 | A.    Handing out literature on early vote -- during |
| | 23 | early vote. |
| | 24 | Q.    Did you ever knock on any doors for the defendant? |
| 11:34:12 | 25 | A.    No. |

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 11:34:14 | 1 | Q.    And did you like -- were you supplied with like |
| | 2 | materials? |
| | 3 | A.    Yes, sir. |
| | 4 | Q.    And did you get like T-shirts and like -- |
| 11:34:23 | 5 | A.    I did.  I met him at Clayton at the Crossroads |
| | 6 | where it's a polling site one day after early voting and he |
| | 7 | gave me T shirt and polling materials. |
| | 8 | Q.    At some point -- I mean, how did you view the |
| | 9 | defendant at around that time of election day in 2020? |
| 11:34:38 | 10 | A.    During it was all professional. |
| | 11 | Q.    Okay.  And what happened?  Did the defendant win |
| | 12 | his election? |
| | 13 | A.    He did. |
| | 14 | Q.    Okay.  And that election would have been on, like, |
| 11:34:50 | 15 | the first or second week of November? |
| | 16 | A.    Correct. |
| | 17 | Q.    Probably the first week of November? |
| | 18 | A.    Yes, sir. |
| | 19 | Q.    And after that election, did you have occasion to |
| 11:35:00 | 20 | see the defendant in a more personal setting? |
| | 21 | A.    I did, yes, sir. |
| | 22 | Q.    When was that? |
| | 23 | A.    That was at a restaurant Nina's in Clayton, North |
| | 24 | Carolina. |
| 11:35:13 | 25 | Q.    And was that around November 14th, does that sound |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 11:35:16 | 1 | right? |
| | 2 | A.    It was in November. |
| | 3 | Q.    This is 2020? |
| | 4 | A.    Correct. |
| 11:35:20 | 5 | Q.    So that night, what were you doing? |
| | 6 | A.    Just socializing.  He came out to meet me and a |
| | 7 | group of my personal friends.  One was another teacher.  The |
| | 8 | rest were just friends.  We were hanging out, and we sat |
| | 9 | around a table and had a conversation and drinks. |
| 11:35:35 | 10 | Q.    How did you feel when you the defendant showed up? |
| | 11 | A.    I was surprised.  I didn't actually think he would |
| | 12 | show up. |
| | 13 | Q.    Okay.  At some point -- what happened next?  Are |
| | 14 | you sitting at a table with a bunch of your friends and the |
| 11:35:48 | 15 | defendant? |
| | 16 | A.    We just had casual conversation about all things. |
| | 17 | It wasn't necessarily politics.  It was just regular goofing |
| | 18 | off, telling jokes.  A very personal, fun conversation. |
| | 19 | Q.    Okay.  And were people drinking? |
| 11:36:01 | 20 | A.    Yes. |
| | 21 | Q.    And then what happened later on in the night? |
| | 22 | A.    He -- we started to leave, and he followed us |
| | 23 | to -- we went to Revival right after that. |
| | 24 | Q.    And when you went to Revival, who was there? |
| 11:36:19 | 25 | A.    Same group of friends. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 11:36:20 | 1 | Q.   All of you sitting at a table? |
| | 2 | A.   We all walked together to Revival. |
| | 3 | Q.   Did you begin to talk to him about more personal |
| | 4 | subjects? |
| 11:36:28 | 5 | A.   We did.  We went outside.  There's an outside area. |
| | 6 | We went outside and did talk politics.  And then, you know, |
| | 7 | we -- personal as in my husband life? |
| | 8 | Q.   Sure.  Sure. |
| | 9 | A.   No, no. |
| 11:36:39 | 10 | Q.   You did not? |
| | 11 | A.   No. |
| | 12 | Q.   Okay.  Then what happened next? |
| | 13 | A.   He asked me to walk with him to his car. |
| | 14 | Q.   And then what happened when you got to his car? |
| 11:36:48 | 15 | A.   He kissed me. |
| | 16 | Q.   And how did you feel at that point? |
| | 17 | A.   Happy. |
| | 18 | Q.   Okay.  To be clear, at this point you're working as |
| | 19 | a teacher in the Johnston County school system? |
| 11:37:02 | 20 | A.   Yes, sir. |
| | 21 | Q.   And he's a school board member? |
| | 22 | A.   Yes, sir. |
| | 23 | Q.   And then did he leave? |
| | 24 | A.   No, sir. |
| 11:37:09 | 25 | Q.   He did not leave? |

11:37:10  1          A.    No.  I got in the car with him, sir.

        2          Q.    What happened at that point?

        3          A.    We continued kissing, and it led to other things.

        4          Q.    And at some point that night did you like roll your

11:37:24  5    ankle or hurt your ankle?

        6          A.    Yes, sir.  That you afterwards.

        7          Q.    So when you were in the car, I guess, did you have

        8    some sort of romantic interaction?

        9          A.    We did.  Yes, sir.  Yes, sir.

11:37:35 10          Q.    And then did he leave in his car at that point?

       11          A.    He did.  And I went.  He dropped me off at the

       12    front of the bar, and I walked in back to meet my group of

       13    friends.

       14          Q.    And then when was it that you ended up rolling your

11:37:46 15    ankle?

       16          A.    When we walked to -- it's a bar in Clayton.  It's a

       17    white front house -- Tavern.  That's what it's called.

       18          Q.    Okay.  And while you were walking there, did

       19    something happen?

11:37:58 20          A.    I twisted my ankle walking through the parking lot.

       21          Q.    And what happened next?

       22          A.    We went there.  I sat, put my leg up, and then I

       23    told my friends to call Ryan, and then immediately I knew that

       24    my husband would be very irate and upset with the situation

11:38:18 25    that had happened as far as me being -- having too much to

| | | |
|---|---|---|
| 11:38:21 | 1 | drink and rolling my ankle. It would have embarrassed him, so |
| | 2 | I said, call Ron. |
| | 3 | Q. And what happened next? |
| | 4 | A. He picked me up. |
| 11:38:30 | 5 | Q. And then at this point in the night, had you been |
| | 6 | drinking? |
| | 7 | A. A lot. |
| | 8 | Q. So were you impaired? |
| | 9 | A. I was. |
| 11:38:39 | 10 | Q. Can you describe for the jury how impaired you |
| | 11 | were? |
| | 12 | A. I was very impaired. Impaired to the point of |
| | 13 | it -- I had a lot of Titos. |
| | 14 | Q. What do you remember from the rest of that night? |
| 11:38:52 | 15 | A. Not a whole lot. It's bits and pieces. Enough to |
| | 16 | know that I had had intercourse, because women can kind of |
| | 17 | tell that after the fact. |
| | 18 | Q. Okay. And at some point in that night, did -- do |
| | 19 | you know where that occurred? |
| 11:39:15 | 20 | A. Honestly, I'm pretty sure we had intercourse at my |
| | 21 | friend's house that he dropped me off at. |
| | 22 | Q. And so then did he leave you at your friend's |
| | 23 | house? |
| | 24 | A. He did. |
| 11:39:27 | 25 | Q. And did anybody else see you with the defendant |

Angela Barbour - Direct by Mr. Zellinger

11:39:29    1    that night?

2    A.    My good friend Carly, as far as she saw him with me

3    at my friend Tammy's house.

4    Q.    And was it the next day, I guess, that you realized

11:39:39    5    that you may have had intercourse the night before?

6    A.    Yes.

7    Q.    Following that, what was your next communication

8    with the defendant?

9    A.    I -- I remember the next day or -- I don't think I

11:39:55   10    talked to him maybe the very next day, but the next day or two

11    I tried to reach out and apologize for my behavior and being

12    so intoxicated and just saying I'm sorry for being so drunk.

13    Q.    And what happened at that point?  Did you talk to

14    the defendant?

11:40:09   15    A.    I did talk to him.

16    Q.    And?

17    A.    And he said that nothing happened, as far as he

18    didn't really have -- didn't really have intercourse and he

19    apologized, and no need to apologize and those kind of things.

11:40:22   20    Q.    Okay.  So immediately after, he said that you all

21    did not have sex; is that correct?

22    A.    Yes.

23    Q.    And then some time later did you find out that you

24    did have sex that night?

.1:40:30   25    A.    Yes.

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 11:40:31 | 1 | Q.    Regardless, at that point did you begin |
| | 2 | communicating with the defendant via something other than |
| | 3 | Facebook Messenger? |
| | 4 | A.    Snapchat. |
| 11:40:39 | 5 | Q.    What is Snapchat? |
| | 6 | A.    An app where you talk and then the messages go |
| | 7 | away. |
| | 8 | Q.    And so -- |
| | 9 | MR. ZELLINGER:   Can I have one moment, Your Honor? |
| 11:40:49 | 10 | THE COURT:   Yes, sir.   Whenever you are ready. |
| | 11 | Q.    Snapchat, how did you start using Snapchat? |
| | 12 | A.    I didn't know anything about Snapchat until Ronald |
| | 13 | Johnson. |
| | 14 | Q.    And so what he -- did he teach you how to use |
| 11:41:27 | 15 | Snapchat? |
| | 16 | A.    Yes.   I started using it when I met Ronald Johnson. |
| | 17 | Q.    Okay.   And does Snapchat, can you go back and look |
| | 18 | at your old messages? |
| | 19 | A.    No.   Not unless you save them, and I was not |
| 11:41:41 | 20 | allowed to do that. |
| | 21 | Q.    Why did you not want to save your messages with |
| | 22 | Ronald Johnson? |
| | 23 | A.    It's not that I didn't.   He didn't want any record |
| | 24 | of our conversation. |
| 11:41:50 | 25 | Q.    Okay.   And at this point you're married; is that |

| | | |
|---|---|---|
| 11:41:52 | 1 | correct? |
| | 2 | A. Yes, sir. |
| | 3 | Q. Now, the defendant, did you know about his marital |
| | 4 | status? |
| 11:41:56 | 5 | A. I did. |
| | 6 | Q. What was that? |
| | 7 | A. He was married. |
| | 8 | Q. Do you know what his wife's name is? |
| | 9 | A. Jamie. |
| 11:42:03 | 10 | Q. And did you receive the -- so when you were |
| | 11 | communicating with the defendant on Facebook Messenger, is it |
| | 12 | before with, like, Ronald Johnson's Facebook and it's got his |
| | 13 | name; is that correct? |
| | 14 | A. Uh-huh. |
| 11:42:19 | 15 | Q. On Snapchat, did you get his phone number? |
| | 16 | A. Yes. That's how you get connected is through your |
| | 17 | phone. |
| | 18 | Q. Okay. And how did you save his number? |
| | 19 | A. In my personal phone or through Snapchat? |
| 11:42:30 | 20 | Q. Through Snapchat. |
| | 21 | A. It saves. |
| | 22 | Q. It saves? |
| | 23 | A. It saves, yea. |
| | 24 | Q. As the phone number? |
| .1:42:33 | 25 | A. Yes. |

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 11:42:33 | 1 | Q.    Okay.  At some point did you receive a phone number |
| | 2 | for Ronald Johnson? |
| | 3 | A.    I did. |
| | 4 | Q.    Did you save it under his name? |
| 11:42:39 | 5 | A.    Yes.  That was a different phone number though. |
| | 6 | Q.    Okay.  So did you receive two phone numbers from |
| | 7 | Ronald Johnson? |
| | 8 | A.    I did. |
| | 9 | Q.    Okay.  And was there a second number that you |
| 11:42:49 | 10 | received from Ronald Johnson? |
| | 11 | A.    Yes, sir.  That was the one that -- that was not |
| | 12 | the Snapchat one though.  Snapchat was the personal number. |
| | 13 | Q.    Okay.  So the second phone number, did you save |
| | 14 | that in your phone as Ronald Johnson? |
| 11:42:59 | 15 | A.    I did not. |
| | 16 | Q.    Okay.  How did you save it in your phone? |
| | 17 | A.    As the alias he instructed me to, Heather Jones. |
| | 18 | Q.    Okay.  And so what did he tell you? |
| | 19 | A.    That that was a way he could communicate with me |
| 11:43:08 | 20 | and my husband would not know that we were talking or see if |
| | 21 | we were texting and it wouldn't be his name. |
| | 22 | Q.    Okay.  And so he was saved in your phone as the |
| | 23 | name Heather Jones? |
| | 24 | A.    Correct. |
| 1:43:19 | 25 | Q.    And then did you continue to communicate with the |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 11:43:22 | 1 | defendant? |
| | 2 |     A.   Yes, sir. |
| | 3 |     Q.   And what was the primary -- would you, like, text |
| | 4 | with that Heather Jones' number or would you use Snapchat, or |
| 11:43:31 | 5 | what would you use? |
| | 6 |     A.   If it was anything with the board of education, it |
| | 7 | went through a regular phone.  If it was anything else, it |
| | 8 | went through Heather Jones. |
| | 9 |     Q.   Okay.  So your primary source of communication was |
| 11:43:41 | 10 | with this Heather Jones' number? |
| | 11 |     A.   Yes. |
| | 12 |     Q.   Just to be clear, that is a number the defendant |
| | 13 | gave you. |
| | 14 |     A.   Correct. |
| 11:43:47 | 15 |     Q.   And told you to save it in your phone; is that |
| | 16 | correct? |
| | 17 |     A.   Yes, sir. |
| | 18 |     Q.   But it was actually the defendant; is that right? |
| | 19 |     A.   Correct.  Yes. |
| 1:43:52 | 20 |     Q.   Okay.  How often would you communicate with the |
| | 21 | defendant? |
| | 22 |     A.   Lots. |
| | 23 |     Q.   Like? |
| | 24 |     A.   Multiple times a day.  Multiple.  Every day it |
| 1:43:59 | 25 | was -- it was -- in the beginning of the relationship, that |