11:44:02  1    was how it was.

2         Q.    Okay.  And at this point was the relationship --
3    like did it become more romantic?

4         A.    Yes, sir.

11:44:12  5         Q.    And can you describe that for the jury?  I mean,
6    what --

7         A.    He asked me to go on trips.  He took me to
8    Virginia.  We went to Charlotte multiple times.  We had a
9    relationship.

11:44:25 10         Q.    Okay.  And at the time this is happening you're
11   living in your home with your husband and children; is that
12   correct?

13        A.    For the Virginia trip, yes.  I think Charlotte may
14   have been -- no, I was still at home for the first Charlotte
11:44:39 15   trip.

16        Q.    At some point did you move out?

17        A.    I did, yes.

18        Q.    Did you move to an apartment?

19        A.    I did.  Because I felt I needed -- that's what had
11:44:47 20   to happen because of what I was doing.

21        Q.    Okay.  Are you -- were you aware of where the
22   defendant was living?

23        A.    Yes, sir.  He lived in Clayton.  I didn't know
24   where he lived.

.1:44:58 25        Q.    Did you know if he ever left his house?

```
l1:45:00   1        A.    No.  I don't think he did.

           2        Q.    You mentioned Virginia.  What was -- can you tell

           3   the jury what happened on that trip to Virginia?

           4        A.    He went ahead of me.  I met him.  He created this

l1:45:11   5   -- the ruse was -- to be honest, the ruse was -- what he told

           6   me was he created a binder for this convention I was attending

           7   the weekend before Christmas, and I was to pretend I was going

           8   to a superhero comic book reading elementary event for

           9   teachers.  I still have that binder.  And he wanted to meet

l1:45:37  10   and just have a weekend with me in Virginia.

          11        Q.    And so was there really a conference about, like,

          12   superheros --

          13        A.    No, sir.

          14        Q.    -- and reading in elementary school?

l1:45:46  15        A.    No.

          16        Q.    And who created the binder?

          17        A.    Ronald Johnson.

          18        Q.    And so the purpose of that was so you'd have this

          19   binder so it looked like you were going to something

l1:45:55  20   legitimate?

          21        A.    Yes, sir.

          22        Q.    And what did you all actually do over the weekend?

          23        A.    We stayed in the hotel room and then went and had

          24   breakfast and dinner.

l1:46:04  25        Q.    And were you all romantically involved?
```

| | | | |
|---|---|---|---|
| 11:46:09 | 1 | A. | Yes, sir. |
| | 2 | Q. | Where in Virginia was this? |
| | 3 | A. | Virginia Beach. |
| | 4 | Q. | Do you recall where you stayed? |
| 11:46:14 | 5 | A. | On the beach. |
| | 6 | Q. | Was it like in a hotel? |
| | 7 | A. | Yes, sir. |

8   Q.   At that point -- prior to going to Virginia, would
9 you meet with the defendant?  I mean, were you just
11:46:28  10 communicating with the defendant via Snapchat or the Heather
11 Jones' phone number?
12   A.   No.  During that time was around COVID, I believe.
13 We would meet at restaurants because our school days were
14 asynchronous.  So sometimes we would meet for lunch at
11:46:43  15 different restaurants in Smithfield.
16   Q.   And what is an asynchronous day?
17   A.   Where students are not necessarily in class.  We
18 had to give them the work and just the teachers had to make
19 sure the work was being done and things like that.
11:46:58  20   Q.   Okay.  And so do you remember what day of the week
21 was often the asynchronous day?
22   A.   At that time I -- I don't.  With COVID, COVID was a
23 nightmare.
24   Q.   Okay.  So was it -- was it like every Friday was an
11:47:11  25 asynchronous day?

| | | |
|---|---|---|
| 11:47:13 | 1 | A.    I believe it was -- it was -- Wednesday.  It just |
| | 2 | popped in my head.  Wednesday was an asynchronous day, I'm |
| | 3 | pretty sure. |
| | 4 | Q.    Okay.  And that day you didn't have to, like, be in |
| 11:47:21 | 5 | the -- |
| | 6 | A.    Be in class, correct. |
| | 7 | Q.    And so what would you do on these asynchronous |
| | 8 | days? |
| | 9 | A.    Well, I did my work because I'm a teacher. |
| 11:47:26 | 10 | Q.    Sure. |
| | 11 | A.    But for lunch he would ask and we would go meet and |
| | 12 | have lunch. |
| | 13 | Q.    Where would you all meet? |
| | 14 | A.    Sometimes we ate at -- is it Kobe in Smithfield, |
| 11:47:34 | 15 | the Japanese restaurant, and then the Buffalo Wild Wings. |
| | 16 | Q.    I'm sorry, can you say that again? |
| | 17 | A.    Buffalo Wild Wings. |
| | 18 | Q.    Okay. |
| | 19 | A.    And then a couple times at the La Cocina, a Mexican |
| 11:47:46 | 20 | restaurant in Smithfield. |
| | 21 | Q.    Okay.  You mentioned Buffalo Wild Wings was some |
| | 22 | place that you would go with him? |
| | 23 | A.    Uh-huh. |
| | 24 | Q.    And would you ever -- I mean, aside from this |
| 11:47:56 | 25 | Virginia trip, was that the only time that you were |

Angela Barbour - Direct by Mr. Zellinger

| 11:47:58 | 1 | romantically intertwined with the defendant or would you find |
| | 2 | other places? |
| | 3 | A.    We would go other places. |
| | 4 | Q.    Where would that be? |
| 11:48:05 | 5 | A.    In the vehicle. |
| | 6 | Q.    Okay.  In whose vehicle? |
| | 7 | A.    Other hotel rooms around the area. |
| | 8 | Q.    Okay.  And when you say "the vehicle," whose |
| | 9 | vehicle? |
| 11:48:14 | 10 | A.    His, and sometimes mine. |
| | 11 | Q.    And at this point was the defendant a law |
| | 12 | enforcement officer? |
| | 13 | A.    Yes, sir. |
| | 14 | Q.    And so what kind of car did he drive? |
| 11:48:24 | 15 | A.    Dodge.  I always get it mixed up if it's a |
| | 16 | Challenge or Charger. |
| | 17 | Q.    Okay.  And was it like a marked police car? |
| | 18 | A.    It was an unmarked. |
| | 19 | Q.    Do you remember what color? |
| 11:48:33 | 20 | A.    Charcoal.  Like a dark gray. |
| | 21 | Q.    And so it was like a Charger or Challenger and it |
| | 22 | didn't look like a police car, but you could conceivably turn |
| | 23 | on the lights or something? |
| | 24 | A.    Correct. |
| 11:48:42 | 25 | Q.    And so where would you -- did you have sex with the |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 11:48:44 | 1 | defendant in a car? |
| | 2 | A.    Not in the police car, no, sir. |
| | 3 | Q.    Not in the police car.  So how would that work? |
| | 4 | Would he come into your car? |
| 11:48:51 | 5 | A.    Uh-huh.  Yes. |
| | 6 | Q.    And then you all would have sex in your car? |
| | 7 | A.    Yes, sir. |
| | 8 | Q.    And was he on duty at this point? |
| | 9 | A.    It was during the day.  So I mean, he would have to |
| 11:48:59 | 10 | remove his badge and his holster and all the things a police |
| | 11 | officer has on him. |
| | 12 | Q.    Okay.  And would he have his radio with him? |
| | 13 | A.    Yes -- well, I can't say that.  I don't know about |
| | 14 | a radio.  Cellphone, yes. |
| 11:49:12 | 15 | Q.    And you mentioned -- where would -- where would you |
| | 16 | go to do this in the car? |
| | 17 | A.    We went to his house one time.  We left Smithfield |
| | 18 | and drove to his house because he -- and we had to do it |
| | 19 | quickly because he had to be back to work.  We met in the |
| 11:49:28 | 20 | Mayflower parking lot multiple times.  And then we would just |
| | 21 | drive and find different places that he knew where we could |
| | 22 | park, just depending what time of day it was. |
| | 23 | Q.    Okay.  And at those places you would have sex in |
| | 24 | your car? |
| 11:49:42 | 25 | A.    Yes, sir. |

<div align="center">
Denise St. Clair, RPR, CRR, CRC<br>
Official Court Reporter
</div>

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 11:49:42 | 1 | Q.    And then you also mentioned hotels.  What hotels |
| | 2 | would you go to? |
| | 3 | A.    We went to one in Clayton, and then we went to the |
| | 4 | Marriott across -- we went to the Marriott across from the |
| 11:50:00 | 5 | mall, and we went to one in Durham. |
| | 6 | Q.    Let me write those down.  You said one in Clayton. |
| | 7 | Do you know what kind of hotel that was? |
| | 8 | A.    It was close to the gym because he ran back to the |
| | 9 | gym afterwards when I left.  This was prior to me leaving my |
| 11:50:12 | 10 | home though in Benson. |
| | 11 | Q.    Then you said the Marriott across from the mall, is |
| | 12 | that -- where is that? |
| | 13 | A.    It's is the Marriott across from Crabtree. |
| | 14 | Q.    Is that in Raleigh? |
| 11:50:22 | 15 | A.    Yes, sir. |
| | 16 | Q.    And then did you say another hotel? |
| | 17 | A.    We went to Marriott in Durham one time, because |
| | 18 | when we went to the one at Crabtree, he came out and said that |
| | 19 | there were people in there that knew him, that we had to go |
| 11:50:34 | 20 | somewhere else. |
| | 21 | Q.    Okay.  And did you say what people were there at |
| | 22 | that point? |
| | 23 | A.    Michelle Antoine. |
| | 24 | Q.    And when you would go to these hotels, would you |
| 11:50:47 | 25 | both go in at the same time? |

| | | |
|---|---|---|
| 11:50:49 | 1 | A. Usually he would be there first. |
| | 2 | Q. Okay. |
| | 3 | A. I think we might have went one time in together. |
| | 4 | That's not the way it worked. He would go in, get a room, and |
| 11:50:56 | 5 | then I would go. |
| | 6 | Q. And then would he communicate to you where to go? |
| | 7 | A. Yes, sir. |
| | 8 | Q. Okay. How often were you seeing each other at this |
| | 9 | time period in, I guess, late 2020? |
| 11:51:10 | 10 | A. Quite often. I try to go to the gym. And I know |
| | 11 | there were times that I would say that I was going to the gym |
| | 12 | and I would drive all the way to Smithfield to meet him. |
| | 13 | Q. Okay. You would say you were going to the gym in |
| | 14 | Benson and you'd drive to Smithfield to see him? |
| 11:51:23 | 15 | A. Yes, sir. |
| | 16 | Q. Okay. And I mean, during a week coming into 2020 |
| | 17 | or 2021, how often were you all communicating via Snapchat or |
| | 18 | text? |
| | 19 | A. We communicated a great deal. We communicated on a |
| 11:51:40 | 20 | regular phone a great deal. |
| | 21 | Q. Okay. And then you would also go on trips. You |
| | 22 | mentioned to Virginia, to Virginia Beach; is that correct? |
| | 23 | A. Correct. |
| | 24 | Q. Did you ever go anywhere else? |
| 11:51:51 | 25 | A. We went to Charlotte a couple times. |

Angela Barbour - Direct by Mr. Zellinger

| 11:51:56 | 1 | Q. When you went to Charlotte, would you drive with |
| | 2 | him or would you -- |
| | 3 | A. No. We were never supposed to be in the same car |
| | 4 | when we went on trips in case there was an accident, we would |
| 11:52:05 | 5 | not be able to explain it. |
| | 6 | Q. Did you come up with that rule? |
| | 7 | A. No, sir. |
| | 8 | Q. Who came up with that rule? |
| | 9 | A. Ronald Johnson. |
| 11:52:15 | 10 | Q. At some point did the defendant ask you to get |
| | 11 | information on people? |
| | 12 | A. Yes, sir. |
| | 13 | Q. When was the first time that that happened? |
| | 14 | A. When he found out that D and I were friends. |
| 11:52:28 | 15 | Q. And who is D? |
| | 16 | A. DeVan Barbour. |
| | 17 | Q. And do you know him as D? |
| | 18 | A. I know him as D. |
| | 19 | Q. How long have you been known DeVan Barbour? |
| 11:52:37 | 20 | A. I've known DeVan since my daughter was -- prior to |
| | 21 | her being Little Miss Benson. I know D because his in-laws |
| | 22 | had a beach house right across from my husband's family since |
| | 23 | probably my early 20s. |
| | 24 | Q. Before you get to that, you mentioned Charlotte. |
| 11:52:58 | 25 | Did you ever go on a Charlotte trip with anybody else? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Angela Barbour - Direct by Mr. Zellinger

| 11:53:01 | 1 | A. I took my -- what was my good friend Ally Bond at |
| | 2 | the time. |
| | 3 | Q. And so she came with you? |
| | 4 | A. She did. |
| 11:53:12 | 5 | Q. And you met up with the defendant? |
| | 6 | A. I did. I took her because I knew she had been |
| | 7 | unfaithful with her husband, and I knew she would be someone I |
| | 8 | could trust. |
| | 9 | Q. And you said she used to be your good friend. Is |
| 11:53:24 | 10 | she not your good friend any more? |
| | 11 | A. No. In fact, she taught both my nieces and my |
| | 12 | daughter. Yes, we were really good friends in college. She |
| | 13 | taught with me at the elementary school. |
| | 14 | Q. Is she or was she a Johnston County public school |
| 11:53:35 | 15 | teacher? |
| | 16 | A. She still is. She teaches across the road from me. |
| | 17 | Q. Okay. And what school is that? |
| | 18 | A. McGee's Crossroads Elementary. |
| | 19 | Q. Elementary. And do you know what grade she |
| 11:53:43 | 20 | teaches? |
| | 21 | A. Honestly, I don't. She used to teach first. I |
| | 22 | don't know if she's changed. |
| | 23 | Q. And you used to be friends with her, and then did |
| | 24 | something happen that made you not be friends with her? |
| 11:53:53 | 25 | A. She just ghosted me. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 11:53:58 | 1 | Q. Before that happened when you were friends, did she |
| | 2 | come with you to Charlotte? |
| | 3 | A. Yes, sir. |
| | 4 | Q. Did you stay in a hotel room? |
| 11:54:05 | 5 | A. Yes, sir. |
| | 6 | Q. And were you staying in a hotel with the defendant? |
| | 7 | A. She stayed with the -- Lindsey, which is Ronald's |
| | 8 | cousin, and Ron and I stayed in a room. |
| | 9 | Q. And did she know that? |
| 11:54:17 | 10 | A. She did. |
| | 11 | Q. Okay. So did you -- I guess, did you tell her |
| | 12 | about -- |
| | 13 | A. Yes, sir. |
| | 14 | Q. -- the affair? |
| 11:54:21 | 15 | A. Yes. The ruse was we were going to IKEA to look at |
| | 16 | furniture. |
| | 17 | Q. To IKEA? |
| | 18 | A. IKEA. |
| | 19 | Q. Okay. And so then you stayed with the defendant |
| 11:54:31 | 20 | and she stayed with Ronald Johnson's cousin. |
| | 21 | A. Yes, sir. |
| | 22 | Q. And did you tell people about this affair? |
| | 23 | A. No. My close circle of friends. |
| | 24 | Q. Okay. And so back then, your close circle of |
| 11:54:46 | 25 | friends. Who else would you have told about this affair? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 11:54:48 | 1 | A.   My good friend April, my good friend Erin, another |
| | 2 | friend Amy, and my neighbor Brittney. |
| | 3 | Q.   At some point was it on that Charlotte trip, did |
| | 4 | you -- at some point did the defendant get jealous of you |
| 11:55:17 | 5 | talking to somebody? |
| | 6 | A.   On that trip?  Yes. |
| | 7 | Q.   It was on that Charlotte trip? |
| | 8 | A.   It was just because I went into the bar to get a |
| | 9 | drink and I didn't want to wait in line.  So I didn't want to |
| 11:55:30 | 10 | wait in line so I went to a different floor and there were a |
| | 11 | bunch of younger gentlemen up there.  And I said, if you will |
| | 12 | let me buy you a drink -- I will buy you all a drink if you |
| | 13 | let me get to the front of the line, because it was so packed. |
| | 14 | And I tried -- and he saw that.  He went up and watched me and |
| 11:55:46 | 15 | saw that and got really upset. |
| | 16 | Q.   And did you all talk about that? |
| | 17 | A.   We argued about it. |
| | 18 | Q.   And this was in Charlotte? |
| | 19 | A.   Yes, sir. |
| 11:55:55 | 20 | Q.   Okay.  At some point did you find out that you had |
| | 21 | in fact had sex the first night that you had met the |
| | 22 | defendant? |
| | 23 | A.   I did.  That was a while after. |
| | 24 | Q.   Okay.  And how did that happen? |
| 1:56:07 | 25 | A.   He was honest with me, because I asked him if we |

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 11:56:09 | 1 | had sex, and he said he didn't want to tell me that we had sex |
| | 2 | because he was scared I would accuse him of rape. |
| | 3 | Q.   And so at this point, I mean, how would you -- how |
| | 4 | would you characterize your relationship with the defendant. |
| 11:56:23 | 5 | Were you close? |
| | 6 | A.   We were very close.  It was an everyday |
| | 7 | conversation.  If we didn't talk, it was kind of odd. |
| | 8 | Q.   At some point did you tell the defendant that you |
| | 9 | loved him? |
| 11:56:31 | 10 | A.   I did. |
| | 11 | Q.   What did he say? |
| | 12 | A.   I love you. |
| | 13 | Q.   Okay.  So you told each other that you loved each |
| | 14 | other? |
| 11:56:36 | 15 | A.   Yes, sir. |
| | 16 | Q.   And at some point did you move out of your house? |
| | 17 | A.   Yes, sir. |
| | 18 | Q.   Where did you move? |
| | 19 | A.   I moved to Stallings Mill Apartments. |
| 11:56:49 | 20 | Q.   Okay.  And what city is that? |
| | 21 | A.   Clayton. |
| | 22 | Q.   And is that actually pretty close to Clayton |
| | 23 | Fitness? |
| | 24 | A.   Right across the road. |
| 11:57:05 | 25 | Q.   Okay.  And did the defendant go to Clayton Fitness |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Angela Barbour - Direct by Mr. Zellinger

| 11:57:07 | 1 | pretty frequently? |

2    A.    Uh-huh.    That's where I picked him up and met him.

3    Q.    Okay.    When you say -- when did you pick him up and

4    meet him at Clayton Fitness?

11:57:15    5    A.    Quite frequently.

6    Q.    At some point did you learn he had an office at

7    Clayton Fitness?

8    A.    Yes, sir.

9    Q.    Do you know, like, did he work there?  Or why did

11:57:22    10    he have an office there?

11    A.    I don't know.  I don't know why he had an office

12    there, but he did have an office there.  That's where we made

13    the initial video for his election in 2020.

14    Q.    Was at Clayton Fitness?

11:57:34    15    A.    Yes, sir.

16    Q.    Did you ever meet the owners of Clayton Fitness?

17    A.    No.  If I did, I didn't know it was the owner.

18    Q.    And so you moved to an apartment.  I guess at this

19    point are you getting more politically involved in Johnston

11:57:50    20    County politics?

21    A.    I was helping him.  But I was becoming part of -- I

22    joined the -- the Republican Women's Club.

23    Q.    Why did you join the Republican Women's Club?

24    A.    To become more active in politics.

11:58:06    25    Q.    I'm sorry?

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

```
11:58:06   1            A.    To become more active in politics.

           2            Q.    Would you attend meetings regularly?

           3            A.    Yes, sir.

           4            Q.    At some point did you meet -- did the defendant

.1:58:17   5    want you to record stuff wearing a wire?

           6            A.    Yes, sir.

           7            Q.    When did that happen?

           8            A.    I cannot give you the exact time.  I know it was --

           9    the event, what it was for, was for the Johnston County GOP

.1:58:32  10    convention where they elect a chairman.  And he was not going

          11    to be able to attend, and so he asked me if he could wire me

          12    to hear what was being said and what was going on.

          13            Q.    And so where did you -- and did you agree to do

          14    that?

.1:58:47  15            A.    I did.

          16            Q.    And why did you agree?

          17            A.    Because I loved him and I thought a lot of him.

          18    And I didn't think I was doing anything -- I'll just leave it

          19    at that.  I loved him.  That's why I did it.

.1:58:59  20            Q.    So where did you go to do this?

          21            A.    Smithfield Police Department.

          22            Q.    The police department?

          23            A.    Yes.

          24            Q.    What happened when you got to the Smithfield Police

.1:59:07  25    Department?
```

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 11:59:08 | 1 | A. He told me where to pull up. I pulled up. And he |
| | 2 | tried to do it. It wouldn't work. And then he had to go back |
| | 3 | in and get something, and then he came back out with something |
| | 4 | else, and then gave me like a fob and another cellular device. |
| 11:59:27 | 5 | Q. Okay. When you said that he tried to do it |
| | 6 | originally, do you remember what the object was that he was |
| | 7 | trying to -- |
| | 8 | A. It was -- it was a some sort of key fob handheld |
| | 9 | device. |
| 11:59:35 | 10 | Q. Is that what you eventually used to try to record |
| | 11 | it? |
| | 12 | A. I did. Well, I tried. |
| | 13 | Q. Okay. Prior to that though, when you first went |
| | 14 | there, did he try to wire you up with something else? |
| 11:59:43 | 15 | A. No. Not like a -- not like anything under the |
| | 16 | shirt or anything. |
| | 17 | Q. So the only thing he gave you was a key fob? |
| | 18 | A. And a phone. |
| | 19 | Q. And a phone? |
| 11:59:52 | 20 | A. Yes. |
| | 21 | Q. What did you do with that key fob and phone? |
| | 22 | A. I honestly could not figure out how to work it, but |
| | 23 | I pushed the buttons like he instructed me to, but... |
| | 24 | Q. So it looked like a car key thing? |
| 12:00:05 | 25 | A. Yes. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 12:00:05 | 1 | Q. Like to open a car? |
| | 2 | A. Yes. |
| | 3 | Q. And so did you go to the Johnston County GOP |
| | 4 | Convention? |
| 12:00:12 | 5 | A. I did. |
| | 6 | Q. Did you actually try to record stuff? |
| | 7 | A. I pushed the button, yes, sir. I'm going to be |
| | 8 | honest, I did, but I don't know if -- I still to this day |
| | 9 | don't know if I done anything right for him. I just know I |
| 12:00:26 | 10 | tried to do it. |
| | 11 | Q. And after that convention, what did you do next? |
| | 12 | A. I met with him for dinner at the Buffalo Wild |
| | 13 | Wings. |
| | 14 | Q. Did you give him the fob back? |
| 12:00:38 | 15 | A. I did. |
| | 16 | Q. Did you download stuff? |
| | 17 | A. I didn't. I didn't. No, sir. |
| | 18 | Q. Do you know how to, like, splice recordings? |
| | 19 | A. No, sir. |
| 12:00:47 | 20 | Q. I mean, do you have equipment on your computer to |
| | 21 | make a recording? |
| | 22 | A. No, sir. |
| | 23 | Q. At some point, I guess, did your relationship |
| | 24 | become a little bit less consistent? |
| 12:01:07 | 25 | A. We still talked, but it was maybe like every other |

| | | |
|---|---|---|
| 12:01:11 | 1 | -- I mean, it was like every other day type thing. |
| | 2 | Q. You would talk to the defendant every other day as |
| | 3 | opposed to every day? |
| | 4 | A. Because sometimes it was multiple times a day back |
| 12:01:23 | 5 | then. |
| | 6 | Q. Okay. |
| | 7 | A. And then it went to like maybe every other day. |
| | 8 | Q. And I guess the sexual part of your relationship, |
| | 9 | did that -- did that slow down as well? |
| 12:01:35 | 10 | A. Toward the very end right before it stopped. |
| | 11 | Q. Okay. And eventually, when did it stop? |
| | 12 | A. I believe right around Reagan Day. |
| | 13 | Q. And do you know when Reagan Day is? |
| | 14 | A. I think it's usually in February, March. |
| 12:01:52 | 15 | Q. Was that in -- I'm sorry, go ahead. |
| | 16 | A. I'm trying to think. Like I don't -- but it was |
| | 17 | right before the Reagan Day event. |
| | 18 | Q. Okay. And was that in 2022? |
| | 19 | A. Yes. |
| 12:02:01 | 20 | Q. Okay. We'll get to Reagan Day in a minute. But at |
| | 21 | some point did you, like, go to a bar and become concerned |
| | 22 | that the defendant was watching you? |
| | 23 | A. Yes. That was in Raleigh. I was just with myself |
| | 24 | and my friend Erin and my friend Amy. |
| 12:02:15 | 25 | Q. And do you remember what bar you went to? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Angela Barbour - Direct by Mr. Zellinger

| 12:02:17 | 1 | A. I do not remember the bar because I don't frequent |
| | 2 | Raleigh. We were just trying to have a girls' night out. We |
| | 3 | were going through a rough time. |
| | 4 | Q. And so what happened that night and the next day? |
| 12:02:27 | 5 | A. We went. We had us a good time. We U-ber'd. And |
| | 6 | then we got back, and then I met Ronald. It was either the |
| | 7 | next day or the following. I can't give you the exact time, |
| | 8 | but it was right after that night. I went with him to |
| | 9 | Bojangles to get sweet tea. He asked me how my night out |
| 12:02:46 | 10 | went. I explained everything went great. He asked if I met |
| | 11 | anybody. I said no, nobody. Because I didn't want him to be |
| | 12 | mad at me. And then so that day passed and then we met again, |
| | 13 | had some sweet tea, McDonald's unsweet tea -- excuse me, |
| | 14 | unsweet tea. |
| 12:03:04 | 15 | He said, are you sure you didn't meet anybody? Are |
| | 16 | you positive you didn't? No, nobody to be concerned with. |
| | 17 | And then he goes to turn the radio up, and it's God Bless |
| | 18 | Texas by Little Texas, which is an old 1990s song. And I did |
| | 19 | meet a guy at the bar that night. Nothing happened. It's |
| 12:03:25 | 20 | just the guy told me he was from Texas, and I remember that |
| | 21 | very well. |
| | 22 | Q. Okay. And so -- |
| | 23 | A. At that point I became scared of Ronald Johnson. |
| | 24 | Q. Okay. And so you meet this guy from Texas at the |
| 12:03:35 | 25 | bar, and then the next day Ronald Johnson is asking you if you |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 12:03:39 | 1 | met anybody, and you say no, and then he turns up? |
| | 2 | A. He's like, I love this song, don't you? |
| | 3 | Q. And it was God Bless Texas? |
| | 4 | A. Yes, sir. |
| 12:03:49 | 5 | Q. And how did you -- I mean, at that point how did |
| | 6 | you feel? |
| | 7 | A. I was scared at that point. I was uneasy, let me |
| | 8 | say. Not -- I was very -- I knew something was off at that |
| | 9 | point. |
| 12:04:05 | 10 | Q. And at some point did you become concerned that |
| | 11 | there was a private eye following you? |
| | 12 | A. Yes. I even had my husband -- I had to even get my |
| | 13 | husband to come in, and he brought in somebody that used to |
| | 14 | work for the SBI and took this long wand and wanded my entire |
| 12:04:22 | 15 | apartment. He wanted, you know, to make sure I had no bugs in |
| | 16 | my apartment, because it was -- I was con -- I felt like I was |
| | 17 | constantly being listened to, people knew what I was saying -- |
| | 18 | Ronald knew what I was say. |
| | 19 | Q. Okay. And so were there multiple moments where you |
| 12:04:37 | 20 | felt like you had been recorded? |
| | 21 | A. Yes. |
| | 22 | Q. And did you know how the defendant was recording |
| | 23 | you? |
| | 24 | A. No. |
| 12:04:42 | 25 | Q. To this day do you know how the -- |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

12:04:44   1          A.    Still don't.   I'll ask Jesus that when I get to

           2    heaven.

           3          Q.    Do you know -- I mean, you mentioned this thing

           4    with the Texan and God Bless Texas.   What other things would

12:04:57   5    happen that would make you think the defendant was recording

           6    you?

           7          A.    He knew there were -- well, as far as recording, I

           8    just -- he -- he knew there was a man under my apartment, an

           9    old man that smoked cigarettes.   He knew what was going on in

12:05:08  10    my apartment complex and things that I would never talk to him

          11    about.

          12          Q.    Okay.   And did you at some point become concerned

          13    that he was following you?

          14          A.    I did, yes.

12:05:21  15          Q.    And you know, on phones now there's a mechanism

          16    through which you can share your location.   Would you share

          17    your location with the defendant?

          18          A.    I did not ever do that.   In fact, the person that

          19    came in and wanded my apartment went through my phone and

12:05:32  20    tried to make sure nothing was on my phone, and then he

          21    requested that I take every app off that shared location and

          22    then turn off my location services.

          23          Q.    Okay.   And at this point, like heading into the end

          24    of 2021, are you still like meeting up with the defendant and

12:05:52  25    going to like -- at some point did you go to a movie with the

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 12:05:54 | 1 | defendant in Raleigh? |
| | 2 | A. I did. |
| | 3 | Q. Do you remember what movie that was? |
| | 4 | A. I don't remember the name of it. I remember it was |
| 12:05:59 | 5 | about a superhero comic book, Japanese-type thing. |
| | 6 | Q. The defendant was into, like, comic book superhero |
| | 7 | stuff? |
| | 8 | A. Yes, sir. |
| | 9 | Q. Okay. And at some point did you become aware |
| 12:06:12 | 10 | -- would the defendant talk to you about like his work on the |
| | 11 | school board? Would you all talk about that? |
| | 12 | A. Yea, but he would call me and share all the things |
| | 13 | that happened at the school board meeting. |
| | 14 | Q. Okay. And there was like a scandal with Bennett |
| 12:06:27 | 15 | Jones; do you recall that? |
| | 16 | A. Yes, sir. |
| | 17 | Q. And would you guys talk about that? |
| | 18 | A. Very little, but, yes, we did talk about it. |
| | 19 | Q. And then there was a removal of a school board |
| 12:06:37 | 20 | attorney? |
| | 21 | A. Yes. |
| | 22 | Q. And did you guys talk about that as well? |
| | 23 | A. No. But, I mean, it was -- he didn't talk about |
| | 24 | those things much. |
| 12:06:46 | 25 | Q. And you mentioned you had a falling out with |

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| .2:06:49 | 1 | Allyson Bond? |
| | 2 | A.   Yes, sir. |
| | 3 | Q.   When did that happen? |
| | 4 | A.   Well, I approached her at Reagan Day and asked her |
| .2:06:58 | 5 | to take a photo with me because we were dressed really nice. |
| | 6 | Q.   Okay.  And so at this point, this is -- you said |
| | 7 | Reagan Day is, like, in February of 2022? |
| | 8 | A.   Yes.  Don't hold me to it, but I know it was after |
| | 9 | the first of the year. |
| l2:07:10 | 10 | Q.   And at that Reagan Day event, do you see -- do you |
| | 11 | go -- do you go to political events with the defendant? |
| | 12 | A.   No. |
| | 13 | Q.   At any point during your relationship would you go |
| | 14 | to political events with the defendant? |
| l2:07:22 | 15 | A.   No.  We would show up at different times. |
| | 16 | Q.   Why was that? |
| | 17 | A.   So no one would know we were having relations. |
| | 18 | Q.   Did you tell anybody else about this affair besides |
| | 19 | the close friends that you mentioned, April, Erin, and |
| l2:07:36 | 20 | Brittney? |
| | 21 | A.   I eventually told Kevin Donovan. |
| | 22 | Q.   And do you know when you told Kevin Donovan? |
| | 23 | A.   I do not know the exact time that I told Kevin |
| | 24 | Donovan. |
| l2:07:45 | 25 | Q.   Was it before that Reagan Day event? |

| | | |
|---|---|---|
| 12:07:47 | 1 | A.    Yes, it was. |
| | 2 | Q.    And you mentioned DeVan Barbour.  Was he at that |
| | 3 | Reagan Day event? |
| | 4 | A.    Yes, sir. |
| 12:07:59 | 5 | Q.    Now, prior to Reagan Day, had you had an |
| | 6 | interaction with DeVan Barbour? |
| | 7 | A.    Prior to Reagan Day? |
| | 8 | Q.    Yes. |
| | 9 | A.    Yes, sir. |
| 12:08:10 | 10 | Q.    And is DeVan Barbour somebody you talk to |
| | 11 | frequently? |
| | 12 | A.    Not frequently, no. |
| | 13 | Q.    And so in late 2021, do you remember what happened |
| | 14 | with DeVan Barbour? |
| 12:08:23 | 15 | A.    Are you talking about after the hockey game? |
| | 16 | Q.    Yes, ma'am.  So, I mean, leading up to this time, |
| | 17 | you're not frequently talking to DeVan Barbour? |
| | 18 | A.    No. |
| | 19 | Q.    You would see him at political events? |
| 12:08:36 | 20 | A.    Yes.  The most that we would have conversation |
| | 21 | about in regards to politics was when the lines were changing. |
| | 22 | Some sort of county lines the Commissioner -- something |
| | 23 | dealing with the lines were changing, and we talked about |
| | 24 | those types of things. |
| 12:08:48 | 25 | Q.    And then at some point did DeVan Barbour contact |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 12:08:52 | 1 | you? |
| | 2 | A. He did. |
| | 3 | Q. What time of day was that? |
| | 4 | A. It was in the afternoon initially. I was invited |
| 12:08:59 | 5 | to a hockey game, and then I said no, and I was contacted |
| | 6 | later on that evening. |
| | 7 | Q. Okay. And do you remember what time of night that |
| | 8 | was? |
| | 9 | A. Like after 12. Before 2 or 3:00 in the morning. |
| 12:09:17 | 10 | It was very late. Early morning. |
| | 11 | Q. Okay. So it was late at night? |
| | 12 | A. Yes. Should have been sleeping. |
| | 13 | Q. And can you tell the jury what happened? |
| | 14 | A. D had had too much to drink and he tried to get me |
| 12:09:32 | 15 | to go to his house. I would not. And he kept calling. He |
| | 16 | kept calling. |
| | 17 | Q. And how would he contact you? |
| | 18 | A. Snap call. You can call through Snap, and I didn't |
| | 19 | really know how to use that till that night either. So that |
| 12:09:48 | 20 | was something Ronald didn't even use. So he kept calling |
| | 21 | through Snap, and I answered the first few times and then I |
| | 22 | quit because he wouldn't stop. Bless his heart, he was drunk. |
| | 23 | Q. And how did you know that he was drunk? |
| | 24 | A. He was drunk. You could tell in his voice. And he |
| 12:10:07 | 25 | was saying all kinds of things that were inappropriate for him |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 12:10:11 | 1 | to be a married man. |
| | 2 |      Q.    Okay.  And then what happened next? |
| | 3 |      A.    I quit answering him, and then the last thing I -- |
| | 4 | I laid my head down, and there was a small gap of time where |
| 12:10:24 | 5 | there was nothing, and I was like, thank God, and then my |
| | 6 | phone shows Britnay Barbour. |
| | 7 |      Q.    Who is Britnay? |
| | 8 |      A.    His wife. |
| | 9 |      Q.    So what did you think when you saw that? |
| 12:10:33 | 10 |      A.    Honestly, I said, oh, my God, she knows that he's |
| | 11 | been talking smack to me, and I'm just going to pick up the |
| | 12 | phone and say, let's clear this up.  Bless his heart, he |
| | 13 | was -- |
| | 14 |      Q.    And when you say talking smack to you, what do you |
| 12:10:44 | 15 | mean? |
| | 16 |      A.    He asked me to go to his house and have sex with |
| | 17 | him.  And he was going to turn the cameras off.  He had had a |
| | 18 | crush on me for the longest time, he was very proud at where |
| | 19 | I'd come with politics and that I had a great future.  And |
| 12:10:58 | 20 | just said all the things that somebody has had too much to |
| | 21 | drink would say to somebody. |
| | 22 |      Q.    Okay.  And so you get the call from his wife at |
| | 23 | that point? |
| | 24 |      A.    No, it was not.  Well, it said his wife. |
| 12:11:07 | 25 |      Q.    Sure.  So your phone says -- |

```
12:11:09   1        A.    Britnay Barbour.

           2        Q.    And what happens?

           3        A.    I answered it.  I thought, oh, God, she knows.  And

           4   nothing had really happened.  And it was D.  And it was not a

12:11:19   5   phone call.  It was a Facetime.  And he was standing there

           6   fully nude in his bathroom, fully nude, and I covered my eyes

           7   and put the phone down, and I said, oh, my God, go to bed.

           8        Q.    Okay.  And then did you hang up on him?

           9        A.    (Witness nods.)

12:11:40  10        Q.    Did you tell Ronald Johnson about this?

          11        A.    I did, because I thought it was funny.  I did.

          12        Q.    When did you tell Ronald Johnson about that?

          13        A.    The following day.  And he couldn't talk when I

          14   first initially called him, and he waited for a little bit,

12:11:52  15   and then he called me back because he was too busy to talk

          16   about it.

          17        Q.    And when you told Ronald Johnson about this, what

          18   was his reaction?

          19        A.    Initially, the first conversation it was -- it was

12:12:01  20   laughed off.  And then when I talked to him the next time, he

          21   just wanted to know all what happened.  He made me tell what

          22   happened.

          23        Q.    Okay.  And did you tell him what had happened?

          24        A.    I did, yes, sir.

12:12:14  25        Q.    Okay.  And then what, if anything, did he tell you
```

Angela Barbour - Direct by Mr. Zellinger

12:12:18   1    about DeVan Barbour?

         2         A.    At that point, nothing.

         3         Q.    Nothing.  Okay.  What happened next?

         4         A.    We went on with the relationship, seeing each other

12:12:30   5    and doing all the things.

         6         Q.    Okay.  And did the defendant, Ronald Johnson, ever

         7    ask you or say anything about DeVan Barbour after that?

         8         A.    Well, he accused me and him initially of having an

         9    affair back when he wired me for the GOP event because D came

12:12:49  10    down and sat beside me.  What he didn't realize was, was D and

        11    I were friends.  There was nothing romantic.  Like we joked

        12    and talked.  Our kids went to school together.  And they --

        13    one of them graduated preschool together and kindergarten at

        14    the time together.  We were just mutual friends.

12:13:04  15         Q.    Okay.  At some point did the defendant ask you to

        16    do anything with regard to this?

        17         A.    Months later.

        18         Q.    Months later.  And do you remember what time of

        19    year that was?

12:13:14  20         A.    October.

        21         Q.    What was it that the defendant asked you to do with

        22    DeVan Barbour?

        23         A.    He said, do you think you can catch him doing

        24    anything wrong?  Do you think you can have sex with him and

12:13:23  25    get it caught on video?

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Angela Barbour - Direct by Mr. Zellinger

```
.2:13:31    1          Q.    How did you feel when he --
            2          A.    I laughed about it, because I'm not that kind of
            3   person.  But I guess he thinks I'm that kind of person because
            4   I had an affair.
.2:13:41    5          Q.    And so when he asked you to do that, what did you
            6   tell him?
            7          A.    My initial reaction was no.  You know, I believe we
            8   -- I changed the subject.  I very -- I remember changing the
            9   subject.
l2:13:54   10          Q.    Okay.
           11          A.    But then I told him I would do what I could.  I
           12   remember saying, give me the phone.
           13          Q.    Which phone?
           14          A.    He was going to bring me a phone.
l2:14:06   15          Q.    And so why was he going to bring you a phone?
           16          A.    To use to be able to take pictures of all different
           17   Snaps and anything that he sent me and that it would be --
           18   anything that I could catch him doing.
           19          Q.    Okay.
l2:14:19   20          A.    It was an extra phone.
           21          Q.    Okay.  And so did the defendant eventually bring
           22   you a phone?
           23          A.    Yes, sir.
           24          Q.    Okay.  And what kind of phone was that?
l2:14:28   25          A.    It was just a black cellphone like a -- just a
```

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 12:14:33 | 1 | black cellphone. |
| | 2 | MR. ZELLINGER: Your Honor, if I can two minutes? |
| | 3 | THE COURT: Yes. |
| | 4 | MR. ZELLINGER: Your Honor, may I approach the |
| 12:15:15 | 5 | witness? |
| | 6 | THE COURT: Yes, sir. |
| | 7 | (State's Exhibit Number 12 marked for |
| | 8 | identification.) |
| | 9 | Q. I hand you what's been marked for identification |
| 12:15:22 | 10 | purposes as State's Exhibit 12. Do you see an object inside |
| | 11 | this bag? |
| | 12 | A. I see one. |
| | 13 | Q. Okay. And is this -- is this commonly referred as |
| | 14 | a TracFone? |
| 2:15:35 | 15 | A. I don't -- that I don't know. |
| | 16 | Q. Okay. You don't know. Okay. But does this appear |
| | 17 | to be -- |
| | 18 | A. That's it. Because, you know -- I mean, unless |
| | 19 | you've got another one that looks just like it. It had this |
| 2:15:43 | 20 | sticker on it and the LG logo. I tried to figure out where |
| | 21 | this cellphone came from. |
| | 22 | Q. Okay. And is this the phone that the defendant |
| | 23 | gave you? |
| | 24 | A. Yes, sir. |
| 2:15:52 | 25 | Q. Why did he give you a phone? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 12:15:53 | 1 | A.    To see what I could catch DeVan Barbour doing, |
| | 2 | anything inappropriate. |
| | 3 | THE COURT:   Ladies and gentlemen, I told you |
| | 4 | because of the weather and because schools are out we're going |
| 12:16:09 | 5 | to recess early today.  We will be back at 9:30 Monday |
| | 6 | morning.  Just make sure that you leave your notes. |
| | 7 | Do you want them keep them here or take them back? |
| | 8 | SHERIFF:   They stay on the seat. |
| | 9 | THE COURT:   Just leave your notes in the seat. |
| 12:16:34 | 10 | Just as a -- I don't think you guys know this, but they are |
| | 11 | going to need this courtroom for something else.  This is the |
| | 12 | bigger of the two courtrooms.  We're going to be in the |
| | 13 | smaller courtroom, but we'll be back here Tuesday. |
| | 14 | So when you come in here Monday, plan to be in a |
| 12:16:49 | 15 | different location. |
| | 16 | I want to remind you since we have a weekend break |
| | 17 | before this testimony continues, those same rules.  Please do |
| | 18 | not talk about the case among yourselves.  Do not let anybody |
| | 19 | else speak with you about it.  Do not do anything on your own |
| 12:17:02 | 20 | to try to learn anything more about that.  Don't Google |
| | 21 | anything, watch any news, drive by any places you might have |
| | 22 | heard testimony about.  Do not form or express an opinion to |
| | 23 | anybody about this.  In the event you do see somebody |
| | 24 | connected to this case, please don't communicate to them about |
| 12:17:21 | 25 | anything at all. |

State v Ronald Johnson                    January 10, 2025

| | |
|---|---|
| 12:17:23 | 1 |

12:17:23   1          Thank you for your patience.  I hope you guys have
           2    a great weekend.  We'll see you all at 9:30 on Monday.  Have a
           3    good weekend.
           4               (Jury excused.)
12:18:03   5          THE COURT:  You can step down.
           6               (Witness steps down.)
           7          THE COURT:  Is there anything?  I've just got a
           8    couple sort of administrative announcements before we break
           9    for you, just things to consider.
12:18:24  10          Anything we need to get on the record from either
          11    side before the weekend?
          12          MR. ZELLINGER:  Your Honor, I just wanted to
          13    memorialize.  I think we discussed this in chambers.
          14    Judge Holcombe had this advisory opinion he wanted us to see.
12:18:40  15    I asked him to e-mail it to me via text.  I haven't received
          16    it, but when I do, I'll provide it to the Court.  I don't
          17    anticipate him testifying on Monday, so I think we can
          18    reevaluate it Tuesday.
          19          THE COURT:  That's the one thing I'll ask.  I do
12:18:53  20    know the opinion is out there.  I know we probably need to
          21    review it and then have some discussion how we need to
          22    proceed.
          23          Also, and I apologize for the inconvenience, but we
          24    have to move everything out of this courtroom, but we will be
12:19:08  25    back in here on Tuesday.

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 12:19:11 | 1 | We did talk some yesterday about the proposed draft |
| | 2 | of that jury instruction for failing to discharge duties. |
| | 3 | Again, it doesn't have to be Monday, but I just want to plant |
| | 4 | that seed and maybe have something for you guys to maybe think |
| 12:19:28 | 5 | through and work on. |
| | 6 | The other thing I did want to say is earlier this |
| | 7 | week, you know, we addressed this motions to suppress.  I |
| | 8 | don't want those orders to get old.  I don't want them to go |
| | 9 | past the conclusion of this trial.  So what I would ask is if |
| 12:19:46 | 10 | the State can maybe draft a proposal, give it to Mr. Tyndall, |
| | 11 | let him look at it and give it to the Court so we can look at |
| | 12 | that.  That's something we might want to review and maybe have |
| | 13 | some discussion on it.  At least I want to get that in the |
| | 14 | works, but my goal is to get that entered prior to the |
| 12:20:03 | 15 | completion of this trial. |
| | 16 | MR. ZELLINGER:  We'll take care of that, Your |
| | 17 | Honor. |
| | 18 | THE COURT:  Anything else we need to consider |
| | 19 | before we recess? |
| 12:20:11 | 20 | MR. TYNDALL:  I don't think so, Your Honor. |
| | 21 | THE COURT:  All right.  Everybody have a good |
| | 22 | weekend and be safe.  Thank you very much. |
| | 23 | (Adjourned at 12:20 p.m.) |
| | 24 | (END OF VOLUME 5 OF 10.) |
| | 25 | |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

IN THE NORTH CAROLINA GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
JOHNSTON COUNTY

* * * * * * * * * * * * * * * * * * *

STATE OF NORTH CAROLINA,   : File No. 23 CR 003494-500

    versus          :

RONALD LEE JOHNSON, JR.,
         Defendant.   :   Pages:   325-548

* * * * * * * * * * * * * * * * * * *
TRANSCRIPT VOLUME 6 OF 10

Monday, January 13, 2025

    Transcript of proceedings in the General Court of

Justice, Superior Court Division, Johnston County, 207 East

Johnston Street, Smithfield, North Carolina, at the January 6,

2025, Criminal Session, before the Honorable Joseph

Crosswhite, Judge Presiding.

APPEARANCES:

    Benjamin O. (Boz) Zellinger
    Arneatha James
    Special Deputy Attorney General
    Raleigh, NC 27603
    On Behalf of the State

    Amos G. Tyndall
    Valentin J. Bruder
    Parry Law
    Chapel Hill, NC
    On Behalf of the Defendant

---

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter
N.C. Administrative Office of the Courts
denise.stclair@nccourts.org

INDEX

WITNESSES

ON BEHALF OF THE STATE

ANGELA BARBOUR

Direct by Mr. Zellinger                       331
Cross by Mr. Tyndall                          416
Voir Dire by Mr. Tyndall                      420
Voir Dire by Mr. Zellinger                    423
Voir Dire by Mr. Tyndall                      424
Voir Dire by Mr. Zellinger                    424
Cross by Mr. Tyndall                          425
Redirect by Mr. Zellinger                     473
Cross by Mr. Tyndall                          491
Redirect by Mr. Zellinger                     495
Recross by Mr. Tyndall                        496

CHRIS SULLIVAN

Direct by Ms. James                           500

KEVIN DONOVAN

Direct by Ms. James                           505
Cross by Mr. Tyndall                          540

EXHIBITS

ON BEHALF OF THE STATE

| No. | Description | ID | EVD |
|-----|-------------|-----|-----|
| 2 | 50C restraining order | 361 | 363 |
| 3 | 50B restraining order | 366 | 366 |
| 5 | Document of phone contact between defendant and Angela Barbour | 368 | |
| 5A | Document by Angela Barbour's texts with defendant minus columns | 369 | 370 |
| 6 | Screenshot | 387 | 388 |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| No. | Description | ID | EVD |
|---|---|---|---|
| 8 | Snapchat conversation | 389 | 391 |
| 9 | Photograph of phone | 393 | 393 |
| 11 | Donovan's Immunity agreement | 519 | 520 |
| 12 | Phone | 393 | |
| 44 | Angela Barbour's phone number | 397 | 398 |
| 45 | Text exchanges | 398 | 399 |
| 46 | Text exchange | 398 | 399 |
| 47 | Ronald Johnson's contact information | 399 | 400 |
| 48 | Angela Barbour's Facebook post | 400 | 401 |
| 49 | Angela Barbour's texts with defendant | 400 | 401 |
| 50 | Angela Barbour's texts with defendant | 400 | |
| 51 | Angela Barbour's texts with defendant | 401 | 401 |
| 52 | Angela Barbour's texts with defendant | 401 | 401 |

ON BEHALF OF THE DEFENDANT

| No. | Description | ID | EVD |
|---|---|---|---|
| 7 | Transcript and audio recording 2022.04.13 | 421 | |
| 7 | Transcript of recording | 499 | |
| 7A | Audio of recording | 499 | |
| 8 | Text messages | 428 | |
| 9 | Text messages | 434 | |
| 10 | Facebook posts by Angela Barbour | 452 | |
| 11 | Text messages | 457 | |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

(Court convenes at 9:30 a.m.)

THE COURT: While we're waiting on the last juror anything to get on the record? Anything that came up over the weekend that we need to discuss?

09:31:57 MR. ZELLINGER: Your Honor, with this witness who's on the witness stand, the State intends on playing some recordings that she's previously heard and identified as being her voice. Inherently we would have to play those recordings for her to hear them, and then inevitably the jury would hear them.

09:32:18 I think that -- the recordings are going to come later in the trial through a different means, but I didn't know if the defendant had a specific objection to that. And if so, I thought we could play the recordings outside the presence of the jury so that the witness can hear that, and then we can ask questions about them later.

09:32:28 MR. TYNDALL: The objection we would have is pursuant to the pretrial motion. I don't think we have an objection to her hearing them in front of the jury if it's for -- I assume it's for illustrative purposes that --

09:32:43 MR. ZELLINGER: At this point -- I'm sorry. At this point it would be for the witness to identify her voice on them. These would be admitted for substantive purposes. It's just that she's not the one who had these recordings. They were acquired later on in the investigation. So it's

09:33:02

| | | |
|---|---|---|
| 09:33:05 | 1 | basically just like with the phone, to have her identify it |
| | 2 | and then it come in later. |
| | 3 | THE COURT: Okay. So just identify it now, but not |
| | 4 | to admit it now; is that right? |
| 09:33:12 | 5 | MR. ZELLINGER: Correct. |
| | 6 | MR. TYNDALL: I don't really have a problem with |
| | 7 | that. I mean, other than subject to our objection based on |
| | 8 | the pretrial motions, but I think they were discovered on a |
| | 9 | device or something. |
| 09:33:25 | 10 | MR. ZELLINGER: Correct. |
| | 11 | THE COURT: Okay. All right. So when you say -- |
| | 12 | MR. TYNDALL: It's one of the search warrants. I'm |
| | 13 | not -- you know, following the trail, it's somewhat difficult, |
| | 14 | but I think whether it's one of the early ones or one of the |
| 09:33:44 | 15 | ones you ruled on, we've got to renew our objection. So we'll |
| | 16 | will do that. It will be very subtle, but we'll do that and |
| | 17 | then just let them move on, as far as I'm concerned. |
| | 18 | THE COURT: Okay. Yes, sir. That would be fine. |
| | 19 | I've been told that we do have all our jurors. |
| 09:34:08 | 20 | Are you ready for Ms. Barbour to come on back up? |
| | 21 | MR. ZELLINGER: Yes. Ma'am, if you will come back |
| | 22 | up there. |
| | 23 | Your Honor, there was one other thing. Ms. Barbour |
| | 24 | alerted us that she received a text message over the weekend. |
| 09:34:21 | 25 | Her attorney and her alerted us that she received a text |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 09:34:25 | 1 | message this weekend from a person named Dale Lands, and also |
| | 2 | an individual who I believe has been in the courtroom reached |
| | 3 | out to her on Facebook whose name is Requan Hardy.  I would |
| | 4 | just ask that those folks not be in the courtroom while she |
| 09:34:47 | 5 | testifies. |
| | 6 | I don't believe Mr. -- I think Mr. Hardy was in |
| | 7 | here at some point during the trial, but he's not a witness. |
| | 8 | I don't believe he's a witness in the case, but I think it's |
| | 9 | inappropriate to reach out to a witness while she's on the |
| 09:35:00 | 10 | witness stand while you're in the courtroom.  So I just ask to |
| | 11 | bar Mr. Hardy and Mr. Lands from the courtroom while the |
| | 12 | witness is testifying. |
| | 13 | THE COURT:  Okay.  And Ms. Barbour, you haven't |
| | 14 | seen them this morning?  They are not in the courtroom now; |
| 09:35:13 | 15 | right? |
| | 16 | THE WITNESS:  No, sir.  I've not looked around |
| | 17 | though, sir. |
| | 18 | THE COURT:  Okay.  All right. |
| | 19 | Ms. Barbour, just while you're coming up here, when |
| 09:35:23 | 20 | the jury gets in here, I'm just going to remind you that you |
| | 21 | are still under oath.  Okay? |
| | 22 | THE WITNESS:  Yes, sir. |
| | 23 | THE COURT:  Sheriff, if we can go ahead and bring |
| | 24 | them in. |
| 09:35:30 | 25 | (Jury enters.) |

| | | |
|---|---|---|
| 09:35:30 | 1 | ANGELA BARBOUR, |
| | 2 | having been called as a witness for the State and having been |
| | 3 | previously sworn, testified as follows: |
| | 4 | THE COURT: Everybody, good morning. I hope you |
| 09:37:53 | 5 | all had a good weekend. While you're getting settled, take a |
| | 6 | look to make sure you have your notes and nobody else's notes. |
| | 7 | I believe we're all ready. |
| | 8 | Ms. Barbour, I want to remind you, you are still |
| | 9 | under oath from last Friday. |
| 09:38:06 | 10 | THE WITNESS: Yes, sir. |
| | 11 | THE COURT: Mr. Zellinger, whenever you are ready. |
| | 12 | MR. ZELLINGER: Thank you. |
| | 13 | DIRECT EXAMINATION BY MR. ZELLINGER: |
| | 14 | Q. Ms. Barbour, I believe where we left off on Friday |
| 09:38:10 | 15 | I had shown you a phone; do you recall that? |
| | 16 | A. Yes, sir. |
| | 17 | Q. And the phone was State's Exhibit 12, and I have it |
| | 18 | here in my hand. Do you recognize that phone? |
| | 19 | A. Yes, sir. |
| 09:38:18 | 20 | Q. How did you come to acquire this phone? |
| | 21 | A. Mr. -- Ronald brought it to my apartment and gave |
| | 22 | it to me. |
| | 23 | Q. Okay. And why did he bring that phone to you? |
| | 24 | A. For purposes of catching DeVan Barbour doing |
| 09:38:33 | 25 | something inappropriate with me. |

Angela Barbour - Direct by Mr. Zellinger

| 09:38:35 | 1 | Q. And was this -- when did this occur? |
| | 2 | A. At the time that he brought the phone? |
| | 3 | Q. Yes, ma'am. |
| | 4 | A. I believe it was during the month of April -- I'm |
| 09:38:46 | 5 | sorry, October. My apologies. |
| | 6 | Q. October of 2021? |
| | 7 | A. Yes. |
| | 8 | Q. And you told this jury about -- that DeVan Barbour |
| | 9 | had reached out to you at some point late at night; do you |
| 09:38:57 | 10 | recall that? |
| | 11 | A. Yes, sir. |
| | 12 | Q. And that was in -- when did that occur? |
| | 13 | A. That occurred during the month of July. |
| | 14 | Q. Okay. That occurred, I believe -- did you earlier |
| 09:39:10 | 15 | testify that it happened in October? |
| | 16 | A. If I did -- I'm pretty sure that the hockey game |
| | 17 | was in July, and the phone came months later in October. |
| | 18 | Q. Okay. How much later -- after you had this |
| | 19 | interaction with Mr. Barbour, how much later was it that the |
| 09:39:32 | 20 | defendant brought you the phone? |
| | 21 | A. It was a few months later. |
| | 22 | Q. It was a few months later. |
| | 23 | A. Yes. He spoke to me about it right afterwards. |
| | 24 | Q. Okay. And what did he say? |
| 09:39:39 | 25 | A. Do you think I can catch DeVan doing something |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

09:39:43   1    inappropriate.

           2         Q.   Okay.  Did he say why he wanted to catch him doing

           3    something inappropriate?

           4         A.   It's good to have leverage on people.

09:39:49   5         Q.   Did you ever learn if he had leverage on other

           6    people?

           7         A.   He didn't go into a lot of details, but he shared

           8    with me he had inappropriate pictures of one individual.

           9         Q.   And was that somebody in politics in Johnston

09:40:01  10    County?

          11         A.   I believe so.  He was with Johnston County school

          12    system.

          13         Q.   Did the defendant take pride -- I mean, did he ever

          14    mention to you anything about removing people from office?

09:40:21  15         A.   Yes.

          16         Q.   Okay.  And who was it that he talked about removing

          17    from office?

          18         A.   Doc Bracy, Mr. Renfrow.

          19         Q.   Did he ever say anything to you about Jimmy

09:40:34  20    Lawrence?

          21         A.   Yes.  But he didn't really talk about that.

          22         Q.   Okay.  And Mr. Lawrence was the school board

          23    attorney; was that correct?

          24         A.   Yes.

09:40:43  25         Q.   At some point did he brag about having people

| | | |
|---|---|---|
| 09:40:47 | 1 | removed from the school system? |
| | 2 | A.    He did it in a way that it was not -- I don't want |
| | 3 | to say it was bragging.  It was just the simple fact that he |
| | 4 | tried to just use it to tell me about it.  I guess to show his |
| 09:41:06 | 5 | power.  I guess that's bragging. |
| | 6 | Q.    Okay.  And when you received this phone from the |
| | 7 | defendant, State's Exhibit 12, what, if anything, did you do |
| | 8 | with it? |
| | 9 | A.    It stayed in my apartment. |
| 09:41:25 | 10 | Q.    Okay.  Did you ever use it? |
| | 11 | A.    No. |
| | 12 | Q.    What else did the defendant ask you to do with |
| | 13 | regard to DeVan Barbour? |
| | 14 | A.    He wanted me to see if I could catch him, take all |
| 09:41:35 | 15 | the pictures of anything that he sent me, and try to have sex |
| | 16 | with him if I could get it on camera. |
| | 17 | Q.    So the defendant asked you to have sex with DeVan |
| | 18 | Barbour? |
| | 19 | A.    Yes, and if I could get it on camera. |
| 09:41:48 | 20 | Q.    And at this point were you in a relationship with |
| | 21 | the defendant? |
| | 22 | A.    Yes. |
| | 23 | Q.    You testified yesterday that you told each other |
| | 24 | you loved each other? |
| 09:41:54 | 25 | A.    Yes, sir. |

| | | |
|---|---|---|
| 09:41:55 | 1 | Q.   How did that make you feel? |
| | 2 | A.   Needed, wanted, happy.  My life at home was not |
| | 3 | doing well. |
| | 4 | Q.   When the defendant asked to you have sex with DeVan |
| 09:42:07 | 5 | Barbour, how did that make you feel? |
| | 6 | A.   I thought it was a joke initially.  I didn't really |
| | 7 | take -- I was hoping it was not true.  But you have to realize |
| | 8 | I was in love with him, and I didn't think he would honestly |
| | 9 | mean for me to do that. |
| 09:42:22 | 10 | Q.   Okay.  Did he ever ask you if you acquired anything |
| | 11 | with this phone? |
| | 12 | A.   He did. |
| | 13 | Q.   What specifically do you recall him telling you. |
| | 14 | A.   I told him -- I didn't -- he didn't give me the pin |
| 09:42:36 | 15 | number, and then we tried to figure out how to get the pin |
| | 16 | number, and I could never get in the phone so I never did |
| | 17 | anything with it. |
| | 18 | Q.   Did you ever seek to record DeVan Barbour? |
| | 19 | A.   No. |
| 09:42:51 | 20 | Q.   Did you ever reach out to DeVan Barbour to make |
| | 21 | that happen? |
| | 22 | A.   No. |
| | 23 | Q.   Eventually did your relationship with the defendant |
| | 24 | come to an end? |
| 09:43:02 | 25 | A.   Yes. |

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 09:43:02 | 1 | Q. Okay. And when did that happen? |
| | 2 | A. We started -- that was in the beginning of 2022. I |
| | 3 | would say around January or February right prior to Reagan |
| | 4 | Day. |
| 09:43:15 | 5 | Q. And what happened? |
| | 6 | A. As in the ending of the relationship? |
| | 7 | Q. Yes, ma'am. |
| | 8 | A. We just stopped seeing each other. |
| | 9 | Q. I guess, did you go to the Reagan Day event? |
| 09:43:27 | 10 | A. I did. |
| | 11 | Q. What happened when you went to the Reagan Day |
| | 12 | event? |
| | 13 | A. I saw he was sitting beside my friend Ally. I went |
| | 14 | and tried to speak with Ally. I did not talk to him because |
| 09:43:37 | 15 | we had cut off ties, and then that's when she started acting |
| | 16 | weird and didn't want to take a picture with me. I had a |
| | 17 | conversation with Ally to figure out what was going on, and |
| | 18 | then I went and sat at my table because I knew something was |
| | 19 | off. Something wasn't right. |
| 09:43:52 | 20 | Q. Did you have a normal practice of taking pictures |
| | 21 | with your friends? |
| | 22 | A. I have tons of she and I together. |
| | 23 | Q. You would take, like, selfies all the time? |
| | 24 | A. That's why I felt it was weird she didn't want to |
| 09:44:04 | 25 | take a selfie with me. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

09:44:06   1          Q.    This is Allyson Bond; is that correct?

           2          A.    Yes, sir.

           3          Q.    When you had gone to Charlotte with the defendant,

           4    one time you went with Allyson Bond as well; is that correct?

09:44:15   5          A.    Yes.

           6          Q.    Did anything unusual happen that night when you

           7    went to the Charlotte with Allyson Bond and the defendant?

           8          A.    I had a lot to drink so I -- I passed out, and then

           9    the next morning it was very odd.  She kind of treated me a

09:44:34  10    little differently, but you got to understand that she just

          11    said she was tired and stayed up all night.  And then later

          12    she said that she and Ronald stayed up all night talking.

          13          Q.    And then fast forward.  When is Reagan Day?

          14          A.    I think I said the other day it was in February,

09:44:48  15    but I'm pretty sure it was warmer.  It was maybe March or

          16    April.  It's in that timeframe.  I cannot -- that was my very

          17    first one.  I have never been.  So it's not something I attend

          18    every year.

          19          Q.    Just clear, this is like a Reagan Day celebration;

09:45:02  20    is that right?

          21          A.    Yes.  A Republican event.

          22          Q.    And so you don't know if the event was on Reagan

          23    Day or if --

          24          A.    No.  I don't think so.  That's just what they call

09:45:11  25    it.

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 09:45:12 | 1 | Q.   Okay.  But you recall it being a little bit warmer |
| | 2 | out than in February? |
| | 3 | A.   Yes. |
| | 4 | Q.   So then when you go to this event, you just see |
| 09:45:22 | 5 | Allyson Bond sitting with the defendant? |
| | 6 | A.   Beside him, yes, sir. |
| | 7 | Q.   At some point -- well, let me ask you, what does |
| | 8 | Allyson Bond do for a living? |
| | 9 | A.   She's a teacher. |
| 09:45:40 | 10 | Q.   And when you -- when your relationship started |
| | 11 | to -- I guess you said your relationship started to sort of |
| | 12 | end prior to that happening.  Did you continue to see the |
| | 13 | defendant after that happened? |
| | 14 | A.   After it ended? |
| 09:45:58 | 15 | Q.   After that Reagan Day event or wherever it was |
| | 16 | where you saw is Allyson Bond. |
| | 17 | A.   No.  Because I would make sure I would reach out to |
| | 18 | Dale Lands to make sure he was not present where I was at or |
| | 19 | another friend I would ask to make sure he was not there. |
| 09:46:11 | 20 | Q.   Okay.  And why was? |
| | 21 | A.   I didn't want to be around him. |
| | 22 | Q.   Why? |
| | 23 | A.   Because he scared me. |
| | 24 | Q.   Okay.  Why did he scare you? |
| 09:46:21 | 25 | A.   At that point I knew that somehow I was being |

| | | |
|---|---|---|
| 09:46:24 | 1 | listened to.  He knew things that were going on, that there |
| | 2 | was no way that only -- he had to be snooping on me to figure |
| | 3 | out what was going on.  That's why he scared me. |
| | 4 | Q.    Do you remember a time where you went and met with |
| 09:46:38 | 5 | an individual named Owen Phillips? |
| | 6 | A.    I do. |
| | 7 | Q.    And what time of year was that? |
| | 8 | A.    I mean, if I'm going to tell the truth, I honestly |
| | 9 | do not know the exact date I met with him, but it was maybe in |
| 09:46:50 | 10 | the summer because I was out of school. |
| | 11 | Q.    This is like summer of 2021 or? |
| | 12 | A.    Yes.  Yes.   '22. |
| | 13 | Q.    It's 2021? |
| | 14 | A.    2021, yes. |
| 09:47:02 | 15 | Q.    So you sort of break up or end your relationship |
| | 16 | with the defendant some time in 2022; is that correct? |
| | 17 | A.    Yes.  At the very beginning 2021 -- end of 2021 |
| | 18 | because I had started befriending somebody else, and, yes, so |
| | 19 | it was during that time.  I'm well aware of that. |
| 09:47:18 | 20 | Q.    Okay.  So this incident with Owen Phillips is from |
| | 21 | earlier? |
| | 22 | A.    Earlier. |
| | 23 | Q.    Okay.  And who is Owen Phillips? |
| | 24 | A.    Owen Phillips is someone I did not know at the |
| 09:47:25 | 25 | time, but it's Ronald Johnson's best friend -- or was Ronald |

| | | |
|---|---|---|
| 09:47:28 | 1 | Johnson's best friend. |
| | 2 |     Q.   At some point did you come into contact with Owen |
| | 3 | Phillips that summer? |
| | 4 |     A.   He did.  He tried to reach out to me to tell me to |
| 09:47:36 | 5 | be careful, that he feared for my safety. |
| | 6 |     Q.   Did you actually meet with him? |
| | 7 |     A.   Yes.  He actually wanted to come to my apartment. |
| | 8 | I said no, because I did not want any men at my apartment, and |
| | 9 | I wanted to meet with him somewhere public so we went to a |
| 09:47:51 | 10 | park. |
| | 11 |     Q.   Do you remember what park you went to? |
| | 12 |     A.   I don't know the name.  I know it was near the |
| | 13 | apartment complex that I lived at. |
| | 14 |     Q.   Was this before or after you broke up with the |
| 09:48:01 | 15 | defendant? |
| | 16 |     A.   This was -- we were still -- no, this was after -- |
| | 17 | sorry.  This is after. |
| | 18 |     Q.   So this was after you broke up with the defendant? |
| | 19 |     A.   Yes.  We were still seeing each other sexually. |
| 09:48:17 | 20 |     Q.   Oaky.  So you run into Allyson Bond and the |
| | 21 | defendant at the -- |
| | 22 |     A.   At Reagan Day. |
| | 23 |     Q.   -- Reagan Day event.  At that point your |
| | 24 | relationship is over; is that right? |
| 09:48:28 | 25 |     A.   It went to 2022.  If I'm not mistaken, that's 2022. |

| | | |
|---|---|---|
| 09:48:34 | 1 | Q. Okay. So the summer of 2022? |
| | 2 | A. Yes. |
| | 3 | Q. This incident with Owen Phillips was in the summer |
| | 4 | of 2022? |
| 09:48:40 | 5 | A. Yes. |
| | 6 | Q. Were you still sexually active with the defendant |
| | 7 | in the summer of 2022? |
| | 8 | A. No. That stopped in February of 2022. |
| | 9 | Q. When the Reagan Day event happened, did you ever |
| 09:48:50 | 10 | have sex with the defendant again after that? |
| | 11 | A. No. No, sir. |
| | 12 | Q. So 2022 when you met with Owen Phillips, do you |
| | 13 | remember what park you met with him? Where you met with him? |
| | 14 | A. It was the park near my apartment. I just don't |
| 09:49:03 | 15 | know the name of it. I'm sorry. |
| | 16 | Q. What did you do when you got there? |
| | 17 | A. We sat in his vehicle, and we -- he tried to tell |
| | 18 | me that -- |
| | 19 | MR. TYNDALL: I'm going to object to what he says |
| 09:49:16 | 20 | to her. If she wants to talk about what she did, that's fine. |
| | 21 | THE COURT: I'll sustain that. |
| | 22 | MR. ZELLINGER: I believe Owen Phillips is going to |
| | 23 | testify. |
| | 24 | Q. Without going into what they said, did you talk |
| 09:49:26 | 25 | with Owen Phillips? |

09:49:27  1          A.   I did.

         2          Q.   Did anything else happen after you talked?

         3          A.   While we were having a conversation --

         4               MR. ZELLINGER:  Hold on one second.  I think we

09:49:35  5     have a web issue.

         6          Q.   So you were having a conversation Owen Phillips in

         7     this park; is that correct?

         8          A.   Yes, sir.

         9          Q.   What happened then?

09:50:09 10          A.   His phone kept going off over and over again

        11     constantly, and then I turned my phone off because Ronald

        12     taught me that.  If you don't want to be followed, just turn

        13     it off.  He had his devices on and he kept getting pinged and

        14     texts and phone calls and Snapchats from Ronald Johnson the

09:50:27 15     entire time he was trying to talk to me.

        16          Q.   And how did that make you feel?

        17          A.   Scared.  I knew at that point something -- there's

        18     no -- I don't believe in coincidences anymore.

        19          Q.   Does the defendant ever talk to you about phones or

09:51:07 20     anything along those lines, about using phones, tracking

        21     people, anything about that?

        22          A.   I only got little bits.  He -- I can only say he

        23     shared with me.  He told me way more than he told his wife

        24     about stuff.  But yes, he talked with me very sparingly.  I

09:51:25 25     got bits and pieces.

| | | |
|---|---|---|
| 09:51:26 | 1 | Q. What, if anything, would he tell you about phones |
| | 2 | or using phones or hiding phone numbers? |
| | 3 | A. He never talked about -- he talked about having |
| | 4 | extras, and I knew that because I had one. |
| 09:51:40 | 5 | Q. And that extra phone, was this State's Exhibit 12? |
| | 6 | A. Yes. |
| | 7 | Q. And you never used this; is that correct? |
| | 8 | A. No. |
| | 9 | Q. Did you see the defendant using multiple phones? |
| 09:51:48 | 10 | A. Yes. But typically it was -- they looked the same. |
| | 11 | But you could -- there were two different phones. There was |
| | 12 | more than one phone at a time. |
| | 13 | Q. When your relationship with the defendant started |
| | 14 | to end, how would you describe your demeanor as that was |
| 09:52:07 | 15 | happening? |
| | 16 | A. I was sad. |
| | 17 | Q. Were you upset? |
| | 18 | A. I was. |
| | 19 | Q. At some point did you tell folks you'd been having |
| 09:52:17 | 20 | an affair with the defendant? |
| | 21 | A. Not until it was brought to my attention by someone |
| | 22 | else. I mean, my friends knew. My closest circle of friends |
| | 23 | knew. And then I told Kevin Donovan because I was concerned |
| | 24 | for Kevin. |
| 09:52:32 | 25 | Q. At some point -- I guess, did you tell a group of |

09:52:37  1    folks at like a Republican women's meeting?

2         A.   At a Republican women's meeting?

3         Q.   Yes.   Did you ever tell a group of folks that you

4    were having an affair?

09:52:47  5    A.   At a CAAG meeting.

6         Q.   At a CAAG meeting.

7         A.   That was only because Kevin Donovan yelled at me

8    and embarrassed me in front of the entire group and told me I

9    needed to say what I needed to say, and so I said it.

09:52:57  10   Q.   Okay.

11        A.   Because he demanded proof.   He kept asking for

12   proof.

13        Q.   So how many people were at that meeting?

14        A.   Ten, 12, I mean, at the most.

09:53:11  15   Q.   What is CAAG?

16        A.   I can never tell you what it stands for.   I always

17   get it mixed up, but it is an organization to hold citizens

18   accountable for -- you know, holding the government

19   accountable for their actions.

09:53:24  20   Q.   Okay.   So is it kind of like a subset of the

21   Republican Party here in Johnston County?

22        A.   Yes, sir.

23        Q.   At some point did you have -- did you ever go to

24   dinner with a former student; do you recall that?

09:53:37  25   A.   I did.

| | | | |
|---|---|---|---|
| 09:53:38 | 1 | Q. | Do you remember when it was? |
| | 2 | A. | That was before October because he was getting |
| | 3 | | married in October, and he was meeting me to give me a wedding |
| | 4 | | invitation, as to which I kept for the longest time. |
| 09:53:53 | 5 | Q. | Okay. |
| | 6 | A. | I may still have it. |
| | 7 | Q. | So you met with a former student.  And was this |
| | 8 | | person like an adult at this point? |
| | 9 | A. | Yes.  He was getting married, yes. |
| 09:54:00 | 10 | Q. | How long had it been since you had taught the |
| | 11 | | student? |
| | 12 | A. | A long time.  I taught him at the very beginning of |
| | 13 | | my sixth grade career. |
| | 14 | Q. | He had grown up and he was getting married? |
| 09:54:10 | 15 | A. | Yes. |
| | 16 | Q. | You met and had dinner with him? |
| | 17 | A. | I did. |
| | 18 | Q. | He gave you an invitation to his wedding? |
| | 19 | A. | He did. |
| 09:54:15 | 20 | Q. | Presumably because you were an influential force on |
| | 21 | | his life? |
| | 22 | A. | That's what he said. |
| | 23 | Q. | Did the defendant ever talk to you about Owen |
| | 24 | | Phillips? |
| 09:54:35 | 25 | A. | He did toward the middle, ending of our friendship. |

| | | |
|---|---|---|
| 09:54:38 | 1 | He tried to hook us up which was odd because we were seeing |
| | 2 | each other. |
| | 3 | Q. So what happened there? |
| | 4 | A. He supposedly gave me his Snapchat, but I'm still |
| 09:54:48 | 5 | to this day not sure that he initially gave me Owen's |
| | 6 | Snapchat. I can't say that with 100 percent accuracy. Owen |
| | 7 | said it was not his Snapchat, and it was wrong snapping me as |
| | 8 | a -- |
| | 9 | Q. Okay. When you said you were seeing him, you never |
| 09:55:00 | 10 | dated Owen Phillips. |
| | 11 | A. No. |
| | 12 | Q. You said this was when you were -- you met around |
| | 13 | the time you met with the Owen Phillips in a park; is that |
| | 14 | correct? |
| 09:55:08 | 15 | A. Yes. |
| | 16 | Q. And so the defendant gave you Owen Phillips' |
| | 17 | Snapchat contact; is that correct? |
| | 18 | A. Yes. |
| | 19 | Q. And what did he tell you when he gave it to you? |
| 09:55:17 | 20 | A. That I had to start dating sometime. |
| | 21 | Q. At this point did you have any interest in dating |
| | 22 | Owen Phillips at this time? |
| | 23 | A. No. |
| | 24 | Q. Did you ever reach out to that Snapchat? |
| 09:55:27 | 25 | A. No. The Snapchat reached out to me. |

| | | |
|---|---|---|
| 09:55:30 | 1 | Q. What did it send you? |
| | 2 | A. It was very pornographic messages, as to which I |
| | 3 | did not respond to those. |
| | 4 | Q. Okay. So you got some perverse stuff -- |
| 09:55:43 | 5 | A. I did. |
| | 6 | Q. -- from this Snapchat. And did you ever find out |
| | 7 | if that was Owen Phillips? |
| | 8 | A. I asked him. He said it was not him. |
| | 9 | MR. TYNDALL: Objection. |
| 09:55:52 | 10 | THE COURT: I'm sorry? |
| | 11 | MR. TYNDALL: Just objection to what Owen says. |
| | 12 | THE COURT: Yes, sir. To that we'll sustain it and |
| | 13 | let you rephrase. |
| | 14 | Q. Without saying what Owen said, did you ask Owen |
| 09:56:03 | 15 | Phillips about it? |
| | 16 | A. I did. |
| | 17 | Q. And did you ever communicate with Owen Phillips |
| | 18 | that you knew via that Snapchat? |
| | 19 | A. The dirty one, no. |
| 09:56:15 | 20 | Q. At some point did you become aware that when you |
| | 21 | told this CAAG group you were having an affair with the |
| | 22 | defendant, I guess, had you heard -- did you feel like other |
| | 23 | people might have known that you were having an affair? |
| | 24 | A. I did. I had been told by a mutual friend. |
| 09:56:33 | 25 | Q. Without going into what the person told you, I |

| 09:56:37 | 1 | guess, based on that information did you believe other people |

09:56:37    1    guess, based on that information did you believe other people

            2    might know that you were -- that some things were being said

            3    about you in the community?

            4         A.    Yes, sir.

09:56:44    5         Q.    Did you specifically hear anything that the

            6    defendant said about you?

            7         A.    I was crazy.  I was a stalker, and I was obsessed

            8    and wanted to have an affair.

            9         Q.    How did that make you feel?

09:56:57   10         A.    Honestly?  Very angry.

           11         Q.    Following that, you told this CAAG group you were

           12    having an affair; is that correct?

           13         A.    I did.

           14         Q.    You mentioned earlier that you had this interaction

09:57:14   15    with DeVan Barbour where you allege he sent you some -- that

           16    he called you --

           17         A.    That was FaceTime.

           18         Q.    FaceTime.  And that was from his wife's account; is

           19    that correct?

09:57:27   20         A.    Correct.

           21         Q.    At some point did you learn -- did DeVan Barbour

           22    contact you again?

           23         A.    He reached out the next day to apologize for his

           24    behavior.

09:57:42   25         Q.    And then some at point did DeVan Barbour reach out

09:57:45  1   to you about something having to do with the affair you had

          2   with Ronald Johnson?

          3          A.   Yes.  But that was later down road, yes.

          4          Q.   That was in 2022?

09:57:55  5          A.   I believe, yes, sir.

          6          Q.   And what, if anything, did DeVan Barbour tell you

          7   in 2022 about your affair with the defendant?

          8          A.   The first time DeVan reached out to me he said he

          9   had -- DeVan told me he had received a message from someone

09:58:12 10   stating that he -- there was pictures or something going

         11   around of what he had done and wanted to know who I told, who

         12   I talked, who he talked to, why have you told somebody this.

         13   And I apologized to him.  I told him I did not mean to.

         14          At first I -- first, I will honestly say I denied

09:58:34 15   it because I don't remember it, because I was very drunk when

         16   I told Kevin Donovan.  And apparently Kevin is the one that he

         17   was referring to at the time.  I apologized after the fact.

         18   But initially when he reached out, he wanted to know who I had

         19   told, and I said nobody.

09:58:51 20          Q.   Okay.  So just to stop you.  DeVan Barbour says,

         21   why did you tell someone that this incident happened; is that

         22   correct?

         23          A.   Yes.  I told him I didn't, but then I said, I am so

         24   sorry.  It's got to be Ronald because I've been seeing him for

09:59:07 25   a little bit.  I guarantee he had something to do with this.

| | | |
|---|---|---|
| 09:59:09 | 1 | I'm so sorry.  And that's when I told D about my and Ron's |
| | 2 | relationship, and I apologized to him. |
| | 3 | Q.   Okay.  Did DeVan Barbour ask you to do anything |
| | 4 | about that relationship? |
| 09:59:20 | 5 | A.   Initially about my and Ron's relationship? |
| | 6 | Q.   Yes. |
| | 7 | A.   No.  Initially he -- we just stopped talking.  Like |
| | 8 | he didn't say anything to me. |
| | 9 | Q.   At some point did DeVan Barbour ask you to do |
| 09:59:33 | 10 | something with regard to -- |
| | 11 | A.   Yes.  Months later I got a phone call while at |
| | 12 | school, and I could not talk because I was teaching.  And I |
| | 13 | said, I can't talk right now.  So then he -- initially he |
| | 14 | said, we'll talk later.  Then he sent me a text.  And then we |
| 09:59:45 | 15 | ended up where I said we'll talk a little bit later that day. |
| | 16 | We ended up talking.  He asked me if I could send a |
| | 17 | text to Ronald Johnson saying, I'm so sorry I was having -- |
| | 18 | going through a rough time in my marriage, you know, I'm sorry |
| | 19 | for telling a lie about us having an affair.  And I told DeVan |
| 10:00:05 | 20 | that day, I said, sir, you know, you're running for Congress, |
| | 21 | but my reputation is -- your reputation is no more important |
| | 22 | than mine.  And I can't do that, because what Ronald was |
| | 23 | saying about me, that I was crazy and a stalker will be true, |
| | 24 | and that's not true.  I can't do that.  Everybody will think |
| 10:00:23 | 25 | I'm crazy. |

| | | |
|---|---|---|
| 10:00:24 | 1 | Q. So DeVan asked you to recant or deny that you had |
| | 2 | an affair with the defendant? |
| | 3 | A. Yes, sir. |
| | 4 | Q. And you didn't want to do that because then |
| 10:00:33 | 5 | everything that Ronald was saying about you would then have |
| | 6 | more credibility? |
| | 7 | A. Correct. |
| | 8 | Q. So did you ever send the defendant a letter or text |
| | 9 | saying that you did not have an affair with him? |
| 10:00:44 | 10 | A. I did not. |
| | 11 | Q. And that's what DeVan requested that you do? |
| | 12 | A. And I also need to state this. It's not that he |
| | 13 | told it -- |
| | 14 | Q. I'm sorry, can you just answer the question though. |
| 10:00:51 | 15 | Is that what DeVan asked you to do? |
| | 16 | A. Yes, sir. |
| | 17 | Q. Do you remember when that interaction was? |
| | 18 | A. The text or the phone call, that whole day? |
| | 19 | Q. Yes. When DeVan asked you -- |
| 10:01:05 | 20 | A. It was prior to the primaries. |
| | 21 | Q. Okay. How close to the primary was it? |
| | 22 | A. Maybe a month. A few weeks. It wasn't -- it |
| | 23 | wasn't long before -- the early voting had not started by that |
| | 24 | time. |
| 10:01:21 | 25 | Q. At this point did you find out that the defendant |

Case 5:23-cv-00349-D-RN    Document 158-3    Filed 10/27/25    Page 60 of 150

| | | |
|---|---|---|
| 10:01:22 | 1 | had a conversation with DeVan Barbour? |
| | 2 | A. I did not know any of that. |
| | 3 | Q. At some point did you find that out? |
| | 4 | A. That DeVan and Ronald had talked? |
| 10:01:32 | 5 | Q. Yes. |
| | 6 | A. I honestly don't think I found that out until |
| | 7 | later. |
| | 8 | Q. At some point did you find out that there was a |
| | 9 | recording? |
| 10:01:40 | 10 | A. I did. |
| | 11 | Q. At some point did you find out that there was a |
| | 12 | recording of you talking about this incident with DeVan? |
| | 13 | A. DeVan did tell me that, yes. I apologize. He did |
| | 14 | tell me that -- supposedly he was worried there were pictures. |
| 10:01:53 | 15 | DeVan thought I had pictures. Yes. He said Ronald's got |
| | 16 | them. He's going to show everybody, and I don't have the |
| | 17 | means or the money to defend myself in court and deal with |
| | 18 | this. You are going to ruin my career. Yes, I did find that |
| | 19 | out. |
| 10:02:15 | 20 | Q. At some point did you become concerned that the |
| | 21 | defendant had access to your iPhone? |
| | 22 | A. Yes. |
| | 23 | Q. Why? |
| | 24 | A. Because he knew where I was at and he knew things |
| 10:02:26 | 25 | that I was telling my friends. |

| 10:02:39 | 1 | Q. The recording of you talking about what happened |
| | 2 | with DeVan, have you heard that recording? |
| | 3 | A. Yes, sir. |
| | 4 | Q. Do you know where that recording comes from? |
| 10:02:49 | 5 | A. Place? Maybe my apartment. |
| | 6 | Q. I mean, do you know -- you've heard the recording? |
| | 7 | A. I've heard the recording, yes. |
| | 8 | Q. You don't specifically know where you were, who you |
| | 9 | were talking to? |
| 10:03:03 | 10 | A. I do. The only person I can say that I was talking |
| | 11 | to when I listened to the recording was either Ronald or |
| | 12 | Kevin. |
| | 13 | Q. And Kevin is Kevin Donovan? |
| | 14 | A. Yes, sir. |
| 10:03:34 | 15 | Q. When DeVan talked to you about this recording, what |
| | 16 | was DeVan's demeanor like? |
| | 17 | A. He was concerned. |
| | 18 | Q. How you could you tell he was concerned? |
| | 19 | A. He did not want this to come out. His whole voice, |
| 10:03:46 | 20 | the way that he spoke to me. He was scared he was going to |
| | 21 | lose the election because of it. |
| | 22 | Q. You mentioned that this was a few weeks before his |
| | 23 | May primary in 2022? |
| | 24 | A. (Witness nods.) |
| 10:04:01 | 25 | Q. If you can answer out loud. |

| | | |
|---|---|---|
| 10:04:03 | 1 | A.    Yes, sir.  Sorry. |
| | 2 | Q.    Did you ever joke about the defendant recording |
| | 3 | people? |
| | 4 | A.    Did I ever joke about it? |
| 10:04:23 | 5 | Q.    Yes, ma'am. |
| | 6 | A.    Yes, sir. |
| | 7 | Q.    Okay.  And who would you joke about that with? |
| | 8 | A.    My close friends. |
| | 9 | Q.    And did you ever joke about it where the defendant |
| 10:04:34 | 10 | heard you talk about it, about him recording people? |
| | 11 | A.    No, because that would make him upset with me. |
| | 12 | Q.    Did you want the defendant to be upset with you? |
| | 13 | A.    No, sir. |
| | 14 | Q.    Why not? |
| 10:04:46 | 15 | A.    Because I loved him. |
| | 16 | Q.    At some point, I guess, after -- did you ever call |
| | 17 | the defendant or text the defendant or write a letter to the |
| | 18 | defendant recanting or saying that you did not have a |
| | 19 | relationship? |
| 10:05:08 | 20 | A.    No, sir. |
| | 21 | Q.    And was -- did you ever become aware if the |
| | 22 | defendant was concerned about you talking about this |
| | 23 | relationship with people?  Did you ever talk with the |
| | 24 | defendant about it? |
| 10:05:22 | 25 | A.    Yes. |

| | | | |
|---|---|---|---|
| 10:05:22 | 1 | Q. | What did the defendant tell you? |
| | 2 | A. | As in our relationship? |
| | 3 | Q. | Did he want you to talk to people? |
| | 4 | A. | No. He told me to keep my mouth shut. Deny, deny, |
| 10:05:32 | 5 | deny. |
| | 6 | Q. | What tone did he use when he told you? |
| | 7 | A. | Fierce. |
| | 8 | Q. | Your relationship you mentioned with the defendant |
| | 9 | ended around this time, spring of 2022? |
| 10:05:43 | 10 | A. | Yes, sir. |
| | 11 | Q. | When DeVan Barbour asks you to text or write a |
| | 12 | letter to the defendant recanting this relationship, is |
| | 13 | this -- this is in the spring of 2022; is that correct? |
| | 14 | A. | It was prior to the primaries. That's all I can |
| 10:06:00 | 15 | tell. |
| | 16 | Q. | At that point your relationship was over? |
| | 17 | A. | Yes, sir. |
| | 18 | Q. | At that point you had told these CAAG members that |
| | 19 | you had an affair with the defendant? |
| 10:06:09 | 20 | A. | Yes. Because I was feeling pressure. |
| | 21 | Q. | And the defendant at this time is still married to |
| | 22 | his wife; is that correct? |
| | 23 | A. | Correct. |
| | 24 | Q. | And after the election -- well, on election day, |
| 10:06:23 | 25 | the primary day, May 17th, did you later see the defendant |

| | | |
|---|---|---|
| 10:06:27 | 1 | that night? |
| | 2 | A. I did. |
| | 3 | Q. Where was that? |
| | 4 | A. Dale Lands. |
| 10:06:32 | 5 | Q. And Dale Lands is a person; is that correct? |
| | 6 | A. That's correct. I called to make sure he wasn't |
| | 7 | there. Dale told me he wasn't there. And then Dale sent |
| | 8 | texts that said -- |
| | 9 | Q. Okay. Without getting into what Dale Lands said, |
| 10:06:41 | 10 | did you see him at Dale Lands' house? |
| | 11 | A. I did. |
| | 12 | Q. Did you go in Dale Lands' house? |
| | 13 | A. I did. |
| | 14 | Q. What happened when you went to Dale Lands' house? |
| 10:06:47 | 15 | A. I was sitting there beside Dale Lands. We were |
| | 16 | looking at the polling results coming in and Dale gets up and |
| | 17 | he's brave enough to come sit right down beside me. |
| | 18 | Q. Who's he? |
| | 19 | A. Ronald Johnson. |
| 10:06:57 | 20 | Q. So he comes and sits next to you? |
| | 21 | A. He does. |
| | 22 | Q. How did you feel when he sat next to you? |
| | 23 | A. Angry. I'm trying hard not to sound pissed off. |
| | 24 | Q. And why were you pissed off? |
| 10:07:07 | 25 | A. Because it was his way of showing dominance once |

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 10:07:09 | 1 | again which is what he had done for a very long time. |
| | 2 | Q.   Okay.  And so at that point did you and the |
| | 3 | defendant have a conversation? |
| | 4 | A.   We did. |
| 10:07:19 | 5 | Q.   And was that a calm conversation? |
| | 6 | A.   Not really. |
| | 7 | Q.   There was -- I mean, did you all raise your voices? |
| | 8 | A.   We did. |
| | 9 | Q.   Was there yelling involved? |
| 10:07:32 | 10 | A.   Yes, sir. |
| | 11 | Q.   And that was the night of the primary at Dale |
| | 12 | Lands' house? |
| | 13 | A.   Yes, sir. |
| | 14 | Q.   At some point -- who's Paul Holcombe? |
| 10:07:43 | 15 | A.   I worked for him.  I just made his campaign |
| | 16 | advertisements, and I worked outside the polls to help the |
| | 17 | Republican Party for him. |
| | 18 | Q.   At some point when you worked the polls, is that |
| | 19 | working at, like, the early voting sites? |
| 10:08:01 | 20 | A.   Handing out literature, yes, sir. |
| | 21 | Q.   Handing out stuff to voters? |
| | 22 | A.   Yes. |
| | 23 | Q.   You were helping Paul Holcombe; is that correct? |
| | 24 | A.   Yes, sir. |
| 10:08:07 | 25 | Q.   He was on the ballot? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 10:08:08 | 1 | A. Yes. |
| | 2 | Q. Did you tell him at some point what was happening |
| | 3 | in your life? |
| | 4 | A. I did. |
| 10:08:13 | 5 | Q. At the polling site? |
| | 6 | A. After our relationship had become public and I knew |
| | 7 | people were talking about me, I was worried about what people |
| | 8 | thought about me, and I didn't want him, someone like that, |
| | 9 | thinking poorly of me. |
| 10:08:35 | 10 | Q. When this relationship ended, you are pretty angry; |
| | 11 | is that fair to say? |
| | 12 | A. Yes, sir. |
| | 13 | Q. I mean, did you think that you were -- I mean, did |
| | 14 | you think you were going to have a future with the defendant |
| 10:08:45 | 15 | during this? |
| | 16 | A. Right. During the beginning part of the |
| | 17 | relationship, absolutely. |
| | 18 | Q. What type of things would he say to you about the |
| | 19 | relationship? |
| 10:08:53 | 20 | A. Can I say what he said like? |
| | 21 | Q. Yes. What did the defendant tell you. |
| | 22 | A. He couldn't go to church because his wife was an |
| | 23 | atheist, and they were not going to have children because she |
| | 24 | didn't want children. And I thought, you know, there was a |
| 10:09:08 | 25 | future for me and him, because at that point my husband -- we |

| 10:09:11 | 1 | were having -- going through that kind of issue too, and so I |
|---|---|---|
| | 2 | thought, God had sent me somebody I can go to church with. |
| | 3 | That's the truth. |
| | 4 | Q.   And then you all -- I mean, in 2020, 2021, you all |
| 10:09:26 | 5 | see each other all the time; is that correct? |
| | 6 | A.   Yes, sir. |
| | 7 | Q.   And I mean, ma'am, you're still angry at the |
| | 8 | defendant; aren't you? |
| | 9 | A.   Yes, sir, I'm angry. |
| 10:09:36 | 10 | Q.   Well, so in January, February, and March of 2022, |
| | 11 | right before the primary, you were talking to a fair amount of |
| | 12 | people about this affair; is that accurate? |
| | 13 | A.   If they asked me about it, I sure did. |
| | 14 | Q.   For instance, you sat down with an individual named |
| 10:09:54 | 15 | Tim Shipman and talked to him about the affair; is that |
| | 16 | correct? |
| | 17 | A.   Uh-huh. |
| | 18 | Q.   Who is Tim Shipman? |
| | 19 | A.   I honestly did not know Tim Shipman other than |
| 10:10:02 | 20 | meeting him at the Republican Party events, but I knew he had |
| | 21 | shared with me that he was trying to -- |
| | 22 | Q.   Don't tell me what he said. |
| | 23 | A.   I told him about the affair. |
| | 24 | Q.   And so then you told ten or 12 people at this CAAG |
| 10:10:19 | 25 | meeting, you told Tim Shipman, you told Paul Holcombe.  You're |

| | | |
|---|---|---|
| 10:10:23 | 1 | telling folks about the fact that you're having this affair; |
| | 2 | is that correct? |
| | 3 | A. Yes, because I'm trying to defend my reputation. |
| | 4 | Q. Meanwhile, the defendant is an elected school board |
| 10:10:32 | 5 | member; is that accurate? |
| | 6 | A. Yes, sir. |
| | 7 | Q. During your relationship with him, would you say he |
| | 8 | was pretty protective of his reputation? |
| | 9 | A. Yes, sir. |
| 10:10:40 | 10 | Q. So at some point did you find out the defendant had |
| | 11 | filed a 50C restraining order against you? |
| | 12 | A. When it was served on me. |
| | 13 | MR. TYNDALL: Objection. |
| | 14 | THE COURT: Hold on. Can you guys approach a |
| 10:10:51 | 15 | minute, please. |
| | 16 | (Sidebar.) |
| | 17 | THE COURT: In the Court's discretion, I certainly |
| | 18 | appreciate the objection; however, I'll overrule the objection |
| | 19 | and allow limited questions consistent with what we discussed |
| 10:12:41 | 20 | at the bench. |
| | 21 | Q. Ma'am, was the 50C served on you? |
| | 22 | A. Yes, sir. |
| | 23 | Q. That was a restraining order? |
| | 24 | A. Yes, sir. |
| 10:12:48 | 25 | Q. And that was from, like, June of 2022; is that |

| | | |
|---|---|---|
| 10:12:51 | 1 | correct? |
| | 2 | A. During the summer, sir, yes. |
| | 3 | (State's Exhibit Number 2 marked for |
| | 4 | identification.) |
| 10:12:57 | 5 | Q. And ma'am, if you could look at that binder next to |
| | 6 | you. If you can look at Exhibit 2. Do you recognize that |
| | 7 | document? |
| | 8 | A. Yes, sir. |
| | 9 | Q. Does that document have your name on it? |
| 10:13:23 | 10 | A. Yes, sir. |
| | 11 | Q. Does it have your address on it? |
| | 12 | A. At the time, yes, sir. |
| | 13 | Q. That was when you were staying in the apartment? |
| | 14 | A. Yes, sir. |
| 10:13:29 | 15 | Q. Later on after all of this, you and your husband |
| | 16 | have gotten back together? |
| | 17 | A. We reconciled. |
| | 18 | Q. And so you got back together. So you are back at |
| | 19 | your original house? |
| 10:13:39 | 20 | A. Yes, sir. |
| | 21 | Q. And is that the 50C that was served on you? |
| | 22 | A. Yes, sir. |
| | 23 | Q. And just to be clear, that 50C was filed by the |
| | 24 | defendant, Ronald Johnson? |
| 10:13:50 | 25 | A. Yes, sir. |

| | | |
|---|---|---|
| 10:13:52 | 1 | MR. ZELLINGER:  Your Honor, I seek to admit State's |
| | 2 | Exhibit 2. |
| | 3 | THE COURT:  Mr. Tyndall? |
| | 4 | MR. TYNDALL:  Other than the previous discussion. |
| 10:14:01 | 5 | THE COURT:  Yes, sir.  We'll note the objection. |
| | 6 | In the Court's discretion, allow it to be admitted. |
| | 7 | (State's Exhibit Number 2 entered into |
| | 8 | evidence.) |
| | 9 | MR. ZELLINGER:  Your Honor, can I approach? |
| 10:14:18 | 10 | THE COURT:  Yes, sir. |
| | 11 | (Sidebar.) |
| | 12 | MR. TYNDALL:  Your Honor, I just restate the |
| | 13 | objection to the relevance of this. |
| | 14 | THE COURT:  The objection is made for the purpose |
| 10:15:03 | 15 | of relevance.  Mr. Zellinger, any response from the State? |
| | 16 | MR. ZELLINGER:  I do have a response.  We discussed |
| | 17 | at the bench the relevance of this document.  I don't want to |
| | 18 | argue it in front of the jury; however, it is probative on the |
| | 19 | interaction between the defendant and Ms. Barbour during this |
| 10:15:23 | 20 | time period.  I'd provide more of the argument with that |
| | 21 | probably outside the presence of the jury. |
| | 22 | THE COURT:  Yes, sir.  We had some conversation at |
| | 23 | the bench.  In the Court's discretion, I'll find the probative |
| | 24 | value outweighs any prejudicial value.  I'll allow it to be |
| 10:15:39 | 25 | admitted. |

```
10:15:41   1              MR. ZELLINGER:  So Your Honor, State's Exhibit 2 is
           2   admitted at this time?
           3              THE COURT:  Yes.
           4                  (State's Exhibit Number 2 entered into
10:15:44   5                   evidence.)
           6       Q.    Looking at State's Exhibit 2, is that the 50C
           7   document?
           8       A.    Yes, sir.
           9              MR. ZELLINGER:  Your Honor, may I publish State's
10:16:05  10   Exhibit 2 at this time?
          11              THE COURT:  Yes, sir.  Give me one minute.  Yes,
          12   sir.  In the Court's discretion, it can be published.
          13              MR. ZELLINGER:  Madam clerk, can we?  Thank you.
          14                  (State's Exhibit Number 2 published to the
10:16:37  15                   jury.)
          16              MR. ZELLINGER:  If we can zoom into the top portion
          17   there.
          18       Q.    Ms. Barbour, you're going by Angela McLeod; is that
          19   correct?
10:16:46  20       A.    Yes, sir.
          21       Q.    And that's your maiden name?
          22       A.    That's what he called me.
          23       Q.    Okay.  So he never called you Barbour?
          24       A.    No.  He called me by my maiden name.
10:16:55  25       Q.    This was a 50C filed against you back in June of
```

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 10:16:58 | 1 | 2022; is that correct? |
| | 2 | A.   Yes, sir. |
| | 3 | Q.   And is -- just to be clear, looking at -- this |
| | 4 | document is related to -- basically alleges you were doing |
| 10:17:24 | 5 | something wrong; is that correct? |
| | 6 | A.   Yes, sir. |
| | 7 | Q.   That you were, like, irritating, annoying, or |
| | 8 | stalking the defendant; is that correct? |
| | 9 | A.   Yes, sir. |
| 10:17:31 | 10 | Q.   Were you stalking or having -- |
| | 11 | A.   No, sir. |
| | 12 | Q.   Okay.  And under "note to plaintiff," could you |
| | 13 | read that for the jury? |
| | 14 | A.   The "do not use?" |
| 10:17:44 | 15 | Q.   Yes.  Could you read that out loud?  It's right in |
| | 16 | front of you in the notebook, if it's easier.  And then go to |
| | 17 | tab 2.  Do you see it right there? |
| | 18 | A.   Do not use -- do not use this form if the |
| | 19 | relationship between you or the person on whose behalf you are |
| 10:18:04 | 20 | filing this complaint and the defendant is current or former |
| | 21 | spouse, persons of the opposite sex who live or have lived |
| | 22 | together, have a child in common, or are related as parent and |
| | 23 | child or grandparent or grandchild, are current or former |
| | 24 | household members, or are persons of the opposite sex who are |
| 10:18:28 | 25 | in a dating relationship or have been in a dating |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 10:18:32 | 1 | relationship.  In that situation, use complaint and motion for |
| | 2 | domestic violence protective order. |
| | 3 | Q.   And there's a form number AOC-CV-303; is that |
| | 4 | correct? |
| 10:18:47 | 5 | A.   Yes, sir. |
| | 6 | Q.   And so what you just read says:  Do not use this |
| | 7 | form if you are persons of the opposite sex or in a dating |
| | 8 | relationship or have been in a dating relationship.  Is that |
| | 9 | correct? |
| 10:18:55 | 10 | A.   Yes, sir. |
| | 11 | Q.   Were you in a dating relationship with the |
| | 12 | defendant? |
| | 13 | A.   Yes, sir. |
| | 14 | Q.   Okay.  And do you recall what happened with this |
| 10:19:06 | 15 | 50C, was it granted? |
| | 16 | A.   He stopped it. |
| | 17 | Q.   Okay. |
| | 18 | A.   I remember that. |
| | 19 | Q.   Who stopped it? |
| 10:19:12 | 20 | A.   Ronald Johnson stopped it. |
| | 21 | Q.   And then at some point did you then file 50B |
| | 22 | against him? |
| | 23 | A.   Much later, because that was the point he showed up |
| | 24 | at the polling site, different elections, and parked right |
| 10:19:27 | 25 | beside me.  At that point I was over the intimidation so |

| 10:19:31 | 1 | someone said, just go get paperwork on him, and that's what I |
| | 2 | did. |
| | 3 | (State's Exhibit Number 3 marked for |
| | 4 | identification.) |
| 10:19:34 | 5 | Q.   Okay.  So then -- could you turn to tab 3. |
| | 6 | A.   Yes, sir. |
| | 7 | Q.   Is that the 50B that you filed against the |
| | 8 | defendant? |
| | 9 | A.   Yes, sir. |
| 10:19:50 | 10 | Q.   And does that have your name on it? |
| | 11 | A.   Yes, sir. |
| | 12 | Q.   Did you take this out in October of 2022? |
| | 13 | A.   Yes, sir. |
| | 14 | MR. ZELLINGER:  Your Honor, at this time I move to |
| 10:20:03 | 15 | enter State's Exhibit 3. |
| | 16 | THE COURT:  Any objection? |
| | 17 | MR. TYNDALL:  The same relevance objection, Your |
| | 18 | Honor. |
| | 19 | THE COURT:  Yes, sir.  In the Court's discretion, |
| 10:20:09 | 20 | allow it to be admitted. |
| | 21 | (State's Exhibit Number 3 entered into |
| | 22 | evidence.) |
| | 23 | MR. ZELLINGER:  Your Honor, may I publish State's |
| | 24 | Exhibit 3? |
| 10:20:15 | 25 | THE COURT:  Yes, sir. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Angela Barbour - Direct by Mr. Zellinger

| | |
|---|---|
| 10:20:16 | 1 |

```
10:20:16   1              MR. ZELLINGER:  If we can highlight the top half of

           2   this page.

           3        Q.   So you took out a 50B against the defendant?

           4        A.   Yes, sir.

10:20:31   5              (State's Exhibit Number 3 published to the

           6              jury.)

           7        Q.   At some point was that also dismissed?

           8        A.   Yes, sir.

           9        Q.   And at some point I guess -- so he filed a 50C, and

10:20:44  10   then you filed 50B against him; is that correct?

          11        A.   (Witness gesturing affirmatively.)

          12        Q.   Okay.  When you filled out -- did you fill this

          13   out?

          14        A.   Yes, sir.

10:21:29  15        Q.   Did you check that you and the defendant had

          16   been -- or check the box marked:  Currently or formerly in a

          17   dating relationship?

          18        A.   Yes, sir.

          19        Q.   Thank you.  Now, at some point did you meet with a

10:21:50  20   friend, an attorney, and start sort of compiling materials

          21   from this interaction with the defendant?

          22        A.   Yes, sir.

          23        Q.   And did you save things like your phone records and

          24   text messages and things along those lines?

10:22:07  25        A.   I did, yes, sir.
```

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 10:22:10 | 1 | Q.   Ma'am, if you could turn in your binder to State's |
| | 2 | Exhibit 38. |
| | 3 | I'm sorry, ma'am.  Can you turn to State's Exhibit |
| | 4 | Number 5. |
| 10:22:54 | 5 | A.   (Witness complies.) |
| | 6 | (State's Exhibit Number 5 marked for |
| | 7 | identification.) |
| | 8 | Q.   And do you recognize that document? |
| | 9 | A.   Yes, sir. |
| 10:22:59 | 10 | Q.   And what is that document? |
| | 11 | A.   This is a document of every phone contact that he |
| | 12 | and I had together. |
| | 13 | Q.   When you say "he," is that the defendant? |
| | 14 | A.   Ronald Johnson, yes, sir. |
| 10:23:12 | 15 | Q.   Okay.  And how did you make this document? |
| | 16 | A.   Using a Google Excel format and -- is that what you |
| | 17 | want to know? |
| | 18 | Q.   Yes.  Did you -- yea, I mean, how did you remember |
| | 19 | the -- |
| 10:23:24 | 20 | A.   I sat down -- |
| | 21 | Q.   How did you remember all the phone calls? |
| | 22 | A.   I asked -- I pulled up all my phone calls from |
| | 23 | Verizon online, and I literally printed them all out.  And I |
| | 24 | used two color highlighters; one for where he called me, and |
| 10:23:37 | 25 | one for where I called him.  And then I documented every |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 10:23:40 | 1 | single time, because when I get called crazy, I'm not crazy, I |
| | 2 | wanted to prove that he contacted me more than I contacted |
| | 3 | him. |
| | 4 | Q.   Okay.  And in your binder should also be -- |
| 10:23:52 | 5 | MR. ZELLINGER:  Your Honor, can I approach the |
| | 6 | witness? |
| | 7 | THE COURT:  Yes, sir. |
| | 8 | MR. ZELLINGER:  Your Honor, I'm going to substitute |
| | 9 | our binders because that one doesn't have one of the State's |
| 10:24:33 | 10 | exhibits in it. |
| | 11 | THE COURT:  All right.  Any objection? |
| | 12 | Mr. Tyndall, do you want to look? |
| | 13 | MR. TYNDALL:  No objection. |
| | 14 | Q.   Looking at State's Exhibit 5, do you recognize that |
| 10:24:47 | 15 | as the document that you produced? |
| | 16 | A.   Yes. |
| | 17 | Q.   And did you produce this to your attorney as well? |
| | 18 | A.   I did. |
| | 19 | (State's Exhibit Number 5A marked for |
| 10:24:55 | 20 | identification.) |
| | 21 | Q.   And then if you can you turn to State's Exhibit 5A. |
| | 22 | Is that the same thing minus some of the columns describing -- |
| | 23 | A.   Yes, sir. |
| | 24 | Q.   -- each interaction. |
| 10:25:05 | 25 | A.   Yes. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 10:25:05 | 1 | Q. If you will look for 5A. Does that appear to be |
| | 2 | the document you created without one of those columns? |
| | 3 | A. Yes, sir. |
| | 4 | Q. Okay. And will this help illustrate your testimony |
| 10:25:15 | 5 | to the jury? |
| | 6 | A. Yes, sir. |
| | 7 | MR. ZELLINGER: Your Honor, I seek to admit 5A. |
| | 8 | THE COURT: Any objection? |
| | 9 | MR. TYNDALL: I don't have any objection to that, |
| 10:25:24 | 10 | Your Honor. |
| | 11 | THE COURT: So allowed. |
| | 12 | (State's Exhibit Number 5A entered into |
| | 13 | evidence.) |
| | 14 | Q. And ma'am, if you could -- |
| 10:25:29 | 15 | MR. ZELLINGER: Your Honor, can I publish State's |
| | 16 | Exhibit 5A at this time? |
| | 17 | THE COURT: Yes, sir. |
| | 18 | (State's Exhibit Number 5A published to the |
| | 19 | jury.) |
| 10:25:58 | 20 | Q. Will State's Exhibit 5 help refresh your |
| | 21 | recollection as to what each one of these events was? |
| | 22 | A. Yes, sir. |
| | 23 | Q. And so, for instance, on November 14 of 2020, at |
| | 24 | 11:23, there appears to be a two-minute call between you and |
| 10:26:22 | 25 | the defendant; is that correct? |

| | | |
|---|---|---|
| 10:26:23 | 1 | A. Yes, sir. |
| | 2 | Q. Do you remember what the event was that happened on |
| | 3 | November 14 of 2020? |
| | 4 | A. Where he went out drinking with us. He picked me |
| 10:26:33 | 5 | up from Allyson Bond's and picked me -- picked me and Allyson |
| | 6 | Bond up from the bar and was going to take us home. |
| | 7 | Q. Is this the night you had your first romantic |
| | 8 | encounter with the defendant? |
| | 9 | A. Yes, sir. |
| 10:26:45 | 10 | Q. Okay. And later found out you had sex with the |
| | 11 | defendant that night? |
| | 12 | A. Yes, sir. |
| | 13 | Q. Okay. And then if we can highlight from |
| | 14 | November 16th to 12/10. |
| 10:27:03 | 15 | Q. Are those all phone calls between you and the |
| | 16 | defendant? |
| | 17 | A. Yes, sir. |
| | 18 | Q. Some of these are you calling the defendant and |
| | 19 | some of these is the defendant calling you? |
| 10:27:15 | 20 | A. Correct. |
| | 21 | Q. Is it fair to say -- I mean, you all talked a fair |
| | 22 | amount between November 16th and December 10th? |
| | 23 | A. Yes, sir. |
| | 24 | Q. That's reflected on this document, ma'am? |
| 10:27:25 | 25 | A. Yes, sir. Yes, sir. |

| | | |
|---|---|---|
| 10:27:26 | 1 | Q.   And then on December 10th, what happened? |
| | 2 | A.   We met at a Comfort Suites in Clayton. |
| | 3 | MR. ZELLINGER:  If we can highlight the bottom of |
| | 4 | that page. |
| 10:27:46 | 5 | Q.   You all had more contact.  Then what happened on |
| | 6 | December 18th of 2020? |
| | 7 | A.   December 18th?  We were in Virginia.  We were in |
| | 8 | Virginia. |
| | 9 | Q.   What happened on -- is that when you went to |
| 10:28:02 | 10 | Virginia Beach? |
| | 11 | A.   Yes, sir. |
| | 12 | Q.   Is that when the defendant made you -- |
| | 13 | A.   Binder. |
| | 14 | Q.   -- the binder to go to a school conference that |
| 10:28:10 | 15 | didn't exist? |
| | 16 | A.   Yes, sir. |
| | 17 | Q.   And there's some entries on here for midmorning and |
| | 18 | dinner.  Do you remember specifically even where you had |
| | 19 | breakfast and dinner? |
| 10:28:26 | 20 | A.   I know that, because when I get told I'm being |
| | 21 | crazy, I just did the research.  So I remember -- |
| | 22 | Q.   The question was, do you remember where you were? |
| | 23 | A.   Yes, I very well remember where I was at. |
| | 24 | Q.   And where were you? |
| 10:28:39 | 25 | A.   I was at -- at Virginia Beach Pocahontas Pancake |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 10:28:41 | 1 | House. |

                    2    Q.   So you documented all that?

                    3    A.   I did.

                    4    Q.   And then dinner, do you remember where you had
    10:28:47    5    dinner that night?

                    6    A.   At a Mexican restaurant.

                    7    Q.   And what was that called?

                    8    A.   Pelon's Baja Grill.

                    9         MR. ZELLINGER:  If we can turn to the next page.
    10:28:55   10    And if we can go to just the month of January.  So January 30,

                   11    2021.  I'm sorry, the pagination might be a little different

                   12    on State's Exhibit 5 and 5A.

                   13    Q.   I mean, there are more phone calls between you and

                   14    the defendant; is that correct?

    10:29:23   15    A.   Yes, sir.

                   16    Q.   And many of these are the defendant calling you; is

                   17    that right?

                   18    A.   Yes, sir.

                   19    Q.   For instance, on January 5th, you all talked for
    10:29:31   20    13 minutes when he called you?

                   21    A.   January 5th, yes, sir.

                   22    Q.   And on January 6th, you talked for ten minutes; is

                   23    that correct?

                   24    A.   Yes, we did.

    10:29:45   25    Q.   In that instance you called him?

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 10:29:48 | 1 | A. January 6th? |
| | 2 | Q. Yes, ma'am. |
| | 3 | A. We talked three different times. |
| | 4 | Q. Okay. |
| 10:29:54 | 5 | A. If you can look, it says 1, 2, 3. He called me |
| | 6 | twice. I called him once. |
| | 7 | Q. You all were dating at this point; is that correct? |
| | 8 | A. We were. |
| | 9 | Q. And then January 29th, it says, all weekend. What |
| 10:30:07 | 10 | happened that weekend? |
| | 11 | A. That was the weekend we took a trip to Charlotte. |
| | 12 | Q. Was that the trip with Allyson Bond or is that just |
| | 13 | the two of you? |
| | 14 | A. This initial trip was just me and Ronald. |
| 10:30:19 | 15 | Q. Okay. And again, would you drive together? |
| | 16 | A. No, sir. |
| | 17 | Q. Okay. So you met separately? |
| | 18 | A. Yes, sir. |
| | 19 | Q. And do you remember where you stayed? |
| 10:30:26 | 20 | A. Marriott. |
| | 21 | Q. And after that -- looking at the rest of this |
| | 22 | document from February through March 5th, there's a lot more |
| | 23 | phone calls; is that correct? |
| | 24 | A. Yes, sir. |
| 10:30:43 | 25 | MR. ZELLINGER: And if we could go to the next |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 10:30:54 | 1 | page. If we could go all the way from the top to |
| | 2 | January 29th. |
| | 3 | A. I'm sorry. I'm in March. |
| | 4 | Q. I'm sorry. That's what I meant, March. Thank you. |
| 10:31:08 | 5 | A. Right where I'm at. |
| | 6 | Q. The month of March 2021, do you see that? |
| | 7 | A. Yes, sir. |
| | 8 | Q. Specifically, do you remember what happened on |
| | 9 | March 25th of 2021? |
| 10:31:19 | 10 | A. That is where I was wired in Smithfield Police |
| | 11 | Department parking lot. |
| | 12 | Q. Okay. |
| | 13 | A. Well, I was getting a phone and key fob. |
| | 14 | Q. Did you get it to work? |
| 10:31:31 | 15 | A. No, sir. |
| | 16 | Q. And that was where you tried? |
| | 17 | A. Well, I tried to. I still don't know if I got it |
| | 18 | to work. I just pushed buttons. I'm just being honest. I |
| | 19 | don't know if it worked or not. |
| 10:31:41 | 20 | Q. Okay. Why did you do? |
| | 21 | A. I did it for Ronald. |
| | 22 | Q. What did he tell you to do? |
| | 23 | A. He wanted to hear what was going on during the |
| | 24 | meeting and what others were saying. And I need to say that |
| 10:31:50 | 25 | he was at that meeting as well, and he was not supposed to be. |

| | | |
|---|---|---|
| 10:31:55 | 1 | He showed up. |
| | 2 | Q.  At some point did you all have a conversation about |
| | 3 | wanting to see how people reacted to him? |
| | 4 | A.  Yes, he wanted to see how people reacted when he |
| 10:32:03 | 5 | walked up. |
| | 6 | Q.  Okay.  March 26th -- well, actually March 25th |
| | 7 | following that attempt to record at the Johnston County |
| | 8 | Republican meeting, there's an entry for 8:45.  Do you |
| | 9 | remember what that was for? |
| 10:32:21 | 10 | A.  We had dinner afterwards. |
| | 11 | Q.  Where did you go? |
| | 12 | A.  Buffalo Wild Wings in Smithfield. |
| | 13 | Q.  After that, March 26th, it says:  All weekend.  Do |
| | 14 | you remember what you did all weekend March 26th of 2021? |
| 10:32:34 | 15 | A.  We went to Charlotte. |
| | 16 | Q.  Okay.  And was that the Charlotte trip with? |
| | 17 | A.  Allyson Bond. |
| | 18 | Q.  And the defendant's cousin? |
| | 19 | A.  And Lindsey, yes. |
| 10:32:43 | 20 | Q.  And the defendant? |
| | 21 | A.  Yes. |
| | 22 | Q.  Did you actually go -- on March 27th, where did you |
| | 23 | eat lunch? |
| | 24 | A.  5Church. |
| 10:32:54 | 25 | Q.  And I guess, later that day did you also go to |

| 10:32:58 | 1 | Buffalo Wild Wings again? |

2      A.   Myself, Allyson, and Lindsey did.  Ronald stayed

3  back.  He met us there later.

4      Q.   Okay.

10:33:07  5      MR. ZELLINGER:  If we could go to the second half

6  of the page.

7      Q.   Do you recall what happened on April 6th where you

8  met with the defendant?

9      A.   Yes, sir.  We met at the JCC Workforce Development

10:33:26  10  Center.

11      Q.   What did you do there?  I'm sorry, is that a place

12  where you had --

13      A.   Relations, yes, sir.

14      Q.   -- in a car?

10:33:34  15      A.   Uh-huh.

16      Q.   Okay.  And is that a parking lot you all would

17  utilize?

18      A.   A lot.

19      Q.   Okay.  April 15th, you have an entry on here.  Do

10:33:45  20  you recall where you met with the defendant?

21      A.   Yes, we met at the Clayton Fitness Center after the

22  JCR meeting.

23      MR. ZELLINGER:  If we can go to the next page.

24      Q.   Ms. Barbour, I'm going to ask you about May 13th.

10:34:08  25      A.   That's when he gave me the phone -- oh, no.  That's

| 10:34:13 | 1 | when he said we were no longer going to use the Heather Jones |
| | 2 | contact. |
| | 3 | Q. And Heather Jones was the number that you had in |
| | 4 | your phone for his phone; is that correct? |
| 10:34:23 | 5 | A. Uh-huh. |
| | 6 | Q. Later on did you discover that there actually is a |
| | 7 | person named Heather Jones? |
| | 8 | A. I did, yes. She's also an employee of Johnston |
| | 9 | County schools. |
| 10:34:30 | 10 | Q. Okay. Did you actually, like, meet her? |
| | 11 | A. No. |
| | 12 | Q. No. Okay. You just learned that? |
| | 13 | A. Uh-huh. |
| | 14 | Q. On May 13th at 2:00, did you meet with the |
| 10:34:39 | 15 | defendant? |
| | 16 | A. I did. |
| | 17 | Q. Where did you meet with him? |
| | 18 | A. Clayton Fitness. |
| | 19 | Q. July 13th, without going into each one of these, |
| 10:34:50 | 20 | did you meet with the defendant after a board meeting? |
| | 21 | A. Yes. We had dinner. |
| | 22 | Q. Where did you meet? |
| | 23 | A. This was at Buffalo Wild Wings. |
| | 24 | Q. Okay. |
| 10:35:02 | 25 | A. And then one was -- well, we met -- we frequented |

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 10:35:04 | 1 | Buffalo Wild Wings and San Marcos, but I -- I don't remember |
| | 2 | which restaurant it was that night. |
| | 3 | Q.   I mean, did you record -- do you remember text |
| | 4 | messages with the defendant where he had asked you about |
| 10:35:18 | 5 | watching a movie.  Did that occur on July 16th? |
| | 6 | A.   Yes. |
| | 7 | Q.   Okay.  And you were watching Splendor in the Grass; |
| | 8 | is that correct? |
| | 9 | A.   Yes. |
| 10:35:28 | 10 | Q.   Now, jumping forward to July 26th.  At some point |
| | 11 | in July, did you have a phone call with the defendant |
| | 12 | about -- well, do you recall what you recorded that the |
| | 13 | defendant told you? |
| | 14 | A.   Do I recall? |
| 10:35:55 | 15 | Q.   Yes. |
| | 16 | A.   Yes. |
| | 17 | Q.   What did you -- when I say record, did you write it |
| | 18 | down? |
| | 19 | A.   I didn't write it down.  It was shocking enough |
| 10:36:02 | 20 | that I can remember it.  Most of it. |
| | 21 | Q.   Did you take notes though in putting this together |
| | 22 | with your attorney? |
| | 23 | A.   I did. |
| | 24 | Q.   And you wrote that down? |
| 10:36:08 | 25 | A.   I did. |

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 10:36:09 | 1 | Q.   Did you ever record the defendant? |
| | 2 | A.   Did I ever -- no.  I don't know how to record.   I |
| | 3 | don't know how to record. |
| | 4 | Q.   Okay. |
| 10:36:15 | 5 | A.   Can I say on record I tried to learn how, but I did |
| | 6 | not know.  I don't know how to record. |
| | 7 | Q.   On July 26th, did you have a phone call with the |
| | 8 | defendant? |
| | 9 | A.   On July 26th, I did. |
| 10:36:26 | 10 | Q.   And what did you all discuss? |
| | 11 | A.   That was where he wanted me to recall.  I shared |
| | 12 | what happened with DeVan, and that's when he asked me if I |
| | 13 | thought I could catch him.  That was the words he used, "catch |
| | 14 | him." |
| 10:36:40 | 15 | Q.   Okay.  July 30th, did you meet with the defendant? |
| | 16 | A.   I did. |
| | 17 | Q.   Where did you meet with the defendant? |
| | 18 | A.   At the Marriott across from Crabtree. |
| | 19 | Q.   August 14th did you meet with the defendant again? |
| 10:36:55 | 20 | A.   Yes, sir. |
| | 21 | Q.   Where did you meet with the defendant? |
| | 22 | A.   Marriott in Charlotte again. |
| | 23 | Q.   During that trip to Charlotte did the defendant |
| | 24 | tell you something that you wrote down? |
| 10:37:16 | 25 | A.   Did he tell me something that I had written down? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 10:37:19 | 1 | Q. Yes, ma'am. If you look at you State's Exhibit 5 |
| | 2 | for August 14th, did you write down the defendant told you |
| | 3 | something? |
| | 4 | A. No. This is what he told me. He told this to me. |
| 10:37:27 | 5 | Can I read it? |
| | 6 | Q. You can tell the jury what he told you. |
| | 7 | A. Ronald shared he knew bad people. He told me he |
| | 8 | didn't just get his money from regular jobs. He stated, you |
| | 9 | don't think I could have this nice of a house and multiple |
| 10:37:39 | 10 | vehicles on a teacher/cop salary, do you? I know people. |
| | 11 | People that you do not need to know. In fact, I've shared |
| | 12 | more with you than I ever have with Jamie. |
| | 13 | Q. How did that make you feel? |
| | 14 | A. Initially, special during this part of my |
| 10:37:56 | 15 | relationship, and then scared. |
| | 16 | Q. September 3rd, did you meet with the defendant to |
| | 17 | go to a superhero movie? |
| | 18 | A. We did. |
| | 19 | Q. And just for purposes of the record, was that |
| 10:38:08 | 20 | Shang-Chi and the Legend of the Ten Rings? |
| | 21 | A. Yes. |
| | 22 | Q. As we get into October 2021, on October 7th, entry |
| | 23 | at 7:05, what did the defendant tell you? |
| | 24 | A. Can you repeat that? I'm sorry. |
| 10:38:26 | 25 | Q. On October 7th, at 7:05, that entry, did you write |

| 10:38:30 | 1 | the defendant had told you something? |

10:38:30  1  the defendant had told you something?

2      A.    That's when he told me I needed to start dating

3   some time.

4      Q.    Okay.  And how did that -- I mean, at that point

10:38:37  5  were you sort of on again/off again, or what was going on?

6      A.    On again/off again.  And I think he realized that I

7   wasn't doing some of the things that he asked me to do with

8   the phone.  He was getting frustrated.

9      Q.    On that date also, I guess, did you become

10:38:51  10  nominated for the Johnston County Republican Women

11  vice-president position?

12     A.    I was.

13     Q.    Did you exchange texts about that?

14     A.    I did.  I was excited.  I was proud.

10:39:01  15     Q.    Okay.  And then, I mean, are there more phone calls

16  between you and the defendant as time goes on in your

17  relationship?

18     A.    Yes, sir.

19     Q.    On November 4th of 2021 --

10:39:23  20     A.    Yes, sir.

21     Q.    -- do you remember talking with the defendant about

22  something unusual?

23     A.    Yes, sir.

24     Q.    And did the defendant ask you to do something in

10:39:38  25  regard to having sex; is that correct?

| | | |
|---|---|---|
| 10:39:41 | 1 | A.   Yes, sir. |
| | 2 | Q.   And without going into that, did you actually |
| | 3 | follow through in talking to somebody? |
| | 4 | A.   Yes, sir. |
| 10:39:51 | 5 | Q.   Ma'am, I'll give you a moment just to -- we'll skip |
| | 6 | past that. |
| | 7 | On November 5th, did you try to go to the Marriott |
| | 8 | in Crabtree with the defendant? |
| | 9 | A.   Yes, sir. |
| 10:40:05 | 10 | Q.   And was that the instance where you couldn't go |
| | 11 | there? |
| | 12 | A.   Because him and Michelle was there.  That's what he |
| | 13 | told me. |
| | 14 | Q.   Okay.  So he went in and then came out and was |
| 10:40:13 | 15 | like, we have to go someplace else? |
| | 16 | A.   (Witness nods.)  He actually called me. |
| | 17 | Q.   Okay.  And then in January of 2022, simply January |
| | 18 | 27th, if we can go to the next page.  These are all calls |
| | 19 | between you and the defendant; is that correct? |
| 10:40:40 | 20 | A.   Yes, sir. |
| | 21 | Q.   Okay.  And without going into every one, I mean, |
| | 22 | some of them -- there's one on -- you have phone calls on |
| | 23 | February 3rd for 32 minutes; is that correct? |
| | 24 | A.   Yes, sir.  You can check my phone records. |
| 10:40:53 | 25 | Q.   Sure.  And around this time is this when your |

| | | |
|---|---|---|
| 10:40:54 | 1 | relationship started to sort of end? |
| | 2 | A.   Yes, sir.  It was basically just sex at that point. |
| | 3 | Q.   And would you all talk aside from the sex? |
| | 4 | A.   Every so often, but not as much as it was |
| 10:41:12 | 5 | initially. |
| | 6 | Q.   And then if we could jump to March 10th. |
| | 7 | A.   That was the other incident. |
| | 8 | Q.   What did the defendant text you? |
| | 9 | A.   It was a Snapchat to Owen.  The one that we don't |
| 10:41:30 | 10 | think was real. |
| | 11 | Q.   And I guess, did you receive a text from the |
| | 12 | defendant as well on March 10th, 6 p.m.? |
| | 13 | A.   March 10th, a text, yes.  Here's your new |
| | 14 | boyfriend.  And he was talking about Owen Phillips and sent me |
| 10:41:46 | 15 | Snapchat information. |
| | 16 | Q.   And on April 13th, did you, I guess, receive |
| | 17 | communication from Owen Phillips? |
| | 18 | A.   I did.  That was when Owen came into the picture. |
| | 19 | Q.   Don't tell me what Owen Phillips said.  He's going |
| 10:42:01 | 20 | to testify later. |
| | 21 | A.   Yes.  That's when he came into the picture, yes. |
| | 22 | Q.   Now, April 14th, is that the Reagan Day event? |
| | 23 | A.   Yes, sir, that was in April. |
| | 24 | Q.   Is that when you tried to get a selfie with Allyson |
| 10:42:16 | 25 | Bond? |

| | | |
|---|---|---|
| 10:42:16 | 1 | A.   I did, yes. |
| | 2 | Q.   That was unusual she wouldn't take a selfie with |
| | 3 | you? |
| | 4 | A.   It was very unusual. |
| 10:42:22 | 5 | Q.   Okay.  Now, there's an entry for April 26th, at |
| | 6 | 12:28 p.m.  And is that a con -- do you remember was that a |
| | 7 | call or -- |
| | 8 | A.   Yes.  I was eating lunch with my friend. |
| | 9 | Q.   And was that a contact between you and DeVan |
| 10:42:39 | 10 | Barbour? |
| | 11 | A.   Yes.  That's when he asked me why I shared the |
| | 12 | information with Kevin Donovan. |
| | 13 | Q.   And then April 26th at 1:14, the next entry, is |
| | 14 | that with DeVan Barbour again? |
| 10:42:56 | 15 | A.   Yes. |
| | 16 | Q.   What happened on April 26th, at 1:14 when you |
| | 17 | talked to DeVan Barbour? |
| | 18 | A.   He contacted me and as -- this was the whole text |
| | 19 | thing.  He said, I need you to send Ronald Johnson a text and |
| 10:43:15 | 20 | tell him you're crazy, and that you were having a hard time in |
| | 21 | life, and that it was never a relationship between you and |
| | 22 | him. |
| | 23 | Q.   And basically recanting that you had an affair with |
| | 24 | the defendant? |
| 10:43:30 | 25 | A.   Yes. |

| | |
|---|---|
| 10:43:31 | 1 |

Q.   And did DeVan Barbour tell you why he was asking

2   you to do that?

3       A.   Because Ronald was going to release some recording

4   of me telling the whole story of what happened, and he was

10:43:45   5   fearful that his election -- he wouldn't be elected.

6       Q.   And you were you concerned for DeVan Barbour?

7       A.   I was.

8       Q.   And did you agree to recant your affair with him?

9       A.   I did not.

10:44:02   10       Q.   And then May 17th, at 7:30, is that the election

11   night when you met with --

12       A.   Yes.

13       Q.   Okay.  There's an entry in between there with

14   Barbour and Slay.  Who is Ms. Slay?

10:44:18   15       A.   She's a lady that lives in South Carolina and is

16   extremely active in Johnston County politics, for some reason.

17       Q.   Okay.  May 18th, was there was a CAAG meeting at

18   6:30 that night?

19       A.   Yes.

10:44:37   20       Q.   Eventually after the election did the defendant

21   reach back out to you and try -- what was the tenor of those

22   conversations?

23       A.   He -- he wanted to get me to shut up and do

24   anything that it took basically to get me to basically say

10:44:54   25   that we did not have an affair.

| | | |
|---|---|---|
| 10:44:56 | 1 | Q.   Did you agree to do that? |
| | 2 | A.   No, sir. |
| | 3 | Q.   Did he offer some things to you to get you to say |
| | 4 | that? |
| 10:45:03 | 5 | A.   He did.  Through a mutual friend said that, you kn |
| | 6 | you, I -- yes, he did. |
| | 7 | Q.   So he offered things through a mutual friend.  Who |
| | 8 | was the mutual friend? |
| | 9 | A.   Dale Lands. |
| 10:45:13 | 10 | Q.   So he didn't say it to you? |
| | 11 | A.   No. |
| | 12 | Q.   Okay. |
| | 13 | A.   At this time we weren't communicating. |
| | 14 | Q.   Ma'am, if you turn your attention to tab 6 in that |
| 10:45:41 | 15 | document. |
| | 16 | A.   Yes, sir. |
| | 17 | Q.   What is that? |
| | 18 | A.   That is DeVan's contact in my phone, D's. |
| | 19 | Q.   Okay.  And did you take a picture of that? |
| 10:45:54 | 20 | A.   I did, to show the time of when he called and how |
| | 21 | long we talked. |
| | 22 | (State's Exhibit Number 6 marked for |
| | 23 | identification.) |
| | 24 | Q.   And State's Exhibit 6, is that that picture you |
| 10:46:04 | 25 | took of your phone? |

| | | |
|---|---|---|
| 10:46:11 | 1 | A. Yes, sir. Yes. I'm sorry. I was on the wrong |
| | 2 | one. Yes, sir. |
| | 3 | MR. ZELLINGER: Your Honor, at this time I move to |
| | 4 | enter State's Exhibit 6. |
| 10:46:18 | 5 | MR. TYNDALL: No objection. |
| | 6 | THE COURT: So allowed. |
| | 7 | (State's Exhibit Number 6 entered into |
| | 8 | evidence.) |
| | 9 | MR. ZELLINGER: Your Honor, may I publish State's |
| 10:46:23 | 10 | Exhibit 6? |
| | 11 | THE COURT: Yes, sir. |
| | 12 | (State's Exhibit Number 6 published to the |
| | 13 | jury.) |
| | 14 | Q. What phone number did you have for DeVan Barbour? |
| 10:46:30 | 15 | A. The one that it says 919-909-1507. |
| | 16 | Q. What was your phone number at the time? |
| | 17 | A. The same that it is today, 901-5376. |
| | 18 | Q. Can you say that again just a little bit slower? |
| | 19 | Sorry. |
| 10:46:51 | 20 | A. 919-901-5376. |
| | 21 | Q. You said that you took -- why did you take a |
| | 22 | picture of this entry? |
| | 23 | A. To show that he had called at 1:14. |
| | 24 | Q. And was this when he called to ask you to recant? |
| 10:47:15 | 25 | A. I believe so. |

Angela Barbour - Direct by Mr. Zellinger

| | | | |
|---|---|---|---|
| 10:47:16 | 1 | Q. | So that was like a 15-minute phone call? |
| | 2 | A. | Yes. |
| | 3 | Q. | And what name do you have DeVan Barbour as? |
| | 4 | A. | D. |
| 10:47:23 | 5 | Q. | Okay.  And why do you have him in there as D? |
| | 6 | A. | Because that's what we call D.  That's what he -- |
| | 7 | we're good friends. | |
| | 8 | | (State's Exhibit Number 8 marked for |
| | 9 | | identification.) |
| 10:47:37 | 10 | Q. | If you can turn your attention to State's |
| | 11 | Exhibit 8. | |
| | 12 | | Do you recall you communicated with DeVan Barbour |
| | 13 | on Snapchat and the defendant on Snapchat as well? | |
| | 14 | A. | Yes, sir. |
| 10:47:56 | 15 | Q. | Do you remember what -- off the top of your head, |
| | 16 | do you remember what DeVan Barbour's Snapchat name was? | |
| | 17 | A. | I do not, sir. |
| | 18 | Q. | Do you remember what your Snapchat name was? |
| | 19 | A. | I think it was my name.  Pretty sure it's my name. |
| 10:48:10 | 20 | Q. | Was it Angela Barbour 10? |
| | 21 | A. | 10, yes. |
| | 22 | Q. | Looking at State's Exhibit 8, is that reflected on |
| | 23 | this document? | |
| | 24 | A. | Yes, sir. |
| 10:48:18 | 25 | Q. | And does this appear to be a record of a chat from |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 10:48:24 | 1 | October 23rd of 2021? |
| | 2 |     A.   Yes, sir. |
| | 3 |     Q.   And how often would you converse with DeVan Barbour |
| | 4 | on Snapchat? |
| 10:48:35 | 5 |     A.   Rarely.  Rarely. |
| | 6 |     Q.   The first time you interacted with DeVan Barbour |
| | 7 | was the incident in question? |
| | 8 |     A.   No, sir. |
| | 9 |     Q.   It was over text? |
| 10:48:49 | 10 |     A.   Repeat your question. |
| | 11 |     Q.   I'm sorry.  When you had this incident where DeVan |
| | 12 | Barbour was calling you repeatedly -- |
| | 13 |     A.   Yes. |
| | 14 |     Q.   -- and Facetimed you from his wife's account, was |
| 10:49:00 | 15 | that the initial contact? |
| | 16 |     A.   Yes.  That was over Snapchat, yes. |
| | 17 |     Q.   And aside from that contact on Snapchat, would |
| | 18 | DeVan Barbour have other contact on Snapchat? |
| | 19 |     A.   We did snap, but it was mostly political, and we |
| 10:49:13 | 20 | were talking about lines and things like that. |
| | 21 |     Q.   So you would have Snapchat messages back and forth |
| | 22 | with him aside from that? |
| | 23 |     A.   Yes.  And friendly banter. |
| | 24 |     Q.   So this record, does it show a Snapchat interaction |
| 10:49:29 | 25 | from October 23rd of 2021? |

| | | |
|---|---|---|
| 10:49:36 | 1 | A.   I'm looking for the date. |
| | 2 | MR. ZELLINGER:   Your Honor, may I approach the |
| | 3 | witness? |
| | 4 | THE COURT:   Yes. |
| 10:49:42 | 5 | THE WITNESS:   It's really small. |
| | 6 | Q.   Yes, I'm sorry.   Does it have a date of |
| | 7 | October 23rd? |
| | 8 | A.   Yes. |
| | 9 | Q.   Is that DeVan Barbour's Snapchat name? |
| 10:49:52 | 10 | A.   I'm going to say so, yes, sir. |
| | 11 | Q.   Do you recall that being your Snapchat? |
| | 12 | A.   Yes, sir. |
| | 13 | MR. ZELLINGER:   At this time, Your Honor, I'd seek |
| | 14 | to admit State's Exhibit 8. |
| 10:50:10 | 15 | MR. TYNDALL:   No objection. |
| | 16 | THE COURT:   So allowed. |
| | 17 | (State's Exhibit Number 8 entered into |
| | 18 | evidence.) |
| | 19 | Q.   If we can look on the bottom left corner -- or I'm |
| 10:50:25 | 20 | sorry. |
| | 21 | A.   Oh, it was October. |
| | 22 | Q.   So is that your Snapchat name, Angela Barbour 10? |
| | 23 | A.   Yes, sir. |
| | 24 | Q.   Okay.   And then it appears that it says the sender |
| 10:50:42 | 25 | user name was DVB4? |

| | | |
|---|---|---|
| 10:50:46 | 1 | A. Yes, sir. |
| | 2 | Q. Okay. And DeVan Barbour is DeVan the IV; is that |
| | 3 | correct? |
| | 4 | A. Yes, sir. |
| 10:50:52 | 5 | Q. Okay. And the date of this appears to be from |
| | 6 | October 23rd of 2021; is that correct? |
| | 7 | A. Yes, sir. |
| | 8 | Q. And it's 222556, which would be like 10:25 p.m., |
| | 9 | assuming that this is in the same timezone that you are in; is |
| 10:51:13 | 10 | that correct? |
| | 11 | A. Yes, sir. |
| | 12 | MR. TYNDALL: It's UTC. |
| | 13 | MR. ZELLINGER: UTC. |
| | 14 | Q. I mean, do you recall what time of night it was? |
| 10:51:25 | 15 | A. It was late. It was very late. |
| | 16 | Q. Okay. So do you know if -- is October when you |
| | 17 | were having this interaction with DeVan Barbour, or do you |
| | 18 | believe it was earlier in July or September, the one that |
| | 19 | culminated in him naked FaceTiming you allegedly from his |
| 10:51:44 | 20 | wife's phone? |
| | 21 | A. I think it was July. |
| | 22 | Q. Okay. And October is when you received the phone; |
| | 23 | is that correct? |
| | 24 | A. Yes. |
| 10:52:04 | 25 | Q. Okay. If you can turn to tab 9. |

| | | |
|---|---|---|
| 10:52:06 | 1 | (State's Exhibit Numbers 9 and 12 marked for |
| | 2 | identification.) |
| | 3 | Q. Is that a photograph of State's Exhibit 12, the |
| | 4 | phone? |
| 10:52:09 | 5 | A. Yes, sir. |
| | 6 | MR. ZELLINGER: Your Honor, I move to admit State's |
| | 7 | Exhibit 9. |
| | 8 | THE COURT: Any objection? |
| | 9 | MR. TYNDALL: What is State's 9, the phone? |
| 10:52:17 | 10 | MR. ZELLINGER: It's just a picture of the phone. |
| | 11 | MR. TYNDALL: I don't have any objection to that, |
| | 12 | no. |
| | 13 | THE COURT: So allowed. |
| | 14 | (State's Exhibit Number 9 entered into |
| 10:52:22 | 15 | evidence.) |
| | 16 | MR. ZELLINGER: Your Honor, can we publish State's |
| | 17 | Exhibit 9? |
| | 18 | THE COURT: Yes, sir. |
| | 19 | (State's Exhibit Number 9 published to the |
| 10:52:26 | 20 | jury.) |
| | 21 | Q. Eventually, did you give that phone to someone? |
| | 22 | A. I gave it to the investigator. |
| | 23 | Q. Investigator Hoffman? |
| | 24 | A. Yes, sir. |
| 10:52:37 | 25 | Q. Okay. When he came to interview you about this? |

| | | |
|---|---|---|
| 10:52:39 | 1 | A.    Yes, sir. |
| | 2 | MR. ZELLINGER:  Can I have one moment, Your Honor? |
| | 3 | THE COURT:  Yes, sir. |
| | 4 | It's almost 11:00.  Let's take a short recess. |
| 10:53:10 | 5 | Ladies and gentlemen, leave your notes there.  They |
| | 6 | are going to escort you out of here.  Just remember the same |
| | 7 | rules.  I know it's been a couple days.  Please don't talk |
| | 8 | about this case among yourself.  Don't let anybody else speak |
| | 9 | with you about it.  Don't do anything on your own.  See you |
| 10:53:25 | 10 | back about 11:15. |
| | 11 | (Jury exits.) |
| | 12 | THE COURT:  Anything for either side before we |
| | 13 | recess? |
| | 14 | MR. ZELLINGER:  Your Honor, just only the relevance |
| 10:54:28 | 15 | argument for the 50C argument.  The relevance of that is that |
| | 16 | the defendant was actively trying to get the information about |
| | 17 | this affair hidden from public view.  He didn't want anybody |
| | 18 | to find out about it.  You heard the testimony when |
| | 19 | Ms. Barbour was talking about it.  He was trying to get her to |
| 10:54:46 | 20 | be quiet.  That's the reason for the extortion.  And |
| | 21 | similarly, it's the reason for this 50C; and that even when he |
| | 22 | takes out the 50C to try to silence her, he still doesn't |
| | 23 | admit on it that they were in a dating relationship.  And so |
| | 24 | that's the relevance.  I didn't want to say that in front of |
| 10:55:00 | 25 | the jury. |

| 10:55:02 | 1 | THE COURT: Mr. Tyndall, anything further? |
| | 2 | MR. TYNDALL: No, sir. |
| | 3 | THE COURT: Okay, guys. Recess for 15 minutes. |
| | 4 | (Recess.) |
| 11:18:06 | 5 | THE COURT: Everybody, welcome back. |
| | 6 | You may resume. |
| | 7 | MR. ZELLINGER: Thank you. |
| | 8 | Q. Ms. Barbour, in addition to the document that we |
| | 9 | looked at with all the phone entries on it, you put that |
| 11:18:20 | 10 | together with your attorney; is that correct? |
| | 11 | A. Yes, sir. |
| | 12 | Q. Do you recall who you gave your -- did you give |
| | 13 | your phone to your attorney and did it -- do you recall what |
| | 14 | happened with your cellphone? |
| 11:18:37 | 15 | A. I gave it to Smithfield Police Department. |
| | 16 | Q. In trying to sort of memorialize everything that |
| | 17 | happened, did you write a document called The Truth of the |
| | 18 | Subordinate? |
| | 19 | A. I did. |
| 11:18:54 | 20 | Q. Okay. And what was the purpose of that? |
| | 21 | A. My attorney initially asked me to write everything |
| | 22 | down, and being a teacher, I always put emotion into it. He |
| | 23 | needed it to be more objective. |
| | 24 | Q. So you wrote it sort of as a narrative; is that |
| 11:19:08 | 25 | right? |

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 11:19:09 | 1 | A.   I did. |
| | 2 | Q.   And in there you wrote about everything that |
| | 3 | happened with DeVan Barbour and the defendant, your affair; is |
| | 4 | that correct? |
| 11:19:17 | 5 | A.   I did, yes, sir. |
| | 6 | Q.   And the things that you testified to this jury |
| | 7 | about today? |
| | 8 | A.   Yes, sir. |
| | 9 | Q.   And do you recall in there, did you write about the |
| 11:19:25 | 10 | incident with DeVan Barbour occurring in October? |
| | 11 | A.   Yes. |
| | 12 | Q.   Okay.  And that -- and the incident being where he |
| | 13 | allegedly naked Facetimed you? |
| | 14 | A.   Yes. |
| 11:19:39 | 15 | Q.   And that would put it that the defendant gave you a |
| | 16 | cellphone -- how much later after that incident did the |
| | 17 | defendant give you a cellphone, if you recall? |
| | 18 | MR. TYNDALL:  Well, Your Honor, objection to -- I |
| | 19 | mean, she said she wrote about it. |
| 11:19:54 | 20 | THE COURT:  Yes, sir.  We'll sustain that.  Let you |
| | 21 | reask, if you would. |
| | 22 | MR. ZELLINGER:  Okay. |
| | 23 | Q.   In that writing, did you actually refer to it as a |
| | 24 | trap at one point? |
| 11:20:06 | 25 | A.   I did. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 11:20:06 | 1 | Q.   And what did you mean by that? |
| | 2 | A.   I was friends with D.  I did not want him to get in |
| | 3 | trouble.  I didn't want D to get in trouble. |
| | 4 | Q.   Okay.  And in fact, he, I mean -- |
| 11:20:18 | 5 | A.   I didn't want to mess up his marriage, and I didn't |
| | 6 | want to get him in trouble. |
| | 7 | Q.   When you said "trap," did you extort DeVan Barbour? |
| | 8 | A.   No. |
| | 9 | Q.   Did you ever send him any text messages threatening |
| 11:20:34 | 10 | him? |
| | 11 | A.   No, sir. |
| | 12 | Q.   Do you know how to spoof text messages? |
| | 13 | A.   I don't even know what that word means. |
| | 14 | Q.   Did you ever talk with the defendant about making |
| 11:20:45 | 15 | phone calls appear that they come from other places? |
| | 16 | A.   No, sir. |
| | 17 | MR. ZELLINGER:  Your Honor, may I approach the |
| | 18 | witness? |
| | 19 | THE COURT:  Yes, sir. |
| 11:21:12 | 20 | (State's Exhibit Number 44 marked for |
| | 21 | identification.) |
| | 22 | Q.   I hand what's been marked for identification as |
| | 23 | State's Exhibit 44.  Do you recognize that? |
| | 24 | A.   Yes, sir. |
| 11:21:33 | 25 | Q.   And is that -- does that appear to be your name |

| | | |
|---|---|---|
| 11:21:37 | 1 | with your phone number? |
| | 2 | A.  Yes, sir. |
| | 3 | Q.  Does it also appear to have a contact for Heather |
| | 4 | Jones? |
| 11:21:43 | 5 | A.  Yes, sir. |
| | 6 | Q.  And that number? |
| | 7 | A.  Yes, sir. |
| | 8 | MR. ZELLINGER:  Your Honor, may I admit State's |
| | 9 | Exhibit 44 at this time? |
| 11:21:49 | 10 | THE COURT:  Mr. Tyndall? |
| | 11 | MR. TYNDALL:  Hold on.  I got these out of order. |
| | 12 | Give me just second.  I don't object to that. |
| | 13 | THE COURT:  So allowed. |
| | 14 | (State's Exhibit Number 44 entered into |
| 11:22:04 | 15 | evidence.) |
| | 16 | (State's Exhibit Number 45 marked for |
| | 17 | identification.) |
| | 18 | Q.  State's Exhibit 45, is that some text exchanges |
| | 19 | with -- |
| 11:22:12 | 20 | A.  Yes, sir. |
| | 21 | Q.  Okay. |
| | 22 | (State's Exhibit Number 46 marked for |
| | 23 | identification.) |
| | 24 | Q.  State's Exhibit 46, is that another text exchange? |
| 11:22:18 | 25 | A.  Yes, sir. |

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 11:22:19 | 1 | Q. Okay. And do you recall that text message? |
| | 2 | A. Yes, sir. |
| | 3 | Q. Would that help -- is that a fair and accurate |
| | 4 | depiction of what that text with that Heather Jones entry look |
| 11:22:30 | 5 | like? |
| | 6 | A. Yes, sir. That went to Ronald's real phone. |
| | 7 | Q. Went to his real phone. |
| | 8 | A. Yes. |
| | 9 | Q. Okay. Not to the Heather Jones' phone. |
| 11:22:38 | 10 | A. Yes. |
| | 11 | MR. ZELLINGER: Your Honor, at this time I'd seek |
| | 12 | to admit 45 and 46 into evidence. |
| | 13 | MR. TYNDALL: No objection. |
| | 14 | THE COURT: So allowed. |
| 11:22:45 | 15 | (State's Exhibit Numbers 45 and 46 entered into |
| | 16 | evidence.) |
| | 17 | (State's Exhibit Number 47 marked for |
| | 18 | identification.) |
| | 19 | Q. State's Exhibit 47, is this the contact for Ronald |
| 11:22:50 | 20 | Johnson? |
| | 21 | A. Yes, sir. |
| | 22 | Q. Does it have his phone number on there? |
| | 23 | A. Yes, sir. |
| | 24 | Q. A phone number found in messages, I guess? |
| 11:22:57 | 25 | A. I guess so. |

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 11:22:59 | 1 | Q. And that comes from your phone; is that correct? |
| | 2 | A. I don't know what that is. I don't ever pay that |
| | 3 | any attention. |
| | 4 | MR. ZELLINGER: Your Honor, the State would seek to |
| 11:23:08 | 5 | admit State's Exhibit 47 at this time. |
| | 6 | MR. TYNDALL: No objection, Your Honor. |
| | 7 | THE COURT: So admitted. |
| | 8 | (State's Exhibit Number 47 entered into |
| | 9 | evidence.) |
| 11:23:11 | 10 | (State's Exhibit Number 48 marked for |
| | 11 | identification.) |
| | 12 | Q. Now, State's Exhibit 48, is that a Facebook post by |
| | 13 | you? |
| | 14 | A. Yes, sir. |
| 11:23:16 | 15 | (State's Exhibit Number 49 marked for |
| | 16 | identification.) |
| | 17 | Q. State's Exhibit 49. Are those some text messages |
| | 18 | with the defendant? |
| | 19 | A. Yes, sir. |
| 11:23:22 | 20 | (State's Exhibit Number 50 marked for |
| | 21 | identification.) |
| | 22 | Q. State's Exhibit 50, are those further text |
| | 23 | messages? |
| | 24 | A. Yes, sir. |
| 11:23:27 | 25 | |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 11:23:27 | 1 | (State's Exhibit Number 51 marked for |
| | 2 | identification.) |
| | 3 | Q.   State's Exhibit 51, are those further text |
| | 4 | messages? |
| 11:23:34 | 5 | A.   Yes, sir. |
| | 6 | (State's Exhibit Number 52 marked for |
| | 7 | identification.) |
| | 8 | Q.   State's Exhibit 52, more text messages about a |
| | 9 | meeting that's coming up with the defendant? |
| 11:23:41 | 10 | A.   Yes, sir. |
| | 11 | MR. ZELLINGER:  Your Honor, at this time I'd seek |
| | 12 | to admit State's Exhibits 48, 49, 51, and 52. |
| | 13 | THE COURT:  Mr. Tyndall, any objection? |
| | 14 | MR. TYNDALL:  No objection. |
| 11:23:54 | 15 | THE COURT:  So allowed. |
| | 16 | (State's Exhibit Numbers 48, 49, 51, and 52 |
| | 17 | entered into evidence.) |
| | 18 | MR. ZELLINGER:  Your Honor, may I publish those at |
| | 19 | this time? |
| 11:24:11 | 20 | THE COURT:  Yes, sir. |
| | 21 | (State's Exhibit Numbers 48, 49, 51, and 52 |
| | 22 | published to the jury.) |
| | 23 | Q.   I'm going to leave this up here, Ms. Barbour, so |
| | 24 | you can see them. |
| 11:24:11 | 25 | If we can start with State's Exhibit 44.  Okay. |

| | | |
|---|---|---|
| 11:24:18 | 1 | And so, is that your name, Angela Barbour? |
| | 2 | A.   Yes, sir. |
| | 3 | Q.   Okay.  And that's your phone number that ends with |
| | 4 | 5376? |
| 11:24:25 | 5 | A.   Yes, sir. |
| | 6 | Q.   919-901-5376. |
| | 7 | A.   Yes, sir. |
| | 8 | Q.   And then that Heather Jones entry, that's 421-4545? |
| | 9 | A.   Yes, sir. |
| 11:24:35 | 10 | Q.   Was that the number for the real Heather Jones? |
| | 11 | A.   I don't know, sir. |
| | 12 | Q.   Whose number was that? |
| | 13 | A.   That's the other phone I have for Ronald Johnson. |
| | 14 | The other one. |
| 11:24:43 | 15 | Q.   Okay.  So you entered that in your phone as Heather |
| | 16 | Jones; is that correct? |
| | 17 | A.   Yes. |
| | 18 | Q.   If we can proceed to State's Exhibit 45. |
| | 19 | Is this a text exchange that you had with the |
| 11:24:58 | 20 | defendant in May of 2021? |
| | 21 | A.   Yes, sir. |
| | 22 | Q.   What did he ask you? |
| | 23 | A.   He asked me what I needed.  What do you need, |
| | 24 | buddy. |
| 11:25:07 | 25 | Q.   What is your response? |

| | | |
|---|---|---|
| 11:25:08 | 1 | A. I need some serious parachuting time right now. |
| | 2 | Q. And I'm sorry to bring this up, but what did |
| | 3 | parachute time mean? |
| | 4 | A. Sex. |
| 11:25:17 | 5 | Q. Why was that called parachute time? |
| | 6 | A. It was in relation to a song, I believe. |
| | 7 | Q. If we can go to State's Exhibit 46. Is this a text |
| | 8 | that you wrote to the defendant? |
| | 9 | A. Yes, sir. |
| 11:25:33 | 10 | Q. Could you read to the jury what you wrote? |
| | 11 | A. Sure. I cannot lay my head down without sharing |
| | 12 | this with you. I've meant every word what I said to you. You |
| | 13 | have brought me so much joy and happiness. I've never cared |
| | 14 | what your name is or who you are. I've also been attracted to |
| 11:25:50 | 15 | you as a person. I can only -- I can only say I'm so sorry |
| | 16 | for disappointing you. I've never been unfaithful or not |
| | 17 | loyal, and I guess I struggled with it after I started falling |
| | 18 | for you because I hated lying to anyone. I'm so big on being |
| | 19 | honest. I've been a big liar. I guess if I failed -- I guess |
| 11:26:12 | 20 | I fell too hard too fast. For what it's worth, I miss you. I |
| | 21 | am being honest when I say my time here with Ryan is coming to |
| | 22 | an end. I've never painted a pretty picture on Facebook. |
| | 23 | Ryan started posting comments on my post just in the last |
| | 24 | month because he knows he's losing me. I told him that |
| 11:26:33 | 25 | to -- that to his face. I hope one day when both our lives |

| 11:26:40 | 1 | settle down we can spend time together again.  Hugs and |
| | 2 | sunshine. |
| | 3 | Q.   So at this time you are in love with the defendant; |
| | 4 | is that correct? |
| 11:26:48 | 5 | A.   Yes. |
| | 6 | Q.   If we can turn to State's Exhibit 47.  Is that the |
| | 7 | number that you had for Ronald Johnson? |
| | 8 | A.   Yes, sir. |
| | 9 | Q.   And that number ends in 3337; is that correct? |
| 11:27:07 | 10 | A.   Yes, sir. |
| | 11 | Q.   There's also a number there that Siri found in |
| | 12 | messages; is that correct? |
| | 13 | A.   Yes, sir. |
| | 14 | Q.   If we can turn to State's Exhibit 48.  Is this the |
| 11:27:23 | 15 | same example of a Facebook post that you posted about the |
| | 16 | defendant? |
| | 17 | A.   Yes, sir. |
| | 18 | Q.   And this is from October 2021? |
| | 19 | A.   Yes, sir. |
| 11:27:34 | 20 | Q.   And -- |
| | 21 | A.   I'm going -- yes. |
| | 22 | Q.   Do you know exactly when this is from? |
| | 23 | A.   By looking at the date, yes, sir. |
| | 24 | Q.   Okay.  Is it possible -- I don't want to skew |
| 11:27:42 | 25 | things though.  Is it possible that you took that capture of |

| | | |
|---|---|---|
| 11:27:46 | 1 | the Facebook thing in October of 2021? |
| | 2 | A.    That is possible. |
| | 3 | Q.   Okay.  So I mean, do you know when this Facebook |
| | 4 | post was -- |
| 11:27:52 | 5 | A.    I'm not really good with timelines, sir. |
| | 6 | Q.    But you would post things on Facebook. |
| | 7 | A.    Positively in favor of Ron. |
| | 8 | Q.    Okay.  And at the time you were dating him; is that |
| | 9 | correct? |
| 11:28:01 | 10 | A.    Yes. |
| | 11 | Q.    This actually appears to be liked by his wife; is |
| | 12 | that correct? |
| | 13 | A.    Yes, sir. |
| | 14 |       We were not dating then.  Not in '20 -- wait.  Yes, |
| 11:28:12 | 15 | we were.  Sorry.  Yes, sir. |
| | 16 | Q.    If we could go to State's Exhibit 49. |
| | 17 |       Is this an example of a text exchange with the |
| | 18 | defendant? |
| | 19 | A.    Yes, sir. |
| 11:28:29 | 20 | Q.    So here it started out:  That's some crazy and |
| | 21 | childish stuff.  LOL.  How old are we?  And then what do you |
| | 22 | respond? |
| | 23 | A.    Right.  I officially have the nomination for the |
| | 24 | vice president for the JCRW. |
| 11:28:43 | 25 | Q.    Okay.  And so what is JCRW? |

| | | |
|---|---|---|
| 11:28:44 | 1 | A.     Johnston County Republican Women's Association. |
| | 2 | Q.     Okay.  And what does he respond?  You can say the |
| | 3 | word.  I don't want to speak for the Court, but I think you |
| | 4 | can say the word out loud.  You can just abbreviate it with |
| 11:28:55 | 5 | the first letter. |
| | 6 | A.     F yea. |
| | 7 | Q.     And what did you respond? |
| | 8 | A.     I'm just waiting for the executive committee spot. |
| | 9 | That's the big deal.  2023 is the year we have to take it. |
| 11:29:06 | 10 | Q.     So you responded to it:  It only took me one year. |
| | 11 | Is that correct? |
| | 12 | A.     I'm sorry.  It only took me one year.  Yes, sir. |
| | 13 | Q.     And then he responded.  On the left is what he |
| | 14 | responded? |
| 11:29:11 | 15 | A.     I'm just waiting for the executive spot.  Yes, sir. |
| | 16 | Q.     Okay.  So what was that exchange? |
| | 17 | A.     He was wanting me on the executive board for the |
| | 18 | GOP. |
| | 19 | Q.     And did you all ever talk about why he wanted you |
| 11:29:26 | 20 | to do that? |
| | 21 | A.     Because I would have say so over who got on the |
| | 22 | yellow ticket. |
| | 23 | Q.     What is a yellow ticket? |
| | 24 | A.     It's the ticket that gets passed out to pretty much |
| 11:29:35 | 25 | every person at a poll that tells -- for the conservative |

| | | |
|---|---|---|
| 11:29:38 | 1 | party that tells them who to vote for to help people vote |
| | 2 | straight ticket. |
| | 3 | Q. Okay. Is that used in primaries as well? |
| | 4 | A. CAAG uses one. I think there's laws against it. |
| 11:29:52 | 5 | It can only be in a general. |
| | 6 | Q. Okay. So that's who the Republican Party is sort |
| | 7 | of endorsing or supporting for the election? |
| | 8 | A. Yes. But the Republican Party is in charge of the |
| | 9 | one that goes out for the general election. |
| 11:30:06 | 10 | Q. Sure. And he wanted you on the executive committee |
| | 11 | to help support him? |
| | 12 | A. Correct. |
| | 13 | Q. Is that correct? |
| | 14 | A. Yes. |
| 11:30:12 | 15 | Q. He said: I'm going to the meeting tonight; is that |
| | 16 | correct? |
| | 17 | A. Yes. |
| | 18 | Q. And this is October. It doesn't say the year, but |
| | 19 | is that October? |
| 11:30:20 | 20 | A. Yes, sir. |
| | 21 | Q. Do you know, is that October 2021? |
| | 22 | A. 2021. |
| | 23 | Q. Okay. Were you excited about becoming |
| | 24 | vice-president? |
| 11:30:27 | 25 | A. Yes. I was proud of myself. |

| | | |
|---|---|---|
| 11:30:29 | 1 | Q.   Are you still the vice president of the Johnston |
| | 2 | County Republican Women's -- |
| | 3 | A.   I was asked to step down. |
| | 4 | Q.   And when did you get asked to step down? |
| 11:30:36 | 5 | A.   It was at a bowling fundraiser that I organized for |
| | 6 | the GOP.  I did it for the JCRW.  I was asked to step down. |
| | 7 | Q.   Okay.  And was that after the details of your |
| | 8 | affair emerged? |
| | 9 | A.   The president knew what was going on.  She said it |
| 11:30:52 | 10 | would probably be best if that's what happened. |
| | 11 | Q.   Okay.  Did you step down? |
| | 12 | A.   I did. |
| | 13 | Q.   If we can go to State's Exhibit 51.  Could you -- |
| | 14 | if you can see -- they're in front of you as well on paper. |
| 11:31:16 | 15 | It might be easier to read. |
| | 16 | MR. ZELLINGER:  Your Honor, may I approach the |
| | 17 | witness? |
| | 18 | THE COURT:  Yes. |
| | 19 | THE WITNESS:  I'm sorry. |
| 11:31:20 | 20 | Q.   It might be easier to read from there. |
| | 21 | A.   I got it. |
| | 22 | Q.   Do you have 51 in front of you? |
| | 23 | A.   Yes. |
| | 24 | Q.   He writes to you -- can you read what he writes to |
| 11:31:35 | 25 | you? |

| | | |
|---|---|---|
| 11:31:36 | 1 | A. I'm almost there. Just keep your ears open when I |
| | 2 | show up and see how people react to me. I always like to know |
| | 3 | where people stand on how they think about me. And then: |
| | 4 | Tough room. And then: Damn. |
| 11:31:51 | 5 | Q. And you respond? |
| | 6 | A. Women. |
| | 7 | Q. Okay. And is that a shrug emoji? |
| | 8 | A. Yes. When he walked into a room with a bunch of |
| | 9 | women. |
| 11:32:01 | 10 | Q. Okay. And then what does he respond? |
| | 11 | A. Phew. |
| | 12 | Q. And what do you respond? |
| | 13 | A. You working tonight? Can I trust Dale? |
| | 14 | Q. Okay. And what does he respond? |
| 11:32:10 | 15 | A. He seems cool, like he has my back. I trust him. |
| | 16 | Q. Okay. And then what do you respond? |
| | 17 | A. No -- no literary conference this weekend, I |
| | 18 | suppose. |
| | 19 | It was in my calendar because we were supposed to |
| 11:32:22 | 20 | be out of town that weekend together. |
| | 21 | Q. Okay. |
| | 22 | A. And then he changed his mind all of a sudden. |
| | 23 | Q. Okay. And so literary conference -- was there |
| | 24 | actually a literary conference? |
| 11:32:30 | 25 | A. No. |

Angela Barbour - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 11:32:31 | 1 | Q. Okay. And is that sort of illustrative of the type |
| | 2 | of stuff you all would communicate about? |
| | 3 | A. Yes, sir. |
| | 4 | Q. Okay. And you all would talk about politics a fair |
| 11:32:41 | 5 | amount; is that correct? |
| | 6 | A. Yes, sir. |
| | 7 | Q. If we can go to State's Exhibit 52. Could you read |
| | 8 | what you wrote to the defendant? |
| | 9 | A. Just FYI Lyn is here at our meeting. |
| 11:33:15 | 10 | Q. And then did you respond: What meeting? |
| | 11 | A. What meeting? Where is it? |
| | 12 | Q. Okay. And then what was that? |
| | 13 | A. The JCRW -- do you want me to read? |
| | 14 | Q. Yes, could you read that? |
| 11:33:24 | 15 | A. The Johnston County Republican Women, yellow house. |
| | 16 | Q. Can you read what you wrote back? |
| | 17 | A. Also, Michelle Antoine reached out to me as well. |
| | 18 | Now I'm sitting with her conversing. Trust or no. |
| | 19 | This is before I knew these people. |
| 11:33:38 | 20 | Q. Okay. And what is -- I mean, were you asking him |
| | 21 | whether you could trust Michelle Antoine? |
| | 22 | A. Uh-huh. |
| | 23 | Q. And is she someone who's on the school board? |
| | 24 | A. She is. |
| 11:33:46 | 25 | Q. Could you read what he responded? |

| | | |
|---|---|---|
| 11:33:48 | 1 | A. I'm almost there. Just keep your ears open when I |
| | 2 | show up and see when I show up and see how people react to me. |
| | 3 | I always like to know where people stand on how they think |
| | 4 | about me. |
| 11:33:59 | 5 | Q. The next part is what we just read in the prior |
| | 6 | text messages? |
| | 7 | A. Yes. |
| | 8 | Q. So it really goes 52 then 51; is that correct? |
| | 9 | A. Yes, sir. |
| 11:34:07 | 10 | Q. That's my fault. |
| | 11 | He wants to see how people react to him; is that |
| | 12 | correct? |
| | 13 | A. Yes, sir. |
| | 14 | Q. Ms. Barbour, do you recall when DeVan Barbour |
| 11:34:38 | 15 | talked to you -- you can put those down. I'm sorry. When |
| | 16 | DeVan Barbour talked to you, he talked about you and mentioned |
| | 17 | there was some recordings that he was concerned about coming |
| | 18 | out; is that correct? |
| | 19 | A. Uh-huh. |
| 11:34:52 | 20 | Q. Did you -- when he first spoke to you about those |
| | 21 | recordings, did you know what those recordings sounded like? |
| | 22 | A. I did not. |
| | 23 | Q. Did you know if those recordings existed? |
| | 24 | A. No. |
| 11:35:02 | 25 | Q. Did you make those recordings? |

| | | |
|---|---|---|
| 11:35:03 | 1 | A. No. |
| | 2 | Q. So when he first talked to you, had you heard any |
| | 3 | recordings? |
| | 4 | A. No, sir. |
| 11:35:10 | 5 | Q. Since that time have you played those recordings? |
| | 6 | A. Yes, sir. |
| | 7 | Q. And are they your voice on there? |
| | 8 | A. Yes, sir. |
| | 9 | Q. And are they describing what happened with DeVan |
| 11:35:22 | 10 | Barbour? |
| | 11 | A. Yes, sir. |
| | 12 | MR. ZELLINGER: Your Honor, may I approach the |
| | 13 | witness? |
| | 14 | THE COURT: Yes. |
| 11:35:41 | 15 | (State's Exhibit Numbers 27 and 30 marked for |
| | 16 | identification.) |
| | 17 | Q. Ms. Barbour, I hand you what's been marked for |
| | 18 | identification State's Exhibit 27 and 30. Do you recall |
| | 19 | listening to those recordings with the State? |
| 11:35:59 | 20 | A. Yes, sir. |
| | 21 | Q. In preparation for this trial, you listened to |
| | 22 | those? |
| | 23 | A. Yes, sir. |
| | 24 | Q. Prior to getting ready for this trial, had you |
| 11:36:09 | 25 | heard those before? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 11:36:10 | 1 | A.    Heard them with Richard. |
| | 2 | Q.    With Investigator Hoffman? |
| | 3 | A.    Yes.  A small portion.  Not like with you guys. |
| | 4 | MR. ZELLINGER:  Your Honor, at this time I seek to |
| 11:36:19 | 5 | play portions of State's Exhibit 27 and 30 to see if |
| | 6 | Ms. Barbour recognizes her voice before moving to admit them. |
| | 7 | MR. TYNDALL:  Your Honor, the only objection we |
| | 8 | have is the pretrial motion, and we just renew that.  Other |
| | 9 | than that, we don't. |
| 11:36:37 | 10 | THE COURT:  Yes, sir.  That's something I'm not |
| | 11 | sure if it -- if it was this Court or another Court.  It's |
| | 12 | something ruled on previously. |
| | 13 | MR. TYNDALL:  Right.  Right. |
| | 14 | THE COURT:  In the Court's discretion, it will be |
| 11:36:47 | 15 | allowed to be played for that limited purpose. |
| | 16 | MR. ZELLINGER:  If we can start with State's |
| | 17 | Exhibit 27. |
| | 18 | (State's Exhibit Number 27 published to the |
| | 19 | jury.) |
| 11:37:37 | 20 | Q.    Ms. Barbour, that was State's Exhibit 27.  Do you |
| | 21 | recognize your voice on there? |
| | 22 | A.    Yes. |
| | 23 | Q.    Is that you talking? |
| | 24 | A.    Yes, sir. |
| 11:37:44 | 25 | Q.    That is you talking? |

11:37:45 A. Yes, sir.
Q. Do you know where that was when you said that?
A. No, sir. I have no idea.
Q. Do you know who you were talking to?
11:37:52 A. No, sir. I have no idea.
Q. If we could play State's Exhibit 30.
(State's Exhibit Number 30 published to the jury.)
Q. Is that your voice with some music being played
11:38:29 behind it or over it?
A. Yes, sir.
Q. Do you know who that was?
A. The only person I can think that would be is my best friend April Lee, but I'm not sure.
11:38:42 Q. Do you know if that was at, like, an event or anything where the music was being played?
A. Cleveland Draft House, possibly.
Q. So you think April Lee recorded you; is that correct?
11:38:51 A. No, I don't think she recorded me. There was somebody else there that knew Ronald. That night they came and spoke with us and walked away.
Q. Who was that person?
A. I have no idea.
11:39:00 Q. How do you know they knew Ronald?

| | | |
|---|---|---|
| 11:39:03 | 1 | A. Because he was a board member. |
| | 2 | Q. Do you know who that person is? |
| | 3 | A. Uh-uh. |
| | 4 | Q. And there's music being played in the background; |
| 11:39:14 | 5 | is that correct? |
| | 6 | A. Uh-huh. I talked to April, Kevin, and Ronald. |
| | 7 | Q. Did you tell anybody else about what had happened? |
| | 8 | A. Not that, no, sir. |
| | 9 | Q. So the folks you talked to was Kevin Donovan; is |
| 11:39:39 | 10 | that correct? |
| | 11 | A. Uh-huh. |
| | 12 | Q. Ronald Johnson? |
| | 13 | A. Uh-huh. |
| | 14 | Q. And who else? |
| 11:39:44 | 15 | A. April Lee. |
| | 16 | Q. You say you didn't talk to anybody about what had |
| | 17 | happened except -- |
| | 18 | A. About the DeVan Barbour incident. |
| | 19 | Q. Okay. That was prior to the charges being taken |
| 11:40:15 | 20 | out; is that correct? |
| | 21 | A. Yes. |
| | 22 | Q. After the charges became public -- |
| | 23 | A. That -- yes, I did talk to quite -- |
| | 24 | Q. -- you talked to other people about it? |
| 11:40:23 | 25 | A. Yes, sir. |

| | | |
|---|---|---|
| 11:40:24 | 1 | Q.   And you did talk to other people about it? |
| | 2 | A.   I did. |
| | 3 | Q.   But in this time period leading up to the primary |
| | 4 | in May 2022, the only folks that you believe you talked to |
| 11:40:33 | 5 | about it were Kevin Donovan, Ronald Johnson, and April Lee? |
| | 6 | A.   Yes. |
| | 7 | MR. ZELLINGER:   Nothing further, Your Honor. |
| | 8 | THE COURT:   Mr. Tyndall. |
| | 9 | MR. TYNDALL:   Thank you, Your Honor. |
| 10:05:31 | 10 | CROSS-EXAMINATION BY MR. TYNDALL: |
| | 11 | MR. TYNDALL:   Thank you, Your Honor. |
| | 12 | Q.   Ms. Barbour, let me talk to you a little bit about |
| | 13 | the exhibit that you created, the spreadsheet.  Do you |
| | 14 | remember doing that? |
| 11:41:34 | 15 | A.   I did create the spreadsheet. |
| | 16 | Q.   You said you did it with your lawyer.  Who is your |
| | 17 | lawyer? |
| | 18 | A.   I did the spreadsheet by myself.  I did it on the |
| | 19 | advice of my lawyer. |
| 11:41:44 | 20 | Q.   Who is that? |
| | 21 | A.   Andrew Dickerhoff. |
| | 22 | Q.   Who does he work with? |
| | 23 | A.   Who does he work with? |
| | 24 | Q.   Is he in a firm or by himself? |
| 11:41:51 | 25 | A.   He works with a group of individuals. |

Angela Barbour - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 11:41:53 | 1 | Q.   What firm? |
| | 2 | A.   I honestly do not know name of that firm. |
| | 3 | Q.   Is Jimmy Lawrence a member of that firm? |
| | 4 | A.   Yes, sir. |
| 11:42:00 | 5 | Q.   Now -- |
| | 6 | MR. TYNDALL:  Can we display that exhibit again, |
| | 7 | please? |
| | 8 | MR. ZELLINGER:  Which exhibit? |
| | 9 | MR. TYNDALL:  I'm sorry.  It is State's Exhibit |
| 11:42:12 | 10 | Number 5. |
| | 11 | MS. JAMES:  5A. |
| | 12 | MR. TYNDALL:  Yes, 5A.  Can we move to the page |
| | 13 | around April 12th, 13th, and 14th, please?  I'm sorry, 2022. |
| | 14 | I apologize.  There's a number of years here, but April of |
| 11:42:59 | 15 | 2022. |
| | 16 | Q.   Now, Ms. Barbour, do you see a notation for |
| | 17 | 4/13/2022? |
| | 18 | A.   4/13/2022, yes, sir. |
| | 19 | Q.   Around 2:27? |
| 11:43:38 | 20 | A.   Yes, sir. |
| | 21 | Q.   Do you know what that's for? |
| | 22 | A.   Not right off the top of my head without looking at |
| | 23 | my spreadsheet. |
| | 24 | Q.   And your spreadsheet is where you take information |
| 11:43:48 | 25 | and you put it in the spreadsheet; is that right? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 11:43:51 | 1 | A. Yes, sir. |

2      Q.   And do you remember having a phone call with

3  Mr. Johnson on 4/13/2022?

4      A.   If it says I did, but there's nothing there, for

11:44:03  5  some reason.  But, yes, I would say that is a phone call

6  between me and him because that's why it's on there.

7      Q.   Do you remember him reaching out to you and asking

8  you to leave him alone?

9      A.   No, sir.

11:44:20  10     Q.   Well, do you remember talking to Owen Phillips on

11  April 12th, 2022?

12     A.   I remember talking to Owen Phillips.  I cannot give

13  you an exact time or date.

14     Q.   And do you remember having a phone call with

11:44:38  15  Mr. Johnson the following day?

16     A.   I talked with Ronald all the time, yes, sir.

17     Q.   Well, it's not noted in your spreadsheet.

18     A.   Then that means I didn't talk to him, sir.

19     Q.   I'm sorry?

11:44:50  20     A.   That means I did not talk to him.

21          THE COURT:  You are saying you did not talk to him?

22          THE WITNESS:  If it's not on that spreadsheet, I

23  did not talk to him.  Pull my phone records.

24     Q.   Well, is there something that might refresh your

11:45:04  25  recollection about a conversation with him on the 13th of

Angela Barbour - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 11:45:08 | 1 | April? |
| | 2 |       A.   I don't know. |
| | 3 |         MR. TYNDALL:  Your Honor, what I'm going to do is |
| | 4 | ask to play a recording. |
| 11:45:19 | 5 |         THE COURT:  Yes, sir. |
| | 6 |         MR. ZELLINGER:  Your Honor, as long as that doesn't |
| | 7 | have the defendant's voice on it, only Ms. Barbour's voice on |
| | 8 | it, I don't have an objection. |
| | 9 |         MR. TYNDALL:  Well, we can play it outside the |
| 11:45:28 | 10 | presence of the jury, but, you know, I'm going to ask to play |
| | 11 | that. |
| | 12 |         THE WITNESS:  I know what you're talking about -- |
| | 13 |         THE COURT:  Hang on a minute.  We'll let him ask a |
| | 14 | question. |
| 11:45:36 | 15 |         Can you guys approach a minute? |
| | 16 |         (Sidebar.) |
| | 17 |         THE COURT:  Ladies and gentlemen, I'm going to ask |
| | 18 | you to step out.  I told you there will be times we need you |
| | 19 | to step outside.  It should be five, ten minutes and we'll be |
| 11:46:30 | 20 | back with you. |
| | 21 |         (Jury exits.) |
| | 22 |         THE COURT:  Mr. Tyndall, whenever you are ready. |
| | 23 |         MR. TYNDALL:  Your Honor, it's going to take us a |
| | 24 | minute to pull it up.  While we're doing that, I can show her |
| 11:47:27 | 25 | something else that might help. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 11:47:36 | 1 | May I approach, Your Honor? |
| | 2 | THE COURT: Yes, sir. |
| | 3 | MR. TYNDALL: Your Honor, I'm going to approach -- |
| | 4 | what would this be, Val? What number would this be? |
| 11:47:53 | 5 | MR. BRUDER: This would be 6 for us. |
| | 6 | (Defendant's Exhibit Number 6 marked for |
| | 7 | identification.) |
| | 8 | VOIR DIRE EXAMINATION BY MR. TYNDALL: |
| | 9 | Q. Defendant's Number 6, just for purposes of |
| 11:47:58 | 10 | refreshing her recollection. Now, you recognize your number? |
| | 11 | A. Yes, sir. |
| | 12 | Q. What's the number? |
| | 13 | A. 901-5376. |
| | 14 | Q. And it does appear that there's a number -- this |
| 11:48:10 | 15 | highlighted section, is there another a number there? |
| | 16 | A. Yes, sir. |
| | 17 | Q. Okay. And what's that number? |
| | 18 | A. 919-320-3337. |
| | 19 | Q. And do you recognize that number? |
| 11:48:19 | 20 | A. Ronald Johnson's number. |
| | 21 | Q. Okay. And does it appear that's a phone call to |
| | 22 | you? |
| | 23 | A. Yes, sir. |
| | 24 | Q. And does it appear that that date is -- what's the |
| 11:48:26 | 25 | date? |

| 11:48:27 | 1 | A. 4/13. |
| | 2 | Q. 2022? |
| | 3 | A. Yes, sir, 2022. |
| | 4 | Q. Does that refresh your recollection as to whether |
| 11:48:33 | 5 | you had -- |
| | 6 | A. Yes, sir. |
| | 7 | Q. -- a conversation with Mr. Johnson? |
| | 8 | A. Yes, sir. It's on the record, yes, sir. |
| | 9 | Q. Do you remember the contents of that conversation? |
| 11:48:50 | 10 | A. No, sir. |
| | 11 | Q. You don't remember what you all talked about? |
| | 12 | A. We had a lot of conversations, sir. I'm just being |
| | 13 | honest. |
| | 14 | MR. TYNDALL: While they are doing that, can I show |
| 11:50:04 | 15 | this to the -- |
| | 16 | (Defendant's Exhibit Number 7 marked for |
| | 17 | identification.) |
| | 18 | MR. TYNDALL: Your Honor, may I approach? |
| | 19 | MR. ZELLINGER: Your Honor, I'm concerned we're |
| 11:51:30 | 20 | going a little off the rails on the voir dire here. My |
| | 21 | understanding is he wanted to refresh her memory with a |
| | 22 | recording, but that's a transcript of that recording. |
| | 23 | MR. TYNDALL: This is a transcript. I'm going to |
| | 24 | see if that refreshes her recollection about what they talked |
| 11:51:46 | 25 | about. |

| | | |
|---|---|---|
| 11:51:46 | 1 | THE COURT: It's the same as the recording; is that |
| | 2 | right? |
| | 3 | MR. TYNDALL: Yes, Your Honor. |
| | 4 | MR. ZELLINGER: That's fine. |
| 11:51:51 | 5 | Q. I show you Defendant's Number 7. Will you just |
| | 6 | read that to yourself, please. |
| | 7 | A. The whole thing? |
| | 8 | Q. Yes. It's not very long. |
| | 9 | A. Or the highlighted? |
| 11:52:01 | 10 | Q. No. Just read the whole thing. |
| | 11 | A. Out loud? |
| | 12 | Q. No, no. To yourself. |
| | 13 | A. I'm sorry. I recall this conversation, if this is |
| | 14 | what you needed me to do. |
| 11:52:20 | 15 | Q. You do recall? |
| | 16 | A. I do recall. But I'm -- I recall this |
| | 17 | conversation, yes. |
| | 18 | MR. TYNDALL: If you have the recording, we can |
| | 19 | play it now. |
| 11:55:42 | 20 | THE WITNESS: Please do. Can I keep this while you |
| | 21 | play it? |
| | 22 | MR. TYNDALL: Yes, you can keep that. |
| | 23 | (Defendant's Exhibit Number 7 played.) |
| | 24 | MR. ZELLINGER: Did she just read the whole thing? |
| 12:00:53 | 25 | Q. Did that refresh your recollection -- |

| | | |
|---|---|---|
| 12:00:55 | 1 | A.   Yes, sir. |
| | 2 | Q.   -- about the -- does that refresh your recollection |
| | 3 | about the conversation you had with Mr. Johnson on the 13th of |
| | 4 | April 2022? |
| 12:01:06 | 5 | A.   Yes, sir. |
| | 6 | THE COURT:  Are you ready for the jury? |
| | 7 | MR. ZELLINGER:  I have some questions for voir |
| | 8 | dire. |
| | 9 | THE COURT:  Sorry. |
| 12:01:17 | 10 | VOIR DIRE EXAMINATION BY MR. ZELLINGER: |
| | 11 | Q.   That recording you were just played, do you know |
| | 12 | what date that's from? |
| | 13 | A.   The -- he said the 13th. |
| | 14 | Q.   Do you know that that's from the 13th? |
| 12:01:26 | 15 | A.   I do not. |
| | 16 | Q.   Could it be from December of 2021? |
| | 17 | A.   It could be. |
| | 18 | Q.   Could it June 2021? |
| | 19 | A.   It could be. |
| 12:01:32 | 20 | Q.   The incidents discussed in there, does that make |
| | 21 | you think it's from a certain time period? |
| | 22 | A.   It was toward the end of our relationship. |
| | 23 | Everything was done at that point.  He was trying to make me |
| | 24 | look like the bad guy. |
| 12:01:46 | 25 | Q.   So that was toward the end of your relationship? |

| | | |
|---|---|---|
| 12:01:48 | 1 | A.   Yes. |
| | 2 | Q.   You can't say it was April 13; is that correct? |
| | 3 | A.   No, sir, I cannot. |
| | 4 | MR. ZELLINGER:  Nothing further, Your Honor. |
| 12:01:55 | 5 | THE COURT:  Anything further? |
| | 6 | VOIR DIRE EXAMINATION BY MR. TYNDALL: |
| | 7 | Q.   Had you talked to Owen Phillips the night before? |
| | 8 | A.   I did, yes, sir. |
| | 9 | Q.   The phone record I just showed you, did that |
| 12:02:01 | 10 | refresh your recollection that you at least had a conversation |
| | 11 | with my client on the 13th of April? |
| | 12 | A.   If it's in the records, I did.  But I don't know if |
| | 13 | that's the exact date of that conversation. |
| | 14 | Q.   Okay.  But you know that this conversation was one |
| 12:02:17 | 15 | of your last conversations? |
| | 16 | A.   It was, yes, sir. |
| | 17 | Q.   With Mr. Johnson? |
| | 18 | A.   Yes, sir, it was. |
| | 19 | THE COURT:  Ready? |
| 12:02:26 | 20 | MR. ZELLINGER:  Quick follow up. |
| | 21 | VOIR DIRE EXAMINATION BY MR. ZELLINGER: |
| | 22 | Q.   You talked with the defendant a bunch of times in |
| | 23 | January, February, March of 2022; is that correct? |
| | 24 | A.   I did. |
| 12:02:33 | 25 | Q.   So do you know that that recording is from |

| | | |
|---|---|---|
| 12:02:36 | 1 | April 13th? |
| | 2 | A.   I do not know it's from April 13th. |
| | 3 | Q.   Thank you. |
| | 4 | MR. ZELLINGER:  Nothing further, Your Honor. |
| 12:02:42 | 5 | THE COURT:  All right.  You can get them in. |
| | 6 | (Jury enters.) |
| | 7 | THE COURT:  Mr. Tyndall, whenever you are ready. |
| | 8 | MR. TYNDALL:  Thank you, Your Honor. |
| | 9 | CROSS-EXAMINATION BY MR. TYNDALL: |
| 12:04:51 | 10 | Q.   Now, Ms. Barbour, let me just go back.  You just |
| | 11 | heard a recording -- |
| | 12 | A.   Yes, sir. |
| | 13 | Q.   -- of a phone call? |
| | 14 | A.   Yes, sir. |
| 12:04:59 | 15 | Q.   And did you recognize your voice on that phone |
| | 16 | call? |
| | 17 | A.   I did, sir. |
| | 18 | Q.   Did that refresh your recollection about a |
| | 19 | conversation you had with Mr. Johnson in at least some time in |
| 12:05:13 | 20 | March or April of 2022? |
| | 21 | A.   I don't know when the actual recording took place, |
| | 22 | but I do know it was a conversation between myself and Ron. |
| | 23 | MR. TYNDALL:  May I approach, Your Honor? |
| | 24 | THE COURT:  Yes, sir. |
| 12:05:43 | 25 | MR. TYNDALL:  I think this has been previously |

| | | |
|---|---|---|
| 12:05:44 | 1 | marked as Defendant's Exhibit Number 6. |
| | 2 | Q. Ms. Barbour, I've shown you this before; is that |
| | 3 | right? |
| | 4 | A. The conversation -- oh, that? Yes, the |
| 12:05:57 | 5 | spreadsheet. |
| | 6 | Q. Do you recognize the spreadsheet? |
| | 7 | A. Yes, sir. |
| | 8 | Q. Does that refresh your recollection that you had a |
| | 9 | conversation with my client on April 13th of 2022? |
| 12:06:06 | 10 | A. I do not know if it was the exact -- yes, I had a |
| | 11 | conversation with him in April. |
| | 12 | Q. Do you need to see the phone record again? |
| | 13 | A. No, sir. I'm good. |
| | 14 | Q. So you know you had a conversation on April 13th |
| 12:06:20 | 15 | with my client; is that right? |
| | 16 | A. Yes, sir. |
| | 17 | Q. And was that one of the last conversations you had |
| | 18 | with him? |
| | 19 | A. I would have to look at the phone records to know |
| 12:06:30 | 20 | that. |
| | 21 | Q. Do you know that you also had a conversation with |
| | 22 | him that -- well, let me ask you this. |
| | 23 | MR. TYNDALL: May I approach, Your Honor? |
| | 24 | THE COURT: Yes, sir. |
| 12:06:43 | 25 | Q. After February, and we'll talk a little bit about |

| | | |
|---|---|---|
| 12:06:46 | 1 | your relationship, but you said in response to Mr. Zellinger's |
| | 2 | questions that you were sad when the relationship ended. |
| | 3 | A. I was, yes, sir. |
| | 4 | Q. And the relationship ended in February of 2022? |
| 12:07:01 | 5 | A. I believe that's about the time frame, yes, sir. |
| | 6 | Q. Is it fair to say you weren't very happy when the |
| | 7 | relationship ended. |
| | 8 | A. Yes, sir. |
| | 9 | Q. And you wanted it to continue; is that fair to say? |
| 12:07:12 | 10 | A. To continue? Not with what was going on, no, sir. |
| | 11 | At that time, yes, I did think we were going to have a |
| | 12 | relationship. |
| | 13 | Q. And so -- |
| | 14 | A. I don't want one now. |
| 12:07:22 | 15 | Q. I'm sorry. Go ahead. |
| | 16 | A. I'm sorry. I don't want one now. |
| | 17 | Q. I'm not asking you about right now, Ms. Barbour. |
| | 18 | I'm asking you February 2022, you did not want your |
| | 19 | relationship with Mr. Johnson to end; did you? |
| 12:07:36 | 20 | A. No, sir. |
| | 21 | Q. And in fact, you continued to contact him and text |
| | 22 | with him; is that right? |
| | 23 | A. He continued to contact me as well. |
| | 24 | Q. Well, were you sometimes upset with his lack of |
| 12:07:51 | 25 | response to you after February 2022? |

Angela Barbour - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 12:07:54 | 1 | A. Yes. |
| | 2 | Q. And did you criticize him for avoiding you after |
| | 3 | February of 2022? |
| | 4 | A. To him? |
| 12:08:04 | 5 | Q. Yes. |
| | 6 | A. No. |
| | 7 | MR. TYNDALL: May I approach, Your Honor? |
| | 8 | THE COURT: Yes, sir. |
| | 9 | MR. TYNDALL: Defendant Exhibit Number 8. |
| 12:08:12 | 10 | (Defendant's Exhibit Number 8 marked for |
| | 11 | identification.) |
| | 12 | Q. Ms. Barbour, I'm going to show you what's been |
| | 13 | marked Defendant's Exhibit 8 for purposes of refreshing your |
| | 14 | recollection. |
| 12:09:09 | 15 | A. Yes, sir. |
| | 16 | Q. If you will just read the front page to yourself |
| | 17 | and then I'm going to ask you questions about it. |
| | 18 | A. Yes, sir. |
| | 19 | Q. Now, did that refresh your recollection, |
| 12:09:41 | 20 | Ms. Barbour -- |
| | 21 | A. Yes, sir. |
| | 22 | Q. -- about a text exchange you had with him on |
| | 23 | March 9 of 2022? |
| | 24 | A. Yes, sir. |
| 12:09:48 | 25 | Q. Did you send him sort of a lengthy text about a |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Angela Barbour - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 12:09:54 | 1 | person name Holcombe, which I assume is Superior Court Judge |
| | 2 | Paul Holcombe; is that correct? |
| | 3 | A.   Yes, sir. |
| | 4 | Q.   And you asked:  I need a little help.  Any ideas? |
| 12:10:05 | 5 | Is that right? |
| | 6 | A.   Yes.  It was -- we were planning -- I was planning |
| | 7 | for the JCRW, the school board form, and Ronald was working on |
| | 8 | questions for that. |
| | 9 | Q.   Okay.  And you said -- after you said, "any ideas," |
| 12:10:22 | 10 | is it fair to say Mr. Johnson gave a short response? |
| | 11 | MR. ZELLINGER:  Objection. |
| | 12 | THE COURT:  I'll sustain and let you reask, if you |
| | 13 | would. |
| | 14 | MR. TYNDALL:  Okay. |
| 12:10:32 | 15 | Q.   Well, during this text exchange, did it end with: |
| | 16 | Once again avoiding. |
| | 17 | A.   Yes, sir. |
| | 18 | Q.   So you were saying, once again he's avoiding you? |
| | 19 | A.   Yes, sir. |
| 12:10:40 | 20 | Q.   That was your point? |
| | 21 | A.   Yes, sir. |
| | 22 | Q.   Is that right?  Is that -- and that was March of |
| | 23 | 2022? |
| | 24 | A.   I don't know when that was.  You have to show me |
| 12:10:50 | 25 | the date. |

Angela Barbour - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 12:10:51 | 1 | Q. I'm sorry? |
| | 2 | A. You'd have to show me the date again before I say |
| | 3 | yes, sir. |
| | 4 | MR. TYNDALL: May I approach, Your Honor? |
| 12:10:58 | 5 | THE COURT: Yes, sir. |
| | 6 | Q. I'm going to show you what's been marked |
| | 7 | Defendant's Exhibit 8 for purposes of refreshing your |
| | 8 | recollection. Ms. Barbour, does that refresh your |
| | 9 | recollection? |
| 12:11:10 | 10 | A. Yes, sir. |
| | 11 | Q. What date did you have the text exchange? |
| | 12 | A. March 9th, 2022. |
| | 13 | Q. Now, do you remember having a phone conversation |
| | 14 | about a month later with Mr. Johnson? |
| 12:11:36 | 15 | A. I talked with Ron off and on toward the end of our |
| | 16 | relationship. Not as much as we used to, but I can't tell you |
| | 17 | when that phone conversation took place. |
| | 18 | Q. Well, let me ask you about a conversation that we |
| | 19 | refreshed your recollection about a little earlier. |
| 12:11:52 | 20 | A. Okay. |
| | 21 | Q. Now that we've refreshed your recollection, do you |
| | 22 | remember that conversation? |
| | 23 | A. Phone conversation? |
| | 24 | Q. Yes. |
| 12:11:58 | 25 | A. I do remember the phone conversation, yes, sir. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 12:12:01 | 1 | Q. And during that conversation, you mentioned that |
| | 2 | you had a conversation last night with him; is that right? |
| | 3 | A. Correct. With Owen. |
| | 4 | Q. Well, it says "with him." I was going to ask, |
| 12:12:19 | 5 | who's "him?" |
| | 6 | A. It's Owen. |
| | 7 | Q. Is that Owen Phillips? |
| | 8 | A. Yes. I remember that. |
| | 9 | Q. Whenever this conversation was, you had had a |
| 12:12:25 | 10 | conversation with Owen Phillips the night before? |
| | 11 | A. Possibly. I mean, yes, if that's what the records |
| | 12 | show. |
| | 13 | Q. Later in the conversation you said: Ronald, that |
| | 14 | was just spoken about last night, literally last night. Do |
| 12:12:46 | 15 | you remember saying that? |
| | 16 | A. I do. |
| | 17 | Q. Was that in response to questions about some |
| | 18 | conspiracy theories? |
| | 19 | MR. ZELLINGER: Objection. Objection. |
| 12:12:53 | 20 | THE COURT: I'll sustain and let you reask. |
| | 21 | Q. Well, when you're talking about that, are you |
| | 22 | referring to allegations that Mr. Johnson was trying to get |
| | 23 | you to sleep with people for information? |
| | 24 | A. No, sir. That's not what that was about. |
| 12:13:11 | 25 | That's -- that was just -- that was about our relationship. |

| | | |
|---|---|---|
| 12:13:15 | 1 | Q. Well -- okay. |
| | 2 | MR. TYNDALL: Let me approach again, Your Honor, if |
| | 3 | I may? |
| | 4 | THE COURT: Yes, sir. |
| 12:13:20 | 5 | Q. Ms. Barbour, I'm going to show you what's been |
| | 6 | marked as Defendant's Exhibit Number 7. |
| | 7 | A. We were not discussing DeVan Barbour in that. |
| | 8 | Q. I didn't ask about that. |
| | 9 | A. Oh, I thought that's what you wanted to know. |
| 12:13:32 | 10 | Q. I haven't mentioned DeVan Barbour, I don't think. |
| | 11 | But that's okay. Maybe I asked a bad question. Let me clear |
| | 12 | it up. |
| | 13 | On Page 2 at the line that says 217. Will you read |
| | 14 | that to refresh your recollection about what you were talking |
| 12:13:48 | 15 | about? |
| | 16 | A. Read Ronald's response? Right here? |
| | 17 | Q. Read to it yourself. Not out loud, if you will. |
| | 18 | A. All right. Sorry. (Witness reads document.) |
| | 19 | That was a lie. That was a lie. This is not true |
| 12:14:06 | 20 | what he's saying. That is the truth. |
| | 21 | MR. ZELLINGER: Your Honor, I ask you instruct the |
| | 22 | witness to only answer questions. |
| | 23 | THE COURT: Ms. Barbour -- |
| | 24 | THE WITNESS: I'm sorry. That's the teacher in me. |
| 12:14:27 | 25 | Sorry. |

Angela Barbour - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 12:14:36 | 1 | Q. Now, does that refresh your recollection -- |
| | 2 | A. Yes, sir. |
| | 3 | Q. -- about that? |
| | 4 | A. It does. |
| 12:14:41 | 5 | Q. It says, Ronald -- |
| | 6 | MR. ZELLINGER: Objection to what it says. It's |
| | 7 | not been admitted into evidence. |
| | 8 | THE COURT: Yes, sir. |
| | 9 | MR. TYNDALL: Let me reask that. |
| 12:14:50 | 10 | Q. Did you say to Mr. Johnson: That was just spoken |
| | 11 | about last night, literally last night? |
| | 12 | A. Yes. I was trying to tell Owen what he was trying |
| | 13 | to get me to do. |
| | 14 | Q. Do you later on Page 3 -- well, I'm sorry. Did you |
| 12:15:11 | 15 | later in that conversation say: No, that was brought to my |
| | 16 | attention last night? |
| | 17 | A. If that's what it says, yes, but you have to |
| | 18 | understand, I was not being -- I didn't trust Ronald. |
| | 19 | Q. Well, you say: No, that was brought to my |
| 12:15:33 | 20 | attention last night. That's not you telling Mr. Phillips |
| | 21 | anything; is it? |
| | 22 | A. But I talked to Travis too. |
| | 23 | Q. Is this Travis Wheeler the district court judge? |
| | 24 | A. Yes, sir. |
| 12:15:47 | 25 | Q. Are you saying Judge Wheeler told you something? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

```
12:15:52   1        A.   I don't -- I don't recall the details of that
           2   conversation.  I believe there are pieces to that conversation
           3   that may be missing.  I don't recall all of that conversation.
           4   It's been a couple of years ago.
12:16:04   5        Q.   Well, let me ask you --
           6        A.   And I do know that at that time I did not trust
           7   Ronald Johnson, and I felt that he potentially would be
           8   recording me.  So I don't trust him.  I did not trust him to
           9   what I was saying.  But I was trying not to make him mad at
12:16:23  10   me.  I didn't want Ronald -- I still didn't want Ronald mad at
          11   me.
          12              (Defendant's Exhibit Number 9 marked for
          13               identification.)
          14        Q.   Ms. Barbour, I'm going to show you a text exchange.
12:17:19  15   If you will read that again to yourself.
          16        A.   Yes, sir.
          17        Q.   It's for the purposes of refresh your recollection;
          18   okay?
          19        A.   (Witness reviews document.)  Oh, yes, sir.  Yes,
12:17:52  20   sir.
          21        Q.   Now, you said that you did not trust Mr. Johnson,
          22   is that right, on April 13th?
          23              MR. ZELLINGER:  Your Honor, objection to the form
          24   of the question.
12:18:11  25              THE COURT:  We'll let you reask it.
```

12:18:12  1        Q.   Did you just testify to the jury that you didn't

2  trust Mr. Johnson?

3        A.   Yes, sir.

4        Q.   And on April 13th, did you say to him in the text

12:18:27  5  messages:  Don't you think you need to be more concerned about

6  the individual that reached out to me last night and told me

7  you were setting me up?  Did you see that?

8        A.   I did.  Can I explain?

9        Q.   If you want to.

12:18:39  10        A.   Owen stated that Ronald was trying to set me up.

11        Q.   Now, two hours later, did you send him another

12  message that said:  We need to join the same team?

13        A.   I don't know if that was two hours later.

14        Q.   Did you say:  We need to join the same team?

12:18:58  15        A.   That was much later when we were trying to go

16  against something with the school board.  It was completely

17  professional.

18             MR. TYNDALL:  May I approach, Your Honor?

19             THE COURT:  Yes, sir.

12:19:08  20        Q.   I'm going to refresh your recollection,

21  Ms. Barbour.  I'm going to show you a text message.  Let me

22  know if that refreshes your recollection about the date and

23  time that we're talking about.

24        A.   Yes, sir.

12:19:25  25        Q.   Now, on April 13 at 9:24 p.m., did you say in a

| | | |
|---|---|---|
| 12:19:33 | 1 | text message to Mr. Johnson: We need to join the same team. |
| | 2 | He made a video about me. Can we please put this shit aside |
| | 3 | and work together? |
| | 4 | A. Him making a video about me was -- that was Kevin |
| 12:19:51 | 5 | Donovan. |
| | 6 | Q. Did you say to Mr. Johnson: We need to put this |
| | 7 | shit aside and work together? |
| | 8 | A. I did. You are correct. I did do that. |
| | 9 | Q. On April 13th? |
| 12:20:04 | 10 | A. That's what the records show, yes, sir. |
| | 11 | Q. Of 2022? |
| | 12 | A. Yes, sir. |
| | 13 | Q. And Mr. Johnson, he was unwilling to do that; isn't |
| | 14 | true, Ms. Barbour? |
| 12:20:17 | 15 | A. Unwilling to do what, sir? |
| | 16 | Q. He was unwilling to put it aside and work with you; |
| | 17 | isn't that right? |
| | 18 | A. Yes, sir. |
| | 19 | Q. And wasn't the conversation we just talked about |
| 12:20:30 | 20 | where you said "that was brought to my attention last night" |
| | 21 | one of your last conversations with Mr. Johnson? |
| | 22 | A. Possibly. I do not know, sir. We had so many. It |
| | 23 | runs together. It was a long time ago. |
| | 24 | Q. Ms. Barbour, let me talk to you just briefly and |
| 12:21:13 | 25 | we'll come back to some of these things, but I want to go back |

Angela Barbour - Cross by Mr. Tyndall

| 12:21:16 | 1 | to the beginning of your relationship because you said some |
| | 2 | things I want to clarify. |
| | 3 | A.    Yes, sir. |
| | 4 | Q.    You mentioned that you were in a relationship with |
| 12:21:28 | 5 | Mr. Johnson for about two years; is that right? |
| | 6 | A.    Yes, sir. |
| | 7 | Q.    It actually began in late 2020 and after the |
| | 8 | election; is that right? |
| | 9 | A.    Yes, sir. |
| 12:21:37 | 10 | Q.    And it continued until February of 2022; is that |
| | 11 | right? |
| | 12 | A.    Yes, sir.  Approximately. |
| | 13 | Q.    So it was just over a year actually, the sexual |
| | 14 | part of the relationship? |
| 12:21:48 | 15 | A.    Yes, sir. |
| | 16 | Q.    And there's a reason why I'm asking that.  Now, |
| | 17 | when you first -- you mentioned a night when you went out with |
| | 18 | some friends; is that right? |
| | 19 | A.    Yes, sir. |
| 12:22:01 | 20 | Q.    Did you call Mr. Johnson? |
| | 21 | A.    I don't know if it was a phone call.  We talked |
| | 22 | over Messenger.  He asked me what I was up to and I told him. |
| | 23 | Q.    And you all sort of hung out together? |
| | 24 | A.    Yes, sir. |
| 12:22:15 | 25 | Q.    At the bar; is that right? |

| | | |
|---|---|---|
| 12:22:16 | 1 | A.    Yes, sir. |
| | 2 | Q.    And then I -- I wasn't sure about Mr. Zellinger's |
| | 3 | questions.  It sounds like the two of you left and went to a |
| | 4 | car and that's where he kissed you? |
| 12:22:26 | 5 | A.    Yes, sir. |
| | 6 | Q.    Was there some kind of sexual encounter in the car? |
| | 7 | A.    Yes, sir. |
| | 8 | Q.    Then you said that you all went back into the |
| | 9 | restaurant; is that right? |
| 12:22:34 | 10 | A.    He dropped me off at the front of the restaurant |
| | 11 | and left. |
| | 12 | Q.    He left.  And at some point did you call him to |
| | 13 | come back? |
| | 14 | A.    He was sent a text message, I believe.  Or there |
| 12:22:49 | 15 | could -- I didn't call.  My friend did.  My friend got in |
| | 16 | touch with him.  His contact was in my phone. |
| | 17 | Q.    Just to clarify, you were living at home with your |
| | 18 | husband and children? |
| | 19 | A.    Yes, sir. |
| 12:22:59 | 20 | Q.    Did you make the choice to call or have him come |
| | 21 | back and give you a ride? |
| | 22 | A.    I did. |
| | 23 | Q.    And did you make the choice to get in the car with |
| | 24 | him? |
| 12:23:08 | 25 | A.    I did. |

| | | |
|---|---|---|
| 12:23:09 | 1 | Q. And you remember that clearly? |
| | 2 | A. No, I don't. I was highly inebriated. I was |
| | 3 | drunk. |
| | 4 | Q. Did you make the choice? |
| 12:23:15 | 5 | A. I did make the choice, though. |
| | 6 | Q. Did you ask him to take you to your husband and |
| | 7 | children? |
| | 8 | A. I did not ask him to take me home. I asked him to |
| | 9 | take me to my friend's house. |
| 12:23:24 | 10 | Q. Was it his friend? |
| | 11 | A. No, sir. |
| | 12 | Q. It was your friend? |
| | 13 | A. Yes, sir. |
| | 14 | Q. Did you direct him to where that house was? |
| 12:23:31 | 15 | A. I did. |
| | 16 | Q. Did you tell him where the address was? |
| | 17 | A. Yes, sir. |
| | 18 | Q. And did you direct him to that house so that you |
| | 19 | would not have to go home that night? |
| 12:23:40 | 20 | A. I didn't want to go home to my husband because I |
| | 21 | was really drunk. |
| | 22 | Q. Did you want to go to your friend's house to be |
| | 23 | with Ronald Johnson? |
| | 24 | A. I did not. Yes, there was already -- we already |
| 12:23:52 | 25 | had relations in the car, and I was drinking so I can't lie |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 12:23:56 | 1 | about that. |
| | 2 | Q. You can't lie about that? |
| | 3 | A. I mean, it has to be the -- |
| | 4 | Q. Did you make the choice to -- |
| 12:24:06 | 5 | A. I did make -- |
| | 6 | Q. -- go your friend's house? |
| | 7 | A. I made the choice, yes. |
| | 8 | Q. Did you make the choice to go to your friend's |
| | 9 | house instead of going home to your husband and children? |
| 12:24:14 | 10 | A. I didn't want my husband to be upset with me. |
| | 11 | Q. Okay. And did Mr. Johnson take you to your |
| | 12 | friend's house at your direction? |
| | 13 | A. He did. |
| | 14 | Q. The next time you saw Mr. Johnson, you were happy |
| 12:24:54 | 15 | to see him; isn't that right? |
| | 16 | A. Yes, sir. |
| | 17 | Q. You all engaged in an affair together? |
| | 18 | A. We did. |
| | 19 | Q. You were both married to other people? |
| 12:25:03 | 20 | A. Yes, sir. |
| | 21 | Q. You made the choice to do that? |
| | 22 | A. Yes, sir. |
| | 23 | Q. And he made the choice to do that? |
| | 24 | A. Yes, sir. |
| 12:25:09 | 25 | Q. And you were excited about that choice; weren't |

Angela Barbour - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 12:25:11 | 1 | you? |
| | 2 | A.   I was having a tough time at home, and I just lost |
| | 3 | my best friend and my mother.  I could not see her due to |
| | 4 | COVID.  She was in an assisted living facility.  So I was not |
| 12:25:22 | 5 | in the right headspace, sir. |
| | 6 | Q.   And that's fine.  I mean, but you did make the |
| | 7 | choice -- |
| | 8 | A.   I did make the choice. |
| | 9 | Q.   -- to engage in this relationship. |
| 12:25:31 | 10 | A.   I did. |
| | 11 | Q.   And you made the choice to go on trips and things |
| | 12 | like that; is that right? |
| | 13 | A.   He told me to go, I went. |
| | 14 | Q.   Well, Ms. Barbour, you're not -- you are a teacher |
| 12:25:44 | 15 | in the public school system; is that right? |
| | 16 | A.   Yes, sir. |
| | 17 | Q.   You've been a teacher for 20-some years? |
| | 18 | A.   Yes, sir. |
| | 19 | Q.   And you were at one time the vice president of the |
| 12:25:55 | 20 | Republican Women's Club; is that right? |
| | 21 | A.   Yes, sir. |
| | 22 | Q.   You are a pretty strong-willed person; aren't you? |
| | 23 | A.   I try my best, yes, sir. |
| | 24 | Q.   You make decisions on your own; don't you? |
| 12:26:06 | 25 | A.   Yes, sir. |