| 12:26:06 | 1 | Q. And you made the choice to be involved in these |
| | 2 | relationships. |
| | 3 | A. Yes, sir. |
| | 4 | Q. During your -- now, I want to go back, Ms. Barbour, |
| 12:26:52 | 5 | to the spring of 2022. Your relationship with Mr. Johnson has |
| | 6 | ended at that point; isn't that right? At least the sexual |
| | 7 | part of the relationship? |
| | 8 | A. Yes, sir. |
| | 9 | Q. Is it fair to say that you were not very happy |
| 12:27:08 | 10 | about that? |
| | 11 | A. I was not the happiest, yes, sir. |
| | 12 | Q. And during this period of time, you are working |
| | 13 | on -- is it fair to say that you're engaged, though, in |
| | 14 | political campaigns in the Johnston County community? |
| 12:27:26 | 15 | A. I was at that time, yes, sir. |
| | 16 | Q. Let me just follow up with something. When you had |
| | 17 | that conversation with Mr. Johnson on the phone, and we |
| | 18 | contend it's April 13th, but it was one of the last |
| | 19 | conversations you had with him. You weren't very happy about |
| 12:28:02 | 20 | him cutting off the relationship with you; were you? |
| | 21 | MR. ZELLINGER: Objection to the form of the |
| | 22 | question. Move to strike the first part of that conversation. |
| | 23 | THE COURT: Yes, sir. I will ask the jury to |
| | 24 | disregard that. And, Mr. Tyndall, rephrase that, if you |
| 12:28:16 | 25 | would, please. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 12:28:17 | 1 | Q. When you hung up the phone with Mr. Johnson that |

night, did you feel like he did not want any more contact with

you?

3

MR. ZELLINGER: Objection, Your Honor.

12:28:27   5   MR. TYNDALL: I'm asking how she felt.

6   THE COURT: Overruled. I'll let her answer how she

7   felt.

8   THE WITNESS: I felt like he was setting me up.

9   Q. In what way?

12:28:35   10   A. To do what he's done to everybody else. I felt

11   like he was trying to set me up.

12   Q. Did you feel like he was asking you not to be

13   around him?

14   A. He did ask --

12:28:49   15   MR. ZELLINGER: Your Honor --

16   THE COURT: Overruled. I'll let her answer how she

17   felt.

18   THE WITNESS: He -- I felt like he was setting me

19   up. Were there feelings there? Not the same feelings that

12:29:02   20   were in our initial relationship, no, sir.

21   Q. I'm not talking about your personal feelings. Did

22   you feel like he wanted you to stay away from him based on

23   your conversation with him?

24   MR. ZELLINGER: Objection, Your Honor. It's asking

12:29:15   25   the witness what the defendant said.

Angela Barbour - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 12:29:17 | 1 | THE COURT:  Yes, sir.  I'll let her answer as to |
| | 2 | just what her feelings were. |
| | 3 | THE WITNESS:  Yes. |
| | 4 | Q.    Thank you. |
| 12:29:33 | 5 | THE COURT:  It's about 12:30.  Why don't we go |
| | 6 | ahead and we'll break. |
| | 7 | Ladies and gentlemen, we'll be in lunch recess |
| | 8 | until 2:00.  Leave your notes face down.  Briefly, I know |
| | 9 | you've heard this multiple times, but please don't talk about |
| 12:29:45 | 10 | this case with each other.  Don't let anybody else speak with |
| | 11 | you about it.  Don't do anything on your own to try to learn |
| | 12 | anything.  Don't express any opinion about anything. |
| | 13 | Thank you very much.  See you back at 2:00. |
| | 14 | (Jury exits.) |
| 12:30:31 | 15 | THE COURT:  You can come down.  Thank you. |
| | 16 | (Witness exits the witness stand.) |
| | 17 | THE COURT:  Anything before we recess from either |
| | 18 | side? |
| | 19 | MR. ZELLINGER:  Not for the State, Your Honor.  I |
| 12:30:50 | 20 | think we put this on the record enough about -- Judge Holcombe |
| | 21 | is likely going to be called as a witness.  I think the Court |
| | 22 | is satisfied that -- I've never received the advisory opinion |
| | 23 | that we spoke about.  So I'm going to -- I guess I'll reach |
| | 24 | out and ask him for it again, but otherwise, I just wanted to |
| 12:31:08 | 25 | let the Court know where we stood. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Angela Barbour - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 12:31:10 | 1 | THE COURT:  Do you anticipate him being the next |
| | 2 | witness? |
| | 3 | MR. ZELLINGER:  I don't.  I think he will be |
| | 4 | tomorrow. |
| 12:31:14 | 5 | THE COURT:  Okay.  Just a reminder, he's in |
| | 6 | Cumberland County so he'll be a little -- |
| | 7 | MR. ZELLINGER:  Maybe Wednesday. |
| | 8 | THE COURT:  Okay.  Well, and that brings me to my |
| | 9 | next question.  I want to maybe let the jury know, kind of |
| 12:31:24 | 10 | give them a forecast of where we think we're going to be. |
| | 11 | Again, I'm not holding you to it. |
| | 12 | MR. ZELLINGER:  Sure.  I think that -- |
| | 13 | THE COURT:  We don't need any of this on the |
| | 14 | record. |
| 12:31:39 | 15 | (Off the record discussion.) |
| | 16 | (Lunch recess.) |
| | 17 | (Resume at 1:57 p.m.) |
| | 18 | MR. ZELLINGER:  I have something to put on the |
| | 19 | record.  Investigator Hoffman received an e-mail from someone |
| 13:59:02 | 20 | who's on our witness list, and this person relayed -- and I |
| | 21 | don't know if this is accurate.  I question if it's accurate |
| | 22 | because I don't -- I assume the bailiffs would have noticed. |
| | 23 | But they said:  Two people in the courtroom are texting from |
| | 24 | the courtroom.  And then, a retired police officer from |
| 13:59:21 | 25 | Clayton is attempting to record the proceedings here. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 13:59:24 | 1 | I'm just putting that on the record. I don't know |
| | 2 | if this is accurate or not. I have no idea who any of those |
| | 3 | folks are, but I just wanted to bring it to the Court's |
| | 4 | attention and the defendant's attention. |
| 13:59:36 | 5 | THE COURT: Okay. Thank you very much. |
| | 6 | MR. ZELLINGER: There's one other thing. |
| | 7 | THE COURT: Yes, sir. |
| | 8 | MR. ZELLINGER: On a different issue. During the |
| | 9 | break I believe that Ms. Barbour texted our legal assistant, |
| 13:59:49 | 10 | and I just wanted to put that on the record. Since it's the |
| | 11 | middle of the defendant's cross-examination, I feel like I |
| | 12 | probably have to share that with the defendant. So I will |
| | 13 | show Mr. Tyndall at this time. |
| | 14 | THE COURT: When you guys look at that, if you |
| 14:00:05 | 15 | could all come up here. Show it to them. |
| | 16 | MR. ZELLINGER: Sure. Sure. And just for the |
| | 17 | record, anything that I receive during cross-examination, I |
| | 18 | have to show to the defendant. |
| | 19 | MR. TYNDALL: I thought you had to show me |
| 14:00:14 | 20 | anything. |
| | 21 | MR. ZELLINGER: Yes, I have to show you anything. |
| | 22 | (Sidebar.) |
| | 23 | (Jury enters.) |
| | 24 | THE COURT: Everybody, welcome back. |
| 14:05:26 | 25 | Mr. Tyndall, whenever you are ready. |

| 14:05:28 | 1 | MR. TYNDALL: Thank you Your Honor. |
| | 2 | Q. I want to talk to you a little bit about the |
| | 3 | different phases of your relationship with Mr. Johnson. The |
| | 4 | State talked to you and actually introduced an exhibit -- |
| 14:05:48 | 5 | MR. TYNDALL: State's 46 was admitted; wasn't it? |
| | 6 | MR. ZELLINGER: Yes, it was admitted. |
| | 7 | Q. The State talked to you about an exhibit, and it |
| | 8 | appears to be some kind of text or statement you made that |
| | 9 | ends with: Hugs sunshine. Do you remember that? |
| 14:06:19 | 10 | A. Yes, sir. |
| | 11 | Q. One sentence in there is: I've never painted a |
| | 12 | pretty picture on Facebook; is that right? |
| | 13 | A. Yes, sir. |
| | 14 | Q. Do you remember this statement or text was back in |
| 14:06:31 | 15 | April 26th of 2021? |
| | 16 | A. Yes, sir. |
| | 17 | Q. That was sort of in the heat of the passion with my |
| | 18 | client; is that fair to say? |
| | 19 | A. Yes, sir. |
| 14:06:41 | 20 | Q. I mean, you were -- you were in love with my |
| | 21 | client. |
| | 22 | A. We had a relationship. I did love him, yes, sir. |
| | 23 | Q. Okay. And when you say I've never painted a pretty |
| | 24 | picture on Facebook, you're not talking about my client; is |
| 14:06:59 | 25 | that right? |

| | | |
|---|---|---|
| 14:06:59 | 1 | A. No. Just talking about life in general. I'm very |
| | 2 | transparent. |
| | 3 | Q. You're very transparent. You sort of -- you sort |
| | 4 | of wear your emotions and things on your sleeve; don't you? |
| 14:07:10 | 5 | A. Yes, sir. |
| | 6 | Q. Is it fair to say that you post on Facebook a lot? |
| | 7 | A. Yes, but mostly professional stuff. I mean, there |
| | 8 | are personal things, but I know my limits as a Johnston County |
| | 9 | Public School educator. |
| 14:07:26 | 10 | MR. TYNDALL: Can we publish Exhibit 46, please? |
| | 11 | Q. I ask you to read that, Ms. Barbour. |
| | 12 | A. Yes, sir. |
| | 13 | Q. Do you see the sentence: I've never painted a |
| | 14 | pretty picture on Facebook? It's sort of toward the end. |
| 14:08:17 | 15 | A. I've never painted a pretty picture on Facebook, |
| | 16 | yes. |
| | 17 | Q. Do you see the sentence before that? |
| | 18 | A. I am being honest when I say my time here with Ryan |
| | 19 | is coming to an end. |
| 14:08:26 | 20 | Q. Now, who is Ryan? |
| | 21 | A. My husband. |
| | 22 | Q. And then the next sentence after that, it starts |
| | 23 | with Ryan again? |
| | 24 | A. Yes, sir. |
| 14:08:37 | 25 | Q. So is it fair to say you were posting things on |

14:08:41   1   Facebook that indicated your relationship was coming to an

           2   end?

           3        A.   No, sir.  I might have posted emotional feelings,

           4   but there was nothing dealing -- that was my business, not to

14:08:51   5   be on Facebook.

           6        Q.   But you do post a lot of stuff on Facebook?

           7        A.   I do, yes, sir.

           8        Q.   You talk to friends a lot about your problems;

           9   isn't it fair to say that?

14:08:59  10        A.   My close circle of friends, yes, sir.

          11        Q.   Sure.  You talk to your close circle of friends

          12   about your relationship with your husband?

          13        A.   Yes, sir.

          14        Q.   You talk to them about your relationship with

14:09:10  15   Mr. Johnson?

          16        A.   Yes, sir.

          17        Q.   From the time you started being involved with

          18   Mr. Johnson until February of 2022, you were telling your

          19   friends lots of positive things about Mr. Johnson; weren't

14:09:22  20   you?

          21        A.   I was telling one particular friend that knew, but

          22   at the time, yes, until my other friends.  We talked about it,

          23   yes, sir.  They were positive, yes, sir.

          24        Q.   And you were telling them good things about

14:09:34  25   Mr. Johnson?

| | | |
|---|---|---|
| 14:09:34 | 1 | A. Yes, because I wanted my friends to like them. |
| | 2 | Q. Up until February of 2022. |
| | 3 | A. Well, they were not all positive; but, yes, they |
| | 4 | were mostly positive, yes. |
| 14:09:44 | 5 | Q. Well, you didn't tell your friends he wanted you to |
| | 6 | record someone and have sex them; did you? |
| | 7 | A. I did not want to do that because I knew my friends |
| | 8 | would say to end the relationship. |
| | 9 | Q. You certainly didn't post anything on Facebook |
| 14:09:56 | 10 | about Mr. Johnson trying to pressure you to do anything; did |
| | 11 | you? |
| | 12 | A. I would not want to do that. I don't do those kind |
| | 13 | of posts on Facebook, sir. It's not appropriate. |
| | 14 | MR. ZELLINGER: Are you done with this exhibit? |
| 14:11:47 | 15 | MR. TYNDALL: Yes. I'm sorry. I am finished. |
| | 16 | May I approach, Your Honor? |
| | 17 | THE COURT: Yes, sir. |
| | 18 | MR. TYNDALL: Actually, I don't need to approach |
| | 19 | yet. |
| 14:11:55 | 20 | Q. Let me ask, Ms. Barbour. Now, did you mention that |
| | 21 | my client called you McLeod; is that right? |
| | 22 | A. Unless it was in front of the public, he referred |
| | 23 | to me as Ms. Barbour. |
| | 24 | Q. Well, the implication I take from that, and correct |
| 14:12:13 | 25 | me if I'm wrong, is that he called you McLeod, but other |

| | | |
|---|---|---|
| 14:12:16 | 1 | people didn't? |
| | 2 | A. Correct. My last name was Barbour. Angie Barbour. |
| | 3 | Q. Now, I don't know if this is -- maybe I've got the |
| | 4 | wrong information, but I've got a post of some kind. Did you |
| 14:12:31 | 5 | ever refer to yourself as Angie McLeod on Facebook or some |
| | 6 | sort of social media? |
| | 7 | A. I did. At the point I left my husband, yes, sir. |
| | 8 | Q. So you left your husband when? |
| | 9 | A. I cannot give you an exact date. |
| 14:12:47 | 10 | Q. Well, on June 26th of 2021, were you referring to |
| | 11 | yourself as Angie McLeod? |
| | 12 | A. Possibly. |
| | 13 | Q. How many years had you been married? |
| | 14 | A. Almost 20. |
| 14:12:57 | 15 | Q. So after 20 years you dropped the Barbour as soon |
| | 16 | as you left your husband? |
| | 17 | A. I did, yes, sir. There was a lot of anger there, |
| | 18 | sir, from home life. |
| | 19 | Q. It was a tough home life; is that right? |
| 14:13:09 | 20 | A. It was. |
| | 21 | Q. In fact, let me go ahead and ask you this. Did you |
| | 22 | tell my client there was domestic violence in your |
| | 23 | relationship? |
| | 24 | A. Yes, sir. |
| 14:13:16 | 25 | Q. Did you tell him that around October of 2021? |

| | | |
|---|---|---|
| 14:13:19 | 1 | A. I don't know when I told him, but I did. |
| | 2 | Q. Did you tell him that you were afraid? |
| | 3 | A. I was. |
| | 4 | Q. Did you ask him to help you protect yourself? |
| 14:13:29 | 5 | A. To protect me, no. I didn't need him to protect |
| | 6 | me. |
| | 7 | Q. Now, did you post something saying a public service |
| | 8 | announcement about your family? |
| | 9 | A. I did a lot of public service announcements, yes. |
| 14:13:44 | 10 | Q. I mean related to your family. |
| | 11 | A. Probably, because people were -- I was being talked |
| | 12 | about, honestly, sir, by the community. |
| | 13 | Q. In June 26th of 2021? |
| | 14 | A. I don't know the exact date. I have to see the |
| 14:13:55 | 15 | post. |
| | 16 | MR. TYNDALL: May I approach, Your Honor? |
| | 17 | THE COURT: Yes, sir. |
| | 18 | (Defendant's Exhibit Number 10 marked for |
| | 19 | identification.) |
| 14:14:22 | 20 | Q. Ms. Barbour, I'm going to show you what's been |
| | 21 | marked Defendant's Exhibit 10 for purposes of just refreshing |
| | 22 | your recollection. If you don't mind reading it to yourself. |
| | 23 | Not out loud? |
| | 24 | A. (Witness reviews document.) |
| 14:14:49 | 25 | Q. Do you remember posting personal things about your |

| | | |
|---|---|---|
| 14:14:50 | 1 | family on Facebook after you separated? |
| | 2 | A. If you consider that personal, yes, sir. |
| | 3 | Q. I'm just asking you. |
| | 4 | A. That stated that I just asked for people if they |
| 14:15:02 | 5 | needed to know anything, they needed to reach out to the |
| | 6 | source. That was it. |
| | 7 | Q. In September of 2021, did you comment on some |
| | 8 | Facebook post related to -- I don't know how to say this any |
| | 9 | differently, and sorry if it's insensitive, but prominent |
| 14:15:57 | 10 | domestic violence victims, like O.J. Simpson's wife? |
| | 11 | A. Did I do that? |
| | 12 | Q. Yes. Did you make a comment? |
| | 13 | A. No, sir. |
| | 14 | Q. Now, during that period of time you talked to |
| 14:16:43 | 15 | Mr. Johnson about the intimate details of your relationship |
| | 16 | with your husband; is that right? |
| | 17 | A. Some of it, yes, sir. |
| | 18 | Q. You talked to your friends about that; is that |
| | 19 | right? |
| 14:16:50 | 20 | A. My close circle of friends, yes. |
| | 21 | Q. But that same close circle of friends, you never |
| | 22 | said anything to them about Mr. Johnson asking you to do these |
| | 23 | sexual favors, so to speak; did you? |
| | 24 | A. I didn't want them to think bad of him. |
| 14:17:04 | 25 | Q. Do you want somebody to think bad of your husband? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 14:17:06 | 1 | A. I lived -- my home life was hard for a very long |
| | 2 | time, yes, sir. |
| | 3 | Q. Now, let's talk a little bit about your -- and I |
| | 4 | know this is difficult for you, Ms. Barbour, but I want to |
| 14:17:27 | 5 | talk to you a little bit about after February of 2023. Okay? |
| | 6 | I want to go back to State's Exhibit 5A. |
| | 7 | MR. TYNDALL: I'm sorry, can we publish that one? |
| | 8 | If we can go to the portion after April 13, 2022. |
| | 9 | Q. Ms. Barbour, this is a spreadsheet you created |
| 14:18:35 | 10 | related to your calls; is that right? |
| | 11 | A. Yes, sir. |
| | 12 | Q. And your intention here was to capture certain |
| | 13 | calls that you considered relevant to this case; is that |
| | 14 | right? |
| 14:18:49 | 15 | A. Yes, sir. |
| | 16 | Q. And did Mr. Johnson ever call you after April 13th, |
| | 17 | 2022, based on this spreadsheet? |
| | 18 | A. After April 13th? |
| | 19 | Q. Right. |
| 14:19:09 | 20 | A. Did he call me? Yes, he did -- wait. No. That's |
| | 21 | when we saw each other in person. |
| | 22 | Q. So he never called you again? |
| | 23 | A. According to the spreadsheet, no, sir. |
| | 24 | Q. Now, did you contact him after April 13th? |
| 14:19:28 | 25 | A. If I did, it would be on this spreadsheet. |

| | | |
|---|---|---|
| 14:19:37 | 1 | Q. On May 23rd, 2022, does it show that you called him |
| | 2 | several times? |
| | 3 | A. Yes, sir. That was not him per se. That was his |
| | 4 | wife. |
| 14:19:49 | 5 | Q. It says Barbara (sic) Johnson? |
| | 6 | A. Yes. That was Jamie Johnson. |
| | 7 | Q. Okay. Now, do you remember making calls on that |
| | 8 | particular day? |
| | 9 | A. I do. It was very late at night. We were |
| 14:20:01 | 10 | celebrating one of my friend's birthdays. |
| | 11 | Q. Well, that's -- |
| | 12 | A. Late at night, that was late for me. I go to bed |
| | 13 | early. |
| | 14 | Q. So 8:05 was late for you? |
| 14:20:14 | 15 | A. Well, the -- not 8:05, but the 9:51. |
| | 16 | Q. I'm sorry? Is 8:05 late? |
| | 17 | A. No, it's not late. I was referencing the other |
| | 18 | ones. |
| | 19 | Q. During your testimony you said you were afraid of |
| 14:20:47 | 20 | Mr. Johnson. |
| | 21 | A. There came a time when I was. |
| | 22 | Q. Well, you said you were afraid of him after you |
| | 23 | broke up? |
| | 24 | A. I've been afraid of him since I realized he was |
| 14:21:00 | 25 | recording me or taking pictures of me while I was going out to |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

14:21:05  1    a restaurant and recording me with my friends.  Now I have to

          2    look at that timeline to give you an exact date, but, yes,

          3    I've been fearful of him.

          4         Q.    You've been fearful of him.  But between the date

14:21:18  5    of 4/13/2022 and 5/23/2022, he had not contacted you, had he,

          6    Ms. Barbour?

          7         A.    No, sir.

          8         Q.    He hadn't called you?

          9         A.    Not if it's on that timeline.  There could have

14:21:33 10    been -- there could have been a snap, but if it's not on the

         11    timeline, that's the only phone calls.

         12         Q.    On 5/23 you mentioned that you called his wife.

         13         A.    I did.

         14         Q.    That was to tell her you'd been having a

14:21:49 15    relationship with Mr. Johnson?

         16         A.    I called and requested a meeting with her.  I told

         17    her I needed to talk to her and tell her some things as to

         18    what was going on with him being unfaithful.

         19         Q.    Well, did you tell her that you all had a

14:22:02 20    relationship for two years?

         21         A.    I did.  I told her we had a relationship for a very

         22    long time.

         23         Q.    And was that at night?

         24         A.    Yes, sir.

14:22:15 25         Q.    Was that after you had tried to get him to talk to

| | | |
|---|---|---|
| 14:22:19 | 1 | you? |
| | 2 | A. What do you mean "after you?" |
| | 3 | Q. Had you asked him to talk to you earlier in the |
| | 4 | day? |
| 14:22:27 | 5 | A. I don't recall. |
| | 6 | MR. TYNDALL: I'm going to show her what's been |
| | 7 | marked Defendant's Exhibit Number 11, Your Honor. |
| | 8 | (Defendant's Exhibit Number 11 marked for |
| | 9 | identification.) |
| 14:22:38 | 10 | Q. I'm going to show you what's been marked what |
| | 11 | appears to be a text message. If you will take a look at that |
| | 12 | and read it to yourself and see if that refreshes your |
| | 13 | recollection. |
| | 14 | A. It does refresh my memory. |
| 14:23:10 | 15 | Q. Did you contact him at 11:07 a.m. on the 23rd and |
| | 16 | ask him if he wanted to talk to you? |
| | 17 | A. I don't remember if I wanted -- that's not what |
| | 18 | this text message is about. I will read that out loud if the |
| | 19 | Court requests me to. |
| 14:23:33 | 20 | Q. I'm fine with that, but you are not -- I'm not |
| | 21 | allowed to ask you about this out loud. |
| | 22 | MR. ZELLINGER: I have no objection if he wants to |
| | 23 | admit that during my case in chief. |
| | 24 | THE COURT: Are you going to admit that? |
| 14:23:44 | 25 | MR. TYNDALL: I'm not trying to admit it, Your |

| | | |
|---|---|---|
| 14:23:46 | 1 | Honor.  I'm asking her if it refreshes her recollection.  So |
| | 2 | may I approach again? |
| | 3 |      THE COURT:  Yes, sir. |
| | 4 |     Q.  I ask to you read the first line, time and date.  I |
| 14:24:01 | 5 | want to make sure we're on the same wavelength here, |
| | 6 | Ms. Barbour. |
| | 7 |     A.  Yes, sir. |
| | 8 |     Q.  You got it? |
| | 9 |     A.  Yes, sir. |
| 14:24:12 | 10 |     Q.  Now, back to my question.  Did you contact him |
| | 11 | Monday, May 23rd, at 11:07 a.m. and say you want to talk? |
| | 12 |     A.  According to that text, yes, sir.  I sure did. |
| | 13 |     Q.  Do you remember doing that? |
| | 14 |     A.  No, sir. |
| 14:24:28 | 15 |     Q.  So it's not just according to the text message, you |
| | 16 | remember doing it; right? |
| | 17 |     A.  We had conversations so much.  I don't know the |
| | 18 | specific time and dates.  That's why I did this. |
| | 19 |     Q.  I understand, but we're talking about the period |
| 14:24:44 | 20 | between April 13th, 2022, and May 23rd, 2022.  Is it fair to |
| | 21 | say you're not having conversations, at least by phone? |
| | 22 |     A.  Correct.  But he could of -- there was Snapchat |
| | 23 | there, and I did not record Snapchats. |
| | 24 |     Q.  You don't have your Snapchat records? |
| 14:25:01 | 25 |     A.  No, sir. |

| | | |
|---|---|---|
| 14:25:02 | 1 | Q.   Did Investigator Hoffman ever ask you for your |
| | 2 | Snapchat records? |
| | 3 | A.   Any Snapchat records? |
| | 4 | Q.   Yes. |
| 14:25:10 | 5 | A.   I don't think so. |
| | 6 | Q.   Did you ever offer to give your Snapchat records? |
| | 7 | A.   I don't even know how to get Snapchat records. |
| | 8 | Q.   But one thing you know is Snapchat records |
| | 9 | disappear? |
| 14:25:21 | 10 | A.   Yes.   Thanks to Mr. Johnson. |
| | 11 | Q.   Well, Mr. Johnson didn't make Snapchat. |
| | 12 | A.   He told me that.  I knew nothing about Snapchat |
| | 13 | until Ronald told me that's how we were going to communicate |
| | 14 | was via Snapchat so they could not be traced. |
| 14:25:35 | 15 | Q.   And I -- I don't want to confuse you.  I'm just |
| | 16 | asking.  You recognize Snapchat records disappear? |
| | 17 | A.   I do recognize that, yes. |
| | 18 | Q.   Unless you take a screenshot of the Snapchat on |
| | 19 | your phone; is that right? |
| 14:25:48 | 20 | A.   Correct. |
| | 21 | Q.   And you have saved some Snapchats before; haven't |
| | 22 | you? |
| | 23 | A.   I did after you learned I was being followed and |
| | 24 | watched.  I was concerned. |
| 14:25:56 | 25 | Q.   Which phone did you save those on? |

| | | |
|---|---|---|
| 14:25:58 | 1 | A.    On a phone I had to spend $200 on to go buy, |
| | 2 | because that's when I found out I was being listened to and |
| | 3 | recorded, and I was scared of what was being recorded on my |
| | 4 | phone. |
| 14:26:09 | 5 | Q.    Did you tell Investigator Hoffman about that? |
| | 6 | A.    I did. |
| | 7 | Q.    Did you offer to give him your phone? |
| | 8 | A.    I don't remember. |
| | 9 | Q.    Okay.  Did he ask you for that phone where you |
| 14:26:20 | 10 | recorded these things? |
| | 11 | A.    I don't -- I honestly don't remember. |
| | 12 | Q.    There's no way we can check unless we have that |
| | 13 | phone, Ms. Barbour? |
| | 14 | A.    Correct.  I took pictures of -- I used that phone |
| 14:26:31 | 15 | to try to -- I used that phone to try to get messages from |
| | 16 | because Kevin and Ronald were trying to mess with me. |
| | 17 | Q.    Where is that phone? |
| | 18 | A.    I have that phone. |
| | 19 | Q.    You still have that phone? |
| 14:26:48 | 20 | A.    I'm pretty sure I still have that phone. |
| | 21 | Q.    And you never offered it to Investigator Hoffman to |
| | 22 | show that they were messing with you? |
| | 23 | A.    They didn't have access to that phone. |
| | 24 | Q.    Well, if you gave it -- |
| 14:26:59 | 25 | A.    I will give him that phone, yes, sir. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Angela Barbour - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 14:27:00 | 1 | Q.   In the middle of trial you'll give him that phone? |
| | 2 | A.   That phone was -- Ronald and Kevin Donovan, they |
| | 3 | were not allowed to have that phone number because -- they |
| | 4 | were not allowed to have that phone number because that was my |
| 14:27:10 | 5 | way of protecting myself.  They could not communicate with me |
| | 6 | via that phone.  They were listening to things that were on my |
| | 7 | other phone. |
| | 8 | Q.   Are you saying you still have that phone? |
| | 9 | A.   I do. |
| 14:27:24 | 10 | Q.   Have you ever been offered to give that phone to |
| | 11 | Investigator Hoffman to support what you're saying here today? |
| | 12 | A.   There's nothing on that phone other than pictures |
| | 13 | that I've taken of my personal device, my personal iPhone, but |
| | 14 | not 910-5376. |
| 14:27:42 | 15 | Q.   Let me ask you, Ms. Barbour, have you been |
| | 16 | represented by a lawyer since 2022, the summer of 2022? |
| | 17 | MR. ZELLINGER:  Objection to relevance, Your Honor. |
| | 18 | THE COURT:  Overruled.  Let her answer if she can. |
| | 19 | THE WITNESS:  Off and on. |
| 14:28:01 | 20 | Q.   And didn't you deliver one phone to |
| | 21 | investigator -- to the Smithfield Police Department? |
| | 22 | A.   Yes.  That was early when all this started |
| | 23 | happening, yes, sir. |
| | 24 | Q.   And your lawyer negotiated a deal with the |
| 14:28:16 | 25 | Smithfield Police Department that they would turn over the |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 14:28:19 | 1 | phone if they would get an extraction back; is that right? |

14:28:19  1   phone if they would get an extraction back; is that right?

   2   A.   I don't remember the specifics of that.

   3   Q.   Did you ever offer to turn over your second phone?

   4   A.   At that time did I?  I don't know if I -- no, I

14:28:36  5   didn't.  I don't even know if I had that second phone at that

   6   time.  You have to remind of the timeline.  I got that second

   7   phone to be able to call my friends and to be able to have

   8   that to protect myself.

   9   Q.   Did you continue to use the same number,

14:28:49  10  Ms. Barbour?

   11  A.   My iPhone number, yes.  For everything.  That phone

   12  was just there for my protection to make phone calls to talk

   13  to my best friend April so that the conversations would not be

   14  recorded or he wouldn't know where I was at.

14:29:07  15  Q.   And just so we're clear though, the phone you're

   16  talking about there that you talked to April, you never

   17  offered those to Investigator Hoffman?

   18  A.   No, sir.  I don't think so.  I don't know.

   19  Q.   The phone you used to protect yourself you say from

14:29:24  20  Mr. Johnson, you never offered that?

   21  A.   Because it was just my family and friends in that.

   22  The phone that I did not want him to be able to read where I

   23  was going or what I was doing, sir.

   24  Q.   Now, Ms. Barbour, do you have a friend named Amy

14:29:47  25  Monsour?

Angela Barbour - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 14:29:50 | 1 | A.   I do. |
| | 2 | Q.   And do you on April 23rd post a picture of yourself |
| | 3 | with Ms. Monsour? |
| | 4 | A.   I'd have to see that post. |
| 14:30:07 | 5 | Q.   Well, let me ask you about the text that we just |
| | 6 | talked about.  Now, after you attempted to contact |
| | 7 | Mr. Johnson, I'm going to ask you, after you asked:  You want |
| | 8 | to talk?  He didn't respond; did he? |
| | 9 | A.   No, sir. |
| 14:30:28 | 10 | Q.   And so nine hours later did you text him again? |
| | 11 | A.   I did.  I was probably drinking. |
| | 12 | Q.   Did you text him and say your threesome's here with |
| | 13 | me tonight? |
| | 14 | A.   I did, yes, sir. |
| 14:30:45 | 15 | Q.   That's because you were with a woman, Amy Monsour? |
| | 16 | A.   Yes.  She's in my inner circle of friends. |
| | 17 | Q.   And an hour and 20 minutes later did you send him |
| | 18 | another text? |
| | 19 | A.   You have to read it, sir, or allow me to read it. |
| 14:31:04 | 20 | Q.   Well, I'm asking you. |
| | 21 | A.   According to that, I did. |
| | 22 | Q.   I'm sorry? |
| | 23 | A.   According to that. |
| | 24 | Q.   Well, did you say to him:  I'm pretty sure Jamie |
| 14:31:13 | 25 | knows? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 14:31:13 | 1 | A. Yes, because that was the same night of her |
|---|---|---|

14:31:13   1    A.   Yes, because that was the same night of her

2    birthday.  That was all during the same event.

3    Q.   Of whose birthday?

4    A.   Amy's birthday.

14:31:23   5    Q.   So on Amy's birthday after you text him about a

6    threesome with Amy?

7    A.   I did not want to have a threesome with her, sir.

8    That was his idea, and it never happened.

9    Q.   Well, on April 23rd, he didn't even respond to you;

14:31:38  10    did he?

11    A.   That was prior to -- he even had a nickname.  He

12    called her Dinosaur.  He tried to get me to go to Charlotte

13    with her to have a threesome.  I refused.  I did text her.

14    It's in my records.  You can find that.  You can find proof of

14:31:51  15    that where I said:  Awkward alert.  Because I was so

16    embarrassed I had stooped so low to do something that he

17    requested that I do.

18    Q.   There's a lot there I'm going to need to ask you

19    about, Ms. Barbour.

14:32:04  20         First of all, when are you talking about there's

21    a -- a text message.  What date would that be?

22    A.   It's in my records somewhere where I text her.  I

23    text the next day or called her to apologize.  And she

24    replied.  It was a conversation.  We can pull it up in text.

14:32:25  25    And I apologized for requesting -- making such a request to

| | | |
|---|---|---|
| 14:32:29 | 1 | her.  And my initial text to her the next day was:  Awkward |
| | 2 | alert.  Because I was embarrassed that I asked her that. |
| | 3 | Q.  Is it fair to say you actually tried to pressure |
| | 4 | her to have a threesome? |
| 14:32:42 | 5 | A.  I did not pressure my friend, no, sir. |
| | 6 | Q.  Let's go back to the 23rd, though.  That's really |
| | 7 | what I wanted to ask you about. |
| | 8 | A.  Yes, sir. |
| | 9 | Q.  On the 23rd, Mr. Johnson didn't respond to your |
| 14:32:56 | 10 | text messages at all. |
| | 11 | A.  No, sir. |
| | 12 | Q.  And the month and a half prior to that, he had not |
| | 13 | contacted you at all; had he? |
| | 14 | A.  Right.  We in April? |
| 14:33:06 | 15 | Q.  April and May. |
| | 16 | A.  He contacted me prior to that to ask how my |
| | 17 | daughter was doing because she had been admitted to the |
| | 18 | hospital. |
| | 19 | Q.  On the 23rd is when you say:  Your threesome is |
| 14:33:19 | 20 | here with me.  That was at 8:26.  He didn't respond; did he? |
| | 21 | A.  No, sir. |
| | 22 | Q.  At 9:50:  I'm pretty sure Jamie knows. |
| | 23 | A.  Yes. |
| | 24 | Q.  That's because you know you called her. |
| 14:33:31 | 25 | A.  I had called her.  That's the three phone calls |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Angela Barbour - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 14:33:33 | 1 | right there. |
| | 2 | Q. Is it fair to say, Ms. Barbour, when things don't |
| | 3 | go your way, you start getting even; isn't that fair? |
| | 4 | MS. JAMES: Objection. |
| 14:33:47 | 5 | A. No, sir. |
| | 6 | THE COURT: I'll sustain. |
| | 7 | MR. ZELLINGER: Motion to strike, Your Honor. |
| | 8 | THE COURT: Ask the jury to disregard. |
| | 9 | Q. Well, Ms. Barbour, when you were calling |
| 14:33:57 | 10 | Ms. Johnson, why did you do that? |
| | 11 | A. Because she needed to know her husband and what he |
| | 12 | had done. |
| | 13 | Q. Did you feel like she needed to know that the same |
| | 14 | day you said: Your threesome is here with me? |
| 14:34:12 | 15 | A. Repeat the question. |
| | 16 | Q. Did you feel like it just had to be the day that |
| | 17 | you said: Your threesome is here with me? |
| | 18 | A. It was probably a lot of frustration because of the |
| | 19 | rumor mills that were going around the community as well. I |
| 14:34:25 | 20 | was embarrassed for the things I heard about myself. |
| | 21 | Q. And you were angry with Mr. Johnson; isn't it fair |
| | 22 | to say that? |
| | 23 | A. I was frustrated, yes. |
| | 24 | Q. You were frustrated. You were frustrated partly |
| 14:34:48 | 25 | because he wouldn't respond to you? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 14:35:01 | 1 | A.   No, not because he wouldn't respond.  It's because |
| | 2 | everything was on his watch. |
| | 3 | Q.   Now, Ms. Barbour, you were -- you testified a |
| | 4 | little bit ago about some interactions you had with DeVan |
| 14:35:56 | 5 | Barbour -- |
| | 6 | A.   Yes, sir. |
| | 7 | Q.   -- back in April and May; is that right? |
| | 8 | A.   Yes, sir. |
| | 9 | Q.   And you mentioned that he indicated to you he was |
| 14:36:04 | 10 | afraid my client was going to disclose some information about |
| | 11 | him? |
| | 12 | A.   Yes, sir. |
| | 13 | Q.   As far as you know, my client never disclosed any |
| | 14 | information about DeVan? |
| 14:36:14 | 15 | A.   I don't know if he did or didn't. |
| | 16 | Q.   You never learned anything about DeVan Barbour from |
| | 17 | my client; did you? |
| | 18 | A.   I never learned anything about? |
| | 19 | Q.   You never heard about my client releasing anything |
| 14:36:29 | 20 | about DeVan Barbour; did you? |
| | 21 | A.   No, sir. |
| | 22 | Q.   I mean, he didn't release a recording, as far as |
| | 23 | you know; did he? |
| | 24 | A.   He threatened to. |
| 14:36:39 | 25 | Q.   Well, that's your understanding, but that didn't |

| | | |
|---|---|---|
| 14:36:41 | 1 | happen; did it? |
| | 2 | A.    But he told me he did as well. |
| | 3 | Q.    There was some concern that you said you were |
| | 4 | concerned for Mr. Barbour's political career? |
| 14:36:55 | 5 | A.    D and I had been friends for a very long time, as I |
| | 6 | stated.  I didn't want to see him go down like the other |
| | 7 | individuals in this county had gone down because of craziness |
| | 8 | like this. |
| | 9 | Q.    And you've been involved in politics a fair amount; |
| 14:37:12 | 10 | isn't that fair to say? |
| | 11 | A.    No, it's not fair to say.  I just recently got |
| | 12 | involved in politics with Ronald Johnson. |
| | 13 | Q.    Well, you were campaigning with people. |
| | 14 | A.    I was.  He's the first person I ever worked outside |
| 14:37:25 | 15 | the polling and passed literature out for. |
| | 16 | Q.    The person who actually disclosed information about |
| | 17 | DeVan Barbour was you; isn't it, Ms. Barbour? |
| | 18 | A.    I told the person that I had been having a |
| | 19 | relationship with.  I disclosed that to Ron.  I didn't |
| 14:37:42 | 20 | disclose it to anyone else. |
| | 21 | Q.    Didn't you do an interview with a blogger in |
| | 22 | February of 2024? |
| | 23 | A.    I did, yes, sir. |
| | 24 | Q.    Where you went into very explicit detail about |
| 14:37:56 | 25 | Mr. Barbour calling you in the middle of the night? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 14:37:59 | 1 | A. I shared what happened, yes, sir. |
| | 2 | Q. And did you disclose to the blogger that |
| | 3 | Mr. Barbour had contacted you numerous times and asked you for |
| | 4 | sex? |
| 14:38:11 | 5 | A. I did. |
| | 6 | Q. And you told him about him contacting you and |
| | 7 | sending you photos? |
| | 8 | A. Yes, sir. |
| | 9 | Q. And -- |
| 14:38:19 | 10 | A. This was -- it was just FaceTime. There were no |
| | 11 | photos. |
| | 12 | Q. I'm sorry. I may have misspoke. I don't remember |
| | 13 | exactly what it says, but suffice it to say, you went into |
| | 14 | detail with this blogger about those allegations? |
| 14:38:37 | 15 | A. I gave an account of what happened when |
| | 16 | interviewed, yes, sir. |
| | 17 | Q. You're not aware of Mr. Johnson ever giving an |
| | 18 | account of anything like that; are you? |
| | 19 | A. To the blogger, no. |
| 14:38:48 | 20 | Q. Or to anyone else. |
| | 21 | A. I don't know who he told. |
| | 22 | MR. ZELLINGER: Objection, Your Honor. Again, |
| | 23 | we're getting into what the defendant told people. |
| | 24 | Self-serving hearsay. |
| 14:38:56 | 25 | THE COURT: Sustain. And let you reask, if you |

| 14:38:58 | 1 | would. |
| | 2 | Q. Did you ever learn that my client had disclosed |
| | 3 | anything about Mr. Barbour? |
| | 4 | MR. ZELLINGER: Objection. |
| 14:39:07 | 5 | THE COURT: I'll let her answer if she learned |
| | 6 | anything. |
| | 7 | THE WITNESS: I don't know. That's the thing. I |
| | 8 | don't know if he did. He said he was going to. |
| | 9 | Q. You didn't hear anything like that; did you, |
| 14:39:15 | 10 | Ms. Barbour? |
| | 11 | A. He told me he was going to. |
| | 12 | Q. Did you hear anything from someone else? I mean, |
| | 13 | did the rumor mill start that there was a recording out there |
| | 14 | about Mr. Barbour? |
| 14:39:32 | 15 | MR. ZELLINGER: Objection to the hearsay. |
| | 16 | THE COURT: Sustain. Let you rephrase, if you |
| | 17 | would. |
| | 18 | Q. It was you in February of 2024 who disclosed this |
| | 19 | information; isn't that true, Ms. Barbour? |
| 14:39:45 | 20 | A. I told Mr. Johnson. |
| | 21 | MR. ZELLINGER: Your Honor, object to the form. Is |
| | 22 | that to the blogger or somebody else? |
| | 23 | THE COURT: Yes, sir. Reask, if you would. |
| | 24 | Q. Did you give an interview to a blogger in February |
| 14:39:56 | 25 | of 2024? |

| | | | |
|---|---|---|---|
| 14:39:57 | 1 | A. | Yes, sir, I did. |
| | 2 | Q. | And did you know that that was just two or three |
| | 3 | months before the election primary -- before the Republican |
| | 4 | primary? |
| 14:40:11 | 5 | A. | That was not for DeVan's election. |
| | 6 | Q. | Well, wasn't Mr. Barbour a candidate for Congress? |
| | 7 | A. | Not for that election, if my timeline is correct, |
| | 8 | no. |
| | 9 | Q. | In 2024 you're saying he wasn't a candidate for -- |
| 14:40:27 | 10 | A. | Yes, sir.  Sorry.  Yes, sir. |
| | 11 | Q. | Sorry? |
| | 12 | A. | Yes, sir, he was a candidate. |
| | 13 | Q. | I don't want to confuse you. |
| | 14 | A. | You are correct, yes, sir, yes, sir. |
| 14:40:35 | 15 | Q. | The most recent election he was a candidate for |
| | 16 | Congress? |
| | 17 | A. | Yes, sir. |
| | 18 | Q. | And February 2024 would have been the heat of the |
| | 19 | election; wouldn't it, Ms. Barbour? |
| 14:40:45 | 20 | A. | What? |
| | 21 | Q. | The heat of the election. |
| | 22 | A. | I suppose so, yes, sir. |
| | 23 | Q. | That's when you gave your interview to this |
| | 24 | blogger? |
| 14:40:54 | 25 | A. | Yes, sir. |

| | | |
|---|---|---|
| 14:41:40 | 1 | Q. Did you mention, Ms. Barbour, earlier, and I may |
| | 2 | have been confused with this, when Mr. DeVan Barbour contacted |
| | 3 | you about his conversation with Mr. Johnson that he did that |
| | 4 | in a text or was it in a phone call? |
| 14:41:56 | 5 | A. I believe it was a phone call. |
| | 6 | Q. Now, Ms. Barbour, the State showed you a number of |
| | 7 | exhibits at the end of your direct examination, and those were |
| | 8 | exhibits when things were going good with you and Mr. Johnson; |
| | 9 | is that right? |
| 14:46:01 | 10 | A. From what I can remember, yes, yes, sir. |
| | 11 | Q. When you were you enamored with him? |
| | 12 | A. Enamored? |
| | 13 | Q. Well, in love with him; is that fair to say? |
| | 14 | A. Yes, sir. |
| 14:46:13 | 15 | Q. You were saying really nice things about him during |
| | 16 | the time -- throughout 2021? |
| | 17 | A. Yes, sir. |
| | 18 | Q. And until February 2022; isn't that right? |
| | 19 | A. Yes. |
| 14:46:28 | 20 | Q. He was the good guy at that point; isn't that |
| | 21 | right? |
| | 22 | A. In the beginning of our relationship, yes, sir. |
| | 23 | Q. You certainly felt like he was the good guy; is |
| | 24 | that right? |
| 14:46:37 | 25 | A. Initially, yes. |

| | | |
|---|---|---|
| 14:46:39 | 1 | Q. Then by May 23rd of 2022, at 8:07, p.m. did you |
| | 2 | post something with a poop emoji saying: Getting ready to hit |
| | 3 | the fan? |
| | 4 | A. If it is there, I posted it, yes, sir. |
| 14:47:00 | 5 | MR. TYNDALL: Nothing further, Your Honor. |
| | 6 | THE COURT: Mr. Zellinger. |
| | 7 | REDIRECT EXAMINATION BY MR. ZELLINGER:. |
| | 8 | Q. Ms. Barbour, do you recall that specific text that |
| | 9 | the defendant just asked you about? |
| 14:47:15 | 10 | A. No, sir. |
| | 11 | Q. Something about a -- |
| | 12 | A. Poop emoji. |
| | 13 | Q. Yes. |
| | 14 | A. I don't recall sending it, what it was for. |
| 14:47:22 | 15 | Q. Do you remember when that was? |
| | 16 | A. No, I don't remember. |
| | 17 | Q. Do you remember what it was about? |
| | 18 | A. I remember there was a lot of things going on at |
| | 19 | that time with -- no, I don't. Honestly, I don't remember why |
| 14:47:39 | 20 | I put it. |
| | 21 | Q. You don't recall when that was? |
| | 22 | A. No, I don't. |
| | 23 | Q. May 2022, does that sound right? |
| | 24 | A. That could be right. I'm not -- |
| 14:48:07 | 25 | Q. And just to be clear, the primary in this when |

| | | | |
|---|---|---|---|
| 14:48:12 | 1 | | DeVan Barbour was on the ballot, that was May 17th of 2022? |
| | 2 | A. | Correct. |
| | 3 | Q. | So that would have been a week later? |
| | 4 | A. | Yes. |
| 14:48:19 | 5 | Q. | I mean, did you conspire with the defendant to |
| | 6 | | extort DeVan Barbour? |
| | 7 | A. | No. |
| | 8 | Q. | Did you release these recordings of yourself to |
| | 9 | | anyone? |
| 14:48:28 | 10 | A. | No, sir. |
| | 11 | Q. | You talked about them to a blogger in 2024; is that |
| | 12 | | correct? |
| | 13 | A. | I did. |
| | 14 | Q. | At that point do you know hadn't -- at some point |
| 14:48:37 | 15 | | the defendant in this case was charged with these crimes; is |
| | 16 | | that correct? |
| | 17 | A. | Yes, sir. |
| | 18 | Q. | And were there media accounts about that? |
| | 19 | A. | Were there? |
| 14:48:46 | 20 | Q. | Media accounts, stories about that in the media? |
| | 21 | A. | Yes. |
| | 22 | Q. | You saw those; is that correct? |
| | 23 | A. | I read those. |
| | 24 | Q. | After that did you talk to the blogger? |
| 14:48:56 | 25 | A. | Yes. |

| | | |
|---|---|---|
| 14:48:58 | 1 | Q. And you hesitated. I mean -- |
| | 2 | A. I didn't talk to the blogger till everything was |
| | 3 | over with. After the -- after I found out Ronald had got up |
| | 4 | at a Republican -- |
| 14:49:14 | 5 | Q. Sure. I don't want to get into what the defendant |
| | 6 | may have said, but at some point you talked to the blogger |
| | 7 | about this after everything had been out in the open? |
| | 8 | A. Yes. Everybody knew about it. |
| | 9 | Q. And you were asked some questions about DeVan |
| 14:49:34 | 10 | contacting you. |
| | 11 | Do you still have State's Exhibit 5A in front of |
| | 12 | you? |
| | 13 | A. I have 5. |
| | 14 | Q. State's Exhibit 5, that is what you produced, and |
| 14:49:52 | 15 | that has a time -- more content in it than 5A? |
| | 16 | A. Yes. |
| | 17 | Q. 5 has your sort of comments on what each call or |
| | 18 | meeting that happened; is that correct? |
| | 19 | A. Yes, sir. |
| 14:50:05 | 20 | Q. Does that helps refresh your memory as to what |
| | 21 | happened in State's Exhibit 5A? |
| | 22 | A. Yes, sir. |
| | 23 | Q. If we could put up -- |
| | 24 | MR. ZELLINGER: Your Honor, may I publish State's |
| 14:50:15 | 25 | Exhibit 5A? |

| | | |
|---|---|---|
| 14:50:17 | 1 | THE COURT:  Yes, sir. |
| | 2 | (State's Exhibit Number 5A published to the |
| | 3 | jury.) |
| | 4 | Q.   If we can go to November 4th of 2021.  You're |
| 14:50:43 | 5 | looking at State's Exhibit 5, Ms. Barbour? |
| | 6 | A.   Yes, sir. |
| | 7 | Q.   Do you know specific -- do you know the exact date |
| | 8 | the defendant asked you to have a threesome with Amy Monsour? |
| | 9 | A.   That was November 4th. |
| 14:50:58 | 10 | Q.   November 4th? |
| | 11 | A.   Yes, sir. |
| | 12 | Q.   And at 5:53 p.m.? |
| | 13 | A.   Yes, sir. |
| | 14 | Q.   Then there's a blank in the -- if you look up at |
| 14:51:08 | 15 | State's Exhibit 5A.  If you can look up at the screen, that's |
| | 16 | State's Exhibit 5A.  Those blanks, those aren't blank on what |
| | 17 | you filled out -- |
| | 18 | A.   No. |
| | 19 | Q.   -- is that correct? |
| 14:51:21 | 20 | A.   Uh-huh. |
| | 21 | Q.   Did you send a text the next day on November 5th at |
| | 22 | 11:32 a.m.? |
| | 23 | A.   I did.  That was the awkward alert. |
| | 24 | Q.   What was that about? |
| 14:51:31 | 25 | A.   That was my text to Monsour. |

| | | |
|---|---|---|
| 14:51:33 | 1 | Q. So you actually asked Ms. Monsour to have a |
| | 2 | threesome with you and the defendant; is that correct? |
| | 3 | A. Yes, sir. |
| | 4 | Q. The next day you said awkward alert? |
| 14:51:43 | 5 | A. Yes, sir. |
| | 6 | Q. You all are still friends; is that correct? |
| | 7 | A. Yes, sir. |
| | 8 | Q. How did you get past that? |
| | 9 | A. We're best friends. |
| 14:51:56 | 10 | Q. Turning to April 26th of 2022. Do you recall what |
| | 11 | you talked to DeVan or D Barbour about on April 26th of 2022 |
| | 12 | at 12:28 p.m.? |
| | 13 | A. He asked me why I shared private details that went |
| | 14 | on between me and him with Kevin Donovan. |
| 14:52:30 | 15 | Q. So you told Kevin Donovan the incident with the |
| | 16 | naked FaceTime? |
| | 17 | A. I did. |
| | 18 | Q. And this is the 26th of April; is that correct? |
| | 19 | A. Correct. |
| 14:52:43 | 20 | Q. The day before would be April 25th; is that |
| | 21 | correct? |
| | 22 | A. Correct. |
| | 23 | Q. Okay. And then after that, did DeVan Barbour call |
| | 24 | you again and you talked for 15 minutes? |
| 14:52:57 | 25 | A. Yes, sir. |

| 14:52:58 | 1 | Q. What was that conversation about? |
| | 2 | A. He wanted me to ask -- to send a text message to |
| | 3 | Ronald saying that I was going through a rough time in my life |
| | 4 | and that nothing happened between me and him and I apologize |
| 14:53:18 | 5 | for -- the affair didn't happen. I apologize. |
| | 6 | Q. Recanting your affair? |
| | 7 | A. Yes. |
| | 8 | Q. When you took notes on this in State's Exhibit 5, |
| | 9 | you actually said "recant our entire affair." |
| 14:53:28 | 10 | A. Yes. That's what he asked me to do. |
| | 11 | Q. And then -- |
| | 12 | A. He said to say I was going through a tough time -- |
| | 13 | he wanted me to say I was going to through a tough time in my |
| | 14 | marriage and I should apologize for saying these things. |
| 14:53:37 | 15 | Q. If you didn't do that, what was going to happen? |
| | 16 | A. Release the information on DeVan Barbour. |
| | 17 | Q. Okay. And who was going to? |
| | 18 | A. Ronald Johnson. |
| | 19 | Q. Okay. You were asked some questions -- |
| 14:53:58 | 20 | Ms. Barbour, you can put down the book. Thank you. |
| | 21 | You were asked questions about your phone. Your |
| | 22 | old phone, was that given to Smithfield PD to be downloaded? |
| | 23 | A. The one they asked for, yes, sir. |
| | 24 | Q. And your lawyer had some sort of deal where if |
| 14:54:18 | 25 | Smithfield would download it, give it back, he would provide |

| 14:54:21 | 1 | it to Smithfield PD; is that correct? |

14:54:21    1    it to Smithfield PD; is that correct?

            2         A.    Yes.

            3         Q.    The defendant, do you know where he was a law

            4    enforcement officer?

14:54:28    5         A.    Smithfield Police Department.

            6         Q.    At some point during your relationship, did he stop

            7    being an officer for the Smithfield Police Department?

            8         A.    Yes, sir.

            9         Q.    Now, you're concerned, I think you mentioned on

14:54:44   10    cross-examination, that the defendant was recording you or

           11    somehow had access to your cellphone; is that correct?

           12         A.    Yes, sir.

           13         Q.    You said that you paid like $200.  Was that for a

           14    new phone?

14:54:54   15         A.    It was for a burner.  One of those phones you get

           16    from Target.  One of my friends said, they're tracking you,

           17    they're following you, you need to get this to protect

           18    yourself.

           19         Q.    And that was not the phone that the defendant

14:55:04   20    provided you that's State's Exhibit 12.  This is a different

           21    phone?

           22         A.    A different phone.

           23         Q.    And that was the phone that you used to communicate

           24    with friends and family?

14:55:10   25         A.    Yes.

| | | |
|---|---|---|
| 14:55:10 | 1 | Q. Okay. That phone that you used to communicate with |
| | 2 | friends and family, did you only use that phone after this |
| | 3 | whole thing where DeVan Barbour had called you? |
| | 4 | A. Yes, sir. |
| 14:55:19 | 5 | Q. Okay. So when DeVan Barbour called you to ask you |
| | 6 | to recant your affair with the defendant -- or told you that |
| | 7 | the defendant requested that, was that on your old phone or |
| | 8 | your new phone? |
| | 9 | A. My current phone. The phone I possessed. |
| 14:55:34 | 10 | Q. Okay. That was on your new phone? |
| | 11 | A. Yes. |
| | 12 | Q. Okay. When did you switch phones? |
| | 13 | A. No. That was on the -- my phone that I still have, |
| | 14 | that was the one that I had. |
| 14:55:42 | 15 | Q. Okay. The one that was downloaded by Smithfield |
| | 16 | PD? |
| | 17 | A. Yes. |
| | 18 | Q. Okay. Okay. So you still have two phones; is that |
| | 19 | correct? |
| 14:55:49 | 20 | A. I do. |
| | 21 | Q. Okay. And -- |
| | 22 | A. But I've not touched the other one since I don't |
| | 23 | know. |
| | 24 | Q. Which one haven't you touched? |
| 14:55:54 | 25 | A. The one that I bought from Target. |

| 14:55:56 | 1 | Q.   So you don't use that anymore. |
| | 2 | A.   No. |
| | 3 | Q.   So you use that just to communicate with friends |
| | 4 | and family? |
| 14:56:00 | 5 | A.   I did that prior to all this happening, yes. |
| | 6 | Q.   Okay.  So that burner phone, as you put it, the new |
| | 7 | phone, did you use that at all to communicate with the |
| | 8 | defendant or DeVan Barbour or send Snapchats or anything |
| | 9 | relevant to this case? |
| 14:56:12 | 10 | A.   No, sir. |
| | 11 | Q.   That phone, has that phone ever been provided to |
| | 12 | Investigator Hoffman or Smithfield PD directly? |
| | 13 | A.   No, sir. |
| | 14 | Q.   Okay.  The phone that you did use to communicate |
| 14:56:23 | 15 | with the defendant and DeVan Barbour, was that phone provided |
| | 16 | to Smithfield PD? |
| | 17 | A.   Yes. |
| | 18 | Q.   Okay.  You were shown some text messages.  Do you |
| | 19 | know, like, when you have -- look at your phone, can you |
| 14:56:46 | 20 | delete text messages out of your phone? |
| | 21 | A.   Yes, sir. |
| | 22 | Q.   Do you know if those text messages have all the |
| | 23 | messages between you and the defendant or whoever you were |
| | 24 | asked about or -- I mean, do you know if there's stuff missing |
| 14:56:55 | 25 | in between? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 14:56:56 | 1 | A. I haven't deleted anything prior to all this |
| | 2 | because of fear I would need it. |
| | 3 | Q. Okay. Can I see Defendant's 11? |
| | 4 | Ma'am, I show you what's been marked for |
| 14:58:48 | 5 | identification purposes as Defendant's Exhibit 9. This is |
| | 6 | your number at the top; is that correct? |
| | 7 | A. Yes, sir. |
| | 8 | Q. Okay. So I mean, to the best of your knowledge |
| | 9 | Defendant's 9, does that come from your phone or does that |
| 14:59:05 | 10 | come from somebody else's phone? |
| | 11 | A. This? Does this come from my phone? |
| | 12 | Q. Yes, ma'am. |
| | 13 | A. That's my phone. It's got my number up there. |
| | 14 | Q. Okay. So the number though -- |
| 14:59:16 | 15 | A. But my face is not there. |
| | 16 | Q. Yes. So if it was your phone, would it have the |
| | 17 | number of the person that you were texting with? |
| | 18 | A. It should, yes. |
| | 19 | Q. Is it possible this comes from somebody else's |
| 14:59:27 | 20 | phone and this is a record of them contacting you? |
| | 21 | A. Yes. |
| | 22 | Q. And so this doesn't appear to come from your phone; |
| | 23 | is that correct? |
| | 24 | A. Correct. |
| 14:59:36 | 25 | Q. So do you know if this chronology is the chronology |

| | | |
|---|---|---|
| 14:59:41 | 1 | of the text or could there have been other things that were |
| | 2 | deleted out of here? |
| | 3 | A.    Or it could have been other things deleted from |
| | 4 | that. |
| 14:59:47 | 5 | Q.    Okay.  So this didn't -- Defendant's -- |
| | 6 | MR. TYNDALL:  I'm going to object.  I mean, this |
| | 7 | was used to refresh her recollection.  She did that and then |
| | 8 | she answered questions.  I didn't admit -- I mean, this is not |
| | 9 | the -- |
| 14:59:59 | 10 | THE COURT:  Yes, sir.  Maybe you can rephrase your |
| | 11 | questions accordingly, if you would, please. |
| | 12 | MR. ZELLINGER:  Sure. |
| | 13 | Q.    You were shown some stuff on cross-examination; is |
| | 14 | that correct? |
| 15:00:06 | 15 | A.    Yes. |
| | 16 | Q.    And do you know that what you were shown is an |
| | 17 | accurate depiction of the conversations that you had? |
| | 18 | A.    That could not that -- possibly is not an accurate |
| | 19 | depiction of the conversation. |
| 15:00:17 | 20 | Q.    It also could be an accurate depiction? |
| | 21 | A.    It could. |
| | 22 | Q.    Because you don't remember your text messages from |
| | 23 | years ago? |
| | 24 | A.    Correct.  Yes. |
| 15:00:25 | 25 | Q.    Okay.  And just to be clear, we had a picture of a |

Angela Barbour - Redirect by Mr. Zellinger

15:00:36  1    phone.  If it was your phone, it would have the person you

2    were texting's number at the top; correct?

3         A.   Correct.

4         Q.   So if it has your number at the top, it might be

15:00:45  5    from somebody else's phone; is that right?

6         A.   It could.

7         Q.   You were asked some questions about Snapchat.  Is

8    the whole premise of Snapchat that the content doesn't stay

9    forever?

15:01:04  10        A.   Correct.

11        Q.   And so I mean, why were you using Snapchat?

12        A.   That was our main mode of communication.

13        Q.   At some point were you concerned that your husband

14   might see your phone?

15:01:18  15        A.   Yes, sir.

16        Q.   And if a conversation disappeared with Snapchat,

17   would your husband be able to see it?

18        A.   If it disappeared, no, he would not be able to see

19   it.

15:01:32  20        Q.   You were asked some questions about whether you

21   posted on Facebook about your marital problems.  This affair

22   you had with the defendant, was it publicly known?

23        A.   Not until at the very end, no, sir.

24        Q.   Okay.  Until you started talking about it; is that

15:01:49  25   correct?

| | | |
|---|---|---|
| 15:01:49 | 1 | A. Yes, sir. |
| | 2 | Q. Now, at any point did the defendant talk about it? |
| | 3 | A. That I don't know, other than -- I mean, I can't |
| | 4 | say he talked about it. |
| 15:01:57 | 5 | Q. Okay. I mean, in fact, you were served a 50C that |
| | 6 | alleged you weren't in a dating relationship; is that correct? |
| | 7 | A. Correct. Yes, sir. |
| | 8 | Q. So your relationship during the pendency of the |
| | 9 | relationship, did you take measures to make sure that it was |
| 15:02:14 | 10 | secret? |
| | 11 | A. Our affair? |
| | 12 | Q. Yes. |
| | 13 | A. Yes, I made sure it stayed secret, except for my |
| | 14 | close circle of friends, yes, sir. |
| 15:02:20 | 15 | Q. Okay. I mean, would you guys ride in cars |
| | 16 | together? |
| | 17 | A. No. We met up. |
| | 18 | Q. When you went to these hotels, would you go in |
| | 19 | together? |
| 15:02:28 | 20 | A. No, he went in before me. |
| | 21 | Q. You used Snapchat? |
| | 22 | A. Snapchat. |
| | 23 | Q. Yet you all would be together at certain political |
| | 24 | events; is that correct? |
| 15:02:41 | 25 | A. Yes, sir. |

| | | |
|---|---|---|
| 15:02:42 | 1 | Q. Did the defendant ever say anything to you about |
| | 2 | being -- like being with him at political events? |
| | 3 | A. No, sir. |
| | 4 | Q. Okay. Would you ever kiss him or hug him at |
| 15:02:52 | 5 | political events? |
| | 6 | A. No, sir. |
| | 7 | Q. Why not? |
| | 8 | A. That was not allowed. |
| | 9 | Q. Would this -- I mean, based on your interactions |
| 15:03:09 | 10 | with the defendant, would this affair coming out have helped |
| | 11 | his political career? |
| | 12 | A. No. |
| | 13 | Q. Why not? |
| | 14 | A. Because it's an affair. He pleaded with me |
| 15:03:21 | 15 | about -- he would talk to me about his integrity and how he |
| | 16 | would have to testify in court, and how, you know, he had to |
| | 17 | appear to be honest, and an affair would make him look like a |
| | 18 | dishonest person. |
| | 19 | Q. You actually moved out from your home with your |
| 15:03:45 | 20 | husband; is that correct? |
| | 21 | A. I did. |
| | 22 | Q. You moved into an apartment? |
| | 23 | A. I did. |
| | 24 | Q. Did the defendant ever move out of his home? |
| 15:03:52 | 25 | A. No, sir. |

| | | | |
|---|---|---|---|
| 15:03:52 | 1 | Q. | You mentioned that you talked to Travis Wheeler. |
| | 2 | A. | Yes, sir. |
| | 3 | Q. | Did you ever talk to him about what we're here |
| | 4 | | about, the affair or anything along those lines? |
| 15:04:04 | 5 | A. | Affair, yes. |
| | 6 | Q. | Okay. Did you ever talk to him about the -- |
| | 7 | A. | Well, he ended up asking. He wants -- |
| | 8 | Q. | Okay. Don't tell me anything he said. |
| | 9 | A. | Okay. Yes, I had to tell him about it. |
| 15:04:14 | 10 | Q. | When you say "about it," you mean about the affair? |
| | 11 | A. | Yes. |
| | 12 | Q. | You were asked some questions about your lawyer. |
| | 13 | | Are you aware -- I mean, your lawyer was Mr. Dickerhoff; is |
| | 14 | | that correct? |
| 15:04:33 | 15 | A. | Yes, sir. |
| | 16 | Q. | Do you know, did he work with Jimmy Lawrence? |
| | 17 | A. | He did. |
| | 18 | Q. | Okay. Did you ever talk to Jimmy Lawrence? |
| | 19 | A. | No, sir. |
| 15:04:41 | 20 | Q. | Have you ever talked to Jimmy Lawrence? |
| | 21 | A. | No, sir. |
| | 22 | Q. | Did Jimmy Lawrence give you advice about how to |
| | 23 | | handle the end of your affair? |
| | 24 | A. | No, sir. |
| 15:04:50 | 25 | Q. | At that point Jimmy Lawrence had been removed from |

| | | |
|---|---|---|
| 15:04:55 | 1 | being the school board attorney; is that correct? |
| | 2 |      A.   Yes, sir. |
| | 3 |         MR. ZELLINGER:  Can I have one moment, Your Honor? |
| | 4 |         THE COURT:  Yes, sir. |
| 15:05:22 | 5 |      Q.   That conversation with Travis Wheeler, when did you |
| | 6 | have that conversation? |
| | 7 |      A.   It was later in my and Ron's relationship.  It was |
| | 8 | when -- it was -- as far as when I initially told him, it was |
| | 9 | he -- I can't say what Travis asked me.  Travis wanted to know |
| 15:05:38 | 10 | why I had to explain myself to him.  He -- I want to make sure |
| | 11 | I say the exact words.  He, Travis -- I gotta get this right. |
| | 12 | Travis wanted to know why I had to tell him why I was not |
| | 13 | having a relationship with Ronald.  There was a -- I've |
| | 14 | got -- |
| 15:06:05 | 15 |      Q.   Are you struggling with how to get this out |
| | 16 | without -- |
| | 17 |      A.   Without saying what he said. |
| | 18 |      Q.   -- saying what Travis said? |
| | 19 |      A.   Yes. |
| 15:06:11 | 20 |      Q.   Travis Wheeler is a district court judge? |
| | 21 |      A.   Yes.  I had conversation with him.  He had been |
| | 22 | drinking too much and I told him I was concerned I was being |
| | 23 | followed and wired and those things.  I had that conversation |
| | 24 | with Travis.  He wanted to know why I was so worried.  And I |
| 15:06:29 | 25 | had to tell him about the affair. |

15:06:32    1          Q.    When was that?

            2          A.    That was during the later part after I was starting

            3    to become fearful of Ronald.

            4          Q.    During the time period of your relationship, I

15:06:52    5    mean, it was going well for 2020, 2021 for like a large part

            6    of 2021 between you and the defendant?

            7          A.    Yes, sir.

            8          Q.    And then it started to not go well; is that

            9    correct?

15:07:07   10          A.    Yes, sir.  It just popped in my head.  He kept

           11    accusing me of having relations with Travis.  Travis kept

           12    saying, why do you keep having to defend yourself?  He kept

           13    accusing me of that.

           14          Q.    Who was accusing you of having a relationship?

15:07:26   15          A.    Ronald Johnson.  But I was not, but he kept

           16    accusing me.

           17          Q.    Are you still close friends with April Lee?

           18          A.    We're best friends.

           19          Q.    Okay.  You mentioned you talked about this with

15:08:17   20    Kevin Donovan, Ronald Johnson, and April Lee; is that correct?

           21          A.    Yes.

           22          Q.    At any point has April Lee recorded you?

           23          A.    No, sir.

           24          Q.    Has she been helpful to you in dealing with the

15:08:29   25    stress of everything?

| | | |
|---|---|---|
| 15:08:32 | 1 | A. Yes, sir. |
| | 2 | Q. And in terms of Kevin Donovan, did you talk to him |
| | 3 | on the phone about this? |
| | 4 | A. I did. |
| 15:08:42 | 5 | Q. So when you talked to Kevin Donovan, do you know if |
| | 6 | it was being recorded? |
| | 7 | A. I did not. |
| | 8 | Q. And when you would talk with the defendant, do you |
| | 9 | know if or when the defendant would be recording? |
| 15:08:56 | 10 | A. I don't know when he was. |
| | 11 | Q. Just for clarity, when I said "this," I'm talking |
| | 12 | about the incident with DeVan Barbour. |
| | 13 | A. Yes, sir. |
| | 14 | Q. The three people you talked to were the defendant, |
| 15:09:30 | 15 | Kevin Donovan, and April Lee. |
| | 16 | A. Yes, sir. |
| | 17 | Q. April is your best friend? |
| | 18 | A. Yes, sir. |
| | 19 | Q. The other people are the defendant and Kevin |
| 15:09:37 | 20 | Donovan? |
| | 21 | A. Yes, sir. |
| | 22 | Q. Okay. Thank you. |
| | 23 | MR. ZELLINGER: Nothing further, Your Honor. |
| | 24 | THE COURT: Mr. Tyndall. |
| | 25 | |

| | | |
|---|---|---|
| 15:09:44 | 1 | CROSS-EXAMINATION BY MR. TYNDALL: |
| | 2 | Q. I'll bring this up, Ms. Barbour. |
| | 3 | A. Yes, sir. |
| | 4 | Q. You mentioned Mr. Johnson was accusing you of |
| 15:09:51 | 5 | having a relationship with Travis Wheeler; is that right? |
| | 6 | A. Yes, sir. |
| | 7 | Q. Did you call Judge Wheeler on February 6th late at |
| | 8 | night after drinking and ask him if you could come over? |
| | 9 | A. Yes, but we were friends. |
| 15:10:06 | 10 | Q. Well, do you know whether he interpreted it that |
| | 11 | way? |
| | 12 | A. I don't know how he interpreted it. We were |
| | 13 | working on campaign information. |
| | 14 | Q. And then a couple days later did you say: Wanted |
| 15:10:17 | 15 | to share. I spoke with Travis last evening and sincerely |
| | 16 | apologized and talked about how unprofessional I was Saturday. |
| | 17 | A. Because I had had a lot to drink. |
| | 18 | Q. Had nothing to do with your call to him? |
| | 19 | A. Not that I can recall. I had a lot to drink. |
| 15:10:35 | 20 | Q. Okay. |
| | 21 | A. I was apologizing for my behavior for drinking. |
| | 22 | Q. Mr. Zellinger asked you about a series of text |
| | 23 | messages and what order they were in and all that, but when I |
| | 24 | asked you earlier, you said: Can we please put this shit |
| 15:10:51 | 25 | aside and work together. That was something you said to |

| | | |
|---|---|---|
| 15:10:54 | 1 | Mr. Johnson on April 13th; isn't it? |
| | 2 | A.    I did. |
| | 3 | Q.    So you're not denying that you actually said that |
| | 4 | to him? |
| 15:11:02 | 5 | A.    No.  But I know the shit that you're referring to |
| | 6 | was dealing with the GOP and school board members and the |
| | 7 | forum that was going on in JoCo, and another individual that |
| | 8 | was -- that had said some things about me because he was |
| | 9 | displeased that I was helping Ronald and all the school -- |
| 15:11:21 | 10 | Kevin Donovan and all of them getting elected and not him. |
| | 11 | That is the shit. |
| | 12 | Q.    Whatever it was, you were contacting him saying, |
| | 13 | let's put it aside and work together? |
| | 14 | A.    Yes.  Because he had communicated a month prior, |
| 15:11:34 | 15 | not even a month.  You can go back and look at the records. |
| | 16 | We were still talking some. |
| | 17 | Q.    There was some discussion about which phones you |
| | 18 | had and when, but Mr. Zellinger asked you if you were |
| | 19 | concerned that your husband would get ahold of your phone; is |
| 15:11:53 | 20 | that right? |
| | 21 | A.    Yes.  But my husband never messed with my phone, |
| | 22 | but being in a house, married and having a man's number pop up |
| | 23 | on your phone is not a good thing. |
| | 24 | Q.    That would be a reason to get a burner phone too; |
| 15:12:05 | 25 | isn't it? |

| 15:12:06 | 1 | A. That is not why I got a burner phone. |

15:12:06  1      A.    That is not why I got a burner phone.

2      Q.    That would be a reason to get one; wouldn't it?

3      A.    It could be, but that is not the reason.  I bought

4  that burner phone at Target after I had a conversation with D

15:12:17  5  that day.

6            MR. TYNDALL:  May I approach, Your Honor?

7            THE COURT:  Yes.

8      Q.    I'm going to show you what's been marked State's

9  Exhibit 45.  Now, this is an exhibit, Ms. Barbour, that you

15:13:35 10  identified and testified about earlier, State's Exhibit 25 --

11  excuse me, 45.  Now, down at the bottom here, can you see the

12  time?

13      A.    Yes, sir.

14      Q.    It says 5/7/2021, 1:15:15 p.m.?

15:13:56 15      A.    Yes, sir.

16      Q.    Can you see out to the side it says UTC minus 4?

17      A.    Yes, sir.

18            MR. TYNDALL:  May I approach, Your Honor?

19            THE COURT:  Yes, sir.

15:14:34 20            MR. TYNDALL:  State's 8.

21            MR. ZELLINGER:  Sure.

22      Q.    Now, Ms. Barbour, I'm going to show you the

23  Snapchat exhibit that they showed you earlier -- I mean,

24  excuse me, State's Exhibit Number 8.  Do you recognize that

15:14:46 25  from your testimony earlier?

| 15:14:48 | 1 | A. Yes, sir. |
| | 2 | Q. And it appears, at least from Mr. Zellinger's |
| | 3 | questions, that this is your Snapchat identity and that's |
| | 4 | Mr. DeVan Barbour's Snapchat identity. |
| 15:15:01 | 5 | A. Yes, sir. |
| | 6 | Q. You said you would occasionally communicate with |
| | 7 | him on Snapchat; is that right? |
| | 8 | A. Yes, sir. |
| | 9 | Q. You mentioned that the communication you had where |
| 15:15:09 | 10 | he exposed himself was very late at night? |
| | 11 | A. I believe it was. It was -- yes, sir. |
| | 12 | Q. After midnight? |
| | 13 | A. It was in the middle of the night. |
| | 14 | Q. And the date and time on State's Exhibit 8 is |
| 15:15:21 | 15 | 22:25:56 UTC; is that right? |
| | 16 | A. Yes, sir. |
| | 17 | Q. So 22:25:56, that would be 10:56? |
| | 18 | A. Yes, sir. |
| | 19 | Q. That would be UTC, according to this record that |
| 15:15:38 | 20 | says UTC? |
| | 21 | A. Whatever UTC is, sir. I don't know. |
| | 22 | Q. Either way, the communication when he had exposed |
| | 23 | himself was later than that; is that fair to say? |
| | 24 | A. I believe so, yes, sir. |
| 15:16:04 | 25 | Q. Ms. Barbour, do you remember posting something on |

| 15:16:26 | 1 | Facebook on June 29, 2022, with an insignia called checkmate |
| | 2 | across the top? |
| | 3 | A. Yes, sir. |
| | 4 | MR. ZELLINGER: Your Honor, this is outside the |
| 15:16:36 | 5 | scope. |
| | 6 | THE COURT: Yes, sir. Can you approach just for a |
| | 7 | minute, please. |
| | 8 | (Sidebar.) |
| | 9 | THE COURT: Overruled. I'll let you ask that. |
| 15:17:31 | 10 | Q. I think you were about to answer, Ms. Barbour. |
| | 11 | A. Yes, because I remember after I made that, I knew |
| | 12 | it was a bad decision because I got accused. And I was warned |
| | 13 | about Facebook. That was not what that was in reference to. |
| | 14 | It was something related to work. Something not even related |
| 15:17:48 | 15 | to this. |
| | 16 | Q. I think I misspoke. I said Facebook, but this is a |
| | 17 | Snapchat, and it says: Checkmate. |
| | 18 | A. That was something completely unrelated to this -- |
| | 19 | anything dealing with me and Ronald Johnson. |
| 15:18:01 | 20 | Q. On June 29, 2022? |
| | 21 | A. Yes. That was not related to this. |
| | 22 | MR. TYNDALL: I don't have anything further. |
| | 23 | MR. ZELLINGER: Very briefly. |
| | 24 | REDIRECT EXAMINATION BY MR. ZELLINGER: |
| 15:18:13 | 25 | Q. You were asked about if getting a burner phone |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 15:18:16 | 1 | would help avoid your husband.  When you bought that burner |
| | 2 | phone, had you already moved out of your house? |
| | 3 | A.    Yes, sir. |
| | 4 | Q.    You were living in an apartment; right? |
| 15:18:26 | 5 | A.    Yes. |
| | 6 | Q.    And your husband wasn't around then. |
| | 7 | A.    Correct. |
| | 8 | Q.    You were asked some questions about DeVan Barbour |
| | 9 | contacting you on Snapchat. |
| 15:18:58 | 10 | A.    Yes. |
| | 11 | Q.    He actually -- the incident in which you allege he |
| | 12 | exposed himself to you, that was on his wife's FaceTime? |
| | 13 | A.    That was on his wife's FaceTime. |
| | 14 | MR. ZELLINGER:  Nothing further, Your Honor. |
| 15:19:10 | 15 | RECROSS-EXAMINATION BY MR. TYNDALL: |
| | 16 | Q.    I'm sorry, Ms. Barbour, you were saying something |
| | 17 | about the June 29, 2022, Snapchat where it said checkmate was |
| | 18 | unrelated to Mr. Johnson? |
| | 19 | MR. ZELLINGER:  I withdraw my objection. |
| 15:19:24 | 20 | THE WITNESS:  Yes.  Because it was.  Yea. |
| | 21 | Q.    Then you said something else you; didn't you? |
| | 22 | A.    It wasn't related. |
| | 23 | Q.    That's all you said? |
| | 24 | A.    Yes. |
| 15:19:32 | 25 | Q.    Okay.  I'm sorry.  I thought you said something |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 15:19:35 | 1 | else. |
| | 2 |       A.   No, it was unrelated. |
| | 3 |         MR. TYNDALL:  Nothing further, Your Honor.  That's |
| | 4 | it. |
| 15:19:40 | 5 |         MR. ZELLINGER:  Your Honor, I ask Ms. Barbour be |
| | 6 | release from her subpoena at this time. |
| | 7 |         MR. TYNDALL:  The only reason we would need her is |
| | 8 | if we need to introduce something.  I don't need her to stick |
| | 9 | around.  If she can be on standby. |
| 15:19:52 | 10 |         THE COURT:  Ma'am, keep up with Mr. Zellinger, if |
| | 11 | you would, please. |
| | 12 |            (Witness excused.) |
| | 13 |         THE COURT:  We're going to take a 15-minute recess. |
| | 14 | Remember, don't talk about this case with anybody.  Don't let |
| 15:20:16 | 15 | anybody talk to you about it.  See you in 15 minutes. |
| | 16 |            (Jury exits.) |
| | 17 |         THE COURT:  Anything before we break? |
| | 18 |         MR. ZELLINGER:  Not from the State, Your Honor. |
| | 19 |         MR. TYNDALL:  No, Your Honor. |
| 15:21:30 | 20 |         THE COURT:  15 minutes. |
| | 21 |            (Recess.) |
| | 22 |         THE COURT:  Ready? |
| | 23 |         MS. JAMES:  Our next witness is Chris Sullivan. |
| | 24 | He's a magistrate.  We spoke in chambers about the reference |
| 15:38:36 | 25 | to him as a magistrate, not because to bolster our case, but |

| | | |
|---|---|---|
| 15:38:42 | 1 | it makes sense why the defendant went to talk to him. And I |
| | 2 | don't think we've reached a point of conclusion how the Court |
| | 3 | wanted us to handle that. |
| | 4 | THE COURT: You mean on whether or not to refer to |
| 15:38:53 | 5 | him as a judge or as a magistrate? |
| | 6 | MS. JAMES: As a magistrate. |
| | 7 | THE COURT: You did contact AOC or judicial |
| | 8 | standards. You did have some contact with somebody; is that |
| | 9 | correct? |
| 15:39:03 | 10 | MS. JAMES: That was pertaining to Judge Paul |
| | 11 | Holcombe. They asked us not to refer to him as judge. I have |
| | 12 | organized my direct as to call him a state employee. That |
| | 13 | follows suit of whatever we were going to do with Judge |
| | 14 | Holcombe. But the fact that he's a magistrate because it's |
| 15:39:23 | 15 | ingrained in these facts will come out. |
| | 16 | THE COURT: Yes, ma'am. |
| | 17 | Mr. Tyndall, anything you wish to be heard on that? |
| | 18 | MR. TYNDALL: Judge, it doesn't bother me. I mean, |
| | 19 | he's a magistrate. That's fine with me. |
| 15:39:41 | 20 | THE COURT: Well, we will -- and I guess what |
| | 21 | you're asking is should you basically follow the |
| | 22 | recommendation of AOC and just refer to him as a state |
| | 23 | employee. |
| | 24 | MS. JAMES: That's correct, Your Honor. |
| 15:39:53 | 25 | THE COURT: If that's the guidance we got from |

| | | |
|---|---|---|
| 15:39:55 | 1 | Raleigh, that would probably be appropriate. So we'll -- |
| | 2 | certainly during the State's case we'll ask you to do that. |
| | 3 | Mr. Tyndall, you might want to address him |
| | 4 | differently, and I don't know if you do or not, but for the |
| 15:40:10 | 5 | State's case we'll certainly ask that you do that. |
| | 6 | MS. JAMES:  Thank you, Your Honor. |
| | 7 | THE COURT:  Yes, ma'am.  Anything else? |
| | 8 | MS. JAMES:  I think the defense has something to |
| | 9 | put on the record about his exhibits. |
| 15:40:20 | 10 | MR. BRUDER:  Yes, Your Honor.  During |
| | 11 | cross-examination of Ms. Barbour, defense counsel referenced |
| | 12 | Exhibit 8 twice, two different Exhibit 8s; one being a |
| | 13 | recording of a conversation, and the other one being text |
| | 14 | messages introduced thereafter.  We've discussed the matter |
| 15:40:34 | 15 | with the State and the clerk and are going to relabel the |
| | 16 | audio recording that was played for Ms. Barbour as Exhibit 7A. |
| | 17 | Exhibit 7 is the transcript of that same recording. |
| | 18 | THE COURT:  Okay. |
| | 19 | Any objection to that? |
| 15:40:50 | 20 | MS. JAMES:  No, Your Honor.  We discussed that on |
| | 21 | recess. |
| | 22 | (Defendant's Exhibit Numbers 7 and 7A marked |
| | 23 | for identification.) |
| | 24 | THE COURT:  Thank you.  You guys otherwise ready |
| 15:40:55 | 25 | for the jury? |

| | | |
|---|---|---|
| 15:40:56 | 1 | MS. JAMES: Yes, Your Honor. |
| | 2 | (Jury enters.) |
| | 3 | THE COURT: Ms. James, whenever you are ready. |
| | 4 | MS. JAMES: Thank you, Your Honor. The State calls |
| 15:42:04 | 5 | Chris Sullivan to the stand. |
| | 6 | CHRIS SULLIVAN, |
| | 7 | having been called as a witness for the State and being duly |
| | 8 | sworn at 3:42 p.m., testified as follows: |
| | 9 | DIRECT EXAMINATION BY MS. JAMES: |
| 15:42:42 | 10 | Q. Can you please state your name for the jury. |
| | 11 | A. Chris Sullivan. |
| | 12 | Q. And are you a state employee? |
| | 13 | A. Yes. |
| | 14 | Q. And do you know the defendant, Mr. Johnson? |
| 15:42:54 | 15 | A. Yes. |
| | 16 | Q. How long have you known Mr. Johnson, the defendant? |
| | 17 | A. I've been a State employee for 21 and a half years. |
| | 18 | Probably at least 20 of those years. |
| | 19 | Q. Now, at some point did the defendant contact you |
| 15:43:14 | 20 | seeking some advice? |
| | 21 | A. Not necessarily advice. In the position I'm in I |
| | 22 | can't give legal advice. So just asking basically what he |
| | 23 | would qualify for, what type of procedures he would qualify |
| | 24 | for based on his situation. |
| 15:43:44 | 25 | Q. Now, did he contact you about -- what type of |

| | | |
|---|---|---|
| 15:43:47 | 1 | situation did he contact you about, about what procedure he |
| | 2 | could qualify for? |
| | 3 | A.    When he called me, I was actually -- I don't know |
| | 4 | if I can say what my job title is, but I'm a magistrate.  And |
| 15:44:01 | 5 | when he called me, I was actually off duty; but I guess a |
| | 6 | magistrate never really is off duty because we get phone calls |
| | 7 | all the time, but he inquired about a 50B order which is a |
| | 8 | domestic violence type protective order. |
| | 9 | Q.    Now, did he ask you about a 50 -- are there two |
| 15:44:19 | 10 | types of orders? |
| | 11 | A.    Yes, ma'am. |
| | 12 | Q.    And what are the two types of orders? |
| | 13 | A.    There's a 50B order which is more of a domestic |
| | 14 | type of an order; spouses, couples that have lived together, |
| 15:44:31 | 15 | couples that have been in a relationship, parent/child, people |
| | 16 | that have lived in the same house.  That would be qualified |
| | 17 | more for a 50B which is a domestic violence protective order. |
| | 18 | 50C is a regular order of protection; someone you |
| | 19 | don't live with or have really a relationship with but you |
| 15:44:53 | 20 | know of the person, I guess you could say. |
| | 21 | A lot of times 50B orders, people get them on |
| | 22 | neighbors and stuff like that. |
| | 23 | Q.    Do you mean 50B or 50C? |
| | 24 | A.    50C, I apologize. |
| 15:45:09 | 25 | Q.    Now, when he contacted you, what time of -- what |

| | | |
|---|---|---|
| 15:45:13 | 1 | time of year was this? |
| | 2 |     A.   I actually remember the time of the year because it |
| | 3 | was baseball season.  I was actually at my son's baseball |
| | 4 | game. |
| 15:45:23 | 5 |     Q.   What time year was that? |
| | 6 |     A.   Spring. |
| | 7 |     Q.   It wouldn't have been -- did it go into June or |
| | 8 | is -- I'm sorry.  I don't know much about baseball, so can you |
| | 9 | give me some months here? |
| 15:45:38 | 10 |     A.   I remember it was really cold.  I would say March |
| | 11 | or April.  It was still cold for that time of year. |
| | 12 |     Q.   And how did he contact you? |
| | 13 |     A.   Telephone. |
| | 14 |     Q.   When he contacted you by telephone, what did he |
| 15:46:06 | 15 | tell you about his situation? |
| | 16 |     A.   I could kind of tell, because I've known him for a |
| | 17 | long time, he was a little bit distraught, but he told me that |
| | 18 | he had -- did not know this particular person, but that a lady |
| | 19 | was coming to a lot of the board meetings and places where he |
| 15:46:31 | 20 | would be, she would show up, and it was just a situation where |
| | 21 | it was kind of freaking him out a little bit, and he didn't |
| | 22 | really know what to do. |
| | 23 |     Q.   Did he say that he knew this lady? |
| | 24 |     A.   No.  He told me specifically he did not know her, |
| 15:46:47 | 25 | that it was that that was what was freaking him about it, that |

| | | |
|---|---|---|
| 15:46:51 | 1 | she was showing up at places and, you know, board meetings and |
| | 2 | places where there would be political rallies or whatever and |
| | 3 | she would be there, and it was -- just seemed like to him it |
| | 4 | was becoming more than a coincidence. |
| 15:47:08 | 5 | Q. And based on that information of not knowing the |
| | 6 | lady or not having a relationship with her, what did you tell |
| | 7 | him? |
| | 8 | A. I told him, you know, what you explained earlier |
| | 9 | about the two types of orders. You know, if you don't have a |
| 15:47:27 | 10 | relationship, you are going to qualify more for the 50C type |
| | 11 | order instead of a 50B type order. That a magistrate could |
| | 12 | not do those orders. The only time -- the policy is that in |
| | 13 | Johnston County we do have the authority to do domestic |
| | 14 | violence protective orders, but the only time we as a |
| 15:47:46 | 15 | magistrate can do this is when a judge isn't on the bench, so |
| | 16 | it would be after hours. So I directed him basically to go to |
| | 17 | the clerk's office and apply and the next day he would see a |
| | 18 | district court judge. |
| | 19 | Q. Now, during that first conversation with you, did |
| 15:48:06 | 20 | he ever tell you he was having an affair with this person? |
| | 21 | A. No. |
| | 22 | Q. If he had told you that, would he have qualified |
| | 23 | for a different order? |
| | 24 | A. Yes. |
| 15:48:16 | 25 | Q. Now, did he call you a second time about a second |

15:48:22     1    situation?

             2         A.    Yes.   That was -- that was not the same day or

             3    anything, but that would have been a month or so later is he

             4    called wanting to know if any order or anything had been taken

15:48:34     5    out on him.

             6         Q.    And at the time that he called you, did you see if

             7    anybody had taken out any order against him at that time?

             8         A.    Well, I really knew that none could, not through

             9    our office, because it would have been during the day and a

15:49:01    10    judge would have been on the bench so a magistrate couldn't

            11    have done it.

            12         Q.    Now, later on did you hear about the affair with

            13    Ms. Barbour and the defendant?

            14         A.    I don't know a lot about it, but, you know, of

15:49:22    15    course you see on social media, on our local news site and

            16    stuff.   So you see stuff about it on there.   But I don't know

            17    Ronald that way, you know, to -- to know about his personal --

            18    his personal business like that.

            19         Q.    And so you didn't get into his personal business?

15:49:42    20         A.    No.

            21              MS. JAMES:   If you can just a moment, Your Honor?

            22              THE COURT:   Yes.

            23              MS. JAMES:   No further questions.

            24              THE COURT:   Mr. Tyndall.

            25

| | | |
|---|---|---|
| 15:50:07 | 1 | MR. TYNDALL:  No questions. |
| | 2 | THE COURT:  You can step down. |
| | 3 | THE WITNESS:  Thank you. |
| | 4 | MS. JAMES:  May Mr. Sullivan be released? |
| 15:50:16 | 5 | THE COURT:  Yes.  Mr. Sullivan, thank you very |
| | 6 | much. |
| | 7 | (Witness excused.) |
| | 8 | MS. JAMES:  The State calls Kevin Donovan. |
| | 9 | KEVIN DONOVAN, |
| 15:50:25 | 10 | having been called as a witness for the State and being duly |
| | 11 | sworn at 3:50 p.m., testified as follows: |
| | 12 | DIRECT EXAMINATION BY MS. JAMES: |
| | 13 | Q.   Good afternoon.  Can you please state your name for |
| | 14 | the jury. |
| 15:51:42 | 15 | A.   Kevin Donovan. |
| | 16 | Q.   And what county -- what part of the county do you |
| | 17 | live in? |
| | 18 | A.   I live in Smithfield, North Carolina, on the |
| | 19 | eastern side. |
| 15:51:50 | 20 | Q.   And what do you do for a living? |
| | 21 | A.   I'm a robotic programmer for Spirit Air Systems. |
| | 22 | Q.   Are you a member of the Johnston County School |
| | 23 | Board? |
| | 24 | A.   Yes, ma'am. |
| 15:52:01 | 25 | Q.   How long have you been a member? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | | |
|---|---|---|---|
| 15:52:03 | 1 | A. | 2022 I was elected. |
| | 2 | Q. | And when did you launch your campaign for that |
| | 3 | seat? | |
| | 4 | A. | I believe it was early 2021. |
| 15:52:22 | 5 | Q. | And do you know the defendant in this case, Ronald |
| | 6 | Johnson? | |
| | 7 | A. | Yes, ma'am. |
| | 8 | Q. | How do you know Ronald Johnson? |
| | 9 | A. | He was a school board member when I was interested |
| 15:52:33 | 10 | in running for school board. | |

15:52:03    1       A.    2022 I was elected.

            2       Q.    And when did you launch your campaign for that

            3    seat?

            4       A.    I believe it was early 2021.

15:52:22    5       Q.    And do you know the defendant in this case, Ronald

            6    Johnson?

            7       A.    Yes, ma'am.

            8       Q.    How do you know Ronald Johnson?

            9       A.    He was a school board member when I was interested

15:52:33   10    in running for school board.

           11       Q.    And how long have you known him?

           12       A.    Since 2019, 2020.

           13       Q.    When did you and the defendant first meet?

           14       A.    I believe it was -- well, going to school board

15:52:59   15    meetings and we saw each other there, but actually talking, it

           16    was probably late 2019.

           17       Q.    In what capacity did you guys run into each other

           18    prior to running for school board?

           19       A.    Yes.  So it began during COVID when the school

15:53:20   20    board meetings were talking about masks and COVID mandates and

           21    such.  So I had some conversations with him in passing, along

           22    with some others in a group setting.

           23       Q.    Prior to running for school board, did you go to

           24    any school board meetings or participate in that process?

15:53:41   25       A.    During 2019 during the COVID mandates I went to the

15:53:44   1   school board meetings.  Other than that, before that I did
           2   not.

           3        Q.   Do you have kids in the school system?

           4        A.   I do.  I have three kids.  Two of them are in the
15:54:00   5   school system, yes, ma'am.

           6        Q.   And when you were running and launched your

           7   campaign, did you develop a relationship with the defendant, a
           8   friendship?

           9        A.   I believe it was a friendship.  I considered it a
15:54:19  10   friendship, you know, getting to know him and reaching out to
          11   him and me wanting to run.  I was told that he would be the
          12   person to reach out to because he had a campaign strategy that
          13   was second to none.

          14        Q.   And did you reach out to him when you were trying
15:54:36  15   to decide to run and launch your campaign?

          16        A.   I did.  I reached out to him and had a conversation
          17   and told him my intent.  At that time he stated that -- I
          18   think he was looking for a female to run, but that person
          19   eventually moved to Tennessee, so I guess I was the second
15:54:58  20   option.

          21        Q.   During this time did you happen to meet a person by
          22   the name of Angela Barbour?  I think everybody calls her
          23   Angie.

          24        A.   Yes, ma'am, I did.

15:55:15  25        Q.   How did you meet Angie Barbour?

15:55:17   1    A.    I met her -- I was specifically told from Ronald

           2   Johnson that I would be reached out to by Ms. Barbour to tell

           3   about my campaign.  So she did.  She reached out to me and we

           4   just discussed some campaign strategies.

15:55:48   5    Q.    During this time, how did Ms. Barbour help you in

           6   your campaign?

           7    A.    She was mainly instrumental in getting me fire

           8   department meetings, scheduling those, because there was so

           9   many fire departments in Johnston County.  She was helping

15:56:02  10   with that, along with another person that was running for

          11   office.  She introduced me, I guess, to a group that helped me

          12   with the campaign as well.

          13    Q.    So she put you in contact with the people in the

          14   know to help with your campaign and arrange stuff for you?

15:56:28  15    A.    I would consider that, yes.

          16    Q.    Now, during the time that you're running, how often

          17   did you speak with the defendant during your campaign?

          18    A.    During when I was running, it was probably every

          19   day at least.  We talked daily or every other day.

15:56:56  20    Q.    Now, whenever you would see the defendant or meet

          21   with the defendant, what, if anything, did you notice about

          22   his cellphones?  Like how many would he have?

          23    A.    Yea, he had plenty of them.  And I learned that

          24   toward later down the road.  Normally we would just meet and

15:57:17  25   he'd just have a cellphone, but later down the road I learned

15:57:23  1  that there was multiple.

          2        Q.    How did you learn that information?

          3        A.    Specifically in one case I went to his place of

          4  work which is Blueline Aviation in Smithfield and was picking

15:57:43  5  up a book, Robert Schultz War, that he had in his office, and

          6  he pulled out a bag that had two cellphones in it.  And it was

          7  a specific bag.  I didn't even understand what it was at the

          8  time.  It was called a faraday bag.  Assuming that it's to

          9  block some kind of cellphone signal or signals to gain access

15:58:07 10  to the devices.

         11        Q.    Did you ask him about that?

         12        A.    I asked him what a faraday bag was.  I didn't know

         13  what that was.

         14        Q.    Now, during the course of your friendship with the

15:58:32 15  defendant, did he ever talk to you about recordings or

         16  recording people?

         17        A.    We've discussed -- he's discussed recording people

         18  with me.  Specifically at his house he's played a recording

         19  that he's recorded.  But there's been a couple occasions where

15:58:58 20  he's discussed recording others.

         21        Q.    Let's talk about when you went to his house.  Tell

         22  me specifically about that.

         23        A.    So it was -- it was to go to his house during the

         24  campaign because he was going to help me write an appeal

15:59:13 25  letter to voters, appealing to the voters to get votes, that

| | | |
|---|---|---|
| 15:59:17 | 1 | we were going to mail out. And I walked in his house, seemed |
| | 2 | pretty normal. I did notice a bunch of flash drives. Went to |
| | 3 | the dining room and, you know, he had a laptop. He was |
| | 4 | helping type the appeal letter. We got in conversations about |
| 15:59:36 | 5 | recordings, and he said, you know -- he said I'll give you |
| | 6 | something to listen to that you can have. So we went into his |
| | 7 | living room, I think. He had an older desktop and played a |
| | 8 | recording of a school board member conversation that I believe |
| | 9 | that was a closed session conversation. I think it was taken |
| 16:00:02 | 10 | at the time when they were doing remote meetings. |
| | 11 | Q. Now that you are on the school board, do you |
| | 12 | understand the process of what a closed meeting is or closed |
| | 13 | session? |
| | 14 | A. Yes, ma'am. Yes, ma'am. |
| 16:00:17 | 15 | Q. Okay. Why did you believe that you were being |
| | 16 | played a closed session recording? |
| | 17 | A. It was about specific employees. It was about an |
| | 18 | employee matter, if I remember correctly. |
| | 19 | Q. And when he played that for you, what, if anything, |
| 16:00:40 | 20 | did you do or did he ask you to do? |
| | 21 | A. I just had it on my phone. He didn't specifically |
| | 22 | ask me to do anything with it. I think it was maybe -- in my |
| | 23 | opinion, it was to gain favor. |
| | 24 | Q. And gain favor from who? |
| 16:00:57 | 25 | A. To gain -- you know, to gain trust, to gain favor. |

| 16:00:59 | 1 | Hey, I'm giving you something so you can trust me. |

16:00:59   1   Hey, I'm giving you something so you can trust me.

           2        Q.    And he wanted to gain your favor?

           3        A.    I would assume so, yes.

           4        Q.    And when he played this for you, how did you get it
16:01:13   5   on your phone?

           6        A.    We used the recording app.  He played it through a

           7   speaker on his computer and recorded it with my phone.

           8        Q.    And you stated this was early on in the campaign?

           9        A.    This was I think post primary, if I remember right.
16:01:48  10        Q.    And the primary in that year of 2021, when was it?

          11        A.    I believe that was in April.

          12        Q.    Did he ever play a recording about the million

          13   dollars for you?

          14        A.    About hiding the money?
16:02:24  15        Q.    Uh-huh.

          16        A.    Yes.

          17        Q.    Tell me about the hide the money recording.

          18        A.    I'm trying to remember where we were.  But we had a

          19   discussion about what we could do to kind of boost -- almost
16:02:38  20   like to boost name cognition, because his phrase was

          21   negative -- you know, even negative attention is attention to

          22   your name and getting votes.  So he had the idea of this hide

          23   the money clip that he had clipped an audio of to make a video

          24   and put it out there, reach out to the news media and make a
16:03:02  25   story out of it.

| | | |
|---|---|---|
| 16:03:06 | 1 | Q.   And this was his idea? |
| | 2 | A.   This was his idea, yes.  In fact, he was the one |
| | 3 | recording us when we were sitting there. |
| | 4 | Q.   When you say "we," who are you talking about? |
| 16:03:16 | 5 | A.   Myself and another candidate, Michelle Antoine. |
| | 6 | Q.   And Michelle Antoine, she was running for school |
| | 7 | board at the same time you were? |
| | 8 | A.   Yes, ma'am. |
| | 9 | Q.   And he recorded the two of you all being |
| 16:03:39 | 10 | interviewed? |
| | 11 | A.   Yes.  It was the video that I guess you would see |
| | 12 | on the news or whatever. |
| | 13 | Q.   On the news? |
| | 14 | A.   Yes.  Where we were sitting together talking. |
| 16:03:51 | 15 | Q.   And this hide the millions -- hide the money clip, |
| | 16 | you said that he clipped a portion of this recording? |
| | 17 | A.   Yes, ma'am. |
| | 18 | Q.   So was the whole recording played during this |
| | 19 | interview or just a small portion of it? |
| 16:04:09 | 20 | A.   No, ma'am.  The whole recording has never been |
| | 21 | played in front of me. |
| | 22 | Q.   How long was the small clip that you got to hear |
| | 23 | from the defendant? |
| | 24 | A.   Maybe 13 seconds.  I mean, it's very short. |
| 16:04:34 | 25 | Q.   Now, did you clip this particular soundbite? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 16:04:47 | 1 | A.   No, ma'am. |
| | 2 | Q.   And you said the defendant did that for you? |
| | 3 | A.   He provided the sound clip. |
| | 4 | Q.   He provided the clip? |
| 16:04:56 | 5 | A.   Yes. |
| | 6 | Q.   And to your knowledge, does the defendant know how |
| | 7 | to clip sound clips? |
| | 8 | A.   It's my opinion he does, yes, ma'am. |
| | 9 | Q.   And when this recording was played in your |
| 16:05:30 | 10 | interview, what happened with that interview with you and |
| | 11 | Michelle Antoine? |
| | 12 | A.   That video was taken and then an article was |
| | 13 | written and posted on the JoCo Report.  And I believe WRAL may |
| | 14 | have picked it up as well. |
| 16:05:52 | 15 | Q.   At this time where were you in your campaign, you |
| | 16 | and Michelle? |
| | 17 | A.   We were getting ready to start our general |
| | 18 | election.  It was right before the general. |
| | 19 | Q.   Did the story boost your name? |
| 16:06:13 | 20 | A.   I have no clue.  Honestly, I don't know whether it |
| | 21 | did or not.  Yea.  After I found out that it was actually not |
| | 22 | part -- you know, you only get a section of a clip of a whole |
| | 23 | story of a meeting, you know, that happened.  So I mean, after |
| | 24 | finding out that it was taken out of context, then, you know, |
| 16:06:37 | 25 | it's almost sickening to be part of it. |

| | | |
|---|---|---|
| 16:06:40 | 1 | Q.    So later on you found out this small clip was of a |
| | 2 | longer conversation? |
| | 3 | A.    Yes.   It was a conversation taken in secret -- or |
| | 4 | it was a recording taken in secret of a conversation between |
| 16:06:52 | 5 | multiple school board members. |
| | 6 | Q.    Now, at this point you didn't know that information |
| | 7 | until after the fact; correct? |
| | 8 | A.    That's correct. |
| | 9 | Q.    So your relationship going up to the general |
| 16:07:17 | 10 | election with the defendant, can you describe that for the |
| | 11 | jury. |
| | 12 | A.    It was -- we still had a -- I call it a friendship. |
| | 13 | We still had communications back and forth.  At that point you |
| | 14 | start learning more information, so I didn't know whether or |
| 16:07:42 | 15 | not I could trust him, but I still kept, you know, arm's |
| | 16 | length but communication. |
| | 17 | Q.    Okay.  Now, at some point did he talk to you about |
| | 18 | his political aspirations with the school board? |
| | 19 | A.    Yes.  He wanted to be the chair of the board. |
| 16:08:05 | 20 | Q.    And for those who of us who don't know what that |
| | 21 | means, what is the position of a chairperson of the school |
| | 22 | board? |
| | 23 | A.    So the chair of the board, they pretty much sit |
| | 24 | right in the middle.  They set the agenda for the meetings. |
| 16:08:20 | 25 | They don't really have any more -- or they shouldn't have any |

| | | |
|---|---|---|
| 16:08:25 | 1 | more dealings with the board.  They shouldn't have any more |
| | 2 | than any other board member.  We're all equal.  Pretty much |
| | 3 | they set the agenda.  They go to a lot of -- or they should go |
| | 4 | to a lot of the rewards or the ceremonies to represent the |
| 16:08:40 | 5 | school board, but there shouldn't be any more information that |
| | 6 | they know than the other school board members know.  I'm not |
| | 7 | sure it would be that case with the defendant in that chair |
| | 8 | position. |
| | 9 | Q.    And is that a prestigious position to have on a |
| 16:09:02 | 10 | school board to be the chairperson? |
| | 11 | A.    If you see it that way.  I think people that are |
| | 12 | humbled don't see that position in that light.  I think they |
| | 13 | see it as, you know, setting the agenda and doing the things |
| | 14 | that the chair should do. |
| 16:09:18 | 15 | Q.    Based on your friendship with the defendant, do you |
| | 16 | know how he viewed having that position? |
| | 17 | A.    He never said it.  He never told me specifically |
| | 18 | how he viewed that position, just that he would like to be the |
| | 19 | chair. |
| 16:09:36 | 20 | Q.    How is the chairperson selected for the school |
| | 21 | board? |
| | 22 | A.    At the beginning of the year, we would have a vote. |
| | 23 | You would take nominations.  You would nominate a person for a |
| | 24 | chair and then you would vote.  So there might be multiple |
| 16:09:55 | 25 | nominations.  So whoever gets the most votes would get the |

| | | |
|---|---|---|
| 16:09:58 | 1 | chair position. |
| | 2 | Q. And so the chair position is selected among the |
| | 3 | people on the school board? |
| | 4 | A. Yes, ma'am. |
| 16:10:06 | 5 | Q. So when you were talking about gaining -- you |
| | 6 | believe the defendant was trying to gain your favor. Would |
| | 7 | this be one of those favors for your vote for chairperson? |
| | 8 | A. Yes. I believe that that would be definitely one |
| | 9 | of the things that he would want. |
| 16:10:24 | 10 | Q. And take me up to you winning your -- you won your |
| | 11 | general election? |
| | 12 | A. Yes, ma'am. |
| | 13 | Q. When were you sworn in? |
| | 14 | A. I was sworn in December of '21, I believe. It was |
| 16:10:42 | 15 | right before the first meeting. |
| | 16 | Q. Now, when did you start to hear rumors about the |
| | 17 | relationship that the defendant had with Angie Barbour? |
| | 18 | A. So that happened the beginning -- the beginning |
| | 19 | communications about the relationship happened early on when |
| 16:11:09 | 20 | Angie reached out to me. |
| | 21 | Q. How did that come up with Angie? |
| | 22 | A. I'm trying to remember. She -- so she introduced |
| | 23 | herself and we talked about my campaign, and she asked me if |
| | 24 | we could switch to Snapchat to talk. I'm assuming because the |
| 16:11:28 | 25 | conversations -- the assumption is conversations in Snapchat |

| | | |
|---|---|---|
| 16:11:32 | 1 | don't get -- can't be pulled back up. They are encrypted so |
| | 2 | you can't -- you know, once they're gone, they're gone. So |
| | 3 | she asked me to switch to Snapchat and I did. And we had a |
| | 4 | discussion, and she mentioned that she had been sleeping with |
| 16:11:48 | 5 | Mr. Johnson. |
| | 6 | Q. Now, when she told you this and you said it was |
| | 7 | early on in the campaign, was this after the primary? |
| | 8 | A. No. Way before the primary. This is when she was |
| | 9 | introduced to me. Yea. |
| 16:12:03 | 10 | Q. So when she told you this information, did you |
| | 11 | believe her? |
| | 12 | A. At first I did not. In fact, I made a phone call |
| | 13 | with my wife in the front of South Smithfield Elementary |
| | 14 | parking lot to Ronald and had him on speaker and told him |
| 16:12:22 | 15 | about the accusation, because at the time I looked up to him |
| | 16 | and I -- you know, hey, this is happening. You know, somebody |
| | 17 | is saying that this -- that they are sleeping with you, you |
| | 18 | know. You need to probably be aware of this. And I said, is |
| | 19 | this happening? Because I need to know. It's going to affect |
| 16:12:40 | 20 | my campaign if I've got somebody that's, you know, having an |
| | 21 | affair with another person that's a school board member. You |
| | 22 | know, that's not -- morally that's not right. I need to know |
| | 23 | if you are doing this, and he said absolutely not. |
| | 24 | Q. And did you address it any more with Ms. Barbour? |
| 16:13:07 | 25 | A. Yes. I started asking her for proof. I needed to |

| 16:13:12 | 1 | know, because one of the things that Mr. Johnson has told me, |
| | 2 | at least a couple times during my campaign, is not to trust |
| | 3 | anyone, not even him. So I started sticking up for truth. I |
| | 4 | asked for proof of, you know, what happened. She said she had |
| 16:13:30 | 5 | it, but she wasn't going to show me. I said, okay. Well, how |
| | 6 | can I believe you if you can't show me proof. So throughout |
| | 7 | the campaign it was kind of that back and forth. Well, this |
| | 8 | is happening. Well, show me proof. This happened. Well, |
| | 9 | show me proof. |
| 16:14:01 | 10 | So of course I would believe -- if someone can't |
| | 11 | show proof, I would believe the person saying no until there's |
| | 12 | something given; right? |
| | 13 | Q. Okay. Now, at some point did you have an interview |
| | 14 | with the DA's office? |
| 16:14:22 | 15 | A. Yes. There was two. I interviewed with |
| | 16 | Mr. Hoffman once. |
| | 17 | Q. And was that on February 1st of 2023? |
| | 18 | A. The dates are a struggle. Maybe. Yea. |
| | 19 | Q. At that time did you sign an immunity agreement |
| 16:14:50 | 20 | with the State? |
| | 21 | A. That was the second meeting. We did interview one |
| | 22 | time before. I would consider it an interview. Maybe it was |
| | 23 | just a sitdown session. |
| | 24 | Q. In that second conversation, did you do an immunity |
| 16:15:05 | 25 | agreement? |

| | | |
|---|---|---|
| 16:15:07 | 1 | A.   Yes, ma'am. |
| | 2 | (State's Exhibit Number 11 marked for |
| | 3 | identification.) |
| | 4 | Q.   I want you to turn and look at tab number 11.  That |
| 16:15:44 | 5 | is State's Exhibit 11.  Do you recognize that? |
| | 6 | A.   Yes. |
| | 7 | Q.   How were you able to recognize that? |
| | 8 | A.   This is the immunity agreement that I signed with |
| | 9 | my lawyer and Ms. Doyle. |
| 16:15:56 | 10 | Q.   And who was your lawyer at the time? |
| | 11 | A.   Steven Walker. |
| | 12 | Q.   Okay.  And is State's Exhibit Number 11 in |
| | 13 | substantially the same condition as the last time you saw it? |
| | 14 | A.   Yes, ma'am. |
| 16:16:10 | 15 | Q.   Has there been any deletions or changes to that |
| | 16 | agreement? |
| | 17 | A.   It doesn't appear so. |
| | 18 | MS. JAMES:  Your Honor, at this time the State |
| | 19 | would ask to admit State's Exhibit Number 11 which is the |
| 16:16:24 | 20 | immunity agreement between the State of North Carolina and |
| | 21 | this witness. |
| | 22 | THE COURT:  Any objection? |
| | 23 | MR. TYNDALL:  No objection, Your Honor. |
| | 24 | THE COURT:  So allowed. |
| 16:16:34 | 25 | |

| | | |
|---|---|---|
| 16:16:34 | 1 | (State's Exhibit Number 11 entered into |
| | 2 | evidence.) |
| | 3 | Q.   That was signed January 21st, 2023? |
| | 4 | A.   Yes, ma'am. |
| 16:16:47 | 5 | Q.   After that immunity agreement, you would have |
| | 6 | spoken with Mr. Hoffman, the investigator, that second time? |
| | 7 | A.   Yes, ma'am. |
| | 8 | Q.   Now, did you ever have a conversation with the |
| | 9 | defendant concerning DeVan Barbour? |
| 16:17:18 | 10 | A.   Yes, ma'am. |
| | 11 | Q.   How do you know DeVan Barbour, if you know him? |
| | 12 | A.   I don't know him personally.  He ran for U.S. |
| | 13 | Congress. |
| | 14 | Q.   When did he run that first time? |
| 16:17:34 | 15 | A.   He ran -- the only time I'm aware he ran was when I |
| | 16 | was running for school board. |
| | 17 | Q.   And just to make sure, you ran for the school board |
| | 18 | for the '22 election? |
| | 19 | A.   Yes, ma'am. |
| 16:17:49 | 20 | Q.   And I think you said you launched your campaign in |
| | 21 | 2021 for that? |
| | 22 | A.   Yes, ma'am. |
| | 23 | Q.   Okay.  And the primary was in May of 2022? |
| | 24 | A.   I believe so.  It was in 2021.  And then we got on |
| 16:18:09 | 25 | the board in 2022.  We got swore in January 2022. |

16:18:20    1          Q.    I think you said that you were sworn in in 2021.

            2          A.    Yes.  So our first meeting would have been '22.

            3    January '22.

            4          Q.    But you know DeVan Barbour from running for U.S.

16:18:39    5    Congress.

            6          A.    Yes.  The only time we had run-ins was really going

            7    to Republican Party meetings or, you know, when we would speak

            8    and he happens to be at the same location as us.

            9          Q.    What, if anything, did the defendant tell you about

16:18:57   10    the situation with Mr. Barbour?

           11          A.    So I didn't learn about the information from the

           12    defendant.

           13          Q.    Who did you learn about this information from?

           14          A.    I learned -- I'm assuming you're talking about the

16:19:16   15    Angie Barbour?

           16          Q.    Yes.

           17          A.    So I was on a three-hour conversation with Angie

           18    Barbour one night.  We were just having discussions about

           19    campaign, life in general, the situation with her and

16:19:29   20    Mr. Johnson, and she had mentioned that she had slept with

           21    another politician.  Okay.  Who was that?  And she said that

           22    it was DeVan.  I said okay.  So we finished up having our

           23    conversation, and then I believe it was the next day that I

           24    reached out to Mr. Johnson and said, I was told some

16:19:58   25    information that, like Mr. Johnson, it could potentially hurt

16:20:03   1   him, and I felt like I needed to let Mr. Barbour know, DeVan.

           2   And I think --

           3         Q.   Now, don't tell me what the defendant.  Now, after

           4   this conversation with Angie and you talked the defendant,

16:20:21   5   what did you do?

           6         A.   I -- at the time I did nothing.

           7         Q.   What time of year was this when you found out this

           8   information?

           9         A.   It had to be February, March time frame, I think.

16:20:36  10   Maybe.

          11         Q.   And would that have been what year?

          12         A.   '21?

          13         Q.   Would have been 2022?

          14         A.   Yes.  Yea.  Because that was when we went to

16:20:53  15   Disney.  Yea.

          16         Q.   Okay.  And there was a primary in 2022; correct?

          17         A.   Yes.

          18         Q.   And were you and DeVan Barbour in that same primary

          19   election?

16:21:10  20         A.   We were, yes.

          21         Q.   When you found out this information in the

          22   February, March area, you didn't do anything with the --

          23         A.   At the time I did not.

          24         Q.   During that conversation with Ms. Barbour, did you

16:21:33  25   record her?

16:21:34  1    A.    I did not, no.

2    Q.    Why did you share the information that Ms. Barbour

3    gave to you with the defendant?

4    A.    Number one, because he was in -- he was in the know

16:21:53  5    in the politics.  So I didn't really know who else to talk

6    with or to reach out to.  And number two, he was the closest

7    to me for running my campaign so I trusted him the most.

8    Q.    Is it safe to say you looked to him on how to

9    handle that situation?

16:22:37  10    A.    I did, yea.  And I would say that he helped guide

11    me through how to handle it.

12    Q.    Now, eventually did you reach out to Mr. DeVan

13    Barbour?

14    A.    Yes, ma'am.

16:23:10  15    Q.    How did you reach out to him?

16    A.    I got his number and I gave him a call.  So I was

17    talking to the defendant, and he told me that it would

18    probably be a good idea to reach out to DeVan and let him know

19    what was said.  So I reached out to DeVan.  I called.  I said,

16:23:33  20    hey, do you have a second to talk?  It's actually the first

21    time I ever called him.  He say, yea, what's up?  So I said,

22    hey, I want to let you know that I was on a phone call with

23    Ms. Barbour and she made an accusation that you pretty much

24    had slept together.  I couldn't say it any other way, you

16:23:57  25    know, just bluntly.  And he said, okay, give me a few minutes

| 16:24:03 | 1 | and I'll call you back. |
| | 2 | Q. Did he call you back? |
| | 3 | A. He did call me back. He informed me that he was in |
| | 4 | the car on speaker phone with his wife and kids and he needed |
| 16:24:16 | 5 | to step away. So I apologized. And he stated that this |
| | 6 | wasn't the first time that he had -- he had heard this. It |
| | 7 | was a brief conversation. And he said that he was going to |
| | 8 | take care of her or, you know, whatever. I said, well, I just |
| | 9 | wanted to let you know, because I don't know if it's true or |
| 16:24:43 | 10 | not, but I feel like you at least need to know this was said. |
| | 11 | Q. When you contacted him, did you meet behind Clayton |
| | 12 | Fitness? |
| | 13 | A. No. When I called him, I was actually at Disney |
| | 14 | World. |
| 16:24:59 | 15 | Q. So you just picked up the phone and called him? |
| | 16 | A. Uh-huh. |
| | 17 | Q. Did you give him some earbuds to play your voice on |
| | 18 | it? |
| | 19 | A. I couldn't have done that. |
| 16:25:09 | 20 | Q. So you just literally picked up your phone and |
| | 21 | called him. |
| | 22 | A. I was at Fort Wilderness. I picked up my phone and |
| | 23 | I called him and bluntly told him, hey, this is something you |
| | 24 | need to know. |
| 16:25:19 | 25 | Q. When you told him that, did you ask for anything in |

| 16:25:22 | 1 | return from him? |
| | 2 | A.   No. |
| | 3 | Q.   Did you ask him to do any favors for you? |
| | 4 | A.   No. |
| 16:25:36 | 5 | Q.   Did you tell him anything about releasing a |
| | 6 | recording? |
| | 7 | A.   No, ma'am. |
| | 8 | Q.   Did you speak with him again after that about that |
| | 9 | situation? |
| 16:25:56 | 10 | A.   I don't remember talking to him after that, no. |
| | 11 | Q.   After you called Mr. Barbour -- and what time of |
| | 12 | year was that you were at Disney? |
| | 13 | A.   I believe it was April because it was Easter.   We |
| | 14 | were at Fort Wilderness. |
| 16:26:19 | 15 | Q.   That would have been April of 2022? |
| | 16 | A.   Yes, ma'am. |
| | 17 | Q.   And this is right before the May primary; right? |
| | 18 | A.   Yes, ma'am. |
| | 19 | Q.   After you spoke to Mr. DeVan Barbour, did you speak |
| 16:26:40 | 20 | with anyone else after that, Angie or the defendant? |
| | 21 | A.   Yes.   I talked to the defendant and let him know |
| | 22 | that I talked to DeVan and let him know that I felt better |
| | 23 | about, you know, letting him know.   It was off my chest.   I |
| | 24 | wasn't holding it in. |
| 16:26:56 | 25 | I assumed that the defendant called Ms. Barbour and |

16:27:00  1    said something to her, because she had a flurry of text
        2    messages to my phone and after their conversation about, you
        3    know, who told him, how did he know that she said this, you
        4    know.
16:27:15  5            Q.    You said you assumed the defendant called
        6    Ms. Barbour.
        7            A.    I'm sorry.  I assumed that DeVan called
        8    Ms. Barbour.  My apologies.
        9            Q.    That's okay.  And so after your conversation, you
16:27:31 10    and Ms. Barbour, Angie Barbour, started talking?
       11            A.    After our conversation, she was very upset.  She
       12    had a flurry of text messages.  I didn't want her to know it
       13    was me that said something to her.  So I kind of left her on
       14    red, let her send a bunch of messages.  We went about our day
16:27:54 15    at Disney.  And then I kind of went back and forth with her a
       16    little bit, but that was pretty much it, and I didn't really
       17    communicate that much after that.
       18            Q.    Was she still helping you on your campaign at that
       19    point?
16:28:10 20            A.    I don't believe so.
       21            Q.    Did you guys talk on Snapchat or text messages
       22    about the situation?  Did you text her or snap with her?
       23            A.    About the DeVan Barbour situation?
       24            Q.    Yes.
16:28:27 25            A.    I'm sure the messages went back and forth on

| | | |
|---|---|---|
| 16:28:32 | 1 | Snapchat about it.  Specifically, I can't remember, you know, |
| | 2 | what specifically would have been said. |
| | 3 |     Q.   Why didn't you want Ms. Barbour to know that you |
| | 4 | were the one who talked to him? |
| 16:28:53 | 5 |     A.   She told me in confidence.  I told her she could |
| | 6 | trust me with the information.  So you know, telling somebody |
| | 7 | after you've been entrusted with the information is kind of a |
| | 8 | letdown for people. |
| | 9 |     Q.   And you didn't record -- did you record that |
| 16:29:12 | 10 | conversation you had with Ms. Barbour when she told you about |
| | 11 | DeVan? |
| | 12 |     A.   No, ma'am.  No, ma'am. |
| | 13 |     Q.   Did the defendant ever tell you that he met with |
| | 14 | DeVan Barbour? |
| 16:29:49 | 15 |     A.   Yes.  We had a text message.  It was either he was |
| | 16 | going to meet with DeVan or he had met with DeVan. |
| | 17 |     Q.   Was in before or after you had already spoken with |
| | 18 | him? |
| | 19 |     A.   This is after I had spoken with DeVan. |
| 16:30:30 | 20 |     Q.   And what, if anything, did he tell you about that |
| | 21 | meeting, if you can remember? |
| | 22 |     A.   That they had met at Planet Fitness.  That was |
| | 23 | about it.  There was no detail behind. |
| | 24 |     Q.   Did you ask him any details about his meeting? |
| 16:31:05 | 25 |     A.   I did not. |

16:31:06  1    Q.    Did you provide him with details of your -- of your

2    phone call with DeVan Barbour?

3         A.    He knew that I called DeVan Barbour and informed

4    him that, you know, what Angie said, because I called him

16:31:19  5    right after I got off the phone with DeVan.  I said, hey, I

6    called him.  You know, I feel a little bit better, you know,

7    in my conscience about letting somebody know, you know.

8         Q.    You stated -- did the defendant ever mention how

9    that meeting went or how he set that up or where they met or

16:31:43  10   anything like that with you?

11        A.    All I know is they were meeting that night.

12        Q.    Did they attempt to meet another night or another

13   time?

14        A.    As far as a second time?

16:31:56  15        Q.    A time before they actually meet.

16        A.    Yes.  I was aware they did meet at Planet Fitness,

17   yes, ma'am.

18        Q.    Would you have met with DeVan Barbour without the

19   defendant's input that he gave you or would you have spoke

16:32:10  20   with him?

21        A.    I don't know that I would of because I didn't have

22   his number.  I don't think I would of, because I didn't really

23   know DeVan, never had any type of conversation or personal

24   relationship with him.

16:32:26  25        Q.    Who did you get DeVan's number from?

Kevin Donovan - Direct by Ms. James

16:32:29   1          A.    That's a good question.  I don't remember.  I don't

2    know who I got it from.

3                MS. JAMES:   Just one moment, Your Honor.

4          Q.    I just want to make sure this right, Mr. Barbour

16:33:05   5    (sic) -- Mr. Donovan.  There's a lot of Barbours going around

6    in this case.

7          A.    I understand.

8          Q.    I think I just renamed you.

9          A.    That's okay.

16:33:14  10          Q.    So Mr. Donovan, I just want to make sure I have

11    this straight.  So you call the defendant, you tell him about

12    the things that you heard, you get his input about whether you

13    should call Mr. DeVan Barbour; correct?

14          A.    Yes, ma'am.

16:33:33  15          Q.    Do you know if the defendant knew Mr. Barbour?

16          A.    I assume that he did, but from, you know, just

17    meetings.

18          Q.    And he talked about trying to meet with Mr. DeVan

19    Barbour; correct?

16:33:49  20          A.    Yes, ma'am.

21          Q.    And so you would have had his phone number to do

22    that?

23          A.    I would assume so, yes, ma'am.

24          Q.    And then you speak to him.  You don't know how you

16:34:03  25    got his number.

| | | |
|---|---|---|
| 16:34:05 | 1 | A. Right. |
| | 2 | Q. After talking to the defendant. Is that what |
| | 3 | you're telling us? |
| | 4 | A. It's possible he could have sent it to me, but I |
| 16:34:10 | 5 | don't -- I mean, I can't say for sure. I don't want to say |
| | 6 | absolute that he did. |
| | 7 | Q. Okay. But he could have. |
| | 8 | A. Could of. |
| | 9 | Q. But you know you didn't have his number before. |
| 16:34:22 | 10 | A. At the time I did not, no. |
| | 11 | Q. And whenever you talked to -- Ms. Barbour called |
| | 12 | you, correct, after you spoke to DeVan? |
| | 13 | A. Yes. She tried calling and sent multiple messages. |
| | 14 | Q. Did you ever talk to her about this? |
| 16:34:49 | 15 | A. I did. She tried to ask, you know, did you say |
| | 16 | this or did you tell DeVan. And I told her, you know, I was |
| | 17 | backed into a corner, that I felt like I needed to tell him. |
| | 18 | Q. Why did you feel backed into a corner? Why? |
| | 19 | A. I felt like I was making excuses really, because I |
| 16:35:16 | 20 | had -- so I had to admit that I told him. But I had to have |
| | 21 | an excuse along with it that I felt like I was really backed |
| | 22 | in. In reality, I was told that it was a good idea to tell |
| | 23 | him from the defendant. |
| | 24 | Q. Now, at any point did Angie Barbour ask you why you |
| 16:36:04 | 25 | would record a phone call? |

| 16:36:06 | 1 | A. I think she made the assumption I recorded her |
| | 2 | saying that she had slept with DeVan. |
| | 3 | Q. Okay. And did you record her? |
| | 4 | A. I did not. Not in that conversation, no, sir. |
| 16:36:19 | 5 | Q. Did you record her in other conversations? |
| | 6 | A. I've recorded her post election when we had an |
| | 7 | argument. |
| | 8 | Q. Why did you record her in that instance? |
| | 9 | A. Just for protection in case she said something |
| 16:36:53 | 10 | is -- in case we really -- just for my own being really, just |
| | 11 | to protect myself. |
| | 12 | Q. And prior to becoming involved with the defendant, |
| | 13 | did you regularly record your conversation? |
| | 14 | A. I've never recorded a conversation. |
| 16:37:16 | 15 | Q. Is this something you learned from him? |
| | 16 | A. Yes. |
| | 17 | Q. Now, whenever you were going to meet at the DA's |
| | 18 | office to speak with Investigator Hoffman, did the defendant |
| | 19 | call you prior to that meeting? |
| 16:37:40 | 20 | A. The first meeting or the second? |
| | 21 | Q. The second one. |
| | 22 | A. We had a conversation about Mr. Hoffman calling and |
| | 23 | requesting a second meeting. |
| | 24 | Q. What, if anything, did he ask you to do? |
| 16:37:53 | 25 | A. He didn't ask me to do anything on the second |

| | | |
|---|---|---|
| 16:37:58 | 1 | meeting.  It was the first meeting with Hoffman that he asked |
| | 2 | me to record. |
| | 3 | Specifically he asked me to record the conversation |
| | 4 | between me and Mr. Hoffman, then to share my location with him |
| 16:38:17 | 5 | and meet him afterwards. |
| | 6 | Q.    Did you do all those things that he asked you to? |
| | 7 | A.    Unfortunately, yes, ma'am, I did. |
| | 8 | Q.    So you recorded the meeting between you and the |
| | 9 | investigator? |
| 16:38:29 | 10 | A.    Yes, ma'am. |
| | 11 | Q.    And he was investigating the defendant at the time; |
| | 12 | correct? |
| | 13 | A.    Yes, ma'am. |
| | 14 | Q.    And you shared your location? |
| 16:38:36 | 15 | A.    Yes, ma'am. |
| | 16 | Q.    Then you met with him after? |
| | 17 | A.    Yes, ma'am, behind HealthQuest. |
| | 18 | Q.    Behind HealthQuest? |
| | 19 | A.    Yes, ma'am. |
| 16:38:47 | 20 | Q.    Did you all go inside HealthQuest?  Where did you |
| | 21 | all meet at? |
| | 22 | A.    We parked behind HealthQuest. |
| | 23 | Q.    Did you all get out of the car and talk or were you |
| | 24 | all inside the car?  Tell me about this meeting. |
| 16:39:01 | 25 | A.    He either got in my car or I got in his.  Honestly, |

16:39:05    1    I can't remember which one.

            2            Q.    But you got into one of your vehicles?

            3            A.    Yes, ma'am.

            4            Q.    What did you do with the recording.

16:39:14    5            A.    I believe that I airdropped it to him.  IPhone

            6    AirDrop.

            7            Q.    And those of us who don't know what AirDropping is,

            8    what is that?

            9            A.    So AirDropping is almost like sending an audio over

16:39:34   10    a text message, except you're right at each other where the

           11    wifi -- or the cellphones can connect to each other, and you

           12    can drop it over.  I don't know if it's wireless.  I'm not

           13    really technical.

           14            Q.    Okay.  Is it --

16:39:44   15            A.    But you just -- it immediately drops over into the

           16    other person's phone.

           17            Q.    So you transferred that recording to his phone just

           18    sitting there?

           19            A.    Yes, ma'am.

16:40:02   20            Q.    What else did you guys do in the car?  What else

           21    did you talk about?

           22            A.    I mean, that was it.

           23            Q.    He just wanted the recording?

           24            A.    Yes.  He wanted the recording because his words

16:40:12   25    were he didn't think the investigator was really talking to

| | | |
|---|---|---|
| 16:40:15 | 1 | me.  The investigator was talking to him through me.  I guess |
| | 2 | he assumed the investigator knew that I was going to be |
| | 3 | recording. |
| | 4 | Q.   Now, in the second meeting, did you talk to him |
| 16:40:30 | 5 | about -- did he ask you not to go to that meeting? |
| | 6 | A.   He said it would probably be in my best interest |
| | 7 | not to go, but he also told me, hey, talk to, you know, your |
| | 8 | lawyer or whatever, you know, see what they think. |
| | 9 | Q.   Did you ask him why you shouldn't go? |
| 16:40:55 | 10 | A.   We had a discussion.  I'm not sure I asked him why, |
| | 11 | but he said that, you know, if you do go, don't take your |
| | 12 | phone inside because they'll take your phone, they'll extract |
| | 13 | all the information off of it. |
| | 14 | Q.   And in that meeting did you take your phone? |
| 16:41:13 | 15 | A.   I don't believe that I did. |
| | 16 | Q.   Why did you do all these things that the defendant |
| | 17 | asked you to do?  You listed several.  Why did you do that? |
| | 18 | A.   Looking back, hindsight, I felt like it was a |
| | 19 | manipulation tactic to make us think that he was being, you |
| 16:41:59 | 20 | know, attacked or, you know, everybody was out to get him. |
| | 21 | You know, in reality after you learn everything that's |
| | 22 | happened, it was really just to cover his own tail. |
| | 23 | Q.   Did he ever admit to having an affair with Angie |
| | 24 | Barbour to you? |
| 16:42:21 | 25 | A.   He did. |

| | | |
|---|---|---|
| 16:42:23 | 1 | Q.  When was this? |

16:42:23    1    Q.  When was this?

2    A.  The date is going to be tough to remember.  I can
3 give you locations and information, but dates are so hard to
4 remember.

16:42:37   5    Q.  Was it after you won the election?

6    A.  Yes.

7    Q.  Was it during this investigation?

8    A.  If it was during the investigation, it was early,
9 early on, because we all met at a single point location.  I
16:42:59 10 say "we all," it was myself, Michelle Antoine, the defendant,
11 his wife, the owner of the property, and the company, and we
12 met, I guess, in their small meeting room.

13    Q.  When you guys met to talk about -- he admitted to
14 the affair?

16:43:20 15    A.  Uh-huh.

16    Q.  Did you all think strategy at that point?

17    A.  No.

18    Q.  He just told you all and you all just walked away?

19    A.  We discussed it.  You know, I understand -- you
16:43:35 20 know, understanding what happened, I said, well, how the heck
21 did this happen?  And he gave his version of how it happened.
22 And then that was pretty much it.

23    Q.  And at this point you have the beginning of this
24 relationship and Angie telling you that she had an affair, and
16:43:59 25 the whole time you said bring proof.  And you didn't believe

16:44:02   1  | her; right?

           2  |      A.   I did not, unfortunately.

           3  |      Q.   So after you get through the election and you are

           4  | on the school board, you later found out from him it was all

16:44:21   5  | true the whole time?

           6  |      A.   Yes.

           7  |      Q.   And during that entire course of this period, you

           8  | were under the impression that it wasn't true; correct?

           9  |      A.   Oh, yea.  Absolutely.  I was -- I mean, we were

16:44:36  10  | having conversations -- I say "we," myself and Angie, and she

          11  | was sending me messages and I was taking pictures on a camera

          12  | of Snapchat, because if you take a screenshot, it will tell

          13  | the other person.  I was taking pictures and documenting it,

          14  | sending them to the defendant saying, hey, she's saying this,

16:44:54  15  | she's saying that, and this whole time they were having an

          16  | affair and he was gaining information from me while telling me

          17  | it was all a lie.

          18  |      Q.   And so you would talk to Angie and then take

          19  | pictures of your messages to send to the defendant?

16:45:12  20  |      A.   Uh-huh.

          21  |      Q.   How long did that go on?

          22  |      A.   Pretty much my whole campaign.

          23  |      Q.   And so he would know if you and Angie talked about

          24  | something that was supposed to have been confidential and

16:45:23  25  | private, he knew about it; correct?

16:45:25  1      A.   He knew exactly.  Yup.

          2      Q.   Now, would this -- would this affair coming out

          3   have been bad for the defendant?

          4      A.   Yea, it would be bad for the defendant.  It would

16:45:58  5   be bad for the candidates that he supports.  I mean, if it got

          6   into the news, it would not have looked good.

          7      Q.   And when you were saying the candidates that he was

          8   supporting, he supported you; correct?

          9      A.   Yes.

16:46:13 10      Q.   Okay.  And so once you found this out, what did

         11   that do with your relationship with the defendant once you

         12   found out this was all true?

         13      A.   It opened my eyes to start, you know, thinking what

         14   else has been said that he's told me that's a lie that could

16:46:40 15   be true.

         16      Q.   Did he go into detail about the meeting he had?

         17   I'm just going to go back to this again.  Did he ever talk

         18   about what actually happened when he and DeVan Barbour met

         19   behind Clayton Fitness?

16:46:54 20      A.   He didn't tell me specifically that he had gave him

         21   earbuds or, you know, he had listened from his cellphone.  I

         22   mean, he didn't go into detail about that.  He said they had

         23   met, I believe it was around midnight.

         24      Q.   You actually don't know the details really of that

16:47:14 25   meeting.

16:47:15   1        A.    I wasn't there.

           2        Q.    Is it safe to say that information went from you to

           3   him, but not a lot went from him to you?

           4        A.    I would agree with that, yes, ma'am.

16:47:27   5        Q.    So you were sharing stuff with him, but he didn't

           6   go into a lot of details about his dealings?

           7        A.    Looking back, yes, ma'am.  Not really.  Yea.

           8        Q.    Because you were under the assumption the meeting

           9   was at midnight.

16:47:53  10        A.    Yes.

          11        Q.    And since he was supporting you and your campaign,

          12   how would that have looked, you have him supporting you and

          13   then you have Angie Barbour working on your campaign that he

          14   recommended to you to help you.

16:48:17  15        A.    Yes.

          16        Q.    Did she go to the polling places for you during the

          17   primary to hand out literature?

          18        A.    No.  She didn't hand out my literature, no, because

          19   at that time she couldn't stand me.  So yea.

16:48:31  20        Q.    Because you have basically screenshot her text

          21   messages and shared all this information that she's telling

          22   you in confidence with the defendant?

          23        A.    Yes.  And I trusted the defendant because he was

          24   helping me in my campaign major.  I mean, all the people that

16:48:47  25   he knew was helping me.  They were handing out literature.

| | | |
|---|---|---|
| 16:48:52 | 1 | They were, you know, passing out anything that was needed at |
| | 2 | the polling places. They were his people. Even his, I guess |
| | 3 | you'd say, campaign manager was my campaign manager. |
| | 4 | Q. So basically you all were very much intertwined. |
| 16:49:08 | 5 | A. Yes. |
| | 6 | Q. And you wanted to believe what the defendant was |
| | 7 | telling you about the affair? |
| | 8 | A. Yes. |
| | 9 | MS. JAMES: If I can one minute, Your Honor. |
| 16:49:31 | 10 | THE COURT: Yes, ma'am. |
| | 11 | Q. Mr. Donovan, how did you -- specifically tell me |
| | 12 | how you learned to record conversations, because you stated |
| | 13 | that before you met the defendant this was not something you |
| | 14 | did. |
| 16:50:26 | 15 | A. Right. Yea. |
| | 16 | Q. Okay. So tell me a little bit about that. |
| | 17 | A. So I had asked him -- it was at one point when we |
| | 18 | had been talking in good standing, you know, how do you do |
| | 19 | this. There was a call recorder app that you can use. You |
| 16:50:44 | 20 | can go to the app, you hit the person that you are going to |
| | 21 | call, and then you hit call and it calls the number -- if I |
| | 22 | remember this right, it calls the number first and then calls |
| | 23 | the person so there's some kind of recording type. |
| | 24 | Q. Do you know what the app is called? |
| 16:51:02 | 25 | A. I think it's literally called Call Recorder. |

16:51:05  1        Q.    Call Recorder?

        2        A.    Yes.

        3        Q.    And the defendant showed you how to use this?

        4        A.    He didn't show me specifically.  He just told me
16:51:11  5  this is kind of what I do.

        6        Q.    Did he ever encourage you to record calls other

        7  than the stuff with Angie?

        8        A.    He didn't encourage me to record any specific phone

        9  call.  The only time he's encouraged me to record is when I
16:51:29 10  met with the investigator.

       11        Q.    And at any point as you sit here today, did you

       12  record that conversation that Angie Barbour had with you

       13  concerning DeVan Barbour?

       14        A.    No.

16:51:49 15              MS. JAMES:  No further questions at this time, Your

       16  Honor.

       17              THE COURT:  Mr. Tyndall, you got five or ten

       18  minutes.  You want to start now or just wait?

       19              MR. TYNDALL:  Sure.  That's fine.

16:51:55 20              THE COURT:  Start now?

       21              MR. TYNDALL:  Yes.

       22  CROSS-EXAMINATION BY MR. TYNDALL:

       23        Q.    Now, Mr. Donovan, you're clear that Ms. Barbour

       24  told you she slept with DeVan Barbour?

16:52:03 25        A.    Yes.

16:52:03  1          Q.   That was on your three-hour conversation with her?

2          A.   Yes.

3          Q.   So you were having a three-hour conversation with

4   her on the phone at night where you were sharing intimate

16:52:16  5   details; is that right?

6          A.   Sure.

7          Q.   Including her sex life; is that right?

8          A.   Sure.

9          Q.   Now, Mr. Donovan, you've -- is it fair to say that

16:52:35  10   later you were -- you had some very harsh things to say about

11   Ms. Barbour?

12          A.   I did, yes.

13          Q.   In text messages?

14          A.   Yes.  Because I didn't believe her.

16:52:46  15          Q.   Would that include things like, I'm not sorry.  I

16   wish it would have decapitated her?

17          A.   Sure.  Yes.

18          Q.   I'm waiting for the day she has her mental

19   breakdown and can't come back for it.  I'm sorry, but if she

16:53:03  20   needs a bullet, I'll donate.

21          A.   I don't know -- yea, I could have said that.  I was

22   very --

23          Q.   You could have said something like that?

24          A.   Yea.  I was very upset.

16:53:13  25          Q.   Is that something you say about a person you are

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 16:53:15 | 1 | upset with? |
| | 2 | A.   I could of. |
| | 3 | Q.   And you're upset with you because she told you she |
| | 4 | slept with DeVan Barbour? |
| 16:53:20 | 5 | A.   I was upset with her for many things.  I was -- at |
| | 6 | the time I could have been upset with her because I assumed |
| | 7 | that she was lying about a person that I supported so much.  I |
| | 8 | mean, there was multiple things that had gone on. |
| | 9 | Q.   She has caused everyone's lives to become miserable |
| 16:53:38 | 10 | because she wanted some dick.  Is that what you said about |
| | 11 | Ms. Barbour? |
| | 12 | A.   Could have. |
| | 13 | Q.   I've got her talking about a secret meeting at |
| | 14 | DeVan's.  Did you say that about her? |
| 16:54:05 | 15 | A.   I don't remember.  If you give me more context. |
| | 16 | Q.   Well, I mean, I'm just -- did you have some long |
| | 17 | text messages with a person named Alley Bond? |
| | 18 | A.   I've talked Allyson Bond before, yes. |
| | 19 | Q.   Did you tell her:  I've got her talking about a |
| 16:54:24 | 20 | secret meeting at DeVan's? |
| | 21 | A.   I can't remember. |
| | 22 | Q.   Did you mention her and a guy named Cody she slept |
| | 23 | with from a CAAG meeting?  Did you say that, Mr. Donovan? |
| | 24 | A.   I think I said that, yea. |
| 16:54:44 | 25 | Q.   We can't do anything right now but play a long |

| | | |
|---|---|---|
| 16:54:48 | 1 | game. Is that what you told her? |
| | 2 | A. I have to understand the context. I don't remember |
| | 3 | what that was about. If I had -- |
| | 4 | Q. I'm sorry. Go ahead, finish. You don't remember |
| 16:54:59 | 5 | what that was about? |
| | 6 | A. Yea. If I had context, maybe I could. I mean, |
| | 7 | you're reading very small snippets of a conversation that -- |
| | 8 | Q. Well, let me ask you this, Mr. Donovan. Did you |
| | 9 | ever supply your phone or your phone data to Mr. Hoffman for |
| 16:55:19 | 10 | him to download? |
| | 11 | A. No. |
| | 12 | Q. And all of your text messages would have been on |
| | 13 | your phone; is that right? |
| | 14 | A. I would assume. |
| 16:55:26 | 15 | Q. So any context would certainly be supplied if we |
| | 16 | had your phone data; isn't that right? |
| | 17 | A. If you had my phone data, yea. |
| | 18 | Q. But Mr. Hoffman didn't want us to have that; isn't |
| | 19 | that right? |
| 16:55:38 | 20 | A. I don't know. I'm not Mr. Hoffman. |
| | 21 | MS. JAMES: Objection, Your Honor. |
| | 22 | Q. Well, did -- |
| | 23 | THE COURT: Overruled. |
| | 24 | Q. Did Mr. Hoffman tell you that he did not want to |
| 16:55:47 | 25 | get your phone because he would have to give it to the |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | |
|---|---|
| 16:55:50 | 1 defense? |
| | 2      A.   Honestly, I can't remember. |
| | 3      Q.   Okay.  That's fine.  Did you say in a text message: |
| | 4 I'll be exposing every person she has slept with, including |
| 16:56:00 | 5 DeVan Barbour? |
| | 6      A.   I could of said that. |
| | 7      Q.   You could of said that.  That's something -- |
| | 8      A.   Because I was told she had slept with DeVan |
| | 9 Barbour. |
| 16:56:08 | 10      Q.   Let me ask you something, Mr. Donovan.  Why is it |
| | 11 any business of your business if Angie Barbour sleeps with |
| | 12 DeVan Barbour? |
| | 13      A.   Well, first of all, she had made the comment that |
| | 14 she had slept -- well, she made the allegation that she had |
| 16:56:21 | 15 slept with Mr. Johnson.  At the time I did not believe her. |
| | 16 So she also made the allegation that she slept with |
| | 17 Mr. Barbour.  So as the same thing that I did with |
| | 18 Mr. Johnson, I let him know so he would be prepared, you know, |
| | 19 he would be aware.  I afforded that same to Mr. Barbour to let |
| 16:56:44 | 20 him know so that he can be aware. |
| | 21      Q.   Well, and it's fair enough to let someone know in a |
| | 22 political campaign that there may be bad information coming |
| | 23 out about them.  You'd want to know that yourself; wouldn't |
| | 24 you, Mr. Donovan? |
| 16:56:57 | 25      A.   Sure. |

16:56:58  1        Q.   But once you do that, it's really none of your

        2   business; is it?

        3        A.   It's not, no.  Because once I made that phone call

        4   to DeVan, that's pretty much it.

16:57:11  5        Q.   It was pretty much none of your business; right?

        6        A.   Unless I got drug into it.

        7        Q.   Mr. Donovan, how old were you when this campaign

        8   was going on?

        9        A.   37 -- 35, 36.

16:57:27 10        Q.   So that's 14 years after you graduated college

       11   basically; right?

       12        A.   Okay.

       13        Q.   And did you have a job?

       14        A.   Sure.

16:57:36 15        Q.   Did you have a family?

       16        A.   Sure.  Still have a family.

       17        Q.   Did you work for a living?

       18        A.   Sure.

       19        Q.   What did you do?

16:57:43 20        A.   I've always been a robotic programmer for 15 years.

       21        Q.   A robotic programmer.  Does that require some

       22   technical skills?

       23        A.   On the computer.

       24        Q.   Does it require some judgment?

16:57:56 25        A.   Sure.

```
16:57:57    1          Q.    And are you a person who can make your own
            2    decisions?
            3          A.    I can, unless I'm being -- okay.  Yea.  Sure.
            4          Q.    I mean, you're certainly capable of making your own
16:58:10    5    decisions; aren't you, Mr. Donovan?
            6          A.    Sure.
            7                MR. TYNDALL:  That's a good place to stop for
            8    today, Your Honor.
            9                THE COURT:  Okay.  We'll be in recess until
16:58:22   10    tomorrow morning at 9:30.  Leave your notes in the seats face
           11    down.  Remember, please don't talk about this case with each
           12    other.  Don't do anything.
           13                We'll see all back at 9:30 in the morning.
           14                Just a reminder.  We're moving back into the
16:59:56   15    original courtroom tomorrow.
           16                (Jury exits.)
           17                THE COURT:  Anything we need to get on the record
           18    before we recess for the day?
           19                MS. JAMES:  Not from the State, Your Honor.  I've
17:00:06   20    talked with defense counsel about scheduling, but not for the
           21    Court.
           22                THE COURT:  And again, I will probably let the jury
           23    know something tomorrow just to know if we are on schedule or
           24    not, but you're still thinking it's going to get completed
17:00:18   25    this week; right?
```

17:00:21  1          MS. JAMES:  Yes, Your Honor.  I think we'll finish

2      our evidence by Wednesday.

3          THE COURT:  All right.  Thank you very much.

4          Those things we talked about Friday, the orders,

17:00:32  5      the jury instructions, did you get a chance to get those done?

6      I'm not going to rush you if you don't, but I would like to

7      take a look at them.

8          MS. JAMES:  Your Honor, we'll have it tomorrow

9      morning.  We did work on it this weekend, but there was just

17:00:44  10     one portion that we still needed some information from madam

11     court reporter.

12         THE COURT:  Okay.  That will be fine.

13         Mr. Tyndall, have you had a chance to look at them?

14         MR. TYNDALL:  Your Honor, I asked somebody to do

17:00:57  15     it, but that's the last I heard of it.  I'll check into it.

16         THE COURT:  If we can just follow up.  I mean, I'd

17     like to have those.  I'm not rushing, but it would be good to

18     get those in hand.

19         MR. TYNDALL:  And you're just talking about the

17:01:09  20     failure to discharge a duty; right?

21         THE COURT:  That's really it.  I just want to see

22     what you guys have.

23         All right.  Anything else for the record before we

24     leave?  Yes, ma'am.

17:01:18  25         MS. JAMES:  No, Your Honor.

17:01:19   1                    MR. TYNDALL:   That's it.   No, sir.

           2                    THE COURT:   9:30 tomorrow morning.

           3                         (Adjourned at 5:01 p.m.)

           4

           5

           6

           7

           8

           9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

                         Denise St. Clair, RPR, CRR, CRC
                            Official Court Reporter

IN THE NORTH CAROLINA GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
JOHNSTON COUNTY
* * * * * * * * * * * * * * * * * * *

STATE OF NORTH CAROLINA     :   File No. 23 CRS 003494-500

    versus                  :

RONALD LEE JOHNSON, JR.     :
          Defendant.          Pages:   549-768

* * * * * * * * * * * * * * * * * * *
TRANSCRIPT VOLUME 7 OF 10

Tuesday, January 14, 2025


    Transcript of proceedings in the General Court of

Justice, Superior Court Division, Johnston County, 207 East

Johnston Street, Smithfield, North Carolina, at the January 6,

2025, Criminal Session, before the Honorable Joseph

Crosswhite, Judge Presiding.

APPEARANCES:

    Benjamin O. (Boz) Zellinger
    Arneatha James
    Special Deputy Attorney General
    Raleigh, NC 27603
    On Behalf of the State

    Amos G. Tyndall
    Valentin J. Bruder
    Parry Law
    Chapel Hill, NC
    On Behalf of the Defendant

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter
N.C. Administrative Office of the Courts
denise.stclair@nccourts.org

```
 1                              INDEX

 2    State's motions                              755

 3                            WITNESSES

 4    ON BEHALF OF THE STATE

 5    KEVIN DONOVAN

 6    Cross by Mr. Tyndall                         552
      Redirect by Ms. James                        571
 7    Recross by Mr. Tyndall                       582
      Redirect by Ms. James                        585
 8    Recross by Mr. tyndall                       586

 9    DR. THOMAS BENNETT JONES

10    Direct by Ms. James                          587
      Cross by Mr. Tyndall                         623
11    Redirect by Ms. James                        647
      Recross by Mr. Tyndall                       653
12

13    LYN ANDREWS

14    Direct by Mr. Zellinger                      657
      Cross by Mr. Tyndall                         700
15    Redirect by Mr. Zellinger                    702

16    APRIL JONES LEE

17    Direct by Ms. James                          703
      Cross by Mr. Tyndall                         710
18

19    AMY CAYTON

20    Direct by Ms. James                          712
      Cross by Mr. Tyndall                         716
21    Redirect by Ms. James                        719

22    OWEN PHILLIPS

23    Direct by Ms. James                          720
      Cross by Mr. Tyndall                         740
24

25
```

```
 1 | TRACEY FULLER PEEDIN JONES
   |
 2 | Direct by Ms. James                        743
   | Cross by Mr. Tyndall                       750
 3 | Redirect by Ms. James                      752
   | Recross by Mr. Tyndall                     754
 4 |
   |
 5 |                       EXHIBITS
   |
 6 | ON BEHALF OF THE STATE
   |
 7 | No.   Description                     ID      EVD
   |
 8 | 15    Recording-Dr. Jones and Defendant   608     609
   |
 9 | 16    Recording-Dr. Jones and defendant   608     609
   |
10 | 17    Recording-Dr. Jones and Defendant   608     609
   |
11 | 18    Recording-Dr. Jones and Defendant   608     609
   |
12 | 19    North Carolina G.S. 143-318.11      663     663
   |
13 | 20    Policy Code 2120                    677     678
   |
14 | 21    Policy Code 2121                    684     685
   |
15 | 22    Policy Code 2122                    686     687
   |
16 | 23    Policy Code-closed sessions         689     689
   |
17 | ON BEHALF OF THE DEFENDANT
   |
18 | No.   Description                      ID      EVD
   |
19 | 12    Text message - Donovan to Slay      566
   |
20 | 13    Facebook post re:   Threesome       717
   |
21 | 14    Facebook post re:   Threesome       717
   |
22 |
   |
23 |
   |
24 |
   |
25 |
```

| | | |
|---|---|---|
| 09:18:27 | 1 | (Court convenes at 9:30 a.m.) |
| | 2 | THE COURT: Anything before the jurors come in? |
| | 3 | Anything for the record before we bring them in? |
| | 4 | MR. ZELLINGER: I don't believe there's anything |
| 09:35:41 | 5 | for the State, Your Honor. |
| | 6 | MR. TYNDALL: Nothing from us, Your Honor. |
| | 7 | THE COURT: Let's bring the jury in. |
| | 8 | (Jury enters.) |
| | 9 | THE COURT: Hi, everybody. Good morning. |
| 09:35:51 | 10 | KEVIN DONOVAN, |
| | 11 | called as a witness for the State and previously sworn, |
| | 12 | resumes testifying as follows: |
| | 13 | THE COURT: Just to remind you, you are still under |
| | 14 | oath from yesterday. |
| 09:37:55 | 15 | THE WITNESS: Yes, sir. |
| | 16 | THE COURT: Mr. Tyndall, whenever you are ready. |
| | 17 | MR. TYNDALL: Thank you, Your Honor. |
| | 18 | CROSS-EXAMINATION BY MR. TYNDALL: |
| | 19 | Q. Mr. Donovan, when we were speaking at the end of |
| 09:38:03 | 20 | our discussions yesterday, I asked you some questions about |
| | 21 | some of the comments you made to other people about |
| | 22 | Ms. Barbour; is that right? |
| | 23 | A. Yes, sir. |
| | 24 | Q. And some of those comments were very harsh; weren't |
| 09:38:14 | 25 | they? |

| 09:38:15 | 1 | A. | Yes, sir. |

    09:38:15   1        A.   Yes, sir.

            2        Q.   And they weren't very nice; is that right?

            3        A.   I would agree with that.

            4        Q.   I'm sorry?

    09:38:19   5        A.   I would agree with that.

            6        Q.   Now, I want to talk to you a little bit about the

            7   political environment.  How long have you been involved in

            8   politics?

            9        A.   2021.  Early 2021.

    09:38:35  10        Q.   Are you originally from Johnston County?

           11        A.   Yes, sir.

           12        Q.   You are originally from here?

           13        A.   Born and raised.

           14        Q.   And has it changed a good bit over the years over

    09:38:45  15   your lifetime?

           16        A.   Johnston County as a whole, yes.  Where I live, no.

           17        Q.   It did not?

           18        A.   Johnston County as a whole, yes.  The specific area

           19   where I live, not changed a bit.

    09:39:00  20        Q.   When you talk -- when we were talking about those

           21   changes, there's been a big influx of population; is that fair

           22   to say?

           23        A.   I would agree with that.

           24        Q.   I'm having trouble hearing you.  Can you pull it a

    09:39:16  25   little closer.

Kevin Donovan - Cross by Mr. Tyndall

| 09:39:22 | 1 | A. Is that good? |
|---|---|---|
| | 2 | Q. Yes. Now, you decided at some point you wanted to |
| | 3 | get involved in politics; is that right? |
| | 4 | A. School board is not -- it's neither Republican or |
| 09:39:39 | 5 | Democrat. So it's nonpartisan. Did I want to get into |
| | 6 | politics? Not really. But did I want to run for school |
| | 7 | board? Yes. |
| | 8 | Q. So the school -- being on the school board is an |
| | 9 | elected position? |
| 09:39:55 | 10 | A. It is, but it's not specifically a political -- |
| | 11 | whether you are Republican or Democrat doesn't matter. It's a |
| | 12 | nonpartisan board. |
| | 13 | Q. Right. I'm not asking whether you're liberal, |
| | 14 | conservative, Republican, Democratic. It is an elected |
| 09:40:10 | 15 | position; is that fair to say? |
| | 16 | A. Yes. |
| | 17 | Q. And to get elected, you have to get people to vote |
| | 18 | for you; is that fair to say? |
| | 19 | A. I'd agree with that. |
| 09:40:19 | 20 | Q. So to do that, you have to campaign; is that fair? |
| | 21 | A. Yes. |
| | 22 | Q. And one of the reasons you reached out to |
| | 23 | Mr. Johnson was to help you with your political campaign? |
| | 24 | A. A -- yea. I agree. |
| 09:40:34 | 25 | Q. I mean, didn't you testify that he was a person who |

| | | |
|---|---|---|
| 09:40:39 | 1 | had been elected and had a good network of people to help with |
| | 2 | that? |
| | 3 | A.    Sure. |
| | 4 | Q.    That's why you reached out to him? |
| 09:40:49 | 5 | A.    Uh-huh. |
| | 6 | Q.    Now, on the school board, like any other political |
| | 7 | group, there are certain coalitions that you build; is that |
| | 8 | right? |
| | 9 | A.    Describe them.  Describe what you're saying. |
| 09:41:05 | 10 | Q.    Well, people have different opinions about the way |
| | 11 | things ought to be done; is that a fair assessment? |
| | 12 | A.    Sure. |
| | 13 | Q.    Sometimes there's rivalries within those groups |
| | 14 | about the way things ought to happen? |
| 09:41:18 | 15 | A.    Okay.  Yea. |
| | 16 | Q.    Well, I mean, you mentioned masks earlier.  Let's |
| | 17 | take that for an example.  When you started running for school |
| | 18 | board, it was during COVID? |
| | 19 | A.    Yes, sir. |
| 09:41:31 | 20 | Q.    So there were people who had strong opinions about |
| | 21 | masks and strong opinions against masks at school; is that |
| | 22 | fair? |
| | 23 | A.    Yes, sir. |
| | 24 | Q.    And that doesn't mean that they are bad people on |
| 09:41:42 | 25 | one side or the other.  They just might disagree about things; |

| | | |
|---|---|---|
| 09:41:45 | 1 | is that fair to say? |
| | 2 | A. I agree with you. |
| | 3 | Q. Sometimes to get things done you have to build sort |
| | 4 | of coalitions to support your cause. |
| 09:41:55 | 5 | A. Okay. I agree. |
| | 6 | Q. You agree with that? |
| | 7 | A. Yes. |
| | 8 | Q. And you build relationships to do that; is that |
| | 9 | fair to say, Mr. Donovan? |
| 09:42:06 | 10 | A. Yes. |
| | 11 | Q. And in a representative democracy when you go out |
| | 12 | to talk to people who might vote for you, is it fair to say |
| | 13 | that they often have opinions about the way the school board |
| | 14 | ought to be run? |
| 09:42:19 | 15 | A. There are many opinions on how the school board |
| | 16 | should be ran. |
| | 17 | Q. Well, I mean, and it's your job as a school board |
| | 18 | member to listen those people. |
| | 19 | A. I agree with that. |
| 09:42:26 | 20 | Q. And to consider what they say. |
| | 21 | A. Okay. |
| | 22 | Q. Now, sometimes you might agree, sometimes you might |
| | 23 | disagree with them; is that fair to say? |
| | 24 | A. Yes. |
| 09:42:34 | 25 | Q. But ultimately, it's important to consider what |

09:42:37    1    your constituents want.

            2         A.    I agree with that.

            3         Q.    Now, when you ran for the school board, you wanted

            4    to win; is that right, Mr. Hoffman -- Donovan?  I'm sorry.

09:42:52    5         A.    I was waiting for an answer over there.

            6         Q.    There's an Investigator Hoffman in this case.  I

            7    apologize.

            8              Mr. Donovan, when you ran for school board, you

            9    wanted to win the race.

09:43:03   10         A.    Sure.

           11         Q.    I mean, you're putting that much effort into

           12    something, it's important to you to try to win.

           13         A.    I have kids in the school system.  It was very

           14    important.

09:43:11   15         Q.    And you worked closely with Mr. Johnson to win your

           16    race; is that right?

           17         A.    I agree with that.

           18         Q.    Did he help you with your campaign?

           19         A.    He gave me ideas on what to do, tasks pretty much.

09:43:28   20    It's a good idea to go to the fire departments.  It's a good

           21    idea to go to this group that's meeting to get their

           22    endorsement.  Was he out in the public saying, hey, vote for

           23    Kevin?  I've seen him stand in front of a group and say it

           24    maybe once.

09:43:46   25         Q.    But is it fair to say that Mr. Johnson helped you

09:43:49    1    with your strategy to try to get elected?

            2          A.    Yes.   Absolutely he helped with strategy.

            3          Q.    And worked closely with you?

            4          A.    Sure.

09:43:57    5          Q.    Now, is it fair to say at some point during the

            6    campaign you learned Mr. Johnson had some the pretty strenuous

            7    rivals on the board of education?

            8          A.    Yes.

            9          Q.    And there were people on the board who clearly did

09:44:21   10    not like him; is that fair to say?

           11          A.    It went both ways.

           12          Q.    I'm sorry?

           13          A.    It went both ways.   Rivalries went both ways.   He

           14    didn't like people and they didn't like him.

09:44:31   15          Q.    But there was sort of an environment where they

           16    didn't get along?

           17          A.    Sure.   Yup.

           18          Q.    And there were policies that people on the board

           19    disagreed with, that he disagreed with or they disagreed on

09:44:44   20    policies; is that fair to say?

           21          A.    Yes, sir.

           22          Q.    Now, you mentioned you've been in Johnston County a

           23    long time, Mr. Donovan, and you met Mr. Johnson in 2020, did

           24    you say that?

09:45:06   25          A.    2019, 2020.   Yea, probably 2020 time frame.

09:45:13   1        Q.   It's fair to say that he was not part of the

          2   political establishment in Johnston County before you met him;

          3   is that fair to say?

          4        A.   That Mr. Johnson wasn't part of the political

09:45:23   5   establishment?

          6        Q.   Yes.

          7        A.   He was into politics before I even decided to run.

          8   He's been part of politics for a while.

          9        Q.   Growing up he's not a name you heard as a

09:45:33  10   politician or someone who was involved in politics; is that

         11   fair to say?

         12        A.   As I said it before, I wasn't in politics til 2020.

         13   So I did not care honestly who was on the school board or

         14   who -- I didn't pay attention to things.

09:45:46  15        Q.   You didn't keep up with it?

         16        A.   No.

         17        Q.   Now, you mentioned yesterday when Ms. James was

         18   asking you questions sometimes about an advertisement that you

         19   did with Michelle Antoine.

09:46:09  20        A.   Yes, sir.

         21        Q.   You mentioned that part of that advertisement was a

         22   clip of a recording.

         23        A.   Sure.  Yes.

         24        Q.   And did you imply that you hadn't heard the rest of

09:46:21  25   the clip?

09:46:22   1        A.   I have never heard the full audio of the recording

           2   except for the clip.

           3        Q.   Well, let me ask you how long -- do you know how

           4   long the full audio is?

09:46:35   5        A.   I don't.  I think I stated yesterday that I only

           6   heard a clip that's maybe 10, 13 seconds long.

           7        Q.   And that particular audio you're talking about is

           8   from a public meeting; isn't it?

           9        A.   I don't know that it was a public meeting.  If I

09:46:50  10   remember right, there were three elected officials that met,

          11   Mr. Johnson, Ms. Andrews, Mr. Carroll.  I can't remember who

          12   they were meeting with.

          13        Q.   Well, wasn't it a committee meeting?

          14        A.   I'm not sure if it was a committee meeting.

09:47:09  15        Q.   Were there committees on the board of education?

          16        A.   There are.  They are not recorded live or by audio.

          17   So I'm not sure if it was a committee meeting or not.  No way

          18   to go back and see.

          19        Q.   But they are public meetings?

09:47:26  20        A.   They are public meetings.

          21        Q.   Now, did you ever ask to hear the recording?

          22        A.   I did.

          23        Q.   And did you get the opportunity to do that?

          24        A.   Never heard it.

09:47:38  25        Q.   Now, did you keep the recording yourself?

Kevin Donovan - Cross by Mr. Tyndall

| | |
|---|---|
| 09:47:42 | 1 |

A.   I was given that recording via air drop right next to the Howell Theatre by Ronald Johnson.  He gave me that recording.  He provided me that recording via air drop.

Q.   And suffice it to say though that you were not forced to do an advertisement?

A.   No.  I was told that it was a good idea.  It was something to do if I wanted to win, to get views.

Q.   In fairness, Mr. Johnson was not running for election when you were running; was he?

A.   No.

Q.   He wasn't running for the school board; was he?

A.   No, sir.

Q.   He wasn't running for U.S. Congress; was he?

A.   No, sir.

Q.   He was trying to help you; is that right?

A.   Yes, sir.

Q.   And you wanted his help; didn't you?

A.   I was advised that it was best to get his help.

Q.   And you accepted that; didn't you?

A.   I -- yea.

Q.   You accepted in enthusiastically; didn't you, Mr. Donovan?

A.   Well, I thought it was a great idea.

Q.   And you ultimately got elected; right?

A.   I did get elected.

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 09:48:55 | 1 | Q.    Yesterday, Mr. Donovan, you spoke in response to |
| | 2 | Ms. James' questioning -- I want to make sure we're correct |
| | 3 | about this.  She asked you had you recorded Ms. Barbour |
| | 4 | before.  And what was your answer to that? |
| 09:49:12 | 5 | A.    I had not recorded Ms. Barbour, that specific |
| | 6 | statement of the three-hour conversation of her admitting that |
| | 7 | she slept with DeVan Barbour. |
| | 8 | Q.    Did you tell -- did you remember meeting an |
| | 9 | Investigator West at some point? |
| 09:49:33 | 10 | A.    Yes.  With the police department? |
| | 11 | Q.    Detective West, I think is the name, with the |
| | 12 | Smithfield Police Department. |
| | 13 | A.    Yes. |
| | 14 | Q.    Do you remember telling Detective West that you |
| 09:49:45 | 15 | recorded Angie stating she slept with DeVan Barbour, but you |
| | 16 | later deleted it? |
| | 17 | A.    I don't remember that. |
| | 18 | Q.    Do you remember telling him that you stated that |
| | 19 | you deleted a lot of recordings and texts after blocking |
| 09:50:05 | 20 | Angie? |
| | 21 | A.    I think -- it was a very short interview with |
| | 22 | Mr. West.  I believe he recorded as well.  So I mean, you can |
| | 23 | always go back and listen to what I said, but as far |
| | 24 | as -- yea, I blocked Angie, and I probably deleted a lot of |
| 09:50:28 | 25 | our text messages. |

09:50:30  1        Q.    Well, did you tell him you specifically deleted a
        2    lot of recordings of her?
        3        A.    I don't remember saying that.
        4        Q.    Well, did you record her on a number of occasions?
09:50:42  5        A.    Later in the campaign I probably did, yea.
        6        Q.    And did you tell Detective West that Mr. Johnson
        7    never asked you to record anyone?
        8        A.    That was very early in the campaign.  So yea, at
        9    that time he had not asked me to record anybody.  But I'll
09:51:07 10    make a clarifying statement.  Recording is not the same as
       11    taking pictures of screenshots on Snapchat and providing them.
       12        Q.    Right.  And one thing, Mr. Donovan, you mentioned
       13    yesterday that you recorded people to protect yourself.  What
       14    did you mean by that?
09:51:26 15        A.    Pretty much documentation.  When you have a long
       16    conversation with somebody, sometimes the details are hard to
       17    remember.
       18        Q.    Right.
       19        A.    So I would -- I would record and I would, you know,
09:51:37 20    have it for my own documentation.  That way if I ever need to
       21    remember something, I can go back and remember it.  It's not
       22    to hold anything over anybody.  That's ridiculous.
       23        Q.    Right.  For instance, Investigator Hoffman recorded
       24    your second conversation; is that right?
09:51:56 25        A.    Sure.

09:51:57  1        Q.   And sometimes we prefer to have what you actually

2  said versus what the person who is interviewing you said you

3  said; right?

4        A.   I agree with that.

09:52:11  5        Q.   Well, would you prefer that I give my version of

6  what you said or would you prefer we have the transcript of

7  what you actually said?

8        A.   I agree I rather there being a recording.

9        Q.   I mean, it's fair enough to have the accuracy,

09:52:28  10  isn't that fair?  Isn't it, Mr. Hoffman (sic) -- I mean,

11  Mr. Donovan?  I'm sorry.  I keep confusing you.

12        A.   That's all right.

13        Q.   I don't confuse you.  I'm just using the wrong

14  name.  I apologize.

09:52:38  15        A.   No.  That's okay.  Yes, sir.

16        Q.   And sometimes people report that they -- their

17  reports of what they said are different than what they

18  actually say; isn't that right?

19        MS. JAMES:  Your Honor, objection.  That's calling

09:53:02  20  for him to speculate.  What reports?  What recordings?  That's

21  very general.

22        THE COURT:  Yes, sir.  Mr. Tyndall, if I can get

23  you to rephrase that.

24        MR. TYNDALL:  Okay.  Yes, sir.

09:53:12  25        Q.   For instance, Ms. Barbour testified that

09:53:16    1    Mr. Barbour --

            2                MS. JAMES:  Objection.  He wasn't in here when

            3    Ms. Barbour testified.  He has no idea what that's about.

            4                THE COURT:  Yes, sir.  He was not in here.  Can you

09:53:26    5    phrase that a different way, if you would.

            6        Q.    Well, Mr. Donovan, you testified Ms. Barbour said

            7    she slept with DeVan Barbour; right?

            8        A.    Yes, sir.

            9        Q.    And you're clear about that; is that right,

09:53:40   10    Mr. Donovan?

           11        A.    Yes, sir.

           12        Q.    And you said you may or may not have told Detective

           13    West that you had a recording of that at some point but you

           14    deleted it; is that right?

09:53:51   15        A.    I do not remember telling Detective West I had a

           16    recording of Ms. Barbour stating that she slept with DeVan

           17    Barbour.

           18        Q.    But if you had had a recording, we would know

           19    exactly what she said; isn't is that right?

09:54:02   20        A.    If I did have a recording, you would know she said

           21    it.

           22        Q.    And that's part of the reason you record people so

           23    you would know what they said; right?

           24        A.    Typically recording, like I said, it would be to

09:54:21   25    record details in case I need to look back on -- you know, if

| | | |
|---|---|---|
| 09:54:26 | 1 | I need to refresh my memory on something. |
| | 2 | Q. And that's legal conduct; is it? |
| | 3 | A. Yes, it's perfectly legal to record in this state. |
| | 4 | Q. I want to follow up with something you said, |
| 09:55:01 | 5 | Mr. Donovan. You said that you generally make these |
| | 6 | recordings so that you can just go back and refresh your |
| | 7 | memory; is that a fair statement? |
| | 8 | A. Sure. |
| | 9 | Q. And do you remember talking to people online though |
| 09:55:20 | 10 | and threatening to release recordings? |
| | 11 | A. No. |
| | 12 | (Defendant's Exhibit Number 12 marked for |
| | 13 | identification.) |
| | 14 | Q. Do you remember a person named Melinda Hill Slay? |
| 09:55:54 | 15 | A. I do. |
| | 16 | Q. Did you have some rather heated conversations with |
| | 17 | her online? |
| | 18 | A. We've had discussions online. |
| | 19 | Q. And did you call her a mouthpiece for Michelle? |
| 09:56:07 | 20 | A. Absolutely I did. |
| | 21 | Q. And accuse her of being willing to say whatever |
| | 22 | makes anyone look bad but your friends? |
| | 23 | A. Context, please. I'm not really sure what -- |
| | 24 | MR. TYNDALL: May I approach, Your Honor? |
| 09:56:27 | 25 | THE COURT: Yes, sir. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

09:56:51    1        Q.   I'm going to hand you what's been marked

           2    Defendant's Exhibit 12.  For purposes of refreshing your

           3    recollection, Mr. Donovan, if you'll take a look at that and

           4    review it and see if that refreshes your recollection about

09:57:05    5    some of your conversations with Ms. Slay.

           6        A.   Yes.  I do remember this.  Yea.  As long as I get

           7    to explain it.

           8        Q.   Well, let me ask questions first and then you can

           9    explain it.

09:57:27   10        A.   Okay.  Let's do it.

          11        Q.   Did you later say -- I mean, you had a heated

          12    conversation with Ms. Slay; is that fair?

          13        A.   Yes.

          14        Q.   Was it about politics?

09:57:41   15        A.   I'm sure it had something linked to politics.

          16        Q.   And you said, I'm done here, nobody should take you

          17    serious at all.  And you're talking about Ms. Slay; is that

          18    right?

          19        A.   Yes.

09:57:51   20        Q.   If you want to keep on, I can just start releasing

          21    these.

          22        A.   Yes.

          23        Q.   And you're talking about recordings; is that right?

          24        A.   I did.

09:58:02   25        Q.   And you might want to check your friends first; is

| | | |
|---|---|---|
| 09:58:05 | 1 | that right? |
| | 2 | A. I did. |
| | 3 | Q. And then you do a screenshot of a long list of |
| | 4 | recordings you have. |
| 09:58:12 | 5 | A. Uh-huh. |
| | 6 | Q. So you were threatening to release the recordings. |
| | 7 | A. Yes. And those recordings were not actual |
| | 8 | recordings of anything. They were just -- they were just |
| | 9 | recordings that had nothing to do with anything. Nothing to |
| 09:58:27 | 10 | do with politics. It was just me messing with her. |
| | 11 | Q. So you were just -- you were just telling her -- |
| | 12 | A. I was trying to get her off my back. |
| | 13 | MR. TYNDALL: Can I have just a second to get my |
| | 14 | stuff organized, Your Honor? |
| 09:59:43 | 15 | THE COURT: Yes, sir. |
| | 16 | MR. TYNDALL: Can I have just a minute to speak |
| | 17 | with Mr. Bruder? |
| | 18 | THE COURT: Yes, sir. |
| | 19 | Q. Mr. Donovan, do you utilize something called a VPN? |
| 10:01:55 | 20 | A. I do know what VPN is. |
| | 21 | Q. What? |
| | 22 | A. I do know what a VPN is. |
| | 23 | Q. Do you have one? |
| | 24 | A. I've got one on my MacBook. |
| 10:02:05 | 25 | Q. And what is a VPN? |

| 10:02:07 | 1 | A. Virtual private network. |
| | 2 | Q. What does that do? |
| | 3 | A. You can reroute your internet service to a |
| | 4 | different location if you want to be used -- if you want your |
| 10:02:18 | 5 | location to be as if you were in a different location than |
| | 6 | another. |
| | 7 | Would you like me to explain what I use it for? |
| | 8 | Q. That's up to you. |
| | 9 | A. Sure. I use it for an application Game Caller. I |
| 10:02:35 | 10 | can submit a publication to New York and play in New York if I |
| | 11 | want. |
| | 12 | Q. Like a video game? |
| | 13 | A. It's like a video game. |
| | 14 | Q. Mr. Donovan, one question I have for you is you |
| 10:02:47 | 15 | work full time; is that right? |
| | 16 | A. I do. |
| | 17 | Q. And you have a family; is that right? |
| | 18 | A. I do. |
| | 19 | Q. And you are involved in -- you didn't call it |
| 10:02:55 | 20 | politics, but at least the board of education; is that right? |
| | 21 | A. Sure. |
| | 22 | Q. And that takes a lot of time; doesn't it? |
| | 23 | A. I'm a very busy person. |
| | 24 | Q. And also, all these online conversations, you |
| 10:03:07 | 25 | engage in those; is that fair too? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

10:03:09   1        A.    (Witness nods in the affirmative.)

          2        Q.    One thing a VPN will do also is it's hard to track

          3   if someone creates a fake phone number; is that right?

          4        A.    I'm not really sure.

10:03:24   5        Q.    Could you use it to create a separate account for a

          6   phone source?

          7        A.    I don't know.

          8        Q.    Mr. Donovan, you were -- once you were elected --

          9   we talked a little bit about political alliances and

10:04:05   10   coalitions that you were -- after you got elected, you were no

         11   longer aligned with Mr. Johnson; is that fair to say?

         12        A.    I was no longer aligned with Mr. Johnson after my

         13   second interview with Mr. Hoffman.

         14        Q.    And that's where Investigator Hoffman talked to you

10:04:23   15   a fair amount about his investigation; is that right?

         16        A.    He interviewed me.

         17        Q.    Well, and he told you his views on things too;

         18   didn't he?

         19        A.    I'm trying to remember, honestly. He discussed

10:04:41   20   text messages that I sent back and forth to Ronald and asked

         21   me what they meant in context. But as far as giving me his

         22   personal views, I don't remember.

         23        Q.    And you had that interview with Investigator

         24   Hoffman. Before you did it your lawyer negotiated an immunity

10:05:04   25   deal for you; isn't that right?

| | | |
|---|---|---|
| 10:05:06 | 1 | A. Yes, sir. |
| | 2 | Q. So before you even talked to him you had an |
| | 3 | agreement with the Investigator Hoffman in the DA's office |
| | 4 | before you talked? |
| 10:05:14 | 5 | A. With the DA's office, yes, sir. |
| | 6 | Q. Mr. Donovan, let me just ask you. Do you remember |
| | 7 | having Facebook conversations with Alley Bond? When I say |
| | 8 | Facebook conversation, these are messages that go back and |
| | 9 | forth to each other. |
| 10:06:25 | 10 | A. Yes. We had Facebook conversations and I think |
| | 11 | text message conversations. |
| | 12 | Q. And did you say to Ms. Bond: I have a VPN and I |
| | 13 | can route it to any part of the county? |
| | 14 | A. I don't remember if I made that statement. |
| 10:06:47 | 15 | Q. Well, is it true? |
| | 16 | A. Do I have a VPN? |
| | 17 | Q. Yes. |
| | 18 | A. I just told you I did. |
| | 19 | Q. Can you route to it any part of the county? |
| 10:06:54 | 20 | A. I can route it to any part of the country. |
| | 21 | MR. TYNDALL: Nothing further, Your Honor. |
| | 22 | THE COURT: Ms. James. |
| | 23 | MS. JAMES: Thank you, Your Honor. |
| | 24 | REDIRECT EXAMINATION BY MS. JAMES: |
| 10:07:03 | 25 | Q. What does VPN stand for? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 10:07:06 | 1 | A. Virtual private network. |

10:07:06    1          A.    Virtual private network.

           2          Q.    With a VPN isn't it true it also protects people

           3    from looking or getting into your computer and things to not

           4    get your data?

10:07:17   5          A.    That's correct, yes.

           6          Q.    So that's also a purpose of that?

           7          A.    Yes.  So I've used it for routing whenever I'm --

           8    you know, a lot of people use it for browsing the internet.

           9    They don't want ads or being track really.

10:07:37  10          Q.    With a VPN that's something that you can put on

          11    your phones or computers, but it's really to protect the

          12    network.  That's what it stands for.  The virtual private

          13    network is what it stands for; correct?

          14          A.    That's correct.

10:07:52  15          Q.    And you can have one on your computer, you can have

          16    one on your phone, but it's going to protect people getting

          17    inside to your data?

          18          A.    Correct.

          19          Q.    And you didn't know anything about using it for

10:08:08  20    phone numbers in that way?

          21          A.    I did not.

          22          Q.    And that's not your use of it?

          23          A.    No.  Absolutely not.

          24          Q.    Are you even sure it can be used in that manner?

10:08:18  25          A.    I'm honestly not sure if you can.  Are you saying

| | | |
|---|---|---|
| 10:08:21 | 1 | like make a phone number? |
| | 2 | Q.   I don't -- I'm just asking. |
| | 3 | A.   I'm not aware, no. |
| | 4 | Q.   And you were asked about Alley Bond.  I think her |
| 10:08:37 | 5 | full name is Allyson Bond; correct? |
| | 6 | A.   Yes, sir. |
| | 7 | Q.   Now, who is she?  How do you know her? |
| | 8 | A.   I was introduced to her as a friend through |
| | 9 | Mr. Johnson.  She's a teacher at McGee's Elementary. |
| 10:08:58 | 10 | Q.   And did Mr. Johnson explain his relationship with |
| | 11 | Ms. Bond? |
| | 12 | A.   It was only just considered a friendship, my |
| | 13 | understanding at the time. |
| | 14 | Q.   Your understanding at the time? |
| 10:09:10 | 15 | A.   Yes, sir. |
| | 16 | Q.   What's your understanding now? |
| | 17 | A.   After looking, after, you know, viewing search |
| | 18 | warrants, it appears they had more of a relationship. |
| | 19 | MR. TYNDALL:  Object to that, Your Honor. |
| 10:09:19 | 20 | THE COURT:  That's sustained. |
| | 21 | Q.   And so your understanding at the time, it was just |
| | 22 | a friendship? |
| | 23 | A.   Yes, ma'am. |
| | 24 | Q.   But Mr. Johnson didn't share everything.  I think |
| 10:09:30 | 25 | we talked about that yesterday.  That information went from |

| | | |
|---|---|---|
| 10:09:33 | 1 | you to him but not in the other direction? |
| | 2 | A.   That's right. |
| | 3 | Q.   So he didn't share a lot of stuff with you.  He |
| | 4 | only told you what you needed to know? |
| 10:09:42 | 5 | A.   What I needed to know, yea. |
| | 6 | Q.   So this is a person he introduced you to? |
| | 7 | A.   Yes, ma'am. |
| | 8 | Q.   Okay.  And did you have conversations with her? |
| | 9 | A.   Yes. |
| 10:09:51 | 10 | Q.   Did you have conversations about Ms. Barbour with |
| | 11 | her? |
| | 12 | A.   Yes, ma'am. |
| | 13 | Q.   Did you have conversations with the defendant about |
| | 14 | Ms. Barbour? |
| 10:10:01 | 15 | A.   Yes, ma'am. |
| | 16 | Q.   And during the time that you were having these |
| | 17 | conversations and making these comments, were you still under |
| | 18 | the impression that the affair between Ms. Barbour and the |
| | 19 | defendant wasn't true? |
| 10:10:13 | 20 | A.   Correct. |
| | 21 | Q.   Okay.  Was these conversations -- and I think one |
| | 22 | of the things you said:  Donate a bullet. |
| | 23 | A.   Uh-huh. |
| | 24 | Q.   Who did you make that comment to? |
| 10:10:26 | 25 | A.   It was either Mr. Johnson or Ms. Barbour.  I can't |

10:10:30  1   remember.

2   Q.   And so some of the comments that you heard were the

3   things that you made to Ms. Bond, those conversations?

4   A.   Sure.  Yea.

10:10:40  5   Q.   And those things she shared with the defendant,

6   because you were asked about them yesterday and today?

7   A.   I assume so.

8   Q.   And all the time you were making those comments,

9   you were under the impression that Ms. Barbour was not telling

10:10:55  10  the truth about the affair.

11  A.   Yes.  I didn't think she was -- she made the claim

12  of the affair, and I didn't think that she was telling the

13  truth about it.

14  Q.   And we talked about this on yesterday.  I think the

10:11:15  15  defense touched on it.  As soon as you would get information,

16  I think you said that you would take screenshots --

17  A.   Yes.

18  Q.   -- of your conversation with Ms. Barbour?

19  A.   Yes, with Ms. Barbour.

10:11:28  20  Q.   And you would send it straight to the defendant;

21  correct?

22  A.   I would, yea.

23  Q.   Because you believed what he was telling you?

24  A.   I did.

10:11:45  25  Q.   I think you were asked about your ability to make

10:11:50  1  your own decisions and that you're a robotic software

2  programmer.

3       A.   Yes, ma'am.

4       Q.   Very smart.

10:11:58  5       A.   Yes, ma'am.

6       Q.   Was this your first entryway into politics and

7  running for an office?

8       A.   Yes.  So this was my very first political, you

9  know, run.  So when asked who to talk to or who to trust, I

10:12:15  10  was pointed toward Mr. Johnson, and who better to trust than

11  somebody that was sworn into law enforcement to protect the

12  community.

13       Q.   And so you went to him for guidance; correct?

14       A.   I did.

10:12:28  15       Q.   Tell us how you relied on his opinion and why you

16  did that.

17       A.   Yes.  So like I said, there was some favorable --

18  there was a lot of favorable people towards Mr. Johnson that

19  supported him, and I was given that direction if -- you know,

10:12:44  20  you want to talk to him because he had the strategies behind

21  winning an election.  So I just -- it started -- started with

22  small, small conversation.  You know, a little bit of trust,

23  you know, figuring out who he is, and then, you know, it's --

24  after that -- it's really difficult to explain.

10:13:14  25       Q.   And as you sit here today, do you trust him?

| | | |
|---|---|---|
| 10:13:18 | 1 | A.   Absolutely not. |
| | 2 | Q.   Like you did when you first met him? |
| | 3 | A.   I wouldn't trust him in a room with my children. |
| | 4 | Q.   I think you were asked very early in the campaign |
| 10:13:32 | 5 | that he did not ask you to record, and I don't know who "he" |
| | 6 | is when you and the defendant were talking.  Do you remember |
| | 7 | saying that or talking about that? |
| | 8 | A.   It was in a text. |
| | 9 | Q.   Did the defendant ever ask you to record people? |
| 10:13:52 | 10 | A.   Early on, no. |
| | 11 | Q.   Early on, no.  Did he ask you to record people |
| | 12 | later on in the campaign? |
| | 13 | A.   The main one -- the one I can remember is |
| | 14 | Mr. Hoffman's interview.  I don't remember anybody else |
| 10:14:09 | 15 | recording and him specifically asking me. |
| | 16 | Q.   And you were asked about your recordings and how |
| | 17 | you use them, and I think you said it was perfectly legal to |
| | 18 | record in the state. |
| | 19 | A.   It is. |
| 10:14:26 | 20 | Q.   Is it perfectly legal to record a closed session of |
| | 21 | a school board meeting? |
| | 22 | A.   It's my understanding that it's not illegal -- it's |
| | 23 | illegal to record closed session meetings.  It's against the |
| | 24 | closed session meeting law -- or meeting laws. |
| 10:14:39 | 25 | Q.   So there are some situations in this state where |

| | | |
|---|---|---|
| 10:14:42 | 1 | you cannot record things. |
| | 2 |      A.   Right.  Especially an elected official closed |
| | 3 | session meetings.  You can't do that. |
| | 4 |      Q.   And who is Ms. Slay?  Michelle Slay? |
| 10:14:56 | 5 |      A.   Ms. Slay was a -- someone that lived in this county |
| | 6 | at the time that I was running.  She now lives out of state. |
| | 7 | She was a friend of Michelle Antoine's. |
| | 8 |      Q.   And is Michelle Antoine and the defendant -- I |
| | 9 | think you were asked about clicks and coalitions on the board. |
| 10:15:18 | 10 | She's on the school board; right? |
| | 11 |      A.   Yes, ma'am. |
| | 12 |      Q.   Is she aligned with the defendant? |
| | 13 |      A.   Yes, ma'am, very much so. |
| | 14 |      Q.   Are they friends? |
| 10:15:24 | 15 |      A.   I would consider them friends. |
| | 16 |      Q.   And this is somebody in their little -- |
| | 17 |      A.   Click. |
| | 18 |      Q.   -- click? |
| | 19 |      A.   Yea. |
| 10:15:33 | 20 |      Q.   Okay.  And you were asked about that post that you |
| | 21 | did or screenshots of recordings. |
| | 22 |      A.   Yea. |
| | 23 |      Q.   Did you actually have recordings that you were |
| | 24 | going to release? |
| 10:15:47 | 25 |      A.   No.  Absolutely not. |

| | | |
|---|---|---|
| 10:15:48 | 1 | Q. Have you ever released recordings on Facebook? |
| | 2 | A. No. |
| | 3 | Q. So you were bluffing? |
| | 4 | A. I was bluffing. |
| 10:16:02 | 5 | MS. JAMES: May I have just one moment, Your Honor? |
| | 6 | THE COURT: Yes, ma'am. |
| | 7 | Q. Did you ever ask the defendant the question: Do I |
| | 8 | have to inform someone if I record a phone call? |
| | 9 | A. I did. I asked him that because he was a police |
| 10:16:22 | 10 | officer so I figured he would know. |
| | 11 | Q. Do you remember his answer? |
| | 12 | A. It was a one party recording state, that you could |
| | 13 | record people. |
| | 14 | Q. So he gave you that information about the one party |
| 10:16:35 | 15 | state? |
| | 16 | A. Yes, ma'am, because before then, I never recorded |
| | 17 | anybody. |
| | 18 | Q. Now, during this time period where Angie is telling |
| | 19 | people about this affair, did the defendant really want her to |
| 10:16:57 | 20 | be quiet about this information? |
| | 21 | A. Absolutely. |
| | 22 | Q. And how do you know that? |
| | 23 | A. Any time it would come up, it would follow up with |
| | 24 | she's crazy, she's doesn't know what she's talking about, she |
| 10:17:10 | 25 | just -- she just wants something. He just did not want her |

| 10:17:16 | 1 | talking about it. He would degrade her. I mean, any time |
|---|---|---|
| | 2 | somebody degrades somebody, it's my assumption that they |
| | 3 | just -- they want to put them down, they don't want to say |
| | 4 | anything, they don't want them to talk about it. |
| 10:17:35 | 5 | Q.    And so he would degrade her to you? |
| | 6 | A.    Oh, yea, yea. |
| | 7 | Q.    And did you hear him degrade her to others? |
| | 8 | A.    I've heard him in conversations with others, you |
| | 9 | know. |
| 10:17:55 | 10 | Q.    And you were asked about -- the defendant wasn't |
| | 11 | running for school board at the time you were running. |
| | 12 | A.    That's correct. |
| | 13 | Q.    However, isn't it true that he wanted to be the |
| | 14 | chairperson of the school board? |
| 10:18:11 | 15 | A.    He wanted to have "his people," quote/unquote, |
| | 16 | elected so he could have the votes to go the way he wanted. |
| | 17 | He wanted to be chair. He wanted to run the school board how |
| | 18 | he thought it should be ran. |
| | 19 | Q.    And isn't true he needed you on the board in order |
| 10:18:27 | 20 | to get that done? |
| | 21 | A.    Yes, ma'am. |
| | 22 | Q.    And isn't it true that he needed you on his side? |
| | 23 | A.    Absolutely. |
| | 24 | Q.    And isn't that true that that's why he's denying |
| 10:18:38 | 25 | this affair with Ms. Barbour to you? |

| | | |
|---|---|---|
| 10:18:41 | 1 | A.    Anything to get me on his side. |
| | 2 | MR. TYNDALL:  Objection to that, Your Honor.  This |
| | 3 | is just closing argument. |
| | 4 | THE COURT:  I'll sustain that last question. |
| 10:18:50 | 5 | MS. JAMES:  I'll withdraw it, Your Honor. |
| | 6 | THE COURT:  Yes, ma'am.  Thank you. |
| | 7 | Q.    Now, I think you said that when you the found out |
| | 8 | about his affair and after this second interview, you were no |
| | 9 | longer aligned -- |
| 10:19:07 | 10 | A.    Absolute not. |
| | 11 | Q.    -- with the defendant.  Why were you no longer |
| | 12 | aligned with the defendant? |
| | 13 | MR. TYNDALL:  That's not what he said.  I mean, |
| | 14 | objection to that.  I mean, she can ask him a question, Judge, |
| 10:19:20 | 15 | and he can answer, but she can't testify. |
| | 16 | THE COURT:  We'll let you rephrase it if you can. |
| | 17 | MS. JAMES:  Your Honor, I think -- just for |
| | 18 | clarification, I think the defense asked him after the |
| | 19 | second -- you were no longer aligned with the defendant. |
| 10:19:32 | 20 | That's what he asked him.  He said, no, not after that second |
| | 21 | interview with Mr. Hoffman. |
| | 22 | THE COURT:  Yes, ma'am.  You can ask the question, |
| | 23 | just rephrase it in a different way. |
| | 24 | MS. JAMES:  Yes, Your Honor. |
| 10:19:44 | 25 | Q.    Why were you no longer aligned with the defendant? |

| | | |
|---|---|---|
| 10:19:47 | 1 | A.    It was a series of things that added up to it.  So |
| | 2 | it -- sequence of events, finding out he lied to me about the |
| | 3 | affair with Ms. Barbour, then we -- being on the board, we had |
| | 4 | an -- he was requesting to get his censure removed.  I |
| 10:20:10 | 5 | requested to review those censures, the documentation from the |
| | 6 | investigation there.  Come to find out, the -- |
| | 7 | Q.    Don't tell me the result of that censure. |
| | 8 | A.    I'm not.  It wasn't -- as I was explaining, from |
| | 9 | him, that it didn't match up.  So when you start hitting these |
| 10:20:33 | 10 | sequence of events and nothing matches as he's telling me, |
| | 11 | then your eyes start opening and you start realizing what's |
| | 12 | really going on.  So yea, I -- I just figured it was best that |
| | 13 | I did not align with that. |
| | 14 | Q.    You appreciated his help on the campaign? |
| 10:20:59 | 15 | A.    Absolutely. |
| | 16 | Q.    Would you have accepted his help on the campaign if |
| | 17 | you knew all this stuff? |
| | 18 | A.    Absolutely not.  I would have rather lost |
| | 19 | miserably. |
| 10:21:07 | 20 | MS. JAMES:  Can I have just one moment, Your Honor? |
| | 21 | THE COURT:  Yes, ma'am. |
| | 22 | MS. JAMES:  Nothing further at this time. |
| | 23 | RECROSS-EXAMINATION BY MR. TYNDALL: |
| | 24 | Q.    Mr. Donovan, you made a big point of out -- you're |
| 10:21:19 | 25 | saying that Mr. Johnson said degrading things about |

| 10:21:24 | 1 | Ms. Barbour; is that right? |

10:21:24  1  Ms. Barbour; is that right?

2      A.   Yes.

3      Q.   In fact, you said a lot of degrading things about

4  Ms. Barbour; didn't you?

10:21:29  5      A.   Both of us have.

6      Q.   Did you say degrading things about Ms. Barbour?

7      A.   Yes.

8      Q.   Did you say things like:  They need to stop

9  engaging and she will disappear?

10:21:42  10      A.   Stop engaging.  I'm not sure about that.

11      Q.   Did you say:  Angie is going to fuck around and

12  piss DeVan off?

13      A.   I'm sure I could of.

14      Q.   She won't be welcome in the county when I'm done.

10:22:16  15  Did you say that?

16      A.   I'm sure.

17      Q.   The only job she will be able to get is a Waffle

18  House waitress?

19      A.   I could of said that.

10:22:24  20      Q.   And you're talking about a school teacher while

21  you're running for the school board.

22      A.   Yup.

23      Q.   Isn't that right, Mr. Donovan?

24      A.   Absolutely.

10:22:32  25      Q.   You said those things; didn't you?

| | | |
|---|---|---|
| 10:22:34 | 1 | A.   Uh-huh. |
| | 2 | Q.   And you meant them; didn't you, Mr. Donovan? |
| | 3 | A.   Absolutely I did. |
| | 4 | Q.   You meant them until you signed that immunity |
| 10:22:40 | 5 | agreement; didn't you? |
| | 6 | A.   No.  I didn't mean them when I signed the immunity |
| | 7 | agreement.  When I learned the truth is when I understood who |
| | 8 | was in the right and who's in the wrong. |
| | 9 | Q.   So you felt it was okay to threaten a woman's |
| 10:23:03 | 10 | job -- |
| | 11 | A.   I did not directly threaten her job. |
| | 12 | Q.   -- because you didn't like what she was saying? |
| | 13 | A.   One more time. |
| | 14 | Q.   You thought it was okay to threaten a woman's job |
| 10:23:12 | 15 | because you didn't like what she was saying; is that what I'm |
| | 16 | hearing you say? |
| | 17 | A.   I never directly threatened her job.  If you read |
| | 18 | all the text messages between me and the defendant, there was |
| | 19 | a lot of banter back and forth on both sides. |
| 10:23:28 | 20 | Q.   But you know I'm not allowed to read what |
| | 21 | Mr. Johnson says; right? |
| | 22 | A.   You got his phone. |
| | 23 | MS. JAMES:  Objection, Your Honor. |
| | 24 | THE COURT:  I'll sustain that. |
| 10:23:46 | 25 | Q.   You said:  Is the Mustang Ranch still around?  I |

10:23:50  1   got a referral.  Is that what you said about Ms. Barbour?

2        A.   It doesn't have her name in it, but it could of.

3   It could of been about her.

4        Q.   And what's the Mustang Ranch?

10:24:01  5        A.   It's an old strip club over in Selma.

6        Q.   I'm sorry?

7        A.   Old strip club over in Selma.

8        Q.   Over in Selma?

9        A.   Selma.

10:24:11  10       Q.   Those are your comments about Ms. Barbour; isn't

11  that right, Mr. Donovan?

12       A.   Those would be my comments.

13            MR. TYNDALL:  I don't have anything further.

14            THE COURT:  Ms. James, anything further?

15  REDIRECT EXAMINATION BY MS. JAMES:

16       Q.   Do you remember exactly what the defendant told you

17  about Ms. Barbour during these banters?  We heard your side.

18  Do you remember some of his comments?

19       A.   Yea.  She's a drunk.  She's crazy.  She's psycho.

10:24:40  20  She's -- all she wants is power.  It was everything that he

21  told me.  I mean, anything that had something to do with the

22  situation, she's following me.  Or he was -- he would create

23  scenarios where he wanted people to believe that she was doing

24  the things he was doing, that she was going after him all the

10:25:09  25  time when in fact she really wasn't.  She was just trying to

Kevin Donovan - Recross by Mr. Tyndall

| 10:25:14 | 1 | get the truth out. |

2     Q.   Now, she worked on your campaign; correct?

3     A.   She helped me with my campaign, yes.

4     Q.   And you didn't have an affair with her?

10:25:26    5     A.   Absolute not.

6     MS. JAMES:  No further questions, Your Honor.

7 RECROSS-EXAMINATION BY MR. TYNDALL:

8     Q.   Mr. Donovan, you came to my client to help you with

9 your campaign; is that right?

10:25:36   10     A.   Yes.

11     Q.   Now, Ms. James just asked you about what my client

12 said.  I want to ask you if you remember the conversation with

13 him where you said: Have you thought about dangling the DeVan

14 carrot to switch attention?  Do you remember saying that?

10:25:58   15     A.   I could of.

16     Q.   Do you remember his response being:  No, man.  This

17 is my misery.  I'm not going to spread it.  She wants that

18 exposure.

19     A.   Okay.

10:26:10   20     Q.   Do you remember that conversation?

21     A.   I don't remember it, but if you have it documented,

22 then it happened.

23     MR. TYNDALL:  Nothing further, Your Honor.

24     THE COURT:  Thank you, Mr. Donovan.  You are free

10:26:21   25 to come down.

| | | |
|---|---|---|
| 10:26:22 | 1 | (Witness steps down.) |
| | 2 | MS. JAMES:  Your Honor, can he be released? |
| | 3 | MR. TYNDALL:  Your Honor, I ask he remain on |
| | 4 | standby in case we need to recall him. |
| 10:26:43 | 5 | THE COURT:  You are free to go now, but subject to |
| | 6 | being recalled.  Thank you very much. |
| | 7 | Whenever you are ready. |
| | 8 | MS. JAMES:  Your Honor, the State calls Thomas |
| | 9 | Bennett Jones -- or Dr. Thomas Bennett Jones. |
| 10:26:59 | 10 | DR. THOMAS BENNETT JONES, |
| | 11 | having been called as a witness for the State and being duly |
| | 12 | sworn at 10:27 a.m., testified as follows: |
| | 13 | DIRECT EXAMINATION BY MS. JAMES: |
| | 14 | Q.   Good morning. |
| 10:28:15 | 15 | A.   Good morning. |
| | 16 | Q.   Dr. Jones, can you please state your name for the |
| | 17 | jury. |
| | 18 | A.   Sure.  Dr. Thomas Bennett Jones, Jr. |
| | 19 | Q.   And where do you work? |
| 10:28:24 | 20 | A.   Right now I'm the director of the North Carolina |
| | 21 | Teaching Fellows program with the University of North Carolina |
| | 22 | system. |
| | 23 | Q.   What does that job entail? |
| | 24 | A.   I work -- I run a loan forgiveness program for the |
| 10:28:38 | 25 | State of North Carolina to recruit future teachers to help |

| | |
|---|---|
| 10:28:41 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:28:53 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 10:29:07 | 10 |

10:28:41  1   them get into one of our ten partner institutions across the

2   state and receive that teacher licensure and then return to

3   work in North Carolina Public Schools.

4        Q.    At some point did you work for the Johnston County

10:28:53  5   Public Schools?

6        A.    I did.  I worked in Johnston County from 2002 to

7   2022.

8        Q.    That was for about 20 years?

9        A.    20 years.

10:29:07  10       Q.    And what were your positions during that time?

11        A.    Sure.  I was a teacher and coach at Clayton High

12   School from 2002 to 2008.  I was a teacher and coach at West

13   Johnston from 2008 to 2010.  I was a teacher and coach at

14   South Johnston County High School 2010 to 2012.  February 2013

10:29:29  15   I became assistant principal at South Johnston in February of

16   2013 and until I was main principal of Clayton High School to

17   begin July 1 of 2016, and that's where I stayed until leaving

18   on October 31st of 2022.

19        Q.    Did you know the defendant while you were working

10:29:50  20   here in Johnston County Public Schools?

21        A.    I didn't know the defendant until he was elected to

22   the school board in 2016.  I was principal.  I never had any

23   interaction with him until -- outside of school board matters

24   until 2019 was the first time that he and I talked outside of

10:30:11  25   the school board room.

10:30:15  1        Q.    And in 2019 when you met him, tell me about that

          2   meeting.

          3        A.    So it started in the spring of 2019.  I was the

          4   principal of Clayton High School, received an anonymous

10:30:29  5   allegation sheet from somewhere.  I didn't really know where

          6   it came from.  A couple weeks later I had an individual who

          7   was a driver's ed teacher in the school system that was on our

          8   campus taking pictures.  I confronted that individual, and

          9   that individual, when he left the school building called

10:30:51 10   Mr. Johnson, and Mr. Johnson then called me telling me that he

         11   knew that individual, to kind of lay off of him, that, you

         12   know, he was harmless.  That was the first time we really

         13   talked.

         14             He told me that he was coming to our graduation

10:31:05 15   that day -- or that year, June 3rd of 2019.  And it was then

         16   that we kind of talked, started texting back and forth.  I

         17   told him, thank you for coming to graduation.

         18             And then June 11th was the first time I got a text

         19   that said:  Hey, things are going to get rocky.  You know,

10:31:24 20   just know I got your back.  The next day, June 12th, I got a

         21   phone call from the superintendent, said that there had been a

         22   list of allegations against our school about football

         23   recruiting, about grade changes that needed to be

         24   investigated.  And at the end of the call he told me that it

10:31:44 25   came from Mr. Johnson.  He had given it to him.  And that

10:31:47   1    afternoon Mr. Johnson -- I texted Mr. Johnson about -- he had

2    asked me if I would interview a friend for a potential

3    position.

4         Q.   I'm just going to slow you down just a little bit,

10:32:00   5    Dr. Jones, because you are giving us a lot of information.   I

6    want to make sure we hear, and we're going to break this up

7    just a little bit.

8         A.   Sure.

9         Q.   So at some point you get a call from the

10:32:14  10    superintendent that there's been an investigation -- or

11    allegations are made concerning the football, changing of

12    grades, and recruiting.

13         A.   That's correct.   That was June 12th.   So that was

14    June the 12th.

10:32:29  15         Q.   And what year was that?

16         A.   2019.

17         Q.   And in 2019 once you got this information, who had

18    filed this complaint?

19         A.   The allegation -- I didn't know at the time.   It

10:32:43  20    didn't have a name on it.   It was given to Mr. Johnson.

21    Mr. Johnson then gave it to Superintendent Renfrow, and

22    Superintendent Renfrow called me and asked me about it.   We

23    pulled the list of names, but it was that afternoon, that

24    Monday, June 12th, where Mr. Johnson and I spoke on the

10:33:01  25    telephone about a different matter.   He said, I know why

| | |
|---|---|
| 10:33:04 | 1 |

10:33:04    1    you're calling.  And I said -- talked about a different

               2    matter.  And he said, oh, you don't know about the

               3    allegations?  And I said, well, I do, but I don't know

               4    anything.  He said, they haven't given it to you?  And I said,

10:33:14    5    no.  He said, where are you?  I said, I'm in my office.  He

               6    said, I'm on my way.

               7          He came to Clayton High School and gave me a copy

               8    of the allegations and told me how he came in possession of

               9    them, and we sat in my office for over an hour and kind of

10:33:31   10    went through everything at that time.

            11         Q.   Now, he comes to your office and you guys talk

            12    about these allegation he's turned over to the school

            13    superintendent; correct?

            14         A.   That is correct.

10:33:43   15         Q.   And what documentation did he have?

            16         A.   He had a list of like three pages of allegations

            17    that were given that were kind of outlined that I and the

            18    football coach have been recruiting athletes to play in high

            19    school, that they had specific names on there of students,

10:34:01   20    questioning, and when I got to the third page, I realized that

           21·    under Cleveland High School, the person had put "I."  On the

            22    bullet, everything was in third person in the first two pages.

            23         When I got to Cleveland, they had schools listed,

            24    Fuquay, Garner.  And when it got to Cleveland, the narrative

10:34:30   25    changed from third person to first person.  The person put