| | | |
|---|---|---|
| 10:34:33 | 1 | "I." So I questioned Mr. Johnson. I said, you got this Scott |
| | 2 | Riley, the head football coach in Cleveland. I said, I know |
| | 3 | he has organized meetings with other coaches upset about |
| | 4 | Clayton High School with his allegations and kind of went back |
| 10:34:49 | 5 | to the previous person that was there. And so we went back |
| | 6 | and forth, yup. |
| | 7 | Q. Now, not to dive too far into this, but at some |
| | 8 | point did he show you documentation from a system called Power |
| | 9 | School? |
| 10:35:03 | 10 | A. He did. |
| | 11 | Q. And what is Power School? |
| | 12 | A. Power School was the student database of all files, |
| | 13 | information that was stored for the school system. So it |
| | 14 | would have the students' demographics, grades, historical |
| 10:35:17 | 15 | grades, transcripts. Everything is housed. It's the database |
| | 16 | system for student information. |
| | 17 | Q. Can anybody get students Power School information? |
| | 18 | A. No. |
| | 19 | Q. Are you familiar with FERPA? |
| 10:35:34 | 20 | A. I am. |
| | 21 | Q. What is FERPA? |
| | 22 | A. Federal Education Rights and Privacy Act. |
| | 23 | Q. And does that protect students' information from |
| | 24 | getting into the hands of people that shouldn't have it? |
| 10:35:43 | 25 | A. It does. |

| | | |
|---|---|---|
| 10:35:44 | 1 | Q.   Now, are school -- was he a person that was allowed |
| | 2 | to have this FERPA information under that Act? |
| | 3 | A.   Not under the current -- the current situation at |
| | 4 | that time, to my knowledge.  I imagine school board members |
| 10:35:59 | 5 | are privy to information if they are in a hearing or if they |
| | 6 | are in some other place, but at that point, I had no reason to |
| | 7 | know that he -- he shouldn't have been in possession of it. |
| | 8 | My direct words to him were that, whoever gave this |
| | 9 | to you violated FERPA because this is a student's information. |
| 10:36:16 | 10 | And he responded that he thought it might have come from |
| | 11 | internally from one of -- a person at Clayton High School. |
| | 12 | And I quickly dispelled that, because I noticed at the top of |
| | 13 | the page from the student's historical grades that were |
| | 14 | printed, it said LEA office.  And what I told him is that that |
| 10:36:35 | 15 | means it got printed outside of Clayton High School.  Nobody |
| | 16 | in Clayton High School would have printed that, because if it |
| | 17 | had come from Clayton, it would have said Clayton.  It said |
| | 18 | LEA office which meant that they had to have somebody that had |
| | 19 | high-level access to student records, somebody at a county |
| 10:36:50 | 20 | level instead of a school level. |
| | 21 | Q.   So somebody at a higher level, a county level, had |
| | 22 | to have printed this from the central office? |
| | 23 | A.   Yes.  Somebody with higher-level access.  I'm not |
| | 24 | sure who had higher-level access across the county, but it |
| 10:37:06 | 25 | couldn't come from a school -- it couldn't have come from our |

| | | |
|---|---|---|
| 10:37:07 | 1 | school data manager. |
| | 2 | Q. Now, eventually you were placed on administrative |
| | 3 | leave concerning this particular incident; correct? |
| | 4 | A. I was never placed on leave. The investigation |
| 10:37:23 | 5 | started. That day I called Superintendent Renfrow after |
| | 6 | Mr. Johnson left my office. I called him, told him what had |
| | 7 | happened. It was very transparent with him that, you know, I |
| | 8 | believe that Scott Riley had put this information together, |
| | 9 | had given it to Mr. Johnson. Mr. Johnson had texted me again |
| 10:37:46 | 10 | the day before and said, hey, it's going to get rocky. And I |
| | 11 | told him about that, that it seemed to all be coordinated. |
| | 12 | So they commenced to investigating. It went on for |
| | 13 | about a week and a half. And I was concerned, because when |
| | 14 | the investigation came out -- they came out and investigated |
| 10:38:02 | 15 | everybody on that list and found absolutely nothing, according |
| | 16 | to the HR folks. According to the county office that |
| | 17 | investigated, they found absolutely none of it to be true. |
| | 18 | However, it kept -- they kept asking and probing for more. |
| | 19 | Q. Okay. |
| 10:38:17 | 20 | A. And it was -- |
| | 21 | Q. Now, at some point -- and we're not going to rehash |
| | 22 | your entire investigation. At some point what happened |
| | 23 | concerning your investigation on this? |
| | 24 | A. Sure. June 19th, a week after the investigation |
| 10:38:32 | 25 | had started, I got a text from the defendant. He said that, |

| | | |
|---|---|---|
| 10:38:38 | 1 | you know, I wish you would have believed me when -- when I |
| | 2 | told you I had your back, I wish you would have believed me. |
| | 3 | Hang in there, bro. |
| | 4 | The next day it got posted to JoCo Report, a news |
| 10:38:50 | 5 | article that an investigation was going on. That got leaked |
| | 6 | to WRAL, ABC News, and other news outlets who showed up at the |
| | 7 | school and posted stories about grade allegations and changes |
| | 8 | and recruiting. I was very upset. And so I contacted |
| | 9 | Superintendent Renfrow. He wouldn't answer the phone. So I |
| 10:39:10 | 10 | drove to Smithfield and had a meeting with him in his office, |
| | 11 | expressed my concern and told him that I was going to retain |
| | 12 | counsel because I felt like I was not being protected. The |
| | 13 | next -- |
| | 14 | Q.   And so you retained counsel? |
| 10:39:24 | 15 | A.   Not at that time.  I told him I was going to.  Then |
| | 16 | the next -- the next week Superintendent Renfrow directed me |
| | 17 | to work from home during that summer.  He never put me on |
| | 18 | leave, but I was just directed to not go on campus so that I |
| | 19 | would not -- it would not appear that I was a part of any of |
| 10:39:45 | 20 | the investigation. |
| | 21 | Q.   So you were asked to work from home while they |
| | 22 | conducted this investigation? |
| | 23 | A.   Correct. |
| | 24 | Q.   During that investigation, were you cleared? |
| 10:39:57 | 25 | A.   Not -- eventually.  Eventually, yes.  Not at the |

| | | |
|---|---|---|
| 10:39:59 | 1 | time. At the time they continued to investigate other |
| | 2 | matters. They opened up an anonymous tip line that started |
| | 3 | receiving tips. The summer drug on. And really I had no |
| | 4 | communication other than back and forth of when am I going |
| 10:40:14 | 5 | back, when is this going to be over with, Superintendent |
| | 6 | Renfrow. It continued to delay. He explained the delay to |
| | 7 | me, that it was all coming from the defendant, that he was |
| | 8 | continuing to push it, that I had six board members who were |
| | 9 | in my corner, but he was the one that wasn't. He continued to |
| 10:40:31 | 10 | tell me that it was -- that Mr. Johnson was the one behind it. |
| | 11 | So I believed the superintendent until it got to a point in |
| | 12 | July that I just didn't believe the investigation was fair. |
| | 13 | At that time I filed -- July 20th I filed a grievance with -- |
| | 14 | to three board members complaining about the investigation, |
| 10:40:53 | 15 | how it's been handled, the entire matter. |
| | 16 | Q. Now, eventually did you sue Johnston County Public |
| | 17 | Schools? |
| | 18 | A. No, I never sued the school system. |
| | 19 | Q. Did you end up reaching a settlement with the |
| 10:41:04 | 20 | school? |
| | 21 | A. I did. So long story short, the -- in August is |
| | 22 | where the relationship changed with Mr. Johnson. He found out |
| | 23 | that I was telling people in the community -- or people in the |
| | 24 | community were blaming him for the ongoing investigation, and |
| 10:41:23 | 25 | he reached out -- |

10:41:24  1      Q.   And when he found out -- because I have to ask you

2   questions, Dr. Jones, and I can't just have you up there

3   talking.  So I'm going to ask you some questions and then you

4   are going to answer them; okay?

10:41:36  5      A.   Sure.

6      Q.   I know you're nervous, but just relax.  I'm going

7   to ask you some questions to get this out.

8           So at some point did the defendant change his tone

9   as it relates to you?

10:41:46  10     A.   Yes.

11     Q.   When did that occur?

12     A.   I got a message from him through a mutual friend in

13  early August.  I think it was August 4th of 2019.

14     Q.   And did he realize that you had the community

10:42:04  15  support in relations to this investigation?

16     A.   It was nothing had happened at that time, but he

17  knew that he was catching the heat that was coming in the

18  community.  We met on August 4th.

19     Q.   Where did you guys meet at?

10:42:23  20     A.   Clayton Fitness.  At the parking lot at Clayton

21  Fitness.  My wife went with me and we met, and Mr. Johnson got

22  in my wife's car.  We drove -- we sat at Clayton Fitness for a

23  while and then we drove around talking about what had happened

24  and basically sharing notes at that time.

10:42:45  25     Q.   When you say "sharing notes," what kind of things

| | | |
|---|---|---|
| 10:42:47 | 1 | did he share with you at that time? |
| | 2 | A. That he was not the one that had been pushing the |
| | 3 | information, that he was -- he was trying to help me and that |
| | 4 | he felt like Superintendent Renfrow was blaming him or putting |
| 10:43:00 | 5 | things on him trying to pit us against each other. |
| | 6 | I shared information about the grievance. He |
| | 7 | didn't originally receive my grievance. So I gave it to him |
| | 8 | that night so he could see the information that I had |
| | 9 | obtained. He also -- I had a recording of Dr. Renfrow that I |
| 10:43:17 | 10 | made because I knew something wasn't adding up right and he |
| | 11 | asked for that. |
| | 12 | Q. Did you give him that recording? |
| | 13 | A. I don't remember at that time or not. I know I |
| | 14 | gave him a recording at some point of a conversation with |
| 10:43:32 | 15 | Dr. Renfrow. |
| | 16 | Q. And did you -- tell me about you recording |
| | 17 | Dr. Renfrow. When did that happen? |
| | 18 | A. Throughout June and July of that year. Throughout |
| | 19 | the investigation something wasn't adding up. I just kept |
| 10:43:47 | 20 | asking him, when was this going to be over. He kept telling |
| | 21 | me that, you know, I had the board members support but -- |
| | 22 | Q. And you gave him all the recordings or just one? |
| | 23 | A. I don't recall at that time how many I gave him. I |
| | 24 | had several from all that had happened with Dr. Renfrow, with |
| 10:44:07 | 25 | updates, and so I don't recall at that time. I remember |

| | | |
|---|---|---|
| 10:44:11 | 1 | giving him the pieces of paper, and then he told me he was |
| | 2 | going to send a text. We left the conversation where he said |
| | 3 | he was going to confront Dr. Renfrow and that he was going to |
| | 4 | ask for this to be over with, and if it wasn't over with that |
| 10:44:25 | 5 | he was going to push to get him to resign. |
| | 6 | Q. Now, did Dr. Renfrow eventually leave his post as |
| | 7 | superintendent of Johnston County Public Schools? |
| | 8 | A. He did. |
| | 9 | Q. Was it during this time or later on? |
| 10:44:41 | 10 | A. It was -- so after the -- if I may kind of fill |
| | 11 | that gap in. August 12th, after that meeting, Dr. Renfrow |
| | 12 | reassigned me from Clayton High School to the Choice Plus |
| | 13 | Academy. That's what sparked the public outcry. And that's |
| | 14 | where there were rallies and things that happened in the |
| 10:45:03 | 15 | community. |
| | 16 | Mr. Johnson and I started texting a lot more |
| | 17 | frequently during that time to where he said, you know, I'm |
| | 18 | going to help you. And then Dr. Renfrow resigned on the -- I |
| | 19 | think it was August 27th. So after about a two-week period of |
| 10:45:17 | 20 | that is when he retired -- I'm sorry, retired. Not resigned. |
| | 21 | He retired. |
| | 22 | Q. Now, at the beginning of this saga, he confronted |
| | 23 | you with this documentation that's in these allegations. By |
| | 24 | the end of this saga, he's on your side and he switched and |
| 10:45:36 | 25 | he's trying to help you? |

| | | |
|---|---|---|
| 10:45:38 | 1 | A. Correct. |
| | 2 | Q. At that point you guys -- I think you said that you |
| | 3 | all are texting more and talking more. And why did you begin |
| | 4 | to trust him? |
| 10:45:52 | 5 | A. Point blank, he seemed like the only one that was |
| | 6 | helping. I had gone through the proper channels and felt like |
| | 7 | I was getting no assistance from the superintendent, from any |
| | 8 | of the other board members. They stopped talking to me |
| | 9 | because they said, you know, you filed a grievance and we |
| 10:46:11 | 10 | don't want to get involved. And so I had serious questions |
| | 11 | about the investigation. I continued to raise those questions |
| | 12 | and nobody helped, and he reached out to help. And so at that |
| | 13 | point in time, I told him that I didn't care how it started, |
| | 14 | but I appreciated his help. |
| 10:46:27 | 15 | I told him that I thought it was him. He told me |
| | 16 | it wasn't him. So at that point I made the decision I needed |
| | 17 | help to try to save my career. And so we started texting and |
| | 18 | we formed a friendship there. Honestly, I felt like at that |
| | 19 | point he realized that maybe he had messed up to start with |
| 10:46:45 | 20 | and wanted to try help fix what had been started. |
| | 21 | Q. Once you accepted his support, did he start to |
| | 22 | trust you more? |
| | 23 | A. Absolutely. |
| | 24 | Q. When he started to trust you more, did he ever play |
| 10:47:05 | 25 | any recordings and things for you? |

| 10:47:08 | 1 | A.  He did. |

2  Q.  Tell me about that.  Tell me about the first

3  recording, if you can remember the first one.  If not, the one

4  that sticks out in your mind.

10:47:17  5  A.  So the one that probably sticks out was the first

6  recording -- the first recording.  So after I was reassigned

7  and that process was going on, Dr. Causby was named interim

8  superintendent, and there was a lot of conversation going back

9  and forth.  He and I were texting pretty frequently.  And the

10:47:38  10  night that Dr. Causby informed three of the board members that

11  he -- that he was going to put me back at Clayton High School.

12  It was October 3rd.  Mr. Johnson asked me to meet him that

13  night at the bowling alley.

14  So I met him at the bowling alley with Anita Bland

10:47:56  15  and Kim Winslow, and it was then he was -- he was not only

16  amped up about me going back, but that he had had a

17  conversation with Tracie Zukowski and that she had basically

18  been talking disparagingly against me and he had recorded it.

19  So he played the recording of her and his conversation outside

10:48:20  20  of Buffalo Wild Wings in Smithfield that night, and that was

21  the first recording that he played for me.

22  Q.  Did he later play other recordings for you?

23  A.  He did.

24  Q.  And what are some of the other recordings he would

10:48:38  25  play?

| 10:48:39 | 1 | A. So he had other recordings. Part of the |

10:48:39  1        A.   So he had other recordings.  Part of the

2    conversation when he and I kind of started working together

3    was that he wanted me to talk to people and get recordings.

4    So I shared recordings with him of different people that he

10:48:51  5    wanted me to speak with.  And then as he had conversations

6    with some that he felt like may have been beneficial, he would

7    share those.  The ones he shared with me were the ones of

8    Tracie Zukowski.  He also had one of Dr. Causby when he had a

9    conversation with Dr. Causby of a situation that had happened

10:49:09  10   then.  And then as Dr. Causby left and we moved into March of

11   2020 and the pandemic, I was still -- I had been returned back

12   to Clayton High School.

13        Dr. Causby was then -- I was looking for a full

14   resolution, because when he returned me back to Clayton High,

10:49:29  15   I was on probation.  So I was continuing to work to try to

16   clear all of it and get everything removed from my file which

17   eventually happened.  So we were continuing the conversation.

18   And as I was pushing for the board to do that, he told me

19   about the people on the board who are against me who were

10:49:54  20   Tracie Zukowski and Peggy Smith.

21        So it was after one of the board meetings in April

22   where he had me meet at Clayton Fitness.  I think April or May

23   of 2020.  He had me meet him at Clayton Fitness and he played

24   me some of the conversation that Peggy Smith had said about me

10:50:16  25   during that closed session.

Dr. Thomas Jones - Direct by Ms. James

| | | |
|---|---|---|
| 10:50:18 | 1 | Q. And so this meeting where Peggy Smith and Tracie |
| | 2 | Zukowski is talking about you, that was in a closed session? |
| | 3 | A. Yes. |
| | 4 | Q. How do you know that? |
| 10:50:29 | 5 | A. Because that was where I met him after they had met |
| | 6 | in closed session during that time. It was during the |
| | 7 | pandemic, and so it was during those initials times that were |
| | 8 | going on. Also, our interim superintendent, they were meeting |
| | 9 | pretty frequently, so I wasn't -- I'm not sure exactly which |
| 10:50:47 | 10 | meeting that was other than we met at Clayton Fitness, but I |
| | 11 | know it was in closed session. I had to put in earbuds and |
| | 12 | listen to it on his phone so that it wasn't played out loud. |
| | 13 | Q. And so I just want to walk back through that. So |
| | 14 | you meet at Clayton Fitness. Are you inside? |
| 10:51:05 | 15 | A. Inside. |
| | 16 | Q. And he has an office there; correct? |
| | 17 | A. I think he had an area that was there. We were out |
| | 18 | front by -- right behind the front desk. |
| | 19 | Q. And he played this closed session and he gives you |
| 10:51:20 | 20 | earbuds? |
| | 21 | A. Uh-huh. |
| | 22 | Q. Okay. And you don't play it out loud, but you're |
| | 23 | listening through the earbuds? |
| | 24 | A. Through the earbuds. |
| 10:51:28 | 25 | Q. And it was played from his phone? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 10:51:30 | 1 | A.    That's correct. |
| | 2 | Q.    What did you do with this information once you |
| | 3 | heard this closed session? |
| | 4 | A.    Well, it helped to drive further conversations to |
| 10:51:40 | 5 | know that Dr. Smith, who once I felt like was very much in my |
| | 6 | corner was not.  She called me -- |
| | 7 | Q.    Don't tell me what she said because she's not here |
| | 8 | to testify. |
| | 9 | A.    Sure.  Sure.  The recording.  I heard that |
| 10:51:55 | 10 | information, and so at that point in time, he let me know that |
| | 11 | she was not an ally. |
| | 12 | Q.    Now, did you ever hear another closed session |
| | 13 | concerning Tracey Peedin Jones? |
| | 14 | A.    I heard a piece of the conversation about the hide |
| 10:52:14 | 15 | your money piece.  That was in May of 2020 -- that was in |
| | 16 | 2022.  The only other time I heard -- he would tell us what |
| | 17 | happened in closed session, but not necessarily record it.  I |
| | 18 | met with him right after.  I didn't get my settlement in June. |
| | 19 | We were really pushing for a resolution before Dr. Bracy |
| 10:52:37 | 20 | became superintendent.  He called me when we left, and we met |
| | 21 | over behind the JCC extension office over in Clayton, the |
| | 22 | community building there -- or JCC building over there. |
| | 23 | Q.    And what does JCC stand for? |
| | 24 | A.    Sorry.  Johnston Community College.  They have an |
| 10:52:54 | 25 | annex building over in Clayton.  I took Kim Winslow, and my |

| | | |
|---|---|---|
| 10:52:58 | 1 | wife went with me at that meeting.  That meeting is where we |
| | 2 | fully thought we were going to get the full exoneration and |
| | 3 | resolution at that time, and it got delayed.  So he recounted |
| | 4 | everything that happened in open and closed session. |
| 10:53:12 | 5 | And then the next meeting after that is when I |
| | 6 | reached the settlement.  You asked if I reached a settlement. |
| | 7 | I did reach a settlement with Johnston County Schools at that |
| | 8 | time.  And he didn't play another closed session for me that I |
| | 9 | recall until May of 2022. |
| 10:53:28 | 10 | Q.    What was that? |
| | 11 | A.    That was about -- my contract was up at the same |
| | 12 | time as some others, and so he had been concerned that would |
| | 13 | my contract get renewed.  And so there was a lot of |
| | 14 | conversations that were being had there.  So the day after |
| 10:53:46 | 15 | graduation, I think it was June 4th of '22, we met out at |
| | 16 | Clayton High School.  He came by Clayton High after |
| | 17 | graduation, and that was then that he told me about what |
| | 18 | happened in closed session that -- that there had been |
| | 19 | conversation.  I asked him.  I said, what happened about me? |
| 10:54:03 | 20 | He said, no, you were fine.  He said they tried to mess with |
| | 21 | Tracey Peedin Jones and her contract and played that |
| | 22 | information. |
| | 23 | Q.    And so when he played that information, that closed |
| | 24 | session for you, how did he play that?  How did you listen to |
| 10:54:18 | 25 | that? |

Dr. Thomas Jones - Direct by Ms. James

| | | |
|---|---|---|
| 10:54:18 | 1 | A. Out loud. He only played like a 20-second snippet |
| | 2 | of voices. We were outside the concession stand at Clayton |
| | 3 | High School. |
| | 4 | Q. Did you listen to it out loud? |
| 10:54:29 | 5 | A. Out loud. We were outside. |
| | 6 | Q. Now, the first time you listened on earbuds. The |
| | 7 | second time it was out loud? |
| | 8 | A. That's correct. |
| | 9 | Q. But by this time -- |
| 10:54:37 | 10 | A. That was two years later. |
| | 11 | Q. That was two years later. And he trusted you a |
| | 12 | little more at that point? |
| | 13 | A. I think so. |
| | 14 | Q. Now, did you ever record the defendant's |
| 10:54:55 | 15 | conversations with you? |
| | 16 | A. I did. |
| | 17 | Q. Why did you start recording conversations that you |
| | 18 | had with the defendant? |
| | 19 | A. I never recorded conversations in my life until we |
| 10:55:05 | 20 | got into this saga in 2019. Why I started was because I had |
| | 21 | absolutely no one. Something wasn't adding up from the start. |
| | 22 | And so I researched to make sure that I knew the school board |
| | 23 | policy that you could never record on school grounds. That's |
| | 24 | a school board policy. So I never recorded on school grounds. |
| 10:55:27 | 25 | I didn't do it. But when I had personal conversations that |

| | | |
|---|---|---|
| 10:55:30 | 1 | just weren't adding up, and then I would have people that |
| | 2 | would tell me something and then the very next day it was like |
| | 3 | the opposite would occur.  So I started recording.  That's why |
| | 4 | I started recording different people I was having |
| 10:55:42 | 5 | conversations with.  He was included in that. |
| | 6 | The very first conversation we had in my wife's car |
| | 7 | I recorded.  I had other conversations with him that I |
| | 8 | recorded.  I always assumed he was recording me.  I think at |
| | 9 | some point we got to -- I didn't feel the need to record every |
| 10:55:59 | 10 | conversation, because, honestly, I trusted him by that point |
| | 11 | and I felt like he was on my side.  So I stopped recording |
| | 12 | many conversations throughout those two years.  It wasn't |
| | 13 | until there was some of the drama that started coming back in |
| | 14 | 2022 that I started recording again when I talked him. |
| 10:56:19 | 15 | Q.    And in these conversations, would they be in person |
| | 16 | or? |
| | 17 | A.    They varied. |
| | 18 | Q.    The varied? |
| | 19 | A.    Some were on the phone.  Some were in person. |
| 10:56:30 | 20 | Q.    I want you to -- |
| | 21 | MS. JAMES:  Your Honor, may I approach the witness? |
| | 22 | THE COURT:  Yes, ma'am. |
| | 23 | MS. JAMES:  I'm going to show him 15 through 18. |
| | 24 | (State's Exhibit Numbers 15, 16, 17, and 18 |
| 10:57:52 | 25 | marked for identification.) |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Dr. Thomas Jones - Direct by Ms. James

| | | |
|---|---|---|
| 10:58:22 | 1 | Q. Dr. Jones, I'm showing you what's been marked |
| | 2 | State's Exhibit Numbers 15, 16, 17, and 18. I want you to |
| | 3 | look at each one of those and tell me if you recognize those. |
| | 4 | A. Yes. |
| 10:58:48 | 5 | Q. And are these recordings that you made of the |
| | 6 | conversations between you and the defendant? |
| | 7 | A. Yes. |
| | 8 | Q. Have you listened to these recordings prior to |
| | 9 | court today? |
| 10:59:03 | 10 | A. Yes. |
| | 11 | Q. Are these recordings a true and accurate rendition |
| | 12 | of what happened in these conversations that you had with the |
| | 13 | defendant? |
| | 14 | A. Yes. |
| 10:59:13 | 15 | Q. In these conversations, could you hear both sides, |
| | 16 | you talking and the defendant talking? |
| | 17 | A. Yes. |
| | 18 | Q. And how did you record these conversations? |
| | 19 | A. I was at my house the day that we talked and it was |
| 10:59:36 | 20 | during the summer, and I have another phone at that point so I |
| | 21 | was able to hear the voice and had him on speaker. |
| | 22 | Q. Okay. And that's how you recorded things? |
| | 23 | A. That's how I recorded that one, yes, ma'am. |
| | 24 | MS. JAMES: Your Honor, at this time State would |
| 10:59:54 | 25 | ask to admit State's Exhibits 15, 16, 17, and 18. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Dr. Thomas Jones - Direct by Ms. James

| | | |
|---|---|---|
| 10:59:59 | 1 | THE COURT: Any objection? |
| | 2 | MR. TYNDALL: No objection. |
| | 3 | THE COURT: Received. |
| | 4 | (State's Exhibit Numbers 15, 16, 17, 18 entered |
| 11:00:03 | 5 | into evidence.) |
| | 6 | Q. We'll ask to publish that in a minute, but in |
| | 7 | State's Exhibit Number 15, you named that RJ on 7/1, names of |
| | 8 | students. Now, tell me how that conversation occurred. |
| | 9 | A. In spring of '22 we met at Ronald's house in his |
| 11:00:31 | 10 | driveway kind of before my contract was going on. It was like |
| | 11 | in April before my contract was coming up in May about some of |
| | 12 | those things that had been going on at the school. It was at |
| | 13 | that time he asked me -- he said, hey, if people are at your |
| | 14 | school and they don't live there anymore, how does that work? |
| 11:00:48 | 15 | How does that reassignment process work. And I explained the |
| | 16 | process to him as a principal. He said, oh, okay. He said, I |
| | 17 | might hit you up on something. I said, okay. Didn't really |
| | 18 | think anything else of it. Then when we met after graduation |
| | 19 | when he had played a recording for me, he said, hey, I might |
| 11:01:05 | 20 | -- I have to get with you about the reassignments. I was |
| | 21 | like, okay, just let me know if you've got information. Just |
| | 22 | let me know. |
| | 23 | So it was later in June when some of the |
| | 24 | information came out that was heard in the news regarding |
| 11:01:24 | 25 | Mr. Johnson. And then a podcast was done -- or a Facebook |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 11:01:28 | 1 | Live was done by David Marshburn on June 30th. It was in that |
| | 2 | Facebook Live, and I didn't know him, but he said my name. So |
| | 3 | people alerted me who watched it and said he talked about you |
| | 4 | and your situation. |
| 11:01:45 | 5 | Q. Don't tell me what was said in those podcasts |
| | 6 | because those are not evidence and those people are not here, |
| | 7 | but you heard your name mentioned, you became concerned? |
| | 8 | A. I did. I became concerned. Like how am I getting |
| | 9 | connected with this. So I called -- or I texted Mr. Johnson |
| 11:02:01 | 10 | and then we ended up connecting on the telephone that day. |
| | 11 | And I just asked him, you know, who this guy was, where was |
| | 12 | this coming from. And he conveyed that they were coming after |
| | 13 | him and anybody that had been connected to him. And what I |
| | 14 | said to him was, I said, man, I'm sorry you're going through |
| 11:02:23 | 15 | that. What can I do to help. |
| | 16 | Q. Now, that was the context of this phone call which |
| | 17 | is on State's Exhibit Number 15? |
| | 18 | A. That's correct. |
| | 19 | MS. JAMES: Your Honor, State would ask to publish |
| 11:02:33 | 20 | State's Exhibit Number 15. |
| | 21 | THE COURT: Yes, ma'am. So allowed. |
| | 22 | (State's Exhibit Number 15 published to the |
| | 23 | jury.) |
| | 24 | Q. Was that your conversation you recorded with the |
| 11:04:37 | 25 | defendant? |

Dr. Thomas Jones - Direct by Ms. James

| 11:04:37 | 1 | A. Yes. |

2 Q. I think you made the comment: I thought that was

3 your dude. What was your understanding of the relationship

4 between Owen Phillips and the defendant?

| 11:04:48 | 5 | A. He had told me that he and Owen were really tight, |

6 that he had people that he had built relationships with that

7 were kind of like his crew, his guys, that he told me he had

8 girls as well that would do things for him. He told me that

9 Owen was one of that kind that would always help him out and

| 11:05:06 | 10 | get information. When -- I knew Owen from when he had been in |

11 Clayton and so I knew him, but he had told me that was his

12 bro, that that was his guy.

13 Q. And he said that he was coming after him hard?

14 A. That's correct.

| 11:05:36 | 15 | Q. Did he go into further explaining that or did you |

16 ask?

17 A. I didn't ask.

18 Q. Now, did you ever move these students?

19 A. No.

| 11:05:46 | 20 | Q. Did he ever talk to you about these children being |

21 abused in any way?

22 A. No.

23 Q. Did he bring that up in a separate conversation?

24 A. Never.

| 11:05:56 | 25 | Q. Did he make a report to the school about any of |

| 11:06:00 | 1 | that? |
|---|---|---|

2     A.    No.

3     Q.    From your understanding, what was he asking you to

4  do?

11:06:14  5     A.    The previous conversations about reassignment had

6  been, if you find out somebody who is at your school no longer

7  lives in your district, can you send them to their other

8  school, their base school?  And yes, the practice is, as

9  principal if you find someone is not residing in your

11:06:35  10  district, then you can -- you can have their reassignment to

11  your school revoked and go through that process.

12            I would only do that as a principal and say most

13  principals that I know of would only do that if are some type

14  of extenuating circumstances or some other kind of aggravating

11:06:54  15  factors that would say that the student is not being

16  successful at your school and needs to be back at their base

17  school, their reassignment needs to be revoked.

18     Q.    On July 1st did you discuss all of that or did he

19  just ask you to reassign the children?

11:07:08  20     A.    He said it just like you did.

21     Q.    Okay.  And did you check into whether these kids

22  were going into the right school?

23     A.    No.

24     Q.    Did you look into any of this?

11:07:20  25     A.    No -- well, I knew the students.  I knew both

| | | |
|---|---|---|
| 11:07:23 | 1 | students. I did -- I take it back. I did look up their |
| | 2 | information to find out like who they are, what grades they |
| | 3 | were in. I found out they were students in a program at our |
| | 4 | school, and so I stopped there and didn't do anything with it. |
| 11:07:40 | 5 | Q. What type of program were they in? |
| | 6 | A. Special education. |
| | 7 | Q. And these children are autistic; right? |
| | 8 | A. That is my understanding, correct. |
| | 9 | Q. Now, if -- and the defendant had some follow up |
| 11:08:03 | 10 | phone conversations about this reassignment that you recorded? |
| | 11 | A. Yea. Not -- nothing later that month. It was not |
| | 12 | until August, middle of August. What transpired was I got a |
| | 13 | phone call from Dr. Bracy, the superintendent. |
| | 14 | Q. Was there a complaint filed concerning the possible |
| 11:08:29 | 15 | reassignment of Seth and Ash Phillips? |
| | 16 | A. That is my understanding, yes. |
| | 17 | Q. And there was an investigation, an inquiry launched |
| | 18 | concerning this matter; correct? |
| | 19 | A. Correct. |
| 11:08:42 | 20 | Q. And once this was -- an inquiry was launched, you |
| | 21 | were contacted by Dr. Bracy? |
| | 22 | A. That's correct. |
| | 23 | Q. And once you were contacted by Dr. Bracy, did you |
| | 24 | get some phone calls from the defendant? |
| 11:08:59 | 25 | A. I did. |

Dr. Thomas Jones - Direct by Ms. James

| | | |
|---|---|---|
| 11:09:00 | 1 | Q. And did you all have other conversations about that |
| | 2 | situation? |
| | 3 | A. We did. |
| | 4 | Q. And did you record those? |
| 11:09:11 | 5 | A. I did. |
| | 6 | Q. And that would be State's Exhibits 16, 17, and 18; |
| | 7 | correct? |
| | 8 | A. That's correct. It was -- I think it was all in |
| | 9 | one conversation, but it was cut into pieces. The entire |
| 11:09:24 | 10 | conversation was about I think 16 minutes long. And then |
| | 11 | there was those pieces that were there. |
| | 12 | Q. And you had to break it up because it was a long |
| | 13 | conversation? |
| | 14 | A. So yes. So if I may kind of provide the context. |
| 11:09:43 | 15 | Dr. Bracy called me and asked me directly had Mr. Johnson |
| | 16 | asked me about those students. I told him I didn't want to |
| | 17 | get involved. I did not move the students. And he said, but |
| | 18 | were you asked. I need to know were you asked. And I said |
| | 19 | yes. And that launched the investigation. They asked me |
| 11:10:04 | 20 | would I speak to the attorney investigating. I communicated |
| | 21 | to both Dr. Bracy and Chairman Sutton that I did not feel |
| | 22 | comfortable speaking to the lawyer because of my previous |
| | 23 | experiences with that law firm and their investigation |
| | 24 | tactics. However, Dr. Bracy asked me if I would. I did. |
| 11:10:24 | 25 | And -- |

| | | |
|---|---|---|
| 11:10:26 | 1 | Q. I'm just going to slow you down once again. |
| | 2 | A. Sure. |
| | 3 | MS. JAMES: And I think this would be a good time |
| | 4 | to take a break. Okay? I hate to interrupt you, but ... |
| 11:10:38 | 5 | THE COURT: Ladies and gentlemen, we'll be in |
| | 6 | recess for 15 minutes. Just leave your notes in the seat. |
| | 7 | Please remember, don't talk about this case or let |
| | 8 | anybody else speak with you. Thank you very much. We'll see |
| | 9 | you back in 15 minutes. |
| 11:10:48 | 10 | (Jury exits.) |
| | 11 | THE COURT: Anything before we recess? |
| | 12 | MS. JAMES: Not from the State. |
| | 13 | MR. TYNDALL: No. |
| | 14 | THE COURT: We'll be in recess for 15 minutes. |
| 11:11:40 | 15 | (Recess.) |
| | 16 | THE COURT: You guys ready to bring them back? |
| | 17 | MS. JAMES: Yes, Your Honor. |
| | 18 | THE COURT: Okay. Bring them in. |
| | 19 | (Jury enters.) |
| 11:33:18 | 20 | THE COURT: Ms. James, whenever you are ready. |
| | 21 | MS. JAMES: Thank you, Your Honor. |
| | 22 | Your Honor, may I approach the witness? |
| | 23 | THE COURT: Yes, ma'am. |
| | 24 | MS. JAMES: I'm just walking back up with the last |
| 11:33:28 | 25 | three CDs. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 11:33:32 | 1 | Q. Dr. Jones, I think you stated that these |
| | 2 | conversations were broken up, but it's one conversation. So |
| | 3 | where -- which one of these is the beginning of the |
| | 4 | conversation, was it State's Exhibit Number 17, the opening or |
| 11:33:48 | 5 | the call with Bracy, or after the lawyer recap, or do you |
| | 6 | remember? |
| | 7 | A. I'm honestly not recalling which one is which |
| | 8 | during that point in time. |
| | 9 | Q. But they are all conversations with the defendant? |
| 11:34:06 | 10 | A. They are. They are. The names are pretty similar. |
| | 11 | Q. So let's start with publishing. |
| | 12 | MS. JAMES: May I publish State's Exhibit |
| | 13 | Number 17? |
| | 14 | THE COURT: Yes, ma'am. |
| 11:34:17 | 15 | Q. We'll play a short snippet of that and you'll let |
| | 16 | us know. |
| | 17 | A. Sure. |
| | 18 | (State's Exhibit Number 17 published to the |
| | 19 | jury.) |
| 11:35:06 | 20 | Q. Is that the beginning of the call? |
| | 21 | A. That is the beginning of the call. |
| | 22 | MS. JAMES: And if we can play State's Exhibit |
| | 23 | Number 16. |
| | 24 | (State's Exhibit Number 16 published to the |
| 11:35:49 | 25 | jury.) |

| 11:37:32 | 1 | MS. JAMES: If we can publish Number 18. |
| | 2 | (State's Exhibit Number 18 published to the |
| | 3 | jury.) |
| | 4 | Q. So was that the conversation you had with the |
| 11:40:44 | 5 | defendant after the complaint was made -- or the investigation |
| | 6 | was launched into this? |
| | 7 | A. Yes. |
| | 8 | Q. Now, in State's Exhibit Number 15, I just want to |
| | 9 | make sure we're clear, that was the conversation you asked |
| 11:41:02 | 10 | when you gave -- he gave you the name of the students; |
| | 11 | correct? |
| | 12 | A. Correct. |
| | 13 | Q. What did he ask you to do? |
| | 14 | A. When we first talked about the reassignments, it |
| 11:41:15 | 15 | was about could I revoke a reassignment of individuals. Then |
| | 16 | when we talked the second time, that was kind of the followup |
| | 17 | question. Same thing of, what does that process look like. |
| | 18 | When I talked to him the third time in July, that was where he |
| | 19 | said -- I said, what can I do to help. And he said, I |
| 11:41:35 | 20 | appreciate that. He said, those reassignments. And I said, |
| | 21 | who are they? That's when he said the names. |
| | 22 | And what I took that as, you know, that is -- those |
| | 23 | are the people that I want you to revoke their reassignments |
| | 24 | for. I looked at the information, and that's where I didn't |
| 11:41:52 | 25 | do anything with it. And we never talked about them again |

| 11:41:56 | 1 | until that conversation that you just heard. |
| | 2 | Q. And that was -- was that the last time he talked to |
| | 3 | you about that situation? |
| | 4 | A. Yes. We never talked about it again. |
| 11:42:07 | 5 | Q. Okay. Now, did you ever interview or talk to |
| | 6 | anybody else about that school reassignment that he asked you |
| | 7 | to do? |
| | 8 | A. No. Other than Dr. Bracy and answering Dr. Bracy's |
| | 9 | question about it until Dr. Bracy referred it to the law firm |
| 11:42:30 | 10 | and the lawyer wanted to speak with me about it. And I |
| | 11 | hesitated because I did not have a good interaction with them |
| | 12 | during my situation. But Dr. Bracy told me I really needed to |
| | 13 | answer their questions. So I did. |
| | 14 | Right before that phone call I had spoken to the |
| 11:42:51 | 15 | lawyer, and the lawyer had asked me questions about what had |
| | 16 | happened, and I had answered the questions. And I made it |
| | 17 | very clear that I did not want my name or anything to be |
| | 18 | involved with it. And what happened was immediately that |
| | 19 | lawyer tried to contact Mr. Johnson and then sent them an |
| 11:43:12 | 20 | e-mail. |
| | 21 | So within five minutes of my conversation ending, |
| | 22 | he was calling me to speak with me about that. I didn't |
| | 23 | immediately answer his phone call because I was a little |
| | 24 | offput, but, oh, my gosh, how does he know. So I left school |
| 11:43:30 | 25 | campus. I was on school campus. I left school campus so that |

11:43:33  1    I could record the conversation because I didn't know what he

2    was going to say, but I knew he was mad at me for that

3    information.

4               So that's when I called him and tried to play like

11:43:46  5    I didn't know really what was going on because I didn't want

6    to get involved, but that was -- that was the last

7    conversation.  I think at that point he didn't trust me any

8    longer.

9        Q.    And did you guys continue the relationship that you

11:43:59  10    all did?

11        A.    We didn't speak again.

12        Q.    Now, I think earlier you stated and you were asked

13    about -- you were talking about recordings and things that the

14    defendant said he would have people do for him, and he had

11:44:25  15    these people and Owen was one of them, I think was the vain of

16    the conversation.

17               Did the defendant ever ask you to record people for

18    him?

19        A.    He did.

11:44:36  20        Q.    He did.  Okay.  And tell me about those situations

21    where he would ask you to record people.

22        A.    He asked -- asked me first if I would meet with the

23    Johnston County Republican Chairman Darryl Mitchell.  I did

24    not record that.  He didn't ask.  He just wanted to know what

11:44:55  25    Darryl said.  So I met Darryl.  I did not know him, but I

| | | |
|---|---|---|
| 11:44:59 | 1 | talked to him while my situation was going on back in 2019. |
| | 2 | He also asked me to meet with Michelle Haller who |
| | 3 | was on the GOP board who was an ally, and her minor kids went |
| | 4 | to Clayton and so was friendly. And so she came to my house |
| 11:45:19 | 5 | and he asked me to record her so that he could have that |
| | 6 | information. If she spoke disparagingly about him that he |
| | 7 | could use that against her. |
| | 8 | He also asked if I had other recordings of |
| | 9 | Dr. Renfrow. He asked not specifically for me to record them |
| 11:45:39 | 10 | but to provide him with recordings I had. He asked |
| | 11 | specifically for one with Dr. Smith from July of 2019. So |
| | 12 | there were different ones along that line. |
| | 13 | Q. And who's Dr. Smith? |
| | 14 | A. Dr. Peggy Smith who was on the school board during |
| 11:45:59 | 15 | that time. |
| | 16 | Q. And he asked you for recordings of her? |
| | 17 | A. She had expressed her support for me and then |
| | 18 | called me after I had made my initial grievance against what |
| | 19 | was happening. And again, at that time I didn't know who to |
| 11:46:15 | 20 | trust so I had recorded it. And then he asked for that so |
| | 21 | that he could use that in his conversations with her. |
| | 22 | Q. Did he ever tell you what he was going to do with |
| | 23 | these recordings? |
| | 24 | A. Sometimes he did, sometimes he didn't. It just |
| 11:46:30 | 25 | depended upon who it was. |

| | | |
|---|---|---|
| 11:46:32 | 1 | Q. When he did tell you what he was going to do with |
| | 2 | those recordings, what did he say? |
| | 3 | A. That he would have a conversation with him. He |
| | 4 | would take it to them. For example, there was the night that |
| 11:46:44 | 5 | I was -- it was Dr. Causby told the board I was going to back |
| | 6 | and I met with him at Rainbow Lanes. Dr. Causby actually |
| | 7 | called Mr. Johnson while I was sitting there with him. And |
| | 8 | Dr. Causby expressed that he had spoken with Tracie Zukowski |
| | 9 | who was upset about me going back and indicated that there |
| 11:47:08 | 10 | would be problems with the county commissioners in terms of |
| | 11 | getting funding if I went back to Clayton High School. He |
| | 12 | asked me -- he was like record, record, record. So I recorded |
| | 13 | it on my phone that conversation with Dr. Causby, and then he |
| | 14 | wanted me to give that to him so that he could utilize that in |
| 11:47:26 | 15 | his -- to help me in my situation. |
| | 16 | Q. And in that situation you were going to benefit |
| | 17 | from him using those recordings; right? |
| | 18 | A. Everything at that point in time was to try to help |
| | 19 | get my name cleared from that standpoint. He and I were |
| 11:47:40 | 20 | working together at that point in time. |
| | 21 | Q. Okay. And once you got your job back and you were |
| | 22 | cleared, did you continue to record for him? |
| | 23 | A. We really stopped talking after my settlement in |
| | 24 | 2020. We had a lot of conversation through 2019 to 2020. The |
| 11:48:05 | 25 | election was going on during that year as well, and so he |

| 11:48:08 | 1 | wanted to make sure that -- so I helped campaign for him, |
|---|---|---|
| | 2 | helped spread the word. When I came back and got the |
| | 3 | settlement, you know, we -- we kind of put his name front and |
| | 4 | center in 2020 in our conversations of being on the school |
| 11:48:24 | 5 | board, and so that's where we kind of talked. |
| | 6 | We really -- we had continuing dialogue, but really |
| | 7 | there was no -- my drama was kind of over so it was more of |
| | 8 | just general conversations. Other things that were happening |
| | 9 | in the district, Ms. Zukowski leaving the district. There was |
| 11:48:41 | 10 | other pieces that were going on during that time, but we |
| | 11 | didn't have anywhere near the intense communication between |
| | 12 | the fall of 2020 until really the spring of '22. |
| | 13 | Q. And I do believe you said that he did play closed |
| | 14 | sessions for you May of 2022? |
| 11:49:06 | 15 | A. He did. |
| | 16 | Q. And that was the discussions about Tracey Peedin |
| | 17 | and the contracts; correct? |
| | 18 | A. That, and he also played -- yes, that's correct. |
| | 19 | That's correct. |
| 11:49:24 | 20 | Q. And then he played the hide the money clip? |
| | 21 | A. I did hear that. Yes, he played that for me. |
| | 22 | Q. How long was the clip that you heard? |
| | 23 | A. From the Tracey Peedin Jones one, probably 20 |
| | 24 | seconds. Not a lot of information at all. The hide your |
| 11:49:38 | 25 | money was the clip that's pretty much been publicized in |

| | | |
|---|---|---|
| 11:49:41 | 1 | different pieces.  It was the same clip. |
| | 2 | Q.    The same length? |
| | 3 | A.    Yes.  15, 20 seconds.  Not very long, if I recall |
| | 4 | correctly. |
| 11:50:07 | 5 | Q.    Did you ever testify before the school board about |
| | 6 | this issue? |
| | 7 | A.    I never testified before the school board. |
| | 8 | MS. JAMES:  If I can have just one minute, Your |
| | 9 | Honor. |
| 11:50:23 | 10 | No further questions at this time, Your Honor. |
| | 11 | THE COURT:  Mr. Tyndall. |
| | 12 | CROSS-EXAMINATION BY MR. TYNDALL: |
| | 13 | Q.    Just to be clear.  Mr. Jones, you started recording |
| | 14 | people independent of Mr. Johnson? |
| 11:50:33 | 15 | A.    Correct. |
| | 16 | Q.    And that was because you had problems with the |
| | 17 | school board? |
| | 18 | A.    I did not have any problems with the school board. |
| | 19 | I began recording when the allegations were made in 2019, and |
| 11:50:49 | 20 | Dr. Renfrow told me Mr. Johnson had brought it to him, and |
| | 21 | Mr. Johnson actually brought it to me and said he was trying |
| | 22 | to help.  There was just different dialogue.  That's when I |
| | 23 | started recording on that date. |
| | 24 | Q.    It's fair to say you didn't know who to trust in |
| 11:51:04 | 25 | that? |

| 11:51:05 | 1 | A.   That's fair to say. |
| | 2 | Q.   You mentioned ultimately you didn't trust the |
| | 3 | board's attorney investigating the case.  You didn't feel like |
| | 4 | they treated you fairly? |
| 11:51:12 | 5 | A.   I did.  I filed a grievance. |
| | 6 | Q.   Now, when you -- when a person gets information, |
| | 7 | whether it's in the community or -- are they supposed to |
| | 8 | report it to someone about -- you know, let's say it's an |
| | 9 | allegation of misconduct, isn't there a process where the |
| 11:51:33 | 10 | person is supposed to report? |
| | 11 | A.   It would depend upon the level of -- of actions, I |
| | 12 | would imagine, speaking hypothetically.  I'd have to know what |
| | 13 | it is in terms of what their duty to record is. |
| | 14 | Q.   If an individual board member who receives a |
| 11:51:53 | 15 | complaint or inquiry from a parent or interested citizen |
| | 16 | concerning a school matter, we'll refer the complainant to the |
| | 17 | appropriate school administrator.  Are you aware of that |
| | 18 | policy? |
| | 19 | A.   Yes. |
| 11:52:05 | 20 | Q.   I'm sorry? |
| | 21 | A.   Yes, I'm aware. |
| | 22 | Q.   So if Mr. Johnson received information about a |
| | 23 | football player who's ineligible and he gets that information, |
| | 24 | he is supposed to report it to you, right, if it's about your |
| 11:52:19 | 25 | school? |

11:52:20  1      A.    Not necessarily to me.  It would depend upon kind

2    of what the nature of the investigation is and where it was,

3    whether that was to the principal or county athletic director,

4    the superintendent.  It would depend upon where that

11:52:33  5    information came from.

6         Q.    Is it fair to say he's not supposed to just ignore

7    it?

8         A.    I believe that's fair to say.

9         Q.    Now, when this investigation started into your

11:52:43  10   school, and I don't want to spend a ton of time on this, but

11   there were a lot of people involved in that investigation.

12        A.    There were.

13        Q.    And when you heard from Mr. Johnson that he

14   supported you, you then started recording conversations not

11:52:58  15   only with him but with other people; is that fair to say?

16        A.    The first recording I made was on June 12th, 2019,

17   which was the day the allegations were brought to my

18   attention, and that was of Dr. Renfrow and Renfrow's

19   conversation because of the inaccuracies between his recant of

11:53:18  20   how the information was obtained and Mr. Johnson, what he had

21   shared with me in my office.  So at that point in time the one

22   and one didn't add up to two, and so at the very beginning I

23   was skeptical of where this all came from and who was

24   involved.

11:53:33  25        Q.    And did you learn that there were people on the

| | | |
|---|---|---|
| 11:53:35 | 1 | school board who were adverse to your position? |
| | 2 | A.   I did not learn that at the time.  I did learn that |
| | 3 | afterwards that there were people -- I mean, that people took |
| | 4 | stances as the investigation went on. |
| 11:53:49 | 5 | Q.   Right.  As the investigation went on, they took |
| | 6 | stances in opposition to you. |
| | 7 | A.   That's correct. |
| | 8 | Q.   And in opposition to your football coach and things |
| | 9 | like that. |
| 11:54:00 | 10 | A.   That is my understanding, yes. |
| | 11 | Q.   So you were recording the superintendent of |
| | 12 | schools? |
| | 13 | A.   Correct. |
| | 14 | Q.   Now, Dr. Jones, you talked a little bit about the |
| 11:54:16 | 15 | transfer that Mr. Johnson requested you to make. |
| | 16 | What -- people or students are assigned to the school based on |
| | 17 | where they live; is that right? |
| | 18 | A.   That is correct.  Residency is the number one piece |
| | 19 | of where they are assigned to school. |
| 11:54:38 | 20 | Q.   So if a mother lives in Smithfield, South 4th |
| | 21 | Street, those students are not assigned to Clayton school; is |
| | 22 | that right? |
| | 23 | A.   That is correct.  That's not in the boundary. |
| | 24 | Q.   If the father lives in Garner, that's not the |
| 11:54:54 | 25 | appropriate place for the student to go to school; isn't that |

| | | |
|---|---|---|
| 11:54:57 | 1 | correct? |
| | 2 | A.    That is correct.  They would not qualify for |
| | 3 | residency -- for a residency to attend in a residency |
| | 4 | boundary. |
| 11:55:07 | 5 | Q.    So if a person knew those two things and reported |
| | 6 | that to you, it would be your obligation as the school |
| | 7 | administrator to investigate that at least? |
| | 8 | A.    To look into do they have an approved reassignment. |
| | 9 | There are approved reassignments where people may live outside |
| 11:55:25 | 10 | of the district attendance boundary but still attend your |
| | 11 | school.  That could be for programs.  It could also be for any |
| | 12 | other factors to why they might request reassignment to your |
| | 13 | schools so I would have to investigate, yes. |
| | 14 | Q.    But you would have to look into it? |
| 11:55:41 | 15 | A.    That's correct. |
| | 16 | Q.    That's called a waiver if the person is not in your |
| | 17 | district; is that right? |
| | 18 | A.    It's a reassignment. |
| | 19 | Q.    I'm sorry? |
| 11:55:50 | 20 | A.    It's a reassignment. |
| | 21 | Q.    To your school or to a different school? |
| | 22 | A.    They have a reassignment to my school.  If I find |
| | 23 | out that they don't live there and don't have a |
| | 24 | reassignment -- approved reassignment, then I can have them |
| 11:56:06 | 25 | fill out a reassignment form to stay, or I could revoke their |

| | | |
|---|---|---|
| 11:56:12 | 1 | opportunity to be there and tell them they have to go to their |
| | 2 | base school or the school where they're domiciled. |
| | 3 | Q. It requires some action on your part to |
| | 4 | investigate. |
| 11:56:20 | 5 | A. Correct. |
| | 6 | Q. I mean, you just can't say, I'm reassigning this |
| | 7 | person. |
| | 8 | A. We -- the principal does not have the power to |
| | 9 | reassign. That's correct. |
| 11:56:30 | 10 | Q. So it would be your job to investigate and then to |
| | 11 | follow up; is that right? |
| | 12 | A. That's correct. |
| | 13 | Q. Now, is it fair to say, Dr. Jones, over the years |
| | 14 | you cultivated a relationship with Mr. Johnson? |
| 11:57:11 | 15 | A. Yes. |
| | 16 | Q. And it was -- a lot of that relationship related to |
| | 17 | school board or school activities. |
| | 18 | A. Yes. Especially in the beginning. There were |
| | 19 | conversations where it morphed outside of school, but the |
| 11:57:26 | 20 | predominant majority of our conversations centered around |
| | 21 | school matters. |
| | 22 | Q. It related to the functioning and the operation of |
| | 23 | your school. |
| | 24 | A. In some -- it could be, or the district, or other |
| 11:57:38 | 25 | things going on in the district. |

| | | |
|---|---|---|
| 11:57:39 | 1 | Q. Well, you, as principal, you needed allies |
| | 2 | throughout the school district to get things that benefited |
| | 3 | your school. That was part of your job as the principal; |
| | 4 | isn't that fair to say? |
| 11:57:49 | 5 | A. One of the responsibilities of principal is |
| | 6 | external development, external leadership. So yes, part of |
| | 7 | our role as principal is to forge meaningful relationships |
| | 8 | with different elected leaders, community leaders, business |
| | 9 | leaders as well. So yes, that was part of my |
| 11:58:05 | 10 | responsibilities. |
| | 11 | Q. And you forged that kind of relationship with |
| | 12 | Mr. Johnson. |
| | 13 | A. Correct. |
| | 14 | Q. And he supported a lot of the causes that you |
| 11:58:11 | 15 | supported; isn't that fair to say? |
| | 16 | A. Correct. |
| | 17 | Q. At your high school. |
| | 18 | A. He did. |
| | 19 | Q. I mean, when you wanted to -- when you wanted the |
| 11:58:19 | 20 | community's rec department to build a turf at your school, he |
| | 21 | supported you in that. You were really appreciative of that; |
| | 22 | is that fair to say? |
| | 23 | A. I was. That is fair. |
| | 24 | Q. He often showed up at your school to support events |
| 11:58:33 | 25 | and things like that. |

Dr. Thomas Jones - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 11:58:34 | 1 | A.    Not often, but he did when his schedule allowed or |
| | 2 | if we had an event going, he was -- I would invite board |
| | 3 | members, but he did attend. |
| | 4 | Q.    He was a very -- was it fair to say that he was a |
| 11:58:46 | 5 | very active member of the board of education in the schools? |
| | 6 | A.    I don't know the term of active.  He came to our |
| | 7 | school, so not any more than other board members had at some |
| | 8 | point in time.  I felt like if we had events going on, he |
| | 9 | would come.  But that was not any more outside the norm than |
| 11:59:10 | 10 | other board members. |
| | 11 | Q.    And you had a lot of communication with |
| | 12 | Mr. Johnson; is that right? |
| | 13 | A.    That's correct. |
| | 14 | Q.    And did you -- is it fair to say that there were |
| 11:59:27 | 15 | people on the board of education who were adverse to you or |
| | 16 | you felt were adverse to you? |
| | 17 | A.    No.  When before -- prior to?  No, I felt like I |
| | 18 | had a great relationship with everybody in the district, and |
| | 19 | it was only until the allegations came out in 2019 where there |
| 11:59:50 | 20 | started to be some divisive nature on the board in terms of |
| | 21 | support. |
| | 22 | Dr. Renfrow had told me in those initial |
| | 23 | communications that I had all six supporting me except for |
| | 24 | Mr. Johnson, and at some point that changed to the point that |
| 12:00:07 | 25 | when my settlement was reached in 2020, it was a 5 to 2 vote. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 12:00:11 | 1 | So there were people on the board that were not -- that did |
| | 2 | not vote in favor of that resolution. |
| | 3 | Q.    You say Dr. Renfrow told you that, but you started |
| | 4 | recording Dr. Renfrow. |
| 12:00:23 | 5 | A.    I did. |
| | 6 | Q.    And you started recording other members of the |
| | 7 | board of education; is that right? |
| | 8 | A.    I didn't really talk to any members of the board of |
| | 9 | education during that initial part of the investigation except |
| 12:00:32 | 10 | for Mr. Johnson's text messages when he texted me right before |
| | 11 | it started, then right before it went public, and then the |
| | 12 | only person I really talked to outside of that -- I tried to |
| | 13 | reach out to the three. I talked to Dr. Smith during July of |
| | 14 | 2020. I talked to Todd Sutton right after the allegations |
| 12:00:53 | 15 | that were there. And those were really the only two I spoke |
| | 16 | with outside of Mr. Johnson initially. |
| | 17 | As the event ran along, I did meet with Theresa |
| | 18 | Grant during that point. I had some brief conversations with |
| | 19 | Ms. Sessoms, but nothing about those. Those were just |
| 12:01:11 | 20 | interactions when I ran into her. |
| | 21 | But Dr. Smith, I went and presented at her class at |
| | 22 | Campbell in July. That was really -- July of 2020, and that |
| | 23 | was the first time -- I'm sorry, July 2019 -- of 2019 that I |
| | 24 | went and spoke at her class at Campbell and that was where she |
| 12:01:29 | 25 | and I had the conversations about the allegations of abuses |

12:01:32  1   that were going on there.

2            Q.   But it turned out that despite what Dr. Renfrow

3       told you there were people on the board that did not support

4       you; isn't that fair?

12:01:40  5        A.   Over time, yes, that became apparent.

6            Q.   Well, the "over time" part is the investigation

7       part; right?

8            A.   Yes.

9            Q.   I mean, they were investigating the allegations and

12:01:51  10      their opinions changed to the point that they did not support

11      you after the investigation; is that right, Dr. Jones?

12           A.   I can't speak to whether they did -- what they

13      did when they decided make their determination.  I could tell

14      you that I felt like there were -- there were a couple of

12:02:13  15      board members who I felt like were against me going back to

16      Clayton High School.

17           Q.   Now, you mentioned that you met with Mr. Johnson at

18      the Johnston Community College; is that right?

19           A.   Yes.

12:02:27  20           Q.   Did you understand that he was teaching at the

21      Johnston Community College at the time?

22           A.   I did know.

23           Q.   You said that you met with him at Clayton Fitness;

24      is that right?

12:02:36  25           A.   That is correct.

| 12:02:38 | 1 | Q. And did you understand he had an office at Clayton |
| | 2 | Fitness? |
| | 3 | A. He told me he had a room. He had a key. He told |
| | 4 | me he was allowed to go to work out, that he knew the owner |
| 12:02:48 | 5 | and he would go and work out at night and had different things |
| | 6 | where he would kind of use that as an office and had meetings |
| | 7 | at Clayton Fitness. |
| | 8 | Q. His other job was being a detective with the |
| | 9 | Smithfield Police Department at the time; is that right? |
| 12:03:00 | 10 | A. That is correct. |
| | 11 | Q. You were asked to provide information about |
| | 12 | different political situations. GOP members, you were meeting |
| | 13 | with them, and he asked you to report that information back to |
| | 14 | him; is that right? |
| 12:03:29 | 15 | A. Yes. |
| | 16 | Q. And you were -- is it fair to say in politics |
| | 17 | people share information so that they can hope to stay elected |
| | 18 | and get elected? |
| | 19 | A. I'm sure there's dialogue. |
| 12:03:44 | 20 | Q. Well, and you were -- you were gathering |
| | 21 | information and sharing information to promote your agenda |
| | 22 | too; is that right? |
| | 23 | A. No. When I first met them, my sole agenda was to |
| | 24 | dispel the allegations and to return back to Clayton High |
| 12:04:02 | 25 | School as principal. That was -- |

Dr. Thomas Jones - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 12:04:04 | 1 | Q. Well, let me ask it a different way. |
| | 2 | A. -- when I first met them. |
| | 3 | Q. Did you feel like you should be principal of |
| | 4 | Clayton High School? |
| 12:04:10 | 5 | A. Absolutely. |
| | 6 | Q. And did you feel like you were the best person for |
| | 7 | that job? |
| | 8 | A. 100 percent. |
| | 9 | Q. And so part of -- when I say agenda, I don't mean |
| 12:04:18 | 10 | it in a bad way. Your agenda was to be the principal of |
| | 11 | Clayton High School; is that a fair assessment? |
| | 12 | A. That is a fair assessment. |
| | 13 | Q. And help the students going to Clayton High School; |
| | 14 | is that a fair assessment? |
| 12:04:27 | 15 | A. That is a fair assessment. |
| | 16 | Q. So you built these coalitions with people trying to |
| | 17 | get back in your job; is that fair to say? |
| | 18 | A. Yes. I will say, to answer your question, that in |
| | 19 | the initial part of the investigation in June and July I |
| 12:04:43 | 20 | really had no allies. I wasn't really getting a lot of |
| | 21 | information. A lot of misinformation. Feeling like it was |
| | 22 | going to be resolved, but yet it wasn't being resolved. And |
| | 23 | it continued to be pointing the finger at Mr. Johnson until he |
| | 24 | and I talked. |
| 12:05:00 | 25 | When he and I talked on August 4th, he made it very |

| | | |
|---|---|---|
| 12:05:04 | 1 | clear that he was not and that he was an ally, and it was at |
| | 2 | that time where we started sharing information regarding that. |
| | 3 | So yes, I did build that ally or that coalition at that point |
| | 4 | in time with him with the goal of, A, quashing the |
| 12:05:23 | 5 | investigation and the allegations that had been going on; and |
| | 6 | B, remaining in my position at Clayton High School and |
| | 7 | returning to my position at Clayton when I was reassigned. |
| | 8 | Q. Did you ultimately do that? |
| | 9 | A. Yes. |
| 12:05:56 | 10 | Q. Did you ask him to provide information to you about |
| | 11 | what other board members were saying about you? |
| | 12 | A. Yes. We shared information back and forth. |
| | 13 | Q. I mean, you sort of asked -- I mean, you wanted to |
| | 14 | know what their positions were to benefit your situation; is |
| 12:06:09 | 15 | that right? |
| | 16 | A. Absolutely. |
| | 17 | Q. Now, eventually, Dr. Jones, did you decide to leave |
| | 18 | the district? |
| | 19 | A. I did. |
| 12:06:54 | 20 | Q. Was there a time when you wanted to get out of your |
| | 21 | contract? |
| | 22 | A. I asked for a release from my contract. My |
| | 23 | contract required a 60-day period, and when I was offered a |
| | 24 | job at the University of North Carolina system, it was my |
| 12:07:16 | 25 | desire to start in November. So I asked for that -- to be |

| | | |
|---|---|---|
| 12:07:22 | 1 | released from the contract, yes. |
| | 2 |      Q.   Who did you have to ask for that? |
| | 3 |      A.   Dr. Bracy, then the board of education. |
| | 4 |      Q.   And that was -- the chair of the board of education |
| 12:07:31 | 5 | was Todd Sutton at that time? |
| | 6 |      A.   That is correct. |
| | 7 |      Q.   And did you make it a condition of releasing you |
| | 8 | from that that you would go to a closed board meeting and |
| | 9 | confront Mr. Johnson. |
| 12:07:42 | 10 |      A.   No. |
| | 11 |      Q.   Did he ask you to go to a closed board meeting and |
| | 12 | confront Mr. Johnson? |
| | 13 |      A.   No. |
| | 14 |      Q.   Did you ever go to a closed board meeting and |
| 12:07:49 | 15 | confront Mr. Johnson? |
| | 16 |      A.   Yes. |
| | 17 |      Q.   And who initiated that? |
| | 18 |      A.   I did. |
| | 19 |      Q.   So you went to his closed board meeting? |
| 12:07:58 | 20 |      A.   I went to a board session that was a regularly |
| | 21 | scheduled meeting.  It was a meeting, and I had asked |
| | 22 | Dr. Bracy and Chairman Sutton when I made my intention that I |
| | 23 | was going to accept the job and leave the district, I made it |
| | 24 | very clear that up to that time I did not -- after the August |
| 12:08:19 | 25 | conversation that you heard that I had been targeted by |

| | | |
|---|---|---|
| 12:08:25 | 1 | Mr. Johnson before, and I felt like I was in peril being |
| | 2 | targeted again if he felt I was an enemy.  So that's why I |
| | 3 | wanted to be released from the contract as early as possible |
| | 4 | once I got the job so I could leave the district and not |
| 12:08:42 | 5 | interfere. |
| | 6 | I was afraid that 60 days would give time for some |
| | 7 | type of allegation, something else to be -- to start that |
| | 8 | might impact my employment opportunities.  It had happened |
| | 9 | before.  It happened in 2019 when I was -- when that |
| 12:08:59 | 10 | investigation was going on that I was trying to leave the |
| | 11 | district for another job, and it was -- I wasn't released. |
| | 12 | They continued to hold those allegations over my head and I |
| | 13 | lost that job opportunity, and I did not want that to happen |
| | 14 | again with this job opportunity so I asked to be released from |
| 12:09:16 | 15 | my contract. |
| | 16 | Q.   You asked to be released from your contract.  Did |
| | 17 | they immediately say yes? |
| | 18 | A.   No.  I had to submit a formal letter of |
| | 19 | resignation.  And in that letter of resignation I asked for |
| 12:09:30 | 20 | that release to Dr. Bracy, and I also asked if I could stay |
| | 21 | involved with that graduating class and attend the graduation |
| | 22 | ceremony in January and then June of that year to finish out |
| | 23 | that class of students who I had been their principal.  So I |
| | 24 | had those two things in a letter to present and that |
| 12:09:50 | 25 | had -- that was the letter that I went to present. |

12:09:55    1       Q.    Did they let you out of it?

            2       A.    They did.

            3       Q.    Did they let you out of it before the closed

            4   session?

12:10:02    5       A.    There was not an official approval or request

            6   granted other than Dr. Bracy saying, we're not going to hold

            7   you to the contract as my direct supervisor.

            8       Q.    Well, did they tell you that before or after the

            9   closed session when you confronted Mr. Johnson?

12:10:20   10       A.    I didn't get an answer one way or the other, other

           11   than I submitted the letter of resignation.  I asked for that

           12   information.  That information was given in that closed

           13   session meeting, said, yes, that's not a problem, we can do

           14   that.  I said, thank you very much.

12:10:36   15             I was turning to leave and some of the board

           16   members had some comments, and Mr. Johnson had a comment, and

           17   it was at that time that Mr. Johnson had a comment that I

           18   asked could I share information and have a moment of personal

           19   privilege to speak, and it was granted, and that's when I said

12:11:00   20   what I said about Mr. Johnson.

           21       Q.    And that was at a closed session?

           22       A.    That's correct.

           23       Q.    And closed sessions deal with personnel matters?

           24       A.    That's correct.

12:11:08   25       Q.    Not to -- not for personal grievances; is that fair

| | | |
|---|---|---|
| 12:11:11 | 1 | to say? |
| | 2 | A.   It's not my meeting to determine that, but that is |
| | 3 | my understanding of why we were in closed session. |
| | 4 | Q.   Now, do you remember going to something called Eggs |
| 12:11:22 | 5 | & Issues in 2023? |
| | 6 | A.   Sure do. |
| | 7 | Q.   Do you remember meeting Michelle Antoine at that |
| | 8 | meeting? |
| | 9 | A.   I didn't meet her.  I ran into her at the event. |
| 12:11:32 | 10 | Q.   Do you remember talking to her about that issue? |
| | 11 | A.   I talked to her about several issues.  I don't |
| | 12 | necessarily recall which aspect, but we talked for a bit of |
| | 13 | time. |
| | 14 | Q.   Do you remember telling her that Todd Sutton and |
| 12:11:45 | 15 | Dr. Bracy told you they wouldn't let you out of your 60-day |
| | 16 | contract -- |
| | 17 | A.   No. |
| | 18 | Q.   -- unless you -- |
| | 19 | A.   No. |
| 12:11:51 | 20 | Q.   -- confronted Mr. Johnson? |
| | 21 | A.   No. |
| | 22 | Q.   Now, when you first met Mr. Johnson -- or it wasn't |
| | 23 | when you first met him, but he alerted you to the |
| | 24 | investigation; is that right? |
| 12:12:52 | 25 | A.   That is correct. |

Dr. Thomas Jones - Cross by Mr. Tyndall

12:12:54  1          Q.    And ultimately he supported you going to Clayton

2    High School; is that correct?

3          A.    Ultimately, yes.

4          Q.    And your conclusion was a rival football coach came

12:13:04  5    up with the allegation.

6          A.    He told me a rival football coach gave him the

7    information.

8          Q.    There was a full investigation?

9          A.    There was.

12:13:13  10         Q.    Not everybody was in support of it; is that fair to

11   say, Dr. Jones?

12         A.    In terms of --

13         Q.    Not all the board members were supportive?

14         A.    Of the return, correct.

12:13:24  15         Q.    And the allegations were that ineligible people

16   were playing; is that right?

17         A.    The allegations that he presented were that there

18   had been transfers from other schools that had been recruited

19   to come to Clayton High School specifically to play football,

12:13:48  20   and then that possibly there were some grade changes to help

21   make them eligible.  And there was one particular case that

22   they said that a student had received more credits than what

23   was possible when he came in, and that was the one that had

24   the historical grades.  That was the FERPA violation, and

12:14:11  25   that's the information, you know, that I shared during that

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

12:14:15    1    point in time.

            2        Q.    And this is something Mr. Johnson reported to you

            3    and to the superintendent; is that fair to say?

            4        A.    He told me on Sunday it was coming.  On Monday

12:14:26    5    Dr. Renfrow called me and told me, but when I talked him

            6    Monday afternoon on June 12th of 2019, he was a little aghast

            7    that they didn't give me the allegations.  He said, they

            8    didn't give you the sheet, the list?  And that's when he said,

            9    I'll come by and give it to you.  So we sat in my office and

12:14:46   10    went person by person.  It was at that time that I told him I

           11    knew Scott Riley wrote it.  I knew that Scott Riley had been

           12    meeting with other football coaches to try to coordinate some

           13    type of complaints.  And so it kind of was dismissed at that

           14    point in time.  He said that it came from other places.

12:15:04   15            It wasn't until we met on August 4th in my wife's

           16    car at Clayton Fitness that he told me that a teacher from

           17    Cleveland who worked with Scott Riley coordinated for them to

           18    talk, a lady named Michelle Corbett, that she had communicated

           19    with him on June 7th so that they had information that they

12:15:26   20    were going to give to him, and that's how I knew at that

           21    point.  He confirmed that that's where he got it from to me,

           22    and so that's where -- he was really upset that it had

           23    been -- that he was the one to blame for the whole

           24    investigation going on.  So our focus came on not how it

12:15:45   25    started but how it would be -- how the resolution would be

12:15:49  1   found.

2   Q.   Right.  So he presented that to you.  They weren't

3   his allegations.  They were things somebody gave him; is that

4   right?

12:16:00  5   A.   That's correct.

6   Q.   And the school conducted a full investigation;

7   isn't that right?

8   A.   The school -- well, the county office did.

9   Q.   Right.  And the school board member would not be

12:16:14  10  serving the community to ignore allegations like that; would

11  they, Dr. Jones?

12  A.   So whether or not a school board member should be

13  involved in that -- it was supposedly received anonymously,

14  but then it wasn't.  That's not for me to say whether school

12:16:30  15  board members should or shouldn't retain that information.

16  Q.   Is it fair to say people who aren't eligible should

17  not be getting special treatment; isn't that fair to say?

18  A.   If there are any concerns about eligibility,

19  there's a process that goes through.  That would be submitted

12:16:47  20  to the county athletic director, the high school athletic

21  association, they would work through their processes to

22  determine if there's ever any question of eligibility

23  regarding any person anywhere as long as you are a member of

24  the North Carolina High School Athletic Association.  And so

12:17:05  25  it was unique that a coach would give that information to a

| | | |
|---|---|---|
| 12:17:11 | 1 | board member versus giving it to his principal or the county |
| | 2 | athletic director or some other entity with the power to |
| | 3 | investigate instead of a school board member. |
| | 4 | Q.   Is the policy, the role of board members in |
| 12:17:25 | 5 | handling complaints to say the following:  An individual board |
| | 6 | member who receives a complaint or inquiry from a parent or |
| | 7 | interested citizen concerning a school board matter who refer |
| | 8 | the complainant to the appropriate school administrator. |
| | 9 | A.   Yes.  I'm not sure when that policy was enacted. |
| 12:17:41 | 10 | There was a time policy enacted.  So I'm not sure what was in |
| | 11 | play in 2019, but I know that policy exists. |
| | 12 | Q.   Doctor, is -- |
| | 13 | MR. TYNDALL:  May I have just a second, Your Honor? |
| | 14 | THE COURT:  Yes, sir. |
| 12:19:03 | 15 | Q.   Just to follow up.  You were involved in the |
| | 16 | political process as well in the county.  You ran for county |
| | 17 | commissioner. |
| | 18 | A.   That is correct, in 2024. |
| | 19 | Q.   So you were -- I mean, you were out and about in |
| 12:19:16 | 20 | the community trying to promote your political agenda; is that |
| | 21 | fair to say? |
| | 22 | A.   No.  I never considered running for office while I |
| | 23 | was a principal.  I would have stayed a principal during that |
| | 24 | time.  I finished my doctorate to become a superintendent.  My |
| 12:19:33 | 25 | career plans were to become a school superintendent, and so |

| | |
|---|---|
| 12:19:36 | 1 |

12:19:36  1   that was my career path moving forward.  I only decided to
         2   enter into local politics in the earlier -- in 2020 -- the
         3   very end of 2023 when I was in communication with some local
         4   folks and was asked to run for county commissioner.

12:19:55  5        Q.   And just to follow up on the recordings that you
         6   made, Dr. Jones.  You would sometimes send those to
         7   Mr. Johnson unsolicited; is that fair to say?

         8        A.   I don't recall it being unsolicited.  We would have
         9   conversations about either who I spoke with, who he spoke

12:20:17 10   with.  He had his people.  I had my people.  So there would be
        11   conversations.  He had multiple conversations with people
        12   across the county.  And so honestly, when they would coincide
        13   or when he would say some kind of conversation, most of our
        14   recordings and the information was contained to the school

12:20:37 15   board and those pieces or the local politics.

        16             He told me he wanted to be sheriff and that they
        17   were going to be taking over the Republican Party.  So that
        18   was part of why we needed some recordings of some people to be
        19   able to influence local politics.

12:20:56 20        Q.   Influencing local politics is what politician do;
        21   isn't that fair to say, Dr. Jones?

        22        A.   To what manner or ethical behavior they follow, I
        23   don't know that.  Politicians are politicians.

        24        Q.   Well, your ethical behavior was to record people;
12:21:12 25   is that right?

| | | |
|---|---|---|
| 12:21:13 | 1 | A.    I was faced with no other choice than to try to |
| | 2 | fight for my job, for my career, for my family.  I was |
| | 3 | attacked and my school was attacked.  My football coach was |
| | 4 | attacked.  My credibility was attacked.  It went public in |
| 12:21:27 | 5 | nine days from the time the allegations went public.  Nobody |
| | 6 | took ownership of that.  I don't know how it went public.  An |
| | 7 | internal investigation that was supposed to be done went |
| | 8 | public, but I know it was printed first in the JoCo Report. |
| | 9 | I found out later that the JoCo Report was running |
| 12:21:43 | 10 | stories by Mr. Johnson before he published them.  He told me |
| | 11 | that he was.  So at that point in time when I'm going through |
| | 12 | facing that, I didn't trust anyone other than my family and my |
| | 13 | close friends. |
| | 14 | When I met with Mr. Johnson, I never -- I knew he |
| 12:21:59 | 15 | was the one that had started it with those allegations, but I |
| | 16 | put that aside because I needed help and nobody was helping me |
| | 17 | to do that.  So I had to resort to some tactics that I was not |
| | 18 | that comfortable with, but in order to get to where I needed |
| | 19 | to get to for my family and profession, then yes, I recorded |
| 12:22:26 | 20 | individuals.  I recorded individuals at his request. |
| | 21 | Q.    And it ultimately helped get your job back; isn't |
| | 22 | that right? |
| | 23 | A.    It did.  When I met with Dr. Causby when he found |
| | 24 | out I had recordings of what Dr. Renfrow had been telling me, |
| 12:22:43 | 25 | then when his story didn't match what had actually happened, |

| | | |
|---|---|---|
| 12:22:46 | 1 | then that -- it helped to solidify that I was the one actually |
| | 2 | telling truth.  And all those allegations were debunked, and I |
| | 3 | was completely cleared of anything, of any wrongdoing. |
| | 4 | Q.    And without those recordings, you wouldn't have |
| 12:22:59 | 5 | gotten your job back; would you, Dr. Jones? |
| | 6 | A.    I would like to think that the truth would have |
| | 7 | prevailed.  I wasn't so sure.  Sometimes I needed evidence to |
| | 8 | truly capture that what I said happened actually happened. |
| | 9 | Q.    Your implication was that Mr. Johnson was asking |
| 12:23:16 | 10 | you for recordings.  Do you remember sending him a recording |
| | 11 | of a teacher using the N word in class? |
| | 12 | A.    I did. |
| | 13 | Q.    He didn't ask you for that; did he? |
| | 14 | A.    We had a conversation about it on the telephone. |
| 12:23:27 | 15 | It happened when I was not the principal at Clayton High |
| | 16 | School.  I was on reassignment during that time.  There was a |
| | 17 | situation that happened at Clayton High.  A teacher and a |
| | 18 | student sent it to me.  And I thought it highlighted the way |
| | 19 | HR handled that situation versus the way they handled my |
| 12:23:45 | 20 | situation of the discrepancy and the injustices that were |
| | 21 | taking place in the county school system.  As he and I were |
| | 22 | talking about those injustices and things that were happening, |
| | 23 | he -- I did share it with him. |
| | 24 | He was adamant that there were other things going |
| 12:24:01 | 25 | on within the district at the same time during the fall of |

| 12:24:04 | 1 | 2019, early in 2020. And so I added that to the list of |
| | 2 | concerns that I had with HR and some of the things that were |
| | 3 | in my grievance, and this was just another piece of it, I |
| | 4 | guess. |
| 12:24:19 | 5 | Q. And at the bottom of that, you put: In case you |
| | 6 | need it. |
| | 7 | A. I did. |
| | 8 | Q. And you put that because you knew he was an |
| | 9 | advocate for you; right, Dr. Jones? |
| 12:24:29 | 10 | A. At that time he was. |
| | 11 | MR. TYNDALL: No further questions, Your Honor. |
| | 12 | THE COURT: Ms. James. |
| | 13 | MR. ZELLINGER: Thank you, Your Honor. |
| | 14 | REDIRECT EXAMINATION BY MS. JAMES: |
| 12:24:36 | 15 | Q. Now, you were asked about this board meeting that |
| | 16 | you went to, and I can't remember if you used the words |
| | 17 | confronted Mr. Johnson or if the defense did, but this was a |
| | 18 | meeting to discuss your personnel issues in closed session. |
| | 19 | A. Correct. |
| 12:25:00 | 20 | Q. And then you stated that as you were leaving, which |
| | 21 | meant that you finished your portion, Mr. Johnson made a |
| | 22 | comment. |
| | 23 | A. Correct. |
| | 24 | Q. And then that's when you discussed this information |
| 12:25:16 | 25 | and you discussed Mr. Johnson after that comment. |

|          |    |                                                                        |
|----------|----|------------------------------------------------------------------------|
| 12:25:19 | 1  | A.   Correct.                                                          |
|          | 2  | Q.   But prior to that, you went there and you discussed              |
|          | 3  | what you had to discuss which was about getting out of your           |
|          | 4  | contract and you were on your way out of the meeting; correct?        |
| 12:25:32 | 5  | A.   Yes.  If I may?                                                   |
|          | 6  | Q.   Yes, you may.                                                     |
|          | 7  | A.   Thank you.  During the time I was interviewing and               |
|          | 8  | applying for that job, I had been in communications with              |
|          | 9  | Dr. Bracy and Chairman Sutton.  After the lawyer incident, I          |
| 12:25:47 | 10 | felt the lawyer basically put me in a precarious situation            |
|          | 11 | with Mr. Johnson.  I told him that I did not feel protected in        |
|          | 12 | that area.  I told him that I was looking to leave because I          |
|          | 13 | wanted to get out of the district before this piece.                  |
|          | 14 | So in my continued communication with them, I told              |
| 12:26:00 | 15 | him that I did not feel -- we felt like we were being                 |
|          | 16 | followed.  My wife felt like she had been followed.  We moved         |
|          | 17 | during 2020.  We left our house because we felt like there            |
|          | 18 | were people taking pictures of our house or being around our          |
|          | 19 | house.  We moved to a different location in 2020.  So we were         |
| 12:26:18 | 20 | pretty on edge during that time.  And so I didn't really put          |
|          | 21 | anything out in public.  I didn't say anything until I had the        |
|          | 22 | job.  I had the job offer in hand, and I met with Dr. Bracy           |
|          | 23 | only, and I told him that I was going to accept the job, but I        |
|          | 24 | did not want to stay on past the November election because I          |
| 12:26:37 | 25 | did not know what was going to happen in the November 2022            |

| | | |
|---|---|---|
| 12:26:40 | 1 | election, who was going to be elected.  I was concerned that |
| | 2 | there might be changes on the school board. |
| | 3 | During that time I had met with Mr. Johnson earlier |
| | 4 | in 2022, and he had met with Kevin Donovan, Terry Tippett, and |
| 12:26:50 | 5 | Travis Wheeler.  He asked me to meet in the spring of '22 |
| | 6 | before the primary with Terry Tippett, with Kevin Donovan, and |
| | 7 | Travis Wheeler who was in that meeting.  It was at Clayton |
| | 8 | Fitness, and it was all about helping to get them elected into |
| | 9 | positions on the school board and how I could help, and he |
| 12:27:20 | 10 | wanted me to -- to introduce me to them so that, you know, if |
| | 11 | they got on the board I might say, hey, this is a good guy, |
| | 12 | he's -- he's good with it. |
| | 13 | However, after August happened, I felt like |
| | 14 | Mr. Johnson was upset with me because he felt like I had given |
| 12:27:38 | 15 | that information to Dr. Bracy and the lawyers.  I didn't feel |
| | 16 | like his people would necessarily support me.  So what I asked |
| | 17 | was can I be released from my contract October 31st, so that I |
| | 18 | am in my position.  I have left the district, and I am working |
| | 19 | with them before this election happens in November of that |
| 12:27:59 | 20 | year -- in November of '22.  That was the whole setup.  That's |
| | 21 | why I didn't do anything in public. |
| | 22 | What happened is I went and spoke with Dr. Bracy |
| | 23 | about being released from my contract.  He said, ultimately, |
| | 24 | that's between me and the board, and that's where I crafted |
| 12:28:15 | 25 | the resignation letter.  I did not want to put it out |

12:28:18   1    necessarily in public, and so that's where I asked, it's

           2    personnel, can I present this?  I would like to -- with

           3    everything I have gone through, I would like to address the

           4    board and ask this personally if they will allow me to be a

12:28:32   5    part of graduation and release me from my contract so I can

           6    leave.  That was why I went there.  I did go prepared with

           7    information because I didn't know.

           8              That's the first time I had seen Mr. Johnson since

           9    our -- that conversation in August, and so I didn't really

12:28:47  10    know what, but he had an open session and had said that when

          11    he was confronted about the boys' names, he had said that I

          12    was wrong or I had lied.  And I knew I wasn't wrong and I knew

          13    I hadn't lied.  So I went with information that if he

          14    confronted me with that I would be prepared to respond.

12:29:08  15         Q.   So in that meeting he stated that State's Exhibit

          16    Number 15, that conversation didn't happen, that he didn't

          17    give you the names and that you just told a lie?

          18         A.   That's correct.

          19         Q.   And so that's why you actually recorded State's

12:29:23  20    Number 15, to protect yourself; correct?

          21         A.   Correct.  100 percent.

          22         Q.   And those recordings you actually turned over to

          23    Investigator Hoffman also?

          24         A.   I did.

12:29:34  25         Q.   Correct?

Dr. Jones - Redirect by Ms. James

| | | |
|---|---|---|
| 12:29:35 | 1 | A. Yes, I did. |
| | 2 | Q. And that was to back up what you were saying |
| | 3 | concerning these allegations. |
| | 4 | A. That's correct. |
| 12:29:43 | 5 | Q. At that point you were concerned about basically |
| | 6 | your job. |
| | 7 | A. At that point I wanted out. |
| | 8 | Q. You wanted out and get your new job. I think you |
| | 9 | said in 2019 when you went through this, there were |
| 12:29:56 | 10 | opportunities that you lost. |
| | 11 | A. That's correct. Multiple. |
| | 12 | Q. Multiple. Okay. And you talked about a process |
| | 13 | about when players are -- there's allegations concerning |
| | 14 | sports players and their eligibility for sports. Was that the |
| 12:30:22 | 15 | process that Mr. Johnson followed when he received this |
| | 16 | complaint? |
| | 17 | A. No. He gave it directly to the superintendent. |
| | 18 | Q. And I think you used the words, it was a unique |
| | 19 | situation how that happened. |
| 12:30:37 | 20 | A. I've never heard of a coach with concerns -- and |
| | 21 | I've coached and have been in high school athletics for 25 |
| | 22 | years. I never heard of a coach with concerns about the |
| | 23 | eligibility and take that to a board member for them to |
| | 24 | handle. It's always been to the high school athletics |
| 12:30:55 | 25 | association, to their principal, or to their county athletic |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 12:31:00 | 1 | director, someone in athletics who would be involved in that |
| | 2 | conversation. |
| | 3 | MS. JAMES:  Just one moment, Your Honor. |
| | 4 | THE COURT:  Yes. |
| 12:31:32 | 5 | Q.   Just quickly.  You were asked reassignment |
| | 6 | questions about how kids can go to different schools.  In the |
| | 7 | case of Mr. Phillips' kids, did they have special needs that |
| | 8 | made them go to this school or is it because one of their |
| | 9 | parents lived in the district? |
| 12:31:51 | 10 | A.   So there could be different reasons in how kids |
| | 11 | come there.  One, if they had a Clayton address at the time of |
| | 12 | enrollment.  We do not necessarily circle back each year.  If |
| | 13 | that person moves, we kind of put that on the parent to report |
| | 14 | that, hey, we no longer live in this district, we live |
| 12:32:08 | 15 | somewhere else.  So dependent upon initial enrollment, if they |
| | 16 | lived in the Clayton District, that's one.  Two, we have a |
| | 17 | high functioning autistic program, and that's not at every |
| | 18 | school that every school has a high functioning autistic |
| | 19 | teacher.  We had a very good one and a very good program.  And |
| 12:32:25 | 20 | so we did have reassignments that were available for people to |
| | 21 | reassign because of a program and high functioning autism is |
| | 22 | one of those. |
| | 23 | Q.   These children, they were actually autistic; |
| | 24 | correct? |
| 12:32:40 | 25 | A.   That's correct. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 12:32:40 | 1 | Q. Were they in that special program? |
| | 2 | A. Yes. |
| | 3 | Q. And in the conversation in State's Exhibit |
| | 4 | Number 15, he didn't talk about an address of Mr. Phillips; |
| 12:32:53 | 5 | did he? |
| | 6 | A. No. He didn't give me a reason other than they |
| | 7 | were coming at him hard. |
| | 8 | Q. That's the only thing he said; correct? |
| | 9 | A. That's correct. |
| 12:33:02 | 10 | MS. JAMES: No further questions, Your Honor. |
| | 11 | THE COURT: Mr. Tyndall. |
| | 12 | MR. TYNDALL: Briefly. |
| | 13 | RECROSS-EXAMINATION BY MR. TYNDALL: |
| | 14 | Q. You mentioned there was some recordings you talked |
| 12:33:09 | 15 | about from August at the meeting. Did you give those |
| | 16 | recordings to Todd Sutton? |
| | 17 | A. I provided a flash drive of some of the recordings |
| | 18 | at that meeting in August. I went and spoke to the board in |
| | 19 | October. |
| 12:33:24 | 20 | Q. That's what I mean. |
| | 21 | A. In October. Are you talking about the August |
| | 22 | conversation? |
| | 23 | Q. In August. |
| | 24 | A. Yes. That's correct. Yes. Yes, sir. At that |
| 12:33:32 | 25 | meeting in October before I left when I asked for the personal |

| | |
|---|---|
| 12:33:39 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 12:33:55 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 12:34:14 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 12:34:31 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 12:34:48 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 12:35:09 | 25 |

1   privilege, I looked at Mr. Johnson and I confronted him.  I

2   said, I know you were behind everything, and we kind of

3   exchanged there.  And I said you called me a liar.  And I

4   said, I trusted you and you called me a liar.  He said, I

5   didn't do that.  And then I said, what's this?  And I played

6   the audio recording.  And then after he said the names out

7   loud, I said, don't ever call me a liar.  He had told people

8   that he owned me.  You don't own me.  Nobody on this board

9   owns me.  I'm out of here.  I took the flash drive.  I smacked

10  it down on the horseshoe there.  I said, this is all the

11  information that you will need.  I told you all this is going

12  on.  I'm not a liar.  And I walked out of the room.

13      Q.   You mentioned personal privilege.  When Ms. James

14  questioned you, she asked you about personnel matters.  They

15  allowed you to address the committee as a personal privilege;

16  is that right?

17      A.   When I was about to leave, Mr. Johnson said some

18  words and he winked at me.  After he winked at me, I said out

19  loud, I probably should turn and walk out, but if I may,

20  Ms. Chairman, there's something I would like to say.  That's

21  when I looked at Mr. Johnson and I said, I know what you've

22  been doing.  I know about -- I know about the whole -- the

23  allegations between he and Angie Barbour.  I mean, I know all

24  of it.  I know the whole story, and I know you've been telling

25  people this and you're just going to sit here and you ruin my

| | | |
|---|---|---|
| 12:35:12 | 1 | career, you tried to ruin other teacher's career. I listed |
| | 2 | all those things off. And then he was kind of like, wow, wow, |
| | 3 | wow. And I continued on. And then I -- that's when I said, |
| | 4 | you called me a liar in open session, and that's when I said |
| 12:35:30 | 5 | I'm not a liar and I hit play. |
| | 6 | Q. And that was in the closed session? |
| | 7 | A. That was all in closed session, yes. |
| | 8 | Q. You were in the closed session as a matter of |
| | 9 | personal privilege; is that what you are saying? |
| 12:35:39 | 10 | A. I was in there for personnel, then I asked to speak |
| | 11 | before I walked out. |
| | 12 | MR. TYNDALL: I don't have any further questions, |
| | 13 | Your Honor. |
| | 14 | THE COURT: It's about 12:35. Did you have |
| 12:35:52 | 15 | anything further? |
| | 16 | MS. JAMES: Nothing further, Your Honor. |
| | 17 | THE COURT: Thank you, sir. You are free to come |
| | 18 | down. |
| | 19 | THE WITNESS: Thank you. |
| 12:36:00 | 20 | (Witness steps down.) |
| | 21 | MS. JAMES: On standby? |
| | 22 | MR. TYNDALL: Yes. Let's just keep him on standby. |
| | 23 | THE COURT: Ladies and gentlemen, we'll be in lunch |
| | 24 | recess until 2:00. Leave your notes on your seat. Please |
| 12:36:14 | 25 | remember, don't talk about this to anybody or let anybody talk |

Dr. Jones - Recross by Mr. Tyndall

| | | |
|---|---|---|
| 12:36:17 | 1 | to you. We'll see you back at 2:00. |
| | 2 | (Jury exits.) |
| | 3 | THE COURT: Anything before 2:00? |
| | 4 | MS. JAMES: Not from the State. |
| 12:37:07 | 5 | MR. TYNDALL: No, sir. |
| | 6 | THE COURT: We'll be in recess until 2:00. |
| | 7 | (Lunch recess.) |
| | 8 | (Court convenes at 2:02 a.m.) |
| | 9 | THE COURT: Are we ready to get the jury in? |
| 14:02:03 | 10 | MR. ZELLINGER: Your Honor, there's one other thing |
| | 11 | I want to bring up before the next witness, Lyn Andrews. |
| | 12 | She's on the school board. I anticipate she's going to talk |
| | 13 | about the contents of closed session meetings. I think in |
| | 14 | order for her to do that the Court is going to need to order |
| 14:02:18 | 15 | her to divulge that, otherwise she'd be violating that, and |
| | 16 | that comes in consultation with her talking with her attorney. |
| | 17 | So I will ask the Court to order her to answer questions. |
| | 18 | THE COURT: Is she going to have an attorney with |
| | 19 | her? |
| 14:02:32 | 20 | MR. ZELLINGER: I don't believe that her attorney |
| | 21 | is in here with her. I talked to her attorney. I told the |
| | 22 | attorney that I would do that if the Court is okay with it. |
| | 23 | THE COURT: Mr. Tyndall, we can get it on the |
| | 24 | record at the appropriate time. Any issue from that from your |
| 14:02:48 | 25 | standpoint? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 14:02:49 | 1 | MR. TYNDALL: I don't have a problem with it. |
| | 2 | THE COURT: I'm sorry? |
| | 3 | MR. TYNDALL: I don't have an issue with that. |
| | 4 | THE COURT: Mr. Zellinger, we'll just get that on |
| 14:02:58 | 5 | the record at the appropriate time. |
| | 6 | MR. ZELLINGER: All right. Thank you. |
| | 7 | THE COURT: Bring them on in. |
| | 8 | (Jury enters.) |
| | 9 | THE COURT: Welcome back, everybody. |
| 14:04:46 | 10 | Whenever you are ready. |
| | 11 | MR. ZELLINGER: Your Honor, the State calls Lyn |
| | 12 | Andrews. |
| | 13 | LYN ANDREWS, |
| | 14 | having been called as a witness for the State and being duly |
| 14:04:49 | 15 | sworn at 2:04 p.m., testified as follows: |
| | 16 | DIRECT EXAMINATION BY MR. ZELLINGER: |
| | 17 | Q. Ma'am, can you state your name for the jury. |
| | 18 | A. Lyn Andrews. |
| | 19 | Q. And how do you spell your first name? |
| 14:05:32 | 20 | A. L-Y-N. Andrews, A-N-D-R-E-W-S. |
| | 21 | Q. And what do you do for a living? |
| | 22 | A. Well, I'm retired, but I currently serve as an |
| | 23 | adjunct professor at Campbell University, and I serve on the |
| | 24 | board of education. |
| 14:05:43 | 25 | Q. How long have you served on the board of education? |

| | | |
|---|---|---|
| 14:05:45 | 1 | A. I was elected November of 2020 and reelected in |
| | 2 | 2024. |
| | 3 | Q. That is here in Johnston County? |
| | 4 | A. Yes. Yes, sir. |
| 14:05:55 | 5 | Q. You mentioned you're retired. Where did you retire |
| | 6 | from? |
| | 7 | A. From Johnston County Public Schools. |
| | 8 | Q. How long was your career in the Johnston County |
| | 9 | Public School system? |
| 14:06:04 | 10 | A. Thirty years. |
| | 11 | Q. Were you a teacher? |
| | 12 | A. I started out as a teacher and eventually moved |
| | 13 | into the central office, did some various jobs there. I |
| | 14 | retired as a director of exceptional children in 2010. |
| 14:06:21 | 15 | Q. When you were a teacher, what grades did you teach? |
| | 16 | A. I taught high school and elementary at different |
| | 17 | opportunities. |
| | 18 | Q. Sure. And what schools did you teach? |
| | 19 | A. Well, I started out at Smithfield-Selma High School |
| 14:06:34 | 20 | and I went to Wilson Mills Elementary School, and then I came |
| | 21 | to the central office where I served students at all of our |
| | 22 | schools. So I traveled as an itinerant teacher. At that time |
| | 23 | we didn't have as many schools, but I had to travel in my job |
| | 24 | where I went to the central office. I traveled to all the |
| 14:06:55 | 25 | schools in Johnston County. |

Lyn Andrews - Direct by Mr. Zellinger

14:06:57   1        Q.    What was your role in the central office?

           2        A.    I started out as an adaptive physical education

           3   teacher and then I moved into the exceptional children's

           4   program as a diagnostic-prescriptive teacher.

14:07:07   5        Q.    And just to slow you down.  What is that?  What is

           6   that role?

           7        A.    That role was individuals who would help evaluate

           8   students for the AIG program, which at that time fell

           9   underneath exceptional children.

14:07:19  10        Q.    And so eventually, did you hold those front office

          11   roles until you retired?

          12        A.    Well, I moved from those positions into what was

          13   known as a program specialist where I served as a liaison

          14   between the schools and the central office of the exceptional

14:07:36  15   children's program.  After that I became the coordinator of

          16   exceptional children which meant I worked directly under the

          17   director of exceptional children helping to plan, implement

          18   the programs, hire staff, attend IEP meetings.  And then after

          19   that I was named the director of exceptional children.

14:07:55  20        Q.    How long did you serve in that role?

          21        A.    Ten years.

          22        Q.    When did you -- when did you officially retire?

          23        A.    2010.

          24        Q.    And then you mentioned you're an adjunct professor

14:08:07  25   at Campbell.  Is it Campbell University?

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 14:08:10 | 1 | A. Campbell University. |
| | 2 | Q. How did that happen? |
| | 3 | A. Well, I got a call in 2012 from Dr. Chris Godwin |
| | 4 | who worked at Campbell, and I had worked with him in Johnston |
| 14:08:18 | 5 | County schools and he asked if I would come teach some of the |
| | 6 | classes. |
| | 7 | Q. And what kind of -- |
| | 8 | A. I work in the school of education. |
| | 9 | Q. And what sort of classes do you teach? |
| 14:08:27 | 10 | A. Well, student teachers. I teach those who are out |
| | 11 | in the field. I do a seminar class. I also teach SPED, or |
| | 12 | special education classes, to future teachers. |
| | 13 | Q. And at some point did you -- you mentioned in 2020 |
| | 14 | you ran for the school board. |
| 14:08:42 | 15 | A. I did. |
| | 16 | Q. How did that come about? |
| | 17 | A. How did it come about? |
| | 18 | Q. Yes, ma'am. |
| | 19 | A. Well, I just had a deep desire to come back and |
| 14:08:48 | 20 | serve in Johnston County Public Schools in this manner. So I |
| | 21 | ran and was fortunate to be elected. |
| | 22 | Q. Do you live here in Johnston County? |
| | 23 | A. I do. |
| | 24 | Q. How long have you lived in Johnston County? |
| 14:08:57 | 25 | A. Since I was three years old. So without giving |

| | | |
|---|---|---|
| 14:09:01 | 1 | away my age, 60-plus years. |
| | 2 | Q. And so you were elected to the Johnston County |
| | 3 | Board of Education in 2020; is that correct? |
| | 4 | A. Yes, sir. |
| 14:09:13 | 5 | Q. And then in 2022, is that when you became the |
| | 6 | chair? |
| | 7 | A. Yes, sir. |
| | 8 | Q. So you currently serve as the chair of the board? |
| | 9 | A. Yes, sir. |
| 14:09:21 | 10 | Q. And this jury has heard a little bit of testimony |
| | 11 | about that, but does the chair have more power than the rest |
| | 12 | of the board members? |
| | 13 | A. The chair is just one vote. That's the same vote. |
| | 14 | But the chair does help with planning the agenda and being the |
| 14:09:34 | 15 | spokesperson for the board in many situations. But I'm still |
| | 16 | just one vote. |
| | 17 | Q. And the defendant in this case, Ronald Johnson, is |
| | 18 | he on the school board as well? |
| | 19 | A. Yes, sir. |
| 14:09:45 | 20 | Q. Do you recognize him here in the courtroom? |
| | 21 | A. Oh, sure. |
| | 22 | Q. Can you just indicate an item of clothing that he's |
| | 23 | wearing just for the record. |
| | 24 | A. A gray -- sort of a gray/blue sweater. |
| 14:09:53 | 25 | Q. Thank you. And on the school board are there |

14:09:58  1   occasions where -- first of all, are there committees of the

          2   school board?

          3          A.   Yes, sir.

          4          Q.   And what committees are there?

14:10:04  5          A.   We have a policy committee, a finance committee, we

          6   have a legislative committee, we have a bond committee, we

          7   have a legal committee, so we have several.

          8          Q.   Then also are there times during which the board

          9   will go into a closed session?

14:10:21 10          A.   Yes, sir.  At every regular board meeting there

         11   will be a closed session time usually at the beginning of the

         12   meeting, and then if there's a specially called meeting, there

         13   also can be an opportunity to go into closed session.

         14          Q.   So at every regular board meeting there's a time

14:10:37 15   for closed session?

         16          A.   Yes, sir.

         17          Q.   And to instigate that is there something that's

         18   read by you or the board's lawyer?

         19          A.   The vice chair typically reads the motion which

14:10:48 20   involves the general statutes that are -- that we follow when

         21   we go into closed session.

         22          Q.   Ms. Andrews, if I can turn you to that notebook

         23   right there.  If you can look at tab 19.

         24                    (State's Exhibit Number 19 marked for

14:11:12 25                     identification.)

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

14:11:13  1      Q.   Do you see a document marked State's Exhibit 19 for

2    identification purposes?

3      A.   Yes, sir.

4      Q.   Is that the general statute that controls closed

14:11:20  5    sessions of committees or agencies or state entities in

6    North Carolina?

7      A.   Yes.

8      Q.   Is that North Carolina General Statute 143-318.11?

9      A.   Yes, sir.

14:11:33  10     Q.   Is it entitled closed sessions?

11     A.   Yes, sir.

12          MR. ZELLINGER:   Your Honor, I'd move to enter

13   State's Exhibit 19.

14          THE COURT:   Any objection?

14:11:43  15          MR. TYNDALL:   No, sir.

16          THE COURT:   So allowed.

17              (State's Exhibit Number 19 entered into

18              evidence.)

19          MR. ZELLINGER:   Your Honor, may I publish State's

14:11:45  20   Exhibit 19?

21          THE COURT:   Yes.

22              (State's Exhibit Number 19 published to the

23              jury.)

24     Q.   And Ms. Andrews, this is in front of you or you can

14:12:14  25   look on the screen, whichever is easier.

| | | |
|---|---|---|
| 14:12:18 | 1 | Does this say that generally it's a policy of the |
| | 2 | state that a public body shall only be allowed to have a |
| | 3 | closed session as permitted in this statute in this section; |
| | 4 | do you see that? |
| 14:12:30 | 5 | A.   Yes, sir. |
| | 6 | Q.   And so a closed session by definition is when the |
| | 7 | public meeting is closed to the public; is that correct? |
| | 8 | A.   Yes, sir. |
| | 9 | Q.   So the only people that are in the room are -- in |
| 14:12:43 | 10 | your instance, the only people that are in the room are the |
| | 11 | board members; is that correct? |
| | 12 | A.   It would be board members and any staff member that |
| | 13 | would need to bring information.  Our attorney would be in |
| | 14 | there.  Our superintendent would be there. |
| 14:12:56 | 15 | Q.   And there are certain specified reasons why you can |
| | 16 | exclude the public from your meetings; is that correct? |
| | 17 | A.   Yes, sir. |
| | 18 | Q.   And are those listed in this statute, number one, |
| | 19 | to prevent the disclosure of information that's privileged or |
| 14:13:11 | 20 | confidential? |
| | 21 | A.   Yes, sir. |
| | 22 | Q.   Number two is to prevent the premature disclosure |
| | 23 | of an honorary degree, scholarship prize, or similar work? |
| | 24 | A.   Yes, sir. |
| 14:13:20 | 25 | Q.   And so sometimes do you all and the school board |

Lyn Andrews - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 14:13:23 | 1 | confer awards or prizes or honorary degrees or things of that |
| | 2 | sort? |
| | 3 | A.   Yes, sir.  We can do that. |
| | 4 | Q.   And so when you do that, if it's a public meeting, |
| 14:13:33 | 5 | the person would know that you're conferring on that? |
| | 6 | A.   That's right. |
| | 7 | MR. ZELLINGER:  If we can highlight the third |
| | 8 | paragraph. |
| | 9 | Q.   Does it appear on that screen? |
| 14:13:51 | 10 | A.   Yes, sir.  It does now. |
| | 11 | Q.   And so the third prong, is that to consult with an |
| | 12 | attorney employed or retained by the public body? |
| | 13 | A.   Yes, sir. |
| | 14 | Q.   And so you have a school board attorney; is that |
| 14:14:01 | 15 | correct? |
| | 16 | A.   We do, in the room at that time. |
| | 17 | MR. ZELLINGER:  If we can highlight paragraph 4 and |
| | 18 | 5. |
| | 19 | Q.   Number 4 is about discussing matters related to |
| 14:14:28 | 20 | expanding or economic incentives; is that correct? |
| | 21 | A.   Yes, sir. |
| | 22 | Q.   Number 5 has to do with instructing the staff about |
| | 23 | contracts or something along those lines; is that correct? |
| | 24 | A.   Right.  Yes, sir. |
| 14:14:42 | 25 | Q.   And then if we can jump to number 6.  If we can do |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 14:14:48 | 1 | number 6 for right now. And so this part of the statute, |
| | 2 | 143-318.11 subsection 6, this is about the -- considering the |
| | 3 | qualifications or competence of an individual public officer |
| | 4 | or an employee or to hear investigative complaint, charge or |
| 14:15:14 | 5 | grievance against an individual, public officer, or employee; |
| | 6 | is that correct? |
| | 7 | A.   Yes, sir. |
| | 8 | Q.   Does that happen frequently with the school board |
| | 9 | that somebody makes a complaint and you want to discuss it |
| 14:15:23 | 10 | without everyone in the public knowing about it? |
| | 11 | A.   Yes, sir. |
| | 12 | Q.   It says that like general personnel policy can't be |
| | 13 | considered in a closed session, but the public body can |
| | 14 | consider qualifications and sort of personnel activities in a |
| 14:15:40 | 15 | closed session; is that correct? |
| | 16 | A.   Yes, sir. |
| | 17 | Q.   Do you know -- |
| | 18 | MR. ZELLINGER:  If we can you jump to 7, 8, and 9 |
| | 19 | on the next page. |
| 14:15:58 | 20 | Q.   You can also go into closed session -- number 7 is |
| | 21 | about concerning investigations of alleged criminal |
| | 22 | misconduct? |
| | 23 | A.   Yes. |
| | 24 | Q.   And does that come up from time to time? |
| 14:16:08 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 14:16:09 | 1 | Q.   Number 8 is about formulating plans related to |
| | 2 | school violence; do you all do that as well? |
| | 3 | A.   Basically, yes, dealing with any kind of emergency |
| | 4 | response that we may have in place. |
| 14:16:22 | 5 | Q.   Why is that important to be in a closed session? |
| | 6 | A.   Because the public doesn't necessarily need to know |
| | 7 | everything that we have in place. |
| | 8 | Q.   Okay.  And when you go into closed session -- and |
| | 9 | number 9 is about public safety as well; is that correct? |
| 14:16:34 | 10 | A.   Yes.  Yes, sir. |
| | 11 | Q.   Okay.  And when you go into closed session -- |
| | 12 | MR. ZELLINGER:   If we can highlight subsection C. |
| | 13 | Q.   The public body can only go into closed session if |
| | 14 | there's a motion duly made and adopted citing what purpose you |
| 14:16:52 | 15 | are going to go into closed session for; is that correct? |
| | 16 | A.   Yes, sir. |
| | 17 | Q.   So to go into -- so if you're having a public |
| | 18 | meeting, to go into closed session you have to say, we're |
| | 19 | going to discuss personnel actions pursuant to this statute |
| 14:17:04 | 20 | and then somebody makes a motion to close the session and then |
| | 21 | that's adopted by the board? |
| | 22 | A.   Yes, sir. |
| | 23 | Q.   Okay.  And are there minutes kept so that there can |
| | 24 | be some record of what was discussed in that closed session? |
| 14:17:13 | 25 | A.   Yes, sir. |

14:17:14   1        Q.   Do you all -- with the school board, do you all

         2   keep the closed session -- have a public version of the closed

         3   session minutes so people can know sort of the tenor of what

         4   is kept in a closed session?

14:17:29   5        A.   Repeat that.

         6        Q.   If you kept accurate minutes of the closed session,

         7   the public would know exactly what happened in a closed

         8   session and it would kind of --

         9        A.   That's right.

14:17:38  10        Q.   -- frustrate the --

        11        A.   Closed session minutes are kept confidential.

        12        Q.   Okay.  Is there like a public version of the closed

        13   session minutes that is kept or are they solely kept

        14   confidential?

14:17:46  15        A.   They are kept confidential.

        16        Q.   Okay.  And that way there's a record of what was

        17   discussed in closed session?

        18        A.   There is a record, yes.

        19        Q.   And with your board, the Johnston County School

14:17:57  20   Board, do you go into closed session?  What is the reason you

        21   most frequently go into closed session?

        22        A.   Probably the common reason is personnel

        23   recommendations.

        24        Q.   What sort of -- when you say personnel, what sort

14:18:09  25   of stuff is discussed in a closed session meeting?

| | | |
|---|---|---|
| 14:18:12 | 1 | A. Well, when we go into closed session, we would turn |
| | 2 | it over most likely to the director of human resources and |
| | 3 | Dr. Bracy and they would bring to the board recommendations |
| | 4 | for hire for personnel. It could be a new person to the |
| 14:18:26 | 5 | county, it could be someone that already works in the county, |
| | 6 | but he brings those to us in closed session. |
| | 7 | Q. Okay. And back on May 24th of 2022, did you go |
| | 8 | into a closed session to discuss some contracts and salary? |
| | 9 | A. It was May 31st, 2022. |
| 14:18:47 | 10 | Q. May 31st. Okay. Thank you. Do you recall going |
| | 11 | into a closed session? |
| | 12 | A. Yes, sir. |
| | 13 | Q. Because that was a closed session and we're here in |
| | 14 | a public courtroom, if I ask you questions about that, you'd |
| 14:19:01 | 15 | be divulging information about the closed session; is that |
| | 16 | correct? |
| | 17 | A. Yes, sir, I would. |
| | 18 | MR. ZELLINGER: Your Honor, at this time I would |
| | 19 | ask the Court to order the witness to testify about the |
| 14:19:09 | 20 | contents of the closed session meeting. |
| | 21 | THE COURT: Thank you. Mr. Tyndall, anything you |
| | 22 | wish to be heard on? |
| | 23 | MR. TYNDALL: I don't have any objection to that, |
| | 24 | Your Honor. |
| 14:19:18 | 25 | THE COURT: Yes, sir. The Court will adopt that |

| | | |
|---|---|---|
| 14:19:20 | 1 | recommendation, ma'am, and allow you testify about what was |
| | 2 | said in that session; okay? |
| | 3 | THE WITNESS:  Okay. |
| | 4 | THE COURT:  Thank you. |
| 14:19:26 | 5 | Q.    Do you recall that May 31st closed session meeting, |
| | 6 | do you recall what you were discussing? |
| | 7 | A.    It was a special session called.  Our regular |
| | 8 | meeting had been a couple weeks before that.  We meet the |
| | 9 | second Tuesday of the month.  This was a special session |
| 14:19:39 | 10 | called for personnel reasons.  There was one other topic I |
| | 11 | think that was discussed in closed session. |
| | 12 | Q.    Okay. |
| | 13 | A.    But it was primary for personnel. |
| | 14 | Q.    And during that personnel discussion was -- and |
| 14:19:51 | 15 | just to be clear, this is back on May 31st of 2022; is that |
| | 16 | correct? |
| | 17 | A.    Yes, sir. |
| | 18 | Q.    And was that in person or was that virtual? |
| | 19 | A.    We were virtual. |
| 14:20:01 | 20 | Q.    And so a virtual meeting still has the same rules; |
| | 21 | is that correct? |
| | 22 | A.    Absolutely. |
| | 23 | Q.    If you have a virtual public meeting, how does that |
| | 24 | work?  How is the public able to access your meeting if it's |
| 14:20:14 | 25 | virtual? |

| | | |
|---|---|---|
| 14:20:15 | 1 | A. A link is shared to the public and they can join |
| | 2 | in. It's on our website, I believe. |
| | 3 | Q. Okay. And the public can -- do you do it over Zoom |
| | 4 | or WebEx? |
| 14:20:26 | 5 | A. I believe it's, like, Zoom. |
| | 6 | Q. Can the public, like, ask questions at a certain |
| | 7 | time? |
| | 8 | A. No. |
| | 9 | Q. Okay. Is there any public interaction during your |
| 14:20:35 | 10 | board meetings? |
| | 11 | A. No. |
| | 12 | Q. But the public is there and can access it to be |
| | 13 | able to watch the virtual meeting? |
| | 14 | A. During the open session they can. |
| 14:20:43 | 15 | Q. Okay. When you go into closed session, that window |
| | 16 | is shut down and the public can no longer -- |
| | 17 | A. They can no longer see what we are doing. |
| | 18 | Q. During this meeting on May 31st, 2022, was it the |
| | 19 | whole meeting the closed session meeting? |
| 14:20:55 | 20 | A. Pretty much. Now, you have to come to -- you open |
| | 21 | the meeting in open session. You do your invocation, you do |
| | 22 | your pledge, and then you have your motion and second and you |
| | 23 | vote to go into closed session, then you're in closed session. |
| | 24 | But when you finish closed session, if you have made decisions |
| 14:21:09 | 25 | about personnel, you must vote on those in open session so |

| | | |
|---|---|---|
| 14:21:14 | 1 | would you go back and go back into open session. |
| | 2 | Q.    And when you vote on those, do you say, I vote -- |
| | 3 | you know, calling for a vote on the thing that was discussed |
| | 4 | in closed session, or how do you know what you are voting |
| 14:21:24 | 5 | about? |
| | 6 | A.    It would be -- if it was individual personnel, then |
| | 7 | usually it's our HR director or head of HR would name those |
| | 8 | names for us and then we would vote. |
| | 9 | Q.    Okay.  And in this session on May 31st, 2022, so |
| 14:21:41 | 10 | did you start out with the invocation and the pledge of |
| | 11 | allegiance? |
| | 12 | A.    Always, yes. |
| | 13 | Q.    And then was there a motion to go into closed |
| | 14 | session? |
| 14:21:48 | 15 | A.    Yes, sir. |
| | 16 | Q.    And then did you go into closed session? |
| | 17 | A.    Yes, sir.  There was a second and a vote. |
| | 18 | Q.    And during that closed session were you discussing |
| | 19 | salaries, or what were you discussing at that time? |
| 14:21:59 | 20 | A.    We were discussing several things.  Do you want to |
| | 21 | know all the details of the closed session or just about the |
| | 22 | personnel? |
| | 23 | Q.    I guess -- I guess -- at some point was there a |
| | 24 | conversation about Tracey Peedin Jones? |
| 14:22:13 | 25 | A.    There was a -- there was some central office staff |

Lyn Andrews - Direct by Mr. Zellinger

14:22:17   1   members who were up for contract renewal and we had also had

2   some teachers that were up for contract renewal.  We had a

3   facility service, somebody worked for facility services that

4   were up for contract renewal.  But yes, we did talk about some

14:22:30   5   central office personnel.  There was quite a few of them.

6        Q.   Okay.  And let me just stop you there.  So contract

7   renewal, are most of the school employees on contracts?

8        A.   Yes, sir.

9        Q.   And how long are those contracts generally?

14:22:44  10        A.   Most of them -- it depends on when you -- like how

11   new you are in it, but it's either two or four years.

12        Q.   Okay.  And so if I'm a school teacher and I'm on a

13   four-year contract, when the four years is up, what happens

14   next?

14:22:58  15        A.   Well, teachers are a little bit different, but the

16   board would renew the contract if everything was going okay.

17        Q.   Okay.  For a principal or someone working in the

18   central office, if I'm on a contract and my contract comes to

19   an end, does the board then decide whether to give me a new

14:23:16  20   contract at that point?

21        A.   That's right.  It comes to the board to renew it.

22        Q.   And is that what you were discussing on May 31st of

23   2022?

24        A.   Yes.  There were several who were up for renewal.

14:23:26  25        Q.   And did Tracy Peedin Jones' name come up?

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Lyn Andrews - Direct by Mr. Zellinger

14:23:31  1       A.    Yes, sir.

2       Q.    And was she one of the people that was slated to be

3    discussed during that?

4       A.    She was on the list.  Her name was on the list,

14:23:39  5    along with many others.

6       Q.    With regard to Ms. Peedin Jones, what was the

7    conversation about her salary?

8       A.    Well, the conversation was -- the question -- the

9    board was asking questions of HR and the attorney that when

14:23:56  10    someone comes -- Ms. Jones had been in the central office for

11    several years, but the question came up that when someone

12    comes from a school with one salary and goes into the central

13    office, if they are under that one contract, they continue

14    with that salary.  Our question was, but when their contract

14:24:14  15    runs out, do they continue to make the salary they were making

16    as a principal when they come into the central office or do

17    they make the salary at the position that they now hold in the

18    central office.  Sometimes those salaries are different.  So

19    that was the discussion.

14:24:27  20       Q.    Okay.  So if I'm a principal, I might be making X

21    amount, and then if I go to the central office -- is it

22    generally the central office salaries are lower than those of

23    the principals?

24       A.    Not necessarily, but we were just asking,

14:24:42  25    because -- it just depends.  It depends on years of

14:24:45   1   experience.  It depends on the job you have.

2          Q.   Okay.  And so sometimes folks would come to the

3   central office with the salary that was sort of inaccurate for

4   the role that they had at the central office?

14:24:55   5          A.   Well, that's what we were asking.  We were trying

6   to find out does the salary change.  So when someone's

7   contract in coming up for renewal, would that be the time to

8   change the salary.

9          Q.   Okay.  And so how did Tracy Peedin Jones factor

14:25:09  10   into that?

11          A.   Well, because she was one of the people, one of

12   many that was up for renewal, so the discussion just took

13   place about -- she was one of the people that had this happen

14   to.

14:25:19  15          Q.   Okay.  Do you recall the defendant being present on

16   that meeting?

17          A.   Yes.

18          Q.   And did they -- did you as a -- did the

19   board -- what happened?  Did the board vote for a new salary

14:25:31  20   for Tracy Peedin Jones?

21          A.   We had -- there were several things on the list,

22   but we decided to table the central office staff, which I

23   think was -- I don't know, it was about 12, 15 people, and we

24   would come back and do those in June.  So we just decided to

14:25:47  25   table that because we were really trying to get more

| | | |
|---|---|---|
| 14:25:50 | 1 | information. |
| | 2 | Q. Okay. And tabling means just like postponing it? |
| | 3 | A. Postponing it until the next meeting which was |
| | 4 | going to be in two weeks. |
| 14:25:56 | 5 | Q. And was there some discussion about Tracey Peedin |
| | 6 | Jones being on FMLA? |
| | 7 | A. I think the question was raised, was she on FMLA. |
| | 8 | Q. At some point there was a decision made, let's just |
| | 9 | postpone and get more information? |
| 14:26:09 | 10 | A. Right, and get more information. |
| | 11 | Q. All right. And following that meeting, were you |
| | 12 | approached by someone who had information that the defendant |
| | 13 | had recorded a closed session? |
| | 14 | A. Yes, sir. |
| 14:26:24 | 15 | Q. And do you recall who that person was? |
| | 16 | A. I believe it was Ms. Edmundson who was the head of |
| | 17 | HR. |
| | 18 | Q. Okay. And I guess, did you learn that Tracy Peedin |
| | 19 | Jones had been informed that there was a recording made of the |
| 14:26:42 | 20 | discussion of her? |
| | 21 | A. Yes. |
| | 22 | Q. Okay. Now, are you allowed to record closed |
| | 23 | sessions? |
| | 24 | A. No, sir. |
| 14:26:49 | 25 | Q. Okay. Does your board have policies barring that? |

| 14:26:52 | 1 | A. Yes, sir, policy 2021 (sic). |
| | 2 | (State's Exhibit Number 20 marked for |
| | 3 | identification.) |
| | 4 | Q. Ma'am, if you could turn your attention to tab |
| 14:27:00 | 5 | number 20. |
| | 6 | A. Yes, sir. |
| | 7 | Q. And before you, is that policy 2120? |
| | 8 | A. 2120, yes. |
| | 9 | Q. Okay. And -- |
| 14:27:15 | 10 | A. I said 2021, but it's 2120, excuse me. |
| | 11 | Q. Okay. And that policy code 2120 that's before you, |
| | 12 | is that the policy that was adopted -- if you can look at the |
| | 13 | second page -- |
| | 14 | A. Yes, sir. |
| 14:27:25 | 15 | Q. -- on July 13 of 2021? |
| | 16 | A. Yes, sir. |
| | 17 | Q. And so was that the policy that was in effect |
| | 18 | during that board meeting of May 31st of 2022? |
| | 19 | A. Yes. |
| 14:27:35 | 20 | Q. And is that the -- when you get on the board, do |
| | 21 | they give you these policies, or how do you know that there |
| | 22 | are these policies? |
| | 23 | A. You have an opportunity to review all the policies, |
| | 24 | and, of course, these policies go before the board for a vote. |
| 14:27:48 | 25 | So every board member sees the policy before they vote on it. |

| | | |
|---|---|---|
| 14:27:52 | 1 | It actually comes to a first read and second read.  So there's |
| | 2 | two opportunities for every board member to see these |
| | 3 | policies.  Plus, many of us serve on the policy committee. |
| | 4 | Q.    So there's a committee that can amend the policies? |
| 14:28:04 | 5 | And this policy that's before was in effect on May 31st of |
| | 6 | 2022? |
| | 7 | A.    Yes, sir. |
| | 8 | MR. ZELLINGER:  Your Honor, at this time I would |
| | 9 | seek to admit State's Exhibit 20. |
| 14:28:12 | 10 | THE COURT:  Any objection? |
| | 11 | MR. TYNDALL:  No, sir. |
| | 12 | THE COURT:  So allowed. |
| | 13 | (State's Exhibit Number 20 entered into |
| | 14 | evidence.) |
| 14:28:15 | 15 | MR. ZELLINGER:  May I publish State's Exhibit 20 at |
| | 16 | this time? |
| | 17 | THE COURT:  Yes, sir. |
| | 18 | (State's Exhibit Number 20 published to the |
| | 19 | jury.) |
| 14:28:41 | 20 | MR. ZELLINGER:  If we can highlight the first half |
| | 21 | of that page including the title.  Thank you. |
| | 22 | Q.    As we pull that up, Chair Andrews, this starts out |
| | 23 | that the Johnston County Board of Education recognizes that |
| | 24 | collectively and individually all members of the board must |
| 14:29:05 | 25 | adhere to a code of ethics as required by, and it gives some |

14:29:09  1   general statutes; is that correct?

       2        A.   Yes, sir.

       3        Q.   Okay.  And that -- where it says collectively and

       4   individually, so the board votes on its own policies; is that

14:29:21  5   correct?

       6        A.   Yes, sir.

       7        Q.   And in the section before you it's got some board

       8   member ethical requirements; is that accurate?

       9        A.   Yes, sir.

14:29:35  10       Q.   And it says:  The following standards will guide

      11   each board member in the performance of his or her official

      12   duties.  Could you read those first five board member ethical

      13   requirements?

      14        A.   The need to obey all applicable state and federal

14:29:48  15   laws regarding official actions taken as a board member;

      16   number 2, the need to uphold integrity and independence of the

      17   board members' office; number 3, the need to avoid impropriety

      18   in the exercise of the board and board members official

      19   duties; and 4, the need to perform faithfully the duties of

14:30:04  20   the office; and number 5, the need to conduct the affairs of

      21   the board in open and public manner complying with all

      22   applicable laws governing open meetings and public records.

      23        Q.   Thank you.  If we can move on to subsection B.

      24   Does it state:  In order to implement the above standard, each

14:30:24  25   member of the board commits to do the following?

Lyn Andrews - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 14:30:26 | 1 | A. Yes, sir. |
| | 2 | Q. Okay. And the first one is: Attend all regularly |
| | 3 | scheduled board meetings insofar as possible. |
| | 4 | A. Yes, sir. |
| 14:30:34 | 5 | Q. And become informed concerning issues to be |
| | 6 | considered at those meetings; is that correct? |
| | 7 | A. Yes, sir. |
| | 8 | Q. Could you read the second one? |
| | 9 | A. Endeavor to make policy decisions while always |
| 14:30:46 | 10 | keeping in mind the objective of providing the students the |
| | 11 | opportunity to receive a sound, basic education and only after |
| | 12 | full discussion at publically held board meetings. |
| | 13 | Q. The third one is rendering all decisions based on |
| | 14 | available facts and independent judgment and refuses to |
| 14:31:03 | 15 | surrender that judgment to individuals or special interest |
| | 16 | groups; is that correct? |
| | 17 | A. Yes, sir. |
| | 18 | Q. The fourth one is about modeling civility to |
| | 19 | students, employees, and all elements of the community; is |
| 14:31:14 | 20 | that correct? |
| | 21 | A. Yes, sir. |
| | 22 | Q. And could you read after that -- I mean, could you |
| | 23 | read number 4 for the jury. |
| | 24 | A. Model civility to students, employees, and all |
| 14:31:24 | 25 | elements of the community by encouraging the free expression |

| | | |
|---|---|---|
| 14:31:26 | 1 | of opinion by all board members and engaging in respectful |
| | 2 | dialogue with fellow board members on matters being considered |
| | 3 | by the board. |
| | 4 | Q.   Number 5 has to do with confidentiality.  Could you |
| 14:31:35 | 5 | read that for us. |
| | 6 | A.   Respect the confidentiality of information that is |
| | 7 | privileged under applicable law and refrain from unauthorized |
| | 8 | disclosures of matters discussed in closed session. |
| | 9 | Q.   Okay.  So if you recorded a closed session, |
| 14:31:49 | 10 | conceivably you could not be respecting the confidentiality of |
| | 11 | information that's privileged; is that correct? |
| | 12 | A.   I guess so. |
| | 13 | Q.   Okay.  Next is number 6, can you read that for the |
| | 14 | jury. |
| 14:31:57 | 15 | A.   Work with other board members to establish |
| | 16 | effective board policies and to delegate authority for the |
| | 17 | administration of the schools to the superintendent. |
| | 18 | Q.   You mentioned that you found out that there's an |
| | 19 | allegation the defendant had recorded one of these closed |
| 14:32:11 | 20 | sessions; is that correct? |
| | 21 | A.   Yes, sir. |
| | 22 | Q.   What was -- what is number 7 of this policy? |
| | 23 | A.   Do you want me to read it? |
| | 24 | Q.   Yes, ma'am. |
| 14:32:21 | 25 | A.   Not making secret recordings, in any format, on |

| | | |
|---|---|---|
| 14:32:25 | 1 | school system property, at school or board-related events or |
| | 2 | meetings, or otherwise connected to the business of the board |
| | 3 | or the Johnston County Public Schools. |
| | 4 | Q.   If we can turn to the second page.  There, if you |
| 14:32:48 | 5 | just can highlight that subsection. |
| | 6 | There are other listed policies that require board |
| | 7 | members to get ethics education; is that correct? |
| | 8 | A.   Yes, sir. |
| | 9 | Q.   Refrain from investigating or attempting to resolve |
| 14:33:06 | 10 | complaints received personally, but instead direct the |
| | 11 | complainant to follow the board's complaint or grievance |
| | 12 | process. |
| | 13 | A.   Yes, sir. |
| | 14 | Q.   And that's number 13; is that correct? |
| 14:33:14 | 15 | A.   Yes, sir. |
| | 16 | Q.   Number 14, avoid being placed in a position of a |
| | 17 | conflict of interest and refrain from using board members' |
| | 18 | position on the Board for personal or partisan gain. |
| | 19 | A.   Yes, sir. |
| 14:33:26 | 20 | Q.   At some point -- do you know a woman named Carolyn |
| | 21 | Rotondaro? |
| | 22 | A.   Yes, sir. |
| | 23 | Q.   And who is she? |
| | 24 | A.   She's a former employee of Johnston County Public |
| 14:33:37 | 25 | Schools. |

| | | |
|---|---|---|
| 14:33:37 | 1 | Q. And do you know what she did prior to leaving? |
| | 2 | A. She had several jobs, but her last job was in the |
| | 3 | central office. |
| | 4 | Q. At one point was she a school teacher? |
| 14:33:45 | 5 | A. Not to my knowledge. |
| | 6 | Q. Okay. So she's always -- has she always worked in |
| | 7 | the central office or did she work -- |
| | 8 | A. No. She worked over -- well, she worked out of |
| | 9 | the central -- she worked in positions in the central office, |
| 14:33:54 | 10 | but not always in our central office, which is located on |
| | 11 | Highway 70. |
| | 12 | Q. Okay. Did anyone on the board ever advocate for a |
| | 13 | raise for Ms. Rotondaro? |
| | 14 | A. Yes, sir. |
| 14:34:03 | 15 | Q. Who did that? |
| | 16 | A. Mr. Johnson. |
| | 17 | Q. Do you remember when that was? |
| | 18 | A. I don't recall the exact meeting. |
| | 19 | Q. Was that like a contentious discussion of it, or |
| 14:34:24 | 20 | was it -- what, if anything, do you remember about it? |
| | 21 | A. I just remember that -- I think that we were |
| | 22 | talking about raises for several individuals in the central |
| | 23 | office and he brought her up. |
| | 24 | Q. If we can go down to the bottom of this document, |
| 14:34:45 | 25 | on page 2, bottom paragraph. And on there is it reflected |

| | | |
|---|---|---|
| 14:34:56 | 1 | that it was adopted July 13th, 2021? |
| | 2 | A.   Yes, sir. |
| | 3 | (State's Exhibit Number 21 marked for |
| | 4 | identification.) |
| 14:35:00 | 5 | Q.   Now, if you can turn your attention to tab 21.  Do |
| | 6 | you see a document marked State's Exhibit 21 for |
| | 7 | identification purposes? |
| | 8 | A.   Yes, sir. |
| | 9 | Q.   And is that policy code 2121, board member conflict |
| 14:35:19 | 10 | of interest? |
| | 11 | A.   Yes, sir. |
| | 12 | Q.   And is that a policy that was in effect back in |
| | 13 | May of 2022? |
| | 14 | A.   Yes, sir. |
| 14:35:27 | 15 | Q.   It was adopted July 13th of 2021? |
| | 16 | A.   Yes, sir. |
| | 17 | Q.   Just to be clear, on July 13th of 2021, when this |
| | 18 | was adopted, the defendant was on the school board; correct? |
| | 19 | A.   Yes, sir. |
| 14:35:38 | 20 | MR. ZELLINGER:  Your Honor, at this time I move to |
| | 21 | enter State's Exhibit 21. |
| | 22 | MR. TYNDALL:  No objection, Your Honor. |
| | 23 | THE COURT:  So allowed. |
| | 24 | (State's Exhibit Number 21 entered into |
| 14:35:45 | 25 | evidence.) |

14:35:46  1          Q.   And if I can draw your attention to -- this has to
          2   do with board members and conflicts of interest; is that
          3   correct?
          4          A.   Yes, sir.
14:35:55  5          Q.   And looking at -- I guess pulling up the paragraphs
          6   surrounding number 1.
          7               This policy pertains to not taking action on issues
          8   in which the board member has some direct benefit or has a
          9   conflict of interest; is that correct?
14:36:27 10          A.   Yes, sir.
         11          Q.   Do you read like a conflict of interest statement
         12   before meetings, or do you all do that at all?
         13          A.   No.
         14          Q.   Okay.  But this policy was enacted so that if you
14:36:36 15   have some sort of conflict of interest, you are to not be
         16   involved?
         17          A.   Right.  Every board member has read this policy.
         18          Q.   If you are dating someone, would you have a
         19   conflict of interest in dealing with their potential salary?
14:36:51 20          A.   In my opinion?
         21          Q.   Yes, ma'am.
         22          A.   Yes, sir.
         23          Q.   Just to be clear, you're the chair of the Johnston
         24   County School Board; correct?
14:37:01 25          A.   Yes, sir.

14:37:01  1      Q.   And just looking at the document, without pulling

2      the whole thing up, the second page talks about board members

3      not soliciting or accepting trips or free things from folks or

4      basically not being bribed or anything along those lines; is

14:37:16  5      that correct?

6          A.   Yes, sir.

7                      (State's Exhibit Number 22 marked for

8                      identification.)

9          Q.   If I can turn your attention to tab number 22.  Do

14:37:28 10      you recognize -- is that marked State's Exhibit Number 22 for

11      identification purposes?

12         A.   Yes, sir.

13         Q.   Do you recognize that policy?

14         A.   Yes, sir.

14:37:39 15         Q.   And with regard to that policy, is that a policy

16      regarding the role of board members in handling complaints?

17         A.   Yes, sir.

18         Q.   And that was adopted July 13th, 2021?

19         A.   Same day.

14:37:52 20         Q.   Do you adopt all the policies at one time?

21         A.   Not at one time.  We did adopt several policies

22      that day.

23              MR. ZELLINGER:  At this time I seek to enter

24      State's Exhibit 22.

14:38:01 25              THE COURT:  Any objection?

| | | |
|---|---|---|
| 14:38:03 | 1 | MR. TYNDALL:  No, Your Honor. |
| | 2 | THE COURT:  So allowed. |
| | 3 | (State's Exhibit Number 22 entered into |
| | 4 | evidence.) |
| 14:38:06 | 5 | MR. ZELLINGER:  If I can publish |
| | 6 | State's Exhibit 22. |
| | 7 | (State's Exhibit Number 22 published to the |
| | 8 | jury.) |
| | 9 | Q.    This policy -- this jury may have heard some |
| 14:38:16 | 10 | testimony about this earlier, but do you know -- is Kevin |
| | 11 | Donovan on your school board? |
| | 12 | A.    Yes, sir. |
| | 13 | Q.    And how long has he been on the school board? |
| | 14 | A.    He was elected in 2022. |
| 14:38:27 | 15 | Q.    And is there a process for which board members are |
| | 16 | supposed to handle complaints? |
| | 17 | A.    Complaints from the public or from -- yes, sir. |
| | 18 | Q.    And this policy, can you just read the first two |
| | 19 | paragraphs of this. |
| 14:38:41 | 20 | A.    An individual board member who receives a complaint |
| | 21 | or an inquiry from a parent or interested citizen concerning a |
| | 22 | school matter will refer the complainant to the appropriate |
| | 23 | school administrator and, when appropriate, advise the |
| | 24 | complainant of the procedures in place for making such |
| 14:38:56 | 25 | complaints. |

14:38:56  1          The board member also may refer the complainant to

2      the superintendent, who shall determine an appropriate means

3      of responding to the complaint.  The board attorney also may

4      be notified of the complaint in accordance with policy 2610,

14:39:09  5      board attorney.

6          Q.    The next paragraph, can you read that?

7          A.    Yes, sir.  Individual board members will refrain

8      from taking individual action with regard to such complaints

9      other than referring them to the proper administrative

14:39:22  10      employee.

11          Q.    Why do you not want individual board members to

12      just investigate these complaints on their own?

13          A.    Because we have a school -- because we have staff

14      and that's their responsibility.

14:39:31  15          Q.    Okay.  With regard to athletics, if there's an

16      allegation of some sort of complaint about athletes, does

17      that -- is that supposed to go to the superintendent, or where

18      is that supposed to go?  Do you run into that in your career?

19          A.    I'm not sure what the actual complaint was, but if

14:39:52  20      there was complaint about athletics to me, you would start

21      with your superintendent.  And we have people that are in

22      charge of athletics which would be one of your assistant

23      superintendents, and then you could go all the way down to

24      your county athletic director.  But you'd start with your

14:40:06  25      superintendent.

| | | |
|---|---|---|
| 14:40:06 | 1 | (State's Exhibit Number 23 marked for |
| | 2 | identification.) |
| | 3 | Q. Okay. If I can turn your attention to tab 23. Is |
| | 4 | that another policy that was enacted by the Johnston County |
| 14:40:21 | 5 | School Board? |
| | 6 | A. Yes, sir. |
| | 7 | Q. And is that titled Closed Sessions? |
| | 8 | A. Yes, sir. |
| | 9 | Q. Was that enacted on July 13th of 2021 as well? |
| 14:40:34 | 10 | A. Yes, sir. |
| | 11 | Q. So this would have been in effect on May 31st of |
| | 12 | 2022? |
| | 13 | A. Yes, sir. |
| | 14 | Q. And was that the policy for closed sessions that |
| 14:40:44 | 15 | existed for the Johnston County Board of Education? |
| | 16 | A. Yes, sir. |
| | 17 | MR. ZELLINGER: Your Honor, at this time I'd seek |
| | 18 | to admit State's Exhibit 23. |
| | 19 | MR. TYNDALL: No objection. |
| 14:40:52 | 20 | THE COURT: So allowed. |
| | 21 | (State's Exhibit Number 23 entered into |
| | 22 | evidence.) |
| | 23 | MR. ZELLINGER: Your Honor, may I publish it? |
| | 24 | THE COURT: Yes, sir. |
| 14:40:56 | 25 | MR. ZELLINGER: If we can highlight the top |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Lyn Andrews - Direct by Mr. Zellinger

| 14:40:58 | 1 | paragraph. Yes, there. |
| | 2 | Q. So this policy is about closed sessions; is that |
| | 3 | correct? |
| | 4 | A. Yes, sir. |
| 14:41:06 | 5 | Q. And this policy, is it -- does it actually in this |
| | 6 | part -- well, actually we can't see it. Does this make |
| | 7 | reference to the North Carolina General Statutes under A1, do |
| | 8 | you see a reference to Chapter 132 of the General Statutes? |
| | 9 | A. Yes, sir. |
| 14:41:27 | 10 | Q. And so the first paragraph is that: Closed |
| | 11 | sessions will be held only when required to permit the |
| | 12 | Johnston County Board of Education to act in the public |
| | 13 | interest as provided by law? |
| | 14 | A. Yes, sir. |
| 14:41:37 | 15 | Q. Okay. And then subsection A is: By majority vote |
| | 16 | of the members present, the board basically agrees that you |
| | 17 | can only go into closed session for these reasons; is that |
| | 18 | correct? |
| | 19 | A. Yes, sir. |
| 14:41:50 | 20 | Q. And then if we could highlight 1 through 9. I'm |
| | 21 | not going to ask you to go word for word, but is this |
| | 22 | basically the same thing that we saw on the statute that we |
| | 23 | went through earlier? |
| | 24 | A. Yes, sir, meaning the same things. |
| 14:42:09 | 25 | Q. Okay. So to plan or conduct, hear reports about |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

14:42:13   1    criminal misconduct, examine qualifications, deal with

           2    personnel stuff, those are the general tenor of the reasons

           3    you can go into closed session?

           4         A.    Yes, sir.

14:42:24   5         Q.    And you, as a board, go into closed session for

           6    these reasons routinely; is that correct?

           7         A.    Yes, sir.

           8         Q.    In fact, every public meeting you end up going into

           9    closed session.

14:42:33  10         A.    Every regular session we do.

          11         Q.    And then the next section, if we can go to the

          12    bottom of that page.

          13               This is actions that must be reported or taken in

          14    open session.  And so it says:  When deliberations may occur

14:42:53  15    in closed session, the following board actions must be then

          16    done in the open session.

          17         A.    In the open session.

          18         Q.    And then if we can go to the next page.  If we can

          19    highlight 1 and 2 at the top.  And there does it detail -- and

14:43:14  20    if you can read 1 and 2 for the jury.

          21         A.    The following are expressly prohibited by law as a

          22    basis for closed sessions.  Number one, to discuss general

          23    policy matters or other issues that would be open merely

          24    because an attorney employed or retained by the board is a

14:43:26  25    participant; and number two, to consider the qualifications,

14:43:28  1   competence, performance, character, fitness, appointment or

        2   removal of a member of the board or another body or to

        3   consider or fill a vacancy.

        4        Q.   And if we can highlight the next paragraph 1 and 2.

14:43:46  5   If we can highlight C.

        6        A.   Is that what you wanted me to read?  I'm sorry.

        7        Q.   We're fine.  No, so you just read --

        8        A.   Well, I wanted me to read -- you wanted me to read

        9   the first thing.  Okay.

14:43:56 10        Q.   Totally fine.  Bad question.

       11             So subsection C is the reasons why you can't go

       12   into closed session.

       13        A.   That's right.

       14        Q.   Basically you can't go into closed session to

14:44:05 15   discuss general policy or qualifications or removal of a board

       16   member, things of that nature.  That should be done in open

       17   session; is that correct?

       18        A.   Sure.  Sure.  I'm sorry.

       19        Q.   Okay.

14:44:16 20        A.   I'll back up and read that.

       21        Q.   No, no, no.  You are totally fine.  So the top of

       22   that page is the stuff that needs to be done in open session;

       23   is that correct?

       24        A.   Yes, sir.

14:44:24 25        Q.   And if we can highlight 1 and 2 at the top of the

| | | |
|---|---|---|
| 14:44:29 | 1 | page. |
| | 2 | So there -- basically if the board approves or |
| | 3 | considers a settlement in closed session, the terms have to be |
| | 4 | reported in open session; is that correct? |
| 14:44:42 | 5 | A. Yes, sir. |
| | 6 | Q. As soon as possible within a reasonable time after |
| | 7 | a settlement is concluded; is that right? |
| | 8 | A. Yes, sir. |
| | 9 | Q. Okay. And then if there's a final action to make |
| 14:44:49 | 10 | an appointment or discharge or removal by the board, that has |
| | 11 | to be -- if that's done in closed session, it has to be |
| | 12 | reported out in open session. |
| | 13 | A. Right. |
| | 14 | Q. Okay. There's a mechanism what's done in closed |
| 14:44:59 | 15 | session to remain confidential, but some things have to be |
| | 16 | done open and publically; is that correct? |
| | 17 | A. That's right. |
| | 18 | Q. At any point do you publish a recording of the |
| | 19 | closed session? |
| 14:45:14 | 20 | A. No, sir. |
| | 21 | Q. Okay. That always stays confidential; is that |
| | 22 | correct? |
| | 23 | A. Yes, sir. |
| | 24 | Q. And moving to subsection F. This policy also |
| 14:45:25 | 25 | includes the procedure for going to closed session and the |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 14:45:29 | 1 | minutes -- keeping minutes of the closed session; is that |
| | 2 | correct? |
| | 3 | A.   Yes, sir. |
| | 4 | Q.   Section F is about confidentiality; is that |
| 14:45:38 | 5 | correct? |
| | 6 | A.   Yes, sir. |
| | 7 | Q.   And could you read that for the jury. |
| | 8 | A.   Anyone who attends a closed session shall maintain |
| | 9 | the confidentiality of information shared during the session. |
| 14:45:46 | 10 | It is unlawful to disclose confidential personnel or student |
| | 11 | information or for anyone to use information learned during |
| | 12 | closed session for any pecuniary benefit of the person |
| | 13 | disclosing the information or for the pecuniary benefit of any |
| | 14 | other person.   No one will make any recording of a closed |
| 14:46:05 | 15 | session without the knowledge and consent of the board, and |
| | 16 | with said consent duly recorded in the minutes of the closed |
| | 17 | session. |
| | 18 | Q.   Did the board consent to Ronald Johnson recording |
| | 19 | the May 31st, 2022, closed session? |
| 14:46:21 | 20 | A.   No, sir. |
| | 21 | Q.   Was there even a discussion of it? |
| | 22 | A.   No. |
| | 23 | Q.   When you heard about this allegation that the |
| | 24 | defendant had recorded a closed session, what did you do with |
| 14:46:38 | 25 | that information? |

| | | |
|---|---|---|
| 14:46:39 | 1 | A. I notified Mr. Todd Sutton who was chairman of the |
| | 2 | board at that time. |
| | 3 | Q. Okay. And this jury heard from Mr. Sutton. He was |
| | 4 | the chair back then? |
| 14:46:46 | 5 | A. Yes, sir. |
| | 6 | Q. And then this was like May of 2022. When did you |
| | 7 | assume the role as chair? |
| | 8 | A. In December of 2022. |
| | 9 | Q. Now, at some point in time was there an |
| 14:47:10 | 10 | investigation into the allegation that the defendant had |
| | 11 | recorded a closed session? |
| | 12 | A. Yes, sir. Mr. Sutton, as the chair, would have |
| | 13 | asked for that investigation based on our policies. |
| | 14 | Q. And do the board members do that investigation on |
| 14:47:26 | 15 | their own? |
| | 16 | A. No, sir. |
| | 17 | Q. Who does that go to? |
| | 18 | A. It went to our attorneys at the time. |
| | 19 | Q. And who were your attorneys at the time? |
| 14:47:31 | 20 | A. At that time it was Tharrington Smith. |
| | 21 | Q. Okay. Is that a law firm? |
| | 22 | A. Yes, sir. Based on out of Raleigh. |
| | 23 | Q. Okay. And do you have to pay for them to do an |
| | 24 | investigation? |
| 14:47:41 | 25 | A. Yes, sir. |

| | | |
|---|---|---|
| 14:47:42 | 1 | Q. So that costs the board money? |
| | 2 | A. Absolutely, yes, sir. |
| | 3 | Q. Okay. And the board's money, where does the money |
| | 4 | come to run the public school system in Johnston County? |
| 14:47:52 | 5 | A. Well, we get a variety of different funds of money. |
| | 6 | We get federal dollars, we get state dollars, and we get local |
| | 7 | dollars. |
| | 8 | Q. The federal, state, and local dollars, does that |
| | 9 | all come from the public? |
| 14:48:07 | 10 | A. Well, pretty much, yea. The federal dollars would |
| | 11 | come from the federal government. The state comes from the |
| | 12 | state, the general assembly. And local dollars come from the |
| | 13 | citizens of Johnston County. |
| | 14 | Q. Okay. And the federal dollars come from |
| 14:48:20 | 15 | conceivably federal taxes? |
| | 16 | A. Federal tax dollars. |
| | 17 | Q. State comes from state taxes. |
| | 18 | A. That's right. |
| | 19 | Q. And local comes from local taxes. |
| 14:48:28 | 20 | A. Yes, sir. |
| | 21 | Q. Do you know off the top of your head how much the |
| | 22 | board had to pay for the investigation into these allegations? |
| | 23 | A. I don't know exactly. I think it was a |
| | 24 | considerable amount of money. It would have come out of our |
| 14:48:45 | 25 | local dollars. |

| | | |
|---|---|---|
| 14:48:47 | 1 | Q. Okay. And is there a code of conduct for board |
| | 2 | members? |
| | 3 | A. Yes, sir, there's a code of ethics. |
| | 4 | Q. Code of ethics. Is there also code of conduct or |
| 14:49:13 | 5 | ethics for teachers as well? |
| | 6 | A. Yes, sir. |
| | 7 | Q. Off the top of your head, do you know what that |
| | 8 | code for teachers involves? |
| | 9 | A. Basically the -- just the general behavior and |
| 14:49:24 | 10 | fulfilling of duties and things that they are responsible for |
| | 11 | doing. |
| | 12 | Q. And conceivably -- strike that. |
| | 13 | Did you ever see the defendant interact with |
| | 14 | Carolyn Rotondaro? |
| 14:49:41 | 15 | A. Not personally. |
| | 16 | Q. Do you know a person named Allyson Bond? |
| | 17 | A. I know of a person named Allyson Bond. |
| | 18 | Q. Did you ever see Allyson Bond interact with the |
| | 19 | defendant? |
| 14:49:50 | 20 | A. No, sir. |
| | 21 | Q. And who is Allyson Bond? |
| | 22 | A. She's a teacher in our school system. |
| | 23 | Q. And do you know a person named Angie Barbour? |
| | 24 | A. Yes, sir. |
| 14:50:03 | 25 | Q. And is she a teacher in your school system as well? |

| 14:50:05 | 1 | A. Yes, sir. |

2      Q.   And have you ever seen Angie Barbour and the

3  defendant together?

4      A.   Yes, sir.

· 14:50:10   5      Q.   When was that?

6      A.   The first time would have been in a meeting with

7  our county commissioners.  I do not know the exact date, but

8  we were meeting with the commissioners about funding and they

9  were together at that meeting.  That would have been in 2021.

14:50:35  10      Q.   At some point was there also a board investigation

11  into the allegations that the defendant tried to transfer two

12  students related to a person named Owen Phillips?

13      A.   Yes, sir.

14      Q.   Was there an investigation into that?

14:50:54  15      A.   Yes, sir.

16      Q.   Was that investigation given to the school board's

17  attorneys?

18      A.   The attorneys did the investigation, I believe, and

19  then they gave a report to the school board.

14:51:05  20      Q.   And the attorneys that did that, who was that?

21      A.   That was Tharrington Smith as well.

22      Q.   And did the school board have to pay for that?

23      A.   Yes, sir.

24      Q.   Again, do you know off the top of your head how

14:51:15  25  much that cost?

| | | | |
|---|---|---|---|
| 14:51:16 | 1 | A. | I don't. I don't have an exact figure. |

14:51:16    1         A.    I don't.  I don't have an exact figure.

2         Q.    Was it also a considerable amount of money?

3         A.    Yes, sir.  I'm sure.

4         Q.    And that money, did that come from federal, state,

14:51:26    5    and local dollars?

6         A.    It would have been paid out by local dollars.

7         Q.    And that was public money; is that correct?

8         A.    Public money, yes.

9         Q.    If that allegation hadn't been done, that money

14:51:38   10    could have been used for other things in the school system;

11    correct?

12         A.    Most certainly.

13               MR. ZELLINGER:  Can I have one moment, Your Honor?

14               THE COURT:  Yes, sir.

14:52:18   15         Q.    Ms. Andrews, as a school board member, is there a

16    power dynamic that you have with teachers or employees in the

17    public school system?

18         A.    I would hope not.  I mean, there's -- our job is to

19    serve them.

14:52:43   20         Q.    Okay.  I mean, is there any board policy barring

21    board members from dating school teachers?

22         A.    No.

23         Q.    Ethically is there any concerns that you have

24    voiced or that you have about board members dating school

14:53:00   25    teachers?

| | | |
|---|---|---|
| 14:53:00 | 1 | A. I do. |
| | 2 | Q. What is that? |
| | 3 | A. Well, board members vote on teachers' contracts. |
| | 4 | They vote on other issues that directly affect our schools and |
| 14:53:13 | 5 | could affect teachers and students. |
| | 6 | Q. Okay. So board members, I mean, they have some |
| | 7 | power over the salaries and lives of school teachers. |
| | 8 | A. Oh, yea. I understand what you're asking now. |
| | 9 | Yea. I didn't -- yes, sir. A board member is going to have |
| 14:53:28 | 10 | direct influence on what happens in a school, inside the |
| | 11 | school with teachers. |
| | 12 | Q. And the -- |
| | 13 | A. Plus policy affects teachers. |
| | 14 | Q. And board members vote on policies. |
| 14:53:38 | 15 | A. Board members -- well, board members develop and |
| | 16 | vote on policies. So yes, they write the policies. |
| | 17 | MR. ZELLINGER: Nothing further, Your Honor. |
| | 18 | THE COURT: Mr. Tyndall. |
| | 19 | MR. TYNDALL: Thank you, Your Honor. |
| 14:54:05 | 20 | CROSS-EXAMINATION BY MR. TYNDALL: |
| | 21 | Q. Ms. Andrews, you have been on the board of |
| | 22 | education with Mr. Johnson for several years; is that correct? |
| | 23 | A. Yes, sir. |
| | 24 | Q. It would be fair to say there's a divide between a |
| 14:54:13 | 25 | group on the board and Mr. Johnson and another member? |

| | | |
|---|---|---|
| 14:54:18 | 1 | A. Only maybe a disagreement about voting on certain |
| | 2 | topics. |
| | 3 | Q. Well, there's certainly been some very contentious |
| | 4 | meetings. |
| 14:54:25 | 5 | A. Yes. So there have been, yea. |
| | 6 | Q. And as part of the code of ethics is to set an |
| | 7 | example for the students and all that; is that right? |
| | 8 | A. Yes, sir. Absolutely. |
| | 9 | Q. There's actually been instances, or at least one |
| 14:54:38 | 10 | instance, where one of the board members challenged |
| | 11 | Mr. Johnson to a fistfight in an open session; isn't that |
| | 12 | correct? |
| | 13 | A. That was only after Mr. Johnson made a statement to |
| | 14 | him. |
| 14:54:52 | 15 | Q. He made a statement? |
| | 16 | A. Yes, sir. |
| | 17 | Q. Well, I'm making statements to you, but you're not |
| | 18 | going to challenge me to a fistfight; are you? |
| | 19 | A. That's right. |
| 14:55:00 | 20 | MR. ZELLINGER: Objection. |
| | 21 | THE COURT: I'll sustain. Sustained. |
| | 22 | Q. Making a statement doesn't justify that kind of |
| | 23 | behavior; does it? |
| | 24 | A. I don't think so. |
| 14:55:11 | 25 | Q. And you mentioned in some of the code of ethics |

| | | |
|---|---|---|
| 14:55:19 | 1 | there you talked about conflicts of interest.  There were |
| | 2 | allegations that at least one of the board of education |
| | 3 | members was engaging in a conflict of interest through her |
| | 4 | company; is that right? |
| 14:55:29 | 5 | A.   Yes, sir. |
| | 6 | Q.   Was there an investigation into that? |
| | 7 | A.   That is still going on. |
| | 8 | Q.   So that's an investigation that's been going on for |
| | 9 | a while. |
| 14:55:38 | 10 | A.   Yes, sir. |
| | 11 | Q.   So it's not uncommon at all for the board of |
| | 12 | education to initiate an investigation? |
| | 13 | A.   Not if it's requested. |
| | 14 | MR. TYNDALL:  Nothing further, Your Honor. |
| 14:55:48 | 15 | THE COURT:  Mr. Zellinger. |
| | 16 | MR. ZELLINGER:  Yes, sir. |
| | 17 | REDIRECT EXAMINATION BY MR. ZELLINGER: |
| | 18 | Q.   You were asked about setting an example for the -- |
| | 19 | that the board of ethics involved setting an example for |
| 14:55:59 | 20 | students and teachers; is that correct? |
| | 21 | A.   Yes, sir. |
| | 22 | Q.   Would having an affair with teachers set an example |
| | 23 | for them? |
| | 24 | A.   Not a good one. |
| 14:56:07 | 25 | MR. ZELLINGER:  Nothing further. |

| 14:56:09 | 1 | THE COURT: Mr. Tyndall. |
| | 2 | MR. TYNDALL: Nothing further. |
| | 3 | THE COURT: All right. Thank you, ma'am. |
| | 4 | MR. ZELLINGER: Your Honor, I ask that Ms. Andrews |
| 14:56:15 | 5 | be released from her subpoena. |
| | 6 | THE COURT: Ma'am, you are free to go, just subject |
| | 7 | to recall possibly. Okay? |
| | 8 | THE WITNESS: Okay. Thank you very much. |
| | 9 | (Witness excused.) |
| 14:56:29 | 10 | MS. JAMES: Your Honor, we call April Lee. |
| | 11 | APRIL JONES LEE, |
| | 12 | having been called as a witness for the State and being duly |
| | 13 | sworn at 2:57 p.m., testified as follows: |
| | 14 | DIRECT EXAMINATION BY MS. JAMES: |
| 14:57:33 | 15 | Q.   Could you please state your name for the jury. |
| | 16 | A.   Yes.  My name is April Jones Lee. |
| | 17 | Q.   And are you a member of the Johnston County School |
| | 18 | Board? |
| | 19 | A.   I am. |
| 14:57:41 | 20 | Q.   When were you elected to the school board? |
| | 21 | A.   This past November. |
| | 22 | Q.   And do you know the defendant in this case? |
| | 23 | A.   I do. |
| | 24 | Q.   How long have you known the defendant? |
| 14:57:54 | 25 | A.   For several years.  I was the president of Johnston |

| | | |
|---|---|---|
| 14:57:59 | 1 | County Association of Educators.  So with that role and my |
| | 2 | advocacy work, I communicated with lots of board members. |
| | 3 | Q.   Now, what do you do for a living? |
| | 4 | A.   I'm a classroom teacher.  I teach high school math. |
| 14:58:17 | 5 | Q.   How long have you been a teacher? |
| | 6 | A.   Since January of 2021 -- no, January 2000.  Sorry. |
| | 7 | Q.   That's okay. |
| | 8 | A.   It's been a long time.  Years run together. |
| | 9 | Q.   So you've been an educator for over 20 years? |
| 14:58:33 | 10 | A.   Yes. |
| | 11 | Q.   Have you always taught in the Johnston County |
| | 12 | Public School? |
| | 13 | A.   I no longer teach in Johnston County Public |
| | 14 | Schools.  I left Johnston County in February of 2023.  I now |
| 14:58:41 | 15 | teach in Harnett County Public Schools. |
| | 16 | Q.   And do you live here in Johnston County? |
| | 17 | A.   I do. |
| | 18 | Q.   And do you know Angie?  You call her Angie, but her |
| | 19 | name is Angela Barbour.  Do you know her? |
| 14:59:03 | 20 | A.   I do. |
| | 21 | Q.   How do you know Ms. Barbour? |
| | 22 | A.   We taught at the same school together beginning |
| | 23 | about 20 years ago. |
| | 24 | Q.   Are you guys friends? |
| 14:59:16 | 25 | A.   We are very good friends, yes. |

| | | |
|---|---|---|
| 14:59:20 | 1 | Q. And tell me about your relationship with |
| | 2 | Ms. Barbour. |
| | 3 | A. Well, we have been good friends. We -- you know, |
| | 4 | teachers tend to form very strong bonds when we were together. |
| 14:59:34 | 5 | We worked in the same grade level for many years and our |
| | 6 | friendship just continued to evolve. We spent a lot of time |
| | 7 | together, girls nights, dinner, just, you know, hanging out at |
| | 8 | our house. We're just very, very good friends. She's like a |
| | 9 | sister to me. |
| 14:59:51 | 10 | Q. And did she ever talk to you about her personal |
| | 11 | life? |
| | 12 | A. Absolutely. |
| | 13 | Q. And at some point did her and her husband separate? |
| | 14 | A. Yes, they did. |
| 15:00:03 | 15 | Q. And I think you guys had a riff in your friendship |
| | 16 | but then you guys got close again? |
| | 17 | A. Yes. |
| | 18 | Q. Tell me about that period of time. |
| | 19 | A. Well, politically we see things a little |
| 15:00:16 | 20 | differently, and the 2020 election and COVID was strenuous on |
| | 21 | our relationship. So we kind of -- we would talk |
| | 22 | occasionally, but we were not as close as we had been during |
| | 23 | that time period. And after the election was over, we made |
| | 24 | contact again and kind of renewed the friendship. |
| 15:00:47 | 25 | Q. You all got past that? |

| | | |
|---|---|---|
| 15:00:49 | 1 | A. Yes, we got past it. |
| | 2 | Q. And at some point did she move out of her marital |
| | 3 | home? |
| | 4 | A. She did. |
| 15:00:57 | 5 | Q. And did she ever tell you about her and the |
| | 6 | defendant? |
| | 7 | A. She did. |
| | 8 | Q. What would she tell you? |
| | 9 | A. Well, she initially held off telling me who she was |
| 15:01:10 | 10 | having a relationship with. This was prior to when she moved |
| | 11 | out from her home, but she did tell me it was a school board |
| | 12 | member. And there were only so many people to narrow it down |
| | 13 | from. And initially she -- well, in the same night that she |
| | 14 | told me, she told me who it was, that it was Ronald Johnson. |
| 15:01:33 | 15 | That was December of 2020. |
| | 16 | Q. And once she told you this, did she continue to |
| | 17 | tell you other things? |
| | 18 | A. Yes, sir. |
| | 19 | Q. Would he ask her to do things for him? |
| 15:01:51 | 20 | A. Yes. |
| | 21 | Q. Did she tell you about those? |
| | 22 | A. Yes. |
| | 23 | Q. What were those things? |
| | 24 | A. She told me about -- and a lot of the things that |
| 15:01:58 | 25 | she told me were after the fact because she knew I would try |

| | | |
|---|---|---|
| 15:02:01 | 1 | to talk her out of it.  I indicated to her this was not |
| | 2 | healthy and that she needed to protect herself.  But after the |
| | 3 | Republican Convention where she was wired, she told me about |
| | 4 | that event, about how she was wired in the parking lot, that |
| 15:02:20 | 5 | he had asked her to collect information and talk to people at |
| | 6 | that convention. |
| | 7 | Then in December of 2022, this was much after she, |
| | 8 | I'll say, confessed, she finally confided in me about the |
| | 9 | situation with DeVan Barbour and what had been going on with |
| 15:02:44 | 10 | that.  So she told me that -- about the phone calls that had |
| | 11 | taken place, I believe, that summer, and that he had been |
| | 12 | drinking and that -- then there was a video call and about his |
| | 13 | nudity.  And then she told me that she had told Ronald and |
| | 14 | that Ronald had then asked her to sleep with him to get more |
| 15:03:13 | 15 | information so that he could use it against DeVan.  Then she |
| | 16 | told me she kind of did like, I'm not -- you know, I don't |
| | 17 | want to do that, you know, and she had been hesitant about it. |
| | 18 | And then she told me that Ronald had dropped off a |
| | 19 | phone to her apartment that she had had for -- what was it, |
| 15:03:36 | 20 | December?  So maybe for a couple months, a month -- a couple |
| | 21 | months.  At this point she had the phone in her possession, |
| | 22 | but she said, girl, I don't feel comfortable doing this.  And |
| | 23 | I told her that she absolutely should not do this, that it was |
| | 24 | wrong. |
| 15:03:54 | 25 | Q.   She told you these things while close in the time |

| | | |
|---|---|---|
| 15:03:59 | 1 | to when they were happening? |
| | 2 | MR. TYNDALL: Objection, Your Honor. She's |
| | 3 | testified as to what happened. |
| | 4 | THE COURT: I'll sustain that. |
| 15:04:07 | 5 | Q. Now, you stated that that happened in December of |
| | 6 | 2022. That would have been after the primary in 2022. |
| | 7 | A. I'm sorry. Let me back up with that date. Sorry. |
| | 8 | This has been a course of four years. |
| | 9 | Q. Yes. |
| 15:04:28 | 10 | A. So that would be -- okay. That would be December |
| | 11 | '21. It happened prior to the primary. |
| | 12 | Q. And so that conversation that occurred about DeVan |
| | 13 | happened in 2021? |
| | 14 | A. December 2021, yes. |
| 15:04:43 | 15 | Q. And that would have been before his primary? |
| | 16 | A. Yes. |
| | 17 | Q. And where did that conversation occur? |
| | 18 | A. In her apartment. |
| | 19 | Q. And at some point did you and Angie go away on a |
| 15:05:14 | 20 | trip together for spring break? |
| | 21 | A. We've been on many trips together. We were not |
| | 22 | on -- if you are referring to spring break of 2022, we were |
| | 23 | not on a trip. We just met at Buffalo Brothers in Garner |
| | 24 | eating lunch together over spring break. |
| 15:05:36 | 25 | Q. And so during that meeting, did she get a phone |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 15:05:38 | 1 | call from anyone? |
| | 2 |     A.   She did.  She got a phone call from DeVan Barbour. |
| | 3 |     Q.   And how did you know it was DeVan Barbour? |
| | 4 |     A.   Well, you know, sometimes when you are on the phone |
| 15:05:48 | 5 | with people sitting directly across, you can hear, and |
| | 6 | although I don't know DeVan well, the tone of the conversation |
| | 7 | you could tell was very emotional.  And when she looked at me |
| | 8 | and she said, it's -- you know, like mouthed to me it's DeVan. |
| | 9 | And so I -- you know, I just kind of sat there frozen until |
| 15:06:14 | 10 | the conversation was over. |
| | 11 |     Q.   And that was in April of 2022? |
| | 12 |     A.   Yes.  During spring break. |
| | 13 |     Q.   Now, at any point during your friendship with |
| | 14 | Ms. Barbour, did you ever record your conversations with her? |
| 15:06:39 | 15 |     A.   Absolutely not.  I don't have devices -- I don't |
| | 16 | even know how to use a phone to do that.  So no.  Absolutely |
| | 17 | not.  It's laughable. |
| | 18 |     Q.   And did you ever record her conversation when she |
| | 19 | told you about DeVan Barbour? |
| 15:06:55 | 20 |     A.   Absolutely not.  I don't record my friends.  Who |
| | 21 | makes a habit of doing that? |
| | 22 |           MS. JAMES:  If I can have just a moment, Your |
| | 23 | Honor? |
| | 24 |           THE COURT:  Yes, ma'am. |
| 15:07:14 | 25 |           MS. JAMES:  Nothing further at this time, Your |

| | | |
|---|---|---|
| 15:07:16 | 1 | Honor. |
| | 2 | THE COURT:  Mr. Tyndall. |
| | 3 | CROSS-EXAMINATION BY Mr. Tyndall: |
| | 4 | Q.   Ms. Lee, you mentioned that Ms. Barbour told you |
| 15:07:32 | 5 | about a relationship with my client? |
| | 6 | A.   Uh-huh. |
| | 7 | Q.   In December of 2020; is that right? |
| | 8 | A.   Yes. |
| | 9 | Q.   That was the first disclosure to you? |
| 15:07:40 | 10 | A.   Yes. |
| | 11 | Q.   And at that time she was actually -- well, she's |
| | 12 | still married, but at that time she was married and still |
| | 13 | living with someone else? |
| | 14 | A.   Yes.  She was still with her husband. |
| 15:07:50 | 15 | Q.   Between December 2020 and the end of that |
| | 16 | relationship she was pretty enamored with my client it's fair |
| | 17 | to say; isn't it right? |
| | 18 | A.   Yes.  As much as anyone is in a new relationship. |
| | 19 | Q.   And their relationship lasted just over a year; is |
| 15:08:10 | 20 | that right? |
| | 21 | A.   About a year and a half, yes. |
| | 22 | Q.   And during that time she was saying really good |
| | 23 | things about him; isn't that fair to say?  That she was crazy |
| | 24 | about him and they were in love and things like that, did she |
| 15:08:21 | 25 | report that to you? |

| | | |
|---|---|---|
| 15:08:26 | 1 | A. Yes. But -- I'll just tell you yes. Yes. |
| | 2 | Q. And I'm just asking you what she reported to you. |
| | 3 | I realize as a friend you might have had a different |
| | 4 | impression of that, but that's what she was reporting to you. |
| 15:08:40 | 5 | A. Yes. |
| | 6 | MR. TYNDALL: Can I have just moment, Your Honor? |
| | 7 | Q. Ms. Lee, all of the information you have related to |
| | 8 | the relationship is what Ms. Barbour reported to you; isn't |
| | 9 | that right? |
| 15:09:58 | 10 | A. That is correct. |
| | 11 | Q. You didn't go on trips or anything with my client |
| | 12 | and Ms. Barbour? |
| | 13 | A. No. |
| | 14 | MR. TYNDALL: Nothing further, Your Honor. |
| 15:10:12 | 15 | THE COURT: Anything further? |
| | 16 | MR. ZELLINGER: No, Your Honor. |
| | 17 | THE COURT: Thank you. |
| | 18 | MS. JAMES: Your Honor, can she just be on standby |
| | 19 | the same as all the other witnesses? |
| 15:10:21 | 20 | THE COURT: She can. |
| | 21 | MR. TYNDALL: That's fine. |
| | 22 | THE COURT: Thank you, ma'am. |
| | 23 | THE WITNESS: Thank you. |
| | 24 | (Witness excused.) |
| 15:10:28 | 25 | MS. JAMES: Your Honor, the State will call Amy |

| | | |
|---|---|---|
| 15:10:30 | 1 | Monsour. |
| | 2 | AMY CAYTON, |
| | 3 | having been called as a witness for the State and being duly |
| | 4 | sworn at 3:10 p.m., testified as follows: |
| 15:11:23 | 5 | MS. JAMES:  May I proceed, Your Honor? |
| | 6 | THE COURT:  Yes, ma'am. |
| | 7 | DIRECT EXAMINATION BY MS. JAMES: |
| | 8 | Q.  Ms. Monsour, can you please state your name for the |
| | 9 | court. |
| 15:11:33 | 10 | A.  My name now is Amy Cayton. |
| | 11 | Q.  I'm so sorry.  And could you spell it? |
| | 12 | A.  C-A-Y-T-O-N. |
| | 13 | Q.  I feel like I knew that.  I do apologize. |
| | 14 | What do you do for a living? |
| 15:11:54 | 15 | A.  I'm a teacher. |
| | 16 | Q.  Are you a teacher with Johnston County Public |
| | 17 | Schools? |
| | 18 | A.  Yes. |
| | 19 | Q.  At one point that was your married name? |
| 15:12:05 | 20 | A.  Monsour, yes. |
| | 21 | Q.  And how long have you known -- do you know Angie |
| | 22 | Barbour? |
| | 23 | A.  I have known her about five years. |
| | 24 | Q.  How did you guys meet? |
| 15:12:18 | 25 | A.  At work. |

| | | | |
|---|---|---|---|
| 15:12:24 | 1 | Q. | Are you guys -- are you and Ms. Barbour friends |

15:12:24    1         Q.    Are you guys -- are you and Ms. Barbour friends

            2    outside of work?

            3         A.    Yes.

            4         Q.    When did you guys become close?

15:12:32    5         A.    I would say probably around January 2021 is when we

            6    started hanging out outside of work.

            7         Q.    And during the summer of that year, did you guys

            8    spend time -- hang out and spend time together?

            9         A.    We did.

15:12:57   10         Q.    Did you know the defendant in this case, Ronald

           11    Johnson?

           12         A.    I know of him, yes.

           13         Q.    And how do you know of him?

           14         A.    He's on the board.

15:13:14   15         Q.    Now, at some point would Angie talk to you about

           16    her relationship with the defendant?

           17         A.    She did.

           18         Q.    And what kind of things would you guys talk about

           19    concerning her relationship with the defendant?

15:13:43   20         A.    I had opened up to her about my marriage ending at

           21    the time, and she opened up to me that she was having issues

           22    in her marriage and that she was -- eventually she told me she

           23    was having an affair with Mr. Johnson.

           24         Q.    Now, at some point would she go places with him?

15:14:10   25         A.    She would.

| | | |
|---|---|---|
| 15:14:12 | 1 | Q. What would she ask you to do whenever she would go |
| | 2 | places with him? |
| | 3 | A. She wouldn't really ask me to do anything, but she |
| | 4 | would say, hey, we're going to Raleigh on Friday night. And |
| 15:14:26 | 5 | it's kind of a joke. Like I was her alibi, even though no one |
| | 6 | ever asked me where she was or what she was doing, but we had |
| | 7 | talked about, you know, she didn't want anyone to know where |
| | 8 | she was, and so I would be the one that would say that she was |
| | 9 | with me if they asked. |
| 15:14:49 | 10 | Q. At some point did she ask you -- did she send you |
| | 11 | or communicate with you and ask you for a favor with regard to |
| | 12 | her and the defendant? |
| | 13 | A. Concerning? Or about what? |
| | 14 | Q. At some point did she ask you to participate in a |
| 15:15:12 | 15 | threesome? |
| | 16 | A. Yes. |
| | 17 | Q. How did she communicate that information to you? |
| | 18 | A. It was over a couple different conversations. The |
| | 19 | first conversation we had we were out, and it was just like |
| 15:15:28 | 20 | casually brought up, have I ever had a threesome. And of |
| | 21 | course, I asked her why she was asking me that. And she said |
| | 22 | that Ronald Johnson wanted her to have a threesome, and we |
| | 23 | just kind of talked about threesomes at that time. They |
| | 24 | didn't mention my name or anything during that conversation. |
| 15:15:53 | 25 | The next conversation I had with her about the |

Amy Cayton - Direct by Ms. James

15:15:55   1   threesome, she said that he had mentioned my name.  I guess he

           2   called me Dinosaur because my name was Monsour, so through

           3   messages he called me that, and he said, what about Dinosaur

           4   for the threesome?  And when she told me, I just laughed it

15:16:16   5   off.  I really didn't think it was a serious thing.

           6          And the third time she -- it was one of those times

           7   when she was going away.  She was going to Charlotte.  And she

           8   had said something to me about going to Charlotte with her.  I

           9   said, yea, I'll go with you, because that was just what I did

15:16:34  10   when I did the alibi thing.  And it wasn't until like a day

          11   before or close to when she was going to go to Charlotte that

          12   she talked to me again and she was more serious about picking

          13   me up and what time she was going to pick me up.  And the more

          14   we talked, the more I realized she actually did want me to go

15:16:55  15   to Charlotte to have a threesome.  And at that point I was

          16   like, no, I'm -- no, that's -- no.  And she got upset.

          17          She said that she promised Ronald and he would be

          18   upset with her if I didn't go.  I just kept saying, you know,

          19   Angie, I can't do this.  I can't.  I didn't realize you were

15:17:19  20   serious.  I thought you were just saying you were going to

          21   Charlotte with him, you know, and I was the alibi person.

          22          She went to Charlotte.  The next time I heard from

          23   her I think she sent me a text with like a wavy hand and said

          24   something like awkward moment, or something like that.  And,

15:17:38  25   you know, from that point on, we just started talking again.

| | | |
|---|---|---|
| 15:17:42 | 1 | We laughed it off. And I said it wasn't a big deal. We're |
| | 2 | friends, and, you know, that's fine. |
| | 3 | Q. And you guys are still friends now? |
| | 4 | A. Oh, yea, yea. |
| 15:17:55 | 5 | MS. JAMES: May I have a moment Your Honor? |
| | 6 | THE COURT: Yes, ma'am. |
| | 7 | MS. JAMES: No further questions. |
| | 8 | THE COURT: Mr. Tyndall. |
| | 9 | MR. TYNDALL: Thank you, Your Honor. |
| 15:18:07 | 10 | CROSS-EXAMINATION BY MR. TYNDALL: |
| | 11 | Q. Did you say Ms. Cayton? |
| | 12 | A. Cayton. |
| | 13 | Q. Spell that for me, please. |
| | 14 | A. C-A-Y-T-O-N. |
| 15:18:13 | 15 | Q. C-A-Y-T-O-N, so Cayton. Did you -- you talked a |
| | 16 | little bit, but you learned pretty early on that my client and |
| | 17 | Ms. Barbour were having a relationship; is that right? |
| | 18 | A. Yes. |
| | 19 | Q. And I think you described her in a prior interview. |
| 15:18:31 | 20 | Did you tell someone that she was super excited about the |
| | 21 | relationship? |
| | 22 | A. She was. She was excited about it. |
| | 23 | Q. And that she thought it would be forever and seemed |
| | 24 | very happy? |
| 15:18:52 | 25 | A. She did. |

| | | | |
|---|---|---|---|
| 15:18:55 | 1 | Q. | And that she was head over heels for him? |
| | 2 | A. | Yes. |
| | 3 | Q. | And now, did Mr. Johnson never contact you to have |
| | 4 | a threesome with him; did he? | |
| 15:19:03 | 5 | A. | No. |
| | 6 | Q. | He didn't ask you for anything; did he? |
| | 7 | A. | No. |
| | 8 | Q. | So all this is coming from your good friend? |
| | 9 | A. | Correct. |
| 15:19:10 | 10 | Q. | And you said that she invited you for a threesome, |
| | 11 | but she said it was actually him who wanted to do it? | |
| | 12 | A. | Correct. |
| | 13 | Q. | Are you friends with her on Facebook? |
| | 14 | A. | Yes. |
| 15:19:20 | 15 | Q. | And do you -- have you seen her posts that say |
| | 16 | hashtag threesome with your face on it? | |
| | 17 | | (Defendant's Exhibit Numbers 13 and 14 marked |
| | 18 | | for identification.) |
| | 19 | A. | They say hashtag twosome, I believe. |
| 15:19:33 | 20 | | MR. TYNDALL: May I approach, Your Honor? |
| | 21 | | THE COURT: Yes, sir. |
| | 22 | Q. | Ms. Monsour, if I can ask you one question. Do you |
| | 23 | remember the date of May 23rd of 2022? | |
| | 24 | A. | Just that that's my birthday. I don't know |
| 15:20:58 | 25 | anything else about it. | |

Amy Cayton - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 15:20:59 | 1 | Q. Do you remember being with Ms. Barbour? |
| | 2 | A. Yes. |
| | 3 | Q. And do you remember her making phone calls to my |
| | 4 | client or his wife? |
| 15:21:08 | 5 | A. I do. |
| | 6 | Q. And were you aware that she sent my client a |
| | 7 | message saying: Your threesome is here tonight? |
| | 8 | A. No. |
| | 9 | Q. Now, I'm going to show you what's been marked |
| 15:21:24 | 10 | State's Exhibit Number 13 and 14, if you will. See if those |
| | 11 | refresh your recollection about some of her Facebook posts. |
| | 12 | A. I remember the post. I thought it said twosome on |
| | 13 | there though. |
| | 14 | Q. Do you remember her taking a photo of you and |
| 15:22:01 | 15 | Ms. Barbour together in October of 2022? |
| | 16 | A. Do I remember a photo? Is that the photo from |
| | 17 | 2022? |
| | 18 | Q. I'm just asking you. Do you remember appearing in |
| | 19 | photos on Facebook with Ms. Barbour? |
| 15:22:18 | 20 | A. I know we took photos, and they were on Facebook, |
| | 21 | yes. |
| | 22 | Q. And do you remember there being a hashtag |
| | 23 | threesome? |
| | 24 | A. No. |
| 15:22:51 | 25 | Q. Ms. Monsour, during this time Ms. Barbour made the |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 15:22:54 | 1 | choice of being in a relationship with Mr. Johnson. There's |
| | 2 | no doubt in your mind about that, is there? |
| | 3 | A.   Correct. |
| | 4 | MR. TYNDALL:  Nothing further, Your Honor. |
| 15:23:03 | 5 | THE COURT:  Ms. James. |
| | 6 | REDIRECT EXAMINATION BY MS. JAMES: |
| | 7 | Q.   He just showed you a picture.  He asked you if that |
| | 8 | was in October of 2022.  Was that when those posts were made? |
| | 9 | Did you make those posts? |
| 15:23:15 | 10 | A.   I don't remember making those posts.  I don't |
| | 11 | remember that specific date, no. |
| | 12 | Q.   And you had nothing to do with that post.  Was that |
| | 13 | on your page or hers? |
| | 14 | A.   I don't even -- I don't even remember.  I don't |
| 15:23:32 | 15 | think it's on mine. |
| | 16 | Q.   Would you and Angie take selfies a lot together? |
| | 17 | A.   Yes. |
| | 18 | MS. JAMES:  No further questions, Your Honor. |
| | 19 | THE COURT:  Mr. Tyndall. |
| 15:23:51 | 20 | MR. TYNDALL:  I don't have any questions. |
| | 21 | THE COURT:  Thank you.  You may step down. |
| | 22 | Before we call the next witness, we're going to |
| | 23 | take our afternoon break for about 15 minutes.  Leave your |
| | 24 | notes in the seat.  We'll be back with you shortly. |
| 15:24:16 | 25 | (Jury exits.) |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 15:24:16 | 1 | (Witness excused.) |
| | 2 | THE COURT:  Thank you.  15 minutes. |
| | 3 | (Recess.) |
| | 4 | THE COURT:  Bring the jury in. |
| 15:45:33 | 5 | (Jury enters.) |
| | 6 | THE COURT:  Whenever you are ready, Ms. James. |
| | 7 | MS. JAMES:  Thank you, Your Honor.  The State calls |
| | 8 | Owen Phillips. |
| | 9 | OWEN PHILLIPS, |
| 15:45:39 | 10 | having been called as a witness for the State and being duly |
| | 11 | sworn at 3:46 p.m., testified as follows: |
| | 12 | DIRECT EXAMINATION BY MS. JAMES: |
| | 13 | Q.    Good afternoon.  Can you state your name for the |
| | 14 | jury. |
| 15:46:08 | 15 | A.    Owen Phillips. |
| | 16 | Q.    Mr. Phillips, what do you do for a living? |
| | 17 | A.    I'm self employed.  I'm a commercial contractor for |
| | 18 | cleaning. |
| | 19 | Q.    Do you know the defendant, Ronald Johnson, in this |
| 15:46:27 | 20 | case? |
| | 21 | A.    I do. |
| | 22 | Q.    How do you know the defendant? |
| | 23 | A.    We met back in 2006.  When I started working at the |
| | 24 | Smithfield Police Department, he was already employed there. |
| 15:46:35 | 25 | Q.    And so you guys worked together at the Smithfield |

| | | |
|---|---|---|
| 15:46:40 | 1 | Police Department? |
| | 2 | A. We were on the same squad for a year or so and |
| | 3 | continued to talk after I left Smithfield Police Department to |
| | 4 | go to Clayton Police Department. |
| 15:46:51 | 5 | Q. Over the years, how would you describe your |
| | 6 | relationship with the defendant? |
| | 7 | A. Friendly. As we may go a couple weeks without |
| | 8 | talking, but then we might text each other, see each other |
| | 9 | every once in a while, but it was like no time had gone by. |
| 15:47:14 | 10 | So it was one of those type relationships where friends who |
| | 11 | aren't really tight-knit all the time but still somewhat |
| | 12 | close. |
| | 13 | Q. And at some point did he run for school board? |
| | 14 | A. He did. |
| 15:47:30 | 15 | Q. Did you help him on his campaign when he ran? |
| | 16 | A. I did. |
| | 17 | Q. What did you help him with? |
| | 18 | A. I've help put together some signs, the roadway |
| | 19 | signs, and passing out some of the information cards at the |
| 15:47:45 | 20 | polling places. |
| | 21 | Q. At some point during this relationship would the |
| | 22 | defendant ask you to do certain things for him? |
| | 23 | A. Yes, ma'am. |
| | 24 | Q. What kind of things would he ask you to do? |
| 15:48:04 | 25 | A. Different things that seemed -- different things |

| | | |
|---|---|---|
| 15:48:07 | 1 | that seemed not really wrong, but somewhat iffy. Like, for |
| | 2 | example, drive a car past a house or down the street in a |
| | 3 | subdivision in Clayton two or three times and at night. I'm |
| | 4 | not sure why. I didn't ask. Maybe I should have. There was |
| 15:48:27 | 5 | that. There was -- |
| | 6 | Q. Before you say something else, if you can get |
| | 7 | closer to the microphone so that everybody can hear you. |
| | 8 | A. Yes, ma'am. |
| | 9 | Q. You stated that he would ask you to drive a car up |
| 15:48:39 | 10 | a street two or three times? |
| | 11 | A. Yes, ma'am. On one occasion. |
| | 12 | Q. On one occasion. And would you ask him why? |
| | 13 | A. I did not. |
| | 14 | Q. What subdivision was this? |
| 15:48:53 | 15 | A. The Glen Laurel subdivision. |
| | 16 | Q. What other things would he ask you to do? |
| | 17 | A. On one occasion he asked me to go to an apartment |
| | 18 | complex in town and watch an apartment building. He had |
| | 19 | gotten -- he said he got a complaint a teacher was having an |
| 15:49:17 | 20 | inappropriate relationship with a student and he was across |
| | 21 | the county and he wanted to check it out himself. He asked if |
| | 22 | I would stand by and watch until he got there to see if this |
| | 23 | meeting took place. |
| | 24 | Q. And did you do that? |
| 15:49:32 | 25 | A. I did. |

Owen Phillips - Direct by Ms. James

15:49:33   1     Q.   And did you see this teacher or this person meet

2   with somebody?

3     A.   Yes, ma'am, I did.

4     Q.   And what did you observe in that meeting?

15:49:45   5     A.   I observed her. I believe she was on the third

6   floor. She came down to the bottom floor, a red car pulled

7   up, a gentleman got out and spoke with her. I then called

8   Ronald and said this person is here. I'm not sure who they

9   are. They talked for a little bit more, and then she got in

15:50:06   10   the car and left with him, and he told me to follow them to

11   see where they were going.

12     Q.   And did you follow that car?

13     A.   I did.

14     Q.   Where did you follow that car to?

15:50:17   15     A.   To McKinley's. It's a bar right across the street.

16     Q.   And this person, this teacher was meeting with, did

17   it look like a student to you?

18     A.   He did not. I told him when we got to the parking

19   lot. I said this person does not look young enough to be a

15:50:35   20   student. He looked a lot older and maybe it was someone else.

21     Q.   Now, did he ask you to take pictures or anything of

22   them?

23     A.   He did. I took pictures while I was at the

24   apartment complex watching the two interact with each other.

15:50:51   25   I took one more photo when I got to the parking lot of the bar

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 15:50:56 | 1 | so he could see that the person looked a little bit older than |
| | 2 | a student, because I was parked maybe a couple cars away so I |
| | 3 | could get a good picture of it. |
| | 4 | Q.   Did he show up at the bar and meet you there? |
| 15:51:12 | 5 | A.   He did. |
| | 6 | Q.   What did the two of you guys do in this parking lot |
| | 7 | while you're watching this person? |
| | 8 | A.   I told him she had gone inside with the gentleman, |
| | 9 | whoever she met, and they'd been in for a few minutes.  And |
| 15:51:24 | 10 | initially he told me to go inside and pick up a to-go order |
| | 11 | and try to get pictures of them and see where they were at. |
| | 12 | He said, no, I'll just do it myself.  And after that, I left |
| | 13 | shortly after that.  I don't know what happened following |
| | 14 | that. |
| 15:51:38 | 15 | Q.   Now, later on as -- strike that. |
| | 16 | Do you remember during what time period he asked |
| | 17 | you to follow this person? |
| | 18 | A.   It's been so long.  I can't quite remember what |
| | 19 | time of year it was. |
| 15:52:00 | 20 | Q.   And when you followed this person, did you later |
| | 21 | find out who the woman you were following? |
| | 22 | A.   I did.  Months later I did. |
| | 23 | Q.   And months later who did you find out this person |
| | 24 | was? |
| 15:52:14 | 25 | A.   Angie Barbour. |

| | | |
|---|---|---|
| 15:52:23 | 1 | Q. Now, did he ask you to follow Angie Barbour any |
| | 2 | other time or keep tabs on her any other time? |
| | 3 | A. Not in the aspect. |
| | 4 | Q. What aspect did he ask you to do something with |
| 15:52:36 | 5 | Angie Barbour? |
| | 6 | A. It was a few months after that, he called me and |
| | 7 | asked me to meet him. Once at that Planet Fitness in |
| | 8 | Smithfield in the parking lot. He said that there was lady |
| | 9 | who was obsessed with him, that he needed to get her attention |
| 15:52:52 | 10 | off of him and on someone else and asked me if I wouldn't mind |
| | 11 | talking to her trying to date her. |
| | 12 | Q. So he asked you to date Angie Barbour? |
| | 13 | A. Correct. |
| | 14 | Q. What did you say to him? |
| 15:53:12 | 15 | A. I told him, okay, but I didn't follow through. I |
| | 16 | didn't message her. I didn't because I was told she's kind of |
| | 17 | crazy, I need her to get away from me. So I was like, I'm not |
| | 18 | going to bring that crazy upon myself. So I kind of backed |
| | 19 | off, and I didn't message her for at least close to two weeks. |
| 15:53:33 | 20 | And he kept asking me if I'd messaged her. I lied to him. I |
| | 21 | told him I did because I wanted him off my back about it, but |
| | 22 | -- because I didn't to talk with her about that. |
| | 23 | Q. And did you set up a Snapchat -- |
| | 24 | A. I did. |
| 15:53:48 | 25 | Q. -- account and communicate with Angie Barbour on |

| | | |
|---|---|---|
| 15:53:51 | 1 | it? |
| | 2 | A. Yes, ma'am. |
| | 3 | Q. And did you send her dirty pictures? |
| | 4 | A. No, ma'am. |
| 15:54:10 | 5 | Q. You stated you lied about contacting Angie Barbour. |
| | 6 | Eventually you did contact her; correct? |
| | 7 | A. Yes. |
| | 8 | Q. Okay. And when you contacted her, what was your |
| | 9 | understanding with the relationship between the defendant and |
| 15:54:29 | 10 | Ms. Barbour? |
| | 11 | A. I had no clue what their relationship was until I |
| | 12 | believe it was maybe a Friday -- Thursday or Friday evening. |
| | 13 | I don't recall which one. It was toward the end of the week. |
| | 14 | She started messaging me. I think she may have been |
| 15:54:43 | 15 | intoxicated by the way she continued to message me, but |
| | 16 | something to the effect of, do you know if Ronald's wife is |
| | 17 | pregnant. He's telling me she's pregnant so he can't be with |
| | 18 | me. And she just continued to, I guess, pester me with |
| | 19 | questions for the next two hours about, is he really doing |
| 15:55:00 | 20 | this, is he really doing that. Which I quickly put two and |
| | 21 | two together, because I never even looked to see who the woman |
| | 22 | was, like at all. And I said, oh, that's the lady who he had |
| | 23 | me follow. And two and two said that she's telling the truth. |
| | 24 | There was a relationship I didn't know about. They were |
| 15:55:16 | 25 | having an affair of some sort from what she was telling me. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

15:55:20  1      Q.   And what did he tell you about the relationship?

        2      A.   Nothing.  As far as I knew, they were just

        3    acquaintances, possibly friends who -- and she was someone who

        4    had become infatuated with him.

15:55:30  5      Q.   And he didn't tell you about the affair with her?

        6      A.   No, ma'am, he did not.

        7      Q.   Now, at some point did you meet with Ms. Barbour?

        8      A.   I did.  I believe I may have met with her the very

        9    next day.  I believe that's what it was.

15:55:55 10      Q.   Do you remember when this meeting occurred, what

       11    time of year?

       12      A.   I don't believe it was winter, because I don't

       13    remember it being cold.  I don't.

       14      Q.   Was it like in 2021?  2022?

15:56:05 15      A.   Oh, what year?

       16      Q.   What year.

       17           Let me ask you this, Mr. Phillips.  Do you remember

       18    getting information about your kids possibly being

       19    transferred?

15:56:21 20      A.   I do.

       21      Q.   Okay.  And did you meet with Ms. Barbour before or

       22    after that?

       23      A.   Before.

       24      Q.   So you would have met with her before all this

15:56:27 25    stuff with your children occurred?

Owen Phillips - Direct by Ms. James

| | | |
|---|---|---|
| 15:56:30 | 1 | A.    Correct. |
| | 2 | Q.    And so where did you guys meet at? |
| | 3 | A.    At the Clayton Municipal Park on Amelia Road in |
| | 4 | Clayton. |
| 15:56:46 | 5 | Q.    Tell me about that meeting.  Why did you want to |
| | 6 | meet there?  Get close to the microphone. |
| | 7 | A.    Yes, ma'am.  At, like I said, the night before when |
| | 8 | she had sent all those messages and whatnot, I was kind of |
| | 9 | curious what was going on.  And the very next morning Ronald |
| 15:57:05 | 10 | had called me.  I was doing something and I didn't get a |
| | 11 | chance to answer the phone.  He left a voicemail and said, |
| | 12 | this lady is crazy.  You need to block her, quit talking to |
| | 13 | her.  She's saying that you're telling her to do all these |
| | 14 | things.  She's crazy. |
| 15:57:19 | 15 | He called me at one point and said she's telling |
| | 16 | everybody that you're saying these things about me and that |
| | 17 | you're trying to get her into a sex ring.  And at that point, |
| | 18 | I realized that he was just trying to get me to -- from |
| | 19 | speaking with her that little bit, there was no way that I |
| 15:57:38 | 20 | didn't believe any of that, the fact that I didn't know that |
| | 21 | he was having an affair with her and everything else.  I felt |
| | 22 | like he was just trying to play me at that point. |
| | 23 | So at the same time some of the things he said |
| | 24 | seemed too specific, and the first time I messaged her, I said |
| 15:57:54 | 25 | maybe we should meet.  And literally as soon as I said that, |

| | |
|---|---|
| 15:57:56 | 1 | maybe within three to five seconds he texted me, what's going |
| | 2 | on? Did you block this lady? Blah, blah, blah. Which I |
| | 3 | thought might have been coincidental, but then when I was |
| | 4 | driving into town, I texted her again, and I said, is there |
| 15:58:08 | 5 | any way you can meet me at community park. And within three |
| | 6 | to five seconds, again my phone started ringing. He continued |
| | 7 | to call me until I turned my phone off. And I met with her at |
| | 8 | the park then. |
| | 9 | Q. Now, when you said he continued to call you, who is |
| 15:58:23 | 10 | that "he?" Is that the defendant? |
| | 11 | A. Yes, ma'am, Ronald Johnson. |
| | 12 | Q. So you sent her a text message and he starts |
| | 13 | calling you, telling you this lady is crazy, block her, don't |
| | 14 | meet her. Did it seem to you -- what did it seem to you that |
| 15:58:37 | 15 | he was trying to prevent you from doing? |
| | 16 | A. I felt like he did not want me talking -- he did |
| | 17 | not want me talking to her any further, because I told her |
| | 18 | some truthful things. When I found out what she was saying, |
| | 19 | you know, he's been leading me on, he's been doing this and |
| 15:58:51 | 20 | some other stuff. And I said, well, we need to meet to talk |
| | 21 | about this because I think you are being told a lot of lies, |
| | 22 | and you need to know the truth about this. I was -- I'm |
| | 23 | sorry. |
| | 24 | Q. Go ahead. |
| 15:59:01 | 25 | A. I was also worried that -- I told her when we |

15:59:03  1    pulled up -- when I pulled up to the park, I said -- just like

2    this, I said, you never met me before.  Would you please leave

3    your phone in your car and let's just get in mine.  I think

4    he's got your phone bugged because he keeps calling me

15:59:15  5    whenever I message you.  That was another reason I wanted to

6    meet with her in person to talk to her.

7         Q.    And did she do what you said?

8         A.    She did.

9         Q.    Okay.  And at some point did you go through her

15:59:26  10   phone?

11        A.    I did not.

12        Q.    You didn't.  Okay.  So you guys get into your car

13   and you drive away?

14        A.    Yes, ma'am.

15:59:34  15        Q.    And what do you talk about?

16        A.    We probably drove around maybe ten minutes, around

17   town like in a large loop.  And the reason I drove is I told

18   her, I said, well, if he knows we're meeting at the park, we

19   need to get away from here in case he shows up.

15:59:53  20             But we drove around, and she starts telling me

21   various details of their relationship and other detailed

22   things that made me believe her immediately the whole time.

23   And I told her, I said, I did not know about any of these

24   things.  And she said, well, you're his ride or die, why would

16:00:09  25   you say that he's not doing these things?  If he says I'm his

| | | |
|---|---|---|
| 16:00:12 | 1 | ride or die and I'm telling you that he's lying to you, you |
| | 2 | should believe he's lying to you. |
| | 3 | But there was so many different things within that |
| | 4 | ten minutes that she just went on and on about. It was from |
| 16:00:23 | 5 | like the beginning of the relationship to that point that I |
| | 6 | was just -- I said I can't believe this is going on. |
| | 7 | Q. Okay. Now, once she tells you all these things, do |
| | 8 | you all go back to the park? |
| | 9 | A. Yes, ma'am. |
| 16:00:37 | 10 | Q. Okay. And what happens? Do you all part ways? |
| | 11 | What happens? |
| | 12 | A. She got in her car. We parted ways. And that was |
| | 13 | it from then. |
| | 14 | Q. Now, did you talk to the defendant again after |
| 16:00:49 | 15 | that? |
| | 16 | A. No, ma'am. |
| | 17 | Q. At some point did you talk to the defendant about |
| | 18 | the affair? |
| | 19 | A. No, ma'am. |
| 16:01:00 | 20 | Q. Okay. Did he find out that you knew about the |
| | 21 | affair? |
| | 22 | A. I assume so when -- because she said she was going |
| | 23 | to give him an earful, or something like that. So I assume |
| | 24 | whenever he -- after I dropped her off that she was going to |
| 16:01:13 | 25 | go back and tell him everything I said anyway. So at that |

| 16:01:16 | 1 | point I went ahead and blocked him. So that day at the park I |
| | 2 | blocked his number and any other way for him to communicate |
| | 3 | with me at that point. |
| | 4 | Q. Now, at some point would he ask you to get |
| 16:01:31 | 5 | cellphones or different things for him? |
| | 6 | A. Yes. That happened in the same time frame as when |
| | 7 | I was driving past that house in the Glen Laurel subdivision. |
| | 8 | Q. And tell me about the cellphone. |
| | 9 | A. It was basically -- once again, he met me Planet |
| 16:01:51 | 10 | Fitness parking lot, asked me if I'd be willing to go buy a |
| | 11 | prepaid cellphone from Wal-Mart for him. |
| | 12 | Q. Did you ask him why? |
| | 13 | A. I don't believe I did, no. |
| | 14 | Q. And did you go and get that cellphone? |
| 16:02:09 | 15 | A. I did. |
| | 16 | Q. Did you give it to him? |
| | 17 | A. I did. |
| | 18 | Q. And when you drove through -- at some point did he |
| | 19 | ask you to drive -- who's Monica Ward? |
| 16:02:30 | 20 | A. My girlfriend. |
| | 21 | Q. Okay. And what type of car does she have? |
| | 22 | A. A black Nissan Rogue. |
| | 23 | Q. At some point did he ask you to drive her car |
| | 24 | somewhere? |
| 16:02:40 | 25 | A. Yes. That was through the Glen Laurel subdivision. |

| 16:02:44 | 1 | Q. And why did he want you to drive her car? |
| | 2 | A. I believe because my -- I had a Jeep, and it would |
| | 3 | be too recognizable for what it was. Like someone could |
| | 4 | potentially recognize my vehicle because it was -- the |
| 16:02:58 | 5 | modifications on it made it a little more specific for someone |
| | 6 | to identify. |
| | 7 | Q. So your car stood out and hers didn't. |
| | 8 | A. Correct. |
| | 9 | Q. And did you find out who lived at the Glen Laurel |
| 16:03:12 | 10 | neighborhood that you were asked to go to? |
| | 11 | A. I didn't find out that night. I can't remember. |
| | 12 | He asked me a couple months later about finding a phone number |
| | 13 | for someone's husband who lived on the street in the Glen |
| | 14 | Laurel subdivision. That's when I was like -- or it may have |
| 16:03:30 | 15 | been -- maybe it was after that. But that's when I started |
| | 16 | thinking, I wonder if that's the person's house that I was |
| | 17 | supposed have driven by, if that had something to do with it. |
| | 18 | Q. And who was that person? |
| | 19 | A. I can't recall the name right now. |
| 16:03:43 | 20 | Q. Mr. Phillips, how many children do you have? |
| | 21 | A. Four. |
| | 22 | Q. And how old are your children? |
| | 23 | A. 18, 19, 24, and 27. |
| | 24 | Q. And do you know a Seth and Asher Phillips? |
| 16:04:29 | 25 | A. Seth Ash Phillips? |

Owen Phillips - Direct by Ms. James

| | | |
|---|---|---|
| 16:04:32 | 1 | Q. Ash Phillips, I'm sorry. |
| | 2 | A. Well, it was Seth and Owen. Those are my two |
| | 3 | youngest, 18 and 19. |
| | 4 | Q. And does Owen go by something else? |
| 16:04:42 | 5 | A. No. |
| | 6 | Q. Okay. And what school do they go to? |
| | 7 | A. Clayton High School. |
| | 8 | Q. Did all your children go to Clayton High School? |
| | 9 | A. No, ma'am. |
| 16:04:53 | 10 | Q. And your two youngest children, what type of |
| | 11 | disabilities do they have? |
| | 12 | A. They both have autism. |
| | 13 | Q. And are you and your wife still together? |
| | 14 | A. We are not, no. |
| 16:05:14 | 15 | Q. And do you share custody of these children? |
| | 16 | A. We do. |
| | 17 | Q. Okay. And since you all are not together, I take |
| | 18 | it you all don't stay together either. Do you all live |
| | 19 | together, you and your ex-wife? |
| 16:05:26 | 20 | A. No, ma'am. |
| | 21 | Q. Okay. And so where do you live at? |
| | 22 | A. Currently? |
| | 23 | Q. Uh-huh. |
| | 24 | A. Smithfield, on 5th Street -- 4th Street in |
| 16:05:33 | 25 | Smithfield. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | |
|---|---|
| 16:05:34 | 1 |

16:05:34    1    Q.    And at some point did you live within the district?

            2    Who lived within the Clayton High School district?

            3    A.    You mean when they were --

            4    Q.    In school.

16:05:44    5    A.    -- in school?  Initially she lived in Riverwood

            6    subdivision, so they were tested for that school.  And I was

            7    living in my parents' house between their house and Ms. Woods'

            8    house which is also both of us are in the district for Clayton

            9    High School.  So when she moved to Smithfield, their mother

16:06:01   10    moved to Smithfield, she thought she was going to have to take

           11    them out of school.  But I went to the school and spoke to

           12    someone -- I can't remember who -- up there, and I said we

           13    share custody 50/50, and my address is here, is it okay if

           14    they stay here?  And they told me it was.  So as far as I

16:06:16   15    know, they had been in district the whole time.

           16    Q.    Because you lived in district the whole time?

           17    A.    Correct.

           18    Q.    And at some point did you become aware of an

           19    attempt to move your children from that school?

16:06:35   20    A.    I did.  A David Marshburn called me.  I had no clue

           21    who this man was.  So when I was on the phone with him, he

           22    told me he was a private investigator.

           23    Q.    And don't tell me what Mr. Marshburn said, but you

           24    became aware of this?

16:06:50   25    A.    Yes, ma'am.

16:06:51    1          Q.    Once you became aware of this information, what did

            2    you do?

            3          A.    I sat on it for about two or three weeks because

            4    I -- when he told me this, my assumption was that -- because I

16:07:04    5    didn't know who he was, I was kind of guarded about what I

            6    told him.  I thought he made it up possibly to try to get me

            7    to say more, give him more information than I wanted to.  So I

            8    just kind of was, like, he must have made it up or something.

            9    But about three weeks later someone else, I want to say it may

16:07:21   10    have been Ms. Barbour, told me, have you heard that he was

           11    trying to get your kids -- Ronald Johnson was trying to get

           12    your kids moved out of the school.  I said I did hear that.

           13          So it was a conversation with the principal he

           14    had -- Ronald had a conversation with the principal, Bennett

16:07:37   15    Jones, about moving the kids.  So I asked Monica Ward.  She

           16    works at Jones in Clayton, a restaurant in Clayton, if he ever

           17    went there.  She said, yes, he goes there probably about once

           18    a week.  I said, the next time he's eating, since I don't know

           19    him that well, can you go to him and ask him if any of this is

16:07:57   20    true whatsoever.

           21          Q.    And did she do so?

           22          A.    About -- I want to say I asked her on a Wednesday,

           23    and I'd say that Friday -- Thursday or Friday she -- when she

           24    was done work, she said, yea, he said that basically the

16:08:09   25    conversation happened where he was trying to get the kids

16:08:12    1    removed.

            2        Q.    Now, once you found that out, did you send a

            3    complaint?

            4        A.    I did.  I e-mailed the president of the school

16:08:18    5    board.

            6        Q.    Now, at this time what was the status of your

            7    relationship with the defendant?

            8        A.    I had not spoken to him in, I'm sure, well over a

            9    year at that point, if not longer.

16:08:36   10        Q.    Once you sent this complaint, do you know anything

           11    about -- did your kids ever get moved?

           12        A.    They did not, no.

           13        Q.    Prior to you blocking him, which happened after

           14    your meeting with Angie Barbour; correct?

16:09:41   15        A.    Correct.

           16        Q.    And what was -- when was the last time you spoke to

           17    the defendant, and what did you speak about?

           18        A.    You mean prior to when I blocked him?

           19        Q.    Yes.

16:09:51   20        A.    It was when he said -- when he was telling me

           21    something about that she was running around telling lies,

           22    saying I told her things about -- was telling her various

           23    things about him and that I was trying to tell people that I

           24    was trying to get her into a sex ring or sex cult.  Whatever

16:10:06   25    it was it sounded so ridiculous that's when I kind of through

| | | |
|---|---|---|
| 16:10:09 | 1 | my hands up and said this is -- this whole thing, something is |
| | 2 | wrong with it. |
| | 3 | MS. JAMES: May I have a moment, Your Honor? |
| | 4 | THE COURT: Yes, ma'am. |
| 16:10:31 | 5 | Q. You stated your kids were you at Clayton High |
| | 6 | School. What type of programming did they get for their |
| | 7 | autism at that school? |
| | 8 | A. They had IEPs. They each had different programs. |
| | 9 | So they have different services, different -- well, the two, |
| 16:10:48 | 10 | one had a different track for his high school diploma's; Owen, |
| | 11 | the 19-year old, and Seth had one where he was -- had a little |
| | 12 | more mainstream, but still has assistance with it. He had |
| | 13 | someone he could talk to. He had a safe place to go if he was |
| | 14 | out of sorts. Owen had more directed, one-on-one type |
| 16:11:11 | 15 | classroom situation. |
| | 16 | Q. And did you want your children moved from this |
| | 17 | school? |
| | 18 | A. I did not, no. |
| | 19 | Q. And during this time, had you ever gotten any DSS |
| 16:11:24 | 20 | complaints about your kids -- |
| | 21 | A. No, ma'am. |
| | 22 | Q. -- made against you? |
| | 23 | A. No, ma'am. |
| | 24 | Q. How about your wife? |
| 16:11:32 | 25 | A. No. |

| | | |
|---|---|---|
| 16:11:33 | 1 | Q.   At some point would he play recordings for you, |
| | 2 | Mr. Phillips? |
| | 3 | A.   Yes.  I remember him playing one with a -- he had |
| | 4 | spoken to an attorney once.  There was just a little snippet |
| 16:12:30 | 5 | of it.  I can't remember who it was.  Or it had something to |
| | 6 | do with like an attorney with the school board, whoever worked |
| | 7 | with the school board.  I can't remember who.  But that was |
| | 8 | about the only one I can recall him playing.  It was just like |
| | 9 | a small little -- I can't remember what was said on it. |
| 16:12:54 | 10 | Q.   Did he ever talk to you about people giving him |
| | 11 | favors? |
| | 12 | A.   Yes, ma'am. |
| | 13 | Q.   Okay.  Tell me about. |
| | 14 | A.   He would just say different people that he knew |
| 16:13:03 | 15 | would do things for him.  I can't remember the person's name. |
| | 16 | I remembered it when I was first interviewed about it and it |
| | 17 | was investigated.  I knew the name of someone with like maybe |
| | 18 | TJ.  I don't know.  It was someone with initials.  It was |
| | 19 | someone who would do a lot of things for him. |
| 16:13:22 | 20 | Like if there was something that may have been a |
| | 21 | little more -- I can't remember how he put it.  Basically |
| | 22 | unsavory.  I remember that he would have this person |
| | 23 | requesting to go do whatever it was.  He never gave me |
| | 24 | examples of it or anything.  I just met the guy once or twice |
| 16:13:39 | 25 | when he was putting out signs for the school board. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 16:14:02 | 1 | MS. JAMES: Nothing further questions at this time, |
| | 2 | Your Honor. |
| | 3 | THE COURT: Mr. Tyndall. |
| | 4 | CROSS-EXAMINATION BY MR. TYNDALL: |
| 16:14:06 | 5 | Q. Mr. Phillips, you mentioned that you live in |
| | 6 | Clayton. But did -- in 2022, did you live at 614 Forest Ridge |
| | 7 | Road, Garner, North Carolina? |
| | 8 | A. No, sir, I did not. My children live there. My |
| | 9 | two older children. My daughter lived there. And for some |
| 16:14:22 | 10 | reason whenever my stuff is run through the system, because |
| | 11 | one of my cars is registered there, it had that come up as my |
| | 12 | address, but I never lived there, so... |
| | 13 | Q. So when you got a speeding ticket in 2022, was the |
| | 14 | address listed on the speeding ticket as 614 Forest Ridge |
| 16:14:43 | 15 | Road, Garner, North Carolina? |
| | 16 | A. It may have been, but that's all populated through |
| | 17 | DCI because DMV has it incorrectly because of the car, for |
| | 18 | some reason, but I never lived there, no, sir. |
| | 19 | Q. Did you tell Investigator Hoffman that you lived at |
| 16:14:55 | 20 | 614 Forest Ridge Road, Garner, North Carolina? |
| | 21 | A. I do not recall telling him that, no, sir. |
| | 22 | Q. Okay. And I don't know whether you did or not, but |
| | 23 | you don't remember that? |
| | 24 | A. No. Because that's where -- I never lived there. |
| 16:15:05 | 25 | It's just where my daughter lived. And her car was registered |

| | | |
|---|---|---|
| 16:15:07 | 1 | there -- well, I owned her vehicle, and she had it registered |
| | 2 | at that address for her insurance, and so somehow that got |
| | 3 | miscommunicated through DMV. So whenever my stuff is run, my |
| | 4 | name and information is run through DMV, for some reason that |
| 16:15:22 | 5 | address still pops up. It even popped up for the subpoena for |
| | 6 | this. So I'm not sure where the disconnect is. |
| | 7 | Q. So the DMV records show you living in Garner, North |
| | 8 | Carolina. You do concede that? |
| | 9 | A. I do not. My driver's license all say Clayton or |
| 16:15:37 | 10 | Smithfield. None of them ever say Garner, North Carolina. |
| | 11 | Q. So I think you just said when the subpoena was |
| | 12 | issued, it was issued to you in Garner; is that right? |
| | 13 | A. I believe that may have been the address on it. I |
| | 14 | can't remember. I thought I saw that strange address on it. |
| 16:15:51 | 15 | But I didn't get it from Garner. |
| | 16 | Q. Okay. |
| | 17 | A. No, sir. |
| | 18 | Q. Now, you mentioned your discussions with |
| | 19 | Ms. Barbour. Did you tell Investigator Hoffman during that |
| 16:16:01 | 20 | first meeting that she allowed you to look through her phone |
| | 21 | and you didn't find any irregularities? |
| | 22 | A. I don't recall. |
| | 23 | Q. Do you remember looking through her phone? |
| | 24 | A. I don't believe so. No, sir. I don't believe I |
| 16:16:13 | 25 | did. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter