16:16:14  1       Q.   Now, were you starting a securities business at

2    some point?

3           A.   Yes, sir.

4           Q.   And you worked at a police officer?

16:16:23  5       A.   Yes, sir.

6           Q.   And do you know how to look for irregularities on a

7    phone?

8           A.   To a point, but I don't remember looking at the

9    phone, sir.

16:16:45 10       Q.   Do you remember having a conversation with

11   Ms. Barbour on April 12th, 2022?

12          A.   Possibly.  I don't -- I don't remember the specific

13   day.  I mean, I don't believe I had a conversation that day.

14          Q.   You don't remember a particular conversation on

16:17:01 15   April 12th, 2022?

16          A.   No.  I don't remember that date, no, sir.

17          Q.   You were in communication with her during that

18   period of time; is that right?

19          A.   Yes, sir.  Most likely.  I don't...

16:17:37 20          MR. TYNDALL:  I don't have any further questions

21   for Mr. Phillips, Your Honor.

22          THE COURT:  Ms. James.

23          MS. JAMES:  No further questions, Your Honor.

24          THE COURT:  Thank you.  You can step down.

16:17:49 25          (Witness excused.)

Tracey Peedin Jones - Direct by Ms. James

| 16:17:52 | 1 | MS. JAMES: Your Honor, the State would call Tracey |
| | 2 | Peedin Jones. |
| | 3 | TRACEY FULLER PEEDIN JONES, |
| | 4 | having been called as a witness for the State and being duly |
| 16:18:01 | 5 | sworn at 4:18 P.m., testified as follows: |
| | 6 | DIRECT EXAMINATION BY MS. JAMES: |
| | 7 | Q.   Good afternoon, Ms. Jones.  How are you doing |
| | 8 | today? |
| | 9 | A.   I'm good.  How are you doing? |
| 16:19:23 | 10 | Q.   I'm doing well.  Can you please state your name for |
| | 11 | the jury. |
| | 12 | A.   Tracey Fuller Peedin Jones. |
| | 13 | Q.   What do you do for a living? |
| | 14 | A.   Currently I'm disabled.  I will be retiring in |
| 16:19:38 | 15 | July. |
| | 16 | Q.   And prior to becoming disabled and retiring, what |
| | 17 | did you do for a living? |
| | 18 | A.   My most recent position I was the employment |
| | 19 | assistant -- excuse me, employment systems administrator for |
| 16:19:51 | 20 | Johnston County Public Schools. |
| | 21 | Q.   At some point did you also work in other positions |
| | 22 | with the Johnston County Public School? |
| | 23 | A.   I did.  Before that I was the public information |
| | 24 | officer.  Before that I was the principal, assistant |
| 16:20:04 | 25 | principal, and I was a teacher. |

| | | |
|---|---|---|
| 16:20:06 | 1 | Q. And you taught the defendant in sixth grade; |
| | 2 | correct? |
| | 3 | A. I did, yes, ma'am. |
| | 4 | Q. And so you've known him for a very long time. |
| 16:20:14 | 5 | A. Correct. |
| | 6 | Q. At some point was he the school resource officer at |
| | 7 | the school you taught at? |
| | 8 | A. He was. He worked with the Smithfield Police |
| | 9 | Department, and he was the acting SRO when I was the principal |
| 16:20:27 | 10 | at Smithfield Middle School. |
| | 11 | Q. At some point you encouraged him to run for |
| | 12 | Johnston County Public School? |
| | 13 | A. I did. I thought he would be a good influence on |
| | 14 | the board of education. |
| 16:20:36 | 15 | Q. And so you're a big fan. |
| | 16 | A. Yes, I am. |
| | 17 | Q. And so at some point in this situation, did the |
| | 18 | defendant come to your house and play a recording for you? |
| | 19 | A. He did. He called me and spoke a little bit about |
| 16:20:51 | 20 | a situation where my pay, which, of course, would upset |
| | 21 | anybody, was being questioned, and he did ask to come to my |
| | 22 | house. I gave him my address, and my husband and I were there |
| | 23 | when he came and spoke with me, and he also did play a |
| | 24 | recording. |
| 16:21:06 | 25 | Q. Okay. And this recording that he played for you, |

16:21:09  1    what was it a recording of?

        2         A.    There was some people talking.  There was a board

        3    member Carroll, Kay Carroll, mentioned that if I'm going to

        4    keep my salary, I needed to apply for a position, a different

16:21:25  5    position.  And then another person said something like -- he

        6    mentioned that I needed to retire.

        7         Q.    Okay.  And at this time you were on FMLA?

        8         A.    I was.  I was out on FMLA at that time.

        9         Q.    Now, this recording, did he play that whole session

16:21:40 10    or just a snippet?

       11         A.    I just got a snippet.  There was just a snippet

       12    where it was specifically talking about me.

       13         Q.    And did he tell you this was from a closed session

       14    of a school board meeting?

16:21:53 15         A.    He didn't.  I made assumptions, but at no time did

       16    he tell me it was from a closed session.

       17         Q.    But he came to your house and played it for you.

       18         A.    He did, yes.

       19         Q.    Once you got that information, what did you do with

16:22:05 20    that?

       21         A.    I was very upset.  This is not the first time that

       22    the situation had come about.  Not due to my evaluations or

       23    anything like that, but just due to the amount of money that I

       24    was currently making.  At one time I had been a cabinet member

16:22:22 25    as a public information officer, and before I came in, he

16:22:25   1   actually made a level above that.  So nobody was demoted.  And

           2   those people got a really big salary which the newspaper was

           3   very upset about.  But they came in.  I kept my salary at that

           4   point in time.

16:22:37   5            Due to several, what I call, well, illegal

           6   situations and unethical situations that I continued to bring

           7   to HR at different points in time.  I felt the best thing for

           8   me to do, since it was not being listened to, would be move

           9   out of that position; specifically after I received threats

16:22:53  10   from the person above me, Dr. Renfrow and Dr. Brian Vetarno

          11   felt like they agreed and that it was probably best for me to

          12   be moved -- or for me to take a position that I had actually

          13   interviewed for, because that position actually was lower and

          14   less than my pay grade.  I didn't want to do that.  I wanted

16:23:12  15   to keep my pay grade.

          16            So at that point in time they actually came up with

          17   additional duties for me that actually went with talents.  A

          18   lot was the technology implementation of data programs that I

          19   took over to HR.  So I signed a brand-new contract with my new

16:23:29  20   salary.  Two years later when my contract came up, there were

          21   a lot of people at that point in time that were actually

          22   making higher salaries because they had been moved.  I was not

          23   moved.  I requested to leave.  So they were actually -- the

          24   board was trying to go through.  I was a part of HR at that

16:23:45  25   time so I was a part of that process trying to go through and

| | | |
|---|---|---|
| 16:23:48 | 1 | equal people's salaries.  My name was brought up even though I |
| | 2 | wasn't a part of that.  My salary was not changed at that |
| | 3 | time. |
| | 4 | Q.    Okay.  So that was a lot. |
| 16:23:58 | 5 | A.    Uh-huh. |
| | 6 | Q.    So let's break this down, Ms. Jones.  So you were |
| | 7 | in a position; correct -- |
| | 8 | A.    Yes. |
| | 9 | Q.    -- where eventually Dr. Renfrow, who was like the |
| 16:24:13 | 10 | incoming superintendent -- |
| | 11 | A.    Yes. |
| | 12 | Q.    -- had your -- put a cabinet or positions above you |
| | 13 | so you had to report to another supervisor.  You weren't happy |
| | 14 | about that. |
| 16:24:23 | 15 | A.    You know what, I was trying to make it work.  I was |
| | 16 | fine with that, to be quite honest.  I was good as long as I |
| | 17 | continued to be able to do my job, which is what I was able to |
| | 18 | do.  I was able to continue to be the PIO. |
| | 19 | Q.    So at some point your contract came up for renewal. |
| 16:24:38 | 20 | Was that renewal going to be in June of -- |
| | 21 | A.    Actually, it was twice during all of that process, |
| | 22 | but the last time was 2022. |
| | 23 | Q.    So it came up in June of 2022.  Okay.  And so this |
| | 24 | closed session you heard about -- or he played for you, was |
| 16:24:58 | 25 | that in the May 2022 closed session? |

16:25:02   1    A.   Yes.

2    Q.   And at some point you changed positions?

3    A.   I did.

4    Q.   Okay. Now, at any point was your salary changed

16:25:24   5   when your contract was renewed?

6    A.   No, it was not. After the 2022 conversation, I

7   actually called my boss at that time, and that was Brian

8   Vetarno; he was the chief of HR. I expressed my concerns that

9   my salary was being discussed, as anybody would be concerned

16:25:44   10   about that. He explained to me at that point -- he was very

11   vague, but he did explain to me at that point that there was

12   another session that was coming up, and the lawyer was looking

13   into -- you know, that the conversation had ended in that

14   meeting because the lawyer had said he really needed to look

16:25:59   15   into what they were asking for. He told me he really didn't

16   think that I needed to worry because, you know, it would go

17   against general statute if that's what occurred, and also the

18   FMLA comment. You have to be really careful about ADA and

19   telling someone they have to be retired when they are

16:26:17   20   disabled. So those were issues.

21     I also called Jimmy Lawrence at that time, who was

22   a lawyer in Smithfield. He stated to me that he would make

23   some calls.

24    Q.   Don't get into what Mr. Lawrence said.

16:26:30   25    A.   Not a problem.

Tracey Peedin Jones - Direct by Ms. James

| | | |
|---|---|---|
| 16:26:31 | 1 | Q. But did Mr. Lawrence advocate on your behalf? |
| | 2 | A. He did. He said he did. |
| | 3 | Q. Okay. |
| | 4 | A. And then come the next board meeting that occurred, |
| 16:26:41 | 5 | Vetarno called me in, who was my boss at the time. He called |
| | 6 | me after and said that things were fine, that I would keep my |
| | 7 | salary. |
| | 8 | Q. So your salary never changed. |
| | 9 | A. No, it did not change while I was working for the |
| 16:26:57 | 10 | school system. |
| | 11 | MS. JAMES: If I can just one moment. |
| | 12 | THE COURT: Yes, ma'am. |
| | 13 | Q. Just to make sure everybody understands. On that |
| | 14 | May closed session, they tabled that discussion? |
| 16:27:23 | 15 | A. Yes. |
| | 16 | Q. Okay. And then your salary came up in June 2022. |
| | 17 | A. Yes. |
| | 18 | Q. And it didn't change. |
| | 19 | A. No, it did not change. The lawyer was speaking to |
| 16:27:36 | 20 | that, is my understanding. |
| | 21 | Q. Did you tell anyone else that you listened to a |
| | 22 | closed session? |
| | 23 | A. No. In fact, I did not mention that to either |
| | 24 | Vetarno or Lawrence, and they didn't ask. I was more |
| 16:27:58 | 25 | concerned about the fact that my salary had come up. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

16:28:02    1    Q.   Did you mention it to anybody in HR that you had

2    heard the closed board session?

3    A.   No.   Uh-uh.   I did mention that I had spoken to

4    Mr. Johnson, but I had not mentioned a recording.

16:28:14    5    Q.   And then you were interviewed by Investigator

6    Hoffman?

7    A.   Yes.   That's correct.

8    Q.   So then you disclosed all the things that you knew

9    about that situation; correct?

16:28:29    10    A.   Yes.   That's correct.

11    MS. JAMES:   No further questions.

12    THE COURT:   Mr. Tyndall.

13    MR. TYNDALL:   Thank you, Your Honor.

14    CROSS-EXAMINATION BY MR. TYNDALL:

16:28:36    15    Q.   Ms. Peedin Jones, you've known my client for years;

16    is that right?

17    A.   Yes, sir.   That's correct.

18    Q.   And when you first met him, he was a student.

19    A.   He was.   He was a sixth grade student, yes, sir.

16:28:44    20    Q.   And later he came back when you were principal; is

21    that right?

22    A.   Yes, sir.   That's correct.

23    Q.   Tell me a little bit about his work as a school

24    resource officer.

16:28:53    25    A.   Honestly, everybody loved O.J.   That's what they

Tracey Peedin Jones - Cross

| 16:28:56 | 1 | called him there at Smithfield Middle School. The students -- |
| | 2 | honestly, the students, they absolutely loved him, and the |
| | 3 | teachers did too. The students would seek him out to tell him |
| | 4 | things. So to be quite honest, they would go to him first |
| 16:29:12 | 5 | before they would come to an administrator, because they felt |
| | 6 | that comradery with him. They knew that he was looking out |
| | 7 | for their best interests. And that really is -- he played |
| | 8 | basketball with them. He made time out of his day to be a |
| | 9 | part of their groups, and the students absolutely loved him. |
| 16:29:29 | 10 | Because not only was he there at the school, but he was also |
| | 11 | involved in the community as well. So there was a very big |
| | 12 | trust that was built with him. |
| | 13 | Q. And Ms. James asked you, you were the one who |
| | 14 | encouraged him to run for the board of education. |
| 16:29:48 | 15 | A. I did. One thing that I've always respected about |
| | 16 | Officer Johnson was the fact that he was all about what was |
| | 17 | doing -- what was right and doing what was best for the |
| | 18 | students. I felt that would be a good thing to add to the |
| | 19 | board of education. We worked very well together. I know |
| 16:30:03 | 20 | sometimes there are -- police officers have different rules |
| | 21 | than the school system does. So there are times where you can |
| | 22 | clash because my rules may be different. I can do things that |
| | 23 | he can't or he can do things that I could not. But we always |
| | 24 | seemed to be able to talk those through and do what was, once |
| 16:30:20 | 25 | again, in the best interests of the students. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

16:30:23  1          Q.   When he brought you this information about your

2     salary, did you at least feel like he was trying to do the

3     right thing?

4          A.   He did.  He was.  In fact, that's when he told

16:30:32  5     me -- he goes, I really want to play this for you.  I'm like,

6     I believe you.  I absolutely believe that you are not going to

7     tell me something that is not true.  And I feel like he felt

8     like he needed to play it because there were things that were

9     being said that, like I said, really went against general

16:30:49  10     statute when it came to HR law and really would be an issue

11     when it comes to ADA compliance as well.

12               MR. TYNDALL:  Nothing further, Your Honor.

13               MS. JAMES:  Briefly, Your Honor.

14     REDIRECT EXAMINATION BY MS. JAMES:

16:31:02  15          Q.   Now, you stated that he did like doing the right

16     thing, it felt like, when he was an SRO; correct?

17          A.   Correct.

18          Q.   Now, he was playing -- well, first of all, do you

19     feel like recording a closed session, which is against the

16:31:18  20     law, was the right thing for him to do as a school board

21     member?

22          A.   I guess it depends on what you felt was right in

23     that situation.  We had a lot of situations where things were

24     being done behind closed doors that really shouldn't have been

16:31:30  25     happening.  That was one of the reasons why the superintendent

Tracey Peedin Jones - redirect by Ms. James

| | | |
|---|---|---|
| 16:31:33 | 1 | did not want me to continue being the PIO. It's because there |
| | 2 | were several times that I explained that what they were |
| | 3 | bringing up in closed session was illegal and went against the |
| | 4 | general statutes. |
| 16:31:42 | 5 | Q. Okay. But you don't know what was going on in the |
| | 6 | closed session because he didn't play that whole closed |
| | 7 | session for you. |
| | 8 | A. No, he did not. |
| | 9 | Q. He only played the portion that dealt with you. |
| 16:31:51 | 10 | A. That is correct. |
| | 11 | Q. And so you didn't get the context of that |
| | 12 | conversation. |
| | 13 | A. No, not the context -- well, I did get the context |
| | 14 | that dealt with me. |
| 16:32:00 | 15 | Q. But not the context to the entire conversation. |
| | 16 | A. No. |
| | 17 | Q. Because there were other things discussed with |
| | 18 | other contracts of people that were in similar situations. |
| | 19 | A. Nobody else was in a similar situation to me. |
| 16:32:13 | 20 | Other people at that point in time were not. I do know |
| | 21 | because I was in HR that several people had been moved during |
| | 22 | their contract, and I had not been moved during my contract. |
| | 23 | Q. So that was under your understanding. |
| | 24 | A. Under my understanding, yes. |
| 16:32:28 | 25 | Q. But you weren't at the meeting because it was a |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 16:32:30 | 1 | closed session. |
|---|---|---|
| | 2 | A. No, I was not. |
| | 3 | Q. And you did not get to hear the whole entire closed |
| | 4 | session. |
| 16:32:35 | 5 | A. No. |
| | 6 | Q. He only played a little small snippet for you. |
| | 7 | A. That's correct. |
| | 8 | Q. So you didn't get the context of that conversation. |
| | 9 | A. No, I did not. |
| 16:32:45 | 10 | MS. JAMES: No further question. |
| | 11 | RECROSS-EXAMINATION BY MR. TYNDALL: |
| | 12 | Q. Ms. Peedin Jones, would you felt like it was fair |
| | 13 | for him to play something about other teachers or other |
| | 14 | personnel matters from the closed session? |
| 16:32:55 | 15 | A. To me, absolutely not. |
| | 16 | MR. TYNDALL: Nothing further, Your Honor. |
| | 17 | MS. JAMES: I'll let it go, Your Honor. |
| | 18 | THE COURT: Thank you, ma'am. You are free to come |
| | 19 | down. |
| 16:33:08 | 20 | THE WITNESS: Thank you. |
| | 21 | (Witness excused.) |
| | 22 | MS. JAMES: May we approach, Your Honor? |
| | 23 | THE COURT: Yes, ma'am. |
| | 24 | (Sidebar.) |
| 16:34:05 | 25 | THE COURT: There's one matter to address. There's |

| | | |
|---|---|---|
| 16:34:07 | 1 | not a lot of sense you going out for 15, 20 minutes and to |
| | 2 | bring you back in. We're going to wrap it up for the day. I |
| | 3 | appreciate your patience. Leave not in your seats. We'll |
| | 4 | make sure they are secured. Don't talk about this with each |
| 16:34:19 | 5 | other. Don't let anybody else speak with you about it. Don't |
| | 6 | do anything to try to learn anything more, that means stay |
| | 7 | away from any media coverage, any kind of posting, anything |
| | 8 | related to this, and certainly don't try to Google anything on |
| | 9 | your own. |
| 16:34:35 | 10 | Thank you very much. See you tomorrow at 9:30 |
| | 11 | tomorrow morning. |
| | 12 | (Jury exits.) |
| | 13 | THE COURT: Outside the presence of the jury, are |
| | 14 | there any other matters we need to address? |
| 16:35:27 | 15 | MR. ZELLINGER: Your Honor, just forecasting the |
| | 16 | evidence, I think it's likely that with future witnesses |
| | 17 | there's the potential that the defendant's -- there's no way |
| | 18 | to delicately say this. The defendant from the evidence the |
| | 19 | State has acquired had other affairs, and in opening |
| 16:35:44 | 20 | defendant's counsel argued that the defendant came to the aid |
| | 21 | of Carolyn Rotondaro when she was sexually harassed by Jimmy |
| | 22 | Lawrence. There's been testimony that the defendant sought to |
| | 23 | have a raise for Carolyn Rotondaro. Those buttress the |
| | 24 | reasons that the State would want to go into the defendant's |
| 16:36:06 | 25 | relationship with Carolyn Rotondaro, who was a school |

| | |
|---|---|
| 16:36:10 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 16:36:22 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 16:36:40 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 16:36:55 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 16:37:12 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 16:37:32 | 25 |

employee.  But the best evidence is that the defendant had

communications with Carolyn Rotondaro, and the jury might sit

and think, well, this is weird.  Why would he have these

communications with this person.  Well, the fact that the

defendant was having an affair with Carolyn Rotondaro would be

especially relevant to explain why he was communicating this

information about the extortion scheme.

At the same time defendant also, again, no way to

sort of get into this without just going at it, sent

information to woman named Allyson Bond.  The Court's heard

testimony about how there's this awkward interaction in

Charlotte when Angie Barbour and the defendant and the

defendant's cousin were there and Angie Barbour passed out,

and then the next morning she felt like things were weird

between Allyson Bond and her and the defendant.  And then when

the relationship was starting to die off, she goes to this

Reagan Day dinner and Allyson Bond is there and they have this

habit of taking selfies together, and Allyson Bond won't take

a selfie with her.  And the defendant was e-mailing

information to Allyson Bond and that information is incredibly

probative on the extortion thing.

The reason that he was e-mailing that stuff to her

is because they were also in a relationship, and that proof of

that relationship is found on information that's acquired via

a search warrant from a social media -- I don't know what to

16:37:35 1   call it, a social media service, an electronic service called

2   Pinger which is a mechanism, an app through which you can text

3   with other people, and I think it somewhat masks the phone

4   number that it's coming from.  The Pinger records have a ton

16:37:56 5   of information the defendant sent to Ms. Rotondaro and to

6   Ms. Bond and also videos the defendant captured.

7           So that would be some of the evidence that would

8   come in through witnesses in the future.  I just wanted to

9   bring that up because the State is not putting on this

16:38:14 10  evidence to try to convict this defendant based on the fact

11  that he had affairs.  The State is putting this evidence on

12  because he contacts these people about the extortion scheme,

13  and that is tremendously relevant, and the State deserves to

14  have the right to explain why he was contacting these people

16:38:32 15  about it, because otherwise to the jury, it seems like, oh, he

16  was just reaching out to Allyson Bond who's a friend of a

17  friend, or Carolyn Rotondaro who is somebody that he's saved

18  from this harassment scheme.

19          So that's the relevance of that material.  I just

16:38:47 20  wanted to sort of lay that out there, because I believe

21  Mr. Tyndall indicated earlier today that he objects to that,

22  and I thought it would be a good use of the Court's time to

23  evaluate that at this time.

24          THE COURT:  Okay.  Yes, sir.  And that's a lot of

16:38:59 25  information in a couple minutes.  I might ask you questions

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | |
|---|---|
| 16:39:02 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 16:39:22 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 16:39:39 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 16:39:59 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 16:40:26 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 16:40:41 | 25 |

individually.  Who was the first woman you mentioned?

MR. ZELLINGER:  Her name is Carolyn Rotondaro.
It's R-O-T-O-N-D-A-R-O.

THE COURT:  Is she on the witness -- Yes, she is.
She's number 33 on the witness list.

MR. ZELLINGER:  And Your Honor, just to be clear, I
don't anticipate the State calling these witnesses because
they were -- I don't want to characterize the response to
receiving the subpoena, but this evidence is going to come
through investigators who acquired these records from Pinger,
which is this service the defendant utilized.

THE COURT:  Yes, sir.  I guess here's specifically
my question.  Looking at the charges we have, the extortion,
failure discharge duty, and obstruction of justice, tell me
again so I make sure I understand the probative value of any
testimony about any kind of sexual relationship between those
two might have to do with the charges in this case.

MR. ZELLINGER:  Your Honor, there's an exhibit,
Exhibit 34, in which Ms. Rotondaro is -- this is kind of
showing the State's hand.  I'm trying to avoid this, but I'm
happy to bring it up.  Ms. Rotondaro, the defendant sends her
a message on Pinger that says: I love you.  When you get to
school tomorrow try to find Owen Phillips' kids and where they
go to school.

And then there's another -- this exhibit I think is

| 16:40:44 | 1 | -- we have an updated version of this exhibit, but the |

16:40:44    1    -- we have an updated version of this exhibit, but the

            2    defendant reaches out again and says -- or Ms. Rotondaro

            3    reaches out and says:  What's their last name?  Defendant

            4    respond:  Phillips.  And so the way that the defendant finds

16:41:00    5    this information out is through Ms. Rotondaro.  And so it is

            6    directly relevant to how the defendant acts in trying to move

            7    Owen Phillips' kids, because otherwise he wouldn't be able to

            8    reach out to Mr. Jones.

            9            The reason that the relationship between them is

16:41:20   10    relevant is that -- otherwise to the jury, it seems like he's

           11    just asking a stranger this information.  And so it is

           12    directly relevant that they have a very close relationship,

           13    that they have a dating relationship, and that is the

           14    relevance of why the fact that -- and the State does not

16:41:39   15    intend to portray videos or pictures of Ms. Rotondaro, but for

           16    the State to not be able to prove its case and put the facts

           17    forward to the jury about the defendant's relationship with

           18    Ms. Rotondaro would be to misrepresent to the jury the facts

           19    of the case that they were also having an affair, and that is

16:41:59   20    how he got the information to be able to say where Owen

           21    Phillips went to school.  And so, you know, just to say it's

           22    some random person from the public totally changes the

           23    reliability of that evidence.

           24            THE COURT:  Again, help me connect the dots between

16:42:17   25    the testimony you want to get out and the fact that they may

| 16:42:22 | 1 | have been having a sexual relationship. How does that add |
| | 2 | any -- tell me the probative value other than the fact that |
| | 3 | they knew each other, they had a relationship with each other. |
| | 4 | Tell me. |
| 16:42:34 | 5 | MR. ZELLINGER: So the jury's heard that he sought |
| | 6 | to get her a raise. The fact that they were in an affair is |
| | 7 | more 404(b) evidence that he's inappropriately using his |
| | 8 | duties and powers as a school board member to try to get her a |
| | 9 | raise. |
| 16:42:49 | 10 | There's also, directly related to the extortion, |
| | 11 | there are communications between him and her. The jury is |
| | 12 | going to sit there and think, why is this guy telling these |
| | 13 | details to this random person? The State has evidence to |
| | 14 | explain how they are connected. To not allow us to -- and |
| 16:43:04 | 15 | again, we don't necessarily need to put on evidence of videos |
| | 16 | or the explicit material that is found in his Pinger |
| | 17 | information with Ms. Rotondaro, but to rob the State of the |
| | 18 | ability to be able to give the accurate picture that these |
| | 19 | people are in a relationship is to blind the jury to the true |
| 16:43:25 | 20 | facts of this case. |
| | 21 | THE COURT: Is she -- I mean, I understand what you |
| | 22 | are saying. I'm just wondering if this might be something we |
| | 23 | need just a couple minutes to voir dire on to actually see |
| | 24 | what her testimony is going to be. Is she here? Is she |
| 16:43:38 | 25 | available now? |

| 16:43:39 | 1 | MR. ZELLINGER: She is not. And the testimony |
| | 2 | would come in through an investigator who found these |
| | 3 | materials on the computer that would show -- so I mean, to |
| | 4 | avoid -- and I have weighed this. I mean, there's this 403 |
| 16:43:52 | 5 | issue where, you know, we do not want this jury to convict the |
| | 6 | defendant because he had an affair with multiple women. That |
| | 7 | is not why the State is seeking to put this information |
| | 8 | forward. So to mitigate that, we don't necessarily need to |
| | 9 | show pictures of him with Ms. Rotondaro. |
| 16:44:09 | 10 | The other huge fact that I haven't addressed is |
| | 11 | that for the longest time the defendant tried to hide the fact |
| | 12 | that he was having an affair with Angie Barbour, and then -- |
| | 13 | and now in trial it's, oh, everybody knew that he was having |
| | 14 | an affair. But we've already sort of put forward a lot of |
| 16:44:28 | 15 | evidence showing how he was trying to hide that he was having |
| | 16 | an affair with Angie Barbour and keep that quiet. This is |
| | 17 | again further evidence of the defendant having an affair and |
| | 18 | trying to keep it quiet it. And that's just with respect to |
| | 19 | Ms. Rotondaro. |
| 16:44:43 | 20 | With respect to Ms. Bond, that evidence is |
| | 21 | extremely critical in that the defendant -- I mean, the |
| | 22 | defendant is asked questions that about Allyson Bond, asked |
| | 23 | questions about messages with Allyson Bond, information the |
| | 24 | State doesn't even have, and she is receiving information from |
| 16:45:03 | 25 | the defendant about this extortion scheme. And she actually |

| 16:45:08 | 1 | receives critical evidence in this case through an e-mail with |
| | 2 | the defendant. |
| | 3 | And so again, it's going to be this vacuum of |
| | 4 | information where the way that we could put on this |
| 16:45:20 | 5 | information is by the investigator saying, yes, I acquired |
| | 6 | evidence that they were having an affair. But I mean, to give |
| | 7 | the Court an example, the defendant can get up in closing, if |
| | 8 | barred from being able to put forward this evidence, and say, |
| | 9 | can you really believe this? You know, this information came |
| 16:45:39 | 10 | from Pinger, and here he is sending this stuff to some random |
| | 11 | person. There's no explanation for why he's sending it to |
| | 12 | this random person. It lacks credibility. |
| | 13 | So this evidence is evidence that the defendant |
| | 14 | sent these people -- I think that easily comes in. The |
| 16:45:56 | 15 | relationship that he had with them, I understand there's a 403 |
| | 16 | balancing for the Court to do, and we can mitigate that by not |
| | 17 | getting into playing the explicit content. But the fact that |
| | 18 | the defendant had these affairs is critical in that it's the |
| | 19 | same modus operandi as what he did with Angie Barbour. |
| 16:46:17 | 20 | THE COURT: Okay. Thank you. Mr. Tyndall, any |
| | 21 | response to that? |
| | 22 | MR. TYNDALL: I would first say it's somewhat |
| | 23 | ironic that the State didn't even want us to be able to ask a |
| | 24 | Superior Court judge what he does for a living but wants us to |
| 16:46:29 | 25 | get into a sexual relationship with someone he had text |

| | | |
|---|---|---|
| 16:46:33 | 1 | messages exchanged with.  The messages say what they say.  If |
| | 2 | they ask for some special treatment or some special |
| | 3 | information, that's relevant.  Obviously, if they ask for Owen |
| | 4 | Phillips' information, the person who gave it to them and why |
| 16:46:50 | 5 | they gave it to them, unless they are testifying or denying it |
| | 6 | or something, the fact that he's having -- supposedly having |
| | 7 | sex with this person is not really relevant to that fact at |
| | 8 | all. |
| | 9 | I mean, the fact that -- assuming this Pinger app |
| 16:47:06 | 10 | that, you know, Investigator Hoffman is going to get up there |
| | 11 | and say that, you know -- and we have a stipulation that says |
| | 12 | we're not questioning the authenticity of those messages.  So |
| | 13 | the -- you know, that part is not an issue.  I don't know |
| | 14 | really what argument we could come up with that there's some |
| 16:47:29 | 15 | random person and you can't believe it.  My understanding is |
| | 16 | they are my client's statements or texts to someone else that |
| | 17 | the State discovered through Pinger. |
| | 18 | So the fact that he is having a sexual relationship |
| | 19 | to someone he's sending these to related to a child in the |
| 16:47:49 | 20 | school or related to getting some information seems irrelevant |
| | 21 | first, but highly prejudicial otherwise. |
| | 22 | As far as Ms. Bond, I mean, someone sent her |
| | 23 | messages.  We haven't talked about what, you know, she's |
| | 24 | saying to someone, what she's doing.  You know, Mr. Donovan |
| 16:48:12 | 25 | was communicating with Allyson Bond.  We haven't gotten into, |

| | | |
|---|---|---|
| 16:48:18 | 1 | you know, what Allyson Bond did and don't intend to, and it |
| | 2 | doesn't sound like the State intends to call her either. |
| | 3 | So I just don't see how the purpose that they are |
| | 4 | trying to use this for, it's not about -- this case, he's not |
| 16:48:38 | 5 | charged with some violation based on a conflict of interest. |
| | 6 | He charged with two specific counts where he has recorded a |
| | 7 | closed session and he's attempted to transfer -- to influence |
| | 8 | someone to transfer students. Sex doesn't enter into those |
| | 9 | two things. |
| 16:49:01 | 10 | I think the State is doing exactly what it says it |
| | 11 | is not intending to do, which is just throw more, you know, |
| | 12 | mud at Mr. Johnson, making him look really bad. The text |
| | 13 | messages, frankly, are bad enough where he's asking for this |
| | 14 | information. The fact that, you know, there's really |
| 16:49:24 | 15 | not -- if the person were testifying, there was some question |
| | 16 | her credibility or something, that may be different, but |
| | 17 | that's not the question that the State intends to offer it |
| | 18 | for. We would contend that it's highly -- it's not relevant, |
| | 19 | first of all, but it's highly prejudicial. |
| 16:49:41 | 20 | THE COURT: Yes, sir. What I'm going to do is I'm |
| | 21 | going to take this under advisement. I'm going to go back and |
| | 22 | review 404 and 403 again tonight. |
| | 23 | But just for planning purposes. Mr. Zellinger, I |
| | 24 | will tell you probably the way I'm leaning right now, what I |
| 16:49:59 | 25 | might change is probably -- based on my understanding of the |

|          |    |                                                                  |
|----------|----|------------------------------------------------------------------|
| 16:50:03 | 1  | charges and what the anticipated testimony will be, and I'm       |
|          | 2  | trying to look at any probative value the other alleged affair    |
|          | 3  | will have, but I certainly understand the prejudicial value of    |
|          | 4  | it.                                                               |
| 16:50:25 | 5  | So I'm probably at this point inclined to rule --                 |
|          | 6  | and I'm telling you this for your planning purposes.  I'll        |
|          | 7  | make a final decision tomorrow.  But I'm inclined to probably     |
|          | 8  | balance it under 403 that the prejudicial value of that will      |
|          | 9  | outweigh any probative value, the criminal charges; but          |
| 16:50:45 | 10 | certainly, Mr. Tyndall, that doesn't mean that you can't open     |
|          | 11 | the door on your cross-examination and you might be inclined      |
|          | 12 | to circle back on that.                                          |
|          | 13 | MR. TYNDALL:  Sure.                                              |
|          | 14 | THE COURT:  Yes, sir.  Yes, sir, Mr. Zellinger.                  |
| 16:50:59 | 15 | MR. ZELLINGER:  And Your Honor, there is going to              |
|          | 16 | be evidence that jurors could use to infer that there is some     |
|          | 17 | sort of inappropriate relationship between the defendant and      |
|          | 18 | these folks.  And I'm taking -- and I just want to get clarity    |
|          | 19 | on the Court's sort of preliminary ruling.  I mean, these        |
| 16:51:17 | 20 | exhibits, within them are communication about Angie Barbour       |
|          | 21 | and back and forth.  And when the defendant is writing back       |
|          | 22 | and forth to these folks, there are things that are said that     |
|          | 23 | could give the jury the idea that they are in a relationship.     |
|          | 24 | I would strongly argue that it would be                          |
| 16:51:37 | 25 | inappropriate to change the nature of the evidence to blind       |

| | |
|---|---|
| 16:51:43 | 1 |

the jury to the interaction between them.  Is that covered by

2     this ruling or is that -- is this solely, did you find out

3     that Carolyn Rotondaro was --

4             THE COURT:  It would not be my intention and I've

16:51:56   5     not heard any request to redact any of the evidence at this

6     point.  I just am not quite certain any benefit we're going to

7     get by spending time on that evidence.  But I will look at

8     that, and we'll get a final ruling in the morning.  But at

9     this point I'm -- I mean, the text messages are what they are.

16:52:18   10   You can highlight what you need to highlight that are relevant

11     to these charges.

12            Anything else we need to get on the record before

13     tomorrow?  There is one other thing I'd like to talk to you

14     about, but I'm going to have to show it to you on the screen.

16:52:31   15   So we can close court.

16            If you can approach.  I just want the give either

17     side a chance to get something on the record before we recess.

18            MR. ZELLINGER:  Can I have one moment, Your Honor?

19            THE COURT:  Yes, sir.

16:53:02   20          MR. ZELLINGER:  There's something related to this

21     that I want to put on the record, but I'll just do it in the

22     morning or at some break, if that's okay.

23            THE COURT:  Yes, sir.

24            MR. ZELLINGER:  And then the only other thing that

16:53:09   25   I have for the Court is that -- and to put something on the

| | | |
|---|---|---|
| 16:53:16 | 1 | record also, I -- the State is fine calling Judge Holcombe |
| | 2 | Judge Holcombe. It's just that AOC had some issue with it. |
| | 3 | The defendant -- we discussed this in chambers. We discussed |
| | 4 | it on the record. The defendant wishes to call Judge Holcombe |
| 16:53:33 | 5 | Judge Holcombe, and I think actually did in opening. That's |
| | 6 | where that came in. He has just -- well, I can approach and |
| | 7 | tell the Court about this. He brought up the advisory opinion |
| | 8 | again and wants to meet with the Court. |
| | 9 | THE COURT: So he's been in contact with you today? |
| 16:53:51 | 10 | MR. ZELLINGER: I sent him a text requesting that |
| | 11 | he be here tomorrow. And he said that it would be important |
| | 12 | for the State, the defense, and the Judge to see the ethics |
| | 13 | opinion before he is called as a witness. |
| | 14 | THE COURT: Is he your first witness in the |
| 16:54:12 | 15 | morning? |
| | 16 | MR. ZELLINGER: He is not. So I can attempt to get |
| | 17 | that ethics opinion from him when he arrives and then bring it |
| | 18 | to the Court's attention. I don't intend on handling him |
| | 19 | differently than any other witness, and I just wanted to put |
| 16:54:29 | 20 | that on the record so everybody was -- the defense is aware of |
| | 21 | it. And I'll follow up. |
| | 22 | THE COURT: It would be my intention to handle him |
| | 23 | just as any other witness. I do want to pay respect to the |
| | 24 | advisory opinion to the extent that we possibly can. But from |
| 16:54:45 | 25 | my standpoint he's going to be just another fact witness. |

| 16:54:52 | 1 | I know he mentioned meeting. If it's something all |
| | 2 | parties want to do, I certainly will make myself available to |
| | 3 | do that; however, I'm certainly not going to meet with him by |
| | 4 | myself. I would not do that unless guys were present. But if |
| 16:55:08 | 5 | that's something you want to do, I'll certainly make myself |
| | 6 | available for him. |
| | 7 | MR. ZELLINGER: Thank you, Your Honor. |
| | 8 | THE COURT: Anything else for the record? |
| | 9 | MR. ZELLINGER: Not for the State. |
| 16:55:18 | 10 | THE COURT: We're going to close court. I'm going |
| | 11 | to go back here for one second, and then I'll be right back |
| | 12 | out. Okay? |
| | 13 | MR. TYNDALL: Nothing further, Your Honor. |
| | 14 | THE COURT: Thank you, guys. Thank you very much. |
| 16:55:25 | 15 | Tomorrow at 9:30. |
| | 16 | (Proceedings adjourned at 4:55 p.m.) |
| | 17 | (END OF VOLUME 7 OF 10.) |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

IN THE NORTH CAROLINA GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
JOHNSTON COUNTY
* * * * * * * * * * * * * * * * * *

STATE OF NORTH CAROLINA ) File No. 23 CR 003494-500
)
    versus )
)
RONALD LEE JOHNSON, JR., :
         Defendant. ) Pages: 769-1002

* * * * * * * * * * * * * * * * * *
TRANSCRIPT VOLUME 8 OF 10

Wednesday, January 15, 2025
* * * * * * * * * * * * * * * * * *

    Transcript of proceedings in the General Court of

Justice, Superior Court Division, Johnston County, 207 East

Johnston Street, Smithfield, North Carolina, at the January 6,

2025, Criminal Session, before the Honorable Joseph

Crosswhite, Judge Presiding.

APPEARANCES:

       Benjamin O. (Boz) Zellinger
       Arneatha James
       Special Deputy Attorney General
       Raleigh, NC 27603
       On Behalf of the State

       Amos G. Tyndall
       Valentin J. Bruder
       Parry Law
       Chapel Hill, NC
       On Behalf of the Defendant

---

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter
N.C. Administrative Office of the Courts
denise.stclair@nccourts.org

```
 1                              INDEX
 2    State rests                                    970
      Defense motion                                 971
 3                           WITNESSES

 4    ON BEHALF OF THE STATE

 5    RICHARD HOFFMAN

 6    Direct by Mr. Zellinger                        774
      Cross by Mr. Tyndall                           907
 7    Redirect by Mr. Zellinger                      934
      Recross by Mr. Tyndall                         944
 8    Redirect by Mr. Zellinger                      945
      Recross by Mr. Tyndall                         947
 9

10    PAUL HOLCOMBE

11    Direct by Mr. Zellinger                        953
      Cross by Mr. Tyndall                           965
12    Redirect by Mr. Zellinger                      970

13                           EXHIBITS

14    ON BEHALF OF THE STATE

15    No.    Description                        ID     EVD

16    12     TracFone                          321    846

17    26     File name 20220424                903    904

18    27     Recording of Angela Barbour       903    904

19    29     Email from defendant's MSN records 889   891

20    30     Email attachment                  890    891

21    30     Metadata                          903

22    33     Defendant's Pinger records        856    857

23    34     Audio recording                   894    895

24    35     Pinger information                853    855

25    36     T-Mobile records                  787    788
```

| No. | Description | ID | EVD |
|-----|-------------|-----|-----|
| 37 | Verizon records | 787 | 788 |
| 38 | Spreadsheet of cellphone records | 788 | 789 |
| 39 | Cellphone tower map | 832 | 834 |
| 40 | Video at Planet Fitness gym | 820 | 821 |
| 41 | Photo from Detective Brantley to Hoffman | 825 | 825 |
| 42 | Map of Clayton | 840 | 841 |
| 62 | Pinger information | 887 | 889 |
| 65 | Defendant's Apple records | 874 | 876 |
| 66 | June 14, 2022 email | 875 | 876 |
| 67 | July 10, 2022 email | 876 | 876 |
| 68 | August 25, 2022 email | 876 | 876 |
| 69 | TracFone call information | 846 | 847 |
| 70 | SpoofCard's website | 878 | 879 |
| 71 | SpoofCard's website-recording calls | 878 | 879 |
| 72 | SpoofCard packages | 878 | 879 |
| 73 | SpoofCard credits | 878 | 879 |
| 74 | SpoofCard's info on phone calls | 878 | 879 |
| 75 | SpoofCard info for text messaging | 878 | 879 |
| 76 | Message from Dustin Parks | 813 | 829 |

* * *

```
  1              (Court convenes at 9:30 a.m.)
  2              THE COURT:  Good morning.  A couple of things I
  3   want to get on the record before the jury comes in.
  4              Mr. Zellinger, the first thing, I don't know if
09:30:10   5   it's actually a motion, but it's about your next two
  6   witnesses.
  7              Mr. Zellinger, I've taken from my ruling under 403
  8   and basically find that the prejudicial value of the
  9   anticipated testimony will outweigh any probative value.  Do
09:30:25  10   not address any e-mails, text messages.  It's just the Court
 11   doesn't necessarily see the probative value in going into
 12   additional affairs or things of that nature.  So we'll ask
 13   that you ask around, if you would.
 14              The other thing I wanted to get on the record, I
09:30:53  15   said something concerning the testimony of Judge Paul Holcombe
 16   when he does testify.  I know he's been concerned about it.
 17   He's been contacting multiple people.
 18              I did make a comment yesterday that I would be --
 19   first of all, we want to treat him like any other witness,
09:31:10  20   then I said I would be willing to meet with the attorneys with
 21   him, and then upon further consideration I thought I wouldn't
 22   treat any other witness that way.  So I think if I need to
 23   deal with Paul Holcombe, it will be just like any other
 24   witness.  It will be in court and on the record.
09:31:35  25              We have our jurors here.  Anything before we start?
```

| 09:31:39 | 1 | MR. ZELLINGER: Your Honor, there's six exhibits |
| | 2 | that I'm numbering right now that do not appear in the Court |
| | 3 | or defendant's notebooks. Can I have one moment to number |
| | 4 | those very quickly? |
| 09:31:51 | 5 | THE COURT: Yes, sir. That's fine. |
| | 6 | MR. ZELLINGER: Your Honor, one other thing I want |
| | 7 | to put on the record. We subpoenaed Allyson Bond who received |
| | 8 | some inculpatory material from the defendant. We asked her to |
| | 9 | be here this morning at 9:15. She's not present. Not here. |
| 09:32:32 | 10 | I'm not asking the Court to do anything at this point. I |
| | 11 | think she reached out and said she's running late. I just |
| | 12 | wanted to put that on the record. |
| | 13 | THE COURT: Was she going to a witness this |
| | 14 | morning? |
| 09:32:50 | 15 | MR. ZELLINGER: No. But we asked her to be here in |
| | 16 | time so we could potentially -- I don't know. I mean, it |
| | 17 | could have affected our order, but I think at this point she's |
| | 18 | not going to be our next witness. |
| | 19 | THE COURT: Okay. All right. Well, if there's |
| 09:33:02 | 20 | anything I need to do to assist, let me know. |
| | 21 | MR. ZELLINGER: Can I just have -- |
| | 22 | THE COURT: While he's doing that, anything to get |
| | 23 | on the record? |
| | 24 | MR. TYNDALL: I don't believe so. Not right now. |
| 09:34:52 | 25 | MR. ZELLINGER: Your Honor, may I approach? |

Case 5:23-cv-00349-D-RN   Document 158-6   Filed 10/27/25   Page 32 of 150

| | | |
|---|---|---|
| 09:34:53 | 1 | THE COURT: Yes, sir. |
| | 2 | MR. ZELLINGER: Your Honor, I have to write one |
| | 3 | more thing down. I apologize. |
| | 4 | THE COURT: I'm going to tell our bailiff to get |
| 09:35:40 | 5 | them lined up. Don't bring them in, but we'll have them lined |
| | 6 | up and ready to go. |
| | 7 | MR. ZELLINGER: Your Honor, we can proceed at this |
| | 8 | point. Your Honor, we're ready to proceed. I apologize. |
| | 9 | THE COURT: Okay. Bring them in. |
| 09:39:27 | 10 | (Jury enters.) |
| | 11 | THE COURT: All right. Everybody, good morning. |
| | 12 | Mr. Zellinger, whenever you are ready. |
| | 13 | MR. ZELLINGER: Your Honor, the State calls Richard |
| | 14 | Hoffman. |
| 09:40:19 | 15 | RICHARD HOFFMAN, |
| | 16 | having been called as a witness for the State and being duly |
| | 17 | sworn at 9:40 a.m., testified as follows: |
| | 18 | DIRECT EXAMINATION BY MR. ZELLINGER: |
| | 19 | Q. If you can state your name for the jury. |
| 09:40:45 | 20 | A. My name is Richard Hoffman. |
| | 21 | Q. What do you do for a living? |
| | 22 | A. I'm an investigator for the district attorney's |
| | 23 | office here in Johnston County. |
| | 24 | Q. How long have you been in the law enforcement |
| 09:40:58 | 25 | field? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 09:40:58 | 1 | A. Thirty years. |
| | 2 | Q. Where did you start your law enforcement career? |
| | 3 | A. In Raleigh. At the Raleigh Police Department. |
| | 4 | Q. What was your first role at the Raleigh Police |
| 09:41:08 | 5 | Department? |
| | 6 | A. Patrol officer. |
| | 7 | Q. And after that, did you -- can you take us through |
| | 8 | your career? What was your career like in the Raleigh Police |
| | 9 | Department? |
| 09:41:19 | 10 | A. I started in patrol, became a field training |
| | 11 | officer. I was sent to the police academy to do instructions |
| | 12 | there, became a detective. Let's see, got promoted to |
| | 13 | lieutenant supervisor there, got promoted to captain, and I |
| | 14 | did my career in the investigative division as division |
| 09:41:38 | 15 | commander. |
| | 16 | Q. And what kind of training did you receive as an |
| | 17 | investigator with the Raleigh Police Department? |
| | 18 | A. A week long basic training, and then you have |
| | 19 | classes that you can attend on your own. |
| 09:41:51 | 20 | Q. And so what kind of cases did you investigate when |
| | 21 | you were in the detective division with the Raleigh Police |
| | 22 | Department? |
| | 23 | A. So I'm fluent in Spanish. That's what brought me |
| | 24 | to the investigation very early on. They needed somebody to |
| 09:42:04 | 25 | translate, and I got mentored through that. But I've worked |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Richard Hoffman - Direct by Mr. Zellinger

09:42:07  1    predominantly sexual assault, violent crime, shootings, pretty

2    much all of them.

3        Q.    So you worked homicides and --

4        A.    Yes.

09:42:16  5    Q.    -- everything under the sun, basically?

6        A.    Yes.

7        Q.    Okay.  And as part of that, did you learn how to

8    investigate different materials that folks might have with

9    them while they committed crimes?

09:42:29 10    A.    Yes.

11       Q.    Those could be things like cellphones; is that

12   correct?

13       A.    Digital evidence, yes.

14       Q.    And while you were with the Regional Police

09:42:38 15   Department -- after you were in the detective division, where

16   did you go next?

17       A.    I went to the detective division, stayed there till

18   I retired.

19       Q.    Did you elevate to a different level with the

09:42:49 20   detective division?

21       A.    Yes.  As I progressed, I was supervisor of the

22   unit.  When I was lieutenant, I supervised the Intel unit and

23   the realtime crimes, crime stoppers, career criminal unit,

24   gang unit.  Then when I got promoted to captain, I had all the

09:43:04 25   drugs and vice units, and then task force officer with ATF,

09:43:09    1    DEA, and FBI, then as major, had all of them.

           2         Q.    So as major, you were supervising all the

           3    investigative units at the Regional Police Department?

           4         A.    Yes.

09:43:23    5         Q.    What is the Intel unit?

           6         A.    Intel unit is basically a unit that gets

           7    information about different threats and hazards that we use in

           8    plain clothes.  We try to harvest intelligence and things on

           9    social media and then use that to see where that intersection

09:43:42   10    is with any crime throughout the City of Raleigh.

          11         Q.    And so did you have a lot of experience in -- you

          12    mentioned the realtime crime unit.  What is that?

          13         A.    So the realtime crime center is where all of the

          14    Intel for the police department is hosted.  So you have gang

09:43:55   15    intelligence files.  They have access to things like record

          16    management systems that are integrated with other police

          17    departments record management systems.  They have access to

          18    unsecured commission records, and just a whole wealth of

          19    records that serve as a resource to officers that don't have

09:44:15   20    those resources.

          21         Q.    And so by the time you became major, you were

          22    supervising every detective in the Regional Police Department?

          23         A.    I didn't supervise all of them.  There's a lot of

          24    other supervisors, but the functional responsibilities fell on

09:44:29   25    me.  So when they made mistakes, I'd vouch for them.

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Richard Hoffman - Direct by Mr. Zellinger

09:44:32   1        Q.   Eventually did you retire from the Regional Police

       2   Department?

       3        A.   I did.  I retired December 2017.

       4        Q.   And then after that, did you come to your role with

09:44:41   5   the Johnston County DA's office?

       6        A.   I did, in 2019, November.

       7        Q.   And what is your role at the Johnston County

       8   District Attorney's Office?

       9        A.   So I serve as their investigator in the office.

09:44:52  10   Many cases are filed in the office and require additional

      11   investigative follow up.  So I do that.  If there are any

      12   other special investigations or investigations that I'm asked

      13   to get involved in, then I do those.

      14        Q.   Okay.  And who is the district attorney's office

09:45:11  15   led by?

      16        A.   The hiring authority, the elected DA in Johnston

      17   County is Susan Doyle.

      18        Q.   And are you in a sworn role with the Johnston

      19   County?

09:45:21  20        A.   So the position is a state position for the State

      21   of North Carolina, but I'm cross credentialed through the

      22   Johnston County Sheriff's Office, and I'm a sworn deputy with

      23   the Johnston County Sheriff's Office.

      24        Q.   So you're duly sworn as a Johnston County -- under

09:45:35  25   their authority basically; is that correct?

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 09:45:36 | 1 | A. Yes. |
| | 2 | Q. And do you have experience with things like search |
| | 3 | warrants? |
| | 4 | A. Yes. |
| 09:45:42 | 5 | Q. And can you estimate how many search warrants |
| | 6 | you've done in your career? |
| | 7 | A. Hundreds. |
| | 8 | Q. In your old job with the Regional Police Department |
| | 9 | as major or captain or lieutenant overseeing these |
| 09:45:58 | 10 | investigative divisions, did you have occasion to work with |
| | 11 | digital records? |
| | 12 | A. I did. So I've been doing this since '94. I |
| | 13 | remember when Facebook first started, so it just kind of |
| | 14 | became integrated with what we do every day. |
| 09:46:14 | 15 | Q. There are social media sites out there that you |
| | 16 | would use and get search warrants to examine during your |
| | 17 | investigations; is that correct? |
| | 18 | A. Yes. Frequently used. |
| | 19 | Q. At some point did you become involved in the |
| 09:46:27 | 20 | investigation of the defendant in this case, Mr. Ronald |
| | 21 | Johnson? |
| | 22 | A. Yes. In August of 2022 a referral was made to the |
| | 23 | district attorney's office from the board of education. |
| | 24 | Q. So the board of education referred it to the DA's |
| 09:46:43 | 25 | office? |

09:46:43  1    A.    Yes.

       2    Q.    When did you begin the investigation into the

       3  defendant?

       4    A.    I didn't begin until I was asked to, but, yes, it

09:46:52  5  was a later time.  There was a second referral made sometime

       6  in October, and then shortly thereafter I started the

       7  investigation.

       8    Q.    Was that referral also from the Johnston County

       9  Board of Education?

09:47:03 10    A.    Yes.

      11    Q.    To start, did you know the Johnston County Board of

      12  Education had done an investigation with their lawyers

      13  Tharrington Smith?

      14    A.    Yes.  And when they made the referral, they asked

09:47:15 15  me also to provide their findings.

      16    Q.    Okay.  And at that point did you begin a new

      17  investigation?

      18    A.    I did.  I needed a separate independent to confirm

      19  the facts that they had got but also to obtain them on my own.

09:47:29 20    Q.    So at some point did you begin an investigation

      21  with the defendant?

      22    A.    Yes.  On October the 7th.

      23    Q.    You said October 7th?

      24    A.    Yes.

09:47:40 25    Q.    That was of 2022?

09:47:41   1          A.   2022.

           2          Q.   Okay.  And what's the first thing that you start to

           3   do when you were investigating someone?

           4          A.   Interviews.  I made a list of people that I knew

09:47:53   5   were involved or had been cited in the original report.  I

           6   interviewed them.  During my interviews with them I also asked

           7   them who might have more information about this, and there was

           8   some spinoff interviews from there.

           9          Q.   You interviewed folks like Angie Barbour, DeVan

09:48:09  10   Barbour; is that correct?

          11          A.   All the witnesses that are here so far, yes.

          12          Q.   Do you recall how many people you interviewed?

          13          A.   24-ish.

          14          Q.   And were you able to interview Carolyn Rotondaro?

09:48:24  15          A.   No.  She declined to interview.  I asked to

          16   interview her.  She declined.

          17          Q.   What about Allyson Bond?

          18          A.   She also declined an interview.

          19          Q.   So what's the time period over which you

09:48:41  20   interviewed all these people?

          21          A.   From the first week of October to the first week of

          22   December 2022.

          23          Q.   Okay.  And at that point did you receive

          24   information after talking to these people and interviewing

09:48:57  25   them?

Richard Hoffman - Direct by Mr. Zellinger

09:48:58 1      A.   Yes, I did.

2      Q.   And at that point, what did you do next?

3      A.   So I looked at the information they had provided

4   me, and one of the things that's important is corroboration.

09:49:09 5   So I looked at sources other than what these people told me

6   where those sources of information might be and made a list of

7   preservation letters so that I could send those copies asking

8   to preserve records so the records wouldn't get deleted, and

9   then I served all those preservation letters, as many as I

09:49:27 10   could.

11      Q.   Okay.  And so what is a preservation letter?

12      A.   So a preservation letter is simply a request.  It's

13   a request from a law enforcement agency to a company under the

14   Restore Communications Act that requires them to preserve the

09:49:39 15   records that they have for a defined period of time, usually

16   90 days.

17      Q.   And sometimes is there data that you can't get from

18   these companies?

19      A.   Yes.  If they don't have it, they can't provide it

09:49:51 20   to you.  They are not required to keep it.  Sometimes they

21   bill you for it.

22      Q.   For instance, have you been able to in your career

23   to acquire records from FaceTime?

24      A.   No.  FaceTime is only kept for a 30-day period.

09:50:06 25      Q.   And so if I was to commit a crime on January 1, if

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 09:50:10 | 1 | you tried to investigate me in December and I had used |
| | 2 | FaceTime, would it be possible for you to see what I did on |
| | 3 | FaceTime? |
| | 4 | A.   It wouldn't exist. |
| 09:50:20 | 5 | Q.   In this case when you first began investigating, |
| | 6 | what were you -- were you seeking to look into the allegations |
| | 7 | from the school board referral? |
| | 8 | A.   Yes.  I was trying to determine whether or not this |
| | 9 | request for a transfer had been made and under what |
| 09:50:37 | 10 | circumstances, and there was also trying to determine whether |
| | 11 | or not a closed session had been recorded, and if so, when was |
| | 12 | it recorded. |
| | 13 | Q.   Okay.  And at some point did you speak with DeVan |
| | 14 | Barbour? |
| 09:50:51 | 15 | A.   I did. |
| | 16 | Q.   And during that conversation, did you learn about |
| | 17 | this extortion situation? |
| | 18 | A.   I did.  I actually learned from that while speaking |
| | 19 | to Ms. Barbour first and then I interviewed him. |
| 09:51:03 | 20 | Q.   So from speaking with Angie Barbour you heard it |
| | 21 | first? |
| | 22 | A.   Uh-huh. |
| | 23 | Q.   When you talked to DeVan Barbour, did you talk to |
| | 24 | him about it? |
| 09:51:10 | 25 | A.   I did. |

| | | |
|---|---|---|
| 09:51:12 | 1 | Q. Did you tell DeVan Barbour what to say? |
| | 2 | A. I didn't tell him what to say. |
| | 3 | Q. Okay. And did you ask him about a recording? |
| | 4 | A. I did. I was pretty direct with it. |
| 09:51:27 | 5 | Q. Did he instantly start talking about the recording? |
| | 6 | A. No. I kind of -- I wanted to know about this |
| | 7 | interaction that he had with Ms. Barbour, and he immediately |
| | 8 | started trying to explain away the date and the circumstances, |
| | 9 | and then he calmed down a little bit and we went to -- I |
| 09:51:48 | 10 | started asking him about the interaction, and he said, yea, |
| | 11 | I've heard this recording, and then we -- we continued the |
| | 12 | conversation. |
| | 13 | Q. At some point did you also seek to get records from |
| | 14 | places like Apple and TracFone? |
| 09:52:06 | 15 | A. I did. |
| | 16 | Q. And were you able to get some of those |
| | 17 | exhibits -- or were you able to get some records from those |
| | 18 | companies? |
| | 19 | A. I did get records. |
| 09:52:15 | 20 | Q. Specifically you reached out to Apple for Apple |
| | 21 | records related to the defendant; is that correct? |
| | 22 | A. Yes. I reached out to Apple iCloud records. |
| | 23 | Q. Okay. For TracFone, what TracFone were you looking |
| | 24 | into? |
| 09:52:29 | 25 | A. I was looking into the device that Ms. Barbour |

| | | |
|---|---|---|
| 09:52:33 | 1 | turned over to me. |
| | 2 | Q. And the device that Ms. Barbour turned over to you, |
| | 3 | that was State's Exhibit 12; is that correct? |
| | 4 | A. Yes. |
| 09:52:42 | 5 | Q. And that is the TracFone. Is that the one that she |
| | 6 | told you she was given by the defendant; is that correct? |
| | 7 | A. Correct. |
| | 8 | Q. And were you able to get anything off of that |
| | 9 | TracFone? |
| 09:52:54 | 10 | A. So the first thing I did, I got a consent form from |
| | 11 | Ms. Barbour to have it forensically examined. She did not |
| | 12 | have the pin code. We did that. I got the phone number off |
| | 13 | of it. So I used that phone number to get the records from |
| | 14 | Verizon because TracFone doesn't have it is own towers. They |
| 09:53:12 | 15 | are serviced by Verizon, and at a later time got the |
| | 16 | subscriber information from TracFone. |
| | 17 | Q. Okay. And did you discover who the TracFone was |
| | 18 | registered to? |
| | 19 | A. The subscriber for the TracFone was Ronald Johnson. |
| 09:53:25 | 20 | And I know that because he used his email address from the |
| | 21 | police department. |
| | 22 | Q. Did you also attempt to get records from Verizon? |
| | 23 | A. I did. |
| | 24 | Q. And also from T-Mobile? |
| 09:53:43 | 25 | A. I did. |

| 09:53:44 | 1 | Q. And so when you talked to these folks, did they |

09:53:44  1    Q.   And so when you talked to these folks, did they

2    tell you their phone numbers in these interviews?

3    A.   They did.  In some instances I used that phone

4    number to call them.

09:53:54  5    Q.   And did you also corroborate that?  Like, do you

6    take their phone number and run it through a system?

7    A.   I do.

8    Q.   What's that system called?

9    A.   So I use Thomson Reuters' CLEAR.  They are law

09:54:06  10   enforcement tools that have a government, I guess,

11   subscription to them.  What that does is when I enter the

12   phone number, it doesn't give me phone records.  It tells me

13   who the carrier is so I know who has records so that I can get

14   a court order to acquire those records.  So that's what I

09:54:22  15   used.

16   Q.   So in this case the defendant, Ronald Johnson,

17   his -- T-Mobile was his cellphone company; is that correct?

18   A.   That's correct.

19   Q.   And for DeVan Barbour, Angie Barbour, Kevin

09:54:37  20   Donovan, they were all on Verizon; is that accurate?

21   A.   That's correct.

22   MR. ZELLINGER:  Your Honor, may I approach the

23   witness?

24   THE COURT:  Yes, sir.

09:54:45  25

| | | |
|---|---|---|
| 09:54:45 | 1 | (State's Exhibit Numbers 36 and 37 marked for |
| | 2 | identification.) |
| | 3 | Q.   Just to clarify, the records from Verizon that you |
| | 4 | got for DeVan Barbour, Angela Barbour, and Kevin Donovan, and |
| 09:55:22 | 5 | the records you got for the defendant from T-Mobile. |
| | 6 | After you find out that those numbers belong to |
| | 7 | those companies, did you send them a search warrant to get |
| | 8 | that information? |
| | 9 | A.   I did. |
| 09:55:34 | 10 | Q.   And then in response to the search warrant, do they |
| | 11 | send you records? |
| | 12 | A.   Correct. |
| | 13 | MR. ZELLINGER:   Your Honor, may I approach the |
| | 14 | witness? |
| 09:55:39 | 15 | THE COURT:   Yes, sir. |
| | 16 | Q.   And State's Exhibits 36 and 37, are |
| | 17 | those -- State's Exhibit 36, are these the T-Mobile records |
| | 18 | that you received for the defendant, Ronald Johnson? |
| | 19 | A.   Yes. |
| 09:55:50 | 20 | Q.   State's Exhibit Number 37, are those the Verizon |
| | 21 | records that you received for DeVan Barbour, Angie Barbour, |
| | 22 | and Kevin Donovan? |
| | 23 | A.   Yes. |
| | 24 | MR. ZELLINGER:   Your Honor, at this time I seek to |
| 09:56:01 | 25 | admit State's Exhibits 36 and 37. |

| | | |
|---|---|---|
| 09:56:05 | 1 | THE COURT: Any objection? |
| | 2 | MR. TYNDALL: Your Honor, subject to the pretrial |
| | 3 | motion, we object, but other than that, no. |
| | 4 | THE COURT: In the Court's discretion, I'll allow |
| 09:56:14 | 5 | those to be admitted. |
| | 6 | (State's Exhibit Numbers 36 and 37 entered into |
| | 7 | evidence.) |
| | 8 | Q. After you received those records, did you combine |
| | 9 | those into a worksheet on Excel? |
| 09:56:46 | 10 | A. I did. I wanted to consolidate all of the records |
| | 11 | and I needed a tool to do that. I reached out to Justin |
| | 12 | Heinrich with the State Bureau of Investigation. He had a |
| | 13 | tool called Gladiator, and he got that for me, and it was |
| | 14 | delivered on an Excel spreadsheet. |
| 09:57:04 | 15 | MR. ZELLINGER: Madam clerk, can I publish |
| | 16 | something to just the parties and the witness? |
| | 17 | CLERK: Yes. |
| | 18 | MR. ZELLINGER: Your Honor, may I approach the |
| | 19 | witness? |
| 09:57:28 | 20 | THE COURT: Yes, sir. |
| | 21 | (State's Exhibit Number 38 marked for |
| | 22 | identification.) |
| | 23 | Q. And before you, Investigator Hoffman, is |
| | 24 | there -- is this the spreadsheet of the different cell records |
| 09:57:41 | 25 | merged into one? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 09:57:43 | 1 | A. It is. |
| | 2 | Q. And on the far right, does that include the source |
| | 3 | of which cellphone record each line -- or each row came from? |
| | 4 | A. It does. |
| 09:57:57 | 5 | Q. Would this help illustrate your testimony to the |
| | 6 | jury here today? |
| | 7 | A. I believe so. |
| | 8 | MR. ZELLINGER: Your Honor, I would mark this as |
| | 9 | State's Exhibit 38, and I would seek to admit it. I |
| 09:58:08 | 10 | don't -- this is a replacement exhibit, so it does not appear |
| | 11 | in the notebooks, but I will have this on a CD to admit during |
| | 12 | the first break. |
| | 13 | THE COURT: Okay. Thank you. Mr. Tyndall? |
| | 14 | MR. TYNDALL: Your Honor, just pursuant the |
| 09:58:25 | 15 | pretrial, the same objection otherwise. |
| | 16 | THE COURT: Okay. Yes, sir. We'll allow it to be |
| | 17 | admitted. |
| | 18 | (State's Exhibit Number 38 entered into |
| | 19 | evidence.) |
| 09:58:33 | 20 | MR. ZELLINGER: Your Honor, may I publish this to |
| | 21 | the jury at this time? |
| | 22 | THE COURT: Yes, sir. |
| | 23 | (State's Exhibit Number 38 published to the |
| | 24 | jury.) |
| 09:58:49 | 25 | Q. I show you State's Exhibit 38. Going to the top of |

09:58:59  1    this document, does it have the provider timezone on the far

2    left?

3         A.    It does.

4         Q.    And then the date and time?

09:59:06  5    A.    Correct.

6         Q.    It says UTC minus 5, and these sort of vary on the

7    left column.  What, if anything, does that mean?

8         A.    UTC is Universal Time Coordinate, and they are used

9    to convert it to either Eastern Standard Time or Eastern

09:59:21 10    Daylight Savings Time.  So Eastern Daylight Savings Time is

11    from the second Sunday in March to the first Sunday of --

12    excuse me -- yea, first Sunday of November.  So what it means

13    is to convert this time to the current Eastern Standard Time

14    in March you have to subtract five.

09:59:39 15    Q.    Okay.  And so you -- looking at just the first

16    entry, it appears it's March 1, 2022, at 12:32 and says:  UTC

17    minus five, and so you subtract five hours to get the correct

18    time; is that correct?

19         A.    Yes.

09:59:56 20    Q.    Okay.  And the time is in column D; is that

21    accurate?

22         A.    Yes.

23         Q.    And that time is local time?

24         A.    Local time.

10:00:05 25    Q.    And then there's column E is target, and it has the

| | | |
|---|---|---|
| 10:00:09 | 1 | phone number; is that correct? |
| | 2 | A. Yes. |
| | 3 | Q. And that is the phone number of the person; is that |
| | 4 | accurate? |
| 10:00:14 | 5 | A. Yes. |
| | 6 | Q. So for instance, here, looking at the row marked |
| | 7 | 2185, there's a number 919-320-3337, is that the defendant's |
| | 8 | phone number? |
| | 9 | A. Yes. |
| 10:00:27 | 10 | Q. And a number ending in 5376, is that Angie |
| | 11 | Barbour's phone number? |
| | 12 | A. Correct. |
| | 13 | Q. Moving over to the side, it has the call, the type, |
| | 14 | and some of these are voice; is that accurate? |
| 10:00:40 | 15 | A. Yes. |
| | 16 | Q. Some of these are MMS. What is MMS? |
| | 17 | A. It's a multimedia message. |
| | 18 | Q. So it's like a text message? |
| | 19 | A. Text message with a GIF or a photograph of some |
| 10:00:50 | 20 | kind. |
| | 21 | Q. Okay. Then -- |
| | 22 | A. GIF or median. |
| | 23 | Q. I'm sorry. Column I is direction; is that correct? |
| | 24 | A. Yes. |
| 10:00:58 | 25 | Q. And that's incoming or outgoing? |

Richard Hoffman - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 10:01:01 | 1 | A.   Yes. |
| | 2 | Q.   So for this first entry, the row 2155, for purposes |
| | 3 | of the record, this is Kevin Donovan, and then it says |
| | 4 | direction incoming and then contact is 537 -- the number that |
| 10:01:18 | 5 | ends is 5376 which is Angie Barbour; is that correct? |
| | 6 | A.   Yes. |
| | 7 | Q.   So where it says incoming right here, what does |
| | 8 | that mean? |
| | 9 | A.   It means that Kevin Donovan is receiving a phone |
| 10:01:29 | 10 | call from Angie Barbour. |
| | 11 | Q.   The next line, line 2156, does it have Angela |
| | 12 | Barbour as the target name? |
| | 13 | A.   Yes. |
| | 14 | Q.   And this is outgoing; is that correct? |
| 10:01:44 | 15 | A.   Yes. |
| | 16 | Q.   And then the contact ID is 0982 or Kevin Donovan? |
| | 17 | A.   Yes.  And the reason you see it duplicated is |
| | 18 | because both of the records are included.  So it's pulling the |
| | 19 | first line off of one person's records and the second line off |
| 10:01:59 | 20 | one person's record. |
| | 21 | Q.   Okay.  So this is -- and the duration is the amount |
| | 22 | of time that was the call? |
| | 23 | A.   Yes. |
| | 24 | Q.   So here it was like 17 minutes and 19 seconds? |
| 10:02:07 | 25 | A.   Correct. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

10:02:07  1        Q.    So for line 2155 it's Kevin Donovan receiving a

2   call from Angie Barbour, and then line 2156 is Angie Barbour

3   calling Kevin Donovan; is that correct?

4        A.    It's the same call, just the two different records.

10:02:19  5        Q.    Okay.  And then on the column N where it says

6   source, is that where in these phone records that are State's

7   Exhibit Number 36 and 37 this came from?

8        A.    Yes.  It gives you the file name and the date and

9   time.

10:02:30 10        Q.    Okay.  And these things say things like CDR.  What

11  is a CDR?

12        A.    Call detail records.

13        Q.    And that's something that you get from the search

14  warrant from the phone company; is that correct?

10:02:41 15        A.    Yes.

16        Q.    And it's got a lot of data in there; is that

17  accurate?

18        A.    Yes.

19        Q.    And also in there does it have -- does it sometimes

10:02:49 20  have cellphone tower information?

21        A.    It does.

22        Q.    Is that sometimes like a code in the spreadsheet

23  and you look up the code and it tells you the latitude and

24  longitude of the cellphone tower?

10:02:59 25        A.    Yes.  Depending on the company, it's either a

10:03:02   1   number that you can go to a tower list to see what the number

2   is. Within the number it might tell you a sector. It varies

3   a little bit, but it's the tower, yes.

4       Q.   Jumping down to on the left is the date; is that

10:03:31   5   correct?

6       A.   Yes.

7       Q.   And so on April 24th, this is line 28401; do you

8   see that?

9       A.   I do.

10:03:41   10       Q.   And I probably just made that harder to see.

11       Let's start with -- there's 28401. So that appears

12   to be at 130104; is that correct?

13       A.   Yes.

14       Q.   And you what time is that in nonmilitary terms?

10:04:08   15       A.   It's 1:01 p.m.

16       Q.   And does it appear that DeVan Barbour called Ronald

17   Johnson for two minutes at that time?

18       A.   Yes.

19       Q.   And then on April 24th at 1:35, is there an

10:04:26   20   outgoing call from DeVan Barbour that's another three minutes?

21       A.   Yes.

22       Q.   And then here at line 28408 is there a call at

23   1:44, Ronald Johnson calling DeVan Barbour and it's 0.0

24   minutes; is that correct?

10:04:47   25       A.   Yes. That states it's not answered.

| | | |
|---|---|---|
| 10:04:51 | 1 | Q. Okay. And it actually says in column H not |
| | 2 | answered; is that accurate? |
| | 3 | A. Yes. |
| | 4 | Q. And then the next interaction between Ronald |
| 10:05:09 | 5 | Johnson and DeVan Barbour, according to these records, is |
| | 6 | line 28486; is that correct? |
| | 7 | A. Yes. |
| | 8 | Q. And this is a voice call that appears to be some |
| | 9 | 35 seconds; is that accurate? |
| 10:05:26 | 10 | A. Correct. |
| | 11 | Q. And this is? |
| | 12 | A. 3:43 p.m. |
| | 13 | Q. And that's on April 25th. Are you -- this time |
| | 14 | period, is this before or after the defendant -- I mean, we've |
| 10:05:42 | 15 | heard testimony that the defendant and that Mr. Barbour met at |
| | 16 | sometime around 12:30; do you know is this after that? |
| | 17 | A. Yes. |
| | 18 | Q. This 3:43 would actually be like 1543; is that |
| | 19 | correct? |
| 10:06:02 | 20 | A. It should be, but if you look at the UTC, it says |
| | 21 | plus zero. |
| | 22 | Q. Okay. So is -- |
| | 23 | A. Or a zero. |
| | 24 | Q. So is this supposed to be 3:43 a.m. or is this 3:43 |
| 10:06:13 | 25 | p.m.? |

| | | |
|---|---|---|
| 10:06:14 | 1 | A.   I believe it's 7:43 a.m., and it's incorrect |
| | 2 | because it says plus zero. |
| | 3 | Q.   So you believe it's at 7:43 a.m.? |
| | 4 | A.   I believe it is. |
| 10:06:23 | 5 | Q.   On April 25th? |
| | 6 | A.   Yes. |
| | 7 | Q.   And here on line 28454 there's an entry at 1923, |
| | 8 | that would be like 7:23? |
| | 9 | A.   7:23 p.m. |
| 10:06:34 | 10 | Q.   The next entry is at like 2:22, but that's the |
| | 11 | middle of the night; is that accurate? |
| | 12 | A.   Yes.   These records have different timezones. |
| | 13 | That's why I'm looking at the column that says plus zero. |
| | 14 | Q.   Okay.  And so these records are put into something |
| 10:06:48 | 15 | to amalgamate them or pull that together? |
| | 16 | A.   Yes. |
| | 17 | Q.   So your belief is that this 3:43 call is actually |
| | 18 | 7:43 even though the UTC says plus zero? |
| | 19 | A.   Yes.  A.m. |
| 10:07:00 | 20 | Q.   Okay.  And then April 25th at like 7:40, that would |
| | 21 | be around like 11:40 a.m.; is that correct? |
| | 22 | A.   Yes. |
| | 23 | Q.   Is that an outgoing call for some seven seconds |
| | 24 | from Ronald Johnson to DeVan Barbour? |
| 10:07:18 | 25 | A.   Yes. |

Richard Hoffman - Direct by Mr. Zellinger

| 10:07:18 | 1 | Q. And then are there two calls around -- this is 8:43 |
| | 2 | would that be around 12:43? |
| | 3 | A. Yes. |
| | 4 | Q. And this appears to be a duplicate of one second; |
| 10:07:31 | 5 | is that accurate? |
| | 6 | A. That's correct. |
| | 7 | Q. Okay. And then there's more calls at 12:40; do you |
| | 8 | see that? |
| | 9 | A. Yes. |
| 10:07:41 | 10 | Q. And then I want to draw your attention to -- |
| | 11 | there's then at 28540, line 28540, there's a call |
| | 12 | from -- there's a call -- is this from DeVan Barbour to Angie |
| | 13 | Barbour? |
| | 14 | A. Yes. |
| 10:07:59 | 15 | Q. And this says UTC minus 4 and it says 1314. Is |
| | 16 | that at 1:14 p.m.? |
| | 17 | A. Yes. |
| | 18 | Q. So 1:14 p.m. would be right after -- if they met at |
| | 19 | 12:30 on April 25th, this would be right after? |
| 10:08:18 | 20 | A. Just under an hour. |
| | 21 | Q. Okay. And these two lines, 28540 and 28541, those |
| | 22 | reflect -- |
| | 23 | A. The same call but from two parties' records. |
| | 24 | Q. And that's DeVan Barbour calling Angie Barbour; is |
| 10:08:33 | 25 | that correct? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

10:08:33  1          A.   Yes.

       2          Q.   And this is for some 15 minutes; is that accurate?

       3          A.   Yes.

       4          Q.   I want to draw your attention to sort of focusing

10:08:44  5   on DeVan Barbour.  There's more calls between -- there's an

       6   outgoing call between -- Ronald Johnson calls DeVan Barbour on

       7   April 27th?

       8          A.   Yes.

       9          Q.   And that's for some 30 minutes; is that correct?

10:08:58 10          A.   Correct.

      11          Q.   And that is -- that's at 5:28 where it says UTC

      12   plus zero; is that accurate?

      13          A.   No.  You go down the -- go down to the next one

      14   that says DeVan.  That's the one that's accurate.

10:09:13 15          Q.   Okay.  So line 28773 says 5:28 a.m. basically, but

      16   the record from DeVan's cellphone records says 10:28 a.m.; is

      17   that correct?

      18          A.   Yes.

      19          Q.   So does this lead you to believe that this

10:09:29 20   timestamp on the defendant's cellphone record might be off by

      21   five hours?

      22          A.   I do think so.

      23          Q.   So this 28773 and 28795 are --

      24          A.   It's the same call.

10:09:44 25          Q.   Okay.  And that's for some 30 minutes?

| 10:09:48 | 1 | A. Yes. |

2    Q. Okay. And then April 28th, there's an incoming

3    call to Ronald Johnson from DeVan Barbour; is that correct?

4    A. Yes.

10:09:59  5    Q. And that is not answered?

6    A. No.

7    Q. And then there appears to be an outgoing call from

8    the defendant to DeVan Barbour on April 28th, and it says not

9    answered as well?

10:10:17  10    A. Correct.

11    Q. And so do you know if those are separate calls?

12    A. If you can slide it over to the right to look at

13    the row. They do appear to be separate.

14    Q. So they are different phone calls. This is a

10:10:38  15    situation where it's duplicated?

16    A. No.

17    Q. And so that non-answered call is at line 28498.

18    The next line 28950, there's a voice call from DeVan Barbour

19    to Ronald Johnson that appears they talked for some four

10:10:56  20    minutes?

21    A. Correct.

22    Q. And then April 28th there's another non-answered

23    call between DeVan Barbour and Ronald Johnson; is that

24    correct?

10:11:08  25    A. Yes.

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 10:11:08 | 1 | Q. There appears to be a call non-answered on |
| | 2 | April 28th at 5:08 p.m.; is that accurate? |
| | 3 | A. Doesn't appear to be a call. It looks like a |
| | 4 | multimedia message. |
| 10:11:30 | 5 | Q. A text; is that correct? |
| | 6 | A. Yes. |
| | 7 | Q. Okay. And then another one at 29 -- line 29022 at |
| | 8 | 5:08 on April 28th? |
| | 9 | A. Correct. |
| 10:11:41 | 10 | Q. And another one a couple minutes later on the 28th? |
| | 11 | A. That one from Mr. Donovan. |
| | 12 | Q. Oh, I'm sorry. Thank you. Line 29028 at 5:19 p.m. |
| | 13 | there appears to be more multimedia messages exchanged between |
| | 14 | the defendant and DeVan Barbour; is that correct? |
| 10:12:03 | 15 | A. Correct. |
| | 16 | Q. And suffice it to say, DeVan Barbour -- there are |
| | 17 | multiple listings on here where DeVan Barbour is communicating |
| | 18 | with Ronald Johnson, Kevin Donovan, line 29032; is that |
| | 19 | correct? |
| 10:12:17 | 20 | A. Yes. |
| | 21 | Q. That's a text. Multiple times they are talking on |
| | 22 | the 28th? |
| | 23 | A. Yes. |
| | 24 | Q. And the defendant and Kevin Donovan have -- I mean, |
| 10:12:30 | 25 | this entire sort of page that we're looking at lines 29060 |

| | | |
|---|---|---|
| 10:12:35 | 1 | through 29115. These are all phone calls between the |
| | 2 | defendant and Kevin Donovan; is that accurate? |
| | 3 | A. Correct. |
| | 4 | Q. I want to turn your attention to May 9th. There's |
| 10:12:57 | 5 | these -- there appears to be an outgoing call on May 6th where |
| | 6 | DeVan Barbour is calling Ronald Johnson; is that accurate? |
| | 7 | A. Yes. Appears to be only one second. |
| | 8 | Q. I'm sorry? |
| | 9 | A. Appears to be only one second. |
| 10:13:11 | 10 | Q. Okay. So maybe -- and then there's two other |
| | 11 | entries at the lines 30063 and 30064, and all of these the |
| | 12 | highlighted ones appear to be 0.00 or 001. So it appears to |
| | 13 | be not a conversation; is that correct? |
| | 14 | A. Correct. |
| 10:13:32 | 15 | Q. And then on April 9th, there's an -- at line 30660, |
| | 16 | and again, this appears -- this shows 5:24 a.m. Do you know |
| | 17 | if this is 9:24 a.m.? |
| | 18 | A. I think it's 9:24 a.m. |
| | 19 | Q. There's an outgoing call from Ronald Johnson to |
| 10:13:54 | 20 | DeVan Barbour; is that correct? |
| | 21 | A. Yes. |
| | 22 | Q. That's 33 seconds? |
| | 23 | A. Correct. |
| | 24 | Q. Then there's a call from DeVan Barbour receiving |
| 10:14:03 | 25 | this call from Ronald Johnson that's some six minutes and 38 |

| | | |
|---|---|---|
| 10:14:07 | 1 | seconds? |
| | 2 | A.   Yes. |
| | 3 | Q.   Then there's some calls that are not answered later |
| | 4 | in the morning; is that correct? |
| 10:14:16 | 5 | A.   Correct. |
| | 6 | Q.   And then there's several phone calls that -- and do |
| | 7 | you know that these are duplicates where it's line 30723 and |
| | 8 | 30720, and I think I might have said April.  This is May 9th; |
| | 9 | correct? |
| 10:14:40 | 10 | A.   This is May 9th. |
| | 11 | Q.   May 9th.  So the meeting allegedly occurs |
| | 12 | April 25th, and this is May 9th? |
| | 13 | A.   Yes. |
| | 14 | Q.   So on May 9th there's a flurry of activity between |
| 10:14:50 | 15 | DeVan Barbour and Ronald Johnson; is that accurate? |
| | 16 | A.   It is. |
| | 17 | Q.   And these two calls on May 9th, lines 30720 and |
| | 18 | 30723, do you know if those are duplicates? |
| | 19 | A.   They don't appear to be duplicates.  They appear to |
| 10:15:08 | 20 | be short calls in succession. |
| | 21 | Q.   Okay.  And then there's 30720 and 30723.  There's |
| | 22 | other information on these phone records where defendant or |
| | 23 | Mr. Barbour might have been calling other people; is that |
| | 24 | correct? |
| 10:15:25 | 25 | A.   Correct. |

Richard Hoffman - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 10:15:26 | 1 | Q. This is just a record of communication between |
| | 2 | DeVan Barbour, Angie Barbour, Kevin Donovan, and the |
| | 3 | defendant, Ronald Johnson? |
| | 4 | A. Yes. |
| 10:15:36 | 5 | Q. Okay. And there's multiple calls on May 9th; is |
| | 6 | that accurate? |
| | 7 | A. That is correct. |
| | 8 | Q. Going into May 10th, there's some -- I'm sorry. |
| | 9 | Those calls appear to end on May 9th around -- is that around |
| 10:15:51 | 10 | 8:53 p.m.? |
| | 11 | A. Correct. |
| | 12 | Q. And then again on May 11th, there's more calls |
| | 13 | between the defendant and DeVan Barbour? |
| | 14 | A. Yes. |
| 10:16:05 | 15 | Q. Again, the primary date in this is May 17th; is |
| | 16 | that accurate? |
| | 17 | A. I believe so. |
| | 18 | Q. Now, following those calls, is there a call on |
| | 19 | May 12th where Angie Barbour receives a call from DeVan |
| 10:16:21 | 20 | Barbour? |
| | 21 | A. Yes. |
| | 22 | Q. And appears to be that one second. So potentially |
| | 23 | it wasn't connected or -- |
| | 24 | A. Yes. |
| 10:16:29 | 25 | Q. If you left a voicemail, it would take longer than |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Richard Hoffman - Direct by Mr. Zellinger

10:16:32  1   one second; correct?

2        A.    I believe so.

3        Q.    Okay.  And then it appears they connected, lines

4   31723 and 31724, for a minute and 54.  According to these

10:16:43  5   records, there's a phone call between them; is that correct?

6        A.    Yes.

7        Q.    And then there appears to be another call for some

8   16 seconds, and then it appears that Ronald Johnson, the

9   defendant, receives an incoming call from DeVan Barbour on

10:17:04 10   May 12th for some six minutes; is that accurate?

11        A.    That's correct.

12        Q.    And then this appears to be duplicated on line

13   31278; is that correct?

14        A.    Yes.

10:17:24 15        Q.    And then this call is at, like, 10:44 in the

16   morning?

17        A.    Yes.

18        Q.    And then at 10:56 there appears to be another call

19   between the defendant and Mr. Barbour; is that correct?

10:17:41 20        A.    Yes.

21        Q.    And that's Ronald Johnson receiving a phone call

22   from DeVan Barbour; is that accurate?

23        A.    Yes.

24        Q.    Then after that, there's another call between DeVan

10:17:52 25   Barbour and the defendant on April 15th that's not answered;

| 10:17:56 | 1 | is that correct? |

2       A.    It's not a phone call.  It's a text.

3       Q.    Okay.  There's another -- there's a phone call on

4    May 16th that's not answered; is that accurate?

10:18:08   5       A.    Correct.

6       Q.    May 16th is the day before the election day; is

7    that right?

8       A.    Yes.

9       Q.    Then, I mean, on May 17th there appears to be a

10:18:24  10    non-answered call where Angela Barbour called DeVan Barbour

11    sort of late at night?

12       A.    May 16th, and it is like a media message.

13       Q.    Okay.  So that might be a text message; is that

14    correct?

10:18:43  15       A.    Correct.

16       Q.    Then on May 17th, there appears to be a

17    non-answered call where the defendant calls DeVan Barbour?

18       A.    It's not a phone call.  It's a text message.

19       Q.    It's a text.  Thank, sir.  And another text at 1:17

10:18:58  20    p.m. that day?

21       A.    Correct.

22       Q.    And more information exchanged.  Another text

23    between DeVan Barbour and Angie Barbour on May 17th heading

24    towards the evening; is that correct?

10:19:14  25       A.    Correct.

| | | |
|---|---|---|
| 10:19:14 | 1 | Q. Then following May 17th, there's -- DeVan Barbour |
| | 2 | is not talking to these folks, at least until the record ends |
| | 3 | on May 28th; is that accurate? |
| | 4 | A. Correct. |
| 10:19:26 | 5 | Q. So election day is when their communication ended? |
| | 6 | A. I gave him a date range. I had those records |
| | 7 | through September, and there was no communication through |
| | 8 | September. |
| | 9 | Q. So DeVan Barbour didn't talk to the defendant or |
| 10:19:43 | 10 | Angela Barbour or Kevin Donovan after election day, as far as |
| | 11 | the records went to September? |
| | 12 | A. Yes. |
| | 13 | MR. ZELLINGER: Can we pull that down, madam clerk. |
| | 14 | Q. You mentioned you got records from Apple, TracFone, |
| 10:20:29 | 15 | Verizon, and T-Mobile. Did you also get records from other |
| | 16 | companies? |
| | 17 | A. I did. I got records from Pinger, from Google. |
| | 18 | Q. Did you get records from Microsoft? |
| | 19 | A. MSN. |
| 10:20:46 | 20 | Q. What is MSN? |
| | 21 | A. Microsoft's email service. |
| | 22 | Q. Did the defendant appear to have an email with |
| | 23 | Microsoft? |
| | 24 | A. He did. On the board of education each board |
| 10:20:57 | 25 | member lists their email address. Most of them use the school |

| 10:21:00 | 1 | email address. Mr. Johnson did not. He listed his MSN email |
| | 2 | address on the school board's website. |
| | 3 | Q. And do you recall, is that him there with something |
| | 4 | like RonJon something @MSN? |
| 10:21:13 | 5 | A. I think so. |
| | 6 | Q. Okay. I mean, do you know you off the top of your |
| | 7 | head? |
| | 8 | A. I don't know off the top of my head. |
| | 9 | Q. Okay. As you're doing these search warrants, |
| 10:21:23 | 10 | you're collecting this information throughout September 2022; |
| | 11 | is that correct? |
| | 12 | A. The search warrant information? |
| | 13 | Q. I'm sorry, yes. |
| | 14 | A. Yes. So I did the first search warrant on December |
| 10:21:33 | 15 | the 9th, and it takes those service providers and they have |
| | 16 | their own process to review it and return it to you. And |
| | 17 | sometimes it can take four to six weeks. Sometimes it takes |
| | 18 | them a couple of weeks. |
| | 19 | Q. Did you do a second batch of search warrants in |
| 10:21:49 | 20 | this matter? |
| | 21 | A. I did, on January 11th. |
| | 22 | Q. Okay. And what were those for? |
| | 23 | A. So after I got some of the returns, I realized that |
| | 24 | the -- when you request records, they only give the records |
| 10:22:00 | 25 | you requested. So there may be more. So when I was looking |

10:22:03  1  through there I said, I think I missed some of these records

2  by asking the same question a different way, and there was a

·3  followup search warrants based on the information that I

4  started to get.

10:22:15  5      Q.   At some point did you mess up the request for

6  records from DeVan Barbour?

7      A.   I did.  So when you ask iCloud or Apple and you

8  list an Apple ID, an Apple ID is an email address, and so I

9  listed the incorrect email address for Mr. Barbour.

10:22:34  10      Q.   And was it like a scribner's error?  Did you make a

11  mistake in his email address?

12      A.   I used the wrong one.  He has multiple.  That was

13  not the correct one.

14      Q.   And at this point had you learned about this -- the

10:22:51  15  allegation of this extortion that it occurred April 25th and

16  the followup phone call; did you know about this at that

17  point?

18      A.   Yes.

19      Q.   And you had talked to Mr. Barbour about it?

10:23:02  20      A.   Correct.

21      Q.   And at this point had you also become aware that

22  there was some recordings that were alleged to have been made

23  in this case?

24      A.   Yes.

10:23:12  25      Q.   Okay.  At this point you were also investigating

| | | |
|---|---|---|
| 10:23:14 | 1 | the closed session potential recording by the defendant; is |
| | 2 | that correct? |
| | 3 | A.   Correct. |
| | 4 | Q.   And so Mr. Barbour in the extortion, what was -- I |
| 10:23:28 | 5 | mean, as you looked at the case, was Mr. Barbour |
| | 6 | technically the -- what was his role in the case? |
| | 7 | A.   He was the victim. |
| | 8 | Q.   Okay.  Because he was the one who |
| | 9 | allegedly -- well, I mean, what was alleged to have happened |
| 10:23:43 | 10 | to him? |
| | 11 | A.   He was -- he stated that Mr. Johnson asked to meet |
| | 12 | with him, played a recording for him, then told him that that |
| | 13 | recording would go public and that he needed to get a |
| | 14 | recantation from Angela Barbour denying that they had an |
| 10:24:01 | 15 | affair.  And then he actually contacted to her so that, to me, |
| | 16 | met that elements of that. |
| | 17 | Q.   That's for the jury to decide. |
| | 18 | A.   It is.  I'm sorry.  I apologize. |
| | 19 | Q.   But that was what you're investigating whether you |
| 10:24:17 | 20 | could get evidence to show that the defendant had committed |
| | 21 | this crime; is that accurate? |
| | 22 | A.   Correct. |
| | 23 | Q.   And after you completed these interviews, you |
| | 24 | mentioned you got records from Apple, from Verizon, from |
| 10:24:41 | 25 | Gmail; is that correct? |

| | | | |
|---|---|---|---|
| 10:24:44 | 1 | A. | Yes. |
| | 2 | Q. | From MSN, which is the Microsoft email server? |
| | 3 | A. | Correct. |
| | 4 | Q. | T-Mobile? |
| 10:24:51 | 5 | A. | Correct. |
| | 6 | Q. | Snapchat? |
| | 7 | A. | Correct. |
| | 8 | Q. | Pinger? |
| | 9 | A. | Correct. |
| 10:24:54 | 10 | Q. | What is Pinger? |

11      A.   Pinger is basically a VOIP, a voiceover internet

12  provider.  So when you use your cellphone and you like to have

13  a second number that's not your number and you'd like to make

14  phone calls and use that number, and you can use that service

10:25:12  15  and route your phone calls through that server.  You can do it

16  through data instead of cellular as well.

17      Q.   At some point did you execute search warrants on

18  physical locations?

19      A.   I did.

10:25:29  20      Q.   Where were those locations?

21      A.   The Clayton Fitness gym was one of the locations,

22  the airport office where Mr. Johnson is employed, and his

23  home.

24      Q.   Okay.  And just to be clear, Mr. Johnson used to be

10:25:46  25  a Smithfield police officer; is that correct?

| | | |
|---|---|---|
| 10:25:48 | 1 | A. Yes. |
| | 2 | Q. At this time in December of 2022 was he still |
| | 3 | employed with by Smithfield PD? |
| | 4 | A. No. |
| 10:25:53 | 5 | Q. And he was working at the airport here in Johnston |
| | 6 | County? |
| | 7 | A. Yes. |
| | 8 | Q. Okay. And do you know what his role is there? |
| | 9 | A. He works for Blueline Aviation. I'm not sure what |
| 10:26:03 | 10 | his role is. |
| | 11 | Q. Okay. And then was he employed by Clayton Fitness? |
| | 12 | A. No. |
| | 13 | Q. But why did you want to do a search of Clayton |
| | 14 | Fitness? |
| 10:26:11 | 15 | A. I had learned that he kept an office there and that |
| | 16 | he also apparently had meetings there. I did not initially |
| | 17 | set out to do a search warrant at the gym until January 25th. |
| | 18 | Q. At some point after learning of this extortion |
| | 19 | allegation, did you seek to see if the gym had any video of |
| 10:26:44 | 20 | it? |
| | 21 | A. I did. On January 25th, I actually received a |
| | 22 | phone call from a detective in South Carolina asking me to go |
| | 23 | to Matthew -- |
| | 24 | Q. Don't say anything that anybody else said. |
| 10:26:54 | 25 | But you received a phone call from somebody in |

| | | |
|---|---|---|
| 10:26:56 | 1 | South Carolina? |
| | 2 | A. To go help someone not related to this case. |
| | 3 | Q. Okay. |
| | 4 | A. I knew that I'd be having a meeting some weeks |
| 10:27:03 | 5 | after, and I was in the area of the gym. So I wanted to do my |
| | 6 | due diligence and do a site visit, basically go to the area |
| | 7 | for where this allegedly occurred and see if there was any |
| | 8 | video. I knew it had been many, many, many month. I didn't |
| | 9 | have any high hopes that there would be video, but I stopped |
| 10:27:24 | 10 | by the gym that day. |
| | 11 | Q. Okay. And when you went to the gym, what happened? |
| | 12 | A. When I went to the gym, I met with a gentleman |
| | 13 | named Dustin Parks. We were in the front. I asked him if we |
| | 14 | could talk in private because there were several other people |
| 10:27:36 | 15 | there. And he took me back to an office behind the workout |
| | 16 | area. |
| | 17 | Q. Okay. And did Mr. Parks share anything with you? |
| | 18 | A. He did. He told me that -- |
| | 19 | Q. Well, without going into what he said, did he |
| 10:27:55 | 20 | actually -- actually, was it a later date that he shared |
| | 21 | something with you electronically? |
| | 22 | A. Oh, yes. It was that same day. |
| | 23 | Q. Okay. And was it a Facebook message? |
| | 24 | A. It was. |
| 10:28:08 | 25 | MR. ZELLINGER: Your Honor, may I approach the |

| | | |
|---|---|---|
| 10:28:09 | 1 | witness? |
| | 2 | THE COURT:  Yes, sir. |
| | 3 | (State's Exhibit Number 76 marked for |
| | 4 | identification.) |
| 10:28:27 | 5 | MR. TYNDALL:  We just have a hearsay objection to |
| | 6 | this, Your Honor. |
| | 7 | MR. ZELLINGER:  Your Honor, I haven't asked any |
| | 8 | questions about it yet. |
| | 9 | Your Honor, may I approach the witness? |
| 10:28:36 | 10 | THE COURT:  Yes, sir. |
| | 11 | Q.  I hand you what's been marked as State's |
| | 12 | Exhibit 76.  Is this what Dustin Parks sent you? |
| | 13 | A.  Correct. |
| | 14 | Q.  And was that information relevant to you about the |
| 10:28:49 | 15 | defendant's involvement with the gym there? |
| | 16 | A.  Yes. |
| | 17 | Q.  And you knew that -- |
| | 18 | MR. ZELLINGER:  Your Honor, may I approach the |
| | 19 | bench for this exhibit notebook? |
| 10:29:14 | 20 | Q.  When you met with Dustin Parks, did he show you |
| | 21 | where the defendant had an office? |
| | 22 | A.  He did. |
| | 23 | Q.  And then what happened when he showed you that he |
| | 24 | had an office? |
| 10:29:27 | 25 | A.  He opened the door, and the first thing I saw was a |

| | | |
|---|---|---|
| 10:29:34 | 1 | plastic table with metal folding chairs, and there was a phone |
| | 2 | right on top of there.  There was an Apple phone. |
| | 3 | Q.    Why did that phone draw your attention? |
| | 4 | A.    It drew my attention because I knew that |
| 10:29:47 | 5 | Mr. Johnson had been given two phones by the police department |
| | 6 | that had not been returned, and one of those phones was an |
| | 7 | iPhone SE, and the phone that I could see appeared to match |
| | 8 | that. |
| | 9 | Q.    When you say "appeared to match that," did you know |
| 10:30:02 | 10 | that that was that exact phone?  I mean, can you identify an |
| | 11 | SE versus anything else? |
| | 12 | A.    No.  The reason I narrowed it down was it was face |
| | 13 | up, the home button was away from me.  The home button was |
| | 14 | flat.  Okay?  It had a home button, and it was not concave, |
| 10:30:20 | 15 | which means that you have to put your finger on it like you |
| | 16 | put your finger for finger ID.  I knew that the 5C was |
| | 17 | concave, but the 5S and SE were just like that.  It was |
| | 18 | bigger, the screen size, than a three and a half inch small, |
| | 19 | older phone, and it was not as big.  The screen was at a six |
| 10:30:41 | 20 | or a seven.  So because it had that home button, it was either |
| | 21 | going to be a 5S or -- excuse me, an iPhone SE.  So it was |
| | 22 | narrowed in scope, which is why I chose to use the word match. |
| | 23 | Q.    Okay.  And so when you see that phone, did you want |
| | 24 | to get that phone? |
| 10:31:00 | 25 | A.    I did. |

| | | |
|---|---|---|
| 10:31:00 | 1 | Q.   Could you just grab it? |
| | 2 | A.   It was within arm's length. |
| | 3 | Q.   But did you just grab it? |
| | 4 | A.   I did not. |
| 10:31:07 | 5 | Q.   And why not? |
| | 6 | A.   Because I needed to get a search warrant.  I think |
| | 7 | he had an expectation of privacy.  The door was locked. |
| | 8 | Q.   Okay.  And so what did you do when you -- what did |
| | 9 | you do after you saw that phone sitting there? |
| 10:31:21 | 10 | A.   I went to go get a search warrant. |
| | 11 | Q.   Physically did you leave the gym? |
| | 12 | A.   I did. |
| | 13 | Q.   And at this point you know about -- you've |
| | 14 | interviewed DeVan Barbour, you know, about that the allegation |
| 10:31:32 | 15 | of extortion; is that correct? |
| | 16 | A.   Correct. |
| | 17 | Q.   And that's alleged to have happened behind the gym? |
| | 18 | A.   Yes. |
| | 19 | Q.   And did you ask about video at the gym? |
| 10:31:40 | 20 | A.   I did. |
| | 21 | Q.   And did you find out if there was video of the back |
| | 22 | parking lot of the gym? |
| | 23 | A.   They did not have -- they didn't even have the same |
| | 24 | video system.  They had replaced the video system. |
| 10:31:52 | 25 | Q.   So there was no video from eight months earlier in |

Richard Hoffman - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 10:31:56 | 1 | April of the back? |
| | 2 | A. No. |
| | 3 | Q. And so when you leave, where did you go? |
| | 4 | A. I went straight to the courthouse where my office |
| 10:32:07 | 5 | is. |
| | 6 | Q. Okay. And did you start drafting a search warrant |
| | 7 | at that time? |
| | 8 | A. I did. |
| | 9 | Q. Now, were you concerned about leaving the -- this |
| 10:32:16 | 10 | evidence that you wanted? |
| | 11 | A. Yes. My understanding was that the gentleman I |
| | 12 | spoke with was friends with the defendant, and I was concerned |
| | 13 | he might contact the defendant. |
| | 14 | Q. Okay. Later did you find out that Mr. Parks did in |
| 10:32:32 | 15 | fact contact the defendant? |
| | 16 | MR. TYNDALL: Objection. |
| | 17 | THE COURT: I'll overrule and let him answer if he |
| | 18 | can. |
| | 19 | THE WITNESS: Yes. |
| 10:32:40 | 20 | Q. Okay. And how did you figure that out? |
| | 21 | A. The defendant came to the gym after I left. |
| | 22 | Q. And did you know that prior to that Mr. Parks had |
| | 23 | contacted the defendant? |
| | 24 | A. I asked. I asked Mr. Parks. |
| 10:32:56 | 25 | Q. Okay. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 10:32:57 | 1 | MR. TYNDALL: Objection to anything he said, Your |
| | 2 | Honor. |
| | 3 | THE COURT: Yes, sir. We'll wait, I guess, for a |
| | 4 | question maybe as to what he said, so... |
| 10:33:05 | 5 | MR. ZELLINGER: Sure. |
| | 6 | Q. But just to be clear, you talked to Mr. Parks and |
| | 7 | then -- was anybody at the gym while you are here? |
| | 8 | A. Yes. So I contacted Jamie Brantley, the detective |
| | 9 | from Clayton Police Department, because I wanted to have |
| 10:33:20 | 10 | somebody observing the gym, because I had hoped that I didn't |
| | 11 | seem excited or interested in the phone, that I'd have enough |
| | 12 | time to get this search warrant, but I'm pessimist so I |
| | 13 | contacted Detective Brantley and asked if he could watch the |
| | 14 | gym for me. |
| 10:33:37 | 15 | Q. After anything that happened that day, did |
| | 16 | Mr. Parks send you a message later that day? |
| | 17 | A. He did. |
| | 18 | Q. And what's before you, State's Exhibit 76, is that |
| | 19 | the message that he sent you? |
| 10:34:15 | 20 | A. He sent me a screenshot to my phone, and that is |
| | 21 | the screenshot of what he sent. |
| | 22 | Q. And that message -- after you acquired that |
| | 23 | message, was it your belief that -- did you understand why the |
| | 24 | defendant went to the gym that day? |
| 10:34:38 | 25 | A. Yes. |

| | | |
|---|---|---|
| 10:34:39 | 1 | MR. TYNDALL: Objection. |
| | 2 | THE COURT: I'll overrule. If he understands, |
| | 3 | we'll let him answer. |
| | 4 | Q. After receiving that message, you then figured out |
| 10:34:49 | 5 | why the defendant went to the gym? |
| | 6 | A. Correct. |
| | 7 | Q. In the notebook next to you, sir, if you can turn |
| | 8 | to -- |
| | 9 | MR. ZELLINGER: Well, Your Honor, can I just |
| 10:35:02 | 10 | approach the witness? |
| | 11 | THE COURT: Yes, sir. |
| | 12 | Q. Investigator Hoffman, after you did this, did you |
| | 13 | draft the search warrant here? |
| | 14 | A. I did. |
| 10:35:27 | 15 | Q. And then did you ever communicate with the Clayton |
| | 16 | police -- is it a detective? |
| | 17 | A. With a detective. |
| | 18 | Q. Did you communicate with a Clayton police detective |
| | 19 | who's at the scene of the gym? |
| 10:35:40 | 20 | A. He actually communicated with me first to alert me |
| | 21 | that the defendant was there. |
| | 22 | Q. So what did you do at that point? |
| | 23 | A. At that point he had already entered. There's |
| | 24 | nothing going to stop him to enter. I asked him to take a |
| 10:35:52 | 25 | picture when he comes out, because I wanted to see if he was |

| | | |
|---|---|---|
| 10:35:55 | 1 | carrying anything. |
| | 2 | Q.  And you saw that cellphone.  Was that cellphone on |
| | 3 | the white table? |
| | 4 | A.  It was.  It was within arm's length. |
| 10:36:03 | 5 | Q.  Okay.  And was there anything else that you saw on |
| | 6 | the table? |
| | 7 | A.  There were miscellaneous cords and some other |
| | 8 | things, but I was really focused on the phone. |
| | 9 | Q.  Okay.  And so did you eventually do the search |
| 10:36:15 | 10 | warrant? |
| | 11 | A.  I did. |
| | 12 | Q.  You did go back to execute the search warrant; is |
| | 13 | that correct? |
| | 14 | A.  I did. |
| 10:36:19 | 15 | Q.  And did you go in the office? |
| | 16 | A.  I did. |
| | 17 | Q.  When you went in the office, did you find the |
| | 18 | cellphone? |
| | 19 | A.  No.  There wasn't any phone on the table. |
| 10:36:28 | 20 | Q.  At that point did you ask to look at anything from |
| | 21 | the gym? |
| | 22 | A.  I did.  I asked to look at the video to be able to |
| | 23 | observe what happened inside the gym. |
| | 24 | Q.  Is that their security footage? |
| 10:36:38 | 25 | A.  It is. |

Richard Hoffman - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 10:36:39 | 1 | Q.   And so did they show you that security footage? |
| | 2 | A.   He did. |
| | 3 | Q.   And what did that depict? |
| | 4 | A.   It depict Mr. Johnston entering the gym, going to |
| 10:36:48 | 5 | the office, using a key to open the door, staying in there for |
| | 6 | a little over minute and a half, and then exiting, then going |
| | 7 | back to the -- down where the hallway bathroom is, making a |
| | 8 | left turn into the bathroom, and then being in there for about |
| | 9 | a minute and change and then leave. |
| 10:37:07 | 10 | Q.   Okay.  And did you preserve that video? |
| | 11 | A.   I did. |
| | 12 | Q.   How did you preserve the video? |
| | 13 | A.   Because of the phone call, I wasn't sure, so I used |
| | 14 | my phone to get it. |
| 10:37:18 | 15 | Q.   So did it appear that the defendant and the person |
| | 16 | in the gym were friends? |
| | 17 | A.   Yes. |
| | 18 | Q.   Okay.  And you just filmed it on your phone? |
| | 19 | A.   Yes. |
| 10:37:29 | 20 | (State's Exhibit Number 40 marked for |
| | 21 | identification.) |
| | 22 | Q.   I show you State's Exhibit 40.  Is that the video |
| | 23 | that you recorded from the gym? |
| | 24 | A.   It is. |
| 10:37:35 | 25 | MR. ZELLINGER:  Your Honor, at this time I seek to |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 10:37:36 | 1 | admit State's Exhibit 40. |
| | 2 | THE COURT: Any objection? |
| | 3 | MR. TYNDALL: No, Your Honor. |
| | 4 | THE COURT: So allowed. |
| 10:37:42 | 5 | (State's Exhibit Number 40 entered into |
| | 6 | evidence.) |
| | 7 | MR. ZELLINGER: Your Honor, may I publish State's |
| | 8 | Exhibit 40 at this time? |
| | 9 | THE COURT: Yes, sir. |
| 10:38:12 | 10 | Q. Investigator Hoffman, before you is this State's |
| | 11 | Exhibit 40? |
| | 12 | A. Yes. |
| | 13 | Q. Is this video of the gym? |
| | 14 | A. Correct. |
| 10:38:18 | 15 | Q. We saw picture earlier of the outside of Clayton |
| | 16 | Fitness. When you walk in the front door, is this essentially |
| | 17 | what you're looking at? |
| | 18 | A. Yes. If you go past the entrance, then this is |
| | 19 | their kind of main workout area. |
| 10:38:33 | 20 | Q. Okay. And up here, is this the top of the screen |
| | 21 | that you are watching? |
| | 22 | A. The top of the monitor. |
| | 23 | Q. So you are watching this on a monitor; is that |
| | 24 | correct? |
| 10:38:41 | 25 | A. Yes. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 10:38:41 | 1 | Q.    And is this from -- do you remember the date that |
| | 2 | this was? |
| | 3 | A.    January 25th, 2023. |
| | 4 | Q.    And is this time accurate, it was around 10 a.m.? |
| 10:38:50 | 5 | A.    It's accurate. |
| | 6 | Q.    Okay.  And it was around 10:54 a.m.; is that |
| | 7 | correct? |
| | 8 | A.    Yes. |
| | 9 | Q.    And just to be clear, there's people in this |
| 10:39:04 | 10 | working out; is that accurate? |
| | 11 | A.    Yes.  There were a handful of people there. |
| | 12 | Q.    Okay.  And where the cursor is, are these the |
| | 13 | offices in the gym? |
| | 14 | A.    Yes.  I spoke with that gentleman in the office to |
| 10:39:16 | 15 | the left, the office that doesn't have a marker or arrows on, |
| | 16 | is an office that Mr. Johnson was using. |
| | 17 | Q.    If I can stop you right there.  The person in the |
| | 18 | black, who is that? |
| | 19 | A.    That's the defendant, Mr. Johnson. |
| 10:39:33 | 20 | Q.    And do you recognize him here in the courtroom? |
| | 21 | A.    Yes.  He's seated next to counsel. |
| | 22 | (State's Exhibit Number 40 played.) |
| | 23 | Q.    Okay.  And so at that point he goes into that |
| | 24 | office, and that's around 25 seconds into the video; is that |
| 10:40:06 | 25 | correct? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 10:40:06 | 1 | A.   Yes, sir. |
| | 2 | Q.   And he's in there for around a minute or so, is |
| | 3 | that accurate? |
| | 4 | A.   Yea.  It's approximate. |
| 10:40:17 | 5 | Q.   So for the next minute in this video, it's just |
| | 6 | people working out? |
| | 7 | A.   Uh-huh.  It's a small office, about 10 foot by 10 |
| | 8 | foot. |
| | 9 | Q.   And here at two minutes four seconds into the |
| 10:41:50 | 10 | video, that is the defendant emerging from that office? |
| | 11 | A.   Yes. |
| | 12 | Q.   Okay.  So that's like a minute and 38 seconds |
| | 13 | later? |
| | 14 | A.   Correct. |
| 10:42:18 | 15 | Q.   And he spends a couple seconds at the door.  Was it |
| | 16 | unlocked? |
| | 17 | A.   No, it wasn't.  Mr. Parks unlocked it and opened it |
| | 18 | because it was not in use.  When he opened it, it appeared to |
| | 19 | me to be in use, and then he closed the door and I left. |
| 10:42:34 | 20 | Q.   Okay.  But that -- when you first went into that |
| | 21 | office and saw the cellphone, it was locked; is that correct? |
| | 22 | A.   It was locked.  Mr. Parks unlocked the door, showed |
| | 23 | me that it was not in use, and it appeared to be in use to me. |
| | 24 | Q.   And just to go back from when the defendant comes |
| 10:42:48 | 25 | out.  It appears that he does something with the door at that |

| | | |
|---|---|---|
| 10:42:55 | 1 | point; is that correct? |
| | 2 | A.  Yes. |
| | 3 | Q.  He could be locking it, you don't know for sure. |
| | 4 | A.  I don't know. |
| 10:43:01 | 5 | Q.  At that point what, if anything, did you see the |
| | 6 | defendant have in his hands? |
| | 7 | A.  He has a white box in his hands.  Now he's going |
| | 8 | down the hallway to the bathroom. |
| | 9 | Q.  And at that point -- I mean, do you know where he |
| 10:43:26 | 10 | went after he went into the bathroom? |
| | 11 | A.  Yes.  It's the bathroom or a locker room. |
| | 12 | Q.  It's a locker room? |
| | 13 | A.  Locker room/bathroom. |
| | 14 | Q.  Okay.  And did you actually search that locker room |
| 10:43:36 | 15 | as well? |
| | 16 | A.  I did. |
| | 17 | Q.  Okay.  And again, is he coming down the central |
| | 18 | hallway? |
| | 19 | A.  Yes. |
| 10:44:29 | 20 | Q.  And he's got a white box in his hands. |
| | 21 | A.  Yes.  So inside the office there was some lamps |
| | 22 | maybe for a podcast or something, and the lamp fixture itself |
| | 23 | came with a box.  That's what the box like that is, but the |
| | 24 | two lamps were still in the office. |
| 10:44:57 | 25 | Q.  And he leaves.  He appears to leave the gym; is |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 10:45:01 | 1 | that correct? |
| | 2 | A. Yes. |
| | 3 | (State's Exhibit Number 41 marked for |
| | 4 | identification.) |
| 10:45:01 | 5 | Q. Investigator, before you is State's Exhibit 41 in |
| | 6 | that notebook. |
| | 7 | A. You say 41? |
| | 8 | Q. Yes, 41. |
| | 9 | Do you recognize that image? |
| 10:45:22 | 10 | A. Yes. That is the picture Detective Brantley sent |
| | 11 | me. |
| | 12 | Q. Is that the defendant leaving the gym? |
| | 13 | MR. ZELLINGER: At this time I seek to admit |
| | 14 | State's Exhibit 41. |
| 10:45:32 | 15 | MR. TYNDALL: No objection. |
| | 16 | THE COURT: So allowed. |
| | 17 | (State's Exhibit Number 41 entered into |
| | 18 | evidence.) |
| | 19 | MR. ZELLINGER: Your Honor, may I publish State's |
| 10:45:40 | 20 | Exhibit 41? |
| | 21 | THE COURT: Yes, sir. |
| | 22 | (State's Exhibit Number 41 published to the |
| | 23 | jury.) |
| | 24 | Q. Is that the defendant leaving the gym with that |
| 10:45:58 | 25 | white box? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Richard Hoffman - Direct by Mr. Zellinger

10:45:59  1        A.    Yes, it is.

        2        Q.    At this point do you know what was in that white

        3   box?

        4        A.    No.  I know when I found it, it was in his car, and

10:46:05  5   it was no longer closed.  It was empty and in the front

        6   passenger seat.

        7        Q.    And so you found that white box during the search

        8   warrant --

        9        A.    I did.

10:46:13 10        Q.    -- of his car?

       11        A.    Yes.

       12        Q.    And it didn't have anything in it?

       13        A.    Didn't have anything in it, and it was open.

       14        Q.    Now, after you got the search warrant, did you go

10:46:21 15   back to this gym?

       16        A.    I did.

       17        Q.    And did you go to search that office?

       18        A.    Yes.  I went to search his car first because he

       19   left, and then I went to search the office.

10:46:33 20        Q.    And when you searched the office, did you find that

       21   phone in there?

       22        A.    No, I did not find any phone in his office.

       23        Q.    And in this case is the -- were you seeking to find

       24   any digital evidence in this case?

10:46:59 25        A.    I was.

| | | |
|---|---|---|
| 10:46:59 | 1 | Q. And what digital evidence were you seeking to find? |
| | 2 | A. I was seeking to find digital recordings that |
| | 3 | Mr. Barbour described that were used when he met with |
| | 4 | Mr. Johnson. |
| 10:47:09 | 5 | Q. And those types of things, could they potentially |
| | 6 | be on the phones? |
| | 7 | A. Yes. |
| | 8 | Q. Okay. And evidence can affect a future court |
| | 9 | proceeding; is that correct? |
| 10:47:28 | 10 | A. Yes. |
| | 11 | Q. Like if you don't have certain evidence, it can |
| | 12 | impair a future court proceeding; is that correct? |
| | 13 | A. Correct. |
| | 14 | MR. ZELLINGER: Your Honor, may I approach the |
| 10:47:46 | 15 | witness? |
| | 16 | THE COURT: Yes, sir. |
| | 17 | Q. Are you aware of whether the defendant had |
| | 18 | communication with the person in the gym? I think his name |
| | 19 | was Dustin Parks; is that correct? |
| 10:48:02 | 20 | A. Correct. |
| | 21 | Q. And that was the person -- you go into the gym and |
| | 22 | you would talk to Dustin Parks. |
| | 23 | A. You do. |
| | 24 | Q. And you go to the office and you see this phone; is |
| 10:48:08 | 25 | that right? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 10:48:09 | 1  | A. Correct. |
| | 2  | Q. And then you leave? |
| | 3  | A. I do. |
| | 4  | Q. And we just saw on that exhibit when you leave, the |
| 10:48:16 | 5  | defendant comes in the gym and goes in that office and leaves |
| | 6  | with that white box; is that correct? |
| | 7  | A. Correct. |
| | 8  | Q. And that's at like 10:50 a.m. ish? |
| | 9  | A. Within an hour of me being there. |
| 10:48:25 | 10 | Q. Okay. And do you remember what time you got there? |
| | 11 | A. A little after 10, 10 and change. I'm not for |
| | 12 | sure. |
| | 13 | Q. Are you aware if the defendant had communication |
| | 14 | with Dustin Parks after you left? |
| 10:48:39 | 15 | A. I am. |
| | 16 | Q. And are you aware of when that interaction |
| | 17 | occurred? |
| | 18 | A. It occurred as I left. |
| | 19 | Q. Okay. And do you know the specific time? And |
| 10:48:52 | 20 | would looking at State's Exhibit 76 help refresh your memory |
| | 21 | as to the exact time that the defendant communicated with |
| | 22 | Mr. Parks? |
| | 23 | A. It would. |
| | 24 | Q. To be clear, this is a communication from Mr. Parks |
| 10:49:03 | 25 | to the defendant? |

10:49:04   1          A.    Yes.

           2          Q.    And do you know specifically -- does this refresh

           3    your memory as to exactly what time that was?

           4          A.    Yes.

10:49:09   5          Q.    And what time was that?

           6          A.    9:57 a.m.

           7          Q.    Okay.  So Mr. Parks communicates with the defendant

           8    at 9:57 a.m.  After you leave the gym after seeing this stuff,

           9    and then at 10:50 the defendant comes back and goes into that

10:49:22  10    office?

          11          A.    Yes.

          12          Q.    And takes that white box?

          13          A.    Correct.

          14          Q.    Okay.  And when you later find that white box, it

10:49:27  15    is empty.

          16          A.    It is empty and open.

          17                MR. ZELLINGER:  Your Honor, at this time I move to

          18    admit State's Exhibit 76 into evidence.

          19                MR. TYNDALL:  Objection, Your Honor -- wait.  What

10:49:49  20    is that?  I don't object to it.

          21                THE COURT:  So allowed.

          22                     (State's Exhibit Number 76 entered into

          23                     evidence.)

          24                MR. ZELLINGER:  Your Honor, may I publish State's

10:49:58  25    Exhibit 76 at this time?

| | | |
|---|---|---|
| 10:50:00 | 1 | THE COURT: Yes, sir. |
| | 2 | (State's Exhibit Number 76 published to the |
| | 3 | jury.) |
| | 4 | Q. Just to be clear, State's Exhibit 76, is this the |
| 10:50:33 | 5 | message you got from Dustin Parks? |
| | 6 | A. Yes. |
| | 7 | Q. And so could you read for the jury what this |
| | 8 | message was from Dustin Parks to the defendant? |
| | 9 | A. Hey, man. A guy from the DA's office just stopped |
| 10:50:46 | 10 | by and asked me about you and how far my security cameras |
| | 11 | backed up. Just figured I'd let you know. He didn't seem too |
| | 12 | concerned about anything. |
| | 13 | MR. ZELLINGER: Your Honor, may I publish State's |
| | 14 | Exhibit -- the video, I think it's State's Exhibit 41, at this |
| 10:51:05 | 15 | time? |
| | 16 | THE COURT: Yes, sir. |
| | 17 | (State's Exhibit Number 41 published to the |
| | 18 | jury.) |
| | 19 | Q. To be clear, that was at 9:57 a.m.; is that |
| 10:51:14 | 20 | correct? |
| | 21 | A. Correct. |
| | 22 | Q. And the video is from 10:55 a.m. when the defendant |
| | 23 | comes in to get that box? |
| | 24 | A. Correct. |
| 10:51:26 | 25 | Q. Well, the defendant goes into office and retrieves |

| | | |
|---|---|---|
| 10:51:28 | 1 | a box; is that correct? |
| | 2 | A. Yes. |
| | 3 | Q. At some point you had these cellphone records and |
| | 4 | you knew there was an allegation that the defendant and |
| 10:51:53 | 5 | Mr. Barbour had met on April 25th? |
| | 6 | A. Correct. |
| | 7 | Q. Mr. Barbour told you that the defendant gave him |
| | 8 | earbuds to put in and played a recording for him? |
| | 9 | A. Yes. |
| 10:52:05 | 10 | Q. And in fact, when you talked with him, did you ever |
| | 11 | even play that recording? |
| | 12 | A. I tried to play it. He listened to the first part, |
| | 13 | and he started with, I've heard this. |
| | 14 | Q. Okay. So he stopped you and said, I heard this |
| 10:52:18 | 15 | before? |
| | 16 | A. Yes. He was really uncomfortable. |
| | 17 | Q. When you say "he was really uncomfortable," can you |
| | 18 | talk about his demeanor during the interview? |
| | 19 | A. So he was sitting directly across from me, and he |
| 10:52:29 | 20 | was holding onto his knees, and when I started to play the |
| | 21 | video, he raised his hand and leaned in forward and he started |
| | 22 | talking at a rapid pace. |
| | 23 | Q. Did you say when you played the video? |
| | 24 | A. Excuse me. I'm sorry. I misspoke. I meant the |
| 10:52:43 | 25 | recording. |

| | | |
|---|---|---|
| 10:52:44 | 1 | Q. What recording was that? |
| | 2 | A. The recording of Angie Barbour that's been played |
| | 3 | here. |
| | 4 | Q. And you've been present during this trial; is that |
| 10:52:50 | 5 | correct? |
| | 6 | A. I have. |
| | 7 | Q. And the recording that you played for him, is that |
| | 8 | the one that has her voice on it talking about D was there |
| | 9 | naked, that sort of thing? |
| 10:53:00 | 10 | A. Yes. |
| | 11 | MR. ZELLINGER: Your Honor, can I publish something |
| | 12 | to the parties and the witness at this time? |
| | 13 | THE COURT: Yes, sir. |
| | 14 | (State's Exhibit Number 39 marked for |
| 10:53:53 | 15 | identification.) |
| | 16 | Q. Investigator Hoffman, I show what's been marked for |
| | 17 | identification purposes State's Exhibit 39. Do you recognize |
| | 18 | this exhibit? |
| | 19 | A. I do. |
| 10:54:06 | 20 | Q. And this exhibit, does it feature a map of the |
| | 21 | cellphone tower that was -- that you figured out was used in a |
| | 22 | call, the most -- the closest call to April 25th at 12:30? |
| | 23 | A. Yes. |
| | 24 | Q. And one of those -- the call is at like April 25th |
| 10:54:27 | 25 | at 12:40; is that correct? |

| | | |
|---|---|---|
| 10:54:31 | 1 | A.    That's correct. |
| | 2 | Q.    And just to get to how you mapped this, the |
| | 3 | cellphone records, in addition to the information that we've |
| | 4 | looked at also have a code that has a latitude and longitude |
| 10:54:43 | 5 | for the cellphone tower; is that accurate? |
| | 6 | A.    No.    The cellphone record, the call detail records |
| | 7 | tell you what tower was used, and then from that line you can |
| | 8 | go to their most current tower list and look at the tower |
| | 9 | number, and then that tells you the longitude and latitude of |
| 10:55:01 | 10 | that tower.    So those lists get changed by dates. |
| | 11 | Q.    Okay.    So when you look at a phone record, the |
| | 12 | original phone records, State's Exhibit 36 and 37, it's got |
| | 13 | like a code in it, and you take that code and go to a |
| | 14 | different spreadsheet from T-Mobile, or whatever cellphone |
| 10:55:17 | 15 | company, then that code corresponds to a tower that has |
| | 16 | latitude and longitude? |
| | 17 | A.    Yes, sir. |
| | 18 | Q.    And then that latitude and longitude, did you map |
| | 19 | that? |
| 10:55:25 | 20 | A.    I did. |
| | 21 | Q.    Okay.    And is that depicted in State's Exhibit 39? |
| | 22 | A.    It is. |
| | 23 | MR. ZELLINGER:    Your Honor, I move enter State's |
| | 24 | Exhibit 39 at this time. |
| 10:55:35 | 25 | MR. TYNDALL:    No objection. |

Richard Hoffman - Direct by Mr. Zellinger

| 10:55:41 | 1 | THE COURT: So allowed. |
| | 2 | (State's Exhibit Number 39 entered into |
| | 3 | evidence.) |
| | 4 | MR. ZELLINGER: And Your Honor, I would seek to |
| 10:55:43 | 5 | publish solely the picture depicted on State's Exhibit 39. |
| | 6 | Q. On State's Exhibit 39, you have basically your work |
| | 7 | where -- |
| | 8 | MR. TYNDALL: May I interrupt for one second? |
| | 9 | THE COURT: Yes, sir. |
| 10:55:52 | 10 | MR. TYNDALL: And just for the record, I think I |
| | 11 | need to object based on the pretrial ruling, but no further |
| | 12 | objection. I'm sorry. I apologize, Mr. Zellinger. |
| | 13 | THE COURT: We'll note the previous objection, but |
| | 14 | the Court will allow it to be admitted into evidence and |
| 10:56:06 | 15 | published. |
| | 16 | Q. And State's Exhibit 39 has the call detail record |
| | 17 | with the call time and the corresponding code and latitude and |
| | 18 | longitude of the tower; correct? |
| | 19 | A. Correct. |
| 10:56:22 | 20 | Q. The part of State's Exhibit 39 you are looking at |
| | 21 | right now, this pertains to the defendant's last call, and |
| | 22 | that's at like 12:40 p.m. that day on April 25th; is that |
| | 23 | correct? |
| | 24 | A. Correct. |
| 10:56:35 | 25 | Q. So like right near the 12:30 ish time is when they |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 10:56:38 | 1 | were alleged in that? |
| | 2 | A.    Yes. |
| | 3 | Q.    And the part that's depicted that you can see right |
| | 4 | now, that is solely the map; correct? |
| 10:56:45 | 5 | A.    Just the map with two circles that were added to |
| | 6 | the map. |
| | 7 | MR. ZELLINGER:  Your Honor, may I publish State's |
| | 8 | Exhibit 39 at this time? |
| | 9 | THE COURT:  Yes, sir. |
| 10:57:00 | 10 | MR. TYNDALL:  Same objection for the record. |
| | 11 | MR. ZELLINGER:  To be clear, that's from the |
| | 12 | pretrial motion? |
| | 13 | MR. TYNDALL:  Yes.  Yes.  Only based on the |
| | 14 | pretrial motion.  I just -- we got to do it right. |
| 10:57:08 | 15 | THE COURT:  Yes, sir. |
| | 16 | (State's Exhibit Number 39 published to the |
| | 17 | jury.) |
| | 18 | Q.    Investigator Hoffman, I'm going to zoom in a little |
| | 19 | bit, because I think this might be a little difficult for the |
| 10:57:18 | 20 | jury to see. |
| | 21 | Firstly, do you see a La Cocina, Clayton? |
| | 22 | A.    I do. |
| | 23 | Q.    Is that like a Mexican restaurant? |
| | 24 | A.    It is. |
| 10:57:28 | 25 | Q.    And did we hear about that yesterday, it's near |

| | | |
|---|---|---|
| 10:57:29 | 1 | Angie Barbour's house? |
| | 2 | A.   Yes. |
| | 3 | Q.   And Clayton Fitness, is that circle kind of a |
| | 4 | purple-ish looking roof? |
| 10:57:38 | 5 | A.   It is. |
| | 6 | Q.   And then the cellphone tower that the defendant |
| | 7 | bounced off of at 12:40, is that depicted and circled at the |
| | 8 | bottom of this map? |
| | 9 | A.   It is.  It's at the southeast corner of that |
| 10:57:52 | 10 | parking lot. |
| | 11 | Q.   Okay.  And then -- |
| | 12 | MR. ZELLINGER:  Your Honor, can I have one moment? |
| | 13 | THE COURT:  Yes, sir. |
| | 14 | Q.   You also did this for DeVan Barbour's cellphone; is |
| 10:58:18 | 15 | that correct? |
| | 16 | A.   It is. |
| | 17 | MR. ZELLINGER:  And madam clerk, can we just |
| | 18 | portray this to the parties and not the whole courtroom? |
| | 19 | Q.   Is that this cellphone tower -- is this from DeVan |
| 10:58:40 | 20 | Barbour's calls at 12:40, 1:01, 1:07 p.m.? |
| | 21 | A.   Correct. |
| | 22 | MR. ZELLINGER:  May I again publish this to the |
| | 23 | jury? |
| | 24 | MR. TYNDALL:  No objection, Your Honor. |
| 10:58:54 | 25 | THE COURT:  So allowed. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 10:58:55 | 1 | (State's Exhibit Number 39 published to the |
| | 2 | jury.) |
| | 3 | Q. The purple-ish building, the gym is right there? |
| | 4 | A. Correct. |
| 10:59:19 | 5 | Q. At the sort of bottom of this picture -- see if I |
| | 6 | can zoom in. |
| | 7 | At the top there's a little dot, is that a water |
| | 8 | tower? |
| | 9 | A. Yes. At least the water tower for the actual |
| 10:59:33 | 10 | cellular equipment. |
| | 11 | Q. So the cellphone number is on the water tower? |
| | 12 | A. It is. |
| | 13 | Q. So for both the defendant and DeVan Barbour, their |
| | 14 | cellphones are bouncing off towers within a couple of miles or |
| 10:59:50 | 15 | close proximity to this gym; is that correct? |
| | 16 | A. Yes. |
| | 17 | MR. TYNDALL: May we approach? |
| | 18 | THE COURT: Yes, sir. |
| | 19 | (Sidebar.) |
| 11:01:24 | 20 | THE COURT: Ladies and gentlemen, we're going to |
| | 21 | take our morning recess. Leave your notebooks face down. |
| | 22 | Don't talk about this or let anybody else speak with you. |
| | 23 | We'll see you back about 11:15. |
| | 24 | (Jury exits.) |
| 11:02:10 | 25 | THE COURT: All right. 15 minutes. |

| 11:02:11 | 1 | (Recess.) |

2    THE COURT:  Are we ready to bring the jury back in?

3    MR. ZELLINGER:  May I have 20 seconds?

4    THE COURT:  Yes, sir.

11:19:36   5    MR. ZELLINGER:  Your Honor, there's likely to be

6  testimony coming up.  We're not seeking to introduce that the

7  defendant was having an affair with anyone, but the exhibit

8  that I just handed up to the Court, for instance, the

9  defendant asks Carolyn Rotondaro to find out where Owen

11:19:52  10  Phillips' kids go to school.  And that message is:  I love

11  you.  When you get to school tomorrow, try to find Owen

12  Phillips' kids and where they go to school.

13    And I can't redact that.  I mean, it's -- this

14  stuff is so woven into the -- we're not going to say, did you

11:20:08  15  find evidence that the defendant's having an affair with

16  Allyson Bond or Carolyn Rotondaro, but I just wanted to not

17  violate the Court's order, because intrinsically in these

18  documents there's information that's going to include things

19  that --

11:20:24  20    THE COURT:  I understood that.  Mr. Tyndall,

21  anything to be heard on this?

22    MR. TYNDALL:  It's a little different than what we

23  discussed yesterday, Your Honor.

24    THE COURT:  Yes, sir.

11:20:32  25    MR. ZELLINGER:  Thank you. The State is ready to

| | | |
|---|---|---|
| 11:20:33 | 1 | proceed. |
| | 2 | THE COURT:  You ready? |
| | 3 | MR. ZELLINGER:  Yes, Your Honor. |
| | 4 | THE COURT:  We can get them in. |
| 11:20:39 | 5 | (Jury enters.) |
| | 6 | THE COURT:  Whenever you are ready. |
| | 7 | MR. ZELLINGER:  Thank you. |
| | 8 | Q.    Investigator Hoffman, where we left off, we just |
| | 9 | looked at the cellphone towers that were sort of in proximity |
| 11:21:36 | 10 | to Clayton Fitness; do you recall that? |
| | 11 | A.    I do. |
| | 12 | Q.    Does the defendant and DeVan Barbour have a |
| | 13 | different cellphone carrier or provider? |
| | 14 | A.    They did.  Mr. Barbour uses Verizon, and |
| 11:21:52 | 15 | Mr. Johnson uses T-Mobile, and they will often share on what |
| | 16 | tower they will be using in a specific geographic areas |
| | 17 | because it's proprietary to them. |
| | 18 | Q.    Okay.  So if I'm standing next to -- if Ms. James |
| | 19 | and I make a call and I use AT&T and she uses T-Mobile, we |
| 11:22:09 | 20 | could be bouncing off of different towers. |
| | 21 | A.    You'll be accessing your provider's network, not |
| | 22 | the other person's. |
| | 23 | Q.    The cellphone towers are owned by one company or |
| | 24 | leased by one company? |
| 11:22:21 | 25 | A.    Either owned, leased, or a combination thereof. |

| | | |
|---|---|---|
| 11:22:23 | 1 | Q. And we were talking about FaceTime earlier. At any |
| | 2 | point in this allegation did you ever recover a FaceTime |
| | 3 | recording of DeVan Barbour and Angie Barbour? |
| | 4 | A. No. I wanted to know immediately if I could. I |
| 11:22:38 | 5 | consulted with some folks, and you can't get them after 30 |
| | 6 | days. And I think it had been approximately six months. |
| | 7 | Q. By the time you were investigating the extortion? |
| | 8 | A. Yes. |
| | 9 | Q. And the recordings that we were just speaking |
| 11:22:50 | 10 | about, that's a recording of Angie Barbour talking about DeVan |
| | 11 | Barbour? |
| | 12 | A. Correct. It's only her voice and her description |
| | 13 | of the events. |
| | 14 | (State's Exhibit Number 42 marked for |
| 11:22:57 | 15 | identification.) |
| | 16 | Q. Investigator Hoffman, if you can turn to Exhibit 42 |
| | 17 | at this time. Is that another map? |
| | 18 | A. Yes. |
| | 19 | Q. And is that a map that illustrates where Angie |
| 11:23:10 | 20 | Barbour lived when she moved out of her marital home and into |
| | 21 | an apartment? |
| | 22 | A. Correct. |
| | 23 | Q. And does it also display where Clayton Fitness is? |
| | 24 | A. It does. |
| 11:23:23 | 25 | MR. ZELLINGER: Your Honor, at this time I seek to |

| | | |
|---|---|---|
| 11:23:24 | 1 | admit State's Exhibit 42 and publish it. |
| | 2 | THE COURT:  Any objection? |
| | 3 | MR. TYNDALL:  No objection to that, Your Honor. |
| | 4 | THE COURT:  So allowed. |
| 11:23:34 | 5 | (State's Exhibit Number 42 entered into |
| | 6 | evidence.) |
| | 7 | MR. ZELLINGER:  May I publish that to everyone? |
| | 8 | THE COURT:  Yes, sir. |
| | 9 | (State's Exhibit Number 42 published to the |
| 11:24:00 | 10 | jury.) |
| | 11 | Q.   Sir, are we looking at a map of Clayton; is that |
| | 12 | correct? |
| | 13 | A.   Yes. |
| | 14 | Q.   And over here on the right with sort of purple-ish |
| 11:24:12 | 15 | or blue-ish roof, that's Clayton Fitness? |
| | 16 | A.   Yes. |
| | 17 | Q.   State's Exhibit 39 is where the cellphone towers |
| | 18 | were? |
| | 19 | A.   Yes. |
| 11:24:20 | 20 | Q.   And La Cocina, Clayton -- I apologize for my |
| | 21 | accent -- that is right next to -- |
| | 22 | A.   It's a restaurant.  Yes, in close proximity. |
| | 23 | Q.   Angie Barbour moved pretty close to where those |
| | 24 | locations are; is that right? |
| 11:24:36 | 25 | A.   Yes.  She lives about -- let me see -- the third |

| | | |
|---|---|---|
| 11:24:41 | 1 | building from the top, if you start left and go right. |
| | 2 | Q.   Where my cursor is? |
| | 3 | A.   A little up.  Directly up.  Keep going and go to |
| | 4 | the right.  That building. |
| 11:24:53 | 5 | Q.   So Angie Barbour lived in that building just north |
| | 6 | of Stallings Mill or -- |
| | 7 | A.   The address is Stallings Mill.  It's an apartment |
| | 8 | complex. |
| | 9 | Q.   Just for purposes of the record, where the cursor |
| 11:25:05 | 10 | is, is sort of the northern part of that apartment complex |
| | 11 | directly to the west of like a little parking lot; is that |
| | 12 | correct? |
| | 13 | A.   Correct. |
| | 14 | Q.   Okay.  And again, looking at Clayton Fitness, where |
| 11:25:20 | 15 | my cursor is here, is that the entrance to Clayton Fitness? |
| | 16 | A.   Yes.  There's two entrances.  I would say that's |
| | 17 | the front entrance, because the front door where you enter the |
| | 18 | gym and as I enter the gym, it's right where that is. |
| | 19 | MR. ZELLINGER:  Your Honor, may I publish State's |
| 11:25:57 | 20 | Exhibit Number 13 at this time?  It's already in evidence. |
| | 21 | THE COURT:  Yes, sir. |
| | 22 | Q.   And State's Exhibit 13, Detective -- or |
| | 23 | Investigator Hoffman, these are the interactions between the |
| | 24 | defendant and DeVan Barbour; is that correct? |
| 11:26:38 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:26:39 | 1 | Q. And there's all this language above the defendant's |
| | 2 | writing. Do you know where those messages came from? |
| | 3 | A. Yes. So when Apple gives you records, they don't |
| | 4 | really give you a lot of help. They come as GPD files. |
| 11:26:51 | 5 | They're encrypted. You have to unencrypt them because they |
| | 6 | come in packages and they have to be unpackaged. There is a |
| | 7 | tool that this company provides to law enforcement, and you |
| | 8 | can use that tool after you've unencrypted them to download |
| | 9 | it. And that's why you see some of the language associated, |
| 11:27:07 | 10 | like where the hard drive is, that it's zipped and decrypted. |
| | 11 | Q. So like where the defendant is saying: Going to |
| | 12 | the gym around 8. Can go to Clayton or Smithfield. Available |
| | 13 | tomorrow. Probably won't be available after that. Above that |
| | 14 | it says: Ronjon1983@msn.com and a bunch of numbers. That's |
| 11:27:30 | 15 | how you received the file from Apple? |
| | 16 | A. Yes. Because that's the Apple ID associated with |
| | 17 | the iCloud account where the records came from. |
| | 18 | Q. And so the defendant used his Apple email for -- |
| | 19 | I'm sorry, his MSN email for his Apple records? |
| 11:27:45 | 20 | A. He used both his personal and his police department |
| | 21 | email. |
| | 22 | Q. Okay. And so this exhibit, this was about them |
| | 23 | meeting at Clayton Fitness at 12:30; is that correct? |
| | 24 | A. Yes, 12:30, at like lunchtime. |
| 11:27:59 | 25 | Q. Okay. 12:30 -- and originally did you think that |

11:28:01  1    12:30 was at night?

2         A.    Yes.   If I can explain that.  So these records are

3    on UTC.  So it's four hours less time, but the text messages,

4    I was also looking at the content to get contextual clues as

11:28:14  5    to what time and where people were at, and the text message

6    directly before that says:  I hope to see you tonight.  And I

7    convoluted those two things, and that was my mistake.

8         Q.    So you originally thought it was 12:30 at night?

9         A.    I did.

11:28:27  10        Q.    And then you found out it was 12:30 in the day?

11        A.    Yes.

12        Q.    Okay.  And on this exhibit, there's a picture of

13    Clayton Fitness and this entryway; is that correct?

14        A.    That's the front door.

11:28:36  15             MR. ZELLINGER:  Your Honor, if you can jump back to

16    State's Exhibit 42 at this time?

17             THE COURT:  Yes, sir.

18             MR. ZELLINGER:  And publish State's Exhibit 42.

19             THE COURT:  Yes.

11:28:51  20                 (State's Exhibit Number 42 published to the

21                  jury.)

22        Q.    And that entrance that we were just looking at, is

23    that on this, the bottom left or southwest corner?

24        A.    Yes.

11:29:05  25        Q.    Okay.  And then did Mr. Barbour tell you where he

| | | |
|---|---|---|
| 11:29:08 | 1 | met with the defendant? |
| | 2 | A.  He said he met in the back parking lot. |
| | 3 | Q.  Okay.  And so would that be in this northeast |
| | 4 | parking lot? |
| 11:29:15 | 5 | A.  That's where I interpreted that to mean. |
| | 6 | Q.  Okay.  Thank you. |
| | 7 | MR. ZELLINGER:  Madam clerk, if we can take that |
| | 8 | down. |
| | 9 | Your Honor, may I approach the witness? |
| 11:30:11 | 10 | THE COURT:  Yes, sir. |
| | 11 | Q.  Investigator Hoffman, I hand you what's been marked |
| | 12 | State's Exhibit 12 for identification purposes.  Were you in |
| | 13 | here when Angie Barbour looked at this TracFone? |
| | 14 | A.  I was. |
| 11:30:19 | 15 | Q.  Is this the TracFone that she gave you? |
| | 16 | A.  Correct. |
| | 17 | Q.  And how do you know that? |
| | 18 | A.  I know that because it has the evidence label where |
| | 19 | I put it on it. |
| 11:30:26 | 20 | Q.  Okay.  It's got your name on it? |
| | 21 | A.  Correct. |
| | 22 | Q.  And it's got a date that it was -- |
| | 23 | A.  That I got the phone from her. |
| | 24 | Q.  Okay.  And that it was obtained from Angie Barbour? |
| 11:30:35 | 25 | A.  Correct. |

| 11:30:36 | 1 | Q. And this is the phone that you obtained? |

11:30:36    1       Q. And this is the phone that you obtained?

2       A. Correct.

3       Q. And there was also, it appears to be a little

4 thumb drive in here. What is that?

11:30:41    5       A. So I had it forensically examined. So they imaged

6 the actual content of the phone and provided to me on a thumb

7 drive so I put them in the same bag.

8       Q. Just to sort of cut to the end, was there anything

9 on this phone?

11:30:53   10       A. No.

11          MR. ZELLINGER: Your Honor, I move to enter State's

12 Exhibit 12.

13          THE COURT: Any objection?

14          MR. TYNDALL: I'm sorry, did you say which

11:31:01   15 one -- oh, the phone. Yes. No objection.

16          THE COURT: So allowed.

17             (State's Exhibit Number 12 entered into

18             evidence.)

19             (State's Exhibit Number 69 marked for

11:31:07   20             identification.)

21       Q. And we talked about this earlier. You actually

22 were able to get some -- I show you what's been marked as

23 State's Exhibit 69 for identification purposes. Were you

24 actually able to get some information on the registration of

11:31:17   25 that TracFone?

| | | |
|---|---|---|
| 11:31:17 | 1 | A.    Yes.   I received subscriber information based on |
| | 2 | the phone number from the phone service provider called |
| | 3 | TracFone. |
| | 4 | Q.    And Angie Barbour told you that the defendant gave |
| 11:31:28 | 5 | her this phone; correct? |
| | 6 | A.    Yes.   She couldn't open it.   She didn't remember |
| | 7 | the pin.   She provided it to me, because he provided it to |
| | 8 | her. |
| | 9 | Q.    Did she ever tell you that she faked phone calls? |
| 11:31:40 | 10 | A.    No. |
| | 11 | Q.    And this information is what you got from TracFone |
| | 12 | about that phone? |
| | 13 | A.    Correct. |
| | 14 | MR. ZELLINGER:   At this time I move to enter |
| 11:31:50 | 15 | State's Exhibit 69. |
| | 16 | MR. TYNDALL:   No objection. |
| | 17 | THE COURT:   That's allowed. |
| | 18 | (State's Exhibit Number 69 entered into |
| | 19 | evidence.) |
| 11:31:56 | 20 | MR. ZELLINGER:   I ask to publish State's |
| | 21 | Exhibit 69. |
| | 22 | THE COURT:   Okay.  So allowed. |
| | 23 | (State's Exhibit Number 69 published to the |
| | 24 | jury.) |
| 11:32:22 | 25 | Q.    So this is the information you received from |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 11:32:24 | 1 | TracFone? |
| | 2 | A.    Correct. |
| | 3 | Q.    And to zoom in a little bit.  This phone number, |
| | 4 | you were able to get that phone number off the actual phone? |
| 11:32:31 | 5 | A.    I got that phone number two ways.  The way I got -- |
| | 6 | first got the phone number was from the extraction itself |
| | 7 | which I had higher confidence, but I also received that from |
| | 8 | email. |
| | 9 | Q.    Okay.  And so you then asked for subscriber |
| 11:32:48 | 10 | information for that phone? |
| | 11 | A.    I did. |
| | 12 | Q.    And what is the email profile for the subscriber |
| | 13 | for that TracFone? |
| | 14 | A.    It is rljohnson@smithfieldpd.org. |
| 11:32:59 | 15 | Q.    Was that the defendant's email address? |
| | 16 | A.    Yes. |
| | 17 | Q.    And here where it says account, it also says |
| | 18 | rljohnson@smithfieldpd.org? |
| | 19 | A.    Yes. |
| 11:33:10 | 20 | Q.    Thank you. |
| | 21 | During your investigation you also acquired records |
| | 22 | from Pinger; is that correct? |
| | 23 | A.    It is. |
| | 24 | Q.    And what is Pinger? |
| 11:33:30 | 25 | A.    Pinger it's basically a VOIP, voice over internet |

Richard Hoffman - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 11:33:37 | 1 | provider.  It allows you to generate a second number that you |
| | 2 | can -- or any other number that you want.  So if you call |
| | 3 | somebody, you're using that number rather than your own |
| | 4 | personal phone number.  It's favored for privacy.  So perhaps |
| 11:33:48 | 5 | if you are selling a car or something like that, you would |
| | 6 | want to use a different number, but it also allows you to |
| | 7 | exchange media files and keeps large videos. |
| | 8 | Q.  And before we get to Pinger, did you also try to |
| | 9 | get records from Snapchat? |
| 11:34:04 | 10 | A.  I did. |
| | 11 | Q.  And are you able to get content, that is, what the |
| | 12 | messages were from Snapchat? |
| | 13 | A.  No.  Snapchat is encrypted end to end.  You can't |
| | 14 | actually see the messages.  The only thing you can get from |
| 11:34:17 | 15 | Snapchat is if they store videos on memories and they don't |
| | 16 | password protect it, you can get that. |
| | 17 | Q.  And did you get that? |
| | 18 | A.  I did not. |
| | 19 | Q.  And so, I mean, you got material from Apple, |
| 11:34:29 | 20 | iCloud, Verizon, Pinger, Gmail, MSN, Snapchat, T-Mobile; is |
| | 21 | that correct? |
| | 22 | A.  Yes. |
| | 23 | Q.  TracFone.  And where we left off is you had |
| | 24 | actually executed physical search warrants at Clayton Fitness |
| 11:34:43 | 25 | and with the defendant's car; is that right? |

Richard Hoffman - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 11:34:46 | 1 | A. Yes. |
| | 2 | Q. And then you acquired some phones during that -- |
| | 3 | those search warrants; is that correct? |
| | 4 | A. Correct. |
| 11:34:57 | 5 | Q. Did you find an iPhone 5? |
| | 6 | A. I did find an iPhone 5. |
| | 7 | Q. And ultimately, could you get into that iPhone 5? |
| | 8 | A. No. They did a Before -- it's called Before First |
| | 9 | Unlock, and it did not open the phone. |
| 11:35:10 | 10 | Q. And earlier we saw with this jury State's Exhibit 8 |
| | 11 | which was a Snapchat record that had DVB4 and Angela Barbour |
| | 12 | on it. Where did that record come from? |
| | 13 | A. I'm sorry, which one are you referring to? |
| | 14 | MR. ZELLINGER: Your Honor, may I approach the |
| 11:35:29 | 15 | witness? |
| | 16 | THE COURT: Yes, sir. |
| | 17 | Q. Actually, it's in your notebook on State's |
| | 18 | Exhibit 8. |
| | 19 | A. Oh, that came from -- from DeVan Barbour and Angela |
| 11:35:51 | 20 | Barbour Snapchat records. |
| | 21 | Q. So you got Snapchat records for Angela Barbour and |
| | 22 | DeVan Barbour; is that correct? |
| | 23 | A. Yes. |
| | 24 | Q. And you were attempting to see if you can find |
| 11:35:59 | 25 | anything between them; is that right? |

Richard Hoffman - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 11:36:00 | 1 | A. Yes. And the reason I did that was based on the |
| | 2 | interview with Ms. Barbour, and I wanted to confirm whether or |
| | 3 | not that was true. |
| | 4 | Q. Okay. So when you executed the search warrant on |
| 11:36:11 | 5 | Clayton Fitness and the defendant's car, did you also |
| | 6 | investigate the defendant's house? |
| | 7 | A. Later in, I believe, March. |
| | 8 | Q. In March. Okay. And eventually you found an |
| | 9 | iPhone 5 and you couldn't get into that; is that correct? |
| 11:36:25 | 10 | A. The state -- I didn't try get into that. The state |
| | 11 | lab couldn't get into that. |
| | 12 | Q. You sent some of this material off to the state |
| | 13 | crime lab; is that correct? |
| | 14 | A. Yes. |
| 11:36:34 | 15 | Q. And to make this story a little bit faster, they |
| | 16 | couldn't get into it? |
| | 17 | A. They didn't get into it. |
| | 18 | Q. There's an iPhone 7 that was found? |
| | 19 | A. Correct. |
| 11:36:42 | 20 | Q. What was that? |
| | 21 | A. It was pink in color. They did produce an |
| | 22 | extraction. It was clearly his spouse's phone. |
| | 23 | Q. His wife's phone? |
| | 24 | A. Yes. |
| 11:36:51 | 25 | Q. And that is Jamie Johnson? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 11:36:55 | 1 | A.    I believe so. |
| | 2 | Q.    Did you also find a number of thumb drives, a |
| | 3 | Nokia? |
| | 4 | A.    There was a Nokia TracFone in the trunk and also |
| 11:37:06 | 5 | five thumb drives. |
| | 6 | Q.    Did you send that out to the state crime lab to try |
| | 7 | to download? |
| | 8 | A.    Yes. |
| | 9 | Q.    And did any of that ultimately end up fruitful for |
| 11:37:13 | 10 | your investigation? |
| | 11 | A.    They gave me the content of the thumb drives maybe |
| | 12 | a month ago. |
| | 13 | Q.    And the T-Mobile -- you got records from T-Mobile. |
| | 14 | Did you get Facebook records as well? |
| 11:37:30 | 15 | A.    I did.  I got Mr. Johnson's Facebook records. |
| | 16 | Q.    And just to be clear, those records from the lab, |
| | 17 | they weren't helpful to this investigation? |
| | 18 | A.    No, they weren't.  There were some duplicates in |
| | 19 | there.  They weren't helpful. |
| 11:37:42 | 20 | Q.    Ultimately, you were trying to find the FaceTime |
| | 21 | interaction between Angie Barbour and DeVan Barbour.  You |
| | 22 | could not get that because FaceTime does not keep it for -- |
| | 23 | A.    I was looking for any evidence of the recordings, |
| | 24 | the recordings that Mr. Barbour described. |
| 11:37:58 | 25 | Q.    Okay.  And the recordings -- when you say |

| | | |
|---|---|---|
| 11:37:59 | 1 | recordings, the audio recordings, like what was played for him |
| | 2 | when he was in the car? |
| | 3 | A.   Correct. |
| | 4 | Q.   Where he was given the earbuds.  And there was a |
| 11:38:07 | 5 | snippet played of Angie Barbour talking about what he |
| | 6 | allegedly did? |
| | 7 | A.   Yes.  And/or evidence of who actually recorded |
| | 8 | Ms. Barbour. |
| | 9 | Q.   And that residential search, that was at like |
| 11:38:21 | 10 | 423 Westminster; does that sound right? |
| | 11 | A.   Yes.  That's Mr. Johnson's residence. |
| | 12 | Q.   You found all these materials.  Did you ever find |
| | 13 | that phone you saw at the gym? |
| | 14 | A.   No. |
| 11:38:47 | 15 | Q.   And where we left off, we were talking about |
| | 16 | Pinger. |
| | 17 | MR. ZELLINGER:  May I approach the witness? |
| | 18 | THE COURT:  Yes, sir. |
| | 19 | (State's Exhibit Number 35 marked for |
| 11:38:54 | 20 | identification.) |
| | 21 | Q.   Investigator, I hand you what's been marked State's |
| | 22 | Exhibit 35.  Do you recognize that? |
| | 23 | A.   I do. |
| | 24 | Q.   Is that information you received from Pinger? |
| 11:39:10 | 25 | A.   It is. |

| | | |
|---|---|---|
| 11:39:17 | 1 | Q. And is that sort of subscription information for |
| | 2 | Pinger? |
| | 3 | A. It is. So when you use Pinger, they track your |
| | 4 | account based on your actual phone number, and they call that |
| 11:39:26 | 5 | their registered phone number, and that's how they designate |
| | 6 | or can link accounts. |
| | 7 | Q. And what was the registered phone number for the |
| | 8 | defendant's Pinger account? |
| | 9 | A. 919-320-3337. |
| 11:39:44 | 10 | Q. 3337? |
| | 11 | A. Yes. |
| | 12 | Q. That was the defendant's? |
| | 13 | A. Yes. |
| | 14 | Q. Okay. And then they essentially give him a new |
| 11:39:51 | 15 | phone number with Pinger? |
| | 16 | A. Yes. |
| | 17 | Q. Okay. And is that depicted on here? |
| | 18 | A. Yes. |
| | 19 | MR. ZELLINGER: Your Honor, at this time I seek to |
| 11:39:57 | 20 | admit State's Exhibit 35. |
| | 21 | THE COURT: Any objection? |
| | 22 | MR. TYNDALL: Your Honor, I just to renew that same |
| | 23 | objection from the pretrial hearing. |
| | 24 | THE COURT: Yes, sir. We'll allow it to be |
| 11:40:06 | 25 | admitted. |

| | | |
|---|---|---|
| 11:40:08 | 1 | (State's Exhibit Number 35 entered into |
| | 2 | evidence.) |
| | 3 | MR. ZELLINGER:  Your Honor, may I publish that at |
| | 4 | this time? |
| 11:40:14 | 5 | THE COURT:  Yes, sir. |
| | 6 | (State's Exhibit Number 35 published to the |
| | 7 | jury.) |
| | 8 | Q.    Before you, is that State's Exhibit 35? |
| | 9 | A.    It is. |
| 11:41:06 | 10 | Q.    Okay.  And you mentioned this registered phone |
| | 11 | number where the cursor is, that is 919-320-3337; is that |
| | 12 | correct? |
| | 13 | A.    Yes. |
| | 14 | Q.    Okay.  And so this 4545 number, that was assigned |
| 11:41:23 | 15 | to the defendant to use on the Pinger network; is that |
| | 16 | correct? |
| | 17 | A.    Yes.  On September 7th of 2019.  That's the user |
| | 18 | date at the bottom. |
| | 19 | Q.    And it was assigned on September 7th of 2019; is |
| 11:41:37 | 20 | that what you said? |
| | 21 | A.    Yes.  Through June 26th of 2022. |
| | 22 | Q.    Okay.  And this name, do you know -- it says |
| | 23 | HAPeedin (phonetic).  Do you have any idea what that is? |
| | 24 | A.    That would have been what the subscriber entered as |
| 11:41:50 | 25 | a name for the account.  I don't know Mr. Johnson well enough |

| | | |
|---|---|---|
| 11:41:55 | 1 | to know if that means anything. |
| | 2 | MR. ZELLINGER:  Your Honor, may I approach the |
| | 3 | witness? |
| | 4 | THE COURT:  Yes, sir. |
| 11:42:11 | 5 | (State's Exhibit Number 33 marked for |
| | 6 | identification.) |
| | 7 | Q.  Investigator Hoffman, I hand you what's marked |
| | 8 | State's Exhibit 33.  What is that? |
| | 9 | A.  So when the Pinger records arrive, they arrive in |
| 11:42:32 | 10 | different file names.  The first is email direct message log. |
| | 11 | It has the date, time, to, from.  And then it has MC for |
| | 12 | message chat, which is basically the font text fields, and |
| | 13 | then it has message chat with media files.  They don't |
| | 14 | actually put them all together.  They are separate.  This is |
| 11:42:52 | 15 | message chats between two numbers, one of those numbers being |
| | 16 | Mr. Johnson's Pinger number. |
| | 17 | Q.  And that content that you see in that exhibit, in |
| | 18 | State's Exhibit 33, is that what you received from the |
| | 19 | defendant's Pinger records? |
| 11:43:12 | 20 | A.  Yes. |
| | 21 | Q.  Registered to his phone number? |
| | 22 | A.  Yes. |
| | 23 | MR. ZELLINGER:  Your Honor, at this time I seek to |
| | 24 | admit State's Exhibit 33. |
| 11:43:19 | 25 | MR. TYNDALL:  Your Honor, subject to the pretrial |

11:43:20  1    hearing order, objection.

2    THE COURT:  Yes, sir.  In the Court's discretion,

3    we'll allow it to be admitted.

4    (State's Exhibit Number 33 entered into

11:43:27  5    evidence.)

6    Q.    In those records, is the top line the most recent?

7    And the bottom of it -- it goes chronologically?

8    A.    It's reverse.  Go from bottom up.

9    Q.    Okay.  So if you can turn to the last page.

11:43:42  10   MR. ZELLINGER:  Your Honor, may I publish State's

11   Exhibit 33 at this time?

12   THE COURT:  Yes, sir.

13   (State's Exhibit Number 33 published to the

14   jury.)

11:43:51  15   Q.    As we pull that up, Investigator Hoffman, do you

16   recall some questions being asked of Kevin Donovan and how he

17   talked about Angela Barbour?

18   A.    Yes.

19   Q.    Okay.  In this document are there messages between

11:44:08  20   the defendant and a person named Carolyn Rotondaro?

21   A.    No.  This document is the messages between

22   Mr. Johnson's Pinger number and a phone number that belongs to

23   Allyson Bond.

24   Q.    Allyson Bond; is that correct?

11:44:21  25   A.    That's correct.

| | | |
|---|---|---|
| 11:44:23 | 1 | Q. And so on the first column, is that a date? |
| | 2 | A. It is. It's the date the message was sent. Below |
| | 3 | it on the left hand -- starting the left-hand side is the time |
| | 4 | and UTC. |
| 11:44:37 | 5 | Q. Okay. And then this 4545 number, we just looked at |
| | 6 | that exhibit, that's the Pinger number associated with the |
| | 7 | defendant; is that correct? |
| | 8 | A. Yes. |
| | 9 | Q. The other number, the 9994, through your |
| 11:44:47 | 10 | investigation you figured out that that belonged to Allyson |
| | 11 | Bond? |
| | 12 | A. That's a T-Mobile number, and the subscriber for |
| | 13 | that number is Allyson Bond. |
| | 14 | Q. And did you also corroborate that based on some of |
| 11:44:57 | 15 | the conversation that you were able to read through this? |
| | 16 | A. There are contextual details that make it really |
| | 17 | apparent. |
| | 18 | Q. And are there also images sent between these folks? |
| | 19 | A. Yes. |
| 11:45:08 | 20 | Q. Okay. And this first entry is, what's next for AB; |
| | 21 | is that correct? |
| | 22 | A. Correct. |
| | 23 | Q. And the next line is this 4545 number. The |
| | 24 | defendant, what does he written there in the second row from |
| 11:45:23 | 25 | the bottom? |

Richard Hoffman - Direct by Mr. Zellinger

| 11:45:24 | 1 | A. I need to redirect and keep pressure on her. |
| | 2 | Q. If you can read from the bottom. Is there then a |
| | 3 | message from Ms. Bond that says: She sounds like the |
| | 4 | Republican ho? |
| 11:45:43 | 5 | A. Yes. On 4/18/2022. |
| | 6 | Q. And then: She's obviously getting around. |
| | 7 | A. Yes. Same date. |
| | 8 | Q. Further up: She likes to make herself out to be |
| | 9 | Republican ho. Is that correct? |
| 11:45:56 | 10 | A. Yes. Same date. |
| | 11 | Q. On April 18th, this is a week before the April 25th |
| | 12 | meeting between the defendant and DeVan Barbour. What does |
| | 13 | the defendant respond? |
| | 14 | A. I think DeVan is the key. |
| 11:46:37 | 15 | Q. An entry April 18th at 1346? |
| | 16 | A. Yes. |
| | 17 | Q. And is that from the defendant to Ms. Bond? |
| | 18 | A. Yes. |
| | 19 | Q. Could you read that? |
| 11:46:45 | 20 | A. She told Kevin Donovan she was coming to Smithfield |
| | 21 | to speak with someone in high authority about me today. |
| | 22 | Q. Okay. And then is there another entry where the |
| | 23 | cursor is at 1352? |
| | 24 | A. Yes. |
| 11:47:02 | 25 | Q. What does say? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 11:47:04 | 1 | A. She told KD some juicy lies about multiple people. |
| | 2 | He told those people. It all comes back to you. |
| | 3 | Q. Okay. And above it does it also say: Kevin also |
| | 4 | said he'd been texting him? |
| 11:47:18 | 5 | A. Yes. With an emoji face winking. |
| | 6 | Q. Okay. And that's from the defendant to Ms. Bond? |
| | 7 | A. Ms. Bond, correct. |
| | 8 | Q. On April 18th, this appears to be 1410. So that |
| | 9 | could be around 2:10 p.m.; is that correct? |
| 11:47:35 | 10 | A. No. That would be in the morning. That's 8:10 |
| | 11 | a.m. |
| | 12 | Q. Okay. I was way off. And what was the message |
| | 13 | there? |
| | 14 | A. I know he's worried about not having support. He's |
| 11:47:48 | 15 | sending that stupid bitch. Control him and affect his |
| | 16 | campaign. |
| | 17 | Q. And that's from Ms. Bond; correct? |
| | 18 | A. Yes. |
| | 19 | Q. And then the next message: He kept saying that on |
| 11:47:59 | 20 | Saturday? |
| | 21 | A. Correct. |
| | 22 | Q. And then the next message from the defendant |
| | 23 | appears to be at 164113 from the defendant to Ms. Bond. And |
| | 24 | what did he write there? |
| 11:48:10 | 25 | A. Got the next move figured out. That would have |

Richard Hoffman - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 11:48:39 | 1 | been -- |
| | 2 | Q. On April 19th, this says -- |
| | 3 | A. It would have been April the 18th at 9:00 p.m., |
| | 4 | because you have to go back in time. |
| 11:48:53 | 5 | Q. Okay. And what does the defendant say at that |
| | 6 | line? |
| | 7 | A. You're fine, babe. I just want to see if she's |
| | 8 | bullshitting or not. It will dictate my next couple of moves. |
| | 9 | Q. Moving to later on April 19th -- and to be |
| 11:49:16 | 10 | accurate, as you go up this document, you're going -- you're |
| | 11 | moving chronologically? |
| | 12 | A. Yes. Correct. |
| | 13 | Q. So on April 19th, would this have been at like 9:38 |
| | 14 | a.m.? |
| 11:49:31 | 15 | A. Correct. |
| | 16 | Q. On the document, just for purposes of the record, |
| | 17 | it says 133830; is that correct? |
| | 18 | A. Yes. That's correct. |
| | 19 | Q. And what did the defendant message to Ms. Bond? |
| 11:49:43 | 20 | A. Message to Ms. Bond is: Did psycho go to work |
| | 21 | today? |
| | 22 | Q. And Ms. Bond responded? |
| | 23 | A. She did. |
| | 24 | Q. And Ms. Bond worked at a school directly adjacent |
| 11:49:56 | 25 | or like across the street? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 11:49:57 | 1 | A.   They share a parking lot.   There's one building on |
| | 2 | one side.   There's the elementary school, a parking lot, a |
| | 3 | driveway, parking lot, and then a middle school.   They are on |
| | 4 | the same campus. |
| 11:50:14 | 5 | Q.   135756, where the cursor is, that would have been |
| | 6 | like close to 9:57 a.m., on April 19th; is that accurate? |
| | 7 | A.   Correct. |
| | 8 | Q.   That's a message from the defendant to Ms. Bond. |
| | 9 | And what does he say? |
| 11:50:29 | 10 | A.   Stupid bitch. |
| | 11 | Q.   What's the next message? |
| | 12 | A.   I think she's going to end up ruining me. |
| | 13 | Q.   Then his next message after Ms. Bond responds is: |
| | 14 | Dude, I just got a feeling. |
| 11:50:44 | 15 | A.   Correct. |
| | 16 | Q.   You heard some questions asked of Mr. Donovan about |
| | 17 | how he referred Angie Barbour.  Does this documents also |
| | 18 | include how the defendant referred to Ms. Barbour? |
| | 19 | A.   Yes.   There's a lot of the derogatory language. |
| 11:51:05 | 20 | Q.   On April 19th, at 4:15, did the defendant write |
| | 21 | something else about -- well, we don't know who this is about, |
| | 22 | but what did he write at this point? |
| | 23 | A.   I want us the way we were before this psycho bitch. |
| | 24 | Q.   Jumping forward to April 21st, at around -- is this |
| 11:51:53 | 25 | around -- would this have been like 11:24 a.m.? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 11:51:58 | 1 | A. | Correct. |

2    Q.   Okay.  And so it says 1524 on this document?

3    A.   Yes.

4    Q.   And I mean, the message immediately before that is

11:52:06   5   from the defendant to Ms. Bond.  And what does that say?

6    A.   Holy fucking shit.

7    Q.   And what's the next message?

8    A.   The psycho bitch blocked me.

9    Q.   And then it appears Ms. Bond responds:  Me too.  Is

11:52:22   10   that correct?

11    A.   Correct.

12    Q.   And then it said:  Or maybe she got rid of

13   Facebook.

14    A.   Yes.

11:52:27   15    Q.   And then the defendant responds:  I think she

16   ditched her Facebook.

17    A.   I think she ditched her FB.

18    Q.   And then the next message is:  LOL?

19    A.   Correct.

11:52:38   20    Q.   And that's from the defendant as well?

21    A.   Yes.

22    Q.   And then the next message on April 21st, at 11:30

23   is what from the defendant?

24    A.   Bye bitch.

11:53:04   25    Q.   Now, in addition to some words in here or explosive

11:53:08  1  language, did you also find something relevant to your

2  investigation?

3       A.   Yes.

4       Q.   Starting at the bottom of this page, at line -- the

11:53:26  5  second to last line on April 21st at around 3:53 is there a

6  message from Ms. Bond to the defendant?

7       A.   I have 1:53 p.m.

8       Q.   I'm sorry.

9       A.   I think there are so many crazy things out there

11:53:39  10  that she's sad.

11       Q.   Okay.  And then the next message is:  Said?

12       A.   Correct.  Said.

13       Q.   And then what does the defendant respond on

14  April 21st at --

11:53:52  15       A.   2:08.

16       Q.   -- 2:08 p.m.?

17       A.   Kevin Donovan said:  Angie is still trying to prove

18  to everyone we were a thing.

19       Q.   Okay.  And I've just highlighted that on that page;

11:54:03  20  is that correct?

21       A.   Correct.

22       Q.   And here he responds -- after he says that, he

23  says:  She called Melinda Slay.

24       A.   Yes.

11:54:13  25       Q.   And then Ms. Bond responds:  Why, why, why, why,

11:54:17  1    why, why?

       2         A.    Correct.

       3         Q.    And he responds?

       4         A.    Exactly.

11:54:26  5         Q.    And then what does the defendant then say on

       6    April 21st, four days before this meeting, at -- I'm sorry, at

       7    2:14 p.m.  And this is a message from the defendant to

       8    Ms. Bond; is that correct?

       9         A.    Yes.  She needs to feel the DeVan bomb.

11:54:45 10         Q.    It says:  She needs to feel DeVan bomb.

      11         A.    I'm sorry.  Yes.

      12         Q.    When you got this information, did you know what

      13    DeVan bomb meant?

      14         A.    I know that Mr. Barbour's first name is DeVan.

11:55:10 15         Q.    Okay.  Later on that day there's a message that

      16    Angie wasn't at school today -- Angie's not at school today.

      17    Is that correct?

      18         A.    Correct.

      19         Q.    And the defendant responds on April 21st, at like

11:55:30 20    3:19.  Could you read that for the jury.

      21         A.    I fucking hate that bitch.  Can you scroll down?

      22         Q.    I'm sorry.  On this page, this is April 23rd; is

      23    that correct?

      24         A.    Yes.

11:56:11 25         Q.    Okay.  On April 23rd, at 1:53; is that correct?

| | | |
|---|---|---|
| 11:56:22 | 1 | A.   Yes. |
| | 2 | Q.   I'm sorry.  At 2:01 the defendant sends a message: |
| | 3 | Where TF is she? |
| | 4 | A.   Yes. |
| 11:56:35 | 5 | Q.   And what could the abbreviation TF mean?  Have you |
| | 6 | seen that abbreviation before? |
| | 7 | A.   Yes. |
| | 8 | Q.   And? |
| | 9 | A.   You want me to say it? |
| 11:56:45 | 10 | Q.   If you could. |
| | 11 | A.   The fuck. |
| | 12 | Q.   Okay.  And then does the defendant write:  Oh, the |
| | 13 | county convention is today. |
| | 14 | A.   Correct. |
| 11:56:55 | 15 | Q.   And at this time you're looking for evidence, you |
| | 16 | know, that a recording was played to DeVan Barbour of Angie |
| | 17 | Barbour talking; is that correct? |
| | 18 | A.   Correct. |
| | 19 | Q.   Okay.  And you're trying to figure out how she was |
| 11:57:08 | 20 | recorded; is that correct? |
| | 21 | A.   True. |
| | 22 | Q.   And that if there was a recording that it was |
| | 23 | played to DeVan Barbour; is that correct? |
| | 24 | A.   Correct. |
| 11:57:12 | 25 | Q.   And eventually you got that recording and the |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 11:57:15 | 1 | jury's heard it. |
| | 2 | A. Yes. |
| | 3 | Q. Okay. On April 23rd, at 2:06 p.m., could you tell |
| | 4 | the jury what the defendant wrote? |
| 11:57:30 | 5 | A. Listen to the audio and tell me if it appears |
| | 6 | authentic or altered. |
| | 7 | Q. Later that day on April 23rd, at 5:00 ish p.m. On |
| | 8 | here this document is at 2100 hours; is that correct? |
| | 9 | A. Correct. |
| 11:57:55 | 10 | Q. Defendant writes -- can you read to the jury what |
| | 11 | the defendant wrote? |
| | 12 | A. Gonna handle this bitch. |
| | 13 | Q. And again, this is April 23rd. So this is two days |
| | 14 | before the defendant allegedly met with DeVan Barbour and |
| 11:58:10 | 15 | handed DeVan Barbour earbuds to put in potentially extorting |
| | 16 | him. |
| | 17 | A. That's correct. |
| | 18 | Q. There's an entry on here. Defendant writes at like |
| | 19 | 7:55 p.m. on April 23rd: Just to F with Angie I'm in the same |
| 11:58:40 | 20 | fucking clothes I was earlier. Is that correct? |
| | 21 | A. Correct. |
| | 22 | Q. April 24th -- this says April 24th, at like 12:18 |
| | 23 | a.m. This would be four hours back. So that it's actually |
| | 24 | 8:18 p.m. on -- |
| 11:59:03 | 25 | A. The 23rd. |

| | | |
|---|---|---|
| 11:59:03 | 1 | Q.   -- April 23rd; is that correct? |
| | 2 | A.   Correct. |
| | 3 | Q.   And could you read what the defendant wrote? |
| | 4 | A.   Oh, it's totally with Angie.  Don't get why he |
| 11:59:17 | 5 | turned his back on me. |
| | 6 | Q.   And then what does Ms. Bond respond? |
| | 7 | A.   What.The.Fuck?! |
| | 8 | Q.   Okay.  Ms. Bond says:  Thought she was with her |
| | 9 | husband. |
| 11:59:33 | 10 | A.   Correct. |
| | 11 | Q.   And the defendant responds? |
| | 12 | A.   She's not. |
| | 13 | Q.   What's the next entry? |
| | 14 | A.   Owen would be that support she needs. |
| 11:59:44 | 15 | Q.   Okay.  And then there's some conversation from |
| | 16 | Ms. Bond.  And could you read it at 00 at 3158, which would |
| | 17 | have been on the evening of April 23rd, can you read what |
| | 18 | Ms. Bond writes? |
| | 19 | A.   And he would tell her you tried to set her up. |
| 12:00:03 | 20 | Right? |
| | 21 | Q.   And then the next thing there's a correction |
| | 22 | saying? |
| | 23 | A.   Wouldn't. |
| | 24 | Q.   And when somebody writes that with an asterisk, is |
| 12:00:12 | 25 | that typically a vernacular, can that sometimes mean a |

| 12:00:15 | 1 | correction? |
| | 2 | A. Yes. |
| | 3 | Q. And you don't know. Ms. Bond refused talk to you; |
| | 4 | is that accurate? |
| 12:00:20 | 5 | A. Yes. She declined. |
| | 6 | Q. And then the defendant responds? |
| | 7 | A. Yes. |
| | 8 | Q. And then what's the next entry? |
| | 9 | A. He would. |
| 12:00:31 | 10 | Q. And then Ms. Bond asks: Thought he was your |
| | 11 | friend. |
| | 12 | A. Correct. |
| | 13 | Q. And defendant responds: He vanished. |
| | 14 | A. Yes. |
| 12:00:42 | 15 | Q. And later on defendant says -- could you read that |
| | 16 | for the jury? |
| | 17 | A. Yes. Sure. Piece of shit. |
| | 18 | Q. Then he says: Had to go shoot basketball. Just |
| | 19 | got home. And then what's the next entry? |
| 12:00:58 | 20 | A. I stuck by that guy through everything. |
| | 21 | Q. This would be at like 10:00 at night -- |
| | 22 | A. On the 23rd, uh-huh. |
| | 23 | Q. -- on the 23rd. During that same conversation, and |
| | 24 | I apologize for the language, but if you can read that entry |
| 12:01:20 | 25 | that the defendant wrote at 10:40 p.m. for the jury. |

Richard Hoffman - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 12:01:25 | 1 | A. On the 23rd: If she gave him pussy, he would tell |
| | 2 | her anything. |
| | 3 | Q. And that actually says "have him;" is that correct? |
| | 4 | A. Sorry, yes. |
| 12:01:36 | 5 | Q. And then the next thing the defendant writes is: I |
| | 6 | have no idea why he's turned his back on me. |
| | 7 | A. Correct. |
| | 8 | Q. I think I'm okay without him. |
| | 9 | A. Correct. |
| 12:01:46 | 10 | Q. Then can you read the next entry? |
| | 11 | A. He told her last week I was trying to her up, and I |
| | 12 | called him. He won't respond to me anymore. |
| | 13 | Q. And then later does the defendant write something |
| | 14 | at 10:42 p.m.? |
| 12:02:03 | 15 | A. Yes. I will be certain JoCo Report does a story on |
| | 16 | her ass. |
| | 17 | Q. Okay. And later on in that conversation, some |
| | 18 | 40 minutes later, is there an entry from the defendant: So |
| | 19 | pissed at that guy. |
| 12:02:27 | 20 | A. Yes. |
| | 21 | Q. And then the next entry: She's not getting back |
| | 22 | with Ryan. |
| | 23 | A. Correct. |
| | 24 | Q. Are you aware what Angie Barbour husband's name is? |
| 12:02:34 | 25 | A. Yes. It's Ryan. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Richard Hoffman - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 12:02:36 | 1 | Q. It appears the next day, April 24th, at like 7:29, |
| | 2 | and Ms. Bond says: I want to hear about Owen. |
| | 3 | A. Correct. |
| | 4 | Q. And the defendant responds like a half an hour |
| 12:02:55 | 5 | later. What does he respond? |
| | 6 | A. I've done so much to help these fucking people. |
| | 7 | Q. On April 24th, at 12:55 p.m. is there a message |
| | 8 | from the defendant to Ms. Bond? |
| | 9 | A. Correct. |
| 12:03:30 | 10 | Q. Could you read that for the jury? |
| | 11 | A. When the audio comes out, it will confirm |
| | 12 | everything in joule's (phonetic) head and she will spread. |
| | 13 | Q. Do you know what joules means in that context? |
| | 14 | A. I have no idea. |
| 12:03:47 | 15 | Q. Okay. And then two hours later does the defendant |
| | 16 | send another message to Ms. Bond right above an emoji of like |
| | 17 | crying? |
| | 18 | A. Yes. |
| | 19 | Q. What is that message the defendant sends? |
| 12:03:59 | 20 | A. Got another clip. |
| | 21 | Q. This is on April 24th? |
| | 22 | A. Correct. |
| | 23 | Q. The day before the defendant allegedly met with |
| | 24 | DeVan Barbour? |
| 12:04:18 | 25 | A. Yes. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 12:04:35 | 1 | Q. And these records -- on April 25th, there's a |
| | 2 | message from Allyson Bond, and this would be at like -- what |
| | 3 | time would this be at? |
| | 4 | A. 11:52. |
| 12:04:59 | 5 | Q. And then there's a gap and the defendant responds |
| | 6 | at what time? |
| | 7 | A. 1:27 p.m. |
| | 8 | Q. And it was: How are you feeling? And he said: |
| | 9 | Okay, I guess. |
| 12:05:11 | 10 | A. Yes. |
| | 11 | MR. ZELLINGER: Madam clerk, you can pull that |
| | 12 | down. |
| | 13 | Q. Now, do you recall the defendant presenting DeVan |
| | 14 | Barbour with an exhibit that was Defendant's Exhibit 9. Do |
| 12:05:52 | 15 | you recall that? |
| | 16 | A. I don't recall the exhibit by number. |
| | 17 | Q. Do you remember some questions being asked about |
| | 18 | DeVan Barbour being asked about -- you were here for his |
| | 19 | testimony; is that correct? |
| 12:06:04 | 20 | A. Yes. |
| | 21 | Q. And he talks about the meeting with the defendant |
| | 22 | and then consequent phone call where defendant is alleged to |
| | 23 | have said: If you don't get Angie Barbour to recant that |
| | 24 | we're having an affair, then I'm going to release this |
| 12:06:21 | 25 | recording? |

| 12:06:22 | 1 | A. Correct. |
| | 2 | MR. TYNDALL: Objection. |
| | 3 | THE COURT: I'll overrule and let him answer. |
| | 4 | Q. And that was just the allegation, and it's the job |
| 12:06:29 | 5 | of the jury to remember the testimony if I say something |
| | 6 | wrong, basically go with what they say; right? |
| | 7 | A. Yes. |
| | 8 | Q. But you remember that testimony from DeVan Barbour |
| | 9 | about that subject? |
| 12:06:41 | 10 | A. I do. |
| | 11 | Q. Then Mr. Barbour also testified that there was a |
| | 12 | text that he received a week or two later near the primary. I |
| | 13 | think the date may have been May 9th where he received |
| | 14 | something said the recording was going to go out. Do you |
| 12:07:01 | 15 | recall that? |
| | 16 | A. I do. I remember that counsel gave him the number. |
| | 17 | Q. Were you ever able to get that text message? |
| | 18 | A. No. |
| | 19 | Q. Did you do some inquiry into phone numbers involved |
| 12:07:25 | 20 | in this case? |
| | 21 | A. I did. |
| | 22 | Q. Okay. And additionally, did you get some records |
| | 23 | from the defendant about the defendant's email? |
| | 24 | A. Yea, I did. |
| 12:07:38 | 25 | Q. So you acquired through a search warrant the |

| | | |
|---|---|---|
| 12:07:40 | 1 | defendant's email? |
| | 2 |     A.   Yes.  His MSN account. |
| | 3 |     MR. ZELLINGER:  Your Honor, may I approach the |
| | 4 | witness? |
| 12:07:50 | 5 |     THE WITNESS:  Yes, sir. |
| | 6 |     Q.   And going back to Mr. Barbour's testimony, and |
| | 7 | again, this is for the jury to remember, but he mentioned |
| | 8 | something about a text message prior to meeting with the |
| | 9 | defendant; correct? |
| 12:08:22 | 10 |     A.   Yes.  On April 13th, I think. |
| | 11 |     (State's Exhibit Number 65 marked for |
| | 12 |     identification.) |
| | 13 |     Q.   And I show you what's been marked State's |
| | 14 | Exhibit 65.  Is this from the records you received from Apple |
| 12:08:33 | 15 | for the defendant's Apple records? |
| | 16 |     A.   It is. |
| | 17 |     Q.   Okay.  Actually, is this from the defendant's MSN |
| | 18 | records? |
| | 19 |     A.   Yes.  It's ronjon@msn. |
| 12:08:43 | 20 |     Q.   Okay.  And so this is a receipt from Apple; is that |
| | 21 | accurate? |
| | 22 |     A.   Yes.  So he subscribed to this service and Apple |
| | 23 | sent the receipt to his email address.  So I have the receipt |
| | 24 | from his email address. |
| 12:08:58 | 25 |     Q.   So you got Apple records from Apple and you also |

| | | |
|---|---|---|
| 12:09:01 | 1 | got email records from Microsoft, MSN? |
| | 2 | A.   Correct. |
| | 3 | Q.   And this revolves around his Microsoft email, a |
| | 4 | receipt from his Apple stuff? |
| 12:09:11 | 5 | A.   Yes.  Like you would get a receipt for services and |
| | 6 | they send it to your email address. |
| | 7 | Q.   And so -- do you have an iPhone? |
| | 8 | A.   I do. |
| | 9 | Q.   And so if you have an app, can Apple charge you and |
| 12:09:20 | 10 | then send a receipt? |
| | 11 | A.   Yes.  Some of them are reoccurring billing.  Some |
| | 12 | pay a year to get a discount. |
| | 13 | Q.   I show you State's Exhibit 65.  Is this from |
| | 14 | defendant's ronjon1983@msn.com email address? |
| 12:09:36 | 15 | A.   It's from Apple to ronjon1983msn.com. |
| | 16 | Q.   But this came from the MSN records? |
| | 17 | A.   Yes. |
| | 18 | Q.   Okay.  And I show you State's Exhibit 65.  Is that |
| | 19 | an email he received from May 25 of 2022. |
| 12:09:49 | 20 | A.   It is. |
| | 21 | (State's Exhibit Number 66 marked for |
| | 22 | identification.) |
| | 23 | Q.   And then I show you State's Exhibit 66.  Is that an |
| | 24 | email from June 14th of 2022? |
| 12:09:57 | 25 | A.   Correct. |

Richard Hoffman - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 12:09:57 | 1 | (State's Exhibit Number 67 marked for |
| | 2 | identification.) |
| | 3 | Q. I show you another email, State's Exhibit |
| | 4 | Number 67. Is that from July 10, 2022? |
| 12:10:07 | 5 | A. It is. |
| | 6 | (State's Exhibit Number 68 marked for |
| | 7 | identification.) |
| | 8 | Q. And lastly, I show you State's Exhibit 68, is that |
| | 9 | an email from August 25th, 2022? |
| 12:10:14 | 10 | A. Yes. |
| | 11 | Q. These are records that you received from MSN from |
| | 12 | the defendant's email records? |
| | 13 | A. They are. |
| | 14 | MR. ZELLINGER: At this time I seek to admit |
| 12:10:22 | 15 | State's 65 through 68. |
| | 16 | MR. TYNDALL: Subject to our -- just renew our |
| | 17 | objection in the pretrial motion and otherwise. |
| | 18 | THE COURT: Yes, sir. So noted. In the Court's |
| | 19 | discretion, we'll allow it to be admitted. |
| 12:10:38 | 20 | (State's Exhibit Number 65, 66, 67, 68 entered |
| | 21 | into evidence.) |
| | 22 | MR. ZELLINGER: May I publish State's Exhibit 65 at |
| | 23 | this time, Your Honor? |
| | 24 | THE COURT: Yes, sir. |
| 12:10:50 | 25 | |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 12:10:50 | 1 | (State's Exhibit Number 65 published to the |
| | 2 | jury.) |
| | 3 | Q. This is an email from the defendant's Microsoft |
| | 4 | records; is that correct? |
| 12:11:15 | 5 | A. Correct. |
| | 6 | Q. And so it's from Apple. And that appears at the |
| | 7 | top of the page? |
| | 8 | A. Yes. |
| | 9 | Q. And it's to what email address? |
| 12:11:24 | 10 | A. Ronjon1983, that's R-O-N-J-O-N -- @msn.com. |
| | 11 | Q. And this is from May 25th of 2022? |
| | 12 | A. Correct. |
| | 13 | Q. And this says: Your receipt from Apple. |
| | 14 | A. Yes. |
| 12:11:39 | 15 | Q. And it says app store on it; is that accurate? |
| | 16 | A. Correct. |
| | 17 | Q. It was billed to, it looks like, defendant's name |
| | 18 | Ronald Johnson PayPal? |
| | 19 | A. Yes, he has PayPal. |
| 12:11:52 | 20 | Q. And this address, do you know where 301 Longview |
| | 21 | Drive is? |
| | 22 | A. No, I don't. |
| | 23 | Q. And it appears to be a receipt for $20 on |
| | 24 | SpoofCard? |
| 12:12:04 | 25 | A. Yes, sir. 100 credits. So you get credits for |

| 12:12:05 | 1 | that. |

2      Q.   What's that?

3      A.   An application you can download on IOS or on

4  Android whereby you can basically spoof a number.  So you

| 12:12:21 | 5 | would pick a number that's not yours, and then you call |

6  somebody, a second number is displayed so you can choose what

7  is displayed on recipient's phone number.

8      Q.   And that -- could you also do it via text?

9      A.   Yes.

| 12:12:36 | 10 | MR. ZELLINGER:  Your Honor, may I approach the |

11  witness?

12          THE COURT:  Yes, sir.

13              (State's Exhibit Numbers 70, 71, 72, 73, 74, 75

14                  marked for identification.)

| 12:12:40 | 15 | Q.   And Investigator Hoffman, I hand you what's been |

16  marked for identification purposes State's Exhibit 70, 71, 72,

17  73, 74, 75.  Are these all from SpoofCard's website?

18      A.   They are.

19      Q.   Will this help illustrate your testimony for some

| 12:13:27 | 20 | of the services SpoofCard provides? |

21      A.   Yes.

22          MR. ZELLINGER:  I move to admit State's Exhibit 70

23  through 75.

24          MR. TYNDALL:  These just come off the explanation;

| 12:13:36 | 25 | right? |

| 12:13:37 | 1 | MR. ZELLINGER:  May we approach? |
| | 2 | (Sidebar.) |
| | 3 | MR. TYNDALL:  No objection. |
| | 4 | THE COURT:  So allowed. |
| 12:13:54 | 5 | (State's Exhibit Numbers 70, 71, 72, 73, 74, 75 |
| | 6 | entered into evidence.) |
| | 7 | MR. ZELLINGER:  Your Honor, may I publish State's |
| | 8 | Exhibit 70 through 75? |
| | 9 | THE COURT:  Yes, sir. |
| 12:14:03 | 10 | (State's Exhibit Numbers 70, 71, 72, 73, 74, 75 |
| | 11 | published to the jury.) |
| | 12 | Q.  You mentioned what SpoofCard was.  This is from |
| | 13 | their website? |
| | 14 | A.  Yes. |
| 12:14:44 | 15 | Q.  So SpoofCard gives folks the ability to call and |
| | 16 | text from a virtual number to protect their own personal |
| | 17 | information or privacy; is that correct? |
| | 18 | A.  VPN. |
| | 19 | Q.  Okay.  I'm sorry, what did you say? |
| 12:14:55 | 20 | A.  Yes.  That's long for VPN. |
| | 21 | Q.  Did you say VPN? |
| | 22 | A.  V, like Victor, VPN. |
| | 23 | Q.  And a VPN is a virtual private network; is that |
| | 24 | correct? |
| 12:15:07 | 25 | A.  Yes. |

| 12:15:07 | 1 | Q. So that is something where you can mask your IP |

12:15:07    1    Q.    So that is something where you can mask your IP

2    address; is that accurate?

3    A.    Yes.

4    Q.    So we heard some testimony earlier about a VPN.

12:15:16    5    This is different than a VPN; is that correct?

6    A.    Yes.

7    Q.    How is different than a VPN, if you know?

8    A.    So a VPN obfuscates your IP address.  So when you

9    connect to the internet, your device has to have a way to go

12:15:30    10    out and then that information has to be identified and where

11    is it going back to.  You would access the internet through an

12    IP address.  What a virtual private network allows you to do,

13    it allows you to use an IP address that's not your IP address

14    so that you have virtual privacy.  It doesn't come back to the

12:15:48    15    IP address you are using.

16    A virtual number is just that.  It's a number other

17    than the one that's assigned to your device.  So you can

18    select and use that number and then contact somebody and that

19    will be displayed as your access number.

12:16:04    20    Q.    Like Mr. Donovan testified, he uses VPN to make it

21    appear that his IP is in New York so he can play Pokemon; is

22    that correct?

23    A.    Some services are limited to a geographic area.  So

24    in order for you to be included in an area, you have to have

12:16:18    25    an IP address from that area.  So people you use it for that

12:16:22  1  reason too.

2      Q.   Okay.  For this service you can use a different

3  number to text or call somebody; is that correct?

4      A.   Yes.  And it would be displayed on their phone as

12:16:30  5  the number that you want it to be.

6          MR. ZELLINGER:  And Your Honor, can I publish

7  State's Exhibit 71 at this time?

8          THE COURT:  Yes, sir.

9      Q.   This is also from the website stating that it makes

12:16:41  10  it easy to use a second phone number while ensuring your

11  personal information is private and secure.  So for instance,

12  could a company use this if they had to call people to try to

13  mask the number that they are calling from?

14      A.   Yes.  So like scammers and spammers use services

12:16:57  15  that are similar to this, and also a company that wants to

16  robo call you and offer you healthcare access or whatever it

17  is.

18      Q.   Okay.  If you wanted to call somebody or text

19  somebody and have it be from a different number so it didn't

12:17:12  20  look like it was you, you can use this service?

21      A.   Absolutely.

22          MR. ZELLINGER:  Your Honor, may I publish State's

23  Exhibit 72?

24          THE COURT:  Yes, sir.

12:13:53  25

Richard Hoffman - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 12:13:54 | 1 | (State's Exhibit Number 72 published to the |
| | 2 | jury.) |
| | 3 | Q.   It appears does SpoofCard also offers the ability |
| | 4 | to record calls? |
| 12:17:24 | 5 | A.   It includes that functionality, yes. |
| | 6 | Q.   And you don't know if back in May of 2022 if that |
| | 7 | functionality existed then? |
| | 8 | A.   I don't. |
| | 9 | Q.   But you do know from that exhibit that the |
| 12:17:37 | 10 | defendant received a receipt from Apple for this service? |
| | 11 | A.   Yes. |
| | 12 | MR. ZELLINGER:   Your Honor, may I publish State's |
| | 13 | Exhibit 73? |
| | 14 | THE COURT:   Yes, sir. |
| 12:13:54 | 15 | (State's Exhibit Number 73 published to the |
| | 16 | jury.) |
| | 17 | Q.   These are some of the packages; is that correct? |
| | 18 | A.   They are credits.   So the way that they accept |
| | 19 | payment is when you want a number, it costs a certain number |
| 12:17:56 | 20 | of credits, and they also bill you for credits depending on |
| | 21 | text messages or phone calls.   And as you access their |
| | 22 | services, they remove those credits and you purchase a package |
| | 23 | of credits. |
| | 24 | Q.   And those -- this lists -- basically so no matter |
| 12:18:15 | 25 | what you do it costs credits, and then you have to buy those |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Richard Hoffman - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 12:18:20 | 1 | credits in order to use it? |
| | 2 | A.  Correct. |
| | 3 | MR. ZELLINGER:  Can I publish State's Exhibit 74? |
| | 4 | THE COURT:  Yes, sir. |
| 12:13:54 | 5 | (State's Exhibit Number 74 published to the |
| | 6 | jury.) |
| | 7 | Q.  Their website includes how to send a spoof phone |
| | 8 | call; is that right? |
| | 9 | A.  Yes, they provide instructions. |
| 12:18:31 | 10 | Q.  So it's a little bit foggy down here, but basically |
| | 11 | you use this app and you give it a number to display to the |
| | 12 | person that you are calling? |
| | 13 | A.  You put the number you're going to call, and then |
| | 14 | the number you want to display to the recipient of that call. |
| 12:18:51 | 15 | Q.  Okay.  And are there certain limits on what numbers |
| | 16 | you can use to -- I mean, can you use anybody's number or are |
| | 17 | there limits on what numbers can appear? |
| | 18 | A.  I have used this app, and you have to select the |
| | 19 | number to access and that number -- then you select a number |
| 12:19:06 | 20 | to display.  You display the number you want it to display and |
| | 21 | then call the person you're calling and the display number |
| | 22 | shows up on the caller ID, unless they are using something |
| | 23 | like Truecaller ID or something different. |
| | 24 | Q.  Okay. |
| 12:19:19 | 25 | MR. ZELLINGER:  Can I publish State's Exhibit 75? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 12:19:21 | 1 | THE COURT: Yes, sir. |
| | 2 | (State's Exhibit Number 75 published to the |
| | 3 | jury.) |
| | 4 | Q. It also includes information on how to send a |
| 12:19:25 | 5 | spoofed text messages; is that correct? |
| | 6 | A. Correct. |
| | 7 | Q. It's the same process. The number that you are |
| | 8 | sending the message to, the number that you want it to appear |
| | 9 | it's coming from? |
| 12:19:33 | 10 | A. Yes. |
| | 11 | Q. And then the content of it, and then it sends a |
| | 12 | text message from not your number but the number that you |
| | 13 | wanted? |
| | 14 | A. The displayed number. The number that you want |
| 12:19:42 | 15 | displayed. |
| | 16 | MR. ZELLINGER: Your Honor, may I publish State's |
| | 17 | Exhibit 65 and go back to that? |
| | 18 | THE COURT: Yes, sir. |
| | 19 | (State's Exhibit Number 65 published to the |
| 12:14:01 | 20 | jury.) |
| | 21 | Q. Just to be clear, the defendant paid $19.99 -- it |
| | 22 | appears the defendant paid $19.99 for the use of this service |
| | 23 | and the receipt of that is May 25th; is that correct? |
| | 24 | A. Yes. |
| 12:20:02 | 25 | Q. Do you know if the defendant was billed at the end |

| | | |
|---|---|---|
| 12:20:05 | 1 | of the month for that or if this is the instigation of it? |
| | 2 |      A.   I don't know. |
| | 3 |      MR. ZELLINGER:  Your Honor, may I publish State's |
| | 4 | Exhibit 66? |
| 12:13:54 | 5 |      (State's Exhibit Number 66 published to the |
| | 6 |      jury.) |
| | 7 |      THE COURT:  Yes, sir. |
| | 8 |      Q.   Here's the receipt from June 14th of 2022; do you |
| | 9 | see that? |
| 12:20:18 | 10 |      A.   Yes. |
| | 11 |      Q.   Again, this is for Ronald Johnson, billed to |
| | 12 | PayPal? |
| | 13 |      A.   Yes. |
| | 14 |      Q.   And it's from his Apple ID? |
| 12:20:26 | 15 |      A.   Yes.  You can also see the Pinger app, which is the |
| | 16 | Sideline down there. |
| | 17 |      Q.   I'm sorry? |
| | 18 |      A.   You see the Pinger app which is on the bottom of |
| | 19 | that receipt. |
| 12:20:39 | 20 |      Q.   And these are receipts for three apps, it appears? |
| | 21 |      A.   Yes. |
| | 22 |      Q.   When you said Pinger, was that the carbon smart -- |
| | 23 |      A.   No.  Sideline.  It's a service, and he used that. |
| | 24 |      Q.   Oh, okay.  So Sideline's second phone number -- |
| 12:20:53 | 25 |      A.   That's Pinger. |

| | | |
|---|---|---|
| 12:20:54 | 1 | Q. That's Pinger? |
| | 2 | A. Yes. |
| | 3 | Q. Okay. And why does it not just say Pinger? |
| | 4 | A. Because Pinger has other services, and that's what |
| 12:21:00 | 5 | they call their Sideline. |
| | 6 | Q. So what does Sideline do? |
| | 7 | A. It's the exact service we've been discussing, but |
| | 8 | it's part of Pinger. |
| | 9 | Q. So with Pinger, you can have a number that is not |
| 12:21:12 | 10 | your number appearing -- |
| | 11 | A. Yes. That's correct. |
| | 12 | Q. -- to communicate with people. |
| | 13 | A. Right. When we went over that exhibit. |
| | 14 | Q. Again, is there a receipt for SpoofCard here? |
| 12:21:23 | 15 | A. Another 100 credits for 1999. |
| | 16 | MR. ZELLINGER: Your Honor, may I publish State's |
| | 17 | Exhibit 67? |
| | 18 | THE COURT: Yes, sir. |
| | 19 | (State's Exhibit Number 67 published to the |
| 12:14:01 | 20 | jury.) |
| | 21 | Q. This is from July 10th, 2022. And again, this |
| | 22 | another receipt for SpoofCard? |
| | 23 | A. It is. |
| | 24 | Q. This is a reduced amount this time, 45 credits? |
| 12:21:42 | 25 | A. Correct. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 12:21:42 | 1 | MR. ZELLINGER: May I publish State's 68? |
| | 2 | THE COURT: Yes, sir. |
| | 3 | (State's Exhibit Number 68 published to the |
| | 4 | jury.) |
| 12:21:47 | 5 | Q. Is that from August 2022? |
| | 6 | A. Yes. |
| | 7 | Q. Is that also for SpoofCard? |
| | 8 | A. Yes. |
| | 9 | Q. For 45 credits at that point? |
| 12:21:54 | 10 | A. Correct. |
| | 11 | Q. Do you know, Investigator, this number in the |
| | 12 | parenthesis, iPhone (8); does mean it's an iPhone 8? |
| | 13 | A. I don't think so. I don't know. |
| | 14 | Q. You don't know what that parenthesis number is? |
| 12:22:25 | 15 | A. I don't know. It looks like they are successive to |
| | 16 | me. They've gone up as I've gone through, but I don't know. |
| | 17 | Q. Some of them say 8. This one on State's Exhibit 66 |
| | 18 | says 5; is that correct? |
| | 19 | A. Correct. |
| 12:22:41 | 20 | Q. And the one before it on May says 4; is that |
| | 21 | accurate? |
| | 22 | A. Yes. |
| | 23 | (State's Exhibit Number 62 marked for |
| | 24 | identification.) |
| 12:23:07 | 25 | MR. ZELLINGER: Your Honor, may I approach the |

| | | |
|---|---|---|
| 12:23:07 | 1 | witness? |
| | 2 | THE COURT:  Yes, sir. |
| | 3 | Q.   Investigator Hoffman, I hand you what's been marked |
| | 4 | for identification you purposes State's Exhibit 62.  Do you |
| 12:23:23 | 5 | know where that comes from? |
| | 6 | A.   Yes. |
| | 7 | Q.   And where does that come from? |
| | 8 | A.   From Pinger records. |
| | 9 | Q.   Is that from May 24th of 2022? |
| 12:23:32 | 10 | A.   It is. |
| | 11 | Q.   And does that depict the defendant using that |
| | 12 | Pinger 4545 number communicating with a 9994 number? |
| | 13 | A.   That's Allyson Bond's phone number. |
| | 14 | Q.   And do you recall during this trial Angie Barbour |
| 12:23:51 | 15 | being asked about, like, Facebook posts? |
| | 16 | A.   Yes. |
| | 17 | Q.   Something about like poop emojis ready to hit the |
| | 18 | fan? |
| | 19 | A.   Yes. |
| 12:24:00 | 20 | MR. ZELLINGER:  At this time I seek to admit |
| | 21 | State's Exhibit 62. |
| | 22 | MR. TYNDALL:  Your Honor, just subject to our |
| | 23 | pretrial motion objection. |
| | 24 | THE COURT:  Yes, sir.  In the Court's discretion, |
| 12:24:11 | 25 | I'll allow it to be admitted. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 12:24:14 | 1 | (State's Exhibit Number 62 entered into |
| | 2 | evidence.) |
| | 3 | Q.    The highlighted column that's from May 24, and |
| | 4 | that's from the defendant to Ms. Bond.  And can you read that |
| 12:24:44 | 5 | for the jury? |
| | 6 | A.    Shit ready to hit the fan.  Post still on her page |
| | 7 | or has it been deleted. |
| | 8 | Q.    As part of your investigation, you sought to find |
| | 9 | the recording that was played to DeVan Barbour, the clip of |
| 12:25:19 | 10 | Angie Barbour talking about what had happened or what |
| | 11 | transpired; is that correct? |
| | 12 | A.    Yes, I did. |
| | 13 | Q.    And was it important for you to -- I mean, |
| | 14 | eventually did you find that recording? |
| 12:25:33 | 15 | A.    I never found that recording. |
| | 16 | Q.    Did you find a recording of Angie Barbour talking |
| | 17 | about what DeVan Barbour had done? |
| | 18 | A.    I did.  I did find that recording. |
| | 19 | (State's Exhibit Number 29 marked for |
| 12:25:45 | 20 | identification.) |
| | 21 | Q.    Sir, can you turn to State's Exhibit 29 in your |
| | 22 | book. |
| | 23 | A.    Okay. |
| | 24 | MR. ZELLINGER:  Your Honor, may I approach the |
| 12:26:04 | 25 | witness? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 12:26:05 | 1 | THE COURT: Yes, sir. |
| | 2 | Q. Looking at page 2 of that exhibit, is that also an |
| | 3 | email from the defendant's email records from MSN? |
| | 4 | A. It is. |
| 12:26:19 | 5 | Q. So you did a search warrant to MSN and received |
| | 6 | these materials back? |
| | 7 | A. Yes. |
| | 8 | Q. Is that email from the defendant to Allyson Bond? |
| | 9 | A. It is. The email address is alleybond528@aol.com. |
| 12:26:34 | 10 | Q. And does that have an attachment with it? |
| | 11 | A. It did. |
| | 12 | (State's Exhibit Number 30 marked for |
| | 13 | identification.) |
| | 14 | Q. Okay. And looking at State's Exhibit 30 -- |
| 12:26:42 | 15 | MR. ZELLINGER: Your Honor, can I have one moment? |
| | 16 | THE COURT: Yes, sir. |
| | 17 | Q. State's Exhibit 30, is that the attachment that |
| | 18 | came with that email? |
| | 19 | A. It is. |
| 12:26:58 | 20 | Q. Okay. And did you listen to this? |
| | 21 | A. I did. I initialed it, and I also noted it was |
| | 22 | sent from my phone. |
| | 23 | MR. ZELLINGER: Your Honor, at this time I move to |
| | 24 | enter State's Exhibits 29 and 30. |
| 12:27:10 | 25 | THE COURT: Any objection? |

Richard Hoffman - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 12:27:11 | 1 | MR. TYNDALL: Just renew our objection from the |
| | 2 | pretrial motion, Your Honor, otherwise. |
| | 3 | THE COURT: Yes, sir. In the Court's discretion, I |
| | 4 | will allow it to be admitted. |
| 12:27:28 | 5 | (State's Exhibit Numbers 29 and 30 entered into |
| | 6 | evidence.) |
| | 7 | MR. ZELLINGER: Your Honor, can I publish State's |
| | 8 | Exhibit 29 at this time? |
| | 9 | THE COURT: Yes, sir. |
| 12:27:46 | 10 | (State's Exhibit Number 29 published to the |
| | 11 | jury.) |
| | 12 | Q. So this is the document you received -- or part of |
| | 13 | the documents that you received from MSN? |
| | 14 | A. It was in the sent files, yes. |
| 12:28:10 | 15 | Q. Okay. And MSN, does that stand for Microsoft |
| | 16 | Network? |
| | 17 | A. Yes. |
| | 18 | Q. So that if you use Microsoft email, you've got an |
| | 19 | msn.com email address? |
| 12:28:18 | 20 | A. Yes. |
| | 21 | Q. This is ronjon1983@msn.com? |
| | 22 | A. Yes. |
| | 23 | Q. And this is an email from ronjon1983@msn.com to |
| | 24 | alleybond528@aol.com. |
| 12:28:27 | 25 | A. Yes. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter