Richard Hoffman - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 12:28:29 | 1 | Q.   And what is the date of this email? |
| | 2 | A.   It is April the 23rd of 2020. |
| | 3 | Q.   So to be clear, that's two days before the |
| | 4 | defendant's alleged event with DeVan Barbour? |
| 12:28:41 | 5 | A.   Yes. |
| | 6 | Q.   And there's an attachment to this email; is that |
| | 7 | correct? |
| | 8 | A.   Correct. |
| | 9 | Q.   And that attachment is titled ronjon4.mp3? |
| 12:28:52 | 10 | A.   Yes. |
| | 11 | Q.   And that attachment is on State's Exhibit 30? |
| | 12 | A.   Yes, it is. |
| | 13 | MR. ZELLINGER:   Your Honor, may I play State's |
| | 14 | Exhibit 30 at this time? |
| 12:29:02 | 15 | THE COURT:   Yes, sir. |
| | 16 | (State's Exhibit Number 30 played for the |
| | 17 | jury.) |
| | 18 | Q.   And is this the attachment to that email that the |
| | 19 | defendant sent on April 23rd? |
| 12:29:31 | 20 | A.   It is. |
| | 21 | Q.   It's hard to hear because there's music? |
| | 22 | A.   Correct. |
| | 23 | Q.   To back it up a little bit 18 seconds.  Can you |
| | 24 | make out -- do you hear Ms. Barbour's voice on there? |
| 12:30:02 | 25 | A.   Yes.  I listened to it several times. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Richard Hoffman - Direct by Mr. Zellinger

| 12:30:12 | 1 | (State's Exhibit Number 30 played for the |
| | 2 | jury.) |
| | 3 | MR. ZELLINGER: Your Honor, I might try to play |
| | 4 | this over my speaker. |
| 12:31:30 | 5 | Q. So in that recording, can you hear Ms. Barbour |
| | 6 | talking about an interaction with DeVan Barbour? |
| | 7 | A. Yes. |
| | 8 | Q. Okay. And at one point she says he's drinking; is |
| | 9 | that correct? |
| 12:31:39 | 10 | A. Correct. |
| | 11 | Q. Okay. And at one point she said, I was flattered? |
| | 12 | A. She did. |
| | 13 | Q. It's kind of hard to hear? |
| | 14 | A. There's background music. |
| 12:31:47 | 15 | Q. Just to be clear, that clip is sent via -- from the |
| | 16 | defendant's email to Allie Bond's email on April 23rd, two |
| | 17 | days before this meeting allegedly occurred? |
| | 18 | A. It was. |
| | 19 | Q. And on that same day this jury just saw a Pinger |
| 12:32:14 | 20 | message that said, listen to the audio and tell me if it |
| | 21 | sounds altered. |
| | 22 | A. Yes. I read it to them earlier. |
| | 23 | MR. ZELLINGER: Your Honor, may I approach the |
| | 24 | witness? |
| 12:32:37 | 25 | THE COURT: Yes, sir. |

| | | |
|---|---|---|
| 12:32:37 | 1 | (State's Exhibit Number 34 marked for |
| | 2 | identification.) |
| | 3 | Q. Investigator Hoffman, I hand you what's been marked |
| | 4 | for identification purposes State's Exhibit 34. Where does |
| 12:32:55 | 5 | this document come from? |
| | 6 | A. From the Pinger records as well. |
| | 7 | Q. Are these some Pinger records that are put on a |
| | 8 | separate page; is that correct? |
| | 9 | A. They are. |
| 12:33:06 | 10 | Q. Okay. And these are from May 10th of 2022 and then |
| | 11 | May 23rd of 2022? |
| | 12 | A. Yes. |
| | 13 | Q. Does it depict the defendant's Pinger number 4545 |
| | 14 | talking to a different Pinger number? |
| 12:33:21 | 15 | A. Yes. |
| | 16 | Q. And that different Pinger number, is that |
| | 17 | 919-651-3403? |
| | 18 | A. It is. |
| | 19 | Q. And that Pinger number, were you able to identify |
| 12:33:32 | 20 | who that Pinger number belongs to? |
| | 21 | A. Yes. I believe so. |
| | 22 | Q. Were you able to discern that based on conversation |
| | 23 | between those two numbers and pictures exchanged? |
| | 24 | A. Yes. And also Mr. Johnson's Pinger number refers |
| 12:33:49 | 25 | to the recipient as Carolyn. |

| | | |
|---|---|---|
| 12:33:53 | 1 | Q. That 3403, is that Carolyn Rotondaro? |
| | 2 | A. Carolyn Rotondaro. |
| | 3 | MR. ZELLINGER: Your Honor, at this time I seek to |
| | 4 | admit State's Exhibit 34. |
| 12:34:01 | 5 | MR. TYNDALL: Your Honor, just subject to our |
| | 6 | pretrial -- objection to it based on the pretrial motion. |
| | 7 | THE COURT: So noted, and I'll allow it to be |
| | 8 | admitted. |
| | 9 | (State's Exhibit Number 34 entered into |
| 12:34:10 | 10 | evidence.) |
| | 11 | MR. ZELLINGER: Your Honor, may I publish State's |
| | 12 | Exhibit 34? |
| | 13 | THE COURT: Before you do that, can you come up |
| | 14 | here just a minute. |
| 12:35:13 | 15 | (Sidebar.) |
| | 16 | MR. ZELLINGER: Your Honor, can I publish State's |
| | 17 | Exhibit Number 34? |
| | 18 | THE COURT: Yes, sir. |
| | 19 | (State's Exhibit Number 34 published to the |
| 12:14:01 | 20 | jury.) |
| | 21 | Q. And this is chronological from the bottom going up. |
| | 22 | So this bottom message is defendant's number 4545 |
| | 23 | to this 3403 number that you believe to be Carolyn Rotondaro? |
| | 24 | A. I have high confidence that's her number. |
| 12:35:40 | 25 | Q. That's from May 10th of 2022; is that correct? |

| | | |
|---|---|---|
| 12:35:41 | 1 | A. Yes. |
| | 2 | Q. Can you read that to the jury? |
| | 3 | A. I love you. When you get to school tomorrow try to |
| | 4 | find Owen Phillips' kids and where they go to school. |
| 12:35:52 | 5 | Q. And then the next day or later that day, the top |
| | 6 | line of that, is there a message back from that number, the |
| | 7 | 3403 number, that you believe to be Carolyn Rotondaro to the |
| | 8 | defendant? |
| | 9 | A. Yes. |
| 12:36:05 | 10 | Q. What does it say? |
| | 11 | A. Got what you needed, love. |
| | 12 | Q. And then on May 23rd the entry is 011928. Is there |
| | 13 | a message from who you believe to be Ms. Rotondaro to the |
| | 14 | defendant? |
| 12:36:24 | 15 | A. Yes. It would have occurred on the 22nd at 9:20 |
| | 16 | p.m., and it states: What is Owen's last name. |
| | 17 | Q. And then the next message is allegedly |
| | 18 | Ms. Rotondaro saying: I'm fading talking to you. And then |
| | 19 | the defendant responds: What. Would this have been at 10:02 |
| 12:36:48 | 20 | p.m.? |
| | 21 | A. Correct, on the 22nd. |
| | 22 | Q. Okay. And what does the defendant respond? |
| | 23 | A. Phillips. |
| | 24 | Q. And as part of this you are investigating whether |
| 12:36:59 | 25 | the defendant sought to move Owen Phillips' children from |

| | | |
|---|---|---|
| 12:37:05 | 1 | their school at Clayton; is that correct? |
| | 2 | A. Yes. |
| | 3 | Q. And this is an interaction between the defendant |
| | 4 | and what you believe to be Ms. Rotondaro potentially involving |
| 12:37:17 | 5 | that; is that accurate? |
| | 6 | A. Yes. And I know she works at the central office |
| | 7 | and has access to those records. |
| | 8 | MR. ZELLINGER: Your Honor, this might be an |
| | 9 | appropriate time. |
| 12:37:27 | 10 | THE COURT: Ladies and gentlemen, we're going to |
| | 11 | take our lunch recess until 2. Leave your notes in at the |
| | 12 | seat. We'll see you back at 2. |
| | 13 | I know you heard the rule several times. Please |
| | 14 | remember, please don't talk about this case with each other. |
| 12:37:39 | 15 | If you meet with somebody over lunch, don't talk with them or |
| | 16 | communicate in any way to any of the parties connected to it. |
| | 17 | Thank you very much. See you at 2:00. |
| | 18 | (Jury exits.) |
| | 19 | THE COURT: Before we break, anything to get on the |
| 12:38:32 | 20 | record? |
| | 21 | MR. ZELLINGER: Not from the State, Your Honor. |
| | 22 | THE COURT: Mr. Tyndall? |
| | 23 | MR. TYNDALL: No, Your Honor, not at this time. |
| | 24 | THE COURT: We'll be at recess until 2. |
| 12:38:43 | 25 | If I can see the lawyers in the back for a couple |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 12:38:45 | 1 | of minutes, if down mind. |
| | 2 | (Lunch recess.) |
| | 3 | THE COURT: We have our jury. Ready to bring them |
| | 4 | back in? |
| 14:01:25 | 5 | MR. TYNDALL: We were just exchanging some |
| | 6 | documents. |
| | 7 | MR. ZELLINGER: I think we are ready to proceed. |
| | 8 | THE COURT: All right. If we can get them on in. |
| | 9 | (Jury enters.) |
| 14:02:47 | 10 | THE COURT: Everybody, welcome back. |
| | 11 | Mr. Zellinger, whenever you are ready. |
| | 12 | MR. ZELLINGER: Thank you, Your Honor. |
| | 13 | Q. Investigator Hoffman, when we left off, we heard a |
| | 14 | recording that was Ms. Barbour's voice? |
| 14:03:03 | 15 | A. Yes. |
| | 16 | Q. That was from an email that the defendant allegedly |
| | 17 | sent Ms. Bond on April 23rd, two days before this meeting? |
| | 18 | A. That's correct. |
| | 19 | Q. And in searching -- in your investigation, you had |
| 14:03:17 | 20 | this information from DeVan Barbour that he had got in the |
| | 21 | car, been given these earbuds and played some kind of |
| | 22 | recording; is that correct? |
| | 23 | A. Correct. |
| | 24 | Q. And that recording was -- part of it was the |
| 14:03:27 | 25 | defendant talking and part of it was Ms. Barbour talking. |

| 14:03:31 | 1 | A. Yes. |
| | 2 | Q. And you were trying to find that recording; is that |
| | 3 | accurate? |
| | 4 | A. Yes. |
| 14:03:37 | 5 | Q. Before we get to that, do you recall when |
| | 6 | Mr. Barbour testified the defendant asked him questions about |
| | 7 | a phone number? |
| | 8 | A. Yes. |
| | 9 | MR. ZELLINGER: Your Honor, may I approach the |
| 14:03:49 | 10 | witness? |
| | 11 | THE COURT: Yes, sir. |
| | 12 | Q. I hand you what's been marked Defendant's |
| | 13 | Exhibit 3. And do you remember some questions about the |
| | 14 | highlighted phone number there? |
| 14:03:57 | 15 | A. Yes, I do. |
| | 16 | Q. That highlighted phone number, did you take that |
| | 17 | phone number after that and enter it into a law enforcement |
| | 18 | database or law enforcement system? |
| | 19 | A. I did. I entered it in CLEAR to figure out who the |
| 14:04:14 | 20 | subscriber would be -- the carrier would be. Excuse me, not |
| | 21 | the subscriber, the carrier. |
| | 22 | Q. Who the carrier would be? |
| | 23 | A. Yes. |
| | 24 | Q. Did you then begin to do research some into a |
| 14:04:25 | 25 | company? |

| 14:04:25 | 1 | A. I did. |

14:04:25   1        A.    I did.

          2        Q.    And what company was that?

          3        A.    Telneyx, T-E-L-N-E-Y-X.

          4        Q.    And what does Telneyx provide?

14:04:32   5        A.    It provides phone numbers.

          6        Q.    And that company -- can you buy a phone number from

          7   that company?

          8        A.    Yes.  You purchase phone numbers to use.

          9        Q.    And so can you explain to the jury how that works?

14:04:47  10   I mean, so you -- does it give you a list of option numbers

         11   that you can buy?

         12        A.    It does.  So it allows you to select area codes

         13   that are not your area code and also other countries so that

         14   you can select a number that is local to your area outside of

14:05:01  15   wherever you are.

         16        Q.    And then can you call or text people from that

         17   number?

         18        A.    Yes, you can.

         19        Q.    Mr. Barbour was asked about getting a text message

14:05:19  20   from an out of state number; is that correct?

         21        A.    Yes.

         22        Q.    That was on May 9th of 2022?

         23        A.    He testified that he received one on April the

         24   13th, and then he testified that this record was accurate, and

14:05:29  25   he got one on the 9th.

14:05:32  1          Q.   Okay.  And the number you ran through the -- it's

        2    called CLEAR; is that correct?

        3          A.   CLEAR.

        4          Q.   That's just to get you the provider?

14:05:48  5          A.   So in law enforcement you're going to have to serve

        6    somebody with records or legal process and you need to know

        7    what company it is and that was what was available.

        8          Q.   Okay.  And so after getting information, you

        9    reached out to Telneyx, which was company that you can

14:06:07 10    essentially select a phone number from?

       11          A.   Yes.

       12          Q.   And so if you use that service, I could get a phone

       13    number with like a 212 area code or 313 or someplace else in

       14    the country?

14:06:21 15          A.   Yes.  You can get a Canadian phone number as well.

       16          Q.   And you can use that to contact someone

       17    conceivably?

       18          A.   Yes.

       19          Q.   Before we get to the next exhibit, one other

14:06:50 20    question, Investigator Hoffman.  There was some questioning

       21    about Angie Barbour and a blog from 2024; do you recall that?

       22          A.   I recall the questions.

       23          Q.   Without getting into it, there were media reports

       24    about this case after the defendant was charged in 2023; is

14:07:11 25    that correct?

| | | |
|---|---|---|
| 14:07:11 | 1 | A. Yes. There were search warrants that were released |
| | 2 | after the seal expired and they were made public, and there |
| | 3 | were media reports about the contents of those search |
| | 4 | warrants. |
| 14:07:23 | 5 | Q. And those became public well before Ms. Barbour |
| | 6 | allegedly talked to a blog; is that correct? |
| | 7 | A. At least a year afterward -- or before. |
| | 8 | MR. ZELLINGER: Your Honor, may I approach the |
| | 9 | witness? |
| 14:07:39 | 10 | THE COURT: Yes, sir. |
| | 11 | MR. ZELLINGER: May I have a minute? |
| | 12 | THE COURT: Yes, sir. |
| | 13 | Q. You mentioned you did a search warrant for Apple |
| | 14 | records; is that correct? |
| 14:08:21 | 15 | A. Yes. |
| | 16 | Q. And you got a whole bunch of data from Apple; is |
| | 17 | that right? |
| | 18 | A. We get the entire account. |
| | 19 | Q. So then you have to sift through it to see if |
| 14:08:29 | 20 | there's anything relevant? |
| | 21 | A. It comes in categories and you go through them. |
| | 22 | Q. And when you went through that, did you find a |
| | 23 | recording in the defendant's Apple records? |
| | 24 | A. Yes. And in the section called media, there was a |
| 14:08:41 | 25 | subsection called audio, and this is where I found recordings. |

| 14:08:47 | 1 | Q. Okay. And was it the file -- is it the source name |
| | 2 | ronjon1983@msn.com? |
| | 3 | A. Yes. That's the Apple ID for the iCloud account. |
| | 4 | Q. Okay. And then there's a whole bunch of other |
| 14:09:01 | 5 | information/library/recording? |
| | 6 | A. Yes. |
| | 7 | Q. And then 20220424? |
| | 8 | A. Yes. |
| | 9 | (State's Exhibit Number 30 marked for |
| 14:09:09 | 10 | identification.) |
| | 11 | Q. Okay. And so does this exhibit illustrate the |
| | 12 | metadata that was associated with that recording? |
| | 13 | A. It does. |
| | 14 | Q. That recording, is that State's Exhibit 30? |
| 14:09:21 | 15 | A. It is. |
| | 16 | Q. Does that have a file name on there? |
| | 17 | A. It does. |
| | 18 | MR. ZELLINGER: And can I have one moment, Your |
| | 19 | Honor? |
| 14:09:33 | 20 | THE COURT: Yes, sir. |
| | 21 | (State's Exhibit Numbers 26 and 27 marked for |
| | 22 | identification.) |
| | 23 | Q. Exhibit 27, does that have the file number that |
| | 24 | matches the metadata in State's Exhibit 26? |
| 14:10:26 | 25 | A. It does. |

| 14:10:27 | 1 | Q. | Is that 20220424, 143454? |

Q.   Is that 20220424, 143454?

A.   Yes.

Q.   .m4a?

A.   Yes.

14:10:35   Q.   And that matches?

A.   The metadata on the file.

Q.   In State's Exhibit 26?

A.   Yes.

MR. ZELLINGER:  Your Honor, I seek to enter 26 and

14:10:44   27 at this time.

MR. TYNDALL:  We just renew our objection based on

the pretrial motion.

THE COURT:  Yes, sir.  So noted.  In the Court's

discretion, I'll allow it to be admitted.

14:10:55        (State's Exhibit Number 26 and 27 entered into

evidence.)

MR. ZELLINGER:  Your Honor, may I publish State's

Exhibit 26 at this time?

THE COURT:  Yes, sir.

14:12:14   MR. ZELLINGER:  Your Honor, I'll publish State's

Exhibit 26 at this time.  I apologize.

Q.   Investigator Hoffman, is that State's Exhibit 26 on

the screen?

A.   Yes.

14:12:33   Q.   Does it specifically have a file name as 20220424?

14:10:27  1    Q.   Is that 20220424, 143454?

2    A.   Yes.

3    Q.   .m4a?

4    A.   Yes.

14:10:35  5    Q.   And that matches?

6    A.   The metadata on the file.

7    Q.   In State's Exhibit 26?

8    A.   Yes.

9         MR. ZELLINGER:  Your Honor, I seek to enter 26 and

14:10:44  10   27 at this time.

11        MR. TYNDALL:  We just renew our objection based on

12   the pretrial motion.

13        THE COURT:  Yes, sir.  So noted.  In the Court's

14   discretion, I'll allow it to be admitted.

14:10:55  15        (State's Exhibit Number 26 and 27 entered into

16        evidence.)

17        MR. ZELLINGER:  Your Honor, may I publish State's

18   Exhibit 26 at this time?

19        THE COURT:  Yes, sir.

14:12:14  20        MR. ZELLINGER:  Your Honor, I'll publish State's

21   Exhibit 26 at this time.  I apologize.

22   Q.   Investigator Hoffman, is that State's Exhibit 26 on

23   the screen?

24   A.   Yes.

14:12:33  25   Q.   Does it specifically have a file name as 20220424?

| | | |
|---|---|---|
| 14:12:41 | 1 | A.    It does. |
| | 2 | Q.    And so over here is there more information about |
| | 3 | the created date time for that file? |
| | 4 | A.    Yes.  It shows you the date that it was created was |
| 14:12:53 | 5 | 4/24/2222, the time UTC, which would be after you converted |
| | 6 | it, it shows 10:34 p.m., and that would make it 6:34 p.m. |
| | 7 | Q.    Okay.  So 6:34 p.m. on April 24th; is that |
| | 8 | accurate? |
| | 9 | A.    Yes. |
| 14:13:08 | 10 | Q.    That is the day before the defendant and the DeVan |
| | 11 | Barbour were alleged to meet? |
| | 12 | A.    Yes. |
| | 13 | Q.    And even the file name is 20220424 and then 1434; |
| | 14 | is that correct? |
| 14:13:23 | 15 | A.    Yes.  That's correct.  It's the date. |
| | 16 | Q.    And so the created access last modified date, are |
| | 17 | those all in close proximity to that time of the day on |
| | 18 | April 24th? |
| | 19 | A.    It is.  It looks like it was last accessed at 11:12 |
| 14:13:41 | 20 | p.m. on April the 24th. |
| | 21 | Q.    And this recording, this is from the defendant's |
| | 22 | Apple records; is that correct? |
| | 23 | A.    It is correct. |
| | 24 | Q.    And so when you received these records from Apple |
| 14:13:54 | 25 | for the defendant's ronjon account, this is what you got? |

Richard Hoffman - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 14:13:58 | 1 | A. Yes. |
| | 2 | MR. ZELLINGER: Your Honor, at this time may I |
| | 3 | publish State's Exhibit 27? |
| | 4 | THE COURT: Yes, sir. |
| 14:14:09 | 5 | (State's Exhibit Number 27 published to the |
| | 6 | jury.) |
| | 7 | MR. ZELLINGER: Can I have one moment, Your Honor? |
| | 8 | THE COURT: Yes, sir. |
| | 9 | (Recording played to the jury.) |
| 14:15:31 | 10 | Q. That's Angie Barbour talking about her interaction |
| | 11 | with DeVan Barbour; is that correct? |
| | 12 | A. It is. She confirmed it when I interviewed her. |
| | 13 | Q. And she recognized her voice? |
| | 14 | A. She did. |
| 14:15:40 | 15 | Q. Is that the recording that you started to play for |
| | 16 | DeVan Barbour? |
| | 17 | A. Yes. |
| | 18 | Q. That's a recording that he said he recognized? |
| | 19 | A. He said he recognized it when I began to play it |
| 14:15:51 | 20 | and then didn't want to listen to any more of it. |
| | 21 | Q. He stopped you from playing it? |
| | 22 | A. Yes. |
| | 23 | Q. And that recording you found on the defendant's |
| | 24 | Apple records having been created on April 24th of 2022? |
| 14:16:08 | 25 | A. That's correct. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Richard Hoffman - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 14:16:08 | 1 | Q. The evening before they met on April 25th? |
| | 2 | A. Yes. |
| | 3 | MR. ZELLINGER: Nothing further, Your Honor. |
| | 4 | THE COURT: Mr. Tyndall. |
| 14:16:23 | 5 | CROSS-EXAMINATION BY MR. TYNDALL: |
| | 6 | Q. You mentioned a phone that you saw at the Clayton |
| | 7 | Fitness; is that right? |
| | 8 | A. Yes. |
| | 9 | Q. And you describe that as an iPhone SE. |
| 14:16:35 | 10 | A. I did. |
| | 11 | Q. In your search warrant you describe there was an |
| | 12 | iPhone SE missing; is that correct? |
| | 13 | A. I did. |
| | 14 | Q. You did not -- you had the actual serial number and |
| 14:16:46 | 15 | model. You didn't describe any color or anything like that? |
| | 16 | A. I didn't. That search warrant wasn't planned, and |
| | 17 | it was as quickly as I could write it. Literally things were |
| | 18 | changing as I was writing it. I was getting contacted by |
| | 19 | Detective Brantley who was in a hurry. |
| 14:17:05 | 20 | Q. One thing you know from 30 years as a Raleigh |
| | 21 | police officer in doing search warrants is when you see |
| | 22 | something in plain view -- and that's what we're talking about |
| | 23 | here; right? Mr. Dustin Parks opened the door and you saw a |
| | 24 | phone in plain view; correct? |
| 14:17:24 | 25 | A. I did see it in plain view, but it was behind a |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Richard Hoffman - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 14:17:26 | 1 | locked door that Mr. Parks opened after explaining that he |
| | 2 | opened, and I didn't feel like -- I felt like Mr. Johnson had |
| | 3 | a reasonable expectation of privacy in a locked door. |
| | 4 | Q.   So there was nothing stopping you, since it was in |
| 14:17:43 | 5 | plain view, from taking a little photo? |
| | 6 | A.   Physically, no.  Legally, yes. |
| | 7 | Q.   Well, that's your opinion legally, you can't take a |
| | 8 | photo of something in plain view? |
| | 9 | MR. ZELLINGER:  Objection. |
| 14:17:54 | 10 | THE COURT:  I'll let him answer as to what his |
| | 11 | opinion was. |
| | 12 | THE WITNESS:  I can take a photo.  I didn't want to |
| | 13 | take a photo, because I wanted to get a search warrant.  And |
| | 14 | by taking a photo, I would have drawn attention to the very |
| 14:18:06 | 15 | item I was trying to preserve at that location. |
| | 16 | Q.   Was there anything that stopped you when you did |
| | 17 | that search warrant of putting the color of the phone in your |
| | 18 | search warrant? |
| | 19 | A.   No.  I didn't do a good job.  I did it as quickly |
| 14:18:17 | 20 | as I could.  I could have included the color. |
| | 21 | Q.   Or describing the color of the phone in your search |
| | 22 | warrant? |
| | 23 | A.   That would be writing down the color. |
| | 24 | Q.   Now, when left, you also know after 30 years that |
| 14:18:30 | 25 | instead of asking an officer just to sit outside and watch |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 14:18:34 | 1 | that you could have posted him at the door and secured the |
| | 2 | scene? |
| | 3 | A.    So when I asked that officer to go out there, I did |
| | 4 | not expect Mr. Johnson to come there because the property had |
| 14:18:46 | 5 | been described as abandoned, that he was not using it.  So I |
| | 6 | didn't expect him to come.  He had no reason to be there.  I |
| | 7 | was told he hadn't been there for months.  I put an officer |
| | 8 | there to make sure no one was accessing it, and I gave him a |
| | 9 | description of Mr. Johnson's car hoping that he wouldn't come, |
| 14:19:03 | 10 | but being a pessimist... |
| | 11 | Q.    Was there anything that stopped you from having |
| | 12 | that officer go inside and stand by the door so make sure |
| | 13 | nobody could exit? |
| | 14 | A.    There wasn't anything stopping me from asking; |
| 14:19:15 | 15 | however, I can tell you the officer would not have wanted to |
| | 16 | do that. |
| | 17 | Q.    You're saying an officer wouldn't have wanted to do |
| | 18 | that? |
| | 19 | A.    There isn't anybody that wanted to participate in |
| 14:19:24 | 20 | this investigation. |
| | 21 | Q.    The officer did participate in the investigation; |
| | 22 | didn't he? |
| | 23 | A.    He did.  And he told me at 2:00 that he had a |
| | 24 | meeting that he had to be to and he could only help me until |
| 14:19:34 | 25 | 2:00. |

Richard Hoffman - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 14:19:35 | 1 | Q. When you mentioned this gym, it's about -- it's in |
| | 2 | Clayton; is that right? |
| | 3 | A. It is in the city limits of Clayton. |
| | 4 | Q. Mr. Johnson's house is in Clayton? |
| 14:19:46 | 5 | A. It is. |
| | 6 | Q. His work is about 15 minutes away; is that right? |
| | 7 | A. Absolutely correct. |
| | 8 | Q. The video shows that it was nearly an hour later |
| | 9 | when he went back to his office. |
| 14:19:57 | 10 | A. Yes. |
| | 11 | Q. Now, you mentioned to this jury that you then |
| | 12 | searched his car; is that right? |
| | 13 | A. I did. |
| | 14 | Q. And you said you didn't you find that iPhone; is |
| 14:20:06 | 15 | that correct? |
| | 16 | A. I did not find the iPhone that I saw. |
| | 17 | Q. You found an iPhone SE; didn't you? |
| | 18 | A. I wrote iPhone SE on the inventory, and that's a |
| | 19 | clerical error I made. I found an iPhone C. I was writing. |
| 14:20:19 | 20 | It was raining. I'm trying to hurry to the gym, and so I |
| | 21 | really -- on that inventory I wrote iPhone SE. |
| | 22 | Q. On your inventory you said you found an iPhone SE. |
| | 23 | A. I did, yes, sir. |
| | 24 | Q. And now you're telling them you can't find an |
| 14:20:36 | 25 | iPhone SE? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 14:20:37 | 1 | A. I know I didn't find an iPhone SE. |
| | 2 | Q. I want to talk to you a little bit -- you mentioned |
| | 3 | this investigation, Investigator Hoffman. When you start an |
| | 4 | investigation, your objective is to find the truth; isn't that |
| 14:20:52 | 5 | right? |
| | 6 | A. Yes. |
| | 7 | Q. And finding the truth requires you to consider sort |
| | 8 | of all sides; is that right? |
| | 9 | A. That's generally correct. |
| 14:21:01 | 10 | Q. Not just to take one path and go down that path; |
| | 11 | isn't that fair to say? |
| | 12 | A. That's fair. |
| | 13 | Q. Now, you mentioned that you began this |
| | 14 | investigation in when, early October did you say? |
| 14:21:12 | 15 | A. I believe it was October. The first week of |
| | 16 | October. |
| | 17 | Q. So by the time you interviewed Mr. Barbour on |
| | 18 | November 1st, it had only been about three weeks. |
| | 19 | A. That's correct. |
| 14:21:35 | 20 | Q. You said no one wanted to participate, but your |
| | 21 | boss, Ms. Doyle, wanted to participate? |
| | 22 | A. My boss? |
| | 23 | Q. Yes. |
| | 24 | A. She doesn't do investigations. |
| 14:21:48 | 25 | Q. You're hired by Ms. Doyle to do the investigation; |

| | | |
|---|---|---|
| 14:21:50 | 1 | is that correct? |
| | 2 |      A.   I'm a state employee, and she is my boss.  She's |
| | 3 | the hiring authority for this district. |
| | 4 |      Q.   And you report back to her; don't you? |
| 14:21:56 | 5 |      A.   Yes.  She's my supervisor. |
| | 6 |      Q.   She makes decisions about the investigation; isn't |
| | 7 | that right? |
| | 8 |      A.   She makes prosecutorial decisions on every case |
| | 9 | whether or not it's prosecuted, just like every other |
| 14:22:07 | 10 | prosecutor in this county. |
| | 11 |      Q.   You consulted with her throughout the |
| | 12 | investigation; didn't you? |
| | 13 |      A.   I consulted her at key times, yes. |
| | 14 |      Q.   Didn't she tell you at one point it was about time |
| 14:22:16 | 15 | someone took Ronald Johnson down? |
| | 16 |      MR. ZELLINGER:  Objection, Your Honor. |
| | 17 |      THE COURT:  Can you guys approach a minute, please. |
| | 18 |          (Sidebar.) |
| | 19 |      THE COURT:  For the record, the Court will note the |
| 14:23:36 | 20 | objection.  I'll overrule. |
| | 21 |      Mr. Tyndall, I'll let you reask that question, and |
| | 22 | the witness can answer if he can. |
| | 23 |      Q.   In your conversations with Ms. Doyle, did she say |
| | 24 | it was about time somebody took Mr. Johnson down? |
| 14:23:49 | 25 |      A.   She did not say that to me. |

14:23:51  1      Q.   Now, when you started conducting this

2   investigation, though, you did consult with Ms. Doyle; is that

3   fair to say?

4      A.   I did, yes, sir.

14:23:58  5      Q.   In fact, you mentioned in your conversations with

6   DeVan Barbour that he had probably talked to Ms. Doyle; is

7   that right?

8      A.   I would assume so.

9      Q.   Because they were political, they were both

14:24:10 10   involved in politics in the community?

11      A.   She knows him, has a phone number for him, and I

12   needed to contact him.  And she's a person of trust in the

13   community, and so I thought that would be a good way to get

14   him to come in the office and talk to me about something he

14:24:24 15   doesn't want to talk about.

16      Q.   Now, you mentioned that you did a number of search

17   warrants in this case; is that right?

18      A.   Yes, sir.

19      Q.   You also mentioned some of the things you couldn't

14:24:33 20   get, like FaceTime; is that right?

21      A.   That's correct.

22      Q.   Now, if I pull out my phone and FaceTime you -- you

23   got an apple iPhone; don't you?

24      A.   Yes, sir, I do.

14:24:44 25      Q.   And if I FaceTime you right now, it will record in

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Richard Hoffman - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 14:24:47 | 1 | my phone; won't it? |
| | 2 | A. I'm sorry? |
| | 3 | Q. It will show that I FaceTimed you in my phone. |
| | 4 | A. Yes. In your log registry. |
| 14:24:55 | 5 | Q. In my log registry. And it will stay there; won't |
| | 6 | it? |
| | 7 | A. It will stay there for a while. |
| | 8 | Q. Now, as far as the FaceTime messages between |
| | 9 | Ms. Barbour and Mr. Barbour or whether they happened or the |
| 14:25:12 | 10 | date that it happened, that would be recorded in some phone; |
| | 11 | wouldn't it? |
| | 12 | A. FaceTime is not messages. I think you're talking |
| | 13 | about the videos. There would be a register for the log as |
| | 14 | long as the log exists. |
| 14:25:24 | 15 | Q. So let's just break it down for the jury. If it's |
| | 16 | true that DeVan Barbour one night FaceTimed Ms. Barbour, it |
| | 17 | would be recorded in the registry of phone; isn't that right? |
| | 18 | A. I believe so, but I don't know how long that would |
| | 19 | be, and this is like six months later. |
| 14:25:46 | 20 | Q. Well, the way to know that is to ask them; right, |
| | 21 | Investigator Hoffman? |
| | 22 | A. Whether or not the FaceTime interaction occurred |
| | 23 | was not really part of what I was investigating. |
| | 24 | Q. You knew when you talked to DeVan Barbour that his |
| 14:26:00 | 25 | credibility was important; didn't you, Investigator Hoffman? |

| | | |
|---|---|---|
| 14:26:03 | 1 | A. I think everybody's credibility is important. |
| | 2 | Q. Didn't you mention to him -- didn't you mention |
| | 3 | earlier to this jury that it's important to corroborate your |
| | 4 | investigation? |
| 14:26:12 | 5 | A. To the extent it's possible, yes. |
| | 6 | Q. And as far as you know, Mr. Barbour when he walked |
| | 7 | into your office to interview had his phone with him? |
| | 8 | A. He had a phone with him, yes. |
| | 9 | Q. Did you ask if you can scroll through it to see if |
| 14:26:29 | 10 | he was telling the truth? |
| | 11 | A. I did not ask if I could go through his phone. |
| | 12 | Q. But do you sometimes ask people to get their |
| | 13 | consent to look at phones and things like that; don't you, |
| | 14 | Investigator Hoffman? |
| 14:26:40 | 15 | A. I have. |
| | 16 | Q. And that either tells you they are telling the |
| | 17 | truth or they are not telling the truth; isn't that fair |
| | 18 | enough, or you can't figure it out? |
| | 19 | A. Correct. Sometimes they are telling you the truth, |
| 14:26:52 | 20 | but they don't know whether it's inaccurate and you can help |
| | 21 | them figure it out. |
| | 22 | Q. Right. And that's one thing about these devices is |
| | 23 | they are important to us to help us figure out what |
| | 24 | information is there. |
| 14:27:05 | 25 | A. If it's relevant to the investigation, yes. |

| | | |
|---|---|---|
| 14:27:08 | 1 | Q.    Certainly Mr. Barbour's credibility was relevant to |
| | 2 | the investigation. |
| | 3 | A.    I don't think he'd be lying about something that he |
| | 4 | didn't even want to talk about. |
| 14:27:16 | 5 | Q.    Well, so when he talked to you, he told you |
| | 6 | essentially that this FaceTime thing did not happen. |
| | 7 | A.    No, he did not.  He said he can't imagine a time, |
| | 8 | and that's what I recall him saying. |
| | 9 | Q.    Did you follow up and say, if you can't imagine a |
| 14:27:30 | 10 | time, does that mean you didn't do it? |
| | 11 | A.    I didn't ask him, because I felt like if I focused |
| | 12 | on whether or not he had this embarrassing interaction that he |
| | 13 | wouldn't talk to me about anything else. |
| | 14 | Q.    Now, Ms. Barbour, when you talked to her, she said |
| 14:27:46 | 15 | it absolutely happened; right? |
| | 16 | A.    She did. |
| | 17 | Q.    So you've got two conflicting stories there; don't |
| | 18 | you, Investigator Hoffman? |
| | 19 | A.    You do about this interaction. |
| 14:27:55 | 20 | Q.    You do about the interaction, which is -- it's |
| | 21 | important to this case; isn't it, Investigator Hoffman? |
| | 22 | A.    It's the catalyst of the case, but I don't think it |
| | 23 | is going to be critical in determining ultimately what happens |
| | 24 | in this case. |
| 14:28:11 | 25 | Q.    One thing you know, Investigator Hoffman, sometimes |

| 14:28:14 | 1 | the path of least resistance is important in an allegation; |
| | 2 | isn't that right? |
| | 3 | A.    I think it's not the path of least resistence, but |
| | 4 | the reality is you have to be efficient because this isn't the |
| 14:28:25 | 5 | only case that you're working. |
| | 6 | Q.    But it's a little easier, isn't it, to get |
| | 7 | information from people who cooperate with an investigation |
| | 8 | sometimes than people you are investigating; is that fair |
| | 9 | enough to say? |
| 14:28:39 | 10 | A.    Yes. |
| | 11 | Q.    And a lot of times people who -- let's say a person |
| | 12 | calls you to their house and there's been an invasion of their |
| | 13 | home, a breaking and entering or something, I mean that person |
| | 14 | is usually cooperative letting the police come in and take |
| 14:28:53 | 15 | pictures and do things like that; isn't that fair? |
| | 16 | A.    Yes, sir. |
| | 17 | Q.    And if it was relevant in a case where a person is |
| | 18 | the victim, they may just let you look at their device; isn't |
| | 19 | that right? |
| 14:29:04 | 20 | A.    I think that is correct, but every case is kind of |
| | 21 | different. |
| | 22 | Q.    You didn't ask Mr. Barbour to look at any of that |
| | 23 | information; did you? |
| | 24 | A.    I didn't ask to look through his phone, no. |
| 14:29:16 | 25 | Q.    Well, and it's actually some question in this case |

Richard Hoffman - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 14:29:20 | 1 | about whether -- you know Mr. Barbour testified that this |
| | 2 | event happened in July; is that right? |
| | 3 | A.   Yes.   Correct.   She did say that. |
| | 4 | Q.   July of 2021.   And the State's presented some |
| 14:29:36 | 5 | evidence that they had a Snapchat encounter in October of |
| | 6 | 2021; isn't that right? |
| | 7 | A.   That's correct. |
| | 8 | Q.   Now, while Snapchat doesn't have records, people |
| | 9 | sometimes screenshot Snapchats; don't they? |
| 14:29:52 | 10 | A.   So Snapchat, if you try screen record it, it |
| | 11 | notifies the other user.   People will often use a second phone |
| | 12 | to try to record it. |
| | 13 | Q.   Right.   Now, when you met, you mentioned all the |
| | 14 | interviews you did, Investigator Hoffman.   So let's talk about |
| 14:30:08 | 15 | Angie Barbour.   You obtained a phone, an old phone from the |
| | 16 | Smithfield Police Department; is that right? |
| | 17 | A.   I never obtained an old phone from Smithfield |
| | 18 | Police Department. |
| | 19 | Q.   I'm sorry.   I misspoke.   You obtained an extraction |
| 14:30:25 | 20 | from an old phone; is that right? |
| | 21 | A.   I found it, yes. |
| | 22 | Q.   Okay.   Now, you never asked her for her current |
| | 23 | phone; did you? |
| | 24 | A.   No, I didn't. |
| 14:30:36 | 25 | Q.   Mr. Donavon, you never asked him for his phone; did |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 14:30:40 | 1 | you? |
| | 2 | A.   I did.  I asked for all his text messages, and |
| | 3 | between him and Mr. Johnson I think there were 332 pages. |
| | 4 | Q.   Okay.  Just between him and Mr. Johnson? |
| 14:30:51 | 5 | A.   Correct. |
| | 6 | Q.   And did you tell Mr. Donovan that you did not want |
| | 7 | to get his phone because then you would have to give that |
| | 8 | information to the defense? |
| | 9 | A.   I did, and I'd like to explain that.  So we have |
| 14:31:03 | 10 | discovery obligations.  We have to give everything.  Your |
| | 11 | phone is your diary.  And in this specific case I had concerns |
| | 12 | about handing over all of Mr. Donovan's information to a |
| | 13 | person accused of using information in a way that didn't |
| | 14 | benefit the person.  So I did what I always do and try to make |
| 14:31:24 | 15 | them give them the things we need to give them that are |
| | 16 | relevant to the investigation and try to protect them. |
| | 17 | Q.   And you decided what was relevant; is that right, |
| | 18 | Investigator Hoffman? |
| | 19 | A.   I decided communication between Mr. Donovan and |
| 14:31:36 | 20 | Kevin were relevant, yes. |
| | 21 | Q.   Now, when you were -- back when you were talking to |
| | 22 | Mr. Zellinger about training other officers, do you train them |
| | 23 | to get only one side of the evidence? |
| | 24 | A.   I was in the academy.  I didn't do that training. |
| 14:31:52 | 25 | I generally did PT and firearms. |

| | | |
|---|---|---|
| 14:31:57 | 1 | Q. Did you train to look at both sides and look at as |
| | 2 | much information as they could gather? |
| | 3 | A. Yes. I would agree. |
| | 4 | Q. Now, Mr. Zellinger mentioned to you earlier about a |
| 14:32:40 | 5 | phone number that -- well, first of all, Mr. Barbour talked to |
| | 6 | you about a text message he says he got April 13th of -- |
| | 7 | A. 2022. |
| | 8 | Q. -- 2022; is that right? |
| | 9 | A. That's correct. |
| 14:32:56 | 10 | Q. And did you find that text message anywhere? |
| | 11 | A. I didn't. And that was one of the challenges. So |
| | 12 | I knew IP numbers don't frequently show up on CDRs for |
| | 13 | Verizon. I wasn't sure about that. So I contacted Justin |
| | 14 | Heinrich who's an expert with the SBI. He saw the five digit |
| 14:33:15 | 15 | numbers that you get when you're scrolling. It gives you |
| | 16 | notification, and then he told me he didn't think they were |
| | 17 | there. |
| | 18 | So then I contacted Harris Putnam with the FBI. |
| | 19 | He's an expert. He said the same thing, that Verizon records |
| 14:33:28 | 20 | don't frequently show text messages that come from third-party |
| | 21 | applications like iMessage or VOIP. Then I called Verizon |
| | 22 | VSAT team, which is a legal team, and I asked the same |
| | 23 | specific questions because I couldn't find the text messages |
| | 24 | on April 14th Mr. Barbour said he got, and I couldn't find |
| 14:33:49 | 25 | them on May the 12th. And one of the reasons that I probably |

14:33:54  1  didn't find them because they are not reflected in the CDRs.

        2      Q.   Investigator Hoffman, I was just scrolling back

        3  while you were talking as fast as I could.  I've yet to run

        4  out of text messages in my phone.  Don't text messages in a

14:34:10  5  person's phone go back?

        6      A.   They do.  However, when I asked Mr. Barbour, he

        7  said he deleted them.  I read it and I deleted it.

        8      Q.   And when you extract a phone, it will show whether

        9  somebody deleted a text messages; won't it?

14:34:25 10      A.   It can.  But I don't extract phones.  I send those

       11  to the lab.

       12      Q.   But you are a person who analyzes stuff that's been

       13  extracted; right?

       14      A.   That's fair.

14:34:35 15      Q.   We talked a little bit earlier in the week about a

       16  404 area code number that showed up in Mr. Barbour's -- an

       17  incoming text message to Mr. Barbour, and Mr. Zellinger made

       18  reference to it earlier today; is that right?

       19      A.   That's correct.

14:34:55 20      Q.   That same number showed up in an incoming text

       21  message to Mr. Johnson later in June; didn't it?

       22      A.   I'm trying to remember the date.  Yea, I think so,

       23  yes.

       24      Q.   Now, Investigator Hoffman, Mr. Zellinger talked to

14:36:01 25  you about some of the receipts that you recovered in your

Richard Hoffman - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 14:36:05 | 1 | examination; is that right? |
| | 2 | A.    That's correct. |
| | 3 | Q.    And there are Apple receipts for something called |
| | 4 | SpoofCard; is that right? |
| 14:36:15 | 5 | A.    That's correct. |
| | 6 | Q.    And you looked in there for this type of thing |
| | 7 | throughout the iCloud account; is that fair to say? |
| | 8 | A.    Are you asking me if I looked for receipts? |
| | 9 | Q.    Well, did you find more than this, I guess is the |
| 14:36:29 | 10 | more direct question. |
| | 11 | A.    Sorry, sir.  I wasn't able to go through those MSN |
| | 12 | accounts because there's some privileged material in there. |
| | 13 | So there was supposed to be a third party to go through those. |
| | 14 | So I was only recently able to go through those, and I found |
| 14:36:45 | 15 | those.  I have not had a chance to go thoroughly through |
| | 16 | those. |
| | 17 | Q.    You didn't find anymore than what you have right |
| | 18 | here; is that right? |
| | 19 | A.    I haven't had time to find anymore, no, sir.  The |
| 14:36:56 | 20 | answer to your question is yes. |
| | 21 | Q.    You've had this case for two years; is that right, |
| | 22 | Investigator Hoffman? |
| | 23 | A.    I had this case since it started.  It's been two |
| | 24 | years.  But this case has been prosecuted through the attorney |
| 14:37:06 | 25 | general's office.  Like I said, they have a process to go by |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 14:37:10 | 1 | where somebody else is supposed look at these and separate |
| | 2 | what I'm allowed to see and not allowed to look at. I never |
| | 3 | got a straight answer about that. |
| | 4 | Q. The earliest receipt you have is May 25, 2022; |
| 14:37:22 | 5 | isn't that right? |
| | 6 | A. That's correct. |
| | 7 | Q. That is after May 17, 2022? |
| | 8 | A. That is correct. |
| | 9 | Q. Mr. Zellinger asked you if you know when the |
| 14:37:35 | 10 | receipt comes in. |
| | 11 | A. I answered truthfully, I don't. |
| | 12 | Q. Well, if it's a credit type of receipt, it would |
| | 13 | make sense that it came in before you used the credits; |
| | 14 | wouldn't it, Investigator Hoffman? Wouldn't that be logical? |
| 14:37:48 | 15 | A. As I previously stated, I don't know. |
| | 16 | Q. And Exhibit Number 66, there are two apps that |
| | 17 | renew on a particular date and renew regularly; right? |
| | 18 | A. I believe so. |
| | 19 | Q. But the SpoofCard doesn't renew every month; does |
| 14:38:07 | 20 | it? |
| | 21 | A. No. You purchase credits. |
| | 22 | Q. When you purchase credits, it just makes sense that |
| | 23 | the receipt, you would get it that day; right? |
| | 24 | A. I don't know. |
| 14:38:17 | 25 | Q. Now, Investigator Hoffman, when that -- when you |

| 14:39:19 | 1 | met Mr. Barbour, it was on the -- on November 1st of 2022; is |
| | 2 | that right? |
| | 3 | A.   That's correct. |
| | 4 | Q.   You talked to him about his memory of the events, |
| 14:39:30 | 5 | his meeting with Mr. Johnson; is that right? |
| | 6 | A.   Yes. |
| | 7 | Q.   At one point he told you he had a conversation with |
| | 8 | Mr. Johnson, and after that he had not heard anything else |
| | 9 | about it. |
| 14:39:44 | 10 | A.   Yes. |
| | 11 | Q.   And that conversation was prior to the primary |
| | 12 | election; isn't that correct? |
| | 13 | A.   Yes. |
| | 14 | Q.   His description of the conversation anyway. |
| 14:39:53 | 15 | A.   I believe so. |
| | 16 | Q.   When a witness comes to talk to you, do you |
| | 17 | consider it your job to be as objective as possible? |
| | 18 | A.   I consider it my job to get the information about |
| | 19 | what's happening and try to be objective. |
| 14:40:24 | 20 | Q.   Okay.  And do you consider it your job to convince |
| | 21 | the person of a particular line of a story or what's happened? |
| | 22 | A.   No. |
| | 23 | Q.   During your interview with DeVan Barbour, at some |
| | 24 | point you switched from what had happened to telling him about |
| 14:41:01 | 25 | your investigation; isn't that fair to? |

| | | |
|---|---|---|
| 14:41:03 | 1 | A. I did. He was a victim. I was reading his body |
| | 2 | language. He looked -- he looked upset, and I was trying to |
| | 3 | reassure him that I would do a good, thorough investigation |
| | 4 | and that we would get back with him to let him know stuff. |
| 14:41:19 | 5 | Q. Well, and you talked to him about lots of school |
| | 6 | board stuff; is that right? |
| | 7 | A. I remember what I said about school board stuff, |
| | 8 | but I'm not involved with school board politics. |
| | 9 | Q. Well, you talked to him about Angie Barbour? |
| 14:41:41 | 10 | A. I did. |
| | 11 | Q. And you said she'd been drinking which, is another |
| | 12 | issue she has; right? |
| | 13 | A. I believe it is. |
| | 14 | Q. And so you were telling a witness about the issues |
| 14:41:52 | 15 | another witness has. |
| | 16 | A. You could see it that way. |
| | 17 | Q. I'm sorry? |
| | 18 | A. I think you can say that. |
| | 19 | Q. And you said: So that one thing that I'm going to |
| 14:42:02 | 20 | get a bunch of records involved in this because that's |
| | 21 | something he actually did, and I can prove it. The second one |
| | 22 | I'm going to do is I'm going to use obstruction of justice |
| | 23 | felony, and the reason I'm going to do that is that justice is |
| | 24 | defined. It is not a criminal vio -- you go on this long |
| 14:42:15 | 25 | story about describing what you think is wrong with this case. |

Richard Hoffman - Cross by Mr. Tyndall

| | | |
|---|---|---|
| 14:42:19 | 1 | A. No. So I'm trying to understand the statute |
| | 2 | 14-230. I've never used that statute for anything. I |
| | 3 | contacted the School of Government trying to get a fair |
| | 4 | understanding of the statute. And I talked to several people |
| 14:42:33 | 5 | there, and that's what I was explaining. It had nothing to do |
| | 6 | with charging him with a felony obstruction. It had |
| | 7 | everything to do with what is obstructive behavior in public |
| | 8 | justice. |
| | 9 | Q. But you're telling a witness these things. |
| 14:42:48 | 10 | A. I'm telling the victim. |
| | 11 | Q. Huh? |
| | 12 | A. I'm telling the victim. |
| | 13 | Q. He's a potential witness in a case; right? |
| | 14 | A. True. |
| 14:42:55 | 15 | Q. I mean, you don't know that he's a victim; do you? |
| | 16 | A. I believe him to be a victim. |
| | 17 | Q. You believe that, but you don't know that at that |
| | 18 | point because you are only three weeks into your |
| | 19 | investigation; right, Investigator Hoffman? |
| 14:43:05 | 20 | A. I believe based on all the interviews I had done he |
| | 21 | was a victim. |
| | 22 | Q. So you're telling him that he's claimed extortion. |
| | 23 | Everything is a claim; is that right? |
| | 24 | A. I don't recall the word I used. Maybe. |
| 14:43:22 | 25 | Q. But you're telling him about your investigation and |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 14:43:25 | 1 | telling him what you believe about it. |

2    A.    I'm explaining to him what I believe is going to

3    happen next so that he would have a better understanding of

4    what might come.

14:43:36    5    Q.    And it's fair enough to say, Investigator Hoffman,

6    that people look to investigators, they have a lot trust in

7    police officers oftentimes?

8    A.    This particular investigation, given his

9    circumstances, it was obvious to me that this was going to be

14:43:52    10    very impactful for him.

11    Q.    Speaking of the impact, between the time of my

12    client's meeting with him and the time you met with

13    Mr. Barbour, no recording had been released, as far as your

14    allegation showed; had it?

14:44:11    15    A.    Not that I'm aware of.

16    Q.    And Mr. Johnson had not said anything publicly

17    about DeVan Barbour.

18    A.    I need to correct it.  Actually, I believe he had

19    given some of those to the police department.  I'm not sure.

14:44:22    20    Q.    Publicly?

21    A.    No, not publicly.

22    Q.    I mean, you know, it would not have been in the

23    interest of the Smithfield Police Department to publicize

24    something about Mr. Barbour; would it, Investigator Hoffman?

14:44:33    25    A.    No.    Just trying to give a correct answer.

| | | |
|---|---|---|
| 14:44:37 | 1 | Q. Mr. Johnson had provided that information as part |
| | 2 | of an internal affairs investigation; isn't that fair to say? |
| | 3 | A. Yes. |
| | 4 | Q. He cooperated and gave information? |
| 14:44:46 | 5 | A. He gave it to them. I don't know the other stuff. |
| | 6 | Q. Now, you read a series of text messages between my |
| | 7 | client and a person named Allyson Bond earlier? |
| | 8 | A. Yes. Those were the Pinger records. |
| | 9 | Q. And it's clear that my client said some very |
| .14:45:18 | 10 | unfavorable things about Angie Barbour in those text messages; |
| | 11 | is that right? |
| | 12 | A. Yes. |
| | 13 | Q. And it was clear that his focus was on her; isn't |
| | 14 | that right? |
| 14:45:28 | 15 | A. I think he was intensely preoccupied with Angie |
| | 16 | Barbour. |
| | 17 | Q. Yea. He barely mentions DeVan Barbour. |
| | 18 | A. He mentioned him I think maybe three times. |
| | 19 | Q. The messages you have in State's Exhibit 33 go up |
| 14:45:54 | 20 | to 4/25? |
| | 21 | A. Can you give me the exhibit number you want me to |
| | 22 | look at? |
| | 23 | Q. Okay. State's Exhibit Number 33. |
| | 24 | MR. ZELLINGER: Madam clerk has it. |
| 14:46:12 | 25 | MR. TYNDALL: Do you have it? |

| 14:47:03 | 1 | Q. Investigator Hoffman, there's a reference in the |
| | 2 | messages about Ms. Barbour feeling the DeVan bomb; is that |
| | 3 | right? |
| | 4 | A. Right. |
| 14:47:53 | 5 | Q. There's no message in there that says anything |
| | 6 | about harming DeVan Barbour. |
| | 7 | A. No. |
| | 8 | Q. There were messages after the primary where Kevin |
| | 9 | Donovan said something about: She needs feel the DeVan bomb. |
| 14:48:10 | 10 | Do you remember that? |
| | 11 | A. I don't. |
| | 12 | Q. Is it fair to say that Kevin Donovan made |
| | 13 | references to DeVan Barbour before and after the primary |
| | 14 | election? |
| 14:48:21 | 15 | A. I recall him making -- you talking about the text |
| | 16 | messages between -- |
| | 17 | Q. Yes, the text messages. |
| | 18 | A. I recall him making a comments about who Angie |
| | 19 | would be with, and -- but I don't recall anything about bomb. |
| 14:48:35 | 20 | Q. Do you remember at some point my client saying: |
| | 21 | It's my misery. I'm not going to spread it. |
| | 22 | A. I don't recall, but he may have said that. |
| | 23 | Q. Now, did you determine whether in 2022 Mr. Johnson |
| | 24 | was a candidate for any political office? |
| 14:48:57 | 25 | A. I know that he wasn't. |

| 14:48:58 | 1 | Q. | He was not a candidate? |

14:48:58  1      Q.   He was not a candidate?

         2      A.   No, he was not a candidate.

         3      Q.   Now, do you remember Mr. Barbour testifying?

         4      A.   I believe so.

14:50:21  5      Q.   This is my memory.  He said he spoke to my client

         6  one time after the 4/25 meeting.

         7      A.   I don't recall how many times he said that.

         8      Q.   But the phone records show that they talked to each

         9  other several times?

14:50:35 10      A.   Yes, sir.

        11      Q.   Between 4/25 and the primary; is that right?

        12      A.   Yes.

        13      Q.   And in fact, you described various calls of various

        14  length during that period of time?

14:50:55 15      A.   Yes, sir.

        16           MR. TYNDALL:  Can I have Exhibit Number 13, please?

        17      Q.   And this is an exhibit that you either, I'm going

        18  to say, created, but it may have just been pulled out of the

        19  records; is that fair to say?

14:52:32 20      A.   It is screenshots of the records themselves.

        21      Q.   And these are -- this is sort of their text

        22  messages leading up to the meeting; is that right?

        23      A.   Correct.

        24      Q.   Is one of the things my client says in this text

14:52:43 25  message:  I'm good either way.  Just trying to help.  No

| | | |
|---|---|---|
| 14:52:46 | 1 | worries. |
| | 2 | A.  That is correct. |
| | 3 | Q.  And that's part of the lead up of their meeting |
| | 4 | that particular day? |
| 14:52:52 | 5 | A.  Yes, sir.  I think it was after he said -- he asked |
| | 6 | timeline -- the question with timeline, then he said that. |
| | 7 | Q.  Right.  Now, you have State's Exhibit 69 up there? |
| | 8 | A.  I don't. |
| | 9 | Q.  Investigator Hoffman, I'm going to show you what's |
| 14:54:10 | 10 | been marked State's Exhibit 69.  Tell me what that is. |
| | 11 | A.  Subscriber information from a TracFone concerning |
| | 12 | the phone number which is the 919-414-3388 and has the dates |
| | 13 | of service up here that he highlighted, then it's got the |
| | 14 | email address for Mr. Johnson's employment. |
| 14:54:30 | 15 | Q.  And is this the TracFone that Ms. Barbour described |
| | 16 | as Mr. Johnson giving her? |
| | 17 | A.  Yes. |
| | 18 | Q.  Did she say he gave it to her in October? |
| | 19 | A.  Yes. |
| 14:54:40 | 20 | Q.  What's the date of service? |
| | 21 | A.  Activation date shows August 22nd, 2021. |
| | 22 | Q.  And when is the deactivation date? |
| | 23 | A.  September 22nd, 2021. |
| | 24 | Q.  It's fair to say, Investigator Hoffman, if you |
| 14:54:56 | 25 | don't get this record, you don't know that information; isn't |

| | | |
|---|---|---|
| 14:54:59 | 1 | that right? |
| | 2 | A.   That's correct. |
| | 3 | Q.   We're left to rely on what Mr. Barbour says. |
| | 4 | A.   Correct. |
| 14:55:06 | 5 | Q.   Getting information from people whether they are |
| | 6 | the victim or the accused or just a witness helps clarify |
| | 7 | things; doesn't it? |
| | 8 | A.   In most instances. |
| | 9 | Q.   That's why you don't decide just to get it from one |
| 14:55:24 | 10 | side, Investigator Hoffman. |
| | 11 | A.   I think there's a weighing, a balance that has to |
| | 12 | be taken, but generally speaking, I'd lean towards getting |
| | 13 | more than less. |
| | 14 | Q.   You also know there's a protective order in this |
| 14:55:41 | 15 | case; don't you? |
| | 16 | A.   Yes.  At the time I was applying for the search |
| | 17 | warrants, the protective order existed after the charges were |
| | 18 | filed. |
| | 19 | Q.   You could have walked to the office down the hall |
| 14:55:53 | 20 | and spoken to Ms. Doyle about what ways to protect information |
| | 21 | that you are worried about. |
| | 22 | A.   I did.  I sealed the search warrants -- well, I |
| | 23 | didn't seal them.  I asked for them to be sealed. |
| | 24 | Q.   And that's a legal proceeding; isn't that right? |
| 14:56:06 | 25 | A.   My understanding, yes.  I'm not an attorney. |

| 14:57:39 | 1 | MR. TYNDALL: May I approach? |
| | 2 | THE COURT: Yes, sir. |
| | 3 | Q. I'm going to approach what's been marked at State's |
| | 4 | Exhibit 62. Do you recognize that? |
| 14:57:48 | 5 | A. It's a Pinger records between Allyson Bond and that |
| | 6 | number that we linked to Mr. Johnson. |
| | 7 | Q. Does it appear they are still discussing |
| | 8 | Ms. Barbour? |
| | 9 | A. I don't see her name on here. |
| 14:58:02 | 10 | Q. Well, the highlighted text appears to reference a |
| | 11 | post that she testified to; is that fair to say? |
| | 12 | A. Yes, sir. |
| | 13 | Q. Okay. It says: Shit ready to hit the fan. |
| | 14 | A. Yes. |
| 14:58:16 | 15 | Q. And that's something she testified about. |
| | 16 | A. Yes. |
| | 17 | Q. This is after the primary? |
| | 18 | A. This is on May 24th. |
| | 19 | Q. They are still talking about Ms. Barbour; aren't |
| 14:58:24 | 20 | they, Investigator Hoffman? |
| | 21 | A. Yes. |
| | 22 | Q. Still upset with her, it appears? |
| | 23 | A. Correct. |
| | 24 | Q. My client still hasn't released any recording; has |
| 14:58:33 | 25 | he? |

14:58:34   1          A.    Not that I'm aware of.

           2                MR. TYNDALL:   Your Honor, I have no further

           3    questions.

           4                THE COURT:   Any redirect?

14:59:04   5                MR. ZELLINGER:   Can I have a moment?

           6                THE COURT:   Yes, sir.

           7    REDIRECT EXAMINATION BY MR. ZELLINGER:

           8          Q.    Investigatory Hoffman, you were asked some

           9    questions about whether the defendant was still upset with

14:59:12  10    Angie Barbour after the primary.

          11          A.    Yes.

          12          Q.    You acquired evidence that the defendant is still

          13    upset with Angie Barbour to this day.

          14          A.    I know that on June 15th there was a 50C order.

14:59:27  15          Q.    And so the defendant took out this 50C alleging

          16    that he didn't have an affair with her; is that correct?

          17          A.    That's correct.

          18          Q.    And then that got dismissed, then she took

          19    something out against him; is that also correct?

14:59:44  20          A.    That's correct.

          21          Q.    You were asked about the defendant being upset with

          22    Angie Barbour after the primary.  Would it have been -- this

          23    allegation that was alleged, if the defendant was to release

          24    the recording, would it affect Angie Barbour at all?

15:00:06  25          A.    I don't think so.  I can't speak for her job, but I

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 15:00:08 | 1  | don't believe so. |
|          | 2  | Q.    And you were also asked a bunch of questions about |
|          | 3  | whether the defendant released the recording.  I mean, you saw |
|          | 4  | an email where the defendant emailed it to another person; |
| 15:00:20 | 5  | correct? |
|          | 6  | A.    He emailed it on the 24th to Allyson Bond. |
|          | 7  | Q.    You were asked some questions about the phone |
|          | 8  | records.  Those phone records, without going through them all, |
|          | 9  | they reflect that DeVan Barbour was reaching out to the |
| 15:00:39 | 10 | defendant; is that correct? |
|          | 11 | A.    Yes. |
|          | 12 | Q.    Following the April 25th meeting? |
|          | 13 | A.    That's why I made that, because I was trying to |
|          | 14 | figure out who's calling who. |
| 15:00:48 | 15 | Q.    You reached out to Angie Barbour a couple times as |
|          | 16 | well; is that correct? |
|          | 17 | A.    Yes. |
|          | 18 | Q.    You reached out to Kevin Donovan even? |
|          | 19 | A.    Yes. |
| 15:00:54 | 20 | Q.    Ultimately, those recordings -- do you know who |
|          | 21 | recorded Angie Barbour? |
|          | 22 | A.    I never was able to determine that. |
|          | 23 | Q.    But you know that the defendant possessed those |
|          | 24 | recordings; is that correct? |
| 15:01:05 | 25 | A.    Correct. |

| | | |
|---|---|---|
| 15:01:06 | 1 | Q. And he also referenced clips of them in his Pinger |
| | 2 | messages with Ms. Bond. |
| | 3 | A. He referenced audio clips. |
| | 4 | Q. You were asked some questions, do you know -- on |
| 15:01:21 | 5 | the SpoofCard receipt. There's also a receipt for renewals of |
| | 6 | other apps; is that correct? |
| | 7 | A. That's correct. |
| | 8 | Q. Do you know if he bought the SpoofCard credits on |
| | 9 | the day he got the renewals or if those automatically renewed? |
| 15:01:35 | 10 | A. I don't know when he purchased those credits. I |
| | 11 | know from having used the app that you activate it, you get a |
| | 12 | certain amount of credits, and when you're running low, you |
| | 13 | have to purchase more credits. |
| | 14 | Q. When you started the app, you are given credits? |
| 15:01:50 | 15 | A. I think you're given $9 worth of credits. |
| | 16 | Q. Just to be clear, the receipt for it is May of |
| | 17 | 2022? |
| | 18 | A. Yes. |
| | 19 | Q. And you were asked some questions about that phone |
| 15:02:01 | 20 | number with respect to DeVan Barbour. The phone number that |
| | 21 | DeVan Barbour received allegedly a text message from about |
| | 22 | these recordings; do you recall that? |
| | 23 | A. Are you talking about the one on May 9, 4014? |
| | 24 | Q. Yes. And there was also one on April 13th. |
| 15:02:19 | 25 | A. Yes. |

15:02:21  1        Q.   And it was your testimony -- I just wanted to --

        2    you mentioned VOIP.  So that's Voice Over Internet Protocol?

        3        A.   It is.  So it uses the internet.  It doesn't use a

        4    cellular network.  So most frequently when you use the

15:02:35  5    internet, it doesn't show up in your call detail records

        6    because it's not accessing your cellar network.

        7        Q.   And the call detail records, why does a cellphone

        8    company keep call detail records?

        9        A.   It could be a lot of reason.  For billing.  They

15:02:50  10    keep it for customers.  They have the towers where the

       11    coverage is.  Maintenance.  For lots of reasons.

       12        Q.   They want to be able to make people pay for what

       13    they use; right?

       14        A.   Yes.

15:03:03  15        Q.   Nowadays people have plans that allow unlimited

       16    data, or whatever, but you've worked in this field for 30

       17    years; is that correct?

       18        A.   I've been working in law enforcement for 30 years.

       19        Q.   Cellphone records -- I mean, CDRs and cellphone

15:03:19  20    records were originally billing documents?

       21        A.   Yes.  It's evolved.

       22        Q.   So if you use the Voice Over Internet Protocol,

       23    you're using the internet to call somebody or text somebody?

       24        A.   Yes.

15:03:32  25        Q.   Just to be clear, you also -- nowadays, if you're

| | | |
|---|---|---|
| 15:03:37 | 1 | using your cellphone network, you can use data that comes from |
| | 2 | cellphone towers too; is that accurate? |
| | 3 | A.   Yes. |
| | 4 | Q.   You were asked some questions about your interview |
| 15:03:49 | 5 | with DeVan Barbour.  When you spoke with him, how would you |
| | 6 | describe his demeanor? |
| | 7 | A.   Initially, very anxious, and then really defensive |
| | 8 | when I mentioned the recording.  He tried to push past that. |
| | 9 | And then he was -- you know, he disclosed what happened.  It |
| 15:04:12 | 10 | was to the point, but then when I started asking more |
| | 11 | questions, his physical composure, he seemed distraught. |
| | 12 | Q.   Okay.  And he told you that he did not want to |
| | 13 | testify; is that right? |
| | 14 | A.   He did not want any part of this investigation. |
| 15:04:28 | 15 | That's why I felt so bad for him, because I felt like it was |
| | 16 | probably going to go forward, and this wasn't going to be |
| | 17 | good. |
| | 18 | Q.   And when you talked to him -- when you talked to |
| | 19 | him during your interview, he used the term blackmail; is that |
| 15:04:45 | 20 | correct? |
| | 21 | A.   Yes. |
| | 22 | Q.   You were asked questions about his phone and the |
| | 23 | investigation and why you didn't take that man's phone on that |
| | 24 | day; do you recall? |
| 15:05:03 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 15:05:03 | 1 | Q. Okay. And just to jump aside, did you know that |
| | 2 | Kevin Donovan had recorded you? |
| | 3 | A. No. |
| | 4 | Q. And then did you listen to his testimony that he |
| 15:05:13 | 5 | took that recording to the defendant? |
| | 6 | A. I did. |
| | 7 | Q. Do you remember where that was? |
| | 8 | A. I believe it was on November -- |
| | 9 | Q. No, I'm sorry. Where he met the defendant? |
| 15:05:24 | 10 | A. At HealthQuest, at the gym. |
| | 11 | Q. What is HealthQuest? |
| | 12 | A. It's a gym where the pool is. |
| | 13 | Q. Another gym? |
| | 14 | A. Yes. A gym here in Smithfield, close to the |
| 15:05:33 | 15 | courthouse. |
| | 16 | Q. There's a lot of questions about FaceTime and like |
| | 17 | blogs being kept, not over the provider, but on the actual |
| | 18 | phone; is that correct? |
| | 19 | A. Yes. |
| 15:05:48 | 20 | Q. Did Mr. Barbour tell you that he FaceTimed Angie |
| | 21 | Barbour from his phone? |
| | 22 | A. No. |
| | 23 | Q. And whose phone did -- I'm sorry. He didn't tell |
| | 24 | you that he did this at all. |
| 15:06:06 | 25 | A. No. |

| 15:06:06 | 1 | Q. Well, he said -- you were able to hear his |

15:06:06  1    Q.   Well, he said -- you were able to hear his
           2    testimony in this courtroom; is that correct?
           3         A.   Right.
           4         Q.   And in the interview, did he have a similar
15:06:12   5    demeanor when talking about it?
           6         A.   Yes.
           7         Q.   When you talked to Angie Barbour, did she tell you
           8    that DeVan Barbour had FaceTimed her from DeVan Barbour's
           9    phone?
15:06:25  10         A.   I believe she said that, yes, they started from his
          11    phone, and then she refused to pick it up anymore.  And the
          12    only reason she picked up the last one was because it came
          13    from his wife's device and she thought it was his wife and
          14    realized it was him and hung up on him.
15:06:40  15         Q.   And did you go get DeVan Barbour's wife's phone
          16    after he told you this?
          17         A.   No.
          18         Q.   Why not?
          19         A.   Honestly, I didn't think the records would be
15:06:51  20    there, but I don't think whether or not the interaction
          21    happened has anything to do with Angie talking about it and
          22    then her conversation about it being used to ask for
          23    something.
          24         Q.   And also if you had gone to DeVan Barbour's wife to
15:07:11  25    get that phone, it would be likely you would have to disclose

| | | |
|---|---|---|
| 15:07:13 | 1 | to her what the allegations were. |
| | 2 |     A.   Yes. |
| | 3 |     Q.   And at that point in the investigation DeVan |
| | 4 | Barbour had just disclosed this to you? |
| 15:07:26 | 5 |     A.   Yes. |
| | 6 |     Q.   And is that when you began to follow up and try to |
| | 7 | find recordings? |
| | 8 |     A.   I did.  I tried to preserve as many records as I |
| | 9 | could. |
| 15:07:34 | 10 |     Q.   Then eventually you were able to you find the |
| | 11 | recording that's been played to this jury that was created on |
| | 12 | April 24th? |
| | 13 |     A.   Yes. |
| | 14 |     Q.   And also the recording the defendant emailed |
| 15:07:45 | 15 | Allyson Bond -- or Angie Barbour. |
| | 16 |     A.   Yes. |
| | 17 |     Q.   That recording it's hard to hear, but is she |
| | 18 | talking about that same incident? |
| | 19 |     A.   She's talking about the same incident.  She's just |
| 15:07:54 | 20 | trying to do it in a different way, with different words. |
| | 21 | It's not the same recording with music behind it, but yes. |
| | 22 |     Q.   Investigator Hoffman, there's a Victim's Rights Act |
| | 23 | in North Carolina; is that correct? |
| | 24 |     A.   That's correct. |
| 15:08:31 | 25 |     Q.   And that Act requires you to give victims |

15:08:35    1    information about the case that they potentially are a victim

            2    of?

            3         A.    Yes.

            4         Q.    And even though the allegation in this case is that

15:08:43    5    DeVan Barbour -- the catalyst for the allegations that

            6    Mr. DeVan Barbour may have FaceTimed somebody.  As to the

            7    extortion allegation, DeVan Barbour is perceived as the victim

            8    in that; is that correct?

            9         A.    That's correct.

15:09:00   10         Q.    And so are there certain requirements that the

           11    State has to abide by to keep Mr. Barbour informed of things

           12    with regard to the investigation in the case?

           13         A.    Yes.

           14         Q.    And with regard to the search warrants in this

15:09:37   15    case, search warrants can only be sealed for a certain amount

           16    of time; is that correct?

           17         A.    They are limited, and the ADA did the order and put

           18    everything on there and the judge released whatever the order

           19    says.

15:09:54   20         Q.    Okay.  And so eventually, information about this

           21    case came out and there were media reports about this.

           22         A.    Yes.  It's public.

           23         Q.    Okay.  And additionally, the defendant was then

           24    later charged in 2023; is that correct?

15:10:09   25         A.    That's correct.

                              Denise St. Clair, RPR, CRR, CRC
                                    Official Court Reporter

| | | |
|---|---|---|
| 15:10:10 | 1 | Q.   You were asked about things that you did not get in |
| | 2 | this investigation.  Did you get the defendant's Apple iCloud |
| | 3 | records? |
| | 4 | A.   Yes. |
| 15:10:22 | 5 | Q.   Did you get the defendant's Verizon records? |
| | 6 | A.   Yes. |
| | 7 | Q.   Did you get the defendant's Pinger records? |
| | 8 | A.   Yes. |
| | 9 | Q.   Did you get the defendant's Gmail, MSN records? |
| 15:10:30 | 10 | A.   Yes. |
| | 11 | Q.   Did you get the defendant's Snapchat records? |
| | 12 | A.   Yes. |
| | 13 | Q.   Did you also get Snapchat records for anybody else? |
| | 14 | A.   I got Snapchat records for Kevin Donovan, for |
| 15:10:40 | 15 | Mr. Barbour and Mrs. Barbour. |
| | 16 | Q.   Did you get T-Mobile records for anyone? |
| | 17 | A.   I got T-Mobile records for the defendant and |
| | 18 | Allyson Bond. |
| | 19 | Q.   Did you get Verizon records? |
| 15:10:53 | 20 | A.   I got Verizon records for DeVan Barbour and Verizon |
| | 21 | records for TracFone. |
| | 22 | Q.   Did you execute 23 search warrants in this case? |
| | 23 | A.   I think I did 24. |
| | 24 | Q.   Did you send multiple devices and thumb drives to |
| 15:11:17 | 25 | the state crime lab? |

| | | |
|---|---|---|
| 15:11:19 | 1 | A. I sent nine, I think. |
| | 2 | MR. ZELLINGER: Nothing further, Your Honor. |
| | 3 | THE COURT: Mr. Tyndall. |
| | 4 | MR. TYNDALL: Just briefly, Your Honor. |
| 15:11:26 | 5 | RECROSS-EXAMINATION BY MR. TYNDALL: |
| | 6 | Q. Now, you mentioned that someone releasing the |
| | 7 | recording wouldn't affect Angie Barbour; is that right? |
| | 8 | A. I don't think so, but I can't speak for Angie |
| | 9 | Barbour. |
| 15:11:37 | 10 | Q. Wasn't that your testimony with Mr. Zellinger? |
| | 11 | A. Yea, I said I don't think so. |
| | 12 | Q. It wouldn't harm her at all. |
| | 13 | A. I don't believe so. |
| | 14 | Q. But having a recording of her saying those things |
| 15:11:50 | 15 | would inform DeVan Barbour that she was saying it; isn't that |
| | 16 | right? |
| | 17 | A. Yes. He would be aware of defendant. |
| | 18 | Q. And Mr. Zellinger asked you if Mr. Barbour used the |
| | 19 | term blackmail to my client; is that right? |
| 15:12:03 | 20 | A. Yes. |
| | 21 | Q. And he said when he said that, my client got |
| | 22 | defensive and said forget about it; isn't that right? |
| | 23 | A. Yes. |
| | 24 | Q. And he never heard from it again; did he? |
| 15:12:16 | 25 | A. He didn't. The only thing that differs from your |

| | | |
|---|---|---|
| 15:12:19 | 1 | explanation -- or excuse me, your statement is that when we |
| | 2 | spoke to him, he said it was his tone, sort of like when your |
| | 3 | wife says, forget about it, and you know you are not going to |
| | 4 | forget about it. You know, it was his tone that led him to |
| 15:12:36 | 5 | believe that this wasn't over. |
| | 6 | Q. But it was over; wasn't it? |
| | 7 | A. I don't know. |
| | 8 | Q. He never released any recordings; did he? |
| | 9 | A. Oh, yes, sir, he didn't release any recordings. |
| 15:12:44 | 10 | Q. And he didn't make anybody public statement about |
| | 11 | it; did he? |
| | 12 | A. Not that I'm aware of. |
| | 13 | Q. Angie Barbour made a public statement about; didn't |
| | 14 | she? |
| 15:12:50 | 15 | A. Are you referring to the blog? |
| | 16 | Q. The blog. |
| | 17 | A. Yes. |
| | 18 | MR. ZELLINGER: Nothing further, Your Honor. |
| | 19 | THE COURT: Mr. Zellinger. |
| 15:12:59 | 20 | MR. ZELLINGER: One more question. |
| | 21 | REDIRECT EXAMINATION BY MR. ZELLINGER: |
| | 22 | Q. You were asked if anything ever happened with it, |
| | 23 | yet DeVan Barbour after that conversation got a text message |
| | 24 | saying the recording is about to go out; correct? |
| 15:13:08 | 25 | A. Yes. He sent a -- he called -- he attempted to |

| | | |
|---|---|---|
| 15:13:11 | 1 | call Angie Barbour on May the 12th at 10:24.  I think it was |
| | 2 | 10:24.  She didn't pick up the phone.  He sent her a text |
| | 3 | message.  And in the text message he said:  Call me ASAP.  And |
| | 4 | then she called and they spoke. |
| 15:13:40 | 5 | Q.   We've talked about DeVan Barbour allegedly received |
| | 6 | a text message saying the recording was going out. |
| | 7 | A.   That's what he told me. |
| | 8 | Q.   And the number that was used in that text message |
| | 9 | is a number that's supplied by -- well, is it supplied by |
| 15:13:52 | 10 | Telneyx? |
| | 11 | A.   That's a number that was on May 12th, what I'm |
| | 12 | talking about -- excuse me, May 9th.  I'm talking about |
| | 13 | May 12th there are no numbers on the records which was my |
| | 14 | concern is that most VOIP don't show up. |
| 15:14:07 | 15 | Q.   And so, for example, if you used a VOIP service |
| | 16 | like, I don't know, SpoofCard, it might not show up on a CDR? |
| | 17 | A.   It might not show up on a CDR. |
| | 18 | Q.   And that set off a flurry of phone calls that this |
| | 19 | jury has seen and communications between the defendant -- |
| 15:14:27 | 20 | A.   On the 12th. |
| | 21 | Q.   -- on the 12th; is that correct? |
| | 22 | A.   Yes, sir. |
| | 23 | Q.   And that's after the defendant allegedly said: |
| | 24 | Well, forget about it. |
| 15:14:32 | 25 | A.   That's correct. |

RECROSS-EXAMINATION BY MR. TYNDALL:

    Q.    Well, wait a second.  The calls between my client and DeVan Barbour were on the 12th; isn't that right? May 12th?

    A.    Yes.  They were phone calls between those parties on the 12th.

    Q.    So that's three days after Mr. Barbour supposedly got a text saying the recordings are about to go out.

    A.    No.  That's three days after that number called. According to Ms. Barbour, when she was contacted, it was because he had received a text message that day that the recording was about to go out on the 12th, which is why I said that a lot of those don't show up on a CDRs.  And because he got that message, he immediately reached to Angie Barbour.  He couldn't get ahold of her.  She sent that text message:  ASAP. And then there was a flurry of phone calls.

    So there is a record of a VOIP number on the 9th, the number that you brought up with the 404 area code, and then there's this conversation about him receiving another text message on the 12th that isn't in the records.

    Q.    Okay.  So text message on the 12th isn't in the records.

    A.    No, sir, it is not.

    Q.    And you didn't look at his phone to see if there was any record of it in his phone; did you?

| 15:15:45 | 1 | A. No. He told me he had deleted them. And then when |
| | 2 | I asked him what date did you get it, he had to rely on me to |
| | 3 | get it. He didn't have any, i.e. he deleted it. |
| | 4 | Q. Why would you delete something like that, |
| 15:15:55 | 5 | Investigator Hoffman? |
| | 6 | A. I'm assuming he was embarrassed. |
| | 7 | MR. TYNDALL: Nothing further, Your Honor. |
| | 8 | THE COURT: Thank you very much, sir. You are |
| | 9 | excused. |
| 15:16:01 | 10 | THE WITNESS: Thank you, sir. |
| | 11 | (Witness excused.) |
| | 12 | THE COURT: It's 3:15. We're going to take our |
| | 13 | break a little bit early. They need to get the next witness |
| | 14 | lined up. |
| 15:17:08 | 15 | I just want to let you know -- I always like to |
| | 16 | give the jury kind of an update as to where things stand. I |
| | 17 | did talk to the lawyers over lunch. It looks like everything |
| | 18 | is on schedule. I know that we told you it would be about |
| | 19 | two-week trial. It looks like it's going to be two weeks, but |
| 15:17:22 | 20 | there's no indication that it's going to go over two weeks. |
| | 21 | So I think this will be completed by Friday at the latest, at |
| | 22 | the least from the information we have now. |
| | 23 | Thank you all very much. We'll see you back in |
| | 24 | about 15 minutes. |
| 15:17:35 | 25 | (Jury exits.) |

| | | |
|---|---|---|
| 15:18:16 | 1 | THE COURT:  It's my understanding is the State's |
| | 2 | next witness may be Paul Holcombe.  And there's an advisory |
| | 3 | opinion that we need to consider; is that correct? |
| | 4 | MR. ZELLINGER:  I think I need to ask the witness |
| 15:18:29 | 5 | if there is something that he wants the Court to consider.  I |
| | 6 | have not talked to the witness.  I've not treated the witness |
| | 7 | any differently than any other witness. |
| | 8 | THE COURT:  I have not seen that, but if there is |
| | 9 | an advisory opinion that we need to consider, and to the |
| 15:18:43 | 10 | extent either of you think it's necessary, I can also offer |
| | 11 | you voir dire outside the presence of the jury just to make |
| | 12 | sure we're in compliance with whatever requirement there is. |
| | 13 | So we'll just be in recess.  Let you -- if you can |
| | 14 | just come maybe back in chambers and find me once you've had |
| 15:18:58 | 15 | an opportunity to talk to him. |
| | 16 | MR. ZELLINGER:  And I'll consult with the defendant |
| | 17 | beforehand as well. |
| | 18 | THE COURT:  Thank you.  All right.  We'll be in |
| | 19 | recess for about 15 minutes. |
| 15:19:04 | 20 | (Recess.) |
| | 21 | MR. ZELLINGER:  For purposes of the record, Judge |
| | 22 | Paul Holcombe is our next witness.  The parties spoke with him |
| | 23 | previously to make sure that there weren't any issues.  As has |
| | 24 | been related to the Court, it is the concern from AOC, and |
| 15:41:10 | 25 | Judge Holcombe also reached out to get some advice, was that |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

15:41:14    1    it would be improper for the State to call him Judge in front
            2    of the jury unless the defendant requests to do that.  The
            3    defendant has already requested to do that and has done that.
            4    So that door has been opened.

15:41:30    5            So at this point, the only thing I can think to do
            6    is to make sure that the defendant himself is aware that he
            7    wants to go forward with this.  Mr. Tyndall on behalf of the
            8    defendant has indicated that he wants to call Judge Holcombe
            9    Judge Holcombe, and so I would just ask the Court to conduct
15:41:50   10    an inquiry with Mr. Tyndall to make sure that his client is
           11    aware of this and wants him to do this at this point.

           12            THE COURT:  Okay.  Mr. Tyndall, just a couple
           13    questions.  Have you had a chance to discuss this and possibly
           14    review the advisory opinion with Judge Holcombe?

15:42:14   15            MR. TYNDALL:  I did, Your Honor.  We just spoke in
           16    the back.

           17            THE COURT:  Okay.  And you understand the nature of
           18    that opinion, I believe, is to refer to him as either
           19    Mr. Holcombe or Paul Holcombe and not as Judge Holcombe; is
15:42:25   20    that correct?

           21            MR. TYNDALL:  Right.  And my understanding is it's
           22    -- the concern is that by the State calling him, it somehow
           23    bolsters his credibility.  I think for our purposes, it's sort
           24    of hard to refer to someone on election night who's running
15:42:39   25    for election and just avoid that issue.  So I just think it

Discussion regarding Judge Paul Holcombe

| | | |
|---|---|---|
| 15:42:44 | 1 | makes sense to let the jury know what position he holds and |
| | 2 | why he was at the events and things like that. I think it's |
| | 3 | relevant to the facts. |
| | 4 | THE COURT: I will say, I know the magistrate, that |
| 15:42:56 | 5 | was addressed, at least initially, from the magistrate |
| | 6 | volunteering it himself, but at first he was referred to as a |
| | 7 | state employee, which I believe we can do in that case. |
| | 8 | I guess, Mr. Tyndall, I just want to make sure that |
| | 9 | I'm clear. I mean, I think there are ways that it can be |
| 15:43:14 | 10 | addressed from their standpoint, but is it the intention of |
| | 11 | the defendant to refer to him as Judge Holcombe? |
| | 12 | MR. TYNDALL: I think so, Your Honor. I mean, it's |
| | 13 | just an honest way of approaching the evidence. |
| | 14 | THE COURT: Have you had a chance to discuss that |
| 15:43:27 | 15 | with your client? |
| | 16 | MR. TYNDALL: Yea. We've talked about it. He |
| | 17 | understands that. |
| | 18 | THE COURT: And Mr. Johnson, I just might have the |
| | 19 | same questions for you. Have you had a chance to discuss that |
| 15:43:37 | 20 | about your attorney? |
| | 21 | THE DEFENDANT: Yes, sir. |
| | 22 | THE COURT: And there are reasons, I guess, for and |
| | 23 | against referring to him by a certain title or by his name, |
| | 24 | but you've had a full opportunity to discuss that with your |
| 15:43:52 | 25 | lawyer, and it is your intention if your lawyer intends to do |

| | | |
|---|---|---|
| 15:43:55 | 1 | so to allow him to be referred to as Judge Holcombe; is that |
| | 2 | correct? |
| | 3 | THE DEFENDANT:  Yes, sir.  Based on our |
| | 4 | conversations yes, sir. |
| 15:44:00 | 5 | THE COURT:  Yes, sir.  Thank you very much.  We |
| | 6 | will -- I guess we'll proceed.  My understanding it's still |
| | 7 | the State's intention to abide by -- |
| | 8 | MR. ZELLINGER:  Yes.  I don't want to look like I'm |
| | 9 | lying to the jury though, and the defendant has already called |
| 15:44:18 | 10 | Judge Holcombe judge, but I think I'll try to dance around it, |
| | 11 | and then after cross-examination, I'll probably refer to him |
| | 12 | as a judge just out of an abundance of caution at this point. |
| | 13 | THE COURT:  All right.  Anything else on behalf of |
| | 14 | the defendant? |
| 15:44:38 | 15 | MR. TYNDALL:  I don't think so. |
| | 16 | MR. ZELLINGER:  The only thing that I would say -- |
| | 17 | and I apologize to Judge Holcombe -- is that if he could come |
| | 18 | sit out here like the rest of the witnesses before he's |
| | 19 | called. |
| 15:44:47 | 20 | JUDGE HOLCOMBE:  Actually, I was going to go step |
| | 21 | out. |
| | 22 | MR. ZELLINGER:  Okay.  I just wanted to not make it |
| | 23 | look any different than any other witness. |
| | 24 | THE COURT:  All right.  Once he gets positioned. |
| 15:45:13 | 25 | MR. ZELLINGER:  Your Honor, we are ready to |

| | | |
|---|---|---|
| 15:45:14 | 1 | proceed. |
| | 2 | THE COURT: We'll get our jury. Bring them in. |
| | 3 | (Jury enters.) |
| | 4 | THE COURT: Everybody, welcome back. |
| 15:48:15 | 5 | Mr. Zellinger, are you ready with your next |
| | 6 | witness? |
| | 7 | MR. ZELLINGER: Thank you. Your Honor, the State |
| | 8 | calls Paul Holcombe. |
| | 9 | PAUL HOLCOMBE, |
| 15:48:22 | 10 | having been called as a witness for the State and being duly |
| | 11 | sworn at 3:48 p.m., testified as follows: |
| | 12 | DIRECT EXAMINATION BY MR. ZELLINGER : |
| | 13 | Q. Good afternoon. |
| | 14 | A. Good afternoon. |
| 15:48:53 | 15 | Q. And sir, can you state your name for the jury. |
| | 16 | A. My name is Paul Holcombe. |
| | 17 | Q. And can you spell your last name. |
| | 18 | A. It's H-O-L-C-O-M-B-E. |
| | 19 | Q. And are you a lawyer? |
| 15:49:01 | 20 | A. I am. I'm an elected official. |
| | 21 | Q. Okay. And as an elected official, you are involved |
| | 22 | in state government; is that correct? |
| | 23 | A. I am. |
| | 24 | Q. Do you know the defendant, Ronald Johnson, in this |
| 15:49:16 | 25 | case? |

| | | | |
|---|---|---|---|
| 15:49:16 | 1 | A. | I do. |
| | 2 | Q. | And did you know him when he ran for school board? |
| | 3 | A. | I did. |
| | 4 | Q. | Okay.  And at some point did you know DeVan |
| 15:49:26 | 5 | Barbour? | |
| | 6 | A. | I know DeVan also. |
| | 7 | Q. | Okay.  And how do you know DeVan? |
| | 8 | A. | His father was also named DeVan, and he was a |

County Commissioner here when I first ran for elected office
in 2008.  So I met him at that time, and then I would see him
at events during both of the times that DeVan, III, sometimes
referred to as Little D, ran for Congress.

Q.    Okay.  And DeVan Barbour, IV, Little D, as you call
him --

A.    Yes.

Q.    -- ran in 2022 and 2024; is that correct?

A.    Yes.  I believe that's correct.

Q.    And do you know a woman named Angie Barbour?

A.    I do.

Q.    How do you know Angie Barbour?

A.    So Angie Barbour joined the Johnston County
Republican Women's Group in 2021, and she was nominated to be
vice president at the end of that year, November, and then
started and serving in that capacity in the spring of 2022.
My wife has been a member of that group since 2008, and I've

Paul Holcombe - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 15:50:31 | 1 | been an associate member of that group since 2008. So I saw |
| | 2 | her at those events. I saw her at other political events |
| | 3 | during the spring of 2022. She actually volunteered on my |
| | 4 | campaign. She handed out palm cards during early voting on |
| 15:50:48 | 5 | primary election day, and she even designed an ad that ran on |
| | 6 | the JoCo Reports for me. |
| | 7 | Q. Okay. Like an advertisement on the JoCo Report |
| | 8 | website? |
| | 9 | A. Yes. |
| 15:50:58 | 10 | Q. And did she work at polling places for you? |
| | 11 | A. She did. |
| | 12 | Q. And before election day, specifically with respect |
| | 13 | to 2022, this jury has heard that there was a primary on |
| | 14 | May 17th of 2022. Do you recall that? |
| 15:51:12 | 15 | A. There was. |
| | 16 | Q. And were you on the ballot back then? |
| | 17 | A. I was. |
| | 18 | Q. And did Ms. Barbour help with your campaign? |
| | 19 | A. She did. As I said, she handed out palm cards |
| 15:51:24 | 20 | during the early voting period, which is approximately two and |
| | 21 | a half weeks prior to the actual primary election day. She |
| | 22 | handed out palm cards on primary election day. And as I said, |
| | 23 | she designed the ad for me that ran on the JoCo Reports. |
| | 24 | Q. At some point did you find out Angie Barbour had |
| 15:51:42 | 25 | had an affair with the defendant in this case, Ronald Johnson? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

15:51:44   1        A.    I did.

           2        Q.    How did you come into that information?

           3        A.    In mid April, it basically came out to sort of

           4   everybody somewhere around the time that we did the Reagan Day

15:52:07   5   Dinner and Easter weekend.  It's my understanding that she

           6   told her husband about it, and from there it went out to

           7   everybody.  So I was aware of it by the time early voting

           8   started the end of April.

           9        Q.    So that information that she had an affair with the

15:52:23  10   defendant started to come out in the middle of April; is that

          11   correct?

          12        A.    It did.

          13        Q.    And did you hear people talking about it?

          14        A.    I did.

15:52:32  15        Q.    And the defendant at that time, he was an elected

          16   school board member?

          17        A.    He was.

          18        Q.    He wasn't on the ballot in 2022 though; correct?

          19        A.    He was not.

15:52:44  20        Q.    And at some point did you talk to Angie Barbour

          21   about that subject?

          22        A.    I did.

          23        Q.    Do you remember when that was?

          24        A.    So I do not recall exactly what day it was, but it

15:53:05  25   occurred during the early voting period which ran from

Paul Holcombe - Direct by Mr. Zellinger

15:53:11    1   April -- from Thursday, April 28th through Saturday, May 14th.

            2   I believe it was toward the first half of that window, because

            3   during the last week of early voting I worked primarily at a

            4   different location in Clayton for the one where the

15:53:33    5   conversation took place which was here in Smithfield at the

            6   church annex.

            7       Q.   And do you recall -- so there's an early vote

            8   location at a church annex here in Smithfield?

            9       A.   Yes.  Just a few blocks from here.

15:53:47   10       Q.   Before we get to that, you mentioned Reagan Day.

           11   Is Reagan Day in February -- well, let me ask you.  Does the

           12   Johnston County Republican Party have like a Reagan Day event

           13   in April?

           14       A.   They have that event.  That event is not always at

15:54:05   15   the same time.

           16       Q.   Okay.  Do you remember in 2022, roughly, when

           17   Reagan Day was?

           18       A.   That dinner took place on the Thursday before

           19   Easter.  So that whatever that particular -- let's see.  Yes,

15:54:29   20   I believe Easter was the 17th.  I believe that dinner took

           21   place Thursday, the 14th.

           22       Q.   Okay.  Thursday, April 14th?

           23       A.   Thursday night, yes.

           24       Q.   And to jump back.  So early vote, the first half of

15:54:42   25   it was at this annex in Smithfield, and then the second half

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 15:54:46 | 1 | was someplace else in Clayton; is that correct? |

2        A.    Well, no.  The early voting went on during that

3  entire period of time.  It's just that --

4        Q.    In both places?

| 15:54:54 | 5 | A.    Yes.  In fact, there may have been three or four |

6  locations.  I just know that I had moved to be at the church

7  of Clayton Crossings during the last primarily, if not all, of

8  the last week.

9        Q.    Okay.  So that first section of early voting, you

| 15:55:09 | 10 | were at this annex in Smithfield; is that correct? |

11        A.    I was.

12        Q.    And on one of those days, what happened with

13  respect to Angie Barbour?

14        A.    So I was there.  She was there.  There were at

| 15:55:19 | 15 | least a couple other people that were there handing out |

16  information, palm cards.  At one point she asked if she could

17  speak with me.  So we walked several feet away from the

18  50-foot line that is in front of the area where you go in to

19  early vote.  We walked several feet away from that as to not

| 15:55:40 | 20 | be overheard and were kind of standing between two parked |

21  cars.  There were not a lot of people there to vote coming and

22  going because it was a non-presidential election year.  It was

23  a primary, early in the primary.

24              So she then began to share with me that -- let's

| 15:56:04 | 25 | see.  So she said she started talking about this interaction |

| | |
|---|---|
| 15:56:13 | 1 |

15:56:13   1   she had with DeVan.  So it was either a phone call or FaceTime

2   call that she was describing.  It wasn't in person.  She told

3   me -- she didn't give me a lot of details, quite honestly.

4   She didn't want to give me a lot of details.  It was clear to

15:56:28   5   me that DeVan had made statements about her attractiveness,

6   her desirability, and statements that were inappropriate for

7   him to make to anybody other than his wife, Britany.

8          Then she told me that she, within the context of

9   their relationship, she had relayed this to Ronald Johnson,

15:56:46   10   and that unbeknownst to her he had audio taped it.  So she

11   then went on to tell me that he was now pressuring her to

12   provide him with a written statement that they had not had any

13   sort of affair, because, like I said, it all kind of came out

14   kind of from Easter forward.

15:57:13   15          Q.   If I can slow you down a little bit.  So she said

16   that she had this conversation with DeVan Barbour on FaceTime

17   or some -- not in person.

18          A.   Not in person.

19          Q.   And he made inappropriate comments about her

15:57:24   20   attractiveness or desirability; is that correct?

21          A.   He did.

22          Q.   And then she relayed that to the defendant, who she

23   was in a relationship with; is that correct?

24          A.   Yes.

15:57:33   25          Q.   And then who pressured -- what happened?  What else

15:57:37   1    did she tell you at that point?

2         A.   So at this time she said that he was pressuring her

3    to --

4         Q.   I'm sorry.  Who is pressuring?

15:57:45   5    A.   Okay.  That Ronald Johnson was pressuring her,

6    threatening to release the audiotape of her describing this

7    conversation between her and DeVan if she did not provide him

8    a written statement that they had not, in fact, had an affair.

9              She told me also that she had gone to the

15:58:05  10    Smithfield Police Department and talked to them about it, and

11    they had indicated that they -- whoever she talked to.  She

12    didn't tell me who at the Smithfield Police Department she

13    talked to.

14         Q.   Let's not get into -- so she told you she relayed

15:58:18  15    that information to the Smithfield Police Department; is that

16    correct?

17         A.   Yes.

18         Q.   And without getting what she was told, at some

19    point did she ask you a question about that?

15:58:28  20    A.   The point of her telling me all this appeared to be

21    that she, A, wanted to know what I thought about what

22    Smithfield's response was; and B, what I thought she should do

23    as a result of Ronald pressuring her.

24         Q.   Okay.  And did she also tell you releasing this

15:58:49  25    recording would hurt or harm DeVan Barbour's campaign?

| | | |
|---|---|---|
| 15:58:53 | 1 | A.    I don't know that she specifically said that.  It |
| | 2 | was kind of obvious to me. |
| | 3 | Q.    Okay.  And why was it obvious to you? |
| | 4 | A.    Well, I mean, clearly it was an embarrassing sort |
| 15:59:06 | 5 | of incident involving him propositioning someone who wasn't |
| | 6 | his wife, and so we were within a few days, you know, of the |
| | 7 | actual primary occurring.  So there was no question to me that |
| | 8 | it was, and she was very concerned about it. |
| | 9 | Q.    Did you give her some advice on what she should do? |
| 15:59:33 | 10 | A.    I did. |
| | 11 | Q.    And was that advice that -- what was that advice? |
| | 12 | A.    So I didn't make any comments about what was going |
| | 13 | on between her and reporting it to the Smithfield Police |
| | 14 | Department, but as for her practical advice, I told her she |
| 15:59:50 | 15 | should not acquiesce to what Ronald Johnson was asking her to |
| | 16 | do, that she should make very clear to him that she was not |
| | 17 | going to do what he wanted her to do, and then that she should |
| | 18 | limit any future contact with him and focus on reconciliation |
| | 19 | with her husband which she told me was part of her goal in |
| 16:00:10 | 20 | telling him at Easter. |
| | 21 | Q.    Did you say that you were going to tell anyone else |
| | 22 | about the conversation that you had? |
| | 23 | A.    No.  In fact, she asked me not to tell anybody, and |
| | 24 | I never did tell anybody, at least not until I was subpoenaed. |
| 16:00:35 | 25 | Q.    Now, did you have an occasion to see Angie Barbour |

| | |
|---|---|
| 16:00:38 | 1 |

and the defendant interact together?

2     A.   I did.  On primary election night.

3     Q.   Okay.  And that was a night that you were on the

4 ballot as well; is that correct?

16:00:51  5     A.   I was.

6     Q.   And where did you go that evening?

7     A.   So there was what was commonly referred to as a

8 Watch Party at a private residence the night of the primary

9 election which was May 17th.  I worked at a particular

16:01:05  10 location off of Cleveland School Road, the old Presbyterian

11 Church, until that poll closed at 7:30.  I then went home.

12 And I live in the general Cleveland area, so I went home

13 first.  My wife, myself, my adult daughter, and her friend who

14 had all worked at polls that day went with me.

16:01:28  15     So we arrived at the residence probably around

16 maybe 8:45 in the evening.  The party had clearly already been

17 going on since the polls closed at 7:30.  We walked back to

18 the area where it was taking place which was basically there

19 was a pool, a pool house.  We walked through the pool house

16:01:51  20 where a lot of people were hanging out, watching the election

21 returns, and then we moved -- then we went through there to a

22 side room that had the food in it.

23     Once we got into the side room, I could hear two

24 people kind of having what appeared to be a disagreement.

16:02:14  25 There were some raised voices, and I recognized Angie's voice,

| | |
|---|---|
| 16:02:18 | 1 |

and I had not seen her between the time that I came in from

2  the parking lot through that period of time.  So I went back

3  out through the main area where people were watching the

4  returns.  I went down behind the area where the food was.  The

16:02:35  5  first person I encountered was Angie and then a few feet away

6  I saw Ronald Johnson.

7       Q.   When you saw them, what was their -- could you

8  describe the defendant's demeanor?

9       A.   I mean, it was -- I mean, I said polite hellos and

16:02:53  10  acknowledged both of them.  It was clear they had been in an

11  extended discussion at that point.

12       Q.   Was that sort of awkward?

13       A.   It was.  I mean, it was.  But I mean, I

14  acknowledged them.  They acknowledged me.  I felt I had

16:03:09  15  accomplished my purpose which was just to make sure that

16  everything was okay and for Angie to see that I was there and

17  then I left.  I texted her as we were getting ready to leave

18  about an hour and 15, hour and a half later, sometime around

19  10:15, 10:30.  I said, hey, we're getting ready to leave.  I

16:03:37  20  assume if you didn't want to continue that conversation, you

21  would have come and found me.  That apparently was the end of

22  the conversation because she showed up few minutes later.  I

23  thanked her for the work that she did, and we left the party.

24       Q.   Okay.  And just to be clear, so when you left --

16:03:56  25  when you heard these raised voices and this discussion between

16:04:01   1   Angie Barbour and the defendant on the night of May 17th, you

          2   go in and exchange these sort of -- you say hello and then you

          3   stay at that party for another hour or so; is that correct?

          4        A.   I did.   I mean, they were off by themselves behind

16:04:15   5   the residence.   There was no one else out there, and it was

          6   basically dark, even though was early summer.   It was 8:50 at

          7   night.   And so I just left them to their interaction and went

          8   back up.   Again, I had accomplished my purpose which was to

          9   let her know that I was there and give her an opportunity, if

16:04:35   10   she wanted, to stop having that conversation.

        11        Q.   Then when you go to leave an hour or something

        12   later, you text her and she comes and says bye?

        13        A.   I did.   Because I did not see her again until the

        14   very end when we left.

16:04:47   15        Q.   And when you went back there and -- I asked about

        16   the defendant's demeanor.   What did Angie Barbour's demeanor

        17   seem like?

        18        A.   I mean, their demeanor was essentially the same.

        19   It was two people that, you know, probably didn't expect me to

16:05:00   20   show up and I showed up.   You know, they both tried to act

        21   like everything was somewhat normal given the fact that they

        22   were out there by themselves behind the residence.   I did not

        23   stay long.   I did not hear what they were talking about.   I

        24   just acknowledged both of them, realized that she was having a

16:05:19   25   conversation with somebody she had obviously been in a

| | | |
|---|---|---|
| 16:05:22 | 1 | relationship with a long time and I left. |
| | 2 | Q.   Thank you, sir. |
| | 3 | MR. ZELLINGER:  Nothing further, Your Honor. |
| | 4 | THE COURT:  Mr. Tyndall. |
| 16:05:29 | 5 | MR. TYNDALL:  Thank you, Your Honor. |
| | 6 | CROSS-EXAMINATION BY MR. TYNDALL: |
| | 7 | Q.   Now, on that particular night, you knew my client |
| | 8 | as well as Ms. Barbour; is that right? |
| | 9 | A.   I do know Mr. Johnson. |
| 16:05:42 | 10 | Q.   How long had you known him? |
| | 11 | A.   For many years.  I knew him as a police officer |
| | 12 | before he ran for school board, and then the first time that |
| | 13 | he ran in 2016 I was up for reelection to my third term.  So |
| | 14 | we were both on the campaign trail.  I saw him at numerous |
| 16:06:00 | 15 | events at that time and then after that. |
| | 16 | Q.   Did you all have a good relationship? |
| | 17 | A.   We did. |
| | 18 | Q.   Did you continue to maintain a good relationship? |
| | 19 | A.   We did. |
| 16:06:10 | 20 | Q.   Now, you mentioned you knew him as a police |
| | 21 | officer.  Did he have -- was there was an occasion where he |
| | 22 | actually helped you as a police officer? |
| | 23 | A.   There was. |
| | 24 | Q.   Tell us a little bit about that. |
| 16:06:22 | 25 | A.   There was an occasion several years ago that I was |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

16:06:25   1   the victim of a credit card incident here in Smithfield where

2   I had used my credit card at a gas station, and without

3   knowing it there was a skimmer on the inside of the gas pump.

4   So I would never have been able to tell because it was on the

16:06:48   5   inside.  But I was able to give the police some information

6   about the places I had used it, and they were able to kind of

7   figure out where it was.  And so Ronald Johnson was serving as

8   a detective.  He went really above and beyond in terms of

9   trying to help locate these people.

16:07:12   10          It turns out that they were doing this kind of up

11   and down I-95.  They were out of state.  And he did, in fact,

12   use the information I had provided and some skills to

13   determine that somebody -- who the person was, and we brought

14   them back, and at least one of the two individuals was

16:07:32   15   prosecuted by the local district attorney's office.

16          Q.   I want to talk to you a little bit about the period

17   of time leading up to the election.  I assume that you were

18   running for office so it's a pretty intense environment; is

19   that fair to say?

16:07:52   20          A.   It was.  It was a contested primary.

21          Q.   And you were working during the day as well?

22          A.   I was.

23          Q.   So you're managing your work life, as well as your

24   campaign life and all that.

16:08:05   25          When it became common knowledge sometime in mid --

16:08:11  1   you said you think it was April 14th by the time of the Reagan

2   Day Dinner; is that right?

3        A.   No.  I specifically know that I was not aware of it

4   on the Reagan Day Dinner.  I found out sometime after that

16:08:24  5   Easter Sunday.

6        Q.   Oh, okay.  So Easter Sunday was the 17th?

7        A.   Yes.

8        Q.   And so you found out sometime after that?

9        A.   Sometime between the 17th and 28th.

16:08:34  10       Q.   The 28th, that's a date you're aware of because of

11   the early voting.

12       A.   It's the first day of early voting.

13       Q.   At some point you had this conversation with

14   Ms. Barbour.

16:08:47  15       A.   Correct.

16       Q.   She represented to you that Ronald was putting

17   pressure on her.

18       A.   She did.

19       Q.   Did she tell you she had not spoken to him since

16:08:56  20   the 13th of April?

21       A.   She did not.

22       Q.   The night you heard my client and Ms. Barbour

23   having a discussion, the polls had closed; is that right?

24       A.   They had.

16:09:39  25       Q.   Between the time of your conversation with

| | | |
|---|---|---|
| 16:09:44 | 1 | Ms. Barbour and the closing of the polls, had you had any |
| | 2 | discussion with DeVan Barbour? |
| | 3 | A. No. |
| | 4 | Q. Is he someone you actually attend church with? |
| 16:10:00 | 5 | A. We do attend the same church. That is true. We |
| | 6 | don't go to the same service often, but we do attend the same |
| | 7 | church. |
| | 8 | Q. I take it that you know him decently well, but you |
| | 9 | guys don't hang out together all the time; is that fair to |
| 16:10:14 | 10 | say? |
| | 11 | A. I have always considered DeVan a friend, but that |
| | 12 | is correct. He's not a close friend, certainly not close |
| | 13 | enough that I would have gone out of my way to talk to him |
| | 14 | about allegedly propositioning someone other than his wife. |
| 16:10:28 | 15 | Q. Right. Right. And have you continued to see my |
| | 16 | client occasionally around town following these events? |
| | 17 | A. I have. |
| | 18 | Q. Do you see him in a political -- sort of in a |
| | 19 | political environment or a social environment or just bumping |
| 16:10:52 | 20 | into him? |
| | 21 | MR. ZELLINGER: Objection to relevance. |
| | 22 | THE COURT: I'll let him answer if he can. |
| | 23 | THE WITNESS: I would say primarily it would still |
| | 24 | be political. I don't know that we really run into each other |
| 16:11:11 | 25 | very often socially, although there have been one or two |

16:11:14  1   occasions.  I guess there is a mixture, now that I think about

        2   it.

        3       Q.   Suffice it to say that at the time the polls closed

        4   and any time since then, you never heard of a recording being

16:11:29  5   released by my client; have you?

        6       A.   No.

        7       Q.   And you've certainly never heard him talk about

        8   DeVan Barbour or anything like that; have you?

        9       A.   I never talked to Ronald Johnson about the

16:11:40 10   incident, no.

       11       Q.   I'm sorry, say that again.

       12       A.   I never talked to Ronald Johnson about the incident

       13   either, no.

       14       Q.   But as far as you know, you never heard him make a

16:11:48 15   public statement about it or anything?

       16            MR. ZELLINGER:  Objection, Your Honor.  Calls for

       17   self-serving hearsay.

       18            THE COURT:  I'll sustain that and let you reask, if

       19   you would.

16:12:02 20       Q.   You were aware of -- Ms. Barbour shared some

       21   information with you; is that right?

       22       A.   She did.

       23       Q.   And her concern was there was a recording or

       24   something that Mr. Johnson might release if she didn't do what

16:12:17 25   he asked her to do?

16:12:18  1      A.   Yes.

2      Q.   As far as you know, that never happened.

3      A.   I mean, I never personally heard any tape or heard

4   that it was released.

16:12:27  5      Q.   Or you never heard a report in the newspaper that

6   he released some recording of DeVan Barbour?

7      A.   I did not.

8           MR. TYNDALL:  Nothing further, Your Honor.

9           THE COURT:  Mr. Zellinger.

16:12:35  10          MR. ZELLINGER:  Just briefly.

11   REDIRECT EXAMINATION BY MR. ZELLINGER:

12      Q.   You haven't been in this courtroom for the last two

13   weeks; have you?

14      A.   I have not.

16:12:42  15          MR. ZELLINGER:  Nothing further.

16          MR. TYNDALL:  I don't have anything further.

17          THE COURT:  Thank you.  You may step down.

18          MS. JAMES:  Your Honor, may he be released?

19          THE COURT:  Yes, ma'am.

16:13:20  20          (Witness excused.)

21          MR. ZELLINGER:  Your Honor, can I approach the

22   clerk?

23          THE COURT:  Yes.

24          Mr. Zellinger, any further evidence?

16:13:57  25          MR. ZELLINGER:  Your Honor, the State rests.

| | | |
|---|---|---|
| 16:13:58 | 1 | THE COURT: At the close of the State's evidence |
| | 2 | there's matters that need to be discussed outside the presence |
| | 3 | of the jury. For that reason, I'm going to excuse you for the |
| | 4 | day. I ask that you come back at 9:30 in the morning. |
| 16:14:12 | 5 | I also ask -- well, maybe let you know as we get |
| | 6 | toward kind of the end of the trial there's going to be a |
| | 7 | little bit of in and out and maybe extra waiting on your part. |
| | 8 | I apologize for that. There's matters that we do need to take |
| | 9 | care of. So if we ask you to be here at 9:30 and we're not |
| 16:14:27 | 10 | right with you, please understand that and just be patient |
| | 11 | with us as well. |
| | 12 | Remember those same rules remain in effect. You |
| | 13 | are not to talk about this with each other or let anybody |
| | 14 | speak with you about it. You are not to talk or communicate |
| 16:14:39 | 15 | in any way with the parties connected to this. Please don't |
| | 16 | do anything on your own and try to learn more. |
| | 17 | Thank you very much. See you at 9:30 in the |
| | 18 | morning. |
| | 19 | (Jury exits.) |
| 16:15:21 | 20 | THE COURT: At the close of the State's evidence, |
| | 21 | any motions from either side? |
| | 22 | MR. BRUDER: Yes, Judge. May I have a moment? |
| | 23 | Thank you, Your Honor. I have two motions for the Court. |
| | 24 | First, we would move again to make our motion in opposition to |
| 16:15:43 | 25 | the joinder, or in the alternative to sever for the reasons |

| | | |
|---|---|---|
| 16:15:48 | 1 | Mr. Tyndall stated at the original hearing on that motion and |
| | 2 | during his argument before the jury was impaneled. |
| | 3 | THE COURT: With respect to the first motion, does |
| | 4 | the State wish to be heard? |
| 16:16:01 | 5 | MR. ZELLINGER: On the motion for joinder and |
| | 6 | severance, Your Honor? |
| | 7 | THE COURT: Yes, sir. |
| | 8 | MR. ZELLINGER: Your Honor, I think it was |
| | 9 | appropriately made, and following the State evidence, it's |
| 16:16:07 | 10 | still appropriately made. The willful failure to discharge |
| | 11 | duties in this case is potentially the most disparate charge |
| | 12 | in terms of activity. And you heard that this was done in |
| | 13 | response to Owen Phillips befriending and helping Angie |
| | 14 | Barbour. So these two things are linked together. |
| 16:16:25 | 15 | In terms of the other willful failure to discharge |
| | 16 | duties in terms of recording the closed meeting of the school |
| | 17 | board, that happened nearly contemporaneously with the events |
| | 18 | in this case that's alleged to have occurred on May 31st, |
| | 19 | 2022. This involves April -- we really heard that it goes |
| 16:16:43 | 20 | from April into and up to election day of the primary on |
| | 21 | May 17th of 2022. So those things are very close to being |
| | 22 | contemporaneous. |
| | 23 | Additionally, it's all the same motus operandi. |
| | 24 | The defendant either records people or seeks to acquire |
| 16:17:01 | 25 | recordings to use for his political advantage. We heard that |

| | | |
|---|---|---|
| 16:17:04 | 1 | from a number of witnesses, including, most starkly, from |
| | 2 | Thomas Bennett Jones, who essentially said that he was sharing |
| | 3 | recordings with the defendant acting as the defendant's |
| | 4 | satellite to record folks to benefit the defendant |
| 16:17:18 | 5 | politically. |
| | 6 | In terms of the felony obstruction of justice, |
| | 7 | that, of course, revolves around the investigation into this |
| | 8 | by Investigator Hoffman. So all these matters are linked in |
| | 9 | close proximity in time and in the facts and motus operandi |
| 16:17:35 | 10 | the defense has committed. So I would ask the Court to deny |
| | 11 | that motion. |
| | 12 | THE COURT: Thank you. At this point having heard |
| | 13 | the evidence, the Court will reiterate its prior findings that |
| | 14 | the allegations asserted by the State were separated by a |
| 16:17:50 | 15 | matter of roughly -- I think I originally said nine months. |
| | 16 | It may have been 12 months, but separated by a matter of |
| | 17 | months. |
| | 18 | The Court will also find that the allegations |
| | 19 | related to the defendant's service on the Johnston County |
| 16:18:02 | 20 | Board of Education, that each allegation could serve |
| | 21 | potentially as 404(b) evidence from the other allegation. Now |
| | 22 | that the allegations contain factual assertions by the State |
| | 23 | and involve recording individuals, playing recorded |
| | 24 | conversations, and that is consistent with all charges, the |
| 16:18:27 | 25 | Court will also specifically find that Counts 1 and 4 are |

| | | |
|---|---|---|
| 16:18:30 | 1 | related to the allegation that defendant has been accused of |
| | 2 | pressuring individuals for third-party action. |
| | 3 | Therefore, I certainly do appreciate the motion on |
| | 4 | behalf of the defendant; however, in the Court's discretion, |
| 16:18:48 | 5 | it will be denied. |
| | 6 | MR. ZELLINGER: Thank you, Your Honor. May I |
| | 7 | approach? |
| | 8 | THE COURT: Yes, sir. |
| | 9 | MR. BRUDER: Your Honor, at this time Mr. Johnson |
| 16:19:08 | 10 | moves to dismiss under North Carolina General Statute Sections |
| | 11 | 15-173 and 15A-1227 for insufficiency of the evidence. |
| | 12 | As Your Honor knows, in ruling on a motion to |
| | 13 | dismiss, the Court's obliged to view the evidence in the light |
| | 14 | most favorable to the State. The Court must determine whether |
| 16:19:28 | 15 | there's substantial evidence to support each element of each |
| | 16 | offense. Although the State is entitled to reasonable |
| | 17 | inferences based off of the evidence, inference may not be |
| | 18 | based off of inference. Every inference must stand on some |
| | 19 | clear and direct evidence and not upon the some other |
| 16:19:45 | 20 | inference. That's State vs. Davis. That will be the second |
| | 21 | blue tab in your binder. |
| | 22 | THE COURT: I'm sorry, the second what now? |
| | 23 | MR. BRUDER: I'm sorry? |
| | 24 | THE COURT: The second what? |
| 16:19:57 | 25 | MR. BRUDER: The second blue tab in your binder. |

| | |
|---|---|
| 16:19:59 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 16:20:11 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 16:20:30 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 16:20:52 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 16:21:22 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 16:21:48 | 25 |

THE COURT: Okay. Thank you. Yes, sir.

MR. BRUDER: Following all of that, if the evidence is sufficient only to raise suspicion of each individual element, even if that suspicion is strong, the motion for dismissal must be allowed. We move to dismiss for insufficiency of the offense for each element of each offense. Without waiver of those arguments, I would point the Court to a few specific elements.

First, with respect to the willful failure counts, that's Counts 2 and 4 of the indictment, Count 2 refers to the recording that Mr. Zellinger referenced a few moments ago, and Count 4 is the alleged removal or request for the removal of the students.

With reference to both of these counts, both come under the willful failure to discharge duties statute. That statute is for your convenience under the first yellow tab. That's North Carolina General Statute Section 14-230. It's important to note that this statute deals specifically with omissions, neglect, or refusals to discharge a duty. The allegations for both of these counts, as the evidence has come in through the State's witnesses, speak to alleged actions by Mr. Johnson. In short, those actions do not fall within the prohibitions of the statute which speaks consistently about failing to exercise duties and does not apply to affirmative acts of Mr. Johnson.

| 16:21:52 | 1 | More importantly, the State through its evidence |
|---|---|---|
| | 2 | has suggested that for the recording count, that's Count 2, |
| | 3 | the duty that Mr. Johnson has failed to discharge is not |
| | 4 | recording -- an affirmative duty not to record the school |
| 16:22:12 | 5 | board session. The State has contended at several points and |
| | 6 | made statements to the effect of that the mere recording of a |
| | 7 | school board session goes against the duty. The only duty |
| | 8 | that I can discern from the State's evidence is through the |
| | 9 | code of ethics that is adopted by the school board, which |
| 16:22:34 | 10 | there was testimony to the effect of stating, and this is |
| | 11 | exhibits -- it's coming through in Exhibit -- I think it's 22. |
| | 12 | MR. ZELLINGER: 20. |
| | 13 | MR. BRUDER: 20. 20 is the code of ethics, but 23 |
| | 14 | is the school board policy with respect to closed sessions. |
| 16:22:59 | 15 | That is what I understand the State to be alleging is where |
| | 16 | this duty comes from. |
| | 17 | It's important to note that the statute here talks |
| | 18 | about legal duties. It has to. That's what it's talking |
| | 19 | about. However, the board ethical requirements, this is |
| 16:23:17 | 20 | Exhibit 20A, states that the following standards will guide |
| | 21 | each board member in the performance of his or her duties. |
| | 22 | That language mirrors the statute which requires school |
| | 23 | boards, like the Johnston County School Board, to adopt codes |
| | 24 | of ethics. This is North Carolina General Statue Section |
| 16:23:38 | 25 | 160A-86. It is the reverse side of the first pink tab in your |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | |
|---|---|
| 16:23:47 | 1 | binder which states under part A:  That governing boards of |
| | 2 | cities, counties, local boards of education, unified |
| | 3 | governments, sanitary districts, and consolidated city |
| | 4 | councils shall adopt a resolution or policy containing a code |
| 16:24:02 | 5 | of ethics to guide the actions by the governing board members |
| | 6 | in the performance of the member's official duties as members |
| | 7 | of that governing board. |
| | 8 | Any code of ethics that was adopted, including |
| | 9 | Johnston County School Board Code of Ethics that was adopted, |
| 16:24:19 | 10 | was adopted in order to guide the official duties of the board |
| | 11 | members.  It itself cannot be the duties that the board |
| | 12 | members promise to abide by.  The thing that guides someone to |
| | 13 | do something is separate and distinct from the thing itself. |
| | 14 | The State has offered no evidence and made no |
| 16:24:42 | 15 | argument as there being any other duties outside of these |
| | 16 | ethics opinions.  It is solicited testimony about what is |
| | 17 | ethical and what is not, and I think that's precisely why this |
| | 18 | charge is so dangerous. |
| | 19 | Under the State's reading, any violation of the |
| 16:25:00 | 20 | codes of ethics adopted by any local board, any governing body |
| | 21 | could become the basis of a criminal charge under the failure |
| | 22 | to discharge duties.  That includes the testimony that we've |
| | 23 | heard here today about a school -- or a few days ago about a |
| | 24 | school board member threatening to fight another school board |
| 16:25:20 | 25 | member or threatening to cause them physical harm.  That |

Case 5:23-cv-00349-D-RN   Document 158-7   Filed 10/27/25   Page 86 of 150

| | |
|---|---|
| 16:25:24 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 16:25:42 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 16:26:04 | 10 |
| | 11 |

16:25:24    1    certainly might be a criminal act separately, but it's also a

           2    violation of the ethics requirements that was testified to

           3    regarding civility certainly.

           4           The point is the school board is not a legislative

16:25:42   5    body.  It adopts a code of ethics to governor its own

           6    behavior.  But that code of ethics become the basis of

           7    criminal liability simply because a local school board has

           8    adopted it.  That's not to say that the school board doesn't

           9    have other methods of potentially or plausibly enforcing its

16:26:04  10    code of ethics, including censure, which there was testimony

          11    to in this case that that has occurred.  That is the proper

          12    enforcement mechanism for these code of ethics, not a criminal

          13    statute that has been pigeonholed to meet the needs of the

          14    State.

16:26:19  15           With respect to the second willful failure count,

          16    which is Count 4, I believe, reflecting the alleged movement

          17    of students or request for the movement of students.  Again,

          18    this statute specifically speaks about failures to discharge

          19    official duties.  The State would have to show that there's an

16:26:44  20    official duty not to request the transfer of students or bring

          21    to the -- and taking the evidence in the light most favorable

          22    to the State can see that's what the evidence showed.

          23    However, there's been no evidence that Mr. Johnson was acting

          24    in any way within his official capacities as a school board

16:27:05  25    member.

| | |
|---|---|
| 16:27:06 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 16:27:20 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 16:27:38 | 10 |

1    By contrast, the other willful failure charge was
2    related to events happening at a school board meeting relating
3    specifically to his performance as a member of the school
4    board.  Dr. Bennett Jones was testifying that all of the
5    discussions with -- the discussions relating to the potential
6    movement of students was happening off school grounds, not
7    during any board meeting, as far as we can tell had no
8    relation to any board of education function except for the
9    fact that the identity of the people involved were two
10   students.

11   The State has not provided evidence to show that
12   Mr. Johnson was acting in his official capacity as a school
13   board member, and certainly has not provided evidence that he
14   was failing to discharge his duties while he was not acting in
15   the capacity of the school board member.

16   In addition, we contend that for both willful
17   failure counts the State has to prove an injury to the public.
18   That comes from State vs. Rone.  It's -- as an example of it
19   comes in State vs. Rone, which is in the second green tab in
20   Your Honor's binder.  That's been recognized as far as State
21   vs. Anderson which was back in the 1920s.  The State simply
22   has not provided any evidence that there was injury to the
23   public.  At best, in light most favorable to the State, the
24   State provided evidence that there might have been injury to
25   individual people, but not the public at large, which is what

16:28:42  1    they are required to do in order to prove this statute.

2             I think Investigator Hoffman testified that he had

3    not -- had no familiarity with the statute after having been a

4    police officer for 30 years.  And I think that's important

16:28:56  5    because it shows that this statute isn't used very often.

6    It's not used very often because it's supposed to do a

7    specific thing.  It's supposed to be a way for the State to

8    require officials to exercise their duties.  Officers who

9    might be constitutional officers who might not be able to be

16:29:17 10    fired in other ways.

11             State vs. -- or In Re:  Alamance, which is the

12    first green tab, I think is instructive here.  It speaks in

13    detail about a trial court's frustration with the local county

14    commissioners who were refusing to fund the infrastructure of

16:29:43 15    the court system and had no method of enforcing that short of

16    provisions like this statute.

17             I'm not familiar having done research into the

18    subject of certainly anyone on a school board being·charged

19    with this violation.  As far as I can tell, the kinds of

16:30:05 20    things the statute has been used to enforce in the past have

21    been magistrate's failing to issue warrants.  That's, again,

22    what happened in Rone.  The second orange tab, Stanley, which

23    is a failure to have made an arrest.  The Greer, again, a

24    police officer refusing to issue a warrant -- or a magistrate

16:30:29 25    refusing to issue a warrant.  And Birdsong, which is the first

| | |
|---|---|
| 16:30:34 | 1 | pink tab, which was charging a prison official for his |
| | 2 | failures to exercise duties of care in investigating a |
| | 3 | prisoner's suicide. |
| | 4 | All of those charges again deal with acts, |
| 16:30:48 | 5 | omissions, and neglect. The precise language of the statute. |
| | 6 | Whatever the actions Mr. Johnson had taken, they were |
| | 7 | affirmative actions. The State cannot use a statute that is |
| | 8 | used to charge against omissions, neglects, and failures to |
| | 9 | punish affirmative acts. |
| 16:31:14 | 10 | With respect to the extortion count, the State has |
| | 11 | not presented sufficient evidence to allow a rational finder |
| | 12 | of fact to find that Mr. Johnson made or communicated a threat |
| | 13 | to Mr. Barbour. Mr. Barbour's testimony has been throughout |
| | 14 | this trial that he could not remember the explicit words |
| 16:31:41 | 15 | Mr. Johnson gave to him, nor could he ever remember a threat |
| | 16 | being specifically made. The record shows that the first time |
| | 17 | that Mr. Johnson asked anything of Mr. Barbour was the phone |
| | 18 | conversation following up to the meeting at Clayton Fitness |
| | 19 | with Mr. Johnson sometime after that meeting. However, even |
| 16:32:02 | 20 | with respect to that conversation and with respect to every |
| | 21 | conversation, the jury has not heard that Mr. Johnson made a |
| | 22 | threat to Mr. Barbour. Mr. Johnson had made a threat to |
| | 23 | Mr. Barbour that Mr. Johnson would release any recording in |
| | 24 | his possession if Mr. Barbour did not speak to Ms. Barbour |
| 16:32:23 | 25 | about recanting the affair. |

| 16:32:25 | 1 | The State's evidence shows at best that Mr. Barbour |
|---|---|---|
| | 2 | felt threatened by the content of the recording and felt by |
| | 3 | extension the existence of the recording itself and that he |
| | 4 | transferred that feeling of threat to Mr. Johnson.  But that's |
| 16:32:44 | 5 | all internal to Mr. Barbour.  It speaks not of Mr. Johnson's |
| | 6 | actions or intentions to threaten or communicate a threat to |
| | 7 | Mr. Barbour.  Instead, what the evidence does show is that as |
| | 8 | soon as Mr. Barbour externalized his feelings about the |
| | 9 | content of that recording and felt that it was blackmail, as |
| 16:33:05 | 10 | the State has offered into testimony, Mr. Johnson got |
| | 11 | offended, told Mr. Barbour, never mind, not to worry about it, |
| | 12 | and Mr. Barbour never heard about it from Mr. Johnson again. |
| | 13 | Critically, Mr. Johnson never released the |
| | 14 | recording, even though Ms. Barbour never recanted the |
| 16:33:29 | 15 | existence of the affair, which was the object of the supposed |
| | 16 | threat under the State's theory. |
| | 17 | Although this motion is under a posture of a motion |
| | 18 | to dismiss and we have to take evidence in the light most |
| | 19 | favorable to the State allowing for reasonable inferences and |
| 16:33:45 | 20 | resolving contradictions in their favor, there is no |
| | 21 | contradiction here to be resolved.  There are no inferences to |
| | 22 | be made to get the State past their burden of even strong |
| | 23 | suspicion that Mr. Johnson made a threat.  There just wasn't |
| | 24 | evidence that a threat was made. |
| 16:34:05 | 25 | Since the record does not contain substantial |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | |
|---|---|
| 16:34:09 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 16:34:21 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 16:34:41 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 16:35:07 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 16:35:26 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 16:35:48 | 25 |

1  evidence that Mr. Johnson threatened to communicate a threat,

2  the Court should dismiss the extortion count at this stage.

3  In addition, the State has not presented sufficient

4  evidence to allow a rational trier of fact to find that

5  Mr. Johnson made or communicated a threat to Mr. Barbour.  He

6  did so wrongfully in that Mr. Barbour speaking to Ms. Barbour

7  on Mr. Johnson's behalf could constitute an advantage for the

8  purposes of this statute.

9  With respect to obstruction, the State hasn't

10  provided evidence -- first, provided evidence that Mr. Johnson

11  knew that Investigator Hoffman was seeking a search warrant.

12  The evidence that came in through Investigator Hoffman, the

13  only way that Mr. Johnson knew about it was a Facebook message

14  that came from the owner of the gym.  That message made no

15  reference of any investigation outside of the fact that the

16  identity of the person he had spoken to was the DA office

17  investigator.  There was no mention of a search warrant.

18  Indeed, Mr. Hoffman testified that he was trying to conceal

19  his own interest in the item specifically to avoid arousing

20  any suspicion.

21  It's entirely -- there isn't any evidence to

22  support that when Mr. Johnson went to the gym he knew a search

23  warrant was forthcoming or that any item in that room was to

24  be seized.  Even in resolving that gap of the evidence in the

25  favor of the State, there is no evidence that Mr. Johnson

| 16:35:52 | 1 | removed any items within the gym with deceit and intent to |
|---|---|---|
| | 2 | defraud, which critically is the third element of obstruction |
| | 3 | of justice which makes it a felony and not a misdemeanor. |
| | 4 | The State has alleged -- or has provided evidence |
| 16:36:08 | 5 | to the effect of Mr. Johnson had an office at the gym. |
| | 6 | Investigator Hoffman saw there was an item that he wanted to |
| | 7 | seize. Mr. Hoffman left. A text message of some kind went to |
| | 8 | Mr. Johnson. Mr. Johnson appeared. The phone was no longer |
| | 9 | there. That is the extent of the evidence. In the light most |
| 16:36:33 | 10 | favorable to the State, at best that meets the misdemeanor |
| | 11 | level of obstruction justice. |
| | 12 | There is no suggestion that Mr. Johnson ever lied |
| | 13 | to anyone about the place where the phone was, that he ever |
| | 14 | misled anyone of where the phone was, or that he has in any |
| 16:37:02 | 15 | way defrauded anyone or any entity or Mr. Hoffman with respect |
| | 16 | to the location of the phone. The evidence shows the phone |
| | 17 | was there. Mr. Johnson went there. By the time Mr. Hoffman |
| | 18 | went back, he didn't find the phone anywhere, and the phone |
| | 19 | was never recovered. |
| 16:37:21 | 20 | Nothing in that is evidence of fraud or an intent |
| | 21 | deceive. At most, it is the obstructive act is physically |
| | 22 | talking the phone away, at most. But there's no fraud or |
| | 23 | intent to deceive within there, and that's the critical |
| | 24 | element which raises this from a misdemeanor to a felony. |
| 16:37:41 | 25 | May I have a moment, Your Honor? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 16:37:44 | 1 | THE COURT: Yes, sir. |
| | 2 | MR. BRUDER: Thank you, Your Honor. |
| | 3 | THE COURT: May I ask a couple questions? |
| | 4 | MR. BRUDER: Of course. |
| 16:37:51 | 5 | THE COURT: Going back to your first argument on |
| | 6 | the failure to discharge duties, we have -- we've had a lot of |
| | 7 | discussion about that. We've had discussion about the |
| | 8 | instruction for that. That's my understanding, and I think |
| | 9 | that we're all in agreement. |
| 16:38:11 | 10 | I'm going to ask Mr. Zellinger to correct me if I |
| | 11 | misspeak, but my understanding is there is no pattern jury |
| | 12 | instruction for that. There is no specific statute that |
| | 13 | covers that. Any jury instruction is going to have to be |
| | 14 | crafted from common law. That seems to be agreed to. Is that |
| 16:38:28 | 15 | my correct understanding? |
| | 16 | MR. BRUDER: That's certainly our position, and |
| | 17 | from discussions with Mr. Zellinger, I understand that to be |
| | 18 | the State's position as well. |
| | 19 | THE COURT: And you had mentioned one of the |
| 16:38:40 | 20 | elements in that, that it requires injury to the public. Can |
| | 21 | you tell me what case law you are referring to? |
| | 22 | MR. BRUDER: Yes, Your Honor. If you look at the |
| | 23 | last green tab. This is, again, Rone on page 8 of 12. |
| | 24 | There's a highlighted portion here, and I'll just read it for |
| 16:38:57 | 25 | the record. |

| | | |
|---|---|---|
| 16:38:58 | 1 | It says: The essential elements of the offense |
| | 2 | therefore include the willful omission, neglect or refusal to |
| | 3 | discharge the duties of the office of the magistrate -- this |
| | 4 | is the public officer by -- this is element 2 -- a magistrate; |
| 16:39:12 | 5 | an official of a state institution, rather than a state |
| | 6 | employee. And then 3, injury to the public must occur as a |
| | 7 | consequence of the omission, neglect, or refusal. It's citing |
| | 8 | to a case called State vs. Anderson, which is 196 N.C. 771, |
| | 9 | 773 South -- 147 S.E. 305, 306 from 1929. |
| 16:39:41 | 10 | THE COURT: Thank you. I'm going to go back and I |
| | 11 | am going to read that. |
| | 12 | My second question under the extortion argument. |
| | 13 | We do have -- I'm sorry, not the extortion, the obstruction |
| | 14 | charge. We do have a pattern jury instruction for a |
| 16:40:00 | 15 | misdemeanor charge that lays out two elements. There's a |
| | 16 | footnote that to make it a felony you have to apply paragraph |
| | 17 | B of 14-3. I'm just going to read that. I'm going to get you |
| | 18 | to, I guess, answer to that, but it says: If a misdemeanor |
| | 19 | offense as to which no specific punishment is prescribed, the |
| 16:40:28 | 20 | infamous done in secrecy or malice, the offender shall be |
| | 21 | guilty of a class H felony. |
| | 22 | So my understanding is your argument is to make |
| | 23 | this a felony, I believe you said the fallback is the |
| | 24 | misdemeanor. There might be some evidence to support that, |
| 16:40:48 | 25 | but there's no evidence to support the felony. Can you tell |

| 16:40:53 | 1 | me what your understanding is on that paragraph B where it |
| | 2 | talks about it being infamous, done in secrecy and malice and |
| | 3 | how that applies to this case. Mr. Zellinger, I'm probably |
| | 4 | going to ask you the same thing in reverse. |
| 16:41:08 | 5 | MR. BRUDER: Yes, Judge. So the obstruction of |
| | 6 | justice offense is a common law offense. It's not statutory. |
| | 7 | If you will look at the second yellow tab, which is State vs. |
| | 8 | Ditenhaufer, that case provides some background on the history |
| | 9 | of -- that case provides background -- actually, I apologize. |
| 16:41:41 | 10 | It might be Coffee. Yes, Your Honor. I apologize. It's |
| | 11 | Coffee. It's State vs. Coffee, the first orange tab. On Page |
| | 12 | 4 of 6 going to into page 5 of 6, the Court describes the |
| | 13 | history of this offense and says: At common law, it is an |
| | 14 | obstruction of justice to suppress, fabricate, or destroy |
| 16:42:14 | 15 | physical evidence. Stating later: All the statutes reflect a |
| | 16 | common law principle that when a person believing that an |
| | 17 | official proceeding is pending or about to be instituted and |
| | 18 | acting without legal right or authority alters, destroys, |
| | 19 | conceals, or removes any record, document, or thing with a |
| 16:42:36 | 20 | purpose to impair its veracity or availability for such a |
| | 21 | proceeding, he is guilty of obstruction of justice. |
| | 22 | Now, turning to Ditenhaufer, the second yellow tab, |
| | 23 | that case on page -- I believe it's page 8. I apologize. |
| | 24 | It's page 7 on the second column. As the Court of Appeals -- |
| 16:43:23 | 25 | it's about half way down the second column in the first block. |

| 16:43:27 | 1 | As the Court of Appeals has correctly held, a defendant |
| | 2 | commits felonious, as compared to misdemeanor obstruction of |
| | 3 | justice, in the event that he or she unlawfully and willfully |
| | 4 | obstructs the justice by providing false statements to a law |
| 16:43:39 | 5 | enforcement officer investigating a crime with the intent to |
| | 6 | deceive and intent to defraud. |
| | 7 | That's not exactly on point, but I think the point |
| | 8 | it's trying to illustrate is that prior to the codification of |
| | 9 | the section that Your Honor referenced, which brings common |
| 16:43:58 | 10 | law -- primarily common law misdemeanors into the felony |
| | 11 | range, is that the legislature was intending to provide an |
| | 12 | extra level of punishment not only to all sorts of perfectly |
| | 13 | legal conduct that might otherwise fall under the obstruction |
| | 14 | of justice umbrella elevating it for a further level of |
| 16:44:20 | 15 | wrongfulness, which is that intent to defraud or mislead an |
| | 16 | investigation as opposed to misplacing or otherwise removing. |
| | 17 | That's my understanding. |
| | 18 | THE COURT: I may have some follow up questions. |
| | 19 | Mr. Zellinger, I'll let you respond. If I can ask |
| 16:44:37 | 20 | you -- and I hate to direct your argument, but to the |
| | 21 | obstruction charge, first, while I have that information in |
| | 22 | front of me, I'm going to ask you what I just asked the |
| | 23 | defendant. It seems what it takes to make this a felony is |
| | 24 | under B, and if I'm reading it right, it has to have those |
| 16:44:58 | 25 | three elements: Infamous, done in secrecy, and malice. It |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 16:45:03 | 1 | doesn't seem to say either/or. It seems to be all three have |
| | 2 | to be met. |
| | 3 | MR. ZELLINGER: Your Honor, I think that's |
| | 4 | incorrect. And I apologize to disagree with the Court. And I |
| 16:45:15 | 5 | can provide the Court the case law. But in an indictment, the |
| | 6 | conjunctive "and" should be interpreted in a jury instruction |
| | 7 | as "or." |
| | 8 | So the State would merely need to prove that there |
| | 9 | was deceit and intent to defraud or in secrecy and with malice |
| 16:45:36 | 10 | or was infamous. The State does not have to prove that it was |
| | 11 | done with deceit and intent to defraud and in secrecy and |
| | 12 | malice. |
| | 13 | I would agree with the Court that if we're going |
| | 14 | under the deceit and intent to defraud prong that there has to |
| 16:45:50 | 15 | be deceit and intent to defraud. If the State is going with |
| | 16 | the secrecy and malice that there has to be secrecy and |
| | 17 | malice, but there does not need to be deceit and an intent to |
| | 18 | defraud and in secrecy and with malice. |
| | 19 | Regardless, the State has put forward enough |
| 16:46:07 | 20 | evidence to prove to this jury beyond a reasonable doubt that |
| | 21 | the defendant is guilty of this offense because intent to |
| | 22 | defraud means an intention to deceive another person, and in a |
| | 23 | sort of financial sense it means induce another person in |
| | 24 | reliance upon such deception to give up something or forego |
| 16:46:19 | 25 | something. That's what we have here, the defendant's |

| | | |
|---|---|---|
| 16:46:29 | 1 | deception was that he found out or was tipped off that the |
| | 2 | investigation was going on. |
| | 3 | And let's be abundantly clear about that, that |
| | 4 | Facebook message. I mean that Facebook message says: Hey, |
| 16:46:37 | 5 | man, a guy from the DA's office just stopped by and asked me |
| | 6 | about you. Just figured I'd let you know. He didn't seem too |
| | 7 | concerned about anything. And that is -- within an hour the |
| | 8 | defendant is there and is taking evidence away that the State |
| | 9 | will never get. That phone is never found. |
| 16:47:00 | 10 | Looking at the case the defendant provided I think |
| | 11 | is instructive. Because if you look at Ditenhaufer, in that |
| | 12 | case the Supreme Court, I believe, ratifies the Court of |
| | 13 | Appeals in finding that the defendant precluding investigating |
| | 14 | officials from having access to the victim in that case. It |
| 16:47:20 | 15 | was a sex abuse case, and I think a parent prevented officials |
| | 16 | from having access to her. The Court found that that was |
| | 17 | deceit and intent to defraud. That was just sort of |
| | 18 | obfuscating or trying to interfere with an interview of a |
| | 19 | potential victim. Here we have the defendant literally taking |
| 16:47:40 | 20 | the evidence and obstructing the State's ability to have |
| | 21 | justice in this case by getting ride of it in that box. And |
| | 22 | it impairs a future proceeding in that it robs the State of |
| | 23 | the ability to look at this evidence. |
| | 24 | So I would argue to the Court that this is not just |
| 16:48:00 | 25 | in the light most favorable to the State evidence that would |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | |
|---|---|
| 16:48:01 | 1 |

establish that the defendant on this third prong has met the

2  requirements of felony obstruction of justice, and under a

3  reasonable doubt the State has proven that at this point.

4  I'd be happy to answer any questions the Court may

16:48:15  5  have, but I believe that -- going back to the Court's original

6  question which I have now talked over for way too long, the

7  State has sort of alleged three different theories through

8  which this could be proven under that third element.  And

9  really, infamy or infamous is exceptionally amorphous, and I

16:48:35  10  would encourage the Court to -- I think we can leave that one

11  alone.

12  The State I think should go on deceit and intent to

13  defraud or secrecy and malice.  And secrecy and malice, I

14  mean, there's abundant information to show that.  I mean, this

16:48:48  15  jury just saw the video where the defendant goes into this

16  locked office, takes something, appears to -- and there's a

17  box taken out of that office and then the door is locked.  I

18  mean, that is the secrecy.  And the malice there is that he's

19  actively trying to prevent the State from getting this

16:49:07  20  evidence.  So I think under any threshold that this Court puts

21  forward, the State has met its burden with respect to that.

22  THE COURT:  Yes, sir.  And get the other charges as

23  well.

24  MR. ZELLINGER:  Sure.  Going backwards.  The

16:49:17  25  extortion, the lack of a threat, I can only theorize or

| 16:49:23 | 1 | compare it to that the Court has to interpret the evidence |
| | 2 | that has come out in a light most favorable to the State, but |
| | 3 | again, sort of under a reasonable doubt theory.  I mean, DeVan |
| | 4 | Barbour is told, hey, I'm going to release this recording |
| 16:49:38 | 5 | unless you get Angie Barbour to write a letter recanting or a |
| | 6 | text recanting that she had an affair.  That sentence is a |
| | 7 | threat.  The defendant does not have to say I am threatening |
| | 8 | you right now.  That is not what the State has to prove. |
| | 9 | Saying that to somebody is a threat.  That is extortion. |
| 16:49:57 | 10 | DeVan Barbour, when he's asked about it, calls it blackmail. |
| | 11 | In fact, he says it to the defendant:  This feels like |
| | 12 | blackmail. |
| | 13 | There's all this questioning on cross-examination |
| | 14 | in which there was this attempt to get DeVan Barbour to say, |
| 16:50:11 | 15 | yea, he was just helping me out.  But I mean, what DeVan |
| | 16 | Barbour said over and over again -- I have the exact quote |
| | 17 | written down and it's not in front of me, but he said |
| | 18 | something to the effective of, I couldn't feel like it was |
| | 19 | anything about malicious.  So that is the definition of a |
| 16:50:26 | 20 | threat. |
| | 21 | Defendant argues, well, it was internalized and it |
| | 22 | wasn't externalized.  And that is not an element of this |
| | 23 | crime.  It's akin to if someone comes up to me with a gun and |
| | 24 | says, give me your money.  And I said, this feels like armed |
| 16:50:45 | 25 | robbery.  And the person says, oh, my bad, and walks away. |

| 16:50:48 | 1 | That's still an armed robbery all day long. The elements have |
| | 2 | been met even though the recording was not released by the |
| | 3 | defendant. |
| | 4 | And honestly, the recording not being released |
| 16:50:59 | 5 | actually speaks to the credibility of the witnesses and |
| | 6 | evidence in the case in that it wouldn't make sense for the |
| | 7 | defendant to release the recording at the end of this. It was |
| | 8 | being used to try to accomplish a goal, and when that goal |
| | 9 | wasn't met, the crime was essentially over. |
| 16:51:17 | 10 | The extortion, the State has proven that beyond a |
| | 11 | reasonable doubt. I'm very interested to hear defendant's |
| | 12 | argument otherwise. |
| | 13 | The willful failure to discharge duties with Count |
| | 14 | 2 and Count 4, it's a very novel argument that omission, |
| 16:51:31 | 15 | neglect, or refuse means that you can't do anything. That is |
| | 16 | not what the statutes says. It is an omission, neglect, or |
| | 17 | refusal to -- and let me pull the statute up, Your Honor. |
| | 18 | It's an omission, neglect, or refusal to discharge a duty of |
| | 19 | his office. And so it's not that he neglected to do something |
| 16:51:59 | 20 | and therefore violated the statute. It's that he neglected, |
| | 21 | omitted, refused to discharge a duty of his office. And the |
| | 22 | duty of his office are these policies. And the defendant can |
| | 23 | say, well, they are just, you know, somewhat -- they are |
| | 24 | somewhat just meant to guide the board members and the ethics. |
| 16:52:15 | 25 | You can violate the ethics, but there's no sort of legal |

| | | |
|---|---|---|
| 16:52:17 | 1 | liability for that. And that's not what the policy code says. |
| | 2 | Looking at State's Exhibit 20. It says: Recognize |
| | 3 | that collectively and individually all members of the board |
| | 4 | must adhere to a code of ethics as required by North Carolina |
| 16:52:31 | 5 | G.S. 160A-86 and G.S. 115C-47. |
| | 6 | Even if the Court was to buy that argument that |
| | 7 | these ethical guidelines or ethical requirements of the board |
| | 8 | members, which the defendant absolutely ignored and violated |
| | 9 | and refused to abide by, those are his responsibilities. The |
| 16:52:54 | 10 | policies are his responsibilities, and he omitted, neglected, |
| | 11 | refused to discharge a duty; that is, to abide by those. Even |
| | 12 | if the Court is interested in that argument, the other |
| | 13 | policies that are not about ethics also put these burdens on |
| | 14 | the defendant. |
| 16:53:13 | 15 | Policy 2321, which the Court admitted as State's |
| | 16 | Exhibit 23, includes a clause for confidentiality, and anyone |
| | 17 | who attends a closed session shall maintain a confidentiality |
| | 18 | of information shared during the session. It is unlawful to |
| | 19 | disclose confidential personnel or student information or for |
| 16:53:32 | 20 | anyone to use information learned during closed session for |
| | 21 | any pecuniary benefit. And it goes on. No one will make any |
| | 22 | recording of a closed session without the knowledge and |
| | 23 | consent of the board with consent duly recorded in the minutes |
| | 24 | of the closed session. That is a policy of the Johnston |
| 16:53:50 | 25 | County School Board. That is a duty of the defendant's board |

| 16:53:54 | 1 | duties, and he neglected, refused, or omitted to discharge |
| | 2 | that by doing the exact opposite of what that calls for. |
| | 3 | The same thing applies to the attempting to have |
| | 4 | the special needs students removed. You heard a little bit |
| 16:54:13 | 5 | about the process for doing that and how this went off of that |
| | 6 | process, but these board policies also include: Model |
| | 7 | civility to students, employees in all elements of the |
| | 8 | community by encouraging the free expression of the opinion by |
| | 9 | all board members, render all decisions based on the available |
| 16:54:31 | 10 | facts and independent judgment and refuse to surrender that |
| | 11 | judgment to individuals or special interest groups, endeavor |
| | 12 | to make policy decisions -- I mean, these policies go on about |
| | 13 | all the requirements of the board members. And the defendant |
| | 14 | flaunted that and ignored that and did not discharge that by |
| 16:54:49 | 15 | doing the opposite in attempting to have these two Clayton |
| | 16 | High School special needs students transferred to another |
| | 17 | school is an act of personal retaliation. So that overtly |
| | 18 | violated policy code 2120, the code of ethics for school board |
| | 19 | members. |
| 16:55:06 | 20 | So I would argue to the Court that it's not just -- |
| | 21 | it's not an omission or a failure to act to do something. |
| | 22 | It's not that the defendant couldn't do something to violate |
| | 23 | this law. It's that the defendant had to omit or neglect to |
| | 24 | perform a duty, and that duty is established by these |
| 16:55:24 | 25 | policies. And the defendant's failure to abide by those |

| | | |
|---|---|---|
| 16:55:27 | 1 | policies is the reason he's violated that statute. |
| | 2 | I'd be happy to answer any questions. |
| | 3 | THE COURT: None. I have none right now. I will |
| | 4 | give you a chance to respond if you'd like to. |
| 16:55:37 | 5 | MR. BRUDER: Thank you, Judge. Approaching those |
| | 6 | in reverse order. The State repeatedly and throughout the |
| | 7 | entire case spoke in conclusory language about the policies |
| | 8 | being the duties. I'm not aware of any authority that holds |
| | 9 | that. The State, as far as I'm aware, hasn't presented |
| 16:55:52 | 10 | anything to that effect. |
| | 11 | The State is attempting to delegate criminal |
| | 12 | legislative power to local school boards. I mean, local |
| | 13 | school boards cannot set the constitutional duties of the |
| | 14 | officers. The State has presented the constitutional oath |
| 16:56:09 | 15 | which provides no guidance as to what a duty is. The State |
| | 16 | has not pointed to any statute which requires the defendant or |
| | 17 | any member of any board to follow any particular board code of |
| | 18 | ethics. |
| | 19 | The statute setting out the board as a whole's |
| 16:56:27 | 20 | requirement to adopt a code of ethics makes no individual |
| | 21 | mention of any criminal responsibility or any legal |
| | 22 | responsibility for any member to abide by that code of ethics. |
| | 23 | The statute that describes closed sessions, which |
| | 24 | the State has introduced into evidence, makes absolutely no |
| 16:56:49 | 25 | statement prohibiting any conduct by a member of the board |

| | | |
|---|---|---|
| 16:56:52 | 1 | outside of going into closed session. All that statute does, |
| | 2 | which the State pointed to during testimony and stated as a |
| | 3 | reason for why this was illegal, does not make any requirement |
| | 4 | on an individual member. It is just an exception to North |
| 16:57:10 | 5 | Carolina's open meeting laws. That's all it is. |
| | 6 | Moving towards the extortion. I'm afraid that |
| | 7 | Mr. Zellinger misstated the evidence. There has never been |
| | 8 | any testimony that Mr. Johnson told Mr. Barbour that he would |
| | 9 | release the recording unless Mr. Barbour said anything. The |
| 16:57:36 | 10 | only testimony that was made, at best, was Mr. Barbour said |
| | 11 | that Mr. Johnson had said I have this recording and he felt |
| | 12 | threatened. He was very careful to say he did not remember |
| | 13 | exactly what was said. He felt threatened. |
| | 14 | Moving towards obstruction, what the State is |
| 16:58:03 | 15 | describing and talking about actively trying to obstruct |
| | 16 | justice, that is misdemeanor obstruction. If all it took for |
| | 17 | misdemeanor obstruction to become felony obstruction was a |
| | 18 | defendant actively trying to obstruct justice, there would be |
| | 19 | no difference between the offenses. The specific requirement |
| 16:58:25 | 20 | is that the defendant has met those burdens of that third |
| | 21 | element. |
| | 22 | Again, the State has provided no evidence that |
| | 23 | separates Mr. Johnson's alleged obstruction from your run of |
| | 24 | the mill misdemeanor obstruction. They are essentially just |
| 16:58:42 | 25 | saying it's particularly bad obstruction without specifically |

| | | |
|---|---|---|
| 16:58:47 | 1 | citing to the secrecy or anything like that. I submit it's no |
| | 2 | different than your run of the mill misdemeanor obstruction |
| | 3 | case. |
| | 4 | And the fact that the evidence wasn't ever |
| 16:58:56 | 5 | recovered, again, is not at all different from the run of the |
| | 6 | mill obstruction case. |
| | 7 | The Ditenhaufer case that Mr. Zellinger cited -- or |
| | 8 | referred to in my packet. It's important to note that there |
| | 9 | wasn't just the obstruction element. In that instance, the |
| 16:59:16 | 10 | mother had specifically obstructed the DSS investigation into |
| | 11 | her husband's behavior -- this is on page 7 -- by precluding |
| | 12 | investigative officials of having access to Jane and actively |
| | 13 | encouraging that everyone now acknowledges were false |
| | 14 | statements exonerating Mr. Ditenhaufer from criminal |
| 16:59:37 | 15 | liability. That's the fraud. Nothing like that is present in |
| | 16 | this case. In the light most favorable to the State, maybe |
| | 17 | there's the obstruction, but no fraud, not intent to deceive, |
| | 18 | no malice. |
| | 19 | I agree that we should stay away from the infamy as |
| 16:59:53 | 20 | that's so vague as to mean nothing for Mr. Johnson's criminal |
| | 21 | liability. |
| | 22 | THE COURT: Thank you very much. |
| | 23 | Mr. Zellinger, I'm going give you a last |
| | 24 | opportunity to respond to anything specifically. My only one |
| 17:00:06 | 25 | specific question is just to respond to his argument that the |

| | |
|---|---|
| 17:00:10 | 1  policy of the Johnston County School Board, does that create a |
| | 2  duty that can be charged as a crime under the North Carolina |
| | 3  statute? |
| | 4       MR. ZELLINGER:  Your Honor, I would argue if the |
| 17:00:21 | 5  Court looks at State's Exhibit 1, which is the defendant's |
| | 6  oath of office, it requires him to execute the duties of the |
| | 7  office, a member of the Johnston County Board of Education |
| | 8  according to his best skill and ability.  And absolutely these |
| | 9  policies are binding on the defendant as a duty of his office. |
| 17:00:43 | 10       If the defendant violated the conflict of interest, |
| | 11  the pecuniary conflict of interest, if the defendant violated |
| | 12  any of these policies, he is refusing to discharge a duty of |
| | 13  the office by flagrantly ignoring them.  It might be a little |
| | 14  bit different if it was a close call, but here the policies |
| 17:01:04 | 15  are, don't record closed sessions.  He knows that that's a |
| | 16  policy.  He made the policy.  I mean, there was testimony that |
| | 17  he was part of the accepting of the policy.  So clearly, he |
| | 18  knew the policy.  All of these exhibits that the State has put |
| | 19  forward have references to statues in them. |
| 17:01:23 | 20       I mean, I can see a situation which the defendant |
| | 21  could argue that that's a question for the jury over whether |
| | 22  these policies are really the duties of his office, but on the |
| | 23  face of them, they are clearly the legal requirements of folks |
| | 24  who are holding these offices that they bind together and |
| 17:01:42 | 25  establish policies that they have to abide by.  So I would |

| 17:01:46 | 1 | argue strenuously that clearly that these are duties of the |
| | 2 | defendant's office. And then -- I mean, I don't think there's |
| | 3 | any -- I don't see any logical reason why that would not be |
| | 4 | true, and defendant has failed to provide any case law to |
| 17:02:03 | 5 | support that. |
| | 6 | So on the motion to dismiss on those facts, I |
| | 7 | would -- and additionally at this stage, it's in the light |
| | 8 | most favorable to the State. |
| | 9 | I'd be happy to answer any questions the Court may |
| 17:02:16 | 10 | have on any of the other counts. I don't want to belabor the |
| | 11 | point because I think that the State has met its burden beyond |
| | 12 | a reasonable doubt. |
| | 13 | THE COURT: Thank you. I do appreciate everybody's |
| | 14 | argument, and I appreciate your work for making this argument |
| 17:02:30 | 15 | on behalf of your client. However, at the close of the |
| | 16 | State's evidence, at this point, in the Court's discretion, |
| | 17 | does believe there are issues to go forward. So we will |
| | 18 | respectfully deny the defendant's motion to dismiss at this |
| | 19 | time. I certainly expect it to be revisited at the close of |
| 17:02:49 | 20 | all the evidence. But at this point, those motions are |
| | 21 | denied. |
| | 22 | Mr. Tyndall, in the morning it will be the |
| | 23 | defendant's opportunity to present any evidence, if the |
| | 24 | defendant would like to. Do you have a decision on that yet? |
| 17:03:06 | 25 | MR. TYNDALL: Can you give me a moment? |

| | | |
|---|---|---|
| 17:03:08 | 1 | THE COURT: Yes, sir. |
| | 2 | MR. TYNDALL: At this time I can't say we're not |
| | 3 | going to present any evidence. That's all I can say. I mean, |
| | 4 | I don't know. That's an honest answer. It's certainly |
| 17:03:43 | 5 | possible we'll come in tomorrow morning and call witnesses. |
| | 6 | That's all I can tell you. |
| | 7 | THE COURT: At some point we'll need to a definite |
| | 8 | answer. I'm going to go ahead and address one thing to your |
| | 9 | client. I don't know if he intends to testify or not. |
| 17:04:04 | 10 | Mr. Johnson, I just want you to know as you are |
| | 11 | thinking this over with your attorney that you do not have |
| | 12 | to -- and I probably will address this with you again tomorrow |
| | 13 | depending on your decision, but I just want you to know now |
| | 14 | that you do not have to present evidence if you do not want |
| 17:04:21 | 15 | to. You are protected by the 5th Amendment. You are not |
| | 16 | required to do so. |
| | 17 | If you do decide to exercise your 5th Amendment |
| | 18 | privilege, there's an instruction that I will give to the |
| | 19 | jury. It says that your decision not to testify, that they |
| 17:04:37 | 20 | are not to hold that against you or consider that in any way |
| | 21 | in their deliberations. |
| | 22 | So I just want you to know that you do not have to |
| | 23 | testify, that you are protected by the 5th Amendment, and you |
| | 24 | are not required to do so. I will you give you, if you would |
| 17:04:53 | 25 | like, a copy of that instruction as well. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 17:04:56 | 1 | What we'll do then is we'll have to address that |
| | 2 | first thing in the morning, and since that decision is not |
| | 3 | quite yet been made and the jury is coming in at 9:30 |
| | 4 | tomorrow, can I ask you to be here at 9:00 so we can address |
| 17:05:13 | 5 | it on the record then.  Is that convenient to everybody? |
| | 6 | MR. ZELLINGER:  Yes, that's convenient for the |
| | 7 | State. |
| | 8 | MR. TYNDALL:  That works for us, Your Honor. |
| | 9 | THE COURT:  We will recess this matter until 9:00 |
| 17:05:25 | 10 | in the morning. |
| | 11 | If I can ask the attorneys to stick around for just |
| | 12 | a short while, if that's okay. |
| | 13 | We'll let everybody get packed up.  You certainly |
| | 14 | can go.  I just have a couple things to talk to you about. |
| 17:05:38 | 15 | (Proceedings adjourned at 5:05 p.m.) |
| | 16 | (END OF VOLUME 7 OF 10.) |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

IN THE NORTH CAROLINA GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
JOHNSTON COUNTY
* * * * * * * * * * * * * * * * * *

STATE OF NORTH CAROLINA,   :   File No. 23 CRS 003494-500

    versus               :

RONALD LEE JOHNSON, JR.,   :
           Defendant.      Pages:  1003-1174

* * * * * * * * * * * * * * * * * * *
TRANSCRIPT VOLUME 9 OF 10

Thursday, January 16, 2025

* * * * * * * * * * * * * * * * * * *
Transcript of proceedings in the General Court of

Justice, Superior Court Division, Johnston County, 207 East

Johnston Street, Smithfield, North Carolina, at the January 6,

2025, Criminal Session, before the Honorable Joseph

Crosswhite, Judge Presiding.

APPEARANCES:

    Benjamin O. (Boz) Zellinger
    Arneatha James
    Special Deputy Attorney General
    Raleigh, NC 27603
    On Behalf of the State

    Amos G. Tyndall
    Valentin J. Bruder
    Parry Law
    Chapel Hill, NC
    On Behalf of the Defendant

---

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter
N.C. Administrative Office of the Courts
denise.stclair@nccourts.org

INDEX

Defense motions                                      1170

State Rests                                          1169

                        WITNESSES

ON BEHALF OF THE DEFENDANT:

RONALD LEE JOHNSON

By the Court - decision to testify                  1006

RONALD LEE JOHNSON

Direct by Mr. Tyndall                               1010
Voir Dire by Mr. Tyndall                            1057
Voir Dire by Mr. Zellinger                          1057
Direct by Mr. Tyndall                               1060
Cross by Mr. Zellinger                              1069

MICHELLE ANTOINE

Direct by Mr. Tyndall                               1126
Cross by Mr. Zellinger                              1134
Redirect by Mr. Tyndall                             1137

                    REBUTTAL WITNESSES

ON BEHALF OF THE STATE

RICHARD HOFFMAN

Direct by Mr. Zellinger                             1138
Voir Dire by Mr. Zellinger                          1151
Voir Dire by Mr. Tyndall                            1153
Direct by Mr. Zellinger                             1163

JAMES GRADY

Direct by Mr. Zellinger                             1167
Cross by Mr. Tyndall                                1168
State Rests                                         1169

| | | | |
|---|---|---|---|
| 1 | EXHIBITS | | |
| 2 | ON BEHALF OF THE STATE | | |
| 3 | No.    Description | ID | EVD |
| 4 | 76    Defendant's email address | 1123 | |
| 5 | 77    Pinger message | 1116 | 1140 |
| 6 | 78    Board meeting minutes May 31, 2022 | 1117 | |
| 7 | 78    Motion to move into closed session | 1136 | |
| 8 | 79    SpoofCard printout | 1165 | |
| 9 | ON BEHALF OF THE DEFENDANT | | |
| 10 | No.    Description | ID | EVD |
| 11 | 5    Recorded statement by Angela Barbour | | 1034 |
| 12 | 6    Spreadsheet | | 1023 |
| 13 | 7A    Audio of recording | | 1018 |
| 14 | 15    Audio recording-after meeting clip | 1036 | 1037 |
| 15 | 16    May 31, 2022, school board meeting | 1049 | 1049 |
| 16 | 17    Defendant's timeline chart | 1063 | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

)9:03:59    1                    (Commencing at 9:10 a.m.)

           2                    THE COURT:  Are we ready for the jury?

           3                    MR. TYNDALL:  If we can have five or ten minutes.

           4         I've given the State notice.  I'm trying to get them on a

)9:30:23    5         thumb drive to get them all to the clerk.

           6                    THE COURT:  Yes, sir.  Are you close?

           7                    MR. TYNDALL:  We are very close.  We can probably

           8         start.

           9                    THE COURT:  Let me ask you.  I know you had

)9:42:47   10         overnight to think about it.  Have you had a chance to discuss

          11         with your client if he intends to testify or if the defendant

          12         intends to introduce any other evidence?

          13                    MR. TYNDALL:  Yes, Your Honor.

          14                    THE COURT:  What is that decision?

)9:42:58   15                    MR. TYNDALL:  He is going to introduce evidence,

          16         Your Honor.

          17                    THE COURT:  You've talked to him?  He understands

          18         it's his right not to testify?

          19                    MR. TYNDALL:  He does, Your Honor.  We've discussed

)9:43:08   20         that.

          21                    THE COURT:  Thank you, Mr. Johnson.  If would you

          22         stand, I'll again have you sworn, please.

          23                    RONALD LEE JOHNSON, JR.,

          24         having being duly sworn at 9:43 a.m., testified as follows:

)9:43:31   25                    THE COURT:  Mr. Johnson, good morning.  Your lawyer

| | | |
|---|---|---|
| 09:43:34 | 1 | tells me you wish to waive your Fifth Amendment privilege and |
| | 2 | offer testimony in this case; is that correct? |
| | 3 | THE DEFENDANT:  Yes, sir, I do. |
| | 4 | THE COURT:  I want to let you know -- we talked |
| 09:43:41 | 5 | about this last night.  I want to let you know that you do not |
| | 6 | have to testify, that you are protected by the 5th Amendment. |
| | 7 | You do not have to offer any testimony on your behalf if you |
| | 8 | do not want to.  In fact, there's an instruction that I will |
| | 9 | give to the jury. |
| 09:43:57 | 10 | I'll read this instruction to you now.  It says: |
| | 11 | The defendant in this case has not testified.  The law gives |
| | 12 | the defendant this privilege.  This same law also assures the |
| | 13 | defendant that this decision not to testify creates no |
| | 14 | presumption against the defendant; therefore, the silence of |
| 09:44:14 | 15 | the defendant is not to influence your decision in any way. |
| | 16 | Have you had a chance to fully discuss your rights |
| | 17 | and options with your attorney? |
| | 18 | THE DEFENDANT:  Yes, sir, I have. |
| | 19 | THE COURT:  And you are satisfied with his advice? |
| 09:44:28 | 20 | THE DEFENDANT:  Yes, sir, I am. |
| | 21 | THE COURT:  At this time it's your decision to |
| | 22 | waive your 5th Amendment privilege and offer testimony in this |
| | 23 | case? |
| | 24 | THE DEFENDANT:  Yes, sir, it is. |
| 09:44:36 | 25 | THE COURT:  Thank you very much, sir.  You can have |

09:44:38    1   a seat.

            2              THE DEFENDANT:  Thank you.

            3              THE COURT:  Mr. Tyndall, are you ready for the

            4   jury?

09:44:54    5              MR. TYNDALL:  I am, Your Honor.

            6              THE COURT:  If we can bring them in.

            7              MR. ZELLINGER:  If we can have a moment.

            8   Mr. Hoffman is printing something.  I don't want him to come

            9   in and hand something to Mr. Tyndall with the jury here.  That

09:45:13   10   would look kind of weird.

           11              MR. TYNDALL:  Your Honor, that is -- my plan is

           12   with some of this stuff we have digitally would be to

           13   introduce it, then put it on a disk after we introduce it and

           14   then give it to the clerk, if that's okay.  We agree if before

09:45:35   15   we pass it to the clerk it's what we played.

           16              MR. ZELLINGER:  Your Honor, I just ask if there's

           17   anything the defendant seeks to introduce he hasn't provided

           18   to the State yet.  Pursuant to 15-905A, it would be

           19   appropriate that we receive it before.  At this point

09:45:50   20   certainly.  I think my understanding is we've received

           21   everything the defendant seeks to admit.

           22              MR. TYNDALL:  I think so there may be a couple text

           23   messages that, frankly, I don't have in my hand right now, and

           24   once we get them, I'll know whether we've given them to you or

09:46:07   25   not.  But I'm not sure.  We gave a whole bunch of stuff to the

| | | |
|---|---|---|
| 09:46:11 | 1 | State in reciprocal discovery, just the possibility -- |
| | 2 | THE COURT:  Do you have those now?  Can you get |
| | 3 | your hands on them? |
| | 4 | MR. TYNDALL:  We are looking for them, Your Honor. |
| 09:46:22 | 5 | We're looking for them. |
| | 6 | MR. ZELLINGER:  Your Honor, just for purposes of |
| | 7 | the record, the State's motion for reciprocal discovery was |
| | 8 | filed on January 16th of 2024. |
| | 9 | THE COURT:  Yes, sir.  Thank you. |
| 09:48:13 | 10 | Do you know how much longer you're going to be, |
| | 11 | because the jury is standing outside the door. |
| | 12 | MR. ZELLINGER:  We're trying to do the defendant a |
| | 13 | favor.  Maybe we can give it to you at a break. |
| | 14 | MR. TYNDALL:  It was something in discovery.  He |
| 09:48:25 | 15 | was just making a paper copy for everybody. |
| | 16 | THE COURT:  We'll bring the jury in and we'll get |
| | 17 | started. |
| | 18 | (Jury enters.) |
| | 19 | THE COURT:  Good morning, everybody. |
| 09:49:22 | 20 | Mr. Tyndall, any evidence on behalf of the |
| | 21 | defendant? |
| | 22 | MR. TYNDALL:  Your Honor, the defense calls Ronald |
| | 23 | Johnson. |
| | 24 | THE COURT:  Yes, sir. |
| | 25 | |

Ronald Johnson - Direct by Mr. Tyndall

```
)9:49:28   1              RONALD LEE JOHNSON, JR.

           2    having been called as a witness for the Defendant and being

           3    duly sworn at 9:49 a.m., testified as follows:

           4              THE COURT:  Mr. Tyndall, whenever you are ready.

)9:49:28   5    DIRECT EXAMINATION BY MR. TYNDALL:

           6        Q.    Mr. Johnson, will you introduce yourself to the

           7    jury, please.

           8        A.    Yes, sir.  Ronald Johnson, Jr.

           9        Q.    And where do you live, Mr. Johnson?

)9:50:19  10        A.    I live in Clayton, North Carolina.

          11        Q.    And what do you do for a living?

          12        A.    Right now I'm a student advisor at Blueline

          13    Aviation where I help raise scholarship money for kids to

          14    become pilots.

)9:50:35  15        Q.    Prior to that, what did you do?

          16        A.    I was a Smithfield police officer for 17 years, and

          17    I was a college professor for seven years.

          18        Q.    What did you do -- where did you teach?

          19        A.    I taught at Johnston Community College.

)9:50:50  20        Q.    What did you teach?

          21        A.    I taught consumer relations, human relations,

          22    principles of management, and marketing.

          23        Q.    Now, how long have you been working at Blueline

          24    Aviation?

)9:51:04  25        A.    I've been working at Blueline for a little over two
```

Ronald Johnson - Direct by Mr. Tyndall

09:51:07   1   years.

2         Q.   Tell us a little bit about your law enforcement

3   career.

4         A.   Yes, sir.  I started my law enforcement career in

09:51:16   5   2005.  I was assigned to uniform patrol where I did basic

6   patrol duties, crime prevention.  I was reassigned as a school

7   resource officer for several years.  I was briefly assigned to

8   narcotics where I did undercover work and was a narcotics

9   investigator.  I went back to the school as a resource

09:51:36   10   officer, and then I became a major crimes detective from about

11   2013 until 2022.

12         Q.   Now, were you eventually -- tell us about -- were

13   you eventually dismissed by the Smithfield Police Department?

14         A.   Yes, sir, I was.  There was an investigation based

09:51:53   15   on a podcast and that investigation grew and I was terminated

16   from the police department under several violations.  One was

17   a violation that occurred under a policy that said my

18   perceived character, integrity, and reputation was damaged and

19   that was due to all the news coverage and the school board

09:52:15   20   interactions that I've had.  It was a major cause for my

21   termination.

22         Q.   Now, Mr. Johnson, you mentioned the school board.

23   Did you at some point decide to get into -- to run for the

24   school board?

09:52:28   25         A.   Yes, sir.  I decided to run for the school board in

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Direct by Mr. Tyndall

1 | 2015 after a phone call from my sixth grade teacher,

2 | Ms. Tracey Peedin Jones, and kind of entered the world of

3 | politics that I was unfamiliar with.

4 |     Q.   Had you been involved in politics before then?

5 |     A.   No.

6 |     Q.   Now, can you tell us a little bit about the

7 | campaign, how that developed?

8 |     A.   So in politics, it's a cliquey environment where

9 | you have different groups of people who support each other for

10 | various reasons.  I came in by myself and I received the help

11 | from my students, you know, ones that I helped while they were

12 | in middle school as SRO and various teachers throughout when I

13 | was a resource officer.  It was a true grassroots campaign.

14 | None of my family was involved in politics.  I was blessed

15 | enough to win, blessed enough to win a couple of times.

16 |     Q.   How many times have you been elected?

17 |     A.   I was elected for the first time in 2016, and I was

18 | elected in 2020, and I was also reelected a couple months ago

19 | in 2024.

20 |     Q.   You mentioned your family.  Tell us about your

21 | family.

22 |     A.   My mother lives in Smithfield.  My father, who is

23 | deceased in 2021, lived at the Cleveland area, 40/42.  He was

24 | a -- you know, he owned a janitorial service.  My mother

25 | worked in a factory.  I've got a brother -- two brothers, a

Ronald Johnson - Direct by Mr. Tyndall

| | |
|---|---|
| 09:54:07 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 09:54:21 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 09:54:43 | 10 |
| | 11 |

1  sister, and you great bonus mom and a great bonus dad.

2      Q.  Are you married?

3      A.  I am married, yes, sir.  I'm married to Jamie

4  Johnson.  We've been married since 2015.

5      Q.  Now, Mr. Johnson, I want to talk to you a little

6  bit about sort of the environment of the school board, and

7  there's been some testimony here about interactions with the

8  school board.  Tell us a little bit about how that developed

9  and your interactions with the school board.

10     A.  Sure.  Politics is very contentious and that

11  translates to your elected position --

12         MR. ZELLINGER:  Objection.  Not responsive.

13         THE COURT:  We'll let you reask that question.

14     Q.  Tell us a little bit about your relationship with

15  the school board and how that developed over time.

16     A.  Sure.  I ran and was reelected -- or I ran and was

17  elected.  I didn't really know the individuals on the school

18  board, but we were just involved in a campaign where we were

19  running against each other.  So serving on the school board

20  after some heated campaigns with the individuals that you had

21  just ran against made it a little bit difficult, and there was

22  some conflict, and then we had some disagreements on different

23  policies, different expenditures of funds and where they were

24  going.  We had different philosophical outlooks on things.  So

25  there was some differences of opinion.

Time stamps:
09:54:07 — line 1
09:54:21 — line 5
09:54:43 — line 10
09:54:57 — line 15
09:55:13 — line 20
09:55:33 — line 25

Ronald Johnson - Direct by Mr. Tyndall

| | | |
|---|---|---|
| 19:55:36 | 1 | Q. At some point in 2019 did you do a podcast about |
| | 2 | some of the actions of the school board? |
| | 3 | A. I did. I was called into an office in 2019, and I |
| | 4 | was told by Dr. Causby that there was an issue -- |
| 19:55:55 | 5 | MR. ZELLINGER: Objection. |
| | 6 | THE WITNESS: I apologize. |
| | 7 | THE COURT: I'll sustain as to what he was told or |
| | 8 | what somebody else said. |
| | 9 | Q. Just tell us what you did in response to your |
| 19:56:03 | 10 | discussions with Dr. Causby. |
| | 11 | A. Sure. I went public with it. I thought that the |
| | 12 | public needed to know that there was a shortage of money, and |
| | 13 | from what I was told, that the money was misallocated, and I |
| | 14 | felt like the public needed to know that we were missing that |
| 19:56:20 | 15 | money. |
| | 16 | Q. Now, after you disclosed that -- after you did the |
| | 17 | podcast and made some allegations, did your sort of |
| | 18 | relationship with the board or with the political |
| | 19 | establishment in town change? |
| 19:56:34 | 20 | MR. ZELLINGER: Objection to leading, Your Honor. |
| | 21 | THE COURT: All right. We'll overrule that and let |
| | 22 | him answer. |
| | 23 | THE WITNESS: It went from bad to worse. And |
| | 24 | that's how the relationship went. When I went public, it went |
| 19:56:43 | 25 | from not so good to bad. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Direct by Mr. Tyndall

09:56:47 1    Q.    Now, while you've been involved in politics and

2    running for the school board, at some point did you meet a

3    woman named Angie Barbour?

4    A.    Yes.

09:57:01 5    Q.    Tell us a little bit about that.

6    A.    I met Angie Barbour in 2020 through the mask -- I

7    say through the mask, just to be clear, there was a big ordeal

8    about wearing masks or not wearing masks in the school system.

9    She took a pretty strong stance with it.  And I agreed with

09:57:23 10   her stance.  I met her sometime in 2020.  I began speaking

11   with her in October 2020 when she started showing up at

12   political events.

13   Q.    At some point did you develop a sexual relationship

14   with Ms. Barbour?

09:57:43 15   A.    Yes.

16   Q.    Did that continue?  She's testified from sometime

17   in 2020 to February of 2022?

18   A.    It continued until about that date, and there was a

19   lot of gaps in between.

09:57:54 20   Q.    When you say "gaps," what do you mean by that?

21   A.    I would stop talking to her.  She actually dated

22   several people in between that time.  So I mean, we -- there

23   were gaps.

24   Q.    So there were times when the two of you were not

09:58:12 25   really together?

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Direct by Mr. Tyndall

| | | |
|---|---|---|
| 09:58:13 | 1 | A.   Yes. |
| | 2 | Q.   And were you still married to your wife while that |
| | 3 | was going on? |
| | 4 | A.   Yes. |
| 09:58:18 | 5 | Q.   In February of 2022, did you make any decisions |
| | 6 | about that relationship? |
| | 7 | A.   Yes.  I decided I just didn't want to be around her |
| | 8 | anymore, and I decided not -- just to kind of be done with it. |
| | 9 | Q.   At some point later after you and Ms. Barbour broke |
| 09:58:43 | 10 | off your relationship, did you get some information or some |
| | 11 | feedback that concerned you? |
| | 12 | A.   I did.  I got some information from Kevin Donovan |
| | 13 | and several others that Ms. Barbour was telling people that I |
| | 14 | was making her sleep with elected officials. |
| 09:59:02 | 15 | Q.   And why did that concern you? |
| | 16 | A.   Because I wasn't doing that, and that is sex |
| | 17 | trafficking, prostitution.  There's a lot of problems with |
| | 18 | that, and it was untrue. |
| | 19 | Q.   Now, did you at some point after hearing those |
| 09:59:18 | 20 | things have a phone call with Ms. Barbour where you |
| | 21 | asked -- did you have a phone call with Ms. Barbour? |
| | 22 | A.   Yes, sir, I did. |
| | 23 | Q.   Did you discuss those -- that information? |
| | 24 | A.   Yes, sir, I did. |
| 09:59:35 | 25 | Q.   And if you -- have you heard that recording since |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Direct by Mr. Tyndall

| | | |
|---|---|---|
| 9:59:39 | 1 | this trial has begun? |
| | 2 |     A.   Yes, sir, I have. |
| | 3 |     MR. TYNDALL:  Your Honor, we've marked this |
| | 4 | previously to play for Ms. Barbour.  We're just trying to |
| 0:00:08 | 5 | figure out what that number is. |
| | 6 |     THE COURT:  Yes, sir.  If I remember correctly, it |
| | 7 | was marked for identification but never introduced; is that |
| | 8 | right? |
| | 9 |     MR. TYNDALL:  Yes. |
| 0:00:24 | 10 |     Q.   When you spoke with Ms. Barbour, what was your |
| | 11 | intention? |
| | 12 |     A.   To get her to stop saying those things because they |
| | 13 | were untrue that I was trying to get her to sleep with these |
| | 14 | elected officials, and it wasn't accurate.  That was |
| 0:00:37 | 15 | completely false, and I was just telling her that needs to |
| | 16 | stop.  I'm asking her for it to stop.  I heard about it for a |
| | 17 | while, and, like, I was going to go right to her and say, hey, |
| | 18 | you gotta stop saying this because it's not true. |
| | 19 |     Q.   Now, did you record that conversation with her? |
| 0:00:53 | 20 |     A.   I did. |
| | 21 |     Q.   Have you heard it played here earlier in the |
| | 22 | trial -- |
| | 23 |     A.   I have. |
| | 24 |     Q.   -- without the jury present? |
| 0:01:02 | 25 |     A.   Yes, sir, I have. |

Ronald Johnson - Direct by Mr. Tyndall

| | |
|---|---|
| !0:01:03 | 1 |
| | 2 |
| | 3 |
| | 4 |
| !0:01:12 | 5 |

1    Q.   Would that recording help to help illustrate your

2 testimony?

3    A.   Yes, sir, it would.

4    MR. TYNDALL:  Your Honor, at this time I'd move

5 to introduce -- we have it on -- we can just publish it.  And

6 what I'll do is put it on a separate disk and give it to the

7 clerk later, if that's okay.

8    THE COURT:  Mr. Zellinger, any objection to that

9 being introduced and published?

10    MR. ZELLINGER:  Do you know what number it is?

11    MR. TYNDALL:  7A is what we marked it before.

12    MR. ZELLINGER:  No, Your Honor.

13    THE COURT:  So allowed.

14    (Defendant's Exhibit Number 7A entered into

15    evidence.)

16    Q.   Now, you mentioned you had a couple people reach

17 out to you over the last couple weeks.  What was the date of

18 this call?

19    A.   April 13th, 2022.

20    Q.   And go ahead.  Play that.

21    (Defendant's Exhibit Number 7A played.)

22    Q.   She mentioned Owen.  Who did you know to be Owen?

23    A.   Owen Phillips, former co-worker, and at the time a

24 friend.

25    Q.   And when she mentioned Travis, who is Travis?

Timestamps in left margin: !0:01:28 (line 10), !0:02:15 (line 15), !0:02:58 (line 20), !0:04:36 (line 25)

Ronald Johnson - Direct by Mr. Tyndall

'0:04:39   1       A.   A friend of mine.  He was running for district

        2   court judge.

        3       Q.   And was he someone that you had -- at least had

        4   sort of a political relationship with?

'0:04:50   5       A.   We had a political relationship, but it was more of

        6   a friendship than a political relationship.

        7              (Resume playing recording.)

        8       Q.   When she says that was just spoken about last

        9   night, what did you understand her to mean?

'0:05:42  10              MR. ZELLINGER:   Objection.

       11              THE COURT:   Sustained as to what she was thinking.

       12       Q.   How did you interpret what she was saying?

       13       A.   That that was what Owen Phillips and her talked

       14   about the night before.

'0:05:54  15       Q.   When Ms. Barbour says the conspiracies were brought

       16   to my attention last night, how did you interpret that?

       17       A.   I interpreted that as Owen Phillips spoke to her

       18   the night before and told her I was trying to make her sleep

       19   with elected officials.

'0:07:52  20       Q.   How did you interpret the timing of that?

       21       A.   The only person she had referenced that she had

       22   spoken to the night before was Owen Phillips over Snapchat,

       23   and she mentioned that a couple of times in the conversation

       24   to this point.

'0:09:04  25       Q.   Mr. Johnson, did the phone call end?

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

'0:09:08  1    A.   I got frustrated and hung up.  I had realized --

2   well, in my mind I interpreted that as Owen was telling her

3   these things in an effort to gain some type of favor with her,

4   and I was done.  I was just done with the whole conversation,

'0:09:23  5   and I seriously had to teach.  I think I called her right

6   around 10:50 and we were coming up on 11 a.m. and my class

7   started at 11 a.m.

8    Q.   Now, when you -- I want to talk about prior to this

9   phone call.  Between the time you and Ms. Barbour stopped

'0:09:42  10  seeing each other, had you had at least some cordial

11  relationship with her?

12   A.   I tried to be cordial with her.  She would reach

13  out to me, and I would respond, you know, nice enough, but it

14  was kind of like a response that you didn't want any further

'0:10:04  15  conversation.  So yea, I did.  I did try to respond to her

16  when she messaged me.

17       MR. TYNDALL:  Can you take -- madam clerk, can you

18  remove that call, please.

19   Q.   Mr. Johnson, is it fair to say that after the 13th,

'0:10:26  20  your feelings about your relationship with Ms. Barbour

21  changed?

22   A.   They were changing, and I would say April 13th, I

23  had made my mind up, you know, I'm not going to talk to her

24  anymore.  And if she's willing to say these things about me,

'0:10:41  25  then there's no need for any other discussion.

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Direct by Mr. Tyndall

!0:10:45   1          Q.   Did you have any phone calls with her after that

2    date?

3          A.   No.

4          Q.   Mr. Johnson, I want to talk to you a little bit

!0:11:22   5    about the days that follow that.  Did you learn some

6    information from Kevin Donovan about discussions that he had

7    had with Ms. Barbour?

8          A.   Yes.

9          Q.   Are those the discussions he described in here

!0:11:41  10    earlier?

11          A.   He's the one that told me about Angie Barbour

12    saying I was trying to make her sleep with people.  He's the

13    one that initially brought it to my attention.

14          Q.   Now, did you also learn at that some point that --

!0:11:54  15    did he -- did he come to you with some information about DeVan

16    Barbour?

17          A.   He did.  He came to me and said Ms. Barbour was

18    saying the same thing about DeVan Barbour and that I was

19    forcing her to sleep with him, and he told me that he had

!0:12:11  20    recorded it.

21          Q.   Okay.  Did he ever play you a recording of that

22    conversation with Ms. Barbour?

23          A.   No, he never played me a recording.  He just told

24    me he was recording her.

!0:12:25  25          Q.   Now, on -- after he told you about her statements

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Direct by Mr. Tyndall

| | | |
|---|---|---|
| !0:12:31 | 1 | about Mr. Barbour, did you advise him -- did you give Mr. |
| | 2 | Donovan some advise about Mr. Barbour? |
| | 3 |     A.    I told him that he shouldn't go around spreading |
| | 4 | this about DeVan, that he should contact DeVan directly and |
| !0:12:51 | 5 | let DeVan know what she's saying, because at the time she was |
| | 6 | involved in his campaign and it seems a little |
| | 7 | counterproductive to have someone involved in your campaign |
| | 8 | who's saying that you are doing things to them. |
| | 9 |             MR. TYNDALL:  May I approach, Your Honor? |
| !0:13:07 | 10 |             THE COURT:  Yes, sir. |
| | 11 |     Q.    I'm going to show you, Mr. Johnson, an exhibit that |
| | 12 | the State prepared.  What does that appear to be? |
| | 13 |     A.    It appears to be the spreadsheet that was |
| | 14 | referenced by Investigator Hoffman. |
| !0:13:52 | 15 |     Q.    And what does it appear to have on it? |
| | 16 |     A.    Phone communications between myself, Kevin Donovan, |
| | 17 | DeVan Barbour, and Angie Barbour. |
| | 18 |     Q.    And now, would it help you illustrate your |
| | 19 | testimony? |
| !0:14:09 | 20 |     A.    Yes. |
| | 21 |             MR. TYNDALL:  Your Honor, at this time I move to |
| | 22 | introduce the spreadsheet for purposes of illustrating |
| | 23 | Mr. Johnson's testimony. |
| | 24 |             THE COURT:  Any objection? |
| !0:14:20 | 25 |             MR. ZELLINGER:  No, Your Honor. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Direct by Mr. Tyndall

| | | |
|---|---|---|
| '0:14:21 | 1 | THE COURT:  So allowed. |
| | 2 | (Defendant's Exhibit Number 6 entered into |
| | 3 | evidence.) |
| | 4 | Q.   Mr. Johnson, there are several dates here. |
| '0:14:27 | 5 | MR. TYNDALL:  And if I can stand up here because I |
| | 6 | don't have another copy right at my disposal. |
| | 7 | THE COURT:  Yes. |
| | 8 | Q.   Are there several dates down the left-hand column? |
| | 9 | A.   Yes, sir. |
| '0:14:37 | 10 | Q.   And what are the -- what are the first dates there? |
| | 11 | A.   4/15/2022.  April 15, 2022. |
| | 12 | Q.   And it looks like several conversations |
| | 13 | between -- who are the several conversations between -- who |
| | 14 | are the several conversations with on 4/15? |
| '0:14:55 | 15 | A.   Yes, sir.  The conversations on 4/15 are between |
| | 16 | myself and Kevin Donovan, and Angie Barbour and Kevin Donovan. |
| | 17 | Q.   Now, on -- what happens on 4/16?  What's your |
| | 18 | memory of what happened? |
| | 19 | A.   So there was some phone communications between |
| '0:15:19 | 20 | myself and Kevin Donovan, and Kevin Donovan calls me with an |
| | 21 | outrageous story about DeVan Barbour that was told to him by |
| | 22 | Angie Barbour.  And that's when I told Kevin, hey, you |
| | 23 | probably don't need to be saying this.  You probably need to |
| | 24 | be calling DeVan and tell him what she's saying because we |
| '0:15:41 | 25 | have an election coming up.  She's working with his campaign, |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Direct by Mr. Tyndall

'0:15:45  1    and, you know, it's just pretty straightforward; you don't

2    want anyone working for your campaign who's also saying these

3    things.

4        Q.    Does it appear based on the phone records that

'0:15:59  5    Mr. Donovan called Mr. Barbour?

6        A.    Yes, sir.

7        Q.    And what date was that?

8        A.    April 16th, 2022.

9        Q.    And does it appear under their call that there's

'0:16:11 10    also a call between Angie Barbour and DeVan Barbour?

11        A.    It does.

12        Q.    And who calls you on April 16th, other than

13    Mr. Donovan?

14        A.    DeVan Barbour.

'0:16:28 15        Q.    How long did you all talk?

16        A.    It says 10 minutes and 26 seconds.

17        Q.    What was the gist of that conversation?

18        A.    He was grateful.  He said he appreciated it, and he

19    didn't know what she was talking about.  I told him I didn't

'0:16:45 20    care.  And he said, I didn't know she was crazy before I

21    started letting her help me.  And I just kind of let it go at

22    that.  I told him that the only thing that matters is you win

23    the race.  Because when you are running for office, any

24    election cycle there's going to be a lot of stuff happening

'0:17:07 25    and you just got to keep the -- winning.  Winning is what

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Direct by Mr. Tyndall

!0:17:10    1    matters.

2                    MR. ZELLINGER:  Objection.  This is not responsive.

3                    THE WITNESS:  Sorry.

4                    THE COURT:  I'll sustain it.

!0:17:16    5    Q.    In your discussions --

6          A.    Yes.  I'm sorry.

7          Q.    -- with Mr. Barbour, did you advise?

8          A.    I advised him that winning was the only thing that

9    mattered.  Don't worry about what she's saying.  He told me

!0:17:29   10   that it wasn't true.  I didn't care.  I just told him the only

11   thing that mattered was winning.  And I think we had some text

12   messages back and forth after that that kind of, you know,

13   lends credibility to that.

14         Q.    Now, at some point did you become concerned about

!0:17:52   15   these ongoing statements?

16         A.    I did.  The statements continued and transformed

17   into, it was DeVan Barbour that I was making her sleep with.

18   It wasn't just random elected officials.  It wasn't just, you

19   know, elected officials.  It became specifically DeVan

'0:18:12   20   Barbour.

21         Q.    And what did you -- first of all, did you -- had

22   Ms. Barbour disclosed to you prior to this that Mr. Barbour

23   had exposed himself or something like?

24         A.    She did.  He exposed -- she sent -- yea.  We had a

'0:18:28   25   phone call about it, and she did say that he exposed himself

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Direct by Mr. Tyndall

!0:18:32    1    to her.

2    Q.    Now, what did you decide to do in response to what

3    you were hearing?

4    A.    Tell DeVan Barbour.

!0:18:40    5    Q.    Now, why -- you'd talked to him.  Why did you feel

6    like you needed to tell him again?

7    A.    Because Kevin Donovan -- Kevin Donovan saying he

8    had recordings and Kevin Donovan telling me that, you know,

9    I'm going to -- you know, I'm looking for evidence.  I'm going

!0:18:58    10    to expose him.  And it seemed like Kevin Donovan wanted to

11    expose DeVan Barbour.

12    Q.    How did you decide how to handle that?  I mean,

13    we've heard testimony about your meeting with Mr. Barbour and

14    your, you know, recording this conversation.  Tell us a little

!0:19:18    15    bit about that.

16    A.    So I have an office at Clayton Fitness.  I met

17    people there.  It was a place I rented and it was a place I

18    went to.  So I asked him to meet me there because he was going

19    to be in Raleigh and I was going to be in Smithfield and that

!0:19:39    20    was going to be kind of a midway point anyway.  I would have

21    met him anywhere else.  So I asked him to meet me there, and

22    he did lunchtime on a Monday.

23    Q.    So when -- I think when most of us think about a

24    meeting, we think we're going to have a conversation with

!0:20:00    25    someone.  How did it -- what did you end up doing?

Ronald Johnson - Direct by Mr. Tyndall

10:20:03  1        A.    I ended up making a recording that would allow him

2   to hear the recording and me telling him what the recording

3   was so he could actually hear it.  I was concerned about if he

4   was going to be with his wife or if he was going to have

10:20:18  5   campaign workers with him.

6              When Kevin Donovan called him, he was with his

7   wife, and his wife heard that interaction and it caused a lot

8   of problems for DeVan.  So I wanted to be sure if he was with

9   someone that they weren't able to hear it.  It wasn't

10:20:37 10   something I would have to play out loud or tell him, so...

11        Q.    And what did you record and what did you play for

12   him?

13        A.    I had the recording of Angie Barbour talking about

14   that incident, and then I described to him what he was going

10:20:54 15   to hear.  I told him, don't worry.  I got your back.  Don't

16   panic.  You know, I'm going to help you as much as you can.

17        Q.    Well, did you ask him for anything?

18        A.    No.

19        Q.    Did you -- you didn't ask him to talk to

10:21:11 20   Ms. Barbour?

21        A.    No.  That was kind of implied that you need to talk

22   to her about what she is saying about you and me trying to

23   force her to sleep with you.

24        Q.    Well, did he know -- at that time was it -- was it

10:21:27 25   you -- was it general knowledge that you had had a

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Direct by Mr. Tyndall

10:21:32  1   relationship with Ms. Barbour?

2       A.   It was.

3       Q.   When do you think people started realizing -- I

4   mean, when did it come back to you that there was sort of this

10:21:41  5   gossip going around that you had had a relationship with

6   Ms. Barbour?

7       A.   Different circles.  In 2020 it started coming back

8   to me from different circles of people.  And then in 2021, you

9   know, the circles continued to grow.  And then, you know,

10:21:58  10   2022, you know, pretty much everyone knew.

11       Q.   When you spoke to Mr. Barbour that day, did you

12   ever tell him that Ms. Barbour was saying these things about

13   you?

14       A.   I told him I was concerned about her saying that I

10:22:18  15   was trying to make her sleep with him, yes.

16       Q.   And did you -- I mean, what did you tell him,

17   essentially?

18       A.   Well, I played the recording for him.  And he said,

19   I don't want -- I know what you're talking about.  I don't

10:22:35  20   want to hear it.  So we had a conversation in his truck after

21   that, and I told him what she was doing.  He said, well,

22   that's -- that's bullshit because her and I have never slept

23   together.  And I said, well, I know my end is bullshit because

24   I'm not making her sleep with you.  And he said, I'll talk to

10:22:57  25   her about that.  He's like, that's gotta stop, he said,

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | |
|---|---|
| 10:22:59 | 1 |

10:22:59  1  because it's not true.

2       Q.   And did you have follow-up conversations with

3  Mr. Barbour?

4       A.   We did.  Some related and some unrelated to that.

10:23:08  5  Because, you know, we talked about his campaign, things he

6  needed, various meetings we were going to go to.  There were

7  several conversations between -- yea, but after that, yea.

8       Q.   Now, was it ever your intention to release a

9  recording of Ms. Barbour saying these things about

10:23:37  10  Mr. Barbour?

11       A.   No.

12       Q.   When you left, was it your intention to tell other

13  people that Ms. Barbour was saying these things about

14  Mr. Barbour?

10:23:46  15       A.   No.

16       Q.   When you had a follow-up conversation with -- did

17  you have a follow-up conversation with DeVan Barbour about

18  your discussion on the 25th?

19       A.   We did.  But it was -- it was not intended to be a

10:24:07  20  follow-up discussion about that.  It was because he received a

21  text message that concerned him.  He was upset about it and he

22  called me about it.

23       Q.   How did you respond to what he said to you?

24       A.   I told him it was Angie Barbour.  I said, this is

10:24:25  25  Angie.  This is Owen.  This is what they're doing.

Ronald Johnson - Direct by Mr. Tyndall

10:24:30 1     Q.    And when did he confront you out of concern that
2     you might be behind the threats?
3         A.    Right.  So when he received that text message, he
4     said, I received a text message that said Ronald Johnson is
10:24:44 5     going to release a recording of you to save his own ass.  And
6     he said, do you know anything about this?  And I said, I
7     don't, but I know it's Angie and Owen.  And he said, all
8     right.  How do you know?  I said, this is them.  And he said
9     he deleted the text because I was filing a report or had filed
10:25:03 10    a report with the Clayton Police Department.  And I said,
11    what's the number?  Give me the text.  We need to get it to
12    the Clayton Police Department.  He said, I deleted it.  And I
13    was upset about that because he deleted the text.
14         And you know, he told me -- and it was a lengthy
10:25:22 15    conversation.  He told me, he said, when I get to Washington
16    D.C., I'm going to open up a federal investigation on all
17    these people who are doing this.
18         Q.    Well, now, when he -- he described you as getting
19    defensive --
10:25:36 20        A.    Yes.
21         Q.    -- or something like that.  Explain from your
22    perspective how that went.
23         A.    So whenever he said he received the text message,
24    my comments were, I told you, dumbass, that they were doing
10:25:50 25    this.  And he said, this feels a lot like blackmail.  And I

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Direct by Mr. Tyndall

10:25:56   1   said, you're saying I'm blackmailing you?  And he said, no.  I

2   said, because we can just not worry about talking, I mean, if

3   you're claiming I blackmailed you.

4       Q.   How did that make you sort of respond after this?

10:26:10   5   I mean, what was sort of your perspective?

6       A.   You know, hands off.  If -- you're on your own with

7   Angie and dealing with this.  But, you know, I'm going to help

8   you campaign because you asked me to.  But yea, I'm not going

9   to talk much about this -- you know, much about it with you

10:26:27  10   any more.

11       Q.   And did you all have conversations after that date?

12       A.   We did.  We've had a lot of conversations after

13   that date spanning into 2022, 2023, and 2024.

14       Q.   Were they specifically about protecting him from

10:26:48  15   the disclosure of these things?

16       A.   Absolutely.  He, you know -- he wanted to talk with

17   me, and the first time he wanted to speak to me is when I lost

18   my job, and he said --

19           MR. ZELLINGER:  Objection, Your Honor.

10:26:59  20   Technically, this is hearsay.

21           THE COURT:  Yes.  We'll let you rephrase that

22   question.

23           MR. TYNDALL:  Yes, Your Honor.

24       Q.   And don't tell us what he said, but did you have

10:27:07  25   follow-up conversations with him about politics?

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Direct by Mr. Tyndall

| | | |
|---|---|---|
| *10:27:11* | 1 | A. Sure. |
| | 2 | Q. About these event? |
| | 3 | A. Sure. Sure. Yes. |
| | 4 | Q. And now, were you -- do you remember primary season |
| *10:27:53* | 5 | of 2022? |
| | 6 | A. Yes. |
| | 7 | Q. Were you running for office? |
| | 8 | A. No. |
| | 9 | Q. Were you campaigning for people or helping campaign |
| *10:28:01* | 10 | for people? |
| | 11 | A. I was. |
| | 12 | Q. Were you active in the community at that time? |
| | 13 | A. I was. |
| | 14 | Q. As far as you know, did you ever hear that a |
| *10:28:10* | 15 | recording of Ms. Barbour making these allegations being |
| | 16 | released during that period? |
| | 17 | A. No. |
| | 18 | Q. Did you hear anyone outside your small circle |
| | 19 | repeating these allegations or talking about them? |
| *10:28:25* | 20 | A. I had a small circle, the Republican circle, there |
| | 21 | were people talking about various things that Angie had said. |
| | 22 | But it was nothing about any recording that I had. It was |
| | 23 | about things that she was saying to them. |
| | 24 | MR. ZELLINGER: Objection. |
| *10:28:39* | 25 | THE WITNESS: Sorry. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Direct by Mr. Tyndall

| | |
|---|---|
| 10:28:39 | 1            MR. TYNDALL:  This is hearsay. |

1            MR. TYNDALL:  This is hearsay.

2            THE COURT:  I'll sustain that.

3     Q.  Let me ask you this.  I want to talk specifically

4 about the allegations against DeVan Barbour.

5     A.  Sure.

6     Q.  Did anyone release anything publicly between the

7 25th and the 17th of May, as far as you know?

8     A.  2022, no.

9     Q.  Now, did you have a conversation with Ms. Barbour

10 on election day of -- primary election day?

11     A.  Yes.

12     Q.  Was it about your relationship and things like

13 that?

14     A.  It was -- it had some to do with the relationship

15 and, you know, some to do with politics.

16     Q.  Now, you've mentioned that you had conversations

17 with DeVan Barbour over the next couple of years.

18     A.  Yes.

19     Q.  How would you describe your relationship in general

20 with Mr. Barbour before and after these events.

21     A.  Kind of in passing.  Somebody you see in a room,

22 it's like, hey, how's it going, man.  Shake hands.  Give a

23 hug.  When you give a political speech, you shout them out,

24 you know, DeVan Barbour is over here doing this, and, you

25 know, he -- he's conservative.  He's fighting for our

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

10:30:04    1   principles. And just in passing, you know, just talked. And

2   you know, we never hung out anyway, you know, but we, you

3   know, eat together at events and, you know, just kind of went

4   on as normal.

10:30:18    5        Q.    Were you present at events where he gave statements

6   in favor of your candidacy?

7        A.    Yes.

8        Q.    Were you present at an event in January of 2024

9   where you gave a statement and following that statement he

10:30:38   10   gave a statement to the crowd as well?

11        A.    I was.

12        Q.    Have you heard that recording played in the

13   courtroom this week?

14        A.    I have.

10:31:13   15        Q.    Would it help illustrate your testimony?

16        A.    It would.

17        MR. TYNDALL:   Your Honor, at this time we move to

18   introduce what's previously been marked as Defendant's 5,

19   which is a recording of a statement by Mr. Barbour.

10:31:28   20        THE COURT:   So allowed.

21          (Defendant's Exhibit Number 5 entered into

22           evidence.)

23        Q.    Tell me again what kind of event was this.

24        A.    It was a dinner that we hold monthly and we discuss

10:32:08   25   local, state, and political issues, and it's held at the

Ronald Johnson - Direct by Mr. Tyndall

10:32:13  1  Cleveland Draft House in Clayton, Shotwell Road, in kind of

2  like a conference/party room type area, and it's where people

3  get together to discuss social issues and any type of, like,

4  legislative things coming up.

10:32:30  5      Q.   Now, were you running for election during this

6  period of time?

7      A.   During this period of time I was.

8      Q.   Had you made a statement to the crowd that was

9  intended to bolster your campaign, so to speak?

10:32:45  10      A.   I did.

11      Q.   And Mr. Barbour was he -- when was he speaking in

12  relation to when you spoke?

13      A.   He spoke after I spoke.

14      MR. TYNDALL:  So go ahead and play that.

10:33:00  15          (Defendant's Exhibit Number 5 played.)

16      Q.   How did you interpret that at the time,

17  Mr. Johnson?

18      MR. ZELLINGER:  Objection.

19      THE COURT:  I'll let him answer as to how he

10:33:37  20  interpreted it.

21      THE WITNESS:  Based on the speech I had

22  immediate -- well, gave right before DeVan spoke, I felt like

23  he was supporting me and the statements that I made in my

24  speech to the group.

10:34:52  25      Q.   Did you at some time after the meeting have a

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 10:34:54 | 1 | conversation with Mr. Barbour? |
| | 2 |       A.   I did. |
| | 3 |       Q.   Was it this same meeting? |
| | 4 |       A.   It was that same meeting, yes.  It was after |
| 10:35:00 | 5 | everyone had finished speaking and we were getting ready to |
| | 6 | leave. |
| | 7 |       Q.   And is there a recording of that conversation? |
| | 8 |       A.   There is. |
| | 9 |       Q.   Can you hear Mr. Barbour's voice on the |
| 10:35:20 | 10 | conversation? |
| | 11 |       A.   There's a lot of conversations going on in the |
| | 12 | background which you can hear DeVan Barbour. |
| | 13 |       Q.   And would it help to you illustrate your testimony? |
| | 14 |       A.   Yes, sir, it would. |
| 10:35:33 | 15 |       MR. TYNDALL:  Your Honor, I move to admit for |
| | 16 | illustrative purposes, it will be Defendant's 15 -- 16, I'm |
| | 17 | sorry. |
| | 18 |       I'm sorry.  It is 15. |
| | 19 |       MR. ZELLINGER:  Do you know what that file name is? |
| 10:36:14 | 20 |       MR. TYNDALL:  Yes.  It is -- |
| | 21 |       (Discussion held off the record.) |
| | 22 |       THE COURT:  So admitted it. |
| | 23 |       MR. ZELLINGER:  No objection. |
| | 24 |       (Defendant's Exhibit Number 15 marked for |
| 10:36:16 | 25 |          identification and entered into evidence.) |

Ronald Johnson - Direct by Mr. Tyndall

| | |
|---|---|
| 10:36:20 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:36:32 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 10:36:48 | 10 |

Q.   So what was going on right after the meeting?

A.   So I was getting ready to leave the meeting.  I was walking out the door.  I was approached by DeVan Barbour.  He was standing beside Michelle Antoine, and Michelle Antoine was talking to another individual.  I don't recall who that was. As I was walking out, DeVan Barbour said, what's going on, man?  And we engaged in some conversation.  Yea.  We just -- we talked.

MR. TYNDALL:  Can you play the clip.

(Defendant's Exhibit Number 15 played.)

Q.   So let me ask you.  What was the general -- without telling us what he was saying, what was the general demeanor of Mr. Barbour at that time?

A.   He was smiling, just to demonstrate.  He was smiling, and when we approached each other, we did the handshake and kind of brought it -- you know, just kind of brought it in close, and then he -- well, then we began discussing not to worry about anything, you know, we know how this ends up, and I told him to just go win this MFer, is what I said.

Q.   What did you mean by that?

A.   Go win your race.  He was running again.  You know, he was on the ballot again.  I supported him in '22.  I'll support you in '24.  You run again, I'll support you in '26. You know, just go win.

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Direct by Mr. Tyndall

10:38:41  1      Q.   He also said --

2            MR. ZELLINGER:   Objection.

3            THE COURT:   Sustained.  We'll wait for a question.

4      Q.   Between the time that you met with him on the 25th

10:38:57  5  and your most recent meeting with him, has he been anything

6  other than cordial to you?

7      A.   He's been very nice to me.

8      Q.   Other than the more intense discussion you had

9  after the 25th, has he ever accused you of --

10:39:18  10     A.   No.

11     Q.   -- doing anything to him?

12     A.   No.

13     Q.   I want to switch gears a little bit.  Well, I just

14  want to finish up.  When you had that discussion on the 25th

10:39:33  15  and the follow-up discussions between then and the primary

16  date, what was your general intentions?

17     A.   Are you referring to 2022?

18     Q.   Yes, 2022.  I'm sorry.

19     A.   To encourage him and keep him, you know, motivated

10:39:53  20  to win because I was a supporter.  And unfortunately, I read

21  the results wrong on election night and I only looked at

22  Johnston County and I thought he won the race.  So I sent him

23  a congratulations text, but then I realized that I was only

24  looking at Johnston County and not the entire district and he

10:40:14  25  actually lost.  So I was looking at Johnston County results

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Direct by Mr. Tyndall

10:40:17   1   and he won Johnston County, so I sent him a congratulations

2   text and was excited that I thought he won.

3        Q.   And I appreciate that.  But as far as advising him

4   on the 25th and your follow-up conversation, what was your

10:40:32   5   intention by talking to him about Ms. Barbour, the recording,

6   and things like that?

7        A.   Oh.  Just give him a heads-up so he could, you

8   know, make a decision about what he was going to do for his

9   campaign, just kind of try to help him.

10:40:49  10        Q.   Did you ever tell him that you would release the

11   recording?

12        A.   Never.

13        Q.   And did you tell him you would make sure it was not

14   released?

10:40:57  15        A.   I told him I would do everything I could to make

16   sure any recordings weren't released.

17        Q.   And did you -- did you tell him that that would

18   only -- that you would only do that if he did certain things?

19        A.   No.

10:41:16  20        Q.   Now, I want to talk to you a little bit about the

21   allegation in this case, and you've heard some testimony about

22   the period of time after -- in 2023.  When did you -- when

23   were you dismissed from the Smithfield Police Department?

24        A.   Mid October of 2022.

10:41:48  25        Q.   What did you do -- I mean, other than as far as

Ronald Johnson - Direct by Mr. Tyndall

| | |
|---|---|
| 10:41:52 | 1 |

1    your political career goes, were there other things you did to

2    sort of promote politics in the local community and sort of

3    staying involved?

4         A.   Sure.  Yea.

5         Q.   What kinds of things were those?

6         A.   I got another job and talked to my boss about

7    starting a scholarship for kids and I continued going to --

8              MR. ZELLINGER:  Objection to the relevance, Your

9    Honor.

10        Q.   Well, let me sort of be a little more specific,

11   Mr. Johnson.  Did you do like public statements about politics

12   and podcasts and things like that?

13        A.   I did.

14        Q.   Where did you do your podcast from?

15        A.   Oh, I did my podcast from Clayton Fitness.

16        Q.   And how often did you do podcasts from Clayton

17   Fitness?

18        A.   Not too often.  You know, a couple of

19   times -- four, five times a year.

20        Q.   Did you maintain an office at Clayton Fitness?

21        A.   I did.

22        Q.   Tell us a little bit about that.

23        A.   It's an office.  It was converted to a studio for a

24   podcast that I did with some of my students.  It's in a gym.

25   It's got a door on it that's secured.  I don't -- it's just an

Timestamps (left margin):
- 10:41:52 — line 1
- 10:42:03 — line 5
- 10:42:17 — line 10
- 10:42:30 — line 15
- 10:42:47 — line 20
- 10:43:10 — line 25

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Direct by Mr. Tyndall

10:43:16    1    office.

2            Q.    And why did you do your podcast there?  Why did you

3    use that as an office?

4            A.    Rent was cheap and after hours there would be no

10:43:28    5    sound so you wouldn't have to have like any, you know -- when

6    you're doing a podcast there's a concern for sound coming in.

7    So after hours there's no sound that could interfere with the

8    podcast.

9            Q.    Did you still have some of your property in the

10:43:44   10    room in January of 2023?

11           A.    Yes.  It had studio lights and stuff that we use to

12    actually film the podcast, and a table, chairs, dream team

13    jerseys, comic books, action figures, things like that that we

14    used for display.

10:44:07   15           Q.    You heard Investigator Hoffman testify about

16    the -- about your returning or going to the office that day.

17    Tell us a little bit about that.  What kind of -- you know,

18    what happened that day.

19           A.    So I was on the way to work and, you know, received

10:44:27   20    a message that said, you know, Investigator Hoffman just -- it

21    was -- it was the message that was shown -- I can't remember

22    the exact words off the top of my head -- saying that he

23    didn't seem too concerned.  And, you know, prior to that there

24    had been some issues with my office as far as people putting

10:44:51   25    things on the doors, disparaging things when I lost my job,

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter