Ronald Johnson - Direct by Mr. Tyndall

10:44:56  1    and they had to scrape my name off the door because people

2    kept putting things on the door about me.  And, you know, I

3    got a message that Investigator Hoffman just stopped by to

4    look at -- you know, just to talk or something.  It's

10:45:16  5    something -- whatever that was on that message is what it was.

6        Q.   And prior to that, did -- had you ever been

7    contacted by Investigator Hoffman?

8        A.   No.

9        Q.   Had anybody ever contacted you about an ongoing

10:45:30  10   investigation in this case?

11       A.   No.

12       Q.   Were you aware that Investigator Hoffman was

13   talking to witnesses?

14       A.   I knew he was talking to people, but, I mean --

10:45:41  15   yea, I knew he was talking to people, yea.

16       Q.   And had anyone contacted you and asked you to

17   provide information or provide -- voluntarily provide

18   recordings or phones --

19       A.   No.

10:45:58  20       Q.   -- or anything like that?

21       A.   No, sir.

22       Q.   And were the -- the material in the office, who did

23   it belong to?

24       A.   Everything belonged to me.

10:46:13  25       Q.   And when you -- when you went there that day, what

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Direct by Mr. Tyndall

10:46:20  1  did you do?

2      A.    I went in because, you know, we got people putting

3  stuff on the door, now you have Investigator Hoffman, you

4  know, talking to my friends.  And it's embarrassing.  So I

10:46:35  5  decided, let me figure what all I have in there, go get my

6  family's truck, and I'm just going to load it up and get it

7  out.  They already had to scrape my name off the door.

8          You know, that podcast is past.  And it's

9  embarrassing to say, you know, I needed some money and there

10:46:53  10  was some equipment in there that, you know, I could sell.  You

11  know, I just lost my job.  There was some equipment in there

12  that I could sell for, you know, money, and I was going to get

13  it out.  I just wanted to go by there, kind of take a look at,

14  you know, how much stuff is in here.  Am I going to need a

10:47:14  15  trailer or can just one truck get it.  And then I went in

16  there briefly and then I went to work.

17      Q.    Did you take things out of there?

18      A.    I did.

19      Q.    What did you take out?

10:47:24  20      A.    I took some of my comic books.  I took an action

21  figure.  I took a microphone and I took some papers that I

22  needed.  I don't know why I remember this, a WWF magazine from

23  the early '90s.

24      Q.    Did you have any idea that Investigator Hoffman was

10:47:49  25  coming back that day?

| | | |
|---|---|---|
| 10:47:50 | 1 | A. I had no idea. |
| | 2 | Q. Did you see a police car in the parking lot? |
| | 3 | A. No. No, sir. |
| | 4 | Q. Was there a police car in the parking lot anywhere? |
| 10:47:59 | 5 | A. I'm learning now that there was, but at the time I |
| | 6 | didn't see any police cars. |
| | 7 | Q. Did anyone when you went back in suggest to you |
| | 8 | that you should have gone in your office or that it was secure |
| | 9 | in any way? |
| 10:48:12 | 10 | A. No, no one told me anything. |
| | 11 | Q. Now, I want to switch gears a little bit from that |
| | 12 | and talk about a little bit of the testimony that you've heard |
| | 13 | about the board of education. |
| | 14 | A. Yes. |
| 10:48:49 | 15 | Q. You mentioned that your relationship with some of |
| | 16 | the people has been somewhat contention; is that fair to say? |
| | 17 | A. Yes, sir. |
| | 18 | Q. And how have -- have you believed that the board |
| | 19 | has always acted in and behaved in a lawful manner? |
| 10:49:04 | 20 | A. Absolutely not. |
| | 21 | Q. Were those some of the allegations you made in |
| | 22 | 2019? |
| | 23 | A. 2019, and other years, yes, sir. |
| | 24 | Q. That State introduced evidence earlier this week |
| 10:49:19 | 25 | about a closed session meeting. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Direct by Mr. Tyndall

| | | |
|---|---|---|
| 10:49:22 | 1 | A. Yes. |
| | 2 | Q. Do you know the requirements of a closed session |
| | 3 | meeting? |
| | 4 | A. I do. |
| 10:49:27 | 5 | Q. I think the State actually introduced -- |
| | 6 | MR. TYNDALL: May I approach, Your Honor? |
| | 7 | THE COURT: Yes, sir. |
| | 8 | Q. As an elected official -- |
| | 9 | MR. TYNDALL: Your Honor, I'm going to show |
| 10:50:17 | 10 | Mr. Johnson what's been marked State's Exhibit 19. It's been |
| | 11 | previously introduced. |
| | 12 | THE COURT: Yes, sir. |
| | 13 | Q. What is that? |
| | 14 | A. This is the North Carolina General Statute that |
| 10:50:28 | 15 | outlines closed session and the law surrounding. |
| | 16 | Q. Now, closed session, this statute, what is it |
| | 17 | designed to do? I mean, what's the -- what does it talk |
| | 18 | about? |
| | 19 | A. It talks about how you legally go into closed |
| 10:50:43 | 20 | session, what you can discuss in closed session, and, you |
| | 21 | know, what you may and may not be able to do within that |
| | 22 | closed session. |
| | 23 | Q. Are there certain requirements before the board can |
| | 24 | go into closed session? |
| 10:51:09 | 25 | A. Yes, sir. There's a specific thing at the end of |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Direct by Mr. Tyndall

| | | |
|---|---|---|
| 10:51:11 | 1 | the statute called calling a closed session, and it outlines |
| | 2 | what you must say before you can go into a closed session |
| | 3 | meeting. |
| | 4 | Q.   And what must a person say or what must the chair |
| 10:51:24 | 5 | say -- or I don't know if it's the chair or somebody else -- |
| | 6 | before you go into closed session. |
| | 7 | A.   It can be any member of the board of education to |
| | 8 | make the motion to go into closed session, but for it to be a |
| | 9 | legally called closed session -- |
| 10:51:37 | 10 | MR. ZELLINGER:   Objection. |
| | 11 | THE COURT:   Sustained. |
| | 12 | Q.   Now, can you read State's Exhibit -- |
| | 13 | MR. ZELLINGER:   19. |
| | 14 | Q.   -- 19, what the legislature says about what you |
| 10:51:47 | 15 | have to do before you go into a closed session. |
| | 16 | A.   Sure.   Every motion to close the meeting shall cite |
| | 17 | one or more of the permissible purposes listed in this |
| | 18 | subsection A.   A motion based on subdivision A1 of this |
| | 19 | section shall also state the name and citation of the law that |
| 10:52:07 | 20 | renders the information to be discussed privileged and |
| | 21 | confidential.   So the relevant point here is of the section -- |
| | 22 | MR. ZELLINGER:   Objection. |
| | 23 | THE COURT:   Sustained.   I'll let you reask that |
| | 24 | question. |
| 10:52:21 | 25 | Q.   As a board of education member, what's your |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Direct by Mr. Tyndall

| | |
|---|---|
| 10:52:25 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:52:37 | 5 |
| | 6 |

1　understanding of who these laws are designed to protect, the

2　closed session laws.

3　　　　A.　　The employees of the body and the board of

4　education.

5　　　　Q.　　And why are there limitations on going into closed

6　session?

7　　　　A.　　Open meetings law.　You can't just talk about

8　anything in closed session, and you have to list the general

9　statute before you go into closed session.

10　　　　Q.　　And on 5/31/22, the night that they are talking

11　about the closed session that's been testified to here, did

12　the -- was this law followed?　Was Subsection C about calling

13　a closed session followed?

14　　　　A.　　No, sir.

15　　　　Q.　　What was missing from that statute?

16　　　　A.　　They failed to call out the general statute that

17　governors closed session and allowed you to legally enter a

18　closed session meeting.

19　　　　Q.　　And is there a recording of that that's publically

20　available?

21　　　　A.　　It is.　It's online.

22　　　　MR. TYNDALL:　Your Honor, it's just going to take a

23　second.　It's on my computer.

24　　　　THE COURT:　Do we need take a short recess?

25　　　　MR. TYNDALL:　That wouldn't hurt, Judge.　That's

*(Timestamps in left margin: 10:52:25 at line 1, 10:52:37 at line 5, 10:52:53 at line 10, 10:53:11 at line 15, 10:53:26 at line 20, 10:53:41 at line 25)*

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Direct by Mr. Tyndall

| | | |
|---|---|---|
| 10:53:43 | 1 | fine. |
| | 2 | THE COURT: We'll take a little longer than |
| | 3 | typical. We were -- we've been here since 9:00. We're going |
| | 4 | to go ahead and take a short recess. Leave your notes |
| 10:53:55 | 5 | facedown, and we'll see you back in about 15 minutes. |
| | 6 | (Jury exits.) |
| | 7 | THE COURT: 15 minutes. |
| | 8 | (Recess.) |
| | 9 | THE COURT: Mr. Tyndall, are you ready to get the |
| 11:08:41 | 10 | jury back? |
| | 11 | MR. TYNDALL: Yes, sir. |
| | 12 | THE COURT: You can bring them in. When you get |
| | 13 | them all, just bring them all back in. |
| | 14 | (Jury enters.) |
| 11:12:25 | 15 | THE COURT: Mr. Tyndall, whenever you are ready. |
| | 16 | MR. TYNDALL: Thank you, Your Honor. |
| | 17 | Q. Your Honor, I think when we left off we |
| | 18 | were -- Mr. Johnson when we left off we were discussing the |
| | 19 | closed session and you talked a little bit about the statute. |
| 11:12:46 | 20 | A. Yes, sir. |
| | 21 | Q. Prior to that meeting that night, was there a |
| | 22 | meeting of the legislative authority to close the session? |
| | 23 | A. There was not. |
| | 24 | Q. And is that meeting publically available? |
| 11:13:03 | 25 | A. It is. |

| 11:13:03 | 1 | Q. Would that help you to illustrate your testimony? |

2       A.   It would.

3            MR. TYNDALL:  Your Honor, I would move to introduce

4       what we've marked as Defense Exhibit Number 16.  It's a

11:13:14  5  recording of the closed session -- or of the preliminary

6       proceedings of the school board on May 31st.

7            THE COURT:  So allowed.

8                 (Defendant's Exhibit Number 16 marked for

9                 identification and entered into evidence.)

11:13:28  10          MR. TYNDALL:  I'd like to publish that to the jury.

11           THE COURT:  Yes, sir.  So allowed.

12                (Defendant's Exhibit Number 16 published to the

13                jury.)

14      Q.   Mr. Johnson, while that's coming up, I think that

11:13:49  15  Ms. Andrews testified this was not an in-person meeting; is

16      that right?

17      A.   That's correct.  It's what we call a virtual

18      meeting, yes, sir.

19      Q.   Was it streamed for the public?

11:14:00  20  A.   The open session was streamed for the public.  The

21      closed session would go to a blank screen where you couldn't

22      see it.

23      Q.   What are you seeing here, Mr. Johnson?

24      A.   That's the screen that is preempted to the board of

11:14:22  25  education meeting starting.

| | | |
|---|---|---|
| 11:14:25 | 1 | (Recording played.) |
| | 2 | Q.   What's going on with the roll call? |
| | 3 | A.   Given the fact it's a virtual meeting, we're not |
| | 4 | all in one place, North Carolina General Statute also require |
| 11:16:22 | 5 | that we vote individually.  So instead of saying, all in |
| | 6 | favor, then everyone answering at the same time, a roll call |
| | 7 | vote is where you would have -- you know, Ronald would vote, |
| | 8 | then Lyn Andrews would vote, then Todd Sutton would vote, so |
| | 9 | it's a one at a time thing. |
| 11:16:40 | 10 | (Resume playing recording.) |
| | 11 | Q.   Now, after you all voted for the closed session, |
| | 12 | what should have happened then by law? |
| | 13 | A.   We should -- after we vote?  We would have went |
| | 14 | into closed session. |
| 11:17:44 | 15 | Q.   Are you saying prior to voting? |
| | 16 | A.   Yes. |
| | 17 | Q.   Okay.  Explain the process what should happen. |
| | 18 | MR. ZELLINGER:  Objection. |
| | 19 | THE COURT:  To the extent he understands, we'll let |
| 11:17:53 | 20 | him. |
| | 21 | MR. TYNDALL:  He's on the board of education. |
| | 22 | THE COURT:  Approach. |
| | 23 | (Sidebar.) |
| | 24 | THE COURT:  We'll let you rephrase so he can |
| 1:18:24 | 25 | answer. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Direct by Mr. Tyndall

| | | |
|---|---|---|
| 11:18:25 | 1 | Q. Mr. Johnson, let me ask you this. First of all, do |
| | 2 | you have a general understanding of the way the meetings are |
| | 3 | supposed to be conducted? |
| | 4 | A. I do, and I've received advice from the school |
| 11:18:36 | 5 | board's legal counsel. |
| | 6 | Q. And tell us about the process that you would expect |
| | 7 | to happen based on your understanding of the closed session |
| | 8 | meeting? |
| | 9 | A. Yes. So before you vote on anything, a board |
| 11:18:51 | 10 | member has to make a motion and then another board member |
| | 11 | would have to second that motion, but the first motion has to |
| | 12 | specifically say something. Based on my understanding of the |
| | 13 | North Carolina General Statute, when you make a motion to go |
| | 14 | into a closed session meeting, in order for it to be a legally |
| 11:19:11 | 15 | called closed session meeting, you have to verbally recite the |
| | 16 | North Carolina General Statute. You have to explicitly say |
| | 17 | it. And we received advice from our legal counsel. |
| | 18 | MR. ZELLINGER: Objection. |
| | 19 | THE COURT: I'll sustain as to that. |
| 11:19:29 | 20 | Q. So did that happen during this meeting? |
| | 21 | A. During the May 31st, 2022, virtual meeting, it did |
| | 22 | not happen. |
| | 23 | MR. TYNDALL: Can you play that. |
| | 24 | (Recording played.) |
| 11:19:42 | 25 | Q. So what was happening here? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Direct by Mr. Tyndall

11:19:44  1    A.    We're going into closed session to discuss items

2    that were on the agenda.  And you're asking what's happening

3    here?  We're also discussing items that were not explicitly

4    stated on the agenda.

11:20:00  5    Q.    Let me ask you because we're not -- we don't -- I

6    suspect some of us here don't attend these meetings very

7    often.  But you read part of State's Exhibit 19:  Every motion

8    to close a meeting shall cite one or more of the permissible

9    purposes listed in Subsection A of this section.  A motion

11:20:31  10   based on Subdivision A1 of this section shall also seek the

11   name and citation of the law that renders the information to

12   be discussed privileged and confidential.  A motion based on

13   Subdivision A3 of this section shall identify the parties

14   in -- that's different.  That's a lawsuit.

11:20:51  15   But did -- did anyone cite the name and citation of

16   the law that renders the information to be discussed

17   privileged and confidential?

18   A.    No, sir, they didn't.

19   Q.    During this meeting?

11:21:03  20   A.    No, sir.

21   Q.    Now, I want to talk to you a little bit,

22   Mr. Johnson, about the allegation related to the transfer of

23   the children or your discussion with Mr. Jones about the

24   transfer of the children.  Tell us a little bit about that.

11:21:37  25   A.    I received information regarding the student

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

11:21:41   1  assignment in May of 2022, and I approached Dr. Jones with

2  just general questions about the assignment process, what it

3  would entail, and, you know, who would be notified considering

4  that it was his school.  You know, he gave me the answers.

11:22:01   5  And I told him that, you know, I would get with him at a later

6  time considering that any transfer or anybody who may be out

7  of district, you don't move them in the middle of the year

8  because you don't want to disrupt their learning year.  That's

9  standard in all Johnston County, you know, practices.  You let

11:22:22  10  the child finish the school year.  And that was in May.

11         We had a follow-up conversation in June, and then,

12  you know, I had forgotten about it, and he contacted me in

13  July of 2022 via text.  You know, I received a text from him.

14  My interpretation of the text was he was, you know, telling me

11:22:49  15  that I always had his back and that if I needed anything --

16              MR. ZELLINGER:  Objection to hearsay, Your Honor.

17              THE COURT:  I'll sustain as to what somebody else

18  said.

19         A.    After the text message I --

11:23:00  20         Q.    Just tell us what you did in response.

21         A.    So in response, I gave him a call, and then we

22  spoke, and, you know, he asked me -- well, I can't talk about

23  what he asked me.  I made the comment to him about the

24  reassignment of the kids.  And he asked me the kids' names,

11:23:20  25  and, you know, I gave him the names of the children.

Ronald Johnson - Direct by Mr. Tyndall

| | | |
|---|---|---|
| 11:23:24 | 1 | Q. Were the children ever reassigned? |
| | 2 | A. No. |
| | 3 | Q. Why were you concerned about that? |
| | 4 | A. I received information regarding Mr. Phillips about |
| 11:23:38 | 5 | him being -- |
| | 6 | MR. ZELLINGER: Objection to the hearsay. |
| | 7 | THE COURT: Sustained. |
| | 8 | Q. You don't say what you heard. Tell us what your |
| | 9 | concerns were and why you contacted Mr. Jones. |
| 11:23:51 | 10 | A. Physical, mental -- |
| | 11 | MR. ZELLINGER: Objection, Your Honor. This is |
| | 12 | hearsay. |
| | 13 | THE COURT: Approach the bench. |
| | 14 | (Sidebar discussion.) |
| 11:25:50 | 15 | THE COURT: Ladies and gentlemen, I'm going to ask |
| | 16 | you to step out for a few minutes, if you would. I think it |
| | 17 | will be just but a few minutes. Thank you very much. |
| | 18 | (Jury exits.) |
| | 19 | THE COURT: Outside the presence of the jury I'm |
| 11:26:37 | 20 | going to give either side an opportunity to be heard, then |
| | 21 | offer some voir dire, if necessary. |
| | 22 | Mr. Zellinger, I will hear from the State as to |
| | 23 | your objection. |
| | 24 | MR. ZELLINGER: Your Honor, the defendant is |
| 11:26:46 | 25 | seeking to solicit information from this witness alleging that |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 11:26:53 | 1 | Owen Phillips' children were in some way abused, which as far |
| | 2 | as I know is completely unsubstantiated. And regardless, it's |
| | 3 | hearsay. Unless somebody comes in and says, I saw them, you |
| | 4 | know, I did an investigation, they were abused. |
| 11:27:07 | 5 | So regardless of how the defendant came to learn |
| | 6 | this information, the information that he learned is not from |
| | 7 | his own personal knowledge. It is hearsay. And I think the |
| | 8 | effort is just to sort of backdoor around that to get to it. |
| | 9 | So I think there's a critical issue with the veracity of the |
| 11:27:28 | 10 | information that's being put forward. |
| | 11 | THE COURT: Yes, sir. |
| | 12 | MR. TYNDALL: Well, Your Honor, I don't know if the |
| | 13 | information is true or not. We're not offering it for that |
| | 14 | reason. My understanding from Mr. Johnson is he received some |
| 11:27:41 | 15 | information that concerned him, and that based on that |
| | 16 | information he contacted Mr. Jones, among other people, in |
| | 17 | response. That's all that my -- I don't think the details |
| | 18 | of -- I mean, I can't verify or I can't dispute it's true or |
| | 19 | not. |
| 11:28:09 | 20 | I know that in any case where it's just like an |
| | 21 | investigator receiving information, you know, what did you do? |
| | 22 | I responded to the scene of where I heard something was going |
| | 23 | on. And it doesn't mean that it's true. It just means that |
| | 24 | you did something. |
| 11:28:25 | 25 | THE COURT: Well, I am concerned the nature of this |

Ronald Johnson - Voir Dire by Mr. Tyndall

| | |
|---|---|
| 11:28:28 | 1 |

1  testimony might be hearsay. Can we have a little more voir

2  dire so I can understand what the testimony might be.

3  VOIR DIRE EXAMINATION BY MR. TYNDALL:

4      Q.   You know, you were explaining why you called

5  Dr. Bennett about transferring these children. Tell us why

6  you did that.

7      A.   I received information that Owen Phillips was

8  physically abusive.

9      Q.   Okay. And so how did that relate to Dr. Jones?

10      A.   Me contacting Dr. Jones?

11      Q.   Yes.

12      A.   That was one part of many reasons that I contacted

13  Dr. Jones and others, but that particular part he would have

14  instituted a verification of the child residency and a school

15  social worker would have evaluated the home and verified their

16  residency and if there were or were not any signs of abuse.

17  That's what they're trying to do.

18      Q.   And so is that only in the case of a report of

19  abuse?

20      A.   No. They would do that. School social workers are

21  trained to verify residency, but they are also trained to look

22  for other things.

23      Q.   So your reason -- my understanding is that the

24  reason you contacted Dr. Jones was based on those reports?

25      A.   Yes.

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 11:29:49 | 1 | ᵃ   THE COURT:  Mr. Zellinger. |
| | 2 | VOIR DIRE EXAMINATION BY MR. ZELLINGER: |
| | 3 | Q.   Mr. Johnson, the information that you had was that |
| | 4 | Owen Phillips was abusive; is that correct? |
| 11:29:58 | 5 | A.   Yes. |
| | 6 | Q.   And you got that off Facebook; is that correct? |
| | 7 | A.   A Facebook message, yes, sir, communication. |
| | 8 | Q.   And who was the Facebook message from? |
| | 9 | A.   A young lady named Candice Smith. |
| 11:30:06 | 10 | Q.   Okay.  And who is Candice Smith? |
| | 11 | A.   She is a former girlfriend, live-in roommate with |
| | 12 | Owen Phillips. |
| | 13 | Q.   And is she here today? |
| | 14 | A.   She's not. |
| 11:30:22 | 15 | Q.   And so based on that information you got from |
| | 16 | Facebook, that is why you contacted Mr. Jones? |
| | 17 | A.   Yes.  With a follow-up conversation with her. |
| | 18 | Q.   And when did you dated Ms. Smith -- |
| | 19 | A.   I never dated Ms. Smith. |
| 11:30:43 | 20 | Q.   I'm sorry.  I thought you said you were saying |
| | 21 | former roommate. |
| | 22 | A.   Not me, no, sir.  I'm sorry. |
| | 23 | Q.   And do you know when they dated? |
| | 24 | A.   They dated from 2020 to 2021. |
| 11:31:01 | 25 | Q.   Did you ever take part in any sort of investigation |

| | | |
|---|---|---|
| !1:31:03 | 1 | of his children? |
| | 2 | A. No. |
| | 3 | MR. ZELLINGER: Nothing further, Your Honor. |
| | 4 | THE COURT: Do you wish to be heard on that? |
| !1:31:12 | 5 | MR. TYNDALL: Not really, Your Honor. I mean, you |
| | 6 | know, the bottom line is we're not trying to prove that |
| | 7 | Mr. Phillips abused his children. We're trying to show simply |
| | 8 | that Mr. Johnson -- |
| | 9 | THE COURT: Hang on one minute. |
| !1:31:32 | 10 | MR. TYNDALL: Yes, sir. |
| | 11 | THE COURT: Yes, sir. Sorry. |
| | 12 | MR. TYNDALL: -- received a report that concerned |
| | 13 | him, and based on that report he followed up with a phone call |
| | 14 | and after that phone call he contacted Dr. Jones, and then to |
| !1:31:46 | 15 | tell what he expected to happen after he contacted Dr. Jones |
| | 16 | before there was any. |
| | 17 | THE COURT: Mr. Zellinger, anything for the record? |
| | 18 | MR. ZELLINGER: Your Honor, under a 403 analysis, I |
| | 19 | mean, we've got a Facebook message as being the basis for this |
| !1:32:00 | 20 | content. And so unless Ms. Smith is going to come in here and |
| | 21 | testify and say that this happened, there's a huge prejudicial |
| | 22 | aspect, and they're basing a claim without any evidence that |
| | 23 | Owen Phillips abused his children. And that's going to be the |
| | 24 | effect it's going to have on the jury. If that's not their |
| !1:32:16 | 25 | goal, then they can merely ask, were you contacted by somebody |

| 11:32:20 | 1 | on Facebook? Yes. Or received that information. Based on |
|---|---|---|
| | 2 | that information you received, did you contact Dr. Jones? |
| | 3 | THE COURT: If you guys will approach for just a |
| | 4 | minute, please. |
| 11:32:31 | 5 | (Sidebar.) |
| | 6 | THE COURT: Just for the record, before we bring |
| | 7 | the jury in, after voir dire arguments and discussion with |
| | 8 | counsel, the Court will find the original testimony was |
| | 9 | hearsay. I will sustain that objection. However, |
| 11:35:16 | 10 | Mr. Tyndall, we will let you reask those questions |
| | 11 | specifically with what we discussed at the bench, which is in |
| | 12 | some form or another just information he got off Facebook |
| | 13 | without going into detail. |
| | 14 | MR. ZELLINGER: Your Honor, is the Court going to |
| 11:35:30 | 15 | recite that ruling in front of the jury when they come back? |
| | 16 | THE COURT: I will. Thank you. |
| | 17 | MR. ZELLINGER: Thank you. |
| | 18 | THE COURT: If we can bring the jury back in. |
| | 19 | (Jury enters.) |
| 11:37:30 | 20 | THE COURT: Everybody, welcome back. Just for the |
| | 21 | record, the Court will sustain the objection as hearsay. |
| | 22 | We'll ask the jury to disregard any answer if one was given in |
| | 23 | it. |
| | 24 | Mr. Tyndall, we will let you reask your question |
| 11:37:44 | 25 | consistent with what we discussed outside the presence of the |

11:37:47  1   jury.

2         MR. TYNDALL:   Thank you, Your Honor.

3   DIRECT EXAMINATION BY MR. TYNDALL:

4         Q.   Mr. Johnson, tell us, did you get some information

11:37:53  5   sometime in the spring of 2022 that concerned you?

6         A.   I received a complaint from an individual, Candice

7   Smith, on Facebook Messenger.

8         Q.   In response to that, did you reach out and talk to

9   Ms. Smith?

11:38:06  10        A.   I did.   We had a follow-up phone call.

11        Q.   In response to your conversations with Ms. Smith,

12   did you contact Dr. Jones?

13        A.   I contacted Dr. Jones and others as a result of

14   that conversation.

11:38:19  15        Q.   What did you expect Dr. Jones or the school

16   administration to do?

17        A.   For the school part, I anticipated them to have a

18   school social worker conduct the investigation.

19        Q.   Now, Mr. Johnson, I want to talk to you -- I want

11:38:59  20   to talk to you about some of the information Ms. Barbour

21   shared.   And you alluded in the earlier in your testimony that

22   she had accused you of doing certain things --

23        A.   Yes.

24        Q.   -- in the spring of 2022.

11:39:16  25        A.   Yes.

Ronald Johnson- Direct by Mr. Tyndall

| | | |
|---|---|---|
| '1:39:16 | 1 | Q. Was there a time when you actually provided to her |
| | 2 | a TracFone? |
| | 3 | A. Yes. |
| | 4 | Q. And when was that? |
| '1:39:24 | 5 | A. It was in October of 2021. |
| | 6 | Q. Tell me -- tell the jury why you provided her with |
| | 7 | a TracFone. |
| | 8 | A. She contacted me regarding her husband, and she was |
| | 9 | having issues with him -- |
| '1:39:39 | 10 | MR. ZELLINGER: Objection to the hearsay. |
| | 11 | THE COURT: As to what Ms. Barbour said? |
| | 12 | MR. TYNDALL: Yes. This is the contact from her to |
| | 13 | Mr. Johnson. This is his reason for providing her the |
| | 14 | TracFone. |
| '1:39:55 | 15 | THE COURT: Do you wish to be heard further? |
| | 16 | MR. ZELLINGER: I mean, she could have been asked |
| | 17 | about this. This is hearsay. |
| | 18 | THE COURT: Yes, sir. I'm going to sustain that |
| | 19 | and let you re-ask it, if you would, Mr. Tyndall. |
| '1:40:08 | 20 | Q. Was it your impression that Ms. Barbour was |
| | 21 | concerned about something? |
| | 22 | A. It was. |
| | 23 | Q. And what did you do in response to that? |
| | 24 | A. Brought her a phone to use. |
| '1:40:20 | 25 | Q. What was the point of the phone? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson- Direct by Mr. Tyndall

1:40:22  1        MR. ZELLINGER:  Objection.

2        THE COURT:  I'll let him answer.

3    Q.   Why did you provide her with a TracFone?

4    A.   Because she could have a phone to use that wasn't

1:40:33  5    tracked where she couldn't be followed and she would have to

6    avoid her husband.

7    Q.   Did you ever -- I mean, did you ever -- did you

8    have a subscription or was it used for a --

9    A.   At the time it was an old phone that I didn't use.

1:40:57  10   So no, I had no subscription at the time.  It was just an old

11   phone.

12   Q.   You just gave her the TracFone?

13   A.   Yes, I gave it to her.

14   Q.   Now, at some point did you -- in the spring of 2022

1:41:32  15   you've mentioned some messages that your understanding was

16   Mr. Barbour received?

17   A.   Yes.

18   Q.   Did you start receiving some messages as well?

19   A.   I did.

1:41:44  20   Q.   Tell us a little bit about that.

21   A.   I can't remember the exact date.  I have it notated

22   on an exhibit, but the first message I received said something

23   to the effect of, rest up, you're going to need to use those

24   Marriott reward points soon.  It was the first message, and I

1:42:07  25   responded sarcastically:  Sounds good.  And I didn't know who

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 1:42:12 | 1 | it was from.  It was from an out of state number.  Then I |
| | 2 | started receiving subsequent follow up text messages, and the |
| | 3 | content of those messages were only things that I believed |
| | 4 | Angie Barbour knew and Angie Barbour could know. |
| 1:42:36 | 5 | So I had a -- you know, at some point I had a civil |
| | 6 | attorney, and I was told to make a timeline of what, you know, |
| | 7 | Angie Barbour is doing and saying and then put that on the |
| | 8 | bottom, and on the top put the things that you think she's |
| | 9 | doing and saying and see if they line up.  So I did that.  And |
| 1:43:02 | 10 | I had a graphic designer make a big exhibit of it.  And when |
| | 11 | Investigator Hoffman served a search warrant on my house, I |
| | 12 | showed it to him and asked him to take that into evidence. |
| | 13 | (Defendant's Exhibit Number 17 marked for |
| | 14 | identification.) |
| 11:43:47 | 15 | MR. TYNDALL:  May I approach, Your Honor -- |
| | 16 | THE COURT:  Yes, sir. |
| | 17 | MR. TYNDALL:  -- with what's marked as Defendant's |
| | 18 | Exhibit 17. |
| | 19 | Q.    Mr. Johnson, I'm going to show you what's been |
| 11:44:34 | 20 | marked Defendant's Exhibit Number 17 for purposes of refresh |
| | 21 | your recollection; okay? |
| | 22 | A.    Yes, sir. |
| | 23 | Q.    Let's talk a little bit about the timeline.  Tell |
| | 24 | us what you did.  Does this refresh your recollection about |
| 11:44:47 | 25 | the timeline? |

Ronald Johnson- Direct by Mr. Tyndall

| | |
|---|---|
| 1:44:49 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 1:44:59 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 1:45:27 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 1:45:39 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 1:45:55 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 1:46:14 | 25 |

1       A.   Sure.

2       Q.   Okay.  Tell us sort of when things began in this

3   timeline.

4       A.   So I put them -- the first date of March 3rd, it

5   was:  Late night at the gym I see, which was a text message

6   that she sent me from her number that I knew her to use; and

7   then I put a series of three text messages I received in March

8   of 2028 (sic) where she's again at the gym talking about me

9   playing racquetball and then --

10       MR. ZELLINGER:  Your Honor, I think he said March

11   of 2028.

12       THE WITNESS:  No, March 28th.  I'm sorry.  I

13   apologize.

14       Q.   What was your purpose documenting this?

15       A.   My lawyer told me to and I needed to provide her

16   something, you know, for our civil case, and I also wanted to,

17   you know, have it documented.

18       Q.   And to be fair, I was not your lawyer at that time;

19   is that right?

20       A.   No.  No, sir.  Valerie Bateman from New South Law.

21       Q.   Okay.  And after that, what are the next relevant

22   periods of time?  What happened after that?  What did you do?

23   Not what somebody told you, but what did you do?

24       A.   I continued to document the text messages and

25   document Angie Barbour's behavior.

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson- Direct by Mr. Tyndall

'1:46:17   1     Q.   Now, when you say text messages, do you mean text

2  messages directly from her?

3     A.   No.  Text messages I was receiving from an

4  anonymous number, and I reported that to the Clayton Police

'1:46:29   5  Department.  I wanted to have a timeline for them to kind of

6  see it.  Because, you know, I was a police officer for some

7  time and sometimes you got to show it to them.  So I wanted to

8  be able to show it to them because no one understood it like

9  me.

'1:46:43  10     Q.   You also said that you received a -- when you were

11  receiving these anonymous text messages, what was the

12  information that made you believe it might be Ms. Barbour?

13     A.   The same exact things that were in the text

14  messages were on her social media profiles.  For example, if I

'1:47:12  15  can look here on June 15th, 2022, at 6:32 p.m., I received a

16  text message that says:  So you really think that creating

17  false information to obtain an order will cause this to stop?

18  Desperate people do desperate things.  You are just causing

19  the train to go full throttle.  Game on.  You just have no

'1:47:34  20  idea the harm you are creating for yourself.

21       I received that text message on June 15th, 2022, at

22  6:32 p.m.  And then on June 15th, that same day, at 10:24 p.m.

23  Ms. Barbour puts on her Facebook page --

24       MR. ZELLINGER:  Objection.  Hearsay.

'1:47:52  25       THE COURT:  Sustained as to that.

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson- Direct by Mr. Tyndall

| | | |
|---|---|---|
| 11:47:54 | 1 | Q.   Well, based on information you saw on Facebook, did |
| | 2 | you have reason to believe that she might be involved in |
| | 3 | sending the other messages? |
| | 4 | A.   When I saw a post of hers that says, game on, |
| 11:48:07 | 5 | everybody, four hours after I received a text message -- |
| | 6 | MR. ZELLINGER:  Objection.  Motion to strike. |
| | 7 | THE COURT:  Yes, sir.  I will sustain.  Ask the |
| | 8 | jury to disregard that. |
| | 9 | Mr. Tyndall, if you can reask that question, |
| 11:48:21 | 10 | please. |
| | 11 | MR. TYNDALL:  Yes. |
| | 12 | Q.   So on June 27th, did you receive a text message |
| | 13 | from a number that you did not recognize? |
| | 14 | A.   Yes. |
| 11:48:28 | 15 | Q.   What was that number? |
| | 16 | A.   That number is 404-328-7853. |
| | 17 | Q.   Based on that information, did you have some |
| | 18 | concerns about who was sending it?  Did you reach a |
| | 19 | conclusion? |
| 11:48:48 | 20 | A.   I did. |
| | 21 | Q.   And who did you believe it was? |
| | 22 | A.   I believed it was Angie Barbour. |
| | 23 | Q.   Now, there was testimony earlier about Ms. Barbour |
| | 24 | posting on Facebook with something called checkmate in front |
| 11:49:07 | 25 | of her. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson- Direct by Mr. Tyndall

1:49:07  1    A.  Yes, sir.  It was a Snapchat banner, and on that
2    Snapchat banner it had checkmate running across her picture.
3    Q.  And did you receive another text message from
4    404-328-7853 with a message to you on July 7th?
1:49:26  5    A.  I did.  It said checkmate.
6    Q.  Now, when you -- after you created this timeline,
7    Mr. Johnson, when did you -- did you have any more interaction
8    with Ms. Barbour individually or personally?
9    A.  Oh, yea.  I mean, I've seen her and she's
1:49:55  10   approached me, you know, screaming at me throughout all up
11   until 2024.  I -- yea, I've had some interactions with her.
12   Q.  But you didn't have a personal relationship with
13   her after that?
14   A.  Oh, no, no, no, no, no.
1:50:12  15   Q.  Now, in response to the text messages and things
16   you received, did you initiate an investigation?
17   A.  I did.  I notified my place of employment, the
18   Smithfield Police Department, and I also filed a report with
19   the Clayton Police Department, and when Investigator Hoffman
1:50:35  20   did a search warrant on my house I provided him with this
21   information.
22   Q.  Who did you talk to at the Clayton Police
23   Department?
24   A.  I contacted Captain Kenny Lunger and he asked me --
1:51:09  25   MR. ZELLINGER:  Objection to hearsay.

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson- Direct by Mr. Tyndall

| | | |
|---|---|---|
| !1:51:10 | 1 | THE WITNESS: Okay. So I contacted Captain Kenny |
| | 2 | Lunger, and then it was assigned to Detective Jason Linder. |
| | 3 | Q. As far as you know, did Detective Linder do an |
| | 4 | investigation? |
| !1:51:22 | 5 | A. He did. He -- as far as I know, he sent everything |
| | 6 | to the SBI, and he did court orders and subpoenas through the |
| | 7 | SBI trying to find out who this was. |
| | 8 | Q. Did you interact with Detective Linder while he was |
| | 9 | doing that? |
| !1:51:44 | 10 | A. I contacted him several times. I gave him |
| | 11 | additional messages. As I received them, I would e-mail them |
| | 12 | to him, and as other people who were friends of mine received |
| | 13 | them, I also forwarded those messages to Detective Linder. |
| | 14 | Q. Now, after you reported these messages to Detective |
| !1:52:16 | 15 | Linder, did you continue to get these messages? |
| | 16 | A. To Detective Linder? |
| | 17 | Q. Did they ever stop? |
| | 18 | A. The last one I have documented on the timeline |
| | 19 | would be the last one that I received. I would block the |
| !1:52:35 | 20 | numbers and then they would just find another way. I can't |
| | 21 | say -- I would block the numbers and then I would receive |
| | 22 | messages from other numbers. |
| | 23 | Q. Have you received anything in the last couple of |
| | 24 | years? |
| !1:52:48 | 25 | A. I haven't received anything since -- I believe the |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

!1:52:51  1   last date is July 7th of 2022.

2        Q.   Mr. Johnson, you testified for a while this

3   morning.  Was it ever your intention to threaten DeVan Barbour

4   in any way?

!1:53:25  5        A.   No, not at all.

6        Q.   Was it ever your intention to interfere with

7   Investigator Hoffman's investigation in any way?

8        A.   No, not at all.

9             MR. TYNDALL:  I don't have any further questions,

!1:53:39  10  Your Honor.

11            THE COURT:  Mr. Zellinger.

12            MR. ZELLINGER:  Thank you, Your Honor.

13   CROSS-EXAMINATION BY MR. ZELLINGER:

14        Q.   Mr. Johnson, you now admit that you had an

!1:53:51  15  affair --

16        A.   Yes.

17        Q.   -- with Angie Barbour; correct?

18        A.   Yes, sir.

19        Q.   And it was a consensual affair?

!1:53:57  20        A.   There was some threats involved in that affair,

21   yes, sir.

22        Q.   Okay.  And did you threaten her?

23        A.   Never.

24        Q.   You dated her for, I think your attorney said, like

!1:54:06  25  a year and a half?

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 11:54:07 | 1 | A.  October 14 -- no.  November 14th of 2022 and then |
| | 2 | on and off till January, February -- I'm sorry.  Let me get |
| | 3 | the dates.  November 14th, 2020, on and off to February of |
| | 4 | 2022.  Sorry about that. |
| 11:54:30 | 5 | Q.  And that November 4th date that's when -- |
| | 6 | A.  14th. |
| | 7 | Q.  14th? |
| | 8 | A.  Yes, sir. |
| | 9 | Q.  That was the time where she was out with some |
| 11:54:37 | 10 | friends and met up with her; is that correct? |
| | 11 | A.  That is correct. |
| | 12 | Q.  And then she was drinking and you left; is that |
| | 13 | right? |
| | 14 | A.  I was drinking -- no.  She was drinking or I was |
| 11:54:47 | 15 | drinking? |
| | 16 | Q.  She was drinking. |
| | 17 | A.  She was drinking, yes.  She was drinking. |
| | 18 | Q.  She was drinking -- |
| | 19 | A.  And I left. |
| 11:54:51 | 20 | Q.  -- you left, went to the gym or something; right? |
| | 21 | A.  Correct. |
| | 22 | Q.  And then like she sprained her ankle and you came |
| | 23 | back? |
| | 24 | A.  She -- I didn't know she sprained her ankle.  I was |
| 11:55:03 | 25 | contacted and that was not the information I received, but I |

| | |
|---|---|
| *11:55:07* | 1 |

1 did come back.

2   Q. So you came back and then, for lack of a better

3 term, you guys became romantically intertwined that night; is

4 that fair to say?

*11:55:18* 5   A. Yes. With a little bit in between that, but, yea,

6 that's fair to say.

7   Q. I mean, what happened that night?

8   A. So she called me and said that there was some

9 people at a bar with a gun and that I needed to come pick them

*11:55:32* 10 up, and I went to the bar, which was a bar called Revival, and

11 there was no one there. So I said, hmmm, I'm just going home.

12 You know, I don't have time for this. I'm going home.

13   So on the way home she calls again and she said,

14 where you at? And I said, I just left the bar and there's no

*11:55:51* 15 one there. And she's like, no, we're at a house in your

16 neighborhood. So she gives me the address. I drive to the

17 house, you know, thinking there could be, you know, something

18 sketchy. Everybody was pretty normal. She got in the car.

19 She said that they were going to -- her and her friend,

*11:56:08* 20 Allyson Bond, needed a ride back to Allyson Bond's house

21 because that's where they were going.

22   I took them back to Allyson Bond's house and

23 Allyson got out of the car, and she said, I need you to take

24 me home. My ankle is messed up. So I took her.

*11:56:26* 25   Q. Can I just ask you, didn't you just say that you

| | | |
|---|---|---|
| 11:56:28 | 1 | didn't know anything about her sprained ankle? |
| | 2 | A. When she called. You said she called and said that |
| | 3 | she had a sprained ankle. I'm sorry. |
| | 4 | Q. So you did know she had a sprained ankle? |
| 11:56:37 | 5 | A. When I picked her up, she said she had a sprained |
| | 6 | ankle. |
| | 7 | Q. So then did you -- you picked her up; is that |
| | 8 | correct? |
| | 9 | A. Yes. |
| 11:56:43 | 10 | Q. And then -- |
| | 11 | A. She was supposed to -- |
| | 12 | Q. I have to ask the questions, sir. |
| | 13 | A. Yes, sir. |
| | 14 | Q. She then you -- then you take her back to her |
| 11:56:50 | 15 | house? |
| | 16 | A. She said we were going back to her house. That |
| | 17 | isn't where she took me. |
| | 18 | Q. Where did you go? |
| | 19 | A. Somewhere in Meadow. I don't know the address. It |
| 11:57:01 | 20 | was a trailer. It was, I believe, one of her friend's house. |
| | 21 | I mean, for lack of a better word, it was deep in the country. |
| | 22 | Like it was a place I was unfamiliar with. |
| | 23 | Q. And as you drove there, she performed oral sex on |
| | 24 | you? |
| 11:57:15 | 25 | A. Yes. Yes. |

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 11:57:15 | 1 | Q.   Okay.   Then you took her there; is that correct? |
| | 2 | A.   To that trailer, yes. |
| | 3 | Q.   Then did you have sex with her there? |
| | 4 | A.   No. |
| 11:57:22 | 5 | Q.   That was at the end of the night? |
| | 6 | A.   That was at the end of the night. |
| | 7 | Q.   You took her there and left? |
| | 8 | A.   Yes, I left her there with her friends. |
| | 9 | Q.   Another one of her friends saw you all together; |
| 11:57:33 | 10 | correct? |
| | 11 | A.   Carly was her name, yes. |
| | 12 | Q.   Was that at that trailer? |
| | 13 | A.   That was at the trailer. |
| | 14 | Q.   That was at the trailer? |
| 11:57:40 | 15 | A.   Uh-huh.   Her friend Carly was with her at the bar. |
| | 16 | Q.   Sure. |
| | 17 | A.   And I didn't see her friend Carly when I picked her |
| | 18 | at the house, but her friend Carly was at the trailer, yes, |
| | 19 | sir.   And eventually her friend Tiffany, same situation, was |
| 11:57:56 | 20 | also at the trailer. |
| | 21 | Q.   Then you continued to meet her to have sex |
| | 22 | continually; is that correct? |
| | 23 | A.   I continued to meet with her to have relationships, |
| | 24 | yea.   I would, yes.   We did have sex, but it was mainly oral |
| 11:58:13 | 25 | sex, I mean. |

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 11:58:14 | 1 | Q.   And you would meet her in parking lots; is that |
| | 2 | correct? |
| | 3 | A.   No, not for that.  I mean, no.  Not -- not for |
| | 4 | that. |
| 11:58:22 | 5 | Q.   Let me ask you, if not for that, what would you |
| | 6 | meet her in parking lots for? |
| | 7 | A.   Talk to her, you know, see what's up on the way |
| | 8 | passing and stuff like that. |
| | 9 | Q.   We saw these messages, like phone calls -- |
| 11:58:33 | 10 | A.   Yea. |
| | 11 | Q.   -- between you.  You all talked a lot back then; is |
| | 12 | that correct? |
| | 13 | A.   We did talk quite a bit. |
| | 14 | Q.   And you gave her a fake name to put in her phone, |
| 11:58:41 | 15 | Heather Jones; is that accurate? |
| | 16 | A.   That was the name she put in her phone.  I didn't |
| | 17 | put that in her phone.  No, I didn't put that in her phone. |
| | 18 | She put that in her phone. |
| | 19 | Q.   Did you introduce her to Snapchat? |
| 11:58:53 | 20 | A.   No. |
| | 21 | Q.   She was already -- |
| | 22 | A.   She had Snapchat, yea. |
| | 23 | Q.   Angie Barbour is not real technically competent; is |
| | 24 | she? |
| 11:59:02 | 25 | A.   I'm -- I know she can design ads and graphic |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 1:59:09 | 1 | design.  I don't -- she would be more technically competent |
| | 2 | than me.  I can't do that stuff, so ... |
| | 3 | Q.   You're saying that Angie Barbour is more |
| | 4 | technically competent than you? |
| 1:59:19 | 5 | A.   As far as like graphic design and doing stuff like |
| | 6 | that, yea. |
| | 7 | Q.   I mean, you couldn't -- she couldn't figure out how |
| | 8 | to use the TracFone; right? |
| | 9 | A.   Right.  I mean, to my knowledge -- to my knowledge, |
| 1:59:30 | 10 | I didn't say she couldn't figure out how to use it.  I just -- |
| | 11 | Q.   You didn't say that earlier. |
| | 12 | A.   I mean, I don't -- I don't know if she could figure |
| | 13 | out how to use it or not.  I mean, that's what she said.  I |
| | 14 | don't know that. |
| 1:59:43 | 15 | Q.   When you gave Angie Barbour the TracFone, was she |
| | 16 | able to use it? |
| | 17 | A.   I don't know.  She said she wasn't, but I don't |
| | 18 | know. |
| | 19 | Q.   So she told you she couldn't use it? |
| 1:59:53 | 20 | A.   Yea.  I never saw that TracFone again, so I don't |
| | 21 | know. |
| | 22 | Q.   And just to be clear, even if the subscription |
| | 23 | period is over for a TracFone, you can still use it to just |
| | 24 | record videos and things like that; correct? |
| 2:00:04 | 25 | A.   You could, yea. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 12:00:08 | 1 | Q. Now, this relationship with Angie Barbour, where |
| | 2 | would you have sex with her? |
| | 3 | A. Hotels. |
| | 4 | Q. You would meet her at hotels? |
| 12:00:19 | 5 | A. I would, yea. |
| | 6 | Q. Sometimes you would go in first? |
| | 7 | A. Sometimes I would, yea. Yea, I would get the room, |
| | 8 | so I would have to go in and get the room, yes, sir. |
| | 9 | Q. How many times would you say you met with Angie |
| 12:00:33 | 10 | Barbour in hotels? |
| | 11 | A. Ten. |
| | 12 | Q. Where else would you meet with Angie Barbour to |
| | 13 | have sex? |
| | 14 | A. Her apartment eventually, yea. |
| 12:00:48 | 15 | Q. So you would go to her apartment? |
| | 16 | A. I would, yea. |
| | 17 | Q. Did you also take trips with her? |
| | 18 | A. Yes. We went places, yea. |
| | 19 | Q. And where did you go? |
| 12:01:00 | 20 | A. We went to Charlotte twice, and we went to Virginia |
| | 21 | Beach once. |
| | 22 | Q. And when you went to those places, did you pretend |
| | 23 | you were at a conference or something? |
| | 24 | A. I didn't. No. No, I didn't. |
| 12:01:18 | 25 | Q. How did you get away for the weekend? |

| | | |
|---|---|---|
| 12:01:20 | 1 | A. I always -- I mean, I always go places. I mean, |
| | 2 | I -- I don't have to give a reason for going places. I mean, |
| | 3 | I -- you know, I travel. |
| | 4 | Q. Now, you claim that Angie Barbour sexually -- |
| 12:01:44 | 5 | committed a sex offense on you; is that correct? |
| | 6 | A. Yes. |
| | 7 | Q. And you claimed in a filing that you believe that |
| | 8 | you were a victim of first-degree forcible sex offense; is |
| | 9 | that correct? |
| 12:01:58 | 10 | A. In a filing? |
| | 11 | Q. In a filing. |
| | 12 | A. You talking about a civil lawsuit? |
| | 13 | Q. I am. |
| | 14 | A. Yes. |
| 12:02:03 | 15 | Q. Federal filing. |
| | 16 | A. A federal filing, absolutely. |
| | 17 | Q. You claim you are a victim of first-degree sex |
| | 18 | offense. |
| | 19 | A. Absolutely. |
| 12:02:11 | 20 | Q. And that's not true; is it? |
| | 21 | A. That is true. |
| | 22 | Q. When you just told the jury about your whole |
| | 23 | relationship, did you mention to them that you'd been sexually |
| | 24 | assaulted? |
| 12:02:20 | 25 | A. No, I didn't. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 12:02:30 | 1 | Q.   I want to talk to you about your meeting with DeVan |
| | 2 | Barbour on April 25th of 2022.  First of all, you were the |
| | 3 | catalyst for that meeting; correct? |
| | 4 | A.   I contacted him, yes, sir. |
| 12:02:43 | 5 | Q.   And you reached out to him.  You told him that you |
| | 6 | had something that would make or break his campaign. |
| | 7 | A.   Yes.  I was concerned. |
| | 8 | Q.   When you did that, you were trying to meet with |
| | 9 | him; correct? |
| 12:02:53 | 10 | A.   I was. |
| | 11 | Q.   And you prepared for that meeting; correct? |
| | 12 | A.   I did. |
| | 13 | Q.   And the preparation for that meeting was you took a |
| | 14 | recording of Angie Barbour and you spliced it with a recording |
| 12:03:04 | 15 | of yourself. |
| | 16 | A.   No.  I had two recordings.  So it would be back to |
| | 17 | back. |
| | 18 | Q.   So they were back to back? |
| | 19 | A.   Yes, sir. |
| 12:03:11 | 20 | Q.   All right.  And then at that time you had an office |
| | 21 | at Clayton Fitness; correct? |
| | 22 | A.   I did. |
| | 23 | Q.   By the way, when you were supposedly sexually |
| | 24 | assaulted, you were a Smithfield Police Officer; correct? |
| 12:03:23 | 25 | A.   I was. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 12:03:23 | 1 | Q. Did you report it to the Smithfield Police |
| | 2 | Department? |
| | 3 | A. I contacted the Town of Smithfield and asked for |
| | 4 | the EAP. |
| 12:03:32 | 5 | Q. Okay. Did you report that a sex offense had been |
| | 6 | committed on you? |
| | 7 | A. I didn't. |
| | 8 | Q. In fact, you continued to have sex with this woman |
| | 9 | for another year and a half? |
| 12:03:43 | 10 | A. I did. |
| | 11 | Q. Did you lie in that federal filing? |
| | 12 | A. No, sir. |
| | 13 | Q. Going back to the DeVan Barbour incident. You met |
| | 14 | with him not in your office; correct? |
| 12:04:05 | 15 | A. That is correct. I did not meet with him in my |
| | 16 | office. |
| | 17 | Q. You met with him in the back parking lot of Clayton |
| | 18 | Fitness; is that correct? |
| | 19 | A. That is correct. |
| 12:04:16 | 20 | Q. You got in his car? |
| | 21 | A. That is correct. |
| | 22 | Q. And when you got in there, there was nobody else in |
| | 23 | there but DeVan Barbour; right? |
| | 24 | A. That is correct. |
| 12:04:22 | 25 | Q. And then you didn't have a conversation with him at |

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 12:04:23 | 1 | that point.  You played him two recordings for him. |
| | 2 | A.  No.  We spoke. |
| | 3 | Q.  And you ended up playing those two recordings for |
| | 4 | him; correct? |
| 12:04:31 | 5 | A.  I ended up playing one, and he said -- he said, I |
| | 6 | don't want to hear it.  I was like, okay.  And we had a |
| | 7 | conversation afterward. |
| | 8 | Q.  And you gave him earphones to listen to it; is that |
| | 9 | right? |
| 12:04:51 | 10 | A.  I did. |
| | 11 | Q.  You also gave Thomas Bennett Jones earphones to |
| | 12 | listen when you played him a recording too; is that right? |
| | 13 | A.  I did. |
| | 14 | Q.  So how many of these secret recordings of people do |
| 12:05:00 | 15 | you have on your computers? |
| | 16 | A.  How many secret recordings do I have? |
| | 17 | Q.  Recordings of people where they don't know that |
| | 18 | they are recorded. |
| | 19 | A.  You talking about iPhones or computers? |
| 12:05:12 | 20 | Q.  I don't -- any recording that you have.  How many |
| | 21 | of these do you have? |
| | 22 | A.  Total recordings that I have?  I would believe |
| | 23 | between the police department and my official duties and the |
| | 24 | recordings that I made, I think I had 76 last time I looked. |
| 12:05:30 | 25 | So, yea. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 12:05:31 | 1 | Q. Just to be clear, you kept the recordings from your |
| | 2 | police work? |
| | 3 | A. Um, they -- they were on the phones that |
| | 4 | Investigator Hoffman seized, yes, sir. |
| 12:05:41 | 5 | Q. And so when you left the -- and to be clear, you |
| | 6 | were fired from the Smithfield Police Department? |
| | 7 | A. Yes, sir. |
| | 8 | Q. And so you kept the recordings from your |
| | 9 | investigations with you after you were fired by the Smithfield |
| 12:05:54 | 10 | Police Department? |
| | 11 | A. So I believe Terry West -- Lieutenant Terry West |
| | 12 | told Investigator Hoffman that my phone -- |
| | 13 | Q. That was not my question, sir. My question was -- |
| | 14 | A. So yea. Yes. So they were on my phone, yes, sir. |
| 12:06:03 | 15 | Q. So these 76 recordings, are these -- I mean the |
| | 16 | ones that aren't -- what kind of cases were you investigating |
| | 17 | in Smithfield? |
| | 18 | A. Anything. I would go out and help with any type of |
| | 19 | crime, things of that nature. |
| 12:06:17 | 20 | Q. Okay. I mean, so like these are recordings of |
| | 21 | victims talking about things or defendants talking about |
| | 22 | things? |
| | 23 | A. It could be anything, yes, sir. |
| | 24 | Q. And you kept all this? |
| 12:06:26 | 25 | A. The police department had a copy, but they were |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 12:06:28 | 1 | on -- my iCloud was in my personal phone, sir, so, I mean... |
| | 2 | Q. That wasn't my question. |
| | 3 | A. Yes, sir. |
| | 4 | Q. You kept those? |
| 12:06:34 | 5 | A. I had a copy of them, yes, sir. |
| | 6 | Q. And then outside of those, who else did you record |
| | 7 | without that person knowing that they are being recorded? |
| | 8 | A. Angie Barbour was one, board members, school |
| | 9 | people. I mean, you know, school board members really. That |
| 12:07:06 | 10 | would be about it, yea. |
| | 11 | Q. And you would use those and share them with other |
| | 12 | folks; is that correct? |
| | 13 | A. If I felt necessary, yes, sir. |
| | 14 | Q. And you were sharing stuff with Kevin Donovan; is |
| 12:07:20 | 15 | that right? |
| | 16 | A. I didn't share any of my recordings with Kevin |
| | 17 | Donovan, I don't believe. I shared a recording that Bennett |
| | 18 | Jones made with Kevin Donovan. |
| | 19 | Q. So you did share a recording with Kevin Donovan? |
| 12:07:32 | 20 | A. With Kevin Donovan, yes, sir. |
| | 21 | Q. And Kevin Donovan shared recordings with you; is |
| | 22 | that correct? |
| | 23 | A. He did, yes, sir. |
| | 24 | Q. In fact, when Kevin Donovan was interviewed as part |
| 12:07:39 | 25 | of the investigation into you, you told him to record |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 12:07:43 | 1 | Investigator Hoffman; is that correct? |
| | 2 | A.    I think it was his idea to record Investigator |
| | 3 | Hoffman. |
| | 4 | Q.    You knew about that and you told him to do it; |
| 12:07:51 | 5 | didn't you? |
| | 6 | A.    It was his idea to record. |
| | 7 | Q.    So it's your testimony you didn't tell him to do |
| | 8 | that? |
| | 9 | A.    I don't recall that. |
| 12:07:57 | 10 | Q.    Okay.  And then -- |
| | 11 | A.    Yea. |
| | 12 | Q.    Immediately after he has that meeting with |
| | 13 | Investigator Hoffman, he goes and meets you behind a gym. |
| | 14 | A.    He did. |
| 12:08:04 | 15 | Q.    Okay.  But it was just Kevin Donovan's idea to do |
| | 16 | this? |
| | 17 | A.    He offered to do it.  It was his idea to do it.  He |
| | 18 | was very on my team, and, you know, he thought the |
| | 19 | investigation was bogus at the time. |
| 12:08:25 | 20 | Q.    Sure.  And so this is the investigation that we're |
| | 21 | here for today.  You had somebody try to record the |
| | 22 | investigator? |
| | 23 | A.    Kevin Donovan went into an interview, so one party |
| | 24 | consent state.  He said they wanted to interview him.  He |
| 12:08:40 | 25 | didn't trust the system.  He didn't trust the process, so he |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 12:08:43 | 1 | did. |
| | 2 | Q. Then afterwards he gave that recording to you |
| | 3 | immediately following? |
| | 4 | A. He Airdropped it. |
| 12:08:49 | 5 | Q. In fact, I think he shared his location with you; |
| | 6 | is that right? |
| | 7 | A. We had shared locations on many apps. So it would |
| | 8 | be like Snapchat and stuff like that, yea. |
| | 9 | Q. So you all are pretty closely aligned at that time. |
| 12:09:01 | 10 | A. During that time, yes. We were -- you know, we |
| | 11 | were allies. |
| | 12 | Q. You even shared your -- |
| | 13 | A. We shared locations with each other, yes, sir. |
| | 14 | Yea, we did. |
| 12:09:15 | 15 | Q. With these recordings, where do you keep them? |
| | 16 | A. With his recordings? |
| | 17 | Q. The 76 recordings that you were just talking about. |
| | 18 | A. Oh, oh, oh. They're in the iCloud. |
| | 19 | Q. In the iCloud? |
| 12:09:26 | 20 | A. Yea, they are in your Cloud. I mean, Investigator |
| | 21 | Hoffman got it from the Cloud. Yea. That's where I keep |
| | 22 | them. |
| | 23 | Q. And so the recording of Angie Barbour is on that |
| | 24 | Cloud; is that correct? I mean the recording. |
| 12:09:38 | 25 | A. Yea. Sure. Yes, sir. |

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 12:09:39 | 1 | Q. The jury listened to where she's talking about he |
| | 2 | showed his -- |
| | 3 | A. Yea. That's on the iCloud, yes, sir. |
| | 4 | Q. You admit you had that? |
| 12:09:46 | 5 | A. Absolutely I had that. |
| | 6 | Q. And you took that and a recording of yourself and |
| | 7 | played those for DeVan Barbour; correct? |
| | 8 | A. I did play those, yes, sir. |
| | 9 | Q. And to be clear, when you played that for him, you |
| 12:09:55 | 10 | gave him headphones inside his car behind the gym? |
| | 11 | A. Yes. |
| | 12 | Q. Now, you and DeVan Barbour had another follow-up |
| | 13 | conversation in which you asked him to get Angie Barbour to |
| | 14 | recant that she had an affair with you. |
| 12:10:19 | 15 | A. No, sir. |
| | 16 | Q. DeVan Barbour made that up? |
| | 17 | A. DeVan Barbour -- I did not ask Angie Barbour to |
| | 18 | recant an affair she had with me. |
| | 19 | Q. That wasn't the question. Did you ask DeVan |
| 12:10:29 | 20 | Barbour to get Angie Barbour -- |
| | 21 | A. No. No, I didn't. |
| | 22 | Q. -- to recant or write -- |
| | 23 | A. No. |
| | 24 | Q. -- a letter or send a text? |
| 12:10:34 | 25 | A. No. No, sir. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 12:10:34 | 1 | Q. So it wasn't important to you? |
| | 2 | A. About the affair? |
| | 3 | Q. Yes, sir. |
| | 4 | A. No, sir. |
| 12:10:40 | 5 | Q. And in truth, sir -- |
| | 6 | A. I mean, the conversation I had with DeVan Barbour |
| | 7 | was about me forcing to have -- me forcing Angie Barbour to |
| | 8 | have sex with people. That was the main part of our |
| | 9 | conversation. That's how he fit into this. |
| 12:11:00 | 10 | Q. That's not what DeVan Barbour said; correct? |
| | 11 | A. No, that's not what he said at all. |
| | 12 | Q. Okay. And you all are boys now; is that right? |
| | 13 | You all are friendly. You see each other and stuff. |
| | 14 | A. We're friendly. I wouldn't say boys, but we're |
| 12:11:14 | 15 | friendly. |
| | 16 | Q. Acquaintances? |
| | 17 | A. Yes. That's fair. |
| | 18 | Q. If he was in the middle -- I mean, he was running |
| | 19 | for Congress in 2024; correct? |
| 12:11:22 | 20 | A. He was, yea. |
| | 21 | Q. And when he was running for Congress if he told a |
| | 22 | room full of his supporters or your supporters, hey, that guy |
| | 23 | extorted me, that would probably make him look a little weird; |
| | 24 | wouldn't it? |
| 12:11:37 | 25 | A. What do you mean weird? |

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 12:11:39 | 1 | Q. I mean, if he called you out in that meeting and |
| | 2 | said -- |
| | 3 | A. It would be confrontational. |
| | 4 | Q. Sure. Sure. And he needed your support to get |
| 12:11:46 | 5 | elected to Congress; didn't he? |
| | 6 | A. I mean, I don't want to say he needs my support. I |
| | 7 | want to say I supported him, but I don't think anybody needs |
| | 8 | my support. I don't think like that. |
| | 9 | Q. Are you the leader of this CAAG group here in |
| 12:12:00 | 10 | Johnston County? |
| | 11 | A. No, sir. |
| | 12 | Q. Are you an influential member of that CAAG group? |
| | 13 | A. Influential member? |
| | 14 | Q. Sure. |
| 12:12:08 | 15 | A. No. I'm not on the board. I'm not a -- you know, |
| | 16 | I'm not on the board. I don't make decisions for them. |
| | 17 | Q. Who else is in that group? |
| | 18 | A. Dale Lands -- are you talking about like the |
| | 19 | management of that group? |
| 12:12:21 | 20 | Q. Is Michelle Antoine a member of that group? |
| | 21 | A. I know she attends. Regarding her membership, I |
| | 22 | can't say. |
| | 23 | Q. And she's a close friend of yours; is that correct? |
| | 24 | A. She's a board member, and I do consider her a |
| 12:12:32 | 25 | friend. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 12:12:37 | 1 | Q. That recording that we heard that -- your testimony |
| | 2 | is that was from 2024; is that correct? |
| | 3 | A. Which recording you talking about, sir? |
| | 4 | Q. The one with DeVan Barbour where talks about MSNBC |
| 12:12:50 | 5 | and Trump and that stuff. |
| | 6 | A. Yes. Yes, sir. That's from 2024, January, I |
| | 7 | believe. |
| | 8 | Q. And you secretly recorded him again. |
| | 9 | A. It was an open -- it was an open meeting. I |
| 12:12:59 | 10 | recorded the meeting, sir. |
| | 11 | Q. And when you secretly recorded that meeting, I |
| | 12 | mean, do people know you are recording them? |
| | 13 | A. The people sitting by me knew that the recorder was |
| | 14 | on, yes, sir. |
| 12:13:10 | 15 | Q. Did DeVan Barbour know? |
| | 16 | A. To my knowledge, no. |
| | 17 | Q. And when you went up to him afterwards, did he know |
| | 18 | that he was being recorded at that time? |
| | 19 | A. No. |
| 12:13:18 | 20 | Q. So you were charged with these crimes in March of |
| | 21 | 2023; is that correct? |
| | 22 | A. I believe it was April of 2023, sir. I'm sorry. |
| | 23 | Q. Spring of 2023, somewhere around there? |
| | 24 | A. Yes. |
| 12:13:32 | 25 | Q. So even after you were charged in this case, you |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 12:13:34 | 1 | were still secretly recording people. |
| | 2 | A. Yes, sir. That's how you get the truth. |
| | 3 | Q. You said that's how you get the truth. That |
| | 4 | recording of you talking to DeVan Barbour on April 25th, did |
| 12:13:50 | 5 | you record that? |
| | 6 | A. The recording of me talking to -- |
| | 7 | Q. Yes. |
| | 8 | A. -- DeVan, did I record a recording? |
| | 9 | Q. No. You just said -- |
| 12:13:58 | 10 | A. You asked me did I record a recording. |
| | 11 | Q. You said that you had a conversation with him in |
| | 12 | the car on April 25th. |
| | 13 | A. That's what I said, yes, sir. |
| | 14 | Q. Did you record that? |
| 12:14:08 | 15 | A. You're confusing me. Did I record the conversation |
| | 16 | I had in the car with him or did I record the thing I played |
| | 17 | for him? |
| | 18 | Q. I'm sorry. |
| | 19 | A. I'm sorry for not understanding. |
| 12:14:16 | 20 | Q. The conversation that you had with DeVan Barbour -- |
| | 21 | A. Okay. The verbal back and forth like we're having |
| | 22 | now. |
| | 23 | Q. Correct. |
| | 24 | A. Okay. |
| 12:14:23 | 25 | Q. Did you record that? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 12:14:24 | 1 | A. No. |
| | 2 | Q. You told this jury earlier that -- |
| | 3 | MR. ZELLINGER: Can I have a moment, Your Honor? |
| | 4 | THE COURT: Yes, sir. |
| 12:14:52 | 5 | Q. You told this jury that you were fired from the |
| | 6 | Smithfield Police Department due to a violation of policy |
| | 7 | involving your character and integrity, that it was due to the |
| | 8 | news; is that correct? |
| | 9 | A. Yes. So when I met with Michael Scott, there was |
| 12:15:07 | 10 | four things I was terminated for, and the one that stuck out |
| | 11 | to me the most was the -- and I think you have it, but it's |
| | 12 | three things. It's like your neutrality, character, your |
| | 13 | perceived neutrality, fairness, or something like that. But |
| | 14 | that was one of the things. |
| 12:15:24 | 15 | The other things -- the other thing was having an |
| | 16 | affair. And then there was two more things. I remember there |
| | 17 | being four things, but they were all kind of related to each |
| | 18 | other. So yea. And then there was the 50C, 50B, that one. |
| | 19 | And then there's one more, yes, sir. |
| 12:15:46 | 20 | Q. And it was that you lied. |
| | 21 | A. I didn't lie, no, sir. |
| | 22 | Q. When you took out the 50C, you lied; is that |
| | 23 | correct? |
| | 24 | A. No, sir. I made a mistake. |
| 12:16:05 | 25 | MR. ZELLINGER: Your Honor, may I approach the |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 12:16:05 | 1 | clerk? |

2    THE COURT:  Yes, sir.

3    Q.    Mr. Johnson, I hand you what's been admitted as

4    State's Exhibit Number 2.  On this form it says:  Do not use

12:16:43    5    this form if the relationship between you or the person on

6    whose behalf you are filing this complaint and the defendant

7    is:  Current or former spouse, persons of the opposite sex who

8    live or have lived together, have a child in common, are

9    related as parent and child or grandparent and grandchild, are

12:17:02    10    current or former household members -- could you read from

11    there what it says?

12    A.    Right here, sir?

13    Q.    Yes.

14    A.    Or are a person of the opposite sex who are in a

12:17:11    15    dating relationship or have been in a dating relationship.

16    Q.    That is literally on the form, this 50C; is that

17    correct?

18    A.    It's on the form, yes, sir.

19    Q.    Okay.  I mean, you were -- and in this 50C you

12:17:27    20    allege that Angie Barbour was stalking you; correct?

21    A.    Yes, sir.

22    Q.    And you told a magistrate that there was a stranger

23    stalking you and what kind of process should you take out; is

24    that accurate?

12:17:40    25    A.    I said there was a stranger harassing me, wouldn't

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 12:17:43 | 1 | leave me alone.  I said there was a person. |
| | 2 | Q.    And who was that person? |
| | 3 | A.    That person was Angie Barbour. |
| | 4 | Q.    So you lied to Magistrate Sullivan; is that |
| 12:17:53 | 5 | correct? |
| | 6 | A.    No.  I told him there was a person that wouldn't |
| | 7 | leave me alone. |
| | 8 | Q.    You didn't tell him that you were in a dating |
| | 9 | relationship with that person? |
| 12:17:59 | 10 | A.    I didn't tell him, no. |
| | 11 | Q.    That's because you didn't want people to know you |
| | 12 | were having an affair? |
| | 13 | A.    That's not it at all. |
| | 14 | Q.    I mean, have you tried to mask this affair with |
| 12:18:08 | 15 | Angie Barbour? |
| | 16 | A.    I avoided it, and I have tried to just avoid the |
| | 17 | conversation and I ignored it. |
| | 18 | Q.    And it wouldn't look good for a sitting school |
| | 19 | board member to be having an affair; correct? |
| 12:18:22 | 20 | A.    In today's politics, I don't think it would matter; |
| | 21 | but I don't think it would look good. |
| | 22 | Q.    And not only are you having affair, you were having |
| | 23 | an affair with a teacher; is that correct? |
| | 24 | A.    That is correct. |
| 12:18:34 | 25 | Q.    And there's sort of a power dynamic from where you |

Ronald Johnson - Cross by Mr. Zellinger

| 12:18:37 | 1 | control the teacher's salary; is that accurate? |
| | 2 | A. You don't -- state legislature controls the |
| | 3 | salaries. |
| | 4 | Q. But you control their contracts? |
| 12:18:47 | 5 | A. You do vote on their contracts, yes, sir. |
| | 6 | Q. In fact, you got a raise for Carolyn Rotondaro; |
| | 7 | correct? |
| | 8 | A. I didn't get a raise for Carolyn Rotondaro. |
| | 9 | Q. You didn't bring forward a raise for Carolyn |
| 12:18:57 | 10 | Rotondaro? |
| | 11 | A. I agreed with the board of education when they |
| | 12 | wanted to give her and others a raise, yes, sir. |
| | 13 | Q. And you were the one who brought that up; correct? |
| | 14 | A. No. |
| 12:19:07 | 15 | Q. So Lyn Andrews is lying when she testified to that? |
| | 16 | A. Lyn Andrews was incorrect. |
| | 17 | Q. And DeVan Barbour was lying when he said that you |
| | 18 | requested or threatened him that if he didn't get Angie |
| | 19 | Barbour to recant that affair, that you were going to release |
| 12:19:30 | 20 | the recording? |
| | 21 | A. I didn't hear Mr. Barbour say I threatened him. |
| | 22 | And that is incorrect that I wanted her to recant an affair |
| | 23 | through DeVan Barbour, but I never heard Mr. Barbour say I |
| | 24 | threatened him. |
| 12:19:43 | 25 | Q. And you were able to see all those Pinger messages |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 12:19:46 | 1 | between you and Ms. Bond? |
| | 2 | A. I was. Yea, I was. |
| | 3 | Q. And in those messages you're talking about how |
| | 4 | Angie Barbour is the key? |
| 12:19:55 | 5 | A. That Angie Barbour is the key? |
| | 6 | Q. Sure. Yes, that she is the key. |
| | 7 | A. I don't think I said Angie Barbour is the key. If |
| | 8 | I can help you, I think I said DeVan Barbour was the key. |
| | 9 | Q. Okay. DeVan Barbour is the key? |
| 12:20:07 | 10 | A. Yes, sir. |
| | 11 | Q. Okay. And that was about trying to get Angie |
| | 12 | Barbour to recant that she had had an affair. |
| | 13 | A. No, sir. It was about DeVan Barbour being the |
| | 14 | subject that Angie Barbour was telling people I was trying to |
| 12:20:21 | 15 | make her sleep with him. That was the key to understanding |
| | 16 | exactly what was going on. Why was she saying DeVan Barbour. |
| | 17 | It had nothing to do with the affair. It had everything to do |
| | 18 | with her telling people that I was trying to make her sleep |
| | 19 | with DeVan Barbour. It had nothing to do with the affair. |
| 12:20:41 | 20 | Q. And so that you say that has nothing to do with the |
| | 21 | affair, but why did you get that recording from Kevin Donovan |
| | 22 | with Angie Barbour talking about what DeVan Barbour did or |
| | 23 | allegedly did to her on Facetime? |
| | 24 | A. I think you need to ask that again because that's |
| 12:20:58 | 25 | not true. |

| | | |
|---|---|---|
| 12:21:00 | 1 | Q.   Okay.   You didn't get a recording from Kevin |
| | 2 | Donovan of Angie Barbour talking about when DeVan Barbour |
| | 3 | Facetimed her? |
| | 4 | A.   No. |
| 12:21:08 | 5 | Q.   You never got that recording? |
| | 6 | A.   From Kevin Donovan? |
| | 7 | Q.   Yes.   Where did you get that recording from? |
| | 8 | A.   I made it. |
| | 9 | Q.   You made the recording? |
| 12:21:16 | 10 | A.   I made the recording. |
| | 11 | Q.   Of Angie Barbour talking about the DeVan Barbour |
| | 12 | incident? |
| | 13 | A.   Yes. |
| | 14 | Q.   When did you do that? |
| 12:21:24 | 15 | A.   I do not recall the exact date. |
| | 16 | Q.   You just went through a poster board of dates in |
| | 17 | this courtroom, but you don't remember the date when you were |
| | 18 | secretly recording Angie Barbour that you later used with |
| | 19 | DeVan Barbour? |
| 12:21:38 | 20 | A.   I referenced dates on the poster board.   I don't |
| | 21 | directly recall them.  So I'm going to be answer your question |
| | 22 | yea. |
| | 23 | Q.   So you don't remember when you made the recording |
| | 24 | of Angie Barbour? |
| 12:21:46 | 25 | A.   Not off the top of my head, no, sir. |

| | | |
|---|---|---|
| 12:21:48 | 1 | Q. Do you remember where you were? |
| | 2 | A. I do not. |
| | 3 | Q. So you -- |
| | 4 | A. I recorded Angie Barbour. So I don't remember |
| 12:22:04 | 5 | exactly where I was, because I recorded her a couple times, |
| | 6 | sir. |
| | 7 | Q. Okay. |
| | 8 | A. Yea. |
| | 9 | Q. And then that recording of Angie Barbour that you |
| 12:22:17 | 10 | made -- |
| | 11 | A. Yes, sir. |
| | 12 | Q. -- you played it for DeVan Barbour in his truck? |
| | 13 | A. Yes, sir. |
| | 14 | Q. That recording didn't come from anybody else, it |
| 12:22:25 | 15 | came from you. |
| | 16 | A. It came from me, yes, sir. |
| | 17 | Q. You just told this jury that there was some phone |
| | 18 | numbers that called you -- I'm sorry, that texted you and you |
| | 19 | believe those to be Angie Barbour; is that correct? |
| 12:22:45 | 20 | A. That is correct. |
| | 21 | Q. Sir, you texted yourself using the SpoofCard app; |
| | 22 | didn't you? |
| | 23 | A. Absolutely not. |
| | 24 | Q. You used the SpoofCard app; is that accurate? |
| 12:22:54 | 25 | A. I have used the SpoofCard, but the first thing you |

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 12:22:57 | 1 | said is completely inaccurate. |
| | 2 | Q. How do you use SpoofCards? |
| | 3 | A. So I was seeing a girl, and her husband became wise |
| | 4 | to the number, so I changed my number to look like a friend of |
| 12:23:15 | 5 | hers so I could call her and it would appear to be a friend. |
| | 6 | Q. And who is that girl? |
| | 7 | A. Carolyn Rotondaro. |
| | 8 | Q. And Carolyn Rotondaro is the one who you asked to |
| | 9 | look up Owen Phillips' kids names; is that correct? |
| 12:23:36 | 10 | A. That is correct. Did you say names? |
| | 11 | Q. Yes, sir. |
| | 12 | A. I probably need to correct you on that. I think it |
| | 13 | was like what school they were assigned to. I'm sorry. I |
| | 14 | apologize. I'm sorry. |
| 12:23:48 | 15 | Q. So you asked Carolyn Rotondaro to look up the |
| | 16 | school that Owen Phillips' kids went to? |
| | 17 | A. That is correct, yes, sir. |
| | 18 | Q. And going back to these text messages that you |
| | 19 | received that you read to the jury, it's your testimony that |
| 12:24:02 | 20 | you believe they are from Angie Barbour? |
| | 21 | A. Yes, sir. Or someone affiliated with Angie |
| | 22 | Barbour, yes. |
| | 23 | Q. And you took those text messages and you gave them |
| | 24 | to law enforcement; is that correct? |
| 12:24:10 | 25 | A. Yes, sir, I did. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 12:24:12 | 1 | Q. And that was sent to the SBI, State Bureau of |
| | 2 | Investigation? |
| | 3 | A. It was, yes, sir. |
| | 4 | Q. And they figured out those numbers belong to a |
| 12:24:21 | 5 | company called Telnyx; is that accurate? |
| | 6 | A. I don't know. I think -- I think it was something |
| | 7 | else. I never heard of Telnyx. |
| | 8 | Q. You never used Telnyx? |
| | 9 | A. Never used Telnyx, to my knowledge. |
| 12:24:32 | 10 | Q. To your knowledge. |
| | 11 | A. Unless, I mean, you know, because you all bring up |
| | 12 | Pinger all the time. You say Pinger, Pinger, Pinger. I never |
| | 13 | knew it as Pinger. I knew it as Sideline. So, when you say |
| | 14 | Telnyx, if Telnyx is the owner of Verizon or T-Mobile, then, |
| 12:24:49 | 15 | yea, okay, that would be a yea. |
| | 16 | Q. Have you ever been to Telnyx and purchased a phone |
| | 17 | number? |
| | 18 | A. Not to my knowledge, no. |
| | 19 | Q. Have you ever sent yourself a message from a Telnyx |
| 12:25:08 | 20 | number to yourself? |
| | 21 | A. Not to my knowledge, no. |
| | 22 | Q. Have you ever done it with any service? Any |
| | 23 | service, have you ever texted yourself? |
| | 24 | A. Now, I will text myself like if I wanted to pick up |
| 12:25:22 | 25 | milk today, I will text myself and say, pick up milk. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

12:25:26  1    Q.    Sure.

2    A.    But as far as like -- I'm not trying to be comical.

3    As far as carrying on a conversation with myself, no.

4    Q.    And I'm not talking about a conversation.  I'm

12:25:36  5    talking about have you ever used a service to use a different

6    phone number to then text yourself?

7    A.    I would save data on the Sideline app.  So I would

8    like upload videos and media that I had from, you know, one

9    phone to another.  That's -- that's the best answer I can give

12:26:06  10   you, sir.

11   Q.    You never used any sort of apps or service called

12   Telnyx to buy a phone number and then text yourself from that

13   phone number?

14   A.    No.

12:26:27  15   Q.    Are you aware that the numbers that you

16   provided -- did you follow up with the investigation from the

17   Clayton Police Department when you provided those texts that

18   were threatening you?

19   A.    I did, yea.

12:26:37  20   Q.    Did you follow that investigation?

21   A.    Did I follow it?

22   Q.    Yes, sir.

23   A.    I communicated with a detective.  I wasn't

24   privileged to the details.

12:26:46  25   Q.    Did the detective share with you that those numbers

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 12:26:48 | 1 | were spoofed? |
| | 2 | A. He did, yes, sir. |
| | 3 | Q. And did he tell you where they were spoofed to? |
| | 4 | A. No. |
| 12:26:56 | 5 | Q. Did you know where they were spoofed from? |
| | 6 | A. No. |
| | 7 | Q. And what was your understanding from the detective |
| | 8 | of how those numbers were spoofed? |
| | 9 | A. He didn't give me much details. He just said that |
| 12:27:07 | 10 | they were spoofed numbers. |
| | 11 | Q. And did you know that -- did you know Detective |
| | 12 | Linder? |
| | 13 | A. Yea. I know him, yea. |
| | 14 | Q. I mean, you've worked with these folks; is that |
| 12:27:20 | 15 | correct? |
| | 16 | A. Different agencies, but I know I've worked -- they |
| | 17 | were police officers in different towns, yes, sir. |
| | 18 | Q. Sure. You interacted. |
| | 19 | A. Interacted, yes, sir. |
| 12:27:34 | 20 | Q. He never did -- did he ever give you like the data |
| | 21 | from that investigation? |
| | 22 | A. He didn't give me any information that he received |
| | 23 | from that investigation, no, sir. |
| | 24 | Q. But it's your testimony here under oath that you |
| 12:27:54 | 25 | have never used an app or any sort of service to send yourself |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

| | |
|---|---|
| 12:27:59 | 1 | a text message from another number? |
| | 2 | A. I told you before, sir, that I would send media |
| | 3 | from one of my phones to another of my phones, but as far as |
| | 4 | sending myself a text message for the purposes I think you're |
| 12:28:18 | 5 | inferring, no. I have text myself to remind myself of things. |
| | 6 | I have text myself to do things, but as far as texting myself |
| | 7 | to communicate anything, no. |
| | 8 | Q. Now, I want to ask you about the closed session. |
| | 9 | You admitted you recorded that closed session? |
| 12:28:43 | 10 | A. Yes, sir. |
| | 11 | Q. And after the part that we watched, only the board |
| | 12 | members were in that virtual meeting; isn't that correct? |
| | 13 | A. No. There were staff members in there. |
| | 14 | Q. Okay. But the public wasn't in there; correct? |
| 12:29:09 | 15 | A. They were allowed access to the virtual meeting, |
| | 16 | yea. |
| | 17 | Q. And you took that recording and you played it for |
| | 18 | Tracy Peedin Jones; didn't you? |
| | 19 | A. I absolutely did. |
| 12:29:26 | 20 | Q. And when that meeting started, you started |
| | 21 | recording; correct? |
| | 22 | A. When the meeting with Tracy Peedin Jones? |
| | 23 | Q. No. When you started the closed session meeting, |
| | 24 | you started recording; correct? |
| 12:29:38 | 25 | A. No, sir. |

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 12:29:38 | 1 | Q. When did you start recording? |
| | 2 | A. When they started talking about Tracy Peedin Jones |
| | 3 | needing to retire. |
| | 4 | Q. Do you have that recording? |
| 12:29:46 | 5 | A. I do not. You guys have it. |
| | 6 | Q. And where do we have it? |
| | 7 | A. You took all my electronics. |
| | 8 | Q. Some of your electronics are password protected; is |
| | 9 | that correct? |
| 12:30:01 | 10 | A. I'm not trying to be disrespectful. I imagine all |
| | 11 | of them are. They should be, yea. |
| | 12 | Q. And the phone, the iPhone SE, where is that? |
| | 13 | A. I don't know iPhones by models. |
| | 14 | Q. The iPhone that was at the gym, where did that go? |
| 12:30:20 | 15 | A. It's in my car. |
| | 16 | Q. Now where is it? |
| | 17 | A. Mr. Hoffman has it. |
| | 18 | Q. Mr. Hoffman has the iPhone 5. Where is the iPhone |
| | 19 | SE? |
| 12:30:31 | 20 | A. I'm not a big iPhone person, so we're talking makes |
| | 21 | and models, sir. I'm sorry. |
| | 22 | Q. You had two iPhones from the Smithfield Police |
| | 23 | Department; correct? |
| | 24 | A. I had two phones -- maybe two iPhones, yea. And |
| 12:30:45 | 25 | they actually had other phones that they had given us too. |

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 12:30:49 | 1 | Yea, but two iPhones, yes, sir. |
| | 2 | Q.   We have one of them; correct? |
| | 3 | A.   Yea.   Or you have -- you have all the iPhones I |
| | 4 | have.   The police department has the other one. |
| 12:31:02 | 5 | Q.   So which is it, does the police department have it |
| | 6 | or do we have it? |
| | 7 | A.   There's two.   You said you have one of them. |
| | 8 | That's you what said; right?   Then I said the police |
| | 9 | department has the other one.   So you said two. |
| 12:31:12 | 10 | Q.   How did that one get back to the police department? |
| | 11 | A.   To the best of my recollection, I met Captain James |
| | 12 | Grady and Lieutenant Terry West in the Food Lion on West |
| | 13 | Market Street, and whenever I saw them, I gave them all my |
| | 14 | property that I had from the police department back.   And I |
| 12:31:39 | 15 | told them that I thought I gave it to them in that box or it |
| | 16 | was in the patrol car.   And they said they would look in the |
| | 17 | patrol car, and that's the last I heard of it until |
| | 18 | Investigator Hoffman served a search warrant. |
| | 19 | MR. ZELLINGER:   Your Honor, I don't know if the |
| 12:32:02 | 20 | Court intends to break.   This might be a good time. |
| | 21 | THE COURT:   We can go ahead and take our lunch |
| | 22 | recess.   We'll be in recess until 2:00.   Leave your notes in |
| | 23 | your seats.   Please remember, don't talk about the case over |
| | 24 | lunch.   Don't let anybody else speak with you about it. |
| 12:32:19 | 25 | Please don't communicate in any way to any of the parties |

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 12:32:22 | 1 | connected to it. Thank you very much. See you back at 2. |
| | 2 | (Jury exits.) |
| | 3 | THE COURT: Anything we need to get on the record |
| | 4 | before we break? |
| 12:33:18 | 5 | MR. ZELLINGER: Not at this time, Your Honor. |
| | 6 | MR. TYNDALL: No, sir, Your Honor. |
| | 7 | THE COURT: We'll be in recess until 2:00. |
| | 8 | (Lunch recess.) |
| | 9 | (Resume at 2:02 p.m.) |
| 14:03:16 | 10 | THE COURT: Bring the jurors on in. |
| | 11 | (Jury enters.) |
| | 12 | THE COURT: Welcome back. Mr. Zellinger, whenever |
| | 13 | you are ready. |
| | 14 | MR. ZELLINGER: Your Honor, can I have one moment? |
| 14:05:07 | 15 | THE COURT: Yes, sir. |
| | 16 | Q. Mr. Johnson, did you ever use a user name called |
| | 17 | John Walker 2809? |
| | 18 | A. Yes, sir. |
| | 19 | Q. What is that for? |
| 14:05:54 | 20 | A. That was for a Snapchat account that I had for the |
| | 21 | Smithfield Police Department. |
| | 22 | Q. And also affiliated with your working email was |
| | 23 | PayPal, Netflix, Cine-mark, Uber, and Hilton Honors; is that |
| | 24 | correct? |
| 14:06:12 | 25 | A. That sounds correct, yes, sir. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 14:06:15 | 1 | Q.    Smithfield did an investigation of you related to |
| | 2 | some allegations against you; is that correct? |
| | 3 | A.    That's correct. |
| | 4 | Q.    And you talked to them; is that right? |
| 14:06:24 | 5 | A.    I did. |
| | 6 | Q.    Did you tell them the truth? |
| | 7 | A.    I did. |
| | 8 | Q.    You told them originally that around the end of May |
| | 9 | or the first of June that Angie Barbour had been stalking you |
| 14:06:36 | 10 | and sending you threatening text messages? |
| | 11 | A.    That's what I believed, yes, sir. |
| | 12 | Q.    And you told them that you were asked why she would |
| | 13 | be targeting you; do you recall that? |
| | 14 | A.    Not off the top of my head, no. |
| 14:06:53 | 15 | Q.    Do you recall that you told them that she had |
| | 16 | worked on your campaign and was infatuated with you? |
| | 17 | A.    That would have been something I would have told |
| | 18 | them, yes, sir. |
| | 19 | Q.    Do you recall that they asked you if you ever had |
| 14:07:05 | 20 | sex with her and you initially denied it? |
| | 21 | A.    They asked me in front of a group of people, and I |
| | 22 | asked Lieutenant West, hey, let's step in here, because it was |
| | 23 | something that was talked about; you know, they talked about |
| | 24 | in public.  There was a group officers out there and there was |
| 14:07:21 | 25 | some civilians out there, and they asked it rather crudely, so |

Ronald Johnson - Cross by Mr. Zellinger

14:07:26  1  I told Lieutenant West, no, man. Hey, let's step in here so
       2  we can talk.
       3      Q.  So you are telling me that Lieutenant West
       4  interviewed you amongst a group of people?
14:07:35  5      A.  I didn't say that, no, sir. I said when he
       6  initially asked me -- whenever I was initially asked about it,
       7  it was in a group of people, yes, sir.
       8      Q.  So this IA investigation, the investigator asked
       9  you if you were having an affair in front of a group of
14:07:50 10  people?
      11      A.  No, sir. What I'm telling you is that when it was
      12  initially brought up in front of a group of people, Lieutenant
      13  West was present, and then when we spoke. I've always been
      14  honest with Lieutenant West. I've read the reports you're
14:08:04 15  talking about. I've always been honest with Lieutenant West,
      16  and I told him that it happened.
      17      Q.  But initially you denied it, is what he recorded.
      18      A.  We were in a group of people, and I was asked with
      19  everyone around, and I think I said something to the effect,
14:08:22 20  oh, no, man. Then I called him in because, hey, let's talk,
      21  and we did. Because he was my direct supervisor. He wasn't
      22  just the IA investigator. I went to him first. He didn't
      23  approach me. And if you listen to the recording of that IA,
      24  you will know that he said, you've been honest about this from
14:08:41 25  the jump with me.

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

14:08:55  1      Q.   If everybody knew about this affair, why did you

2  deny it?

3      A.   We were at work and there were civilians present.

4  They didn't really know me.  It was a professional setting.

14:09:03  5  And the way it was asked of me, the manner in which it was

6  asked, I wanted to disengage from it at that moment and get it

7  in a more confidential setting with my direct supervisor.

8      Q.   When you talked to Lieutenant West, you played down

9  your role in the affair and implied that you only had sex one

14:09:27  10  time; is that correct?

11      A.   That's incorrect.

12      Q.   So if Lieutenant West recorded that, he'd be lying

13  also?

14      A.   That would be just incorrect.  I mean, we had sex

14:09:36  15  more than once.  And I would like to reference the interviews,

16  the recorded interviews.

17      Q.   At some point in June did you find out that the

18  school board had received a request from a media outlet asking

19  if a restraining order had been taken out on you?

14:09:55  20      A.   Yes.  The middle of June, yes, sir.

21      Q.   And you reacted and tried to find out from the

22  magistrate's office if there had been any order taken out

23  against you; is that correct?

24      A.   I'm not sure if it was the magistrate's office.  I

14:10:11  25  think it might have been a direct call to a magistrate.  Yes,

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| *14:10:14* | 1 | sir.  But I can't recall if I called the magistrate's office |
| | 2 | or it was a direct call to a magistrate.  If I'm being a -- |
| | 3 | their cellphone.  I didn't call the magistrate's office.  I'm |
| | 4 | trying to tell you I called a magistrate. |
| *14:10:31* | 5 | Q.    Did you also call Susan Doyle, the DA? |
| | 6 | A.    I did. |
| | 7 | Q.    That was on June 14 of 2022; is that correct? |
| | 8 | A.    It sounds correct, sir. |
| | 9 | Q.    And do you recall the date that you filed your 50C? |
| *14:10:53* | 10 | A.    It should have been the day after, because the |
| | 11 | police department told me to go get an order. |
| | 12 | Q.    So the police department told you to go get an |
| | 13 | order? |
| | 14 | A.    They did.  It's in text messages, sir.  Yes, sir. |
| *14:11:04* | 15 | Q.    Do you have those text messages? |
| | 16 | A.    I do. |
| | 17 | Q.    And in that 50C, that's the one that has the |
| | 18 | language on there:  Do not use this form if you are persons of |
| | 19 | the opposite sex who are in a dating relationship or have been |
| *14:11:22* | 20 | in a date relationship; correct? |
| | 21 | A.    It does have that on there.  At the time I |
| | 22 | didn't -- I just asked for a form.  They asked me what they |
| | 23 | were doing.  I said, they are stalking and harassing me.  I |
| | 24 | was brought a form and I filled it out. |
| *14:11:34* | 25 | Q.    And when you said stalking and harassing, you |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

14:11:37    1    didn't put on there that you had been having an affair for a

          2    year and a half with Angie Barbour?

          3          A.    No, sir, I didn't.

          4          Q.    Earlier you said with respect to this form that you

14:11:50    5    made a mistake; is that correct?

          6          A.    I did.  After consulting with my lawyers, and they

          7    did a lot of research, and they said, yea, I guess technically

          8    you can't do that.

          9          Q.    Was the research looking at the form where it says:

14:12:06   10    Persons of the opposite sex are in a dating relationship or

         11    have been in a dating relationship?

         12          A.    I think they were looking for the definition of a

         13    dating relationship and what constituted that.

         14          Q.    And at that point you had been in 14 different

14:12:18   15    classes in your law enforcement career involving restraining

         16    orders; is that correct?

         17          A.    I've been in a lot of classes.  I think most of

         18    them are what you would be referencing would be like a legal

         19    update or something to that effect, but nothing specific to

14:12:33   20    orders.

         21          Q.    You attended a class titled Domestic Violence, Law

         22    and Procedure Update?

         23          A.    I think it was an online class.  It sounds about

         24    right.

14:12:58   25          Q.    You spoke with Lieutenant West and told him that

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 14:13:01 | 1 | you would not call the relationship with Angie Barbour a |
| | 2 | relationship. She just helped you on the campaign and only |
| | 3 | contacts you about work until November of 2020; is that |
| | 4 | correct? |
| 14:13:13 | 5 | A. I'm assuming it's correct, if he said it in the |
| | 6 | report, sir, yea. |
| | 7 | Q. You related to him the night of November -- was it |
| | 8 | November 24th? |
| | 9 | A. No. November 14th of 2020. |
| 14:13:29 | 10 | Q. November 14th, I'm sorry. |
| | 11 | A. Yup. |
| | 12 | Q. And that's the night where you gave -- you met up |
| | 13 | with Angie Barbour and gave her a ride to a house and then a |
| | 14 | ride to a trailer; is that correct? Tell me what happened. |
| 14:13:47 | 15 | A. Absolutely. So November 14th, 2022 -- you just |
| | 16 | want me to go to the part you're referencing; is that correct? |
| | 17 | Q. Yes, sir. If you can. |
| | 18 | A. Okay. Yes, sir. So I picked her up at a residence |
| | 19 | that I was unfamiliar with. It was in my neighborhood, but it |
| 14:14:01 | 20 | was in a large subdivision. I picked her up, took her to |
| | 21 | Allyson Bond's house, and I thought they were both going to |
| | 22 | stay at Allyson Bond's house. And then she said she needed to |
| | 23 | go home because her foot was messed up. Allyson got out of |
| | 24 | the car. I thought I was taking her to her house, and then |
| 14:14:19 | 25 | she had me go to a place in -- I believe it's Meadow. I mean, |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 14:14:25 | 1 | it's deep in the country so it could be -- I mean, I may be |
| | 2 | getting them, you know, the municipality messed up.  I believe |
| | 3 | it's Meadow. |
| | 4 | Q.   Okay.  You stopped at Allyson Bond's house; is that |
| 14:14:35 | 5 | correct? |
| | 6 | A.   That is correct. |
| | 7 | Q.   And she lives in a neighborhood called Glen Laurel; |
| | 8 | is that accurate? |
| | 9 | A.   That is accurate. |
| 14:14:42 | 10 | Q.   And were you here when Owen Phillips testified |
| | 11 | about being asked by you to drive down the street in Glen |
| | 12 | Laurel? |
| | 13 | A.   I was. |
| | 14 | Q.   Who is Allyson Bond to you? |
| 14:14:51 | 15 | A.   Currently she's a friend.  She's a close friend. |
| | 16 | Q.   Currently she's a friend? |
| | 17 | A.   Sure. |
| | 18 | Q.   In 2022, what was she? |
| | 19 | A.   The first part of 2022?  You know, we were involved |
| 14:15:05 | 20 | romantically, and the latter part 2022 we were no longer |
| | 21 | involved. |
| | 22 | Q.   So you had Owen Phillips drive by another affair |
| | 23 | partner's house? |
| | 24 | A.   Are you talking about Allyson Bond's house? |
| 14:15:26 | 25 | Q.   Yes, sir. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| *14:15:27* | 1 | A. No, sir. |
| | 2 | Q. When did you have Owen Phillips drive by this house |
| | 3 | in Glen Laurel? |
| | 4 | A. Sure. It was Carolyn Rotandaro's house. |
| *14:15:33* | 5 | Q. So she also lives in Glen Laurel? |
| | 6 | A. She does, yes, sir. |
| | 7 | Q. So both Allyson and Carolyn Rotondaro live in Glen |
| | 8 | Laurel? |
| | 9 | A. To my knowledge, yes, sir. Not currently. Then |
| *14:15:41* | 10 | they did, but I don't know currently. |
| | 11 | Q. So Owen is driving by Carolyn Rotandaro's house? |
| | 12 | A. He was. |
| | 13 | Q. You were asked some questions when you were |
| | 14 | interviewed as part of this. You also talked with the |
| *14:16:21* | 15 | Smithfield folks about a key fob camera; do you recall that? |
| | 16 | A. Yes. |
| | 17 | Q. You used a key fob camera, but that did not belong |
| | 18 | to the Smithfield Police Department; correct? |
| | 19 | A. That's correct, it did not belong to the Smithfield |
| *14:16:38* | 20 | Police Department. |
| | 21 | Q. It belonged to somebody else. Who was it, was it |
| | 22 | Mr. Tyndall? |
| | 23 | A. It was. |
| | 24 | Q. And it was his personal, like, key fob camera? |
| *14:16:47* | 25 | A. To my knowledge, that's what he told me. I have no |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

| | |
|---|---|
| *14:16:49* | 1 |

1   reason to believe different.

2           Q.   And you were present when that was put on -- that

3   was given to Angie Barbour?

4           A.   Present, yes, sir.

5               MR. TYNDALL:  Not this Mr. Tyndall.

6           Q.   Just to be clear.

7           A.   I apologize.  I'm sorry.  It's Sergeant Tyndall.

8   It's a different person.  I'm sorry.

9           Q.   Okay.  Not Amos Tyndall; correct?

10          A.   Correct.  It's Sergeant David Tyndall with the

11  Smithfield Police Department, yea.

12          Q.   Okay.  And that was given to Angie Barbour to go

13  record at some sort of event; is that correct?

14          A.   It was.  There was going to be some leadership

15  change at the GOP convention; and there was supposed to be

16  some theatrics.  There was protesters, and there was going to

17  be an election for a new chairperson, and it was supposed to

18  be eventful.  I couldn't make it.  I heard it was going to be

19  very active, lively.  So, you know, I thought it would be

20  interesting to actually see that.

21          Q.   And do you recall earlier seeing a text between you

22  and Angie Barbour where you requested that she take note of

23  how people reacted to you entering a room or being in some

24  sort of event?

25          A.   Yes, sir.  When you're in politics and you're an

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 14:18:04 | 1 | elected official entering the room, people are going to react |
| | 2 | a certain way.  People show up to watch and you want to see |
| | 3 | how they react to you, and you want to know how you are |
| | 4 | perceived and who's perceiving you that way, yes, sir. |
| 14:18:18 | 5 | MR. ZELLINGER:  Your Honor, can I approach the |
| | 6 | clerk? |
| | 7 | THE COURT:  Yes, sir. |
| | 8 | Q.   When you were speaking with Lieutenant West, you |
| | 9 | also told him:  In full disclosure I bought this chick some |
| 14:18:43 | 10 | phones before, but they were like TracFones and she should |
| | 11 | still have one.  Do you remember telling him that? |
| | 12 | A.   I did. |
| | 13 | Q.   So did you bring her multiple TracFones? |
| | 14 | A.   No. |
| 14:18:56 | 15 | Q.   Then you went on to tell him that you did this |
| | 16 | because she could not figure out how to record or anything |
| | 17 | else; is that correct? |
| | 18 | A.   She said that people were bothering her.  That's |
| | 19 | what I told him.  I don't know what he wrote, but you can |
| 14:19:08 | 20 | reference the recording.  She said people were bothering her. |
| | 21 | Q.   Okay.  She couldn't figure out how to use the key |
| | 22 | fob camera; is that correct? |
| | 23 | A.   No.  I couldn't either. |
| | 24 | Q.   And then you were asked questions about having sex |
| 14:19:32 | 25 | while on duty; correct? |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

14:19:34  1          A.    I was.

       2          Q.    Did you ever have sex while you were on duty?

       3          A.    Never.

       4          Q.    Did you tell Lieutenant West, I get it.  We could

14:19:40  5   be in my patrol car on Finney Drive doing it, but I guarantee

       6   you, you won't see that damn patrol car at her apartment.

       7          A.    I do remember saying that.  Like I get it, because

       8   the patrol cars were tracked.  There was GPS on all those

       9   patrol cars.  And he asked me prior to, did you ever take your

14:20:00  10  patrol car to her apartment.  And I said no, check the GPS on

      11   that patrol car.  And he said, did you ever have sex while you

      12   were on duty?  And I said, no.  And then I said, you know, you

      13   can say I was on Finney Drive -- I just made up a random

      14   street.  And I said, ask her where we had sex while I was on

14:20:20  15  duty, and I guarantee you, you won't see me anywhere near that

      16   place.

      17          Q.    But you did tell them that we could be in my patrol

      18   car on Finney Drive doing it?

      19          A.    That was a hypothetical situation, but she actually

14:20:33  20  told the police department that never happened, so...

      21          Q.    Did you ever track Angie Barbour?

      22          A.    No.

      23                MR. ZELLINGER:  Can I have one moment?

      24                THE COURT:  Yes, sir.

14:20:53  25

14:20:53   1              (State's Exhibit Number 77 marked for

           2              identification.)

           3       Q.   Mr. Johnson, I show you what's been marked State's

           4   Exhibit 77.  Do you remember every Pinger message that you

14:21:17   5   ever exchanged with Carolyn Rotondaro?

           6       A.   I don't remember every one, but I remember the one

           7   you're referencing.

           8       Q.   If I can show you State's Exhibit Number 77.  On

           9   January 30th of 2022, did you write to Carolyn Rotondaro:  AB

14:21:36  10   rode by CF Draft House, McKinley's, and then down my street.

          11   And then followed up with a message that said:  Super got her

          12   tracked.  Now she's at home.  Evidently she's not learned.

          13       A.   Yes.

          14       Q.   And then do you follow up with:  It looks like she

14:21:51  15   tried the turn her phone off when she came into my

          16   neighborhood though.

          17       A.   Correct.  That's -- AB is not Angie Barbour.

          18       Q.   Later on did you converse with Carolyn Rotondaro:

          19   Apparently you can't even go to Clayton Fitness now?

14:22:35  20       A.   Yea.

          21       Q.   And Clayton Fitness is right by Angie Barbour's

          22   apartment; correct?

          23       A.   It is, but you are intermingling --

          24       Q.   My question was:  Is Clayton Fitness nearby Angie

14:22:49  25   Barbour's apartment?

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 14:22:50 | 1 | A. It is nearby Angie Barbour's apartment. |
| | 2 | Q. Mr. Johnson, as part of your work on the school |
| | 3 | board, do you all keep minutes of school board meetings? |
| | 4 | A. We do, yes, sir. Well, attorneys do, but we do, |
| 14:23:24 | 5 | yes, sir. |
| | 6 | Q. Okay. And are those minutes important to be |
| | 7 | accurate? |
| | 8 | A. They should be accurate, yes, sir. |
| | 9 | Q. Those are kept on the Johnston County Public |
| 14:23:37 | 10 | School's website? |
| | 11 | A. Of open session meetings? |
| | 12 | Q. Sure. |
| | 13 | A. Yes. |
| | 14 | MR. ZELLINGER: Your Honor, may I approach the |
| 14:23:44 | 15 | witness? |
| | 16 | THE COURT: Yes, sir. |
| | 17 | (State's Exhibit Number 78 marked for |
| | 18 | identification.) |
| | 19 | Q. Mr. Johnson, I will show you what's been marked for |
| 14:24:15 | 20 | identification as State's Exhibit 78. Do those appear to |
| | 21 | be -- well, let me ask you, what is that? |
| | 22 | A. It's a printout from Johnston County Public |
| | 23 | Schools. |
| | 24 | Q. Is that minutes from a board meeting? |
| 14:24:29 | 25 | A. It is. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

1       Q.    Is that minutes from a board meeting from May 31st

2  of 2022?

3       A.    It is.

4       Q.    And are those board minutes kept in the regular

5  course of business?

6       A.    Yes.

7       Q.    It's important to keep those accurate so that the

8  board can keep track of everything that happens during these

9  board meetings?

10      A.    It's important to do that.  It doesn't necessarily

11 mean it is always done that way.

12      Q.    Mr. Johnson, the board minutes from the May 31st

13 meeting reflect Dr. Bracy stating that the board should ask

14 that we enter into executive session for the purposes stated

15 on the agenda as outlined in G.S. 115C-402, 153-318.11A36; is

16 that correct?

17      A.    What are you asking me again, sir?

18      Q.    Is that what it says Dr. Bracy said?

19      A.    Yes, sir.  It's on the agenda.  Dr. Bracy doesn't

20 make motions, sir.

21      Q.    Is that from somebody else asking that the board

22 enter into an executive session for the purposes stated on the

23 agenda as outlined in the general statutes?

24      A.    I believe you just said it was Dr. Bracy, and

25 Dr. Bracy's name is there.  Dr. Bracy didn't say that, sir.

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| !4:26:16 | 1 | Q. Okay. |
| | 2 | A. You watched the meeting just like I did. |
| | 3 | Q. Okay. But the minutes reflect the statute; is that |
| | 4 | correct? |
| !4:26:21 | 5 | A. The minutes inaccurately reflect what you just saw. |
| | 6 | Q. Let me ask you this. During the -- when you went |
| | 7 | into closed session, was the citation given of the general |
| | 8 | statute? |
| | 9 | A. No. And it's supposed to be given in the motion, |
| !4:26:37 | 10 | sir, not when you get into closed session. It's an open, |
| | 11 | transparent government. |
| | 12 | Q. Sure. And is part of that motions and transparent |
| | 13 | government not to record a closed session? |
| | 14 | A. No, it's not. It's not outlined by North Carolina |
| !4:26:50 | 15 | General Statute anywhere that you don't record a closed |
| | 16 | session meeting. |
| | 17 | Q. Do your board policies say that? |
| | 18 | A. It does say that. My oath of office doesn't say |
| | 19 | that. |
| !4:27:01 | 20 | Q. Your oath of office just says that you will -- |
| | 21 | A. Uphold the Constitution. |
| | 22 | Q. But you admit you just totally violated the |
| | 23 | policies of your office. |
| | 24 | A. I admit that I took action to prevent an FMLA |
| !4:27:17 | 25 | violation, which is a federal law, and I recorded in violation |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| !4:27:20 | 1 | of board policies to prevent such breach of federal law. |
| | 2 | Q. Sure. But I mean, you can do that in a closed |
| | 3 | session and say, hey, we're violating FMLA right now, and what |
| | 4 | happened was everybody tabled it for another discussion to |
| !4:27:33 | 5 | make sure that that didn't happen for Ms. Peedin Jones; |
| | 6 | correct? |
| | 7 | A. At that point there had been a lot said, |
| | 8 | Mr. Zellinger. |
| | 9 | Q. Okay. And do you have the rest of that recording |
| !4:27:43 | 10 | of the closed session? |
| | 11 | A. You guys have the rest of the recording. You took |
| | 12 | from it my home. |
| | 13 | Q. Okay. And again, the cellphone that you took out |
| | 14 | of the gym, it's your testimony that you gave that back to |
| !4:27:55 | 15 | investigators in a Food Lion? |
| | 16 | A. Say that again. |
| | 17 | Q. The cellphone you took from the gym -- you admit |
| | 18 | you took the cellphone out of the office in the gym? |
| | 19 | A. Yes. |
| !4:28:05 | 20 | Q. It was a white cellphone? |
| | 21 | A. I don't remember what color it was. |
| | 22 | Q. You have so many phones you can't remember what |
| | 23 | color they are? |
| | 24 | A. Are you asking me or telling me, sir? |
| !4:28:16 | 25 | Q. Asking. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 14:28:16 | 1 | A. I don't remember what color my phone was in 2022, |
| | 2 | no, sir, or '23. I apologize. |
| | 3 | Q. You had two phones from Smithfield PD; is that |
| | 4 | correct? |
| 14:28:29 | 5 | A. I had four phones from Smithfield PD, sir. |
| | 6 | Q. Was one of them white? |
| | 7 | A. I don't remember that. |
| | 8 | Q. There was a phone in your office the day that you |
| | 9 | went and walked out with that white box; correct? |
| 14:28:45 | 10 | A. There was a phone in my office when I went and |
| | 11 | walked out with that white box, yes, sir. |
| | 12 | Q. And you took that phone out of the office; is that |
| | 13 | correct? |
| | 14 | A. I took that phone out of the office. |
| 14:28:56 | 15 | Q. And your testimony was that you pawned some stuff |
| | 16 | to raise money? |
| | 17 | A. Mr. Zellinger, I don't think I ever said I pawned |
| | 18 | some stuff. |
| | 19 | Q. I'm sorry, you sold some stuff. |
| 14:29:06 | 20 | A. Mr. Zellinger, I said my intent was to go in there |
| | 21 | and see what I could sell because I needed money because I |
| | 22 | just lost my job. |
| | 23 | Q. Okay. So what else was in that white box. |
| | 24 | A. Comic books, a WWE magazine. There was some actual |
| 14:29:22 | 25 | like 20 or 30 books that I had left in there. I mean, that's |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 14:29:27 | 1 | to the best of my recollection, sir. |
| | 2 | Q. And that cellphone? |
| | 3 | A. The cellphone was in my pocket, I believe, sir. I |
| | 4 | don't remember exactly where it was, but I'm telling you I |
| 14:29:39 | 5 | took that out of the office, yes, sir. |
| | 6 | Q. Just to be abundantly clear, you admit you took |
| | 7 | that cellphone out of the office after you received that |
| | 8 | message that we saw from Facebook from Dustin Parks? |
| | 9 | A. Yes. |
| 14:30:07 | 10 | Q. You testified that you received text messages, and |
| | 11 | I think they are portrayed on your board; is that correct? |
| | 12 | A. They are portrayed on the board the text messages |
| | 13 | that I received. |
| | 14 | Q. And those are text messages from out of state |
| 14:30:17 | 15 | numbers? |
| | 16 | A. They are. |
| | 17 | Q. I think we went over this before lunch, but I asked |
| | 18 | you several times if you ever sent yourself a text message or |
| | 19 | call from a spoofed phone number to yourself; do you recall |
| 14:30:29 | 20 | that? |
| | 21 | A. I recall you asking the question, yes, sir. |
| | 22 | Q. And one last time. Have you ever sent a spoofed |
| | 23 | call or a spoofed text message from a spoofed number to |
| | 24 | yourself? |
| 14:30:43 | 25 | A. No. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 14:30:45 | 1 | MR. TYNDALL: Your Honor, may I approach? |
| | 2 | THE COURT: Yes, sir. |
| | 3 | (State's Exhibit Number 76 marked for |
| | 4 | identification.) |
| 14:30:53 | 5 | Q. I hand you what's been marked for identification |
| | 6 | State's Exhibit 76. Is that your email address? |
| | 7 | A. Ronjon1983@msn.com, yes, sir. |
| | 8 | Q. Is this a dollar balance; is that correct? |
| | 9 | A. That's correct. |
| 14:31:08 | 10 | Q. Do you know what this document is? |
| | 11 | A. I do not. |
| | 12 | Q. And sir, on May 8th of 2022, the day before May |
| | 13 | 9th, did you send a spoof text or call from 561-701-9736 to |
| | 14 | your cellphone number 919-320-3337? |
| 14:31:54 | 15 | A. I didn't send a message, no. I didn't -- no. I |
| | 16 | think that's just how the printout works. I didn't send a |
| | 17 | message to myself on that day. |
| | 18 | Q. You did not send a MSM message? |
| | 19 | A. No. |
| 14:32:07 | 20 | Q. That's your testimony under oath? |
| | 21 | A. That is my testimony under oath, yes, sir. |
| | 22 | Q. Are you aware that this document comes from an |
| | 23 | account related to your cellphone? |
| | 24 | A. I'm unaware. |
| 14:32:25 | 25 | Q. Have you ever looked at your account with |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 14:32:28 | 1 | SpoofCard? |
| | 2 | A. I have. I've looked at what my account -- I've |
| | 3 | looked at the app, yes, sir. |
| | 4 | Q. Did you send yourself this with using SpoofCard a |
| 14:32:38 | 5 | message on May 8th, the day before May 9th? |
| | 6 | A. No. |
| | 7 | MR. ZELLINGER: May I approach the witness? |
| | 8 | Q. Before I approach, you mentioned earlier that you |
| | 9 | used a SpoofCard to contact Carolyn Rotondaro from a number |
| 14:33:25 | 10 | that appeared to be some other number so that her husband |
| | 11 | wouldn't notice? |
| | 12 | A. Yes, sir. |
| | 13 | Q. Okay. And so do you know Carolyn Rotandaro's |
| | 14 | number? |
| 14:33:34 | 15 | A. 919 -- it's a 919-219 number. I'm sorry. |
| | 16 | MR. ZELLINGER: Can I approach, Your Honor? |
| | 17 | THE COURT: Yes, sir. |
| | 18 | Q. Is it 919-219-8742? |
| | 19 | A. That is correct, yes. |
| 14:33:51 | 20 | Q. And in June of 2022, you were sending calls using |
| | 21 | SpoofCard to Carolyn Rotondaro? |
| | 22 | A. Yes. |
| | 23 | Q. But it's your testimony here today that you did not |
| | 24 | send yourself one? |
| 14:34:04 | 25 | A. No, I did not. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Ronald Johnson - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 14:34:05 | 1 | Q.    The 561? |
| | 2 | A.    No, I did not send myself one. |
| | 3 | Q.    Just to be clear, your use of SpoofCard, that |
| | 4 | actually started in -- all the way back in 2017; is that |
| 14:34:45 | 5 | correct? |
| | 6 | A.    Yes. |
| | 7 | Q.    When did you start having a relationship with |
| | 8 | Ms. Rotondaro? |
| | 9 | A.    2020. |
| 14:35:00 | 10 | Q.    2020? |
| | 11 | A.    Yes. |
| | 12 | Q.    You continued to use SpoofCard in March of 2022; is |
| | 13 | that correct? |
| | 14 | A.    Yes, sir. |
| 14:35:23 | 15 | Q.    And in April of 2022 you used SpoofCard? |
| | 16 | A.    Sure.  Yea. |
| | 17 | Q.    And in May of 2022 you used SpoofCard? |
| | 18 | A.    I did. |
| | 19 | MR. ZELLINGER:  Your Honor, can I have one moment? |
| 14:35:47 | 20 | THE COURT:  Yes, sir. |
| | 21 | MR. ZELLINGER:  Nothing further, Your Honor. |
| | 22 | THE COURT:  Mr. Tyndall. |
| | 23 | MR. TYNDALL:  I don't have any questions for |
| | 24 | Mr. Johnson. |
| 14:36:28 | 25 | THE WITNESS:  Thank you.  Appreciate it. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| 14:36:47 | 1 | THE COURT:  Mr. Tyndall, any further evidence? |
| | 2 | MR. TYNDALL:  Can I have just a moment? |
| | 3 | THE COURT:  Yes, sir. |
| | 4 | MR. TYNDALL:  I need to step outside. |
| 14:36:55 | 5 | THE COURT:  Yes, sir. |
| | 6 | MR. TYNDALL:  Your Honor, we call Michelle Antoine. |
| | 7 | MICHELLE ANTOINE, |
| | 8 | having been called as a witness for the Defendant and being |
| | 9 | duly sworn at 2:38 p.m., testified as follows: |
| 14:37:53 | 10 | DIRECT EXAMINATION BY MR. TYNDALL: |
| | 11 | Q.   Can I ask you to introduce yourself, Ms. Antoine. |
| | 12 | A.   I'm Michelle Antoine. |
| | 13 | Q.   And tell us where you live? |
| | 14 | A.   I live in Clayton, North Carolina. |
| 14:38:40 | 15 | Q.   What do you do for a living? |
| | 16 | A.   I run a commercial construction business. |
| | 17 | Q.   Tell us a little bit about your family. |
| | 18 | A.   I have been married to my husband for 25 years. |
| | 19 | We've been together since we were 18.  We have eight children |
| 14:38:56 | 20 | together, and we've lived in North Carolina since 2017. |
| | 21 | Q.   And do you -- are you involved in any sort of |
| | 22 | political activities? |
| | 23 | A.   I am.  I'm a school board member here in Johnston |
| | 24 | County. |
| 14:39:07 | 25 | Q.   And when did you run for school board? |

Michelle Antoine - Direct by Mr. Tyndall

14:39:11  1      A.   I first ran in 2020.  I was just upset with the
       2  condition of the schools that my own children weren't getting
       3  the services that they needed, so I ran in 2020 but did not
       4  win, and I ran in '22 and did win a seat.

14:39:26  5      Q.   How long -- you've been on the school board since
       6  2022?

       7      A.   Yes.

       8      Q.   We've had some testimony in this case about the
       9  school board activities.  Tell us a little bit about the
14:39:42 10  dynamics on the school board.

       11      A.   Can you be more specific?

       12      Q.   Well, does everybody get along?

       13      A.   No, I wouldn't say we get along.

       14      Q.   What's the environment like on the school board?

14:39:55 15      A.   It's not friendly.  It's very -- a little bit
       16  toxic.

       17      Q.   Over the years that you've been on the school
       18  board, have certain factions developed?

       19      A.   I've been on the school board for two years, and
14:40:21 20  when I initially got on the school board, I really wanted to
       21  cooperate and work together for the kids and for the teachers
       22  and to serve the community, and unfortunately, it seems to
       23  have been very divided.  The chair doesn't really allow myself
       24  and Mr. Johnson to have committees, appointments like the
14:40:44 25  other members do.  She kind of iced us out of serving our

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Michelle Antoine - Direct by Mr. Tyndall

14:40:49  1  constituents, so it became a little bit divided, if that

2  helps.

3      Q.  Yes, that helps.  Just to follow up with that.

4  There's been some testimony about closed sessions, and is it

14:41:05  5  your experience that the school board always follows the

6  procedures when it goes into closed session?

7          MR. ZELLINGER:  Objection to the form.

8          THE COURT:  I'll let her answer.

9          THE WITNESS:  No, we do not.  Since I've been on

14:41:22  10  the board, initially they were not going into closed session

11  properly.  Within a few meetings they started citing the

12  statute to go into closed session properly.  But when we are

13  in closed session a lot of times they would discuss things in

14  closed session which should be an open discussion for the

14:41:44  15  public.  That's my experience.

16      Q.  Did you and Mr. Johnson raise some objections to

17  things?

18      A.  Mr. Johnson would regularly bring up the fact that

19  we should not be discussing things in closed session and it's

14:41:59  20  supposed to be an open session discussion.

21      Q.  Based on your understanding, why is it important to

22  discuss some of that business in open session when it's not

23  allowed in closed session?

24      A.  Right.  My understanding is it's statutory.  So to

14:42:14  25  follow the law and to give the public the most transparent

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Michelle Antoine - Direct by Mr. Tyndall

14:42:18  1    board possible, there's only certain things that are allowed

2    to be discussed in closed session, like personnel, salaries,

3    or issues with a student.  So anything above and beyond what

4    we're supposed to be -- what we notice the public we're

14:42:34  5    supposed to be talking about is supposed to be done in the

6    public session.

7         Q.   Now, is it fair to say that you have been

8    politically aligned with my client, Mr. Johnson?

9         A.   Yes, that's fair.

14:42:53  10        Q.   You've worked together on political campaigns and

11   things like that?

12        A.   That's a fair statement.

13        Q.   Have you had occasion to see him interact with

14   DeVan Barbour?

14:43:03  15        A.   Yes.

16        Q.   Based on your observation, what has their

17   interaction been like?

18        A.   Friendly, aligned politically.

19        Q.   Were you -- do you remember going -- have you ever

14:43:18  20   been to an event called Eggs and Issues?

21        A.   Yes.

22        Q.   And do you remember a particular Eggs and Issues

23   event -- first of all, tell us what that event is.

24        A.   So public school forums have a large consortium of

14:43:33  25   public school educators and all different kinds of people that

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| *14:43:36* | 1 | get together and they have a yearly agenda that they want to |
| | 2 | push, and they have a conference every year that a lot of |
| | 3 | people and individuals across this North Carolina come to and |
| | 4 | kind of hear what they want to -- what they want to |
| *14:43:51* | 5 | accomplish. So I was very interested in hearing what they had |
| | 6 | to say, so I went to that conference. |
| | 7 | Q. Do you remember going to that conference on |
| | 8 | January 31st of 2023? |
| | 9 | A. Yes, I do. |
| *14:44:05* | 10 | Q. And do you remember seeing -- do you know Bennett |
| | 11 | Jones? |
| | 12 | A. I do know Bennett Jones, yes. |
| | 13 | Q. And did you see him at that event? |
| | 14 | A. I did see him at that event. |
| *14:44:16* | 15 | Q. And did he -- when you saw him, did he come up to |
| | 16 | you and ask to discuss something with you? |
| | 17 | A. He did. |
| | 18 | Q. Tell us about that. |
| | 19 | A. Initially I just tried to discuss the policies that |
| *14:44:33* | 20 | we had just heard about at the public school forum event. He |
| | 21 | kept bringing up Mr. Johnson. |
| | 22 | MR. ZELLINGER: Objection. |
| | 23 | THE COURT: Sustained as to what he said. |
| | 24 | MR. TYNDALL: I'd like to be heard on that. |
| *14:44:45* | 25 | THE COURT: Yes, sir. Can you approach for a |

Michelle Antoine - Direct by Mr. Tyndall

| | | |
|---|---|---|
| *14:44:47* | 1 | minute. |
| | 2 | (Sidebar discussion.) |
| | 3 | THE COURT: For the record, we'll sustain that |
| | 4 | objection. Mr. Tyndall, I'll let you reask. |
| *14:46:58* | 5 | Q. Let me ask you something. Were you on the school |
| | 6 | board in the fall of 2022? |
| | 7 | A. I was elected in the fall of '22. November of 2022 |
| | 8 | I was elected. |
| | 9 | Q. Okay. So were you on the school board when there |
| *14:47:13* | 10 | was a meeting where Mr. Bennett Jones was allowed to come into |
| | 11 | a closed session? |
| | 12 | A. No. |
| | 13 | Q. Let me ask you, in your experience when there's a |
| | 14 | closed session, are the people whose contracts are being |
| *14:47:30* | 15 | reviewed or discussed generally allowed into the closed |
| | 16 | session to discuss with the school board their own contracts? |
| | 17 | A. No. |
| | 18 | Q. So that's generally -- is that part of the purpose |
| | 19 | of the closed session -- |
| *14:47:46* | 20 | A. Yes. |
| | 21 | Q. -- to discuss for the privacy of personnel matters |
| | 22 | and things like that? |
| | 23 | A. Yes. |
| | 24 | Q. And so were you aware based on your work with the |
| *14:47:56* | 25 | school board that Mr. Bennett Jones was allowed to come into a |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Michelle Antoine - Direct by Mr. Tyndall

14:48:01   1    closed session?

2         A.    No.

3         Q.    So you didn't know about that at the time?

4         A.    I did not.

14:48:06   5    Q.    Did you later learn about that?

6         A.    Yes.

7         Q.    And did you have some discussions with Mr. Jones?

8    Without telling us what he said, did you have some discussions

9    about that with Mr. Jones?

14:48:28  10    A.    He told me about that, yes.

11        Q.    So that was at the Eggs and Issues -- or at the

12   Eggs and Issues conference?

13        A.    Yes, January of '23.

14        Q.    Based on your conversation with Mr. Jones in 2023,

14:48:47  15   what was your impression of what he expected from you or

16   wanted from you?

17        A.    He wanted me to tell Ron Johnson --

18             MR. ZELLINGER:   Objection.

19             THE COURT:   I'll let her answer as to what her

14:49:00  20   expectation was.

21        Q.    What your understanding of that -- the reason for

22   that conversation.

23        A.    The expectation was that I was to tell Ronald

24   Johnson why he was doing the things he was doing.

14:49:14  25        Q.    And that was -- was it your impression that

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Michelle Antoine - Direct by Mr. Tyndall

| | | |
|---|---|---|
| 14:49:21 | 1 | Dr. Jones was angry with Mr. Johnson? |
| | 2 | A. No. |
| | 3 | Q. Was it your impression that he actually wanted to |
| | 4 | get in touch with Mr. Johnson? |
| 14:49:28 | 5 | A. That is the impression. He said that. Yes. |
| | 6 | Q. Ms. Antoine, as a result of some of the conflict on |
| | 7 | the board, has it been very difficult for you or -- |
| | 8 | A. Yes. |
| | 9 | Q. Tell us a little bit about that. |
| 14:50:47 | 10 | A. I would say probably one -- |
| | 11 | MR. ZELLINGER: Your Honor, I object to the |
| | 12 | relevancy of this. |
| | 13 | THE COURT: Yes, sir. I do question the relevancy |
| | 14 | of this. I'll give you a chance to be heard if you'd like, |
| 14:51:01 | 15 | but... |
| | 16 | Can you approach? |
| | 17 | (Sidebar discussion.) |
| | 18 | MR. TYNDALL: Let me rephrase the question, Your |
| | 19 | Honor, if I could. |
| 14:51:07 | 20 | THE COURT: Yes, sir. |
| | 21 | Q. Ms. Antoine, has it been clear throughout your time |
| | 22 | with the school board that you've been aligned -- are your |
| | 23 | viewpoints and Mr. Johnson's viewpoints about education very |
| | 24 | similar? |
| 14:51:19 | 25 | A. Yes. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Michelle Antoine - Cross by Mr. Zellinger

14:51:19   1        Q.   Have you all sort of been aligned as members of the
           2   school board?
           3        A.   Yes.
           4        Q.   And has there been conflicts as a result of that?
14:51:32   5        A.   I don't know if it's the result of that.  Honestly,
           6   I don't know why there's so much conflict.
           7             MR. TYNDALL:  I don't have anything further of
           8   Ms. Antoine, Your Honor.
           9             THE COURT:  Mr. Zellinger.
          10   CROSS-EXAMINATION BY MR. ZELLINGER:
          11        Q.   My name is Boz Zellinger.  I'm a prosecutor in the
          12   Department of Justice.
          13        A.   Hello.
          14        Q.   What is an IEP?
14:51:53  15        A.   Individual Education Plan.
          16        Q.   So if there's a child with special needs, what is
          17   that used for?  If there's a child with special needs, are
          18   there often Individualized Education Plans for those children?
          19        A.   Yes.  About 16 percent of our students in our
14:52:10  20   district have them.
          21        Q.   Okay.  And what sort of things does an IEP entail?
          22        A.   It will lay out a plan for a student that they need
          23   some extra help or some more testing time or some therapies.
          24        Q.   And is there a program at Clayton High School for
14:52:30  25   students with special needs?

Michelle Antoine - Cross by Mr. Zellinger

14:52:33   1        A.    Yes.

           2        Q.    And is that a good program?

           3        A.    I can't speak to the goodness or badness of any

           4   program.  I certainly hope it's a good program for our

14:52:43   5   students.

           6        Q.    Okay.  And each school board member, do you have

           7   like certain schools that you're responsible for?

           8        A.    Typically, yes.

           9        Q.    And is Clayton one of yours?

14:52:51  10        A.    It has been.  Also Wilsons Mills is mine.

          11        Q.    Okay.  And is that all about sort of fostering in a

          12   comfortable environment for a child with special needs?

          13        A.    Can you clarify?

          14        Q.    The IEP or what they have at Clayton for special

14:53:09  15   needs students, is that to help students to have a comfortable

          16   environment to go to school in?

          17        A.    It's supposed help them with their education.  It's

          18   supposed to provide a way for those students to learn.

          19              MR. ZELLINGER:  Your Honor, can I approach the

14:53:22  20   witness?

          21              THE COURT:  Yes, sir.

          22        Q.    Ms. Antoine, I hand you what's been marked State's

          23   Exhibit 78.  Do you know what that is?

          24        A.    It looks like a motion to move into closed session.

14:53:48  25        Q.    And is that -- the Johnston County Public Schools,

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Michelle Antoine - Cross by Mr. Zellinger

| | | |
|---|---|---|
| 14:53:50 | 1 | is that typically kept on the school -- on the Johnston County |
| | 2 | Public Schools website are the minutes kept; is that correct? |
| | 3 | A.   Yes, we keep the meeting minutes there. |
| | 4 | Q.   Okay.  And does that appear to be from May 31st of |
| 14:54:04 | 5 | 2022? |
| | 6 | A.   That is the date written on that sheet. |
| | 7 | Q.   And you weren't on the board till the next year; |
| | 8 | correct? |
| | 9 | A.   I was starting December of '22 -- |
| 14:54:15 | 10 | Q.   Okay.  So you -- |
| | 11 | A.   -- when I became a board member. |
| | 12 | Q.   So you get elected in November and you come on in |
| | 13 | December? |
| | 14 | A.   December, that's correct. |
| 14:54:20 | 15 | Q.   Okay.  Got you.  Do you know a person named Allyson |
| | 16 | Bond? |
| | 17 | A.   I know of her, yes. |
| | 18 | Q.   At one point did you send a disparaging email about |
| | 19 | another teacher to Allyson Bond? |
| 14:54:42 | 20 | A.   An email? |
| | 21 | Q.   Yes, ma'am. |
| | 22 | A.   No, not that I'm aware of.  I don't know. |
| | 23 | Q.   I mean, ma'am, were you sanctioned for violating |
| | 24 | the board's code of ethics for sending an email to Allyson |
| 14:54:58 | 25 | Bond about Angie Barbour? |

14:55:01   1        A.    No.

           2        Q.    Okay.  What was that for?

           3        A.    I wasn't sanctioned.

           4        Q.    Have you ever been declared to be in violation of
14:55:07   5   the board's codes of ethics?

           6        A.    There's been no declaration.

           7        Q.    Did you ever send an email to Allyson Bond about
           8   Angie Barbour?

           9        A.    I sent an email to our superintendent about a
14:55:18  10   grievance that was filed by Allyson Bond.

          11        Q.    And in that did you reference Angie Barbour?

          12        A.    I did, because Angie Barbour was the grievant or
          13   the grievee, I'm not sure.  She was the one who was being
          14   complained about.

14:55:36  15        Q.    Angie Barbour was being complained about by Allyson
          16   Bond?

          17        A.    That's correct.

          18              MR. ZELLINGER:  Nothing further, Your Honor.

          19              THE COURT:  Anything further?

14:55:49  20              MR. TYNDALL:  Yes.

          21   REDIRECT EXAMINATION BY MR. TYNDALL:

          22        Q.    Does Dr. Bracy, the superintendent, make motions?

          23        A.    The only time I've heard him make motions are when
          24   you don't have a chair appointment yet.  Even then I don't
14:56:06  25   really -- yea, he did make motions.  So when we're appointing

| | | |
|---|---|---|
| *14:56:10* | 1 | the chair, that is the only time I've heard him make motions. |
| | 2 | Q.    Can he move to go into closed session? |
| | 3 | A.    Not that I'm aware of.  I've never seen him do it. |
| | 4 | MR. TYNDALL:  I don't have anything further. |
| *14:56:24* | 5 | THE COURT:  Thank you.  Anything further? |
| | 6 | MR. ZELLINGER:  No.  Thank you. |
| | 7 | THE COURT:  Thank you very much.  You can go. |
| | 8 | (Witness excused.) |
| | 9 | MR. TYNDALL:  Nothing further for the defense. |
| *14:56:47* | 10 | THE COURT:  Yes, sir.  Mr. Zellinger, any rebuttal |
| | 11 | evidence for the State? |
| | 12 | MR. ZELLINGER:  Yes, Your Honor.  The State calls |
| | 13 | Rick Hoffman. |
| | 14 | RICHARD HOFFMAN, |
| *14:56:55* | 15 | having been called as a witness for the State and being duly |
| | 16 | sworn at 2:57 p.m., testified as follows: |
| | 17 | DIRECT EXAMINATION BY MR. ZELLINGER: |
| | 18 | Q.    Investigator Hoffman -- |
| | 19 | MR. ZELLINGER:  Your Honor, may I approach the |
| *14:57:26* | 20 | witness? |
| | 21 | THE COURT:  Yes, sir. |
| | 22 | Q.    I hand you what's been marked for identification |
| | 23 | purposes State's Exhibit 77.  Do you recognize that document? |
| | 24 | A.    I do. |
| *14:57:42* | 25 | Q.    Where does this come from? |

Richard Hoffman - Rebuttal - Direct by Mr. Zellinger

| | | |
|---|---|---|
| *14:57:45* | 1 | A. Pinger records. |
| | 2 | Q. We've looked at a ton of Pinger records. Is this |
| | 3 | more records from Pinger? |
| | 4 | A. Correct. |
| *14:57:51* | 5 | Q. And this is from January 30th of 2022? |
| | 6 | A. Yes, it is. |
| | 7 | Q. Going up until January 31st of 2022? |
| | 8 | A. They are. |
| | 9 | Q. And does this involve the defendant's Pinger phone |
| *14:58:00* | 10 | number, the 4545 number? |
| | 11 | A. Yes. |
| | 12 | Q. And does it also involve the -- who is the -- it's |
| | 13 | to another number, this 3403? |
| | 14 | A. The other number is linked to Ms. Rotondaro. |
| *14:58:12* | 15 | Q. Okay. And so this appears to be communications |
| | 16 | between the defendant and Ms. Rotondaro? |
| | 17 | A. Correct. |
| | 18 | MR. ZELLINGER: Your Honor, at this time I seek to |
| | 19 | enter State's Exhibit 77. |
| *14:58:23* | 20 | MR. TYNDALL: Isn't that already entered? No |
| | 21 | objection, Your Honor. |
| | 22 | THE COURT: Allowed. |
| | 23 | |
| | 24 | (State's Exhibit Number 77 entered into |
| *14:58:31* | 25 | evidence.) |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Richard Hoffman - Rebuttal - Direct by Mr. Zellinger

14:58:37    1        Q.    Detective, I don't have a way to portray that to

            2    the jury.  Can you, starting from the bottom, read who the

            3    message comes -- I guess starting at the bottom, is that from

            4    January 30th of 2022?

14:58:48    5        A.    Correct.

            6        Q.    And is that from the defendant's phone number, the

            7    4545 number, to Ms. Rotandaro?

            8        A.    Yes.

            9        Q.    And could you read what that message was?

14:58:59   10        A.    It said the messages are not always in one

           11    direction.  They go back and forth.  The first one is from the

           12    45 number, and it says:  AB rode by CF Draft House,

           13    McKinley's, and then down my street.

           14        Q.    And who is that from?

14:59:15   15        A.    That's from the number linked to Mr. Johnson to a

           16    number linked to Ms. Rotondaro.

           17        Q.    Then the next line, is that also from what you

           18    believe to be Mr. Johnson to Ms. Rotondaro?

           19        A.    Yes.

14:59:29   20        Q.    And what does that read?

           21        A.    Super got her tracked and now she's at home, but

           22    evidently she's not learned.

           23        Q.    The next entry, is that also from the defendant to

           24    Ms. Rotondaro?

14:59:39   25        A.    Yes.

| | | |
|---|---|---|
| *14:59:39* | 1 | Q. Can you read the next three entries as it moves |
| | 2 | chronologically? |
| | 3 | A. It looks like she tried to turn her phone off when |
| | 4 | she came into my neighborhood though. Your neighbors are |
| *14:59:50* | 5 | psycho, bro, but I think at least one of them has fucked up. |
| | 6 | Holy fuck. What the fuck does she want from you, to confront |
| | 7 | you? Was she by herself? Stupid fucking bitches. Were you |
| | 8 | home? |
| | 9 | Q. And then the next message, is that from |
| *15:00:08* | 10 | Ms. Rotondaro to the number associated with the defendant? |
| | 11 | A. Yes. |
| | 12 | Q. What does that say? |
| | 13 | A. So apparently we can't even go to Clayton Fitness |
| | 14 | now. |
| *15:00:27* | 15 | MR. ZELLINGER: May I approach the witness? |
| | 16 | THE COURT: Yes, sir. |
| | 17 | MR. TYNDALL: Can we be heard on this? |
| | 18 | THE COURT: Yes, sir. |
| | 19 | Q. Investigator Hoffman, were you present in the |
| *15:01:28* | 20 | courtroom and heard testimony that the defendant at some point |
| | 21 | claimed that there had been text messages threatening towards |
| | 22 | him from numbers that he did not know? |
| | 23 | A. Yes. |
| | 24 | Q. And that's just my summary. The jury should listen |
| *15:01:43* | 25 | to the witness from the witness stand. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

15:01:46    1             But was information -- that information was given

2    to the Clayton Police Department; is that correct?

3       A.    Yes.   Mr. Johnson filed the police report with

4    Clayton concerning the texts that he was receiving.

15:01:59    5       Q.    And then Clayton then utilized the State Bureau of

6    Investigation; is that correct?

7       A.    They did.

8       Q.    And then they made findings in the report; is that

9    correct?

15:02:10    10       A.    Correct.   The Clayton Police Department requested

11    limited assistance from the State Bureau of Investigation

12    which has the ability to assist local agencies, and then they

13    referred to those numbers to help them get information about

14    them.

15:02:26    15       Q.    And so an investigation was done by the FBI into

16    those numbers; is that correct?

17       A.    That's correct.

18       Q.    Was anybody ever charged with threatening the

19    defendant with those messages?

15:02:39    20       A.    They could not determine the identity of any of the

21    senders.

22             MR. TYNDALL:   Objection to hearsay again.

23             THE COURT:   We'll sustain that, Mr. Zellinger.

24    Rephrase.

15:02:50    25       Q.    Was anyone ever charged with sending messages to

Richard Hoffman - Rebuttal - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 15:02:53 | 1 | the defendant? |
| | 2 | A.   No. |
| | 3 | Q.   Into the investigation into that, were there a |
| | 4 | number of -- did you acquire the materials from that |
| 15:03:03 | 5 | investigation as part of your investigation? |
| | 6 | A.   I did.  I requested them, and I put them in |
| | 7 | discovery. |
| | 8 | Q.   Okay.  And there are several spreadsheets that you |
| | 9 | received as part of that investigation; is that correct? |
| 15:03:13 | 10 | A.   Yes. |
| | 11 | Q.   Did those come from an organization known as |
| | 12 | SpoofCard? |
| | 13 | MR. TYNDALL:  Objection, Your Honor.  This is |
| | 14 | the -- |
| 15:03:23 | 15 | THE COURT:  We'll let him answer where they came |
| | 16 | from, and he can answer that. |
| | 17 | THE WITNESS:  Can I clarify? |
| | 18 | Q.   Probably this would not be a good time to clarify. |
| | 19 | But you got materials from the SBI; correct? |
| 15:03:35 | 20 | A.   I did. |
| | 21 | Q.   And from via the Clayton Police Department? |
| | 22 | A.   Yes.   There were two different sources. |
| | 23 | Q.   And those materials, did those come from SpoofCard? |
| | 24 | A.   Yes. |
| 15:03:47 | 25 | MR. TYNDALL:  Judge, objection again.  That's three |

| | | |
|---|---|---|
| *15:03:49* | 1 | levels of hearsay, so... |
| | 2 | THE COURT: Yes, sir. I will sustain at this |
| | 3 | point, Mr. Zellinger. |
| | 4 | MR. ZELLINGER: Okay. |
| *15:03:54* | 5 | Q. Did you acquire these records that were part of the |
| | 6 | Clayton PD SBI investigation? |
| | 7 | A. Yes. |
| | 8 | Q. Based on looking at those records, did you then |
| | 9 | research any companies? |
| *15:04:07* | 10 | A. I did. |
| | 11 | MR. TYNDALL: Objection. |
| | 12 | THE COURT: I'll let him answer if he researched. |
| | 13 | MR. ZELLINGER: Can I have a moment? |
| | 14 | THE COURT: Yes, sir. |
| *15:04:22* | 15 | MR. ZELLINGER: May I publish State's Exhibit 53 at |
| | 16 | this time? |
| | 17 | THE COURT: Yes, sir. |
| | 18 | Q. State's Exhibit 53, this is a screenshot from Angie |
| | 19 | Barbour's phone; is that correct? |
| *15:04:57* | 20 | A. Yes. |
| | 21 | Q. The contact that she had for the defendant in her |
| | 22 | phone? |
| | 23 | A. Yes. |
| | 24 | Q. Okay. And there's also a phone number listed Siri |
| *15:05:06* | 25 | found in messages; is that correct? |

| | | | |
|---|---|---|---|
| 15:05:09 | 1 | A. | Yes. |
| | 2 | Q. | And that number that was involved that appears on |
| | 3 | State's Exhibit 53, did you -- did you run that? | |
| | 4 | | MR. TYNDALL: Objection, Your Honor. |
| 15:05:21 | 5 | | THE COURT: We'll let him answer if he ran it. |
| | 6 | Q. | Did you run that in a law enforcement program? |
| | 7 | A. | Yes. |
| | 8 | Q. | Based on what you received from that, did you |
| | 9 | research any companies? | |
| 15:05:35 | 10 | A. | I did. |
| | 11 | Q. | What company was that? |
| | 12 | A. | Telnyx. |
| | 13 | Q. | T-E-L-N-Y-X? |
| | 14 | A. | Sure. |
| 15:05:48 | 15 | Q. | Based on the materials that you received as part of |
| | 16 | the Clayton SBI investigation, did you reach out to any | |
| | 17 | companies? | |
| | 18 | A. | I did. |
| | 19 | Q. | What company was that? |
| 15:05:58 | 20 | A. | Same company, Telnyx. |
| | 21 | Q. | Have you had occasion to go to Telnyx's website? |
| | 22 | A. | I did. |
| | 23 | Q. | And again, that's just a modern website; is that |
| | 24 | correct? | |
| 15:06:09 | 25 | A. | Yes. |

| 15:06:09 | 1 | Q. And you don't know what the website looked like |
| | 2 | back in 2022? |
| | 3 | A. I do not. |
| | 4 | Q. What kind of services does Telnyx offer? |
| 15:06:15 | 5 | A. VOIP provider, a Spoof phone number provider. |
| | 6 | MR. ZELLINGER: Your Honor, may I publish State's |
| | 7 | Exhibit 36? |
| | 8 | THE COURT: Yes, sir. That's already been |
| | 9 | introduced? |
| 15:07:30 | 10 | MR. ZELLINGER: Yes. Just for helping the defense |
| | 11 | out here -- well, let me just ask. |
| | 12 | Q. Investigator Hoffman, State's Exhibit 36, there's |
| | 13 | multiple phone records that belong to the defendant from the |
| | 14 | defendant's T-Mobile account; is that correct? |
| 15:07:42 | 15 | A. I believe so. I don't recall the exact number. |
| | 16 | Q. Okay. And then -- |
| | 17 | MR. ZELLINGER: And Your Honor, may I publish |
| | 18 | State's Exhibit 36 at this time? |
| | 19 | THE COURT: Yes, sir. |
| 15:07:52 | 20 | MR. TYNDALL: The same objection, just subject to |
| | 21 | the objection from the pretrial motion, Your Honor. That's |
| | 22 | the only objection. |
| | 23 | MR. ZELLINGER: Your Honor, may I approach the |
| | 24 | witness? |
| 15:08:23 | 25 | THE COURT: Yes. |

15:08:24    1       Q.    Let me ask you.   Detective Hoffman, looking at --

        2    do you recall looking at the materials that you received from

        3    the SBI Clayton Police Department?

        4       A.    I do.

15:08:37    5       Q.    When you looked at those materials, did you then

        6    look at the defendant's phone records for any specific phone

        7    records?

        8       A.    I did.

        9           MR. ZELLINGER:   Your Honor, may I approach the

15:08:47   10    witness?

      11           THE COURT:   Yes, sir.

      12       Q.    Would looking at State's Exhibit 76 help refresh

      13    your memory as to the phone number you looked up?

      14       A.    Yes.

15:08:56   15           MR. TYNDALL:   Your Honor, I object and ask to be

      16    heard on this.

      17           THE COURT:   Yes, sir.

      18             (Sidebar discussion.)

      19           THE COURT:   Ladies and gentlemen, we'll take our

15:10:23   20    afternoon recess a little early.   Should be 15 minutes.   Leave

      21    your notes in your seat, and we'll be back with you shortly.

      22    Thank you.

      23             (Jury exits.)

      24           THE COURT:   Mr. Tyndall, we'll let you get your

15:11:09   25    objection fully on the record.

Richard Hoffman - Rebuttal - Direct by Mr. Zellinger

15:11:10   1          MR. TYNDALL:  Your Honor, the objection is -- I

2     mean, obviously, the phone records are the phone records.

3     They've been authenticated and entered.  The problem we have

4     is some information that the SBI or the -- I can't remember,

15:11:26   5     but it's like three levels of hearsay.

6          But the bigger problem is my client can't confront

7     who provides this information and who creates the spreadsheet.

8     So if Investigator Hoffman is going to look at this record and

9     then testify based on what he finds in the record, the

15:11:45  10     implication for the jury is that there's some comparable

11     information from the SBI that matches.  I don't know if it's

12     going to match or not because we haven't heard that part, but

13     the point is it's essentially presenting hearsay through an

14     agent when we don't have the ability to confront the source of

15:12:04  15     the information.  So we would object on that basis.

16          THE COURT:  Yes, sir.  Mr. Zellinger, I'm going to

17     give you a chance to respond.  Obviously, the record we are

18     looking at now has already been admitted into evidence.

19          MR. ZELLINGER:  Correct.

15:12:19  20          THE COURT:  Is there any response to that, maybe

21     what your --

22          MR. ZELLINGER:  Your Honor, the State's in a tough

23     position because the defendant gets up and says that he's

24     received these text messages from another number, an out of

15:12:32  25     state number, and so the State then has to investigate that.

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

15:12:36   1   And the State did investigate -- or I'm sorry, Clayton Police
           2   Department SBI investigated that years ago, and they came to
           3   the conclusion that the defendant had spoofed the phone
           4   number.  And so then the defendant having that in discovery
15:12:48   5   gets up on the stand and doubles down and says, I -- you know,
           6   I was contacted by these numbers and I believed it to be Angie
           7   Barbour.  And this question number is the day before the text
           8   message to DeVan Barbour that is the claim that the recordings
           9   are going to go out.  So that's the relevance of it.
15:13:15  10        The testimonial -- I mean, the confrontation
          11   argument by the defendant, first of all, this is rebuttal.  So
          12   I mean, the troubling thing for the Court is that there's a
          13   lot of evidence to support that what the defendant just told
          14   this jury is false.  And so that's why this information -- I
15:13:33  15   mean, ideally we would have gotten a search warrant and been
          16   able to look into this and found these records, but here we
          17   are on the ninth day of trial and that's difficult to do at
          18   this juncture.
          19        So these records do exist, and some of the records
15:13:47  20   that were inquired as part of that investigation are from
          21   SpoofCard.  No, we do not have the SpoofCard witness here.  We
          22   don't have the 902 certification for the SpoofCard thing, but
          23   these are not testimonial.  These are not being created in
          24   anticipation of future litigation.  These are business records
15:14:06  25   that are being kept in the ordinary course of business.

Richard Hoffman - Rebuttal - Direct by Mr. Zellinger

15:14:09   1          I don't want to delve into that much.  I intend on

           2   asking the investigator, based on what you looked at from the

           3   SBI and from SpoofCard, did you then -- did that draw your

           4   attention to anything in this, which has already been

15:14:25   5   admitted, and I believe he'll say that the specific line, that

           6   phone number, his attention was drawn to that.

           7          I don't know that at this juncture that the State

           8   can get much farther than that.  The reason the State can't

           9   get much farther than that is because of this fraud that has

15:14:38  10   been perpetrated on the Court that this claim that these text

          11   messages are coming from other people when -- I mean, just for

          12   a proffer to show to the Court, I mean, State's Exhibit 76,

          13   the spoofed number which was reflected in defendant's phone

          14   records, is calling -- or I'm sorry, it's not calling, it's

15:14:59  15   sending a text message, an SMS message, to the defendant's

          16   phone number on May 8th at 7:06 a.m.

          17          And so I think there should be some latitude

          18   granted to the State because if this trial is a search for the

          19   truth, State's Exhibit Number 76 has a lot of weight on what

15:15:20  20   the truth is in this case, but at the same time I understand

          21   the objection, and I can try to gently work into it.  But it's

          22   just a -- I mean, on its face, Your Honor, it just seems

          23   unfair.

          24          THE COURT:  Yes, sir.  Let me ask, and I'm almost

15:15:44  25   asking for my own benefit.  What I'm thinking is maybe some

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Richard Hoffman - Voir Dire by Mr. Zellinger

15:15:47   1   voir dire will help a little bit. Can we just maybe have a

2   little bit --

3           MR. ZELLINGER: Sure.

4           THE COURT: -- so we understand kind of your line

15:15:52   5   of questioning and where they might go and then give

6   Mr. Tyndall a chance to ask questions.

7           MR. ZELLINGER: Sure. I sort of proffered the

8   evidence to the Court that this shows the circumstances

9   surrounding it. So I think this voir dire would be just what

15:16:09   10   I sort intend to ask the investigator if the jury was here.

11   VOIR DIRE EXAMINATION BY MR. ZELLINGER:

12       Q.   Investigator Hoffman, when the defendant complained

13   to the Clayton Police Department about these text messages,

14   did the Clayton Police Department then reach out to the SBI?

15:16:25   15       A.   Yes.

16       Q.   Okay. And you know that because you have those

17   records?

18       A.   Yes.

19       Q.   Okay. And so the SBI investigation into that, that

15:16:30   20   was given to you?

21       A.   It was given to the -- the investigation was given

22   to me from Clayton.

23       Q.   Okay. And within those records, this exhibit,

24   State's Exhibit 76 that I believe is before you, was that

15:16:42   25   within those records?

Richard Hoffman - Voir Dire by Mr. Zellinger

15:16:44  1        A.    No.   The SBI routinely when they do any limited
         2    assistance, they will provide those records to the district
         3    attorney's office separately.
         4        Q.    Okay.  So those records were provided through the
15:16:56  5    discovery through --
         6        A.    Yes.
         7        Q.    -- the portal, if you will?
         8        A.    Yes.
         9        Q.    So this State's Exhibit 76, this is the information
15:17:08 10    that was received through the portal?
        11        A.    Yes, sir.
        12              MR. ZELLINGER:  Your Honor.  I said I would only
        13    ask questions I intend to ask in front of the jury.  I'm not
        14    doing that.  I apologize.  If you can cut it down.
15:17:19 15              THE COURT:  Yes, sir.
        16        Q.    Based on this information that you received from
        17    the SBI, you mentioned that you looked a number up in a law
        18    enforcement database; is that correct?
        19        A.    I did.
15:17:34 20        Q.    Okay.  And then did you also look for a number in
        21    the defendant's phone records?
        22        A.    Yes.
        23        Q.    And did you find a text message from a number to
        24    the defendant on May 8th at 11:06 a.m.?
15:17:57 25        A.    I did.

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

15:17:57  1    Q.   I guess it was actually 7:06 a.m. because it's UTC;
2    is that correct?
3    A.   Uh-huh.
4         MR. ZELLINGER:  Can I have moment, Your Honor?
15:18:07  5         THE COURT:  Yes, sir.
6    Q.   And that number you looked up, was that a number
7    with a 561 area code?
8    A.   I did.  What drew my attention is because it
9    matched the area code that he was receiving text messages
15:18:24 10   from.
11        MR. ZELLINGER:  Nothing further.
12        THE COURT:  Mr. Tyndall, I'll give you a chance to
13   ask any questions and to be heard.  But to the line of
14   questioning that we just heard, do you have an objection to
15:18:44 15   that?
16        MR. TYNDALL:  Well, can you clarify because I'm not
17   sure I totally understood it, Your Honor, I mean...
18        THE COURT:  Yes, sir.
19   VOIR DIRE EXAMINATION BY MR. TYNDALL:
15:18:54 20   Q.   The Clayton Police Department provided information
21   to the SBI.  Is that sort of the origin of all this?
22   A.   It is.  Mr. Johnson made his complaint.  They
23   initiated their investigation.  They wanted limited assistance
24   through administrative subpoenas, so they asked the SBI to
15:19:12 25   open a case and do that.  Then the SBI shared their findings

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Richard Hoffman - Voir Dire by Mr. Tyndall

| | | |
|---|---|---|
| 15:19:17 | 1 | with Clayton Police Department. They completed their report. |
| | 2 | They weren't able to charge anyone. And then the SBI during |
| | 3 | the course of their regular business submitted all of the |
| | 4 | records that they obtained from those subpoenas into |
| 15:19:32 | 5 | evidence.com which is a portal that comes to the district |
| | 6 | attorney's office. |
| | 7 | Q. Say that again about they -- all the administrative |
| | 8 | subpoenas that they served, did the results go to the portal? |
| | 9 | A. The results go to the portal and are as the normal |
| 15:19:51 | 10 | course of business, but they are also shared with the |
| | 11 | investigating agency. |
| | 12 | Q. Okay. So the Clayton police was the investigating |
| | 13 | agency? |
| | 14 | A. Yes, sir. |
| 15:19:58 | 15 | Q. And it was sent to the -- |
| | 16 | A. Police department. |
| | 17 | Q. And the results showed that a particular number was |
| | 18 | a spoof number; is that right? |
| | 19 | A. That's correct. |
| 15:20:08 | 20 | Q. That's essentially the results -- |
| | 21 | A. Essentially. |
| | 22 | Q. -- of the investigation. |
| | 23 | A. Essentially. |
| | 24 | Q. And explain again what drew your attention to -- |
| 15:20:24 | 25 | did something draw your attention to the records that had been |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Richard Hoffman - Voir Dire by Mr. Tyndall

15:20:28   1   admitted or to the portal?

           2       A.    In the report, in the original Clayton police

           3   report, there is one sentence, and it says:  Ronald Johnson

           4   spoofed -- also spoofed numbers.  It's in the middle of, I

15:20:42   5   think, the third or fourth page.  So that drew my attention.

           6   Well, how did he do that?  So I looked at the records and I

           7   found the records that produced the spreadsheet.

           8       Q.    So does it say it also appears that Ronald Johnson

           9   spoofed a number and contacted the 561-668- --

15:21:03  10       A.    Yes.

          11       Q.    -- 0568 number?

          12       A.    Yes.

          13       Q.    So what they said was he contacted that number?

          14       A.    Yes.  And what drew my attention was how did and

15:21:12  15   what service did he use to spoof it and are those records

          16   available.

          17       Q.    To spoof what though?

          18       A.    The number.  So he spoofed a number to contact the

          19   number that was calling him that was also spoofed.

15:21:23  20       Q.    Okay.  So he spoofed a number to then contact a

          21   number?

          22       A.    Yes.

          23       Q.    Okay.  And so the 561-701-9736 is the number he

          24   tried to contact; is that right?

15:21:37  25       A.    I don't believe so.  What makes it confusing,

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Richard Hoffman - Voir Dire by Mr. Tyndall

15:21:39  1   Mr. Tyndall, is they both have the same area code, the 561.

2       Q.   I see.  I see the area code.  Okay.  So they're the

3   same area code but the spoof number is different.

4       A.   It differs, yes, sir.

15:21:53  5       Q.   But all of this information comes from somebody who

6   assembled it at the SBI and loaded it onto the portal.

7       A.   Yes.  I believe the analyst was Hadley Robinson.

8       Q.   And the analyst was somebody at the SBI?

9       A.   Yes, sir.

15:22:08 10       Q.   You are getting this information from a report or

11   data that was established by the SBI?

12       A.   I'm getting it through evidence.com which is the

13   secured portal that the state bureau shares with the district

14   attorney's office, yes, sir.

15:22:23 15       Q.   But you've taken them at their word this is what

16   the report says.  You haven't looked behind it or anything.

17       A.   No.  They put the records in there as they have

18   them, and I review the records as they have them.

19       Q.   And what drew your attention to the records that

15:22:37 20   have actually been admitted?

21       A.   Are you talking about T-Mobile?  That's

22   Mr. Johnson's T-Mobile account.

23       Q.   Okay.  And what particular record are we talking

24   about that it drew your attention to it?

15:22:49 25       A.   Oh, so I saw -- I looked at the Telnyx numbers, and

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Richard Hoffman - Voir Dire by Mr. Tyndall

| | | |
|---|---|---|
| 15:22:55 | 1 | I was interested in the Telnyx number because the 404 number |
| | 2 | that you brought out was a Telnyx number. |
| | 3 | Q. Right. |
| | 4 | A. So I saw that line in the report and got the |
| 15:23:06 | 5 | spreadsheet, and I went back to his original T-Mobile to see |
| | 6 | if that number that he had in his spoofed account was |
| | 7 | reflected in his records, and it was. |
| | 8 | Q. 561? |
| | 9 | A. I don't remember the whole number. It's 561. It's |
| 15:23:19 | 10 | Line 85 on the spreadsheet. |
| | 11 | Q. Right. I don't think I have the number, but I just |
| | 12 | have a 561-701-9736. |
| | 13 | A. I believe that's correct. I brought it to |
| | 14 | Mr. Zellinger's attention the day before. |
| 15:23:39 | 15 | Q. The conclusion you are making about this being |
| | 16 | spoofed is based on some report you got on a portal from the |
| | 17 | SBI? |
| | 18 | A. It's based on records the SBI submitted, yes. |
| | 19 | Q. And of course that person is not here to testify |
| 15:23:52 | 20 | about that or anything? |
| | 21 | A. No, sir. |
| | 22 | MR. TYNDALL: Can you tell me, Mr. Zellinger, where |
| | 23 | that record is, the 561-701-9736 in the -- |
| | 24 | MR. ZELLINGER: In the phone records? |
| 15:24:09 | 25 | MR. TYNDALL: Yes. |

| | |
|---|---|
| 15:24:10 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 15:25:46 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 15:26:10 | 10 |

1    MR. ZELLINGER: It's a -- the phone records have --

2    the phone records have multiple spreadsheets on that disk, and

3    the file number is 4155815_ -- it ends with CDRT.

4    MR. TYNDALL: I think, Your Honor, those are my

5    questions. The objection doesn't change. The information

6    that Investigator Hoffman's relying on is coming from data

7    where there's not a person we can cross-examine, and it's a

8    spreadsheet. We don't know -- we're not able to look behind

9    the underlying data to determine whether that's correct. They

10   say it's a spoof number. You know, I can't verify that by --

11   it's just we're taking their word for it. I just don't

12   think -- I mean, he's relying on hearsay to testify, and

13   that's what the rule's about.

14   THE COURT: Mr. Zellinger.

15   MR. ZELLINGER: Your Honor, can I hand -- I

16   realized the Court does not have a copy of State's Exhibit 76.

17   I thought that it might be helpful for the Court to look at

18   this document.

19   THE COURT: This is a lot. Can you point me on

20   here where you are looking at?

21   MR. ZELLINGER: Yes. So the first page, Your

22   Honor, at the top is ronjon1938@msn.com. As you go to the

23   next page, it has how much the defendant has spent on this.

24   But regardless, the real issue is on Page 9.

25   THE COURT: Where the red tab is?

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | |
|---|---|
| *15:27:07* | 1 |

MR. ZELLINGER: Yes. SMS is like text messages, I

2 believe, and spoof number is this 9736 number, destination

3 number 3337 which is defendant's number on May 8th at 7:06

4 a.m.

*15:27:24* 5 THE COURT: Yes, sir. And I'm going to, I guess,

6 ask you some -- I think Mr. Tyndall's objection is under the

7 confrontation clause. I just want to give you a chance to be

8 heard on that.

9 MR. ZELLINGER: Your Honor, I'm not seeking to

*15:27:44* 10 enter any documents at this point which there's no out of

11 court -- I mean, first of all, this is a business record and

12 that satisfies the hearsay element. I'm not seeking to admit

13 State's Exhibit 76, but what I am seeking to admit is that

14 Investigator Hoffman received these records, looked at these

*15:28:04* 15 records, and then based on that discovered -- consulted with

16 Telnyx and then went to the defendant's phone record which is

17 in evidence and looked up the number in Line 1618 where on

18 May 8th of 2022 the defendant texted himself from that number.

19 That's not what I'm going to seek to get out, but basically

*15:28:31* 20 that this Telnyx number texted to the defendant.

21 So in terms of a confrontation clause issue, I

22 mean, this is all the effect on the listener and what he did

23 next. But again, I mean, the central issue here is that 561

24 number is the same area code that the defendant is complaining

*15:28:53* 25 about receiving text messages from. And so there's a lot of

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | |
|---|---|
| 15:28:59 | 1 | evidence to support the State's theory that the defendant has |
| | 2 | gotten up there and -- and additionally, I mean, potentially, |
| | 3 | you know, brought this to the Clayton Police Department and |
| | 4 | claimed that he was receiving threatening texts from 561 |
| 15:29:16 | 5 | numbers, and that isn't true. |
| | 6 | And so I would ask -- I mean, I guess the line of |
| | 7 | questioning that I would seek to ask is whether Investigator |
| | 8 | Hoffman after looking at those records looked at State's |
| | 9 | Exhibit -- the T-Mobile records and whether he then took a |
| 15:29:41 | 10 | number from the T-Mobile records and tried to figure out if |
| | 11 | that was a Telnyx number. I think that's probably the |
| | 12 | farthest that the State can go at this point. |
| | 13 | But just really this is -- I just -- it just |
| | 14 | doesn't seem particularly fair that the defendant can get up |
| 15:30:01 | 15 | on the witness stand, claim this and there's concrete evidence |
| | 16 | to contradict it and the State is precluded from using it in |
| | 17 | rebuttal. But I'll abide by any ruling the Court may have. |
| | 18 | THE COURT: Anything further? |
| | 19 | MR. TYNDALL: Well, your Honor, I disagree that |
| 15:30:16 | 20 | there's concrete evidence, because what we have is a |
| | 21 | spreadsheet, and, you know, what Mr. Zellinger is attempting |
| | 22 | to do is not -- it's not the effect on the listener. The |
| | 23 | effect on the listener is I see a number, I then go research, |
| | 24 | it leads me to some other place, but what they are looking to |
| 15:30:31 | 25 | do is to get results of his investigation which is hearsay. |

| | | |
|---|---|---|
| 15:30:37 | 1 | You know, we've had a number of times today where |
| | 2 | we've been unable to get evidence in because, you know, you |
| | 3 | can say what you did next, but you can't say, well, I looked |
| | 4 | at this spreadsheet and then I compared it to the phone record |
| 15:30:54 | 5 | and it's a spoof number. He's giving that conclusion which is |
| | 6 | what the State is trying to do. I just disagree that it's |
| | 7 | definitive evidence because I haven't looked behind it to see |
| | 8 | if they are right. It's just a spreadsheet to me. |
| | 9 | THE COURT: All right. What I'd like to do is if |
| 15:31:11 | 10 | you can give -- we need to take a break anyway. I want to |
| | 11 | look up one thing on the Judge's Benchbook. If you'll give me |
| | 12 | about five minutes. We'll just be in recess for five minutes. |
| | 13 | MR. TYNDALL: And I would say something else. It's |
| | 14 | not a business record. It might be a business record, but |
| 15:31:23 | 15 | it's not -- it's not a business record that's been certified |
| | 16 | and admissible as a business record. So there's not that |
| | 17 | exception. |
| | 18 | THE COURT: Five minutes. |
| | 19 | (Recess.) |
| 15:47:38 | 20 | THE COURT: To close out this objection, the |
| | 21 | defendant did make an objection basically under the |
| | 22 | confrontation clause. Having reviewed and considered it, I |
| | 23 | certainly do understand the State's argument for some latitude |
| | 24 | based on the defendant's testimony earlier today; however, we |
| 15:47:58 | 25 | still have to apply the Rules of Evidence. So consistent with |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| | | |
|---|---|---|
| *15:48:04* | 1 | that and for the record, Mr. Tyndall, I will sustain your |
| | 2 | objection; however, Mr. Zellinger, I will allow you to ask |
| | 3 | questions. I believe we did have some discussion in chambers |
| | 4 | about questions, and certainly in the Court's discretion I'll |
| *15:48:20* | 5 | allow you to answer those questions when the jury comes back. |
| | 6 | Okay? |
| | 7 | MR. ZELLINGER: Thank you, your Honor. |
| | 8 | Your Honor, I messed something up earlier that I |
| | 9 | need to put on the record. When I published that exhibit of |
| *15:48:29* | 10 | the defendant's phone number went to Angie Barbour, I have it |
| | 11 | in my list twice, and I said it was State's Exhibit 53, and it |
| | 12 | was actually State's Exhibit 47. I believe that's correct, |
| | 13 | madam clerk? |
| | 14 | CLERK: Yes. |
| *15:48:44* | 15 | THE COURT: So it actually is State's Exhibit 47. |
| | 16 | So when we come back, because the jury has been taking |
| | 17 | frenetic notes, I feel like I should correct that in front of |
| | 18 | them as well. |
| | 19 | THE COURT: All right. Let's get them back in. |
| *15:48:55* | 20 | (Jury enters.) |
| | 21 | THE COURT: Welcome back. There was objection |
| | 22 | before the break, and the Court in its discretion will sustain |
| | 23 | the objection; however, Mr. Zellinger, I'll allow you to ask |
| | 24 | questions consistent with what we discovered outside the |
| *15:51:24* | 25 | presence of the jury. |

| | | |
|---|---|---|
| 15:51:26 | 1 | MR. ZELLINGER:  Thank you, Your Honor. |
| | 2 | DIRECT EXAMINATION BY MR. ZELLINGER: |
| | 3 | Q.    Investigator Hoffman, where we left off, the |
| | 4 | defendant complained about some numbers texting him from like |
| 15:51:37 | 5 | an out of state area code? |
| | 6 | A.    That's correct. |
| | 7 | Q.    And do you recall what area code that was? |
| | 8 | A.    561. |
| | 9 | Q.    And the SBI acquired records, and did you conduct |
| 15:51:51 | 10 | your own independent investigation into those records as well? |
| | 11 | A.    I did. |
| | 12 | Q.    Based on that investigation, did that draw your |
| | 13 | attention to a specific entry in the defendant's phone |
| | 14 | records? |
| 15:52:04 | 15 | A.    It did. |
| | 16 | MR. ZELLINGER:  Your Honor, may you publish State's |
| | 17 | Exhibit 36? |
| | 18 | THE COURT:  Yes, sir. |
| | 19 | (State's Exhibit Number 36 published to the |
| 15:52:24 | 20 | jury.) |
| | 21 | Q.    Investigator Hoffman, as we pull that up, was it |
| | 22 | solely the area code that attracted your attention to this |
| | 23 | number? |
| | 24 | A.    The area code and the carrier for the service. |
| 15:52:52 | 25 | Q.    And at line -- it's hard to see.  On Line |

Richard Hoffman - Direct by Mr. Zellinger

| | | |
|---|---|---|
| 15:52:58 | 1 | 1618 -- first of all, is this the defendant's records? |
| | 2 | A. These are the defendant's T-Mobile records, yes. |
| | 3 | Q. Can you see Line 1618 on this document? |
| | 4 | A. You can. |
| 15:53:26 | 5 | Q. The defendant's phone number, is that listed as the |
| | 6 | call number, 3337? |
| | 7 | A. Yes. |
| | 8 | Q. That's 919-320-3337? |
| | 9 | A. Yes. |
| 15:53:37 | 10 | Q. And the number that sent the defendant a text |
| | 11 | message, is that -- can you read that number for the jury? |
| | 12 | A. 561-701-9736. |
| | 13 | Q. And that also is a 561 area code; is that correct? |
| | 14 | A. Yes. |
| 15:53:58 | 15 | Q. Just to be clear, that's May 8th of 2022? |
| | 16 | A. Yes. |
| | 17 | Q. And DeVan Barbour stated that he received a text |
| | 18 | message that the recordings were about to go out on May 9th of |
| | 19 | 2022? |
| 15:54:12 | 20 | A. Yes -- actually, no. He said that he got one |
| | 21 | later. He got one on April the 13th, that he got one shortly |
| | 22 | before he called Ms. Barbour. |
| | 23 | Q. And do you remember what date that was? |
| | 24 | A. It was May 12th. |
| 15:54:32 | 25 | Q. May 12th. Were you present for the defendant's |

15:54:35  1    testimony?

       2         A.    I was.

       3         Q.    And do you remember off the top of your head
       4    specifically everything DeVan Barbour told you?

15:54:44  5         A.    I don't.

       6              MR. ZELLINGER:  Your Honor, may I approach the
       7    witness?

       8              THE COURT:  Yes, sir.

       9              (State's Exhibit Number 79 marked for
15:54:48 10                  identification.)

      11              MR. ZELLINGER:  Your Honor, may I approach the
      12    witness?

      13              THE COURT:  Yes, sir.

      14         Q.    Did Mr. Barbour talk to you about the meeting that
15:55:24 15    you had on -- the meeting that he had with the defendant in
      16    his truck on April 25th of 2022?

      17         A.    Yes.  He described it.

      18         Q.    And would looking at this help refresh your memory
      19    as to exactly what he told you?

15:55:38 20         A.    Yes.

      21         Q.    Can you tell the jury exactly you what he told you?

      22         A.    He told me:  And um, I started about how, you know,
      23    implications of the campaign and turning it loose and all
      24    that, and if I can get Angie Barbour to write a letter saying
15:55:55 25    that all her side was a lie and stuff like that, that he would

Richard Hoffman - Direct by Mr. Zellinger

| | |
|---|---|
| *15:55:59* | 1 make sure the recording never got out.  So me rising in the |
| | 2 polls as an underdog in a pretty consequential election.  As |
| | 3 you can imagine, I'm thinking, number one, what in the hell is |
| | 4 she talking about; number two, so I'm thinking, oh, you know, |
| *15:56:16* | 5 obviously, the only term that I could come up with is |
| | 6 blackmail. |
| | 7        Do you want me to continue? |
| | 8 Q.   No. |
| | 9        MR. ZELLINGER:  Nothing further, Your Honor. |
| *15:56:31* | 10        THE COURT:  Mr. Tyndall. |
| | 11        MR. TYNDALL:  I don't have any questions for |
| | 12 Investigator Hoffman. |
| | 13        THE COURT:  Thank you very much. |
| | 14            (Witness excused.) |
| *15:56:39* | 15        MR. ZELLINGER:  Your Honor, can we approach? |
| | 16        THE COURT:  Yes, sir. |
| | 17            (Sidebar discussion.) |
| | 18        MR. ZELLINGER:  I made a mistake.  The State was |
| | 19 portraying State's Exhibit 47.  I said that we were portraying |
| *15:58:25* | 20 State's Exhibit 53, and it's actually State's Exhibit 47. |
| | 21 That is my fault.  I apologize. |
| | 22        THE COURT:  Yes, sir.  And my understanding your |
| | 23 next witness is in route just a few minutes out. |
| | 24        MR. ZELLINGER:  And I apologize, Your Honor.  We |
| *15:58:35* | 25 did everything we could. |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

| 15:58:37 | 1 | THE COURT: That's okay. Ladies and gentlemen, |
| | 2 | maybe only five minutes, but I told you when we get near the |
| | 3 | end of the trial there is going to be a little more in and |
| | 4 | out. Instead of making us all sit here and look at each |
| 15:58:49 | 5 | other, I'm going to let you step out. We'll get you as soon |
| | 6 | as that witness gets here. |
| | 7 | (Jury exits.) |
| | 8 | MR. ZELLINGER: The witness is here. |
| | 9 | THE COURT: Bring the jury in. |
| 15:58:57 | 10 | (Jury enters.) |
| | 11 | THE COURT: Mr. Zellinger, whenever you are ready. |
| | 12 | JAMES GRADY, |
| | 13 | having been called as a witness for the State and being duly |
| | 14 | sworn at 4:14 p.m., testified as follows: |
| 10:05:31 | 15 | DIRECT EXAMINATION BY MR. ZELLINGER: |
| | 16 | Q. Captain Grady, where do you work? |
| | 17 | A. Smithfield Police Department. |
| | 18 | COURT REPORTER: Can I get his full name, please? |
| | 19 | THE WITNESS: James Grady. |
| 16:14:44 | 20 | Q. And what is your role there? |
| | 21 | A. I'm a patrol captain. |
| | 22 | Q. Do you know the defendant, Ronald Johnson? |
| | 23 | A. Yes, sir, I do. |
| | 24 | Q. Does Smithfield Police Department have any records |
| 16:15:00 | 25 | of the defendant turning in a white iPhone that the defendant |

| | | |
|---|---|---|
| 6:15:03 | 1 | possessed? |
| | 2 | A.   No, sir, not that I could find. |
| | 3 | Q.   And did you ever meet with the defendant in the |
| | 4 | parking lot of a Food Lion to receive that phone? |
| 6:15:13 | 5 | A.   Not at the Food Lion, no, sir. |
| | 6 | Q.   Did you ever meet with the defendant? |
| | 7 | A.   Only once early on myself and Lieutenant West, just |
| | 8 | as standard procedure, we went to get his badge and gun at the |
| | 9 | time. |
| 6:15:29 | 10 | Q.   Did you ever meet with him at a Food Lion to get a |
| | 11 | phone? |
| | 12 | A.   No, sir, not that I recall. |
| | 13 | MR. ZELLINGER:  Nothing further, Your Honor. |
| | 14 | THE COURT:  Mr. Tyndall. |
| 16:15:36 | 15 | MR. ZELLINGER:  Just quickly. |
| | 16 | CROSS-EXAMINATION BY MR. TYNDALL: |
| | 17 | Q.   Captain Grady, do you call keep an inventory of |
| | 18 | items that are given to a police officer? |
| | 19 | A.   Yes, sir. |
| 16:15:48 | 20 | Q.   Did you keep an inventory of the items that were |
| | 21 | returned? |
| | 22 | A.   From my job, I handle most of the uniform, |
| | 23 | equipment type stuff.  The actual cellphones is -- their |
| | 24 | inventory is done through the detective lieutenant at the |
| 16:16:04 | 25 | time. |

| | | |
|---|---|---|
| 16:16:04 | 1 | Q. So you don't have an inventory one way or the |
| | 2 | other? |
| | 3 | A. No, sir, not for the cellphone. I personally do |
| | 4 | not. |
| 16:16:11 | 5 | MR. TYNDALL: Nothing further Your, Honor. |
| | 6 | MR. ZELLINGER: Nothing further, Your Honor. Thank |
| | 7 | you, Captain Grady. |
| | 8 | THE COURT: Thank you very much. |
| | 9 | (Witness excused.) |
| 16:16:27 | 10 | MR. ZELLINGER: Your Honor, the State rests. |
| | 11 | THE COURT: That's all the evidence? |
| | 12 | MR. ZELLINGER: Yes, Your Honor. |
| | 13 | THE COURT: All right. Members of the jury, at |
| | 14 | this point all the evidence has been presented. It will be |
| 16:16:31 | 15 | your duty in the morning to decide from the evidence what the |
| | 16 | facts are and to apply the law that I give to you in arriving |
| | 17 | at your verdict in this case. |
| | 18 | Prior to the arguments of the attorneys and |
| | 19 | instructions of the Court, I'm required to confer with the |
| 16:16:41 | 20 | lawyers about the law involved in this case. For this |
| | 21 | purpose, it is 4:15, I'm going to excuse you and ask that you |
| | 22 | be back at 9:30 in the morning. We should be ready to go with |
| | 23 | closing arguments at that time. |
| | 24 | I just want to give you the same cautionary |
| 16:16:56 | 25 | instructions that you've heard before. Even though the |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Defense motions

| | |
|---|---|
| 16:16:58 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 16:17:11 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 16:17:28 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 16:18:05 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 16:18:17 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 16:18:35 | 25 |

1    evidence has been presented, you've not yet heard the

2    arguments of counsel or the instructions of the Court.  All

3    those rules remain in effect.  Please do not let your mind be

4    made up.  Please do not discuss this case with each other.  Do

5    not let anybody discuss it with you.  Do not talk or

6    communicate in any way with any of the parties connected to

7    this, and please don't do anything on your own to learn

8    anymore.  That means Google anything, please avoid any news or

9    television reports you might see.  Just stay away from it all,

10   and we will see you back at 9:30 in the morning.  Thank you

11   very much.

12                    (Jury exits.)

13            THE COURT:  Thank you all very much.

14            MR. TYNDALL:  Go ahead.

15            THE COURT:  I was just going to say, at the close

16   of all the evidence, any motions or other matters from either

17   side?

18            MR. TYNDALL:  Your Honor, Mr. Bruder is going to do

19   that, but I did want to clarify something.  Throughout the

20   trial I have objected as subtly as I could based on the

21   pretrial motion.  Of course I just want to clarify that the

22   motions to suppress that were filed and that the Court ruled

23   on, either a prior judge or you ruled on.  So I just wanted to

24   make that clear for the record.

25            THE COURT:  Yes, sir.  Yes, sir.  Thank you very

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

Defense motions

| | | |
|---|---|---|
| 16:18:36 | 1 | much. |
| | 2 | Any motions at the close of all evidence? |
| | 3 | MR. BRUDER: Yes, Your Honor. First, the defendant |
| | 4 | would move again in opposition of joinder and to sever. |
| 16:18:48 | 5 | THE COURT: Yes, sir. Mr. Zellinger, any response |
| | 6 | to that? |
| | 7 | MR. ZELLINGER: Your Honor, just the same argument |
| | 8 | I made yesterday. |
| | 9 | THE COURT: Yes, sir. The Court will maintain |
| 16:18:55 | 10 | consistent. I appreciate that argument. However, that will |
| | 11 | be denied. |
| | 12 | MR. BRUDER: Then secondly, Your Honor, the |
| | 13 | defendant would again move dismiss for the insufficiency of |
| | 14 | the evidence with respect to each count for the reasons argued |
| 16:19:08 | 15 | yesterday. |
| | 16 | THE COURT: Okay. We'll adopt your full argument |
| | 17 | from yesterday, as well as the documents and case law |
| | 18 | submitted. |
| | 19 | Mr. Zellinger, any argument on behalf of the State? |
| 16:19:17 | 20 | MR. ZELLINGER: No, Your Honor. Just the same |
| | 21 | argument as yesterday. |
| | 22 | THE COURT: At the close of all the evidence, |
| | 23 | again, I do appreciate that motion. In the Court's discretion |
| | 24 | it will be denied. |
| 16:19:26 | 25 | What I'd like to do is move on directly to the |

Defense motions

| | |
|---|---|
| 16:19:29 | 1 charge conference and get everything on the record we need to |
| | 2 get on the record so we can get our court staff out of here. |
| | 3 I'm going to ask our clerk to prepare a verdict |
| | 4 sheet. It's my understanding it's going to be guilty or not |
| 16:19:43 | 5 guilty of the felony extortion. Two counts of felony |
| | 6 discharge duty, that is to be guilty or not guilty. One count |
| | 7 felony obstruction of justice, and we will put a lesser |
| | 8 included in there for common law obstruction, I believe. Is |
| | 9 that consistent with everybody's understanding? |
| 16:20:03 | 10 MR. TYNDALL: Yes, Your Honor. |
| | 11 THE COURT: Mr. Zellinger? |
| | 12 MR. ZELLINGER: Yes, Your Honor. |
| | 13 THE COURT: If you can help us prepare that. |
| | 14 Just for the record, we kind of had sort of an |
| 16:20:14 | 15 informal conference while we were trying to make use of our |
| | 16 time. Here are the charges that I have. I'm just going to |
| | 17 read them on the record and make sure we're in agreement. |
| | 18 Function of the jury, making notes by jurors, |
| | 19 burden of proof, reasonable doubt, credibility of the witness, |
| 16:20:30 | 20 weight of the evidence, circumstantial evidence, testimony of |
| | 21 witnesses with immunity. We will remove 101.30 which is the |
| | 22 defendant's decision not to testify. We have photographs and |
| | 23 maps as illustrative evidence. We have videos as substantive |
| | 24 evidence. Then we have the two charges that there are pattern |
| 16:20:57 | 25 instructions for. One is 220.80, that is the extortion |

| | |
|---|---|
| 16:21:02 | 1   charge. The second one is 230.62, that is the misdemeanor |
| | 2   common law obstruction. We're going to have to draft that to |
| | 3   make it a felony. That's the one that will have the lesser |
| | 4   included. Also, we're going to have to draft from common law |
| 16:21:24 | 5   the charges to the failing to discharge duty. |
| | 6          Mr. Zellinger, I'll start with the State. Are |
| | 7   those instructions -- and what we'll do, just to let you know, |
| | 8   is once we get an agreement on what's on there, I'm going to |
| | 9   print them off, then what I'd like to ask is that we very |
| 16:21:41 | 10   informally let everybody else go, we go in chambers, we |
| | 11   continue working on this tonight to make all the changes we |
| | 12   need to make and get anything on the record in the morning if |
| | 13   that's satisfactory to you. |
| | 14          MR. ZELLINGER: That's satisfactory to the State. |
| 16:21:54 | 15          Your Honor, as to the proposed instructions, the |
| | 16   one thing -- I think that we did this in a bench conference. |
| | 17   I just want to memorialize it on the record. My understanding |
| | 18   is that the defendant is requesting a misdemeanor obstruction |
| | 19   of justice lesser included to be added, and I just want the |
| 16:22:08 | 20   defendant to say that on the record. |
| | 21          THE COURT: That's a good point. |
| | 22          Mr. Tyndall, we did have that discussion off the |
| | 23   record. Is it your intention to ask for a misdemeanor lesser |
| | 24   included on that charge? |
| 16:22:23 | 25          MR. BRUDER: That's correct. We believe that |

Defense motions

| | | |
|---|---|---|
| *16:22:24* | 1 | instruction is appropriate. |
| | 2 | THE COURT: All right. Mr. Zellinger, is there any |
| | 3 | other charges that you would ask to be added at this point? |
| | 4 | MR. ZELLINGER: No, Your Honor. I believe the |
| *16:22:33* | 5 | State is satisfied with those. |
| | 6 | THE COURT: Anything else on behalf of the |
| | 7 | defendant? |
| | 8 | MR. BRUDER: Outside -- at this point, no, Your |
| | 9 | Honor. |
| *16:22:44* | 10 | THE COURT: Is there anything else we need to get |
| | 11 | on the record? I've already got them for the most part |
| | 12 | printed. We're going to close court, step back in chambers, |
| | 13 | go through what we have here. |
| | 14 | But for the record, before I dismiss everybody for |
| *16:22:59* | 15 | the afternoon, is there anything either side needs to get on |
| | 16 | the record? |
| | 17 | MR. ZELLINGER: Not for the State, Your Honor. |
| | 18 | MR. BRUDER: Not from the defense, Your Honor. |
| | 19 | THE COURT: Okay. We'll be in recess until 9:30 in |
| *16:23:12* | 20 | the morning. |
| | 21 | You guys take a few minutes, get yourself together, |
| | 22 | and I'll meet new the back, if I could. |
| | 23 | (Adjourned at 4:23 p.m.) |
| | 24 | (END OF VOLUME 9 of 10.) |
| | 25 | |

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

IN THE NORTH CAROLINA GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
JOHNSTON COUNTY

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

STATE OF NORTH CAROLINA,   :   File No. 23 CRS 003494-500

    versus   :

RONALD LEE JOHNSON, JR.,   :
          Defendant.     Pages:   1175-1219

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TRANSCRIPT VOLUME 10 OF 10

Friday, January 17, 2025

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Transcript of proceedings in the General Court of

Justice, Superior Court Division, Johnston County, 207 East

Johnston Street, Smithfield, North Carolina, at the January 6,

2025, Criminal Session, before the Honorable Joseph

Crosswhite, Judge Presiding.

APPEARANCES:

    Benjamin O. (Boz) Zellinger
    Arneatha James
    Special Deputy Attorney General
    Raleigh, NC 27603
    On Behalf of the State

    Amos G. Tyndall
    Valentin J. Bruder
    Parry Law
    Chapel Hill, NC
    On Behalf of the Defendant

---

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter
N.C. Administrative Office of the Courts
denise.stclair@nccourts.org

INDEX

Jury charge conference                    1177

Jury charge                               1188

Jury deliberates                          1199

Verdict                                   1201

Sentencing                                1204

SENTENCING HEARING TESTIMONY:

Vivian Maynor                             1207

Rick Walker                               1208

Gloria Thornton                           1210

EXHIBITS

COURT EXHIBITS:

1     Charges-lesser included offenses    1182   1182

1    (Commencing at 9:16 a.m.)

2         THE COURT:    There's a couple things to get on the

3    record.   Yesterday afternoon after court we met in chambers.

4    We had an another hour or so worth of work on the jury

5    instructions.   I believe the parties continued to work on them

6    after they went home.

7         The first thing I want to do is the two charges for

8    willful failing -- the failure to discharge duties.   We do

9    need to get some argument on the record.   There was

10   conversation about whether that should be two elements or

11   three elements with the possibility of a third element being

12   injury to the public.   And I'll let the defense be heard on

13   that, if you would.

14        MR. BRUDER:    Thank you, Judge.   It's our position

15   that third element, injury to public, is required to be

16   instructed to the jury.   We're basing that off the Anderson

17   line of cases.   Anderson is 196 North Carolina 771 from 1929;

18   and also the Rone case, that's 120 N.C. App 278 from 1994; and

19   then also the Birdsong case which is 325 North Carolina 418

20   from 1989.   We think each of those cases state that the injury

21   to the public is a judicially recognized element of the

22   offense.   We think it's critical to the underlying purpose for

23   the offense being a criminal offense, the legislature's

24   adoption, and we would ask that it be instructed to the jury

25   as an element of the offense.

1    THE COURT:  Yes, sir.  Just so I'm clear, and so

2   the record is clear, it's your contention that the three

3   elements ought to be, number one, that the defendant was an

4   official of a state institution; number two, willfully failed

5   to fulfill the duties of that office; and number three, injury

6   to the public was as a result of his actions.  Is that correct

7   or some form thereof?

8    MR. BRUDER:  Essentially, Your Honor.

9    THE COURT:  Thank you.

10    Ms. James, I'll let you be heard on that.

11    MS. JAMES:  In Birdsong I think the Court stated

12   that it was actually two elements, and that the public injury

13   was baked in.  It was like a judicial acknowledgment

14   essentially, and I think that was the strongest language for

15   stating that it was two elements only.  So we're asking that

16   you just instruct on that the offense occurred when he was a

17   school board -- a member of the Johnston County School Board,

18   and that the second one being he willfully, omitted,

19   neglected, or refused to discharge his duties of his office by

20   recording a closed session or in violation of his board

21   duties.  That's what the State asks for.

22    THE COURT:  Yes, ma'am.  Just to get a couple

23   things on the record to make sure we are clear.  Both sides do

24   agree that there is no pattern jury instruction for these

25   charges; is that right?

1   　MS. JAMES:   That is correct, Your Honor.

2   　THE COURT:   Both sides do agree there's really no

3   clear statute that would governor -- I mean, there is a

4   statute that controls, but no statute that gives the elements

5   that we need.   So I think everybody's understanding this is

6   going to be a common law instruction; is that right?

7   　MS. JAMES:   That's correct, Your Honor.

8   　THE COURT:   The third thing that we did discuss and

9   I want to get on the record, it seems like there are not many

10  cases and the cases we do have are not completely clear; is

11  that -- would that be a fair assessment?

12  　MS. JAMES:   That would be a fair assessment.

13  　MR. BRUDER:   I think that's right.

14  　THE COURT:   Looking at this.   Here's the argument

15  of both sides.   I did review all the cases.   It does appear

16  the 1989 cases, Birdsong has language that will be most on

17  post.   The Court will adopt that language.   I'll use the

18  language.

19  　The offense has two statutory components.   One,

20  that the defendant be an official of a state institution; and,

21  two, that he willfully failed to discharge the duties of his

22  office.   Injury to the public is a judicially recognized

23  element of the crime.

24  　Ms. James, I believe that does go back to your

25  argument that it is essentially baked in.   So the Court

1   adopting that language in its discretion will charge on the

2   first two elements of this, and we'll certainly note the

3   defendant's objection to that as you would like me to.

4           MR. BRUDER:  Thank you, Your Honor.

5           THE COURT:  The other thing I want to do is go back

6   and get some of the things on the record about the extortion

7   charge 220.80.  Under the first element, and I believe this is

8   at the defendant's request, they want that first element to

9   read, first, that the defendant threatened or communicated a

10   threat to the victim.  The second part in the parentheticals,

11   it is your request to have that removed; is that correct?

12           MR. BRUDER:  Yes.  Correct.  We would ask that the

13   parenthetical that says describe threat (is a threat) be

14   removed.

15           THE COURT:  Ms. James, does the State wish to be

16   heard on that?

17           MS. JAMES:  We do not wish to be heard on that,

18   Your Honor.

19           THE COURT:  The second element -- again, this is at

20   the defendant's request.  That element is to read, second,

21   that the defendant did this with the intent to obtain an

22   advantage.  And just leave it at that; is that correct?

23           MR. BRUDER:  That's correct, Your Honor.

24           THE COURT:  And Ms. James, does the State wish to

25   be heard on the second element?

1    MS. JAMES:  No, Your Honor.

2    THE COURT:  Then the third element to that we're

3  going to modify that so that it will read:  The defendant

4  intended to obtain a statement from Angela Barbour recanting

5  the affair wrongfully; that is, knowing that he was not

6  entitled to obtain in this matter.  I believe that was by

7  mutual agreement that that change was made; is that correct?

8    MR. BRUDER:  That's correct.  I believe that

9  essentially tracks the language of the pattern jury

10  instruction with the object of the threat being described.

11    THE COURT:  Ms. James, anything on behalf of the

12  State?

13    MS. JAMES:  That's correct.  That's the language we

14  agreed on.  It's from the indictment.

15    THE COURT:  This is again at the defendant's

16  request.  The obstruction of justice, 260.62, that will

17  include the lesser included offense.  And I believe the change

18  on that we both agreed on is the first one is to say that the

19  defendant has been charged with felony obstruction of justice;

20  and then the second one, if they do not return a verdict of

21  guilty to that, then they must consider common law obstruction

22  of justice.  I don't remember if that was at the defendant's

23  request or if that was by mutual agreement of the parties.

24    MR. BRUDER:  The defendant requested the lesser

25  instruction for the common law misdemeanor, and I think that

1  language is a consequence of that request.

2              THE COURT:  So you concur with that?

3              MR. BRUDER:  We concur with that.

4              THE COURT:  Ms. James, anything on behalf of the

5  State in that regard?

6              MS. JAMES:  No, Your Honor.  That was agreed on and

7  that was to distinguish the felony from the lesser included.

8              THE COURT:  And what we'll do is these changes will

9  be made.  I am going to print out at this point a single copy

10  that I'm going to mark as Court's 1 that incorporates those

11  changes.  I'm going to let you both review that, be heard

12  again because that's the one that we will read to the jury; is

13  that correct?

14              (Court's Exhibit Number 1 marked for

15              identification and entered into evidence.)

16              MS. JAMES:  That is correct, Your Honor.  And just

17  for the record, the parties did add the definition of intent,

18  120.10.  I do have printed copies for everyone.  I'll pass

19  those around.

20              THE COURT:  Is that the completed instructions?

21              MS. JAMES:  Yes.

22              THE COURT:  The only other thing I did notice, the

23  two misdemeanors, we need to put a preamble in there.  I added

24  that in there.  I think you guys found that and corrected that

25  over night; is that correct?

1     MS. JAMES:  Yes, Your Honor.

2     MR. BRUDER:  That's correct.

3     MS. JAMES:  We need to get on the record that the

4  defense agreed to add in the definition of intent for the

5  record.

6     MR. BRUDER:  We did.

7     THE COURT:  I am going to identify that as Court's

8  1.  That's going to be the copy that is going to be read to

9  the jury.  I'm going to ask you guys both to please read that

10  carefully and make sure you are satisfied with that.

11     These verdict sheets, can I get you both to look at

12  the verdicts sheets.

13     We're going to be at ease for a few minutes.  I'll

14  ask when I come out if you've had a chance to review the

15  amended instructions and if you are satisfied with that, then

16  the same thing on the verdict sheets.  So why don't you guys

17  take a few mintues on that.

18     I have an unrelated call I need to make.  I'll be

19  back out in a just a couple of minutes.

20          (Court at ease.)

21     THE COURT:  We have all our jurors.  Before we

22  bring them out, there's a couple of things.  I believe there's

23  been circulated a final addition of the jury instructions.

24  I'm going to start with the State.  Has the State had the

25  opportunity to review that with the changes, and is there any

1  objection on behalf of the State?

2          MS. JAMES:  Not from the State, Your Honor.

3          THE COURT:  And for the defendant, same question.

4  Has the defendant had an opportunity to review those with the

5  changes?  Anything for the record on behalf of the defendant?

6          MR. BRUDER:  We would renew our objection to the

7  third element of the willful failure instruction, but

8  otherwise no objection.

9          THE COURT:  Yes, sir.  I'll certainly note that,

10  but other than that, you're satisfied, and we do have the

11  ruling on that under the Court's ruling.

12          MR. BRUDER:  Yes, Your Honor.

13          THE COURT:  We'll certainly note that, but

14  otherwise, you are fine with these?

15          MR. BRUDER:  Otherwise, no objection.

16          THE COURT:  Finally, have you guys had an

17  opportunity to review the verdict sheets?

18          MS. JAMES:  Yes, Your Honor.

19          THE COURT:  Are you satisfied with them?

20          MS. JAMES:  Yes, Your Honor.

21          MR. BRUDER:  Yes, Your Honor, to both.

22          THE COURT:  And I believe the order of argument

23  when the jury comes out, the defense will go first, followed

24  by the State.  The State's waiving the two arguments.  You are

25  just going to argue last?

1    MR. ZELLINGER:  That's correct, Your Honor.

2    THE COURT:  Is there anything else we need to get

3  on the record before we bring the jury out from either side?

4    MS. JAMES:  Not from the State, Your Honor.

5    MR. BRUDER:  Not from the defendant, Your Honor.

6    THE COURT:  Mr. Tyndall, I'll ask you since you are

7  up first, are you ready for the jury?

8    MR. TYNDALL:  I am, Your Honor.

9    THE COURT:  Mr. Zellinger, are you ready for the

10  jury?  I know you asked for a brief recess to get set up, but

11  are you otherwise ready?

12    MR. ZELLINGER:  Yes.  The State is otherwise ready.

13  I want to set up at the conclusion of Mr. Tyndall's argument.

14    THE COURT:  You can bring them in.

15    (Jury enters.)

16    THE COURT:  Everybody, good morning.  As you may

17  recall from yesterday, all the evidence has been presented.

18  It is now time for the final arguments of the attorneys.  At

19  the conclusion of these arguments, I will instruct you on the

20  law in this case, and then you will be taken to the jury room

21  to begin your deliberations.

22    The final arguments is not evidence but is given to

23  assist you in evaluating the evidence.  The lawyers are

24  permitted in their final statements to argue, to characterize

25  the evidence, and to attempt persuade you to a particular

1  verdict.

2         It is improper for the lawyer abusive, to inject

3  personal experiences, or to express a personal belief as to

4  the truth or falsity of the evidence.  The lawyer may,

5  however, argue any position or conclusion with respect to a

6  matter in issue.  If in the course of making their final

7  arguments the attorney attempts to restate a portion of the

8  evidence to you and your recollection differs from that of the

9  attorneys, you are to be guided by your own recollection as to

10 what that evidence was.

11        Before I turn this over to the attorneys, I just

12 want to take this opportunity to thank you guys.  Again, two

13 weeks ago we picked you for this trial.  You guys have been

14 attentive.  You've been on time.  You know, both sides

15 appreciate that.  I think I said it two weeks ago, most

16 countries don't have a jury trial system.  We're lucky that we

17 do, but it only works because of people like you willing to

18 come in and do it.  So with my thanks and I know the thanks of

19 everyone else, we appreciate your willingness to participate

20 in this trial.

21        Mr. Tyndall, whenever you are ready.

22        MR. TYNDALL:  Thank you, Your Honor.

23            (Closing arguments.)

24        THE COURT:  Ladies and gentlemen, while

25 Mr. Zellinger gets set up.  It's going to take about five or

1  ten minutes.  We'll take a short beak.  I'll let you step out

2  for a little bit.  A quick reminder you now heard the closing

3  arguments from defendant.  You have not heard it from the

4  State or the instructions of the Court.  You are not yet at

5  the point of deliberations.  All those same rules remain in

6  effect.

7          Thank you very much.  We'll see you back in about

8  ten minutes.

9          (Jury exits.)

10          THE COURT:  Ten minutes.  We'll be back at 10:25.

11          (Recess.)

12          THE COURT:  Are you ready?

13          Can you guys come up for one minute, please?

14          (Sidebar.)

15          THE COURT:  Welcome back.  Mr. Zellinger, whenever

16  you are ready.

17          (Closing argument by Mr. Zellinger.)

18          THE COURT:  It's going to take me about 20 minutes

19  to read the law to you.  Before we start, why don't we take

20  about another 10 minutes.  I just remind you, you have not

21  heard the law.  You are not at the point of your

22  deliberations.  All the rules remain effect.  See you back

23  11:45 by the clock in the back.

24          (Recess.)

25          THE COURT:  Anything for either side before we

1  bring the jury back out?

2          MR. ZELLINGER:  No, Your Honor.

3          MR. TYNDALL:  No, sir.

4          THE COURT:  Members of the jury, all the evidence

5  has been presented.  It's now your duty to decide from this

6  evidence what the facts are.  You must then apply the law

7  which I'm about to give to you to those facts.  It's

8  absolutely necessary that you understand and apply the law as

9  I give it to you and not as you think it is or as you might

10  like it to be.  This is important because justice requires

11  that everyone tried for the same crime be treated in the same

12  way and have the same law applied.

13          In this case you have been allowed to take notes.

14  When you begin your deliberations, you may use you are notes

15  to help refresh your memory as to what was said in court.  I

16  caution you, however, not to give your notes or the notes of

17  any other jurors undue significance.  While taking notes a

18  juror may fail to hear important portions of the testimony.

19  Any notes taken by you are not to be considered evidence in

20  this case.  Your notes are not an official transcript of the

21  trial.  For that reason, you must remember that in your jury

22  deliberations your notes are not entitled to any greater

23  weight than the individual recollection of other jurors.

24          The defendant has entered a plea of not guilty.

25  The fact that the defendant has been charged is no evidence of

1 | guilt.  Under our system of justice when a defendant pleads
2 | not guilty, the defendant is not required to prove the
3 | defendant's innocence.  The defendant is presumed to be
4 | innocent.  The State must prove to you that the defendant is
5 | guilty beyond a reasonable doubt.

6 | A reasonable doubt is a doubt based on reason and
7 | common sense arising out of some or all of the evidence that
8 | has been presented or lack or insufficiency of the evidence,
9 | as the case may be.  Proof beyond a reasonable doubt is proof
10 | that fully satisfies or entirely convinces you of the
11 | defendant's guilt.

12 | You are that sole judges of the believability of
13 | witnesses.  You must decide for yourself whether to believe
14 | the testimony of any witness.  You may believe all, any part,
15 | or none of a witness' testimony.  In deciding whether to
16 | believe a witness, you should the use the same tests of
17 | truthfulness that you use in your everyday lives.  Among other
18 | things, these tests may include the opportunity of the witness
19 | to see, hear, know, or remember the facts or occurrences which
20 | the witness testified; the manner and appearance of the
21 | witness; any interest, bias, prejudice, or partiality the
22 | witness may have; the apparent understanding and fairness of
23 | the witness; whether the testimony is reasonable; and whether
24 | the testimony is consistent with other believable evidence in
25 | the case.

1  You are the sole judges of the weight to be given

2  any evidence.  If you decide that certain evidence is

3  believable, you must then determine the importance of that

4  evidence in light of all other believable in the case.

5  There are two types of evidence from which you may

6  find the truth as to the facts of a case - direct and

7  circumstantial evidence.  Direct evidence is the testimony of

8  one who asserts actual knowledge of a fact, such as an

9  eyewitness.  Circumstantial evidence is proof of a chain or

10  group of facts and circumstances indicating the guilt or

11  innocence of a defendant.  The law makes no distinction

12  between the weight to be given to either direct or

13  circumstantial evidence, nor is a greater degree of certainty

14  required of circumstantial evidence than of direct evidence.

15  You should weigh all the evidence in the case.

16  After weighing all the evidence, if you are not convinced of

17  the guilt of the defendant beyond a reasonable doubt, you must

18  find the defendant not guilty.

19  There is evidence which tends to show that a

20  witness testified under a grant of immunity.  If you find that

21  the witness testified for this reason in whole in part, you

22  should examine this testimony with great care and caution.  If

23  after doing so you believe the testimony in whole or in part,

24  you should treat what you believe the same as any other

25  believable evidence.

1    Photographs and maps were introduced into evidence

2    in this case for the purpose of illustrating and explaining

3    the testimony of a witness.  These photographs and maps may

4    not be considered by you for any other purpose.

5    Photographs, audio recordings, videos, and other

6    digital evidence were introduced into evidence in this case.

7    This evidence may be considered by you as evidence of facts it

8    illustrates or shows.

9    Intent is a mental attitude seldom provable by

10   direct evidence.  It must ordinarily be proven by

11   circumstances from which it may be inferred.  You arrive at

12   the intent of a person by such just and reasonable deductions

13   from the circumstances proven as a reasonably prudent person

14   would ordinarily draw therefrom.

15   The defendant has been charged with extortion.  For

16   you to find the defendant guilty of this offense, the State

17   must prove three things beyond a reasonable doubt:  First,

18   that the defendant threatened or communicated a threat to the

19   victim.

20   Second, that the defendant did this with the intent

21   to obtain an advantage.

22   And third, that the defendant intended to obtain a

23   statement from Angela Barbour recanting the affair wrongfully;

24   that is, knowing that he was not entitled to obtain it in this

25   manner.

1  If you find from the evidence beyond a reasonable

2  doubt that on or about the alleged date that the defendant

3  threatened or communicated a threat to the victim with the

4  intent to obtain an advantage wrongfully, it would be your

5  duty to return a verdict of guilty. If you do not so find or

6  have a reasonable doubt as to one or more of these things, it

7  would be your duty to return verdict of not guilty.

8  The defendant has been charged with willful failure

9  to discharge duties. For you to find the defendant guilty of

10 this offense, the State must prove two things beyond a

11 reasonable doubt:

12 First, that the defendant was at the time of this

13 offense a member of the Johnston County School Board; and

14 second, that he willfully omitted, neglected, or refused the

15 discharge of duty of his office by recording a closed session

16 of the Johnston County Board of Education meeting in violation

17 of his board duties.

18 If you find from the evidence beyond a reasonable

19 doubt that on or about the alleged date that the defendant was

20 a member of the Johnston County School Board and that he

21 willfully omitted, neglected, or refused the discharge of duty

22 of his office by recording a closed session of the Johnston

23 County Board of Education in violation of his board duties, it

24 would be your duty to return a verdict of guilty. If you do

25 not so find or have a reasonable doubt as to one or more of

1  these things, it would be your duty to return a verdict of not

2  guilty.

3          The defendant has been charged with willful failure

4  to discharge duties.  For you to find the defendant guilty of

5  this offense, the State must prove two things beyond a

6  reasonable doubt:

7          First, that the defendant was at the time of this

8  offense a member of the Johnston County School Board; and

9  second, that he willfully omitted, neglected, or refused to

10  discharge a duty of his office by attempting to have two high

11  school special needs students transferred to another school as

12  an act of personal retaliation in violation of his board

13  duties.

14          If you find from the evidence beyond a reasonable

15  doubt that on or about the alleged date the defendant was a

16  member of the Johnston County School Board, and that he

17  willfully omitted, neglected, or refused to discharge a duty

18  of his office by attempting to have two Clayton High School

19  special needs students transferred to another school as an act

20  of personal retaliation in violation of his board duties, it

21  would be your duty to return a verdict of guilty.  If you do

22  not so find or have a reasonable doubt as to one or more of

23  these things, it would be your duty to return a verdict of not

24  guilty.

25          The defendant has been charged with felony

1    obstruction of justice.  For you to find the defendant guilty

2    of this offense, the State must prove three things beyond a

3    reasonable doubt:

4            First, that the defendant obstructed justice by

5    removing evidence related to the alleged criminal activity

6    from Clayton Fitness, Incorporated.  Obstruction of justice

7    consists of any act that prevents, obstructs, imposes or

8    hinders public or legal justice; second, that the defendant

9    acted unlawfully and willfully; and third, that the offense

10   was done with the deceit, intent to fraud, or with secrecy and

11   with malice.

12           If you find from the evidence beyond a reasonable

13   doubt that on or about alleged date, the defendant unlawfully

14   and willfully obstructed justice by removing evidence related

15   to the alleged criminal activity from Clayton Fitness,

16   Incorporated, and it was done with deceit and intent to

17   defraud or in secrecy and with malice, it would be your duty

18   to return verdict of guilty.

19           If you do not so find or have a reasonable doubt as

20   to one or more of these things, you will not return a verdict

21   of guilty but must consider whether the defendant is guilty of

22   common law obstruction of justice.

23           For you to find the defendant guilty of common law

24   obstruction of justice, the State must prove two things beyond

25   a reasonable doubt:

1   First, that the defendant obstructed justice by

2   removing evidence related to the alleged criminal activity

3   from Clayton Fitness, Incorporated. Obstruction of justice

4   consists of any act that prevents, obstructs, imposes or

5   hinders public or legal justice; and second, that the

6   defendant acted unlawfully and willfully.

7   If you find from the evidence beyond a reasonable

8   doubt that on or about the alleged date the defendant

9   unlawfully and willfully obstructed justice by removing

10   evidence related to the alleged criminal activity from Clayton

11   Fitness, Incorporated, it would be your duty to return a

12   verdict of guilty. If you do not so find or have a reasonable

13   doubt as to one or both of these things, it would be your duty

14   to return a verdict of not guilty.

15   Members of the jury, you've heard the arguments of

16   counsel. If your recollection of the evidence differs from

17   the attorneys, you are to rely solely upon your recollection.

18   Your duty is to remember the evidence whether called to your

19   attention or not. You should consider all of the evidence,

20   arguments, contentions, and positions urged by the attorneys

21   and any other contention that arises from the evidence.

22   The law requires the presiding judge to be

23   impartial. You should not infer from anything that I have

24   done or said that the evidence is to be believed or

25   disbelieved, that a fact has been proven or what your findings

1  ought to be.  It is your duty to you find the facts and to

2  render a verdict reflecting the truth.  All 12 of you must

3  agree to your verdict.  You cannot reach a verdict by majority

4  vote.

5          When you have agreed upon a unanimous verdict as to

6  each charge, your foreperson should so indicate on the verdict

7  form.

8          At this time we've gotten to the point of

9  deliberations, and our two alternates who have been with us

10 every day for the past two weeks, I can't let you go further

11 from here.  I also can't release you.  We're going to excuse

12 you from the jury at this time, and we're going to have you

13 kept in another location.  We won't forget about you.  But

14 when the jury has reached a verdict, we'll come get you.  At

15 this point, we'll let you follow him.

16          (Alternates exit.)

17          THE COURT:  Ladies and gentlemen, after reaching

18 the jury room, your first order of business will be to select

19 your foreperson.  You may begin your deliberations when the

20 bailiff delivers the verdict forms to you.  Your foreperson

21 should lead the deliberations.

22          When you have unanimously agreed upon a verdict as

23 to each charge and are ready to announce them, your foreperson

24 should record your verdicts, sign and date the verdict forms,

25 and notify the bailiff by knocking on the jury room door.  You

1    will then be returned to the courtroom and your verdict will

2    be announced.

3             Thank you.  You can retire and select your

4    foreperson.

5                  (Jury exits to select foreperson.)

6             THE COURT:  Any comments, corrections, or concerns

7    from either side?

8             MS. JAMES:  Not from the State, Your Honor.

9             MR. BRUDER:  Not from the defense, outside of

10   renewing the objection based on the third element.

11            THE COURT:  So noted.

12            The packet is ready.  The verdict sheets are in

13   there.  I offer either side an opportunity to review them

14   again if you'd like to before it goes back.

15            MR. ZELLINGER:  The State is satisfied.

16            MR. TYNDALL:  No, Judge.

17            THE COURT:  We'll sit here until we get

18   notification that they've selected a foreperson and let them

19   begin their deliberations.

20                  (Court at ease.)

21            SHERIFF:  They have their foreperson.

22            THE COURT:  Anything from either side?

23            MR. ZELLINGER:  No, Your Honor.

24            MR. TYNDALL:  No, Your Honor.

25            THE COURT:  Court will be at ease.

```
 1                  (Court at ease.)

 2                  (Jury enters.)

 3          THE COURT:  I've been told you guys would like to

 4   take a lunch break.  At this point I'm going to leave it up to

 5   your schedule.  We can go to 2 or an hour and have you back at

 6   1:45.  You know how much time you guys would like to take.

 7          FOREPERSON:  One has to go home and get her

 8   medicine.  Hour and a half.

 9          THE COURT:  2:15 is that what you are thinking?

10          FOREPERSON:  Yes.

11          THE COURT:  If you can hand the verdict packet

12   over, we'll collect that up.

13              To let you know, when you come back from lunch,

14   just all 12 jurors can report directly back to your room.  You

15   can go back to where you were.  When we get the report that

16   we've got all 12 primary jurors back, we can send it back and

17   you can continue your deliberations.

18              A reminder.  While you are at lunch, while you

19   started your deliberations, you can't deliberate.  Again, the

20   only time you can talk about this is when all 12 of you are

21   present, the package is back with you and you've been told to

22   begin your deliberations.  So until then, all those same rules

23   you've been under are in effect.  Don't talk about it.  Don't

24   learn about it from any source or talk about it among

25   yourselves.
```

1          Just leave your notes right there on your chair.

2  See you back at 2:15.

3          (Jury exits.)

4          THE COURT:  Anything before we break?

5          MR. ZELLINGER:  Not from the State.

6          MR. TYNDALL:  Not from defense.

7          THE COURT:  2:15.

8          (Lunch recess.)

9          THE COURT:  They are asking for a copy of the law

10  or file for a closed session school board meeting.  After

11  discussing it with both attorneys, Mr. Zellinger, I believe

12  you're all in agreement on what needs to go back.  I'll let

13  you put your response on the record.

14          MR. ZELLINGER:  One moment, Your Honor.  Your

15  Honor, I believe it's State's Exhibit, which is Policy Code

16  2321, closed session.  And then I believe the other is State's

17  Exhibit 19 which is North Carolina G.S. 143-318.11.

18          THE COURT:  All right.  Mr. Tyndall, do you agree

19  with those two?

20          MR. TYNDALL:  I agree that they are the exhibits

21  that relate to closed session.

22          THE COURT:  Mr. Zellinger, I ask that you get those

23  together.  Just show them to Mr. Tyndall.  Once you guys are

24  in agreement on it, it can go directly back.

25          MR. ZELLINGER:  Your Honor, I would just ask if it

1   can go back to the jurors if the defendant has no objection.

2           THE COURT:  We'll get that on the record.  I want

3   to make sure both sides have looked at it.

4           MR. ZELLINGER:  Yes, Your Honor.

5           THE COURT:  Have you looked at this?

6           MR. TYNDALL:  We don't object to that instead of

7   bringing them out.

8           THE COURT:  No objection.  We'll send it directly

9   out to them.

10          (State's Exhibits sent to jury at 5:08 p.m.)

11          THE COURT:  Everybody that's with us, stayed with

12  us, I have been told the jury has reached a unanimous verdict

13  as to all the issues on the verdict sheet.

14          In just a minute we're going to bring the jury in.

15  Some in the audience have been with us the entire.  We

16  appreciate your attendance.  However, when this jury comes

17  in -- I am very protective of our jury.  Okay?  So no matter

18  whether you are seated on the left side or right side or where

19  you are in the courtroom, I ask that when that verdict is

20  read, regardless what it is, that there is no reaction.  No

21  reaction means no kind of outburst, applause, anything like

22  that.  We owe our jury better.  There's going to be a time and

23  place to make a reaction, but inside this courtroom when that

24  verdict is read, it's not that time.  If you don't think you

25  can control yourself, then I'm going to ask that you

1 respectfully step out now before we bring the jury in.  All

2 right?  Other than that, is everybody ready for the jury?

3             MR. TYNDALL:  Yes.

4             MR. ZELLINGER:  Yes.

5             THE COURT:  Bring them in.

6                 (Jury enters.)

7             THE COURT:  I've been told the jury has reached a

8 verdict as to all charges.  I thank you all.  It's been a long

9 two weeks.  I appreciate your work.  I know everybody

10 involved, everybody does as well.

11             Can I get the jury foreman to please stand and

12 state your name.

13             FOREPERSON:  Paul Delaney.

14             THE COURT:  Just answer this question yes or no.

15 Has the jury reached a unanimous verdict as to every issue on

16 the verdict sheet?

17             FOREPERSON:  Yes.

18             THE COURT:  Have you signed and dated the verdict

19 form?

20             FOREPERSON:  I have.

21             THE COURT:  Thank you, sir.  If you can just hand

22 it to the bailiff.

23             Madam clerk, please take the verdict.

24             CLERK:  In the case entitled State of North

25 Carolina vs. Ronald Lee Johnson, File No. 23 CR 003494-500,

1  we, the jury, return as our unanimous verdict that the

2  defendant, Ronald Johnson, to Count I, guilty of felony

3  extortion.

4          As to Count II related to the closed session,

5  guilty of willfully failing to discharge duties.

6          As to Count III, as to the attempt to transfer

7  students, guilty of willfully failing to discharge duties.

8          As to Count IV, guilty of felony obstruction of

9  justice.  Signed and dated by your foreperson.

10         If this was your verdict, so say you all; and if

11  so, please raise your right hand.

12         THE COURT:  Thank you.  We'll let the record

13  reflect every member of the jury raised their hand indicating

14  unanimous consent.

15         Mr. Zellinger, is there anything further at this

16  time with this jury?

17         MR. ZELLINGER:  No, Your Honor.  The State thanks

18  this jury.

19         THE COURT:  Mr. Tyndall, anything further at this

20  time with the jury?

21         MR. TYNDALL:  No, sir, Your Honor.

22         THE COURT:  Then the Court will accept the verdict,

23  order it recorded.

24         Ladies and gentlemen, I made you a promise two

25  weeks ago.  I'm going to give the lawyers an opportunity to

1 | prepare their thoughts, get things ready, and we'll be back
2 | out and address that in a few minutes.
3 |      The promise I made you two weeks ago is to go back
4 | and talk with you and answer any questions you may have.  You
5 | are certainly welcome to come back for the remaining phase.
6 | If you can step out, I'll come and thank you personally for
7 | your service and give you an opportunity to choose what you'd
8 | like to do after that.  If you will have a seat in the back.
9 |      (Jury exits.)
10 |      THE COURT:  Before I go talk to the jury, anything
11 | further at this time from either side?
12 |      MR. ZELLINGER:  No, Your Honor.
13 |      MR. TYNDALL:  No, sir.
14 |      THE COURT:  Thank you.  We'll be at ease for five
15 | minutes and I'll be right back.
16 |      (Court at ease.)
17 |      THE COURT:  Any jurors that want to stay, to come
18 | back in and join us.  We'll give them a couple minutes to get
19 | in here.
20 |      Do we have everybody?  Mr. Zellinger, anything on
21 | behalf of the State?
22 |      MR. ZELLINGER:  No, sir, Your Honor.  In terms of
23 | sentencing, I'd like to hand up a worksheet for the defendant.
24 | He's a Level 1 for sentencing.
25 |      THE COURT:  Yes, sir.

1  Now would be an appropriate time for the State's

2  sentencing argument.

3  MR. ZELLINGER:  Yes, sir.

4  Your Honor, first I'll point out that during the

5  trial we've presented and argued about some of these cases

6  involving issues of obstruction of justice, or I think we

7  talked about State vs. Bradsher which involved a district

8  attorney who was using his office to obtain property, that was

9  actually obtaining property by false pretense.  He received

10  active time for that for taking money.

11  State vs. Wright is another case that I think we

12  discussed at one point.  That's a felony obstruction of

13  justice case that the defendant received time.  Of course that

14  was for filing campaign finance disclosure reports that were

15  inaccurate and obscuring the public view to it.

16  In this case it's not just obstruction of justice,

17  Your Honor.  This is extortion.  These acts by this defendant

18  ruined people's lives.  I just talked to the victim in that

19  case, DeVan Barbour.  He can't be here, but I wanted to tell

20  the Court about a little bit what he said.

21  You heard him testify, and he just told me that

22  this is the worst thing that's ever happened to him in his

23  life.  He lost his mother at a young age, and he said that --

24  he said this has affected every inch of his life; his

25  relationships, his friends, his family, his business,

1 everything.  And you heard him testify that he was thinking

2 about this every minute of every day leading up to that

3 primary election.  This absolutely destroyed his life.

4          And then evaluating for the Court what to do, I

5 would just point out that this isn't some sort of victimless

6 crime.  I mean, this affected so many people in this

7 community.  The whole time the defendant was doing this, he

8 was a sworn police officer -- or the first part of the time

9 the defendant was doing this, he was a sworn police officer,

10 which, you know, a lot of folks think should be held to a

11 higher standard.

12          And then the most staggering part, I think, in the

13 State's view, is that not only does he do this, but then he

14 keeps doing it even after he's charged.  You have to hear that

15 secret recording of DeVan Barbour from January of 2024, and

16 he's not going to stop doing this until somebody does

17 something about it.  So I think it's appropriate that this

18 defendant receive an active sentence.

19          I believe on the class F felony he's a level 1, he

20 receive 16 to 28 months.  I don't know.  I'll leave it in the

21 Court's discretion as to what the sentence would be, if the

22 Court wants to consolidate or run those consecutively.  But I

23 do think it's appropriate this defendant receive an active

24 sentence because he continues to do this.

25          I mean, not only did they do activity that all came

1 up in this case, the extortion, the obstructing, the

2 attempting to transfer two special needs children, which is

3 just vial, but he then gets on the witness stand, and you got

4 to judge his credibility and what he had to say from that

5 witness stand, which was profoundly rejected by the jury.

6        So Your Honor, for that reason and the fact that

7 he, as I stated, used his public office for his personal gain,

8 I would ask that you give this defendant an active sentence.

9        THE COURT:  Yes, sir.  Thank you very much.

10        Mr. Tyndall, is there anything on behalf of your

11 client?

12        MR. TYNDALL:  As Mr. Zellinger just mentioned, it

13 is an intermediate active block.  We would ask the Court not

14 to give him an active sentence.

15        I point out there's a number of mitigating factors.

16 I realize there are a lot of people who are critical of

17 Mr. Johnson and have strong views, but there's also a lot of

18 the community -- clearly, he just won an election -- that

19 feels differently.  I contend he's been a person with a great

20 reputation in the community up until this time.  He supported

21 his family.  He served 17 years as a police officer, rising

22 from a patrol officer up to a police detective.

23        I'd point out to the Court he's not convicted of

24 making secret recordings.  And obviously the jury has reached

25 a verdict, and we accept that and respect that.  But Your

1    Honor, we would contend that -- you know, I hear what

2    Mr. Barbour is saying, but that was certainly not what he said

3    at that meeting back in 2023.  It's hard to sort of mesh

4    together.

5              Your Honor, in closing, I do want to say before I

6    finish my argument, I have three people I want to present to

7    the Court who would make statements on Mr. Johnson behalf.

8    The first is Vivian Maynor.  Would you come up, Ms. Maynor?

9              MR. TYNDALL:  She's a little nervous at speaking in

10   front of these people.  You can tell the Judge, or if you'd

11   like for me to tell him what you told him.

12             MS. MAYNOR:  You can tell him.

13             MR. TYNDALL:  I spoke with Ms. Maynor.  She was a

14   middle school student at the school where Mr. Johnson was a

15   school resource officer, and she was a very troubled child,

16   did not have a good home life, was being, you know, bullied

17   and not treated well, and Mr. Johnson intervened on her

18   behalf, not only intervened, but encouraged her; like he was

19   sometimes sort of the person who had to go get her for

20   disciplinary reasons, but he didn't give up on her.  She stuck

21   with it.  She graduated high school.  She's kept in touch with

22   Mr. Johnson, and they've maintained a relationship.  She is

23   now a student at Johnston Community College and is also --

24   she's a mother of three, and she works full time.

25             So Your Honor, I mean, I realize, you know, the

1 State has an argument that this has affected people, but

2 Mr. Johnson has also had a profound impact on a lot of

3 students, and Vivian is one of those people. So if there's

4 anything you want to add, Vivian, that's fine, but...

5       THE COURT: Yes, ma'am. We'll give you a chance to

6 say anything you'd like to say.

7       MS. MAYNOR: I appreciate it.

8       THE COURT: You don't have.

9       MS. MAYNOR: All I can say is I guess when you give

10 a sentence, give him some grace. I mean, I guess, yea. The

11 jury gave him a guilty verdict, but even though they said he

12 did wrong, he's also done a lot of good for this community and

13 for the kids.

14       THE COURT: Yes, ma'am. Thank you very much for

15 being here.

16       MR. TYNDALL: Your Honor, next is a friend of

17 Mr. Johnson, Rick Walker, and Rick is has known Mr. Johnson

18 mainly through political things. I know Mr. Johnson

19 intervened to help his daughter. Is there anything you want

20 to tell the Judge?

21       MR. WALKER: Yes. Thank you, Your Honor. I met

22 Mr. Johnson in 2016. I was helping out somebody that was

23 running for U.S. Senate at the time. I decided right away I

24 should help him because I believed in what he was telling me.

25       After a year or two, my daughter had an incident at

1    school where she was being bullied by three other girls --

2    sorry.  It's personal -- and the teachers wouldn't do anything

3    at West Clayton Elementary.  So one day she stood up and

4    yelled back at the girls.  My daughter was one day of being

5    away -- she had a league performance showcase of the stars in

6    Smithfield.  When she got up and yelled at the girls, the

7    school decided that they were going to suspend her, a straight

8    A student, and take away the lead performance and showcase of

9    the stars.  Someone that was on the panel she was on knew

10   that -- she was making reports of bullying and nobody was

11   there to help her.  My wife and I had no idea what to do.  I

12   met him a year or two earlier.  I said, I know Ronald Johnson,

13   I'll give him a call right away.  He advised me to write an

14   e-mail, copy me if you want, to superintendent.  I don't

15   remember his name, who he was at that time, but so I did.

16           I explained what happened.  I explained the

17   situation.  The next day or couple days later, I think it was

18   a Friday, the next time my daughter went into school, we were

19   pulled in.  My daughter and our family were issued full

20   apologies from the teachers and the principal of that school

21   for doing my daughter wrong.  I can tell you right now that

22   that wouldn't have happened, that right would not have been

23   wronged if it wasn't for this man.

24           The second thing I want to tell you about, and this

25   is going to be hard.  I'm sorry.  2022 -- in January 2022, I

1    had played basketball with Mr. Johnson a couple times.  I was

2    invited to play again with couple other gentlemen.  Halfway

3    through the basketball game I kept getting phone calls.  My

4    sister in Philadelphia called me about five times in a row.

5    We don't talk that often, especially for her to call me five

6    times in a row.  So I went out in the hallway.  I called her

7    and -- and she told me my grandmother, who was my mother, had

8    died.  I then lost control, and I had an emotional breakdown

9    for an hour on the floor of Clayton Fitness.  Mr. Johnson sat

10   on that floor with me for an hour, made sure I was okay,

11   called my wife to come get me.

12            With all that said, Your Honor, I know the good in

13   this man's heart.  I know what he's done for my family and the

14   countless other members of Johnston County.  And for that, I

15   ask you for leniency for my friend.

16            THE COURT:  Yes, sir.  Thank you for being here on

17   behalf of Mr. Johnson.

18            MR. TYNDALL:  Your Honor, one more person.  Gloria

19   Thornton.  Come up, Ms. Thornton.

20            MS. THORNTON:  Thank you, Your Honor, for allowing

21   us to speak.  I met Ronald almost nine years ago.  And when I

22   met him, my husband and I had split up not very long before

23   that, and I had moved in with my niece.  And just in general

24   conversation I had mentioned this to him, and he was like, you

25   wouldn't be looking for somewhere to live?  I absolutely am,

1    but I don't have a lot of money right now.  He was taking care

2    of a house for a couple that had moved to Florida that fully

3    intended to move back to their home but needed someone to stay

4    in it.  For insurance purposes it needed to be occupied.  He

5    had been living in it, but he and Jamie had not too long

6    before got married and purchased a home of their own and he

7    was going to be leaving that house.  And he's like, I don't

8    know how to take care of this for them without -- you know, he

9    worked out with them that I could live in that home very

10   economically.  And I've lived there for three years.  It

11   helped me get back on my feet and get going again.

12          While I was there for that three, three and a half

13   years, I saw him reach out to two other people.  There was a

14   young girl in college that had been one of his students when

15   he was an SRO and she was coming home, and since she had left

16   her grandmother, moved into her house, and I don't think their

17   house was very large, and she had moved into this child's

18   room.  And this girl had gone to Ronald, you know, she's like,

19   I feel misplaced.  I don't have -- I don't even have anywhere

20   to sleep.  I don't feel like I can go to my home.  She was

21   going to be home for a few months, then go to college.  He

22   asked, would it be possible for her to stay with you.  He

23   said, feel free to say no.  He said, you live here, you know.

24   I said, no, she's welcome.  She came and stayed for a few

25   months, then got back to school.

1    And then another time he came to me and there was a

2  fellow police officer's wife or girlfriend, I'm not sure if

3  they were married.  I just don't remember.  But anyway, he was

4  abusive.  He was beating her.  He bit her.  I saw teethmarks.

5  I saw black eyes.  He was being abusive.  This was one of his

6  fellow officers, and she had come to him and said, I need

7  help.  I need to disappear.  And she needed somewhere with no

8  address nowhere.  She just needed to hide.  He's like, will

9  you take her in until we can figure out what to do?  And she

10  stayed with me for a few months.  Then no one ever knew she

11  was there.  She ended up going back to college.  She married a

12  fellow -- she became a pharmacist, married a fellow

13  pharmacist, lives in Florida, have two beautiful children,

14  doing wonderful.

15    But I know I'm not privy to every aspect of his

16  life.  He's like a brother to me.  But I personally have never

17  witnessed this man cause intentional harm to anybody.  I have

18  seen him reach out time and time again to put himself out to

19  help other people for no reason other than to help them.

20    You know, his family.  He has a wonderful family.

21  And like, you know, as the others said, nobody is perfect and

22  people do make mistakes, but there's a whole lot of good in

23  this man.  A whole lot.  And you know people get on a path

24  every now and then, but he's got a lot of good left to do too.

25    THE COURT:  Yes, ma'am.  Thank you for being here

1 | on his behalf.

2 | Mr. Tyndall, anything further?

3 | MR. TYNDALL: What I would say, Your Honor, to

4 | distinguish Bradshur, those were crimes they were economic

5 | crimes. We realize that doesn't make this, you know, nothing,

6 | but in this particular case, the acts were not carried out. I

7 | disagree with Mr. Zellinger that the comparison of secret

8 | recordings is not what the jury found him guilty of.

9 | So, Your Honor, he's in intermediate block. We

10 | think there's several mitigating factors you heard. We would

11 | ask the Court to impose a probationary sentence. And you've

12 | heard the evidence in this case, Your Honor. I would really

13 | emphasize 17 years on the police force every day putting

14 | himself in the line of fire, you know, obviously that became

15 | unraveled. That doesn't go away with the 17 years before

16 | that, so...

17 | THE COURT: Yes, sir. Thank you, Mr. Tyndall.

18 | I will also offer Mr. Johnson an opportunity to say

19 | anything, if he would like to. He certainly doesn't have to,

20 | but I'll give him chance to say anything. Yes, sir.

21 | THE DEFENDANT: Your Honor, thank you for allowing

22 | me to address the Court. I know we haven't had much time. We

23 | don't interact. I've dedicated my life to helping people and

24 | helping kids is what I've done with my life. You know,

25 | currently I help raise money for underprivileged kids to

1 | become pilots. Throughout all this I never stopped trying to
2 | help people. It's the jury's decision. And I respect the
3 | Court. I will continue to help people. I'm not a danger to
4 | hurt anyone. I've never been physically violent. I put
5 | myself at your mercy. I would appreciate a probationary
6 | sentence so I can continue to help other people.

7 | THE COURT: Yes, sir. Thank you very much.

8 | Mr. Zellinger, anything else on behalf of the
9 | State?

10 | MR. ZELLINGER: Two things. A permanent no contact
11 | order between the defendant and victim, DeVan Barbour. I also
12 | would point out to the Court that being convicted of the
13 | willful failure to discharge duties, I believe the Court can
14 | remove the defendant from the school board. We would ask the
15 | Court to do that.

16 | The Court has to make a finding that this was an
17 | act of corruption, which I think is manifestly obvious. I
18 | think the fact that the defendant was convicted of a felony,
19 | from what I've been told, will automatically remove him from
20 | the board as well.

21 | I think with the defendant, it would be appropriate
22 | for the Court to take his licensure from the Criminal
23 | Education Training Standards Commission. I ask for that as
24 | well.

25 | And then, you know, just to summarize, I mean, Your

1    Honor, the evidence is clear in this case that the defendant

2    used any power he had to attack people that he disagreed with,

3    and that is the nature of this crime, and that is something

4    that he has continued to do.  And he may have done wonderful

5    things in his life and helped people as a law enforcement

6    officer, but at some point he went off that path and he went

7    deep off that path, and he has left a wake of destruction

8    behind him.  And I think the only way that that is going to

9    stop is if the Court sentences him to an active sentence.

10          THE COURT:  The last thing you asked for, to make

11   sure I'm clear, is that the Court revoke his law enforcement

12   certification?

13          MR. ZELLINGER:  From the criminal training and the

14   sheriff's commission.

15          THE COURT:  All right.  I'll give you a chance to

16   respond to those three things.  First, a permanent no contact

17   order with the Angie Barbour; the second, finding of

18   corruption and removal from the school board; and third, is

19   the revocation of his law enforcement certification.

20          MR. TYNDALL:  Your Honor, I think we disagree

21   legally about the school board issue, but I don't think it's a

22   factor in this case because he's been convicted of a felony.

23   I'm not going to argue against that.  And the justice

24   certifications, obviously, is appropriate under these

25   circumstances.

1    THE COURT: Yes, sir. All right. I will say this.

2    I mean, this is something I thought about for a while. I

3    normally don't make any comment prior to sentencing, but I

4    think you can use power either to help or you can use power to

5    harm. It's obvious from the things we've heard that you have

6    used that power to help, but it's also obvious from the past

7    two weeks of testimony that that power has been used to harm

8    not just individuals but families and in some cases children.

9    I do think -- Mr. Tyndall, I appreciate your

10   argument. I do believe that there does -- based on the

11   evidence I heard, I do believe that some portion of active

12   time in this matter is appropriate.

13   So in this matter, upon this jury's verdicts of

14   guilty to the four different charges, specifically class F

15   felony, class H, and then the two misdemeanors, in the class H

16   felony, that will be an active sentence. The Court impose an

17   active sentence of 6 to 17 months. We'll give the defendant

18   any credit for the time he might have served on those charges.

19   In the class F felony, the Court in its discretion

20   will consolidate the two misdemeanors. He is to serve a

21   sentence in that of 16 to 29 months. In the Court's

22   discretion that will be suspended. He will be placed on

23   probation for a period of 30 months with the following

24   conditions: He's to comply with all regular and intermediate

25   conditions of probation. He is to submit to DNA testing, pay

1  court costs in this matter.  As a part of that, the Court will

2  additionally enter a permanent no contact order for DeVan

3  Barbour..

4           The Court will also make a finding, and without

5  objection, will make findings of corruption and remove the

6  defendant from the Johnston County School Board.  And again,

7  without objection, the Court will revoke the defendant's law

8  enforcement certification in this matter.

9           Mr. Zellinger, is there anything further that the

10  State would ask for that you would consider to be appropriate

11  either as part of the active sentence or probationary

12  sentence?

13           MR. ZELLINGER:  Your Honor, I think it would be

14  appropriate to include in that no contact order Owen Phillips.

15  Owen Phillips and his children.

16           THE COURT:  I will include as well.

17           Anything else on behalf of the State?

18           MR. ZELLINGER:  Thank you, Your Honor.

19           THE COURT:  Thank you.

20           Anything else?

21           MR. TYNDALL:  The only thing I would ask is that

22  Mr. Johnson be allowed to report Tuesday morning to begin

23  serving his sentence to arrange some matters for his family.

24           THE COURT:  I'll let the State be heard on that.

25           MR. ZELLINGER:  Your Honor, I would leave it in the

1 Court's discretion. I don't know if the Court has a practice

2 of allowing that. I mean, the only thing I would ask is for

3 the Court to stay consistent with what the Court normally

4 does. If this is something special, then I would ask the

5 Court not do that.

6        THE COURT: I typically -- Mr. Tyndall, I

7 appreciate that, but I don't think in 18 years that's ever

8 been anything I've allowed. So I ask the active sentence be

9 in effect immediately.

10        Anything further either side?

11        MS. JAMES: No, not from the State.

12        THE COURT: Thank you. You all is the court

13 adjourned in this matter.

14        (Proceedings concluded at 5:53 p.m.)

15        (END OF VOLUME 10 OF 10.)

16

17

18

19

20

21

22

23

24

25

Denise St. Clair, RPR, CRR, CRC
Official Court Reporter

```
1              CERTIFICATION OF TRANSCRIPT

2         This is to certify that the foregoing transcript of

3    proceedings taken at the January 6, 2025, Session of Johnston

4    County Superior Court is a true and accurate transcript of the

5    proceedings taken by me and transcribed by me.

6         I further certify that I am not related to any party or

7    attorney, nor do I have any interest whatsoever in the outcome

8    of this action.

9         This 23rd day of June, 2024.

10

11   Denise St Clair
     _____
     DENISE ST. CLAIR, CRR, CRC, RPR
12   Certified Realtime Reporter
     Certified Realtime Captioner
13   Registered Professional Reporter
     Official Court Reporter
14   denise.stclair@nccourts.org

15

16

17

18

19

20

21

22

23

24

25
```