
EXHIBIT
2

**In the Matter Of:**

Ronald L. Johnson, Jr.

V

Town Of Smithfield Et Al.

---

**DAVID MARSHBURN**

*July 16, 2025*

---

# LEGAL | MEDIA | EXPERTS

```
 1                STATE OF NORTH CAROLINA
 2                 U.S. DISTRICT COURT

 3           EASTERN DISTRICT OF NORTH CAROLINA

 4

 5

 6   RONALD L. JOHNSON, JR.,    ) Docket Number:

 7        Plaintiff,            ) 5:23-CV-349-D

 8        v.                    )

 9   TOWN OF SMITHFIELD, ET AL.,)

10        Defendants.           )

11

12   _____

13             DEPOSITION OF DAVID MARSHBURN

14                     9:26 A.M.

15   _____

16

17

18

19

20

21

22

23   Raleigh, North Carolina

24   Wednesday, July 16, 2025

25   Reported By:  Marta J. Charles
```

```
 1              A P P E A R A N C E S:

 2

 3    Representing Plaintiff:

 4    NEW SOUTH LAW FIRM

 5    BY:  VALERIE L. BATEMAN, ESQUIRE

 6    209 Lloyd Street, Suite 350

 7    Carrboro, North Carolina 27510

 8    (919) 810-3139

 9    valerie@newsouthlawfirm.com

10

11    Representing Defendants:

12    HARTZOG LAW GROUP

13    BY:  DANIEL MULLINS

14    2626 Glenwood Avenue, Suite 305

15    Raleigh, North Carolina 27608

16    (919) 578-1218

17    dmullins@hartzoglawgroup.com

18

19    Also Present:  Ronald Johnson

20                   Stephanie Hobson

21

22

23

24

25
```

```
 1              E X A M I N A T I O N    I N D E X

 2

 3    Examination            By Whom                    Page

 4    Direct examination by Ms. Bateman                  6

 5        (EXHIBIT NUMBER 9 WAS RETAINED BY MS. BATEMAN.)

 6                  E X H I B I T    I N D E X

 7    Exhibit Number      Description                   Page

 8

 9    Exhibit 1  Facebook post, photocopy of North       45

10     Carolina PI license

11    Exhibit 2  Transcript of audio file, 6/24/22      103

12    Exhibit 3  Transcript of audio file, Johnson,      72

13               6/27/22, School Board

14    Exhibit 4  Transcript of audio file, Johnson,      78

15               7/10/22 Playing the Victim

16    Exhibit 5  "The Truth of a Subordinate"           150

17    Exhibit 6  Transcript of audio file, Johnson,     151

18               6/30/22 FAFO!

19    Exhibit 7  Smithfield Police Department           181

20               Property/Evidence Form

21    Exhibit 8  Transcript of audio file, 220826_1011  187

22               David Marshburn

23    Exhibit 9  Audio recording                        360

24    Exhibit 10 Transcript of audio file, 11/11/24     248

25               Aftermath
```

```
 1            E X H I B I T   I N D E X   (Cont.)

 2

 3     Exhibit Number     Description                    Page

 4     Exhibit 11 Transcript of audio file, 1/6/25,      258

 5                6:39 a.m.

 6     Exhibit 12 Transcript of audio file, 1/6/25,      267

 7                5:32 p.m.

 8     Exhibit 13 Transcript of audio file, 1/9/25,      272

 9                Facial Expression, 8:04 p.m.

10     Exhibit 14 Transcript of audio file, 1/10/25,     287

11                8:55 a.m.

12     Exhibit 15 Transcript of audio file, 1/13/25,     290

13                7:31 a.m.

14     Exhibit 16 Transcript of audio file, 1/13/25,     308

15                9:06 p.m.

16     Exhibit 17 Transcript of audio file, 1/14/25,     291

17                Secrets Unveiled, 8:34 p.m.

18     Exhibit 18 Transcript of audio file, 1/15/25,     312

19                I Love You, 8:16 p.m.

20     Exhibit 19 Transcript of audio file, 1/16/25,     324

21                Perjury, 8:30 p.m.

22     Exhibit 20 Transcript of audio file, 1/17/25,     337

23                FAFO-MF, 9:16 p.m.

24     Exhibit 21 Transcript of audio file, Johnson,     352

25                10/25/22, Board of Education Meeting
```

 1                This is the deposition of DAVID

 2     MARSHBURN, taken pursuant to Notice of the parties

 3     and in accordance with the North Carolina Rules of

 4     Civil Procedure, before Marta J. Charles, Court

 5     Reporter and Notary Public for the State of North

 6     Carolina, at Winslow Wetsch, PLLC, 416 Morson Street,

 7     Raleigh, North Carolina, on the 16th day of July,

 8     2025, beginning at 9:26 a.m.

 9                     The reading and signing of this

10     transcript is reserved.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                  *  *  *  *  *  *  *  *  *  *

 3       _____

 4       DAVID MARSHBURN,

 5       having been first duly sworn,

 6       was examined and testified as follows:

 7       _____

 8       DIRECT EXAMINATION BY MS. BATEMAN:

 9            Q.    Good morning, Mr. Marshburn.

10            A.    Good morning.

11            Q.    Have you had your deposition taken before?

12            A.    Not that I can recall.

13            Q.    Okay.  Not that you can recall.  Do you

14       think there's a possibility you may have had your

15       deposition taken before?

16            A.    (Witness shook head side to side.)

17            Q.    Do you recall being in front of a court

18       reporter and having someone take down your testimony?

19            A.    Maybe in court, but not privately --

20            Q.    Not privately --

21            A.    -- like this --

22            Q.    -- in a room --

23            A.    -- I don't --

24            Q.    -- separately?

25            A.    -- recall.
```

1    Q.    Okay.  So that's good if you've given

2    testimony in court before, because this is the same

3    thing, only you're giving testimony in this room.  Do

4    you understand that?

5    A.    Yes, ma'am.

6    Q.    Okay.  So at any time you need to take a

7    break, you let me know, we'll take a break.  If you

8    don't understand one of my questions, you tell me,

9    and I'll rephrase it.  Do you -- do you understand

10   that?

11   A.    Yes, ma'am.

12   Q.    And I have to ask, do you understand that,

13   not because I don't think you don't understand it,

14   because just in general conversation we tend to nod

15   our heads.  And the court reporter can't pick that

16   up.

17   A.    Yes, ma'am.

18   Q.    So when I say, do you understand, it's not

19   that I think you don't understand, I'm just trying to

20   catch your affirmative answer on the record.  Do you

21   understand?

22   A.    Yes, ma'am.

23   Q.    Okay.  Is there any reason why you wouldn't

24   be able to give complete and truthful testimony

25   today?

```
 1        A.     There shouldn't be any reason why I
 2   shouldn't tell the truth.
 3        Q.     Okay.  You're not on any medication or
 4   anything?
 5        A.     I am.
 6        Q.     You are?  Are you on medication that would
 7   interfere with your ability to tell the truth today?
 8        A.     No, ma'am.
 9        Q.     Are you on any medication that would affect
10   your ability to recall things?
11        A.     No, ma'am.
12        Q.     At some points during the deposition, Mr.
13   Mullins may object.  It's unlikely, since he doesn't
14   represent you.  But if he does, it doesn't mean you
15   can't answer the question.  You should go ahead and
16   answer it.
17               And I guess, I think I said already,
18   if at any point you need to take a break, just let me
19   know.  We will take these breaks for attending to our
20   parking situation.
21               MR. MULLINS:  Agree to that on the
22   record.
23               MS. BATEMAN:  Right.
24        Q.     (By Ms. Bateman)  So I'm going to just
25   start by asking you some questions about your
```

```
 1   background.  Can you tell me where you were born?

 2       A.     In Buffalo, New York.

 3       Q.     And how long have you lived in North

 4   Carolina?

 5       A.     Exactly?

 6       Q.     Well, your best estimate.

 7       A.     Forty-five years.

 8       Q.     Forty-five years?

 9       A.     (Witness nodded head up and down.)

10       Q.     Okay.  And how old --

11       A.     Yes.

12       Q.     -- were -- and how old were you when you

13   came to North Carolina?

14       A.     (Witness shook head side to side.)

15       Q.     You don't recall?

16       A.     I don't recall, because I was young and

17   adopted.

18       Q.     Okay.  Did you go to school in North

19   Carolina?

20       A.     I did.

21       Q.     Where did you go to school?

22       A.     Clayton.

23       Q.     Clayton?

24       A.     I don't remember the years, when I was real

25   young, kindergarten, when I was in a home for
```

1  children.

2      Q.    Okay.  Were you in a home for children in

3  Clayton?

4      A.    In North Carolina.

5      Q.    In North Carolina.  When did you move to

6  Clayton?

7      A.    1983.

8      Q.    And do you recall how old you were in 1983?

9      A.    Six.  Six, I believe.

10     Q.    Okay.  Did you go to elementary school in

11  Clayton?

12     A.    I did.

13     Q.    And did you go to either middle or junior

14  high school in Clayton?

15     A.    I did.

16     Q.    Did you go to high school in Clayton?

17     A.    I did.

18     Q.    Do you have any post-high school education?

19     A.    Yes.

20     Q.    And what is that?

21     A.    I went to Johnston Community College.  I

22  got two associate's degrees: one in forensics, one in

23  criminology.

24     Q.    Okay.  And do you have any education past

25  that?

```
1        A.      No, ma'am.

2        Q.      What was your first job?

3        A.      I worked at a hardware store.

4        Q.      And how old were you when you did that?

5        A.      Twelve.

6        Q.      And after that, what did you do?

7        A.      I worked in construction.

8        Q.      How long did you work in construction?

9        A.      Approximately ten years.

10       Q.      And after you worked in construction, what

11   did you do?

12       A.      I created a dumpster business.

13       Q.      Do you still own that?

14       A.      No, ma'am.

15       Q.      And how long did you operate that?

16       A.      Six years.

17       Q.      And where was that located?

18       A.      In Clayton.

19       Q.      Why did you stop operating that business?

20       A.      I sold it.

21       Q.      Who did you sell it to?

22       A.      Cary Reconstruction.

23       Q.      Is it still under operation now?

24       A.      Yes.

25       Q.      What did you do after you operated the
```

1   dumpster business?

2       A.      I created a new dumpster business in

3   another location.

4       Q.      Where was that?

5       A.      Wilmington.

6       Q.      Do you still own that business?

7       A.      No, ma'am.

8       Q.      Did you sell it?

9       A.      I did.

10      Q.      And to whom did you sell it?

11      A.      I cannot recall the man's name.

12      Q.      Do you recall when you sold it?

13      A.      2008.  I believe, 2008.

14      Q.      And what did you do after you sold that

15  business?

16      A.      I got into bail bonding.

17      Q.      Pardon me?

18      A.      Bail bonding.

19      Q.      Bail bonding.  Do you still do that?

20      A.      I do.  Well, I have a license, but I'm not

21  actually physically practicing.

22      Q.      Okay.  What else do you -- what else did

23  you do after the dumpster business, the last dumpster

24  business?

25      A.      Private investigation.

1     Q.    And did you do those in Wilmington?

2     A.    No, ma'am.  Here in Clayton.

3     Q.    Okay.  And do you have an LLC in order to

4  do those businesses?

5     A.    I do.

6     Q.    And what is it called?

7     A.    I have an LLC for the investigation.  But

8  I'm not the owner of the bail bonding business.

9     Q.    Who was the owner of the bail bonding

10  business?

11     A.    My wife.

12     Q.    Is she also a bail bonds person?

13     A.    She is.

14     Q.    Is she actively involved in bail bonding?

15     A.    Yes.

16     Q.    Do you-all have any employees?

17     A.    Have to ask her.

18     Q.    Okay.  Do you work for her?

19     A.    I do if she needs something.  I have

20  stepped in in the past year and done two bonds in the

21  past -- since 2017, I believe two.  I might've

22  written for two or three bonds since 2017.  You can

23  go back in the record and check.

24     Q.    Okay.  Do you -- are you aware of whether

25  she has any employees?

```
 1      A.    You have to ask her.

 2      Q.    Well, I'm just asking you.  Do you know if

 3   she has --

 4      A.    I do not --

 5      Q.    -- any employees.

 6      A.    -- know.

 7      Q.    You do not know.  Have you ever interacted

 8   with any employees that she might have?

 9      A.    Before 2017, I did.

10      Q.    You did?

11      A.    Before 2017.

12      Q.    And what happened in 2017?

13      A.    I just quit doing it.

14      Q.    You quit doing bail bonding?

15      A.    I gave the business to her.

16      Q.    So before 2017 you owned the business?

17      A.    I was in business, bail bond business.

18   Before 2017, I was in the bail bonding business.

19      Q.    And did you operate a company that did bail

20   bonding?

21      A.    Her -- it was -- the company she's running

22   now, she owns.

23      Q.    And what is that company called?

24      A.    Afford-a-Bond of Johnston County, LLC.

25      Q.    So how -- do you -- how many companies do
```

1    you own right now?

2       A.    One.

3       Q.    And what's it called?

4       A.    Marshburn's Investigation Agency.  It's

5    short for -- well, we go by MIA.

6       Q.    Okay.  And is it an LLC?

7       A.    Yes.

8       Q.    Do you have any employees?

9       A.    No.

10      Q.    And how long have you been doing that

11   business?

12      A.    Since 2012.

13      Q.    Okay.  Do you have any for-profit

14   businesses?

15      A.    If I do, I didn't just dissolve them or

16   anything, that I know of.  But I don't have -- I

17   don't believe I have any LLCs out there left, unless

18   they've just been dissolved by not reporting.

19            I didn't -- they would just run out of

20   time with the Secretary of State, from what I

21   understand.

22      Q.    Okay.  Do you -- have you incorporated any

23   corporations?

24      A.    I had -- I believe we have Bail Bonds,

25   Inc., but that's been gone.  That's when Afford-a-

```
 1    Bond of Johnston County came about -- LLC.

 2         Q.    So do you -- you no longer operate that

 3    corporation?

 4         A.    I do not.

 5         Q.    Are you involved in any other corporations?

 6         A.    No, none that I'm aware of.

 7         Q.    So I just want to be clear.  You're not

 8    involved in any other for-profit corporations?

 9         A.    Not that I'm aware of.

10         Q.    And you're not involved in any other not-

11    for-profit corporations?

12         A.    Well, the non-profit just went away.  The

13    non-profit that I had --

14         Q.    When did --

15         A.    -- for -- Search for Me Foundation, it just

16    wasn't getting enough momentum, and we just shut it

17    down, just let it dissolve.

18         Q.    And when you say "we," who do you mean?

19         A.    Well, me.  I say "we," but I include

20    everybody, you know --

21         Q.    Okay.

22         A.    -- whatever.  You know, it's a non-profit.

23         Q.    Did that non-profit have any employees?

24         A.    No.

25         Q.    And when you say you shut it down, do you
```

1    mean you formally shut it down?

2        A.    I don't think I did.  I don't think the

3    accountant did.  He just said, let it dissolve.  It's

4    gone.  The government would take it over.  And it

5    didn't own anything, so it just dissolved.

6        Q.    Okay.  So tell me, are you licensed as a

7    bail bondsman?

8        A.    Yes, ma'am.

9        Q.    And do you have any other professional

10   licenses?

11       A.    Private investigation license.

12       Q.    And when did you get that license?

13       A.    2012.

14       Q.    And when did you get your bail bondsman

15   license?

16       A.    2009, I want to say.

17       Q.    And do you do both of those at the same

18   time?

19       A.    I used to.  I just step in when I'm asked

20   to for bail bonding.  I just really don't care to do

21   it.

22              And the investigation part, I'm really

23   not doing anything with it either.  I did all free

24   stuff with it.  So --

25       Q.    Okay.

```
1      A.      -- I just do whatever, when I'm asked.

2      Q.      So what -- what do you do for -- to make a

3    living?

4      A.      My wife.

5      Q.      Pardon me?

6      A.      My wife.

7      Q.      Okay.  So your wife is the primary

8    breadwinner?

9      A.      She makes the money.

10     Q.      Okay.  Do you have any licenses in any

11   other states?

12     A.      Not that I know of.

13     Q.      Okay.  Have you been continuously licensed

14   as a bail bondsman since 2012?

15     A.      I was a bail bondsman since 2009.

16     Q.      Oh.  2009.  Have you been continuously

17   licensed as a bail bondsman since 2009?

18     A.      Yes.

19     Q.      So there have been no lapses in your

20   certification or your license?

21     A.      If there was, there's a -- I don't believe,

22   in the bail bonding one.  But in the PI one, I would

23   forget to do the continuing education, so then I'd

24   have to go back and pay the extra hundred-dollar fine

25   or whatever it is.
```

1          MR. MULLINS: Sorry, I'm just going to
2  chime in. It looks like the court reporter needs us
3  to slow down a little bit. So I just wanted to say
4  that.
5          THE COURT REPORTER: Thank you, sir.
6          MS. BATEMAN: Okay. Sorry about that.
7          THE COURT REPORTER: That's okay.
8          MS. BATEMAN: I am going to try to
9  speak more slowly.
10          MR. MULLINS: I understand. I'm
11  guilty of it.
12          THE WITNESS: Maybe I should pause and
13  then answer.
14          MS. BATEMAN: There you go.
15     Q.   (By Ms. Bateman) So tell me more about
16  your licensure as a PI and any lapses that you
17  recall.
18     A.   I have done several things for Bob Denning,
19  an attorney. I've served some subpoenas. And then
20  the lapse would be -- I think there was two. One, I
21  was -- I had to continue my education, and then --
22  well, that was in both issues where I had to continue
23  my education. And I didn't -- I -- I could file
24  late, and renew it, so that's what I did.
25          Matter of fact, I think I was on time

1    this last time.  It's just, you get so busy, you

2    forget to do it.  So...

3        Q.    Do you recall the specific periods of time

4    during which your license was lapsed?

5        A.    Do I what?

6        Q.    Do you recall the specific periods of time

7    during which your license was lapsed?

8        A.    2019 rings a bell.  But you can go back and

9    look at each one of my licenses and see if I lapsed

10   or not.  Because the dates would change for when I

11   continued with the license.  So I'd have to go back

12   and look.  But, I mean, it's, like, you pay the

13   hundred-dollar fine -- or fee, and then you get

14   renewal after you continue to do your continuing

15   education.

16               I do believe during the COVID time,

17   that was -- that was difficult to -- to get the

18   classes in, and then they allowed us to do it all

19   online at that point in time.

20       Q.    Do you recall how long a period of time

21   your license was lapsed?

22       A.    It would be 30 days, 60 days, something

23   like that.

24       Q.    Again.  And --

25       A.    If it was more, I don't recall.  But if it

 1    was more, it -- I don't recall.

 2         Q.    So is it your testimony that if you had to

 3    figure out when your license was lapsed, you would go

 4    to the website to figure that out?

 5         A.    I don't think I'd have to go to the

 6    website.  I could get just my own licenses out and

 7    look at them and tell you.

 8         Q.    So to get the exact date, you would go and

 9    look at your licenses?

10         A.    I can get -- I can pull my licenses up and

11    look at each individual one and tell I was late on

12    this one, late on that one, late on that one.

13         Q.    So when you say you would pull them up,

14    you're saying you would go to --

15         A.    Physically grab them.  I don't do the

16    internet a lot.  I don't get on the site of -- the PI

17    site that much.  I don't get on many sites at all to

18    -- to look at my license or anything.  I just -- if

19    there's something wrong, they'll send me a letter.

20                    As you can tell in this suit, I've

21    asked for a paper trail from them, everyone.  I like

22    the hard copy.

23         Q.    Is that how you became aware that your

24    license had lapsed?

25         A.    Either that, or my wife would remind me.

1    Q.    So what are you permitted to do in the way

2    of private investigator activities while your license

3    is lapsed?

4    A.    They will -- if I'm in the middle of

5    something, you either have to get another PI to take

6    over -- but they do not recommend me doing anything

7    at that time unless I've been given permission, you

8    know.  I don't even remember doing anything much.

9    Q.    So what kind of activities does your

10   private investigator license allow you to do?

11   A.    Interview witnesses, serve subpoenas, do

12   criminal, civil trials for attorneys, gather

13   evidence.  I'm allowed to obtain evidence and hold

14   evidence for court.

15   Q.    Do you get access to any special databases?

16   A.    I do.

17   Q.    And what are those?

18   A.    I couldn't name them.  There's LEXIS-NEXIS.

19   There's so many databases out there.  But, you know,

20   you can get all public information, public access to

21   everything.  But there is some things you can get

22   access to with your license.

23   Q.    Have you ever had any complaints filed

24   against you?

25   A.    I have.

1       Q.      Okay.  Can you tell me about those?

2       A.      I've had people complain about -- too rough

3    when I'm taking them back to jail.

4       Q.      When you're taking...

5       A.      Well, when I'm -- in bail bonding?  Are you

6    asking bail bonding, or the PI?

7       Q.      Either one.

8       A.      Either one?

9       Q.      Well, tell me about bail bonding first.

10      A.      Okay.  In bail bonding, I would be -- they

11   would say I was being too rough with them when I've

12   taken them back to jail.  We had two agents that

13   failed to pay their premiums, and we took them to

14   court, and then they turned around and took us to

15   court.  Still have not paid the premiums, but we just

16   settled it to get them out of the office.

17              And then the PI stuff, yes, I've had

18   complaints made on me.  Several complaints: not using

19   a licensed PI, or using a licensed PI to do bail

20   bonding work.  I can't remember them all.  It all

21   comes from usually the same person --

22      Q.      Okay.

23      A.      -- or the same group of people in

24   Smithfield.

25      Q.      And who is -- who is that?

1       A.      Dawn Daniels, Niki Daniels, Chris Johnson,

2   pretty much that group.  Or they'll have someone

3   else, like a person we bonded, they would have them

4   make a complaint.

5       Q.      So why do these people file these

6   complaints?

7       A.      Because I pulled a fast one on them back

8   when I first started bail bonding.

9       Q.      Okay.  Tell me about that, please.

10      A.      When I started bail bonding, I found out

11  these individuals were coming from Greenville.  And

12  my general manager was from Greenville.  He told me

13  to watch out for them.  He said we ran them out of

14  Greenville, but I am friends with them.  But you be

15  careful.  And I said, okay.

16              So it wound up, we set it in plan to

17  see if they would do what they were doing in

18  Greenville, paying jailers.  So we would make a ruse

19  that I was paying jailers.  And we knew --

20      Q.      That you were...

21      A.      I was paying jailers.  We made a ruse that

22  I was paying jailers, so that way --

23      Q.      I'm sorry.  Paying...

24      A.      Paying jailers for bonds.

25              MS. BATEMAN:  Can we go off the

25
1    record?

2                        (Discussion off record.)

3          Q.    (By Ms. Bateman)   And when you say "paying

4    jailers," what do you mean?

5          A.    Paying people working in the detention

6    center for bonds.

7          Q.    For bonds?

8          A.    Mm-hm.

9          Q.    Is that improper?

10         A.    Yes, that's improper.

11         Q.    How -- why is -- I don't even understand

12   what that means.

13         A.    You -- you can't even solicit on the

14   grounds of the jail for bail -- bail bonds.

15         Q.    So was the allegation that you were paying

16   jailers to recommend you to people who were being

17   detained?

18         A.    Correct.

19         Q.    And you would -- they would -- so they

20   alleged that you would pay...

21         A.    I told them I was.

22         Q.    You told them you were paying --

23         A.    Mm-hm.

24         Q.    -- jailers for bonds?

25         A.    Mm-hm.

26

1      Q.      And why did you tell them that?

2      A.      Because the way my supervisor at that time

3   was telling me about them doing that very illegal

4   activity, we -- we came up with a plan that I would

5   tell them I was doing that, that very same thing.  So

6   that way, they would start doing it, and then we

7   would report them, and have them gone.

8                Because the business, the type of

9   business that they did was not on the up and up for

10   bail bonding.  It was a bad industry practice of what

11   they were doing.  So we just wanted them out.

12                Found out later that -- well, during

13   this time, that they were trying to get my building

14   that I was in from Hometown Realty away from me.

15   They were trying to take my office and my building.

16   Little did they know, I was purchasing that building

17   with owner finance.

18      Q.      So did they get the building?

19      A.      No.

20      Q.      So these people that you say filed these

21   complaints on you, is it your testimony that those

22   complaints were not legitimate?

23      A.      Correct.

24      Q.      And why were they not legitimate?

25      A.      Well, I -- I conjured this up.  I mean, me

1    and my supervisor made it a plan to make them think I

2    was paying jailers for -- for bonds.

3              When in reality, when I was being

4    investigated by the SBI, they came in, and they

5    thought I had been paying jailers because I was

6    getting business, a lot of business.

7              Well, I told them to take the phone

8    book, pick it up, call the first bail bondsman in

9    there.  They said, you're not in there, you haven't

10   been open long enough.  I said, open the phone book

11   and call the first bondsman.  They did.  Lo and

12   behold, my phone rings in the other room with my

13   wife, and she answered the bail bonds.

14             Because what we do -- what we did is,

15   we purchased all the old phone numbers of all the old

16   bondsmen in all the old phone books to generate new

17   business to get started.  Once they found that out

18   and realized we were getting legitimate business, and

19   not paying jailers, they closed the case.

20        Q.    So were these bail bonding businesses that

21   were no longer in business?

22        A.    Mm-hm.

23        Q.    So that investigation was -- you were

24   cleared during that investigation?

25        A.    Correct.

1        Q.        And were there any other investigations?

2        A.        There was an investigation against me and

3   Chris Johnson, who went to work for that bail bond

4   company.  We put in -- we actually -- my wife helped

5   him straighten out his criminal record, and got all

6   his driving stuff, and his assault charge on the

7   chief of police in Benson, all that cleared up.  And

8   started working with us.

9                Well, then he started having sex with

10  all these women and -- and clients in our office.

11  And due to that, we couldn't have that, so we let him

12  go.  So he went to work for DNA Bail Bonds.  Niki and

13  Dawn Daniels.

14                When he started working for them, he

15  was still collecting premiums for our business on

16  their receipt book.  And that's a no-no.  You don't

17  do that.  That business stays with us.  So we brought

18  it to his attention.  We were going to take him to

19  court.

20                And then the next thing I know, I get

21  a complaint.  And -- so we had to deal with this

22  complaint.  He's on bond with us for a driving charge

23  at that time.  And he was at the magistrate's office

24  taking a no-contact order out on me and Starr.  Well,

25  Starr went to the clerk's office.

1       Q.      And who's Starr?

2       A.      My wife.  She went to the clerk's office to

3   tell him, come on, we're not having this.  You want a

4   no-contact order, that's a violation of your bond,

5   I'm going to take you back.  He jerked back, cussed

6   her out in front of the whole clerk's office,

7   embarrassed her.  She left, she came over to the

8   office crying.

9               I said, don't worry.  I'll go handle

10  it.  I went to the sheriff's office.  I said, I need

11  you to be a presence when I arrest him, because he's

12  going to make a scene.  They would not do it.  So

13  they violated their -- their job.

14              So I went -- they told me he was in

15  the magistrate's office.  I went down there, I said,

16  come on, Chris, let's go.  He wouldn't.

17              My wife intervened.  I -- my back goes

18  out periodically, so that is a medical thing I have,

19  so I will -- if my back went out, I'd have to lay on

20  the floor to straighten it out.

21              So during this time, my back was just

22  starting to straighten out.  So I go -- I said, okay,

23  you're not going, I'm not going to fight you here in

24  the magistrate's office.  I go to my vehicle, get my

25  taser, I come back.

1              I grab my taser, I come back in.  My

2    wife says, no, no, don't tase him.  Let's do this

3    civilly.  So when she goes to handcuff him, he

4    reaches up with his fist, like he's going to strike

5    her, and as soon as he does, I tase him.  We put him

6    in handcuffs, put him in jail.

7              He turns around and sues me, and tries

8    to get me criminally charged for tasing him in the

9    magistrate's office.

10       Q.    And what was the outcome of that?

11       A.    Not guilty.

12       Q.    And has he filed any other complaints

13   against you?

14       A.    I'm sure.  I don't know.  There's so many

15   of them.  I'm telling you, when I say bail bond

16   business is a dirty business, you get complaints just

17   for looking at someone wrong.  So I don't know all

18   the complaints.

19              There was so many complaints that DOI

20   finally took the complaints, but knew it was just

21   because they had a vendetta against us.  So pretty

22   much, we didn't even get to see half of them because

23   they would investigate it and say it's just a

24   repetitious thing.

25       Q.    Did he ever sue you civilly?

1        A.    I think so.

2        Q.    But do you know the outcome of that

3    lawsuit?

4        A.    Oh.  Everything got dropped.

5        Q.    Okay.  So there are no judgments against

6    you?

7        A.    No, ma'am, not that I know of.  Now, there

8    is a judgment on me in Wayne County where I didn't

9    answer -- answer to a lawyer.  I found a missing

10   person.  I found out what happened to him.  He was

11   burnt up in a chicken incinerator.

12               And I did it for the family.  I did it

13   for free.  Well, the family -- the brother wound up

14   suing the family of the man -- the farm he was

15   working for, which was that man's family.  I don't

16   know if that makes sense.

17               So when they -- when the brother of

18   the guy that went missing sued that family, the

19   grandmother had millions of dollars, and she had

20   these high-priced lawyers.

21               Well, I got a letter stating that they

22   needed the recordings of the witness that -- that

23   actually gave me the information of finding this

24   boy's body or what happened to him.

25               Well, I didn't know -- I mean, it's a

1    civil thing.  I'm, like, look, I did this thing for

2    free.  It cost me money.  And I helped her family

3    out.  So I just ignored it.  I -- I was just -- I was

4    too busy.  I was doing other things.

5              And I think they got a judgment on me

6    for a thousand dollars for not answering or giving

7    them the recording that I didn't have.  Law

8    enforcement had it.

9         Q.    So have you paid that judgment?

10        A.    No.  Not going to.

11        Q.    I'm sorry?  You're not going to?

12        A.    No.  I -- I -- I wound up going to the

13   judge and figuring out -- I'm sure they'll dismiss it

14   or drop it.  But I've talked to an attorney about it,

15   and it's no big deal, it's just -- it's got to be

16   done.  It has to get off the record.  So we're going

17   to -- we're going to do that.

18              But that attorney -- the attorney for

19   the defendant didn't realize that I wasn't working

20   for the family.  They thought I was working for the

21   family, but I was not.  I was doing this for free to

22   help find what happened to their son and brother.

23        Q.    So have you ever had any complaints against

24   you as a private investigator in any states other

25   than North Carolina?

```
 1        A.      Yes.

 2        Q.      Can you tell me about that?

 3        A.      Tennessee.  I think, Tennessee.  I wound up

 4    -- was it Tennessee?  Or -- yeah.  I wound up -- I

 5    was doing a -- again, a free thing for a family to

 6    find a missing child, and someone out of Pennsylvania

 7    didn't like my outcome, didn't like what I was doing,

 8    and made a complaint to the State of Tennessee that I

 9    was in their state without a license.

10                    Well, we have a reciprocal license

11    agreement.  I can be in that state for 30, 45 days,

12    60 days, I don't know exactly the number right this

13    minute.

14                    But she made a complaint.  I answered

15    it.  It got dismissed.

16        Q.      In Tennessee?

17        A.      Tennessee.

18        Q.      How about any other states?

19        A.      Tennessee.  If there's another one, it was

20    probably so short that I don't remember it.  But I do

21    remember the Tennessee one.  I think it's the

22    Tennessee one.

23                    It can't be the Kansas one, because

24    the Kansas one, I found the little boy, but I don't

25    remember a lawsuit being out of that, or someone
```

1    making a complaint.

2         Q.    So have you -- you have conducted private

3    investigator activities in other states?

4         A.    Mm-hm.

5         Q.    And have you done that without a license in

6    those states?

7         A.    No, I mean, we have a reciprocal license.

8    I can go in those states and work up to a certain

9    amount of days before I have to get someone else to

10   take over.

11        Q.    And how do you track those days?

12        A.    You have to track it by writing them down.

13        Q.    Okay.  Do you keep --

14        A.    I don't stay in a state no longer than a

15   week.  I get the case solved and I come on home.

16        Q.    Okay.  So have you -- do you keep records

17   about when you go to other states?

18        A.    Mm-hm.

19        Q.    Do you keep records of all your

20   investigations?

21        A.    I have to.

22        Q.    Okay.  Do you --

23        A.    Three years, I have to hold them.

24        Q.    Do you keep those in paper, or

25   electronically?

```
 1        A.      Well, I don't do anything elect- -- I do a

 2   lot of electronic stuff, but most of my stuff, I like

 3   hard copy paper.

 4        Q.      So when you say you do a lot of electronic

 5   stuff, what do you mean by that?

 6        A.      Like, I'll store -- I had this external

 7   file where I'll scan things in and put it in a file.

 8   Or I've got pictures, or photos of a murder scene, or

 9   photos of an autopsy, and I put them in a certain

10   photo -- they come from the state, or come from a law

11   enforcement agency, or from the family, and I put it

12   in a certain file for that.

13               There's a lot that I had on my phone

14   at one time, but then I messed the phone up so bad.

15   It got run over and I had to get a new one.  But

16   nothing transfers if your phone won't work.  So I've

17   lost a lot of -- a lot of stuff.  But my cloud --

18        Q.      I understand.

19        A.      -- picked up a lot of it.

20        Q.      So are you -- is it your testimony that you

21   lost the private investigator files?

22        A.      No, I didn't lose any private investigator

23   -- I've got a lot of photos and stuff.  Like, I don't

24   keep everything on my phone.  I transfer it to an

25   external hard drive, 2 terabytes, so I can have --
```

1    make sure I keep things stored, just in case the

2    Department of Insurance comes in -- or Department of

3    Public Safety comes in and says, we want to see your

4    books.

5        Q.    So who does the Department of Insurance

6    regulate?

7        A.    The bail bonding industry.

8        Q.    And who does the Department of Public

9    Safety regulate?

10        A.    PI, private investigators, law enforcement.

11        Q.    So when you get these autopsy photos from

12    the state, how -- do they just give them to you?  You

13    ask for them, like in --

14        A.    No, I have to request them.

15        Q.    You have to request them?

16        A.    I'm sorry I interrupted you.

17        Q.    I'm sorry?

18        A.    I'm sorry I interrupted you.  I didn't mean

19    to.

20        Q.    That's okay.  Did -- tell me how you're

21    able to get those autopsy photos.

22        A.    I will make a request to the North Carolina

23    Department -- the coroner's office.  I think that's

24    it.

25        Q.    Do they --

Page 37

```
 1      A.    I haven't done it so -- forever.  But if

 2   they do have photos, you can request the photos.  If

 3   you're doing a trial, the criminal stuff, you can

 4   request photos.  You can request the autopsy report.

 5   You can request the notes.

 6      Q.    How are you, as a private investigator,

 7   able to get those documents?

 8      A.    If I'm working for an attorney, I can get

 9   them.

10      Q.    So --

11      A.    I get discovery -- well, I get it on

12   discovery too.  But there was -- there was one from

13   out of state that I requested, and they're not like

14   North Carolina.  They're a totally different kind

15   of...

16      Q.    So who gives you the photos?

17      A.    If I request it, I do it through an

18   attorney.

19      Q.    And the attorney -- you hire the attorney

20   to request the photos?

21      A.    Well, I've hired an attorney several times

22   on doing things for me.  But, no, if I'm working on a

23   case, I'll be able to get the photos, if -- if the --

24   if I request them from the attorney.

25      Q.    You get the photos from the attorney?
```

1        A.      Mm-hm.

2        Q.      If the attorney decides that the attorney

3    will give them to you?

4        A.      Well, they will, because I'm part of the

5    investigation on that case.

6        Q.      Okay.  Can you give me an example of --

7        A.      Or I get it --

8        Q.      -- that if that's --

9        A.      -- from the family.  I get it from the

10   family.  We're talking about several different cases

11   here.  I think we're talking about several different

12   things.

13               I'll do cases for attorneys.  I'll do

14   free cases for families that are missing.  And then

15   I'll do hire cases, for, like, murder, or suspicion

16   of murder, or whatever.

17       Q.      Tell me a situation where you've gotten

18   autopsy photos.

19       A.      Well, just recently we did a case.  And I

20   can't remember the name.  And I've got a whole CD of

21   it.  A whole CD.

22       Q.      And from whom did you get those photos?

23       A.      The attorney.

24       Q.      And who was the attorney?

25       A.      Bob Denning.

```
 1        Q.      And what was the context of your getting
 2   the photos?
 3        A.      I needed to see how the entry wound, the
 4   exit wounds were on the body.
 5        Q.      And were you working for the attorney?
 6        A.      Mm-hm.
 7        Q.      And was the attorney paying you?
 8        A.      Mm-hm.
 9        Q.      And you had a retainer agreement with the
10   attorney?
11        A.      Mm-hm.
12                MR. MULLINS:  Yes.  Sorry.  The court
13   reporter's going to say it, or someone's going to say
14   it.  Just make sure to be audible.
15                THE WITNESS:  Oh.  Yes, yeah,  I'm --
16   I'm just sitting here just dazed off, like...
17                MR. MULLINS:  Not trying to interrupt.
18        A.      I've got some autopsy photos on my phone
19   now, but that's for a missing-person case.  I mean,
20   that's a -- not a missing person.  It's a murder case
21   that y'all are probably pretty aware of.  Faith
22   Hedgepeth.
23        Q.      Okay.
24                MR. MULLINS:  Can we go off the record
25   for one second?
```

1          MS. BATEMAN:  Yes.

2               (Discussion off record.)

3     Q.    (By Ms. Bateman)  Let me ask you this, Mr.

4   Marshburn: Have you -- do you have any liens against

5   you?

6     A.    Not that I'm aware of.

7     Q.    Okay.

8     A.    Unless -- if I do -- I mean, it's not on my

9   credit report.

10     Q.    Okay.  Is the judgment against you on your

11   credit report?

12     A.    I don't think so.  I haven't seen it.

13     Q.    Do you -- when you pay your taxes every

14   year, do you pay them individually?

15     A.    You'll have to ask my wife.

16     Q.    Well --

17     A.    I don't make -- I don't -- let me say this:

18   Last year and this year -- the end of last year and

19   this year, I've worked.  We haven't filed 2024 tax

20   returns yet.  All the other years, I haven't done

21   anything.

22     Q.    So --

23     A.    So she files.  But she does her company tax

24   returns, she does her tax return.  And then if I make

25   nothing, I put zero.

```
 1        Q.      But you have to file a tax return every

 2     year?

 3        A.      Mm-hm.  And 2018 to 2024 is not done yet.

 4        Q.      Say that --

 5        A.      They're not done yet.

 6        Q.      2018 and 2024?

 7        A.      (Witness nodded head up and down.)

 8        Q.      So do you -- have you had any dealings with

 9     the IRS?

10        A.      Oh, yes.

11        Q.      Okay.  Can you tell me about those?

12        A.      Well, in 2000 -- I can't remember the year,

13     but Starr got a 1099 for $200,000 on a landscape

14     business she had.  And we failed to file that, or she

15     failed to file that, rather.  We had already filed

16     our tax return.  And the next thing you know, we get

17     hit with a bill.

18                        And then that bill wound up escalating

19     to a hundred-and-some thousand dollars.  So -- also,

20     I got a call from an attorney out of Charlotte during

21     this time, and we're trying to figure out how we're

22     going to pay the taxes -- and he was talking about

23     how we can do modifications on homes.  Do you

24     remember that issue?

25        Q.      I --
```

```
 1        A.      I mean, the issue that -- modifications on

 2   homes and stuff like that.  But, anyway, so I said,

 3   yeah, I'd love to do it, because that would give us

 4   enough money to start paying on the tax return.

 5   Little did I know, that was a scam.  And I got called

 6   from the attorney general's office to let me know

 7   that it was a scam.

 8                   So we -- it went on for two years.  We

 9   filed bankruptcy.  And I wound up paying it all back

10   by 2017.  And then we got behind on tax returns.  And

11   then the IRS said, we can't have this.  So we hired

12   an accountant, and the accountant's currently working

13   on the other tax returns.

14                   And then in 2012, we just got hit

15   with, oh, you owe twenty-something-thousand dollars.

16   And we're, like, no, that was included in the

17   bankruptcy.

18                   So now, I don't know if it's in limbo,

19   or what it is, but the IRS is -- we're trying to

20   figure out, was it included in the 2012 bankruptcy or

21   not.  Because it went from 2012 to 2017.

22        Q.      So it's your testimony that the IRS has not

23   filed any liens against you?

24        A.      Don't know yet.  I don't know.  I know it's

25   in limbo -- it was in limbo.  Because I made a -- I
```

1    filed an extension of time, because they -- they said

2    we owed them 2- -- 20,000-something dollars for 2012.

3    The state also did -- did also.  And they withdrew

4    $20,000-something from our banking account -- or

5    Starr's banking account.

6                    And then we got that money back.  And

7    then here we are, the IRS is saying, oh, well, you

8    owe us $20,000.  So --

9        Q.    So --

10       A.    -- if I have a lien, or a judgment, or

11   anything from the IRS, I do not know.  I haven't been

12   notified yet.

13       Q.    But you have never received a letter from

14   the IRS?

15       A.    I have, but it wasn't about a lien.  It was

16   about -- they will collect if I don't file this

17   motion for extension for time.  So I have filed for

18   the extension of time, and I've got the CPA working

19   the numbers to make sure we owe -- if we owe, we owe.

20   We'll pay it.  But...

21       Q.    So I'm just going to ask you one more time,

22   to ask you to answer either yes or no.  Have you ever

23   received notice that the IRS has filed a lien against

24   you?

25       A.    I don't know.

```
 1        Q.      You don't know?

 2        A.      I don't know.

 3        Q.      Have you ever received notice that the

 4   State of North Carolina has filed a lien against you?

 5        A.      Time out.  I need clarification.  I need to

 6   know what year you're talking about.  Because they

 7   did do this back in 2008, 2009, or something like

 8   that, when the bankruptcy stuff happened.  But how

 9   about now?  Are you --

10        Q.      No, I'm talk --

11        A.      -- asking now, or...

12        Q.      I'm just asking you if you have any

13   knowledge that the North Carolina Department of

14   Revenue, the State of North Carolina, has filed a tax

15   lien against you, ever.

16        A.      They did.

17        Q.      And do you recall when that was?

18        A.      This past -- I want to say this past year,

19   they were going to file one, they collected the

20   money, and then they returned it.

21        Q.      So the answer to that question is, yes, the

22   State of North Carolina, the North Carolina

23   Department of Revenue filed a tax lien against you

24   this past year.  Is that correct?

25        A.      You're saying, "tax lien."  Lien on what?
```

```
 1        Q.    A lien on any property owned by you?

 2        A.    Not that -- no.

 3        Q.    Okay.

 4        A.    They have not filed anything on my

 5   property, that I know of.  If they did, I didn't see

 6   it in the deed records.  And I just looked at them

 7   six months ago or so.

 8        Q.    Okay.

 9        A.    Matter of fact, an attorney working on our

10   deed right now is -- never said anything about it.

11        Q.    Okay.

12                    (WHEREUPON, EXHIBIT NUMBER 1

13                    WAS MARKED FOR IDENTIFICATION.)

14        Q.    (By Ms. Bateman)  I'm going to show you a

15   document that's been marked Exhibit 1 --

16        A.    Okay.

17        Q.    -- and ask you if you've ever seen that

18   before.

19        A.    (Witness reviewing document.)  Mm-hm.  It

20   looks --

21        Q.    And is that a copy of your license?

22        A.    I can't read it, but my face is on it.  I

23   mean -- hold on.  Let me zoom it in.  It is.

24        Q.    And is this a copy of a post from your

25   social media account?
```

Page 46

1      A.    It appears to be.  But I would say there's

2  something questionable -- well, it might not be.  I

3  don't know.  The dates on it, I can't hardly read it.

4      Q.    Well, let me direct your attention to the

5  top where it says, David Marshburn.  Do you see that?

6      A.    I do.

7      Q.    Do you see the date underneath it?  January

8  13th, 2023?

9      A.    Mm-hm.

10     Q.    Do you recall posting this on January 13th,

11  2023?

12     A.    I don't recall posting it.  But I'm going

13  to assume, yes.

14     Q.    Okay.  So does this mean that you were

15  first licensed as a private investigator in 2023?

16     A.    No.

17     Q.    Okay.

18     A.    I have my licenses since 2009, my very

19  first one.

20     Q.    Right.  So do you recall whether your

21  license expired at the end of May in 2022?

22     A.    I'm not aware of it.

23     Q.    Pardon me?

24     A.    I'm not aware of that date.

25     Q.    Okay.  So is it your testimony that this is

1    a newly issued license?

2        A.    No.

3        Q.    In January of 2023?

4        A.    No.

5        Q.    What -- what is this?

6        A.    This is just to say I am legal.  I mean, I

7    do have a license to practice private investigations.

8        Q.    So prior to this, you were not licensed?

9        A.    I was licensed.  You have to renew every

10   two years.

11       Q.    So this says --

12       A.    You're talking about the issue date?

13       Q.    Yeah.

14       A.    The issue date is -- that's what they do.

15   Every single time, they'll issue the date you did it,

16   and then issue an expiration date of two years later,

17   on every license.

18       Q.    And --

19       A.    They do it on our bail bonding license.

20   Well --

21       Q.    So this --

22       A.    -- no, on the bail bonding license they let

23   you keep the same one.

24       Q.    So this license was issued on what date?

25       A.    The continued license?  It was issued

 1    January 9th, 2023.

 2         Q.    So is it your testimony that you were

 3    licensed on January 8th, 2023?

 4         A.    Yes.

 5         Q.    You were licensed?

 6         A.    If -- if this is a continuance.  Unless I

 7    let it lapse, and then I had to pay the $100 fine.

 8         Q.    But if it lapsed, then you were not

 9    licensed, correct?

10         A.    I'm still licensed, it's just a -- you'll

11    have to ask them the term of it.  It's just in limbo.

12         Q.    It's your testimony that while your license

13    is lapsed, you're still licensed?

14         A.    I mean, I'm temporarily suspended?  Is that

15    what you call it?  I don't know the term, no.

16         Q.    I'm just asking you: Were you permitted to

17    engage in private investigator activities on January

18    8th?

19         A.    I don't -- if I'm not -- if I don't have my

20    license in hand, I don't.

21         Q.    Okay.  Have you ever been criminally

22    charged?

23         A.    Yes.

24         Q.    Can you tell me about that?

25         A.    I've been charged a bunch.

1        Q.      Well, can you tell me about all those

2    charges?

3        A.      You want convictions, or --

4        Q.      Well, I want to know about the charges

5    first.

6        A.      Well, how far back you want to go?

7        Q.      Till you -- since you were 16.

8        A.      16.  You're asking me to go way too far.

9    I've had assaults, I've had -- one, I was charged

10   with possession of a stolen vehicle.  Mainly

11   assaults, but I've had traffic tickets.  But...

12       Q.      How many criminal charges have you had?

13       A.      A bunch.

14       Q.      A bunch?  Too many for you --

15       A.      Yeah, I mean --

16       Q.      -- to remember?

17       A.      Yeah, I mean, there's a lot.  I mean, hell,

18   just with having a bail bond license, I've been

19   arrested, I believe, three times, because -- in the

20   event of doing bail bond business.

21       Q.      Have you ever been criminally convicted?

22       A.      No.  Except -- oh.  Wait.  I was convicted

23   one time, and an assault charge when I found my wife

24   cheating on me, my first wife.

25       Q.      So was that -- was that assault on a

```
 1   female?

 2        A.      There -- yes.  And assault.

 3        Q.      A simple assault, and assault on a female?

 4        A.      Mm-hm.

 5        Q.      You were charged with both?

 6        A.      I was charged with both.

 7        Q.      And were you convicted of both?

 8        A.      At that time, I was, until the motion for

 9   appropriate relief.

10        Q.      And what happened with the motion for

11   appropriate relief?

12        A.      The same judge that was in the original

13   case was Morgan, Michael Morgan, Judge Morgan, my ex-

14   wife knew that it was hindering me, and she went and

15   testified that I did not hit her during that night.

16                But she was so mad that I had really

17   hurt that boy that she was seeing, that -- she was

18   just mad.  And -- and they didn't have to testify

19   that I did anything, because I just went to the

20   courts and told them, I apologized for doing what I

21   did.  And I leave it upon the Court to charge -- you

22   know, to sentence me, or give me whatever.  And he

23   did.  He taught me a good lesson.

24        Q.      So are you saying your conviction was

25   reversed?
```

```
 1        A.     Yes.   On the assault on a female.

 2        Q.     On the assault on a female.  What about the

 3   simple assault?

 4        A.     I still have it.

 5        Q.     Okay.

 6        A.     I earned that one.

 7        Q.     Okay.  I want to take you to your

 8   podcast --

 9        A.     Mm-hm.

10        Q.     -- business.  And is that a business?  Is

11   that a hobby?

12        A.     It's a --

13        Q.     What do you call your podcast business --

14   or what do you call your podcast activities?

15        A.     During that time?  We just, me and -- Joe

16   Preston and I just put it together and put it as news

17   media.

18        Q.     So do you consider it to be a hobby?

19        A.     It's -- I would say hobby.  Let's say

20   hobby.

21        Q.     And why did you and Joe Preston start this

22   social media broadcast?

23        A.     We started right -- right before, I want to

24   say, the collaboration stuff was kicking around,

25   several months before we started on the Ronald
```

1    Johnson issue.

2        Q.    So is it your testimony that you were

3    motivated to start your social media broadcast by

4    your desire to broadcast about Ronald Johnson?

5        A.    No.

6        Q.    No?  What -- what --

7        A.    We -- we collaborated on other issues, far

8    as, we wanted to bring in the politics issue because

9    of the group, CAAG, that was trying to take over our

10   elections.

11       Q.    Okay.  Tell me what the group CAAG is.

12       A.    It's a group of individuals led by a 20-

13   some -- I believe he has 20-some felonies.  Dale

14   Lands.  And a -- I can't -- I never can figure this

15   -- remember this dude's name.  Joe -- John -- I can't

16   remember his last name.

17             But anyway, those two were the ones to

18   collaborate to make this CAAG group to have -- put

19   people in office that agreed with them.

20       Q.    CAAG stands for what?

21       A.    Citizens Government Accountability

22   something or other, something or other.  It's a long

23   name.

24       Q.    So does the podcast -- or does the social

25   media broadcast originate with your Facebook account?

```
 1       A.     I've always had live Facebook stuff going

 2   on with missing children.  But, no, it's -- it had

 3   its own -- own account.  It's just, you can post it

 4   on -- I could post it on up to a thousand people's

 5   Facebook if I wanted to, or YouTube, anywhere.

 6       Q.     Do you post on YouTube?

 7       A.     Yeah.  It automatically does it.  It's a --

 8   it's a program you purchase, you pay yearly for.  And

 9   it automatically -- it does -- a lot of media

10   companies use this -- this software company out of

11   Florida.

12       Q.     And what's it called?

13       A.     It's H -- HD mixer.

14       Q.     Are you the host of the podcast?

15       A.     Joe Preston and I were the hosts.

16       Q.     And Joe Preston died, correct?

17       A.     He did.

18       Q.     And when did he die?

19       A.     I couldn't -- I can't remember the day.

20   I'm bad with dates.  So if you ask me a date --

21       Q.     Well, was it --

22       A.     -- I just cannot --

23       Q.     -- in 2025?

24       A.     No.

25       Q.     Was it in 2024?
```

```
 1        A.       Damn, so much time's gone by.  Can I look
 2   it up?  It's 2023 or 2024, one or --
 3        Q.       Do you recall what --
 4        A.       -- the other.
 5        Q.       -- month it was?
 6        A.       I'll say -- no.  I don't want to guess.
 7        Q.       How long have you known Joe Preston?
 8        A.       At that time, probably around seven months,
 9   eight months --
10        Q.       Would you --
11        A.       -- I would say --
12        Q.       Would you say that you were close with him?
13        A.       We just became good friends real quick.  I
14   mean, it was, like, he -- he had great ideas and
15   things for the political scene, and for Johnston
16   County, so I mean, we really clicked.
17        Q.       How did you meet him?
18        A.       It was at a function in Smithfield at a Ham
19   & Yam -- Ham & Yam Festival.  Excuse me.
20        Q.       And when was that Ham & Yam Festival?
21        A.       (Witness shook head back and forth.)
22        Q.       So you knew him for seven months, and then
23   he died.  Is that your testimony?
24        A.       I want to say it was -- I think it was
25   seven months.
```

1      Q.    Did you go to his funeral?

2      A.    I went to the -- she had a visitation

3  thing, and I did go to that, yes.

4      Q.    And who is "she"?

5      A.    His wife.

6      Q.    And what was his cause of death?

7      A.    They said organ failure.  But I don't

8  believe it.

9      Q.    Okay.  What do you think?

10     A.    Poison.

11     Q.    You think he was poisoned?

12     A.    Mm-hm.

13     Q.    Who do you think poisoned him?

14     A.    I'm not going to speculate on that.

15     Q.    Well, do you have a belief that someone

16  poisoned him?

17     A.    I do.

18     Q.    Well, tell me who you believe poisoned him.

19     A.    His wife.

20     Q.    Okay.  And why would she poison him?

21     A.    You'd have to ask her.

22     Q.    Well, why do you think she poisoned him?

23     A.    She had another interest.

24     Q.    Another interest in another person?

25     A.    Mm-hm.

1      Q.      Okay.  Have you had any people on your

2   podcast besides you and Joe Preston?

3      A.     I have.

4      Q.      And can you tell me who they were?

5      A.      I've had Buddy Berube, I've had Jamie

6   Stoltz, I have had Blake Bizzell, I -- who else have

7   I had?  Gosh, I can't remember all the names.  I

8   mean, it's a lot of people.

9      Q.      How many people have you had?

10     A.      I wouldn't know an exact number.  I know

11   it's over 10, 15 people.

12     Q.      Over 10, 15 people?

13     A.      Mm-hm.

14     Q.      And this -- and when did you first start

15   podcasting -- or broadcasting on your social media

16   page?

17     A.      Under mine?  It's always gone -- it's

18   either -- when you click the button, it goes to its

19   own host, but it also feeds to other ones, if you

20   want it to.

21              Like, if I'm sitting here feeding the

22   host to the David and Joe Show, I can click your

23   Facebook page, you can accept it, and it can feed

24   from your -- your page, unless I automatically have

25   you in there.  And then it can go to YouTube

1    automatically, or Hulu, or whatever.

2          Q.    When did you create the Dave and Joe Show?

3          A.    I want to say several weeks -- several

4    weeks prior to us getting into Ronald Johnson's

5    issues.

6          Q.    Well -- and do you recall when that was?

7          A.    You give me dates.  I can't -- I mean, you

8    put it --

9          Q.    Would -- would it be fair to say it was in

10   June of 2024?

11         A.    I don't think everything started last year.

12   Everything started, like, years ago.

13         Q.    2022 --

14         A.    I mean, we --

15         Q.    -- June of 2022?

16         A.    -- we were -- we were really --

17         Q.    If I told you --

18         A.    Sometime in that time.

19         Q.    Okay.

20         A.    Okay?  Maybe -- I know we spoke -- we did a

21   lot of conversing back and forth to do Ronald

22   Johnson, to do Steve Bizzell.  We did -- we were

23   going to do a commissioner.

24         Q.    What commissioner?

25         A.    God, I wish you hadn't asked that, because

1    -- he's dead and gone now.  He just died not long

2    ago.  Braswell.  Tony Braswell.

3                    We were going to do issues on CAAG

4    having -- there was issues about their finance

5    reports for their non-profit.  And we were just

6    collaborating, like, weeks before all this came

7    around.

8         Q.    Before you started in June of 2022?

9         A.    If we started June 2022, then it was

10   several weeks before that first podcast come out --

11   or the first podcast about Ronald Johnson, that is.

12        Q.    So is it your testimony that you and Joe

13   Preston collaborated for several weeks prior to

14   broadcasting about Ron Johnson?

15        A.    On Ron Johnson's issue.  But we

16   collaborated, like, on way other issues before that,

17   before we nailed it down, and we went to a -- I want

18   -- I hope these times are right.  And I -- to my

19   recollection, they are.

20                    But there was a get-together we had at

21   another person's house, Christine Livingston, where

22   Bo Hines was --

23        Q.    I'm sorry.  Can you -- I just can't -- I am

24   a little bit hard of hearing.

25        A.    All right.

1    Q.    If you have your hands in front of your

2    mouth, it makes it hard for me to read your lips.

3    A.    There was a function at Christine

4    Livingston's house.

5    Q.    And who is Christine Livingston?

6    A.    She's another blogger/podcaster.  She

7    blogs.  And I'm sure you -- someone has showed you

8    her blogs.

9    Q.    Does she -- does she do these social media

10   podcasts on Facebook?

11   A.    She does the blogs on Facebook.  She

12   doesn't do any videos.

13   Q.    She doesn't do any videos?  So --

14   A.    No.  She's been on my podcast.

15   Q.    And what did she talk about at your

16   podcast?

17   A.    The election.

18   Q.    What election?

19   A.    Election issues and stuff.  I let them have

20   the floor, and they took the whole podcast.

21   Q.    And when you say "they," who is they?

22   A.    It was her and her guests that she had at

23   that time.  And I can't recall who they were.

24   Q.    Who was her guest?

25   A.    I can't recall who her guests were.

```
 1        Q.     Was it a female or a male?

 2        A.     She had two.  I know there was two people

 3   there.  I'm trying to picture in my head who they

 4   were.  I can't recall.  You'll just have to go back

 5   and look at it.

 6        Q.     Okay.  When was it?

 7        A.     It was during the time frame we were doing

 8   the Dave and Joe show.

 9        Q.     And how long did you do the Dave and Joe

10   show?

11        A.     Up until he died.

12        Q.     And when was that?

13        A.     That, I can't -- I don't know the date.  I

14   don't -- I mean, if I can -- if I google it, I'd be

15   able to see it.  But...

16        Q.     Okay.  You know what?  I think Mr. Mullins

17   wants to take a break to --

18               MR. MULLINS:  Deal with cars.

19        Q.     (By Ms. Bateman)  -- deal with cars.  So

20   I'm going to let you google that, and come back and

21   tell me, maybe, if you can remember when Joe Preston

22   died.

23        A.     Well, I'll have to -- I'll have to go back

24   and call my wife to go ask her to go back to my

25   podcasts, though.
```

```
 1      Q.      Well, I think we'll be gone at least 10
 2   minutes.  So...
 3      A.      Okay.
 4      Q.      You do what you need to do.
 5      A.      Dates and times --
 6      Q.      Okay.
 7      A.      -- you're going to get me --
 8      Q.      Well --
 9      A.      -- really bad on that.
10      Q.      -- you know, here's the thing, Mr.
11   Marshburn.  In order to be a credible witness, you're
12   going to have to have some recollection of dates and
13   times.
14      A.      All right.
15      Q.      I'm not asking you to trip you up.  I'm
16   just asking you what your --
17      A.      Oh, I can tell you the truth --
18              (Reporter clarification.)
19              MR. MULLINS:  We can go -- can we just
20   do this off the record?
21              (WHEREUPON, A SHORT BREAK WAS TAKEN.)
22      Q.      (By Ms. Bateman)  Okay.  Mr. Marshburn, I'm
23   going to go back and ask you about a few people.
24   Tell me who Blake Bizzell is.
25      A.      The sheriff's son.
```

1       Q.    The sheriff's son?  And why did you have

2  him on your show?

3       A.    He needed -- he wanted to discuss issues

4  with the sheriff's department.

5       Q.    And what were those issues?

6       A.    Policy; procedure; and overall, the

7  handling of the sheriff's office.

8       Q.    Does he work for the sheriff's office?

9       A.    He used to.

10      Q.    And why doesn't he work for them anymore?

11      A.    You'll have to ask him.

12      Q.    Do you know why he doesn't?

13      A.    I do not know.

14      Q.    Has he talked to you about why he doesn't

15  work for the sheriff's office?

16      A.    Yes.

17      Q.    What did he tell you?

18      A.    He left because of issues between him and

19  his dad.

20      Q.    What kind of issues?

21      A.    Don't know.

22      Q.    Well, what did he tell you?

23      A.    I don't remember.

24      Q.    Who is Buddy Berube?

25      A.    A friend.

```
 1        Q.    And why did you have him on your show?

 2        A.    He worked for the sheriff's department.

 3        Q.    Was he another disgruntled employee?

 4        A.    I don't know.

 5        Q.    Did you tell you why he no longer worked for

 6    the sheriff's department?

 7        A.    He mentioned it, yes.

 8        Q.    What did he tell you?

 9        A.    He went to work for Ashley Turner.

10        Q.    Who is Ashley Turner?

11        A.    A builder.

12        Q.    So the only reason he no longer works for

13    the sheriff's department is because he got a better

14    job?

15        A.    I can't answer that.  He'll have to answer

16    that.

17        Q.    Did he tell you why he stopped working for

18    the sheriff's department?

19        A.    He mentioned -- he talked about it.  But

20    again, I don't know the exact details.  It was

21    something about procedure and policy, from what I

22    remember.

23        Q.    And who is Chris Johnson?

24        A.    A bail bondsman.

25        Q.    Pardon me?
```

```
 1      A.    A bail bondsman.

 2      Q.    And why did you -- is that a him or a her?

 3      A.    Him.

 4      Q.    And why did you have him on your show?

 5      A.    I didn't have him on my show.  I --

 6      Q.    Oh, you didn't?

 7      A.    No.

 8      Q.    How do you -- what -- what -- what does he

 9  do?  Why is he related to this?

10      A.    You asked me a question about bail bonding,

11  and his name came up.

12      Q.    Okay.  So that's just -- he's the one who

13  you used to work with.  And then you fired him; is

14  that right?

15      A.    We told him his services were no longer

16  needed.

17      Q.    And then he sued you, correct?

18      A.    Mm-hm.

19      Q.    And he made complaints against you?

20      A.    Mm-hm.  Correct.

21      Q.    Yes.  Correct?

22      A.    I'm sorry.

23      Q.    And -- and then you said he made complaints

24  against you because you let him go; is that correct?

25      A.    Correct.
```

1    Q.    Who is Niki Daniels?

2    A.    A bail bondsman.

3    Q.    Is that he or a she?

4    A.    He.

5    Q.    Is that N-i-c-k-y?

6    A.    I don't know how he spells it.

7    Q.    And is he a friend of yours?

8    A.    No.

9    Q.    Did he also make complaints against you?

10   A.    Yes.

11   Q.    And what kind of complaints?

12   A.    There were so many.  But the number one

13   complaint was, I was paying jailers for bonds.

14   Q.    And to whom did he make that complaint?

15   A.    The district attorney and the Department of

16   Insurance.

17   Q.    The Johnston County District Attorney?

18   A.    Yes, ma'am.

19   Q.    Did the Johnston County District Attorney's

20   Office ever do an investigation?

21   A.    Yes.

22   Q.    And did they interview you as part of that

23   investigation?

24   A.    The SBI did.

25   Q.    Who at the SBI interviewed you?

```
 1        A.      I don't remember the lady's name.  But the

 2    gentleman's name was Kent Parrish.

 3        Q.      Kent Parrish?

 4        A.      Uh-huh.

 5        Q.      P-a-r-r-i-s-h?

 6        A.      Correct.

 7        Q.      And what year was this?

 8        A.      I don't recall.

 9        Q.      And who is Christine Livingston?

10        A.      A friend.

11        Q.      Did you have Christine Livingston on your

12    show?

13        A.      I don't know if I had her on my show, like

14    Joe Preston and I interviewing her, but I let her use

15    my podcast to get across messages about politics and

16    issues.

17        Q.      And what messages did she get across?

18        A.      I don't remember.  I don't know.

19        Q.      Did you listen to the podcast?

20        A.      No, I didn't.

21        Q.      Were you present when she did the podcast?

22        A.      I was in and out.

23        Q.      You were in...

24        A.      I was in and out.

25        Q.      And do you recall when she did the podcast?
```

```
 1      A.      I do not.

 2      Q.      Are you responsible for the content on your

 3   podcast?

 4      A.      Joe Preston and I were responsible for the

 5   content.

 6      Q.      Okay.  But you don't know what contents she

 7   broadcast?

 8      A.      If she was doing her own, it was Joe

 9   Preston that actually oversaw that material.  I was

10   in and out.  I didn't -- I'm not into the big

11   political conspiracy type deal they were trying to

12   maneuver at that time, and I can't remember which one

13   it was.  There's so many.  But I was in and out.  But

14   Joe Preston was there present most of the time.

15      Q.      And do you recall when this was?

16      A.      I do not.

17      Q.      Okay.  Who is Joe Wiesner?

18      A.      A friend.

19      Q.      And did you have him on your podcast?

20      A.      Yes.

21      Q.      And when did you have him on your podcast?

22      A.      I don't recall.

23      Q.      And why did you have him on your podcast?

24      A.      I don't remember that podcast actually

25   making it to the screen -- to the public at that
```

```
 1    time.  It may have.  But I don't remember all the

 2    podcasts we did.

 3              But we would do some and never --

 4    never air them -- air them.  We would -- we would not

 5    air them at that time.  But I do remember him being

 6    part of one of our shows, because I used that -- his

 7    image for the opening credits -- or opening.

 8    Q.    So I called him Joe.  Is his name Jim or

 9    Joe?  Is it Jim or Joe?

10    A.    Which one?  Joe --

11    Q.    Wiesner.

12    A.    Jim Wiesner.

13    Q.    Jim Wiesner.  And you used his image on the

14    broadcast?

15    A.    Yeah.  We used several people being on the

16    podcast.  But we also used some of the people that

17    did an interview, but some of those never made it to

18    the show.

19    Q.    Do you have all of the podcasts saved?

20    A.    No.

21    Q.    Why not?

22    A.    Some would record and some would not.  It

23    depends on what that system was doing at that time.

24    We -- I think we got the kinks worked out of it.

25    Q.    I'm sorry.  Could you say that again?
```

```
 1      A.      I think the kinks are worked out of it now.

 2      Q.      So when you say "back then," when would

 3   that have been?

 4      A.      When we first started.

 5      Q.      In 2022?

 6      A.      I don't remember.

 7      Q.      And why did you have Jim Wiesner on your

 8   podcast?

 9      A.      He wanted to be on it.

10      Q.      And what did he talk about?

11      A.      Politics.

12      Q.      And what about politics?

13      A.      I believe we were having a discussion about

14   Dickie Braswell.

15      Q.      Dickie, D-i-c-k-i-e?

16      A.      That's his nickname.  It's Richard

17   Braswell.

18      Q.      Spell the last name.

19      A.      Braswell, B-r-a-s-w-e-l-l.

20      Q.      And who is he?

21      A.      He was a commissioner.

22      Q.      A county commissioner --

23      A.      County commissioner.

24      Q.      -- in Johnston County?

25      A.      Yes, ma'am.
```

```
 1      Q.      And why is he no longer a commissioner?

 2      A.      He was convicted of child molestation, I

 3   believe.  I don't know the exact terminology they

 4   used.

 5      Q.      And when was that?

 6      A.      I don't remember.

 7      Q.      Was it this year?

 8      A.      Last year.

 9      Q.      2024?

10      A.      Mm-hm.

11      Q.      And who replaced him on the county

12   commissioners?

13      A.      Jesus.  Why can I not remember?

14      Q.      Is that your answer?  You don't remember?

15      A.      How can I -- hold on.  Bill Stovall.

16      Q.      Are you testifying that Bill Stovall

17   replaced Dickie Braswell?

18      A.      Yes.

19      Q.      And did that occur this year?

20      A.      Last year, I believe.

21      Q.      And who is Bill Stovall?

22      A.      Or a year -- I don't remember the year.

23      Q.      And who is Bill Stovall?

24      A.      He is a county commissioner.

25      Q.      What does he do otherwise?
```

```
 1      A.    I don't know.

 2      Q.    Okay.  Who is Jim Davenport?

 3      A.    A friend.

 4      Q.    Friend.  Did you have him on your

 5  broadcast?

 6      A.    Yes.

 7      Q.    And what did he talk about on your

 8  broadcast?

 9      A.    Policy and procedures in the sheriff's

10  department.

11      Q.    And how does he know what the policies and

12  procedures were in the sheriff's department?

13      A.    He said there was none.

14      Q.    Well, how does he know that?

15      A.    He did a -- from his -- he did a FOIA

16  request for a policy and procedure, and was never

17  given one by the sheriff.

18      Q.    Well, when you're saying "a FOIA request,"

19  do you mean a public records request?

20      A.    Yes, ma'am.

21      Q.    And did he receive records from the

22  sheriff's department?

23      A.    No, ma'am.

24      Q.    Are you saying because he received no

25  records, he concluded there were no policies?
```

```
1       A.      That was his opinion.

2       Q.      Did you agree with that opinion?

3       A.      (Unresponsive.)

4       Q.      That's either yes or no.

5       A.      Yes.

6       Q.      Did you agree with him for the same reason?

7       A.      Yes.

8       Q.      Did he ever work at the sheriff's

9  department?

10      A.      I don't know.

11      Q.      Okay.  I'm going to show you -- and I'll

12 put it in front of you.  Let me ask you this: Are you

13 recording the deposition?

14      A.      You are.

15      Q.      No.

16      A.      Not me.

17      Q.      These -- these recorders that you have?

18      A.      They're hers.

19              MS. BATEMAN:  Those are yours.  Got

20 it.  Okay.

21      Q.      (By Ms. Bateman)  Are you recording the

22 deposition?

23      A.      No.

24      Q.      Okay.  I put an exhibit in front of you,

25 and it's marked Exhibit Number 3.
```

```
 1      A.      Do you want this one back?

 2      Q.      No.  Give that one to the court reporter,

 3   please.

 4      A.      Okay.

 5      Q.      I skipped Number 2 because I believe that

 6   there is a transcript of a broadcast prior to this

 7   one.  And I'm going to try and find it, and we'll go

 8   back and discuss it.

 9                   (WHEREUPON, EXHIBIT NUMBER 3

10                   WAS MARKED FOR IDENTIFICATION.)

11      A.      Is -- is this -- this transcript, has it

12   been done by a court reporter?

13      Q.      Is that a question for me?  No, I'm asking

14   you to look at this transcript.

15      A.      But is it a certified copy?

16      Q.      I'm just telling you it's the exhibit I put

17   in front of you.

18      A.      Okay.

19      Q.      The exhibit I put in front of you, we've

20   marked as Exhibit 3.  It's 40 pages.  And I'm going

21   to get you to turn to page 3 and look at the 10:32

22   mark where it says, "And the reason"?

23      A.      Okay.

24      Q.      So if you go back up to 10:19, it says (as

25              read): All right, updates on the detective
```

```
 1              have seemed to be put on pause.

 2                   Do you see that sentence?

 3       A.     I do.

 4       Q.     Is that reference to, quote, the detective,

 5  closed quote, to Mr. Johnson?

 6       A.     I'm not going to comment on this because I

 7  don't know where it came from.

 8       Q.     Well, I'm just asking you.

 9       A.     You never told me what this is.

10       Q.     I'm going to tell you, for purposes of this

11  exhibit and the questions that I'm going to ask you

12  now, that this is a document, the recording of which

13  has been produced in discovery.

14                   If you look on the first page at 1621,

15  and this purports to be a June 27th, 2022, broadcast

16  -- transcript of a broadcast that you disseminated to

17  the public.

18                   So do you recall saying (as read):

19              Updates on the detective have seemed to be

20              put on pause.

21       A.     I'm not going to comment on this

22  transcript.

23       Q.     Well, you have to answer my question.

24  Either yes --

25       A.     I -- I -- and I'm --
```

```
 1      Q.      -- or no.
 2      A.      -- answering you.  I'm -- I'm not going to
 3  comment on a transcript that's not transcribed by a
 4  certified person.  Because I don't know -- you're
 5  saying these are my words.
 6      Q.      No.  I'm asking you --
 7      A.      You're saying --
 8      Q.      I'm asking you --
 9      A.      -- these are my words.
10      Q.      Listen to -- listen to my question.  My
11  question is: Do you recall -- I want to tell you, I
12  have two copy boxes over here.
13      A.      Okay.
14      Q.      And if your answer is going to be yes, or
15  no, that you don't remember, or you do remember,
16  that's fine.  We'll just go through every single one
17  of them, and you can do that.
18      A.      Okay.
19      Q.      But I want to know if you recall saying (as
20              read): Updates on the detective have seemed
21              to be put on pause.
22      A.      I don't recall.
23      Q.      Do you recall, looking down at 10:32,
24  saying (as read): And the reason why we're quiet
25  about it is
```

1          because we -- it's -- it's, like, that the

2     morale -- moral issue on the affair seems

3     to not bother people.

4               Do you recall that statement being

5     made on your broadcast?

6          A.    No.

7          Q.    Do you deny that it was made on your

8     broadcast?

9          A.    I don't remember.

10         Q.    Let's turn over to page 4.

11               MS. BATEMAN:  Can we go off the record

12    for a second?

13               (Discussion off record.)

14         Q.    (By Ms. Bateman)  Mr. Marshburn, it has

15    been pointed out to me that every audio and every

16    transcript have been produced for you in discovery.

17    Have you reviewed those transcripts and audio --

18         A.    No.

19         Q.    -- files?  You have not reviewed them?

20         A.    I can't open them.

21         Q.    Okay.  Did you let me know that before

22    today?

23         A.    I told you I wanted a copy of discovery for

24    my own.  You sent the information with me and the

25    Town of Smithfield together, so I don't know whose is

```
 1    whose.  And I'm confused with it.

 2                 So I'm -- I asked for it separate, and

 3    I haven't received it.

 4         Q.    Do you recall getting a link to this

 5    discovery?

 6         A.    No.

 7         Q.    Okay.  Would it surprise you to know that

 8    there is an email out there that has a link to the

 9    discovery in it with your email address on it?

10         A.    I'm sure there is.

11         Q.    So do you deny receiving that email?

12         A.    I've received a lot of emails.  And you did

13    send links, but I cannot open it.

14         Q.    Okay.  What's the issue with not opening

15    them?

16         A.    I opened one with an email address.  It's

17    some kind of link thing, that you have to put your

18    email address.  I got open that.  But other than

19    that, there was nothing like this on there, I don't

20    recall.

21         Q.    So looking on page 4 at the 11:21 remark, I

22    want you to take a minute and read from 11:21 to

23    12:02.

24         A.    (Witness reviewing document.)

25         Q.    Do you deny that those statements were made
```

```
 1   on your broadcast?
 2        A.    I made comments.  I'm not going to say that
 3   this is correct, because I don't know who transcribed
 4   it.
 5               I will say that I did state that --
 6   that the legal stuff is coming, because we want a
 7   copy of the 50C that was filled out by Ronald
 8   Johnson, and we were going to share that with the
 9   public.
10        Q.    Okay.  And the 50C, are you talking about
11   no-contact order?
12        A.    Correct.
13        Q.    And that's what you were referring to on
14   this June 27th broadcast?
15        A.    For perjury.
16        Q.    For perjury?
17        A.    Correct.
18        Q.    Okay.  So you admit that on your broadcast,
19   you made the statement, "I mean, he committed
20   perjury"?
21        A.    Yes.
22        Q.    And did you also make the statement below
23   that?  (As read): I mean, perjury is -- is something
24               he's done right-out with the court system,
25               so that -- that is what it is.
```

```
 1        A.      That's fair to say I would say that.

 2        Q.      Okay.  I'm going to hand you what we're

 3   going to mark as Exhibit 4.

 4        A.      Are we done with Exhibit 3?

 5        Q.      We're done with Number 3.

 6                (WHEREUPON, EXHIBIT NUMBER 4

 7                WAS MARKED FOR IDENTIFICATION.)

 8                     MR. MULLINS:  Is this for me and

 9   Ronald to look on?

10                     MS. BATEMAN:  Yes.

11                     MR. MULLINS:  Is this for me?

12                     MS. BATEMAN:  Yes.

13                     MR. MULLINS:  Okay.  Sorry.  Thank

14   you.

15        Q.      (By Ms. Bateman)  Okay.  I'm going to get

16   you to turn to page 5.  At the top of page 5, there's

17   a comment that says (as read): We're going to play a

18           video.

19           Do you see that?

20        A.      I see it.

21        Q.      And do you recall what video that was?

22        A.      I do not.

23        Q.      Okay.  And I'm going to take you to page 6

24   at the 2:41 mark.

25        A.      Mm-hm.
```

```
 1      Q.    Where there's a comment that says (as

 2            read): So just taking some feedback from

 3   what everybody has been saying in the

 4   comments and everything, it appears there

 5   are a number of people that, for some

 6   reason, don't see infidelity as a really

 7   big deal.

 8                 Do you see that comment?

 9      A.    I see it.

10      Q.    Do you deny that that comment was made on

11   your broadcast?

12      A.    Who made the comment?

13      Q.    I'm asking you: Did you make that comment?

14      A.    Did I make that comment?

15      Q.    Yes.

16      A.    I don't remember.

17      Q.    Take you to page 7.  At the 3:39 mark, it

18   says (as read): Johnson's statements that we're going

19            to go through, it sounds like there's some

20   sort of admission to something that

21   actually happened.

22                 Do you see that comment?

23      A.    I see it.

24      Q.    Do you -- did you make that comment?

25      A.    I don't remember.
```

1    Q.    Okay.

2    A.    And again, this -- this is not a certified

3  copy, either, correct -- exhibit?

4    Q.    This is Exhibit Number 4.

5    A.    Not certified, correct?

6    Q.    If you go to -- if you go to page 9.  At

7  the beginning of page 9, beginning at the 5:30 mark,

8  going to 5:33, 5:40, 5:44, and 5:58, it says (as

9            read): They may find things that are just

10           unethical.

11               However, if you go beyond the criminal

12           definition of corruption, you will find

13  that it doesn't necessarily have to meet a

14  general statute.

15               There can be corrupt activities that

16           aren't defined by law.

17               However, if you're looking to skirt

18           the law in order for personal gain, or in

19  order to do something unethical, then it

20  doesn't matter if you're breaking the law

21  or not, you're corrupt.

22               5:58 (as read): So we played that a

23           couple of times at the end of the last

24  show, and it's his own words talking about

25  being unethical.

1           Do you see those comments?

2      A.    Yes.

3      Q.    And did you make those comments on your

4  show?

5      A.    Which ones are my comments?

6      Q.    Pardon me?

7      A.    Which ones are my comments?

8      Q.    I'm asking you.

9      A.    That's what I'm saying.  You've -- you

10  stated I played video.  So which part is the video

11  cut-off and I start talking?

12      Q.    No, I'm asking you: Did you make these

13  comments on your show?

14      A.    Is this the video, or me?  I played a video

15  with Ronald Johnson making these exact claims about

16  being unethical.  I do remember the exact wording

17  here.

18           I'm asking: After I played that video,

19  which words are mine?

20      Q.    I'm asking you to tell me that.

21      A.    I recall saying, "It doesn't matter if you

22  broke the law, you're still corrupt."  I do remember

23  making that statement.

24      Q.    And were you referring to Mr. Johnson?

25      A.    I was.

```
 1        Q.     Now, if you go down to the 6:10 mark.  It
 2   says (as read): So let's go ahead and pull up the two
 3              statements that he made on July 8th and
 4              July 13th regarding resigning from the
 5              board.
 6                   Do you see that statement?
 7        A.     I see it.
 8        Q.     Was it your goal to have him resign from
 9   his board of education seat?
10        A.     Was it my what?
11        Q.     Your goal.
12        A.     My goal?
13        Q.     Mm-hm.  Yes.
14        A.     For...
15        Q.     Ronald Johnson to resign from his board of
16   education seat.
17        A.     Was that my main goal?
18        Q.     I'm just saying, was it any goal?  Did you
19   have -- did you want Mr. Johnson to resign from his
20   board of education seat?
21        A.     I did.  Are your pages numbered? because
22   mine are not.
23        Q.     Pardon me?
24        A.     Are your pages numbered?  Mine are not.
25        Q.     Well, let me --
```

1    A.    Where do I need to start numbering them?

2    Q.    No, no, no.  But I don't -- I don't think

3  it matters.

4    A.    I mean, I'm on Number 9.  I have to

5  remember --

6    Q.    Right.

7    A.    -- keep in my head where we're at.  So --

8         THE WITNESS:  Can I borrow your pen?

9         MR. MULLINS:  I think as long as we

10  keep saying the timestamps, no issues for me.  So...

11         MS. BATEMAN:  Yeah.

12    Q.    (By Ms. Bateman)  All right.  Did you

13  understand Mr. Johnson to say that he has suffered

14  from the false accusations that have been made about

15  him?

16    A.    He claimed to have suffered false claims.

17  He made --

18    Q.    After he claimed that, did you go back and

19  ascertain whether all the statements that you had

20  made about him were true?

21    A.    They were true.

22    Q.    Did you ever double-check that?

23    A.    We had the information in front of us.

24    Q.    And what information was that?

25    A.    We had statements from Angie Barbour, and

```
 1   we had the actual 50C in front of us.

 2        Q.    Tell me -- tell me -- let's stop there.

 3   Tell me about the statements from Angie Barbour.

 4        A.    What about them?

 5        Q.    Well, what -- what did they say?

 6        A.    I don't remember all of them word for word.

 7        Q.    Well, you don't have to remember all of

 8   them word for word.  Just tell me what you recall

 9   about those statements.

10        A.    That Ronald had her record other

11   politicians, that Ronald and her were having an

12   affair; that they would meet while he was on duty and

13   have sex in her car, or sexual activity, like oral

14   sex.  You want all the details?

15        Q.    I want all -- I want all the details.

16        A.    Okay.  And there was an issue where -- and

17   -- okay.  So let's talk about he liking certain

18   sexual deeds done to him while they were having sex.

19   She talked about having them meet another officer at

20   the Smithfield PD to get a fob -- key fob to record

21   people at a GOP meeting.

22        Q.    And who was that?

23        A.    I don't remember his name.

24        Q.    But it was not Ron Johnson?

25        A.    It was Ronald and the other detective
```

1    meeting her at the police department, another

2    officer.

3         Q.    You don't recall the other detective?

4         A.    It's in the investigation report.

5         Q.    His --

6         A.    His name.

7         Q.    Is in what inves- --

8         A.    His name.

9         Q.    But what investigation report are you

10   referring to?

11        A.    The Smithfield investigation.

12        Q.    So is that part of the discovery that's

13   been turned over to you?

14        A.    That was from him.

15        Q.    The Town.  So you were able to review the

16   Town's discovery?

17        A.    Mm-hm.

18        Q.    Okay.  And --

19        A.    If you want the name -- because I don't

20   know the name, and even -- I don't --

21        Q.    And for --

22        A.    -- know the name.

23        Q.    -- what purpose -- do you recall for what

24   purpose Angie Barbour said she and the other

25   detective met her and asked her to record the GOP

```
 1   meeting?

 2        A.      Yes, because the -- Ronald met her -- or

 3   they went over there to meet the officer to get the

 4   key fob so he could show her how to use it.

 5        Q.      And was -- this was an officer with the

 6   Smithfield PD --

 7        A.      Correct.

 8        Q.      -- who was part of this request to Angie

 9   Barbour to record the GOP meeting --

10        A.      It wasn't a request from Angie.  It was a

11   request from Ronald.  Ronald had her do the recording

12   -- wanted her to do the recording.

13        Q.      Well, you just said a minute ago it was Mr.

14   Johnson and another Smithfield PD.

15        A.      Yeah.  They were there together.  Ronald --

16   it was either Ronald and Angie went over there

17   together, but they were all there together with the

18   other officer.  And she was to collect a key fob from

19   that officer to record people at a GOP meeting on

20   behalf of Mr. Johnson.

21        Q.      And the Smithfield PD?

22        A.      No, not the officer.  The officer was just

23   letting her use the equipment.

24        Q.      The Smithfield PD equipment?

25        A.      Mm-hm.
```

1    Q.    Okay.  And -- and you know this because

2  Angie Barbour told you?

3    A.    She told me about it.  And from what I -- I

4  know about recording devices, you cannot -- as a

5  general public person, they are not -- any -- anyone

6  selling a video and audio together is not allowed.

7  It's a federal crime.

8              You cannot purchase one unless you're

9  a law enforcement officer with an agency, or you're a

10  private investigator with credentials.

11    Q.    And did Angie Barbour tell you that she did

12  go over and record the GOP meeting?

13    A.    She said she tried to use it but she

14  couldn't figure it out.

15    Q.    Okay.  And does -- and what happened to the

16  key fob?

17    A.    I don't know.

18    Q.    Did she tell you what happened to the key

19  fob?

20    A.    I guess it went back to them.  I don't

21  know.  If she told me then that -- what she did with

22  it, I don't remember.

23    Q.    And what else did she tell you that caused

24  you to believe that your statements about Mr. Johnson

25  were true?

1      A.      She talked about other teachers -- I gotta

2    get this right in my head because there's so much she

3    was telling -- that other teachers could verify that

4    Ronald and her were having an affair.

5      Q.      I'm sorry.  Can you move your hands again?

6      A.      Oh, I'm sorry.

7      Q.      I apologize.

8      A.      I'm sorry.  I've got a sore tooth.  So...

9      Q.      So other than having the affair, did she

10   tell you that -- anything else that Ronald Johnson

11   did that caused you to believe that the statements

12   you made about him were true?

13     A.      Oh, yes.  I mean, there was other things,

14   like, he would take the recordings and rework them to

15   make it work in his favor.  That there was a lot of

16   recordings, that she knew about, that he had, and

17   that he carried -- he had multiple, multiple phones.

18                    And then she gave me instances, like,

19   she talked about the Bennett Jones deal, how that was

20   all a farce, that Bennett Jones -- you know, Ronald

21   was responsible for Bennett Jones being investigated.

22     Q.      Okay.  Let me stop you right there and get

23   you to tell me, when you say "the Bennett Jones

24   deal," to what are you referring?

25     A.      Where Bennett Jones was suspended as the

1    high school principal.

2         Q.    And when did this occur?

3         A.    I don't remember the date.

4         Q.    Okay.  And why was he suspended?

5         A.    Because -- heck, this is so complicated.

6    Ronald Johnson and the Cleveland High School coach

7    got together, and they went and wanted -- wanted to

8    pretty much sideline, from what I -- the information

9    I was told, sideline the Clayton High School coach

10   because there was a problem with the Clayton High

11   School coach and the Cleveland High School coach.

12                 Ronald wound up with a FOIA, or a --

13   not a FOIA, but a HIPAA -- is it HIPAA, or -- I can't

14   remember the exact name of the paperwork, of a

15   student.  When Ronald showed up and showed the paper

16   to Bennett Jones, Bennett Jones had caught on real

17   quickly, you're not supposed to be in possession of

18   that form or that -- that paperwork of a student.

19                 And then Ronald backtracked and said,

20   well, you know -- I don't know the exact wording of

21   everything -- but at that point, it was just a

22   football coach they were going after.  But now he has

23   to go after Bennett Jones because Bennett Jones has

24   got him on a FERPA violation.

25         Q.    Okay.  Let me ask you this: Are you telling

1    me what Angie Barbour told you?

2         A.    Angie told me -- I mean, a lot of people

3    told me.  I'm trying to get it exactly what she --

4    she was a watered-down version of some of the stuff.

5    And then Bennett Jones filled in the other details.

6         Q.    So Bennett Jones told you these things as

7    well?

8         A.    Oh, there's a lot more --

9         Q.    Who else --

10        A.    -- people, it's just -- not just -- it's

11   not -- it's not just Angie Barbour.  There's Bennett

12   Jones.

13        Q.    Okay.  So you also talked to Bennett Jones

14   about the Bennett Jones thing?

15        A.    Correct.

16        Q.    Who else did you talk to about the Bennett

17   Jones thing?

18        A.    What's the name?  Dag dammit.  Eddie --

19   Eddie Price.

20        Q.    And who's Eddie Price?

21        A.    Eddie Price was the -- I want to say

22   assistant superintendent of the schools.  I can't

23   remember his exact title.  But I knew Eddie Price

24   when he taught me in school.

25        Q.    Okay.  So you and Eddie Price discussed the

1    Bennett Jones incident?

2        A.    Very little, because Eddie Price said you

3    need to hear it straight from Bennett Jones.  So he

4    introduced me to Bennett Jones.

5        Q.    Okay.  When did you first meet Angie

6    Barbour?

7        A.    I don't remember the date.

8        Q.    How long have you known her?

9        A.    It was shortly after -- I met her in person

10   shortly after a meeting at Christine Livingston's.

11       Q.    At Christine Livingston's?

12       A.    Mm-hm.

13       Q.    And when was that meeting at Christine

14   Livingston's?

15       A.    I don't remember the date.

16       Q.    Was it in 2025?

17       A.    No.

18       Q.    Was it in 2024?

19       A.    You're trying to pin me down.  I can tell

20   you, I don't remember.

21       Q.    I'm just trying to get a general --

22       A.    It had to be --

23       Q.    -- understanding since --

24       A.    -- before we did -- before we did our

25   podcast.

1      Q.    Before you did your podcasts?

2      A.    Mm-hm.

3      Q.    Okay.  And what was the purpose of that

4  meeting?

5      A.    At Christine Livingston's house, that's

6  when it came out that Ronald was having an affair on

7  his wife.  And that came from Jim Wiesner.

8            But we suspected a mole within the

9  group going back and telling CAAG and Ronald Johnson.

10     Q.    So who was at this meeting?

11     A.    I don't remember everybody.  But it was Bo

12  Hines, I do remember; Christine Livingston, her

13  husband.

14     Q.    What's her husband's name?

15     A.    But are you talking about in just this

16  little meeting group we had, or --

17     Q.    Yes.

18     A.    -- are you talking about the whole part --

19  oh, no.  The whole party -- not the whole party, but

20  just a group.  Okay.  Well, scratch what I just said

21  because I was trying to name people in the party,

22  like, at the party, having fun.  Okay.

23            Just in the meeting, it was Christine

24  Livingston, Joe Preston, me, Jim Wiesner, Rick

25  Walker.  I want to say Christine's husband was

1      sitting there.

2          Q.    What's his name?

3          A.    I don't remember.

4          Q.    And so it's your testimony there was a big

5      party going on at Christine Livingston's house,

6      correct?

7          A.    A big get-together for campaigning for Bo

8      Hines.

9          Q.    Campaigning for who?

10         A.    Bo Hines.

11         Q.    Bo Hines.  And who's Bo Hines?

12         A.    And some other little smaller candidates.

13     Bo Hines ran for, what, Congress, Senate, whatever.

14     I -- I can't remember this.

15               He wasn't anything on my mind at that

16     point in time, so I didn't pay much attention to him.

17     He didn't win.

18         Q.    So prior to your -- beginning of your

19     podcast or Facebook live broadcast in 2022, there was

20     a party at Christine Livingston's house.  Correct?

21         A.    I'd have to say correct on the party at her

22     house.  But the 2022, I'm telling you, dates are just

23     not my thing.

24         Q.    Okay.  Was it prior to an election?

25         A.    Yes.

Page 95

```
 1          Q.     So would it have been prior to the election
 2    in the preceding year in 2021?
 3          A.     I don't remember.
 4          Q.     So would you date it --
 5          A.     I just know what we did.
 6          Q.     Would you date it as when Bo Hines was
 7    running for office?
 8          A.     Yes.
 9          Q.     Okay.  And who was Eddie Price?
10          A.     Like I said, I think he was the assistant
11    superintendent of Johnston County Schools.  But I
12    can't remember exact title.  But I knew him as a
13    friend, and he taught me in high school.
14          Q.     Okay.  And when did you talk to him?
15          A.     It was -- there was a -- I did a podcast,
16    because -- you remember, I told you earlier, a few
17    weeks before this we were talking about Ronald
18    Johnson.
19                 Prior to that, within a two-month
20    period, we were discussing Bennett Jones, the issues
21    with Bennett Jones.  We heard a rumor that Bennett
22    Jones was running around on his wife.
23                 We did not know at that time that was
24    a Ronald Johnson farce story, that Ronald was feeding
25    that story, trying to get that out, about Bennett
```

1    Jones.

2         Q.    And who told you that Ronald Jones [sic]

3    was feeding that story --

4         A.    That Ronald Johnson --

5         Q.    -- Ronald Johnson was feeding that story

6    about Bennett Jones?

7         A.    I don't remember.  I remember it was Joe

8    Preston who wanted to start the story, like, get the

9    story started, like, digging into it and all.

10                   And that's when I started asking

11   questions to people in the community -- I can't

12   remember exactly.  But I know one of them was, in

13   fact, Eddie Price.

14                   Eddie Price said, hold, David, that's

15   not true.  That's a lie.  You need to talk to Bennett

16   Jones.

17                   And that's when I went and talked to

18   Bennett Jones.

19        Q.    And when did you go talk to Bennett Jones?

20        A.    I don't remember the date, but I --

21        Q.    Okay.

22        A.    -- know it was prior to the podcast.

23        Q.    And let me just go back again.  When did

24   you meet Angie Barbour?  At that party?

25        A.    No.  I didn't meet Angie Barbour until

1    after the party.  Because Jim Wiesner, she connected

2    with Jim Wiesner.  Jim Wiesner got her connected with

3    me and Joe Preston.

4         Q.    But was that in 2022?

5         A.    I don't remember the date.  I don't want to

6    say something and then you come back and say, well, I

7    lied because I don't remember the date.  So if I

8    don't remember, I'm just going to say I don't

9    remember the date.

10        Q.    Well, did you meet her before you started

11   your broadcast about Ronald Johnson?

12        A.    Yes, briefly before.

13        Q.    And --- and how long was the meeting with

14   her?

15        A.    I'd say an hour to -- it was -- some of

16   that was with Joe Preston.  You know, Joe had to get

17   his facts and stuff.  And then I would talk to her

18   and get information.  And then, that's it.

19        Q.    Okay.  So Joe Preston was still alive at

20   that point.  Did you ever have any knowledge about

21   whether Joe Preston used drugs?

22        A.    I knew he drank.

23        Q.    You knew he didn't drink?

24        A.    I knew he drank.

25        Q.    You knew he --

1      A.    He -- he would drink.

2      Q.    He would drink?

3      A.    Mm-hm.

4      Q.    Did he ever use any illegal substances?

5      A.    Not to my knowledge.

6      Q.    Okay.  So you never saw him use any?

7      A.    No.

8      Q.    And he never --

9      A.    No, ma'am.

10     Q.    -- told you he used any?

11     A.    No, ma'am.  Now -- wait.  In college, he

12  talked about some days back then, but I don't

13  remember him saying any drugs.  But if he did, I

14  don't remember.

15     Q.    Okay.  So when you met Angie Barbour for

16  the first time, was it prior to her -- prior to Mr.

17  Johnson getting the restraining order against her?

18     A.    No.  I mean, well, yeah, it was -- the

19  restraining order happened -- I'm trying to think.

20  The restraining order happened after Rick Walker had

21  called me.  And Rick Walker had called me, and I made

22  a story up that Angie already took out papers.  And

23  so it was -- it was before Ronald took out the 50C

24  that I met Angie on -- well, we met Angie several

25  times.

1        But this, I recall: I met Angie

2   beforehand on one occasion.  And then when Rick

3   Walker called me, I made it up that Angie was getting

4   papers on Ronald.  And that's when Ronald went and

5   filed his paper.

6        Q.    So why did you make that up?

7        A.    Because Rick Walker was telling me Ronald

8   wouldn't cheat on his wife.  He's not that kind of

9   person.  He wouldn't do this.  I wouldn't be friends

10  with someone.

11            Knowing good and well, nobody has this

12  much information and details about something unless

13  they've done it.

14       Q.    Are you referring to Angie Barbour?

15       A.    Her -- Angie and Ronald, they -- there has

16  to be something going on.  There -- there was

17  something there.  So I can't remember the whole deal,

18  but I just told -- I told Rick Walker that I believed

19  Angie has already filed paperwork on Ronald.

20            Which, I didn't expect Ronald to just

21  go out and just all of a sudden file a 50C and commit

22  perjury.

23       Q.    Well, why do you say he committed perjury?

24       A.    Because he wasn't supposed to file a 50C,

25  he was supposed to file a 50B.

1     Q.    Okay.  But in what -- what do -- what do

2  you understand "perjury" to be?

3     A.    When -- when you fill out a court form --

4  like, when I took my testimony right here, okay?  I'm

5  committing perjury if I intentionally lie, I know and

6  willingly lie, right?

7         So that's the same thing, when you go

8  fill out a court order, a form at the court, it

9  states on there, you know, to the true -- to the best

10  of your ability, knowledge, that this is the truth.

11  I mean, it states it right there on the paperwork.

12     Q.    So what statement is it that you say he

13  perjured himself?

14     A.    When he stated that -- the 50C is for

15  communication, the 50B is for sexual contact, sexual

16  relationship.

17     Q.    Well, did Angie Barbour tell you they were

18  still having sex?

19     A.    No.  You -- you have to file that 50B, even

20  if you're not having sex.

21     Q.    And how do you know that?

22     A.    Because, I -- I just -- I went to school

23  for this.  I learned this stuff in school.

24     Q.    Okay.  So what school was that?

25     A.    JCC.  I got a degree -- associate's degree

1    in criminology.

2        Q.    Okay.  So it's your testimony that, if you

3    are not having a sexual relationship with someone,

4    you still have to file a 50B?

5        A.    If you had a prior sexual encounter with

6    someone, you had a relationship with that person

7    sexually, boyfriend, girlfriend, what -- you do fill

8    out a 50B.

9        Q.    Okay.  And is --

10       A.    It's a domestic violence deal.

11       Q.    Is this in a statute?

12       A.    It should be in some paperwork, if -- if

13   I'm not mistaken.  If I'm -- not, I'll look it up.

14       Q.    Okay.  I want to go back to the statement

15   that you made to Rick Walker, that Angie had already

16   gotten a protective order against Mr. Johnson.  Did

17   you repeat that statement to anybody else?

18       A.    I stated that on my podcast, that this is

19   what I did.  I -- I recorded it, and I gave it to

20   Smithfield Police Department.

21       Q.    Okay.  And did you ever call any media

22   outlets about this allegation?

23       A.    Two parts on that: yes, but only when I

24   found out that Ronald had accused us of calling WRAL

25   stating that there was something going on, he was

1    having an affair on his wife, or whatever.

2                    When I found that out, I called WRAL

3    right then and there.  Because I'm -- I'm not the

4    type to run to media.  Especially if I'm the one that

5    knows it.  Why -- why would I call WRAL?

6                    That was all fabricated by Ronald

7    Johnson.

8        Q.    Okay.  Who called WRAL?

9        A.    It was probably Ronald Johnson.

10       Q.    So it's your testimony that Ronald Johnson

11   called WRAL --

12       A.    No.

13       Q.    -- to record --

14       A.    I -- I'm just -- he just made that up, just

15   like half the things he said, he made up.

16       Q.    So is it your testimony that WRAL did not

17   know about the affair between Ronald Johnson and

18   Angie Barbour?

19       A.    If they did, it wasn't by me.

20       Q.    Okay.  Do you think --

21       A.    I just know I called WRAL, and they stated

22   they did not see anything where I have called them

23   in.

24       Q.    Okay.  Who did you call at WRAL?

25       A.    It was just the desk, the customer service

```
 1   desk.

 2       Q.    Okay.  Are you --

 3       A.    I wanted to know -- I wanted a copy of this

 4   email, or whatever they said that -- or he said that

 5   they had gave him, or texted him, or whatever, I

 6   wanted a copy of this, because now he's accusing me

 7   of something I didn't do.  I know I didn't do it.

 8       Q.    So did anybody ever tell you that they

 9   contacted WRAL?

10       A.    The only time I heard about that was when

11   Ronald Johnson said he got a call from WRAL while he

12   was in a board meeting when -- if we probably

13   backtracked all this, we could probably narrow it

14   down to Rick Walker calling him, telling him that she

15   filed a paper on him.  I -- I would like to see the

16   paperwork on that.

17       Q.    Okay.  Did Angie Barbour ever give you any

18   recordings?

19       A.    She gave me a phone.  But -- she didn't

20   give it to me.  I paid for it.

21       Q.    Okay.  So it's your testimony that Angie

22   Barbour sold you a phone?

23       A.    Mm-hm.

24       Q.    And why did you buy this phone?

25       A.    Because in the past, if -- if I didn't buy
```

1    something, then it's not my property.  Then they

2    would have to go through -- I'd have to -- if -- law

3    enforcement knew I was going to do a download on it,

4    I was going to download everything with a phone

5    system.  And before I could do that, law enforcement

6    called me from Smithfield PD and said, hey, can you

7    come in for questioning?

8                   I was the very last one they called.

9    They knew I didn't have any information except for

10   what I was told.  So that's hearsay, so they couldn't

11   -- exactly from their words.

12                  They called me and said, do you have

13   something, anything, in your possession?

14                  And I wasn't going to say no.  I'm

15   going to tell them truthfully, yes.  I didn't want

16   to, because I wanted to download this phone to see

17   what was on it.  But I never opened it or anything.

18   I just purchased it from her, put it in a drawer, and

19   waited for the time to send it off.

20      Q.    So when you brought it in, who did you give

21   it to?

22      A.    Terry West.  I believe that's who that was.

23      Q.    And do you recall when you did that?

24      A.    The day I was interviewed by Smithfield PD.

25   I was only interviewed one time.

```
 1                    (Discussion off record.)

 2                    MS. BATEMAN:  Let's go ahead and take

 3       a break.

 4                  (WHEREUPON, A SHORT BREAK WAS TAKEN.)

 5                    (WHEREUPON, EXHIBIT NUMBER 2

 6                  WAS MARKED FOR IDENTIFICATION.)

 7         Q.      (By Ms. Bateman)  We're going to backtrack

 8       a little.  I'm going to hand you what's been marked

 9       Exhibit Number 2.  It says at the top, "Audio file,

10       June 24, 2022."  It's been produced in discovery.

11       And I want to ask you a few questions about it.

12       These pages are not numbered, unfortunately.

13                    I want to take you down to the 2:50

14       mark.  And this is a podcast you did.

15         A.      Two minute and what?

16         Q.      2:50 mark.

17         A.      Okay.

18         Q.      And it says (as read): And we have

19                  somebody currently on the board of

20       education also known as -- I mean, I've

21       heard it even before I was even looking at

22       being on the board of education.

23                    And then you say (as read): He is the

24                  golden boy of the board of education.

25                    Do you see that?
```

Page 106

```
1        A.    I see.

2        Q.    Do you -- are you referring to Ronald

3   Johnson?

4        A.    Again, this is not certified.  But I will

5   go based off of what I remember.  I did call Ronald

6   Johnson a golden boy.

7        Q.    And why did you call him that?

8        A.    Because that is a comment that Angie

9   Barbour and Bennett Jones made, including Eddie

10  Price.

11       Q.    So they must've made those comments to you

12  prior to this podcast?

13       A.    I don't know if it was prior or after, but

14  I know -- I mention -- I said golden boy, I don't

15  know how many times, but he -- it was not just them,

16  but it was, gosh, it was -- Christine Livingston

17  stated it.

18       Q.    I mean, why do they call him the golden

19  boy?

20       A.    Because he thinks he can do no wrong.  He's

21  -- he's the best.  He's everything.

22       Q.    And why do you think he thinks he can do no

23  wrong?

24       A.    Well, obviously, based off of this, his

25  whole criminal trial and everything, he still feels
```

```
 1    like he's done nothing.

 2        Q.    Okay.  But can you give me any specific

 3    examples of how he thinks he's done nothing wrong?

 4        A.    I mean, as in -- clarify that.

 5        Q.    I mean, I'm just asking you, anything --

 6    any example you can give me of anything you think he

 7    thinks he's done nothing wrong.

 8        A.    Yes.  When -- when he -- when he has, you

 9    know, fought his criminal case, this whole time he's

10    saying he didn't do this, he didn't do this.

11        Q.    But who are you referring to, that he says

12    he didn't do?

13        A.    Ronald Johnson said he didn't commit

14    blackmail or extortion.  He didn't -- he didn't

15    obstruct justice.  He didn't --

16        Q.    Well --

17        A.    -- violate any rules for recording a

18    private session of the school board.

19        Q.    Okay.  Tell me what the rules are that

20    prohibit recording private sessions?

21        A.    That is in the documents of the school

22    board.

23        Q.    Have you ever looked at those documents?

24        A.    I did.

25        Q.    Okay.  Do you recall what they say?
```

```
 1        A.     I know it states that -- not to record
 2   private sessions.
 3        Q.     Okay.  Have you ever recorded anybody?
 4        A.     Yes.
 5        Q.     Okay.  And what's the difference between
 6   Ronald Johnson recording somebody and you recording
 7   somebody?
 8        A.     Well, he's -- he's a public figure.  He has
 9   rules, and ethics, and procedures to go by that are
10   written.
11               He actually took a -- I believe, it's
12   -- to my recollection, they have to take some kind of
13   course when they become in office about this.  And --
14   I'm trying to think here.
15               State that question again right quick,
16   because I'm...
17        Q.     I'm just asking you what's the basis for
18   your belief that recording closed sessions of board
19   meetings is improper or illegal.  First of all, do
20   you believe it's improper?
21        A.     I do.
22        Q.     And do you believe it's illegal?
23        A.     If it's a rule that we're not supposed to
24   do, yeah.
25        Q.     Okay.  And just tell me your basis for your
```

1    -- for your belief.

2        A.    Okay.  So I can put it this way.  If North

3    Carolina law said you can't record someone unless

4    both parties know, then I would violate the law if I

5    secretly recorded someone, even if they committed

6    murder.  I'm secretly recording that person.  The

7    courts can't use that as a -- as a -- evidence.

8        Q.    Well, let me ask you this: If -- if --

9        A.    But that's not the case for North Carolina.

10       Q.    If -- what's your understanding of why

11   boards can go into closed session?

12       A.    To speak about private matters.

13       Q.    Okay.  And what if they go into closed

14   session and speak about illegal acts?

15       A.    As in --

16       Q.    Any --

17       A.    -- violation of policy?

18       Q.    Anything that's illegal.  Discrimination.

19       A.    I can't testify on what they do behind

20   those closed doors.

21       Q.    I'm not asking you if they did it.  I'm

22   just saying, do you think that that is a proper

23   purpose for a closed-session meeting?

24       A.    I would say closed sessions are for

25   anything with HR, you know, or -- or employment,

1    anything, like, reprimands.  Like, let's say a parent

2    jumped on the school bus --

3         Q.    Okay.

4         A.    -- and did something wrong, that would be

5    in closed session.  Anything discussed with the

6    attorney, far as attorney-client privilege for the

7    school board.

8         Q.    Well, let me give you an example: What if a

9    school board goes into closed session, and -- and

10   their attorney is there.  And they say, hey, we would

11   like to implement a policy of treating black kids

12   worse than white kids?  Would that be a protected

13   communication in that school board closed-session

14   meeting?

15        A.    You're getting beyond my realm.  I can't

16   answer that.

17        Q.    Okay.  Give me more examples, if you have

18   any, of how Ron Johnson thinks he is the -- or you

19   think -- why do you think he thinks he's a golden

20   boy?

21        A.    Well, he made a bunch of accusations

22   against other people, has absolute, no proof --

23        Q.    Well, give -- give me an example before you

24   go any further.

25        A.    Well, an example of this is -- let's talk

1    about Jim Lawrence --

2        Q.      Okay.

3        A.      -- issue.  Okay?  So while Ronald Johnson

4    is having an affair with Carolyn Rotondaro, he's

5    accusing Jimmy Lawrence of sexually assaulting her.

6        Q.      Do you think that Jimmy Lawrence didn't

7    sexually assault her?

8        A.      I don't believe he did.

9        Q.      And what's the basis of your belief?

10       A.      Todd Sutton -- after everything has gone

11   on, I talked with Todd Sutton after the trial.  And I

12   wanted one question answered.  It was told to me that

13   Todd Sutton -- and I think that come from one of his

14   interviews with the TV -- that Todd Sutton heard the

15   male assault the employee.  And he heard the audio.

16   He heard the audio.

17              Well, I wanted to know what was on

18   this audio.  So after everything is said and done, I

19   asked Todd, I said, Todd, did you hear Carolyn

20   Rotondaro being assaulted by Jimmy Lawrence?

21              He said, David, he stated, I heard all

22   this on this audio, and I couldn't hear anything, but

23   you could barely hear a woman talking and a male

24   talking.  But that's all you could hear.  He stated

25   that we all heard it, but there -- it was no actual

1    hearing of a physical struggle or someone being

2    assaulted.

3         Q.    So are you saying that you base your belief

4    that Jimmy Lawrence did not sexually assault Carolyn

5    Rotondaro based on Todd Sutton's conversation with

6    you?

7         A.    No.  There's a lot of other things.

8         Q.    Well, tell me what else.

9         A.    And are you going based off of what I feel

10   now, or what I knew then?

11        Q.    All.  All of the above.

12        A.    Okay.  Well, it came out in court that

13   Ronald Johnson was having an affair with Carolyn

14   Rotondaro.  Carolyn Rotondaro was also the

15   informationist for Ronald Johnson in the

16   administrative office.

17        Q.    Was a what?

18        A.    The information person.  He was getting

19   information from her about what was going on in the

20   administrative office of Johnston County Schools --

21        Q.    Like, what --

22        A.    -- public schools.

23        Q.    -- kind of information?

24        A.    You'd have to ask Carolyn Rotondaro.

25        Q.    Well, wasn't that her job, to give him

1    information --

2         A.    No.

3         Q.    -- to a board member?

4         A.    No, not information of what he was asking.

5    He wanted dirt.  Information, like --

6         Q.    And how do you know this?

7         A.    -- what he can get on -- well, again, my

8    conversation with Bennett Jones and Eddie Price,

9    conversations with others, it's apparent Ronald

10   Johnson was using other people to do his dirty work.

11        Q.    Are you saying that Bennett Jones and Eddie

12   Price personally witnessed Ronald Johnson getting

13   information that he shouldn't have from Carolyn

14   Rotondaro?

15        A.    They knew certain information couldn't have

16   gotten to Ronald Johnson unless it was Carolyn

17   Rotondaro.

18        Q.    And did they give you any examples --

19        A.    They did not.

20        Q.    -- of that information?  And do you have

21   any examples of that kind of information?

22        A.    I'm trying to think if I have any.  Well,

23   the assumption, which, it was assumed that the FERPA

24   information was done with Carolyn Rotondaro.

25        Q.    And who assumed that?

```
 1        A.      That's me assuming that, because that's

 2   what I was getting around the -- being told around

 3   the circle, you know.

 4        Q.      And the circle is you and who?

 5        A.      I mean, it was --

 6        Q.      Livingston, and --

 7        A.      Yeah, I mean, it was --

 8        Q.      -- Wiesner, and --

 9                THE WITNESS:  I'm sorry.  I've been

10   flipping this thing.

11                THE COURT REPORTER:  That's all right.

12                THE WITNESS:  Let me put it over here.

13                THE COURT REPORTER:  Thank you.  Thank

14   you.  And we'll just wait.  One at a time.

15        Q.      (By Ms. Bateman)  So when you say "the

16   circle," do you mean the Livingston, Wiesner -- who

17   else was in that group --

18        A.      Joe Preston --

19        Q.      -- that circle?

20        A.      Well, at this time, Rick Walker has nothing

21   -- we already knew Walker was the mole, so Rick

22   Walker's not in our circle.

23                We -- we had already, at that point in

24   time, as soon as, you know, Rick Walker admitted to

25   me that he went to Ronald Johnson to tell him because
```

1    he's friends with him, we knew that was our mole

2    inside of our information stuff.

3        Q.    Okay.  So then the circle was just you, and

4    Joe Preston, and Wiesner, and Davenport, and

5    Livingston?

6        A.    There's Jamie Stoltz.  Now, I'm not talking

7    about the circle that we had at the party.  I'm

8    talking about way outside of that, it's Jim

9    Davenport.  I mean, it's so many people we would

10   discuss things with and talk --

11       Q.    Tell me who they were, please.

12       A.    -- converse.  Jean Casanave.

13       Q.    Can you spell that last name?

14       A.    I cannot.

15       Q.    Can you say it again?

16       A.    Casanave.

17       Q.    Casanave?

18       A.    Mm-hm.

19       Q.    Jim?

20       A.    Jean.

21       Q.    Jean.

22       A.    J-e-a-n, I believe.

23       Q.    Okay.

24       A.    But, like I said, I mean, the school

25   information that we -- we were talking about on the

1    podcast and all, that's where you're going to have to

2    ask Joe Preston on.

3        Q.    Okay.  And what was that FERPA information?

4        A.    It was a student -- if I can remember

5    correctly, it was a student who was playing football

6    who transferred from another state, and the football

7    coach had a problem with it, saying that they were

8    fixing grades or doing something to it.  I don't know

9    how it all -- you'll have to ask, you know, Bennett

10   Jones more in-depth about that, or Anita Bland.  They

11   know it really well.  And -- and you can throw Anita

12   Bland in that circle of friends with us.

13       Q.    Blaine?

14       A.    Bland.

15       Q.    Bland.  First name?

16       A.    Anita.

17       Q.    Okay.  Did you ever see the FERPA document?

18       A.    No.

19       Q.    And do you know exactly what the FERPA

20   document was?

21       A.    It was a transcript of the boy's grades and

22   his school records.

23       Q.    And school records.  And what did the

24   transcript allegedly show?

25       A.    I can't answer that.  I just have to answer

```
 1   what Bennett Jones told me it was --

 2         Q.    Okay.  And what -- and what's --

 3         A.    And that's what he told me.  It was the --

 4   it was grades.  It was the information of a student's

 5   transcripts.

 6         Q.    And what was the import of that

 7   information?  Like, why did anybody care?

 8         A.    Ronald Johnson was not supposed to have

 9   that.

10         Q.    Okay.  Where did Ronald Johnson get it?

11         A.    That's where we're assuming that Carolyn

12   Rotondaro -- because she's in the administrative

13   office.  But there was some kind of a transition

14   period where other people in the administration could

15   get it from other school areas.  So that way --

16   that's the reason why I say we can assume most of her

17   -- the information that Ronald was wanting would come

18   from

19   -- whether it was hearsay or whatever, somebody

20   saying this about this person, it came from Carolyn

21   Rotondaro.

22                Because the -- we can't a hundred

23   percent say that FERPA violation paperwork came from

24   Carolyn, because at that time what Bennett Jones

25   stated was, anyone with access to the computer could
```

 1    get into those records at that time.

 2         Q.    So are you conceding that the information

 3    that Ronald Johnson got about those students' grades

 4    might not have come from Carolyn Rotondaro?

 5         A.    I can't concede anything.  I'm just giving

 6    my belief of what I believe is true; it came from

 7    Carolyn Rotondaro.

 8         Q.    Okay.  All right.  I'm going to finish with

 9    this, and then I'm going to go back to --

10         A.    This paper?

11         Q.    Exhibit 3.  But on this, I want to go over

12    to the minute mark 3:30.

13              MR. MULLINS:  I'm sorry.  You said 3.

14    Do you mean 2?  Are we going back to 3?

15              MS. BATEMAN:  I'm going -- I'm going -

16    - I'm still on Exhibit 2.  And I'm going to go to the

17    3:32 mark.

18              MR. MULLINS:  Okay.

19         Q.    (By Ms. Bateman)  And there's a comment

20    there by Joe Preston.

21         A.    3 minute and what?

22         Q.    3:30.

23         A.    Okay.

24         Q.    And it says (as read): Do you remember back

25              in 2019 when he had just gotten elected

```
 1    and, you know, he exposed a lot of people
 2    in Johnston County?
 3              And then you reply (as read): I've
 4         seen the videos.
 5              And he says (as read): You know, some
 6         of them are my friends.
 7              And do you see these comments by Joe
 8    Preston?
 9    A.    I see it on this paper --
10    Q.    Okay.
11    A.    -- as it was written.
12    Q.    Do you recall him making those comments?
13    A.    Either he or I made those comments.
14    Q.    Okay.  I mean, do you agree with those
15    comments that he's making?
16    A.    Well, Jimmy Lawrence, if you know any
17    history of Jimmy Lawrence, he was our family attorney
18    from way back on the Ellis's side.
19    Q.    So what does that mean?  Tell me.
20    A.    It means people that work in, like, law --
21    law enforcement, or lawyers, judges, I consider them
22    all, like, friends.  But I don't know them
23    personally- personally, but I know them, you know.
24    It's sort of like, if -- if I know you, and we're on
25    good terms and all, I consider you as a friend, not
```

```
 1   as just somebody I just know a name, you know.
 2        Q.    So --
 3        A.    I can't comment on Joe, what his definition
 4   of friends is.  But mine is, as I met Angie, I became
 5   friends with her.  I became friends with Bennett
 6   Jones.  I became -- well, I already knew Eddie Price,
 7   you know, I've known him forever.
 8                   But "friends" can mean a lot of
 9   things.  So I've said it, and I know Joe has said it.
10        Q.    Okay.  So where Joe says (as read): Do you
11             feel like it's right to use government
12             property to do that.
13                   What are -- what is he talking about,
14   and what are you -- what are you understanding that
15   to mean?
16        A.    Okay.  So Angie came to us with the key fob
17   deal.  I knew that you can't obtain a recorder --
18   audio and video recorder, hideable device, as a -- I
19   want to say it was Obama that put that in place or
20   whatever.
21                   But the federal government outlawed it
22   for that to be used unless you are law enforcement
23   with an agency, or you are a licensed private
24   investigator.
25                   Now, I know Amazon does sell some of
```

```
 1    those products.  But I think it's illegal, a federal

 2    thing --

 3         Q.    Okay.

 4         A.    -- that you can't use it.

 5         Q.    So this podcast is dated June 24th,

 6    correct?

 7         A.    Based off this, yes.

 8         Q.    Okay.  So that means that Angie Barbour had

 9    to have to come to you with that information before

10    June 24th.  Is that correct?

11         A.    I'm pretty confident, oh, yeah.

12         Q.    Okay.  So you were talking about using

13    government property to --

14         A.    Mm-hm.

15         Q.    -- do what?  Record people?

16         A.    Well, record, or use the vehicle to meet

17    her.  There was storage of audio.

18         Q.    Do you know if there was ever any proof

19    that Ron Johnson used his vehicle to meet her?

20         A.    Gosh.  You're asking -- I'm going to say,

21    yes.

22         Q.    Okay.  And what was that evidence?

23         A.    Phone records.

24         Q.    I'm sorry?

25         A.    Phone records.
```

```
 1        Q.     Phone records?  Whose phone records?

 2        A.     And GPS records.

 3        Q.     For whom?

 4        A.     Ronald Johnson's car, Angie Barbour's

 5   phones, and, gosh --

 6        Q.     And how --

 7        A.     I was told --

 8        Q.     Go ahead.

 9        A.     I was told they did the best they could to

10   help Ronald in his situation.  They could care less

11   about his affairs.  But then when it became criminal

12   activity, that changed the tune.  And they had

13   already finished with the GPS and the phone stuff.

14        Q.     So tell me who told you that.

15        A.     That was Keith Powell.

16        Q.     And Keith Powell told you they didn't hear

17   anything about Ron Johnson having an affair with

18   Angie Barbour?

19        A.     They told me at the beginning of this that

20   they were going to try and help him with this -- him

21   having an affair with Angie Barbour, because he was

22   one of theirs.

23               But when it became too big and he

24   start -- and they started uncovering the criminal

25   stuff, that's when they had to pursue.
```

```
 1                     But they did not pursue what they

 2    could have on Angie Barbour.

 3         Q.    Well, tell me what criminal stuff it was

 4    that they --

 5         A.    Well, it was everything that was in the

 6    courts.  Because I didn't talk to Keith Powell till

 7    after that court -- after the trial.

 8         Q.    You didn't talk to Keith Powell till after

 9    the trial?

10         A.    Correct.

11         Q.    You never talked to Keith Powell at any

12    time --

13         A.    One time --

14         Q.    -- prior to trial?

15         A.    One time, when I was being interviewed, he

16    introduced me to Keith West [sic].  And then he

17    walked --

18         Q.    Keith West?

19         A.    The detective.

20                    MR. MULLINS:  I think he means Terry

21    West.

22         A.    Terry West.  Oh.  Terry West.  He walked me

23    in and said, this is Terry West.  He's an

24    investigator in the Ronald Johnson, and then he

25    walked out.
```

1                    (Reporter clarification.)

2          A.    Keith Powell is the chief of police, and

3     then Terry West is the detective with the police

4     department.

5          Q.    And who introduced you to who?

6          A.    Powell introduced me to Terry.  There was

7     another guy there that walked me in, and that's -- we

8     kind of run into Chief Powell.  And then Chief Powell

9     said, y'all are going right into this room.  This is

10    Terry West.  That's it.

11         Q.    Okay.  And you never talked to Powell

12    again?

13         A.    Not until after the trial.

14         Q.    Not until after the trial.

15         A.    Correct.

16         Q.    So was this at the police department?

17         A.    Correct.

18         Q.    And you went to the police department for

19    what purpose?

20         A.    They asked me to come and sit down and

21    interview.

22         Q.    Who is "they"?

23         A.    Terry West.

24         Q.    Terry West asked you to come in?

25         A.    Mm-hm.

1    Q.    Yes?

2    A.    Yes.

3    Q.    So -- but you met with Keith Powell first?

4    A.    Well, I wound up running into him.  Like,

5    another office was coming to get me from the little

6    waiting area, and then we go -- like, it's kind of

7    like, boom, there's Keith Powell.  And now we all

8    walked to the room, and Keith Powell says, this is

9    Terry West.  Terry West was already in the room.

10   Q.    Okay.  And Keith Powell said...

11   A.    This is Terry West.  This is the

12   investigator, Smithfield Police Department -- I don't

13   know exact words.  But he just introduced, and then

14   he said something to Terry West, and then he left.

15   Q.    And then you never talked to him again?

16   A.    There was another time while we were

17   interviewing, he walked in because of a cell phone

18   issue, with Angie Barbour.

19   Q.    And what was that about?

20   A.    Terry West wanted to know -- I bought the

21   phone, so how do they do the chain of command.  And

22   Keith Powell said, have him sign something.

23               And I -- I made a deal with them first

24   that Angie's mama died, or -- yeah, she died, and

25   Angie had information on this phone where her Mom

1  would leave a message for her.  The only way I would

2  do this -- because sometimes those files get

3  corrupted and it gets deleted, so the only way I'll

4  give this phone over is if they'll make a copy for

5  Angie Barbour, because her mom's voice is on this.

6                    And I said, I bought the phone.  It's

7  my phone.  I'm giving y'all permission.  So I signed

8  it over to them.  But they looked right at me, and

9  Terry West said, I'm still going to call Angie

10  Barbour and get her permission.  I said, okay.

11     Q.     Okay.  And you wanted them to do what?

12     A.     Well, they asked me did I have any

13  tangible, physical evidence in my possession.

14  Because they knew I could hold it -- I could have it,

15  if I was doing trials or whatever.  And I said, I do.

16  I said, I can give it --

17     Q.     Let me -- let me just stop you there.

18  Evidence of what?

19     A.     Anything pertaining to Ronald Johnson.

20     Q.     And what -- anything in particular were

21  they looking for?

22     A.     They -- I can't remember the exact words

23  they used.  They just asked did I have anything to --

24  that -- did I have anything that is tangible.  And I

25  answered yes, because I didn't want to lie to them.

1   I didn't want them -- I said, I can give you

2   everything on a silver platter because it's all in a

3   phone that I have.

4       Q.    And when you said, "I'm going to hand you

5   everything on a silver platter," what was that?

6       A.    Well, when I bought it from Angie, it had -

7   - should have had at this time the location of Ronald

8   Johnson's vehicle, or her, where she was, to match up

9   what the GPS said on the car.

10                  And then it also had text messages

11  between her and Ronald Johnson.  And she didn't know

12  at that time that there was pictures on there of

13  Snapchat or anything like that that they could get.

14  But when we do our downloads, we send it off to a

15  forensic place, and they download it all for us no

16  matter what it is on there.  But I didn't get a

17  chance to.

18      Q.    Because you --

19      A.    I got --

20      Q.    -- gave it to Smithfield?

21      A.    I got called into Smithfield.  When they

22  asked me do I have anything, I'm not going to lie.

23  I'm going to tell them, yes, because I don't want to

24  go to jail for lying to them, or lose my license.

25      Q.    So is it your contention that the illegal

 1    things they were looking into were Angie and Ron

 2    having an affair?

 3         A.    No.

 4         Q.    What -- what were they?

 5         A.    It was the usage of government equipment

 6    for personal use.

 7         Q.    Which is what?

 8         A.    I'm trying to remember all the stuff.  I

 9    know one thing was the key fob.  The second thing was

10    his computer, his work phone, and the car.

11         Q.    And do you -- have you ever seen Ronald

12    Johnson's termination letter?

13         A.    I have.

14         Q.    Okay.  And do you recall whether he was

15    terminated for using government property for personal

16    use?

17         A.    I don't remember what it said.  I didn't

18    read the whole thing.  I just briefed over it.

19         Q.    Okay.  So we can go to -- go to minute mark

20    5:24.

21         A.    Okay.

22         Q.    You see your statement there?  (As read):

23                Grandstanding and using government

24                property, you know, to do that.

25                     You said (as read): Because let's

1              remember government property is the

2              people's property.

3                   So is it your testimony that using

4    government property to have an affair with Angie

5    Barbour is criminal?

6         A.    Wait a minute.  Restate that.  Restate --

7    re- --

8         Q.    Is it your testimony that using government

9    property to have an affair with Angie Barbour is

10   criminal?

11        A.    Using government property for personal gain

12   is.

13        Q.    Okay.  And how did he use government

14   property for personal gain?

15        A.    Well, after -- it was assumed at that time

16   that he was using his company phone, his vehicle, and

17   the -- his computer at work for personal usage.

18        Q.    And who told you that?

19        A.    Angie Barbour.

20        Q.    Angie Barbour told you that he was using

21   his personal phone --

22        A.    His -- his work phone.

23        Q.    -- his work phone, his government computer,

24   and --

25        A.    His car.

```
 1        Q.      -- his car?

 2        A.      And the thing about the key fob.

 3        Q.      And the key fob -- to have an affair with

 4   her?

 5        A.      No.  No, no.

 6        Q.      To do what?

 7        A.      To record people and use it with the -- the

 8   school board, and personal use, like, recording other

 9   people to get an advantage in his political stance.

10        Q.      And you said it was assumed at that time.

11   Was it -- was that later --

12        A.      Well --

13        Q.      -- proven not to be true?

14        A.      No.  It's true.

15        Q.      It's true that he did those things?

16        A.      It is true.

17        Q.      That he used his government -- his

18   government computer --

19        A.      Correct.

20        Q.      -- to -- to do what?

21        A.      On his government computer, he has videos

22   of kids wishing him well for being -- for -- good

23   luck for getting elected campaign.  He has recordings

24   on there of people.  What else is on that file?

25   There were certain things that the Smithfield Police
```

1    Department discovered that were on his work computer.

2         Q.    And how do you know that?

3         A.    Because I saw it.

4         Q.    You saw it when?

5         A.    I saw it on his discovery stuff he sent.

6    Danny Mullins.

7         Q.    You saw it --

8         A.    On Daniel Mullins' discovery.

9              MR. MULLINS:  He's testifying that he

10   saw it based on the discovery responses that we

11   provided.

12        Q.    (By Ms. Bateman)  I see what you're saying.

13   Okay.  But how did you know they were assuming that

14   at that time?

15        A.    Well, you can only say they're assuming

16   because it's what they're telling you.  But I

17   believed what they were telling me at the time was

18   true.

19        Q.    So they were telling you the same thing

20   that showed up in their reports?

21        A.    And what showed up in the final result of

22   the criminal case.

23        Q.    Okay.

24        A.    Well, some of -- majority of it.  Some of

25   it never got there, but -- could have, but didn't.

1          Q.      Okay.  So let's go down to minute mark 5:56

2    -- or 5:48.

3          A.      Okay.

4          Q.      So Joe Preston says (as read): You're

5                  saying grandstanding using the public eye

6                  and the offices and publicity --

7                      THE COURT REPORTER:   I can't

8    understand you when you're reading that fast.  I'm

9    sorry.

10                     MS. BATEMAN:   I'm sorry.

11         Q.      (By Ms. Bateman)  (As read): You're saying

12                 grandstanding using the public eye, and the

13   offices, and the publicity to get your

14   message out.

15                     And then the next comment is (as

16                 read): In my room, I'm thinking

17                 microphones, hidden cameras.

18                     And then you say (as read): Oh,

19                 absolutely not.

20                     And then you say at 6:03 (as read):

21                 Absolutely not.  And I did want to say this

22                 before we even got started.

23         A.      Well, I'm not going to say that I didn't

24   say some of this.  Joe Preston said a majority of it.

25   What are you wanting?

1      Q.     I'm asking you --

2      A.     What's your --

3      Q.     -- are you denying that he did those

4 things?  Or are you admitting that he did those

5 things?

6      A.     I'm saying he did those things.

7      Q.     You're saying he did those things.  And --

8 and tell me again your basis for believing that he

9 did those things.

10     A.     If we go to WRAL -- the very one that

11 supposedly got an email from me -- if we go to WRAL

12 in the video, he is standing on school property

13 making his comments and grandstanding about someone

14 being sexually assaulted.

15             We have raw video of actual -- what

16 wasn't showed on TV, but we have raw video of the

17 whole questionnaire, whole questioning.  And then

18 when some of the reporters caught him up in a lie, he

19 had to backtrack and say, oh, oh, oh, well, I didn't

20 notify the SBI.  I just talked to an SBI agent about

21 Carolyn Rotondaro being -- so he didn't say her name,

22 he just said an employee being sexually assaulted.

23     Q.     So did you believe that he used Smithfield

24 Police Department equipment to have Carolyn Rotondaro

25 record Jimmy Lawrence sexually assaulting her?

1      A.      How would I know that?

2      Q.      Well, who did you think he was secretly

3   recording with the Smithfield --

4      A.      Angie --

5      Q.      -- PD property?

6      A.      -- Barbour.  I'm sorry.  Angie Barbour.

7      Q.      You thought he was recording Angie Barbour?

8      A.      No.  He had -- one of his colleagues at the

9   Smithfield Police Department, he gave her a key fob.

10   Those key fobs are known to do drug transactions.

11   I've done many a cases where a defendant was called

12   up by this key fob, audio and video, on -- on -- on

13   drug cases for Smithfield Police Department, so I

14   knew they had a key fob that did audio and video.

15              So -- and I knew a private person

16   cannot just purchase these legally and do it legally

17   with -- with that.  You have to have a -- you have to

18   have a police officer agency purchase that.  Or if

19   you have credentials, like a private investigator,

20   you can purchase that.

21      Q.      Okay.  So later on in this transcript,

22   there's some discussion of exposing Sheriff Bizzell.

23      A.      Well, can we go back one --

24      Q.      Okay.

25      A.      -- real quick?  The grandstanding and using

 1    government property during this time is actually the

 2    school property he's standing on making accusations

 3    against other board members and other people.  The

 4    property itself is what he's using at that time to

 5    make accusations against others in the school board

 6    system.

 7         Q.    So you don't believe that Ron Johnson was

 8    exposing what he believed to be wrongdoing by other

 9    people?

10         A.    He was lying about other people.

11         Q.    Do you believe he didn't believe what he

12    was saying?

13              MR. MULLINS:  Object to form.

14         A.    Yeah, that -- I can't assume what he -- he

15    thinks.  In his mind -- I'll answer it.  In his mind,

16    maybe he thought it was true.  Don't know.

17         Q.    Okay.  So -- so tell me about this exposing

18    Steve Bizzell.

19         A.    Mm-hm.

20         Q.    What -- what -- what is -- what does --

21    what does that have to do with?  I mean, were you

22    trying to do that?

23         A.    Yes.

24         Q.    And why were you trying to expose him?

25         A.    We were trying to expose all moral [sic],

1  ethical [sic], and criminal activity within

2  government officials.

3      Q.      Okay.  So is that what Ron Johnson was

4  trying to do?

5      A.      What?

6      Q.      Expose criminal, immoral activity in

7  government officials?

8      A.      That's what he said he was doing.

9      Q.      Well, it's okay for him to -- it's okay for

10  you to say that's what you're doing, but it's not

11  okay for him to say that's what he's doing?

12      A.      If it's true, it's okay.  If it's false, to

13  better gain your access to -- for -- as a politician,

14  no, it's not okay.

15      Q.      Well, you weren't running for sheriff,

16  though, were you?

17      A.      Yeah.

18      Q.      No?

19      A.      That was to help expose Steve Bizzell.

20      Q.      So you were never running for sheriff?

21      A.      Yeah.

22      Q.      So you didn't do these broadcasts to

23  enhance your chances of winning election as sheriff?

24      A.      I could care less if I won or lost.

25      Q.      Didn't you do broadcasts asking people to

1   vote for you as a write-in candidate for sheriff?

2        A.      You're supposed to do that.

3        Q.      And it's your testimony that you cared less

4   about winning?

5        A.      I made a podcast, which I explained.  I

6   really don't want the position.  Because that

7   position takes a great deal -- you know, based off

8   your beliefs, if you're in a -- in a position of

9   public -- you know, if you take a position as a

10  public figure, you better be on your Ps and Qs,

11  because -- and my belief, you know, you have a lot

12  more to answer for to God when you mess up and you

13  make -- you do criminal things, or ethical things,

14  you have a higher standard in the public eye.

15       Q.      Did you run commercials during your

16  campaign?

17       A.      Oh, gosh, I made those.

18       Q.      Did you run them on the air?

19       A.      Yeah.

20       Q.      Okay.  It sounds like on one hand, you did

21  want the job?

22       A.      No.  It was to make fun.  Just like I made

23  a commercial about Ronald Johnson, I made fun of him.

24  It's a parody.

25       Q.      Did you state it was a parody when you did

1    it?

2        A.    Well, you would know it's a parody if you

3    watched it.

4        Q.    Okay.  I think I'm finished with Exhibit

5    Number 2.  And I want to go back to Exhibit Number 3.

6        A.    Do you want me to use her copy?

7        Q.    Yeah.  And Exhibit Number 3 is the 6/27

8    broadcast --

9        A.    Yeah.

10       Q.    -- done by you and Joe Preston.  And I'd

11   like to take you to minute marker 46:23.

12       A.    Mm-hm.

13       Q.    Do you see that?

14       A.    23 even?

15       Q.    46:23.

16       A.    46 minutes.

17       A.    Mm-hm.

18       Q.    It says (as read): He's on unpaid

19             suspension from the police department.

20                 Do you see that?

21       A.    Mm-hm.

22       Q.    Did you say that about Ronald Johnson?

23       A.    I don't know if I said it like that.  But

24   it was stated he was on unpaid leave.

25       Q.    And this is dated 6/27; is that correct?

```
 1          A.      That's what this paper says.

 2          Q.      Okay.  And how did you know he was on

 3   unpaid suspension from the police department?

 4          A.      Angie Barbour.  Angie Barbour.

 5          Q.      Angie Barbour told you --

 6          A.      Mm-hm.

 7          Q.      -- that he was on unpaid --

 8          A.      (Witness nodded head up and down.)

 9          Q.      Did she tell you how she knew?

10          A.      She told me that she had someone inside of

11   CAAG, the CAAG with Dale Lands, and -- and it was

12   either Dale Lands that told her directly -- because

13   Ronald told her -- told him.  But Ronald also made

14   public comment to everybody there of what was going

15   on with his stuff.

16          Q.      And when you say "everybody there," who's

17   everybody there?

18          A.      There was a lady there by the name of

19   Jackie Lee, and she was telling Angie everything.

20          Q.      Okay.  And where is "there"?

21          A.      At their place on 42.  I don't know the

22   exact address.

23          Q.      What is -- what kind of place is it?

24          A.      It's an -- it's an office building for his

25   construction business and his political stuff.
```

1    Q.    Are you talking about Dale Lands?

2    A.    Dale Lands, correct.

3    Q.    Okay.  And Ronald Johnson was there...

4    A.    Ronald Johnson made comments to everyone

5    there at several meetings they had.  He would tell

6    everyone what was going on.  Jackie Lee was keeping

7    tabs of what was going on and giving it to Angie

8    Barbour.

9    Q.    And who is Jackie Lee?

10    A.    She's some member of the whole group, and I

11    guess, a mutual friend between Ronald and Angie.

12    Q.    Okay.  And that was all before 6/27?

13    A.    There was a -- well, I can't say before or

14    after, whatever.  But I just know I got a lot of

15    information through Angie because of Ronald telling

16    everyone at the CAAG meetings what was going on.

17    Q.    But you admit that you made the statement

18    that he was on unpaid suspension from the police

19    department --

20    A.    I might've mis -- unpaid -- unpaid leave.

21    Q.    Unpaid leave?

22    A.    Mm-hm.

23    Q.    You admit that you said that on your

24    podcast on 6/27?

25    A.    If this is -- again, it's not certified.

1    So I can't say it was or wasn't.  So --

2         Q.     Okay.

3         A.     -- that date.

4         Q.     Okay.  So that's Exhibit 3.

5                All right.  So before we took our

6    break, we were talking about the reason you believed

7    the statements you made about Ronald Johnson in your

8    broadcast were because of information given to you by

9    Angie Barbour and others.  Is that correct?

10        A.     State that one more time.

11        Q.     The reason you believed the truth of the

12   statements that you made about Ronald Johnson in your

13   broadcasts was not because you -- you didn't have any

14   personal knowledge of the statements; is that

15   correct?

16        A.     They made statements to me personally, yes.

17        Q.     Who made statements to you?

18        A.     Angie Barbour, Bennett Jones.

19        Q.     About what Ron Johnson had done?

20        A.     Correct.

21        Q.     But you didn't have any personal knowledge

22   of what Ron Johnson had done?

23        A.     Not directly.

24        Q.     So you believed their statements about what

25   Ronald Johnson had done, correct?

1    A.    After looking into those statements, yes.

2    Q.    So you did independent investigation of all

3    of the statements that these people made to you, and

4    determined that they were telling you the truth.  Is

5    that correct?

6    A.    Pretty much.

7    Q.    What other statements were made to you by

8    Angie Barbour about illegal things that Ronald

9    Johnson had done?

10   A.    Well, she didn't really -- you're talking

11   about the illegal stuff more than, she just -- she

12   liked to talk about -- well, she didn't like to talk

13   about it, but she talked about how -- what the

14   affair, what it did to her and her family, what the

15   affair's going to do later.

16          And, you know, the illegal stuff was

17   pretty much secondary to her.  She was more into the

18   -- the affair stuff.  So we -- Joe Preston and I, we

19   -- we both worked on this.  But Joe Preston worked

20   more on it than I did, because I had to do -- I was

21   doing the sheriff stuff.

22   Q.    You were doing what?

23   A.    The sheriff stuff.

24   Q.    What do you mean, "the sheriff stuff"?

25   A.    Like, looking into the sheriff, doing FOIA

1    requests, things like that.

2        Q.    Okay.  But you continued to broadcast

3    statements about Ronald Johnson after Joe Preston

4    died, correct?

5        A.    Let me think.  Yes.

6        Q.    And did Angie Barbour ever give you any

7    photos during your communications with her?

8        A.    Yes.

9        Q.    What kind of photos?

10       A.    Photos -- or screenshots of other --

11   another female who was a student of his at JCC that

12   had a message on there about what she wanted to do to

13   Ronald Johnson.

14       Q.    And what does that message say?

15       A.    I couldn't -- I can't remember.

16       Q.    Do you still have a copy of it?

17       A.    I only have a copy of the photo --

18       Q.    Do you have a copy --

19       A.    -- not the -- not the wording, because that

20   all went to Smithfield PD, I believe.

21       Q.    So are -- are you testifying it was on the

22   phone that you gave Smithfield PD?

23       A.    No.  I saw where -- she showed me a picture

24   of this female, who Ronald told her it was a student

25   at JCC that he was having an affair with as well, and

1    what she wanted to do to him.

2         Q.     And what did she want to do to him?

3         A.     I mean, there was a lot of sexual

4    "explicities," but I can't remember verbatim.

5         Q.     And so your testimony is that Angie showed

6    you the picture, but you never got a copy of the

7    picture?

8         A.     Yeah.  I got a copy of the picture, but I

9    didn't get a copy of that and the caption of what it

10   said.

11        Q.     So do you have a copy of the -- what Angie

12   showed you?

13        A.     I have a copy of the picture, not of the

14   text.

15        Q.     Okay.  What's the picture of?

16        A.     Two females.

17        Q.     Okay.  Just sitting there? standing there?

18        A.     Sitting there.

19        Q.     Okay.  And do you recall the name?

20        A.     It may be -- wait.  That's the photo I got

21   when I looked her up on Facebook trying to relocate

22   her.  But I can't remember if that is the exact

23   picture, or it's a -- there's another picture of this

24   female.

25                    So I -- I've got to think, because I

1    get so many things.  But I -- I've got one of this

2    female, and it's a photocopy of it that I -- that I

3    have.  And it's in the truck -- car.

4         Q.    Okay.  So this picture you have of this

5    female came from Angie Barbour?

6         A.    Mm-hm.

7         Q.    And Angie Barbour handed you a picture of

8    this female and showed you texts.  Is that your

9    testimony?

10        A.    Correct.

11        Q.    And your testimony is that those texts are

12   sexually explicit?

13        A.    Correct.

14        Q.    Did you produce those texts to anyone?

15        A.    I think I produced the name of the female

16   to Smithfield PD.  But I don't -- as I said, Angie

17   Barbour is the one that has it on her phone.

18              Now, I got another -- a duplicate

19   after.  Because I had lost some of that stuff when I

20   was moving my podcast room from the front to the

21   back, so I got another picture of that female from

22   Angie Barbour.

23        Q.    So did you ever do any investigation to

24   ascertain whether this, in fact, happened?

25        A.    Correct, I did.

```
 1        Q.     You did?  And what was the investigation
 2   you did?
 3        A.     I tried to contact this female who has
 4   moved out of state.  And she would not contact me
 5   back.
 6        Q.     And how did you learn that she had moved
 7   out of state?
 8        A.     Because on her Facebook page, it had
 9   changed and changed the location.
10        Q.     Okay.  And how did you get her contact
11   information?
12        A.     I did a -- a request on it online.
13        Q.     You did a...
14        A.     A request online.  You can pay $20 for a
15   request.
16        Q.     Okay.  And so you located her using an
17   online service?
18        A.     Mm-hm.
19        Q.     And called her up?
20        A.     Mm-hm.
21        Q.     And asked her to speak with you?
22        A.     But she wouldn't talk to me.
23        Q.     Okay.  And what was her name?
24        A.     You're going to ask me to spell this, too.
25   Arianna.
```

1      Q.     Does she have a last name?

2      A.     Mellardo.

3      Q.     Millardo?  Okay.  M-i-l-l-a-r-d-o

4   (phonetic)?

5      A.     Your guess is as good as mine.

6      Q.     Okay.  So do you have any independent

7   evidence that Angie Barbour's allegations were true?

8      A.     As in others, just confirming information

9   from Angie.

10     Q.     Who else confirmed that Angie Barbour's

11  information was true?

12     A.     One was from -- I talked to Hannah Smith.

13     Q.     Hannah Smith knew Arianna Mellardo?

14     A.     No, no, no, no, no.  Now you're getting way

15  off track here.  The Arianna Mellardo, Mellarno,

16  whatever, that was a conversation between Angie and

17  Ronald.  Ronald shared the message with Angie to make

18  her jealous.

19     Q.     So Ronald told Angie that he was having an

20  affair with Arianna Mellardo?

21     A.     Yes, ma'am.

22     Q.     Was it true that he was having an affair

23  with Arianna Mellardo?

24     A.     He's the one that wrote the text message to

25  -- and showed it to Angie Barbour.  And she got a

```
 1   snapshot of it, or a picture of it, a snap of it.
 2   And that's what I saw.
 3        Q.   So you don't know if he was having an
 4   affair with Arianna Mellardo?
 5        A.   He also stated he was beating his wife.
 6        Q.   Okay.  So you testified earlier today about
 7   statements that you made that were not true for
 8   another purpose, correct?
 9        A.   Mm-hm.
10        Q.   So are you saying that that's an okay thing
11   to do?
12        A.   Well, it depends on how you're using it.
13        Q.   Okay.  Well --
14        A.   If I'm using statements about someone, like
15   Jimmy Lawrence having -- sexually assaulting someone,
16   and I go on public TV to tell this, but yet I have no
17   physical proof, nothing but someone I'm having an
18   affair with, together, we're going to make this up
19   and go after Jimmy Lawrence?
20        Q.   Do you think those statements are different
21   from the statements that you made to Chris Johnson?
22        A.   It wasn't to Chris Johnson.  It was Niki
23   Daniels and Dawn Daniels.
24        Q.   Okay.  Are they different?
25        A.   It's much different.
```

1      Q.    Okay.  And it's because you made them, and
2  not Ron Johnson, right?
3      A.    No.  It's because it was -- I'm not
4  publicly going out there and sharing it with
5  thousands of people.  I'm using this as to find out
6  what they're doing to me.
7                 But it's -- you know, Ronald Johnson
8  did this to the whole public.  He -- he went and --
9  went and tried to destroy people's lives and
10  familyhood --
11     Q.    Is it --
12     A.    -- because -- to protect himself.
13     Q.    Is it possible he was trying to protect
14  Carolyn Rotondaro from being sexually assaulted?
15     A.    As a police officer?  No.  Because he had
16  any opportunity, as -- it's -- it's his job to report
17  crime and to take reports.  And he never reported
18  this to --
19     Q.    Do you know that for a fact?
20     A.    Okay.  After the trial, I was told that
21  Carolyn Rotondaro went to the DA's office.  They
22  don't have a record of it.  Why?
23                 And even the reporter backed Ronald
24  into a corner and said, we talked to the SBI.  You
25  never reported this.