1                    Oh.   Oh.   Well, I talked to an SBI

2    agent.  He had something quick to say.

3                    So did he report it?  No.  As a police

4    officer, he could've reported it to his -- his people

5    at work.

6        Q.    Do you know if he did that?

7        A.    I don't see a report of it.  Do you?

8        Q.    Are you aware that they actually knew about

9    it?

10       A.    They said they didn't know about it.

11       Q.    Who did they tell that to?

12       A.    I guess it's in the paperwork, because I

13   read it somewhere.

14       Q.    Okay.

15       A.    Ronald never reported -- reported a sexual

16   assault on himself for getting his mess-up.

17       Q.    So you have no knowledge of him reporting

18   this to both Terry West and Keith Powell?

19       A.    At -- at the time he's making these

20   accusations, no, he did not report that to them.

21       Q.    So you have no knowledge of him reporting

22   it to them at the time it occurred?

23                    MR. MULLINS:  Objection; form.

24       Q.    (By Ms. Bateman)  Is that correct or not?

25       A.    I was told --

```
 1        Q.    I don't want to know what you were told.
 2   What I --
 3        A.    Okay.
 4        Q.    -- want to know is what you know.  What do
 5   you --
 6        A.    Okay.
 7        Q.    -- know about whether Ron Johnson reported
 8   Carolyn Rotondaro being sexually harassed by Jimmy
 9   Lawrence to both Keith Powell and Terry West at the
10   time it was occurring?
11        A.    I don't know.
12        Q.    Are you aware that Ron Johnson reported it
13   to Susan Doyle in January of 2020?
14        A.    I asked, and they said they don't know.
15        Q.    Pardon me?
16        A.    They don't have no record of it.
17        Q.    Okay.  Have -- have we discussed everything
18   that Angie Barbour told you about illegal activities
19   conducted by Ronald Johnson?
20        A.    Have I what now?
21        Q.    Have we discussed today all of the
22   allegations that Angie Barbour made about Ronald
23   Johnson's allegedly illegal activities?
24        A.    All of them?
25        Q.    Yes.
```

```
 1        A.    If there's more, I -- I can't recall them

 2   at this time.

 3        Q.    Okay.  At any time during your discussions

 4   with Angie Barbour, did she ever provide you -- I

 5   know you said she provided you pictures.  Did she

 6   provide you any recordings?

 7        A.    No.

 8        Q.    Did she provide you --

 9        A.    At that time.

10        Q.    -- any doc -- I'm sorry?

11        A.    At that time, no.

12        Q.    Did she provide you with any documents?

13        A.    I don't remember.

14        Q.    Do you recall reading a document she wrote

15   called "The Truth"?

16        A.    I don't remember that.  I know she wrote

17   one.

18        Q.    Okay.  I'm going to --

19        A.    I heard she wrote one.

20              MS. BATEMAN:  I'm going to identify

21   this as -- Exhibit 4?

22              MR. MULLINS:  5.

23              MS. BATEMAN:  5.

24        A.    You want Number 3 back?  I'll keep it.

25              (WHEREUPON, EXHIBIT NUMBER 5
```

```
 1                  WAS MARKED FOR IDENTIFICATION.)

 2        Q.   (By Ms. Bateman)   And ask you if you've

 3   ever seen that document.

 4        A.   No.

 5        Q.   No?   You've never seen that document?

 6        A.   No.

 7        Q.   Okay.

 8                  MS. BATEMAN:   What was number 4?

 9                  THE COURT REPORTER:   (Hands document.)

10                  MS. BATEMAN:   Did we mark an Exhibit,

11   1622, dated 6/30?

12                  MR. MULLINS:   I don't believe so.

13                  MS. BATEMAN:   Okay.   I'm going to mark

14   that 5.

15                  MR. MULLINS:   I'm sorry.   What are you

16   marking 5?

17                  MS. BATEMAN:   The transcript.

18                  MR. MULLINS:   That'll -- that'll be 6,

19   because "The Truth" was 5.

20                  MS. BATEMAN:   6.   Okay.   6.   Thanks.

21                  (WHEREUPON, EXHIBIT NUMBER 6

22                  WAS MARKED FOR IDENTIFICATION.)

23        Q.   (By Ms. Bateman)   I'm sorry we're going

24   back in time.   I don't know why I marked that 7/10

25   one 4.   But in any event, I did.
```

1              I want to go to minute marker 29:20.

2        A.    Okay.

3        Q.    Okay.  And it says (as read): And you know

4              he tried to get Bennett Jones out.

5              What's the basis for that statement?

6        A.    This is when I was discussing -- but I

7    don't know if this is even my -- exactly what I said,

8    because it's not certified.  But I know that I made

9    the comment about Ronald trying to get Bennett Jones

10   out.

11       Q.    And what was the basis of your saying that?

12       A.    Because I found out Ronald Johnson was

13   working two sides of the fence.  He was working the

14   Cleveland side, he was working the Clayton side, and

15   he was working the school board side, and Bennett

16   Jones' side.

17       Q.    What's the Cleveland side?

18       A.    He was helping a football coach get what he

19   needed to get the Clayton football team or coach in

20   trouble.

21       Q.    And who is Cleveland?

22       A.    Cleveland is a high school --

23       Q.    Cleveland...

24       A.    -- High School coach.

25       Q.    And where is that?

1       A.      That's right down the road.   That's in

2    Johnston County.

3       Q.      Okay.   So it's your --

4       A.      Garner, Clayton area.

5       Q.      So it's your testimony that Ronald Johnson

6    was helping the Cleveland coach?

7       A.      Mm-hm.

8       Q.      Why was he doing that?

9       A.      It was assumed that it was to strengthen

10   his public, for voting, or for his politician career

11   -- political career.

12      Q.      Why would he go after Bennett Jones if

13   Bennett Jones was so popular?

14      A.      Well, he didn't know it at the time.   Once

15   Bennett Jones -- once things started going -- and

16   see, you're asking the wrong one here.   I'm just

17   delivering the information.

18              So once Ronald found out -- when this

19   investigation went further, and then it was on

20   Bennett Jones, it was something to do with Ronald was

21   pissed off with Renfrow and Bennett.   There was some

22   deal that something -- I can't, off the top of my

23   head, remember everything, but that's when Bennett

24   became involved.

25              When Bennett became involved -- well,

1    when he was suspended, all of a sudden the community

2    came together and bring Bennett back.

3         Q.    Well, when did that all happen?

4         A.    I don't remember the date.

5         Q.    So did you have any personal knowledge

6    about the Bennett Jones being suspended issue?

7         A.    I had seen it in the papers and read it on

8    the news.

9         Q.    Okay.  So when you -- when you say in your

10   podcast that Ronald Johnson tried to get Bennett

11   Jones out, what's your evidence of that?

12        A.    I made conversation with Ross Renfrow.  I

13   made -- had --

14        Q.    I'm sorry.  Can you move your hands?

15        A.    I had a conversation with Bennett Jones, I

16   had a conversation with Eddie Price, and everything

17   led to that.

18        Q.    And they all told you that Ronald Johnson

19   was trying to get Bennett Jones out?

20        A.    At first.  But then, when Ronald saw all

21   the voters in Clayton getting behind Bennett Jones,

22   he changed his tactic, and started -- started getting

23   Bennett Jones to feel like he was trying to help

24   Bennett Jones out.

25        Q.    Is it possible that someone gave Ronald

1    Johnson information that the Clayton High School

2    coach was playing a student with falsified grades?

3        A.    If that's the case, that would've been the

4    Cleveland head coach.

5        Q.    Well, I'm just saying, is that possible

6    that he got that information?

7        A.    Maybe.

8        Q.    And do you think it was improper for him,

9    as a school board member, to ask for an investigation

10   of those allegations?

11       A.    I think it was improper the way he tried to

12   handle it to maneuver benefiting his position.

13       Q.    And how was calling for an investigation

14   maneuvering it to benefit him?

15       A.    Well, you'll have to listen to all the

16   recordings of Bennett Jones, because he recorded all

17   of these conversations.  And it will self-explain

18   itself of what Ronald was trying to do.

19       Q.    Okay.  So --

20       A.    I can't remember all that stuff.  I --

21   after all this, he's found guilty in a court of law,

22   I did one more podcast.  That was it.

23                I dropped it because there's no more

24   story.  He's not a public figure, he's not a story,

25   it's done.  So...

1    Q.    Well, how -- how is it that Bennett Jones

2    is not a public figure but Ronald Johnson's the

3    public figure?

4        A.    Well, Ronald Johnson -- Ronald Johnson puts

5    himself as a public figure as a school board member.

6                      Bennett Jones is actually the teacher

7    -- or a principal at school.  He's not out there in

8    the public asking for -- look at me, you see me, I'm

9    here.

10    Q.    But he came, you said, and talked to you

11    about what was going on for the purposes of getting

12    that information disseminated to the public, correct?

13    A.    No.

14    Q.    He did not?

15    A.    Ronald Johnson was making false accusations

16    that Bennett Jones was sleeping around on his wife.

17    Q.    Ronald Johnson was making accusations about

18    Bennett Jones sleeping around?

19    A.    Yes.

20    Q.    Who did he make those to?

21    A.    To Bennett Jones.

22    Q.    He --

23    A.    He told Bennett Jones that he was going to

24    start -- if he didn't do something that he wanted,

25    then he was going to tell that.

1    Q.    When did Bennett Jones tell you that?

2    A.    This was during one of our meetings.

3    Q.    And when did these meetings occur?

4    A.    I don't remember the date.

5    Q.    Did you make any notes during any of these

6  meetings?

7    A.    Didn't have to.  I just listened.

8    Q.    But you don't recall any of it now?

9    A.    I don't recall the time, the date.  But I

10  can tell you that I sat there and I listened, and I

11  listened to the recordings.  And it was pretty bad.

12    Q.    So you have pretty specific recollection of

13  what these recordings said, but you have no idea when

14  they occurred?

15    A.    I've got a lot of -- there's a -- there's

16  several recordings.  There's -- of all different

17  types of things.  The -- I just don't have dates at

18  this time.

19    Q.    And how many recordings are there?

20    A.    I have, I'd say at least a dozen.

21    Q.    Have you turned those over in discovery?

22    A.    You have them.

23    Q.    Have you turned those over in discovery?

24    A.    You have them.

25    Q.    Did you turn them over to me?

1        A.      You have them.

2        Q.      I don't have any recordings.  Did you --

3        A.      Did you --

4        Q.      -- turn these over to me?

5        A.      Okay.  Did you collect -- did you collect

6   anything off my podcast?

7        Q.      You played every single one of the

8   recordings you had with Bennett Jones, in totality,

9   on your podcast?

10       A.      Uhm...

11       Q.      You're going to need to turn those over in

12  discovery.

13       A.      Well, I will turn them over.  I mean --

14       Q.      Okay.

15       A.      -- it's not going to hurt me.  It's going

16  to hurt him.  So --

17       Q.      Every single one of them.

18       A.      That's fine.

19       Q.      Completely.

20       A.      But I'd like for you to ask for this

21  separately from the Town of Smithfield, because

22  you're -- it's like you're making this all one

23  lawsuit, but it's actually two.

24               So if you would ask me for this, just

25  me, instead of asking me with his stuff comingled,

1    I'll be glad to give it to you.

2        Q.    I'll be glad to resend the discovery

3    request I sent to you, separate it out.  But you

4    still have an obligation based on the original

5    discovery that I sent you.

6        A.    And then are you going to send me mine?

7        Q.    I did send you yours.

8        A.    You did?

9        Q.    Yes.

10       A.    The very first question I asked was, how

11   many affairs has he had since --

12       Q.    And we're not getting into that question.

13       A.    Okay.  Well, fair is fair.

14       Q.    That's the only question that's not going

15   to get answered.

16       A.    Well --

17       Q.    You know what?  I bet, just like your

18   recollection today, Mr. Johnson can't recall, nor

19   could he probably recall the dates on which those

20   happened.

21              But we digress.  Let's go back to

22   this --

23              MR. MULLINS:  Objection.

24       Q.    (By Ms. Bateman)  Let's go back to this

25   Exhibit 6.

```
 1                    MR. MULLINS:  Can we -- can we take

 2     five?

 3                    MS. BATEMAN:  Yeah.

 4                    MR. MULLINS:  Off the record.

 5              (WHEREUPON, A SHORT BREAK WAS TAKEN.)

 6                    MS. BATEMAN:  We're back on the

 7     record.

 8        Q.      (By Ms. Bateman)  Still on Exhibit 6,

 9     and --

10        A.      Do you want a sticker on this?

11        Q.      Does it not have a sticker?

12        A.      No.

13        Q.      Let's do put a sticker on that.

14        A.      I gave it to her and then she got it all

15     mixed up.

16                    (Brief pause.)

17        Q.      (By Ms. Bateman)  Okay.  So going back to

18     minute 29:20, where it says you tried to get Bennett

19     out, we discussed the evidence you had of that.

20                    And I think you said that you also

21     talked to Ross Renfrow about that.  Is that true?

22        A.      I talked to Ross Renfrow about what

23     happened with him.  See, I can't remember all the

24     stuff.  But Ross Renfrow basically told me Ronald

25     pretty much -- he didn't use the word "blackmail,"
```

1    but he said that he -- I can't remember.

2              In other words, Ronald was holding

3    something over him, and that was to help get -- go

4    after Bennett Jones.  And then there was something --

5    Bennett and Renfrow -- he was good at keeping people

6    separated so they would never find out that Ronald

7    was actually -- what he was up to.

8              So, you know, to this day, Bennett and

9    Renfrow do not talk, from what I understand.

10        Q.    And why is that?

11        A.    Because of the -- the -- I call them

12   shenanigans of what Ronald Johnson played between,

13   you know, Renfrow, Bennett, and all them.  I said

14   "all them," but that's just country talk.

15        Q.    So if you're telling me that both Ross

16   Renfrow and Bennett Jones feel like Ron Johnson

17   played them, why wouldn't they talk to each other?

18        A.    I don't know exactly -- I couldn't tell you

19   exactly what happened.  It's just -- Ronald --

20   Ronald, from what I gathered, Ronald pressured

21   Renfrow into suspending and doing the investigation

22   on Bennett and on the coach -- Clayton coach.

23              The -- the Clayton coach and his wife

24   got so fed up with it that he resigned.

25              And then Bennett, you know, said,

1    well, now I'm just going to start playing Ronald.

2    And that's when Bennett started recording Ronald.

3         Q.    Did Bennett tell you that?

4         A.    Yes.

5         Q.    So if Ron was putting pressure on Ross

6    Renfrow, who was the superintendent, to conduct an

7    investigation into whether a student's grades have

8    been falsified so they can play football, wouldn't

9    that be a proper purpose for an investigation?

10        A.    No.

11        Q.    Why not?

12        A.    Because the investigation was pretty much

13   done.  It's what Ronald wanted him to continue to do

14   to keep it open and keep pressure on him.  That's

15   what Ronald was wanting them to do.

16              Because Renfrow went to Bennett and

17   the coach and said, we don't find anything wrong.

18   We're probably going to close this investigation.

19              No.  Ronald was not going to have

20   that.  And that's what Renfrow relayed to me, is,

21   Ronald just kept the pressure on.

22        Q.    So it's your testimony that Ross Renfrow

23   told you that the investigation found nothing?

24        A.    The investigation part was from Bennett

25   Jones.  He told me -- Bennett Jones -- there's

1    several conversations here.

2              Bennett Jones told me that Ross

3    Renfrow had gone to the coach and told him there was

4    nothing found, and it's probably -- the investigation

5    would be closed.

6        Q.   So let me stop you there and ask you a

7    question --

8        A.   I think I'm answering -- I don't...

9        Q.   She's gonna shoot you if you don't stop

10   talking.

11       A.   Dang.

12       Q.   Let me -- let me try that again.

13             Let me stop you there, and ask you why

14   the coach resigned if he didn't have anything to do

15   with changing a student's grades?

16       A.   The public perception against him, because

17   of this Ronald Johnson issue, Ronald had started

18   this, the pressure was so much on his wife and so

19   much on him -- they -- some people just can't take

20   it, cannot take the -- everybody's not a narcissist,

21   so everybody cannot just take public criticism

22   easily.

23       Q.   So are you saying, if you can't take public

24   criticism, your -- if you can take public criticism,

25   you're necessarily a narcissistic?

1      A.      No.   That's just one of the traits a

2   narcissist has.

3      Q.      Okay.

4      A.      So basically, the coach and his wife were

5   under so much stress that they decided just to leave.

6   Because Ross Renfrow had told him that this

7   investigation didn't lead to anything, and they were

8   fixing to close it.

9      Q.      Well, then why would he resign?

10      A.      He didn't close it, based off what Ronald

11   Johnson kept pushing him to do.

12      Q.      And what did the investigation eventually

13   show?

14      A.      Nothing.

15      Q.      And how do you know that?

16      A.      Because it came out in the papers.

17   Nothing.

18      Q.      So --

19      A.      The only thing it showed is one practice

20   that happened outside the scope of -- a practice that

21   happened in the wrong time of the year by NCAA rules,

22   and that was it.

23      Q.      So why would the coach resign after that?

24      A.      He resigned way before that.  Way before

25   everything was squashed and all.

1      Q.      So is it possible that they discontinued

2   the investigation because the coach resigned?

3      A.      No, that's not the reason.

4      Q.      Okay.

5      A.      Actually, the school board actually

6   exonerated the coach.  By this time, it's years

7   later.  Todd Sutton made a public comment, We

8   apologize to the coach for Clayton High School,

9   Bennett Jones.

10               I mean, they made a public apology for

11   what had transpired.

12      Q.      Why would Ross Renfrow suspend Bennett

13   Jones if he hadn't done anything wrong?

14      A.      I don't know why they did all the stuff

15   they did, except for everything revolved around what

16   Ronald was doing.  That's all I can answer.

17               I don't -- at that time, during this

18   stuff, I was into it big.  And -- and most of all, it

19   was Joe Preston who carried that information and

20   would relay it, and then we'd just do a podcast and

21   feed off of each other.

22      Q.      Okay.  So at 29:20, we talked about Bennett

23   Jones.  And now we just talked about what Ross

24   Renfrow told you.

25               So at the 29:58 mark, it says (as

```
 1               read): But during this whole ordeal, what

 2    transpired?  And I told you all this last

 3    time that I wound up putting a bug in the

 4    ear and it got to him.

 5               Is -- is that a reference to your

 6    telling -- was it Rick? -- Rick.  What's his last

 7    name --

 8      A.      Rick Walker.

 9      Q.      Rick Walker?

10      A.      Mm-hm.

11      Q.      -- that Angie had taken out a restraining

12    order on him?

13      A.      I'm not going to say this is a hundred

14    percent correct, but that sounds about right, what I

15    would've said.

16      Q.      You're saying this is not a hundred percent

17    correct?

18      A.      I don't know.  It's not transcribed by

19    someone that's certified, so -- it's just a

20    transcript by your office.  And I can't justify what

21    they wrote.

22               I can testify to what I said.  If you

23    played the video, I'll tell you if it was --

24      Q.      Well, do you agree that you said whatever's

25    in the video?
```

```
 1      A.    If it's in the video, I said it.  If you
 2  see me, I'd say it.
 3      Q.    Okay.  So --
 4      A.    I don't hide behind anything like that.  I
 5  mean, there's no need to hide from it.
 6      Q.    Okay.  So it says (as read): He went -- he
 7            went -- Ron Johnson went and filed papers
 8  on this woman and says she's harassing me
 9  and stalking me, and took out papers, a
10  50C.  And it should have been a 50B.
11                  Now, who told you that?
12      A.    It's 30:14?
13      Q.    Yes.
14      A.    Well, I knew about the 50C and 50B.  But
15  what are you asking?
16      Q.    I'm saying, is that -- you're saying nobody
17  ever had to tell you that?  You knew that
18  independently?
19      A.    Well, I knew what a 50C and 50B was.
20      Q.    So how did you get a copy of the
21  restraining order?
22      A.    I believe, Angie Barbour.  I can't be a
23  hundred percent, but I believe Angie Barbour brought
24  it to me, or -- or Joe Preston.  But we got a copy of
25  it.  And I believe it was Angie Barbour, because she
```

1   got it.  And she was pissed.  And then I had to tell

2   her it was me that did it.

3       Q.    So down at the 30:42 mark, it says (as

4             read): So there's a 50C, and the whole time

5   in the back of his mind, okay, I need to

6   find out how to shut her up, how to keep

7   her quiet so that I don't lose everything I

8   got that I've worked hard for, to

9   manipulate and blackmail a lot of people,

10  so I can be in this county and become the

11  sheriff, and basically be doing what --

12  what -- and then it says -- what Mr. Biz

13  was doing over there.

14                A lot of shady -- and this does not --

15  did you say, "a lot of shady shit"?

16      A.    Oh, yeah, I'm pretty confident I said,

17  "shit."

18      Q.    Okay.

19      A.    I say that a lot.

20      Q.    So back up at 30:30, it says (as read): But

21            he's not going to admit he's had a sexual

22  relationship with her and use government

23  property for illegal use and so forth.

24                Do you see that?

25      A.    Mm-hm.

```
 1        Q.      Now, are you aware that Terry West

 2   completely cleared Ron of using any government

 3   property to record anyone or conduct any unsanctioned

 4   investigations?

 5        A.      I don't -- I don't know what happened --

 6        Q.      Okay.  Did --

 7        A.      -- during that.

 8        Q.      Did you review the discovery turned over by

 9   the Town?

10        A.      I did.

11        Q.      And do you recall seeing that statement?

12        A.      What I saw -- there was so many pages, I

13   think 300-some pages.  So -- but what I did read was,

14   the district attorney did not file charges on the --

15   on Ronald Johnson for the 50C, 50B, that that would

16   be criminal charges, because that would be on the

17   police department's investigation.

18                    And then I saw where he did use

19   government property.  But I don't know -- they didn't

20   say they charged him for anything or not.  But on his

21   computer at work, he had private emails and

22   recordings and stuff on his personal computer.

23        Q.      So are you aware of the Town of

24   Smithfield's policies on reasonable personal use of

25   their computer?
```

1      A.     I asked -- after the trial and all, when I

2    had talked to Keith Powell, I asked him did he have a

3    copy of that.  He said, David, I'm retired.  He

4    didn't have a copy of the -- he said, I could get

5    one.  But I never followed up on it.

6      Q.     Right, because you just didn't care at that

7    point, right?

8      A.     No.  It was just, I just had so much going

9    on, right?  I just -- it's not that I don't care.  I

10   care.  Obviously, I do, or I wouldn't have done these

11   podcasts.

12     Q.     Or what?

13     A.     I wouldn't have done the podcast.

14     Q.     Okay.  So let's go over to minute number

15   34:26.  Now, a minute ago you just said that Joe

16   Preston -- you don't recall how you got a copy of the

17   order that you put on your podcast that you broadcast

18   on Facebook.  You said you either got it from Angie

19   Barbour, or Joe Preston went and got a copy of it.

20              Do you recall that testimony?

21     A.     Yeah.  I just -- I just told you.  I didn't

22   know which one of us got it.  And Angie Barbour -- I

23   do believe Angie Barbour is the one that gave it to

24   me directly, or Joe Preston.  But we had it.

25     Q.     Okay.  But those aren't -- those records

1    aren't published on the eCourts quarterly.  Do you

2    know?

3        A.    It's been a while since I've been on the

4    eCourts.  We got access and a password and all to get

5    lawyer's notes, and case numbers, and everything.  I

6    think it's -- what? -- 200 a month?

7        Q.    Okay.  So let me ask you to turn to minute

8    37:52.  Do you see that?

9        A.    Mm-hm.

10       Q.    (As read): So he had her followed, not by a

11             licensed private investigator, not by some

12   law enforcement, per se, but had her

13   followed, stalked.

14                    Are you referring to Owen Phillips

15   here?

16       A.    Correct.

17       Q.    And how do you know this?

18       A.    Owen Phillips told me.

19       Q.    And when did you talk to Owen Phillips?

20       A.    I don't remember the time.

21       Q.    How many occasions did you talk to Owen

22   Phillips?

23       A.    Since when to when?

24       Q.    Since June of 2022.

25       A.    Seven, eight conversations.

```
 1        Q.      Okay.  Did you make any notes about any of

 2   these conversations?

 3        A.      Well, some of these conversations weren't

 4   even about Ronald.

 5        Q.      Okay.

 6        A.      I mean --

 7        Q.      How many of them were about Ronald?

 8        A.      I -- I cannot speculate on that.

 9        Q.      Okay.  Did you record any of these

10   conversations?

11        A.      No.

12        Q.      And you don't have any notes about any of

13   these conversations?

14        A.      I didn't have to have any.  I mean, I --

15   just --

16        Q.      But you don't --

17        A.      -- don't remember.

18        Q.      -- recall what any of them were?

19        A.      I know -- I know what they were about.

20        Q.      What were they about?

21        A.      I just don't know when they were --

22        Q.      Okay.  Tell me --

23        A.      -- the exact date.

24        Q.      Tell me what they were about.

25        A.      One of the first conversations was about
```

1    Ronald trying to keep his kids -- Owen Phillips' kids

2    from transferring.  That was one.

3        Q.    Trying to keep them from transferring, or

4    trying to get them back in their home school?

5        A.    No, no, no, no.  No.  Ronald Johnson, on a

6    recording that I heard with Bennett Jones, the

7    recording was where Ronald Johnson was retaliating

8    against Owen Phillips, and he asked Bennett Jones

9    about the transfers.  And that was it.

10                I mean, it was -- it was to keep -- it

11    was to basically -- I can't remember exactly what.

12    It was keeping the kids from transferring.

13        Q.    Okay.  So you know Ronald Johnson's on the

14    school board, right?

15        A.    Mm-hm.

16        Q.    And his duty is to enforce or try to see

17    that school board policy's enforced, correct?

18        A.    Correct.

19        Q.    And isn't it true that Owen Phillips' kids

20    were not going to the school to which they were

21    districted in, according to where they lived?

22        A.    They asked for permission.  That's what

23    this request is for.

24        Q.    And you have personal knowledge of that?

25        A.    That's what Owen told me.

```
1       Q.      Okay.  Did you do any independent

2  verification of that?

3       A.      Well, I had the actual recording of Ronald

4  Johnson telling Bennett Jones, you remember those

5  transfers?  You know?  I got --

6       Q.      And what --

7       A.      -- it on recording.

8       Q.      And what did -- so your testimony is that

9  Ron said, you remember those transfers.  And what did

10  Bennett Jones say back?

11       A.      Well, Owen Phillips' kids, yeah, yeah,

12  yeah, just do me a solid.  I can't remember word for

13  word.  But like I said, I'll give you a copy when you

14  send me that discovery paper, or ask.  So -- so I'll

15  share those with you.

16       Q.      Do you have a copy of that recording?

17       A.      Yes.

18       Q.      Did you produce that in discovery?

19       A.      Like I told you earlier, you give me a

20  request for a discovery, separately from the Town of

21  Smithfield, I'll be glad to give it to you.

22       Q.      Well, you know in this -- in this

23  litigation, there's actually an obligation at the

24  very beginning of litigation to do initial

25  disclosures?
```

```
 1        A.      Mm-hm.

 2        Q.      Where you have to turn over everything that

 3   you're planning on relying on?

 4        A.      Mm-hm.

 5        Q.      So that's an obligation, independent of

 6   producing things in response to a discovery request.

 7   You have an independent obligation to turn over any

 8   evidence upon which you might rely.  And if you're

 9   going to use that evidence at all, you have an

10   independent obligation.

11               I'll be glad to send you a discovery

12   request.

13        A.      I don't need that evidence.

14        Q.      You have -- okay.

15        A.      I mean, you're giving me legal advice here.

16   I mean, I know what I'm doing.  So...

17        Q.      Okay.  Tell me more about this recording

18   that you have.  Did Owen Phillips give it to you?

19        A.      No.

20        Q.      Who gave it to you?

21        A.      Bennett Jones.

22        Q.      Do you know who else Bennett Jones gave it

23   to?

24        A.      No.

25        Q.      You don't have any knowledge of anybody
```

```
 1   else that Bennett Jones shared it with?

 2        A.     Wait.  That he gave a copy to, or just

 3   played it?

 4        Q.     Either one.

 5        A.     I don't know about playing it for someone.

 6        Q.     Who else did he give a copy to?

 7        A.     Copy.  He gave a copy to the school board.

 8        Q.     He played a copy -- he played a copy of the

 9   recording --

10        A.     He gave it -- from what I understand, he

11   played and gave it, a copy, to the school board.

12        Q.     Is -- is that what they used to issue the

13   censure to him?

14        A.     I don't know.  I wasn't a part of that.  I

15   just know Bennett Jones made a comment, well, that's

16   what I did.  I went in there, I played this, and I

17   gave them a copy of it.

18        Q.     Okay.  And --

19        A.     So...

20        Q.     -- the information that was on that

21   recording was about -- two students, correct?

22        A.     Well, it was a -- from what I gather, he

23   said he gave them all the recordings.

24        Q.     Okay.  But the recording you just discussed

25   was one about --
```

```
 1        A.      That's included.

 2                     THE COURT REPORTER:  I'm sorry?

 3                     THE WITNESS:  I'm sorry, I'm sorry,

 4    I'm sorry.

 5                     THE COURT REPORTER:  The one -- you

 6    said, "Okay.  But the recording you just discussed."

 7        Q.      (By Ms. Bateman)  The recording you just

 8    discussed concerned two students, correct?

 9        A.      Correct.

10        Q.      And is that protected information under

11    FERPA?

12        A.      No.

13        Q.      No?  Why not?

14        A.      It's not a record.

15        Q.      It's not a record?

16        A.      It's not -- it's not a -- the record of --

17    of their transcripts.  It's not in their school

18    records.  I didn't obtain any records.

19        Q.      So you're saying that FERPA, in your

20    opinion, only protects documents, not information?

21        A.      That recording was Bennett Jones's.

22        Q.      Are you saying that doesn't make it FERPA

23    information?

24        A.      I'm not a lawyer, so I can't comment on

25    that.
```

```
 1        Q.      Okay.  So how long was the recording that

 2   Bennett Jones gave you?

 3        A.      I can't guess on that.  It's less than two

 4   minutes, I believe.

 5        Q.      Okay.

 6        A.      It's my belief it's less than two minutes

 7   on that one.

 8        Q.      I'm sorry?  It's...

 9        A.      It's less than two minutes, I believe, on

10   that one.

11        Q.      And there's more than one?

12        A.      I have --

13        Q.      You said there were a dozen?

14        A.      At least a dozen.

15        Q.      Okay.  And you'll turn those over if we

16   send you a discovery request?

17        A.      Yeah.

18        Q.      How about recordings of Angie Barbour?  Do

19   you have any recordings that Angie Barbour shared

20   with you?

21        A.      If they are in that phone, I don't know.

22        Q.      Okay.  So do you --

23        A.      I never opened the phone.

24        Q.      You never opened the phone?

25        A.      (Witness shook head side to side.)
```

```
 1        Q.     Did you ever review an extraction of the

 2   phone?

 3        A.     No, ma'am.

 4        Q.     Did you ever receive a copy of the

 5   extraction of the phone?

 6        A.     No, ma'am.

 7        Q.     Okay.  I'm going to show you what we're

 8   going to mark.

 9               MS. BATEMAN:  We're going to mark this

10   Exhibit 7.

11               (WHEREUPON, EXHIBIT NUMBER 7

12               WAS MARKED FOR IDENTIFICATION.)

13        A.     So we're done with 6?

14        Q.     Yeah.  Okay.  Have you seen this document

15   before?

16        A.     Yes.

17        Q.     Okay.  And when did you see it?

18        A.     I think I saw this back paper.  But the

19   front paper, I haven't.  That's when they -- the

20   Smithfield Police Department took the phone.

21        Q.     Okay.  And what date did they take the

22   phone?

23        A.     It says (as read): Chain of custody,

24               received from -- is it 8/26/2022?

25        Q.     And where do you see that?
```

```
 1        A.      On the left, right there.

 2        Q.      Would that be down under "Chain of

 3   custody"?

 4        A.      It is.

 5        Q.      Okay.  So it says, Item Number 1?

 6        A.      Yeah.

 7        Q.      And it says, received by Lieutenant T.

 8   West?

 9        A.      Yeah.

10        Q.      And it says, received from David Marshburn?

11        A.      Yeah.

12        Q.      And then it says, date, 8/26/2022?

13        A.      Mm-hm.

14        Q.      Time, 11:11?

15        A.      Mm-hm.

16        Q.      And is Item Number 1 identified above that?

17        A.      Yes.

18        Q.      And it's identified as iPhone XR?

19        A.      Yes.

20        Q.      Salmon in color, in quotes?

21        A.      Correct.

22        Q.      And case: Serial Number F2LYL0SGKXLJ.  Do

23   you see that?

24        A.      Yeah.

25        Q.      And it says IMEI Number 35 306910 9159754.
```

```
1    Do you see that?

2          A.     Yeah.

3          Q.     And you see it says, Pass code 102060?

4          A.     Mm-hm.

5          Q.     What is Item Number 2?

6          A.     Data extraction from Item Number 1.

7          Q.     Okay.  And whose initials are out to the

8    side of that?

9          A.     Terry West.

10         Q.     And then beside Number 1?

11         A.     David Marshburn.

12         Q.     Okay.  So down under "Chain of custody" --

13         A.     Uh-huh.

14         Q.     -- it appears that on 8/31, the iPhone went

15   to Kyle Richards, correct?

16         A.     That's what it says.

17         Q.     Okay.  And below that, it says, Envista?

18         A.     Where?

19         Q.     Underneath in parentheses, underneath the

20   name Kyle Richards.

21         A.     Envista.

22         Q.     E-n-v-i-s-t-a?

23         A.     Uh-huh.

24         Q.     Okay.  And so that Item Number 1 is also

25   initialed by Terry West, correct?
```

1    A.    Correct.

2    Q.    And it says that it went to Kyle Richards

3  on 8/31/22, correct?

4    A.    Correct.

5    Q.    At 8:46, correct?

6    A.    Mm-hm.

7    Q.    Okay.  Then Item Number 2, it says (as

8          read): Received by T.W. West from Kyle

9          Richards, 8/31/2022.  Do you see that?

10   A.    Mm-hm.

11   Q.    Item Number 1?

12   A.    Yes.

13   Q.    And Item Number 1 is the phone, correct?

14   A.    Correct.

15   Q.    And then Item Number 2 is the data

16  extraction, correct?

17   A.    Correct.

18   Q.    And it says it was received by Terry West

19  from Spencer McInvaille.  Do you see that?

20   A.    I see it.

21   Q.    M-c-I-n-v-a-i-l-l-e, correct?

22   A.    Okay.

23   Q.    On September 7th, 2022, correct?

24   A.    Yeah.

25   Q.    Okay.  And then below that, it says Number

1    1 was received by -- and that's your signature,

2    correct, David Marshburn?

3        A.    Correct.

4        Q.    From T.W. West, 9/19/2022.  So you got the

5    phone back on September 19th, 2022?

6        A.    Mm-hm.

7        Q.    Do you --

8        A.    Correct.

9        Q.    -- still have the phone in your possession?

10       A.    Yes.  Somewhere.

11       Q.    And you've never looked at it?

12       A.    No.

13       Q.    Okay.  And on Number 2, the line underneath

14    that says, on October 19th, that extraction was

15    turned over to Richard Hoffman by T.W. West.  Do you

16    see that?

17       A.    Correct.

18       Q.    And on the second page of this exhibit,

19    Number 2, the extraction, it says it was received by

20    Captain Grady from Richard Hoffman on 10/20/2022.  Do

21    you see that?

22       A.    Correct.

23       Q.    And that it was also received by T.W. West

24    from Captain Grady on 10/21/2022.  Do you see that?

25       A.    I see that.

1        Q.      Okay.  So this phone is still in your

2    possession?

3        A.      Somewhere.

4        Q.      Pardon me?

5        A.      Somewhere in my possession.  I don't know

6    exactly where it's at because I boxed everything up.

7    And it's in my --

8        Q.      And tell me again about --

9        A.      -- room at the house.

10       Q.      I'm sorry.

11       A.      Go ahead.

12       Q.      Tell me about the deal, once again, that

13   you struck with the Smithfield PD.

14       A.      I -- I told them I would give them this

15   phone, but they need to give -- I was going to give

16   them the phone anyway.  It didn't really matter,

17   because I'm not going to hold anything they want.  If

18   -- I'm not going to -- I'm not going to jail for

19   holding something, or -- or get a charge for holding

20   something.

21               So -- but I asked them -- I requested

22   that they give Angie Barbour a copy of the extraction

23   because her mother's voice is on that phone, and it

24   has a lot of them.  And she -- she'd be devastated if

25   that was all gone because her mother's dead, you

1  know?  So I asked them would they at least do that.

2  And they said they would.

3      Q.    And do you know if they gave her a copy of

4  the extraction?

5      A.    I'm not a hundred percent sure.

6      Q.    Okay.  I'm going to take a break from this

7  Exhibit Number 6 and 7 for a minute and go to a

8  document we're going to mark Exhibit 8.

9                (WHEREUPON, EXHIBIT NUMBER 8

10               WAS MARKED FOR IDENTIFICATION.)

11     Q.    (By Ms. Bateman)  Okay.  Have you seen this

12  document before?

13     A.    No.

14     Q.    All right.  Well, I will tell you it

15  purports to be a transcript of your interview with

16  the Smithfield Police Department.

17     A.    Okay.

18     Q.    An audio copy of which was turned over in

19  discovery.  Have you listened to that --

20     A.    No.

21     Q.    -- recording?

22     A.    No, ma'am.

23     Q.    Okay.  So on August 26th, the same day that

24  you gave Terry West the phone that you bought from

25  Angela Barbour --

```
 1      A.      Mm-hm.

 2      Q.      -- that's the day you struck that deal,

 3   correct?  For them to give a copy of the extraction

 4   to Angie Barbour, correct?

 5      A.      I don't -- I don't remember when I

 6   purchased the phone.  It was before -- I purchased

 7   the phone before I went over there to Smithfield.  I

 8   didn't even know when they were going to call me.

 9      Q.      Did --

10      A.      I set it to the side so I could have it

11   extracted myself.

12      Q.      Did you ever do that?

13      A.      No.  Never opened it.

14      Q.      And -- and is it your testimony you never

15   reviewed a copy of the extraction?

16      A.      Never.

17      Q.      Did they give you a copy of the extraction?

18      A.      No.

19      Q.      Have you seen a copy of the extraction in

20   any form from anybody else?

21      A.      No.

22      Q.      Okay.  So --

23      A.      Why?  Did you put it in the discovery

24   somewhere and I saw it somehow?

25      Q.      I'm not -- I'm just asking --
```

1      A.      Unless y'all did that, I wouldn't have

2    known -- I was not --

3              MR. MULLINS:  I'm not going to

4    disguise it.  I have not been able to copy and mail

5    the one that I mailed to you.  I --

6              THE WITNESS:  Yeah, and I'm --

7              MR. MULLINS:  I gave it to you.  I

8    still need a copy of the other one to mail to him.

9    So he does not have that.

10             MS. BATEMAN:  Okay.

11             THE WITNESS:  And I've never seen it.

12             MR. MULLINS:  I did tell him --

13             MS. BATEMAN:  But you will have it?

14             MR. MULLINS:  I will get him that, as

15   well as the computer.

16             MS. BATEMAN:  Right.

17             MR. MULLINS:  There are also -- we

18   have two different protective orders, just to be

19   clear.  We just -- I got you one because I know you

20   needed it faster.

21             MS. BATEMAN:  Okay.

22     Q.      (By Ms. Bateman)  So at the 28 second mark,

23   Terry West is speaking to you, correct?  Do you see

24   that?

25     A.      At the 20 what?

Page 190

1       Q.      At the 28 second mark of the first page.

2       A.      Okay.

3       Q.      Now, I believe you testified earlier that

4  you went to the police department, an officer was

5  escorting you back, you ran into Keith Powell.  Then

6  Keith Powell walked you into the meeting with Terry

7  West.  Is that correct?

8       A.      From what I remember, yes.

9       Q.      Okay.  And the date of the meeting was

10  August 26th, right?

11      A.      Again, times, dates, I don't remember.

12      Q.      Well, do you -- do you have any reason to

13  disagree?

14      A.      If this was done by a court reporter, no.

15  But I don't know who wrote this.

16      Q.      Okay.  Do you see at the 28 second mark,

17  Terry West says (as read): At the start, it was

18              mainly with the affair where the anything

19  was done on duty, and also the allegations

20  about the recording and using departmental

21  equipment that they can do their

22  recordings.

23                  And then he says (as read): We're also

24              obviously any breach of the law that's come

25  into play, and also whether or not he used

```
 1   anybody or used his position here as the

 2   police department.

 3              Is that the gist of what it says --

 4   A.    That's what it says here.

 5   Q.    -- on this paper?  And do you recall Terry

 6   West saying something like that to you?

 7   A.    I don't -- I don't recall.  I recall bits

 8   and pieces of the whole interview.  I don't...

 9   Q.    Okay.  Well, tell me what you recall about

10   the interview.

11   A.    I think I already told that.  I just

12   remember going there, telling them about what Angie

13   had told me.  And then I talked about that 50C and

14   50B.  I mentioned that.  And let's see.

15              I didn't have any direct knowledge,

16   like, I didn't see, you know, somebody doing

17   recordings on government property where I was going,

18   based off of what Angie Barbour had told us,

19   including others, like Bennett Jones.  And if I

20   didn't mention Bennett, I mentioned others or

21   something.

22              But, basically, that's it.  I mean, I

23   just told them what I knew.  And, pretty much, I

24   wasn't worth anything.

25   Q.    Okay.  Do you recall Terry West telling you
```

1    that he had been keeping up with your show on

2    Facebook?

3        A.    If he said -- if he said that, maybe.  I

4    don't remember.  But, okay.

5        Q.    You don't recall it independently?

6        A.    I recall him just saying, hey, I watch your

7    show.

8        Q.    Okay.

9        A.    I'm a fan, dude.  No, nothing like that.

10        Q.    All right.  So do you recall Terry West

11    telling you that he wanted to talk to you because you

12    had a lot of information that you'd been digging

13    through for a lot longer than he had?

14        A.    He wanted to know what I knew.  And that's

15    about all I can comment on that.

16        Q.    Did he tell you that there was a lot of

17    truth out there, but that there was also a lot of

18    false information, and they were trying to weed

19    through it?

20        A.    I don't remember him saying like that.

21    But, I mean, I don't even remember what he said.

22        Q.    Well, you said you remembered some bits and

23    pieces, so I'm just --

24        A.    Right.

25        Q.    -- trying to figure out which parts you

1    remember.

2         A.    Okay.

3         Q.    And do you recall Terry West telling you

4    that the investigation had been dragging on for a

5    while, and that some unforeseen things had been going

6    on?

7         A.    What was he referring to?

8         Q.    I'm just asking if you recall him saying

9    that to you.

10        A.    I mean, if he did, I don't recall that

11   exact statement.

12        Q.    Do you recall him telling you that he

13   couldn't tell you why it had been dragging on?

14        A.    I can remember they being very vague at

15   what they were telling me, or what they could say to

16   me.  And the only thing I could tell them was what

17   Angie told me, you know?

18        Q.    Okay.  Well, let's go to 1:55.  Do you

19   recall telling him (as read): I want to say if it's

20            on the CD, Rick Walker called me.

21                 Now, what does "CD" stand for?

22        A.    Cassette disc?  I mean, I have it to record

23   my call on my phone, and I would put those on a CD.

24   And if that's what they're talking about, a CD given

25   to them, or a USB stick.  But...

Page 194

1      Q.    Did you give the Town of Smithfield a CD or
2   a USB stick?
3      A.    I can't remember which one it was.  But if
4   I had it, I think I gave everything I had.  I don't
5   want to hold anything from them.
6      Q.    So other than the phone that Angie sold to
7   you, and the CD, did you give anything else to the
8   Smithfield Police Department?
9      A.    Just information that I knew.  That's about
10  it.  That's --
11     Q.    Okay.  But the only --
12     A.    -- all I can recall.
13     Q.    -- physical evidence you gave them was
14  either on a CD, or a stick, you said, or on the cell
15  phone you purchased from Angie Barbour?
16     A.    I gave them the cell phone of Angie
17  Barbour.  And if I gave them a copy of the recording
18  of Rick Walker, it was either on a CD or a USB.  But
19  I can't remember what I did, exactly --
20     Q.    Okay.  And what else --
21            THE COURT REPORTER:  I didn't get your
22  last words.
23     A.    I can't remember what I did, exactly what I
24  did.
25     Q.    What else was on that CD?

```
 1      A.      I can't remember.

 2      Q.      Okay.  Do you have a copy of the CD?

 3      A.      No.

 4      Q.      Do you have a copy of what was on the CD?

 5      A.      Everything that -- that you're wanting -- I

 6  wouldn't have given them anything different than what

 7  you're going to ask me for in discovery, so I'm going

 8  to give it all to you.  So whatever I have, I'm going

 9  to give it all to you because I don't -- I don't need

10  it.

11      Q.      Okay.  But can you think of anything else

12  that would've been on that CD?

13      A.      (Witness shook head side to side.)

14      Q.      Okay.  And you gave that to Terry West

15  before this; is that correct?

16      A.      Before what?

17      Q.      Before this meeting.

18      A.      No.  I only went to that police department

19  one time and met Terry West one time.

20      Q.      Okay.  So tell me -- how much did you pay

21  for the cell phone?

22      A.      Now, if it was $10 or $20, I don't know.

23  It was just some monetary value that I -- because

24  Angie didn't want it.  And I said, no, I have to give

25  you some monetary value for it.  So I gave her a
```

1    monetary value.

2         Q.    Okay.  So she wanted to gift you, but you

3    said, no, I have to buy it?

4         A.    I don't know if that's what you want to

5    call it, but I know I gave her some monetary value

6    for it.

7         Q.    Okay.  So you said Rick Walker called you.

8    What did Rick Walker call you about?

9         A.    We're going over this again?  Okay.

10               So Rick Walker called me to tell me he

11   had to go and tell his buddy, Ronald Johnson, that

12   the rumor was going around he was cheating on his

13   wife.

14               Ronald told him he wasn't cheating on

15   his wife.  Told Rick Walker to tell me he wanted to

16   talk to me.  I said, well, he can call me if he wants

17   to.  I don't care.  His BS is not going to work.

18               So Rick Walker said, well, I wouldn't

19   be friends with anybody that would cheat on their

20   wife.  I'm just not that type of person.  I'm not

21   like that.

22               And then he -- he kept going with

23   something else, and I -- he said -- he said something

24   about getting it to stop.  And I said, well, I think

25   she's already filed papers on him.

 1              And don't even ask me why I did it; I
 2    just said it to see what the reaction is.  Because we
 3    knew we had a mole, and we were trying to figure out
 4    who it was.  And that ripped it right in two of what
 5    we were looking for.  But...
 6        Q.    So is that call recorded on that CD?
 7        A.    I have a copy of it, yes.
 8        Q.    Okay.
 9        A.    I can get it to you.
10        Q.    Okay.
11        A.    I played it on my podcast.
12        Q.    All right.  And then at the 2 -- 2:28 mark,
13    you're talking about this meeting that you testified
14    about earlier with Jim Wiesner, Joe Preston, Rick
15    Walker, you, Christine Livingston, and her husband,
16    whose name you can't recall?
17        A.    I know he was there.  I know he was there.
18    Pretty nice guy.  I mean...
19        Q.    But you don't remember his first name?
20        A.    (Witness shook head side to side.)
21        Q.    Is his last name Livingston?
22        A.    I mean, I was -- I was there.  I mean, I
23    knew -- I saw him.  He -- he was very nice.  He was
24    actually doing some of the cooking and stuff like
25    that.  But I just don't know him like that.  I

```
 1    don't...
 2        Q.    So it's your testimony you don't know his
 3    first name?
 4        A.    I don't know his first name.
 5        Q.    Okay.  It says you-all were discussing that
 6    there was a mole in your group, things were getting
 7    back to CAG.
 8                    Is it C-A-G or C-A-A-G?
 9        A.    C-A-A-G.
10        Q.    Okay.  And you -- you said something about
11    accountability, and something run by Dale Lands?  Do
12    you recall what you were telling him about -- what
13    you were telling West about in this meeting?
14        A.    So is this not a complete copy of this?  Or
15    is it just missing?
16        Q.    Well, I don't -- I don't think this is
17    totally accurate.  But I'm just asking you --
18        A.    It's just something to go by, right?  I'm
19    sorry.
20        Q.    I'm just asking you what you recall about
21    telling Terry West.
22        A.    Just, like, I would tell him what Angie
23    Barbour told me.
24        Q.    Well, here, right here, I'm talking about
25    -- I'm not talking about Angie Barbour.  I'm talking
```

```
 1    about -- he asked you to start at the beginning, tell

 2    him how this all went down.  What -- what you know.

 3                    And you start talking about this

 4    meeting that you-all had, and that you found out that

 5    Ron Johnson was connected to CAAG, and that it was

 6    Ronald, and Dale, and Michelle Antoine, and Kevin

 7    Donovan.

 8                    And I'm just trying to figure out how

 9    that fits into what you were trying to tell Terry

10    West about Ron Johnson.

11        A.    Well, as you know, when you ask me

12    something, I tell you.  I mean, I -- I go into a

13    little bit of detail maybe too much.  But that's

14    exactly what he asked me.

15                    He said, how did this thing start?

16    Where did this start at from?  And I just start

17    talking.  Like, I tell a story, as in -- and I forget

18    a lot of things, but there's a lot of -- there's

19    detail enough there for you to know what I'm talking

20    about.  So --

21        Q.    Okay.

22        A.    -- I started with -- that's when -- that's

23    where -- when we found out that Ronald Johnson was

24    having an affair with his wife -- on his wife.

25        Q.    So that's -- you're telling Terry West that
```

1    it was at that meeting where you found out?

2        A.    At that meeting by Jim Wiesner.

3        Q.    Okay.  And how did Jim Wiesner know?

4        A.    Because Angie Barbour went to him.

5        Q.    And did she tell you that independently?

6        A.    Yeah.  And he did.

7        Q.    She told you, and he did?

8        A.    Yeah.

9        Q.    Okay.  Do you know when they first talked?

10       A.    No, ma'am.

11       Q.    Okay.  And so you said all of them are in

12   cahoots with each other.  What do you mean,

13   "cahoots"?

14       A.    I'd have to -- just let me read it for a

15   second so I know what I'm talking about.  Okay.

16             So basically, CAAG is a group led by

17   Dale Lands, who is connected with Ronald Johnson,

18   Michelle Antoine, Kevin Donovan, and -- sort of like

19   a gang in politics.  And that's what I meant.

20       Q.    Okay.  And did Terry West ask you about any

21   of that?

22       A.    Well, like I say, I don't remember

23   specifics of what -- I just -- he asked, and I

24   answered.  And I left.  But...

25       Q.    So at some point, you say Angie Barbour and

1    Owen Phillips told you something about having girls,

2    young girls.

3                    What does that mean?

4         A.    Where is that at?

5         Q.    It says -- text messaging at the 4-point-53

6    -- 4:53 remark.  It says, she (as read): She

7              told me and Owen told me something about

8              having girls.

9                    Is that "she" Michelle?  I mean, she

10   -- sorry.  Is that "she" in that sentence Christine?

11   Is it Angie?  Is it...

12        A.    Talking about young girls.

13        Q.    Young girls.

14        A.    Young girls --

15        Q.    Young girls.

16        A.    -- with his campaigning, taking them to

17   meetings.  And there was something else, because I

18   know -- I was asked that question again by someone

19   else.

20                    But Ronald was seeing these younger --

21   and saw at JCC one evening that was real late, he was

22   parked beside another girl -- young girl.  The two

23   people told me that they spotted Ronald Johnson and a

24   young female meeting up at the JCC parking lot, or

25   the Annex, JCC.

```
 1              And those two people witnessed that,
 2    and they were Jim Wiesner and Joe Preston.
 3         Q.    Okay.  So --
 4         A.    So that's got to be what I'm referring to.
 5         Q.    All right.  Let's go -- let's go back to
 6    the 3:48 mark.  And you said Jim Wiesner told you,
 7    but you said you already knew about it because you
 8    overheard a conversation between Angie Barbour and
 9    Terry Tippett's wife.  Do you recall telling Terry
10    West that?
11         A.    Where at?
12         Q.    And when did you overhear that
13    conversation?
14         A.    Where are you talking about?
15         Q.    Okay.  Do you see at 3:48?  Do you see
16    that?
17         A.    Mm-hm.
18         Q.    (As read): Jim Wiesner said, look, it's
19              going to come out sometime soon.  Don't
20    know when.  Don't even know when, you know,
21    month, two months, whatever.  But Ron's
22    been messing around on his wife.  Well, I
23    already knew this because I overheard
24    conversation between Angie and Terry
25    Tippett's wife, Peggy.
```

1      A.      Correct.

2      Q.      Okay.  When did you overhear that

3  conversation?

4      A.      They were standing together at one of the

5  polling places, I believe it was the Smithfield --

6  the Smithfield one.  And that's when I overheard --

7  but, now, it wasn't nothing confirmed or anything

8  like that.  I'm just listening, you know, but I'm not

9  paying a whole lot of attention to it.

10              But it was -- I mean, she didn't act

11  like she was going to hide it, you know, secretly.

12  She wasn't quiet about it.

13      Q.      So if it was a polling place, this was at

14  an election?

15      A.      It might've been the primary.  I can't

16  recall.  So -- or we were -- we were -- it was the

17  Smith -- it was the Smithfield.  So...

18      Q.      So would this have been the fall of 2019?

19      A.      I can't remember the date.

20      Q.      Did you make any notes about it?

21      A.      And this could've been before that, when it

22  first -- when they're first -- when they were first

23  together.

24              But, no, I didn't make any notes about

25  it.  I wasn't even thinking about doing anything at

1   this time.

2        Q.      And -- and why is that?

3        A.      I don't know.  I was busy doing other

4   things.  I don't know.

5        Q.      So you didn't care enough about his

6   infidelity in the beginning to do anything about it?

7        A.      Well, you know, when you hear news, I mean,

8   you always want to listen.  You're always

9   eavesdropping, you know, hey, what are you talking

10  about.  But, I mean...

11       Q.      So it wasn't until you got together with

12  this -- with this gang, I think you called them

13  your --

14       A.      No, I call --

15       Q.      -- people, circle.  They were called a

16  circle.  Dale's people are called a gang.  Your

17  people are called a circle, correct?

18       A.      Well, you can call them both gangs.  I

19  don't care.

20       Q.      Okay.  But that's when you started to care

21  about Ron Johnson having an affair; is that right?

22       A.      When -- when the affair thing came up,

23  there was -- there was other things talked about that

24  day.  And it wasn't with Rick Walker around or

25  anything.  I actually stepped to the side with Jim

1    Wiesner, I believe it was, and we discussed, you

2    know, the Jimmy Lawrence issue.

3              And I can't remember all the stuff,

4    but, you know, Jim Wiesner is a conspiracy theorist,

5    and he gets off track some.  So you can't go based

6    off everything he says, but you can -- I mean, he's

7    pretty good on some things, but just some things he's

8    just not.

9              But, anyway, that -- that's it.

10   That's all I know.  I mean, we just talk about

11   different things.  I can't remember everything.

12        Q.    Okay.  But this -- again, this -- this

13   meeting when y'all discussed this was a meeting about

14   Bo Hines, correct?

15        A.    Well, it was a get-together with Bo Hines

16   and some other candidates for running for office, and

17   it was just somewhere to go hang out.  I mean, it was

18   just fun.  I wanted to meet Bo Hines, so I did.

19        Q.    Okay.  And when did he run for election?

20        A.    I don't know.  The year, I can't remember

21   it.

22        Q.    So I'm just trying to do my best to figure

23   out the dates on these things.

24        A.    Okay.

25        Q.    What did he run for?

1      A.      If I'm not mistaken, Congress.

2      Q.      U.S. Congress?

3      A.      No.  I don't know what it was.  It was

4  something district, something or other.  I just

5  didn't pay enough attention to it.  I just knew that

6  at that point in time, I wanted to meet him and --

7  and talk to him.  And so I did.  I mean...

8      Q.      Okay.  But at the same date, that's when it

9  came up about Angie Barbour having the affair with

10  Ron Johnson, correct?

11      A.      That was -- that was with Jim Wiesner.

12      Q.      And it also came up about you already knew

13  about that affair, correct?

14      A.      Well, I heard Angie Barbour discussing it

15  with Terry Tippett's wife, Peggy Tippett.

16      Q.      Okay.  And so you had a later conversation

17  with Peggy Tippett, and she told you again that Angie

18  Barbour told her she was having an affair, correct?

19      A.      Oh.  That was -- yeah, I remember her

20  discussing it.  She said that -- we had -- we had

21  discussed it.  Me and Peggy Tippett talked about it.

22  So I just can't remember when we did.  But...

23      Q.      How many times did you talk with Peggy

24  Tippett about it?

25      A.      Oh, I talked to Peggy Tippett all the time

```
 1   because she actually owned the property right beside

 2   my office -- or my wife's office.

 3        Q.    Okay.  So how many times did you talk to

 4   her about Ron Johnson?

 5        A.    If I had to guess -- you want a guess?

 6        Q.    Yeah.

 7        A.    I'd say, shoot, at least a hundred times.

 8        Q.    Okay.  Okay.  And so you -- you told Terry

 9   West that you talked to her again because you wanted

10   to start digging in on this because Ron had been

11   attacking everybody and attacking certain officers

12   and stuff.  Do you see that at the 4 -- about the 4

13   minute mark?  4:25?

14        A.    Yes.

15        Q.    Okay.  And so is it possible that that's a

16   reference to Peggy Tippett there?  (As read): She

17              told me, and Owen told me something about

18              having girls, young girls.

19              Did that come from Peggy Tippett?

20        A.    Well, yeah, Peggy told me about an

21   incident, there was a young female who showed up at

22   one of the meetings with Ronald.

23        Q.    What meetings?

24        A.    GOP meetings.

25        Q.    Okay.
```

```
1         A.      And she arrived with him and left with him.

2     And he had approached her and said, oh, this is one

3     of my proteges or something.  I don't know what.

4         Q.      My what?

5         A.      Protege or something.  I don't know what he

6     called her.

7         Q.      Okay.

8         A.      And -- and Terry -- and Peggy Tippett

9     thought it was odd because they showed up together,

10    and then they left together.

11                    And then she -- this girl worked at a

12    coffee shop or somewhere that Peggy had visited, and

13    ran into her, and the girl said something to the

14    effect of -- you'll have to ask Peggy word for word.

15    I don't know exactly.

16                    But something about Ronald Johnson.

17    And then the next thing you know, Peggy realized when

18    she goes back to that place again later, a month or

19    whatever, this girl's gone.  She moved.

20        Q.      Do we know her name?

21        A.      You'll have to ask -- well, I guarantee

22    Peggy don't even know her name.

23        Q.      Okay.

24        A.      But Peggy could describe her or whatever.

25    But she might be seen in the video, the FAFO video.
```

1    Q.    What's "FAFO"?

2    A.    The fuck around and find out video that --

3    Q.    Is that what that stands for?

4    A.    That's what Ronald said.

5    Q.    I'm sorry.  That's what?

6    A.    What Ronald said.

7    Q.    Okay.  Okay.

8          THE WITNESS:  Did you have to say that
9    dirty word?

10          THE COURT REPORTER:  I did, yes.

11    Q.    (By Ms. Bateman)  All right.  So Terry West
12    says (as read): But let me ask you, were you able to
13          identify any of these?

14          I guess he's referring to the young
15    women, the young girls?

16    A.    I don't know what he's referring to.

17    Q.    All right.  Well, it sounds like you're
18    telling Terry West about young -- young women and
19    girls, because Terry West says to you (as read):

20          Yeah, because that's the only thing I've
21    been getting is women and girls.  And
22    nobody could tell me anything -- I guess
23    maybe -- more than that.

24          I don't know.

25          And then you say something like (as

```
 1              read): I pretty much knew once, that one
 2              female, Arianna --
 3                  And it says male -- Mellardo.  I'm
 4    sorry.
 5                  And that's where you tell Terry West
 6              (as read): She was the one who was having
 7    actual sex with Ron because she had sent a
 8    message, Angie and Ronald were together.
 9                  What is "MHM" at 6:10?
10                  MS. HOBSON:  Mm-hm.
11                  MS. BATEMAN:  Is that an mm-hm?
12                  MS. HOBSON:  Mm-hm.
13        Q.    (By Ms. Bateman)  Mm-hm.  "MHM"?  Do you
14    see that, Mr. Washburn -- Marshburn?
15        A.    I see -- where are you asking me?
16        Q.    I'm at -- I'm at 6:01.  You're telling --
17        A.    Okay.
18        Q.    -- Terry West that she was having -- that
19    Arianna Mellardo and Ronald Johnson were having sex?
20        A.    Based off the message of Angie Barbour, and
21    what I read, and what the picture -- the picture and
22    what I read, that's what I told her.
23        Q.    But you never actually saw them having sex?
24        A.    I just read the text.
25        Q.    Okay.  And Arianna Mellardo never talked to
```

1    you, correct?

2         A.       She wouldn't talk to me.  So --

3         Q.       Right.

4         A.       -- I gave the investigator her name, phone

5    number and stuff, and let him handle it.

6         Q.       What kind of stuff?

7         A.       Like, her information so he could contact

8    her.

9         Q.       Okay.  Like, what kind of information?

10        A.       Her --

11        Q.       How is he going to get her if you can't get

12   her?

13        A.       I got her phone number, and I got her

14   Facebook page, and I got her -- I got her name,

15   Facebook page, and phone number, and gave it to him.

16        Q.       And do you know if he ever contacted her?

17        A.       I don't know.

18        Q.       Okay.  And you gave it to West or Hoffman?

19        A.       Terry West.  I never -- I never met Terry

20   -- Rick Hoffman.

21        Q.       You've never met Rick Hoffman?

22        A.       (Witness shook head side to side.)

23        Q.       You've never sat down and talked to him?

24        A.       (Witness shook head side to side.)

25        Q.       You never --

1    A.    No.

2    Q.    -- were interviewed by him?

3    A.    No.

4    Q.    Okay.  So you said (as read): But let me

5          back up a little bit because I got finished

6          to run a wrong --

7               Well, I don't know what that says.

8    But what -- you said (as read): I get off track.

9          It's my fault.  Rick Walker winds up --

10              THE COURT REPORTER:  I can't do that.

11              MS. BATEMAN:  Okay.

12              THE COURT REPORTER:  You've got to

13   slow down.  Sorry.

14              MS. BATEMAN:  That's okay.

15   Q.    (By Ms. Bateman)  Okay.  Let's just go down

16   to 6:26 where you say -- prior to that you say (as

17         read): I need to finish telling you about

18         Rick Walker.

19              And this is what you testified about

20   earlier where you were trying to figure out if he was

21   the mole in your group, correct?

22   A.    What part are you on?

23   Q.    I'm down at 6:26.  It says -- before that,

24   it says (as read): So Rick Walker winds up going,

25         leaving our group.  He goes and tells wrong

1    -- and I think it means -- it's supposed to

2    say Ron -- and it's in the phone

3    conversation.

4         A.    I don't recall --

5         Q.    Do you recall --

6         A.    -- any -- I know I told him about the

7    conversation between Rick Walker and I.  But I don't

8    know what this is on 6:26.  I mean, it's jumbled up,

9    but it's hard to understand and read.

10        Q.    Okay.  Well, do you recall telling Terry

11   West that -- that Ronald Johnson wanted to talk to

12   you?

13        A.    That's what Rick Walker stated to me.

14        Q.    Okay.

15        A.    And it's on the phone conversation.

16        Q.    Okay.  And then Terry West dates this

17   around June.  7- --

18        A.    Again, I can't --

19        Q.    -- 7:42.

20        A.    The date, I would not know.  I'm not going

21   to guess.

22        Q.    Okay.  And over on 8:07, that's where you

23   explain to Terry Walker [sic] that you told Rick

24   Walker that she's getting ready to file papers

25   against Ronald, right?

1      A.      I did tell Terry West the conversation

2    about me and Rick.  And I did state that she filed

3    papers against him.

4      Q.      Okay.  And you said (as read): So after you

5              talked to Rick, Ronald went and filed

6              papers against her on the 15th.

7                  Correct?  You told Terry that?

8      A.      If that's...

9      Q.      Do you recall --

10     A.      I don't -- I don't know.

11     Q.      -- doing that?  Do you recall telling him?

12     A.      I remember telling him that Rick Walker

13   contacted him and he went and filed papers.  But I

14   don't know what -- if I put a date on there or not.

15     Q.      Okay.  So at --

16     A.      If I did, I don't recall.

17     Q.      So at 9:08, the bottom of that page, and up

18   on top of the next one, it says (as read): You're

19              going to have to remind me on this 50B,

20              50C.

21     A.      Mm-hm.

22     Q.      Do you see that?

23     A.      Mm-hm.

24     Q.      And then Terry West says (as read): The 50C

25              is the civil no contact.  That's basically

1           somebody you didn't have a relationship

2           with.

3                Do you see that?

4      A.     Mm-hm.

5      Q.     So that's Terry West reminding you about

6  the 50B and 50C, correct?

7      A.     Yeah, but is that what I was asking him

8  about the 50C and 50B?

9      Q.     Well, I'm just saying, your sentence says

10 (as read): You're going to have to remind me on this

11          50B, 50C.

12     A.     So what I'm asking is, the -- okay.  So

13 when you're on a 50C, it's communication.  And on a

14 50B, it's a sexual, or you dated them.

15               And I don't know what exactly this is

16 asking, but I'm sure I'm asking him to remind me,

17 does that include prior relationships?

18     Q.     Do you see where you ask him about prior

19 relationships in here?

20     A.     Where?

21     Q.     Because you testified earlier --

22     A.     I don't know.  This is jumbled up.  It's

23 not even in complete sentences on some of this stuff.

24               So, I mean, if you've got the

25 recording, why can't we play the recording?

1     Q.    Okay.  Well, I'm just asking you: Do you

2  recall asking him to clarify for you the difference

3  between a 50B and 50C?

4     A.    If I did, I was just confused about it,

5  because -- I'm still confused about some of it.  But

6  that's okay.  I mean, I'm not a lawyer.  So I don't

7  know.  I'm not a judge.  I'm not...

8     Q.    Okay.  So let's go over to 10 -- 10:04.

9     A.    Mm-hm.

10     Q.    So it says (as read): I needed something in

11           public, something on the record, somewhere

12  that this was going on.  Some something to

13  give me some kind of power to go forward.

14           And then at 10:24, you say (as read):

15          I can't just take Angie's word for it,

16  right?  I just can't take anybody else's

17  word for it, even though I heard it twice

18  from her mouth.  Even though -- it says --

19  she didn't know I was listening one time.

20          So it sounds like you're telling Terry

21  West that you wanted to get a copy of the 50B or 50C

22  to be able to prove that Ron was having a -- an

23  affair with Angie Barbour because you couldn't just

24  take Angie's word for it.

25     A.    I already had the paperwork.  I got it from

1    Angie.  It was either me or Joe Preston that got a

2    copy from Angie Barbour.  And we already had it.

3                 So I don't know -- there's a lot of

4    stuff in here I think's missing.  And part of that is

5    that I have a copy of that.  So I don't understand --

6    that's why I don't like to go off these transcripts

7    that aren't certified.

8         Q.    Well, were you discussing with Terry West

9    the conversation that you had -- not the

10   conversation, the -- the need for you to have proof

11   that he was having an affair?

12        A.    No.  I was probably explaining to him, like

13   I explained to you, in a story form, of what I was

14   doing to get information to prove things.

15        Q.    So once you got a copy of that order, did

16   you feel like you had proof that he was having an

17   affair?

18        A.    I already had it.

19        Q.    You already had proof he was having an

20   affair because you heard it out of her mouth twice.

21   Is that what you said?

22        A.    No.  No, no.  I already had the copy of the

23   order before I went to -- to the police department.

24   I even state that on my podcast, and I show it on my

25   podcast.

1        Q.      Right.  But you're explaining to Terry West

2    how you came to that conclusion.

3        A.      In a story form of, I couldn't believe her,

4    so I had to get the -- maybe it's, I don't believe

5    her, that I had to get it -- a copy of the 50B or

6    50C, whatever I'm saying here.

7                    And pretty much, it's a story I'm

8    telling him of how I come to my conclusions and all.

9    I mean, he didn't give me any paperwork.

10       Q.      Okay.  So did you talk to Terry West about,

11   you were doing this because Ronald went after the

12   principal at Clayton High School, and he went after

13   the coach there, to Hunter?

14       A.      I told -- stated reasons of why I felt

15   Ronald Johnson should be outed in public.  Our tax

16   dollars are paying for him.

17       Q.      So is it your testimony that the only

18   reason he had anything to do with the Cleveland High

19   School and Clayton High School grades issue is for

20   political gain?

21       A.      No.  He went to -- Cleveland school coach.

22   Okay.  There's a lot of people who like the Cleveland

23   School coach, head coach.  And I don't -- you're

24   going to have to go to testimony from somebody who

25   was involved in that directly, and 100 percent by the

1    heart.

2              I can only tell you what, putting

3    pieces together of my memory of -- Ronald used that

4    source, that -- that head coach from Cleveland,

5    because that would have helped him in his political

6    career, helped him in votes, helped him in

7    popularity.

8              So he joined that coach, and did what

9    he did.  And then when he found out Bennett Jones had

10   more support, he jumped ship and went to Bennett

11   Jones's behalf, and acted like he was helping Bennett

12   Jones.

13        Q.    So is what you're telling me, that you put

14   -- you told Terry West these things, and you put

15   these things on your Facebook broadcast, but you

16   didn't actually have any independent verification

17   that they actually happened?

18        A.    I did what I believed, my opinion, and how

19   I felt they were true.  And I did.  And they are

20   true.  They wound up being true.

21        Q.    Well, how -- how is -- how -- how did you

22   prove that Ronald went after the principal at Clayton

23   High School for political gain?

24        A.    Because I talked to Bennett Jones.

25        Q.    Well --

```
 1        A.     And I got recordings.

 2        Q.     Right.  But that's just Bennett Jones'

 3   opinion.

 4        A.     I got the recordings of Ronald Johnson

 5   mouthing off about it.

 6        Q.     Mouthing off to Bennett Jones about it?

 7        A.     Yes.

 8        Q.     Telling him he did it for political gain?

 9        A.     No.  He's mouthing off.  You can -- you can

10   listen to what he's saying and -- and know what he's

11   doing.  I mean, it's just -- I'll -- I'll get you a

12   copy of it.

13        Q.     Okay.  The stuff with Bennett Jones

14   happened in 2019, right?

15        A.     I'm assuming, yeah.

16        Q.     Okay.  And Ronald Johnson ran for school

17   board in 2016, correct?

18        A.     I'm telling you, I don't have the dates,

19   but I'm just -- say, okay.

20        Q.     Okay.  So are you aware that Ronald

21   Johnson's been the top vote-getter in every election

22   that he's run for in Johnston County for school

23   board?

24        A.     Except the last one.

25        Q.     And who was the top vote-getter there?
```

1        A.        That was, I do believe, Kay Carroll.  Kay

2    Carroll.  Are you talking about school board only?

3        Q.        School board only.

4        A.        Maybe Kay Carroll.  I don't know.  I'm

5    going to say Kay Carroll is my best guess.

6        Q.        So you deny it was Ronald Johnson?

7        A.        Ronald Johnson was not the top vote-getter.

8        Q.        In the school board election.

9        A.        In the school board election.  Not the

10   primary.  The election.

11       Q.        Okay.  So you spent a lot of time talking

12   to Terry West about the Bennett Jones matter and the

13   Cleveland and Clayton High School football matters.

14   You recall that?

15       A.        I do.

16       Q.        You do?

17       A.        I remember talking to him about it, yeah.

18       Q.        Okay.  And you're saying you told him about

19   all the recordings you had that Bennett Jones gave

20   you, correct?

21       A.        If I -- I told -- Bennett Jones gave me

22   recordings at different times.  The first set was the

23   same as the second set, except for there was more to

24   it.  So he didn't disclose all of it.  He just

25   disclosed parts of it.

1          So at the time of the meeting of

2   Smithfield PD, I don't -- I remember telling them

3   that I had heard those recordings, but I don't

4   remember anything else.

5          I mean, there was so much I was

6   talking about.  But it seemed like it was fast,

7   believe it or not.  But I left there thinking -- what

8   I -- what I said just didn't matter because it was

9   more of the Angie thing.

10      Q.    It was more what?

11      A.    It was more of an Angie situation there.

12      Q.    So at 17:56, you were talking to Terry West

13  about Arianna again.  And you said she wouldn't talk

14  to you.

15          And in this instance, it says you're

16  telling Terry West that she's a diehard Ronald fan.

17      A.    Let's see.  Where is that stated, that

18  she's a diehard Ronald Johnson fan?

19      Q.    Well, what --

20      A.    Where is that --

21      Q.    -- was that based on?

22      A.    -- at?

23      Q.    At the bottom of -- the pages aren't

24  numbered.  At minutes -- 17:56.

25      A.    Oh, no, no, no, no, no.  This is a

1    different girl.  Not Arianna Mellardo.  I don't think

2    it's the Mellardo girl, no.

3         Q.    Well, it says --

4         A.    That's in your writing.  But there's

5    another girl who he had in a video, and it's on their

6    discovery of -- and I can't remember the girl's name.

7    But that's the girl I think I was talking about at

8    that point.

9              Because she -- she wound up doing a

10   video and telling how good Ronald Johnson was, and

11   then wound up being, like, this super-duper fan, or

12   whatever.

13        Q.    So are you -- are you saying that when you

14   told Terry West that you contacted Arianna, and she

15   is a diehard Ronald fan, that that wasn't true?  That

16   you were --

17        A.    No, no, no.

18        Q.    -- confusing her with somebody else?

19        A.    I'm telling you that's the -- that's two

20   different people.

21        Q.    And they're both named Arianna?

22        A.    If I'm not mistaken, her name's Arianna,

23   but it's on the -- I mean, you can pull it up on the

24   video.  But if it's not it, I misspoke about her

25   name.

1       Q.      Okay.

2       A.      But there -- there is two females.  One, he

3   was having sex with.  The other one was just a young

4   student, that I believe he was the SRO officer when

5   she was in sixth grade.

6       Q.      All right.  So Terry West didn't ask you

7   any questions about that, did he?

8       A.      About -- about what?

9       Q.      At 18:58 --  18:58, you said (as read):

10              Look at all the kids on his Facebook

11              page.  All those kids made a video on

12              YouTube talking about how good Mr. Johnson

13              is.

14              So you -- you told Terry West that his

15   students liked him, correct?

16      A.      I told him he had certain people that --

17   actually, if I didn't, I should've told him.  But it

18   was -- Angie Barbour had told me to go look at this

19   video, and she was the one that lined all this up for

20   these students to tell all these things about Ronald

21   Johnson.

22      Q.      Okay.  Well, let's go down to minute --

23   20:33.  Okay.  (As read): If we can come up to an

24              agreement, I can give you everything on a

25              silver platter, and it's in my pocket right

```
 1              now.
 2      A.      Mm-hm.
 3      Q.      And then at 20:20 -- 20:24, you say (as
 4              read): But we have to have an agreement
 5      because it's based on my person, you know.
 6      If you will agree to give me a copy.
 7                      And then, 20:53 you say (as read): And
 8              download this in front of me and give me a
 9      copy so I can give it to Angie for her
10      attorney -- or to her attorney.  I will
11      give you the phone.
12      A.      I will say bullshit on this.
13      Q.      You don't -- you deny you said --
14      A.      I would've --
15      Q.      -- any of this?
16      A.      -- never said, "download this in front of
17      me."
18      Q.      Okay.  But you would admit that whatever
19      you said is on that recording?
20      A.      If -- if I said "download this in front of
21      me," that would be insane.  Because I know they just
22      don't do that.  That just doesn't happen.
23                      And I told them -- if that's on a
24      recording, I want to hear that.
25      Q.      Okay.  Well --
```

Page 226

```
 1        A.      That -- that's interesting.

 2        Q.      That's up to Mr. Mullins to get it to you.

 3                MS. BATEMAN:  That's the recording

 4   that you're missing, right?

 5                MR. MULLINS:  No, he's got the

 6   recording.

 7                MS. BATEMAN:  He's got --

 8                MR. MULLINS:  He's talking about --

 9                MS. BATEMAN:  -- that --

10                MR. MULLINS:  -- the extraction.

11                MS. BATEMAN:  Oh, okay.  No.  We're

12   talking --

13                THE COURT REPORTER:  Wait.  We have to

14   really go one at a time, guys.

15                MS. BATEMAN:  Sorry.  Tell us to back

16   up to where.

17                THE COURT REPORTER:  "That's up to Mr.

18   Mullins to get it to you.  That's" --

19                MS. BATEMAN:  Okay.

20        Q.      (By Ms. Bateman)  That's up to Mr. Mullins

21   to get it to you.

22                MR. MULLINS:  I don't know what we're

23   talking about anymore.

24                MS. BATEMAN:  We're talking about the

25   transcript of Mr. West's interview with Mr.
```

1    Marshburn.

2              MR. MULLINS:  To be clear, we don't

3    have a transcript of anything.

4              MS. BATEMAN:  The recording.

5              MR. MULLINS:  He has -- that was --

6    that has been provided.  The same link that we sent

7    you was what was sent to him.

8              What I was saying is, the phone

9    extraction that I gave to you -- the physical phone

10   extraction, that is something I have had a chance to

11   get to him.

12             MS. BATEMAN:  Got it.

13        Q.    (By Ms. Bateman)  So you can listen to that

14   recording at your leisure, Mr. Marshburn.

15        A.    Mm-hm.

16        Q.    But at 21:08, you say, if -- well, Terry --

17   Terry West says at 21:04 (as read): Okay.  Talk about

18             the actual phone.

19             And then at 21:08, you say (as read):

20             If you want -- or something like this --

21   it's got everything.  But my deal is that I

22   want a copy to give.  I can't share it on

23   the internet, but I've been told I can't do

24   anything with this.

25             Are you referring to the phone?

Page 228

```
 1        A.      I'm -- I'm talking about -- God, no.  I'm

 2   afraid to say -- any of that, if I said that.  So I'd

 3   like -- I'd like to have the audio before I go any

 4   further on that.

 5        Q.      You want us to play the audio?

 6        A.      If you want to, you can.

 7                MS. HOBSON:  What minute?  33 --

 8                MS. BATEMAN:  20 -- well, let's go

 9   back to 20:33.  It's going to play.

10                THE COURT REPORTER:  I'm not going to

11   record that, right?

12                MS. BATEMAN:  It's going to play.

13                THE COURT REPORTER:  Off the record.

14                (Discussion off record.)

15                AUDIO OF MR. MARSHBURN:  She was a

16   high school --

17                THE COURT REPORTER:  I can't hear it.

18                MR. MULLINS:  I can't hear it either.

19                AUDIO OF MR. MARSHBURN:  I don't know

20   -- I can't verify --

21                (Discussion off record.)

22                AUDIO OF MR. MARSHBURN:  I want a copy

23   to give -- I can't share it --

24                THE COURT REPORTER:  Off the record,

25   please.
```

```
 1                    (Discussion off record.)
 2                    AUDIO OF MR. MARSHBURN:  Joe Preston
 3    is the one that brought this -- and walked in the
 4    door with Ronald and leave with Ronald.  And
 5    -- and she was a high school student.
 6                    AUDIO OF MR. WEST:  Right.
 7                    AUDIO OF MR. MARSHBURN:  So --
 8                    THE COURT REPORTER:  Whoever said
 9    "right"?
10                    AUDIO OF MR. MARSHBURN:  I don't know
11    -- I can't verify about Ronald having -- if we can
12    come up to an agreement, I can give you everything on
13    a silver platter.  And it's in my pocket right now.
14                    AUDIO OF MR. WEST:  Mm-hm.
15                    AUDIO OF MR. MARSHBURN:  But we have
16    to have an agreement, because it's -- it's based on
17    my person, you know?  If you will agree to give me a
18    copy and download this in front of me, and give me a
19    copy so I can get it to Angie for her attorney -- to
20    her attorney, I will give you the call.
21                    AUDIO OF MR. WEST:  Are you talking
22    about the actual phone?
23                    AUDIO OF MR. MARSHBURN:  If you want
24    it.  But it's got everything.
25                    AUDIO OF MR. WEST:  Hm.
```

1                    AUDIO OF MR. MARSHBURN:  But it's in

2    my building.

3                    MS. BATEMAN:  Why don't we go off the

4    record.

5                    THE COURT REPORTER:  Oh.  Thank you,

6    thank you.

7                    (Discussion off record.)

8                    MR. MARSHBURN:  -- I want a copy to

9    give -- I can't share it on the internet.

10                   (Audio clip played.)

11               THE COURT REPORTER:  Off the record,

12   please.  It's just not working.

13                   (Discussion off record.)

14       Q.    (By Ms. Bateman)  Okay.  Mr. Marshburn,

15   we're back on the record after taking a little break

16   there to discuss whether we can actually include the

17   recording in the transcript of the exhibit.

18                   And what we'll do instead, is, we'll

19   agree to mark it, the actual recording, as an exhibit

20   and attach it to the deposition.

21                   But my question to you is -- my

22   question to you is: Having heard that recording, I

23   want to now revisit your testimony that you said you

24   would not say "download this in front of me."

25   Because I think we heard you say that.

1          And you then said while we were off

2    the record, "I know what I was talking about." So

3    can you now put that on the record?

4        A.    Yeah.  The way you say it is two different

5    things than the way I say it.  And the way you're

6    saying it on this paper, it's like I'm demanding it

7    on this paper.  But then when I heard the audio, I

8    know exactly what I'm asking.

9              I'm asking for a copy for Angie.  It's

10   exactly what I'm doing.  I'm not asking for a copy

11   for myself for the podcast, or -- or evidence, or

12   whatever.  It's my phone.  I own it.  I wanted a copy

13   to give to Angie, because Angie wants her mother's

14   information off of it.  That's all she really cared

15   about.  She said she really didn't care about the

16   phone itself.

17             And she wanted the phone back.  But I

18   never gave it back to her.

19       Q.    So is it your testimony you never discussed

20   this with Angie's lawyer?

21       A.    Angie's lawyer?  I never --

22       Q.    Mm-hm.

23       A.    -- talked to Angie's lawyer.

24       Q.    Okay.  So --

25       A.    I talked to Angie, and Angie talked to her

```
 1    lawyer.  Unless I'm missing something that I -- I
 2    didn't -- I forgot about a phone call, but I don't
 3    think I did.
 4         Q.    Okay.  You say, "But my deal is, I want a
 5    copy to give.  I can't share it on the internet.
 6               Who told you you can't share it on the
 7    internet?
 8         A.    No, I -- I can't share that on the
 9    internet.
10         A.    Why not?
11         Q.    If it's evidence, why would you share it on
12    the internet?
13         Q.    You've shared Bennett Jones' recordings,
14    that's evidence.  You've shared --
15         A.    That's not --
16         Q.    -- lots of things that are evidence.
17         A.    That's not what I'm talking about.  I'm
18    talking about -- they're doing an investigation on
19    Ronald Johnson.  And it would be foolish for me to
20    share it.  And especially because Angie's husband is
21    still out -- Angie was watching my podcast.  Angie
22    asked me not to -- to start laying low on -- at some
23    point in time, she told me to stop.  And then she
24    told me to block him from my Facebook, or from the
25    Dave and Joe Show Facebook.  And I did.
```

1    Q.    You say (as read): I can't share it on the

2          internet, but I've been told that I can't

3          do anything with this.

4    A.    That would've been from Angie.  Angie

5    didn't want me to share the phone at all.

6    Q.    Say that again.

7    A.    Angie didn't want me to share the phone at

8    all, like, information that was on it and everything.

9    And that's the agreement she and I talked about.  And

10   I told her that, you know, we were going -- that's if

11   we downloaded the information ourselves.  I don't

12   know -- I'm just not understanding this writing here.

13   Q.    Well, at 21:38, Terry West says (as read):

14         This is coming from her attorney.

15   A.    38 seconds?

16   Q.    21:38.

17   A.    21:38.

18   Q.    And it says (as read): This is coming from

19         her attorney.

20   A.    (As read): This is coming from her

21         attorney.

22               That's maybe -- might be what she's

23   telling me her attorney's telling her.  So I might --

24   may be relaying the message.

25               Is that what I'm doing?  Or not.

```
1        Q.      I'm just asking what Terry West said to
2   you.
3        A.      What Terry West is saying to me?
4        Q.      Yes.
5        A.      On which one?   20- --
6        Q.      At 21:38, Terry West says --
7        A.      Oh.
8        Q.      -- (as read): This is coming from her
9                attorney.
10       A.      21:38?  I don't understand what you're
11  asking here.
12       Q.      Well, you were present.  Do you -- do you
13  -- what did you understand then?
14       A.      I understood that in order for them to have
15  the phone, since it was mine, that I wanted -- Angie
16  wanted a copy for her mother -- because her mother
17  was dead.  That -- that's it.  Angie wanted a copy.
18       Q.      Okay.
19       A.      I don't know the logistics of it, or how,
20  or why, or when.  And maybe it's because I said, give
21  me a copy, I'll give it to her, whatever, I don't
22  know.  I'd have to listen to the context.
23               We just listened to some, and now I
24  understand some of the context of what it's saying --
25  or how I was saying it and why.
```

```
 1        Q.      Okay.  Well, let's go down to the 22nd

 2    minute -- 22:01.

 3        A.      Mm-hm.

 4        Q.      (As read): But we have to have that

 5                agreement that the attorney gets a copy.

 6                    Do you see that?

 7        A.      Oh.  That her attorney gets a copy?  I

 8    don't know what attorney we're talking about.

 9        Q.      Do you see that it says that?  Do you

10    recall telling Terry West that?

11        A.      But what attorney?  Her attorney --

12        Q.      I'm just --

13        A.      -- or my attorney?

14        Q.      -- asking -- I'm asking you if you remember

15    Terry West -- if you remember saying that to Terry

16    West.

17        A.      I don't -- I don't recall.

18        Q.      And then the continuation at 22:07 says (as

19    read): The same copy you get off this phone.

20                    Do you recall saying that to Terry

21    West?

22        A.      What are we referring to?  That's what I

23    don't understand.  I'd have to listen to the whole,

24    entire recording to understand where I'm going with

25    this or what I'm doing.
```

```
 1        Q.      Mr. Marshburn, I think you're

 2   misunderstanding my question.  My question --

 3        A.      Okay.

 4        Q.      -- is: Do you recall saying those words to

 5   Terry West?  I'm not asking what they mean.

 6        A.      I don't --

 7        Q.      I'm asking --

 8        A.      I don't remember.

 9        Q.      Don't talk over me.  I am asking you if you

10   recall saying those words to Terry West.

11        A.      I don't remember.

12        Q.      And let's go down to the 22:24.  And it

13   says (as read): But now I don't need to see it.  I

14             just need you to guarantee there's going to

15   be a copy given to the -- to the lawyer,

16   and exactly the time you get it.  That's --

17   that's -- that's -- that's -- that's her

18   attorney, Mr. -- it says Baker Hall, but we

19   think that's -- Dickerhoff.

20                Do you recall saying those words to

21   Terry West?

22        A.      I don't recall.

23        Q.      Do you recall saying at 22:38 (as read):

24             Yes, I don't need it.  I don't need a copy.

25             But I have one in my hand, I know that I've
```

```
 1   got one to give to them.  But I don't want

 2   to read it.  I don't want to look at it.

 3              Do you recall saying those words --

 4        A.    I don't --

 5        Q.    -- to Terry West?

 6        A.    -- remember that.

 7        Q.    And at 22:51, Terry West says (as read):

 8              Because like I said, I spoke with about it.

 9              And in all honesty, that was -- that was a

10   while back.  And he said he would furnish

11   the phone.

12              Do you recall Terry West saying that

13   to you?

14        A.    I don't remember that.

15        Q.    Was that a no?

16        A.    I just said, I don't remember that.

17        Q.    Okay.  And down at 23:13, do you recall

18   saying to Terry West (as read): I want Ronald to pay

19              for what he's doing, honestly.

20        A.    I don't remember that.

21        Q.    And at 23:37 on the next page, you said

22              (as read): Hell, every time I've ever

23              done one, I get rolled over to.  I mean,

24              I do so many in investigations.

25              And then you say (as read): I do so
```

```
 1              many.

 2                    And then you say (as read): I do so

 3              many cell phone things and investigations

 4       for missing persons, that I do a chain of

 5       custody, and it gets taken from me, and

 6       then I don't get anything.

 7                    Do you recall telling Terry West that?

 8       A.      I don't remember that.

 9       Q.      Other than the -- well, let me ask you

10       this: Did you get the texts about Hannah Smith and

11       the blue dress from Jimmy Lawrence?

12       A.      No.

13       Q.      Who did you get them from?

14       A.      Joe Preston.

15       Q.      And how did Joe Preston get them?

16       A.      I can't speculate.  I don't know.

17       Q.      Did he tell you how he got them?

18       A.      I don't know.

19       Q.      Was he good friends with Jimmy Lawrence?

20       A.      I don't know.

21       Q.      So at 26:38, Terry West starts talking, and

22              he says (as read): Well, we need this phone

23              to get lost.

24                    David Marshburn, it says, "Call me."

25                    Do you recall saying that, having that
```

```
 1    conversation with Terry West?

 2         A.     No.

 3         Q.     Terry West says (as read): If you ask

 4                anybody about me, I'm not really close with

 5                anybody.

 6                       Do you recall Terry West telling you

 7    that?

 8         A.     No.

 9         Q.     Do you recall Terry West telling you (as

10                read): I pretty much do my job.

11         A.     Yes.

12         Q.     Do you recall Terry West telling you (as

13                read): Yeah, I've known Ron for a long

14    time.  He started here a couple years after I did.

15    And I work for 10 years and done before I come here.

16    I got two years left.

17                       Do you recall him telling you that?

18         A.     Not all of it, but some.

19         Q.     Do you recall Terry West saying to you (as

20                read): None of that is going to come into

21    play for me to take a risk.  My retirement,

22    my life is in my reputation over something

23    like this.

24                       Do you recall him telling you that his

25    reputation was at stake?
```

Ronald L. Johnson, Jr. V Town Of Smithfield Et Al.
MARSHBURN, DAVID on 07/16/2025

1    A.    No.

2    Q.    Do you recall telling Terry West (as read):

3          I know this phone is really important.

4    A.    I don't remember exact words, but somewhat.

5    Q.    Do you recall telling Terry West, saying

6  (as

7          read): It's extremely important.  It's what

8          you're saying.

9          Do you recall him saying that to you?

10   A.    I do not.

11   Q.    Do you recall telling Terry West (as read):

12         I haven't shared anything except for on my

13         life.

14   A.    You're going to have to repeat that.

15   Q.    Yes.  (As read): I haven't shared anything

16         except for on my life, I said.

17   A.    I don't remember that.

18   Q.    I'm sorry?

19   A.    I don't recall.

20   Q.    And do you recall Terry West saying (as

21         read): And I assumed it was the phone that

22         Angie -- Angie's attorney was talking

23         about?

24         Do you recall that?

25   A.    I do not.

1    Q.    And do you recall saying to Terry West (as

2          read): This is the one you need.  Now.

3    A.    I don't recall.

4    Q.    And do you recall saying to Terry West (as

5          read): I mean, everything that comes off

6    this thing.  I mean, I'm trying to not go

7    behind Angie, or behind the attorney, or

8    behind their investigator.

9              Do you recall saying that?

10   A.    I don't recall.

11   Q.    Do you know who the investigator was?

12   A.    Are you asking me that question?  Or are

13   you saying that's what's on here?

14   Q.    Well you said, I'm trying not to go behind

15   their investigator.  Do you know the name of their

16   investigator?

17   A.    I asked them who their investigator was?

18   Q.    Your statement to Terry West was (as read):

19          I mean, I'm trying not to go behind Angie

20   or behind the attorney, or behind their

21   investigator.

22   A.    I don't remember.

23   Q.    And do you recall saying (as read): But I

24          know how important this phone is to Terry

25          West?

```
 1       A.      I don't remember.

 2       Q.      And do you recall saying to Terry West that

 3               (as read): I know it can be done.  So my

 4   whole thing is -- and I don't want credit,

 5   nothing like that, it's just, it needs to

 6   be done, but it needs to be done by a pro,

 7   because this thing is two years, you know,

 8   on and on and on, and things that got

 9   deleted by Ron off this phone.

10               Do you recall saying that to Terry

11   West?

12       A.      I don't remember.

13       Q.      Do you recall talking to him about a

14   missing person's case that you used a program on to

15   get stuff off of a criminal defendant's phone?

16       A.      I don't remember.

17       Q.      Okay.  Do you recall Terry West saying to

18   you (as read): Obviously, that's something I have to

19               take that with somebody besides me, and

20   honestly, it would probably be the chief

21   that would probably be Susan Doyle.

22               Susan -- yeah, Susan.  That's what it

23   says.  Susan Doyle.

24               (As read): Yeah, well, it's -- it's,

25               you know, because it would -- it's like you
```

```
 1    said, there was something criminal in

 2    there.  It would -- obviously, it would

 3    become evidence, and then trying to get it

 4    turned back over, you know.

 5                 Do you recall Terry West saying that

 6    to you?

 7         A.     I don't remember.

 8         Q.     Okay.  And do you recall saying to Terry

 9    West --

10                 THE COURT REPORTER:  Okay, and let's

11    slow down now.  Thank you.

12         Q.     (By Ms. Bateman)  Do you recall saying to

13    Terry West (as read): I hate that she hates him, but.

14                 Do you recall saying that?

15         A.     I don't remember.

16         Q.     Okay.  And do you recall Terry West saying

17         (as read): That's why I'm sitting here.

18    I'm not going to promise you something I

19    can't do, and that's why I'm being wishy-

20    washy.  I have to.

21                 Do you recall him saying that to you?

22         A.     I don't remember.

23         Q.     Okay.  And then do you recall saying to

24    Terry West (as read): You want to ask the chief.

25         A.     I don't remember.
```

```
1      Q.     And do you recall Terry West saying (as

2             read): No, we can talk to him.  I'll bring

3             him in in just a second.

4                 Do you recall him saying that to you?

5      A.     I don't remember.

6      Q.     Okay.  And do you recall saying to Terry

7      West (as read): I'm telling you, you want it, you

8             want it bad.

9      A.     Don't remember.

10     Q.     And do you recall Terry West saying to you

11            (as read): Yeah, I do want it.  I do want

12            to bet there's, I said.

13     A.     I don't remember.

14     Q.     And do you recall saying to Terry West (as

15            read): I mean, if you forced me to give it

16            to you, I would have no choice, right?

17     A.     I don't remember.

18     Q.     And Terry -- do you recall Terry West

19     saying to you (as read): Yeah, I know that.  Yeah, if

20            I have to.  If I had to go and get a court

21            order, I could do that.

22     A.     I don't remember.

23     Q.     Do you recall Terry West saying (as read):

24            You've been upfront about it, so I really

25            don't want to go that route.
```

```
 1        A.     I don't remember.

 2        Q.     And do you recall Terry West saying (as

 3               read): You know what happened?  If it goes

 4      to court, you know they're going to want to

 5      know where the information comes from.

 6        A.     I don't remember.

 7        Q.     And do you recall saying (as read): Well, I

 8               don't care about that.  I'm just worried

 9               Angie is going to hate me.

10        A.     I don't remember.

11        Q.     Okay.  Do you recall saying (as read):

12               Because it's my phone now.

13        A.     Don't remember.

14        Q.     And do you recall Terry West saying to you

15               (as read): She should've known about

16               getting that.

17        A.     I don't remember.

18        Q.     Do you recall saying to Terry West (as

19               read): She's just going to be -- this is

20      the only thing that's going to help this

21      case, and I know this.

22               Do you recall saying that?

23        A.     I don't remember.

24        Q.     And do you recall saying to Terry West (as

25               read): He wanted to get Angie to sleep with
```

```
 1    DeVan Barbour, that way he would have

 2    something over her -- over him.

 3         A.    I don't remember.

 4         Q.    Do you recall telling Terry West (as read):

 5               You know, I gotta be out of here by 11:15

 6    because Ron Johnson, Michelle Antoine,

 7    Kevin Donovan, John Saluto, Dale Lands, and

 8    Darrell Mitchell are all meeting.

 9         A.    I don't remember.

10         Q.    Okay.  Do you remember saying that (as

11               read): I know you want this phone.

12         A.    I don't remember.

13         Q.    Okay.  All right.

14                    MS. BATEMAN:  All right.  What time is

15    it?  3:49?

16                    THE COURT REPORTER:  Can I have a

17    break?  It's been an hour and 45 minutes.

18                    MS. BATEMAN:  Yes.  Let's take a

19    break.

20           (WHEREUPON, A SHORT BREAK WAS TAKEN.)

21         Q.    (By Ms. Bateman)  Okay.  Mr. Marshburn, I

22    have some questions about these Facebook broadcasts

23    that you do.

24         A.    Mm-hm.

25         Q.    In looking at those, it looks like there
```

1    was a -- how long did you and Joe Preston do them

2    together?

3         A.    I don't recall.

4         Q.    I mean, till he died?

5         A.    I don't recall.

6         Q.    Is that going to be your answer the rest of

7    the deposition?

8                   MR. MULLINS:  Objection; form.

9         A.    Depends on what your question is.

10        Q.    Well, did you -- did you take a break in

11   doing your podcasts?

12        A.    I am now.

13        Q.    You mean, at this moment in time?

14        A.    Yes.

15        Q.    Well, how about in -- how about between

16   July of 2022 -- no.  Well, let me strike that.

17                   Since -- okay.  There we are.  How

18   about between January 2023 and August of 2023?

19        A.    I don't remember.

20        Q.    Do you have all your podcasts saved?

21        A.    No.

22        Q.    And why not?

23        A.    The program didn't save all of them.

24        Q.    I'm sorry?

25        A.    The program didn't save all of them.

```
 1      Q.     And what's the program?

 2      A.     HD mixer.

 3      Q.     HD mixer?

 4      A.     Mm-hm.

 5      Q.     Okay.  I'm going to ask you about a podcast

 6   -- or Facebook broadcasts that you did in November of

 7   2024.

 8                    MS. BATEMAN:  We're going to mark this

 9   Exhibit 9; is that right?

10                    THE COURT REPORTER:  Yes, ma'am.

11                    MS. BATEMAN:  Thank you.

12                    THE COURT REPORTER:  Oh.  Wait.

13                    MS. BATEMAN:  10?

14                    THE COURT REPORTER:  Yes.

15                    Off the record.

16                    MR. MULLINS:  Yeah, off the record.

17                    (Discussion off record.)

18                    (WHEREUPON, EXHIBIT NUMBER 10

19                 WAS MARKED FOR IDENTIFICATION.)

20      Q.     (By Ms. Bateman)  Okay.  Do you recall

21   making a Facebook broadcast on November 11th, 2024?

22      A.     I don't remember the date.

23      Q.     Okay.  I want you to look at the first page

24   of this podcast.  It starts out (as read): I am a

25           real American, fight for the rights of
```

```
 1              every man.

 2      A.      Mm-hm.

 3      Q.      And it goes down to 1:10.  Is -- is that --

 4  those lines, are they -- are they a poem?

 5      A.      How do I know?

 6      Q.      Well, you seem --

 7      A.      I didn't write this song.

 8      Q.      -- to be --

 9      A.      I just played it from my podcast.

10      Q.      And what are you playing?  What is it?

11      A.      It's Real American.  That's the name of the

12  song.

13      Q.      It's a song?

14      A.      Mm-hm.

15      Q.      And it's called what now?

16      A.      Real American.

17      Q.      Real American?

18      A.      Mm-hm.

19      Q.      And who's it by?

20      A.      I don't remember.

21      Q.      Okay.  So at about 1:55, you say (as read):

22              I first want to go to our dear election we

23              just had where pretty much people of

24  Johnston County can see that this group

25  named C -- and we know that's going to be
```

```
 1    AAG -- is not worth 2 --

 2                   Is that -- what is that word that they

 3    didn't put in there?  Is that supposed to be "shit"?

 4         A.    You're asking me?

 5         Q.    Yeah.

 6         A.    I don't know.  He wrote it.

 7         Q.    Well --

 8         A.    I mean, I can assume, yes.

 9         Q.    Okay.  All right.  So did you run in this

10    election?

11         A.    Yes -- no.  I ran in the primary.

12         Q.    What -- what was this election you're

13    referring to for?

14         A.    School board.

15         Q.    Okay.  And who did you run in the primary

16    against?

17         A.    Ronald Johnson and Jeff Sullivan.  I can't

18    remember the other guy's name.

19         Q.    Okay.  And was that the Republican primary?

20         A.    It was nonpartisan.

21         Q.    Nonpartisan?  And are you registered?

22         A.    I am.

23         Q.    And what are you registered?

24         A.    Republican.

25         Q.    Have you always been a registered
```

```
 1    Republican?

 2         A.    No, I was not.

 3         Q.    When did you become a registered

 4    Republican?

 5         A.    I can't remember.

 6         Q.    Was it recently?

 7         A.    Define "recently."  Define "recently."

 8         Q.    In the last two months?

 9         A.    Not in the last two months.

10         Q.    In the last year?

11         A.    Last -- let's give it two years.

12         Q.    Okay.

13         A.    I don't -- I don't know.

14         Q.    Okay.  So on -- are your pages numbered on

15    the version you're looking at?

16         A.    This one is, yes.

17         Q.    Okay.  On page 2 --

18         A.    Okay.

19         Q.    -- I guess it's at 2:37.  It's going to --

20    let's see.  So on page 3, at 5 -- 5:17, it says (as

21              read): And just the school board race, the

22              school board race told it all about --

23    tells it all about really what that card

24    really does, which is pretty much nothing.

25                   What are you referring to in that
```

1    sentence?

2         A.    I don't recall.

3         Q.    I'm sorry?

4         A.    I don't recall.

5         Q.    You don't recall?  Okay.  All right.

6               And it says (as read): They spent all

7          this money, all this time.  Tom Antoine,

8    Michelle Antoine, all these people put all

9    this money in these campaigns of these

10   school boards.  And what did it get them?

11   Nothing but the --

12               What are the words that are asterisked

13   in there that you used to describe Ronald Johnson?

14        A.    I don't remember.

15        Q.    Okay.  And --

16        A.    I can assume.

17        Q.    Okay.  What do you assume?

18        A.    Piece of shit.

19        Q.    Okay.  That would not be the first time

20   that you've referred to Ronald Johnson by profanity?

21        A.    No.

22        Q.    Okay.  And at 5:50, you say (as read):

23          Which, that piece of crap will be off that

24          board soon enough.

25               Do you recall saying that?

1     A.     I don't recall.

2     Q.     Okay.  And at 6:36 on page 5, it says (as

3            read): If you notice, Kay Carroll spanked

4            that --

5                   Is that euphemism for ass?

6     A.     I don't know.  You wrote it.

7     Q.     Well --

8     A.     -- so I don't know.

9     Q.     -- I actually didn't write it.

10    A.     I don't remember.  I don't remember none of

11    this, except for -- I do podcasts.  I don't go back

12    and watch them.  And I don't remember hardly any of

13    them.  I move on to the next thing.  That's what I

14    do.

15    Q.     So at 7:26, you talk about April Lee,

16    correct?

17    A.     That's what it says.

18    Q.     Okay.  And you say (as read): April Lee is

19           a liberal.

20                  And you say (as read): She's a union

21           boss.  She's been paid by Soros.  That gets

22           me all the time.

23                  What's your -- what's your -- how do

24    you know that?

25    A.     Hm-mm.  I need to make a statement here.

1    You're taking this out of context, just like you did

2    the police department interview.

3                    And I'm not going to sit here and go

4    -- I know you're trying to say I'm -- I'm saying this

5    about this person.  But I did not say this about this

6    person.  That's what that CAAG group said about this

7    person.

8                    So before I answer any more, I'm not

9    going to go nitpicking through this, and then you're

10    pretending that I'm saying this about that person.  I

11    -- that -- the way it's asked, the way it's said

12    makes a statement about what it is.

13                    You doing this is trying to trip me up

14    and trick me.  And I'm not going to do that.

15        Q.    Let me just be clear.  I'm not trying to

16    trip you up.  I'm reading --

17        A.    Yes, you are.

18        Q.    No, I'm not.

19        A.    You said --

20        Q.    You --

21        A.    7:26 --

22        Q.    You repeated these words on your broadcast.

23        A.    Yeah.

24        Q.    You said these words.

25        A.    I said these words --

1      Q.      All you have to do is explain to me that

2   those are not your words, that you're quoting

3   somebody else.  And that's perfectly fine.  I just

4   need you to explain your answer.

5                But you can't tell me you're not going

6   to do it.

7      A.      But if we talk about -- if I feel like I'm

8   being harassed, I will.

9                But we're talking about -- if you just

10  started up at the top where it starts where I'm

11  talking about this, we could avoid all this.  I mean,

12  I'm -- I'm clearly quoting someone about this.  So...

13     Q.      I don't know how it's clear that you're

14  quoting it.  Tell me -- help -- explain to me how

15  it's clear that you're quoting someone.

16     A.      Well, let me read it.  You got time for me

17  to sit here and read it?

18     Q.      Well, just -- in the context of these four

19  lines, where you say, and I'm quoting --

20     A.      I don't know where it is in this, but

21  somewhere in here I'm sure I said I'm quoting

22  someone.  Or after the fact, I show an article, or

23  something in my hand that states what it says about

24  April Lee, or what I'm talking about.

25     Q.      Well, you testified earlier that you're

1    responsible for what you say on your podcast,

2    correct?

3         A.    Yeah.

4         Q.    Okay.  And you said those words in your

5    podcast, correct?

6         A.    If I did, I was quoting someone, like you

7    just mentioned a second ago.

8              Okay.  I'm going to just say this: I

9    don't remember, to answer your questions to this

10   podcast, because I don't remember what exactly I was

11   saying or doing at the time.  I haven't watched it.

12        Q.    Okay.  I'm going to look on page 12 at 16

13   minutes and -- well, let's go back to -- we'll go

14   back to 11.

15              Down at 16:22 at the bottom of page

16   11, it says -- 16:16 (as read): I'm referring to none

17              other than Paul Holcombe.

18              16:22, it says (as read): And the

19              reason why is because, you know, this past

20              week he got served a subpoena.

21              Do you see that?

22        A.    I see it.

23        Q.    Do you recall saying that?

24        A.    I don't recall, but I probably did.

25        Q.    Okay.  And if you go over to page 12 at

```
 1    16:30 it says, "Why?"

 2               And then at 16:31 it says (as read):

 3          Why would he get served a subpoena in Ron

 4          Johnson's case, criminal case?

 5               Do you see that?

 6    A.    I see it.

 7    Q.    Okay.  At 16:37, it says (as read): Is it

 8          because he knew personally -- personally

 9          information about Ron Johnson's

10          wrongdoings?

11               Do you see that?

12    A.    I see it.

13    Q.    And then it says --

14               THE COURT REPORTER:  Okay.  You've got

15    to slow down.

16               MS. BATEMAN:  Oh.  I'm sorry.  I'm

17    sorry.

18               THE COURT REPORTER:  I know you

19    forget.  It's okay.  It's okay.

20    Q.    (By Ms. Bateman)  (As read): Is it because

21          he hung out with Ronald Johnson on a

22    personal level, and Dale Lands, the fellow,

23    the CAAG group, so he could continue

24    scoring big?

25               Do you see those comments?
```

```
 1        A.     No.  Not fellow, but "felon," for the

 2   record.  I probably said that.

 3        Q.     Okay.  And did you get served a subpoena in

 4   Ronald Johnson's criminal trial?

 5        A.     Subpoena.

 6        Q.     Were you served with a subpoena?

 7        A.     I did get something.  I did get a subpoena.

 8        Q.     You did get a subpoena?

 9        A.     (Witness nodded head up and down.)

10        Q.     So you were under subpoena during that

11   trial?

12        A.     Yeah.  I couldn't even be in there to watch

13   it.

14        Q.     Okay.  Well, let me ask you this: Starting

15   January 6th, and going through January 17th, you did

16   multiple broadcasts, correct?

17        A.     I don't remember.

18        Q.     Okay.  Well, that's just this year.  I

19   mean, it's --

20        A.     Okay.  Well, I don't remember.

21        Q.     Okay.

22        A.     I'm telling you.

23        Q.     Do you recall that you did a podcast on

24   January 6th at 6:39 a.m.?

25        A.     I don't remember the date.  Don't remember
```

1    the time.  But I'm probably sure I did one.

2         Q.    Okay.

3                  MS. BATEMAN:  We're going to make this

4    Exhibit 11.

5                  (WHEREUPON, EXHIBIT NUMBER 11

6                  WAS MARKED FOR IDENTIFICATION.)

7         Q.    (By Ms. Bateman)  Does this document

8    refresh your recollection about doing that podcast on

9    January 6th at 6:39 a.m.?

10        A.    That's what it states.

11        Q.    Do you deny that you did a podcast on the

12   day and --

13        A.    I'm not --

14        Q.    -- that time?

15        A.    -- denying I did a podcast.  I just don't

16   know what date and what time.

17        Q.    Do you recall saying (as read): My wife

18             goes to the poll and she's approached by

19   none other than Ronald Johnson's mother-in-

20   law and she's out there supporting Ronald

21   Johnson.

22        A.    Which page?

23        Q.    That's on page 2 at 2:58.  2:58.

24        A.    Okay.  I remember doing a podcast and

25   mentioning his mother-in-law approaching Starr, my

```
 1    wife.

 2         Q.     Okay.  So do you recall at 3:50 saying (as

 3                read): So if you believe that Ronald

 4                Johnson is innocent and you believe that

 5                all these people are just against him, like

 6    he's trying to say, oh, they're after me

 7    like they did Trump, please go to trial.

 8                    Do you recall saying that in your

 9    podcast?

10         A.     I may have.

11         Q.     So at the top of page 3 at 4:09, you say

12                (as read): Because for the next few days,

13                I'm going to do some lives, and I'm going

14    to come out with, hey, I told y'all guys, I

15    told you, and I'll explain it.

16                    Then at 4:19, you say (as read): But

17                it'd be better if you guys went straight to

18    the courtroom and sat in and listened to

19    the testimony and to the witnesses in this

20    trial.

21                    Do you recall saying those things on

22    your broadcast?

23         A.     I don't remember stating that exactly --

24    exact words.  I don't...

25         Q.     So let me get you to turn to page 6 at
```

1    9:12.  You say (as read): And isn't it funny how his

2              civil attorneys, one of their employees,

3    the very one he stood up in front of a

4    meeting and said she quit the Attorney

5    General's Office because they were coming

6    after me.

7        A.    I stated something in that effect, that,

8    she didn't stand up and say it, but Ronald Johnson

9    made the big speech that she quit the Attorney

10   General's Office because she felt -- because she was

11   doing him wrong, is what it was stated.

12       Q.    Did you hear Ronald Johnson say that?

13       A.    That was said in a CAAG meeting.

14       Q.    And how do you know that?

15       A.    That came from -- what's the lady's name?

16   One of the ladies in the CAAG meeting, to Angie

17   Barbour.

18       Q.    One of the ladies that -- and you don't

19   know who that was?

20       A.    And it -- and it was also -- hold on, hold

21   on, hold on.

22       Q.    Pardon me?

23       A.    Hold on.  There's -- there's something else

24   about that, because it was mentioned several times by

25   other people.  I don't remember the whole thing, but

1    it was mentioned by several people.

2         Q.    Can you think of any of their names?

3         A.    Not right offhand.

4         Q.    Well, at the next thing, it says, 9:29 (As

5               read): They are doing me wrong, but from

6               what I gathered -- what I gathered, and

7    what was told to me, she was fired six

8    years earlier before this even happened.

9               Do you see that?

10        A.    That sounds about right.

11        Q.    And did you say that on your broadcast?

12        A.    I probably did.

13        Q.    So you stated --

14        A.    I'm quoting what someone else --

15        Q.    Yeah.

16        A.    -- had told me.

17        Q.    Were you referring to Ms. Hobson?

18        A.    Is that who I'm referring to?

19        Q.    I'm asking you: Who were you referring to?

20        A.    If she worked for the Attorney General's

21   Office, then I would assume that's her.

22        Q.    And so you stated on your podcast that she

23   had been fired; is that right?

24        A.    That's what was told to me.

25        Q.    Okay.  Do you think that's defamatory?

```
 1        A.     Was she?

 2        Q.     Did you do any investigation into whether

 3   she'd been fired before you said that?

 4        A.     I don't know what you're getting at.

 5        Q.     I'm asking if you did any investigation

 6   into whether --

 7        A.     I stated exactly what was stated to me.

 8        Q.     And -- and do you realize that's the

 9   defamation?

10        A.     Okay.  Stating she's dating Ronald Johnson

11   too, or having an affair with him?  Is that --

12        Q.     Did you say that?

13        A.     I probably did too.

14        Q.     And do you realize that's defamatory?

15        A.     If it is, it is.

16        Q.     Did you do any investigation into the

17   statements before you made them?

18        A.     I'm just stating -- is that what you're

19   wanting to do now, is come after me --

20        Q.     Who told --

21        A.     -- for that?

22        Q.     -- you that was --

23        A.     I'm just stating -- do you want to come

24   after me for that, too?

25        Q.     I'm asking you: Did you make these
```

```
 1    statements?  You said, yes.  I want to know who

 2    told --

 3         A.     I said --

 4         Q.     -- you that.

 5         A.     -- I possibly made the statements.  I can't

 6    remember everything in these dadgum podcasts I did.

 7         Q.     Okay.  At 9:40, it says (as read): But yet,

 8                she is out there, standing out there at the

 9                election sites handing out CAAG and Ronald

10                Johnson stuff.

11                    Who are you referring to there?

12         A.     I guess I'm referring to the same female.

13         Q.     Stephanie Hobson?

14         A.     If that's who that is.

15         Q.     And who told you she was standing out there

16    at election sites handing out Ronald Johnson's --

17         A.     I've got a photo.

18         Q.     Pardon me?

19         A.     I've got a photo.

20         Q.     You have a photo of Stephanie Hobson

21    standing at an election site --

22         A.     If that's --

23         Q.     -- handing out --

24         A.     -- her.

25         Q.     -- Ronald Johnson --
```

1      A.      If we're talking about her, you --

2                      MS. BATEMAN:  She's going to quit on

3      us.

4                      Just give us the last thing you have.

5      Give us the last thing you have.

6                      THE COURT REPORTER:  "I've got a

7      photo."  "Pardon me?"  "I've got a photo."

8                      MR. MULLINS:  I'm sorry.  I'm not

9      laughing at your question.  That was...

10                     MS. BATEMAN:  I'm really sorry.

11                     THE COURT REPORTER:  That's all right.

12     No worries.

13                     (WHEREUPON, THE COURT REPORTER

14                     READ BACK REQUESTED TESTIMONY.)

15     Q.      (By Ms. Bateman)  Who gave you the photo?

16     A.      Jim Wiesner.  And --

17     Q.      And did --

18     A.      -- I'm going to state for the record, we

19     never had a name of this person.

20     Q.      Did Jim Wiesner tell you it was Stephanie

21     Hobson handing out Ronald Johnson's stuff?

22     A.      He sent me a picture and stated, this is

23     the female.  Because another person ID'd this person

24     as well.

25     Q.      Another person had --

1          A.      ID'd this person.

2          Q.      And who was that person?

3          A.      I can't remember.  Like I say, there's so

4     much that's been going on, I don't remember half of

5     this stuff.

6          Q.      Okay.  At 9:51, it says (as read): Kind of

7     makes you wonder what goes on there too,

8     what kind of personal relationship's there

9     too.

10                          Did you say that?

11         A.      Maybe.  I don't remember.

12         Q.      And were -- were you referring to Stephanie

13    Hobson, again, and Ronald Johnson?

14         A.      You stated the name here today, the first

15    time I've heard a name.  So I don't know.

16         Q.      Well, you said you assumed it was Stephanie

17    Hobson?

18         A.      That's because you gave me the name.

19         Q.      You stated that you assumed it was

20    Stephanie Hobson, because you identified her as

21    someone who had previously been in the Attorney

22    General's Office.

23         A.      Is she the only one that's been in the

24    Attorney General's Office?

25         Q.      You stated that you agreed that it was

```
 1   Stephanie Hobson, that she had previously worked in

 2   the Attorney General's Office.  Do you recall that

 3   testimony?

 4        A.    Let the judge decide that, okay?  Here and

 5   now, on the record, you stated her name.  I said, if

 6   that's who you're talking about, then fine.  I never

 7   mentioned a name.

 8        Q.    Okay.  I'm going to mark this document --

 9              THE WITNESS:  Is the seven hours

10   almost up?

11              MR. MULLINS:  Not by --

12              MS. BATEMAN:  Do you need to take a

13   break?

14              THE WITNESS:  No.  I'm wondering if

15   your seven hours is up.

16        Q.    (By Ms. Bateman)  This is going to be

17   Exhibit 12.

18              (WHEREUPON, EXHIBIT NUMBER 12

19              WAS MARKED FOR IDENTIFICATION.)

20        Q.    (By Ms. Bateman)  Did you do a podcast at

21   -- January 6th at 5:32 p.m. of this year?

22        A.    I don't remember the date and time.  But

23   I'm probably sure I did a podcast.

24        Q.    So at :34, you said (as read): Well,

25              as suspected, you know Ronald Johnson's
```

1    first day in court, like I said this

2    morning, they'll file a bunch of bogus

3    motions to try and postpone everything,

4    anything and everything to postpone this

5    case.  Bottom line.

6                    Do you recall saying that?

7        A.     I recollect somewhat of that wording.

8        Q.     Okay.  How did you know they filed a bunch

9    of motions?

10       A.     That's just what generally happens.  That's

11   not a secret that a good attorney will file a bunch

12   of motions at the beginning of their trial.

13       Q.     Well, did -- did somebody tell you they

14   filed a bunch of motions?

15       A.     No.  I'm just stating -- there again, the

16   assumption is, I had been told all this information

17   by Smithfield PD, Town employees, and all.  No.

18                    The same thing with me telling people

19   that this thing was going to be -- a bunch of motions

20   would be filed.  I know that as a person that sees

21   the courtroom quite often, that a good attorney will

22   file a bunch of motions just to --

23       Q.     Well, how do you know they lost --

24       A.     That's what a good attorney does.

25       Q.     How do you know they lost their motions?

```
 1        A.     I don't know.

 2        Q.     Well -- at 1:15, it says (as read): But

 3               guess what?

 4                    At 1:16, it says (as read): It didn't

 5               happen.

 6        A.     All right.

 7        Q.     How do you know it didn't happen?

 8        A.     Maybe that's because the person sitting in

 9        the courtroom was telling me these things.

10        Q.     And who was that?

11        A.     Christine Livingston and Cecilia Helms.

12        And I think those are the only two, from what I can

13        gather at this minute in my mind.

14        Q.     I'm sorry.  Christine Livingston and who?

15        A.     Cecilia Helms.

16        Q.     Helms, H-e-l-m-e-s -- m-s?

17        A.     H-e-l-m-s.

18        Q.     And who else?

19        A.     I can't remember the other person.  There

20        was somebody else I talked to that was in the

21        courtroom several times, but I can't remember them.

22        But they didn't give me a lot of information.  They

23        didn't stay all the time.

24        Q.     Could it have been Anita Bland?

25        A.     No.
```

```
 1        Q.      It was not Anita Bland?

 2        A.      No.

 3        Q.      Anita Bland never told you anything about

 4   the trial?

 5        A.      Anita Bland told me she got kicked out.

 6        Q.      Okay.  Was Anita Bland under a subpoena?

 7        A.      She said she was.

 8        Q.      And how about Christine Livingston?

 9        A.      Not that I know of.

10        Q.      Did Anita Bland tell you why she got kicked

11   out?

12        A.      She said she was a witness for the --

13   witness for the trial.  And she could not be in

14   there, so -- and that's what they told her.

15        Q.      Okay.  So when you say at 1:27 (as read):

16              And I'm giving you a rundown version.  But

17   basically, they were saying a private

18   investigator had that phone.

19                    Is that something that either

20   Christine Livingston, or Cecilia Helms, or Anita

21   Bland told you?

22        A.      Yeah, I mean, like I said, what I -- I

23   mean, that is such -- that's six months ago.  I don't

24   remember.  It had to have come from one or the other,

25   because I wasn't there.
```

```
 1        Q.      Okay.  Were you informed that you, as a
 2    potential witness, were sequestered?
 3        A.      I was told, yes.
 4        Q.      And do you recall recounting what happened
 5    at the court today -- that day, and in this
 6    broadcast?
 7        A.      Do I remember what?
 8        Q.      Recounting what happened in court on
 9    January 6th during the course of this podcast.
10        A.      If I did, I was repeating what was told to
11    me.
12        Q.      So on page 7 at 9:48, do you discuss that
13    you've got a piece of property that's about 4-point-
14    something acres?
15        A.      What number?
16        Q.      On page 7 at 9:48.
17        A.      Okay.
18        Q.      Do you recall saying that?
19        A.      I don't know what the context is.  But,
20    okay.
21        Q.      I'm just asking: Do you recall saying it?
22        A.      I don't recall.
23        Q.      Okay.  And at 10:16, do you recall saying
24             (as read): It's tripled in value.
25        A.      Oh.  We're talking about the taxes.  Okay.
```

 1   Tax increase.  Okay.  I probably did say that.

 2        Q.     Okay.

 3                    MS. BATEMAN:  I'm going to mark this

 4   document as Exhibit 13.

 5                    THE WITNESS:  We're done with this

 6   one?

 7                    MS. BATEMAN:  Yes.

 8                    I might need some more exhibit

 9   stickers.  I'm sorry.

10                    THE COURT REPORTER:  (Complies.)

11                    MR. MULLINS:  This doesn't need to be

12   on the record.

13                    (Discussion off record.)

14                  (WHEREUPON, EXHIBIT NUMBER 13

15              WAS MARKED FOR IDENTIFICATION.)

16        Q.     (By Ms. Bateman)  Do you recall doing a

17   podcast on January 9th at 8:04 p.m.?

18        A.     I don't remember the date and time, but I'm

19   pretty sure I did.

20        Q.     And is this introduction on page 1, again,

21   are you playing a song?

22        A.     It's the intro to the show.

23        Q.     To a show?

24        A.     To the show, the podcast.

25        Q.     Oh.  Who -- who wrote that song?

```
 1        A.    I don't remember.  You ask me that every

 2   time.

 3        Q.    Where -- where did you find that song?

 4        A.    It's -- it's a common song.  Everybody

 5   knows it as the Hulk Hogan song.

 6        Q.    It's a what?

 7        A.    Hulk Hogan song from WWE.

 8        Q.    Okay.  Is -- who's singing it?  Do you

 9   know?

10        A.    I don't know.

11        Q.    Do you know if it's protected by copyright?

12        A.    Don't know.

13        Q.    Did you get permission to play it on your

14   podcast?

15        A.    Didn't know I needed it.

16        Q.    Okay.  On page 2 of this podcast at 3:10,

17   do you recall stating (as read): I have not been to

18            the trial because I cannot go.

19        A.    Which one?

20        Q.    3:10.

21        A.    I probably said that, correct.

22        Q.    And what about the statements written down

23   here at 3:15?

24        A.    I may have said that.

25        Q.    Okay.  4:25, it says (as read): And why I
```

1          told you guys what they're going to do is,

2     the first thing they're going to do is try

3     and make Angie look like a --

4               And what are those -- what are those

5     words?

6        A.    I don't remember.

7        Q.    Well, can you guess what they might be?

8        A.    I'm not guessing.

9        Q.    Okay.  But you guessed before.  Why won't

10    you guess this time?

11        A.    Well, because every time I try to explain

12    something, you want to turn it into something else.

13    So right now, my answers are yes, no, I don't

14    remember.  Let's move on.

15        Q.    Okay.  When -- at 4:48, you state (as

16              read): They're wanting to make her look

17              like trash and they're working on it.

18               And at 4:55, he says (as read):

19              They're doing it.

20               At 4:56, you say (as read): They're

21              doing a banging up job with it.

22               Who told you that?

23        A.    I don't remember.

24        Q.    So it's page 4 at 6:51.  You say (as read):

25              And let's -- let's take on the stand today,

1    and we're talking to Todd Sutton.

2                    And then at 6:56, you say (as read):

3            They enter, they had Todd Sutton on the

4    jury, I mean on the witness stand, you say.

5    And defense attorney said, you know, this

6    podcast, getting this information, these

7    secret recordings that Ronald Johnson made

8    and bringing them out on the podcast just

9    hours after.

10                   And then you say (as read): How do you

11           -- how do you think they did that?

12                   And then you say (as read): Did you --

13           did you -- did you -- well, how did it go?

14   A.      What are you asking?

15   Q.      I'm asking you: What did Todd Sutton

16   actually say?

17   A.      I don't remember.

18   Q.      Did you get a recounting of his testimony

19   from anyone?

20   A.      I do now.

21   Q.      Okay.  And -- you do now?

22   A.      I have the whole trans- -- I have the whole

23   criminal trial transcript.

24   Q.      Okay.  And so have you read his testimony?

25   A.      No.

1      Q.      Okay.  Did anybody tell you about his

2      testimony while it was going on?

3      A.      I'm sure they did.

4      Q.      And did you recount that in your podcast?

5      A.      If I did, I recounted it accordingly to

6      what they said.

7      Q.      How many conversations did you have with

8      Todd Sutton about Ronald Johnson?

9      A.      I don't remember.

10      Q.      More than 5?

11      A.      I cannot speculate.

12      Q.      More than 25?

13      A.      I just answered that.  I cannot speculate.

14      Q.      How did you get a copy of the transcript?

15      A.      I paid for it.

16      Q.      And who did you purchase it from?

17      A.      I purchased it from the clerk.  The --

18      Q.      The court reporter?

19      A.      Court reporter.

20      Q.      How much did that cost?

21      A.      I do not want to answer that right now.

22      Q.      Well, I'm going to ask it again.  How much

23      did it cost to purchase that?

24      A.      But I fail to answer.

25      Q.      Are you refusing to answer it?

```
 1        A.    I'm just stating I'm not going to answer

 2   it.

 3        Q.    So you're refusing to answer how much you

 4   paid for --

 5        A.    Correct.

 6        Q.    -- the transcript?  How much would be too

 7   much to pay for a copy of the transcript of Ron

 8   Johnson's testimony to you?

 9        A.    I don't want to speculate.

10        Q.    Do you think you paid more than $2,000?

11        A.    I don't want to speculate.

12        Q.    So how long ago did you pay this amount?

13        A.    Do what now?

14        Q.    How long ago did you pay the court

15   reporter?

16        A.    Yesterday.

17        Q.    And you don't recall how much you paid?

18        A.    I'm not going to answer that.

19        Q.    And why won't you answer it?

20        A.    I'm not going to answer that.

21        Q.    You're not going to answer why you're not

22   going to answer it?

23        A.    Correct.

24        Q.    And you know that I can go to the court and

25   ask them?
```

```
 1        A.    Do so.

 2        Q.    Okay.  Who's the court reporter?

 3        A.    I gave him a card.

 4        Q.    I'm sorry?

 5        A.    I gave him a card.

 6              MR. MULLINS:  He gave it to me this

 7    morning.  I did not do anything with it.  I put it in

 8    my pocket.  So I'm happy to give that to you,

 9    Valerie.

10              MS. BATEMAN:  Okay.

11        Q.    (By Ms. Bateman)  So is it your testimony

12    that you purchased a copy of the trial transcript

13    from Denise St. Clair?

14        A.    That's correct.

15        Q.    And you -- and you gave Mr. Mullins a copy

16    of the card -- a copy of her card this morning?

17        A.    I gave her card to him.

18        Q.    Okay.

19        A.    Do you want one?

20        Q.    No.  I want to know why you bought it.

21        A.    For this trial, this case.

22        Q.    Okay.  And what do you think that

23    transcript's going to show?

24        A.    It shows that everything I said about Ron

25    Johnson's true.
```

1    Q.    Everything you said about Ronald Johnson's

2    true?

3    A.    On my podcast is true, correct.

4    Q.    Okay.  And nobody described Todd Sutton's

5    trial testimony to you at the time?  Or did they?

6    A.    Whoever was in the courtroom would tell me

7    what was going on that day.

8    Q.    Okay.

9    A.    Because I couldn't be in there.

10    Q.    And then you did your broadcast based on

11    what you were told?

12    A.    What I was told, correct.

13    Q.    So when you talked about what DeVan Barbour

14    testified to, you got that from someone in the

15    courtroom?

16    A.    Everything that happened in the courtroom

17    came from Cecelia Helms or Christine Livingston.

18    Q.    Okay.  And they -- and they knew you were

19    being sequestered as a potential witness, correct?

20    A.    Yes.

21    Q.    So on page 7 at 10:45, you state (as read):

22          DeVan Barbour on the blackmail case, right

23          where -- that's not clear to me.

24               But (as read): Ron Johnson texted him

25          and said, hey, man, let's meet up or -- or

1                        -- or -- let's meet up at the Clayton

2               Fitness.

3                        You didn't hear that testimony

4       personally, yourself, did you?

5       A.      I did not.  I was not in the courtroom.

6       Q.      So that's the version reported to you by

7       people who said they were in the courtroom, correct?

8       A.      If that's what it is.  I don't remember.

9       Q.      And so at 11:04, it says (as read): You

10              know, behind Clayton Fitness at midnight,

11      Ronald plays a recording from -- from some

12      -- of some -- Ronald plays a recording that

13      Angie did for Ronald to get dirt on DeVan

14      Barbour so he could use it later.

15                      You didn't hear --

16      A.      I don't remember.

17      Q.      -- that testimony yourself, did you?

18      A.      I don't remember.  I didn't hear the

19      testimony directly, no.

20      Q.      And so what you're writing here is based on

21      what you heard from either from Christine or Cecelia?

22      A.      And I might have -- I might have misstated

23      dates or times, or something in that effect.  But

24      like I told you from the beginning of this, I'm bad

25      with dates and times.

Page 281

```
 1                  And what page are we supposed to be

 2    on?

 3         Q.     I'm on page 8.

 4         A.     8.  Dang.

 5         Q.     And at the top of that page, going down to

 6    11:43, are you testifying that DeVan Barbour -- are

 7    you testifying -- are you testifying today that in

 8    your broadcast that we're looking at, you were told

 9    that DeVan Barbour said he was blackmailed?

10         A.     From what I gather from what this says, it

11    says he -- he stated he -- it seemed to him it looked

12    like he blackmailed him, or basically made -- and the

13    defense wants -- and the defense wants to come --

14    came back out -- came out -- I guess I'm saying his

15    defense attorney made him look like he blackmailed --

16    I don't know what this is saying, and I don't

17    understand the context.

18         Q.     So on page 13, at 18:16, do you recall

19    putting on your broadcast -- making the statement on

20    your broadcast (as read): What are you going to do

21              when you're sitting there with those facial

22    expressions, and the damn state comes out

23    and says, play, and you're out there

24    saying, GDMFFS all it.

25                  Do you recall saying that?
```

1      A.     I don't recall saying that.

2      Q.     Okay.  Do you recall saying (as read): I

3             mean, I'm saying bad words tonight, but you

4      know what?  I'm not -- I'm not running for

5      anything.  I'm not in political office.  I

6      can do what I want to.

7                    Do you recall saying that?

8      A.     No.

9      Q.     Do you recall saying (as read): It's not --

10            it's not nice to hear.  It's kind of potty-

11     mouth-type deal.  But my emotions are high,

12     because I'm telling you, I'm really not

13     happy not being able to be in the

14     courtroom.  I should be at least able to go

15     in and sit in there, but I can't.

16                   Do you recall saying that on your

17     broadcast?

18     A.     Probably that statement, I should be at

19     least able to go and sit in there.  I can remember

20     saying something like that.

21     Q.     On page 14 at the top of the page at 19:17,

22     it says (as read): Go back to DeVan Barbour.  Okay.

23            Now, DeVan Barbour was questioned by the

24     state for about an hour, a little over an

25     hour.

```
 1                    Do you recall putting those

 2    statements?

 3         A.     I do not.

 4         Q.     And then you say (as read): And then the

 5                defense attorney comes up, and first thing

 6    he says, do you recall taking a picture of

 7    yourself naked in front of a mirror?

 8                    Do you recall saying that on your

 9    broadcast?

10         A.     I don't recall.

11         Q.     And at 20:03, do you recall saying (as

12                read): And just so DeVan Barbour can keep

13                saying I don't recall, I don't remember, I

14    don't recall, I don't remember, even if you

15    show it to him, take him.

16                    Do you recall making those statements

17    on your podcast?

18         A.     I don't remember any of this.

19         Q.     Do you remember making this text (as read):

20                Blah, blah, blah, blah, blah, blah, two

21                years ago, blah, blah, blah.

22                    Do you see that at the top of page 15?

23         A.     I see it.

24         Q.     (As read): At this time, no, I don't

25                remember.
```

```
 1                    Do you see that statement?

 2       A.     I see it.

 3       Q.     Do you recall making those statements on

 4  your podcast?

 5       A.     I don't remember.

 6       Q.     Okay.  And do you see the next statement

 7              (as read): It's a way to show, get the jury

 8              to think that he is not a credible witness.

 9                    Do you recall making that statement --

10       A.     I don't remember.

11       Q.     -- on your podcast?  So at 20:30 seconds,

12  do you recall saying (as read): I've got a great

13              Idea.

14       A.     I don't remember.

15       Q.     Okay.  And 20:41, do you recall saying (as

16              read): Why don't the state come back with a

17  rebuttal and say, Mr. DeVan Barbour, have

18  you had communications with Ronald Johnson

19  after he was charged or accused of

20  blackmailing you?

21                    Do you recall saying that on your

22  broadcast?

23       A.     I don't remember.

24       Q.     At 21:00, it says (as read): Well,

25              yes, we have.
```

```
 1              Is -- do you recall saying that on your

 2   broadcast?

 3       A.     I don't remember.

 4       Q.     Well, how were those conversations?  Did

 5   y'all make phone calls to each other?  Do you recall

 6   saying that on your broadcast?

 7       A.     I don't remember.  I don't remember any of

 8   this.  Word for word, I don't remember it.

 9       Q.     On page 16 at 22:42 -- well, let me go back

10   up to the top.

11              At the bottom of page 15 at 21:47, it

12   says (as read): So what the state should

13   say is, well, has Ronald confronted you

14   about this whole order by black -- by the

15   blackmailing, and has anything been worked

16   out between the both of you.

17              Do you recall saying that on your

18   broadcast?

19       A.     I don't remember.

20       Q.     At 22:01, it says (as read): Have y'all

21              discussed how this charge could go away and

22   how the video and photos and all cannot be

23   displayed there in court or anything like

24   that.

25              Do you recall saying that on your
```

1  broadcast?

2      A.    I don't remember.

3      Q.    Okay.  At 22:17 (as read): Is there

4  anything that Ronald has tried and said

5  he'd help you with your campaign, you can

6  help him with his yada ya back and forth?

7  Something happened, because remember, back

8  when we were -- when the campaign was going

9  on during the primary, DeVan Barbour stood

10 up and said, we need Ronald Johnson.

11               Do you recall saying that on your

12 broadcast?

13     A.    I don't remember.

14     Q.    Do you recall asking, why would you do

15 that?

16     A.    I don't remember.

17     Q.    And do you recall saying (as read):

18           Something happened?

19     A.    I don't remember.

20     Q.    At 22:47, do you recall saying (as read):

21           Basically, I'm going to tell Devan a

22           personal message here tonight.

23     A.    I don't remember.

24     Q.    (As read): If somebody wants to get it to

25           him, I don't care.

```
 1                  Do you recall saying that?

 2       A.     I don't remember.

 3       Q.     (As read): Whatever I'm telling you, dude,

 4              your political career, your name, say your

 5   whatever.  It's just trashed for doing,

 6   helping Ron Johnson.  You knew what he did

 7   was wrong.  You knew what he did was

 8   blackmail.

 9                  Do you recall saying that?

10       A.     I don't remember.

11       Q.     Do you remember saying you knew everything

12   about that whole ordeal because you had conversations

13   with other people?

14       A.     Don't remember.

15       Q.     Do you recall saying (as read): So let me

16              say this, the state needs to go back and

17   rebuttal and talk about what happened after

18   this and why did DeVan Barbour turn and

19   decide to help Ronald Johnson.

20                  That's the question.

21       A.     I don't remember.

22              MS. BATEMAN:  13?

23              MR. MULLINS:  14.

24              (WHEREUPON, EXHIBIT NUMBER 14

25              WAS MARKED FOR IDENTIFICATION.)
```

```
 1         Q.     (By Ms. Bateman)   I'm going to show you

 2    what we've marked Exhibit Number 14, and ask you if

 3    you recall making a Facebook broadcast on January

 4    10th at 8:55 a.m.

 5         A.     I don't remember the date and time.

 6         Q.     Okay.  Do you recall saying (as read): Oh,

 7              boy, I just got a call a little while ago,

 8    and it seems that DeVan Barbour has gotten

 9    a case of amnesia or confusion.

10         A.     I don't remember.

11         Q.     And do you recall saying (as read): And

12              then when they went to retrieve everything,

13    that's the one thing they don't have, the

14    phone.

15                    Do you recall saying that?

16         A.     I don't remember.

17         Q.     Okay.  And then at 1:18 you say, "All this"

18    -- and there are a bunch of asterisks.  Do you want

19    to speculate on what those words might be?

20         A.     Do not want to speculate.

21         Q.     Okay.  Do you recall saying at 2:00,

22              (as read): The prosecution needs to go

23    after DeVan Barbour now since he wants to

24    play Mr. Amnesia, and say, Devan, who

25    approached you to get you and Ronald back
```

1   together talking?  Who approached you?

2                  Do you recall?

3        A.     I don't remember.

4        Q.     Do you recall saying that (as read): Ronald

5               has said that, you know, he's still got

6    that information, he's still got all the

7    stuff.  And because Van -- DeVan Barbour's

8    worried it's going to become public and

9    ruin him.  And that's the only thing Ronald

10   had that was, supposedly, he has a cell

11   phone they never recovered, and it's got

12   all that stuff on it.

13                  Do you recall saying that on your

14   podcast?

15       A.     Don't remember.

16       Q.     Okay.  Do you recall saying (as read): Wow,

17              getting deep.  I don't know who this was

18   that called me and talked to me about it.

19   Didn't care.  I just wanted to listen, and

20   it was great.  So how do we fix this?

21   Well, the state needs to go after DeVan

22   Barbour and then pretty much maybe do an

23   investigation on the defense and say, hey,

24   you know your client's been holding

25   evidence.

```
 1        A.      Don't remember.

 2        Q.      You don't recall saying any of that?

 3        A.      No.

 4        Q.      Okay.  Do you recall saying (as read): But

 5                what's amazing to me is how -- how did Van

 6     -- DeVan Barbour go from Ronald Johnson

 7     blackmailed me, to I don't remember, I

 8     don't recall.

 9        A.      I don't remember.

10        Q.      Do you recall saying (as read): This is why

11                DeVan Barbour has all of a sudden gotten a

12     case of amnesia and is playing ball with

13     the defense, and Ronald's going to walk

14     away from that.

15        A.      Don't remember.

16        Q.      I'm going to show you what's been marked

17     Exhibit 15.

18                        (WHEREUPON, EXHIBIT NUMBER 15

19                        WAS MARKED FOR IDENTIFICATION.)

20        Q.      (By Ms. Bateman)  Do you recall doing a

21     broadcast on January 13th at 7:31 a.m.?

22        A.      Don't remember the date and time.

23        Q.      Okay.  Do you recall doing a broadcast

24     where you said (as read): All right.  So today

25                they're going to continue with Angie
```

1              Barbour on the stand.

2      A.     Don't remember.

3      Q.     Do you recall doing a broadcast (as read):

4             Just like they -- they said it in opening

5      statements, they're going to say that Angie

6      Barbour is the one that tried to bribe

7      other people and coerce people for Ronald

8      Johnson to further her political career.

9      A.     Don't remember.

10     Q.     Do you remember anything else you said in

11     your broadcast that day?

12     A.     I told you, I don't remember anything in

13     any of the broadcasts.  I mean, I vaguely remember

14     it.  I tried to explain a little bit.

15             But then, when it's tried to be used

16     against me and all, I'm like, not going to do --

17     explain it.  The way I say things, and the way it's

18     written, and the way you pronounce it are two

19     different things -- three different things.

20             But I don't remember any of them.  I'm

21     not even going to guess anymore.  I told you yes, no,

22     or I don't remember.

23     Q.     Okay.

24             MS. BATEMAN:  I'm going to skip

25     Exhibit 16 for right now.  I'm going to go to Exhibit

```
 1    17, and come back to 16.

 2                    (WHEREUPON, EXHIBIT NUMBER 17

 3                    WAS MARKED FOR IDENTIFICATION.)

 4         Q.      (By Ms. Bateman)  Do you recall doing a

 5    podcast on January 14th, 2025, at 8:34 p.m.?

 6         A.      I don't remember the date and time.

 7         Q.      Okay.  Do you recall stating on your

 8    broadcast (as read): I have been keeping some

 9    recordings that have not been heard, and

10    they're going to be heard tonight, because,

11    you know, for the sake of the case, I kept

12    on with this and didn't share it.

13         A.      I don't remember.

14         Q.      Do you recall saying (as read): So I want

15    you guys to hear it, because this goes way

16    back when Ron -- Ronald started his bull

17    crap, and, you know, started attacking Ross

18    Renfrow.  And then he, Ronald Johnson,

19    tried to get Ross Renfrow to get Bennett

20    Jones involved, when Bennett Jones refused,

21    said he doesn't want any part of it.

22                    Do you recall saying that?

23         A.      I don't remember.

24         Q.      Do you recall playing broad -- recordings

25    on your broadcast?
```

```
 1      A.     I don't remember.

 2      Q.     Do you recall saying on your broadcast (as

 3   read): But I just want you to hear these

 4   recordings because they broke it down to

 5   me.  Because it was when Scott was trying

 6   to tell me all this stuff about codes, and

 7   stuff was, like, I'm going to let you talk

 8   to Tracy because she knows about this

 9   stuff.

10                  Do you recall saying that on your

11   broadcast?

12      A.     I don't remember that.

13      Q.     Who is Scott?

14      A.     Beats me.  I don't -- I don't even know

15   what you're referring to.

16      Q.     Okay.

17      A.     I don't remember --

18      Q.     Well, this is on page 7 of --

19      A.     I don't remember --

20      Q.     -- of this exhibit.

21      A.     -- the podcast at all.

22      Q.     Does reading anything on page 7 refresh

23   your recollection?

24      A.     I don't remember it.  I just don't.

25      Q.     You have no idea who Tracy is?
```

```
 1        A.       In this context, I don't remember.

 2        Q.       Okay.  Do you recall saying (as read): So

 3    let me go back to this.  So and Bennett

 4    didn't get a chance to see this in court.

 5    And one of the other witnesses for the

 6    state was Tracy Payton Jones (phonetic)?

 7        A.       I don't remember that.

 8        Q.       Do you recall saying on your broadcast (as

 9    read): At the beginning of this, when they

10    questioned Todd Sutton, the defense wanted

11    to come at him, that they were having a

12    meeting about someone's pay.

13        A.       I don't remember that.

14        Q.       Do you recall hearing that before?

15        A.       What's that?

16        Q.       That Ron Johnson recorded the closed

17    session because there were improper discussions about

18    someone's pay going on in closed session?

19        A.       That's what he claimed.

20        Q.       So you did hear that before you said it on

21    your broadcast that day?

22        A.       That's what he claimed had -- that's how he

23    explained it --

24        Q.       And why --

25        A.       -- away.
```

```
 1        Q.     I'm sorry.  And why did you discredit that

 2   explanation?

 3        A.     Because he explains everything he does

 4   wrong.  He explains it all.  He gives an excuse for

 5   it.

 6        Q.     Do you recall saying (as read): And they

 7   thought they were talking about Tracy

 8   Payton Jones, that if they came in because

 9   Tracy Payton Jones is not doing the job she

10   was hired to do, so she's getting paid way

11   more than a reduction could be made based

12   off of her job title.

13                    Do you recall saying that?

14        A.     I don't remember that.

15        Q.     Do you consider that to be confidential

16   personnel information?

17        A.     I didn't even remember what was said

18   before.  But now, I can't make a comment on that.

19   That's speculating.

20        Q.     Who told you that Tracy Payton Jones was

21   not doing the job she was hired to do?

22        A.     That was -- that was a comment made, when

23   Ronald Johnson was having a -- kind of a powwow

24   between other board members on the -- on the school

25   board meeting.
```

```
1        Q.      Was that in open session?

2        A.      Yeah.  It was right there on YouTube.

3        Q.      And so are you telling me that school board

4    members discussed confidential --

5        A.      I --

6        Q.      -- personnel information in open session?

7        A.       I remember that I watched one of the school

8    board meetings where Ronald Johnson and Alten

9    (phonetic) were getting heated into it.  And it -- it

10   came out -- I knew who they were talking about, but

11   they never mentioned a name.  But I knew who they

12   were talking about.

13       Q.      And how did you know who they were talking

14   about?

15       A.      I don't remember.

16       Q.      Do you think other people could've known

17   who they were talking about?

18       A.      I can't speculate for that.

19       Q.      And do you recall saying in your podcast

20   (as read): And, you know, Ronald was trying to act

21   like he was protecting Tracy Payton Jones.

22   When, in reality, he was using Tracy Payton

23   Jones for information because she worked in

24   the HR department.

25       A.      I do remember saying that.
```

Page 297

```
 1          Q.    So do you recall saying (as read): So let's

 2     go to this FERPA thing and Scott Riley.

 3          A.    No.  I know I --

 4          Q.    Do you recall --

 5     A.    -- I mentioned the --

 6     Q.    -- saying that?

 7          A.    -- the FERPA issue, but I don't remember

 8     saying that.

 9          Q.    So in your podcast, you say (as read):

10     Scott Riley --

11                    (Cell phone ringing.)

12               MS. BATEMAN:  Sorry about that.

13          Q.    (By Ms. Bateman)  (As read): Scott Riley

14          gets a print-up of the FERPA information on

15     a student from the Clayton High School.

16               Do you recall saying that?

17     A.    I don't recall.

18          Q.    And then you say (as read): How he gets it

19     -- how he gets that, it's pretty clear that

20     Carolyn Rotondaro helped out on that.

21          A.    I don't remember.

22          Q.    You don't recall saying that?

23          A.    I don't remember.

24          Q.    You don't recall accusing Carolyn Rotondaro

25     of violating FERPA?
```

1    A.    I don't -- I told you, I don't remember

2    anything about these podcasts.  I never re-watched

3    them.  I just said it.  That was it.  Done.

4    Q.    And did you do any investigation to

5    determine whether Carolyn Rotondaro gave Scott Riley

6    a copy of the FERPA information?

7    A.    What do you call an "investigation"?

8    Q.    Did you ask Carolyn Rotondaro if she gave

9    Scott Riley a copy of the FERPA information?

10   A.    She wouldn't answer my calls, and wouldn't

11   answer her door when I went to her home.

12   Q.    Did Scott Riley tell you he got a copy of

13   the FERPA information from Carolyn Rotondaro?

14   A.    He would not answer the phone.  And he

15   wound up getting an attorney to keep himself from

16   getting in trouble on that issue.

17   I can't remember if it was Ronald that

18   got a -- Ronald and him got a -- an agreement.  Not

19   the -- I can't remember what.  It's so late in the

20   day now.  I can't remember what kind of agreement

21   they got where they wouldn't get punished for it.

22                    But they agreed to something, so they

23   didn't get in trouble for it.

24   Q.    Did -- did you -- what additional

25   investigation did you do prior to publishing these

1    remarks on your broadcast that Carolyn Rotondaro had

2    violated a federal law?

3        A.    I don't remember stating that.  So there

4    again, I can't say what I investigated on that,

5    because I don't remember saying that in the podcast.

6        Q.    So on page 11 at 17:04, do you recall

7    saying that (as read): Ronald Johnson started going

8    after Jimmy Lawrence.

9        A.    I don't remember.

10       Q.    And do you recall saying that (as read): He

11   got his friend, Carolyn Rotondaro, to say

12   that Jimmy Lawrence sexually assaulted her,

13   and Ronald promised her a big settlement.

14       A.    Don't remember.

15       Q.    Did you do any investigation into whether

16   those statements were true before you made them?

17       A.    I just stated, I don't remember making

18   those statements, and so I can't comment on the

19   investigation that was done on it.

20       Q.    Did you ever make those statements that are

21   on this particular broadcast, or not?

22       A.    I don't remember.

23       Q.    You don't recall ever saying that Ronald

24   Johnson got Carolyn Rotondaro to fabricate that she

25   was sexually assaulted by Jimmy Lawrence?