IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:23-cv-349-D-RN

| | |
|---|---|
| Ronald Johnson, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| **v.** | ) |
| | ) |
| Town of Smithfield et al, | ) |
| | ) |
| Defendants. | ) |

**PROPOSED AMENDED SUPPLEMENTED COMPLAINT**

**PRELIMINARY STATEMENT**

1.  Plaintiff Ronald Johnson (Plaintiff or Johnson) brings this action against the Town of Smithfield ("Town" or "Defendant Town") for violations of Title VII of the Civil Rights Act of 1964 (Title VII) (42 U.S.C. § 2000e).

2.  Johnson also brings this action against Defendant Town for violations of the Americans with Disabilities Act (ADA) of 1990, as amended, (42 U.S.C. 12101 et seq.) and the North Carolina Persons with Disabilities Protection Act (N.C. Gen. Stat. § 168A-1 et seq.).

3.  Johnson also brings this action against Defendant Town, MICHAEL SCOTT, in his individual capacity, TIMOTHY KERIGAN, in his individual capacity, TERRY WEST, in his individual capacity, KEITH POWELL, in his individual capacity, for violations of the Family and Medical Leave Act (FMLA) (29 U.S.C. § 2601, et seq.).

1

4.     Johnson also brings this action under 42 U.S.C. § 1983 against the following persons who acted under color of State law and engaged in State action and violated Johnson's rights, privileges, and immunities guaranteed by the First, Fourth, Fifth, and Fourteenth Amendments of the Constitution of the United States, as well as by 42 U.S.C.A. §§ 1983, 1985, and 1988 and in violation of 18 U.S.C. § 2261(A)(2) and 18 U.S.C. § 875:

    A.  The Town of Smithfield and MICHAEL SCOTT, in his individual capacity and in his official capacity as Town Manager, TIMOTHY KERIGAN, in his individual capacity, TERRY WEST, in his individual capacity and in his official capacity as Investigations Lieutenant, and KEITH POWELL, in his individual capacity and in his official capacity as Chief of Police;

    B.  The Johnston County School Board of Education ("School Board" or "BOE" or "Board") and School Board members, TODD SUTTON, in his individual and official capacity as a member and former chair, LYN ANDREWS, in her individual and official capacity as a member, and KEVIN DONOVAN, in his individual and official capacity;

    C.  SUSAN DOYLE, in her individual and official capacity as District Attorney;

    D.  BENJAMIN O. ZELLINGER, in his individual and official capacity as Special Prosecutor;

    E.  ARNEATHA JAMES, in her individual and official capacity as Special Prosecutor;

    F.  RICHARD HOFFMAN, in his individual and official capacity as the District Attorney's investigator, under N.C. Gen. Stat. § 7A-69; and

    G.  THOMAS BENNETT JONES, DAVID MARSHBURN, JAMES LAWRENCE, and

2

  H. ANGELA MCLEOD BARBOUR (referred to as Barbour[1]) , who conspired with the above State actors;

5. Johnson also brings supplemental claims under the common law of North Carolina against Defendant Town for wrongful termination in violation of the public policy of the State of North Carolina.

6. Defendant Town hired Johnson on June 13, 2005, as a Police Officer and he became a detective in 2012. During Johnson's tenure with the Town of Smithfield, he had excellent performance ratings.

7. During his employment, and with the knowledge and permission of his supervisors and the Town, in 2016, Johnson ran for and was elected to a seat on the School Board.

8. While serving as a School Board member, in 2019, he learned that the School Board's attorney, Defendant James Lawrence, was engaged in sexual harassment of a school system employee. Johnson actively opposed Lawrence's conduct but was unsuccessful in his efforts to convince School Board members to take action to stop the harassment.

9. Eventually, after the intervention of others, Lawrence resigned his lucrative position in March 2020, but blamed Johnson for the loss of his position and determined to retaliate against Johnson for the same.

10. On November 14, 2020, Johnson became involved in a relationship with Defendant Angela Barbour, who had political aspirations for herself and Johnson.  This relationship included an estimated 10 or so sexual encounters over a 14 month period. When Johnson began to withdraw from the relationship in late 2021, Barbour voiced to Johnson and others her intention to retaliate against Johnson for withdrawing from the relationship by

---

[1] This complaint also refers to DeVan Barbour, who is referred to as D. Barbour, to distinguish him from Angela Barbour.

telling individuals she knew had a grudge against Johnson about the relationship and painting the relationship as taking advantage of Barbour.

11. In May of 2022, Johnson disclosed his relationship with Barbour to his supervisor Lt. Terry West who did not indicate that he had any problem with Johnson's extramarital relationship.

12. In June of 2022, David Marshburn, an unsuccessful political candidate for Sheriff in Johnston County, and Joseph Preston (now deceased), a former Board of Education candidate, began publishing information on social media, specifically on Facebook(FB) via a series of FB Live broadcasts, making accusations about and threats towards Johnson that he should resign his position with the Town and his position as School Board member. The posts also included defamatory allegations that Johnson had engaged in misconduct as a police detective, violated the law, and that he had engaged in misconduct as a member of the School Board.

13. Johnson did not seek the attention or publicity that the salacious allegations of David Marshburn broadcast using his FB account and he was not a "public figure" prior to Marshburn's broadcasts.

14. Most of the initial allegations against Johnson by Marshburn came directly from Angela Barbour to Marshburn. Some of the information which was posted by Preston and Marshburn could only have come from members of the School Board or its employees or from the Town and its employees.

15. After the social media posts in June 2022, the Town began an investigation into allegations of misconduct which included initially the improper use of Town resources for political purposes. Johnson was told repeatedly by West that so long as he had not

4

used Town equipment to record anyone for political purposes or to conduct his affair, there was no problem.

16. Eventually, as West was unable to find any evidence that Johnson had used Town equipment to either record anyone for political purposes or to conduct the relationship with Barbour, the scope of the questions posed to Johnson expanded beyond the initial issues he was told were under investigation.

17. When Johnson questioned why the investigation continued, when there was no evidence of his misuse of Town property to record conversations for political purposes or to conduct his relationship with Barbour, Lt. West told Johnson that the investigation was politically motivated and in retaliation for his having reported the sexual harassment of the School Board employee by the then School Board attorney. He was told that the investigation would eventually result in his termination and that the School Board was also focused on his resignation from his seat on the School Board.

18. As a result of the social media attacks and the resulting and expanded investigation by his employer, Johnson developed anxiety and depression, and he eventually sought FMLA. The City then interfered with and retaliated against him for taking FMLA, and when he complained about his denial of FMLA, and alleged that the investigation and his treatment, both before and during the investigation, was illegal discrimination against him motivated by his sex and his disability, and his opposition to the harassment of the School Board employee, he was also subjected to illegal retaliation.

19. In addition, the Town also manifested its intent to retaliate against Johnson for taking FMLA by including information about Johnson's medical condition and his FMLA in its

materials sent to the grievance committee in which the Town urged the committee to uphold Johnson's termination.

20.    During this same period of time and prior to his termination on October 14, 2022, the Defendant School Board issued three public censures against Johnson, who was told repeatedly that they were the consequence of his failure to resign his School Board member seat. The censures were adopted based on incomplete and biased investigations by the School Board attorneys and were adopted in violation of the School Board's own processes and procedures and thus were null and void.

21.    Nonetheless, Todd Sutton, Chair of the BOE, referred the improperly adopted censures to the Johnston County District Attorney Susan Doyle for prosecution under a 1901 statute, N.C. Gen. Stat. § (G.S.) 14-230, which criminalized as a Class 1 misdemeanor certain actions called "misbehavior in office" in the statute. These actions were described as a public official's willful and corrupt *omission*, *neglect, refusal* to discharge his duties or the *willful and corrupt violation of the oath of his office*. If found guilty, a Court was entitled to remove the official from office as part of the punishment.

22.    Because Johnson was popular with the voters in the elections in which he ran for his BOE seat, and was often the largest vote-getter, Sutton determined that he needed to conspire with Angela Barbour, her attorneys (which were Jimmy Lawrence's law firm), the District Attorney and the Town to obtain information to issue censures against Johnson, which he intended to and did, forward to the Defendant Doyle for investigation and prosecution.

6

23. In April of 2022, Angela Barbour met with Tim Shipman. Shipman[2] and Sutton had conspired to obtain information from Barbour in order to get Johnson to resign his position on the BOE.

24. During the Town's investigation into Johnson, West shared confidential personnel information obtained from Johnson with Defendant Marshburn, with Defendant Lawrence via his associate Andrew Dickerhoff, and with Defendant Angela Barbour. He also shared confidential personnel information with Defendant Susan Doyle and her investigator, Defendant Richard Hoffman.

25. It is a violation of law to share an employee's personnel file under G.S. 160A-168(e) and (f).

26. Under G.S. 160A-168(a), "an employee's personnel file consists of *any information in any form gathered by the city* with respect to that employee and, by way of illustration but not limitation, relating to his application, selection or nonselection, performance, promotions, demotions, transfers, suspension and other disciplinary actions, evaluation forms, leave, salary, and termination of employment." (Emphasis added.)

27. Under G.S. 160A-168(b2), only the General Court of Justice may issue an order compelling disclosure of information in an employee's personnel file.

28. Under G.S. 160A-168(c),

> [a]ll information contained in a city employee's personnel file, other than the information made public by subsection (b) of this section, is confidential and shall be open to inspection only in the following instances:
>
> > (1) The employee or his duly authorized agent may examine all portions of his personnel file except (i) letters of reference solicited prior to

---

[2] Upon information and belief, Shipman is very ill at the time of this proposed amended complaint and Johnson has declined to bring claims against him for his part in Johnson's removal from his school board seat.

7

employment, and (ii) information concerning a medical disability, mental or physical, that a prudent physician would not divulge to his patient.

(2)     A licensed physician designated in writing by the employee may examine the employee's medical record.

(3)     A city employee having supervisory authority over the employee may examine all material in the employee's personnel file.

(4)     By order of a court of competent jurisdiction, any person may examine such portion of an employee's personnel file as may be ordered by the court.

(5)     An official of an agency of the State or federal government, or any political subdivision of the State, may inspect any portion of a personnel file when such inspection is deemed by the official having custody of such records to be inspected to be necessary and essential to the pursuance of a proper function of the inspecting agency, but no information shall be divulged for the purpose of assisting in a criminal prosecution (of the employee), or for the purpose of assisting in an investigation of (the employee's) tax liability. However, the official having custody of such records may release the name, address, and telephone number from a personnel file for the purpose of assisting in a criminal investigation.

(6)     An employee may sign a written release, to be placed with his personnel file, that permits the person with custody of the file to provide, either in person, by telephone, or by mail, information specified in the release to prospective employers, educational institutions, or other persons specified in the release.

(7)     The city manager, with concurrence of the council, or, in cities not having a manager, the council may inform any person of the employment or nonemployment, promotion, demotion, suspension or other disciplinary action, reinstatement, transfer, or termination of a city employee and the reasons for that personnel action. Before releasing the information, the manager or council shall determine in writing that the release is essential to maintaining public confidence in the administration of city services or to maintaining the level and quality of city services. This written determination shall be retained in the office of the manager or the city clerk, and is a record available for public inspection and shall become part of the employee's personnel file.

8

29.     None of these exceptions applied to the release of Johnson's personnel file to Detective Hoffman or any of the individuals interviewed by Defendant West.

30.     Defendant West shared confidential information gathered about Johnson in his personnel investigation about Johnson with Hoffman for the purpose of assisting Hoffman in his criminal investigations of Johnson.

31.     West did so with the knowledge and permission of Defendant Powell and Defendant Scott who were law enforcement officers and knew or should have known about the legal precedents in *Garrity v. N.J.*, 385 U.S. 492 (1967) as well as State law prohibiting the release of confidential personnel information without a court order.

32.     Ultimately, after changing the focus of the investigation several times and after conspiring with Defendants Sutton, Marshburn, Lawrence, Angela Barbour, all of whom sought his termination from the Town and his resignation from the School Board, and after sharing confidential personnel information and personal health information about Johnson with multiple individual defendants, including for the purposes of criminally prosecuting Johnson, the Town terminated him.

33.     After his termination, Johnson was subjected to unconstitutional searches and seizures of his person and property pursuant to search warrants drafted by Defendant Hoffman which relied upon information provided by the Town of Smithfield, through Defendant West.

34.     Hoffman and Doyle investigated Johnson pursuant to Sutton's request that they do so based on the improperly adopted censures which were forwarded to Doyle and assigned by her to Hoffman for investigation.

9

35.     Doyle also discussed Johnson with Powell on August 22 and August 24, 2025, indicating that she did not have enough information to prosecute him at that time. After those conversations, Lt. West shared confidential personnel information with Hoffman in an attempt to provide him sufficient information with which to prosecute Johnson.

36.     The information provided by West to Hoffman during his investigation used by Doyle and Hoffman in their investigation and as a basis for search warrants which contained false information and/or information that could only have been obtained from the Town in violation of Johnson's constitutional rights against self-incrimination after the first two censures were forwarded to her using the fruit of the poisoned tree, i.e., the contents of Johnson's personnel file, which was released to Hoffman in violation of State and federal law prohibiting the use of information that Johnson was compelled to provide the Town as a result of his employment by the Town.

37.     Eventually, in January of 2025, the conspiratorial efforts of Defendants Barbour, Marshburn, Sutton, Doyle, Zellinger, James, Hoffman, West, Powell, and Scott came to fruition when Johnson was removed from his BOE seat after being convicted of two counts of misdemeanors under G.S. 14-230, allowing the Court to remove Johnson from office.

38.     As a result of the actions of the Defendants, which violated multiple rights protected by the United States and North Carolina Constitutions, Johnson has suffered significant pecuniary and non-pecuniary damages and irreparable harm to his reputation and livelihood.

**JURISDICTION**

10

39. This Court has jurisdiction over Johnson's Title VII action pursuant to 28 U.S.C. § 1331, because this is a civil action arising under Title VII.

40. This Court has jurisdiction over Johnson's FMLA claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2617, because this is a civil action arising under the FMLA.

41. This Court has jurisdiction over Johnson's constitutional claims pursuant to 28 U.S.C.A. §§ 1331 and 1343.

42. This Court also has supplemental jurisdiction over Johnson's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

**VENUE**

43. Venue is proper in this district for Johnson's Title VII claims under 42 U.S.C. § 2000e-5(f)(3), because the unlawful employment practices were committed in Johnston County, North Carolina, 42 U.S.C. § 2000e-5(f)(3), because the relevant employment records are maintained in this district, 42 U.S.C. § 2000e-5(f)(3), because the Johnson would have worked in this district but for the alleged unlawful employment practice, 42 U.S.C. § 2000e-5(f)(3), because Defendant Town of Smithfield and its employees have their principal office in this district, and there is no other district that has substantial connection to the claim.

44. Venue is proper in this district for Johnson's FMLA claims under 28 U.S.C. § 1391(b)(1), because Defendant Town of Smithfield and its employees, reside in this district and the individual defendant employees of the Town of Smithfield reside in the counties located in the Eastern District of North Carolina, 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district, 28 U.S.C. § 1391(b)(2), because Defendant Town of Smithfield and its employees are subject to

personal jurisdiction in this district with respect to this action, and there is no other district in which the action may otherwise be brought.

45. Venue is proper in this district for Johnson's claims under 42 U.S.C. §§ 1983, 1985, and 1988 because Defendant Town of Smithfield and its employees, and the School Board and its members reside in this district and all individual defendants reside in the counties located in the Eastern District of North Carolina, 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district, 28 U.S.C. § 1391(b)(2), because Defendant Town and its employees, and the School Board and its members, are subject to personal jurisdiction in this district with respect to this action, and there is no other district in which the action may otherwise be brought.

## CONDITIONS PRECEDENT

46. On February 8, 2023, Johnson timely filed a charge of sex and disability discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC).

47. On or about March 28, 2023, the EEOC issued Johnson a Notice of Right to Sue. This Complaint has been filed within 90 days of receipt of that notice. Johnson has fully complied with all prerequisites to jurisdiction in this Court under Title VII and the ADA.

48. The events in the pleading which occurred after Johnson's original complaint was filed are within the statute of limitations or relate back because the claims to which they relate arose out of the conduct, transactions, or occurrences set out—or attempted to be set out—in Johnson's original complaint.

49. In addition, the conspiracy between Defendants related to Johnson's removal from the school board are within the statute of limitations as Johnson was not removed from the

12

school board until January of 2025, even though the conspiracy to remove him began in April 2021 and continued until his removal.

## PARTIES

50. Johnson resides in and is a citizen of Johnston County, North Carolina.

51. Johnson is an employee, as defined by Title VII, and worked for Defendant Town in Smithfield, North Carolina, from approximately June 2005 to October 2022, when he was terminated from his position with the Town

52. Johnson is an employee, as defined by the ADA, and worked for Defendant Town in Smithfield, North Carolina, from June 2005 to October 2022, when he was terminated from his position with the Town.

53. Johnson is a duly elected School Board member of the Johnston County School Board of Education and has been since November 2016.

## TOWN OF SMITHFIELD AND POLICYMAKERS

54. Defendant Town is an employer within the meaning of the ADA and Title VII, and for purposes of the ADA, is engaged in an industry affecting commerce, and has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

55. Defendant Terry West was at all times relevant to this complaint a duly appointed police officer of the Town of Smithfield and a State actor. He is sued in his individual and official capacity and the actions of Defendant West alleged in this Complaint were taken under color of the laws of the State of North Carolina.

56. Defendant Keith Powell was at all times relevant to this complaint a duly appointed police officer of the Town of Smithfield and a State actor. He is sued in his individual

and official capacity, and the actions of Defendant Powell alleged in this Complaint were taken under color of State law.

57. Defendant Michael Scott was at all times relevant to this complaint the duly appointed manager of the Town of Smithfield and a State actor. He is sued in his individual and official capacity, and the actions of Defendant Scott alleged in this Complaint were taken under color of the laws of the State of North Carolina.

58. Defendant Timothy Kerigan was at all times relevant to this complaint the duly appointed human resources director of the Town of Smithfield. He is sued in his individual and official capacity, and the actions of Defendant Kerigan alleged in this Complaint were taken under color of the laws of the State of North Carolina.

59. Defendant Scott as the Town Manager, and who previously served as Chief of Police, exercised the powers and duties contained in N.C. Gen. Stat. § 160A-148(a), including the power to (1) "appoint and suspend or remove all city officers and employees . . . in accordance with such general personnel rules, regulations, policies, or ordinances as the council may adopt" and (2) "direct and supervise the administration of all departments, offices, and agencies of the city, subject to the general direction and control of the council, except as otherwise provided by law," which included the police department.

60. The duly adopted ordinances of the Town provide in Section 16-1 that the "chief of police shall be the head of the police department and he and such employees as the town council may deem necessary shall constitute the police department." Under Section 16-38, "[t]he chief of police, subject to the town manager, shall have charge of the police department and shall be responsible to the town manager in seeing that the police officers faithfully perform their duties."

14

61.     The Town Manager and Chief of Police, along with Defendant West who acted at Defendant Powell's direction and with his knowledge and consent, were policy makers for the Town of Smithfield because they acted jointly and with final policy making authority to engage in the personnel practices applied to Johnson with respect to his investigation and termination and the Town ratified their actions and is thus responsible for them.

## BOE AND POLICYMAKERS

62.     Defendant School Board is body corporate created by State statute, is capable of prosecuting and defending suits for or against the corporation, has "general control and supervision of all matters pertaining to the public schools in [its] respective local school administrative unit" and is charged with the responsibility of "execut[ing] the school laws in" its unit, pursuant to N.C. Gen. Stat. § 115C-40 and is subject to suit in any court of competent jurisdiction in North Carolina.

63.     Upon information and belief, the BOE waived "its governmental immunity from liability for damage by reason of death or injury to person or property caused by the negligence or tort of any agent or employee of such board of education when acting within the scope of his authority or within the course of his employment" pursuant to N.C. Gen. Stat. § 115C-42.

64.     Defendant Sutton was elected to the BOE pursuant to N.C. Gen. Stat. § 115C37 and was elected as chair of the BOE pursuant to N.C. Gen. Stat. § 115C-41 and served in that position during the events alleged in this Complaint until November 2022, at which time he was replaced as Chair by Lyn Andrews. He is subject to suit pursuant to N.C. Gen. Stat. § 115C-43 and is being sued in his individual and official capacity. In his position,

he was a State actor, acting under the color of State law, and his actions in his individual and official capacity were State actions.

65. Defendant Andrews was elected to the BOE pursuant to N.C. Gen. Stat. § 115C-37 and was elected as chair of the BOE pursuant to N.C. Gen. Stat. § 115C-41 after the November 2022 election and currently serves in that position. She is subject to suit pursuant to N.C. Gen. Stat. § 115C-43 and is being sued in her individual and official capacity. In her position, she was a State actor, acting under the color of State law, and her actions in her individual and official capacity were State actions.

66. On November 8, 2022, Defendant Donovan was elected to his first term as a member of the BOE pursuant to N.C. Gen. Stat. § 115C-37 and currently serves in that position. He is subject to suit pursuant to N.C. Gen. Stat. § 115C-43 and is being sued in his individual and official capacity. In his position, he was a State actor, acting under the color of State law, and his actions in his individual and official capacity were State actions. Prior to November of 2022, Donovan was a private citizen, a friend of Johnson's, and provided information to the Town of Smithfield in Johnson's defense which was exculpatory and which was provided to Defendant Hoffman, but which information was not disclosed to Johnson during the criminal discovery process.

67. Defendants Sutton, Andrews, and Donovan were all individuals who acted with final policy making authority for the Defendant BOE and acted with the powers and duties conferred by the General Assembly in N.C. Gen. Stat. § 115C-36 and 115C-47, including the power to elect a superintendent and prescribe the superintendent's duties, § 115C47(13) and (15), and to make rules concerning the conduct and duties of personnel, § 115C-47(18), and who continued to pursue criminal charges against Johnson even after

16

his termination from employment with the Town, conspiring with other Defendants to disadvantage Johnson in his employment, to ensure his removal from the School Board, and to assist in his criminal prosecution.

68. The BOE's policies provides that "[m]embers of the Board have authority only when acting as a board "legally in session." Policy 2100.

69. BOE policy provides that "[a]ll applicants selected for employment must be recommended by the superintendent and approved by the Board." Policy 7100  All employees are protected from "any form of reprisal, retaliation, or discrimination" for making a report of wrongdoing.  Policy 1760/7280.

70. The BOE's policies prohibit "all forms of unlawful discrimination," Policy1710/4030/7230, and the Board is required to act "consistent[ly] with Federal and State Law," Policy 1010, and perform "judicial functions by conducting hearings as appropriate or as required by law regarding decisions of school system personnel or the Board," Policy Code 1010.  All meetings of the BOE "will be conducted in accordance with the current edition of Robert's Rules of Order, Newly Revised, including the manual's procedure for small boards."

71. All BOE members are required to "obey all applicable state and federal laws regarding official actions taken as a board member and "conduct the affairs of the Board in an open and public manner, complying with all applicable laws governing open meetings and public records." Policy 2120. Moreover, Policy 1760/7280 provides that "[b]oard members and employees are expected to be honest and ethical in the performance of their duties and to comply with applicable federal, state, and local laws, policies, and regulations."

17

72. By ratifying the actions of the individual members of the BOE who had policy making authority with regard to Johnson and his service on the board, the BOE ratified the actions of the individual members and is responsible for the consequences of the same.

## DISTRICT ATTORNEY

73. At all times relevant to this Complaint, Defendant Doyle was the duly elected Johnston County District Attorney which is an office created by the N.C. Constitution, Art. IV, Sec. 18. She is being sued in her individual and official capacity and is a State actor, acting under the color of State law, and her actions in her individual and official capacity were State actions. She is not being sued for any prosecutorial conduct but for investigative conduct and conspiring with Town officials and State officials to terminate Johnson's employment and end his service on the School Board.

74. At all times relevant to this Complaint, Defendant Hoffman was a Johnston County District Attorney Special Investigator, a detective assigned to and working under the direction of and with the consent and knowledge of Defendant Doyle. He is being sued in his individual and official capacity and is a State actor, acting under the color of State law, and his actions in her individual and official capacity were State actions. He is not being sued for any prosecutorial conduct but for investigative conduct and conspiring with Town officials and State officials to terminate Johnson's employment and end his service on the School Board.

## SPECIAL PROSECUTORS FOR THE NORTH CAROLINA
## DEPARTMENT OF JUSTICE

75. Benjamin O. Zellinger was employed as a Special Prosecutor working for the State of North Carolina and the Attorney General of the State of North Carolina, and in his official capacity acted on behalf of the State of North Carolina. He is being sued in his

18

individual capacity, acting under the color of State law, for damages for his actions toward Johnson, and he is being sued in his official capacity as a representative of the State of North Carolina for prospective injunctive relief. He is not being sued for any prosecutorial conduct but for investigative conduct and conspiring with Town officials and State officials to terminate Johnson's employment and end his service on the School Board.

76. Arneatha James was employed as a Special Prosecutor working for the State of North Carolina and the Attorney General of the State of North Carolina, and in her official capacity acted on behalf of the State of North Carolina. She is being sued in her individual capacity, acting under the color of State law, for damages for her actions toward Johnson, and she is being sued in his official capacity as a representative of the State of North Carolina for prospective injunctive relief. She is not being sued for any prosecutorial conduct but for investigative conduct and conspiring with Town officials and State officials to terminate Johnson's employment and end his service on the School Board.

**CO-CONSPIRATORS**

77. Thomas Bennett Jones is a private citizen and upon information and belief resides in a county in the Eastern District of North Carolina. He is being sued for his conspiring with Town officials and State officials to terminate Johnson's employment and end his service on the School Board.

78. Angela McLeod Barbour (Barbour) is a private citizen and upon information and belief resides in a county in the Eastern District of North Carolina. She is being sued for his

19

conspiring with Town officials and State officials to terminate Johnson's employment and end his service on the School Board.

79. James "Jimmy" Lawrence is a private citizen, a member of the N.C. State Bar, former school board attorney, and upon information and belief resides in a county in the Eastern District of North Carolina. He is being sued for his conspiring with Town officials and State officials to terminate Johnson's employment and end his service on the School Board.

80. David Marshburn is a private citizen and upon information and belief resides in a county in the Eastern District of North Carolina. He is being sued for defamation and conspiring with Town officials and State officials to terminate Johnson's employment and end his service on the School Board.

81. Owen Phillips is a private citizen and upon information and belief resides in a county in the Eastern District of North Carolina. He is being sued for his conspiring with Town officials and State officials to terminate Johnson's employment and end his service on the School Board.

**FACTS**

82. Ronald Johnson began working for Defendant Town on June 13, 2005, as a police officer in its police department. In 2012, he became a detective in the police department. During his employment Johnson maintained a virtually unblemished history of exceptional performance.

83. On December 18, 2015, with the encouragement and approval of his employer, the Smithfield Police Department (Smithfield PD), Johnson exercised his first amendment rights to run for a seat on the BOE.

20

**JOHNSON ENGAGED IN ACTIVITIES PROTECTED BY THE FIRST AMENDMENT IN HIS CAPACITY WHILE SERVING AS AN ELECTED MEMBER OF THE BOE AND A DETECTIVE FOR THE DEFENDANT TOWN OF SMITHFIELD POLICE DEPARTMENT**

84.    Johnson engaged in activities while serving as a member of the school board since his election in 2016 and the Town did not consider his service on the school board or his first amendment activities disruptive until David Marshburn began his Facebook live broadcasts about Johnson.

85.    In February 2016, a local news media source, The JoCo Report published an article entitled "Commissioner Chairman: The Lights Are On the Board of Education but No One is Home." This article discussed the BOE's giving the then Superintendent Dr. Ed Croom a substantial retirement package at taxpayer's expense.

86.    Johnson, a candidate for the BOE, criticized the retirement package, but Todd Sutton supported the package.

87.    Johnson was elected and took office in December 2016.

88.    As required by statute, G.S. § 115C-47(58) and G.S. § 160A-86(b), the BOE adopted by resolution an ethics code for its members "to guide actions by the governing board members in the performance of the member's official duties as a member of that governing board" and pursuant to G.S. § 160A-86(b), the ethics code included provisions addressing *inter alia* the need for all Board members "to obey all applicable laws regarding official actions taken as a board member," "to uphold the integrity and independence of the board member's office," and "to conduct the affairs of the governing board in an open and public manner, including complying with all applicable laws governing open meetings and public records."

89.     At the time Johnson joined the BOE, James "Jimmy" Lawrence was the School Board's attorney.

90.     Lawrence was a member of the law firm Daughtry, Woodard, Lawrence & Starling.

91.     In June of 2019 Johnson received information that student grades were being altered at Clayton High School. He gave the documents to Clayton High School's Principal Dr. Bennett Jones, who chose not to act. Johnson then took the information to Superintendent Dr. Ross Renfrow. Jones was notified that Human Resources would be coming to investigate the following day.

92.     On June 11, 2019, an investigation into Clayton High School's athletic program was opened.

93.     A local media outlet, the JoCo Report, published an article on June 20th stating the newsgroup had received "Whistleblower" emails on June 3rd and June 18th. Over the next few months, multiple news stories were published covering the investigation and allegations involving Jones.

94.     In July of 2019, Johnson learned from a school employee that she was being sexually harassed by the school board's attorney, Jimmy Lawrence. The employee asked Johnson for help with dealing with the sexual harassment. Johnson encouraged her to reach out to the Superintendent, but the employee indicated that she did not trust the Superintendent and thought he already knew about it and had done nothing because he was afraid of Lawrence.

95.     Johnson reported the allegations to Superintendent Ross Renfrow on July 31, 2019, who told Johnson that he would take care of it.

96. On July 19, 2019, Principal Jones authored a fifteen-page document laying out his complaints with how the investigation was handled by Human Resources employees Linda Edmundson and Brian Vetrano, and JCPS Superintendent Ross Renfrow.

97. On August 8, 2019, Jones provided Johnson a copy of his grievance letter to review on his behalf.

98. On August 12, 2019, Jones was transferred from his position as principal to a position at the JCPS Central Office.

99. On August 13, 2019, Jones formally filed a grievance against Edmundson, Vetrano, and Superintendent Renfrow. On this same day, Johnson and District Attorney Susan Doyle exchanged text messages supportive of Bennett Jones while at a rally supporting Jones.

100. On August 14 and 16, 2019, the JoCo Report published articles about the Jones investigation.

101. On August 17, 2019, Johnson sent a document called "Board Attorney Protocols" via email to each member of the BOE and a text message. With the employee's consent, Johnson told the Board members the issue would be dropped if the Board Attorney adhered to the protocols. The employee knew that certain Board members had a close relationship with Jimmy Lawrence and did not want them to know who she was. On this same day, the employee gave Johnson permission to speak to two members of the BOE, Terri Sessoms and Teresa Grant, but not to share her identity for fear of retaliation.

102. On August 18, 2019, the Clayton High School Parent Advisory Council (PAC) sent an email to BOE with the subject line: "Appeal of Dr. Bennett Jones Position Change". The authors were Tracy Daniels, Susan Doyle, Kevin Hubbard, Judge Addie Rawls, James Rodgers, and Misty Soloman.

103. On August 19, 2019, the JoCo Report published an article titled "Johnston County School Board Violates Open Meeting Law."

104. On August 20, 2019, the JoCo Report published an article titled "Clayton High Football Coach Hunter Jenks Resigns." Jenks issued a public statement thanking Jones for his support and Superintendent Dr. Ross Renfrow for taking the time to meet with him on August 13, 2019.

105. On the same date, the JoCo Report published an article titled Article: "Town Council Adopts Resolution in Support of Former Clayton Principal." The article discussed a rally planned in support of Jones.

106. In addition, on the same date, the JoCo Report published an article titled "Superintendent Accused of Mishandling Clayton High Investigation." The article reported that Bennett Jones had filed a formal 15-page grievance against Superintendent Renfrow alleging he tried to manipulate an internal investigation currently underway and was then retaliated against by Renfrow. The article also stated that "School Board Member Ronald Johnson claimed the allegations were not being properly investigated and that a high ranking official, along with other board members, were trying to manipulate those being investigated."

107. On August 21, 2019, the JoCo Report published an article titled "Clayton High Parent Advisory Council Demands Meeting with School Board." The article stated a letter was sent to the BOE from the PAC; one of the members included on the letter was District Attorney Susan Doyle.

108. On August 23, 2019, Lawrence retaliated against Johnson by attempting to have him charged for bringing his service weapon onto School Board property when he attended

a meeting. Johnson reached out to Susan Doyle via text and scheduled a meeting to discuss Lawrence's attempts to have Johnson arrested.

109. On August 24, 2019, Doyle texted Johnson "Don't worry. I will set Jimmy straight on all this. You won't have to bother with having any further conversations about it with him." Johnson responded "Thank you so much." Johnson also texted Doyle "Another issue you may be able to include in that letter (PAC letter to BOE) is how the public has complained many principles (sp) are moved from the school and sent to central office when they were doing a good job at their respective school." Doyle texted "We are still formulating our letter." A later text in the exchange from Susan stated "I will call Jimmy as soon as I leave here. Thank you."

110. On August 26, 2019, the JoCo Report published an article titled "Update: School Board Chairman Responds to Clayton High Parent Advisory Council Letter." The PAC also sent a second letter demanding a meeting. The article states that Chairman Mike Wooten and Board Member Ronald Johnson met separately with PAC members.

111. On August 27, 2019, the JoCo Report published an article titled, "Superintendent Dr. Ross Renfrow Announces Retirement." Renfrow resigned unexpectedly, following the conclusion of a 45-minute closed session portion of a BOE meeting.

112. On September 3, 2019, James "Jim" Causby became the interim superintendent.

113. On September 17, 2019, Johnson met with Causby and discussed the sexual harassment allegations which had been ignored by Renfrow but did not disclose the employee's name.

114. On September 18, 2019, Johnson met with Assistant Superintendent Ben Williams about the sexual harassment at the employee's urging because the employee expressed her belief that Williams was trustworthy.

115. On October 3, 2019, Johnson texted Doyle and stated that he "Was with Bennett got the phone call from Causby, Zukowski is pressuring him to change his mind about Bennett. Jones heard the entire thing. So messed up. Please call me." Doyle responded the next morning at 6:19 AM, "This is unbelievable. I will call you on my way to work. Around 7:45."

116. On October 7, 2019, ABC-11 reported that Jones had been reinstated at Clayton High School as principal on probationary status.

117. On October 8, 2019, at a BOE meeting, Causby announced the school system was facing a potential $10 million budget shortfall for the fiscal year. Todd Sutton stated: "I would like to say that I'm very disappointed in our previous superintendent." Terri Sessoms agreed with his statements. Johnson spoke about the controversy and certain people wanting conflict and asked that those same people be present for when the Board fixes the problem.

118. On October 11, 2019, the JoCo Report published an article titled Johnston County Schools Facing $10 Million Budget Shortfall." At the end of the article it stated that on June 3, 2019, the former Superintendent had asked county commissioners for $1.5 million to meet obligations for the previous fiscal year, which was approved. In addition, it reported that Renfrow stated that $3.5 million had to be returned to the State. The article also stated that in June 2019, JCPS Finance Director Art Stanley said the school system had $2 million in reserve funds, but that as of October 8, 2019, the funds were

down to $330k and earmarked. Two years prior the school system reportedly had approximately $10 million in reserves.

119. On November 18, 2019, Johnson met with Superintendent Causby about matters of public concern including the budget shortfall and allegations that the school system bought $60,000 worth of products from a School Board member's employer's business (after she promoted her business to the school system, which was a conflict of interest).

120. Board Chair Sutton denied that a conflict of interest existed because after the School Board member was elected she (Tracie Zukowski) stated she no longer represented the company in its dealings with the school system.

121. In October 2019, in a closed session meeting after a Board meeting, Causby informed the board members that the school system's finance officer had been directed by an unnamed person to lie to School Board members and county commissioners about the amount of money the school system needed to cover a budget shortfall.

122. Johnson believed that the public should know about these allegations, but after Johnson disclosed them, Causby denied having made the statement about the finance officer. Defendant Board Chair Sutton also held a press conference denying that the Board acted improperly.

123. On October 30, 2019, and November 15, 2019, additional incidents involving physical contact between Lawrence and the female employee occurred.

124. On November 18, 2019, Johnson met again with Superintendent Causby and expressed his concerns about what was going on and the Board's lack of action.

125. On November 29, 2019, the JoCo Report published an op-ed titled "Ronald Johnson Releases Details on Alleged Corruption, Sexual Harassment, Unethical Activity."

126. On December 9, 2019, one of Johnson's fellow officers at Smithfield PD, Lt. Brian O'Branovich, made a Facebook post supporting Johnson's speaking out about BOE activities.

127. Superintendent Causby wrote an open letter to students, teachers, staff, and parents about matters of public concern and improper activities that the BOE was alleged to have engaged in and denied any BOE wrongdoing.

128. On December 30, 2019, the JoCo Report published a video titled "Video: Ronald Johnson Releases Details on Alleged Corruption, Sexual Harassment, Unethical Activity."

129. On December 31, 2019, the JoCo Report published an article titled "Superintendent: No Evidence of Any Wrongdoing by Staff or Board Members" and an article titled "Latest reaction to School Board Member Allegations."

130. On January 2, 2020, the Durham Herald Sun published an article titled "Johnston County School Leaders Deny Corruption Allegations." The Herald referred to a video interview done by the JoCo Report where Johnson stated he would give the SBI recordings, emails, and text messages proving high-ranking officials have engaged in corrupt behavior.

131. In the same article, the Durham Herald Sun published a quote from Johnson that he believed "that a board member had engaged in a conflict of interest and it was reported to me that this happened. I believe that school system employees have lied to cover this up."

132. Johnson was referring to board member Tracie Zukowski and her employer, Freckle Education, who allegedly solicited school employees for Freckle Education while Zukowski was a sitting BOE member.

28

133.    The article quotes Todd Sutton is quoted as saying, "I don't have a corrupt bone in my body. I don't think any board member does."

134.    On January 2, 2020, the News & Observer[3] ran a story about the allegations of financial impropriety and the lack of action by the Board with regard to the allegations of sexual harassment as well as other issues. Sutton blamed the School Board's lack of action with regard to the allegations of sexual harassment on Johnson, stating that he had not provided any proof of the allegations. He did not explain why the School Board failed to undertake an independent investigation.

135.    On January 3, 2020, the ABC11 published an article titled "Johnston County Board Chair shoots down claims of corruption, sexual assault cover-up." The article referred to the press conference and an attendee asking about a "video of a school board employee being followed to her car, and chair members abruptly ended the conversation."

136.    Todd Sutton again denied claims of criminal activity, corruption and mishandling of funds, but admitted to having recently heard an audio recording he found concerning. He was quoted as saying, "The tape apparently had a recording of a male district employee making sexual advances on a female employee while she repeatedly asked him to stop."

137.    On January 6, 2020, Johnson texted Susan Doyle about meeting with the employee who was the alleged victim of sexual harassment and sexual assault. Doyle texted Johnson ""I can't do Thursday after work either because I have an appointment in Clayton right after work. Can she not ever meet during the day? If not we will make something work. Sorry but my schedule is more complicated than I thought in the evenings."

---

[3] [Johnston County school leaders deny corruption allegations | Raleigh News & Observer (newsobserver.com)](https://www.newsobserver.com/article238899683.html)
https://www.newsobserver.com/article238899683.html

138.     On January 7, 2020, Johnson texted Doyle about setting a time for her to speak with the employee. Doyle texted Johnson, "Still at the appointment with my daughter. I can call you when we leave." Johnson replied: "Yes."

139.     On January 8, 2020, Johnson and the employee met with Superintendent Causby and BOE member Terri Sessoms at St. Paul's Church to discuss the sexual harassment claims by the employee against Jimmy Lawrence. At this time, Sessoms and Johnson were both board members, the employee was an administrative assistant in the Johnston County Public School's Central Office, and Causby was interim Superintendent. Causby stated at the meeting that he would refer to matter to a female investigator.

140.     After the meeting with Causby and Sessoms Johnson accompanied the employee to Doyle's office to discuss the allegations of sexual harassment/assault.

141.     Doyle later texted Johnson stating that she "had no idea you were bringing [the employee] up to my office." Johnson texted back, "It bothers me she was suffering and everyone (school system) was too scared to help her." Doyle replied, "I know. It was particularly anguishing to see her and listen to her since she is a friend. I was just very caught off guard by that."

142.     On January 9, 2020, Maura O'Keefe with the Tharrington Smith law firm contacted the employee to schedule a meeting.

143.     The same day an article ran in The Johnston County Report[4] about the allegations of sexual harassment and the School Board's failure to take any action.

---

[4] Johnston County Schools Sexual Harassment Victim Speaks Out | JoCo Report https://jocoreport.com/johnston-county-schools-sexual-harassment-victim-speaks-out/

144. On January 10, 2020, Causby resigned without notice his position as interim superintendent. In a public statement he thanked Board members by name but omitted the name of Johnson and Teresa Grant, a BOE member often aligned with Johnson.

145. The same day, the JoCo Report published an article titled "Without Additional School Funding 480 Layoffs Could Take Place as Early as March" which contained a note in the article stating it was written prior to the resignation of Causby. A subsequent article on January 10, 2020, was published by the JoCo Report titled "Interim School Superintendent Dr. Jim Causby Resigns." Johnson issued a statement stating that "Dr. Causby and I have disagreed, but we have never spoken a harsh or cross word to each other. Even after our disagreements, we remained friendly. I have no hard feelings toward Dr. Causby. While he didn't thank me, I would certainly like to thank him."

146. Chief of Human Capital Brian Vetrano was named by the Board as interim superintendent for the second time in less than six months.

147. On January 13, 2020, Bennett Jones emailed the BOE a petition. His email stated, "I have concerns of the resignation of Dr. Causby in regards to my ongoing situation and the current acting superintendent (Vetrano), especially since he was included in my grievances." Jones also wrote, "I am willing to speak to you all in closed session regarding this matter." He attached a proposal for consideration to resolve his claims "regarding the CHS investigation and the subsequent retaliation by JCPS leaders."

148. On January 13, days after appointing Vetrano, the Board announced Dr. Ben Williams had been named Interim Superintendent effective January 14 through June 30, 2020.

149. That day the JoCo Report published an article titled "Details Emerge on What Prompted Interim Superintendent's Sudden Departure" in which it cited the removal of Principal

Bennett Jones, low performing schools, and possible employee layoffs as among the many issues Causby had been facing.

150. O'Keefe and the victim of the sexual harassment allegations held their first meeting as scheduled on January 20, 2020.

151. Later that day Superintendent Williams contacted Johnson to call Maura O'Keefe, which led to her request to meet with him as part of the investigation into Lawrence.

152. On January 27, 2020, Maura O'Keefe and Ken Soo interviewed Johnson. As part of that investigation, they questioned Johnson about text messages sent between Lawrence and Johnson on April 9, 2019, and on May 14, 2019, admiring a woman, described only by the color of her dress, in the audience at a BOE meeting..  The texts were provided by Lawrence and in the possession of the BOE attorneys at the time of their meeting with Johnson.

153. After his meeting with O'Keefe and Soo on January 27, 2020, Johnson reached out to the female, a school employee and friend of Johnson's. and asked to meet with her to explain how he let her down.

154. Apparently, neither O'Keefe or Soo or anyone else at Tharrington Smith providing counsel to the BOE considered the messages to be sexual harassment at the time, nor to Johnson's knowledge did they raise any issue about the messages to Board Chair Todd Sutton or any other members of the Board in 2020.

155. However, when searching for a basis on which to issue a censure Johnson in the summer of 2020, the messages however were found by O'Keefe and Soo to be objectionable and suitable to justify censure by the BOE two years later in October 2022.

32

156.    The text messages were either released by the BOE or Jimmy Lawrence and provided to David Marshburn. On August 8, 2022, Marshburn published them on his Facebook live broadcast, without reference to Lawrence, but identifying Johnson as a participant in the messages.

157.    While unremarkable in 2020, in 2022, Soo described the texts in October of 2022 as "disrespectful," "inconsistent with Board policy," "salacious," disrespectful, an "improper example for conduct in the workplace," lacking integrity, demonstrating "impropriety in the exercise of his office," and "an example of incivility."

158.    On January 30, 2020, O'Keefe met again with the sexual harassment victim.

159.    The primary election for the Board of Education was held on March 5, 2020. Johnson received 16, 263 votes, the highest number among the candidates.

160.    The next day Jimmy Lawrence resigned his lucrative position as School Board attorney. [5]On March 18, 2020. Chair Sutton sent the alleged victim of the sexual harassment a certified letter regarding her concerns. The letter confirmed dates the employee had met with (former) Superintendent Causby and board counsel, and that she had "provided information and records pertaining to your concerns", and "described conduct by (Lawrence) occurring between Fall 2018 and January 2020. Ms. O'Keefe and Attorney Ken Soo reported your concerns to the Board and provided Board members with an oral summary of interviews of school employees and Board members and information they obtained from a review of records pertaining to this matter."

---

[5][Johnston County School Board Attorney Resigns | JoCo Report](https://jocoreport.com/johnston-county-school-board-attorney-resigns) https://jocoreport.com/johnston-county-school-board-
attorneyresigns/#:~:text=Johnston%20County%20school%20board%20attorney%20Jimmy%20Lawrence%20resi
gned,as%20the%20attorney%20for%20the%20Board%20of%20Education.

161. Sutton's letter stated, "The Board concluded that your reports and other factors justified protecting you from further contact with (Lawrence). The Board takes any and all concerns regarding workplace conditions seriously, and it will not tolerate harassment or discrimination of any kind in the Johnston County Schools community."

162. On April 27, 2020, attorneys for Bennett Jones wrote Chair Sutton and Interim Superintendent Ben Williams a seven-page letter regarding Bennett Jones's grievances against Dr. Renfrow, Brian Vetrano and others. The letter stated that in the wake of Dr. Renfrow's departure, incoming Superintendent Causby had followed the "incorrect findings of Deputy Superintendent Dr. Paula Coates" and issued a public statement with false claims before talking to Jones as "a tactic to further disparage Dr. Jones and an attempt to validate the removal of Dr. Jones publicly."

163. The letter included strong assertions, among them "This concerted campaign to oust Dr. Jones was orchestrated initially by superintendent Dr. Ross Renfrow and senior JCPS officials…" and "bolstered and carried forward by Board of Education member Tracie Zukowski – aided by county officials' in an attempt to silence Dr. Jones and cover up her fraudulent activity.". It cited ongoing efforts by Zukowski and other school officials to "collaborate on internal efforts to hide the collusion." Jones also contended he was subjected to retaliation for "raising concerns of ongoing corruption" and that Zukowski and "other high ranking JCPS officials have been collectively working to create conflicts for Dr. Jones" to prevent him from meeting the terms of the probationary status "orchestrated" by Dr. Causby.

164. Jones referenced the January 16, 2020, release of two confidential emails between Jones BOE members and senior officials containing his claims of the "corrupt, retaliatory, and

hostile working environment that exists within Johnston County Public Schools" and stated it was an "admitted mistake on the part of JCPS officials".

165. Nowhere in Jones's letter is there any mention of Johnson.

166. On June 24, 2020, Bennett Jones and the BOE entered into a settlement agreement for $53,000. The Board denied any liability and "emphatically asserts that it did not violate any of Dr. Jones' rights under applicable law or policy, and that it did not commit any tort against Dr. Jones."

167. As part of the settlement with the Board of Education, Jones agreed to "forever discharge and release the Johnston County Public Schools and the Johnston County Board of Education and its current or former members...from any and all liability, claims, demands, rights, actions or causes of action of any kind or character whatsoever, whether at law or equity, known or unknown, which they now have or hereafter may have, arising out of or on account of the facts, circumstances, or claims asserted by Dr. Jones, or that could have been asserted by Dr. Jones or in any way arising from Dr. Jones' employment conditions..."

168. The settlement between Jones and the Board also included a stipulation that "the parties will not institute any legal or administrative proceedings against any other party pursuant to any other laws, states, local or federal, as to any matter based upon, arising out of, or related to any of the Released Claims.

169. Proof surfaced that BOE member Tracie Zukowski purchased a home in Oak Island on July 30, 2020, listed her home in Clayton for sale on August 20, 2020, but continued to keep her seat – as well as her taxpayer check for service on the BOE.

170.     On November 3, 2020, Johnson won re-election with a total of 53,011 votes, by far the highest amount received by any candidate. The second vote getter, Lyn Andrews, received 48,086.

171.     At the January 2021 BOE meeting, Johnson again engaged in protective activity. The BOE voted 6-1 for a $16,292 pay raise for Brooks Moore, then the Chief of Facilities and Construction for JCPS. The Joco Report published an article about the vote. Johnson was the only vote against the pay raise.

172.     On January 27, 2021, faced with mounting evidence that she had, in fact, as a BOE member engaged in a conflict of financial interest with her software company employer and the school system, along with irrefutable proof that for months she had no longer resided in Johnston County but had, in fact, sold her home and relocated to Oak Island, Tracie Zukowski resigned from her seat on the BOE.

173.     On February 1, 2021, the JoCo Report published an op-ed by (future) BOE candidate Michelle Antoine titled, "A Delayed Resignation: Johnston County Has a Continued Out of Control, Lawless Board of Education." Antoine recapped the circumstances surrounding Zukowski's controversial time on the board and addressed the unmistakable probability that board and administrative leaders were not only aware that Zukowski's conduct was in violation of her office but deliberately chose to look the other way. Antoine stated, "These Johnston County School officials acted outside of the law and didn't allow the voters to decide who would fill the seat Zukowski held. It appears they decided to forgo the election and wait until it had passed so they could make an appointment of their choice. They had the obligation if she wouldn't resign in August of 2020 to vacate the seat and appoint a temporary member until her expired term could be

36

determined November 3, 2020, by the citizens of the County. If the Attorneys counseling the JCBOE advised them to act in the fashion that they did, with full knowledge of the circumstances i this issue, our legal counsel is also in question."

174. On May 9, 2022, Johnson spoke with a woman who previously lived with Owen Phillips who described disturbing and abusive behaviors by Phillips while she lived with him. On May 11, 2022, Johnson spoke with another woman who described similar behaviors.

175. Johnson was troubled by what he had been told by the two women and he became concerned about the possible mistreatment of Phillip's children.

176. On May 16, 2022, Johnson spoke with Principal Bennett Jones about how school assignments were handled and mishandled. Johnson specifically asked whether a wellness check would be conducted on children if the school district evaluated whether the students' assignments were appropriate.

177. Town of Smithfield Mayor Andy Moore had previously contacted Johnson and made his own complaints about the assignment of his neighbor's children, who were attending out of district schools. Moore told Johnson at that time that something needed to be done about the reassignment processes and students going to schools out of district. Moore stated more children on his street went to other schools besides Smithfield Selma High School. Moore was concerned about the number of students transferring out of Smithfield area schools.

178. Johnson explained to Moore that he was not one of the board members pushing through the reassignments and that Johnson suspected it was other board members. Johnson told Moore that he believed that a notation was being made by Dr. David Pearce every time

a board member pushed through a reassignment without it going through the proper appeals process.

179. On May 31, 2022, Johnson recorded a closed session board meeting when the School Board began discussed reducing the salary of a school system employee because of her age and her disability. A Tharrington Smith school board attorney was present and did not counsel the Board that such considerations were improper.

180. Johnson believed that the discussions were improper, that they were not protected communications under the Open Meetings law, and he was afraid that the School Board would take an adverse action against the employee based on her age and disability. He determined that communicating the possibility of an adverse action involving her employment to the employee was necessary in order to let the employee know about the possibility that it might happen so she could be prepared to deal with it.

## CONTEXTUAL HISTORY OF ANGELA BARBOUR

181. In 2020, Angela McLeod Barbour (Barbour) was a nineteen-year teacher for Johnston County Public Schools, married and living in Benson with her husband and two daughters. She had a strong interest in politics, especially local, and aspired to hold an elected position in Johnston County, despite being a resident of Harnett County, despite denying that she had any political aspirations at her deposition.

182. Barbour had long been an enthusiastic supporter of Johnson's and would frequently post media articles about his actions on the Board of Education on social media, urging others to support his policies and later, in his 2020 bid for re-election.

183.   On November 14, 2020, Barbour and Johnson had their first sexual encounter. Over the next fourteen months they had approximately 10-12 additional encounters, often months apart.

184.   Johnson cut off all physical contact with Barbour at the end of 2021/beginning of 2022, a decision that made Barbour very upset and angry.

185.   On April 20, 2022, Barbour sat for a recorded interview with Tim Shipman to disclose any knowledge she had regarding Johnson. According to Shipman, the intended purpose was to get the information out publicly ahead of the May 17, 2022, primary date. The interview was the idea of Michelle Baker Haller, President of the Johnston County Republican Women's Group, of which Barbour had recently been named Vice-President. Haller reached out to Shipman and arranged for the interview to take place at her home.

186.   A month later, in May 2022, Barbour decided to author a 28-page account of her sexual involvement with Johnson. Barbour titled the manuscript "The Truth of a Subordinate" ("The Truth"). In addition to Barbour's detailed narrative of what she has sworn was an intense, continuous love affair spanning two years, she claims first-hand knowledge of Johnson's illegal activity, misconduct as a law enforcement officer, and his professional sabotage of many others – specifically Bennett Jones, Tracie Zukowski, and Jimmy Lawrence. Barbour provided copies of this manuscript to several people in Johnson's professional and political circles. It was later made available to Lt. Terry West, who conducted the personnel investigation into Johnson, and Investigator Hoffman, who included it as evidence in the State's criminal case.

187.   In June of 2022 Barbour created a detailed spreadsheet in Excel to document her contact with Johnson since their first in-person interaction. According to her sworn testimony,

39

the timeline was a comprehensive account of all her phone calls with Johnson. To supplement this timeline, Barbour used detailed billing statements from her cell carrier, which she highlighted and totaled incoming and outgoing calls between she and Johnson.

188. The timeline also contained entries for meetings between Johnson and Barbour, a selection of message content from texts, Facebook messenger, and Snapchat, as well as "quotes" from conversations between other individuals and/or Angela Barbour herself.

189. On September 1, 2022, an iPhone (iPhone XR) Angela Barbour had used until it became inoperable on May 7, 2021, was forensically extracted by the Town for use in its Internal Investigation of Johnson. A copy of the contents was turned over to Angela Barbour's attorney for her personal use and a copy given to Investigator Hoffman for the State's criminal investigation. The contents were not available to Johnson or counsel until May 30, 2025, at which point Johnson was over four months into serving his six-month active sentence.

190. On October 28, 2022, Angela Barbour applied for a domestic violence protective order against Johnson. Immediate relief was denied and Barbour dismissed the matter without reason or explanation on November 17, 2022.

191. Johnson deposed Barbour on September 22, 2025. Counsel went systematically through Barbour's timeline and addressed every entry. Barbour swore it was an accurate record of all calls between she and Johnson, and that if it was not on the timeline it did not happen.

**NOVEMBER 14, 2020**

192. According to Barbour's timeline, she first met Johnson at an event sponsored by the Johnston County Republican Women's Club on October 4, 2020, where she introduced

40

herself and offered to help with his campaign for re-election, which Johnson accepted. Before meeting face-to-face, Barbour was an ardent and frequent supporter on social media of Johnson's actions on the Board of Education.

193.    Later that afternoon Barbour met with a small group at Clayton Fitness, where Johnson rented a small office, to film a video for Johnson's campaign. The other volunteers were mostly former or current students of Johnson's. Johnson's wife, Jami, was also present and met Barbour.

194.    Johnson and Barbour spoke periodically via Facebook Messenger. Barbour placed campaign signs out and handed out Johnson's literature at poll sites during early voting.

195.    Barbour regularly attended Johnston County GOP events and recruited members for the JCRW's organization.

196.    On November 3, 2020, Johnson won re-election. On November 14th Barbour invited Johnson to Nina's, a restaurant in Clayton, so he could meet and thank several teachers Barbour said had also campaigned for Johnson. When Johnson arrived Barbour was sitting at a circular table with three other women he did not recognize. Johnson walked up to the table and sat with the group. Angela Barbour introduced them as "Allyson", "Carly", and "Tiffany".

197.    Barbour documented the following in her timeline:

| DATE | TIME | EVENT DESCRIPTION | NAME OF IND./ WITNESS TO EVENT |
|---|---|---|---|
| 2020.11.14 | 8:00pm | Met Ronald at Nina's | Tiffany Cipriani, Carley McLeod, Angela Barbour, Allyson Bond, Ronald Johnson |

198.    During the conversation, Johnson learned that Allyson was Allyson Bond. He did not learn the last names of Carly and Tiffany that evening. Johnson learned that other than Barbour, only Bond was a teacher. It also turned out that none of the women had campaigned for him as Angela Barbour had claimed.

199.    Johnson sat with the group for approximately 20 minutes, and Barbour bought Johnson an alcoholic drink, and was insistent that he drink it. Johnson did not consume the beverage because he does not like to drink alcohol.

200.    Johnson told the group he was leaving, and Barbour asked Johnson to walk with the group to another bar, Revival, approximately 0.2 miles from the restaurant. Johnson walked with them and waited while the women ordered drinks.

201.    Barbour stated she wanted to be on the Board of Education and asked for Johnson's help. Bond interjected and stated "Angie, you don't even live in Johnston County." Barbour responded that she was moving to Johnston County soon and apologized to Johnson for lying about her residency. Angela Barbour was a Harnett County resident.

202.    Johnson told Angela Barbour she could not work for the school system and be on the Board of Education at the same time. Barbour and Johnson walked outside to the patio area and continued talking.

203.    Johnson soon stated he needed to go and Barbour said she wanted to walk him to his car. Johnson then drove Barbour up to the entrance of Revival and left to go to the gym. Bond remembers Barbour returning to Revival about ten minutes after she and Johnson left the patio area. Barbour came back with a huge smile and told Bond upon returning, "I'm in trouble. I like him a lot." Barbour stated she was going to get Johnson somehow, and

42

told Bond, "Watch me." Bond asked if Johnson was married, and Barbour replied yes, but she didn't care.

204.    Soon after the four women decided to walk to Front Street Bar, along with three men they had socialized with inside Revival. During this walk Barbour twisted her ankle. The group stopped in an alley and took several photos with Barbour's phone, the first at 8:59pm.

205.    In "The Truth", Barbour wrote that immediately after hurting her ankle she told her friends "to call Ryan (her husband) but then said...no he won't come. He will be mad at me...Call Ronald. He will help me. The last thing I remember is getting in his car."

206.    During Johnson's criminal trial, Barbour testified she told her friends to call Ryan but then knew he "would be very irate and upset...as far as me being—having too much to drink and rolling my ankle. It would have embarrassed him, so I said, call Ron." Zellinger asked what happened next and Barbour responded, "He picked me up."

207.    Phone records show Barbour had been in contact with her husband via text throughout the evening and called him at 9:37pm, over a half hour after hurting her ankle. They spoke for three minutes. At 10:36pm Angela Barbour's phone was used to photograph Cipriani with one of the unidentified males.

208.    Johnson then received Facebook messages from Barbour stating that she had broken her foot and was afraid because there were some guys at Revival with a gun. Johnson called Barbour's cell phone at 11:23pm but her level of inebriation made her difficult to understand. Barbour asked Johnson to pick them up.

209.    Johnson returned to Revival, which was long closed. He could not locate any of the women so Johnson left the area. Barbour messaged him asking where he was and stated

43

she and Bond were at a different location and still needed a ride to Bond's house. Barbour, with Bond's assistance, sent Johnson the location, which was only a few minutes away from Revival. Johnson agreed to pick them up.

210.    Bond and Barbour came outside not long after Johnson pulled up. Bond informed him they had left Revival with the men they had been drinking with earlier that evening, and the house they were at belonged to one of the men named Matt. Johnson drove to Bond's house but Barbour would not get out. Bond asked Barbour if she was coming inside and Barbour stated she needed Johnson to take her home to Benson. Johnson agreed.

211.    Around the time Johnson was pinning down Bond and Angela Barbour's location, Angela Barbour and her husband Ryan began the following text exchange:

| Time | Sender | Text Message |
|------|--------|--------------|
| 10:37pm | Ryan Barbour | "You okay?" |
| 11:42pm | Angela Barbour | "Yelp having fu n" |
| 11:43pm | Ryan Barbour | (thumbs up emoji) |
| 11:44pm | Ryan Barbour | "Y'all still in Clayton?" |
| 11:44pm | Angela Barbour | "Yelp" |
| 11:45pm | Angela Barbour | "I'Mhurting" |
| 11:48pm | Ryan  Barbour | "Did y'all Uber?" |

212.    There were no more texts between Barbour and her husband until the following afternoon. Just after midnight Barbour texted her friends Tiffany Cipriani and Carley McLeod.

| Timestamp | Sender | Text Message |
|-----------|--------|--------------|
| 12:01:20 AM | Angela Barbour | "I'm with y'all right now." |
| 12:01:22 AM | Angela Barbour | "Yes" |
| 12:01:41 AM | Tiffany Cipriani | "Yes" |
| 12:01:55 AM | Angela Barbour | "I love y'all" |
| 12:02:20 AM | Angela Barbour | "I'm in trouble." |

44

| 12:02:23 AM | Angela Barbour | "lol" |

213. While driving Barbour home, Johnson asked Barbour about the guys with the gun at the bar, which she stated "was nothing." Barbour began talking about how she "liked" Johnson and how she was "in trouble" because she has wanted Johnson "for a long time." Johnson attempted to stop the line of conversation by telling Barbour to "chill." Barbour kept trying to hold Johnson's hand while Johnson was driving. Johnson patted her on the hand and said, "Calm down, we will talk about it later."

214. As Johnson got on the interstate, Barbour took off her seatbelt. She held up her cell phone and stated "Do you want to go Facebook Live Mister Board Member" while she was laughing. Johnson told her to stop. She began kissing Johnson's neck and grabbing his penis. Johnson pushed her back and told her to "chill." She fell back into her seat, brought her legs up from the floorboard, rotated in the passenger seat and kicked the steering wheel.

215. Barbour kept advancing, trying to pull at the elastic of Johnson's gym shorts. She put her face in Johnson's crotch area and started licking on top of Johnson's shorts as she was putting her hand in his pants, attempting to pull his penis out. She said, "You're going to let me suck your peter or I am going to bite it off." Johnson was afraid of crashing his car as he drove on Interstate 40..

216. Barbour performed oral sex while Johnson drove for approximately 3 minutes. Johnson did not ejaculate. After passing the Benson exits on Interstate 40 Johnson told Barbour that he did not know where he was, and she said, "It's okay I know where we are." Johnson told her he needed her to stop and help him get to where he was taking her. She then stopped performing oral sex and sat up in her seat.

217. Barbour told Johnson she was going through a divorce, and she was going to move to Johnston County. Eventually, Johnson and Barbour arrived at a single wide trailer where she told Johnson she lived.

218. Barbour did not get out when Johnson parked. Barbour then asked Johnson to help her get into the house because her foot was hurting. Johnson helped her to the door, which was unlocked. Barbour stated no one ever came out to the rural area. Barbour told Johnson her daughters were at their dad's house.

219. A vehicle pulled up driven by an unknown male. Carley McLeod got out and said she had to get home, got into her vehicle, and drove away. Johnson also got back into his car and went home.

### POST NOVEMBER 14, 2020 EVENTS

220. Johnson did not welcome the actions of Angela Barbour. He felt assaulted when she performed oral sex on him and believed he had been the victim of a First Degree Forcible Sexual Offense (GS 14-27.4).

221. In December 2020, Johnson contacted Defendant Tim Kerigan, Town of Smithfield Human Resources director, asking for information regarding the Employee Assistance Program (EAP), because Johnson was dealing with stress and trauma from his relationship with Angela Barbour.

222. He later sought an EAP referral at work about the event. No one at the Smithfield PD believed him when he described the first encounter between himself and Barbour as an assault.

223. The day after Johnson drove Barbour to her friend's home, Barbour sent him a message that she wanted to talk about what happened. Records show on November 16, 2020, at

46

8:03 am, Johnson called Barbour from his cell, (919) 320-3337, and they spoke for 23 minutes. Barbour apologized for being so intoxicated and stated she could not remember what happened. Johnson asked if she recalled anything after leaving Bond's house and she replied, "No....did we have sex?" Johnson said no. Barbour responded, "Damn, I missed my opportunity." Johnson was unsure if Barbour genuinely did not remember.

224. Barbour continued to contact Johnson through Facebook messenger and text. Johnson called Barbour from his cell phone on the 19th, and she talked about her unhappiness at home and desire to divorce her husband. Barbour made comments in text that indicated she was not being completely honest about her memory the evening Johnson drove her home. She wanted to meet in person.

225. Soon after Johnson met with Barbour to discuss the events of that night. Johnson told Barbour she had been aggressive and performed oral sex on him while he was driving. Barbour wanted to know if he ejaculated, and Johnson said no. Barbour apologized and seemed embarrassed. Johnson told her they would stay friends, as they both had similar interests in politics and a genuine desire to improve the school system.

**BARBOUR'S VERSIONS OF HER RELATIONSHIP WITH JOHNSON ARE INCONSISTENT AND UNRELIABLE BUT WERE ACCEPTED AND PERPETUATED BY DEFENDANTS WHO CONSPIRED TO REMOVE JOHNSON FROM HIS EMPLOYMENT AND HIS BOE SEAT.**

226. In April 20, 2022, while being interviewed by Tim Shipman, Barbour claimed the affair started two years before. Barbour started talking about the evening she and her friends went to Nina's: Johnson came there and the group spent some time conversing, Barbour asked Johnson to go to Revival for one drink, which afterwards he and Barbour "went out back and had great conversation. And that's the night the affair started, like, immediately the first time. No, we ,just...yeah. It was an...Yeah." Barbour admitted, "I

47

was too drunk. I mean I was really drunk...I mean, I had way too much to drink." She explained, "I was going through a bad time with my husband. I could not see my Mama because of COVID. I lost my best friend." Barbour then corrected, "Was losing her. That's that..That's not. I lost her in December...that just escalated everything because she got killed in a car wreck in December but had been best friends since kindergarten and we were best friends anyway." 6

227.    Barbour told Shipman she and Johnson sat outside and talked, then stopped from any further description of the evening with, "But I had a lot of drinks that night and things happened that should not have happened. I didn't know if we'd had sex that night. I was so drunk. I waited when I got home that next day. I was kind of in an awkward situation. I didn't know whether to call or text him, because I'd never really met him... met him, met him like that..." Barbour later continued, "I ended up calling him or texting him that next day. I honestly can't remember, and he replied back. I snapchatted him. I think it was a Snapchat. Not, it was a Snapchat...We didn't have Snapchat then. Sorry I called or text the next day and I asked him if we'd had relations because I honestly didn't know."

228.    Barbour told Shipman Johnson immediately confirmed that they did, in fact, have sexual intercourse. "He said he stopped me by the gym. And that we had sex, and I felt really guilty. Really, really guilty and embarrassed because I'd never cheated on my husband of 20 years."

---

6 As with the Shipman interview, Angela Barbour wrote in "The Truth" that in December of 2020 "my best friend since kindergarten was killed in a car wreck...I just prayed for my next visit with Ronald." Information from the extraction of Angela Barbour's cell phone identified the friend as Alicia Mabry Webb. Ms. Webb passed on November 22, 2020.

229. In "The Truth," written a month after the Shipman interview, Barbour stated she and Johnson sat outside and talked on the patio, where "he listened while I shared my unhappiness and at the time hatred for my husband..." Barbour stated Johnson asked her to walk him to the car and sit, where he kissed her and then dropped her off in front of Revival.

230. Unlike what Barbour told Shipman a month earlier, Barbour wrote that the following day she laid in bed all day until she "became brave enough to text...he called. He assured me we had not had sex, but I felt different. I felt like I had had sex."

231. Later in "The Truth," Barbour wrote about being in Charlotte with Johnson in late March of 2021 and upsetting him by talking to other men. In the next section Barbour writes, "Silence filled the next two weeks because he shared he didn't know if he could trust me. I was hurt, but he eventually came back around. We took mini vacations to the Marriott at Raleigh to be able to see one another as much as we could...It was here we both looked at each other and shared that we loved one another. He finally became comfortable enough to me to share we did have sex our first night in Clayton; he was always just worried to tell me because I was so drunk he was fearful I would have accused him or rape. He took me through the back of the gym and was careful to avoid the cameras and took me to his office. Our nights/weekends at the Marriott might have been short, but they were definitely filled with plenty of passion. I continued to step out of my comfort zone and took a trip to Cancun with a best friend."

232. The history of events Barbour gave Shipman is completely inconsistent with Barbour's timeline and phone records.

233. For example, Barbour did not include any visits to a Marriott or any hotel, in Raleigh or any city, during April or May of 2021. Records showed that after April 14, 2021, they did not speak on the phone for at least three weeks.

234. Court records showed that on April 6, 2021, Barbour totaled her vehicle and was charged with DWI. Messages from the forensic extraction of her phone show that days after the DWI she went to the beach with her husband and children. By mid-April Barbour expressed to several of her friends that Johnson was avoiding her.

235. As another example of the inconsistency of Barbour's descriptions of her whereabouts in relationship to Johnson, the Cancun trip with Barbour's friend (Erin Clarke) she refers to in her timeline did happen, but not on the date she indicated, rather over March 7-10, weeks before she was in Charlotte.

**BARBOUR'S CONSPIRACY WITH LAWRENCE, WEST, POWELL, AND SCOTT TO RELY ON FALSE INFORMATION TO TERMINATE JOHNSON'S EMPLOYMENT AND WITH DOYLE, HOFFMAN, ZELLINGER, AND JAMES TO REMOVE JOHNSON FROM HIS SCHOOL BOARD SEAT**

236. On July 5, 2022, Barbour was interviewed by Lt. Terry West at Smithfield PD in Johnson's Administrative Investigation. Barbour was accompanied by her attorney Andrew Dickerhoff, an associate in Jimmy Lawrence's firm. West asked when their first sexual encounter happened. Barbour could not recall the date and suggested first the end of November, then the end of October, until her attorney Dickerhoff referenced Angela Barbour's timeline and provided her and West with the November 14, 2020, date.

237. West asked where it happened and Barbour replied, "The first time we had sex was . . . in Clayton, Clayton. Yes, Clayton fitness. I didn't know we had sex that night. He didn't tell me until months later we had sex that night because I was so drunk that he was scared

50

that I would accuse him of rape." West asked if Johnson ever forced himself on her or anything like that and Barbour said, "No. I just don't remember having sex that night."

238. Investigator Hoffman interviewed Barbour for his criminal investigation on October 31, 2022, and conspicuously omitted contradictory details in her interview. Nowhere in his seven-page summary of her interview does he mention speaking with Barbour about the first night she and Johson had a sexual encounter.

239. On November 4, 2024, over two years after being interviewed by Hoffman, Barbour had her first interview with Special Prosecutors Zellinger and James. At that time, Johnson's criminal trial was scheduled to begin December 2, 2024. (It was later continued to January 6, 2025.) According to their interview summary, Barbour said the first time she met Johnson was when she was receiving an award at the Board of Education, but did not provide a date. (As noted above, her timeline stated she first met Johnson at a JCRW event on October 6, 2020, where she introduced herself and offered to volunteer for his campaign).

240. Barbour told Zellinger and James she then "ran into Johnson in 2020," and he asked her to be in a video. Barbour also offered another version of meeting Johnson, stating their relationship actually began in October, that it began as friendship but when she "invited him out with her and a group of teachers" they "had their first romantic encounter, he kissed her." The relationship "progressed to a sexual relationship in less than a month".

241. James's and Zellinger's interview summary also showed that Angela Barbour told them that she "was so intoxicated the night she met him; don't remember if they had sex; ended up talking with him over Snapchat told her they didn't have sex but later he told her they did have sex at Clayton Fitness, he did not tell her the truth because she was so

51

intoxicated; she did not remember consenting to sex that night; she did not find this out until they had been together for awhile."

242.    On January 10th, 2025, Angela Barbour's first day of trial testimony, Zellinger asked her the first time she met Johnson. Despite what she told Zellinger just two months earlier, Angela Barbour responded, "I met Ronald personally at the Republican Women's event...It was like the 100th anniversary celebrating the 19th Amendment." Later, "He got up and spoke, as all the people that were running for office did, and we just met and introduced ourselves. That was it."

243.    Zellinger asked about the evening in Clayton on November 14, 2020, and what happened once Johnson left Revival.

1.   Q. And then did he leave in his car at that point?
2.   A. He did. And I went. He dropped me off at the front of the bar, and I walked in back to meet my group of friends.
3.   Q. And then when was it that you ended up rolling your ankle?
4.   A. When we walked to -- it's a bar in Clayton. It's a white front house -- Tavern. That's what it's called.
5.   Q. Okay. And while you were walking there, did something happen?
6.   A. I twisted my ankle walking through the parking lot.
7.   Q. And what happened next?
8.   A. We went there. I sat, put my leg up, and then I told my friends to call Ryan, and then immediately I knew that my husband would be very irate and upset with the situation that had happened as far as me being having too much to drink and rolling my ankle. It would have embarrassed him, so I said, call Ron.
9.   Q. And what happened next?
10.  A. He picked me up.

244.    In every version Barbour identified the evening of November 14, 2020, as the date she first encountered Johnson on a more personal level, Barbour omitted that she did call her husband and told him about her ankle, that they were texting throughout the evening and

52

she told him she was hurting. Her husband expressed concern for her location and made sure she and her friends were using Uber.

245.    Barbour failed to mention that almost three hours passed between hurting her ankle and being picked up by Johnson, and that during that time she left with a group of three men she had never met and went to the home of one of them.

246.    Contrary accounts by Allyson Bond indicate hat after leaving the bar with the three men, Matt, who lived in the house they went to, lit a fire pit outside. The three women and four men sat outside and eventually ordered pizza. Barbour went inside and put an ice pack on her ankle and at first told Bond that her husband Ryan was going to pick her up. Bond then asked if Ryan could pick her up as well, since Bond lived close by.

247.    Angela Barbour testified under oath the following:

> Q. And then at this point in the night, had you been drinking?
> A. A lot.
> Q. So were you impaired?
> A. I was.
> Q. Can you describe for the jury how impaired you were?
> A. I was very impaired. Impaired to the point of it -- I had a lot of Titos.
> Q. What do you remember from the rest of that night?
> A. Not a whole lot. It's bits and pieces. Enough to know that I had had intercourse, because women can kind of tell that after the fact.
> Q. Okay.  And at some point in that night, did -- do you know where that occurred?
> A. Honestly, I'm pretty sure we had intercourse at my friend's house that he dropped me off at.
> Q. And so then did he leave you at your friend's house?
> A. He did.
> Q. And did anybody else see you with the defendant that night?
> A. My good friend Carly, as far as she saw him with me at my friend Tammy's house.
> Q. And was it the next day, I guess, that you realized that you may have had intercourse the night before?

53

A. Yes.

Q. Following that, what was your next communication with the defendant?

A. I -- I remember the next day or -- I don't think I talked to him maybe the very next day, but the next day or two I tried to reach out and apologize for my behavior and being so intoxicated and just saying I'm sorry for being so drunk.

Q. And what happened at that point? Did you talk to the defendant?

A. I did talk to him.

Q. And?

A. And he said that nothing happened, as far as he didn't really have -- didn't really have intercourse and he apologized, and no need to apologize and those kind of things.

Q. Okay. So immediately after, he said that you all did not have sex; is that correct?

A. Yes.

Q. And then some time later did you find out that you did have sex that night?

A. Yes.

        Later in direct, Zellinger revisits the subject:

Q. Okay. At some point did you find out that you had in fact had sex the first night that you had met the defendant?

A. I did. That was a while after.

Q. Okay. And how did that happen?

A. He was honest with me, because I asked him if we had sex, and he said he didn't want to tell me that we had sex because he was scared I would accuse him of rape."

248.    Barbour also testified at Johnson's trial that when she walked Johnson to his car and got inside, Johnson kissed her and "we continued kissing, and it led to other things." They had what Zellinger referred to as "some sort of romantic interaction."

249.    Yet, Barbour gave another version of events at her deposition on September 22, 2025. At that time, Angela Barbour said she performed oral sex on Johnson in his car while in the parking lot just before rejoining her friends inside.

250.　　On July 26, 2023, Johnson filed this action. Prior to that date, Angela Barbour had never stated, whether in her own documentation or during multiple recorded interviews, that on the evening Johnson joined her group she performed oral sex on Johnson in his car in the parking lot.

**ANGELA MCLEOD BARBOUR – POST NOVEMBER 20, 2020**

251.　　Beginning in 2018, Johnson utilized a paid app called Pinger, also known to Johnson as Sideline, that allowed users to communicate via text and phone using a different, unregistered number. Johnson admitted to Smithfield PD and under sworn testimony to being unfaithful to his wife over the course of their marriage and utilizing this app to keep his subscribed number from showing up on caller ID. He also used the app when placing calls in the course of his job as a detective, after realizing people were hesitant to answer a number that showed up as "Private" or "Restricted," and to keep his SP Department issued number from being blocked or possibly abused.

252.　　Barbour sent Johnson messages, especially when drinking, on his subscribed cell phone that were sexual in nature. On November 20, 2022, Johnson used a number generated by the Pinger app (919) 421-4545 to contact Angela Barbour.

253.　　Barbour saved the number in her phone under the name "Heather Jones." Johnson did not suggest this to Barbour, as she claimed multiple times when enhancing her account of the relationship between herself and Johnson.

254.　　On November 23 and 24, 2020,  Barbour placed several calls to Johnson using the new number, which she testified that she believed to be an entirely different device and later would refer to as a "burner phone."

255.    Johnson finally answered Barbour's call on November 23, 2020, after Barbour messaged him about the death of a friend, Alicia Mabry Webb, whom Barbour described as her "best friend since kindergarten."

256.    On November 27, 2020, Johnson called Barbour at 2:22pm using the Pinger number after she messaged needing to talk to someone, shaken from just leaving the funeral home. They spoke for 35 minutes during which Barbour cried and thanked Johnson for listening.

257.    An hour before reaching out to Johnson Barbour texted Tiffany Cipriani and Carley McLeod, "I just left the funeral home." The girls proceeded to plan a night out for the following evening to celebrate Cipriani's birthday. Barbour stated she told her husband it was only girls. At 1:35pm Cipriani texted, "Wanna do like last time, meet at the house at 5? Go from there." at 2:07pm Barbour replied, "Sounds like a PLAN to me." At that time she messaged Johnson that she needed someone to talk to. Immediately after hanging up with Johnson, at 2:58pm, Angela Barbour texted the group, "Do we need a ride?"

258.    The next evening, November 28, 2020, Angela Barbour met with Tiffany Cipriani and Carley McLeod at Manning's Restaurant in Clayton for a 6:15pm reservation. A picture of the three women drinking alcohol was taken with Angela Barbour's phone at 7:12pm. The following text messages were on Angela Barbour's phone:

| Timestamp | Sender | Text Message |
| --- | --- | --- |
| 9:19pm | Angela Barbour | "Cover for me" |
| 9:25pm | Angela Barbour | "Where are you" |

56

| 9:26pm | Carley McLeod | "Just want to know where you are" |
|---|---|---|
| 9:26pm | Angela Barbour | "I'm good" |
| 9:26pm | Carley McLeod | "Tiff wants to know we won't bother you Just need to know and the crew Knees (sp) asking" |
| 9:28pm | Angela Barbour | "I'm in bathroom...Lie for me" |
| 9:28pm | Angela Barbour | "Tell them I'm talking to Ryan or something" |
| 9:28pm | Angela Barbour | "I'm with R" |
| 9:39pm | Carley McLeod | "We leaving" |
| 9:39pm | Angela Barbour | "I'm on my way" |

259.    On that evening, Johnson and his wife were at the home of County Commissioner Jonathan Stovall and his wife Martha, along with at least five other people, celebrating a "Friendsgiving." Pictures of the gathering were posted publicly on social media. Johnson was not with Barbour, contrary to what she insinuated to her friends.

260.    In fact, Johnson and Barbour had not spoken since the previous afternoon when Barbour was upset. After the above text exchange with McLeod on November 28, 2021, Angela Barbour called Johnson using his Pinger number at 9:50pm, 10:24pm, 10:44pm, and 10:45pm.

261. However, in June of 2022, Barbour created a spreadsheet for her attorneys at Jimmy Lawrence's law firm that she and they claimed documented all of her contacts with Johnson.

262. The spreadsheet was turned over to Lt. West at Smithfield Police Department, who oversaw the Town's Internal Investigation into Johnson, and for Johnson's criminal trial, where it was used as an exhibit by the State.

263. West undertook no independent investigation of the events on Barbour's timeline, provided to him by Lawrence's law firm.

264. Hoffman undertook no independent investigation of the events on Barbour's timeline.

265. West and Hoffman both had access to a phone extraction of Barbour's phone that they obtained from David Marsburn. A review of the phone extraction would have provided multiple examples of inconsistences and inaccuracies in Barbour's account of her relationship with Johnson.

266. Barbour, Marshburn, West, Lawrence, Powell and Scott all conspired to provide a false narrative about Johnson's relationship with Barbour, painting a picture of it as a "dating relationship" when it was actually a series of random sexual encounters, only a few of which involved intercourse, and most of which involved Barbour performing oral sex on Johnson.

267. Barbour testified that she requested her billing statements from Verizon pertaining details about her calls, and that she used those, text messages, and past social media content in the creation to populate the timeline in an Excel spreadsheet format that she and her attorneys at Lawrence's law firm provided the Town to support their allegations that Johnson and Angela Barbour were involved in a "dating relationship."

268. However, a comparison of Barbour's calls between her spreadsheet and detailed billing statements, and further cross-referencing against the forensic extraction of her own cell phone, show that Barbour's timeline of events of her relationship with Johnson, adopted by Marshburn, Hoffman, West, Powell, and Scott, involved phone calls, but it did not reveal any "dating relationship" described by Angela Barbour and her attorneys at Lawrence's law firm, or by West, Powell, and Scott in their termination recommendations for Johnson.

269. The contents of Barbour's cell phone extraction and detailed billing statements were not available to Johnson or counsel until May of 2025. On September 22, 2025, Barbour was systematically questioned about every entry and swore to the accuracy of each event on her timeline during deposition.

270. Barbour had a pattern of omitting calls to Johnson when he did not answer or went to voicemail, evidenced by a comparison with her detailed billing statements that she said were used to create the timeline and the timeline itself and the phone extraction.

271. In addition, Barbour inaccurately inverted names to show Johnson was the caller, and she was the recipient on her timeline multiple times.

272. Finally, billing statements indicating communications on certain days were missing from the records she provided to the Town.

273. Just as an example, the chart below details calls between Angela Barbour and Johnson from the evening of November 28, 2020, through December 10, 2020, and compares the timeline to actual billing information.

59

| Date | Time | Length | Caller Number Used | Recipient | Angela Barbour's Timeline |
|------|------|--------|--------------------|-----------|---------------------------|
| 2020.11.28 | 9:50pm | 4 min | Angela Barbour (Pinger) | Johnson | |
| 2020.11.28 | 10:24pm | No answer | Angela Barbour (Pinger) | Johnson | Omitted |
| 2020.11.28 | 10:44pm | No answer | Angela Barbour (Pinger) | Johnson | Omitted |
| 2020.11.28 | 10:45pm | 2 min | Angela Barbour (Pinger) | Johnson | |
| 2020.12.01 | 2:47pm | No answer | Angela Barbour (Pinger) | Johnson | Omitted |
| 2020.12.01 | 3:26pm | 13 min | Johnson (Pinger) | Angela Barbour | |
| 2020.12.02 | 9:51 am | No answer | Angela Barbour (Pinger) | Johnson | Omitted |
| 2020.12.02 | 10:20 am | 2 min | Johnson (Pinger) | Angela Barbour | |
| 2020.12.02 | 10:24 am | 8 min | Angela Barbour (Pinger) | Johnson | Has Johnson as caller |
| 2020.12.02 | 9:33pm | No answer | Angela Barbour (Pinger) | Johnson | Omitted |
| 2020.12.02 | 9:34pm | 2 min | Angela Barbour (320-3337) | Johnson | |
| 2020.12.02 | 11:24 am | No answer | Angela Barbour | Johnson | Omitted |

| Date | Time | Length | Caller Number Used | Recipient | Angela Barbour's Timeline |
|------|------|--------|--------------------|-----------|---------------------------|
| | | | (Pinger) | | |
| 2020.12.03 | 2:52pm | 16 min | Angela Barbour | Johnson | |
| 2020.12.04 | 1:39pm | 3 min | Johnson (Pinger) | Angela Barbour | |
| 2020.12.04 | 2:13pm | No answer | Angela Barbour | Johnson | Omitted |
| 2020.12.04 | 2:25pm | No answer | Johnson (Pinger) | Angela Barbour | |
| 2020.12.06 | 2:24pm | 26 min | Angela Barbour (Pinger) | Johnson | |
| 2020.12.07 | 1:55pm | 18 min | Angela Barbour (Pinger) | Johnson | |
| 2020.12.08 | 1:42pm | 9 min | Angela Barbour (Pinger) | Johnson | |
| 2020.12.08 | 8:39pm | 4 min | Angela Barbour (320-3337) | Johnson | |
| 2020.12.08 | 8:45pm | No answer | Angela Barbour (320-3337) | Johnson | Omitted |
| 2020.12.09 | 2:15pm | 12 mins | Johnson (320-3337) | Angela Barbour | |
| 2020.12.09 | 6:10pm | 2 mins | Angela Barbour (Pinger) | Johnson | |

| Date | Time | Length | Caller Number Used | Recipient | Angela Barbour's Timeline |
|------|------|--------|--------------------|-----------|----------------------------|
| 2020.12.09 | 6:13pm | 15 mins | Angela Barbour (Pinger) | Johnson | |
| 2020.12.10 | 4:45pm | 2 mins | Johnson (Pinger) | Angela Barbour | |
| 2020.12.10 | 5:15pm | 2 mins | Johnson (Pinger) | Angela Barbour | |

274. The fact that West, Powell, and Scott did no investigation of Barbour's allegations and relied solely on statements and "documentation" provided by Barbour and her attorneys at Jimmy Lawrence's firm is clear evidence of a conspiracy to terminate Johnson's employment. Marshburn's publication of defamatory statements about Johnson and his receipt from Barbour of information, which he also made no attempt to verify or confirm, and the Town relying on Marshburn's broadcasts without investigating whether or not they contained true information, is also evidence of a conspiracy to terminate Johnson's employment as a law enforcement officer.

275. When those facts are combined with the Town's sharing of false information provided by Barbour to Hoffman and Doyle after Johnson repeatedly refused to resign from office, there is also evidence of a conspiracy to ensure that Johnson was removed from his elected seat on the BOE.

276. Barbour made statements like the following to Lt. West during her July 5, 2022 interview, prior to providing West with the timeline and (incomplete) billing statements: "You should see my phone records, was talking to me 25,000 times a day", and "I have every single phone record between us and you can see who the one was instigating the

62

calls." These exaggerated statements could not be confirmed if the actual phone extraction had been reviewed.

277. On Angela Barbour's second day of testimony in Johnson's criminal trial, on January 13, 2025, Barbour testified about her timeline:

> Q. How did you remember all the phone calls?
>
> A. I asked -- I pulled up all my phone calls from Verizon online, and literally printed them all out. And I used two color highlighters; one for where he called me, and one for where I called him. And then I documented every single time, because when I get called crazy, I'm not crazy, I wanted to prove that he contacted me more than I contacted him.

278. Barbour's testimony about her phone calls with Johnson was offered even though it known to be inconsistent with the phone extraction provided to Hoffman, Doyle, Zellinger, and James, by the Town of Smithfield who obtained it from the phone provided by David Marshburn to West, Powell, and Scott.

279. Prior to Johnson's termination which relied heavily on Barbour's characterization of the relationship, and despite having Barbour's phone records and an extraction of her phone, no effort was extended by the West and the Town to determine the truthfulness of her statements or veracity of the information contained in a timeline she created and provided for use in Johnson's Internal Investigation. Nor did West and the Town make any effort to look into Barbour's truthfulness and credibility with regards to Johnson's statements in his defense.

280. The forensic extraction of Angela Barbour's phone, obtained by West as part of his personnel investigation, and provided to Hoffman for his criminal investigation, showed

multiple searches for information on Johnson's address, salary, marriage and BOE history.

281.    Multiple entries in Barbour's timeline that were for alleged "trips" or meetings with Johnson were easily determined to be misrepresented or completely falsified, using the very information the Town solicited or was provided for its investigation.

282.    For example, Barbour's timeline claimed that Barbour met Johnson at the Comfort Suites in Clayton on December 10, 2020, at 5:30pm.

283.    In "The Truth," Angela Barbour's manifesto provided to Tim Shipman, David Marshburn, Bennett Jones, Hoffman and many others, Barbour described the evening of December 10, 2020. Barbour stated that she picked Johnson up and together they drove to the hotel. "He entered one way and directed me to enter another and demanded that I wear a mask even though one was not required at the time. I resisted but was told it was not an option. We met that evening for another night of great conversation and great passion."

284.    On December 10, 2020, at 4:52pm, Angela Barbour's phone records indicate that Angela Barbour took a picture with her phone of her and an unidentified female inside a bar while in Garner. Phone records show Angela Barbour was in Clayton after 5:00pm, talking to Tiffany Cipriani. Later, phone records show that at 5:30pm, Angela Barbour was on the phone with her husband and continued to text him after the call ended. Finally, at 8:18pm, phone records show that Angela Barbour placed a call to her husband's phone while in the Goldsboro area, and thereafter, she went straight to Benson. The following morning at 11:11 am Barbour texted her husband, "Wanna date night tomorrow night?"

285.	In Shipman's interview in April 2022, after Barbour told him about meeting Johnson the night of November 14, 2020, and their conversation the day after, she stated they then stayed away from each other, other than talking on the phone. Barbour stated, "It was a good while before we seen each other the next time. December rolled around or January rolled around. And he asked me to, no, December rolled around. And he asked me to go to Virginia with him."

286.	In Barbour's interview with Shipman in April 2022, she made no mention of the Comfort Suites meet-up or even seeing Johnson for well over a month after the night he drove her to Benson. The interview with Shipman was only a month before Barbour wrote "The Truth."

287.	Johnson admitted that he told Barbour he was going to Virginia Beach the weekend of December 18-20 to purchase collectible figurines and comic books. Barbour asked where he was staying. Johnson stated he told her the wrong hotel because he thought there was a chance she might just show up. This is corroborated by internet searches in Barbour's phone for "westin VA Beach, and a saved entry found in the Notes section of her phone stating: "Westin VA beach Galilee road." Barbour's timeline stated she stayed at the Sheraton in Virginia Beach, but she told Tim Shipman in April 2022 she stayed at a Marriott, and that the registration had been under Johnson's name

288.	Barbour admitted she told her husband she was attending a teacher's conference that weekend, but contended that Johnson told her to do so. An entry created in her phone calendar showed she was attending a conference called the "Superhero Literacy Initiative."

289. In "The Truth," Barbour offered an explanation of these events: "(Johnson) then manufactured an entire ruse for me to travel to Virginia Beach with him the weekend before Christmas. '"Here, I have created this binder for you to place on your bar at home so that Ryan will see you are prepping for a conference. We will have the best time. Tell your husband you are going with your friend Heather."'

290. During trial testimony, Barbour stated "He created this—the ruse was – to be honest, the ruse was – what he told me was he created a binder for this convention I was attending the weekend before Christmas, and I was to pretend I was going to a superhero comic book reading elementary event for teachers. I still have that binder.7 And he wanted to meet and just have a weekend with me in Virginia."

291. There was no ruse, at least not on Johnson's end. The "Superhero Initiative" was a real literacy program Johnson had designed in 2019. The Smithfield Weekly Sun included a writeup in its report on the November 12, 2019, BOE meeting on Johnson's pilot program, describing it as a "Superhero Initiative" to furnish comic books to third graders to encourage reading.  In addition, on December 19, 2019, the JoCo Report quoted Johnson in a story they ran on him after he formally filed for his second term: "Now, I want to implement my Johnston County Schools Superhero Initiative, a literacy program I designed to improve reading comprehension and help students develop a positive relationship with police officers."

292.  A screenshot taken from the article showing the quote and a picture of Johnson was located in the extraction of Angela Barbour's cell phone which was available to Doyle,

---

7 Neither Investigator Hoffman or the Special Prosecutors took the binder into evidence. Angela Barbour stated at Johnson's during her deposition on September 22, 2025, that she still had it in her possession.

Hoffman, Zellinger, James, West, Powell, Scott, and anyone else who cared about the accuracy of Barbour's allegations against Johnson or her credibility.

293. Barbour recorded the entry for the weekend of December 18, 2020, in her timeline:

| DATE | TIME | EVENT DESCRIPTION | NAME OF INDIVIDUAL WITNESS TO EVENT |
|---|---|---|---|
| 2020.12.18 | | Trip to Virginia Beach – Sheraton Virginia Beach Hotel | Angela Barbour/ Ronald Johnson |
| 2020.12.19 | Mid morning | Breakfast at Pocahantas Pancake | Angela Barbour/ Ronald Johnson |
| 2020.12.19 | dinner | Pelon's Baja Grill Oceanfront | Angela Barbour/ Ronald Johnson |

294. Barbour testified at trial and during her deposition that she and Johnson did not ride together in the same vehicle, because he told her that "If there was an accident, we would not be able to explain it." Barbour acknowledged Johnson went to Virginia Beach before she left. When asked by Zellinger, "What did you all actually do over the weekend?" Angela Barbour replied, "We stayed in the hotel room and then went and had breakfast and dinner."

295. Had any attempt been made by anyone who cared about the true nature of the relationship between Johnson and McLeod, phone records and Barbour's statements to Tim Shipman did not depict a romantic weekend in Virgina Beach, but a lonely one for Barbour. It also would have shown evidence of how Barbour's claims against Johnson changed over the course of multiple statements and interviews, with details fed to her by Shipman and others along the way in a collaborative effort to retaliate against Johnson and force not only his termination, but his removal from the BOE.

67

296.     Phone records showed Barbour arrived in Virginia Beach after 1pm on December 18, 2020, and that Barbour maintained contact with her husband throughout the day by phone and text while in Virginia Beach, even exchanging 23 messages with him between 8 to 9pm, and telling him she loved him.

297.     Barbour's timeline contained no entry for a meal on the evening of December 18, 2020, but at some point Barbour and Johnson connected because both testified under oath they had sexual intercourse at some time during the weekend in Virginia Beach.

298.     Barbour told Shipman, "He told me we were going that weekend to try to find information on individuals. But this was after the fact, I found this out after the fact." When asked by Shipman who the individuals were and what information Johnson was seeking, Angela Barbour said Dr. Bracy (current JCPS Superintendent) and April Jones Lee's husband.

299.     When Shipman pressed her for more information about why those particular people, Barbour stated that Johnson did not go into details, only that "I think he knew Bracy came from Virginia or somewhere up there, had family, and he was looking for information on him. And he said ..was going to get, like he wanted to go see if he could get information on April Lee's husband, which was a ruse because he knew I was best friends with April Lee and he was trying to get dirt on April Lee."

300.     Minutes later in her interview with Shipman, Barbour reiterated, "He left me that Saturday to go somewhere and stayed gone for a long time. Pretty much all day." When Shipman asked where Johnson went, Barbour responded, "No, he said he was just going to get information, but he left me pretty much all day in a hotel."

68

301. Shipman then stated, "He could have gone to Northampton County, North Carolina, which is there on the Virginia Border. Bracy has been there, but he never lived in Virginia Beach." Barbour repeated, "Well, he never told me where he was going." Shipman stated, "He went to Northampton County." Barbour reaffirmed, "He didn't come back til that evening because it was late when we had dinner that night. He stayed gone all day and I was upset I had driven all the way to Virginia Beach to be left in a room by myself all day."

302. A month later, however, Angela Barbour painted a very different picture of the weekend described to Shipman in her description of it in "The Truth:"

> Virginia Beach arrived and it was everything I had expected for the most part...Dinner was delicious food and white wine...watching people walk up and down the boardwalk and sharing stories of our childhood...some good, some bad... but all very REAl." Angela Barbour stated that on Saturday, "Ronald shared he needed to leave me as he needed to go meet someone regarding information pertaining to April Lee's husband and Dr. Bracy. It was then I had my very first real question for Ronald. Are you using me to get information on my best friend? He said no...absolutely not...He would not go into details, and said the less I knew, the better off I was. He shared that he wanted to gain information on Dr. Bracy so that he could use it as leverage on future decision-making pertaining to the Board of Education. The day passed...Ronald stayed gone all day, and I took advanatge of an empty hotel room and slept. When Ronald came back, he swept me up, and it was if he was never gone...Conversation, passion, and then dinner.

303. On October 31, 2022, Angela Barbour was interviewed by Investigator Hoffman in his criminal investigation of Johnson. Hoffman's typed summary stated, "(Johnson) asked (Barbour) to travel to Virginia with him to get information on Dr. Bracy (current JCPS Superintendent) ...Dr. Bracy has ties to the NC/VA borders near Roanoke Rapids. On Saturday (Johnson) said he had to go somewhere with April Lee's husband. Ms. Lee is the Johnston County President of the NCAE. He was gone for 4-5 hours. Ms. Angela Barbour has no idea if he got or didn't get anything."

69

304.    Digital evidence available showed that what actually happened on that weekend was that that Johnson spent the day doing exactly what he had planned to travel to Virginia Beach for – he purchased multiple comic book figures.

305.    A screenshot located in his Cloud showed a conversation between Johnson and "VA Beach James," with Johnson confirming on December 15th that they were still meeting the following weekend. In the message to "VA Beach James," Johnson stated that he was leaving Saturday night.

306.    On Saturday, December 19, 2020, at 8:07pm, Johnson sent a PayPal payment to another vendor named Joffrey Sinong for $585.00. Multiple pictures and short videos from Johnson's Apple account show boxes of collectibles.

307.    A follow-up text from Johnson to "VA Beach James" stated he would be returning the weekend after Christmas for the rest of the items he purchased.

308.    Phone records on Sunday morning, December 20, 2020, show Barbour and her husband texted steadily from 7:30 am until Barbour called Johnson at 8:03am, indicating they were not together in the same location. Barbour and Johnson spoke for 15 minutes, and then Barbour called her husband before departing for home shortly after 9 am.

309.    Yet in "The Truth," which was given to law enforcement and clearly read by people like Todd Sutton, Jimmy Lawrence, Bennett Jones and David Marshburn, Barbour described the time together as a complete weekend, and as stated above, "everything [she had] expected for the most part, even though it included at most one incident of intercourse and dinner.

310.    After that weekend and over the holidays, the following calls were exchanged between Johnson and Angela Barbour:

| Date | Time | Length | Caller Number Used | Recipient | Angela Barbour's Timeline |
|---|---|---|---|---|---|
| 2020.12.21 | 11:27 am | 16 min | Johnson (Pinger) | Angela Barbour | |
| 2020.12.22 | 3:38pm | 20 min | Angela Barbour (Pinger) | Johnson | |
| 2020.12.24 | 11:55 am | 12 min | Angela Barbour (Pinger) | Johnson | |
| 2020.12.30 | 1:17pm | 6 min | Johnson (Pinger) | Angela Barbour | |
| 2020.12.31 | 6:42pm | 3 min | Johnson (Pinger) | Angela Barbour | |
| 2020.12.31 | 8:23pm | 5 min | Johnson (Pinger) | Angela Barbour | Omitted |
| 2021.01.01 | 12:02 am | No answer | Angela Barbour (Pinger) | Johnson | Omitted |
| 2021.01.01 | 12:29 am | No answer | Angela Barbour (Pinger) | Johnson | Omitted |

## BARBOUR AND JOHNSON "RELATIONSHIP" IN 2021

311.    On January 12, 2021, at 3:38pm, Barbour texted Darryl Mitchell, the head of the Johnston County Republican Party (JCGOP): "Hey friend, it's me, Angie. I'm trying to pull myself up by the bootstraps and I have a question. What are the policies or procedures in regards to running for the Board of Education? Can I find that on the board of election webpage? I'm looking...but I'm honestly not seeing requirements for Board of Education. I'm still looking though."

71

312. Barbour texted again stating: "I'm trying to find out if I can be an educator in the same county and run for BOE? Do you know if there are bylaws against that?"

313. Mitchell texted Barbour back at 4:37pm, stating: "I thought it was there somewhere. I wish you could run. How many years do you have in?" Angela Barbour replied: "19."

314. On January 21, 2021, Angela Barbour texted Mitchell at 8:19pm: "I'm definitely interested in becoming more active and ready to serve. Please consider me."

315. Yet on multiple occasions Barbour has stated she only became involved in local politics at the insistence of Johnson, who was "grooming" her to help him in his political career.

316. On January 27, 2021, board member Tracie Zukowski resigned under mounting evidence of misconduct and growing public outcry.

317. Johnson and Barbour had multiple phone conversations throughout the remainder of January. After the entry for Virginia Beach on December 18-20, there was not another entry for in-person contact with Johnson on Angela Barbour's timeline for almost a month and a half, until January 29, 2021, at which time Barbour claimed she and Johnson had a tryst in Charlotte, NC.

318. Angela Barbour recorded the following entry in her timeline:

| DATE | TIME | EVENT DESCRIPTION | NAME OF INDIVIDUAL WITNESS TO EVENT |
|------|------|-------------------|--------------------------------------|
| 1/29/2021 | ALL WEEKEND | Trip to Charlotte – Marriott Trade Street 100 WEST TRADE STREET, CHARLOTTE, NORTH CAROLINA, USA, 28202 | Angela Barbour/ Ronald Johnson |
| 1/30/2021 | | Visited Night at the Roxbury 116 West 5th Street Uptown Charlotte | Angela Barbour/ Ronald Johnson |

72

319.    When interviewed by Tim Shipman in April of 2022, after describing her time in Virginia Beach with Johnson in December of 2020 as a "romantic" weekend, Angela Barbour stated "So Christmas came and Christmas went January um went  by and February we took out next trip...Charlotte."  Shipman asked if there was a reason and Angela Barbour replied, "Just a trip sir."

320.    When asked by Shipman where she and Johnson stayed, Barbour stated, "I will say the Marriott, but sir, I'm not quite sure. I think it was the Marriott. We always stayed at Marriotts." Barbour continued, "We stayed at a couple. I don't know all the different places we stayed in Charlotte. We stayed in different ones, but (Johnson) likes the Marriott."

321.    When writing "The Truth" just a month later, Angela Barbour narrated, "January also included an impromtu [sic] trip to Charlotte with just me and (Johnson) and a weekend to the Marriott for "Ally Bond's" (sp) birthday. That was the alibi anyway..."

322.    Barbour testified at Johnson's criminal trial designed to procure his removal from his BOE seat, on Friday, January 10, 2025, and resumed the following Monday, January 13, 2025.

323.    On her first day on the stand, Barbour was asked by Special Prosecutor Zellinger about any trips Barbour and Johnson took together, but Barbour did not bring up any January, 2021, trip to Charlotte but instead described a trip to Charlotte with Allyson Bond in March of 2021.

324.    On Monday, Barbour's second day of testimony, Zellinger published the timeline Barbour had created and the Court allowed her to use it to "refresh her memory."

73

Zellinger pointed out the January 29, 2021, entry and asked if that was the trip Barbour took with Bond. Angela Barbour responded, "This initial trip was just me and Ronald." Barbour stated they drove separately and stayed at the Marriott. Zellinger did not ask her anything further about that alleged trip to Charlotte.

325.  In fact, Barbour's testimony that she and Johnson were in Charlotte together the weekend of January 29, 2021, was a lie and any investigation into the facts would have clearly evidenced that it was false. The entry Angela Barbour documented about being with Johnson the weekend of January 29, 2021, was fabricated, despite her sworn testimony that she used her Verizon statements and messages to create her timeline.

326.  This false narrative that Barbour and Johnson jointly planned trips together out of town as part of their "many" encounters and their "dating relationship" was adopted and published by Defendants Barbour, Marshburn, West, Powell, and Scott. It was not investigated, intentionally. and the repetition by others, as the truth and the West, Powell, and Scott based Johnson's termination on it, knowing that they had not investigated the veracity of Barbour's allegations.

327.  This same false narrative published by Defendants Shipman, Hoffman, West, Scott, Powell, Barbour, Marshburn, Sutton, Lyn Andrews and Kevin Donovan was used to remove Johnson from his BOE seat, despite either knowing that the narrative was false or willfully failing to investigate the narrative's veracity.

328.  Had any of the Defendants reviewed the phone extraction procured by West, provided to Hoffman, and available to the other defendants, they would have seen the following texts between Barbour and her husband on January 29, 2021, the weekend Johnson claimed to be having a "romantic" weekend in Charlotte:

74

| Date | Timestamp | Sender | Message |
|------|-----------|--------|---------|
| 2021.01.29 | 3:51pm | Angela Barbour | "Imma take her to dance. She an't gonna site here and watch vampire diaries." |
| 2021.01.29 | 3:52pm | Ryan Barbour | "Good. I'll pick her up." |
| 2021.01.29 | 7:39pm | Angela Barbour | "You got Gracie?" |
| 2021.01.29 | 7:39pm | Ryan Barbour | "I do and Sadie just got home to" |
| 2021.01.29 | 7:40pm | Angela Barbour | "I am at the most fun...I have met complete strangers...And just talking about education in general and mask and etc. Etc." |
| 2021.01.29 | 7:40pm | Angela Barbour | "But we're talking about like older women and such not men or anything...LOL" |
| 2021.01.29 | 7:40pm | Angela Barbour | "I think I'll run for president" |
| 2021.01.29 | 7:41pm | Ryan Barbour | "You would be a lot better than we got now!!" |
| 2021.01.29 | 7:42pm | Angela Barbour | "I've just had the most fun...We've had our drinks bought by so many |

| Date | Timestamp | Sender | Message |
|---|---|---|---|
| | | | people...Because were teachers..." |
| 2021.01.29 | 7:42pm | Ryan Barbour | "Good have fun be safe please" |

329.     At 11:46pm, Barbour called her husband. Her billing statement shows that she was in Raleigh when the call was placed.

330.     Text messages exchanged between Barbour and her husband just after midnight while she was driving home after a night of drinking were easily located in the extraction of the iPhone:

| Date | Timestamp | Sender | Message |
|---|---|---|---|
| 2021.01.30 | 12:03 am | Angela Barbour | "Well I'll be home before tomorrow because I'm stuck in traffic apparently there has been a wreck somewhere. I cannot catch a break." |
| 2021.01.30 | 12:04 am | Ryan Barbour | "On 40" |
| 2021.01.30 | 12:05 am | Angela Barbour | "Yes" |
| 2021.01.30 | 12:16 am | Angela Barbour | "I'll be home next week" |
| 2021.01.30 | 12:16 am | Angela Barbour | "Oh0 wait wait cars might be moving...Hang on" |

| Date | Timestamp | Sender | Message |
|---|---|---|---|
| 2021.01.30 | 12:16 am | Ryan Barbour | "What da world" |
| 2021.01.30 | 12:16 am | Angela Barbour | "I'm telling you God is trying my patience...He's trying them" "I should already be home by now" |
| 2021.01.30 | 12:17 am | Angela Barbour | "I move and I will stop texting" |
| 2021.01.30 | 12:17 am | Ryan Barbour | "Drive safe" |

331.    Two calls on her phone later the morning of January 30th placed her in Benson, where Barbour lived with her family

332.    On January 30, 2021, at 3:59pm Ryan Barbour texted his wife "Y'all run away". Barbour responded, "Came to Dewayne's to get orange aide and fudge."

333.    Dewayne's is a gift shop and nursey located in Smithfield, North. Correspondingly, Barbour's phone records showed her receiving calls while located in Smithfield at 3:23pm and 3:29pm.

334.    The State had the extraction of Barbour's phone since October 19, 2022, when it was provided by Lt. West to Investigator Hoffman. Zellinger, James, and Hoffman denied knowledge of the extraction and only after Johnson's criminal attorney threatened to file a motion to compel on the eve of the first day of trial in January 2025 did they suddenly locate the file and extraction and provide it to Johnson's criminal attorney the following morning.

335. Johnson did not obtain the extraction until it was produced by the Town to his civil attorney on May 30, 2025.

336. The following calls were placed between Johnson and Barbour during from February 1, 2021, until March 5, 2021, and are shown with a comparison of Barbour's billing statements and timeline.

| Date | Time | Length | Caller (Number used) | Recipient | Angela Barbour's Timeline |
|------|------|--------|---------------------|-----------|---------------------------|
| 2021.02.01 | 3:27pm | 6 min | Angela Barbour (320-3337) | Johnson | |
| 2021.02.02 | 3:28pm | 4 min | Angela Barbour (Pinger) | Johnson | |
| 2021.02.02 | 6:48pm | 3 min | Angela Barbour (320-3337) | Johnson | |
| 2021.02.04 | 5:48pm | 1 min | Johnson (Pinger) | Angela Barbour | |
| 2021.02.04 | 5:54pm | 1 min | Angela Barbour (Pinger) | Johnson | Omitted |
| 2021.02.05 | 2:46pm | 9 min | Angela Barbour (Pinger) | | |
| 2021.02.08 | 3:50pm | No answer | Angela Barbour (Pinger) | Johnson | Omitted |
| 2021.02.08 | 4:54pm | 3 min | Johnson (Pinger) | Angela Barbour | |
| 2021.02.08 | 4:57pm | 8 min | Johnson (Pinger) | Angela Barbour | |
| 2021.02.09 | 2:45pm | 6 min | Johnson (Pinger) | Angela Barbour | |
| 2021.02.09 | 7:30pm | 3 min | Johnson (Pinger) | Angela Barbour | |

78

| Date | Time | Length | Caller (Number used) | Recipient | Angela Barbour's Timeline |
|---|---|---|---|---|---|
| 2021.02.11 | 2:55pm | 1 min | Johnson (Pinger) | Angela Barbour | Omitted |
| 2021.02.11 | 4:17pm | 4 min | Johnson (Pinger) | Angela Barbour | |
| 2021.02.11 | 8:43pm | 2 min | Johnson (Pinger) | Angela Barbour | |
| 2021.02.13 | 1:30pm | No answer | Angela Barbour (Pinger) | Johnson | Omitted |
| 2021.02.13 | 1:31pm | 17 min | Johnson (Pinger) | Angela Barbour | |
| 2021.02.16 | 5:09pm | 16 min | Angela Barbour (Pinger) | Johnson | |
| 2021.02.17 | 9:33 am | 1 min | Johnson (Pinger) | Angela Barbour | Omitted |
| 2021.02.18 | 6:59pm | 2 min | Johnson (320-3337) | Angela Barbour | |
| 2021.02.20 | 7:11pm | 2 min | Johnson (320-3337) | Angela Barbour | |
| 2021.02.20 | 11:03pm | No answer | Angela Barbour (Pinger) | Johnson | Omitted |
| 2021.02.21 | 2:44pm | 32 min | Johnson (Pinger) | Angela Barbour | |
| 2021.02.22 | 7:31pm | 4 min | Johnson (Pinger) | Angela Barbour | |
| 2021.02.23 | 2:27pm | 13 min | Angela Barbour (Pinger) | Johnson | |
| 2021.02.24 | 9:32 am | 3 min | Angela Barbour (Pinger) | Johnson | Enteredpm |
| 2021.03.02 | 10:43 am | 24 min | Angela Barbour (Pinger) | Johnson | |

| Date | Time | Length | Caller (Number used) | Recipient | Angela Barbour's Timeline |
|---|---|---|---|---|---|
| 2021.03.02 | 11:28 am | 15 min | Johnson (320-3337) | Angela Barbour | |
| 2021.03.02 | 3:17pm | 9 min | Angela Barbour (Pinger) | Johnson | |
| 2021.03.03 | 6:01pm | 5 min | Johnson (320-3337) | Angela Barbour | |
| 2021.03.04 | 10:51 am | 9 min | Angela Barbour (Pinger) | Johnson | |
| 2021.03.05 | 10:14 am | 7 min | Johnson (Pinger) | Angela Barbour | |
| 2021.03.05 | 12:17pm | 2 min | Johnson (Pinger) | Angela Barbour | |

337.   In 2021, Barbour began a practice of calling and sending Johnson messages suggestive of sex on his regular cell phone when he would not respond timely enough through the Pinger number, or when she was angry at Johnson and wanted to "get his attention." Johnson felt Barbour was subtly threatening him by doing this and did not know how else to appease her other than by maintaining contact and attempting to limit it.

338.   Barbour deleted all messages between she and Johnson, not only the ones through the Pinger number but also his regular cellular number, through April 26, 2021.

339.   On February 1, 2021, the JoCo Report published an op-ed by (future) BOE candidate Michelle Antoine titled, "A Delayed Resignation: Johnston County Has a Continued Out of Control, Lawless Board of Education." Antoine recapped the circumstances leading up to the January 27, 2021, resignation of controversial member Tracie Zukowski.

340.   On February 2, 2021, at 6:57pm, Barbour texted Darryl Mitchell: "Hi Darryl, just wanted to touch base with you about serving. Do you mind keep me abreast of anything I need

80

to do in order to participate?" This desire to be involved politically in the Republican party was inconsistent with Barbour's deposition testimony that she had no political aspirations.

341. At 7:00pm Mitchell replied to Barb: " "Sure. I'm tring to figure out how to work it. Board versus Ex Committee and how many. We'll talk soon. Convention end of March."

342. On February 16, 2021, at 5:27pm, Barbour reached out again to Darryl Mitchell: "Hi Daryl, I'm trying to make sure I don't make plans on the date of the convention. Could you possibly give me at least the day of the event so I don't double-book?" Mitchell responded:"March 25 but keep it under wraps."

343. On February 18, 2021, Johnson attended a BOE meeting at 5:00pm, at which a special session was held at 5:30pm, to discuss the method by which the BOE would appoint an individual to serve in the seat that had been vacated by Tracie Zukowski's resignation weeks before. On February 22, Johnson attended a special session meeting of the BOE to discuss the status of candidates for the vacant BOE seat.

344. In July of 2022, Barbour and her attorney both informed the Smithfield PD that on February 1, 2021, sometime after 3:27pm, Barbour met Johnson in the parking lot of the Rose Manor while he was on duty and they had a sexual encounter. However, Barbour's phone records contradict this account.

345. On February 1, 2021, Barbour's phone records showed that at 3:27pm, Barbour called Johnson on his cell phone number 919-320-3337.

346. Barbour's phone records also showed that Angela Barbour sent text messages after her 3:27pm call to Johnson indicating that she was picking up her daughter and making evening plans with her family.

| Time | To/From | Location |
|------|---------|----------|
| 3:27pm | Angela Barbour called Johnson | Benson |
| 3:33pm | Angela Barbour called her husband | Benson |
| 3:36pm | Angela Barbour called unknown number | Benson |
| 3:36pm | Angela Barbour called her daughter | Benson |
| 3:43pm | Angela Barbour called unknown number | Benson |
| 4:53pm | Angela Barbour called her husband | Benson |
| 5:17pm | Angela Barbour called her daughter | Coats |
| 5:22pm | Angela Barbour called her husband | Benson |
| 8:15pm | Angela Barbour called her daughter | Benson |

347.  Barbour's phone records showed that it would have been impossible or at least very unlikely that at or after 3:27pm, Barbour and Johnson met in Smithfield for a tryst in the Rose Manor parking lot.

348.  On March 1, 2021, Johnson attended a special session called by the BOE for a meeting to interview six candidates for the seat, and on March 3, 2021, Johnson attended another BOE meeting to nominate and elect a candidate to fill the Zukowski vacancy.

349.  Barbour and her friend Erin Clarke went to Mexico from March 7-10, 2021. In "The Truth," Barbour wrote: "Even in Cancun, Ronald and I found a way to talk daily...texting, Snapping, calling, and most excitedly Facetimes!!! It was the best feeling knowing someone was so excited for me to return home."

350.  The following are calls between Barbour and Johnson during Barbour's trip to Mexico, as compared with her timeline and time records:

| Date | Time | Duration | Caller | Recipient | Timeline? |
|------|------|----------|--------|-----------|-----------|
| 2021.03.07 | 4:21pm | 2 min | Barbour (Pinger) *called while in Mexico | Johnson | |
| 2021.03.07 | 4:23pm | No answer | Barbour (Pinger) *called while in Mexico | Johnson | Omitted |
| 2021.03.08 | 2:42pm | No answer | Barbour (Pinger) *called while in Mexico | Johnson | Omitted |
| 2021.03.09 | 9:42 am | 11 mins | This entry was on Barbour's timeline but is a call to another person, not Johnson | | |
| 2021.03.09 | 11:09 am | No answer | Barbour – Facebook Messenger Audio Call to Johnson | | Omitted |
| 2021.03.09 | 11:09 am | No answer | Barbour (Pinger) *called while in Mexico | Johnson | Omitted |
| 2021.03.10 | 9:33 am | No answer | Barbour – Facebook Messenger Audio Call to Johnson | | Omitted |
| 2021.03.10 | 9:34 am | 8 min | Barbour (320-3337) *called while in Mexico | Johnson | Has Johnson as the caller |

351.    Phone records show that although Barbour tried to contact Johnson each day by phone she only reached him on the last day. Barbour documented Johnson as the caller for the last two calls, but phone records show she placed those calls .Johnson's Facebook messenger also showed two missed calls from Barbour, both of which he did not answer, on March 9th and 10th.

352. On March 17, 2021, Barbour took multiple screenshots of the names of members in a newly founded group Angela Barbour had just joined, Citizens for Accountable Government (CAAG).

353. On March 23, 2021, Mitchell texted Barbour, "Hey Angie. Hope you are doing good. Who is the other convention ticket for that you purchased?" Barbour replied, "It was for my husband BUT he is no longer going. Just consider it a donation."

354. The following is Angela Barbour's next entry in her timeline Angela Barbour for in-person contact with Johnson:

| DATE | TIME | EVENT DESCRIPTION | NAME OF IND./ WITNESS TO EVENT |
|------|------|-------------------|-------------------------------|
| 2021.03.25 | 5:20pm | Wired in Smithfield Police Department parking lot prior to the Johnston County Republican | Angela Barbour/ Ronald Johnson/ David Tyndall |

355. Barbour has told law enforcement and swore under oath that she was "wired" by Johnson in the parking lot of Smithfield Police Department prior to attending the Johnston County Republican convention. In reality, Barbour was not "wired." Johnson and a fellow Smithfield PD officer, David Tyndall, loaned Barbour a key-fob style recording device.

356. The device belonged to Tyndall and was not the property of Smithfield PD. After the convention Barbour met Johnson at Buffalo Wild Wings in Smithfield to give the device for Johnson to return to Tyndall. Nothing was ever retrieved from the device.

357. Barbour's claim that she was "wired," which Barbour and Marshburn later expanded and described as "wired using Smithfield Police Department equipment," became one of the

Town's central reasons for opening the Administrative Investigation into Johnson after Marshburn made the allegations on his June 24, 2022 FB live broadcast.

358. Marshburn obtained this information from Barbour, published it on his FB live, and at the end of June the Town opened an internal investigation into Johnson based solely on the allegations broadcast by Marshburn on social media.

359. On June 27, 2022, Lt. West filled out a "citizen's complaint" form to document the initiation of the investigation. The form required the citizen providing the information to sign the form, but neither West, Powell, nor Scott required Marshburn to sign confirming the veracity of the allegations he made towards Johnson, even though they knew that Marshburn had made the statements. This deviation from procedure was only one of many during their investigation of Johnson.

## BARBOUR'S ACCOUNT OF MEETING JOHNSON IN CHARLOTTE IN MARCH 2021

360. Barbour recorded the following entry for the day after the GOP convention in her timeline:

| DATE | TIME | EVENT DESCRIPTION | NAME OF IND./ WITNESS TO EVENT |
|------|------|-------------------|-------------------------------|
| 2021.03.26 | ALL WEEKEND | Embassy Suites by Hilton Charlotte, 4800 S. Tryon St., Charlotte, NC | Angela Barbour/ Ronald Johnson/ Allyson Bond/ Lindsey (Ronald's cousin) |
| 2021.03.27 | Brunch | 5 Church 127 N. Tryon St. #8, Charlotte, NC | Angela Barbour/ Ronald Johnson/ Allyson Bond/ Lindsey (Ronald's cousin) |

| DATE | TIME | EVENT DESCRIPTION | NAME OF IND./ WITNESS TO EVENT |
| --- | --- | --- | --- |
| 2021.03.27 | Late lunch | Buffalo Wild Wings, 400 E. Martin Luther King Jr. Blvd, Charlotte, NC | Angela Barbour/ Ronald Johnson/ Allyson Bond/ Lindsey (Ronald's cousin) |
| 2021.03.27 | 8:00pm | Visited Night at the Roxbury 116 W. 5th St., Uptown Charlotte, NC | Angela Barbour/ Ronald Johnson/ Allyson Bond/ Lindsey (Ronald's cousin) |

361. Earlier in 2021, Johnson had mentioned to Barbour that he and his cousin Lindsey Johnson (Lindsey) were going to Charlotte to frequent the Roxbury nightclub at the end of March. Johnson and Lindsey were close and had been taking "road trips" together since 2015. Barbour asked if he and his cousin shared a room and Johnson stated he always got Lindsey her own room. Barbour stated she wanted to go to the Roxbury and suggested she and Allyson Bond also make the trip to Charlotte.

362. Barbour told her husband she and Bond were going to the IKEA store in Charlotte. The two women left on Friday, March 26, 2021. Barbour drove and Bond stated Barbour consumed alcoholic beverages while driving during the trip.

363. A lone picture from that evening on Barbour's phone showed a selfie taken of Angela Barbour and Bond at 7:37pm, which Barbour sent to her husband. At 8:34pm Barbour texted her husband, "Eating at Ale House."

364. There was no entry for dinner or the Ale House on the timeline for March 26, 2021. Later in the evening Bond and Barbour joined up with Johnson and his cousin Lindsey at the hotel. Barbour and Bond put their things in Johnson's room. Bond eventually stayed in Lindsey's room. Barbour and Johnson both stated they had sexual intercourse that first night in Charlotte on March 26, 2021.

365. The following morning the four ate brunch. Barbour ordered a mimosa carafe and drank all of it. After brunch they returned to the hotel and Johnson left Barbour alone for about four hours. The women hung out in the room, napped, and then walked across the street to Buffalo Wild Wings, where they stayed for a couple of hours. Bond stated they had appetizers and drank.

366. Johnson came to Buffalo Wild Wings but was annoyed when he found out Barbour had bought tequila shots for his cousin, which he had asked her not to do based on his cousin's alcohol tolerance. All four left that evening to go to the Roxbury, which has a dance floor set up on the first level and a bar upstairs.

367. Barbour and Lindsey went to order a drink upstairs and did not return. Eventually, Bond and Johnson wanted to leave so Bond went upstairs to find Barbour and Johnson's cousin.

368. A staff member approached Johnson while Bond was looking for them and told him that his cousin was too inebriated to remain in the club. Bond returned downstairs with Johnson's cousin and said Barbour was doing shots with some men and did not want to leave.

369. Johnson ordered an Uber and Bond took Lindsey up front while Johnson went to get Barbour. Barbour was buying shots for a group of college aged males. Johnson told her

87

they had to go right then, and Barbour became belligerent. Johnson went downstairs and joined Bond and his cousin, who was drunk and emotional, and waiting for the Uber. Eventually, Barbour came outside and was mad at Johnson and accusing him of leaving her to be raped.

370. At the hotel the four went into Johnson's room first. Barbour started making out with Johnson's cousin, stating, "I'm calming her down." Johnson took his cousin to the other room and stayed. Bond went back and forth between the two rooms and eventually stayed with Johnson and his cousin, because Barbour would not let her sleep. Barbour got upset and told Johnson if he did not come stay in her room she was calling her husband and telling him everything. Phone records show Barbour called her husband at 2:05 am and they spoke for six minutes.

371. Johnson and his cousin had driven to Charlotte separately. Johnson said a brief goodbye to the three women early the next morning, who were in different stages of alertness after the evening's events, and left Charlotte. On the way back to Johnston County Barbour vented to Bond about Johnson.

372. Barbour told Bond that she felt she and Johnson were going to end up making a life together and that even though Barbour had had her fallopian tubes removed years before, Barbour stated she was going to find a way to give Johnson a child. (Searches on Angela Barbour's phone showed she googled the possibility of pregnancy without fallopian tubes).

373. Barbour also told Bond she kept a list of people Johnson had made angry as a BOE member and mentioned Jimmy Lawrence and Board Chair Todd Sutton. Barbour told

Bond felt she had taken a lot of risks to be with Johnson, and if Johnson would not be with her then Barbour stated that she would make sure Johnson lost everything.

374. Johnson and Barbour spoke the following day. Barbour was convinced Johnson had left the Roxbury because she was buying drinks for other men and apologized profusely. Johnson told Barbour that he had a lot going on with his father's recent cancer diagnosis.

375. In the next few days, Bond contacted Johnson on Snapchat. She asked if Johnson was okay. Johnson responded he was doing the best he could and assumed that Bond was asking because Barbour must have shared with Bond that Johnson's father was suffering from cancer.

376. The next time Barbour documented seeing Johnson on her timeline was April 6, 2021.

| DATE | TIME | EVENT DESCRIPTION | NAME OF INDIVIDUAL WITNESS TO EVENT |
|------|------|------------------|-------------------------------------|
| 2021.04.06 | 5:15pm | Met at JCC Workforce Development Center 135 Best Wood Drive | Angela Barbour/ Ronald Johnson |

377. Barbour testified in her deposition she met Johnson in the parking lot of Johnston Community College's Clayton location on April 6, 2021, and performed oral sex on him.

378. However, in "The Truth," Barbour wrote that on April 6, 2021, she met Bond for drinks and then went to Smithfield to see Johnson and "spend some time with him."

379. Barbour also wrote, "It was this same night my other friend Erin said she needed a friend to talk to because she had received some serious news regarding her health. I don't even remember driving. On my way home I received a text asking if I was safe. As I reached

89

down to respond, I lost control of my vehicle and what killed my best friend just a few months earlier...I walked away without a scratch."

380. Barbour's version of being with Johnson does not align with other evidence of the events that occurred on that date.

381. For example, phone records show that on April 5, 2021, Barbour made plans to eat Mexican food and drink tequila with her friend Erin Clarke in the McGees Crossroads area for the evening of April 6, 2021. The plans were made in text messages.

382. On April 6, 2021, Barbour went to Clayton to see Bond and have drinks. They took a picture together at 4:26pm. Soon after Barbour did searches in her phone for Johnston County Community College(JCC) Workforce in Clayton, where Johnson held a position as an adjunct professor.

383. Barbour showed up at the campus and let Johnson know she was there and wanted to see him. She wanted Johnson to get inside her vehicle so she could perform oral sex on him.

384. Johnson told Barbour he had just learned of his father's cancer diagnosis and said the last thing on his mind was sex. Barbour seemed to accept this and agreed that she and Johnson could be friends without engaging in sexual encounters. At 5:46pm she called her oldest daughter, followed by calls to Erin Clarke, her husband, and she also made an attempt to reach Allyson Bond.

385. At 6:25pm Barbour texted Clarke and told her she was parked outside the restaurant, about a half hour from Clayton.

386. Barbour and Clarke ate and then went to a nearby bar, where they drank for several hours. Barbour made multiple searches on her phone for apartment complexes in Clayton. Barbour and her husband exchanged the following texts:

90

| Timestamp | Sender | Text Message |
|---|---|---|
| 7:24pm | Angela Barbour | "Tacos and Tequila Tuesday!!" |
| 7:27pm | Ryan Barbour | "Does Tequila make you a little horny?" |
| 7:33pm | Angela Barbour | "Tequila makes Erin and I both horny" |
| 7:33pm | Ryan Barbour | "Sweet!! Have one for me!! Be safe" |
| 10:13pm | Ryan Barbour | "You good?" |
| 10:13pm | Angela Barbour | "I'm good" |
| 10:13pm | Ryan Barbour | "Where you at?" |
| 10:13pm | Angela Barbour | "Lol" |
| 10:14pm | Angela Barbour | "Lol" |
| 10:14pm | Angela Barbour | "We are at Shenanigans just me and her" |
| 10:15pm | Ryan Barbour | "You good to drive" |
| 10:15pm | Angela Barbour | "Yelp" |
| 10:15pm | Angela Barbour | "Lol" |
| 10:15pm | Ryan Barbour | "K" |

387.   In fact, Barbour was not "good to drive." Between 7:50pm and 11:10pm Barbour called

Johnson five times (she omitted three of these calls from her timeline). Her last two calls,

in which Johnson did not answer, occurred minutes before Barbour wrecked her vehicle

and a passing motorist called 911 to report a car had veered into a utility pole, overturned,

and the female driver was still inside.

91

388. Barbour was taken by ambulance to the hospital and charged with Driving While Impaired. Her blood was taken just before she was discharged and her blood alcohol content was .16, still twice the legal limit hours after the accident.

389. There was no text on her phone from Johnson asking if she was safe.

390. Angela Barbour's next entry in her timeline for seeing Johnson:

| DATE | TIME | EVENT DESCRIPTION | NAME OF INDIVIDUAL WITNESS TO EVENT |
|---|---|---|---|
| 2021.04.15 | 8:00pm | Met at Clayton Fitness after JCRW | Angela Barbour/ Ronald Johnson |

391. Johnson stated that Barbour showed up unannounced at his office in Clayton Fitness not long after being charged with her DWI, wanting to have sex, and that he told her he was under a doctor's care. Barbour told Johnson her husband wanted to celebrate their upcoming wedding anniversary but she did not, and Johnson told her she should. Johnson stated his anniversary was also coming up and had planned to take his wife to the beach but did not know if he could go out of town with his dad being sick. Barbour was irritated when she left.

392. The following day, April 16th, Barbour texted her friend Pam Gregory, "I was able to see my friend last night and it was WONDERFUL. He's so funny and sweet. But he's in pain. I feel so bad for him and I can't help that much." Later she told Gregory, "He has a messed-up vertebrae."

393. At her deposition, Barbour testified that she performed oral sex on Johnson on this date and they had sexual intercourse in her vehicle in the parking lot.

92

394.    Around April 17, 2021, Johnson's father's health declined, and he ended up being hospitalized in Raleigh. Johnson took leave from work and did not attend BOE meetings during this time.

395.    Barbour did in fact celebrate her anniversary on the weekend of April 17, 2021, and sent pictures to several of her friends, including Bond. On April 19, 2021, Barbour texted Gregory, "R [referring to Johnson] and I are officially taking a two week break too so there's that...he's got some stuff going on so he said...but even after her told me this Friday, he still reached out to me Saturday but I heard nothing from him all day yesterday. Its a mess. Im ready to jump a cliff." Later that afternoon she texted Gregory, "And to let you know he has sent me a snap but I'm terrified to open it. I never know what it is going to say."

396.    Yet, on April 21, 2021, Barbour messaged Bond, providing a different description of her contact with Johnson that weekend: "One song sent to me via Snap this morning, but other than that, nothing." Later, Barbour wrote Bond: "It's almost been a week." Barbour also wrote, "Last he told me was we would still go to beach first weekend in May but I'm questioning that. I can't do this." Barbour stated, "I'm still contemplating moving. I'm just not happy."

397.    On April 22, 2021, Barbour texted Gregory and told her she had reached out to Johnson and "it's his crap he's going through..I just replied back asking about his dad and his arm...told him that talking quite a bit daily to going cold turkey has been no fun for me."

398.    On April 22, 2021, at 1:37pm Barbour texted Bond and said she really needed to talk to Bond, but her daughter had a recital. Barbour stated, "I need a friend."

399.    Ten minutes later Barbour texted Gregory that "Ryan was an asshole to me last night for no good reason. Then started ranting to get the fuck out...I called my attorney again Friday evening." Gregory offered to let Barbour come stay with her and that she wished she could do something to make Ryan stop and stated, "You don't deserve and I hope you can get out ASAP. U nor the kids need that." Barbour did not reply.

400.    On April 26, 2021, Barbour asked her friend James Norris, who Johnson did not personally know, to contact Johnson and ask him about Barbour. The call lasted less than two minutes. Johnson called Barbour a few hours later and they spoke for ten minutes. After the call ended, Barbour called him right back and they spoke again for thirteen minutes. Neither of these calls were highlighted in the detailed billing statements Barbour provided to the Town and Shipman, nor were they documented in her timeline.

401.    Later that same day, Barbour tried to call Bond several times, but Bond did not answer. Barbour then texted, "I did talk to R today via phone .. .Ron has pretty much told me he feels like I'm happy at home and he feels like I'm lying to him." Also Barbour texted Bond: "I'm not lying to him. I'm leaving Ryan's ass; Ryan pretty much knows it as of this weekend and he's walking around moping and acting "all "sad. But I'm putting everything on the line...he's had two weddings and four engagements. I'm worried I'm being played. I want to know if his feelings are real."

402.    On April 28, 2021, Barbour texted Johnson, "I promise I'm not a stalker, but I'm in Raleigh for a massage. If you would like dinner or something to drink, I'll gladly drop it off." Johnson replied, "I'm good buddy!"

403.    As of the end of April 2021, the only confirmed sexual encounters between Johnson and Barbour occurred on December 18-19, 2020, and March 26, 2021.  All other encounters

94

described by Barbour were inconsistent with evidence, including from the phone extraction.

404.     On May 3, 2021, at 12:22pm, Barbour sent Gregory two lengthy "texts" between Barbour and Johnson. Barbour stated it was a conversation on Snapchat that she was writing down as it went. According to Barbour, Johnson wrote, "One minute you're wanting to be with me and then it appears everything is good with you at home. Can we please meet and discuss in person?" Barbour's response (which she shared with Gregory) stated, "I've never changed my mind. I was just terrified of getting hurt, and here we are. Both hurt."

405.     About an hour later, on May 3, 2021, at 1:27pm Barbour sent Tiffani Cipriani a text which said, "I came out to Ryan yesterday and told him the truth. So we will go from there. He was a bit upset but took it better than expected." While it was not clear to what "truth" Barbour was referring, when interviewed by the Town, Barbour's husband, Benjamin Ryan Barbour was interviewed by the Town on July 19, 2021. He told Lt. West that Angela Barbour told him about the affair with Johnson on Easter Sunday (2022), and that it had begun in late summer/early fall of 2020.

406.     The evening of that same day, May 3, 2021, Barbour met Erin Clarke in Garner for dinner. According to Clarke's statements to Zellinger and James in 2024, Clarke did not know about Barbour and Johnson's affair at this time.

407.     Later on May 3, 2021, Clarke texted Barbour at 8:22 for a link and Barbour replied, "Ok...I'll do it as soon as I get home."

408.     GPS coordinates on Barbour's phone placed Barbour in Clayton, on a short service road along the intersection of Shotwell Road and Cameron Way, about 1000 feet and in the line of sight of the entrance of Clayton Fitness at 8:01pm.

409.    At 8:26pm, the GPS coordinates on Barbour's phone placed Barbour in Clayton around the corner from Johnson's home that he shared with his wife in Clayton.

410.    Barbour testified at Johnson's criminal trial intended to procure his removal from his BOE seat that, by the spring of 2021, she had disclosed her relationship with Johnson to a limited number of people:

> Q. And did you tell people about this affair?
>
> A. No. My close circle of friends.
>
> Q. Okay. And so back then, your close circle of friends. Who else would you have told about this affair?
>
> A. My good friend April (Lee), my good friend Erin (Clarke), another friend Amy (Monsour), and my neighbor Brittney (Addison).

411.    The four women Barbour named were never interviewed by Investigator Hoffman during his criminal investigation. Special Prosecutors Zellinger and James interviewed them over two years after the investigation was opened and over a year and a half after Johnson was indicted.

412.    Erin Clarke was interviewed on December 20, 2024, and stated Barbour did not tell her about the affair until after Barbour moved into her own apartment (June 2021) and did not give Clarke a name at first.

413.    "Neighbor Brittany," Brittany Addison,[8] was interviewed on December 19, 2020. Addison did not even meet Barbour until August 20, 2021, when she moved next door to her.

---

[8] Rogers was the only one of the four listed here to be interviewed by Lt. West in 2022, during the Town's investigation into Johnson.

414. Neither Addison nor Clarke were called to testify at Johnson's trial, thus concealing evidence of Barbour's deception in order to facilitate Johnson's removal from his school board seat.

415. Amy Monsour was interviewed on December 20, 2024, and according to Zellinger and James's typed investigation notes, Monsour stated that it was not until the summer of 2021 when Barbour confided in Monsour:

> (Barbour) told Amy – seeing Ronald Johnson, having an affair, super excited. Angie thought it would be forever, seemed super happy. This weekend going to place in Raleigh – Amy was supposed to be her alibi. Head over heels about him – only stayed in Marriotts, would always be a Marriott."

416. By June of 2021, however, Barbour had already left her husband and moved into her own apartment and thus at that time, Barbour would not have needed an "alibi."

417. Texts from Barbour's iPhone extraction showed that Barbour confided in April Lee in January of 2021. (Notably, Lee won a seat on the BOE in the 2024 election.) Lee was interviewed for the first and only time on December 17, 2024, a week after being sworn into office. The following statements by Lee were documented by Zellinger and James in their investigation notes:

> (Barbour) was in a vulnerable spot in marriage; she believed that he and (Johnson) was going to get married and have a child together; (Johnson) told her his wife did not want children
>
> (Johnson) was the person who broke the Bennett Jones/Clayton High Scandal and then when the parents were supporting Bennett Jones he switched sides"
>
> Also broke the Jimmy Lawrence scandal
>
> James Causby left the district because of (Johnson)"
>
> They (Barbour, Johnson and Lee) went out to Buffalo Wild Wings in Smithfield; talked about Covid and mask

97

> If (Barbour) would not do what (Johnson) said he would stop talking to her
>
> Did not see them in public but would come to her apartment in the early morning hours
>
> Knew about the trips to Virginia Beach, South Carolina...

418.  During her deposition, Barbour testified that she and Johnson never met in South Carolina. However, Barbour was in Myrtle Beach between February 7-8, 2021, and during late May of 2021, and not with Johnson.

419.  Barbour's text messages showed Pam Gregory was aware of Johnson early in 2021, if not before. Other friends of Barbour's, such as Carley McLeod, Tiffany Cipriani, Allyson Bond, Brian Barefoot, and James Norris, were not named when Zellinger asked Barbour who in "your close circle" had been told. Barbour's phone records evidenced a completely different story about the nature of her relationship with Johnson that the story which was used to remove Johnson from his school board seat.

420.  At Johnson's criminal trial designed to procure his removal from his BOE seat, Barbour testified that she moved out of her marital home because she was having a relationship with Johnson, not because she was having difficulty with her marriage:

> Q. At some point did you move out?
> A. I did, yes.
> Q. Did you move to an apartment?
> A. I did. Because I felt I needed -- that's what had to happen because of what I was doing.
> Q. Okay. Are you -- were you aware of where the defendant was living?
> A. Yes, sir. He lived in Clayton. I didn't know where he lived.
> Q. Did you know if he ever left his house?
> A. No. I don't think he did.

421.  This testimony, that Barbour did not know where he lived in Clayton, was also false but was presented as part of the narrative that she had Johnson had an ongoing and constant

sexual relationship which he controlled and in which she was the victim, being used by Johnson, and this false narrative was used to remove Johnson from his school board seat.

422. Shortly after 6pm on the evening of May 3, 2021, the same day Barbour sent Pam Gregory the text messages that she claimed were sent between herself and Johnson, Barbour met Erin Clarke in Garner for dinner and again, according to Clarke's statements to Zellinger and James, Clarke still did not know about Barbour and Johnson's affair at this time.

423. At some point, Barbour deleted all the texts on her phone between herself and Johnson through April 26, 2021, in an attempt to conceal them from discovery and to hide the actual nature of her relationship with Johnson. However, messages in the Pinger app from after deletion (in which Barbour disguised Johnson as "Heather Jones,") showed no communication after Johnson declined Barbour's offer to bring him dinner on April 28, 2021. On May 4, 2021, Barbour texted, "I'm swallowing my pride and sharing I miss our conversations." Johnson did not respond.

424. Barbour then sent Brian Barefoot a screenshot for the conditions needed to apply for the Johnston County Crime Prevention Council, with a text in which she told him she thought she was going to apply to be on the council. Again, these actions are inconsistent with her deposition testimony that she had no political aspirations.

425. On May 5, 2021, Barbour texted Pam Gregory telling her that "Next Wednesday 10:00 I'm looking at apartments."

426. On May 6, 2021, Barbour texted Johnson, "Morning." Johnson replies, "What's up." Barbour responded, "Well. I wished I could truthfully see something up." Johnson texted back: "Oh lord."

99

427. On May 7, 2021, Barbour texted Johnson to tell him she needed sex. Johnson declined and said he was with his father. Barbour sent, "But it wouldn't take long. I've had none since you and I and I'm getting...and I need you and your handsome self." Johnson did not respond.

428. The last date Barbour used the iPhone that was provided to Smithfield PD was May 7, 2021. Barbour purchased a new phone on that date. Barbour was never asked, nor offered, to provide her subsequent phone or its record to law enforcement in either Johnson's personnel investigation or during the investigation by Doyle, Hoffman, Zellinger, and James because those records would have been inconsistent with the false narrative being presented, to support Johnson's removal from his BOE seat. Likewise, West, Powell and Scott also did not request additional phone records from Barbour because they knew they might be inconsistent with the false narrative they adopted which was created by Barbour and the Lawrence firm to support both Johnson's termination from employment and his removal from his school board position.

429. Notably, Tim Shipman suggested to Barbour during their interview on April 21, 2022, that Barbour hold on to her iPhone in case it was needed later.

> Tim Shipman : Because there may be a point where we've got to turn that over to someone to do a forensic analysis of it and for them to physically.
>
> Angela Barbour: Oh, you you want my other iPhone then cause that's the one with the good.
>
> Tim Shipman: What do you mean the other iPhone? What other iPhone?
>
> Angela Barbour: I had to buy another one because it broke, but it still works, but I've got it hid in my apartment. I called Verizon, tried my hardest. This was when he first, that we first had our first argument, and I tried my hardest because I felt like that was six months in our relationship when he like ended everything and I wanted to make sure I had those texts with anything bad ever

came out. I was like, he cannot say that I'm a fool. He cannot say that I'm crazy."

430. On May13, 2021, at 12:27pm Barbour tried to call Johnson, who returned her call. They spoke for 15 minutes. Both Johnson and Barbour have testified that it was during this call and on this date, Johnson told Barbour at this time he was not going to use the Pinger app anymore. There was no subsequent communication between Johnson and Barbour on the Pinger app after May 13, 2021.

431. However, Johnson continued to use the Pinger app with other people until July of 2022, just not Barbour.

432. Barbour recorded the following entry in her timeline provided to the Lawrence law firm and the Town of Smithfield, who used it to support Johnson's termination, and to Hoffman, Zellinger, and James, who used it to facilitate Johnson's removal from his school board seat:

| DATE | TIME | EVENT DESCRIPTION | NAME OF IND./ WITNESS TO EVENT |
|---|---|---|---|
| 2021.05.13 | 2:00pm | Met at Clayton Fitness-shared burner phone was no longer going to be used | Angela Barbour/ Ronald Johnson |

433. However, Barbour's phone records show that she was in Clayton when she tried contacting Johnson by phone and during their subsequent 15-minute call. In addition, not long after speaking to Johnson, records show that Barbour then called her husband and was back in Benson, a half hour away, by 1:43pm. Again, Barbour's deception about her meetings with Johnson and the nature of her relationship with Johnson was part of the conspiracy used to terminate Johnson and to remove him from his school board seat.

101

**ANGELA MCLEOD BARBOUR – POST MAY 13, 2021**

434.   After May 13, 2021, Barbour and Johnson never communicated by any other cellular numbers than his T-Mobile number, (919) 320-3337, and her Verizon number, (919) 901-5376, and after this date, Barbour believed Johnson no longer had the Pinger app, or "burner phone" as she referred to it.

435.   Barbour had the same iPhone, an iPhone 12, from May 7, 2021, to when she was interviewed by the Town on July 5, 2022, and when interviewed by Hoffman on October 31, 2022.  At Hoffman's interview, he had access from West to the cell phone extraction of the phone that Barbour that either given (or according to Marshburn) or sold to Marshburn on condition that the Town would provide Lawrence's firm with a copy of the extraction.

436.   As of June of 2021, Barbour had left the home she shared with her husband and daughters in Benson and moved into an apartment less than three miles from Johnson's home in Clayton. The complex she moved into was .3 of a mile from Clayton fitness, where Johnson kept an office.

437.   Barbour stated (and was recorded stating) on multiple occasions stating that moving close to Johnson was something Johnson wanted her to do. In "The Truth," Barbour wrote, "It was necessary for me to move into Johnston County, because Ronald wanted me to work my way to the GOP Executive Board."

438.   However, Barbour's timeline shows a total of only five calls between Barbour and Johnson in the six weeks prior to her moving to Clayton at the end of May of 2021, which is inconsistent with Barbour and Johnson plotting her move to Johnston County as part of their allegedly ongoing relationship.

102

439. At one point, Barbour asked Johnson to come to her home and help her move a television, but Johnson told her he was unavailable. Her timeline shows that Johnson sent her a solitary text from his cell phone on June 1, 2021, "How's the new place?"

440. In early June of 2021, Bond contacted Johnson regarding a conversation she had with Barbour. Bond told Johnson that Barbour was angry that Johnson had stopped talking with Barbour. Bond also told Johnson that Barbour had told Bond that she, Barbour, was going to follow through with her threat of telling Johnson's wife and Barbour's husband about the sexual encounters because he had stopped talked to her.

441. On June 15, 2021, at 6:30pm, while Barbour was attending a JCRW meeting she thought Johnson would be attending, Barbour called Johnson. He stated he was on the way. The call lasted five minutes and was entered on her timeline.

442. That same night, June 15, 2021, Barbour sent Johnson a series of texts that ended in, "Seeing you tonight only reassured me of my feelings. It sucks. Sorry. I had to get it out. I'm about to bust."

443. Johnson texted back: "I think you might have meant to send this text to someone else. Take care." These texts were not recorded in her timeline nor given to the Town but were provided to Tim Shipman and Investigator Hoffman.

444. On June 17, 2021, Angela Barbour entered the following in her timeline:

| DATE | TIME | EVENT DESCRIPTION | NAME OF INDIVIDUAL WITNESS TO EVENT |
|---|---|---|---|
| 2021.06.17 | 7:52pm | Followed while out with a friend. McKinley's in Clayton, NC | Angela Barbour/ Ronald Johnson/Owen Phillips/April Lee |

103

445. On June 17, 2021, Allyson Bond told Johnson that Barbour had told Bond that she was going out to dinner that evening with a male Bond thought was a current high school student.

446. Johnson had been good friends with a former Smithfield PD officer named Owen Phillips. Previously, on January 19, 2021, Phillips, who was a Clayton PD officer at the time, was arrested and later indicted for Possession with Intent to Manufacture, Sell and Deliver Testosterone. Under a conditional discharge agreement, Phillips's charges were later expunged but he had to surrender his law enforcement certification.

447. Phillips had been working various jobs after his arrest, and prior to Johnson's father's death, Johnson's father had given Phillips a vehicle and some money to help get him started in his own business. Phillips had also lived with Johnson and his wife for a period of three weeks during a time he was between homes.

448. On June 17, 2021, Johnson spoke to Phillips and said he had received information that a school system teacher was possibly dating a student and asked if Phillips could sit in the parking lot of the teacher's apartment building and see if he saw anything to confirm or negate this. Johnson gave him the complex name and number of the building. Phillips called Johnson later and said he had seen who he thought was the teacher get into a car driven by a male and had followed them to McKinley's, where Phillips was then parked. Owen sent Johnson two grainy pictures from outside Barbour's complex.

449. Johnson was close by and stated he drove into the parking lot of McKinley's to speak to Phillips. Phillips said the male looked too old to be in high school but that he would get

a clearer picture. Johnson then went into GNC which is in the same retail complex and then home. He never went inside McKinley's. Phillips was gone when Johnson left.

450. On April 20, 2022, Barbour told Tim Shipman that on the evening of June 17, 2021, Barbour saw Johnson sitting in his car in front of McKinley's, staring at her. Angela Barbour told Shipman, "I still to this day don't know how he knew where I was at. I had my car checked for a tracker."

451. Despite her comment to Shipman moments before, Angela Barbour then stated to Shipman that Phillips had told Angela Barbour the previous week before April 20, 2022, that Johnson "got him to go in and buy a meal and sit at the bar and take a picture of me and whoever I was having dinner with...Owen said, I swear I didn't take a picture."

452. On August 11, 2021, Phillips was interviewed by Lt. West for the Town's personnel investigation into Johnson. Phillips told West that Johnson came to the parking lot of McKinley's, went inside the restaurant and came back out. Phillips told West that Johnson asked him to follow Angela Barbour and her dinner partner back to Angela Barbour's apartment, which Phillips said he did and that he took another picture.

453. More than a year later, on October 13, 2022, Owen Phillips was interviewed by Hoffman for the State's criminal investigation. Phillips stated he sat in the apartment parking lot and witnessed who he thought was Angela Barbour get into a vehicle with a male that looked younger than Angela Barbour. He followed the vehicle to McKinley's and called Johnson, who asked if Phillips could get a picture. Inconsistently with what Phillips had told West in the personnel investigation interview in August 2021, Phillips told Hoffman that Johnson said he would come to McKinley's, but that Johnson never came.

454.    Phillips did not tell Hoffman that he then followed Angela Barbour and her companion back to her apartment and took more photos.

455.    During his sworn testimony at Johnson's criminal trial designed to procure his removal from his BOE seat, Phillips gave yet a third account of the events on June 17, 2021. Phillips testified that Johnson came to the parking lot of the restaurant and wanted Phillips to go inside, pick up a to-go order and get pictures, but then changed his mind and told Phillips he would do it himself. Phillips stated he left soon after that and did not know what happened after he left.

456.    However, the likely facts which were evidence by photos taken by Phillips and sent to Johnson were that Phillips did, in fact, enter the restaurant and take a picture of Angela Barbour and her companion, that he also followed the vehicle containing Angela Barbour and her companion from McKinley's back to Angela Barbour's apartment complex once they left, that he took a picture of the car as he was parked behind it in traffic, and another one when Angela Barbour was dropped off in front of her building. These photos were stored in Johnson's photos in the iCloud account associated with his phone, and which were obtained by Doyle, Hoffman, Zellinger, and James during their investigation.

457.    In April of 2022, Angela Barbour told Shipman after allegedly seeing Johnson outside the restaurant she "ended up trying to go to, like, I went to his house...But when I went to go see, because I was riding around, I went back to my apartment, got my car, riding around, and I went to go see if he was at home, because its the one and only time, I've been that way a couple times but the one and only time I've gone by myself, he was coming out and I was like, he knew I was on my way to his house. And I freaked out. He followed me all the way back to my apartment and then turned off at the gym."

458.    And yet in "The Truth," once again, Barbour offered a different account. In "The Truth," Angela Barbour added April Jones Lee as a participant in the story.

> As we were leaving McKinleys' in Clayton, Ronald (Johnson) happened to be sitting right in front of the restaurant as we were leaving. I called my friend April (Lee) to assist with my own little investigation. I have since learned from Ronald's best friend (Phillips) that he was paid to enter the restaurant to order a meal just to sit and take photos of me...and to see who I was having dinner with that evening. His friend also shared that Ronald told him I was being investigated for seeing high school students!! April met me at my apartment, and we started to ride toward Ronald's home because I had a feeling he was tracking me. Yes, Ronald had taken me to his house before. No sooner than we approached his road...he met us at the end of it...and followed me all the way back to my apartment and then turned off. I knew at this point, I became scared of the consequences of my actions.

459.    Angela Barbour's timeline stated she was followed at 7:52pm on the evening of June 17, 2021.

460.    On the evening of June 17, 2021, after he returned home from the shopping center where McKinley's was located, and he was getting ready to go to the gym, Johnson witnessed a dark-colored car drive slowly in front of his home, then again as he was backing out of his drive. Johnson's neighborhood has a main entrance that also serves as the main exit. As Johnson turned left from his residential street onto the road leading to the entrance, he witnessed the vehicle ahead speed up and then suddenly pull to the right shoulder.

461.    Johnson hypothesized that it was Angela Barbour in the car and recorded a 16 second clip as he approached the vehicle, calling out the license plate and muttering, "This is bullshit," as he drove by the stopped car. The video from his phone was time-stamped 9:34pm.

462.    In "The Truth," Angela Barbour stated that April Jones Lee was the driver of the car, and Angela Barbour was in the passenger seat.

463. The following day, June 18, 2021, Angela Barbour sent Bond a Snapchat that read, "I think Ronald may be reading my texts. There is a possibility he has put a stealth app on my phone. I'll explain later. Don't text me anything else with personal stuff about him or me...or about you!!!" Bond sent a Snap back, "Whaaaaat? What the hell?" Angela Barbour responded, "He found me last night. Without my car. TWICE then FOLLOWED me back to My apartment." Bond: "Without your car?" Angela Barbour replied, "I had someone with me. So I'm NOT lying." Bond: "I don't get it." Angela Barbour sent, "He found me the first time without my car." Barbour was clearly unaware that Bond had spoken with Johnson and told him that she suspected the Barbour was meeting a high school student.

464. There was no communication between Johnson and Angela Barbour between June 15, 2021, when Johnson sent Angela Barbour the "I think you meant to send this to someone else" text, and July 3, 2021, on which date, at 1:52 am on July 3rd, Angela Barbour had called and left Johnson a drunken voicemail begging him to be at Lands's party, which call Angela Barbour omitted from her timeline.

465. On July 4, 2021, Max Delano "Dale" Lands, the founder of advocacy group Citizens for Accountable Government of NC (CAAG) and well-known member of the Johnston County GOP, hosted his annual Fourth of July party at his home in Garner..

466. Angela Barbour was in attendance for the first time, having joined CAAG earlier that year. She had arrived early in the afternoon and was drinking and was described as visibly anxious and at times appeared sad, even tearful, which became more noticeable as time went on.

467.   Michelle Antoine was concerned about Angela Barbour and spoke with her. Angela Barbour was distraught and admitted it was because her "friend" Ronald Johnson was not at the party, which she had expected him to be. Angela Barbour shared that she had been reached out to Johnson about coming and he was ignoring her. It became apparent to Antoine from Angela Barbour's comments her feelings for Johnson were not platonic. Antoine directly asked Barbour if something was going on between her and Johnson and Barbour denied it.

468.   After Johnson learned that Angela Barbour was crying and behaving strangely at the July 4th party, he asked Bond to help mediate the situation. Sometime around July 8, 2021, Bond brought Angela Barbour to meet Johnson at the JCC parking lot in Clayton, NC. Angela Barbour's behavior was extremely erratic and aggressive. Angela Barbour told Johnson in front of Bond she wanted a "contract" giving her the right to have sex with Johnson two times a week.

469.   Johnson told Barbour that he would not do that and that they could just be friends. Johnson told Barbour that she was single and she needed to date people who were single. Barbour stated again that she did not want to date other people, that she just wanted a sexual relationship with Johnson. Barbour questioned why Johnson did not want to have a sexual relationship with her.  Bond attempted to persuade Barbour to deescalate, but Barbour would not even look at Bond when she was talking.

470.   Barbour told Johnson she knew he had a lot of enemies and that he had more enemies than just Jimmy  Lawrence and that she could tell a "few people" about their sexual encounters and that Johnson would be "done." The meeting ended. Johnson believed Angela Barbour would carry out her threats if he made her angry. This meeting was not

109

entered in Angela Barbour's timeline, nor did she describe it in her manifesto "The Truth."

471.    On July 9, 2021, Angela Barbour called Johnson at 8:13am, 8:23am, and 3:07pm, and sent messages, but none of these calls were included on her timeline. Angela Barbour asked after his father and wanted to talk about an upcoming BOE meeting. Johnson was scared of Angela Barbour's unpredictability. He called her that evening and was relieved to find Barbour friendly and even-keeled and eager to talk about the upcoming BOE meeting.

472.    On July 13, 2021, Angela Barbour spoke during the BOE meeting on July 13, 2021, as did her friend April Jones Lee and Dale Lands. Johnson ate at Buffalo Wild Wings with Angela Barbour and April Lee after the meeting. The dinner was entered into the timeline, but the entry did not mention that Lee was also present.

473.    After the non-dramatic call with Barbour and the post-BOE dinner with Barbour and Lee, Johnson and Barbour then spoke more frequently. Johnson understood from Barbour that she wanted to see Johnson romantically, but Johnson learned that as long as he called her soon after she tried calling or messaging him, her temper stayed in check and she was not volatile or threatening.

474.    Angela Barbour recorded the following phone call and allegation in her timeline:

| DATE | TIME | Length of Call | EVENT DESCRIPTION | NAME OF INDIVIDUAL |
|------|------|----------------|-------------------|--------------------|
| 2021.07.26 | 11:30 am | 33 min | Phone call – Ronald told me he wanted me to have inappropriate relations with Dee Barbour and record it so that he would have leverage on him. | Angela Barbour/ Ronald Johnson |

110

475. This July 26, 2021, entry was completely false, like many of Angela Barbour's other statements about her relationship with Johnson.

476. Angela Barbour claimed to Johnson that DeVan Barbour (no relation to Angela Barbour), at the time a future Congressional candidate also living in Benson, had propositioned her for sex days prior to July 26, 2021.

477. Notably, although Barbour's timeline stated Johnson asked Angela Barbour to have sex with DeVan Barbour on July 26, 2021, the State represented that this alleged "demand" happened in October of 2021, which they knew to be false, to create a more viable narrative while seeking multiple search warrants.

478. Barbour then represented that just four days later, she and Johnson met for sex on July 30, 2021.

| DATE | TIME | EVENT DESCRIPTION | NAME OF IND./ WITNESS TO EVENT |
|------|------|-------------------|--------------------------------|
| 2021.07.30 | 2:00pm | Marriott with Ronald (Crabtree or Fayetteville Street) | Angela Barbour/ Ronald Johnson |

479. At her deposition, Angela Barbour stated that on Friday, July 30, 2021, she met Johnson in Raleigh for a sexual encounter, although she did not specify which Marriott in Raleigh – stating two different possible locations.

480. Barbour's phone records showed five phone calls between Johnson and Barbour on this date between 10:41 am and 1:46pm, three of which were omitted from Barbour's timeline where Johnson did not answer. Barbour's location during those calls varied, with the calls coming variously from Benson, Coats, and Dunn.

111

481. Johnson's Cloud account, obtained by Doyle, Hoffman, Zellinger, and James, and used in their attempt to remove Johnson from his school board position, however contained photos and a video timestamped at 3:50pm which showed that he was at a comic book convention called GalaxyCon Raleigh, held at the Raleigh Convention Center. GalaxyCon's Official website stated that the convention ran from July 29th until August 1st in Raleigh, and that the host hotel was Marriott City Center, 500 Fayetteville Street. The contents of the phone extraction and the location of Johnson were known to Hoffman, Zellinger, and James.

482. Yet, when testifying, Barbour answered without hesitation:

> Q. Okay. July 30th, did you meet with the defendant?
>
> A. I did.
>
> Q. Where did you meet with the defendant?
>
> A. At the Marriott across from Crabtree.

483. Of note, this is the only entry in the entire timeline where Barbour claimed she and Johnson were at a Marriott in Raleigh. And in fact, the comic book convention on this weekend was located adjacent to the Fayetteville street Marriott, not the Crabtree Marriott.

484. When interviewed by Shipman on April 20, 2022, Angela Barbour said, "He took me places we ate out all the time, he took me . . . we frequented the Marriott in Raleigh West where we stayed all the time across from the mall. That was where we met all the time . . ."

485. Minutes later in the same interview with Shipman, Angela Barbour stated that she and Johnson went to "Raleigh so many times I can't count."

112

486.     Nonetheless, after the alleged encounter on July 30, 2021, Barbour recorded the next

encounter in her timeline as occurring on Saturday, August 14, 2021:

| DATE | TIME | EVENT DESCRIPTION | NAME OF IND./ WITNESS TO EVENT |
|------|------|-------------------|--------------------------------|
| 2021.08.14 | ALL DAY/ NIGHT | TRIP TO CHARLOTTE – MARRIOTT TRADE STREET 100 WEST TRADE STREET, CHARLOTTE, NORTH CAROLINA | Angela Barbour/ Ronald Johnson |
| 2021.08.14 | 8:00pm | VISITED NIGHT AT THE ROXBURY 116 WEST 5TH STREET UPTOWN CHARLOTTE | Angela Barbour/ Ronald Johnson |
| 2021.08.14 | | Ronald shared he knew bad people. Told me he didn't just get his money from his regular jobs...He stated, You don't think I could have this nice of a house and multiple vehicles on a teacher/cop salary...do you? I know people...people that you do not need to know. In fact, I have shared more with you than I ever have with Jami. You already know too much. | |

487.     At her deposition, Angela Barbour was very descriptive in response to questioning

regarding this entry. When questioned how she knew Johnson had made those exact

statements on that day, Barbour swore she could still see the room and the view from the

window, sunlight fading as Johnson spent the day confessing certain things to her, until

it was time to get ready to go to the Roxbury Nightclub. Barbour believed they checked

in late that morning/early afternoon. She stated she even knew what she wore that night – a long black dress.

488.    When confronted with a photo of Barbour and Amy Monsour taken on Saturday, August 14, 2021, at 3:39pm. showing Barbour dressed casually in a jeans and wearing a tank top that reads, "Flip's 40th!!," Angela Barbour became visibly agitated, and stated Johnson must have acquired the picture by hacking her phone.

489.    In response to a question about where the photo was taken, Angela Barbour replied at her friend Phillip Wroughton's house, where they were celebrating a birthday.

490.    When asked if Angela Barbour wanted to amend her testimony because the photo was taken at 3:39pm on August 14, 2021, at a location easily two and a half to three hours away from where she claimed to be with Johnson in Charlotte, Angela Barbour stated she did not want to amend her testimony and now upon being shown the picture, she recalled that she had to hurry to get to Charlotte to make the show at the Roxbury, and pointed at her timeline.

491.    Angela Barbour said that was why she wrote 8:00pm on the timeline, because she needed to get there for when the show started. She re-iterated she was wearing a long black dress. When asked where Angela Barbour changed, Angela Barbour stated she changed when she arrived in Charlotte. When asked when she and Johnson had the claimed sexual encounter, Angela Barbour then stated it must have been after the show.

492.    When asked how she knew where to meet Johnson in Charlotte and showed her timeline indicating no calls between Johnson and Angela Barbour on August 14, 2021, Angela Barbour had no response and insisted the timeline was accurate.

**AUGUST 16, 2021 TEXT**

493. Johnson's birthday was on August 16, 201. There were no calls between Johnson and Barbour from August 13th until August 18, 2021, including on August 14, 2021, on which Barbour claimed they were in Charlotte.

494. Barbour did provide a text to the State dated 5:58pm on August 16, 2021, where Barbour texted Johnson asking him if he was at the County Commissioners meeting on his birthday. Johnson responds, "Yea I am." Barbour then texted Johnson telling him that Dale (Lands) told her there were no seats, just standing room only. Barbour then texted Johnson and asked, "Are they allowing people to stand in there?' When Johnson did not reply, Barbour texted, "That should say I'm getting ready to pull up to it...No eat." Johnson then texted: "Yes standing room." Barbour texted in response, "OK. I have stood ll day...I'll just stand some more...LOL." Ron replied, "You good."

**AUGUST 26, 2021, JCRW BOWLING FUNDRAISER**

495. In her timeline, however, Angela Barbour recorded the following entry:

| DATE | TIME | EVENT DESCRIPTION | NAME OF IND./ WITNESS TO EVENT |
|---|---|---|---|
| 2021.08.26 | 7:00pm | Bowling Fundraiser for JCRW | Angela Barbour/ Ronald Johnson/ Allyson Bond/Ryan Angela Barbour/JCRW members and general public |

496. Angela Barbour admitted that she and Johnson did not have any sexual contact on August 26, 2021, either before or after the bowling event. Angela Barbour's husband was present at the event as well, although at this time Angela Barbour was still living in an apartment

115

in Clayton. Angela Barbour called Johnson that evening at 10:49pm to ask about his father's health condition. They spoke for six minutes.

**DEATH OF JOHNSON'S FATHER ON AUGUST 27, 2021, AND AFTER**

497. On August 27, 2021, Johnson's father died.

498. Angela Barbour texted Johnson at 4:15pm on August 27, 2021, to tell him the fundraiser had earned $970, although her goal was $1000. At 6:51pm Johnson responded, "Hey that's so good. I'm sorry, my dad passed away at 2 o'clock this afternoon. I'm gonna be out of it for awhile." Angela Barbour replied, "I'm soooooooo sorry friend. Please know I'm here."

499. At 9:15pm Johnson texted, "I was gonna let you know that I would donate an extra $30 to make it even thousand, thanks for putting all that work for the party." Angela Barbour replied, "You do not even need to worry about that now. Hush your mouth."

500. The following day at 12:47pm Angela Barbour texted Johnson , "May I ask if you will have visitation?" Johnson responded, "We aren't sure yet, trying to set it up. Probably just a memorial service. Will def let you know, thank you." Angela Barbour answered, "Thanks friend. You are in my prayers."

501. Throughout the rest of the day and the next Angela Barbour sent multiple messages to Johnson asking if there was anything he needed, or his family, and that she felt "Absolutely useless." Johnson politely declined each offer.

502. Bond contacted Johnson and told him that Angela Barbour was planning to go to Johnson's father's service although Johnson had not given her the service information. Johnson asked Bond to please dissuade Angela Barbour from doing so. Johnson also called Angela Barbour on August 30th to say his family was fine and just needed privacy.

116

503. In "The Truth," Angela Barbour wrote, "Sadly, Ronald lost his daddy. It was a quiet time for us....he shared with me that he knew very bad people and he would be going to meet them, and he did not want them to know about me so I was instructed to keep my distance for my safety."

504. Over the next few weeks Angela Barbour sent Johnson multiple Snapchats and texts with messages like, "I'm on my way to dinner and was hoping to speak to you beforehand," "Can I call you, "call me," "You alive?" and "You good?"

**FALL 2021**

505. Angela Barbour's next entry for seeing Johnson was September 3, 3031:

| DATE | TIME | EVENT DESCRIPTION | NAME OF IND./ WITNESS TO EVENT |
|------|------|-------------------|-------------------------------|
| 2021.09.03 | 9:00pm | Met at Raleigh Theater to watch Shang-Chi and the Legend of the The Rings on its release date | Angela Barbour/ Ronald Johnson |

506. At Johnson's criminal trial designed to procure his removal from his BOE seat, using Angela Barbour's timeline to question her, Zellinger asked Angela Barbour if she had gone to a movie in Raleigh with Johnson. She stated she did not remember the name of it. At her deposition she also stated she did not recall the movie.

507. An event receipt in Johnson's email confirmed he did attend the movie on this date. He purchased only one ticket. Johnson stated Angela Barbour did not see the movie with him but he may have told her about it.

508. In September of 2021, Barbour sent Kevin Donovan, an early hopeful for the BOE election the next year, a message on Facebook: "Let me know how I can help you with

117

your campaign. You and Terri (sp) are the only two that I fully support right now. I'd love to chat more soon." Donovan responded, "Thank you so much! You don't know how much I appreciate that! Here is my cell number if you want to text or call 9194640982." Barbour replied, "Thanks! I'll reach out soon."

509. On October 4, 2021, Barbour posted on Facebook, "Fully funded...POSITIVE policy put in place. (Heart, flag, heart emojis) Great job Ronald Johnson." Angela Barbour tagged Johnson's account. The post was liked by Johnson's wife, Jami.

510. During this time, Barbour also randomly sent Johnson ideas for the school board and negative comments and Facebook posts about April Jones Lee, allegedly Angela Barbour's closest friend.

511. On October 5, 2021, Barbour sent Johnson a screenshot of a negative exchange of comments between Lee and Angela Barbour on Facebook. Barbour's accompanying text to Johnson said, "I'm done. She's trying to push me." Johnson did not respond.

512. At one point in a reply text Johnson stated, "Yeah me too babe", immediately followed by "Sorry wrong person". Angela Barbour responds with exclamation marks on the "wrong person" comment.

513. Angela Barbour recorded the following entry on her timeline for October 7, 2021:

| DATE | TIME | Name of Caller /Receiver | EVENT DESCRIPTION |
|---|---|---|---|
| 2021.10.07 | 4:29pm | Angela Barbour to Johnson | Text - "I officially have the nomination for the JCRW vice president" |

| DATE | TIME | Name of Caller /Receiver | EVENT DESCRIPTION |
|------|------|--------------------------|-------------------|
| | | Johnson to Angela Barbour | "Fuck yeah" |
| | | Angela Barbour to Johnson | "It only took me one year" |
| | | Johnson to Angela Barbour | "I'm just waiting for the executive committee spot, that's the big deal. 2023 is the year we have to take it." |

514. The text exchange was provided by Angela Barbour and used as an exhibit by the State at Johnson's criminal trial designed to procure his removal from his BOE seat.

515. Notably, Angela Barbour omitted the bottom part of the screenshot indicating she was seeking an executive committee seat with the Johnston County Republican Women's Club from her timeline because it was inconsistent with her narrative that Johnson was using her and that she had no political aspirations.

516. On this same date, October 7, 2021, Barbour texted Johnson, "I'm going to the meeting tonight," referring to the Johnston County GOP meeting. After receiving the text Johnson, who had originally planned to attend, chose not to attend.

517. After the GOP meeting, Barbour sent Johnson the following text, "Larry...and he walked over and introduced himself...told me about asking for my number." Johnson's response was, "Shrug, I mean I told you." Angie texted, "I just think its funny." Johnson replied, "Give him a call sometime." Angela Barbour: "Nope." Johnson, "You gotta start dating

119

sometime." Angela Barbour responded, "Why are we discussing this?? No." Johnson answered, "Don't. You're right, not my business."

518.    Barbour did not included any of these texts on her timeline. These texts were available from the cell phone extraction provided by West to Hoffman and Doyle, and then to Zellinger, and James. They were also available to the Town and not included by West, Powell, or Scott in any of their recommendations because the texts were inconsistent with their narrative that Johnson was involved in a dating relationship with Barbour about which he allegedly lied.

519.    In "The Truth" Angela Barbour gave a very different version of the events after Johnson's father's death on August 27, 2021. After she wrote about Johnson's father passing away and her claim that Johnson told her to keep her distance for her "safety," Angela Barbour wrote, "We continued to see each other sparingly, but he did not want me seeing anyone else, or should I say..,he told me that if I did, then I needed to let him know because if I saw anyone else he would let me go. I didn't want him to let me go..." This version of events is completely inconsistent with the texts between Barbour and Johnson where he encouraged her to date other people.

520.    In October of 2021, Angela Barbour began to date William "Brent" Wiggs. In the following month their relationship became public – they took pictures together, exchanged gifts, attended one another's work-related events and double-dated. Pictures of the two were posted by one another on their social media until they abruptly stopped at the beginning of 2022.

521.    On October 11, 2021, Angela Barbour texted, "Good morning." She tried to call Johnson, but he did not answer. At 10:39 am she called again, and at 11:11 am she texted "Hey".

120

She then sent angry Snapchats accusing Johnson of blocking her until at 12:20pm he sent, "I don't have you blocked. My phone was off because I was testifying in court." Angela Barbour replied, "I wanna see you testify one day," followed by laughing emojis. None of these text exchanges were included on Angela Barbour's timeline.

522. On October 12, 2021, Angela Barbour texted, "Lunch?" Johnson declined. Again, this text exchange was not on Angela Barbour's timeline.

523. On October 13, 2021, Angela Barbour texted that she was leaving a meeting. Johnson responded, "Gotcha." Angela Barbour asked, "You bowling???" Later again she sent, "Bowling?" Johnson did not respond. Again, these texts were not on Angela Barbour's timeline.

524. On October 15, 2021, Angela Barbour texted, "Did you die?" Johnson did not answer. Again, this text exchange was not on Angela Barbour's timeline.

525. On October 16, 2021, Angela Barbour sent a picture of her youngest daughter holding one of Johnson's 2020 campaign signs. Johnson responded, "Lord! Has it already been a year." Again, this text exchange was not on Angela Barbour's timeline.

526. DeVan Barbour's SnapChat account showed he sent a message to Angela Barbour at 6:25pm on October 23, 2021.

527. Between October 24-25, 2021, the following texts between Angela Barbour and Johnson were recorded on her timeline:

| DATE | TIME | EVENT DESCRIPTION | NAME OF INDIVIDUAL | In Angela Barbour's Timeline |
|---|---|---|---|---|
| 2021.10.24 | 9:00pm | "Will drop phone off tomorrow – mom called and needs me, family drama" | Johnson to Angela Barbour | **YES** |

| | | | | |
|---|---|---|---|---|
| 2021.10.25 | 3:15pm | "call me when you're free about your attorney? | Johnson to Angela Barbour | **YES** |

528. The texts on October 24 and 25, 2021, are the only texts Angela Barbour entered in her timeline between October 7, 2021, until November 4, 2021, during the period of time that the Town claimed Johnson lied about being in a dating relationship with Barbour, and which was used as a reason to terminate his employment.

529. Angela Barbour claimed that Johnson told her he wanted her to have sex with DeVan Barbour, a Congressional Candidate, and record it for Johnson to use against DeVan Barbour.

530. Barbour gave sworn testimony and multiple statements to the effect that on these dates, Johnson told her he was bringing her a phone to use to record Barbour.

531. However, the full text exchange between Barbour and Johnson (available from screenshots Angela Barbour provided to Timothy Shipman) is below:

| DATE | TIME | EVENT DESCRIPTION | NAME OF INDIVIDUAL | In Angela Barbour's Timeline |
|---|---|---|---|---|
| 2021.10.23 | | "I was letting you know I saw the map of the redistricting if it gets approved" | Angela Barbour to Johnson | **NO** |
| 2021.10.23 | 8:54pm | "What does the redistricting look like?" | Johnson to Angela Barbour | **NO** |
| 2021.10.24 | 9:00pm | "Will drop phone off tomorrow – mom called and needs me, family drama" | Johnson to Angela Barbour | **YES** |

| DATE | TIME | EVENT DESCRIPTION | NAME OF INDIVIDUAL | In Angela Barbour's Timeline |
|---|---|---|---|---|
| 2021.10.24 | | "Understand." | Angela Barbour to Johnson | NO |
| 2021.10.24 | | "Will run it by in the morning." | Johnson to Angela Barbour | NO |
| 2021.10.24 | | "Gotcha. Try to have a good night." | Angela Barbour to Johnson | NO |
| 2021.10.25 | 12:00pm | "Rough day. Family stuff." | Johnson to Angela Barbour | NO |
| 2021.10.25 | | "So sorry friend." | Angela Barbour to Johnson | NO |
| 2021.10.25 | 3:15pm | "call me when you're free about your attorney? | Johnson to Angela Barbour | YES |
| 2021.10.25 | | "K give me 10 if possible. I'm doing carpool." | Angela Barbour to Johnson | NO |
| 2021.10.25 | | "no rush." | Johnson to Angela Barbour | NO |
| 2021.10.25 | | Text *Screenshot of JoCo Report article "Commissioner Chad Stewart Announces Resignation"* | Angela Barbour to Johnson | NO |
| 2021.10.25 | | "WTH? I just saw this?" | Angela Barbour to Johnson | NO |

123

| DATE | TIME | EVENT DESCRIPTION | NAME OF INDIVIDUAL | In Angela Barbour's Timeline |
|---|---|---|---|---|
| 2021.10.25 | | "f him. They are protecting him because he can't win re-election." | Johnson to Angela Barbour | **NO** |
| 2021.10.25 | | "I wanna take his seat" (wining emoji") | Angela Barbour to Johnson | **NO** |
| 2021.10.25 | | "You need to move quick." | Johnson to Angela Barbour | **NO** |
| 2021.10.26 | 3:37pm | "Is Kay making money off of giving us flu shots?" | Angela Barbour to Johnson | **NO** |
| 2021.10.26 | 3:22pm | "Can I talk to you about a school meeting I have this week? It's kind of important?" | Angela Barbour to Johnson | **NO** |
| 2021.10.31 | | "I have tried to call you a couple times." | Johnson to Angela Barbour | **NO** |
| 2021.10.31 | | "Bad right now." | Angela Barbour to Johnson | **NO** |
| 2021.10.31 | | "What's going on?" | Johnson to Angela Barbour | **NO** |
| 2021.10.31 | | "Being threatened and belitted. Turned Gracie." | Angela Barbour to Johnson | **NO** |
| 2021.10.31 | | "I'mm sorry. I'm about to be home and I've tried to call you to check on you." | Johnson to Angela Barbour | **NO** |

| DATE | TIME | EVENT DESCRIPTION | NAME OF INDIVIDUAL | In Angela Barbour's Timeline |
|---|---|---|---|---|
| 2021.10.31 | | "I know. I can't talk. He's following me We are trick or treating." | Angela Barbour to Johnson | NO |
| 2021.11.03 | 2:16pm | "Hey I have someone that has a career question." | Angela Barbour to Johnson | NO |

532. Angela Barbour did ask Johnson to bring her a phone – so that she could record her husband being abusive to her. Johnson was going to bring her one, but on October 25, 2021, his brother and sister-in-law were involved in a domestic dispute that ended up having law enforcement involvement, resulting in the family drama to which Johnson referred in his texts with Angela Barbour.

533. Angela Barbour had accused her husband of being verbally, emotionally and physically abusive many times to Johnson and others. In the past, Angela Barbour had had husband charged with Assault on a Female in Wake County, to which he pled Not Guilty and was found Not Guilty.

534. Prior to the fall of 2021, in April of 2021, Angela Barbour told multiple people her husband held a gun to her daughter's head, which was one of the reasons she began looking for apartments. Texts discussing her daughter's desire to leave the family home and a "scary incident" were present in the extraction of her iPhone.

535. On October 28, 2021, during the messages Barbour and Johnson were exchanging, Barbour left the comment "I felt this" on a Facebook post about domestic violence ending in homicide that showed photos of OJ and Nicole Simpson, and Scott Peterson and Laci Peterson.

536.	Angela Barbour's next substantive entries on her timeline were for November 4, 2021:

| DATE | TIME | Length of call | EVENT DESCRIPTION | NAME OF INDIVIDUAL WITNESS TO EVENT |
|------|------|----------------|------------------|-------------------------------------|
| 2021.11.04 | 5:53pm | 1 min | Phone call – Ronald had me ask Amy Monsour for a threesome | Angela Barbour/ Amy Monsour |
| 2021.11.04 | 5:59pm | | Text – I have tried to call you a couple times. I have tried to call on you and check on you." | Johnson to Angela Barbour |

537.	The timeline contains only two entries, one a text and one a phone call. In fact, the phone extraction showed the following:

| DATE | TIME | Length of call | EVENT DESCRIPTION | NAME OF INDIVIDUAL WITNESS TO EVENT | IN ANGELA BARBOURS TIMELINE |
|------|------|----------------|------------------|-------------------------------------|------------------------------|
| 2021.11.04 | 3:13pm | No answer | Phone call | Angela Barbour to Johnson | NO |
| 2021.11.04 | | Text | "In a BOE meeting" | Johnson to Angela Barbour | NO |
| 2021.11.04 | | Text | "my bad" | Angela Barbour to Johnson | NO |
| 2021.11.04 | | text | "It's fine. Will call when I leave here." | Johnson to Angela Barbour | NO |
| 2021.11.04 | | text | "Give me 30 at least I got Gracie." | Angela Barbour to Johnson | NO |

126

| DATE | TIME | Length of call | EVENT DESCRIPTION | NAME OF INDIVIDUAL WITNESS TO EVENT | IN ANGELA BARBOURS TIMELINE |
|---|---|---|---|---|---|
| 2021.11.04 | 5:53pm | 1 min | Phone call – Ronald had me ask Amy Monsour for a threesome | Angela Barbour/ Amy Monsour | **YES** |
| 2021.11.04 | 5:59pm | text | I have tried to call you a couple times. I have tried to call on you and check on you." | Johnson to Angela Barbour | **YES** |

538. The allegation that in the middle of a series of texts about Barbour, her child, and her family situation that Johnson would pick up the phone and randomly call Barbour and tell her that he wanted to have a threesome not credible or logical.

539. For November 5, 2021, Angela Barbour's timeline has only one entry for any contact with Johnson and it suggested that they met at a Marriott in Durham after first arriving at the Crabtree Marriott:

| DATE | TIME | EVENT DESCRIPTION | NAME OF INDIVIDUAL WITNESS TO EVENT |
|---|---|---|---|
| 2021.11.05 | 8:00pm to am | Detoured to Marriott in Durham bc Dale Lands/Michelle Antoine and other members were at a workshop at Crabtree | Angela Barbour/ Ronald Johnson/Dale Lands/Michelle Antoine |

540. Barbour stated that she and Johnson were drove separately to the Marriott in Raleigh across from Crabtree Valley Mall to meet for sex. Angela Barbour also stated that

Johnson walked in and saw people he recognized and told Barbour they would have to re-route, so they drove separately to a Marriott in Durham. Barbour stated they had sexual intercourse, and she stayed the night.

541. Initially, during her deposition, Angela Barbour repeated the same details. Angela Barbour confirmed she and Johnson first went to the Raleigh Marriott, but when Johnson went in to secure the room he came running out and said he had seen Dale Lands and Michelle Antoine in the lobby for an event. They then decided to drive to Durham.

542. When presented with a receipt for the Embassy Suites in Charlotte for Johnson showing that he had checked into the hotel and stayed there between November 5, 2021, through November 8, 2021, Angela Barbour became confused. Again, she then testified that she remembered that Johnson was leaving the Durham Marriott after they had sex to go to Charlotte.

543. When showed Johnson's check-in time on the receipt which was 8:46am on November 5, 2021, the same date that Angela Barbour has testified they met at the Raleigh Marriott, Angela Barbour then corrected her testimony again and said Johnson had been in Charlotte but drove back to Raleigh to have sex with her at the Marriott, then saw Lands and Antoine, so they drove to Durham, had sex, and he drove back to Charlotte. When asked if she wanted to change anything about her testimony she said no, she was positive.

544. When showed a Facebook messages between Johnson and a co-worker the afternoon of November 5, 2021, where Johnson informed the co-worker that he was going to be in Charlotte for the next few days for a comic book convention, Barbour shrugged and reiterated her testimony that she was with Johnson on the evening of November 5, 2021, at the Marriott in Durham.

545. When asked if it mattered to her testimony that Johnson and three male friends exchanged text messages on that date discussing meeting up for different meals, reservations, waiting on one another at different locations in Charlotte, Barbour testified that no, such messages would not cause her to rethink her testimony regarding the November 5, 2021, date.

546. During the month long period between November 8, 2021, and December 9, 2021, phone records showed that Angela Barbour omitted many communications between herself and Johnson from her timeline:

| Date | Time | Length of Call | Sender/ Receiver | Message | On Angela Barbour's Timeline |
|------|------|----------------|------------------|---------|------------------------------|
| 2021.11.08 | 1:04pm | No answer | Angela Barbour to Johnson | | **NO** |
| 2021.11.08 | | Text | Angela Barbour to Johnson | Screenshot of page from JCPS site | **NO** |
| | | Text | Angela Barbour to Johnson | "3 hrs next week" | **NO** |
| | | Text | Angela Barbour to Johnson | "It's a no win" | **NO** |
| 2021.11.08 | 8:46pm | 12 min | Johnson to Angela Barbour | | **YES** |
| 2021.11.09 | 2:41pm | 5 min | Johnson to Angela Barbour | | **YES** |

129

| Date | Time | Length of Call | Sender/ Receiver | Message | On Angela Barbour's Timeline |
|------|------|----------------|------------------|---------|------------------------------|
| 2021.11.09 | 8:38pm | Text | Angela Barbour to Johnson | "Well stated" | **NO** |
| 2021.11.09 | 8:38pm | Text | Johnson to Angela Barbour | "Thanks bro" | **NO** |
| 2021.11.09 | 10:32pm | 2 min | Johnson to Angela Barbour | | **YES** |
| 2021.11.11 | 9:40pm | Text | Johnson to Angela Barbour | Actual text: "Your phone off? (Laughing emoji) Gotta pay the bill" | **"You're phone off? Gotta pay the bill – RJ upset I did not answer** |
| 2021.11.11 | 9:40pm | Text | Angela Barbour to Johnson | "No my phone is not off dingaling" | **NO** |
| 2021.11.11 | | Text | Angela Barbour to Johnson | "You have to remember I have three teenagers at my house tonight...and a six year old..lol | **NO** |
| 2021.11.11 | 10:30pm | No answer | Angela Barbour to Johnson | | **NO** |
| 2021.11.12 | 1:04pm | 6 min | Johnson to Angela Barbour | | **YES** |
| 2021.11.14 | 5:29pm | No answer | Angela Barbour to Johnson | | **NO** |
| 2021.11.14 | 2:55pm | Text | Angela Barbour to Johnson | "Wyd today?" | **NO** |

| Date | Time | Length of Call | Sender/ Receiver | Message | On Angela Barbour's Timeline |
|---|---|---|---|---|---|
| 2021.11.14 | 4:15pm | Text | Angela Barbour to Johnson | Unreadable – Angela Barbour cut screenshot off and did not provide this and following text | **NO** |
| 2021.11.14 | 5:29pm | Text | Johnson to Angela Barbour | "Can I call you later?" | **NO** |
| 2021.11.14 | | Text | Angela Barbour to Johnson | "Absolutely..I was just going to tell you I just finished my first door to door helping Jill" | **NO** |
| 2021.11.14 | 8:26pm | No answer | Angela Barbour to Johnson | | **NO** |
| 2021.11.14 | 8:30pm | No answer | Angela Barbour to Johnson | | **NO** |
| 2021.11.14 | 8:30pm | Text | Angela Barbour to Johnson | **"You blocked me?"** | **NO** |
| 2021.11.14 | 10:10pm | Text | Angela Barbour to Johnson | **"You blocked me on Snap?"** | **NO** |
| 2021.11.14 | 10:13pm | 28 min | Angela Barbour to Johnson | | **YES** |
| 2021.11.14 | 10:48pm | 24 min | Johnson to Angela Barbour | | **YES** |
| 2021.11.16 | 8:00pm | 16 mins | Angela Barbour to Johnson | | **YES** |

131

| Date | Time | Length of Call | Sender/ Receiver | Message | On Angela Barbour's Timeline |
|---|---|---|---|---|---|
| 2021.11.17 | 10:20pm | 2 min | Johnson to Angela Barbour | | **YES** |
| 2021.11.18 | 3:34pm | 5 min | Johnson to Angela Barbour | | **YES** |
| 2021.11.18 | 7:02pm | Text | Angela Barbour to Johnson | "Packed meeting" | **NO** |
| 2021.11.18 | | Text | Angela Barbour to Johnson | "PACKED" | **NO** |
| 2021.11.18 | 9:15pm | 10 min | Angela Barbour to Johnson | | **YES** |
| 2021.11.22 | 4:32pm | 9 min | Johnson to Angela Barbour | | **YES** |
| 2021.11.23 | 1:46pm | 17 min | Angela Barbour to Johnson | | **YES** |
| 2021.11.29 | 8:14pm | 11 min | Johnson to Angela Barbour | | **YES** |
| 2021.12.03 | 6:26pm | 2 min | Johnson to Angela Barbour | | **YES** |
| 2021.12.04 | 1:14pm | No answer | Angela Barbour to Johnson | | **NO** |
| 2021.12.04 | 1:19pm | 5 min | Johnson to Angela Barbour | | **YES** |

| Date | Time | Length of Call | Sender/ Receiver | Message | On Angela Barbour's Timeline |
|------|------|------|------|------|------|
| 2021.12.07 | 7:42pm | 1 min | Johnson to Angela Barbour | | **NO** |
| 2021.12.09 | 3:07pm | No answer | Angela Barbour to Johnson | | **NO** |
| 2021.12.09 | 3:58pm | 2 min | Johnson to Angela Barbour | | **YES** |

547.   Although phone records show Angela Barbour and Brent Wiggs, whom she had starting seeing in October 2021 were in constant communication during this time period, on November 20, 2021, Angela Barbour posted a picture on Facebook of herself and an unknown female with the words, "When your heart gets broken, you find your family." Since Barbour was still seeing Wiggs, presumably she was texted about her relationship with Johnson.

548.   On November 21, 2021, Barbour sent Bond a Snapchat: "Hey friend...just saying hey. I just caught Ryan with another woman. It was not good. It's been going on a long time." Angela Barbour then sent Bond a screenshot of her Facebook profile with the status changed to "Separated."

549.   During her dating relationship with Wiggs, Angela Barbour began to publicly share comments, posts, and pictures of her and Brent Wiggs. Although Angela Barbour had told no less than a dozen people about her "two year" affair with Johnson and rumors had run rampant for months within Johnson's professional and political circles, few

people directly asked Johnson if there was any truth behind the "confidential" confessions Barbour had been making, especially when she had been drinking.

550. In addition, due to the public nature of her relationship with Wiggs, people who knew that Johnson and Angela Barbour had been having a sexual relationship in the past, took the opportunity to openly tease Johnson, especially since Wiggs and Johnson were very similar in height, hair color, and facial hair.

**WINTER 2021**

551. On November 29, 2021, the JoCo report published an op-ed by Johnson: "Corruption and Incompetency are Partly to Blame for Budget Shortfall, School Board Member Says."

552. On December 7, 2021, Angela Barbour commented on Johnson's Facebook, "You are a GREAT EDUCATOR! Proud to call you my friend."

553. On December 12, 2021, DeVan Barbour announced his candidacy for the US House District 4 seat on social media.

554. On December 13, 2021, Maura O'Keefe, the attorney from Tharrington and Smith who handled the investigation into the sexual harassment allegations against Jimmy Lawrence, contacted Johnson several times for reasons then unknown to Johnson.

555. However, at 5:11pm, Johnson received an email stating that that Tharrington and Smith had been contacted by an attorney for the school board employee who had been sexually harassed from July 2017 until January 2020, and who was threatening to file a lawsuit against Superintendent Dr. Eric Bracy, the BOE, and individually named defendants. The email instructed Johnson to preserve his emails and other written documents which he did so.

134

556. On December 14, 2021, the BOE met for its Regular Session followed by a closed session. During the Closed Session portion of the meeting, he BOE discussed the lawsuit and Tharrington and Smith attorney Ken Soo recommended a litigation committee for the lawsuit that had been threatened in order to avoid sharing information with Johnson about the threatened lawsuit.

**Early 2022**

557. By 2022, Barbour was a fixture at Johnston County political meetings and events. She attended meetings of the BOE, Johnston County GOP, JCRW, CAAG, and even the Board of County Commissioners meetings.

558. On January 20, 2022, Angela Barbour was inaugurated as the Vice-President of the Johnston County Republican Women's Club.

559. Angela Barbour and Brent Wiggs were no longer seeing one another after the New Year, despite posting together on social media over Christmas. On January 26, 2021, Angela Barbour sent a friend (identity withheld) a series of Snap messages:

| Timestamp | Sender | Retrieved Snap message content |
|---|---|---|
| 11:38 am | Angela Barbour | "But I'm up for a good sexual beating by a male if you can find one" |
| 11:38 am | Withheld | "Shit. I need one too. Been too long." |
| 11:38 am | Angela Barbour | "Well me too kinda" |
| 11:40 am | Withheld | "Oh boo. There is no kinda!! What happened to Married bad boy?" |
| 11:41 am | Angela Barbour | "Oh he's still around" |
| 11:41 am | Angela Barbour | "The more I ignore him the more he comes around" |

135

| Timestamp | Sender | Retrieved Snap message content |
|---|---|---|
| 11:41 am | Withheld | "You are bad" |
| 11:41 am | Angela Barbour | "Oh I know" |
| 11:41pm | Withheld | "Haha. What about the sweet guy" |
| 11:41pm | Angela Barbour | "Honestly trying to fix things with Ryan but he told me last night he just wan't feeling it. After I stayed with him the last two weekends. So I literally got three hours of sleep last night." |
| 11:42 am | Angela Barbour | "The good guy went crazy" |
| 11:42 am | Angela Barbour | "Too obsessive" |
| 11:43 am | Withheld | "Oh huh. I'm so sorry. Maybe its for the best without Ryan. I know its hard for the girls but you are a different person not around him." |
| 11:43 am | Withheld | "What? Wow. Damn guys." |
| 11:52 am | Angela Barbour | "I know...but I had still hoped to make it work." |

560. The last entry in Angela Barbour's timeline alleging any in-person contact with Johnson also was the only one in 2022:

| DATE | TIME | EVENT DESCRIPTION | NAME OF INDIVIDUAL WITNESS TO EVENT |
|---|---|---|---|
| 2022.01.27 | 7:40pm | Picked Ronald up for Clayton Fitness and greeted by neighbor upon arrival back at apartment | Angela Barbour/Ronald Johnson/Brittany Addison |

561. The neighbor to which this entry referred had lived,  Brittany Addison, moved next-door to Angela Barbour and lived there from August 20, 2021, until the end of April 2022.

136

562.    Addison sat for a recorded interview with Lt. West in Johnson's personnel investigation.

563.    Addison stated Barbour was "really into the whole political scene in Johnston County."

564.    Addison stated Barbour told her she and Johnson were having an affair. Addison stated she saw Johnson one night and Addison knew she had

> the date for it because I had ordered some Amazon packages that I was really excited about coming and Angie was over. That was January 27 (2022). And he had called and she put him on speakerphone, and he had asked if she could pick him up from the gym, which was right across from La Cocina. And he would be there in a little bit.

565.    Addison stated the picture she has of her Amazon packages was taken at 7:18pm and "he probably called shortly after. As soon as I opened the boxes, she had to go pick him up."

566.    Addison told West she was packing to go to Wilmington for the weekend, and saw Barbour's car pull back up, so she went downstairs to put a bag in her car. Addison stated that she saw Barbour walking with a male five feet behind her, wearing a black hoodie over his head. "But we made eye contact. And he just said hey, how are you doing? He went upstairs with her, so that picture was at 7:18. It was probably about an hour, hour and a half after that that I saw them, because we opened the boxes." Addison then shared, "And like I said, we share a wall. So for the next little bit of time you could hear them having sex in her apartment."

567.    Addison told West that Barbour told her that Johnson would come over several times a week, often staying the entire night. However, Addison admitted she was not present for the alleged encounters because she would go to Wilmington on the weekends and that was "when I know he would come over." Addison could not describe Johnson's vehicle nor did she know if the car had two or four doors and when asked when Johnson began

coming over to the apartments stated she only knew what Angela Barbour had told her, "So nothing that I had witnessed personally."

568. In his interview with Addison, West revisited the date of January 27, 2022, and asked if Johnson spent the night. Addison said "I don't think he did spend the night...It was late the time he left. I know that I was in bed because I was going to hopefully spend time with (Angela Barbour) after he left, and it was late when she took him back."

569. Based off the timeframe Addison and West established, Barbour would have picked Johnson up an hour to an hour and a half after the 7:18pm picture, and Barbour took him back late, after Addison went to bed.

570. Addison's statements about the January 27, 2022, date, however, could not be verified as phone records showed there were no calls between Johnson and Barbour on January 27, 2021, through February 3, 2022, and Barbour's phone records contradict Addison's story:

| Date | Time | Length | Caller / Number | Recipient |
|------|------|--------|-----------------|-----------|
| 2022.01.27 | 9:12pm | 2 min | Angela Barbour | Addison |
| 2022.01.27 | 9:22pm | 34 min | 919.669.9508 | Angela Barbour |
| 2022.01.27 | 9:57pm | 4 min | Angela Barbour | Ryan Barbour |
| 2022.01.27 | 10:01pm | 6 min | Angela Barbour | Ryan Barbour |
| 2022.01.27 | 10:06pm | 7 min | Ryan Barbour | Angela Barbour |
| 2022.01.27 | 10:13pm | 5 min | Ryan Barbour | Angela Barbour |

571. Addison was not asked and did not mention if she had ever seen William "Brent" Wiggs, who Angela Barbour dated from October 2021 – January 2022 and who bore a strong resemblance to Johnson, at the apartment.

572. Nor was Addison asked or did she mention whether she had ever seen Cody Shomper, who started coming to Barbour's apartment around March 10, 2022, and was still visiting Barbour at the time Addison moved to another residence in April of 2022. Addison also never mentioned Barbour's husband, whom Barbour admitted she was still intimate with during this time in SnapChat messages to a coworker.

573. When Addison was also interviewed by Zellinger and James on December 19, 2024, she told them that Johnson had been the only board member that had objected to a reassignment request she made for her fiancé's (now husband's) child to attend the school out of district where Addison taught. That request and objection occurred in June of 2022, only a month before Addison spoke with West – yet she did not disclose this to West during her interview with him.

574. Angela Barbour's phone records also show that on July 21, 2022, within the hour before Addison met with West, Angela Barbour and Addison exchanged eight MMS text messages, one with a photo attached. Notably, Barbour's timeline that she and the Lawrence firm produced to the Town spanned a period from October 4, 2020, to May 23, 2022, but ended at that time and was never supplemented either by a Barbour voluntarily or by West's or Hoffman's request.

575. Angela Barbour alleged only 16 occurrences of personal interaction with Johnson during the 14 months, from November 14, 2020, through January 27, 2022, the date Addison claimed she saw Johnson going into Angela Barbour's apartment and allegedly having sex, even though there were no phone calls between Barbour and Johnson on January 27, 2022.

576. Contrary to her deposition testimony that she had no political ambitions, Angela Barbour actively volunteered early in 2022, to help several candidates in their bids for local election, included volunteering to help Travis Wheeler, who was running for District Court judge, and Kevin Donovan, running for a seat on the BOE, and both accepted Angela Barbour's eager willingness to help early in the year.

577. By February of 2022, Angela Barbour was back to contacting Johnson frequently and was posting multiple pictures at a time of Johnson on her social media.

578. On February 6, 2022, Angela Barbour posted multiple pictures on Facebook of Johnson she had taken at a political meeting. At 6:00pm Angela Barbour texted Johnson, "I see you....I came to La Cocina ....saw ya car at the gym." Johnson's response was "Gotcha." Hours later with no sign of interest from Johnson, Angela Barbour reached out to Wheller with an invitation. Wheeler texted Johnson, "Drunk call from Angie to come hang out. I'm like nope. I can't be messing up my election committee in the first week."

579. Days later, on February 9, 2022, Angela Barbour messaged Johnson, "Wanted to share: I spoke with (Wheeler) last evening and sincerely apologized and talked about how unprofessional I was Saturday, just thought I'd share. We will be at CAAG tonight."

580. In "The Truth," Angela Barbour's version again was very different from reality. Angela Barbour wrote, "It wasn't long Ronald was accusing me of having sex with (Travis Wheeler) and that was hilarious. Travis and I were all things politics!"

581. On February 14, 2022, O'Keefe, the school board attorney, contacted Johnson asking for the cell number of Town Manager Michael Scott.

582. On February 18, 2022, Angela Barbour again posted multiple pictures on Facebook of Johnson at an event.

583. In late February/early March 2022, during a conversation with Phillips, Johnson suggested Phillips reach out to Angela Barbour and Johnson gave Phillips her name to locate her on social media. Phillips stated that he would reach out to Angela Barbour.

584. By the end of February, Angela Barbour was in constant contact with Travis Wheeler, but more frequently, Kevin Donovan.

585. A comparison of text messages between Johnson and Angela Barbour from 2022, which Johnson turned over to the Town during the personnel investigation, showed the following exchange:

> On February 25, 2022, Angela Barbour texted Johnson, "Are you free later?"
>
> Johnson responded, "I don't get off work until six, and I've got to go home and get some shit ready so I can head out of town tomorrow morning."

This exchange was not on Angela Barbour's timeline and was selectively omitted from messages Angela Barbour provided to West and then later Hoffman.

586. On March 2, 2022, the Town documented a complaint from Johnson that Councilman Marlon Lee told one of Johnson's fellow Smithfield PD officers that Johnson was racist, which deeply disturbed Johnson.

587. On March 3, 2022, Angela Barbour texted Johnson, "Late night at the gym I see."

588. Soon after the unanswered text to Johnson, Angela Barbour posted a disturbing Tik-Tok of a woman screaming, "You fucking left me! When I fucking needed you! You fucking left me when I was at my fucking lowest! You fucking left me at my fucking lowest!"

589. On March 5, 2022, at 8:41pm, Angela Barbour texted Rick Walker, a fellow member of the GOP, "I need to TALK to you at some point." Walker stated that Angela Barbour

asked him to meet at a bar but upon learning Walker planned to bring his wife, suddenly rescinded the invitation.

590.     On March 8, 2022, Angela Barbour showed up near the end of a live-streamed BOE meeting wearing an extremely short outfit and was observed staring at Johnson. Before the meeting adjourned Johnson was seen on camera standing up and turning to leave out of a side door as Barbour was getting up and moving in his direction.

591.     On March 9, 2022, at 7:30 am, Angela Barbour sent Johnson a text that began, "I wanted to talk to you about this yesterday, but you seemed preoccupied..." Angela Barbour then threw out the names of Judge Paul Holcombe, Dale Lands, and Darryl Mitchell, and asking for Johnson's input on an event she was helping put together.  When Johnson responded, "Really don't now, good luck with it," Angela Barbour responded, "Once again...avoiding."

592.     On March 9, 2022, Johnson attended a CAAG meeting at the Cleveland Draft House in Clayton and Angela Barbour also attended the meeting.  Text messages were exchanged between Donovan, Wheeler, and Johnson, asking one another how she knew to come.

593.     At 6:40pm, on March 9, 2022, Angela Barbour sent Johnson a text that said "I hate this motherfucker" referring to Joe Preston.

594.     At 7:05pm, on March 9, 2022, Owen Phillips sent Angela Barbour a "Friend Request" on Snapchat.  Angela Barbour immediately took a screenshot and sent it to Johnson with the caption "Do I accept this?" Johnson responded, "Yes. That's your new boyfriend." Johnson was sitting next to Smithfield PD Officer David Sholes at the meeting. Angela Barbour then texted, "What about fine ass beside you?" Johnson showed the text to Sholes who shook his head. Johnson sent, "I think he's good." Johnson provided this text

142

to West during the personnel investigation. Scott referred to the exchange between Sholes and Johnson in his dismissal letter and determined that Johnson had been untruthful about the exchange.

595. In Angela Barbour's timeline, that entire exchange was condensed to only Johnson's response (with the wrong date and time) as follows:

| Date | Timestamp | Sender | Recipient | Message |
|---|---|---|---|---|
| 2022.03.10 | 6:00pm | Johnson | Angela Barbour | "Here's your new boyfriend" |

596. Although seemingly minor, that exchange and Angela Barbour's spin on it was later used in Hoffman's investigation of Johnson which he swore to in multiple affidavits for multiple search warrants on Johnson.

597. Angela Barbour claimed that Johnson sent her the contact to get Angela Barbour to reach out to Phillips, but that she refused. Angela Barbour then claimed the account identifying itself as Owen Phillips also sent her a sexually perverse Snapchat message, but that when she later spoke with Phillips, they both decided that the message had been Johnson pretending to be Phillips, which was patently untrue, and they disseminated this false information as part of the conspiracy to get Johnson removed from his school board position and his employment terminated.

598. Just five weeks after receiving the request from Owen Phillips, Angela Barbour sat down for her interview with Tim Shipman, who had been authorized by Todd Sutton to tell Angela Barbour she had immunity for being a whistleblower against Johnson. Angela Barbour told Shipman that Phillips had received Phillips's information on SnapChat but she didn't reach out. "I thought initially it was Ronald on Snapchat, trying to pretend to

143

be Owen, because I know how his mind works, because he deleted me off of Snapchat, because I was catching him with other women." In reality, as noted above, a screenshot of a text exchange between Angela Barbour and Johnson in November of 2021 showed Angela Barbour texted Johnson, asking him: "You deleted me off SnapChat?"

599.  Contrary to her statements to Shipman, Barbour wrote in "The Truth" that Johnson sent her Owen Phillips's SnapChat contact information, and "instructed her it was my new boyfriend. I never reached out. I was not interested in meeting anyone." Then, Angela Barbour stated that

> weeks passed and I got a Snap from Owen. It was perverse. I don't do perverse texts. I ignored it. I guess he figured out I didn't do dirty texts. Fast forward to the present day...I received a new Snap request from Owen that said I am concerned for your safety.

600.  The SnapChat account from which Angela Barbour received the "friend request" that she took a screenshot of on March 9th, sent to Johnson, and clearly then accepted, belonged to Owen Phillips. Records returned from a search warrant for the SnapChat account that requested Angela Barbour to accept the contract on March 9, 2022, showed the account belonged to Phillips and was used to communicate with Angela Barbour. Again, the sharing of false information about Johnson by Angela Barbour and Phillips was part of their conspiracy to ensure his removal from his position on the BOE.

601.  At 7:48pm during the same meeting on March 9, 2021, Wheeler texted Johnson, "(Angela Barbour) is on her third glass of wine and potentially gonna get fussed out in a few."

602.  On March 10, 2021, just after midnight, Angela Barbour tried to call Wheeler, but the call went to Wheeler's voicemail.

603. At 12:33am, not long after Angela Barbour tried to call Wheeler, Angela Barbour received a call from Cody Shomper, a man she had just met at the CAAG meeting. They spoke for two minutes and after hanging up, Angela Barbour excitedly called Michelle Antoine and told her Shomper was coming over to her apartment.

604. At 6:47am on March 10, 2025, Angela Barbour called next-door neighbor Addison, who would later tell West, Zellinger and Hoffman, that Barbour would call Addison to warn her not to go outside whenever "Johnson" was coming to or from her apartment. On March 10, 2025, it was Cody Shomper who was entering and/or leaving Angela Barbour's apartment.

605. Around mid-March 2022, Angela Barbour told Donovan that she and Johnson had been having an affair for two years. At first, Donovan did not believe Angela Barbour but encouraged her to share more.

606. On March 18, 2022, Angela Barbour texted Donovan stating, "He's out of town. No response from him. That means he's "out of town." Donovan replied, "He told me he was going to Virginia Beach." Angela Barbour said, "Yelp. I remember him telling me that. That was the first place he took me." She later texted Donovan, "That was our very first trip. Life sucks sometimes." When Donovan told her to be positive, she replies, "Oh I'm positive. I'm positive I've been used and a liability."

607. At 7:34pm that evening Barbour called Donovan and they spoke for eight minutes. Soon after they hung up, Donovan called Barbour back and they spoke for 42 more minutes.

608. Donovan then texted Barbour, "I feel like you could have wrote a novel from what I've learned recently. I can't believe there is more. LOL."

609.    Barbour responded, "Honey, there are so much more...not in my text though...Keep it out of my text...you're gonna have to invest in Snapchat r something that we can talk that cannot be traced." Donovan replied, "I've got Snapchat. Duh! Walkdaplank24".

610.    The following day, March 19, 2022, Donovan and Barbour spoke for over three hours. At the time Donovan's wife, Holly, was out of town, and Donovan was drinking and riding around on his golf-cart. Barbour was also drinking heavily.

611.    On March 21, 2022, Johnson called Angela Barbour and confronted her about things she had been telling Donovan, Wheeler and others, which she denied.

612.    On March 22, 2022, Johnson's wife Jami bought him front row seats for a Machine Gun Kelly concert playing in Raleigh on June 22, 2022. Johnson excitedly posts a picture of the concert promo with the words "Front Row!!" on Facebook. He also made a post of appreciation to his wife.

613.    At 12:09pm Angela Barbour texted Johnson, "Front row???REALLY???"

614.    By 1:20pm Angela Barbour, who was not a Machine Gun Kelly fan, had bought tickets and texted Johnson, "10th row (emojis) teachers make less money (emojis)."

615.    Donovan and Barbour had the following SnapChat exchange during this time frame:

| Sender | SnapChat Content |
| --- | --- |
| Donovan | "But when's the last time you and him have really done something? You'd think he would be like whatever." |
| Angela Barbour | "I know right? Mid February. Too DAMN long." |
| Donovan | "Damn. That's the last time y'all screwed around? I'd be struggling haha." |
| Angela Barbour | "Shut up! It's the longest we've ever gone. He's told me he's waiting for my divorce but I think he's scared right now." |

146

| Sender | SnapChat Content |
|---|---|
| Donovan | "When is that though?" |
| Angela Barbour | "May 23 is my date...June 3rd Ryans lol.<br>We can't agree!! (laughing emojis) really I'm going to have to wait to June bc I'm tired of fighting<br>I miss him<br>Lil bit<br>NOT MY HUSBAND" |
| Donovan | "You husband? LOL jk"<br>Do you think he will leave Jamie though?" |
| Angela Barbour | "Nope" |
| Donovan | "So what do you do?" |
| Angela Barbour | "She makes too much money<br>Get over his ass somehow"<br>(Avatars of Angela Barbour drinking with the words Wine Time!) |
| Donovan | "Lol!" |
| Angela Barbour | (Avatar of Angela Barbour drinking) |
| Donovan | "So once he comes back around, it's just going to be "party time'? Lol" |
| Angela Barbour | "Probably. Terrible right?" |
| Donovan | "I mean. Y'all had a thing for two years?<br>Kinda hard to get over." |
| Angela Barbour | "I'm really struggling<br>I'm honestly hoping he is...but (shrugging emoji)" |

616.     On March 24, 2022, at 1:23 m, Barbour texted Johnson, "Hey friend! Budgey question?

And can you believe the damn democrats are trying to show their butts bc of our forum."

Johnson did not reply. Angela Barbour sent another text, "Although I think (Joe) Preston

and Jim (Davenport) and Doug...that asshat group are behind it." Johnson still did not respond. Barbour omitted these texts from her timeline.

617. On March 24, 2022,at 5:36pm, Barbour texted Johnson, "Joe (Preston) is being a huge prick right now." Johnson did not respond, and again the text was not included by Barbour on her timeline.

618. At 6:09pm, Johnson called a Barbour and told her she needed to stop drinking in public.

619. At 10:30pm, Angela Barbour texted Johnson, "I'm curious to know what your intentions are with these "forums". Are they helping or hurting Kevin or Michelle? I know Tippett is fine." Ron did not respond.

620. On March 26, 2022, Donovan sent Johnson a screenshot of a Facebook post Barbour made with her photo and a quote by Machine Gun Kelly, "Trust is like an eraser. It gets smaller with every mistake."

621. On March 27, 2022, at 12:57am, Barbour texted Johnson, "I guess this tells me where we stand." Ron did not respond.

622. On March 27, 2022, at 8:37pm, Donovan texted Johnson, "Bro (Angela Barbour) just snapped me a picture of her wearing your elect Ronald Johnson t-shirt." Johnson asked, "Why?" Donovan replied "She was just saying she wished she had something new. Assuming a Donovan shirt...but it is weird she would be wearing yours."

623. On March 28, 2022, at 9:39pm, Barbour texted Johnson, "I was leaving the restaurant and saw were you must be playing raquetball...Just calling to say hey." Johnson did not respond.

148

624.    Phone records show Angela Barbour speaking almost daily to Cody Shomper throughout March and into April, though Shomper would primarily only call Barbour in the hours between midnight and 4am.

625.    In early April of 2022, Angela Barbour confided in Donovan she had also been sleeping with a man named Jim (last name withheld) that she had also meet at a political meeting. Kevin provided a screenshot of a text conversation between himself and Barbour in which he asked, "We're (sp) you with Jim or Ron?" Angela Barbour responded, "Both...but different times...(six laughing emojis). Angela Barbour then sent, "Jim was not as fun as Ron...Lol (shrugging emoji). Donovan simply responded, "Lmao!!"

626.    On April 10th, 2022, Phillips sent Barbour a SnapChat message. That same day Angela Barbour posted a picture of a "DeVan Barbour for Congress" shirt.

627.    On April 12, 2022, Angela Barbour sent Donovan a text that said, "I'm being set up." Kevin asked, "Why whom? By whom?" Angela Barbour: "RJ".

628.    Donovan sent a screenshot of this exchange to Johnson with a caption, "Just a heads up." Johnson replies, "Very sad."

629.    Johnson talked to Phillips, who he still considered one of his closest friends, and learned Barbour had reached out to him and told Phillips that Johnson has been essentially pimping her out. Johnson told Phillips not to listen to her, but Phillips had been harboring negative feelings of his own for some time against Johnson because Phillips believed that Johnson could have done more to keep him from getting in trouble criminally, and that he had the power to help Phillips get not only his reputation back, but also his law enforcement certification.

630.    On April 13, 2022, at 10:50am, Johnson called Barbour and told her he knew she was is telling people things that were not true. Barbour stated that she heard the same rumors just the night before from Phillips. Johnson asked her to stop lying and to leave him alone.

631.    Johnson recorded the phone call with Angela Barbour. It was the last time he and Angela Barbour spoke on the phone.

632.    Sometime around lunchtime on that day, April 13, 2022, DeVan Barbour received an out-of-state text message alluding to a recording about him that was going to be published.

633.    Angela Barbour made the following entry in her timeline:

| Date | Time | Length of Call | Event | Name of Individual/Witness to Event |
|------|------|----------------|-------|-------------------------------------|
| 2022.04.13 | 2:27pm | | Text/Snap "Hey are you okay?" Met Owen bc he sent snap saying he was concerned for my safety. | Angela Barbour/ Owen Phillips |

634.    In her interview with Tim Shipman that same month, Barbour stated that she met with Phillips recently during Spring Break. "And he wanted to come to my apartment, I said no, I don't let men in my apartment. Ron's the only other man that's been in my apartment, besides my husband. I was like, I'll meet you somewhere in public." Barbour stated Phillips made her turn off her phone and they rode around and talked.

635.    Referring to Phillips, Barbour told Shipman, "Oh God, that he had so much on Ronald that he could have him behind bars." Tim Shipman asked, "Like what?" Barbour then backpedaled and staid, "He didn't tell me that, but he said, I've got so much. He said, I'm

going to tell you this in complete confidence. and he prefaced everything with I am concerned about your safety." Barbour told Shipman that she then told Phillips, "I said, well, just to let you know, I'm not going to say anything bad about Ronald because I know how he works," and that Phillips responded with, "I knew you would say that." Phillips then told her that on a night in June he had followed Barbour to McKinley's at Johnson's request.

636.    After riding around with Phillips for some time, Phillips received a call from one of the mothers of his children and told Barbour he needed to take one of his sons to a therapy session. Barbour stated he told her he would take his son in to begin the session and then contact Barbour to meet him outside, where he would then call Johnson on speakerphone and Barbour could listen.

637.    Barbour stated Phillips took her back to her vehicle with the understanding that he would send her a SnapChat message in about 20 minutes, but she then told Shipman that she never heard from Phillips and still hadn't in the week since.

638.    Barbour did not mention to Shipman, nor did she record in her timeline, that she sent the following texts to Johnson that night after Phillips left her at her vehicle.

| Date | Time | Length of Call | Sender/ Receiver | Message |
|------|------|----------------|------------------|---------|
| 2022.04.13 | 7:31pm | Text | Angela Barbour to Johnson | "Don't you think you need to be more concerned with the individual that reached out to me last night and told me you were setting me up? |
| 2022.04.13 | 9:24pm | Text | Angela Barbour to Johnson | "We need to join the same team. He mad a video about me. Can we PLEASE put this shit asie and work together?" |

639.    Johnson did not respond.

640.    The next day, April 14, 2022, there was a ticketed event for the GOP called Reagan Day. Donovan and Johnson had gone in together to sponsor a table, but Donovan ended up taking his family to Disney World for Spring Break and told Johnson to give Donovan's share of the seats away. Johnson offered one of the empty seats to Allyson Bond.

641.    Barbour attended the event and was incensed when she saw Bond at Johnson's table. Bond had slowly stopped communicating with Barbour the previous year. Barbour tried to make a scene with Bond, but Bond refused to engage with Barbour, and Johnson avoided Barbour altogether.

642.    That evening Barbour posted a slew of pictures on Facebook posing with those attending the event, almost all candidates but with a few others, such as DeVan Barbour's wife Britany. Barbour also posted a picture of Johnson's table with his name placard, which Barbour had removed and taken home.

643.    Angela Barbour also texted Dale Lands, "I'm pretty sure someone is accessing my texts. Limited conversation over text."

644.    Barbour's behavior had spurned a new stream of speculation among members of the GOP and others. A Facebook group posted the following and tags Johnson: "@Ronald Johnson...Travis and Angie now a thing?? Hearing she dumped everyone else for Travis." Joy Jones, a sitting Johnston County District Court Judge, commented: "Travis says absolutely NOT! I teased him today. But Travis did take some of the pressure off Ronald!!!" Johnson posted a rare response back, "At least they didn't confuse Travis for Brent Wiggs..geez."

645.    As her "working" relationship with Wheeler and Donovan fractured, Barbour began to help others running in 2022 elections: Jason Kimble, who was seeking to be on the bench in District Court, and Judge Paul Holcombe, running for Resident Superior Court Judge, a seat that had just been added after the state budget was passed in November 2021.

646.    Her social media is inundated with campaign signs and photos of Barbour at events alongside candidates. Barbour also was posted cryptic messages, TikToks, and memes apparently aimed at Johnson, who had long since deleted Angela Barbour and her "close circle of friends" from his social media accounts.

647.    On April 15, 2022, Barbour saw Michelle Antoine at the Republican headquarters and asked to speak to her. Antoine, like Donovan, was running for a seat on the BOE. For almost two hours, Barbour and Antoine spoke and Barbour told Antoine that she and Johnson had been in an affair for the last two years but that things had turned ugly, and she had purchased a new phone because Johnson had access to her phone and could read all her messages, that he knew her location, and that he could see her photos.

648.    Antoine observed that Barbour was borderline hysterical, and while Antoine did not believe most of what Angela Barbour was telling her, she also knew, as everyone in their political circle had long suspected, that something inappropriate had gone on at some time in the past between Barbour and Johnson.

649.    On April 16, 2022, Donovan used a spoofed number and called DeVan Barbour, who was a month away from the Congressional primary. DeVan Barbour was in the car with his wife and children attending Easter festivities when the unidentified call came through.

650. Almost immediately after Donovan identified himself and confirmed that DeVan Barbour knew who Angela Barbour was, he told DeVan that he had heard a recording existed of Angela Barbour claiming to have slept with DeVan Barbour. DeVan Barbour was rattled and told Donovan that he would call him right back and disconnected without getting Donovan's number, assuming it was the number that called him.

651. Subsequently, on this same date April 16, 2022, DeVan Barbour called Angela Barbour, who denied saying anything of the kind and texted him Kevin Donovan's contact information along with a message, "I didn't do this. This is Ronald."

652. Barbour then spoke with Donovan again and was measured and careful in her conversation. Donovan stated that it was not the first time he had heard this from Barbour. Donovan then called Johnson and told him that he (Donovan) had given Devan a head's up about Barbour.

653. Johnson and DeVan Barbour, who knew one another, also spoke on April 16, 2022. Meanwhile, in the three hours after DeVan's Barbour's call, Angela Barbour made multiple attempts to reach Kevin Donovan, Brian Barefoot, Owen Phillips, Michelle Antoine, Allyson Bond, Jack O'Hale (her DUI attorney), Travis Wheeler, and several other people well known in local politics.

654. On this same date, April 16, 2022, Angela Barbour sent Donovan over a dozen texts asking him what he told DeVan Barbour, alternating in her conversation between offering help with Donovan's campaign signs to threatening to call people she knew Donovan considered influential to bad mouth him. At the end of the day she texted Donovan that she was going to tell her husband about Johnson. Moments later she followed up with a text stating, "I can't tell Ryan."

154

655.     Meanwhile that afternoon of April 16, 2022, Angela Barbour also bought a prepaid phone from Target and began sending texts to select people from her new number, (919) 984-2807. Angela Barbour texted Donovan, who informed Johnson that she had bought a new phone with a new number.

656.     Angela Barbour then texted Antoine from her new phone, "I think RJ is after me, and Kevin is involved. This is Angie. I just spent 200 on a phone that i don't even have. I'm a mess Michelle."

657.     Donovan had written to Angela Barbour earlier on April 16, 2022: "I have to take a break for a bit. I can't go into details. I did not do what you think I did."  Barbour responded to Donovan and said, "Ok thank you for reaching out."

658.     At 10:12pm that night on April 16, 2022, Angela Barbour sent DeVan Barbour a text that included a screenshot of a SnapChat conversation between herself and Donovan.

659.     Under the screenshot of the SnapChat between Angela Barbour and Kevin Donovan, that Angela Barbour sent to DeVan Barbour was a message Angela Barbour wrote to DeVan Barbour that began, "I did nothing to jeopardize" but was cut off.

660.     Barbour subsequently provided a screenshot of only this part of her message to DeVan Barbour to Tim Shipman and later to Investigator Hoffman.

661.     Sometime that evening with April Lee present, Barbour told her husband Ryan that she had been sleeping with Johnson since summer/fall of 2020.

662.     On April 17, 2022, shortly after Barbour posted a TikTok video with a series of phrases about trust and "shady" people, she reached out to Antoine. Antoine asked if Donovan really did call "D" (DeVan Barbour), and Barbour replied "Yes." Antoine  replied, "Not cool. But Donovan talks too much and texts too much." Barbour texted: "Yes but he was

155

told to call and tell him. He won't tell me by who but I;m pretty sure I know. That's what I'm trying to find out."

663.    Later the evening of April 17, 2022, Johnson and Donovan had the following text exchanges:

| Date | Time, if known | Sender | Message |
|------|----------------|--------|---------|
| 2022.04.17 | | Donovan | "Surprised DeVan hasn't called me." |
| 2022.04.17 | | Johnson | "He won't" |
| 2022.04.17 | | Donovan | "I bet he is scared AF. He doesn't know me or anything about me. I'm literally a wild card to him." |
| 2022.04.17 | | Johnson | "Yeah. I would be thankful if you called me to tell me about the bs being said about me." |
| 2022.04.17 | | Donovan | "(Barbour) sent me a snap as well but in the snap it said she was going to "get help" |
| 2022.04.17 | | Johnson | "Do you have a picture of it? Dude if she's threatening to hurt herself or some shit like that we have to do something, even though I know its complete bullshit" |
| 2022.04.17 | | Donovan | "I think she is having a breakdown." |
| 2022.04.17 | | Johnson | "I can't help her bro, as much as I want to, she's just too much." |
| 2022.04.17 | 6:02pm | Donovan | "Call me whe you're free. No rush." |
| 2022.04.18 | 7:57 am | Donovan | "(Barbour) kept snapping me so I couldn't stand it anymore. I told her I was done with the BS and I have spent more time and energy on this shit than actually running a campaign fixing the school system." |

156

664. Phone records show Donovan was likely not the only person who Angela Barbour told she was "getting help." Angela Barbour exchanged multiple phone calls with CherylAnn Houseman, a fellow JCRW member known to be level-headed and compassionate. She also contacted Lands, Holcombe, Kimble, and her steady group of friends: Amy Monsour, April Jones Lee, Erin Clark, Brittany Addison, and Brian Barefoot.

665. Over the months leading up to this point, Donovan had taken it upon himself to constantly relay to Johnson anything Angela Barbour was telling him and others regarding Johnson, as well as other men she bragged about having sexual relations or refusing their sexual advances, among them allegedly DeVan Barbour and State Representative John Bell.

666. Texts show that Johnson was not encouraged Donovan to alert him to Barbour's interactions with him, because Johnson was making deliberate efforts to avoid attending to any meetings or functions Angela Barbour would likely attend. In addition, he made efforts to deflect any conversation and make no comments if Angela Barbour was mentioned. His efforts to avoid Barbour were not lost on Barbour, who had grown increasingly angry and vocal.

667. Donovan was heavily relying on being aligned with Johnson to push him through the May primary. Donovan also had a strong personal interest in Johnson's reputation, as Donovan plainly admitted during his trial testimony, because without Johnson he never would have won his seat on the BOE. Donovan asked Barbour for proof that she and Johnson had had a relationship, and Barbour was upset that Donovan would not simply take her word for it.

668.　On April 19, 2022, Angela Barbour sent Donovan the following SnapChat message at 3:31pm:

> "Well, I can't give you all my evidence bc that would be stupid but I have my phone records. That should be enough for you. At this point you gotta take my word. This could get ugly if he continues and I can't jeopardize my livelihood bc someone doesn't believe me. You got to take my word. He took Ally Bond with him Reagan Day. She sat at your table with your student. She went with us to Charlotte. He did not know her before me. She is my friend but he's trying to turn her. She is a teacher at McGee Elementary School. I have photos of us on that trip...you are just going to have to take my word or leave me be.

669.　At 3:56pm Angela Barbour sent Donovan another SnapChat message:

> Why the full (sp) would I tell my husband I cheated on him 6 months before we separated...that's enough.

670.　That evening, on April 19, 2022, Angela Barbour broke down in front of members of the JCRW, of which she had only been Vice-President a few short months. President Michelle Baker Haller saw this as an opportunity to kill two birds with one stone – she intensely disliked Johnson and was friends with some of the people who were the subject of his first amendment activity in the past, and she also needed a way to remove Angela Barbour from her position within JCRW. Angela Barbour had become a point of contention among members for causing drama, as well as becoming intoxicated at meetings and behaving inappropriately. Haller reached out to Timothy Shipman to see if he could get whatever information Barbour had about Johnson recording people and provide the information to Haller so she could ensure that it would get to the "right" people who could use against Johnson. Haller and Shipman set up a meeting at Haller's home for the following day.

## INTERVIEW OF ANGELA BARBOUR BY TIMOTHY SHIPMAN
## ON APRIL 20, 2022

158

671. Angela Barbour, CherylAnn Houseman, and Timothy Shipman met at the home of Michelle Baker Haller the evening of April 20, 2022. Before the meeting Angela Barbour had been instructed to stop using her cell phone serviced by Verizon in her name and only use her new prepaid. Angela Barbour had told multiple people than Johnson had been tracking her location through her Verizon phone and had gained access to all her content. Barbour gave different reasons for her statement that Johnson was tracking her, stating that Johnson must have seen her enter her security pin, or placed a tracking app on her phone, or was using software or resources available to him as a law enforcement officer.

672. Tim Shipman, who stated he was asked by Haller to assist because he had prior background in law enforcement as well as private sector investigative experience, started the interview.

> **SHIPMAN**: First of all one thing that I told you before I cut the recorder on, I have had conversations with (Superintendent) Dr. Eric Bracey and Todd Sutton, who's the chairman of the Johnson County School Board, and what I've told you as long as we get out in front of this that you will be protected you will not lose your job and that you'll be protected as a whistleblower. Did i tell you that?

> **ANGELA BARBOUR**: Yes, sir.

673. This introduction evidenced the conspiracy between Barbour, Shipman, and Sutton to obtain information from Barbour that could be used against him to ensure that he lost his employment and his school board seat.

674. Once Shipman and Barbour establish her understanding and agreed the interview was voluntary, Shipman asked when the affair with Johnson began. Barbour begins to describe the night in Clayton when Johnson came to the restaurant. After repeatedly stating how intoxicated she was, Angela Barbour paused:.

159

**ANGELA BARBOUR:** Am I gonna get in trouble for that one? Np, no, no. I mean, I had way too much to drink.

**SHIPMAN**: Let me back up before I stop you there. You self-reported your DUI so you're covered on that. I've already checked that too. Okay.

**ANGELA BARBOUR**: So anyway, I wasn't driving that night.

**SHIPMAN:** I know, but I'm just telling you, you self-reported to the school system, so you're fine there, Okay, I've covered that base too.

675.　As the interview progressed, Barbour mentioned that Johnson would register under his name at all the hotels they stayed at and that Barbour used his name once with the valet. Shipman stated, "This is further verification that if needed, we can have that information subpoenaed."

676.　Angela Barbour told Shipman the purpose of the Virginia Beach trip was for Johnson to get information on individuals, but that she did not learn that until "after the fact" that Johnson wanted information on (Superintendent) Bracey.

677.　Shipman stated, "Well, I know when (Johnson) becomes chairman, he's gonna get rid of Bracey and put somebody else in as Superintendent."

678.　Angela Barbour said, "I think ((Johnson) knew Dr. Bracey came from Virginia or somewhere up there..."

679.　Shipman told Barbour Bracey never lived in Virginia Beach but (Johnson) could have been going to Northampton County on the Virginia border, because Bracey had lived there. Shipman repeated, "Okay, Northampton County, that's plausible."

680.　Angela Barbour stated, "We always saw each other. I probably left a lot of that out. We never went a week without having lunch or dinner. We would go out to eat a lot." Angela Barbour listed multiple restaurants in Smithfield and Clayton.

681.     Angela Barbour then said they would meet in parking lots where "(Johnson) knew where cameras were at or we wouldn't get caught, " and that Clayton Fitness was one of their regular spots. Angela Barbour then started to sound distressed.

> **ANGELA BARBOUR:** Let's just go ahead. Just go ahead and let me get it over with.
>
> **SHIPMAN:** No, I am not. Look at me.
>
> **ANGELA BARBOUR:** It's okay. I'm being recorded. It's out there now, so.
>
> **SHIPMAN:** But no, no.
>
> **ANGELA BARBOUR:** I just don't want to lose my job.
>
> **SHIPMAN:** Angie, I've already told you, as long as you listen to what I've got to tell you to do, and you get out in front of this like I'm going to tell you to do, you're not going to lose your job.

682.     Shipman referenced a phone call he and Barbour previously had where she twice said Johnson had trained her, and stated, "You know, he's trained you." Michelle Baker Haller chimed in, "Yeah."

> **SHIPMAN:** Which obviously tells me that you're aware of some of the shenanigans he's done to other people. Correct.
>
> **ANGELA BARBOUR:** Uh, I don't know like specifically right now just because I'm so nervous, but yes.
>
> **SHIPMAN**: Okay.
>
> **ANGELA BARBOUR:** Yes, he's went into detail about Bennett Jones.
>
> **SHIPMAN**: Tell me about it.
>
> **ANGELA BARBOUR**: I don't know a whole lot. I'm not really a good listener. I suck at it. I'm a good teacher, but I suck at listening sometimes. So I don't want to say anything wrong, but, well.
>
> **SHIPMAN**: You can't tell me what you can't remember.

161

**ANGELA BARBOUR**: I know he told me he played a part in (Former Superintendent) Renfrow's removal. Mr. Jimmy Lawrence, the attorney's removal. He's caught men in compromising positions with women. He would never be specific about how he, what, called like..I don't know if it was Renfrow or Bennett Jones or he caught – he has pictures of people. He has photos of like, he...

**SHIPMAN**: Ever show you any of them?

**ANGELA BARBOUR:** No, no, I've never seen a photo. But the way that he catches people is he's able to search up their hotel points, it's very easy to track people when they use hotel points, like you have travel miles or whatever that is, the hotel point stuff. He can look that up. I don't now if its through his job or what, but he said that's very, it's how they call..I don't know if it was Renfrow or Bennett, somebody, they caught them in a compromising position with a woman...I don't, you'll have to excuse me, sir, 'cause I was, I'm a horrible listener when it comes to that. **I know it doesn't help you.**

**SHIPMAN:** "Ross didn't get caught with a woman (unintelligible) while he left."

**ANGELA BARBOUR:** "He finds ways to put people in compromising positions so that he can hold stuff over their heads. Like Eddie Price.

**SHIPMAN**: Eddie Price, yeah.[9]

**ANGELA BARBOUR**: He told me he had a picture of him and one of his parts. And it was very easy for Eddie to leave.

**SHIPMAN**: One of his what?

**ANGELA BARBOUR**: Parts, eon of his penis.

**SHIPMAN**: Okay.

**ANGELA BARBOUR: He has a picture of his penis.**

**SHIPMAN: Okay.**

**ANGELA BARBOUR: I'm j**ust telling you things that are bits and pieces.

**SHIPMAN**: No, no. No, you should tell me. Okay, 'cause I. if I don't know everythin, I can't advise you on how to go, proceed. Okay. What's he got on Todd Sutton?

---

[9] Eddie Price was Deputy School Superintendent for Johnson County Schools when he resigned on July 6, 2018, to take a position with the North Carolina Principal Fellows Program.

**ANGELA BARBOUR**: He said, he doesn't have anything, that's why he hates him so bad, I think. Because he can't catch him or I mean that's why he hates him because he can't get anything on him, okay, I mean he literally hates that man.

**SHIPMAN**: Know he does I know he does.

**ANGELA BARBOUR**: (speaking over Shipman): "But he's never it's-

**SHIPMAN**: Because he wants to be chairman that's why oh yeah.

683.     Angela Barbour also told Shipman that Johnson wanted to take the board over. Shipman got confused and asked Barbour if she meant the School Board or the GOP board. Barbour said both, but that Johnson wouldn't be controlling them both.

**SHIPMAN:** Who's going, who's he going to take over the GOP board?

**ANGELA BARBOUR:** I don't now. He tried, he was wanting to use me. That was, I was going to be one of his....He wanted to use me. He wanted to use me. Because.....He wants control of that, too. He wants control of who goes on the ticket?

**SHIPMAN**: What does he think he's going to accomplish by getting control of the GOP board?

**ANGELA BARBOUR:** I don't know, sir. I don't know. He never told me why. He just wants control so he can say who's going to be on that ticket and the goal.

684.     Shipman asked Angela Barbour to think of other names. "Who else? Who's he got stuff on? Just take your time to think." Angela Barbour named Joe Preston, and both agreed Preston was not a serious contender for school board. Finally, Angela Barbour said "…that's all that he's ever really shared with me right now that's in my head, but I might be blocking things just because I'm scared."

**SHIPMAN:** What about using other people to set people up? That's been alluded to. That's okay, you spit it out.

**ANGELA BARBOUR:** He tried to use me one night."\

**SHIPMAN:** "You used what?

**ANGELA BARBOUR:** He tried to wire me to go into the last GOP convention.

685.     Barbour and Shipman then discussed Barbour's thoughts on why Johnson wanted her "wired," and she made a reference "just like that young girl last night." Barbour may have been referring to someone about whom Barbour had reached out to Antoine --ut a young woman who spoke at a meeting that Donovan and Johnson attended.

**SHIPMAN:** Did you go into the commission wired?

**ANGELA BARBOUR:** I did.

**SHIPMAN:** Okay, you did. Okay. And did he get any?

**ANGELA BARBOUR:** "No, no, he heard me singing all the way there. It's probably what he heard because I was doing it just to be funny. I was singing beach music. I mean, literally."

**SHIPMAN:** "Who else has he used you and wired you up for?"

**ANGELA BARBOUR:** "He's not. He wanted to use me for DeVan Barbour."

**SHIPMAN:** "Okay."

**ANGELA BARBOUR:** "But I wouldn't do it. He tried to. He gave me, even gave me a burner phone."

**SHIPMAN:** "For what?"

**ANGELA BARBOUR:** "To try to take pictures of Dee's snaps to me, but Dee never did anything wrong. Dee never did anything wrong. I just told him that Dee and I were friends and he wanted to see if I could use my, good looks apprently that I have. I'm being facetious. He tried to do that. That's the truth. I told my husband even about that. But he didn't do anything wrong. But he did try to get because he says he has stuff on Leo and he does not want him in power because something to do with Mr. Daughtry. Mr. Leo Daughtry. He doesn't like that man either or something."

**SHIPMAN:** That's because he's been in the same law firm with Jimmy Lawrence.

164

686.     Angela Barbour also discussed with Shipman the future she and Johnson were supposedly creating together and Shipman stopped her.

> **SHIPMAN**: "Let me blow your mind something with him anticipating this could blow up. He's been trying to set the stage on how to have a plan A, plan B, or plan C on his exit if it came to that. He told an individual two weeks ago, three weeks ago, that he may have to resign from the school board because he thinks Jami's pregnant. And if so, he was going to have to resign to spend more time at home with her.

> **ANGELA BARBOUR**: I bet he's trying to get her knocked up then.

> **SHIPMAN**: That's what he's trying to figure out.

> **ANGELA BARBOUR**: I've picked him up at his house with Jami in the house. You can judge me how you want to.

> **SHIPMAN:** Do that again.

> **ANGELA BARBOUR**: I've picked him up at the house with Jami in the house.

> **SHIPMAN**: What does she think about all this?

> **ANGELA BARBOUR**: She doesn't know it. She didn't know it at the time he met me outside and I picked him up to go take him to get his police car.

687.     Shipman redirected Barbour throughout the interview, which was just under two hours long. He revisited a few names with Barbour. Shipman brought up Michelle Antoine and Barbour volunteered, "She recorded Tracie (Zukowski)."[10]

> **SHIPMAN**: "But you know why that happened."

> **ANGELA BARBOUR**: "Because Ronald told her."

> **SHIPMAN**: "There you go."

---

[10] Michelle Antoine has been interviewed by law enforcement and given sworn testimony. She adamantly denies ever recording Tracie Zukowski, or anyone else.

**ANGELA BARBOUR**: "Ronald was the one who told her."

**SHIPMAN**: "There you go. There you go. Yeah."

**ANGELA BARBOUR**: "Wow. Oh, God."

688.    Shipman asked if Johnson told Angela Barbour "anything about trying to get legal fees out of the board or anything?"

**ANGELA BARBOUR**: No.

**SHIPMAN**: He didn't tell you anything about that?

**ANGELA BARBOUR**: No.

**SHIPMAN**:  Anything else you can think of he's tried to set up or has set up or how many times have…?

**ANGELA BARBOUR**: He hated Jimmy Lawrence and I know he set hm up.

**SHIPMAN**: Yeah. Well, there's two sides to that story too. Jimmy was wrong. Okay. Jimmy was wrong, but Ronald lured him. Yeah."

689.    Shipman brought up Darryl Mitchell, the head of the Johnston County GOP.

**ANGELA BARBOUR**: "Ronald told him that I was crazy and obsessive and wanted to have an affair. Yeah, that's what Ronald told Darryl."

**SHIPMAN**: "Okay, when did that happen?"

**ANGELA BARBOUR**: "I don't know because I've heard it from a couple people now that have reached out to me to say, look, Darryl knows."

690.    Shipman told Angela Barbour what would happen next, as far as their communication.

**SHIPMAN**: I told you there's going to be things that I'm going to tell you. I'm not going to tell you what you want to hear. I'm going to tell you what you need to hear. Okay.

**ANGELA BARBOUR**: Yes sir.

**SHIPMAN**: But all this can be fixed. It's going to take time, but you can fix this.

166

**ANGELA BARBOUR**: I just envision myself being on the front page of a freaking newspaper, and I don't want that to happen.

**SHIPMAN**: No.

**ANGELA BARBOUR**: I don't want that to happen for my girls, for my husband.

**SHIPMAN**: I don't either.

**ANGELA BARBOUR**: For my husband's family, for my daddy when he..."

**SHIPMAN**: I don't either.

**ANGELA BARBOUR**: I don't want to disappoint my daddy. Okay.

**SHIPMAN**: The way that we're going to frame this up is you're a whistleblower, okay?

**ANGELA BARBOUR**: I don't know what that means.

**SHIPMAN**: Somebody that knows other things that another person has done wrong and you report it to the appropriate people, there's whistleblower protection statutes, okay? And that's why I wanted so bad for you to get out in front of this before he went in there and got out i front of it ahead of you, okay? And he hasn't done it because I know beyond all shadow of any doubt, within three minutes of him leaving after having done it, I'm getting a call. Okay. Okay? So it ain't happened yet.

691.   Angela Barbour talked about how she felt like she was "going through the seven stages of death right now. I go from sad to anger. I can't get out of the sad and anger stage right now." Shipman told her, "I want you to stay angry."

692.   Shipman asked Angela Barbour again, "Anything else you can think of? I know there's more. You're just not remembering it." Angela Barbour replied, "I'm just remembering it right now." At this point Michelle Baker Haller jumped in and said there's a question she's always had.

**HALLER**: Would you like to guess what that is? Because I said, I'll get in my grave asking this question. Did (Johnson) ever admit to having initiated the whole controversy over at Clayton High School?

**ANGELA BARBOUR**; Yes.

**SHIPMAN**: All right. And what did he tell you?

**ANGELA BARBOUR**: That was the top right when we first started dating and (pause) Oh God, this was right when we first started dating. And I think he was just trying to impress me. But he is the one that..is he the one that blew the whistle on Bennett (Jones)? He's the one that blew the whistle on Bennett and then realized that the people of Clayton won't liken (sp) that too good. So he figured he might better change his point of view.

**HOUSEMAN**: How did he manage?

**HALLER**: This is my moment of vindication.

**SHIPMAN**: Well, we knew that all.

**HALLER**: I know. But he would get very upset and say, you can't go after the whistleblower. But he, for your benefit, the first time he ever called me about that, it was to tell me all that had gone on at Clayton High School and that Bennett Jones needed to be investigated.

**ANGELA BARBOUR**: Yes, he told me that.

**HALLER**: And he...?

**ANGELA BARBOUR**: Told me, that's why I wanted to say he had a, he has a he has a photo on Bennett (sp). He caught Bennett coming out of a hotel or something. Is he aware or anything? No, but I know that was in our conversation somewhere that he caught him coming out of a...that's how he told me that initiated our first conversation about hotel rewards. And I'm like, oh my God, you can find somebody using their hotel rewards.

**SHIPMAN**: Does Bennett know Ronald (unintelligble) naked about the photo?

**ANGELA BARBOUR**: I don't know the answer to that question. I don't know. Probably if he...I don't know.

**SHIPMAN**: Can I have a reason for asking it? Because there's just some things on the Bennett side that are not right.

**ANGELA BARBOUR**: I don't know. And there may not be a photo of Bennett, but he had something on him,

**SHIPMAN**: So, I mean, you say there was, but then you don't....

**ANGELA BARBOUR**: I don't know. I remember the conversation. I just don't want to say anything wrong, and I don't want to lie. I just know that we did have that conversation.

693.     Haller talked about how much she and her daughter loved Bennett Jones, and how she's wondered who gave Johnson the information on the grade fixing allegations.

**SHIPMAN**: Did he ever tell you who handed him the files?

**ANGELA BARBOUR**: No, sir.

**SHIPMAN**: Dis he ever tell you they were from Cleveland High School?

**ANGELA BARBOUR**: No, sir.

**SHIPMAN**: Did he ever mention anything to you like about FERPA?

**ANGELA BARBOUR**: No, no FERPA laws, no FERPA rules, no. No, I'm sorry, I can't be help.

**SHIPMAN:** Did he ever tell you he was investigated and it was put upon, demanded upon him by legal counsel from the school board to produce the records he had? Did he ever say anything about any of that?

**ANGELA BARBOUR**: Yeah, he's told me that, but that's pretty much just in general.

694.     Shipman, Houseman, and Haller spoke for a few minutes about the Clayton High School controversy and Jones's settlement with the BOE. Angela Barbour spontaneously offered, "I really think he told me he has a picture of Bennett coming out of a hotel. That was one of the first things. He might have been telling just tellling me that to impress

169

me, but I know that was in our initial conversation, because that was not long after we started."

695.    Angela Barbour did not give a time frame but mentionedthat at some point she "Realized that something's not right here, and that's when I started saving things." She stated that her husband had sent word through Brian Barefoot, who was a mutual friend to Johnson, Angela Barbour, and Angela Barbour's husband Ryan, to tell Johnson that Angela Barbour's apartment was being watched. "(Ryan) said you tell him you make sure you tell him that apartment is being watched because he, Ryan, don't want him in my apartment either because Ryan my husband knows about the condoms I mean it's bad that's bad." (Among the items that Angela Barbour had admitted keeping as "evidence" against Johnson were several used condoms).

696.    Shipman then said he wanted to wrap things up and that he had a few things he needed Angela Barbour to do, the first one being get into therapy.

> **SHIPMAN:** But the second thing is I want it to move quickly before the, I want it out there before the primary.
>
> **HOUSEMAN:** Oh my God.
>
> **SHIPMAN:** Okay, because what you've already told me. There's enough to take him off the board. He's coming off that board.

697.    The interview between Shipman and Angela Barbour, conducted at the behest of Todd Sutton, and with the explicit statement at the beginning and end of it made it clear that the mutual intent of everyone involved was ensure Johnson was removed Johnson from his elected position as a BOE member and Defendants conspired to ensure that his removal would be accomplished.

**TODD SUTTON, KEVIN DONOVAN, AND
THE JOHNSTON COUNTY SHERIFF S OFFICE**

170

698. On April 21, 2022, the day after Barbour was interviewed by Shipman, she received a call from Donovan on her cell phone, not her new phone, which she kept turned on, despite her claims of Johnson using the phone to "track her every location" and alleged fear for her safety, and against her solemn promise to Shipman that she would only use the new phone and line she purchased.

699. Barbour secretly recorded the 10-minute call with Donovan, during which she told Donovan her husband was having her home swept by a private investigator. Barbour provided the recording to Shipman as well as Investigator Hoffman.

700. Unbeknownst to Barbour, Donovan was in turn recording her. Donovan voluntarily turned this recording over to the Town on July 8, 2022, for their personnel investigation. The Town provided this recording and several other pieces of evidence regarding Donovan and Barbour to Susan Doyle and Investigator Hoffman, per Hoffman's specific request, on October 27, 2022. This recording became part of several pieces of exculpatory evidence suppressed as part of a conspiratorial agreement between Hoffman, Doyle, Donovan, Zellinger and James, to ensure Johnson was removed from the BOE.

701. On April 25, 2022, around 12:45pm, Johnson met with DeVan Barbour outside Clayton Fitness and played a recording of Angela Barbour talking about DeVan Barbour Facetiming her while naked.

702. At 1:15pm on April 25, 2022, DeVan Barbour called and confronted Angela Barbour. They spoke for 15 minutes. Immediately after the call ended Angela Barbour sent Devan Barbour the following text: "I have a new number. I will text you from it at some point. I don't use this phone anymore for those phone calls."

703.	Multiple people told Johnson that Barbour had been contacting board members, local politicians, and law enforcement, with claims of being harassed and stalked by Johnson.

704.	On April 27, 2022, Johnson contacted Sheriff's Chief Deputy Gaddis to see if there were any open complaints or investigations into him. He was told there were none.

705.	A week later, on April 28, 2022, Angela Barbour told Antoine she had to resign as vice-president of the JCRW.

706.	Barbour also texted Antoine, "(Johnson) has his clutches on everybody right now...And they are part of his game. Ronald doesn't think anyone is going to believe me. I don't want to see (Devan Barbour) hurt so I'm trying to keep quiet, but it involves law enforcement and I've been so freaking stressed the past two days. I think they are keeping it all quiet through the primary. Even (Sheriff) Bizzell who I LOVE."

707.	If in fact that sentiment was true at that time, Barbour did not love Sheriff Bizzell or the Johnston County Sheriff's Office (JCSO) for long. Barbour's disclosures to the Town showed that Barbour had requested and met with detectives from the JCSO.

708.	In "The Truth," Barbour wrote, "I shared my concern of my safety with the Johnston County Sheriff's Department, and two of their lead detectives shared nothing criminal had taken place; it was immorally wrong not criminally wrong. Wiring using SMPD equipment, extortion, blackmail?"

709.	Barbour's phone records showed in addition to her normal group of friends, she made constant calls to Kevin Donovan, Dale Lands, Judge Holcombe, Jason Kimble, and Michelle Antoine. Barbour also began speaking with Jill Parker, a mutual acquaintance of Devan Barbour's and Jackie Lee, who was the mother-in-law of Johnson's fellow officer, Sgt. Thomas Lee, who was believed to be providing personnel information about

172

Johnson to others outside the Smithfield PD during the subsequent investigation of Johnson.

710.    Not everyone was willing to indulge Barbour. On May 3, 2022, Barbour texted Antoine, angry because despite telling Darryl Mitchell "everything that RJ has had me do and even attempting to force my hand to text him and say its all a lie," Mitchellappeared to be unmoved. Mitchell had made concerted efforts in the months before to get Barbour help for her drinking and to become part of his church's Recovery program. CheryAnn Houseman, who had befriended Barbour and made genuine efforts to get Barbour support, had also begun to retreat from Barbour. Mockingly, Barbour sent out screenshots of Houseman's heartfelt messages.

711.    Barbour was still livid over being forced to resign from her position with the JCRW by Haller. Barbour texted Antoine venting, "I GOT PLAYED...I don't want that position back, but I need advice on how to put something in writing without sounding like a pissed off bitch. The other board members need to know I was not asked to step down for reasons that were NOT in our bylaws. I think all of these people are crooked."

712.    Barbour also sent Antoine screenshots of Snapchats between Barbour and her longtime friend Brian Barefoot in which Barefoot told Barbour to leave him out of her drama. Barbour captioned the screenshots with, "Yesterday was eventful to me."

713.    On May 4, 2022, at 12:13pm, Barbour texted Antoine from her prepaid cell, "Kevin deleted me off of Facebook."

714.    At the same time Barbour sent the text at 12:13pm, she used her regular cell to call Board Chair Todd Sutton but did not reach him. Barbour immediately contacted Judge Paul Holcombe and they spoke for 14 minutes.

715.    Barbour then made multiple brief calls to South Johnston High School and at 2:18pm she sent herself a message from her Verizon cell phone to her second line. The message has two picture attachments.

716.    Before the end of the day Barbour posted on Facebook, "You become very dangerous when you learn to control your feelings."

717.    On May 5, 2021, Barbour texted Antoine from her prepaid phone, "Text me on this phone because somehow I believe my other phone is still being monitored."

718.    On May 8, 2022, Johnson began receiving harassing text messages from an unknown number. Later, Johnson connected the text messages with Angela Barbour's activities on social media. The message on May 8 stated: "Your life is going to get quite interesting next week. Now may be a good time to take advantage of some of those Marriott points you have managed to accumulate."

719.    Phone records received from a search warrant of Johnson's cell phone show he made multiple attempts to contact the number, even spoofing a number to text back, "Sounds great."

720.    On May 9, 2022, at 7:44pm, Barbour texted Antoine from her prepaid cell to warn Antoine that she was being spoken poorly about. Barbour wrote, "I heard it from Joe (Preston) and Jim (Weisner)...Just be well aware that Jim may be saying something about you...on FB because that's what brought it to my attention...I asked him nicely to leave you alone."

721.    That evening, at 8:21pm, DeVan Barbour received another text message about the release of a recording. Devan called Johnson concerned, as well as Brian Barefoot.

722. On May 10, 2022, Dale Lands texted Angela Barbour to see if she and the others manning the poll for early voting would like a sandwich. She responds, "Nooo but I'll take a late dinner. We might have some interesting stories when I finish this day."

723. On May 10, 2022, Barbour walked into the BOE meeting near the end of the meeting. Live stream camera caught Sutton acknowledging her arrival. For the remainder of the meeting, she stared at Johnson so aggressively people took screenshots of Barbour's expressions and sent them to him. Donovan texted Johnson, "I'm worried for you right now."

724. Barbour texted Lands from her second number, "I think he died when I walked in (laughing emojis)."

725. The following day, May 11th, at 6:47am, Angela Barbour texted Lands, "Definitely triggered him last night. He blocked me on FB on his and Jami's page. Unfriended April too. He didn't like me showing up."

726. At 7:39 am Barbour tried reaching Todd Sutton again. Barbour then tried his number again less than a minute later and they spoke for 22 minutes.

727. At 11:28am, Todd Sutton tried calling Barbour. At 1:03pm, Sutton called Barbour again and they spoke for another 39 minutes.

728. The next day, May 12th, Angela Barbour and DeVan Barbour exchanged a few brief texts and had a three minute phone call. Almost immediately after speaking with DeVan, Angela Barbour contacted Lands.

729. At 12:43pm, Angela Barbour contacted Sutton again. They spoke for 8 minutes.

730. Also on this date, May 12, 2022, a party for some of the GOP candidates was held. BOE candidate Joe Preston, David Marshburn, and other members of their "circle" were in attendance – Jim Davenport, Jim Wesiner, and the party's host, Christine Livingston.

731. At this party Jim Weisner brought up the Angela Barbour/Ronald Johnson saga, and a group discussion ensued. Rick Walker, who was a good friend of Johnson's, was present at the gathering but was not part of this particular discussion.

732. That day Barbour, despite her previous and public statements of disdain, joined the "Joe Preston for JCPS BOE 2022" Facebook group.

733. On May 13, 2022, Barbour reached out to Dale Lands on her prepaid phone and asked him if he had heard any news. When Lands had nothing to offer Barbour surmised, "RJ is up to something."

734. Johnson learned in early May from Rod Malone, another attorney from Tharrington and Smith, that a complaint about Johnson had been made to the BOE and was being looked into. Malone stated he would let Johnson know more when he could.

735. Malone told Johnson that Angela Barbour was told that the matters she alleged were "personal" and did not relate to the school system. Johnson understood this to mean that the BOE did not plan to investigate the matter and did not consider it to be a matter of import. Johnson knew and Malone knew that Angela Barbour was a teacher with the school system.

736. These statements were intended to and did mislead Johnson and did not reflect the ongoing conspiracy between Barbour, Sutton, Shipman, and others to use the information that Barbour had provided Shipman and continued to provide Shipman and

Marshburn about Johnson to his detriment and to facilitate his termination and removal from his school board seat.

737. Primary night was held on May 17, 2022. Barbour was back in contact with Phillips, who had re-surfaced but would not speak to Johnson.

738. Dale Lands hosted a Primary Election results party at his home in Garner and Johnson attended. Barbour arrived approximately an hour after Johnson arrived. During the party, Barbour made comments directed at Johnson while Johnson was talking to other people and which were intended to be heard by everyone in earshot. For example, when someone thanked Johnson for his work on the School Board, Barbour laughed loudly and made comments like "You got another thing coming," and "I got something for you," and "You won't be there long enough to be Chairman." Johnson ignored her comments and outbursts of laughter.

739. When Johnson attempted to leave the party through a side door, Barbour approached him and said, "Don't you think we need to have a conversation?" Johnson replied, "No ma'am, we do not."

740. Barbour told Johnson she was going to have him "handled" because Johnson was "just a board member." She followed up that comment by saying "Paul Holcombe is a Judge." She stated, "I am going to get your little police department to handle you because you think you're somebody with your little superhero car and your little superhero muscles." She said, "Ryan is going to sue you, so you will never own anything. I told him everything." She said, "You better start being my friend again before your life gets rough."

741.   At 8:15pm, Barbour called Phillips and they spoke for four minutes. Not long after that, Barbour began to send Antoine a series of panicked messages:

| DATE | TIME | SENDER/RECIPIENT | MESSAGE |
|---|---|---|---|
| 2022.05.17 | 8:22pm | Barbour/Antoine | Please tell me you are coming |
| 2022.05.17 | 8:40pm | Antoine/Barbour | Who's therw<br>There |
| 2022.05.17 | 8:41pm | Barbour/Antoine | He NEVER comes and held acting like the fucking life of the party |
| | | | It's going to get good before it's over |
| 2022.05.17 | 8:48pm | Antoine/Barbour | Alright, we'll come stop by |
| 2022.05.17 | 8:52pm | Barbour/Antoine | Please |
| 2022.05.17 | 8:54pm | Barbour/Antoine | Imma lose my shit |
| 2022.05.17 | 8:55pm | Barbour/Antoine | Apparently melissa bowers is "his girl" |
| 2022.05.17 | 8:55pm | Antoine/Barbour | I'm coming over now |
| 2022.05.17 | 8:55pm | Barbour/Antoine | Imagine that bc he thinks he can tell her what to don<br>Do |
| 2022.05.17 | 8:58pm | Barbour/Antoine | He said he's so glad that helps on the way...And someone made the comment yeah they're still may be some surprises and I looked right at him and said you have no idea what surprises are coming your way. He looked at me shook his head and was pissed (laughing emojis) |

742.     Eventually Johnson left the party and Barbour followed him to his car.

743.     DeVan Barbour did not win in the primary. The top three candidates for the BOE that emerged were Kevin Donovan, Michelle Antoine, and Terry Tippett. Joe Preston finished in 7th place.

744.     At 6:09 am the following morning, May 18, 2022, Barbour sent Donovan a SnapChat: I want to talk to you ASAP. Not tonight." Donovan forwarded a screenshot of the SnapChat to Johnson, who replied, "Enjoy your win dude."

745.     On the evening of March 18, 2022, there was a JCGOP meeting. Johnson did not attend but Donovan did, as did Angela Barbour. Donovan texted Johnson, "She is here and spiraling out of control. She cussed me out and Travis (Wheeler) set her straight so far." Johnson asks, "Is she drunk?" Donovan replied, "Nope. She's mad because I told you what she accused of."

746.     Barbour sent Antoine a series of screenshots with SnapChat messages from Donovan. Barbour told Antoine, "I have more." Among the statements Donovan made in the SnapChats were: "And yes I called Devan because I was told it was probably the best thing to protect his candidacy, to give him a heads up on what you accused. If it's not true, you shouldn't have said it."

747.     Donovan also sent Angela Barbour a SnapChat message that said, "I'll also have to take a look at why you always said we needed to talk in person. You need to be careful what you say when you're drinking and saying to people. The stories don't come together. Your right though, it does end. You get to choose whether we start over on a better foot or if we want to continue down a road of bad choices." Barbour responds, "Why the hell

179

would you record a phone call Kevin? You're as shady as the next....You know what that means right...you know what happens to Domino's when one falls right?"

748. Over the next couple of days, Barbour was in constant contact from her regular Verizon cell phone. (Barbour's prepaid phone contents are unknown. The Town was aware Barbour had a second phone – West jotted it down in his notes, and it was provided by others in witness interviews during the personnel investigation. No search warrant was sworn for her second number despite the fact that Doyle, Hoffman, Zellinger, and James were aware Barbour used it to communicate during same time period requested her subscribed cellular number.)

749. On May 23, 20222, at 7:52 am, Phillips sent a "friend request" to the female employee who accused Jimmy Lawrence of sexual harassment.

750. At 10:05 am, Barbour texted Lands: "I'm still so frustrated so not sure where I stand. I feel like I need to speak with him to work through some things."

751. At 11:07 am, Barbour texted Johnson: "Do you want to talk?"

752. At 12:54pm, Barbour made her first attempt to call Johnson's wife, Jami Johnson, by calling a number that Jami Johnson had when she lived in another city. Eventaully, Barbour located the right number and called Jami Johnson at 3:43pm, 7:02pm, 7:03pm, 7:04pm, 7:36pm, 7:37pm, 7:57, 7:58pm. Several times when Jami Johnson answered Barbour asked for "Christine", before finally giving her real name. They spoke for four minutes, 40 seconds, during which Barbour asked Jami if she had been expecting her call or heard anything about Barbour. Jami Johnson responded, "I don't even know who this is." At the time, Johnson and his wife were together on vacation in Carolina Beach.

180

753. Barbour asks Jami, "Have you heard that I'm crazy and a stalker and I wanted to have an affair?" Jami repeated that she did not know Barbour. Barbour asked Jami to meet her, but Jami refused and told Barbour to tell her why she kept calling. Barbour told her she had been sleeping with Johnson for two years, and Jami Johnson laughed in disbelief. Barbour became angry and told Jami that "(Ryan) is suing your husband."

754. When deposed by Johnson in September of 2025, Barbour stated she called Jami Johnson so that Johnson could know the truth, and that Jami Johnson called her "crazy, a stalker, and that (Barbour) wanted to have an affair" with Johnson – a direct quote of the remarks that Barbour asked Johnson's wife.

755. In between calls Barbour texted Lands at 4:21pm and said, "You know what I'm having?..Red wine. It's been a Monday." Barbour also called Lands at 7:58pm, twice, then at 8:01pm. 9:48pm, and 8:51pm, asking Lands to relay messages to Johnson that if he did not speak to Barbour, she would put everything about him on Facebook. She also made multiple calls to Cody Shomper, her husband, and others.

756. At 8:03pm, Barbour posted on Facebook, "(Shit) getting ready to fit the fan!!!" with a series of laughing emojis.

757. At 8:06pm, 8:26pm Barbour called Johnson, but he did not answer.

758. At 8:26pm Barbour texted Johnson, "Your threesomes here with me tonight."

759. At 8:40pm Barbour posted a picture of her and her friend Monsour at a bar with the caption, "Happy Birthday!"

760. At 8:56pm Barbour texted Antoine from her prepaid, "Done."

761.  At 9:50pm Barbour texted Johnson, "I'm pretty sure Jamie knows," with several laughing emojis. After this point Johnson contacted Superintendent Dr. Eric Bracy and informed him of Barbour's conduct.

762.  Barbour's timeline includes none of these calls.  In fact for the following dates, only three 1-minute calls are listed for May 23, 2022:

| Date | Time | Length of Call | Caller/Recipient |
| --- | --- | --- | --- |
| 2022.05.23 | 8:05pm | 1 min | Barbour/Johnson |
| 2022.05.23 | 9:48pm | 1 min | Barbour/Johnson |
| 2022.05.23 | 9:51pm | 1 min | Barbour/Johnson |

763.  The version of the timeline that Barbour and her attorneys at Lawrence's firm produced to the Town ended on this date, despite the fact that it was not turned over to West until July 19, 2022. A later version provided to Shipman and Investigator Hoffman contained multiple additional entries of communications with Dale Lands, Darryl Mitchell, Jackie Lee, and David Marshburn.

764.  In between all of this activity, at 8:19pm, Barbour received a call from Jim Weisner and they spoke for three minutes. This call was likely the first time Marshburn made contact with Barbour through a third party. During his July 16, 2025 deposition, Marshburn testified it was Weisner who put Marshburn and Barbour in touch with one another.

765.  Barbour also spoke to Phillips at 9:57pm and 10:00pm. At 10:02pm, Barbour contacted Todd Sutton.

766.  The following day, May 24, 2022, Barbour called Jim Weisner.

**SNAPCHAT IN "THE TRUTH OF A SUBORDINATE"**

767.    Metadata for "The Truth of a Subordinate" indicates it was written on May 20, 2022. Dale Lands received a copy of the manuscript sometime in the next couple of weeks after it was written by Barbour and Barbour told Lands she needed him to return his copy, but Lands did not return it; concerned, he gave it to Johnson.

768.    In "The Truth," Barbour stated that she texted Johnson the day after the infamous first night in Clayton to see if they had sex. Johnson returned her call and "It was at this moment, SnapChat was born. I never had Snap." Barbour further stated Johnson assured her they did NOT had sex, and that Johnson insisted on SnapChat to talk because it was "the safest way to communicate".

769.    The extraction of Barbour's iPhone proved that Barbour not only had Snapchat prior to meeting Johnson, but she used it regularly with her husband, daughter, and multiple friends. Dates and times of SnapChats sent and received from as far back as 2018 were recorded in the social media portion of the extraction, many with message content. A search warrant Investigator Hoffman executed on Barbour's SnapChat account confirmed her account had been created on January 1, 2014.

770.    A month prior to writing "The Truth," Barbour told Shipman she sent Johnson a SnapChat the day after that first night, then corrected herself stating, "I think it was a SnapChat. No it was a SnapChat. We didn't have SnapChat. I'm sorry. I called or texted him the next day to see if we'd had relations," to which Barbour stated Johnson told her that they DID have sex – at Clayton Fitness.

771.    During his interview on October 31, 2022, Hoffman did not ask Barbour about the night of November 14, 2020, – or if he did, he did not include it in his interview summary. When interviewed by Zellinger and James two years later in November of 2024, Barbour

told them that she "was so intoxicated the night she met him; don't remember if they had sex; ended up talking with him over Snapchat told her they didn't have sex but later he told her they did have sex at Clayton Fitness, he did not tell her the truth because she was so intoxicated; she did not remember consenting to sex that night; she did not find this out until they had been together for awhile."

772.    On January 10, 2025, under sworn oath, Barbour was asked by Zellinger:

> Q. Snapchat, how did you start using Snapchat?
>
> A. I didn't know anything about Snapchat until Ronald Johnson.
>
> Q. And so what he -- did he teach you how to use Snapchat?
>
> A. Yes. I started using it when I met Ronald Johnson.
>
> Q. Okay. And does Snapchat, can you go back and look at your old messages?
>
> A. No. Not unless you save them, and I was not allowed to do that.

773.    Barbour also testified that Johnson did not tell her they had sex until "awhile after" and repeated what she told Zellinger and James during their pretrial interview – that "(Johnson) he said he didn't want to tell me that we had sex because he was scared I would accuse him of rape." Yet, when asked where she and Johnson had sex at that night, Barbour stated she was "pretty sure we had intercourse at my friend's house that he dropped me off at."

774.    Johnson had plenty of reason to be scared that Barbour would accuse him of rape – Johnson learned in mid-2021 that Barbour had saved his used condoms, because she told him so during drunken threats. By June of 2025, Johnson had read "The Truth" and Barbour's comments about her inability to remember having sex, where Barbour mentioned "saving things" and discussed Johnson's fear about a rape accusation.

Zellinger and James knew the power even a hint of such an accusation could have on a jury – their interview notes state "She did not remember consenting to sex that night."

775. Barbour wrote in "The Truth" that Phillips's first message to her was a perverse SnapChat that she ignored, and that later she "received a new Snap request from Owen that said I am concerned for your safety. Owen met with me and confirmed the story shared earlier. It was during this discussion that he and I both realized Ronald had created a fake snapchat and pretended to be Owen."

776. Barbour told Tim Shipman that she got a message from the account but ignored it because she thought it was Johnson after she had caught him on Snap with other woman and deleted him.

777. Lt. West, who conducted the Town's investigation, admitted during his deposition that he read "The Truth" at Lawrence's office the week following his recorded interview of Barbour. West included the document in his investigation, even those he admitted that Lawrence refused to give him a copy of it. West, Powell, and Scott did not dispute that they failed to investigate the veracity of the information contained in the document and assumed that its contents were true when they decided to terminate Johnson.

778. West interviewed Phillips on August 11, 2022, and Phillips made no claim that a fake account had been made in his name, and stated instead that Barbour had reached out to him.

779. The Town also arranged for the forensic extraction of Barbour's old iPhone, the results of which they shared with Barbour and her attorneys at Lawrence's firm, as well as Investigator Hoffman, Susan Doyle, Zellinger, and James. West made no attempt to cross-check anything Barbour was telling him with the phone extraction records.

185

780. In fact, the Town did no fact-checking into any of the multiple discrepancies told by Phillips and Barbour, who were integral participants in the Town's investigation and later termination of Johnson. Phillips was the named complainant in one of the BOE's censures against Johnson. Johnson did not receive Barbour and Phillips's interviews with the Town or the iPhone extraction until May 30, 2025.

781. On October 13, 2022, Investigator Hoffman interviewed Phillips in the criminal investigation. Phillips stated again that it was Barbour that first reached out to him during Spring Break of that year – this time sharing that Barbour had wanted to know if Jami Johnson was pregnant. (Barely a week later, Tim Shipman told Barbour that there was a rumor Jami Johnson was pregnant, to which Barbour audibly sniffled and feigned this was new news to her).

782. When interviewed by Hoffman, Phillips, a disgraced former law enforcement officer, never denied sending Barbour the "friend request" and did not allege that the SnapChat account was not his. Search warrant returns from SnapChat confirmed the account was his as well.

783. Despite interviewing Phillips on October 13, 2022, obtaining the extraction of Barbour's iPhone on October 27th, and interviewing Barbour on October 31st, and reading "The Truth" and reviewing Shipman's recorded interview of Barbour, Hoffman and Doyle applied for seven search warrants on December 9, 2022, using confidential personnel information obtained from Johnson's employer and making statements which they knew or should have known to be untrue.

784. In those affidavits, Hoffman included information about Barbour, Phillips, and the SnapChat account that Hoffman stated "was believed to be fictitious and created to

186

impersonate Owen Phillips." There was no factual basis for this statement other than Barbour's allegations, which were not corroborated by anyone and were not investigated by Hoffman prior to publishing.

785. Even after receiving the requested records containing irrefutable evidence both Barbour and Phillips were dishonest, more than a dozen additional search warrants were sworn out using the statements of Barbour and Phillips, all in an attempt to remove Johnson from his school board seat.

786. If being dishonest was not enough to cast doubt on Phillips's credibility, conversations contained in Phillips's SnapChat account records showed Phillips was still manufacturing testosterone even after the adjudication of his felony charges for the same.

787. Notably, the State used the complaint made by Phillips, who had questionable credibility against Johnson for the purpose of censuring him for discussing whether Phillips' children were attending the school to which they were districted with the principal of the high school they attended, Bennett Jones.

788. Not only did the School Board rely upon information from Phillips, but they also, acting through Sutton and Andrews, used Johnson's conversation with Jones, which Jones recorded, to censure him for his first amendment protected activity as an elected school board member, for the purpose of seeking his removal from his school board position via criminal charges.

789. Zellinger and James also interviewed Phillips prior to trial on November 12, 2024, days after their first pretrial interview with Barbour. Their interview notes plainly state "Angie Barbour contacted him and asked if RJ's wife was pregnant." Zellinger and James interviewed Barbour a second time a month later, without seeking clarification about the

multiple statements by Phillips that contradicted Barbour, their SnapChat histories only being one. Despite the irrefutable fact that both of their key witnesses, were known to be liars, both gave sworn testimony at trial furthering the conspiracy to remove Johnson from his school board position.

790. A further example of the conspiratorial efforts to remove Johnson from the Board include the fact that Zellinger, James and Hoffman did not turn over to Johnson in criminal discovery all of the SnapChat records returned on the six accounts for which they obtained records. Under each account a file for "Memories" was included – these include saved reels shared by users. Separate from the file for the "Memories", SnapChat provided an Excel log of metadata associated with each "Memory."

791. Barbour had filmed Johnson without his knowledge at a Machine Gun Kelly concert on June 22, 2022, and posted it to SnapChat. At that time, Johnson had an active ex parte order against Barbour for stalking and was alerted by friends who saw Barbour had posted video on SnapChat of Johnson. Johnson was sent a recording of Barbour's SnapChat video taken of him.

792. The Town later used the fact that Johnson sought a 50C order for stalking, rather than a 50B for domestic violence, to accuse Johnson of perjury, without any consideration taken as to the viability of Johnson's need for an order of protection and assuming that Johnson and Barbour had been engaged in a "dating relationship" as described by Barbour, but as refuted by the phone extraction to which they had access.

793. Further, it was learned after his conviction that the State had failed to disclose in criminal discovery the "Memories" file for Barbour. The memories log showed a record of the video taken by Barbour that was the same as the video that Johnson had been sent. Of

the six accounts Hoffman requested, all with a "Memories" file were returned – except Barbour's.

794.     The conspiratorial efforts joining almost every defendant to ensure Johnson was removed from office can be traced back to as far as the Tim Shipman interview and "The Truth," with SnapChat as of the most egregious examples.

## HARASSING TEXT MESSAGES, WRAL TIP AND THE 50C

795.     Johnson was contacted by BOE counsel Rod Malone on May 25, 2022, to talk about Barbour. Johnson was still not apprised of the content of Barbour's complaint to the BOE.

796.     On June 1, 2022, Tim Shipman called Barbour at 4:39 and 4:42pm. Immediately after hanging up with Shipman the second time Barbour called the attorney handling her DUI.

797.     At 6:21pm Johnson received another harassing text "I must assume that you think this is going away but it is not. The package is almost complete with documentation that shows who you really are and will be turned over to various media outlets. It is all up to you."

798.     The next day, June 2, 2022, at 4:56pm Johnson received yet another anonymous text: "So how do you think Lindsey and Ally are going to feel when they get pulled into this? Looks like you had fun at Roxbury's in Charlotte and to also have the place card from your reserved table is priceless."

799.     Johnson reached out to West, who was aware of Barbour's prior involvement with Barbour, advised Johnson to file a complaint with Clayton Police Department (CPD), based on Johnson's residential jurisdiction. Johnson contacted CPD Detective Jason Linder.

189

800. Defendant West told Johnson that he would not tell Defendant Police Chief Powell, because of Powell's previous comments and actions towards Johnson which were well known throughout the police department.

801. In addition, he and Johnson both knew that Powell had a reputation for disclosing confidential information and exaggerating events in a way that damaged a person's reputation. Defendant West had spoken to Johnson on numerous occasions regarding the unethical acts of Powell regarding promotions.

802. As a result of Johnson's disclosures about Angela Barbour, Defendant West told Johnson that they should keep the matter between themselves and not tell anyone else at the Smithfield Police Department.

803. On June 3rd at 1:31am Johnson received another text, this one with explicit sexual content. Johnson sent Linder the messages.

804. At 8:16am Linder informed Johnson the number texting him was a Voice over Internet Protocol (VoIP) number out of Del Ray Beach, Florida. Linder emailed Johnson to tell him a report on the harassing texts had been filed and an SBI analyst has been contacted to assist.

805. SBI crime lab analysts Haley Andrews and Linder communicated about her findings and Linder continued to keep Johnson apprised. Andrews reported the IP addresses are utilizing VPNs.

806. During this first week of June 2022, Barbour's phone records showed she made multiple calls to Jackie Lee, the mother-in-law of Sg. Thomas Lee (Johnson's coworker), Mark Lane, yet another BOE candidate adversarial to Johnson, for whom Barbour volunteered her services, Judge Paul Holcombe and others.

807. During the first week of June, Marshburn had contacted Rick Walker and told him he had heard Johnson was having an affair with Barbour. Walker told Marshburn that Johnson was a good friend and he would contact Johnson and tell him about the things being said about him. Walker reached out to Johnson, who denied the rumors. Walker told Johnson that Marshburn wanted to speak with him, to which Johnson is noncommittal. Johnson did not contact Marshburn.

808. Walker called Marshburn on June 9, 2022, to let him know he spoke with Johnson and Johnson again denied the rumors. Marshburn recorded the call with Walker.  Marshburn then stated that he knew the teacher (Barbour) has "taken out papers" against Johnson and they just had not been served yet. Walker, who was uncomfortable, stated Johnson was aware that Marshburn would like to speak with him.

809. Marshburn has referred to the recorded call of Walker multiple times in his podcasts as "the set-up call", and described Walker was the "mole."

810. The following evening, Walker reached out to Barbour to see if she was aware Marshburn was making these claims. Barbour sent Walker's call to voicemail. Barbour made and received several calls, including a 34-minute conversation with Jackie Lee.

811. Walker waited a full day to hear back from Barbour but didn't, so on June 11, 2022, Walker contacted Johnson to tell him Marshburn was insistent about the rumors and had now claimed that Barbour took papers out seeking a protective order on Johnson.

812. The timeline that Barbour and her attorneys at Lawrence's firm provided to Lt. West and the Town ended on May 23, 2022 – conspicuously without any mention of the numerous harassing phone calls to Jami Johnson and clearly threatening messages to Johnson. In the extended version of Barbour's timeline there is an entry for June 12, 2022. It should

191

be noted that the entry is out of order chronologically, between entries dated June 28th and July 13th. During her deposition on September 22, 2025, Barbour that she must have put the wrong date as she had never met or spoken to Marshburn until AFTER he aired his June 24th Fb Live about Johnson. Barbour's entry as it appears in her timeline is as follows:

| Date | Time | Event Description | Name of Individual/ Witness to Event |
| --- | --- | --- | --- |
| **2022.06.10** | | Gave David Marshburn my phone to retrieve deleted texts from Ronald | Angela Barbour/ David Marshburn |

813. Barbour, in text messages, statements, recorded interviews, and sworn testimony has stated she did not know Marshburn and had never so much as spoken to him until after June 24, 2022. However, the phone contacts between Barbour and Marshburn, along with Joe Preston, Sutton, Phillips, and the Town show that they all participated in this conspiracy to attempt to have his employment terminated and eventually have him removed from his seat as an elected BOE member.

814. By June 14, 2022, Johnson had still not reached out to Marshburn despite Marshburn's attempts through Rick Walker.

815. The Sheriff's Department had declined Barbour's request for an investigation into Johnson, the BOE had not publicly announced any investigation into Johnson, and Johnson himself was no longer attending political meetings and events to avoid Barbour at all costs. However, as a sitting member Johnson continued to fulfill his duty as a BOE member by attending BOE meetings.

816. On June 14, 2022, at 4:03pm, Kara Lysle with media station WRAL sent the following email to Caitlin Furr, the Public Information Officer for JCPS.

Hi Caitlin,

I hope you are doing well. This might be a long shot, but WRAL received a tip that a Johnston County teacher named Angie McLeod filed paperwork in Johnston County against Johnston County school board member Ronald Johnson, accusing him of stalking and sexual harassment.

Source said McLeod has talked about this on Facebook, but we haven't seen anything. Has Johnston County Schools been notified of this? Are you able to confirm anything?

Any information you can provide would be greatly appreciated.

817. At 5:37pm, Furr forwarded the email from WRAL to BOE Chair Sutton, along with the following message:

"Below is the email you requested. She also asked if the topic would be discussed at tonight's meeting."

818. At 6:15pm, as the BOE meeting was solidly underway, Sutton forwarded the email to all the BOE members and Superintendent Bracy, accompanied by the following message:

"Good evening, I wanted to make sure everyone aware of the WRAL request below. I have consulted with our attorneys and we are not aware of any filings. Please do not make any comments on this item.

Thank you"

819. Johnson, upon seeing the email, left the BOE meeting during a break and did not return.

820. Not long after leaving the meeting Johnson reached out to Lands, who he knew had regular contact with Barbour, and asked Lands if he had heard anything with respect to paperwork being taken out. Lands stated he was on the phone earlier with Barbour, while Barbour was watching the meeting live stream of the BOE meeting. Barbour commented

193

to Lands when Johnson did not return after the break, "He must have gotten an email about me."

821.    Johnson began to contact various people in law enforcement and the court system to discern what, if any, "paperwork" had been taken out against him. Johnson contacted Magistrate Chris Sullivan who said he would look into it. At 6:49pm Sullivan messaged Johnson, "I have called Michelle (Ball, Clerk of Superior Court) and got no answer so I left her a message..." Later Sullivan texted Johnson again, "Per clerks with restraining orders. Nothing was issued by the courts for her or against you today."

822.    On June 14, 2022, at 8:14pm, Johnson received yet another anonymous harassing text message:

> "Well as you can see, the walls are closing in, it is up to you how far this goes. Aslo, you need to pick someone who is smarter and someone who can keep their mouth shut to find out information for you. Things wil continue to deteriorate for you until you make some right decisions. The train is rolling and you can't stop it."

823.    Johnson sent his supervisor West and Chief Powell latest text messages. West responded, "Looks like you better get that order." Powell agreed, "As soon as possible."

824.    As it was after courthouse hours, on the date that this was all occurring (June 14, 2022) Johnson contacted Deputy Kelly Garner at the Johnson County Sherrif's office for help getting the protective order paperwork.

825.    The following morning on June 15, 2022, Johnson took leave from work with the encouragement of his superiors at SPD and went to the courthouse to apply for a protective order.

826. At 11:25am, Johnson called Chair Sutton and informed him he was in the process of applying for a protective order against Barbour. At 11:46pm, Sutton called Johnson for more information.

827. At 12:31pm, Todd Sutton called Angela Barbour. They spoke for several minutes.

828. On June 15, 20202, at 8:07am, Johnson texted Capt. Garner and she responded at 9:00am that she had the paperwork ready for Johnson to pick up.

829. Johnson met Capt. Garner at the courthouse steps and he took the paperwork home to fill out. At 11:18am, Johnson received a text message from Capt. Garner telling him that "Judge Wells will be in Courtroom #5 this afternoon. That would be the best way to be discreet. Judge Lock is in a trial so that isn't an option. You have to get on the witness stand and testify to the affidavit."

830. At 11:51am, Johnson received another text message from Capt. Garner: "They can get you in at 2:00 before they let the next case in if you want or we can still play it by ear…(I wouldn't keep the judge waiting too long though.)" Garner also told him to take the paperwork "to the Clerks Office around 1:30 or so."

831. At 1:00pm, Johnson went to the Sheriff's Office and spoke with Capt. Garner. Captain Garner told Johnson she would bring someone from the Clerk of Court's Office to the Sheriff's Office to complete the paperwork.

832. Capt. Garner took Johnson to a court room where they waited for Judge Wells. Once Judge Wells arrived, Johnson went into the Judge's Chambers with her. Judge Wells came in, with a deputy clerk of court, and the form was completed. Johnson then waited for the order to be served on Angela Barbour.

833. Johnson rushed to get the order at the direction of Chief Powell and Lt. West because he was afraid that Barbour would take out false charges against him or obtain a protective order against him.

834. At 2:08pm, in chambers before Judge Mary Wells, Johnson was granted ex parte relief in his application for a 50C No Contact order against Barbour. Johnson did not give testimony as he was prepared, and expected, to do.

835. As a police detective, Johnson had no responsibilities with regard to obtaining orders under Chapters 50B (Domestic Violence), Chapter 50C (Civil NoContact Orders) or Chapter 50D (Permanent Civil No-Contact Order Against Sex Offender on Behalf of Crime Victim) of the North Carolina General Statutes.

836. Neither West, Powell, or Scott (who was the former police chief before becoming manager) were aware of the differences at that time between a 50B and 50C no contact order.

837. As a police detective, Johnson had no responsibilities with regard to obtaining orders under Chapters 50B (Domestic Violence), Chapter 50C (Civil No Contact Orders) or Chapter 50D (Permanent Civil No Contact Order Against Sex Offender on Behalf of Crime Victim) of the North Carolina General Statutes.

838. It was not until Marshburn's FB broadcasts that anyone at the Smithfield PD questioned the appropriateness of the protective order obtained by Johnson.

839. In addition, Marshburn friends Jim Weisner wrote an email to Michael Scott during the personnel investigation and argued passionately that Johnson knew or should have known the difference between the two types of orders.

840. In fact, because Johnson and Barbour were not in a "dating relationship" at any time and had not had any sexual encounters for some period of time, even if questioned, which he was not, Johnson would not have considered himself and Barbour to have been in the kind of relationship which required him to choose one kind of protective order over the other.

841. In fact, West, Powell, and Scott all obtained various and conflicting opinions about whether the type of protective order Johnson obtained was the "wrong" kind of order and whether it was a serious criminal matter or not. Even Doyle declined to initiate any criminal prosecution.

842. In addition, when West questioned various court officials about what Johnson had told them, he informed the officials that Johnson and Barbour had been engaged in a dating relationship, which was not true. West did not provide the actual facts about the relationship between Johnson and Barbour because he had consciously declined to fact check Barbour's allegations about the relationship and he had declined Johnson's offer to provide him with his phone records related to his contacts with Barbour. West, Powell, and Scott chose to remain intentionally ignorant about the facts when it came to the relationship between Barbour and Johnson, because those facts did not fit the false narrative that they and the other conspirators had developed that Johson and Barbour had been in a long term and constant relationship in which he was "using" Barbour for political purposes.

843. Barbour, after she spoke with Sutton on June 14, 2022, made numerous calls to people including Mark Lane, April Lee, Pam Gregory, Cecilia Helm, Jackie Lee, and Allyson

Bond. Bond did not answer Barbour's calls or respond to a text from Barbour asking him to call back.

844.    About 15 minutes after Barbour texted Bond and asked Bond to call her, Barbour made a Facebook post on Bond's Facebook page with two photos. The first photo is a picture of Bond with Barbour's daughter, who she had previously taught. The second was a photo of Barbour and Bond together taken from the weekend in March 2021 when they drove to Charlotte together and went to the Roxbury with Johnson and his cousin.

845.    At 6:32pm, Johnson received another threatening text:

> "So you really think that creating false information to obtain an order will cause this to stop? Desperate people do desperate things. You are just causing the train to go full throttle. Game on. You just have no idea the harm you are creating for yourself."

846.    At 7:01pm, Barbour was served with the no-contact order that Johnson has taken out against her.

847.    At 10:00pm Barbour posts on Facebook, "Well…Game on everybody!"

**ANGELA MCLEOD BARBOUR AND DAVID MARSHBURN**

848.    The day after the 50C was served on Barbour, June 16, 2022, Johnson contacted Chair Sutton again, unaware Sutton was also communicating with Barbour and that he was conspiring with Barbour and Shipman to gather information that could be used to either get Johnson to resign his position on the school board or to later have him removed from his seat via criminal prosecution.

849.    Johnson continued to send Detective Linder the harassing messages he continued to receive as they were received, as well as screenshots of Barbour's social media posts. On the 16th Linder emailed Crime Lab analyst Hailey Andrews and Agent William Del Carmen the following: "All, Attached is the latest text message from 561-668-0568 to

198

Ronald Johnson. Ronald Johnson believes Angela McLeod and Owen Phillips maybe responsible for sending the text messages. I have attached information along with a No-Contact order for Angie McLeod. I would like to request a workup on both individuals. Owen Phillips is no longer a police office so disregard his DMV photo."

850. Besides Linder, Johnson also provided his West and Powell at Smithfield PD a copy of the No-Contact order.

851. On June 17th, Tharrington and Smith attorney and board counsel Rod Malone emailed Johnson:

> "During our last telephone conversation, you mentioned that you obtained a no contact order against Angela Barbour. While you do not have to share a copy of it with us, I would like a copy of the order and any other documents filed with law enforcement or the courts regarding Ms. Barbour for our files.

852. That same afternoon at 3:58 pm Barbour tried calling Marshburn's friend Jim Weisner, who did not answer. Barbour tried again at 3:59 pm, and she and Weisner spoke for about seven minutes.

853. Johnson retained attorney Walter Schmidlin for the upcoming hearing on the protective order scheduled for June 24th.

854. Barbour retained the law firm of Daughtry, Woodard, Lawrence & Starling, of which Jimmy Lawrence was a named partner. Associate Andrew Dickerhoff handled the matter.

855. On June 20, 2022, at 8:22 pm, David Marshburn called Angela Barbour on her regular cell number. They spoke for 13 minutes.

856. Schmidlin prepared a "Rule 65 Order By Consent," which stated Johnson had filed a complaint for No-Contact and contained the following offer to resolve the matter with no further court proceedings:

> Notwithstanding, the Parties have conferred and agree that it is in the best interests of the Parties:
>
> To amend the underlying Complaint and Motion for a No-Contact Order to a Complaint for a Restraining Order pursuant to Rule 65 of the North Carolina Rules of Civil Procedure.
>
> To consent to entry of a No-Contact Order pursuant to Rule 65 of the North Carolina Rules of Civil Procedure and agree by consent that Defendant shall not assault, threaten, harass, nor contact the Plaintiff, shall not go to where the Plaintiff lives, works, or is otherwise present, and Defendant shall not discuss Plaintiff in any respect, on social media or otherwise.

857. On the morning of June 23, 2022,, after learning of the proposed Rule 65 order, Barbour and Marshburn exchanged multiple text messages at 8:18am, 9:57am, 11:41am, 11:42am, and 11:43am. At 12:06 pm Barbour called Marshburn for a two-minute conversation.

858. On June 23, 2022, at 2:01 pm, Dickerhoff emailed Schmidlin in response:

> "My client is not willing to sign the proposed consent order. She is looking forward to the opportunity to tell her side of the story and clear her name from some of the misinformation that has been circulating. She is also looking forward to Mr. Johnson having to answer questions about their relationship under oath."

859. At 5:04 pm, District Court Judge Joy Jones called Johnson and told him he should dismiss the no-contact order against Barbour. Jones stated that she knew Barbour and that Barbour was a good teacher but that she did have . . . problems. Johnson told Judge Jones that he would consult with Schmidlin.

860.   Within the hour Judge Jones contacted Johnson by text and asked him to call her. After speaking, Johnson contacted Schmidlin and indicated that he wantd to dismiss the no-contact order. Johnson's email to Schmidlin explained that going to court would be embarrassing for everyone, and would involve the potential disclosure of Barbour's accusations involving not only Johnson, but Representative John Bell, DeVan Barbour, and several others.

861.   Schmidlin notified Dickerhoff he would be filing a dismissal in the morning during the scheduled court hearing, and attached it to the email. At 6:10 pm, an attorney from Lawrence's firm contacted Barbour for a seven minute phone call.

862.   At 6:50 pm, Barbour called David Marshburn. They spoke for over a half an hour.

863.   At 7:29 pm, Barbour called Marshburn. They stayed on the phone again for over a half an hour.

864.   At 8:01 pm, immediately upon ending the call with Marshburn, Barbour called and spoke to Weisner for just under 14 minutes.

865.   At 8:41 pm, Judge Jones called Ron again to verify he dismissed the order.

866.   The following morning, on June 24, 2022, the 50C against Barbour was dismissed per Johnson's request during the morning session of court.

867.   Immediately following court and the entry of the dismissal, Barbour had the following communication:

| Date | Time | Length of Call | Caller/Recipient |
| --- | --- | --- | --- |
| 2022.06.24 | 11:03 am | 2 min 31 sec | Barbour/Marshburn |
| 2022.06.24 | 11:11 am | 3 mins | Barbour/Marshburn |
| 2022.06.24 | 11:19 am | Text | Barbour/Marshburn |

| Date | Time | Length of Call | Caller/Recipient |
|------|------|----------------|------------------|
| 2022.06.24 | 1:55 pm | 45 mins | Marshburn/Barbour |
| 2022.06.24 | 6:33 pm | N/A | Barbour/Marshburn |
| 2022.06.24 | 6:34 pm | 2 mins 23 sec | Barbour/Weisner |
| 2022.06.24 | 7:46 pm | 2 mins | Marshburn/Barbour |

868.    Barbour's text to Marshburn at 11:19 am had photo attachments.

869.    That evening, David Marshburn and Joe Preston hosted their first FB Live and broadcast allegations of misconduct by Johnson.

870.    Marshburn was s a private investigator and as discussed in the video he received

871.    publicity in 2018 for his efforts to locate a missing child. In the video, Marshburn and Preston alluded to allegations that Johnson was "running around on his wife" and that it "was going to come out."

872.    Marshburn also discussed the fact that he was also a political candidate for office, stating that he was "going to have that experience here in the next few weeks of trying to do that against Steve Bizzell" who was Johnston County Sheriff.  In fact, in November 2022, Marshburn did run as a write-in candidate against Sherriff Bizzell who won his seventh term as Sheriff that election.

873.    Comments from June 24, 2022, broadcast included:

> So do you remember back in 2019 when he had just gotten elected and you know he exposed a lot of people in Johnston County?..You know, some of them were my friends.

> Now when you go out as a person and expose people, and you're doing it on your own, do you feel like it's right to use government property to do that?

Mr. Johnson used SPD's equipment to get this done. Him and another officer within the Police Department, and they used it for private use. It wasn't for an investigation, legal investigation, it was all about who he could look at and say, "I got you."

And well, I have that information...I don't want to tell where it comes from because it's not the right thing to do that right at this point in time, but...I'm gonna put it up on the screen so you guys can see it.

Ronald Johnson released details on alleged corruption, sexual harassment, unetical activity, and you know, he was trying to expose everybody in Johnston County.

I'm fixing to tell you how I did it. And how I actually went to Joe Preston. I went to Chistine (Livingston).

During that little meeting we were told Ronald Johnson has been running around on his wife.

Well, a few weeks later, I get a call from Rick Walker, and Rick said David, you know, I want to let you know that I talked to Ronald Johnson and I let him know about, you know, everybody, what our meeting was about, about him having an affair.

I thought about it, I said I gotta plant the seed.

And I said, well, she's fixing to file papers on him.

The very next day Ronald Johnson goes and files papers against this young lady because he was afraid that she was going to file papers on hers right now.

When I say this, there's two different kinds of papers. There's a 50B, and there's a 50C. 50B is a sexual relationship and 50C is pretty much a worthless piece of paper.

(Joe Preston asks) What? What I have in my hand? Was a 50 B filed against him?

Well, no. Nothing was filed against him. That was just made-up. Well see, I made it up and then I went and told several others and it got around.

An officer of the law that's been in there long enough knows a 50C is not what you do if you've had an intimate relationship and this is what was filed

He's testified under oath that these are true and accurate events without any sexual contact.

Yes, this was served by a supervisor and it was to be served only by a supervisor."\

(After this comment, Marshburn showed a screenshot of the 50C order that was dismissed just that morning on the screen as he live-streamed).

Says harassing plaintiff....for some time since March 2022, well this has been going on for two years.

Ronald Johnson is a police officer. A detective. A detective. He knows exactly what he's doing. He's testified under oath that these are true and accurate events without any sexual contact. Well, we know that's false and we'll be out with that later.

It took an act of Congress (the 50C order). I'm not getting it from either one of the parties.

From what I understand, he loved it and loved it alot.

So Ronald Johnson did not show up today

I mean basically you could probably get charged for pimping or traffcking, human trafficking.

874. On Barbour's timeline she notated the following entry:

| Date | Time | Event | Witnessed By |
|------|------|-------|--------------|
| 2024.06.24 | | David Marshburn reached out to me to apologize for sharing my address. He was sincere and genuinely apologetic and shared he wanted this bad guy to go down. | Angela Barbour/ David Marshburn |

875. Again, Barbour, in text messages, statements, recorded interviews, and sworn testimony has stated she did not know Marshburn and had never so much as spoken to him until after June 24, 2022. But phone records show that the conspiracy between Sutton, Shipman, Marshburn, Lawrence, and Barbour to damage Johnson in his employment and his service as a school board member started well before June 24, 2022.

**BACKGROUND BETWEEN JOHNSON AND CHIEF
POWELL PRIOR TO INVESTIGATION**

876.	After the broadcast, a decision was made between Powell and Scott to commence an investigation against Johnson based on the FB broadcast allegations and Lt. West was assigned to conduct the investigation.

877.	As discussed between West and Johnson, when Johnson first alerted West to the ongoing events with Barbour in May 2022, West and Johnson both knew that Powell did not care for Johnson and that they had a history.

878.	Beginning in 2005, Johnson worked for Powell, who Johnson saw periodically crossed the lines of ethical conduct. Upon information and belief, Johnson knew he had engaged in multiples examples of poor leadership and judgment.

879.	On December 21, 2015, Powell sent text messages to Johnson while on duty regarding Mickey Lamm, a local reporter for jocoreport.com, whom he called a "snake" and making allegations that he was working for other candidates against Johnson when he was running for a position on the Johnston County BOE.

880.	On February 22, 2016, Powell sent text messages to Johnson while on duty requesting political signs.

881.	On April 17, 2019, Powell refused to follow up on allegations and evidence provided to him by Johnson regarding allegations of blackmail and prostitution involving a county Commissioner accused of solicitation of prostitution.

882.	Powell had a longstanding relationship with Defendant Lawrence. Powell had hired Lawrence himself and had referred clients to Lawrence.

883.	When the allegation arose in August 2019 and continued through early January 2020 regarding the sexual harassment by Lawrence of a School Board employee, Powell told Johnson to "let it go" referring to the matter. When Powell told Johnson to "let it go,"

Johnson became afraid for the employee who then became concerned for her own safety, which is what precipitated Johnson taking the employee to the District Attorney on January 8, 2020.

884.   In March of 2020, Powell encouraged Johnson to be responsive to requests by

885.   Defendant West, a subordinate of Powell, but a superior to Johnson, that Johnson use his position as a member of the Board of Education to influence the hiring of Defendant West's wife by the Johnston County BOE.

886.   In June of 2021, Powell encouraged Johnson to be responsive to requests by Defendant Kerigan, Smithfield Police Department Human Resources, a subordinate of Powell, that Johnson use his position as a member of the BOE to influence the hiring of Kerigan's wife by the Johnston Count BOE.

887.   In January of 2022, Powell lied to Johnson by telling him that Defendant Smithfield Councilman Marlon Lee had made allegations against Johnson accusing him of racist behavior and that Powell was going to investigate the matter, which Johnson was later told by both Lee and Defendant Town Manager Michael Scott was not true.

888.   In June of 2022, Powell sanctioned the use of racial epithets by senior officers in the Police Department when referring to alleged criminals.

889.   Powell made statements in front of other employees that Johnson was engaging in a sexual relationship with Craig Olive, the Register of Deeds.

890.   Powell made statements in front of other employees that Johnson was in a three-way sexual relationship with "Jeff and Dean," two individuals who were known to be acquaintances of Craig Olive.

891.     Powell made statements in front of other employees that Johnson was having or had had a sexual relationship with Jessica Zavala, a former employee, and that one of Zavala's children was fathered by Johnson.

892.     Ms. Zavala overhead these comments and later asked Johnson about them.

893.     Powell made statements in front of other employees that Johnson was having sexual relationship with Brandy Galindo/Phelps, by saying on a number of occasions "you are fucking Galindo's wife."

894.     Powell made statements that Laura Stewart, the then wife employee Jeremy Stewart, was part of Johnson's "harem" after Laura Stewart, contacted Johnson about an alleged domestic assault and Johnson followed protocol by contacting Powell about the same.

895.     In fact, Chief Powell was present when Laura Stewart sought refuge with Johnson's aunt and photos were  taken of her injuries. Even though Jeremy Stewart was a police office working for Powell and had allegedly engaged in domestic abuse of his spouse, Powell did not instigate an investigation into the allegations like he did when Marshburn made allegations against Johnson.

896.     Powell abdicated his own responsibility and sanctioned Defendant Kerigan's direct supervision of Police Department employees, including Johnson, on multiple occasions. For example, when Johnson requested a pay raise, he was told that the chain of command for his request was Powell, then Kerigan, and last Town Manager Scott.

897.     Powell both knew of and sanctioned actions by other Town employees which attempted to capitalize for personal and professional gain Johnson's position as an elected School Board member.

898.    For example, in April of 2021, Powell sanctioned Kerigan's reaching out to Johnson's to use his position as a member of the School Board to schedule meetings with the Johnston County Superintendent of Schools to conduct town business with the school system.

899.    In addition, Kerigan contacted Johnson and asked that Lee be removed from his position as a volleyball coach at Clayton High School, which Johnson refused to act on, and Johnson later learned that a position had been created in order to remove Lee from his position as coach.

900.    In October of 2021, Kerigan requested that Johnson use his position on the School Board to call the School Superintendent and ask the school system to expend funds to send school system employees to a leadership class for county government.

901.    Johnson was also aware of multiple incidents of police misconduct involving officers working for the Town of Smithfield's Police Department with regard to which Powell took little or no action.

902.    Powell took no action to investigate a supervisor with the Smithfield Police Department who was known to have been photographed naked with his uniform in the background.

903.    Powell failed to take action to address allegations that a Town Detective, while

904.    on duty, drove his patrol car to a neighboring county to have sexual intercourse with a female, who reported it to the Smithfield Police Department. This happened on multiple occasions. The Detective denied the incident and was subjected to a polygraph examination. After failing the polygraph examination, he eventually admitted to the incident and was allowed to keep his job with the Police Department.

208

905.	Powell failed to take action with regard to an officer who was the subject of numerous disciplinary actions upon information and belief reflecting numerous instances of aggressive behavior towards the public. The officer was allowed to continue working after each of these incidents, including one assaultive incident where he took a woman out of handcuffs and allowed her to fight him. The officer was also caught with his patrol vehicle, out of jurisdiction, behind Selma Middle School with an unknown woman at approximately 4am, by a neighboring town Police Officer with the girl sitting on his lap in the car. The officer was not terminated for this incident, but was ultimately terminated after he was found to have staged a vehicle crash where he damaged his own patrol vehicle.

906.	Powell failed to take action with regard to an officer in July of 2015 who allegedly allowed his duty firearm to be passed around by various individuals at a nightclub within the Smithfield Town Limits.

907.	Powell failed to take action with regard to an officer in September 2007, who

908.	allegedly, while on duty, showed her colleagues pictures and video of herself performing oral sex. This same officer also took photos of suicide victims and disseminated them to others and indicated that she thought doing so was humorous. Luckily, the family of the deceased were never notified of the Officer's unauthorized taking and dissemination of pictures, making fun of their deceased loved one's suicide act.

909.	Powell failed to take action with regard to an officer who had been accused of sexual assault while off duty; instead of suspending the officer pending investigation, the officer was allowed to return to work and this resulted in the Town being sued later as a result.

910.	On one occasion, where a suspect was acting suspicious and potentially under the influence of narcotics, the Town police officer who arrived on the scene did not evaluate or make contact with the suspect. The suspect later had an altercation with officers, where he was tased, and eventually died. Then Police Chief (later Town Manager) Defendant Michael Scott tasked Johnson with the investigation of the incident, telling him that then Lt. Keith Powell "could not even do the simple things right."

911.	In February of 2010, Powell failed to take action with regard to an officer who

912.	admitted to sending text messages of a sexual nature to an 18-year-old female while on duty, and while he was working an off-duty assignment and in full police uniform.

913.	Powell was known to discipline employees who caused him difficulty with his

914.	relationships with other politicians or officials. In 2019, a lieutenant received written permission in the form of a text message from Powell to speak with people regarding a potential raise and have the ability for officers to take home cars. The lieutenant arranged for several officers to attend a town council meeting to show support for more officer benefits. After he did so, and town council members complained, Powell issued the lieutenant disciplinary action for discussing the pay raise and going to Town Hall, even though Powell had given him permission to do so.

915.	In addition, after Powell expressed support for his advocacy for raises for police officers to this officer, this same officer sent a department-wide email which encouraged officers to get involved and compiled an argument for a raise. Prior to sending the email, the officer requested that Johnson proofread the email, which he did. Powell later called in Johnson and questioned him about proofreading the email. Powell then required Johnson to write on a copy of the email, admitting that he had proofread the email for Lt.

Obranovich, and deflecting any responsibility for encouraging the officer to advocate for raises.

916.     Powell also condoned harassing conduct by his officers and engaged in it himself.  In 2022, on two occasions, Johnson heard Powell discussing an officer's sexuality in front of other employees, making statements that the officer was bi-sexual and watched pornography involving two men engaged in sexual activity. Apparently, the officer had disclosed this information during his background investigation and Powell inappropriately shared this information with other employees.

917.     The remarks made by Powell to Johnson regarding Johnson's alleged sexual activity with a variety of individuals, which remarks have been witnessed by many, violated Town policy and were made to Johnson based on his sex.

918.     During the personnel investigation of Johnson, when he described how the relationship with Barbour began and characterized at as a sexual assault,  West, Powell, and Scott repeatedly refused to believe that Johnson was sexually assaulted because of his sex and their skepticism that a man could be sexually assaulted and threatened to have sex.  When Johnson explained that he felt coerced to continue in the relationship because of Barbour's threats to tell his wife, his explanation was discounted as a "lie" to cover up his consensual participation in the relationship because they believed Barbour's account of the relationship as a "dating relationship" with multiple vacations and dinners out and other trysts.  They undertook no investigation to ascertain if Barbour's account of the relationship as consensual and its frequency of contacts between them was actually true.

**ADMINISTRATIVE INVESTIGATION JUNE 27, 2022 AND CONCURRENT
SCHOOL BOARD "INVESTIGATIONS" AND CENSURES**

211

919.    On June 27, 2022, Smithfield Police Department assigned Lt. West to investigate allegations against Johnson made on Marshburn's podcast. West notified Johnson that he was the subject of an Administrative Investigation and scheduled an interview with him for June 29, 2022.

920.    That same afternoon at 2:54 pm, Johnson received another harassing text message:

"So do you really think what did Friday (June 24th) is going to make this all go away? Wrong, it is just the beginning. All of your filthy crap is coming out! Happy trails!"

921.    Marshburn hosted another FB Live that evening. A regularly BOE meeting was also held, but Johnson did not attend. Marshburn and Barbour had been in frequent contact in the days before and after the airing of the podcast and the opening of the Town's investigation. Barbour sent Marshburn numerous text messages with photo attachments. Barbour also sent messages and photo attachments from between her regular cell phone and her prepaid second number.

922.    During the second FB Live, Marshburn made the following statements:

Updates on the detective have seemed to be put on pause

(People) want to hear about the illegal stuff. Well, the illegal stuff's coming.

I mean, he committed perjury

(Johnson) is on unpaid suspension from the Police Department

923.    On June 29, 2022, Johnson was notified by Lt. West that "an administrative investigation" would be conducted to determine if Johnson violated department policy by using "department equipment to investigate people in furtherance of" Johnson's "political career."

924. Secondly, the notice stated that the investigation would also be conducted to determine if Johnson "violated department policy" by using "department equipment . . . in the commission of an extra-marital affair."

925. The policy sections listed as the subject of the investigation included Smithfield General Orders Sections 201 (Standards of Conduct), 202 (Neglect of Duty), 204 (Political Activities), and Town of Smithfield Personnel Regulations Section 42 (Use of Town Supplies and Equipment).

926. Lt. West told Johnson that he believed the internal affairs investigation was due to Johnson's involvement in the allegations against Defendant former School Board attorney Lawrence, by pointing in the direction of Lawrence's law office when he made these remarks to Johnson. Lawrence's office is located directly across the street from the Smithfield Police Department.

927. On June 30, 2022, Defendants Marshburn and Preston posted another webcast in which they made statements such as:

> During this whole ordeal, what transpired, I told y'all this last time that I wound up putting a bug in the ear and it got to him. Ronald Johnson went and filed papers on this woman. Said she is harassing me and stalking me, took out papers, a 50C and it should have been 50B.
>
> He is not going to admit he has had sexual relationship with her and used government property for illegal use so forth so on to get these bad guys right.
>
> Does a 50C and the whole time in the back of his mind, I need to find out how to shut her up so I don't lose everything I got that I have worked hard for to manipulate and blackmail a lot of people so I can be in this county and become the sheriff, basically be doing what Mr. Bizzell is doing over there, a lot of shady shit. I do not see that happening ever, I think the career is over with, I think things are going to be different.
>
> What Ronald Johnson did, when he got into the school board, did all these recordings, paid people, paid people to do that, used government property

213

to get that done, was not a formal investigation through the Smithfield Police Department. So that's got to be thrown out the window, that's not a formal investigation, the chain of command was not filled out, the forms.

It's got to have a chain of command.

People watching might not know that are watching that Ronald Johnson is a detective with Smithfield Police, he does have access to government property, he is also a board of education member, he is also part time teacher at Johnston County Community College. So just for some context.

David- Well I know, I hate it, someone loses their career, someone loses their position they got voted in for.

Allowing other people to use recording devices and things that he got from his authority position as a detective, on people during the campaign that is part of what he was saying earlier that he was going to be very involved. These are these types of things that go on that people don't really believe happen when they see two crazy guys like me and you and talking. That can't be true, I am telling you it is true.

I am going to call him a predator. I am going to call Ronald Johnson a predator, they come in and do what they do and say what they say.

There's a lot more, and it is deep. It goes to teachers, principals, superintendents, school board members, commissioners, town council men. It goes on and on. Some of this stuff was created by Ronald Johnson. It was to gain in the political realm, I call it blackmail, I call it just pure evil to do some of that stuff. We will be exposing more.

928.  Johnson had never used any government property to record anything, and that allegation was never substantiated. Moreover, after Barbour went public with details of the sexual encounters with Johnson, Johnson never denied those encounters occurred. Marshburn intended to damage Johnson by defaming him as a police detective and as a school board member. Describing him as a predator was intended to specifically defame him as a school board member.

929.    Barbour was interviewed at the police department on July 5, 2022, about her encounters with Johnson and was accompanied to the police department by an attorney with Jimmy Lawrence's law firm.

930.    Barbour told West that she and Johnson never went a day without seeing one another or speaking. When West asked for dates, Barbour replied, "I cannot give you specific dates."

931.    Barbour stated she and Johnson would meet in empty parking lots to have sex. "(Johnson) would leave his car there and leave it running during the daytime, and then we would sit in my car because my car windows were completely blacked out, tinted....he would sometimes crack his window so he could hear the radio."

932.    Barbour stated she would also meet at night while Johnson was on duty. "I picked him up here at the police station. Meaning not from the parking lot. I cannot give you specific dates." When asked how frequently they would meet, Barbou states, "Like at one point it was even on Sundays."

933.    When West asked where their first encounter happened, Barbour stated, "Clayton Fitness. I didn't know we had sex that night. He didn't tell me until months later we had sex that night because I was so drunk that he was scared that I would accuse him of rape."

934.    Barbour stated she ended the relationship because "he started asking me to do things that I did not feel comfortable doing. He kept asking me to do certain things and I wouldn't do them." Barbour states once campaign season began, "we basically went from an emotional relationship and from October, November (2021) through political

season, it was more of a just, he was using me for information, using me for sex. I'm not going to lie, I was using him for sex."

935.     Barbour stated Johnson wanted to "use her with other men", and that she "wouldn't allow it. I'm not that person. The only person I've had sex with since I left my husband was Ron Johnson, because one I thought he was going to save me from what I was in. I went from one asshole to another." Barbour added, "He's very jealous. I didn't know this until our first trip to Charlotte. That's another long story. I think that's when he had a plot. I now this sounds real crazy, but..." Barbour brings up that she and Johnson took a lot of trips and that "He took me everywhere."

936.     Barbour told West, "I know something. So I'm being followed right now, like I found that out this weekend. Somebody's been watching me because they know when I have my children and which children I have. I literally heard that with my own ears."

937.     Barbour stated, "He denied our affair right? He's yet to admit that we've had an affair. He's going around telling everyone in Johnston County that I'm crazy, I'm a stalker and I wanted to have an affair."

938.     West attempted to circle back to his focus. "Was he using his patrol car to take him for nay of this stuff or he was doing any of this stuff while he was actually working, which is what you're telling me? Barbour responded, "We definitely had relations while he was one duty." West asked, "You're saying just about every day it was about every day you were doing something, were you just tallking or -" Barbour interrupted with, "He was being pleasured every day."

939.     Barbour explained, "That's why he thought he could scare me with papers because at that point I was a very submissive person because I thought he was going to help me

and that was the, I guess you could say, that's the character I played because I was trying to get out of a bad situation. And then when things turned around and I actually, my friends talked some sense into me. And they're like you realize he's pimping you out. This is what he's trying to do. He's basically pimping you out. Angie, grow some balls. Then I just started looking at things a little differently, I guess you could say."

940.     As West is wrapping up the interview, Barbour asked, "So did he tell you? I was crazy and a stalker and wanted to have an affair?" West stated he did not want to feed into any of that.

941.     On July 5, 2022, at 4:40pm, Defendant West and Capt. James Grady went to Johnson's home and informed him he was on leave with pay. Johnson was provided a copy of a "Memo to File" authored by Defendant Powell which further memorialized that Johnson "was placed on administrative leave with pay on July 5, 2022, due to allegations being made against him." Johnson's car, badge, gun, key card, and physical key were confiscated.

942.     The allegations in the July 5th memo appear to have been lifted directly from the June 29, 2022 memorandum from Lt. West because they include a reference to "you" and quote that memo exactly: "for providing recording equipment to investigate people for the furtherance of your political career and in the commission of an extra-marital affair."

943.     The same town policies as identified in the June 29, 2022, memorandum, were listed in this "memo to file."

944.     On July 6, 2022, Defendant Powell met with Defendant Lawrence at his office. Defendant Powell told his administrative assistant that Lawrence had told him that he had a lot more "s*&^" on Johnson and that "it was not going to end well."

945. On July 7, 2022, Defendants Marshburn and Preston released another webcast in which they made the following statements, among others;

> It is a fact that he used government property paid for by the taxpayers for personal gain. He could actually from what I know, things I have talked to people about, he could be arrested for conspiracy of extortion. Do you remember when and I am not trying to beat a dead horse, Joe mentioned the CAAG.

> Ronald Johnson was involved deeply with this voter guide and that he pushed the agenda and extorted certain people he could because, to better understand it. Ronald Johnson causes problems.

> He goes in and creates a problem. He comes in and goes back and forth and acts like he is a savior.

> Ronald Johnson was the top dog when it came to the CAAG, Conservative card and the people on it. He was the one to put the ADT on the card. He bribed, kind of extorted, I need these people on this board. I will get you where you need to be, higher up in the system, I will get you a raise, I will get you this, but I need support. He actually got these people and had them so afraid because if they didn't do what he said, they felt like their job was in jeopardy, they were out there at polls working because they were afraid Ronald Johnson was going to retaliate against them. That's how sorry that individual is.

> They were being intimidated at the polls, some were under the direction of Ronald Johnson.

> He has gone to the point where he has taken the mistress, and pretty much sell her out, rent her out so he can have dirt on other people, like DeVan Barbour. Go flirt, see if you can have sex with him, and get pictures and video. No what kind of sick, sadistic son of a bitch is that? That's him. That come out of his mouth.

946. None of the allegations made by Defendants Marshburn and Preston were ever substantiated and were made solely to damage Johnson in his position as a police detective and school board member and in his personal life.

947. Initially, during the early days of the investigation, Lt. West told Johnson that the Smithfield Police Department and Town of Smithfield were only concerned with any

218

sexual activity while on duty, any sexual intercourse where Johnson's assigned patrol vehicle was involved, and the use of any departmental recording devices for the "furtherance of a political career."

948. Prior to initiating the investigation, both Powell and Lt. West were aware of and encouraged Johnson, as evidenced by text messages between them and Johnson, on June 14, 2022, to take out a Protection Order against Defendant Angela Barbour after Johnson explained to them that she was threatening Johnson and blackmailing Johnson to continue to have sexual encounters with her or she would make public that Johnson had done so by publicizing it on social media and disclosing it to individuals who would use it against him.

949. Johnson was told by Lt. West and Capt. Grady on June 29, 2022, and again on July 5, 2022, that whether Johnson had engaged in an extramarital affair did not matter to the agency as long as "the affair" did not happen while Johnson was working and on duty. Johnson assured Lt. West and Capt. Grady that at no time did he engage in any sexual activity while on duty.

950. Johnson provided the Town a note from his physician dated July 6, 2022, indicating that due to Johnson's condition of "acute anxiety," he was being advised to remain out of work until at least July 29, 2022.

951. This note put the Town on specific notice that Johnson had a serious medical condition as defined by the Family Medical Leave Act, 29 U.S.C. § 2601 et seq. (FMLA).

952. Despite knowing that Johnson had a serious medical condition, Defendants West and Powell attempted to pressure Johnson into returning to work on July 13, 2022, when they came to his house and provided him with a new "Memo to File" authored by

Powell which informed him that as of the previous date, July 12, 2022, Johnson's administrative leave with pay which began on July 5, 2022, was terminated and he was on administrative leave without pay effective July 12, 2022.

953. This cessation of pay status and failure to offer Johnson paid leave was in direct violation of the FMLA.

954. In addition, the Town of Smithfield has promulgated an employment handbook which contains among other policies a Whistleblower policy (Section 40A), a Family Medical Leave policy (Section 82), and a Suspension policy (Section 89).

955. No one on behalf of the Town responded to Johnson's note that he was suffering from a serious medical condition in any way shape or form by offering him paid leave under the FMLA to which he is entitled both under the employee handbook and under federal law.

956. Instead, Johnson was subjected to repeated requests for doctor's notes which he was told needed to clear him to return to work against medical advice so he could be questioned regarding the allegations against him, which he had been told by Defendant West were politically motivated and orchestrated by Defendant Lawrence, among others.

957. Not only was Johnson informed that he was not being paid as of July 12, 2022, he was also told that he was expected to "cooperate" with the investigation previously begun on June 29, 2022, and to remain in daily contact with Lt. West, in violation of state and federal wage and hour laws.

958. On July 14, 2022, Defendants Marshburn burn and Preston published a fifth webcast during which they discussed Johnson's law enforcement job, his marriage, and his being

an elected member of the School Board. During the webcast they stated that Johnson should be fired from the Smithfield Police Department and removed from the Board.

959. At some point, during the Police Department was conducting its personnel investigation, the School Board initiated investigations into allegations against Johnson, using the law firm of Tharrington Smith who had replaced Defendant Lawrence as the school board attorney after he resigned in March 2020.

960. Defendant Todd Sutton requested that Tharrington Smith conduct investigations into allegations made against Johnson in retaliation for Johnson's actions in 2019 and 2020 with regard to Defendant Lawrence and the sexual harassment of the school board employee, his exposure of possible financial shenanigans related to the budget shortfall, and his raising a conflict of interest issue about purchases from a board member's employer.

961. Sutton had been aware and participating in a conspiracy involving Barbour and Marshburn to obtain information about Johnson that would allow Johnson to be removed from his school board seat at the same time the Town was obtaining information from Barbour and Marshburn that would allow them to terminate Johnson's employment.

962. At 10:05pm, Johnson observed Defendant Council Member Marlon Lee "liked" the video. Johnson took a screen shot of the "like." Subsequently, at 10:51pm Johnson observed Lee remove his "like" from the video. Nonetheless, Johnson was disturbed and uncomfortable that a council member overseeing the management of the Town and its manager and Police Department weighed in approving Johnson's removal both his School Board position and employment.

963. On July 27, 2022, through counsel, Johnson put the Town on notice of his allegations that the investigation was motivated by Defendant Powell's animus toward Johnson because of his sex and was another example of Powell's discriminatory treatment of Johnson.

964. The Town took no action to investigate these allegations nor did it take any action to stop the investigation of Johnson or to limit it to its original parameters, which were stated in writing to be 1) whether Johnson violated department policy by using "department equipment to investigate people in furtherance of" Johnson's "political career," and 2) whether Johnson "violated department policy" by using "department equipment . . . in the commission of an extra-marital affair."

965. Johnson's counsel's letter making the allegations of discrimination, harassment, and violations of the FMLA and other laws was delivered on July 27, 2022. That afternoon, Defendant Powell's administrative assistant observed Defendant Powell slam his door, walk out, saying "I am tired of this s*&^."

966. On August 1, 2022, Defendant Powell told his administrative assistant that "someone" had called Defendant Lawrence and told him that Johnson was being paid using sick time. He also informed her that Johnson had made a sexual harassment complaint against him "like when I said Jesse's baby is Ronald's."

967. Defendant Kerigan had to "redo" Johnson's timesheet three times because he kept changing the entries from regular pay to sick leave. The time sheets were delivered to City Hall on August 1 around 11:30am and around 12:30pm Defendant Powell and Lawrence again discussed Johnson's time sheet. Defendant Powell told his administrative assistant that if he found somebody in the police department was calling

Lawrence, he would fire them. Nonetheless, neither Powell nor Defendants Kerigan or Scott conducted any investigation into how information about Johnson was being leaked outside the department.

968. During this same time, Allyson Bond, Kevin Donovan, and Johnson all noticed that Owen Phillips appeared to be following them.

969. On August 1, 2022, at the request of the BOE's attorneys at Tharrington Smith Jonathan Blumberg and Maura O'Keefe, Johnson spoke with them to discuss allegations that he had recorded a closed session meeting of the BOE. (Investigation I) The meeting was accusatory, and Johnson declined to provide information to the attorneys because he believed that were attempting to obtain information to use against him. He also knew that Tharrington Smith attorneys were present at the meeting and complicit in the discriminatory conduct and remarks.

970. Johnson believed that the discussions were improper, and he was afraid that the School Board would take an adverse action against the employee based on her age and disability. He recorded the remarks in order to let the employee know about the possibility that it might happen so she could be prepared to deal with it.

971. On August 8, 2022, Johnson informed Attorney O'Keefe that he was in the process of obtaining legal advice about the investigation. Patricia Robinson, an attorney with Tharrington Smith, contacted Johnson but did not ask him to provide her with the name of his attorney, and contacted him again on August 10, August 16, and August 19. In her August 19 communication, Robinson informed Johnson that she would write her report based on the information she had by 5pm on August 22.

223

972.    On August 10, and again on August 18, 2022, Lt. West was put on notice of Johnson's diagnosis. Upon information and belief, either Defendant West or Defendant Powell or someone at their direction disclosed Johnson's confidential personal health information and confidential personnel information to the public.

973.    On August 12, 2022, when an employee asked Defendant Powell how the investigation with Johnson was going to end and if it was going to end the same way as an investigation with two other officers who were ultimately terminated, Defendant Powell responded "yeah, probably so."

974.    In the interviews which Defendant West conducted, Johnson attempted to explain the background behind the social media posts exposing his sexual relations with Defendant Angela Barbour and the consequences of those encounters on his mental health.

975.    On August 16, 2022, during a webcast by Defendants Marshburn and Preston, they posted a "Happy Birthday Ronald Johnson" and a picture of a fake classified advertisement seeking an "ADULT ENTERTAINER" with an "interest in porn" and "bisexual tendencies." Johnson noted that the language in post was very similar to the comments made by Defendant Powell regarding Johnson's sexuality. Defendant Powell was the only person to continuously make the assertion that Johnson was bisexual or gay through his frequent statements that Johnson was in a sexual relationship with Craig Olive, and "Jeff & Dean."

976.    Even though Tharrington Smith was on notice that Johnson was seeking legal advice, on August 18, 2022, Johnson received a text message from Robinson asking to interview him about allegation that he had attempted to "tamper" with the Clayton HS assignments

of Owen Phillips' children based on an allegation by Owen Phillips made on August 11, 2022.

977. Johnson called up Principal Jones who informed him that he had not taken any action about the school assignments of the Phillips' children. (Investigation II) Robinson contacted Johnson again the next day.

978. Based on his previous interactions with the Tharrington Smith attorneys regarding the closed session meeting, during which they knew improper conduct had taken place under their watch, Johnson did not trust them to be ethical and he chose not to be interviewed by them without legal counsel.

979. Johnson believed both BOE investigations were retaliation for his previous first amendment protected activity.

980. During Johnson's interview with Defendant West on September 1, 2022, into the allegations that Johnson had had relations with Defendant Angela Barbour in his patrol car, Defendant West stated to Johnson: "her story makes more sense than you being raped every time" and "you mean to tell me you are a grown man and you could not stop her." West flagrantly and maliciously disregarded Johnson's diagnosis of PTSD.

981. He discredited Johnson's allegations that his interactions with Defendant Angela Barbour had not been voluntary and for the purpose of personal pleasure and he took no actions with regard to Johnson's allegation that they constituted sexual assault resulting from her threats of extortion, harassment, and public humiliation or that Angela Barbour's actions were threats to extort something of value to her from him.

982. Defendant West would have never made these comments to a female employee, and his comments were based solely on Johnson's sex and he would never have discredited

Johnson as being the victim of the above mentioned criminal offenses had he been female.

983. Defendant West did not ask for text messages between Defendant Angela Barbour and Johnson because he knew they would provide context and factual support for Johnson's version of events as opposed to Angela Barbour's and that they would substantiate Johnson's claims that Angela Barbour was aggressive and coercive and that she threatened Johnson into engaging in sexual encounters with her.

984. Defendant West also used Johnson's father's death as a tactic to obtain a stress induced response during the investigation. Defendant West was well aware of the trauma and impact Johnson's father's death had on Johnson because of text messages exchanged between the two of them. As a result of this interview tactic, Johnson suffered even more emotional distress which triggered additional therapist visits.

985. On August 24, 2022, the Board of Education held a specially called meeting at which they voted to censure Johnson based on two separate investigations conducted by the Board's attorneys at Tharrington Smith.

986. Both of these reports are dated August 24, 2022.

987. The first allegation involved Johnson's recording of a closed session meeting at which the Board discussed taking an adverse action against a school employee based on her age and her disability. The investigation report was authored by Maura O'Keefe of Tharrington Smith and presented by Rod Malone to the Board. The meeting was transcribed and minutes were taken. The report was provided in public session to the school board who released it to the public and the Board voted to censure Johnson in

violation of its policies requiring it to adhere to Robert's Rules of Order, pursuant to the Board's own policies and procedures.

988. The second allegation involved allegations that Johnson attempted to tampered with the assignment of children in the district. The investigation report was also presented by Rod Malone to the Board at the same meeting. In her report on Investigation II, Attorney Robinson concluded that Johnson had sought to improperly influence the assignment of the children but acknowledged that no change to the students' assignment occurred as a result of any action of Johnson or any of his conversations with the principal. Again, this report was also provided in public session to the school board who released it to the public, and the Board voted to censure Johnson in violation of its policies requiring it to adhere to Robert's Rules of Order.

989. Robert's Rules of Order 61:22 provides:

> If improper conduct by a member of a society occurs elsewhere than at a meeting, the members generally have no first-hand knowledge of the case. Therefore, if disciplinary action is to be taken, charges must be preferred and a formal trial held before the assembly of the society, or before a committee— standing or special—which is then required to report its findings and recommendations to the assembly for action. In addition, even when improper conduct occurs at a meeting, in order for disciplinary action to be taken *other than promptly after the breach occurs*, charges must be preferred and a formal trial held. (Emphasis in original.)

The rules further provide that "[t]he procedures governing all such cases are described in detail in 63" and an entire chapter governing how to conduct a formal investigation and trial is provided, if necessary.

990. Importantly, Robert's Rules 63:2 states explicitly:

> A society has the right to investigate the character of its members and officers as may be necessary to the enforcement of its own standards. But neither the

227

society nor any member has the right to make public any information obtained through such investigation. If it becomes common knowledge within the society, it may not be revealed to any person outside the society. Consequently, a trial must always be held in executive session, as must the introduction and consideration of all resolutions leading up to the trial.

991. The publication of the allegations against Johnson and the remarks of the board members were all conducted in public and without giving Johnson due process to protect his liberty interests or allowing him to exercise his procedural rights under Robert's Rules of Order or his constitutional rights under the first amendment to refute the allegations. The allegations made by the Board in its reports were defamatory and damaged Johnson by their publication.

992. At the August 24, 2022, meeting after the board voted on the first censure, Defendant Wooten made a motion that Johnson

submit his resignation to the board by noon on Friday, August 26, 2022. If a resignation is not submitted by the deadline, then the board would begin the process of removal by submitting a letter with attachments and exhibits to the District Attorney.

993. This threat by the Board to obtain Johnson's resignation, which was of value to certain board members, was itself arguably a violation of G.S. 14-118.4 which defines the crime of extortion as threatening or communicating "a threat or threats to another with the intention thereby wrongfully to obtain anything of value or any acquittance, advantage, or immunity."

994. Tharrington Smith obtained Johnson's attorney's contact information and was able to reach out the day after the August 24 board meeting, on August 25, 2022. The subject of the call was a desire to interview Johnson regarding a third allegation against Johnson involving text messages between Johnson and Defendant Lawrence sent in 2019 which Defendant Lawrence, upon information and belief, had released to Defendants

228

Marshburn and Preston. Defendants Marshburn and Preston published the texts on a webcast on August 8, 2022.

995. The Tharrington Smith attorneys had known of the text messages since their investigation in late 2019/early 2020 into the allegations of sexual harassment made against Jimmy Lawrene.

996. Johnson became aware that the Tharrington Smith attorneys had advised the Board that they could seek Johnson's removal from the school board by asking the District Attorney to prosecute Johnson for a Class 1 misdemeanor under a State statute adopted in 1901, which reads as follows:

> G.S. 14-230. Willfully failing to discharge duties.
>
> (a)     If any clerk of any court of record, sheriff, magistrate, school board member, county commissioner, county surveyor, coroner, treasurer, or official of any of the State institutions, or of any county, city or town, shall willfully omit, neglect or refuse to discharge any of the duties of his office, for default whereof it is not elsewhere provided that he shall be indicted, he shall be guilty of a Class 1 misdemeanor. If it shall be proved that such officer, after his qualification, willfully and corruptly omitted, neglected or refused to discharge any of the duties of his office, or willfully and corruptly violated his oath of office according to the true intent and meaning thereof, such officer shall be guilty of misbehavior in office, and shall be punished by removal therefrom under the sentence of the court as a part of the punishment for the offense.

997. On August 26, 2022, Defendant Sutton transmitted a letter to Defendant Doyle which included the investigations and asking her to "make a determination regarding whether the findings in these reports support [Johnson's] removal as Board member pursuant to GS 14-230."

998. Notably, Defendant Sutton asked Defendant Doyle to "review whether the circumstances that led to [Johnson's] suspensions with and without pay by the

Smithfield Police Department, separately or combined with the results of the investigations, support his removal as a Board member pursuant to GS 14-230."

999. The reference in the referral letter by Sutton to Doyle shows that the Defendants all conspired jointly to accomplish both Johnson's termination as an employee of the Town and Johnson's removal from his duly elected seat as a member of the BOE.

1000. Defendant Sutton specifically noted that the basis for the request for the District Attorney's involvement and review was Johnson's refusal to resign his school board position by noon on August 26, 2020, which was a specific and unambiguous expression of an intention to retaliate against Johnson for exercising his constitutional rights to free speech and his opposition to the discriminatory treatment of multiple employees of the school system going back to 2019 and as recently as May of 2022.

1001. After being contacted on August 25, and subsequently being provided information about the first set of allegations, on September 7, 2022, Johnson, through his attorneys, provided Tharrington Smith attorneys Ken Soo and Rod Malone with information regarding Johnson's reasons for recording the May 31, 2022 closed session meeting. Specifically, Soo and Malone were informed that Johnson taped a closed session of the School Board on May 31, 2022, because Defendant School Board Todd Sutton, along with School Board members Kay Carroll and Terri Sessions had discussed taking actions against Tracey Peedin-Jones based on her possible retirement/age and based on her absence from work due to a disability, which Johnson believed to be illegal violations of the Age Discrimination in Employment Act (ADEA) and the Americans with Disability Act (ADA), federal anti-discrimination laws.

1002. The Tharrington Smith attorneys took no action to amend their report to the BOE to include this additional information. Nor did they recommend revisiting the censure on this matter based on Johnson's assertion of first amendment protected activity.

1003. Defendants Angela Barbour and Marshburn attended the September 15, 2022, school board meeting and were allowed by Defendant Chair Sutton during the public comment session to make inappropriate remarks such as:

- Angela Barbour made remarks directed at Johnson regarding "trust" and "relationships" and "playing mind games."

- Angela Barbour also urged the audience not to vote for Michelle Antoine or Kevin Donovan who were running for school board seats.

- David Marshburn made a public comment where he looked at Johnson and said to him: "don't wink at me, I am not that way." Johnson had not winked at Marshburn.

- Marshburn also stated during his public comments that the sexual harassment allegations against Defendant Lawrence in 2019 and 2020 were a "hoax."

- After Marshburn made his remarks and got up to leave, Councilman Marlon Lee left with him, indicating to Johnson that Lee was biased against Johnson.

1004. On September 7, 2022, Defendant Scott, Town Manager, interviewed Johnson.

1005. On September 19, 2022, Johnson provided an affidavit with written responses to questions posed by Tharrington Smith. Specifically, Johnson noted that he had no control over the release of the messages by Defendants Marshburn and Preston in 2022 and that the attorneys and thus the BOE had known about the content of the text messages since before the resignation of Lawrence in March 2020. Johnson also noted that the messages were between him and the school board attorney (Lawrence), so that if Johnson was culpable then the school board itself was equally culpable as it was responsible for its agent's actions.

231

1006. Finally, Johnson provided the social context for the comments, including the fact that he had disclosed them to his then-friend and apologized to her, and that their relationship was such that such banter would not be considered offensive. In fact, what was clearly offensive and in invasion of privacy of the subject of the texts was the publishing of privately sent text messages on social media for the purpose of embarrassing Johnson, since apparently Lawrence was unconcerned about being embarrassed.

1007. After the investigation into its initial allegations of misconduct into whether Johnson used Town resources to engage in sexual activity or for political purposes could not be substantiated, the scope of the investigation changed over time and on September 30, 2022, shifted to whether his work performance was deficient when he signed paperwork presented to him related to a protective order against Defendant Angela Barbour and where he had travelled in his assigned patrol vehicle on certain dates.

1008. On September 5, 2022, this investigation seemed to take a shift to less serious accusations to include Johnson's case work, performance, his cooperation with the District Attorney's Office, and the mileage on Johnson's assigned police car.

1009. On September 21, 2022, Defendants Marshburn and Preston posted a webcast stating that Johnson had been given the option by the Town to resign or be terminated. Marshburn also disclosed that Johnson was in therapy, which was confidential personnel information.

1010. Johnson notified Defendants Powell and Scott of these statements. To Johnson's knowledge, no investigation was made into who was disclosing his confidential personnel information to Defendants Marshburn and Preston. Johnson also asked for an update on what the exact allegations were against him and what was being investigated

232

since it appeared that the original allegations had not been substantiated and the Defendants were searching for some basis on which to take disciplinary action against Johnson. He received no response to this email.

1011. On September 28, 2022, Defendants Marshburn and Preston posted a webcast stating that Johnson was on FMLA leave, which Johnson again notified Defendants about. In addition, Johnson also requested an update about allegations against him regarding the subject on the ongoing investigation and again he received no response to his email.

1012. On September 30, 2022, Lt. West interviewed Johnson and told Johnson that he had perjured himself when taking out the protective order against Defendant Angela Barbour on June 14, 2022, because Johnson stated that the sexual contact with Angela Barbour was under duress, and that West did not believe that it was. He stated that Johnson should have asked for a 50C order instead of a 50B order. The source of this allegation was the webcast made by Defendants Marshburn and Preston published on June 30, 2022, which had never been communicated to Johnson as a matter of concern prior to that date.

1013. Johnson's criminal attorney advised him that the order he obtained was appropriate given the circumstances. Johnson took a voluntary dismissal on the order, to avoid mental trauma for what would later be diagnosed as PTSD, and because a district court judge called him up and told him to do so. When Johnson showed Defendant West the order in June before the investigation started, Lt West expressed no criticisms about the order.

1014. On October 6, 2022, a report authored by Ken Soo with Tharrington Smith was provided in public session to the school board who released it to the public and voted for a third

time to censure Johnson, which again was issued in violation of its policies requiring the BOE to adhere to Robert's Rules of Order.

1015. After the conclusion of the Town's investigation, on October 5, 2022, Defendant Powell wrote an "Employee Dismissal Recommendation" and delivered it to Johnson in a meeting with Defendant Kerigan and Defendant Powell.

1016. In this document, Powell noted that Johnson had been involved in "an internal affairs investigation due to allegations by a member of the public," a reference to the June 24, 2022 Facebook Live broadcast by Defendants Marshburn and Preston.

1017. Powell stated that the investigation "revealed that Detective Johnson had been involved in a two-year affair (which Detective Johnson alleged he was the victim of an ongoing sexual assault)." This statement was a clear acknowledgment that the Town knew that Johnson had provided factual evidence for not only a sexual assault investigation but an investigation into whether Defendant Angela Barbour had committed extortion against Johnson when she threatened to disclose their sexual encounters unless he continued to have them and a relationship with her.

1018. Moreover, Powell and West knew about the sexual encounters as early as md-May in West's case, and certainly by June 14, when Defendants West and Powell texted Johnson and recommended that he obtain the protective order against her as soon as possible.

1019. Powell stated further that "[d]uring this time, it was alleged that Detective Johnson used Police Department equipment and that he misrepresented facts when obtaining a no contact order (50C) on the female involved in the affair."

1020.	In fact, prior to this document, no allegation that Johnson had misrepresented any facts when obtaining the order had ever been made by anyone except Defendants Marshburn and Preston in their webcast on June 30, 2022.

1021.	Powell then made two contradictory statements back-to-back in the document.

1022.	First, he stated that "[t]he Department is solely looking to determine if Detective Johnson violated any Town or Department policies."

1023.	Then, he stated: "[d]uring the investigation, it was determined that Detective Johnson misrepresented facts to several people to obtain a no contact order (50-C)." This sentence is wholly unrelated to whether Johnson violated any Town or Department policies.

1024.	Next, Powell abandoned any claim that Johnson has misrepresented facts and stated that in fact he misapplied or misunderstood the law pertaining to protective orders, by stating that "[d]ue to the sexual relationship that had taken place with the female, the correct order would have been a (50B)." At no time during the investigation did Powell or West inquire how theorder was generated or ask Johnson if he chose the type of protective order.

1025.	Moreover, as stated above, Johnson gave the facts to the Sheriff's office and the captain working with him determined what paperwork to provide Johnson which he took and filled out.

1026.	Finally, Powell then made a statement which he knew to be false. Powell stated that "[a]s an experienced officer, Detective Johnson knew, or should have known about the correct order." Not only did Powell know that Johnson had no responsibility for either obtaining or executing protective orders, but Powell's statement ignored the fact that at no time after Johnson provided the Town with a copy of the order obtained in June, did Powell

235

or West identify any errors in the order. In addition, the order was dismissed only days after it was obtained after a district court judge called Johnson and told him to do so.

1027. Powell stated that Johnson's "actions bring discredit on him and his abilities to perform the duties of a law enforcement officer."

1028. Powell then purported to base his termination recommendation on Johnson's being involved with the School Board. Powell stated, "Detective Johnson's outside involvement with the School Board has brought a negative light on the Department and the Town. Refer to Town handbook section (37-b): Employment with organizations or in capacities that negatively impact the employee's perceived integrity, neutrality, or reputation related to the performance of the employee's town duties."

1029. At no time did Powell or West or Kerigan or Scott ever give Johnson any indication that his membership on the School Board "negatively impacted" either Johnson's "perceived integrity, neutrality, or reputation related to the performance of the employee's town duties." Nor did Powell's letter explain how Johnson's involvement with the school had a negative impact.

1030. In addition, given Johnson's knowledge of the kind of misconduct condoned by Defendants in the past, Powell's recommendation for termination based on an alleged violation of the "standards of conduct" policy was obviously pretextual. Powell stated that "Detective Johnson [sic] personal life has brought about Issues with his integrity as a police officer by the agency, citizens of Smithfield, and court officials."

1031. Without specifying what particular aspects of Johnson's "personal life" raised issues about his "integrity," Powell then stated that he was recommending Johnson's termination "due to his violation of the Town and Department policies listed above," and

236

that "Detective Johnson's Integrity and truthfulness have been called into question. This ultimately affects his ability to perform the duties of a police officer."

1032. The fact, of course, that his integrity had been "called into question" by Defendants Marshburn and Preston did not mean that he lacked integrity. Defendants' investigation had failed to substantiate any integrity violations or any facts that could remotely be said to involve Johnson's integrity as a police detective.

1033. Johnson sought a final decision on the recommendation and on October 14, 2022, Defendant Scott as Town Manager doubled down on the statements made by Powell.

1034. In the first paragraph of his letter, Scott summarized the October 5 meeting between Johnson and Defendants Powell and Kerigan. He summarized the reasons given in Powell's letter for recommending Johnson's dismissal, described by Scott as "based on violations of Town Handbook Section 37(b) and Police Departmental General Orders Section 201 regarding standards of conduct," and based on the "personal matter in which you obtained a 50C no contact order when you knew, or should have known based on your years of experience, that the correct order was a 50B no contact order."

1035. In addition to this summary, Scott also noted that the day after Powell and Kerigan provided Johnson with the October 5th recommendation for dismissal, Defendants Marshburn and Preston published another Facebook

> Live broadcast in which they published text messages between Johnson and Defendant Lawrence prior to schism in their relationship.

1036. Scott referenced a school board investigation of the text messages and an affidavit by Johnson in which he explained the messages and the subject of the messages.

1037. Scott also referred to a meeting between Johnson and Scott on October 12, during which Scott asked Johnson questions about the school board investigation and the texts which Scott told Johnson represented "Detrimental Personal Conduct."

1038. Scott noted that discussions at the October 12 meeting also included conversations with another Detective regarding communications with the individual involved in obtaining the 50C versus the 50B order, and the original allegation that Johnson had sued Police Department equipment for non-police matters.

1039. Scott then informed Johnson that "[t]he decision to terminate your employment has been made due to the reasons set forth in the first paragraph of this letter as well as for Detrimental Personal Conduct due to the recent allegations reported on October 6 and further discussed with you during our October 12 meeting."

## POST-TERMINATION RETALIATION

1040. Documents produced by the Town show that West with the consent and approval of Scott and Powell provided Hoffman with confidential personnel documents on multiple occasions both prior to Johnson's termination and thereafter.

1041. Documents produced by the Town show that Hoffman with the consent and approval of Scott and Powell provided West with documents obtained during his criminal investigation for the Town to use in its grievance hearing related to Johnson's termination..

1042. The actions by the Town defendants in providing confidential personnel documents without a court order to Hoffman to assist with his criminal investigation was not only in violation of Johnson's rights under State law.

1043. The actions by the Town defendants in providing confidential personnel documents and information which Johnson was compelled to produce upon penalty of termination also violated Johnson's constitutional rights under *Garrity v. United States.*

1044.  The actions by the Town defendants in providing confidential personnel documents and information to Hoffman was intentionally retaliatory for Johnson's opposition to the discriminatory and retaliatory actions taken against him and for his protected first amendment activity.

1045. In addition, Plaintiff's rights under Town policy and procedures was violated by the fact that he was provided no notice of the allegations against him prior to his predisciplinary conference with Chief Powell on October 5, 2022. At his predisciplinary conference, he was provide a recommendation for his dismissal from Chief Powell which contained reasons Powell was recommending his dismissal. Exhibit 5.

1046. Plaintiff was provided no notice of the allegations against him prior to his predisciplinary conference with Manager Scott on October 12, 2022. At that predisciplinary conference, which was also an investigation into new allegations against him which arose after his predisciplinary conference on October 5, 2022, he received no notice of any new allegations against him.

1047. On October 13, 2022, Manager Scott drafted a "Report" in which he gave a summary of reasons why he believed Johnson was required to be terminated from his employment with the Town.

1048. On October 14, 2022, Manager Scott issued a dismissal letter which did not contain the reasons he cited in his October 13, 2022 memo. On November 29, 2022, Plaintiff was

239

given a grievance appeal hearing at which he was provided a notebook of the information the Town was urging the panel to use to uphold his termination.

1049. At an October 25, 2022, BOE meeting, Defendants Bennett Jones and Todd Sutton conspired to extort Johnson to resign from the school board or they would release a recording which they alleged reflected poorly on Johnson with regard to his inquiries to Bennett Jones in May of 2022 concerning whether Owen Phillips's children were attending the school to which they were districted. Jones attended a closed session meeting of the board and provided Sutton with a copy of an alleged recording which was later re-published by Marshburn on his FB live and provided to Hoffman for use in his criminal investigation.

1050. The Town provided Johnson with a grievance appeals hearing November 29, 2022. The grievance appeals committee chair read a prepared statement provided by Tim Kerrigan, as HR director, that the committee had been provided the internal investigation conducted by Lt. West.

1051. During discovery, it became apparent that the binder provided to Johnson and the binders provided the grievance appeals panel members were not identical. It was not until after discovery closed that the Town provided what it identified unofficially as "the binder" provided the panel.

1052. The binder provided Johnson contained only part of the September 28, 2022 memo from West in which he detailed the exchange of information with Hoffman for the purposes of Hoffman's criminal investigation related to the phone provided by Marshburn and also other confidential personnel documents gathered before and after Johnson's termination.

240

1053. Scott previously testified that Mr. Kerrigan prepared the notebook for the grievance appeal committee.

1054. Tim Kerrigan testified at his deposition that he prepared the document with the assistance of counsel and provided it to the grievance appeal committee.

1055. The discrepancy in the binders and the discrepancy between the reasons provided to the grievance hearing panel compared to the reasons provided Johnson are further evidence of the retaliatory motives of West, Powell and Scott.

1056. Plaintiff was deprived of "an adequate and fair means for hearing" his appeal of his termination in violation of Town policy if the grievance panel was given different reasons to uphold this dismissal than Plaintiff was given when he was dismissed and if Plaintiff was not told of the reasons for which he was being terminated.

1057. The grievance appeals committee upheld his termination for reasons which were distinctly different from the reasons provided in both the recommendation made by Chief Powell and his dismissal letter authored by Manager Scott. The Town's attorney indicated that Mr. Kerrigan did not provide truthful testimony when he testified that he consulted with legal counsel in preparing the notebook of information for Plaintiff's grievance appeals hearing.

1058. On January 24, 2023, Johnson's counsel wrote to Defendant Doyle and provided her with the following information:

> I write in reference to an August 26, 2022 letter sent to you by then Johnston County Public School Board Chair Todd Sutton regarding our client, Ronald Johnson, and a further letter we believe was sent to you after the Board's October 6, 2022 meeting, a copy of which the current attorneys for the Board have delayed in providing our firm. The letters attach censures the Board alleges to have issued against

241

Mr. Johnson for three incidents which either happened outside of Board meetings, or happened at previous Board meetings (neither the August 24 nor October 6, 2022 board meetings, during which the censures were alleged to have been issued). Having reviewed the meeting minutes and the YouTube videos of those two meetings attempting to issue the censures, it is clear that the Board failed to follow Board Policy 2340, which dictates, among other things, that "meetings of the Board will be conducted in accordance with the current edition of Robert's Rules of Order, Newly Revised, including the manual's procedure for small boards."

Robert's Rules 61:22 dictates that when alleged improper conduct of a member occurs outside a meeting, or is not addressed promptly after the conduct occurs within a meeting, "charges must pe preferred and a formal trial held." Such a trial must then proceed according to Article 63 of Robert's Rules.

At neither the August 24 nor the October 6 meetings was a trial held, and certainly nothing resembling the procedures required by Robert's Rules. In fact, at one point in the August 24 meeting, Mr. Johnson was prevented by Chairman Sutton from speaking in his own defense. Further, the "investigations" conducted by Tharrington Smith, the then-attorneys for the Board, were presented in an open session, and shared with the public, in further violation of Robert's Rule 63, which dictates "neither the society nor any member has the right to make public any information obtained through such investigation; if it becomes common knowledge within the society, it may not be revealed to any persons outside the society. Consequently, a trial must always be held in executive session, as must the introduction and consideration of all resolutions leading up to the trial."

Thus, Tharrington Smith, and subsequently, the Board of Education, and in particular then-Board chair Sutton violated Mr. Johnson's confidentiality and have caused him irreparable harm, which we will be addressing in a separate manner.

1059. The letter was copied to both Katie Cornetto at Poyner Spruill who had upon information and belief replaced Tharrington Smith as School Board attorneys or alternatively who continued to work with them after they resigned via a letter from Rod Malone on October 25, 2022.

1060. The District Attorney provided no response. Upon information and belief, however, she proceeded to assign an investigator, Defendant Rick Hoffman, to the matter and conduct

interviews for the purpose of gathering information to determine whether Johnson should be prosecuted under N.C. Gen. Stat. § 14-230 for "willfully and corruptly omit[ing], neglect[ing], or refus[ing] to discharge any of the duties of his office, or willfully and corruptly violat[ing] his oath of office." Hoffman admitted this in his affidavit of probable cause discussed below.

1061. On February 7, 2023, in a closed session meeting with Cornetto, Cornetto informed the BOE that Johnson's attorneys had informed her that they believed the censures were improperly adopted by the BOE and were invalid. Defendant Donovan then asked Cornetto whether the process by which the censures were adopted was in accordance with Board policy and Robert's Rules of Order. Cornetto stated that she had not researched the process or evaluated the matter in which the censures were done. Thus, the BOE willfully ignored the fact that the censures were improperly adopted

1062. On January 25, 2023, the very next day after the letter from Johnson's counsel regarding the invalidly adopted censures, a search warrant was obtained by Defendant Hoffman to seize property related to obtain evidence of crimes under G.S. 14-72 "Larceny of property," and G.S. 14-230 "Willfully failing to discharge duties and Obstruction of Justice."

1063. Based on the referrals by the BOE of the three censures against Johnson, Hoffman would have had no probable cause for any of his search warrants. Hoffman's search warrants relied solely on the confidential personnel information about Johnson related to Angela Barbour, which provided by West, with the knowledge and approval of Powell and Scott. Thus, the search warrants relied on evidence that was not allowed under State law to be shared for the purposes of criminal investigation and not permitted to be used against

Johnson under *Garrity v. U.S.,* 385 U.S. 492, 500 (1967), making the evidence seized as a result of the search warrants "fruit of the poisoned tree" under *Nardone v. United States,* 308 U.S. 338, 341 (1939).

1064. The list of Johnson's property to be seized included iphones, computers, identification, mobile devices, removable storage media, including but not limited to hard drives, navigation devices, digital cameras, power cords, modems, routers, email accounts, passwords, PIN codes, account names, screen names, remote data storage, etc. In addition, it sought "[a]ny article of personal property" related to "vehicles and offices."

1065. The office to be searched was Johnson's office. The car to be searched was Johnson's car. Defendant Hoffman provided a sworn statement which contained no information about the alleged offenses and how the property to be seized was connected to the offenses. In the affidavit he identified himself as "Detective Michael Ambrosio on page 6" but signed each page at the bottom.

1066. The affidavit of probable cause stated no grounds for probable cause for larceny or for "willfully and corruptly omit[ing], neglect[ing], or refus[ing] to discharge any of the duties of his office, or willfully and corruptly violat[ing] his oath of office."

1067. Defendants West, Scott, and Powell each testified at their depositions that they did not believe that Johnson had stolen any equipment from the Town of Smithfield and that they did not make any such allegations against Johnson at any time, much less seek his criminal prosecution for larceny.

1068. The affidavit stated among other things only that

- Johnson was employed with the Police Department

- While serving on the BOE, Johnson made several allegations of misconduct involving others where he claimed to possess and, in some instances, produced

244

evidence in the form of recordings of what he described as wrongdoings or corruption.

- Hoffman was assigned to conduct an independent investigation into the matters contained in the August 26, 2022 letter from the BOE.

- Upon being terminated, Johnson was asked by the Town to return phones assigned to Johnson.

- Johnson has "a history of making and sharing recordings of others with their knowledge publicly and privately."

- On social media, BOE members Defendant Kevin Donovan and another school board member playing a recording made by Johnson which showed that Defendant Carroll made the statement "hide your money" and "which members of the BOE disagreed as to whether the statement was inappropriate or constituted misconduct" but that the statement "involved a large sum of funds that could have been reverted to the county."

- Others knew and helped Johnson purchase phones and record conversations.

1069. No allegations of criminal activity were included in the affidavit of probable cause and no facts were stated showing any possible or alleged violation of law except the allegation that Johnson had failed to return two specific iphones with specific serial numbers to the Town.

1070. Hoffman knew or should have known that Johnson had told the Town that he lost the phones and did not have them in his possession. In fact, the affidavit explicitly stated that

> [t]he first was issued to him on approximately 6/22/2020 ( iPhone XS Serial# 356172098919050). The second phone was issued to Ronald Johnson on approximately 6/4/2021 (iPhone SE Serial# 356842116190385) as a replacement phone. Ronald Johnson didn't use his work issued cell phones while working for Smithfield PD to make calls.

1071. The search warrant was extensive and pursuant to it seized much more property that the iphones which purportedly were in Johnson's possession and belonged to the Town.

1072. No indictment was ever presented alleging larceny of the iphones.

1073. Instead, on April 3, 2023, a true bill of indictment was presented and returned against Johnson using Defendant Hoffman's investigation by Special Prosecutor Zollinger for a misdemeanor violation under N.C. Gen. Stat. § 14-230 for recording the May 31, 2022 BOE closed session meeting at which school board members suggested reducing a school employee's salary based on her age and disability.

1074. Hoffman and Zollinger knew or should have known that indicting and prosecuting Johnson for recording a closed session meeting at which illegal activity was believed to have been discussed was a violation of Johnson's constitutional rights and retaliation for his exercising his rights.

1075. On April 3, 2023, a true bill of indictment was presented and returned against Johnson using Defendant Hoffman's investigation by Zollinger for a misdemeanor violation under N.C. Gen. Stat. § 14-230 for "failing to comply with a public records request" on November 10, 2022.

1076. The inclusion of this alleged failure to turn over public records allegedly in Johnson's possession showed the independent animus of Defendants Hoffman and Doyle given that this act was not included in the school board's August 26, 2022 referral letter to the District Attorney. This charge was later dropped by the State.

1077. Hoffman and Zollinger knew or should have known that indicting and prosecuting Johnson for "failing to comply with public records requests" was a violation of Johnson's constitutional rights and retaliation for his exercising his rights.

1078. On April 3, 2023, a true bill of indictment was presented and returned against Johnson using Defendant Hoffman's investigation by Defendant Zollinger for the felony under

N.C. Gen. Stat. § 14-118.4 "Extortion" which provides that "[a]ny person who threatens or communicates a threat or threats to another with the intention thereby wrongfully to obtain anything of value or any acquittance, advantage, or immunity is guilty of extortion and such person shall be punished as a Class F felon."

1079.   The indictment alleged that

> on or about April 25, 2022, the Defendant named above unlawfully, willfully, and feloniously did threaten and communicate a threat to DeVan Angela Barbour IV, a candidate for political office, with the intent wrongfully to obtain an advantage. Defendant threatened to release a recording in the defendant's possession of defamatory allegations concerning DeVan Angela Barbour IV weeks before a primary election in which DeVan Angela Barbour IV was on the ballot. Defendant threatened to release the recording if DeVan Angela Barbour IV did not pressure Angela Barbour Angela Barbour into recanting her statements that she had an affair with the Defendant. Such a recantation would constitute an advantage to the Defendant.

1080.   The inclusion of this offense in the indictment was not only independently retaliatory but it was also the product of the conspiracy to remove Johnson from his duly elected school board position between Defendants West, Powell, Scott, Doyle, Hoffman, Zellinger and James, to publish and act on allegations using information provided by Angela Barbour, which they knew to be false or should have reasonable investigated and then known of its likely falsity. These conspirators were aided in their conspiracy to remove Johnson from his school board seat by Defendants Sutton, Andrews, Marshburn, Lawrence, Donovan, and Bennett Jones.

1081.   At no time did law enforcement investigate Johnson's own allegations that Angela Barbour herself had engaged in extortion when she threatened Johnson "with the intention . . . wrongfully to obtain anything of value or [an] advantage" when she

threatened to disclose details of the sexual encounters between herself and Johnson if he did not continue to have those encounters or have a relationship with her.

1082. At no time did law enforcement investigate Johnson's own allegations that Todd Sutton had engaged in extortion when he threatened Johnson "with the intention . . . wrongfully to obtain anything of value or [an] advantage" when he threatened to forward the censures for criminal prosecution and to disclose the contents of a recording provided by Bennett Jones if Johnson did not resign his BOE seat.

**COUNT ONE**
**Sex Discrimination in Violation of Title VII of the**
**Civil Rights Act of 1964**
**(42 U.S.C. §§ 2000e et al.)**

1083. .Johnson repeats and realleges the preceding paragraphs hereof, as if fully set forth herein.

1084. Johnson is a male and was qualified for his position when he was fired by Defendant Town.

1085. Defendant Powell was the Smithfield Chief of Police and regularly made comments to and about Johnson which were abusive, and he made them because Johnson was male.

1086. In addition, Defendants Powell and West diminished Johnson's complaints that he had been the victim of sexual assault and that he had agreed to engage in sexual encounters with Defendant McCleod out of fear because she threatened him.

1087. Had he been female, Defendants Powell and West would never have diminished and ignored Johnson's complaints.

1088. Because Chief Powell was Johnson's supervisor, the Town is strictly and vicariously liable for the discriminatory treatment to which Johnson was subjected.

248

1089. Johnson suffered damages as a result of Defendants' unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits, and the costs of bringing this action.

1090. Defendants intentionally violated Johnson's rights under Title VII, with malice or reckless indifference, and, as a result, the Defendant Town is liable for punitive damages.

**COUNT TWO**
**Retaliation in Violation of Title VII of the**
**Civil Rights Act of 1964**
**(42 U.S.C. §§ 2000e et al.)**

1091. Johnson repeats and realleges the preceding paragraphs hereof, as if fully set forth herein.

1092. .On July 27, 2022, through counsel, Johnson engaged in protected activity by complaining to the Town that Defendant Powell had discriminated against him during his employment based on his sex.

1093. Johnson also complained that the investigation of Johnson was an additional adverse action by Defendant Powell and the Town which was also discrimination based on his sex.

1094. The Town failed to take any action in response to Johnson's complaints, including but not limited to conducting an investigation into the validity of Johnson's complaints about his past discriminatory treatment by Powell.

1095. The Town allowed Chief Powell to remain in Johnson's chain of command and to oversee the investigation into allegations that Johnson had misused Town property for improper purposes.

1096. When the investigation was unable to substantiate those allegations, the Town allowed Powell to make and consider additional allegations against Johnson which were also not substantiated.

249

1097. .Finally, the Town and the Town Manager terminated Johnson in retaliation for engaging in protected activity and complaining about his discriminatory treatment both prior to and during the investigation.

1098. Defendants' stated reason for terminating Johnson's employment was pretextual and baseless. Defendants fired Johnson because he complained about discrimination on July 27, 2022.

1099. Johnson suffered damages as a result of Defendants' unlawful retaliatory actions, including emotional distress, past and future lost wages and benefits, and the costs of bringing this action.

1100. Defendant Town intentionally violated Johnson's rights under Title VII, with malice or reckless indifference, and, as a result, is liable for punitive damages.

## COUNT THREE
## Discrimination in violation of the Americans with Disabilities Act
### 42 U.S.C. §§ 12101 et seq

1101. .Johnson repeats and realleges the preceding paragraphs hereof, as if fully set forth herein.

1102. At the time of his termination, Johnson was disabled, as defined by the ADA, in that he was suffering from anxiety and depression.

1103. At the time of his termination, Johnson was otherwise qualified to perform the essential functions of his position as a detective for the Town of Smithfield.

1104. Johnson was an employee within the meaning of the ADA.

1105. Defendant Town was an employer within the meaning of the ADA.

1106. Defendant Town violated the ADA by disclosing Johnson's personal health information, knowing it would be published by Defendants Marshburn and Preston, and by

250

intentionally discriminating against Johnson on the basis of his disability and by terminating him because of his disability.

1107. Johnson suffered damages as a result of Defendants' unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits, and the costs of bringing this action.

1108. Defendants intentionally violated Johnson's rights under Title VII, with malice or reckless indifference, and, as a result, the Defendant Town is liable for punitive damages.

### COUNT FOUR
### Retaliation in Violation of the Americans with Disabilities Act
### 42 U.S.C. §§ 12101 et seq

1109. Johnson repeats and realleges the preceding paragraphs hereof, as if fully set forth herein.

1110. On July 27, 2022, through counsel, Johnson engaged in protected activity by complaining to the Town that Powell had discriminated against him during his employment based on his disability.

1111. Johnson also complained that the investigation of Johnson had was an additional adverse action by Chief Powell and the Town which was also discrimination based on his disability.

1112. Johnson also complained that Defendant Town released information about his disability to the public.

1113. The Town failed to take any action in response to Johnson's complaints, including but not limited to conducting an investigation into the validity of Johnson's complaints and whether anyone from the Town released the information that was publicly disclosed by Defendants Marshburn and Preston.

1114. The Town allowed Defendant Powell to remain in Johnson's chain of command and to oversee the investigation into allegations that Johnson had misused Town property for improper purposes.

1115. When the investigation was unable to substantiate those allegations, the Town allowed Powell to make additional allegations against Johnson which were also not substantiated.

1116. Finally, the Town and the Town Manager terminated Johnson in retaliation for engaging in protected activity and complaining about his discriminatory treatment during the investigation.

1117. Defendants stated reason for terminating Johnson's employment was pretextual and baseless. Defendants fired Johnson because he complained about discrimination on July 27, 2022.

1118. Johnson suffered damages as a result of Defendant's unlawful retaliatory actions, including emotional distress, past and future lost wages and benefits, and the costs of bringing this action.

1119. Defendant Town intentionally violated Johnson's rights under Title VII, with malice or reckless indifference, and, as a result, is liable for punitive damages.

## COUNT FIVE
## Interference in Violation of the Family and Medical Leave Act
## 29 U.S.C. 2615(a)(1)

1120. johnson repeats and realleges the preceding paragraphs hereof, as if fully set forth herein.

1121. Defendant Town is an employer covered by the FMLA pursuant to 29 U.S.C. §

1122. 611(4)(A)(iii).

1123. Defendants Scott, Kerigan, Powell, and West are all employers as defined by 29 U.S.C. § 2611(4)(A)(ii)(I) as persons who acted "directly or indirectly in the interest of the Town with regard to Johnson's leave under the FMLA.

1124. Johnson was an FMLA-eligible employee because he was employed by the Town for the requisite period of time prior to requesting FMLA leave and had been employed by the Town for over 1,250 hours in the twelve-month period prior to his request.

1125. Johnson was entitled to FMLA leave because he was suffering from anxiety, depression, and PTSD, serious medical conditions, and he provided the Town with sufficient and timely information to put them on notice of their obligations under the FMLA.

1126. Defendants engaged in prohibited conduct under the FMLA by interfering with, restraining, and denying Johnson with his rights provided under the FMLA, namely the use of paid leave, by placing him on unpaid leave.

1127. Defendants discouraged Johnson from fully using his FMLA leave by repeatedly contacting him with regard to their investigation which was not dependent on Johnson's participation after he was interviewed and denied the allegations.

1128. Defendants action foreclosed Johnson's rights under the FMLA, including but not limited to the right to be returned to his position and to be free from threats and harassment for exercising his rights under the law.

1129. As a result of Defendants wrongful acts and omissions, Johnson suffered damages, including expenses related to additional medical treatment and past and future lost wages and benefits. Johnson is also entitled to liquidated damages, attorneys' fees and costs, and other damages as recoverable by law.

**COUNT SIX**
**Retaliation in Violation of the Family and Medical Leave Act**

253

1130. Johnson repeats and realleges the preceding paragraphs hereof, as if fully set forth herein.

1131. Johnson exercised his FMLA rights by taking FMLA leave from his position as police detective.

1132. Johnson was qualified for his position and had performed his job duties effectively prior to the acts complained of herein.

1133. Johnson suffered an adverse employment action in that he was subjected to additional investigation after the original allegations against him could not be substantiated and subsequently terminated for pretextual reasons. He was also subjected to an adverse action when he was terminated for pretextual reasons.

1134. Johnson was also retaliated against by releasing the fact that he was on FMLA to Defendants Marshburn and Preston, knowing that they would broadcast this information.

1135. Defendants' decision to fire Johnson occurred only weeks after Johnson complained to the Town on July 27, 2022, that they had violated his rights under the FMLA.

1136. Defendants fired Johnson because he complained of FMLA discrimination on July 27, 2022.

1137. Defendants conduct constitutes unlawful retaliation against Johnson in violation of his rights under the FMLA. 29 U.S.C. §2615(a).

1138. As a result of Defendants' wrongful acts and omissions, Johnson suffered damages, including expenses related to additional medical treatment and past and future lost wages and benefits. Johnson is also entitled to liquidated damages, attorneys' fees and costs, and other damages as recoverable by law.

**COUNT SEVEN**
**Against Individual Town Defendants**

254

## 42 U.S.C. § 1983 (First Amendment)

1139.   Johnson repeats and realleges the preceding paragraphs hereof, as if fully set forth herein.

1140.   At the time of the acts alleged in this Complaint, Johnson was a public employee employed as a police detective by the Town of Smithfield and a duly elected member of the Johnston County Board of Education.

1141.   Johnson engaged in protected speech on a matter of public concern when he opposed the sexual harassment of a School Board employee by the School Board attorney, when he opposed the hiding of funds by the School Board from the county, when he opposed the sexual harassment of himself by his supervisors at the Police Department, and age and disability discrimination by the School Board against a School Board employee, and his own sexual assault which Defendants dismissed because he was not female.

1142.   Defendants Town, Scott, Kerrigan, Powell, and West retaliated against Johnson for his protected speech and his actions by terminating him for his protected speech and conduct as a School Board member and his protected speech and conduct in obtaining a protective order against Defendant Angela Barbour.

1143.   Defendants were acting in the course and scope of their employment for the Town when they deprived Johnson of his right to free speech.

1144.   At the time of the Johnson's employment, his investigation, and his termination, Defendants were acting under color of the laws and regulations of the State of North Carolina and the Town of Smithfield.

1145.   The adverse employment actions taken against Johnson would deter a person of ordinary firmness from continuing to engage in the protected speech.

1146. Johnson's protected speech was a substantial and motivating factor in the decision of the Defendants Town, Scott, Kerrigan, Powell, and West to investigate and terminate him.

1147. The decision of Defendants Town, Scott, Kerrigan, Powell, and West decision to investigate and terminate Johnson violated Johnson's clearly established constitutional rights and was not objectively reasonable in light of the circumstances.

1148. Defendants Town, Scott, Kerrigan, Powell, and West acted willfully, deliberately, maliciously, or with reckless disregard for Johnson's right to free speech protected under the First Amendment, and Johnson was damaged by their actions.

1149. The Town of Smithfield had a policy or custom in place that enabled the Town's agents and employees to act with deliberate indifference to Johnson's right to free speech. The Town's policy or custom in place also permitted the individual defendants acting as policymakers for the Town to violate Johnson's right to free speech by discouraging employees from publicly discussing any matter that would cast the Town or particular individuals in the Town in a negative light and this was accomplished by investigating and terminating Johnson for refusing to resign his position as a School Board member and refusing to resign his position as a police detective and otherwise opposing improper conduct by the Town or by Defendants.

1150. The Town knew of the unlawful acts of Defendants Scott, Kerrigan, Powell, and West, and had the power to remedy them, yet failed to do so; further, the Town ratified the acts of Defendants.

**COUNT EIGHT**
**Against Individual BOE Defendants**
**42 U.S.C. § 1983 (First Amendment)**

1151. Johnson repeats and realleges the preceding paragraphs hereof, as if fully set forth herein.

256

1152. At the time of the acts alleged in this Complaint, Johnson was a public employee employed as a police detective by the Town of Smithfield and a duly elected member of the Johnston County Board of Education.

1153. Johnson engaged in protected speech on matters of public concern when he opposed the sexual harassment of a School Board employee by the School Board attorney, when he opposed the hiding of funds by the School Board from the county, when he opposed the pay cut of an employee for reasons related to her age and disability, when he identified conflicts of interest in the expenditure of school system funds, and when he made inquiries of a principal about whether students were assigned to appropriate schools.

1154. Defendants BOE, Sutton, Andrews, Sessoms, Carroll, Tippett, and Wooten retaliated against Johnson for his protected speech and his actions by censuring him for his protected speech and conduct as a School Board member, by threatening him with referring him for criminal prosecution if he did not resign, and by then referring the censures to the District Attorney for criminal prosecution when he refused to resign.

1155. Defendants were acting in the course and scope of their positions as School Board members and acting for the BOE when they deprived Johnson of his right to free speech.

1156. At the time of the investigation, censures, threats to Johnson to resign, and the referral of the censures for criminal prosecution, Defendants were acting under color of the laws and regulations of the State of North Carolina and the Johnston County Board of Education.

1157. Defendants and their attorneys made no attempt to follow their own rules in censuring Johnson and as a result their actions were void ab initio and their threats to Johnson to

refer the censures to the District Attorney for criminal prosecution was illegal and the actual referral for criminal prosecution violated Johnson's constitutional rights.

1158. The actions taken against Johnson by Defendants would deter a person of ordinary firmness from continuing to engage in the protected speech.

1159. When Defendants and their attorneys were notified of the lack of factual basis for the statements in the investigations upon which the censures were based and notified of their failure to use proper procedure in issuing the censures, Defendants took no action to undo their illegal and unconstitutional actions and the resulting damage done to Johnson.

1160. Johnson's protected speech, including but not limited to his refusal to resign his position as a School Board member, was a substantial and motivating factor in the decision of the Defendants BOE, Sutton, Andrews, Sessoms, Carroll, Tippett, and Wooten to conduct the investigations and censure Johnson and refer the censures for criminal prosecution.

1161. The decisions of Defendants BOE, Sutton, Andrews, Sessoms, Carroll, Tippett, and Wooten to investigate and censure Johnson and then refer the censures for criminal prosecution violated Johnson's clearly established constitutional rights and those decisions were not objectively reasonable in light of the circumstances.

1162. Defendants BOE, Sutton, Andrews, Sessoms, Carroll, Tippett, and Wooten acted willfully, deliberately, maliciously, or with reckless disregard for Johnson's right to free speech protected under the First Amendment and Johnson was damaged by their actions.

1163. The BOE had a policy or custom in place that enabled the BOE's agents and employees to act with deliberate indifference to Johnson's right to free speech. The BOE's custom or policy permitted the individual Defendants acting as policymakers for the BOE to

258

violate Johnson's right to free speech and which policy or custom and by discouraging employees from publicly discussing any matter that would cast the BOE or particular individuals associated with the BOE in a negative light and this was accomplished by investigating and censuring Johnson for exercising his first amendment rights, and for refusing to resign his position as a School Board member, opposing improper conduct by the BOE or by Defendants, and by referring the censures for criminal prosecution.

1164. The BOE knew of the unlawful acts of Defendants Sutton, Andrews, Sessoms, Carroll, Tippett, and Wooten and had the power to remedy them, yet failed to do so; further, the Town ratified the acts of Defendants.

**COUNT NINE**

**Against Defendants Doyle, Hoffman, and Zellinger 42 U.S.C. § 1983 (Due Process and Fourth and Fifth Amendments)**

1165. Johnson repeats and realleges the preceding paragraphs hereof, as if fully set forth herein.

1166. At all times relevant to this complaint, Defendants Doyle and Hoffman were acting under color of the laws of the State of North Carolina.

1167. The investigation conducted by Defendant Hoffman under the direction of Defendant Doyle and Zollinger was precipitated by the Defendant BOE's referral of censures on August 24, 2022.

1168. .On January 24, 2023, Defendants were aware the actions of the BOE in censuring Johnson were void ab initio because they were done in violation of the Board's powers under its own policies and under its powers granted by State law.

1169. Despite this knowledge, on January 25, 2023, Defendants swore to facts which were known to be insufficient to establish probable cause to arrest Johnson for larceny or a

259

willful and corrupt omission, neglect, or refusal to discharge his duties as a school member or the willful and corrupt violation of the oath of his office.

1170. Based on this knowingly insufficient affidavit, Defendants seized property wholly unrelated to either of the charges listed in the probable cause affidavit.

1171. By the actions described in the preceding paragraphs, the defendant deprived Johnson of clearly established rights guaranteed by the Constitution of the

1172. United States and by the North Carolina Declaration of Rights, including:

    a. freedom from unreasonable seizure of his property and person;

    b. freedom from arrest without probable cause; and

    c. freedom of speech.

1173. Defendants also engaged in abuse of process in violation of Johnson's rights to procedural due process which forbids the use of legal process for a wrongful purpose.

1174. In depriving Johnson of these rights, the defendants acted willfully, deliberately, maliciously, recklessly and with deliberate indifference to the Johnson's constitutional rights.

1175. As a direct and proximate result of the acts of the Defendants, the Johnson suffered damages for which Defendants are responsible.

**COUNT TEN**
**WRONGFUL TERMINATION**
**IN VIOLATION OF PUBLIC POLICY**
**(North Carolina Common Law)**

1176. Johnson repeats and realleges the preceding paragraphs hereof, as if fully set forth herein.

260

1177. .Johnson complained about Defendants Scott, Kerrigan, Powell, and West improper attempts to have Johnson exert his influence as a School Board member to advance the interests of Defendants or the Town.

1178. Johnson also opposed illegal discrimination by Defendant Lawrence and by Defendant Powell.

1179. Defendants initiated an investigation into allegations of misuse of Town property in retaliation for Johnson's complaints about discrimination by Defendant Lawrence. Defendants were unable to substantiate any of the allegations they made against Johnson.

1180. After Johnson complained about discrimination by Defendant Powell, Defendants then came up with additional reasons to investigate Johnson and ultimately terminate him, based on his service as a School Board member, the censures issued by the School Board, and Johnson's seeking a protective order which Defendants alleged was the wrong kind of protective order.

1181. All of these reasons for Johnson's termination were retaliatory and all of these reasons violated the public policy of the State of North Carolina.

1182. .As a direct and proximate result of the acts of the Defendants, the Johnson suffered damages for which Defendants are responsible.

1183. Johnson's discharge by Defendants was in reprisal for his reporting misconduct and was in violation of public policy, and Defendants' disregard of Johnson's rights was done with actual malice entitling Johnson to punitive damages against Defendants.

**COUNT ELEVEN**
**Against BOE and individual BOE Defendants and Angela**
**Barbour, Marshburn, Lawrence, and Preston**
**Tortious Interference With Contract**

261

**(North Carolina Common Law)**

1184. Johnson repeats and realleges preceding paragraphs hereof, as if fully set forth herein.

1185. .Johnson, by virtue of his employment relationship, had a contract with the Town.

1186. Defendants Angela Barbour, Lawrence, Marshburn, Preston, BOE, Sutton, Sessoms, Tippett, Wooten, Andrews, Donovan and Carroll knew that Johnson was employed by the Town.

1187. Defendants took concerted efforts to make false allegations of misconduct and improper conduct and to issue censures based on incomplete and inadequate investigations which contained unsupported conclusions against Johnson in order to influence the Town to terminate his employment.

1188. The Town in fact relied upon Defendants Marshburn, Lawrence, Preston, and

1189. Angela Barbour's allegations that Johnson obtained the wrong protective order against Defendant Angela Barbour when terminating Johnson.

1190. In addition, the Town relied upon the censures instigated and ratified by Defendants BOE, Sutton, Sessoms, Tippett, Wooten, Andrews, Carroll, and Donovan when terminating Johnson.

1191. Defendants acted without justification in taking the actions which were intended to and did induce the Town to terminate Johnson's employment.

1192. As a direct and proximate result of the acts of the Defendants, the Johnson suffered damages for which Defendants are responsible.

1193. Defendants' disregard of Johnson's rights was done with actual malice entitling Johnson to punitive damages against Defendants.

**COUNT TWELVE**

**Against Defendants Scott, Kerrigan, Powell, West, Barbour, Lawrence, Marshburn, Sutton, and Andrew**
**Defamation**
**(North Carolina Common Law)**

1194. .Johnson repeats and realleges the preceding paragraphs hereof, as if fully set forth herein.

1195. Defendants Scott, Kerrigan, Powell, West, Barbour, Lawrence, Marshburn, Sutton, and Andrews made oral and written statements tending to impeach Johnson in his profession as a police detective and in his capacity as a School Board member and tending to subject Johnson to ridicule, contempt or disgrace.

1196. Some of the statements made were defamatory per se.

1197. As a direct and proximate result of the acts of the Defendants, the Johnson suffered damages for which Defendants are responsible.

1198. Defendants' disregard of Johnson's rights was done with actual malice entitling Johnson to punitive damages against Defendants.

**COUNT THIRTEEN**
**Against All Defendants**
**42 U.S.C. § 1985 (Conspiracy)**

1199. Johnson repeats and realleges preceding paragraphs hereof, as if fully set forth herein.

1200. Defendants, both public and private, all worked together and shared information intended to retaliate against Johnson for speaking out about matters of public concern and to violate Johnson's rights to procedural due process resulting from the improper use of process and his rights to be free from illegal searches and seizures.

1201. There was a symbiosis and interdependence between the private actor

1202. Defendants Angela Barbour, Lawrence, Marshburn, Scott, Powell, Kerigan, West and Andrews, Donovan, Hoffman, Doyle, Zellinger, James and Jones in their actions as seen in the facts showing communication and meetings between Defendants and the similarity of allegations and publication of information, the source of which could only be the public actors, with the then resulting reliance on the publication of information as the basis for taking State action.

1203. Defendants Angela Barbour, Lawrence, Marshburn, and Jones as private actors are liable under section 1983 because they participated with the public actor defendants in a conspiracy to violate Johnson's constitutional rights.

1204. The actions of the public actor Defendants were not done in the normal course of their corporate duties but were outside the scope of their authority as public actors.

## PRAYER FOR RELIEF

There is between the parties an actual controversy as set forth in this complaint. Johnson has suffered and is suffering irreparable injury and is threatened with irreparable harm in the future by reason of the acts herein complained of. A substantial loss or impairment of his constitutional rights has occurred and will continue to occur based on Defendants' actions taken toward Johnson.

WHEREFORE, Johnson respectfully requests judgment as follows:

1. Reinstatement to the position Johnson held with Defendant Department prior to his termination;

2. All pay, benefits, seniority, promotions, leave and emoluments Johnson would have otherwise been entitled to as employee of the Town had it not been for the unlawful termination of Johnson in violation of Johnson's constitutional and statutory rights described above, including his common law and statutory rights and his constitutional rights;

3. Interest on the back pay at the full legal rate, such interest accruing from the date each paycheck or other pay item disbursement would have been received had Johnson not been terminated;

4. General and special compensatory damages according to proof, including but not limited to

   a. Lost earnings.

   b. Loss of earning capacity.

   c. Damage to reputation in the past and future.

   d. Emotional distress, mental anguish, pain and suffering in the past and future.

   e. Loss of pension or retirement benefits.

5. Punitive damages against Defendants according to proof;

6. A preliminary and/or permanent injunction prohibiting Defendants, or any of them, from taking any punitive action against Johnson in response to Johnson's exercise of his rights;

7. Attorney fees pursuant to N.C. Gen. Stat. § 6-21.7 and 42 U.S.C.A. § 1988;

8. Costs and expenses of suit; and

9. Such other and further relief as the court deems just and proper.

**JOHNSON DEMANDS A TRIAL BY JURY ON ALL CLAIMS PROPERLY TRIABLE BY A JURY.**

Respectfully submitted, this 3rd day of November 2025.

/s/ VALERIE L. BATEMAN
Valerie L. Bateman
NC State Bar No. 13417
New South Law Firm
209 Lloyd Street, Ste 350
Carrboro, North Carolina 27510
valerie@newsouthlawfirm.com
Tel: 919-810-3139
Fax: 919-823-6383

/S/ HEATHER A. BENJAMIN
Heather A. Benjamin
NC State Bar No. 28238
New South Law Firm
209 Lloyd Street, Ste 350
Carrboro, North Carolina 27510
heather@newsouthlawfirm.com
Tel: 919-969-6634
Fax: 919-823-6383

*Counsel for Plaintiff Johnson*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that I electronically filed the foregoing **PROPOSED AMENDED SUPPLEMENTAL COMPLAINT** using the CM/ECF filing system which will automatically send email notification of such filing to all counsel of record and to the following by email:

David Marshburn
Defendant Pro Se
agentmarshburn@gmail.com

This 3d day of November  2025.

/S/ VALERIE L. BATEMAN
Valerie L. Bateman
NEW SOUTH LAW FIRM
